UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                         :

UNITED STATES OF AMERICA

                         :

        - v. -

                         :   23 Cr. 430 (KPF)

ROMAN STORM,

                         :

              Defendant.

                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## THE GOVERNMENT'S OPPOSITION TO DEFENDANT ROMAN STORM'S PRETRIAL MOTIONS

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Ben Arad
Benjamin A. Gianforti
Thane Rehn
Assistant United States Attorneys

Kevin Mosley
Special Assistant United States Attorney
    *- Of Counsel -*

i

## <u>TABLE OF CONTENTS</u>

FACTUAL BACKGROUND ............................................................................................... 3

    A. The Ethereum Blockchain ...................................................................................... 4

    B. The Tornado Cash Service ...................................................................................... 5

        1.    Development of the Service .................................................................... 5

        2.    Tornado Cash Transactions .................................................................... 7

    C. Unlawful Money Transmitting, Money Laundering, and Sanctions Violations ............ 13

ARGUMENT ................................................................................................................ 16

I.   The Court Should Deny the Defendant's Motions to Dismiss ............................................. 16

    A. Applicable Law .................................................................................................... 16

    B. Count Two Sufficiently Alleges a Conspiracy to Operate an Unlicensed Money
       Transmitting Business ............................................................................................ 18

        1.    Applicable Law .................................................................................... 18

        2.    Count Two Alleges the Tornado Cash Service Engaged in Unlicensed Money
            Transmitting ........................................................................................ 20

            a. The Tornado Cash Service Is a Money Transmitting Business that Is
            Functionally Indistinguishable from Other Money Transmitting Businesses ...... 202

            b. Section 1960 Does Not Require the Business to Have Control of the Funds ... 204

            c. The FinCEN Guidance Does Not Suggest That Control of Funds is Required .. 31

            d. The Tornado Cash Service Does Not Fall Under the "Network Access Services"
            Exemption .......................................................................................... 34

        3.    Count Two Alleges the Tornado Cash Service Was Conducted as a Business for a
            Profit or Financial Gain ........................................................................ 35

    C. Count One Sufficiently Alleges a Conspiracy to Commit Money Laundering ............. 37

        1.    The Indictment Appropriately Alleges Section 1956's Financial Transaction
            Requirement Under Both Statutory Definitions of "Financial Transaction" ......... 37

        2.    The Indictment Sufficiently Alleges the Defendant's Participation in a Conspiracy
            to Commit Money Laundering ................................................................ 39

    D. Count Three Sufficiently Alleges that the Defendant Conspired to Violate the
       International Emergency Economic Powers Act ............................................................ 47

        1.    Applicable Law and Regulations ............................................................ 47

        2.    The Informational Materials Exemption Does Not Extend to the Conduct
            Alleged in the Indictment ...................................................................... 50

        3.    The Indictment Alleges the Defendant's Participation in a Conspiracy to Willfully

      Violate IEEPA ........................................................................................ 59

II. The Defendant's First Amendment Arguments Are Meritless ............................... 63

    A. The Criminal Statutes at Issue Here Are Not Overbroad ................................ 63

    B. The Defendant's As-Applied Challenge Is Meritless ..................................... 65

III. The Defendant's Due Process Arguments Are Meritless ..................................... 68

    A. The Statutes Are Not Unconstitutionally Vague ............................................ 69

       1.    The Defendant's Vagueness Challenge Fails as to Count One............................. 70

       2.    The Defendant's Vagueness Challenge Fails as to Count Two ............................ 72

       3.    The Defendant's Vagueness Challenge Fails as to Count Three........................... 73

       4.    The Defendant's Facial Vagueness Challenge Must Also Fail ............................. 74

    B. Neither of the Other Two Due Process Doctrines Applies ............................. 76

IV. The Defendant's Disclosure Demands Should Be Denied ................................... 77

    A. The Government Has No Obligation to Produce Diplomatic Communications ............ 77

    B. The Government Has No Obligation to Obtain or Produce Records Not in the
       Possession of the Prosecution Team ............................................................. 81

       1.    Applicable Law ........................................................................................ 81

       2.    OFAC and FinCEN Are Not Part of the Prosecution Team ................................. 85

V. The Court Should Deny the Defendant's Motion to Suppress ............................... 92

    A. Background ................................................................................................ 92

    B. Applicable Law ........................................................................................ 94

    C. The Seizure of Any and All Cryptocurrency Authorized by the Warrant Was
       Supported by Probable Cause that Such Cryptocurrency Was Both Evidence and
       Fruits of the Subject Offenses ..................................................................... 95

    D. The Warrant Appropriately Authorized Seizure Of Cryptocurrency From the
       Defendant's Residence Under Federal Rule Of Criminal Procedure 41(b)(6)(A). ......... 97

    E. The Government Need Not Obtain A Separate Seizure Warrant For Cryptocurrency
       When The Warrant Authorized The Search *And Seizure* Of Any And All
       Cryptocurrency From The Residence............................................................. 99

CONCLUSION ....................................................................................................... 101

# TABLE OF AUTHORITIES

Page(s)

Cases

*Bates v. United States*,
  522 U.S. 23 (1997) ............................................................................................................ 29

*Bennett v. Google, LLC*,
  882 F.3d 1163 (D.C. Cir. 2018) ....................................................................................... 32

*Bernstein v. U.S. Dep't of State*,
  974 F. Supp. 1288 (N.D. Cal. 1997) ................................................................................ 53

*Boyce Motor Lines, Inc. v. United States*,
  342 U.S. 337 (1952) .......................................................................................................... 16

*Carpenter v. United States*,
  138 S. Ct. 2206 (2018) ...................................................................................................... 94

*CFTC v. Vatuli*,
  228 F.3d 94 ........................................................................................................................ 66

*Coin Ctr. v. Yellen*,
  No. 22 Civ. 20375 (TKW), 2023 WL 7121095 (N.D. Fla. Oct. 30, 2023) ................. 58, 59

*Costello v. United States*,
  350 U.S. 359 (1956) .......................................................................................................... 16

*Ferreira v. United States*,
  350 F. Supp. 2d 550 (S.D.N.Y. 2004) .............................................................................. 84

*Groh v. Ramirez*,
  540 U.S. 551 (2004) .......................................................................................................... 94

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ................................................................................................. 69, 70, 74

*In re WorldCom, Inc.*,
  371 B.R. 19 (Bankr. S.D.N.Y. 2007) ............................................................................... 34

*Junger v. Daley*,
  209 F.3d 481 (6th Cir. 2000) ............................................................................................ 67

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023) .......................................................................................................... 45

*Lomax v. Ortiz-Marquez*,
  140 S. Ct. 1721 (2020) ...................................................................................................... 29

*Marland v. Trump*,
  498 F. Supp. 3d 624 (E.D. Pa. 2020) ............................................................................... 58

*McBoyle v. United States*,
  283 U.S. 25 (1931) ............................................................................................................ 68

*Moskal v. United States*,
  498 U.S. 103 (1990) .......................................................................................................... 76

iv

*Phoenix Light SF Ltd. v. Bank of New York Mellon,*
   No. 14-CV-10104 (VEC), 2017 WL 3973951 ........................................................ 67

*Pina v. Henderson,*
   752 F.2d 47 (2d Cir. 1985) .................................................................................. 83

*Ponnapula v. Spitzer,*
   297 F.3d 172 (2d Cir. 2002) ................................................................................ 76

*Pulsifer v. United States,*
   144 S.Ct. 718 (2024) ............................................................................... 25, 76

*Risley v. Universal Navigation Inc.,*
   No. 22 Civ. 2780 (KPF), 2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023) ................ 45, 46

*Rose v. Locke,*
   423 U.S. 48 (1975) ........................................................................................... 69

*Russell v. United States,*
   369 U.S. 749 (1962) ......................................................................................... 17

*SEC v. Stanard, No.,*
   06 Civ. 7736 (GEL), 2007 WL 1834709 (S.D.N.Y. June 26, 2007) ................ 84, 85

*Stagg P.C. v. U.S. Dep't of State,*
   No. 15 CIV. 8468 (KPF), 2019 WL 1863418 (S.D.N.Y. Apr. 25, 2019) ................ 53

*TikTok Inc. v. Trump,*
   490 F. Supp. 3d 73 (D.D.C. 2020) ....................................................................... 58

*United States v. Aiyer,*
   33 F.4th 97 (2d Cir. 2022) ................................................................................. 62

*United States v. Alexandre,*
   No. 22 CR. 326 (JPC), 2023 WL 416405 (S.D.N.Y. Jan. 26, 2023) ............ 87, 88, 89

*United States v. Alfonso,*
   143 F.3d 772 (2d Cir. 1998) ............................................................................... 17

*United States v. Amirnazmi,*
   645 F.3d 564 (3d Cir. 2011) ................................................................... 53, 54, 56

*United States v. Astolas,*
   487 F.2d 275 (2d Cir. 1973) ............................................................................... 38

*United States v. Avellino,*
   136 F.3d 249 (2d Cir. 1998) ............................................................................... 81

*United States v. Awan,*
   459 F. Supp. 2d 167 (E.D.N.Y. 2006) .................................................................. 64

*United States v. Axelson,*
   No. 17 Cr. 0225 (PJS/HB), 2018 WL 614476 (D. Minn. Jan. 9, 2018) .............. 100

*United States v. Bah,*
   574 F.3d 106 (2d Cir. 2009) ............................................................................... 27

*United States v. Banki,*
   685 F.3d 99 (2d Cir. 2012) ......................................................................... 20, 35

*United States v. Barcelo,*
   628 F. App'x 36 (2d Cir. 2015) ........................................................ 82, 83, 89, 90

*United States v. Barcelo,*
   No. 13 Cr. 38 (RJS), 2014 WL 4058066 (S.D.N.Y. Aug. 15, 2014) ...................... 82

*United States v. Bases,*
  No. 18 Cr. 48 (JZL), 2020 WL 5909072 (N.D. Ill. Oct. 6, 2020)......................................79, 80
*United States v. Blaszczak,*
  308 F. Supp. 3d 736 (S.D.N.Y. 2018)....................................................................86, 87, 88
*United States v. Bondarenko,*
  No. 17 Cr. 306 (JCM), 2019 WL 2450923 (D.Nev. June 12, 2019) ...................................... 66
*United States v. Bonventre,*
  No. 10 Cr. 228 (LTS), 2014 WL 3673550 (S.D.N.Y. July 24, 2014) ...................................... 82
*United States v. Budovsky,*
  No. 13 Cr. 368 (DLC), 2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015) ............................. 19, 75
*United States v. Cilins,*
  No. 13 Cr. 315 (WHP), 2014 WL 173414 (S.D.N.Y. Jan. 15, 2014) ...................................... 78
*United States v. Clarke,*
  979 F.3d 82 (2d Cir. 2020)........................................................................................... 78
*United States v. Collins,*
  409 F. Supp. 3d 228 (S.D.N.Y. 2019)................................................................85, 86, 87, 88
*United States v. Connolly,*
  No. 16 Cr. 370 (CM), 2017 WL 945934 (S.D.N.Y. Mar. 2, 2017) ................................... 87, 91
*United States v. Dawkins,*
  999 F.3d 767 (2d Cir. 2021)..................................................................................... 17, 62
*United States v. De La Pava,*
  268 F.3d 157 (2d Cir. 2001)....................................................................................... 1, 16
*United States v. Dobbs,*
  629 F.3d 1199 (10th Cir. 2011) ...................................................................................... 27
*United States v. Dzionara-Norsen,*
  No. 21-454, 2024 WL 191803 (2d Cir. Jan. 18, 2024)........................................................ 38
*United States v. E-Gold, Ltd.,*
  550 F. Supp. 2d 82 (D.D.C. 2008) ............................................................................. 19, 76
*United States v. Elie,*
  No. 10 Cr. 336 (LAK), 2012 WL 383403 (S.D.NY. Feb. 7, 2012)........................................... 2
*United States v. Faiella,*
  39 F. Supp. 3d 544 (S.D.N.Y. 2014)...............................................................18, 21, 30, 64
*United States v. Finnerty,*
  411 F. Supp. 2d 428 (S.D.N.Y. 2006)............................................................................. 84
*United States v. Fiorito,*
  640 F.3d 338 (8th Cir. 2011) ...................................................................................... 100
*United States v. Galpin,*
  720 F.3d 436 (2d Cir. 2013)......................................................................................... 95
*United States v. Gamez,*
  1 F. Supp. 2d 176 (E.D.N.Y. 1998) ............................................................................... 42
*United States v. Garcia,*
  587 F.3d 509 (2d Cir. 2009)......................................................................................... 39
*United States v. Garcia-Torres,*
  341 F.3d 61 (1st Cir. 2003).......................................................................................... 39

*United States v. Gasperini,*
  894 F.3d 482 (2d Cir. 2018)....................................................................... 66

*United States v. Goldberg,*
  756 F.2d 949 (2d Cir. 1985)....................................................................... 16

*United States v. Griffith,*
  515 F. Supp. 3d 106 (S.D.N.Y. 2021)................................................. passim

*United States v. Guerrerio,*
  670 F. Supp. 1215 (S.D.N.Y. 1987)........................................................... 84

*United States v. Halloran,*
  821 F.3d 321 (2d Cir. 2016)....................................................................... 70

*United States v. Harmon,*
  474 F. Supp. 3d 76 (D.D.C. 2020).............................................. 18, 23, 46

*United States v. Holmes,*
  44 F.3d 1150 (2d Cir. 1995)....................................................................... 64

*United States v. Houtar,*
  980 F.3d 268 (2d Cir. 2020)....................................................................... 69

*United States v. Hunter,*
  32 F.4th 22 (2d Cir. 2022) ......................................................................... 81

*United States v. Hutcher,*
  622 F.2d 1083 (2d Cir. 1980)..................................................................... 83

*United States v. Hutchins,*
  No. 17 Cr. 124 (NJ), 2018 WL 1695499 (E.D. Wis. Apr. 6, 2018)................ 79, 80

*United States v. Kinzler,*
  55 F.3d 70 (2d Cir. 1995) .......................................................................... 77

*United States v. Lanier,*
  520 U.S. 259 (1997)................................................................... 68, 75, 76

*United States v. Light,*
  No. 00 Cr. 417, 2000 WL 875846 (N.D. Ill. June 29, 2000) ............................ 44, 61

*United States v. Locascio,*
  6 F.3d 924 (2d Cir. 1993) ................................................................... 81, 83

*United States v. Maher,*
  108 F.3d 1513 (2d Cir. 1997)..................................................................... 41

*United States v. Mandel,*
  914 F.2d 1215 (9th Cir. 1990) ................................................................... 78

*United States v. Martin,*
  411 F. Supp. 2d 370 (S.D.N.Y. 2006)........................................................ 44

*United States v. Mazza-Alaluf,*
  607 F. Supp. 2d 484 (S.D.N.Y. 2009)........................................................ 35

*United States v. Mazza-Alaluf,*
  621 F.3d 205 (2d Cir. 2010).......................................................... 19, 35, 37

*United States v. McDonough,*
  56 F.3d 381 (2d Cir. 1995)......................................................................... 38

*United States v. Mejia,*
  545 F.3d 179 (2d Cir. 2008)....................................................................... 38

*United States v. Meregildo*,
   920 F. Supp. 2d 434 (S.D.N.Y. 2013)................................................. 81, 82, 84, 90

*United States v. Middendorf*,
   18 Cr. 36 (JPO), 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018)........................................ 85, 86

*United States v. Miller*,
   425 U.S. 435 (1976)......................................................................................... 65

*United States v. Morgan*,
   302 F.R.D. 300 (S.D.N.Y. 2014) ............................................................................ 84

*United States v. Morrison*,
   686 F.3d 94 (2d Cir. 2012)................................................................................ 69

*United States v. Murgio*,
   209 F. Supp. 3d 698 (S.D.N.Y. 2016).......................................................... passim

*United States v. Neuman*,
   621 F. App'x 363 (9th Cir. 2015) ........................................................................... 39

*United States v. Neumann*,
   2022 WL 3445820 (S.D.N.Y. 2022)........................................................................ 27

*United States v. Oseguera Gonzalez*,
   507 F. Supp. 3d 137 (D.D.C. 2020) .............................................................. 79, 80

*United States v. Percoco*,
   No. 16 Cr. 776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017)........................ 44, 61

*United States v. Perez*,
   575 F.3d 164 (2d Cir. 2009)............................................................................... 61

*United States v. Quinn*,
   445 F.2d 940 (2d Cir. 1971)......................................................................... 81, 83

*United States v. Ralston*,
   No. 19 Cr. 774 (JMF), 2021 WL 5054464 (S.D.N.Y. Nov. 1, 2021) ......................... 79, 80

*United States v. Requena*,
   980 F.3d 30 (2d Cir. 2020)........................................................................... 69, 75

*United States v. Rigas*,
   583 F.3d 108 (2d Cir. 2009)............................................................................... 84

*United States v. Rigas*,
   No. 02 Cr. 1236 (LBS), 2008 WL 144824 (S.D.N.Y. Jan. 15, 2008)............................. 85

*United States v. Riley*,
   906 F.2d 841 (2d Cir. 1990)............................................................................. 95

*United States v. Robbins*,
   No. 10 Cr. 268, 2015 WL 13864804 (W.D.N.Y. July 28, 2015)................................. 39

*United States v. Rosa*,
   626 F.3d 56 (2d Cir. 2010)............................................................................... 94

*United States v. Salerno*,
   481 U.S. 739 (1987)....................................................................................... 70

*United States v. Seher*,
   562 F.3d 1344 (11th Cir. 2009) ........................................................................ 38

*United States v. Silver*,
   948 F.3d 538 (2d Cir. 2020)............................................................................. 39

*United States v. Stanley,*
  896 F.2d 450 (10th Cir. 1990) ................................................................. 27

*United States v. Stanton,*
  No. 91 Cr. 889 (CSH), 1992 WL 73408 (S.D.N.Y. Mar. 31, 1992) ...................................... 75

*United States v. Stavroulakis,*
  952 F.2d 686 (2d Cir. 1992) ......................................................... 39, 41, 42

*United States v. Sterlingov,*
  573 F. Supp. 3d 28 (D.D.C. 2021) ......................................................... passim

*United States v. Stewart,*
  433 F.3d 273 (2d Cir. 2006) ......................................................... 82, 83, 90

*United States v. Stringer,*
  730 F.3d 120 (2d Cir. 2013) ......................................................... 16, 17

*United States v. Ulbricht,*
  31 F. Supp. 3d 540 (S.D.N.Y. 2014) ......................................................... 46, 77

*United States v. Ulbricht,*
  858 F.3d 71 (2d Cir. 2017) ......................................................... 94, 95

*United States v. Upton,*
  856 F. Supp. 727 (E.D.N.Y. 1994) ......................................................... 84

*United States v. Velastegui,*
  199 F.3d 590 (2d Cir. 1999) ......................................................... 26, 27, 35, 75

*United States v. Velissaris,*
  No. 22 Cr. 105 (DLC), 2022 WL 2392360 (S.D.N.Y. July 3, 2022) ...................................... 86, 87

*United States v. Vilar,*
  729 F.3d 62 (2d Cir. 2013) ......................................................... 17

*United States v. Williams,*
  504 U.S. 36 (1992) ......................................................... 17

*United States v. Williams,*
  553 U.S. 285 (2008) ......................................................... 63, 75

*United States v. Yannotti,*
  541 F.3d 112 (2d Cir. 2008) ......................................................... 17

*Universal City Studios, Inc. v. Corley,*
  273 F.3d 429 (2d Cir. 2001) ......................................................... 66, 67, 68

*Van Loon v. Dep't of Treasury,*
  No. 23 Civ. 312 (RP), 2023 WL 5313091 (W.D. Tex. Aug. 17, 2023) ...................................... 58, 59

*Virginia v. Hicks,*
  539 U.S. 113 (2003) ......................................................... 64

*Washington , D.C., Under Rule 41,*
  512 F. Supp. 3d 23 (D.D.C. 2021) ......................................................... 96, 97

*Wells Fargo Advisors, LLC v. Sappington,*
  884 F.3d 392 ......................................................... 25

Statutes

18 U.S.C. § 1030 ......................................................... 70

18 U.S.C. § 1343 ......................................................... 70, 71, 72

18 U.S.C. § 1956(h) ............................................................................................. 40, 41, 92
18 U.S.C. § 1960(a) ..................................................................................................... 22, 30
18 U.S.C. § 1960(b)(1)(B) ................................................................................................... 18
18 U.S.C. § 1960(b)(1)(C) ................................................................................................... 19
18 U.S.C. § 1960(b)(2) ............................................................................... 18, 24, 25, 30
18 U.S.C. § 3500 ................................................................................................................. 90
31 U.S.C. § 5330 ................................................................................................................. 73
31 U.S.C. § 5330(d)(2) ....................................................................................................... 27
31 U.S.C. §§ 5330(d)(1)(A) ............................................................................... 19, 20, 29
50 U.S.C. §1702(a)(1)(B) ................................................................................................... 48
50 U.S.C. § 1702(b)(3) ..................................................................................... 50, 51, 53, 74
50 U.S.C. § 1705 ................................................................................................................. 92

Rules

Fed. R. Crim. P. 12(b) ....................................................................................................... 16
Fed. R. Crim. P. 7 ............................................................................................................... 16
Fed. R. Crim. P. 41(b)(6)(A) ................................................................................... 97, 98, 99

Regulations

31 C.F.R. Part 510 ............................................................................................................. 49
31 C.F.R. § 510.213(c)(3) ........................................................................................... 50, 54
31 C.F.R. § 1010.100 ..................................................................................... 20, 27, 29
31 C.F.R. § 1010.711 ......................................................................................................... 33
Executive Order 13466 ....................................................................................................... 48
Executive Order 13722 ................................................................................................. 48, 49
Executive Order 13772 ......................................................................................... 49, 50, 54

Other Authorities

Merriam-Webster Dictionary Online ............................................................................. 24, 28
Black's Law Dictionary ....................................................................................................... 25
FinCEN, "Application of FinCEN's Regulations to Certain Business Models Involving
Convertible Virtual Currencies," May 9, 2019 ......................................................... 21, 31, 32, 33

The Government submits this memorandum in opposition to defendant Roman Storm's pretrial motions. (Dkts. 25-30, 37). The defendant's motions should be denied in their entirety.

The Indictment in this case alleges that for nearly two years, from September 2020 to August 2022, the Tornado Cash service operated as a large-scale money laundering enterprise. During this period, the service laundered at least $1 billion in criminal proceeds for a host of cyber criminals, including a sanctioned cybercrime organization that used the service to launder hundreds of millions of dollars' worth of cryptocurrency for North Korea's weapons of mass destruction program. As alleged in the Indictment, the defendant, Roman Storm, along with his co-conspirators, developed, marketed, paid for, and operated the Tornado Cash service, and he personally reaped millions of dollars in profits from this illicit enterprise. Storm did this with full knowledge that the Tornado Cash service was being used to launder criminal proceeds, and that each such transaction using the service concealed those proceeds and frustrated the efforts of victims and law enforcement to trace and recover the stolen funds.

The Government responds to each of the defendant's arguments in detail below, but three general points are worth noting at the outset.

First, as this Court is well aware, dismissal of an Indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted). The defendant cannot meet his heavy burden here where the detailed, 37-page, 91-paragraph speaking Indictment sets forth the criminal conduct underlying the three counts of the Indictment in far more detail than necessary. The defendant cannot obtain dismissal of the Indictment by simply making factual assertions about his own contested view as to how the Tornado Cash service operated and based on his own self-serving version of his intent or lack thereof when taking certain acts. Simply put, "there is no

1

summary judgment in criminal cases." *United States v. Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403, at \*1 (S.D.NY. Feb. 7, 2012).

Second, the Indictment alleges, and the Government expects to prove at trial, that the Tornado Cash service was "a seamless and fully integrated service that executed anonymous transactions" for its customers. (Indictment (Dkt. 1) ("Ind.") ¶ 10). Its features included a website and a user interface (the "UI"), certain smart contracts that held commingled customer deposits (the "Tornado Cash pools"), multiple other smart contracts that were key components of the service, and a relayer network that processed withdrawals in exchange for fees. (*Id.*). The defendant's motion to dismiss argues that these factual allegations are wrong, and that "Tornado Cash" refers only to the Tornado Cash pools and nothing else. (Dkt. 37-1 at 8). But the nature of the Tornado Cash service is a factual issue for the jury, and the defendant cannot obtain dismissal of the Indictment by advancing his own contested version of how the overall service actually operated. Indeed, the vast majority of the defendants' arguments in favor of dismissal of the Indictment consist of factual assertions that are more appropriate for a jury address than a motion claiming that the Indictment is on its face legally insuffiicent. The defendant's repeated efforts to focus the Court's attention only on the Tornado Cash pools while asking the Court to ignore all of the other aspects of his conduct alleged in the Indictment are an exercise in misdirection. This case does not present the question of what circumstances, if any, would give rise to criminal liability for a defendant whose only conduct consisted of writing code for smart contracts that were then deployed on the Ethereum blockchain. The defendant in this case did much more than that, as the Indictment alleges.

Third, and finally, many of the defendant's legal arguments for dismissal rest on a common error, which is his claim that even if the Government can prove the Indictment's allegations at

trial, he should not be held criminally liable because his conduct involved computer software. At points, the defendant goes so far as to suggest that any misconduct committed through computer software is absolutely protected and that cryptocurrency—the preferred asset class of many criminals but especially cybercriminals—is inherently beyond the reach of law enforcement. That is not the law, and such a broad assertion of immunity would undermine the enforcement of not only criminal law, but all regulatory efforts that address conduct using computers or taking place on the Internet. As discussed in more detail below, the defendant's arguments are far afield from established precedent regarding how the Government can regulate and prosecute conduct that involves computers and software.

As discussed below, the defendant's other pretrial motions are similarly lacking in merit.

## FACTUAL BACKGROUND

As alleged in the Indictment, this case arises from the defendant's creation and operation of the Tornado Cash service, a cryptocurrency mixing service that executed anonymous, virtually untraceable cryptocurrency transfers for its customers. The Tornado Cash service implemented multiple features that together allowed it to conceal the connection between deposits and withdrawals, making these transfers untraceable on the publicly available blockchain. These features were of immense value to cybercriminals, who used the Tornado Cash service to launder the proceeds of various criminal exploits. The defendant and his co-conspirators were fully aware of the criminal funds flowing through the Tornado Cash service, and yet continued to operate the Tornado Cash service, facilitate transactions involving criminal proceeds, and reap profits from this conduct.

The Indictment provides an overview of many of the facts the Government expects to prove at trial. This factual background section summarizes some of these facts, and highlights some areas

of disagreement with the defendant's characterization of the facts, but neither this background section nor the Indictment is intended as a complete proffer of the Government's anticipated proof at trial. Of course, on a motion to dismiss the allegations in the Indictment must be accepted as true, and the defendant's own contested version of events does not control.

### A.  The Ethereum Blockchain

Ether ("ETH") is a decentralized form of electronic currency, or cryptocurrency, existing entirely on the Internet and not in any physical form. The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operating on a "peer to peer" network. ETH transactions are processed collectively by the computers composing the network, which are referred to as "nodes." (Ind. ¶ 4). ETH is stored as a balance in an Ethereum "address," designated by a string of letters and numbers. The owner of the ETH can manage the Ethereum address with software or hardware known as an Ethereum "wallet," which is controlled by a "private key" known to the wallet's owner. A private key is akin to a PIN or password that allows a user the ability to access and transfer value associated with the Ethereum address. Once an Ethereum user funds an address in his or her wallet with ETH, the user can then use the ETH to conduct financial transactions, by transferring ETH to the Ethereum address of another user. This is accomplished over the Internet, by sending a message announcing the transfer to the Ethereum peer-to-peer network. (Ind. ¶ 6).

All ETH transactions are recorded on a public ledger known as the "Ethereum blockchain," which is stored on the nodes that make up the Ethereum peer-to-peer network. The Ethereum blockchain records the balance held in each Ethereum address and records all ETH transactions between addresses. This public ledger serves to prevent any user from spending more ETH than the user holds in his or her Ethereum address. The public nature of the Ethereum blockchain means

that the movement of funds over the Ethereum blockchain can be traced. (Ind. ¶ 7). The Ethereum network charges a fee in ETH for each transaction, which is referred to as the "gas" fee, and defrays the costs to the nodes of processing transactions. (Ind. ¶ 24).

The Ethereum blockchain also stores computer programs known as "smart contracts." A smart contract is a computer application hosted on the Ethereum blockchain that can hold ETH in an Ethereum address and release it when the smart contract receives instructions that comply with the smart contract's code. The Ethereum blockchain stores all transactions and balances associated with smart contracts. (Ind. ¶ 8).

### B.  The Tornado Cash Service

#### 1.  Development of the Service

The defendant, along with his co-defendant Roman Semenov and a third co-founder ( "CC-1"), who are referred to in the Indictment collectively as the "Tornado Cash founders" or the "founders," began developing the Tornado Cash service in 2019 and launched it with a public announcement in August 2019. Although the defendant's motion to dismiss now asserts that the Tornado Cash service is "neither a currency mixer nor a service" (Dkt. 37-1 at 8), his public announcement of the service in 2019 described it as a "mixer" and advertised that it "allows you to send Ethereum cryptocurrency 100% anonymously using groundbreaking, non-custodial technology based on strong cryptography!" (Ind. ¶ 9).

Despite the defendant's protestations that Tornado Cash only involved smart contract pools and nothing else, the Indictment's allegations (and the Government's trial proof) says otherwise. The Tornado Cash service included multiple interlocking features that collectively provided a seamless customer experience to anyone using a normal web browser. These features included, among other things: (i) a website, which was developed, controlled, and paid for by the Tornado

Cash founders; (ii) the UI, which was developed, controlled, and paid for by the Tornado Cash founders; (iii) various smart contracts, including multiple smart contracts that held large volumes of commingled customer deposits (the "Tornado Cash pools"), and all of which were developed by the Tornado Cash founders or others working at their direction; and (iv) a network of "relayers" who provided customers with enhanced anonymity in exchange for a fee. (Ind. ¶ 10). At first, the Tornado Cash founders personally approved each individual relayer who was authorized to process withdrawals and maintained a list of these relayers. Later, in or about February and March 2022, they designed and deployed a "relayer algorithm," which used a formula to assign relayers to particular customer withdrawals. (Ind. ¶¶ 29-31). The relayer algorithm required relayers to compete for market share by purchasing tokens created by the Tornado Cash founders, which generated multimillion-dollar profits for the founders. (Ind. ¶¶ 28-31). It also took a portion of those tokens from the relayers each time they processed a withdrawal, so the holders of the tokens, including the founders, could share in the profits generated by the relayer fees. (Ind. ¶ 31).

With respect to the UI, which was accessible on the Tornado Cash website, the defendant's motion asserts that it was "open-source[]" during the relevant time period. (Dkt. 37-1 at 7). In fact, as alleged in the Indictment, the three founders throughout the charged time period controlled the UI and had the ability to make changes to it at their own discretion. (Ind. ¶ 14). Indeed, the Tornado Cash UI did not even purport to be "open source" until near the end of the charged time period, on July 7, 2022.[1] Even then, this simply meant that the founders made the code for the UI available to the public so others could suggest changes to it. The founders continued to exercise actual

---

[1] The Tornado.cash Twitter account announced that the UI was "open-source" on Twitter on July 7, 2022. *See* https://twitter.com/TornadoCash/status/1545097245384757249 (accessed April 19, 2024).

control over the version of the UI that was accessible through the Tornado Cash website throughout the charged time period. Indeed, there is evidence that the founders decided to declare that the code for the UI was "open source" largely as a public relations move in 2022, due to the defendant's self-expressed "anxiety" about being held liable for operating the Tornado Cash service. (Ind. ¶ 43).

In addition to paying to host the website, the founders paid for a service to facilitate the traffic between the UI and the Ethereum blockchain, due to the large volume of traffic needed to communicate the Tornado Cash service's transactions to the blockchain. (Ind. ¶ 23).

      2.  <u>Tornado Cash Transactions</u>

The Tornado Cash service allowed two types of transactions: deposits and withdrawals. While it was technically feasible to make deposits into and withdrawals from the Tornado Cash pools directly on the Ethereum blockchain, this required a degree of technical sophistication that few users possessed—and would have been a laborious and inefficient method of using the Tornado Cash service, even for the most sophisticated customers. (Ind. ¶ 13). Thus, as a practical matter, Tornado Cash customers used the UI almost exclusively. The Government expects that the evidence at trial will show that the vast majority of Tornado Cash transactions went through the UI during the relevant time period.

To make a deposit, a customer would access the UI through the Tornado Cash website, which required no identifying or other "know your customer" ("KYC") information. Instead, as reflected in the screenshot below, the user would go to the "deposit" tab and select the amount to deposit from one of four options. The UI would then initiate a transfer of the selected amount of ETH from that customer's wallet to the corresponding Tornado Cash pool.



As seen in the screenshot, the only allowed deposit amounts were 0.1 ETH, 1 ETH, 10 ETH, and 100 ETH. Thus, if a customer of the Tornado Cash service wanted to send a different amount, such as 37 ETH, the service would not permit a single 37 ETH deposit into a single pool, but rather multiple deposits which were sent to multiple pools that would add up to 37 ETH (e.g., three 10 ETH deposits to the 10 ETH pool and seven 1 ETH deposits to the 1 ETH pool, or another combination of deposits chosen by the customer). The defendant and his co-founders designed the Tornado Cash pools and deployed them to the blockchain in 2019 and 2020. While they initially had control over the pools as well as the other parts of the service, the Indictment alleges that they relinquished their ability to control the pools in May 2020, while maintaining control of the other aspects of the service. (Ind. ¶ 26). Thus, after May 2020, the Tornado Cash pools were "immutable," but the other features of the Tornado Cash service were not.

8

The purpose of mixing customer deposits in the pools was to make it difficult, if not impossible, for someone to attribute any withdrawal or set of withdrawals to a particular deposit or set of deposits through analysis of the public blockchain. The public Ethereum blockchain transactions for each of the Tornado Cash pools would show nothing but a uniform stream of deposits and withdrawals of the same amount of ETH. (Ind. ¶ 19). Also, all deposits were commingled within the Tornado Cash pools, each of which contained an undifferentiated balance of ETH. Thus, the defendant's claim that deposited tokens "are not 'mixed' with other users' deposits" is inaccurate. (Dkt. 37-1 at 10). The deposits are freely intermingled, just as if the pool were a physical pool that contained an undifferentiated hoard of dollar bills. (Ind. ¶ 18). That mixing is in fact a critical part of the service—if the deposits were not mixed in the same pool, it would be possible to connect deposits with withdrawals through blockchain analysis.

When the customer initiated a deposit, the UI would provide the customer with a secret note that the customer could later use to make a withdrawal to a new Ethereum address. (Ind. ¶ 15). In his motion to dismiss, the defendant asserts that the user would generate the secret note on their own computer. (Dkt. 37-1 at 9). In fact, the UI was designed to generate the secret note and provide it to the customer—all the customer had to do was hit the deposit tab on the UI. While a customer with sophisticated technical ability could in theory generate a unique secret note that complied with the Tornado Cash service's protocols, the Tornado Cash founders designed the UI so that it performed this function for any customer, and in practice the vast majority of customer deposits were made through the UI. The Government expects to introduce evidence at trial regarding how the secret notes were generated by the UI, including an instructional video for using Tornado Cash that was endorsed by the defendant, that tells customers that "once you hit deposit [on the UI], a text file is automatically going to be generated with a very secure private key that you'll be able

to use to withdraw your funds later." This also means that, while it is true that the Tornado Cash service did not typically maintain a copy of the secret note, that was a design choice. The UI could have been designed—or modified at any time—to maintain a copy of the secret note.

It is also inaccurate to suggest, as the defendant does, that customers "maintain complete control over their tokens" while they are in the Tornado Cash pools. (Dkt. 37-1 at 10) That is inaccurate for two reasons. First, there is no differentiation among customers' tokens, which are all commingled, so one cannot refer to any particular customer's tokens when those tokens are in the pool. Second, the only thing customers can do with their deposits is withdraw them to a new address using the Tornado Cash service. They cannot convert deposits to other cryptocurrencies or to dollars, spend a portion of the deposits on goods or services, or do anything else other than withdraw them. This is because the Tornado Cash service was a money transmitter (and an unlicensed one at that) with a single function—transferring fixed-quantity customer deposits from one location to another. (Ind. ¶¶ 16, 18-19).

After making a deposit, the customer could withdraw funds in the amount of the deposit to any address chosen by the customer. This was also done through the UI, as can be seen in the screenshot below:

10



As shown here, the customer only needed to enter the secret note for the withdrawal and the address to which the customer wanted the funds sent. Again, the defendant's motion provides an inaccurate description of this process. In the defendant's telling, the customer "must first split their deposit note in two, with one side acting as a 'secret' and the other as a 'lock,' both of which are then used to generate a zero-knowledge proof." (Dkt. 37-1 at 9). The defendant's description bears little resemblance to the actual customer experience of the Tornado Cash service, and, moreover, is at odds with the allegations in the Indictment. Few if any customers would have the sophistication to generate a zero-knowledge proof in the manner described by the defendant. In actual fact, and as alleged in the Indictment, the customer would simply paste their secret note into the UI, which was designed and at all relevant times controlled by the defendant and his co-conspirators, and the UI would do the work for the customer, generate the zero-knowledge proof,

11

and initiate the transaction. (Ind. ¶ 16). If the defendant believes he can prove otherwise and that the allegations in the Indictment are incorrect—which they are not—he will have his opportunity to do so at a trial.

For most withdrawals, the customer would choose to use a relayer, which was an additional anonymity-enhancing feature of the Tornado Cash service, in exchange for a fee. The Government expects the evidence at trial will show that the vast majority—on the order of 98%—of withdrawals used a relayer during the charged time period. The relayer allowed the customer to transfer the funds to a completely clean wallet without any prior transaction history. Absent a relayer, the customer wallet would need to have a pre-existing ETH balance to pay the gas fee necessary to complete the transaction on the Ethereum blockchain. But when the customer used the "relayer" option, the relayer would pay the gas fee in exchange for receiving a portion of the customer withdrawal as a relayer fee. (Ind. ¶ 24). Relayers were third parties who—acting in concert with the founders—paid to set up "relayer nodes" that would transmit the instructions for the customer withdrawal along with the gas fee. (*Id.*).

Prior to March 2, 2022, the UI would select a relayer from an approved list of relayers maintained by the founders. After March 2, 2022, the UI would select a relayer from a new smart contract created by the founders, the "Relayer Registry." (Ind. ¶ 30.). The founders designed the Relayer Registry to ensure that they would be able to profit from the fees being earned by the relayers. To maintain their place in the Relayer Registry, relayers would have to purchase a cryptocurrency token issued by the founders, called a TORN token, and deposit it into a smart contract also created by the founders. When the relayer was chosen to process a withdrawal, a portion of the relayer's TORN tokens—representing a portion of the fee the relayer was charging the customer—was transferred to another smart contract to be distributed to holders of TORN

tokens, including the defendant. (Ind. ¶ 31). These various transactions, involving instructions to multiple smart contracts, were done on the back end, and were not visible to the typical customer.[2] But the net effect was that, for a fee, the Tornado Cash service had transmitted the customers' funds from an initial wallet to a new wallet, without the transfer being traceable on the blockchain.

As this overview indicates, any attempt to characterize the Tornado Cash service, or the defendant's involvement in the service, as solely encompassing the Tornado Cash pools, is inaccurate and misleading. The Indictment alleges, and the Government expects the evidence at trial will show, that the service depended on and profited from many other features intentionally designed by the defendant and his co-founders, which made it possible for customers to easily transmit funds from one wallet to another in exchange for a fee if they used a relayer to protect their anonymity, as nearly all did. The defendant and his co-conspirators operated and profited from the website, the UI, the relayer registry, and the other features that made up this service, and, while they no longer exercised control over the Tornado Cash pools after May 2020, they designed both the pools and the other parts of the service to work together as a single integrated whole.

### C.  Unlawful Money Transmitting, Money Laundering, and Sanctions Violations

Because the Tornado Cash service enabled untraceable cryptocurrency transfers, and did not have a KYC or anti-money laundering ("AML") program, it quickly became a haven for money laundering. (Ind. ¶ 45). As alleged in the Indictment—and not contested by the defendant in his motions—the defendant was fully aware that the service was processing large volumes of criminal

---

[2]  The full process for withdrawals involved several dozen steps and interacted with more than fifteen smart contracts, and both the process and each of the smart contracts involved were designed by the founders or others working at their direction. As alleged in the Indictment, the founders repeatedly revised and updated the Tornado Cash service during the charged time period, which again undermines any suggestion that the service was somehow unchangeable.

proceeds and continued to operate the service, meaning that he knowingly facilitated these laundering transactions.

To take just one of many examples, in December 2021, the defendant received notice of a $200 million cryptocurrency hack, proceeds of which were deposited into the Tornado Cash service. (Ind. ¶ 48). The Government expects that the evidence at trial will show that the date of this hack was the single highest-volume deposit day in Tornado Cash's history, and resulted in the majority of the Tornado Cash pool balances at this point in time being attributable to this single hack. Thus, the withdrawals of funds in the subsequent days, using the UI and the relayer network, necessarily involved criminal proceeds. The defendant and his co-conspirators processed those withdrawals through the UI with full notice they were engaging in transactions that involved criminal proceeds. When the victim contacted the defendant and his co-conspirators, they refused to assist and instead continued to facilitate and conduct the laundering transactions, even though they had complete control over the Tornado Cash website, UI, and relayer network, and could have put procedures in place to combat the ongoing laundering of these stolen funds. (Ind. ¶ 48). This will be one of a number of similar examples of money laundering engaged in by the defendant and his co-conspirators at trial.

Additionally, despite the fact that the Tornado Cash service engaged in the business of transferring funds on behalf of the public, the defendant did not register as a money transmitter, nor did the Tornado Cash service or anyone affiliated with it. (Ind. ¶ 33). And the Tornado Cash founders also did not put in place any KYC or AML features in the Tornado Cash service, despite being required to do so. (Ind. ¶¶ 32, 34). Indeed, although the Government has no obligation to show willfulness for this crime, the Government expects that the evidence at trial will show that the defendants were aware of KYC and AML requirements under U.S. law and even discussed the

14

idea of developing a "compliant mixer," but decided not to do so because it would be less profitable than the non-compliant mixer they were operating. (Ind. ¶ 38).

Finally, the evidence will show that the defendants knowingly engaged in sanctions violations when they continued to facilitate transactions in funds from an Office of Foreign Asset Control ("OFAC")-designated cryptocurrency wallet, fully knowing that it had been sanctioned. As detailed in the Indictment, the founders knew in April 2022 that the Tornado Cash service was laundering hundreds of millions of dollars from a hack perpetrated by the OFAC-sanctioned North Korean Lazarus group, and that the wallet holding the proceeds of the hack was itself OFAC-sanctioned. (Ind. ¶¶ 61-63). In response, rather than take steps to prevent this and stop laundering these funds, they made a nominal change to the UI that they knew, in the defendant's words, would be "easy to evade." (Ind. ¶ 64). And, after making this change, knowing that it would be ineffective, the Tornado Cash founders continued to knowingly permit the Tornado Cash service to be used to launder funds from the sanctioned wallet. (Ind. ¶¶ 65-67). During this time period, hundreds of millions in criminal proceeds that originated in the sanctioned wallet flowed through the Tornado Cash service and were commingled with other customer deposits. Accordingly, each withdrawal conducted through the UI and using the relayer network, which the defendant and his co-conspirators controlled, necessarily involved these illegal funds and helped the Lazarus Group to launder its criminal proceeds. And each such withdrawal generated a relayer fee, with a corresponding payment of TORN tokens to the holders of those tokens, including the defendant. (Ind. ¶ 68). Thus, the defendant knowingly facilitated and profited from these sanctions-violative transactions.

## ARGUMENT

### I.    The Court Should Deny the Defendant's Motions to Dismiss

The defendant moves to dismiss the three charges in the Indictment on the basis that the Indictment's allegations are insufficient and legally defective. (Dkt. 37-1). That motion is meritless. As discussed below, the charges track the relevant statutes, and the defendant's alleged misconduct falls within the heartland of what these statutes prohibit. There can be no serious dispute that the 37-page Indictment returned by the grand jury in this case alleges every element of each charged offense and fairly informs the defendant of the charges against which he must defend. The Indictment is sufficient on this ground alone. *See United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013).

### A.  Applicable Law

On a pretrial motion to dismiss pursuant to Fed. R. Crim. P. 12(b), the allegations of the indictment must be taken as true. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).[3] The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). The dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001).

"Pursuant to Federal Rule of Criminal Procedure 7, the indictment or information must be

---

[3] Unless otherwise noted, case quotations omit internal quotation marks, citations, and previous alterations.

a plain, concise, and definite written statement of the essential facts constituting the offense charged." *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013). To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008). Only in "very rare cases," such as those where the indictment alleges refusal to answer questions before Congress, must an indictment specify "how a particular element of a criminal charge will be met." *Stringer*, 730 F.3d at 125-26 (discussing the special case of *Russell v. United States*, 369 U.S. 749 (1962)). Otherwise, "[a]n indictment is sufficient if it first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Stringer*, 730 F.3d at 124; *see also Yannotti*, 541 F.3d at 127.

Where a defendant has been given sufficient notice of the charges against him by means of, for example, a criminal complaint or discovery, prejudice will not have been shown, and the indictment should stand. *See, e.g.*, *Stringer*, 730 F.3d at 124-25; *Yannotti*, 541 F.3d at 127. Moreover, it is well settled that, "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial," a facially valid indictment is not subject to challenge based on the quality or quantity of evidence. *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998); *see United States v. Williams*, 504 U.S. 36, 54 (1992). To that end, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). Rather, "[t]hat is something [courts] do after trial." *Id.* This is consistent with the well-established principle that summary judgment proceedings "do[] not exist in federal criminal procedure." *Id.*

**B. Count Two Sufficiently Alleges a Conspiracy to Operate an Unlicensed Money Transmitting Business**

### 1. <u>Applicable Law</u>

Count Two alleges that the defendant conspired with others to "conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business," in violation of Title 18, United States Code, Section 1960. (Ind. ¶ 81). Section 1960 defines "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." 18 U.S.C. § 1960(b)(2); *see United States v. Murgio*, 209 F. Supp. 3d 698, 706 (S.D.N.Y. 2016). Courts have uniformly held, and the defendant does not dispute in his motion, that "funds" and "money" for purposes of this statute include cryptocurrencies. *E.g., Murgio*, 209 F. Supp. 3d at 705-10 (Bitcoin exchange covered by 18 U.S.C. § 1960); *United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014) ("Bitcoin clearly qualifies as 'money' or 'funds'" for purposes of 1960 prosecution); *United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020) (applying Section 1960 to Bitcoin mixing service).

Section 1960 also lists three ways in which a money transmitting business can be "unlicensed," in violation of the statute. 18 U.S.C. § 1960(b)(1)(A)-(C). Two of these are alleged in the Indictment in this case as objects of the charged conspiracy. First, the Indictment alleges that the Tornado Cash service, as a money transmitting business, failed to comply with the registration requirements set forth in Tile 31, United States Code, Section 5330, and its accompanying regulations, in violation of 18 U.S.C. § 1960(b)(1)(B). (Ind. ¶ 81). Second, the Indictment alleges that the Tornado Cash service, as a money transmitting business, involved the transportation and transmission of funds known to the defendant to have been derived from a

18

criminal offense and intended to be used to promote and support unlawful activity, in violation of 18 U.S.C. § 1960(b)(1)(C). (*Id.*).

For purposes of the Section (b)(1)(B) prong, the Government must prove that the money transmitting business was in fact required to register under Title 31, United States Code, Section 5330. Accordingly, to prove a violation of Section (b)(1)(B), the Government must prove that there was a money transmitting business as the term is defined in that section.[4] As relevant here, there are two ways in which a business can be a "money transmitting business" under Section 5330. First, the business can be a "money transmitting … service," which is defined to include "accepting currency, funds, or value that substitutes for currency and transmitting the currency, funds, or value that substitutes for currency by any means." 31 U.S.C. §§ 5330(d)(1)(A), (d)(2). Second, the business can be "engage[d] as a business in the transmission of currency, funds, or value that substitutes for currency," which includes "an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or

---

[4] In his brief, the defendant suggests that the definition of "money transmitting" in Section 1960 is "coextensive" with the definition in Section 5330. (Dkt. 37-1 at 19). That is wrong. While the two definitions are plainly similar, to the extent there is any difference between them that is relevant here, that difference would only apply to the Indictment's Section 1960(b)(1)(B) theory. This is because Section 1960(b)(1)(B), which requires a failure to register, incorporates the registration requirements from Section 5330, such that the Government "need only allege a violation of Section 5330's implementing regulations" for a (b)(1)(B) charge. *United States v. Budovsky*, 2015 WL 5602853, at *8 (S.D.N.Y. Sept. 23, 2015). However, Section 1960 has its own definition of "money transmitting," and "Section 1960 does not borrow the definition of 'money transmitting business' from Section 5330." *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82, 89 (D.D.C. 2008); *see also United States v. Mazza-Alaluf*, 621 F.3d 205, 210 (2d Cir. 2010) (rejecting defendant's attempt to "import[] the § 5330(d)(1)(B) definition of 'money transmitting business' into § 1960"). Accordingly, even if the Court were to accept the defendant's arguments for a narrow reading of the definition of money transmitting in Section 5330 and its implementing regulations, that would only apply to the Indictment's allegation that the defendant conspired to violate Section 1960(b)(1)(B), and would not apply to the allegation that the defendant conspired to violate Section 1960(b)(1)(C). *See E-Gold*, 550 F. Supp. 2d at 93 (holding that Section 5330 definition only applied to portion of indictment charging violation of Section 1960(b)(1)(B)).

internationally outside of the conventional financial institutions system." *Id.* § 5330(d)(1)(A). The implementing regulations adopt a similar two-pronged definition of money transmitting, providing that a "money transmitter" is either a person engaged in "the acceptance of currency, funds, or other value that substitutes for currency from one person *and* the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means," or any "other person engaged in the transfer of funds." 31 C.F.R. § 1010.100(ff)(5)(i)(A)-(B). A business that meets either of these definitions is a money transmitter under Section 5330.

Separately, for purposes of Section 1960(b)(1)(C), the Government must prove that the business engaged in "money transmitting" as that term is defined in Section 1960(b)(2), and that the defendant knew that the business involved funds that were derived from a criminal offense or that were intended to be used to promote or support unlawful activity. The Indictment alleges in detail the defendant's knowledge that Tornado Cash was transmitting funds derived from criminal offenses, and the defendant does not contest that allegation in his motion.

Finally, the use of the word "business" in Section 1960 means that the Government must prove that the defendant did more than engage in a "single, isolated transmission of money." *United States v. Banki*, 685 F.3d 99, 114 (2d Cir. 2012). Rather, "under § 1960 a 'business' is an enterprise that is carried on for profit or financial gain." *Id.; see also id.* at 113 (holding that district court erred in not instructing jury that a "money transmitting business" is "(1) an enterprise (not a single transaction) (2) that is conducted for a fee or profit").

### 2. Count Two Alleges the Tornado Cash Service Engaged in Unlicensed Money Transmitting

The defendant's motion argues that the Indictment does not allege the existence of a money transmitting business because it does not allege that the defendant or others involved in the

Tornado Cash service had "control of the funds," which the defendant claims is a "prerequisite to being a money transmitter." (Dkt. 37-1 at 20). That argument fails. The word "control" is not found in any relevant statute or regulation, the defendant does not cite any case or other legal authority that has ever held that "control" of the funds is required, and the words actually used in the statute and regulations do not require any such control.

The only source cited by the defendant or any of his *amici* that uses the word or concept of "control" in connection with Section 1960 is a 2019 regulatory guidance document issued by the Financial Crimes Enforcement Network ("FinCEN"). *See* FinCEN, "Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies," May 9, 2019 (the "FinCEN Guidance").[5] But in the FinCEN Guidance, the "control" concept is listed as just one factor in a four-factor test for determining whether a wallet provider, which is a completely different type of business model than the Tornado Cash service, is a money transmitter. In a separate section of the same guidance, FinCEN describes how to evaluate whether a cryptocurrency mixing service such as Tornado Cash is a money transmitter, and that section of the guidance does not reference the concept of "control" of the funds. Thus, the suggestion by the defendant and his *amici* that "control" is a prerequisite for any money transmitting business is legally baseless, contrary to the plain text of the statute, and should accordingly be rejected. Moreover, accepting the defendant's novel "control" requirement would frustrate the intent of the statute, which was designed to "keep pace with…evolving threats" as new methods of moving criminal proceeds emerge over time. *Faiella*, 39 F. Supp. 3d 544, 546 (S.D.N.Y. 2014).

---

[5]  The FinCEN Guidance is available at https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf.

**a. The Tornado Cash Service Is a Money Transmitting Business that Is Functionally Indistinguishable from Other Money Transmitting Businesses**

To begin with, the conspiracy charge in Count Two extends not only to the defendant's own actions, but also to the actions of his co-conspirators, which include his fellow Tornado Cash founders and others who participated in the overall service, such as the relayers. The relayers in particular played a key part in the service, as they paid the gas fees and obtained a fee from the customer in return, a portion of which was returned to the holders of TORN tokens, including the defendant. The defendant's repeated attempts to narrow the definition of Tornado Cash to just the Tornado Cash pools ignores the actual functioning of the overall service as alleged in the Indictment. The Indictment alleges that the overall Tornado Cash service was a money transmitting business, and the defendant is liable if he conspired with others to conduct, control, manage, supervise, direct, or own "all or part" of that business. 18 U.S.C. § 1960(a).

The essential value of the Tornado Cash service to its customers was that it enabled them to send cryptocurrency from one wallet to another, and it severed the link between the two wallets by mixing, or "pooling," its customers' funds in an intermediary wallet on the blockchain. It also did not require its customers to interact directly with the Ethereum blockchain. Tornado Cash customers could interact with the Tornado Cash service through the website, which provided access to the UI. The effect of a deposit from a Tornado Cash customer was to move cryptocurrency from the customer's wallet into a wallet held by one of the smart contract pools, and the effect of a withdrawal was to move the cryptocurrency from the pool to any wallet designated by the person making the withdrawal. (Ind. ¶¶ 15-16). This type of service to customers is no different from other cryptocurrency mixing services that courts have deemed money transmitting services. As the court explained in *Murgio*, "if the evidence at trial demonstrates that

22

[the alleged money transmitting business] transmitted bitcoin to another location or person for its customers, then that evidence would establish that [the business] was a money transmitting business." 209 F. Supp. 3d at 711; *see also United States v. Harmon*, 474 F. Supp. 3d 76, 103 (D.D.C. 2020) (indictment adequately alleged a violation of Section 1960 when it alleged that the business "enabled customers, for a fee, to send bitcoins to designated recipients in a manner which was designed to conceal and obfuscate the source or owner of the bitcoins"); *United States v. Sterlingov*, 573 F. Supp. 3d 28, 31 (D.D.C. 2021) (applying Section 1960 to cryptocurrency mixer that advertised that it could "eliminate any chance of finding your payments[,] ... making it impossible to prove any connection between a deposit and a withdraw[al] inside our service"). That is exactly what the Tornado Cash service did.

Just as the Tornado Cash service offered the same service to customers as other businesses that courts have held to be money transmitters, so too did it operate as a commercial enterprise like other similar businesses. The Indictment alleges, among other things, that the defendant and his co-conspirators created all aspects of the Tornado Cash service, that they paid for and exercised control over critical components of the service during the charged time period, that they marketed the service, and that they reaped substantial profits from the service. (*E.g.*, Ind. ¶¶ 9, 14, 24-26). Those profits came from the per-transaction fees paid by customers to relayers, some of which the relayers (i) paid as fees to the holders of TORN tokens and (ii) used to buy more TORN tokens, thereby driving up the value of those tokens, of which the defendant and his co-conspirators owned many. (Ind. ¶¶ 29-31). The defendant contests none of these facts for purposes of his motion. Instead, he focuses solely on the fact that, because the Tornado Cash service used zero-knowledge proofs that enabled the service to transfer funds for its customers without having "control" over those funds, it does not qualify as a money transmitting business under Section 1960. That

argument, which would create a significant loophole in the statute, is not warranted by the text of the statute or by any precedent. The Court should reject it.

### b. Section 1960 Does Not Require the Business to Have Control of the Funds

The definition of "money transmitting" in Section 1960 does not require the money transmitter to have "control" of the funds being transferred. The definition exends to "transferring funds on behalf of the public by any and all means." 18 U.S.C. § 1960(b)(2). Under the ordinary meaning of the word "transfer," there is no requirement that the transferer exercise control over the funds being transferred. For instance, in the very definition cited by the defendant, the word "transfer" means "to convey from one person, place, or situation to another," or "to cause to pass from one to another." (Dkt 37-1 at 21 (citing *Transfer*, Merriam-Webster Dictionary Online, available at https://www.merriam-webster.com/dictionary/transfer (last visited April 26, 2024))). These definitions do not require "control" over the thing that is being conveyed or caused to pass from one to another. For instance, a USB cable transfers data from one device to another,[6] and a frying pan transfers heat from a stove to the contents of the pan,[7] although neither situation involves exercising "control" over what is being transferred.

The defendant also cites a Black's Law Dictionary definition of "transfer," but that particular definition appears to apply only in the legal context of disposition of an asset, which

---

[6] *E.g.*, Sarah Whitman, *The Best USB-C Cables and Adapters*, N.Y TIMES, September 12, 2023, available at https://www.nytimes.com/wirecutter/reviews/best-usb-c-cables/ (noting that a USB cable "can transfer data up to four times faster (40 Gbps) between supported devices") (last visited April 19, 2024).

[7] *E.g.*, J. Kenji Lopz-Alt, *The Science of Heat vs. Temperature*, SERIOUS EATS, Feb. 13, 2023, available at https://www.seriouseats.com/the-food-lab-fundamentals-science-of-heat-versus-temperature (describing "a metal pan transferring energy to a juicy rib-eye steak") (last visited April 19, 2024).

would likely not apply to a money transmitting business. (Dkt. 37-1 at 21); *see Transfer*, Black's Law Dictionary (11th ed. 2019) (discussing "[a]ny mode of disposing of or parting with an asset or an interest in an asset"). More to the point is the Black's Law Dictionary's definition of "funds transfer," which means "a payment of money from one person or entity to another; esp., the process by which payment is made through a series of transactions between computerized banking systems." *Funds Transfer*, Black's Law Dictionary (11th ed. 2019). The Tornado Cash service, which executed a series of transactions to make a payment from one person to another, clearly engaged in transferring funds under this more relevant definition.

The context of the definition in Section 1960 provides further support for rejecting the defendant's narrow interpretation. *See Pulsifer v. United States*, 144 S.Ct. 718, 726 (2024) (in statutory construction cases, courts must "review[] text in context"). In the statutory definition, the words "transferring funds" are followed with "by any and all means," a phrase that requires a broad interpretation. 18 U.S.C. § 1960(b)(2); *see Murgio*, 209 F. Supp. 3d at 708 ("[s]ection 1960 defines 'money transmitting' broadly to include transferring 'funds,' not just currency, by 'any and all means'"); *cf., e.g.*, *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 396 n. 3 (2d Cir. 2018) (contract referring "any and all" issues to arbitration should be given a "broad" construction).

Here, the Indictment alleges that the Tornado Cash service transferred funds on behalf of the public because it conveyed cryptocurrency or caused cryptocurrency to pass from one place to another on the Ethereum blockchain every time a customer requested a deposit or withdrawal.

For deposits, customers could access the Tornado Cash website and UI—both of which were designed, controlled, and paid for by the defendant and his co-conspirators at all relevant times—and make a deposit using the "Deposit" tab. (Ind. ¶ 15). The Tornado Cash service would take it from there. The UI would direct the network of computers making up the Ethereum

25

blockchain to debit the customer's account and credit the account of a Tornado Cash pool smart contract. (Ind. ¶ 15). The defendant personally paid the cost of transmitting these instructions from the UI to the Ethereum blockchain. (Ind. ¶ 23).

The UI operated in the same way for withdrawals. The customer would only need to enter their secret note and click "Withdraw" on the UI, and the Tornado Cash service would handle the rest. The UI would conver the secret note to a zero-knowledge proof and interact with the Relayer Registry, another smart contract created and controlled by the defendant and his co-conspirators, to select a relayer to execute the withdrawal and pay the gas fee in exchange for a portion of the withdrawal as a fee. The UI would also instruct multiple other smart contracts to have the relayer pay a fee to the defendant and other holders of TORN tokens. (Ind. ¶¶ 16, 30-31). As with deposits, the Tornado Cash service caused all of these actions to take place behind the scenes and without any further action by the customer. Under the ordinary meaning of the term, the Tornado Cash service was transferring funds when it executed customer deposits and withdrawals in this way. The defendant and his co-conspirators designed, controlled, and paid for this complex money transmission system at all relevant times.

The defendant selectively quotes cases that have described the facts in prior Section 1960 prosecutions and argues that those cases implicitly held that *only* the described facts—and not the facts described above—could constitute money transmitting. For instance, the defendant cites the Second Circuit's description of a money transmitting business as a business that "receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates." (Dkt. 37-1 at 21 (citing *United States v. Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999)). But the quoted language was not a holding of the court; rather, it was in the section of the opinion labeled "background," in which the court provided an overview of the

facts of that particular case. *See* 199 F.3d at 592. For this reason, a court in this district recently observed that this language from *Velastegui* was "dicta" and denied a defendant's motion to dismiss a Section 1960 charge on the basis that his business did not meet the description in *Velastegui*. *United States v. Neumann*, 2022 WL 3445820, at *6-7 (S.D.N.Y. 2022). The court in *Neumann* recognized that the statutory definition of money transmitting plainly encompasses a broader range of conduct than the background description of the facts in *Velastegui*. *Id.*

Similarly, the defendant cites *United States v. Bah*, 574 F.3d 106, 114 n. 6 (2d Cir. 2009), which referred in a footnote to a hypothetical defendant who might maintain "possession" of payments from customers without transferring them to any other person, and thus would not have engaged in money transmitting. But the footnote in *Bah* says nothing about a case like the one here, where the defendant and his co-conspirators operated a business that did engage in large-scale transferring of funds from one person or place to another.

Many of the defendant's arguments focus not on the definition in Section 1960, but on one aspect of the definition of money transmitting in Section 5330, which states that money transmitting includes "accepting" funds and "transmitting" them. 31 U.S.C. § 5330(d)(2); *see also* 31 C.F.R. 1010.100(ff)(5)(A) (similar). The defendant argues that the ordinary meaning of the words "accept" and "transmit" requires the business to have control of the funds. As with the word "transferring," however, the definitions of these words does not require the narrow interpretation urged by the defendant. The dictionary contains one definition of "accept" as "to receive … willingly," a definition that arguably suggests taking control of the thing being accepted,[8] but the

---

[8] Both the defendant and his *amici* essentially assert that "accept" is merely a synonym for "receive," and then cite cases involving the word "receive" in the child pornography statute. (Dkt. 37-1 at 22 (citing *United States v. Stanley*, 896 F.2d 450, 451 (10th Cir. 1990), and *United States*

dictionary also defines "accept" as "to be able or designed to take or hold", and "to give admittance or approval to." *See Accept*, Merriam-Webster Dictionary Online, available at https://www.merriam-webster.com/dictionary/accept (last visited April 26, 2024). Applying these definitions, it would be apt to describe the Tornado Cash service as "able or designed to take or hold" funds, or to say that it "gives admittance to" funds, without requiring that it exercise control over those funds. Indeed, as alleged in the Indictment, the defendant himself used the word "accept" in this way. (Ind. ¶ 11 (quoting defendant's presentation to investors that the Tornado Cash service "uses a smart contract that **accepts** ETH deposits that can be withdrawn by a different address") (emphasis added)). Clearly, the defendant did not understand the word "accept" to require control over the funds.

Similarly, the defendant's cited dictionary includes definitions of "transmit" as "to cause or allow to spread," and also "to cause … to pass or be conveyed through space or a medium." *See Transmit*, Merriam-Webster Dictionary Online, available at https://www.merriam-webster.com/dictionary/transmit (last visited April 26, 2024). These definitions do not imply that control is a prerequisite to the act of transmitting. Rather, these definitions fairly describe the actual functioning of the Tornado Cash service with respect to customer deposits and withdrawals, as the service causes the customers' funds to spread, pass, or be conveyed across the blockchain.

And, even if the defendant were correct that the words "accepting" and "transmitting" somehow imply a control requirement, both Section 5330 and its accompanying regulation expressly include an alternative broader definition that is similar to the definition of money

---

*v. Dobbs*, 629 F.3d 1199, 12-3-04 (10th Cir. 2011); *see also Amicus* Br. for Blockchain Association (Dkt. 45) at 12 (citing same cases)). The Government submits that there is limited persuasive value in these out-of-circuit cases that were interpreting a word that does not appear in Section 1960 or Section 5330, and in the context of a very different criminal statute.

transmitting in Section 1960. Specifically, section 5330 states that a money transmitting business also includes any person that "engages as a business in the transmission" of funds, and then says that this includes "any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system." 31 U.S.C. § 5330(d)(1)(A); *see also* 31 C.F.R. § 1010.100(ff)(5)(B) (a money transmitter is also "any other person engaged in the transfer of funds"); *Murgio*, 209 F. Supp. 3d at 714 (quoting 31 C.F.R. § 1010.100(ff)(5)(B) and concluding this regulatory definition of money transmitting is "at least as broad as 18 U.S.C. § 1960(b)(2)"). The last part of the Section 5330 definition, with its reference to a network of people that facilitate the transfer of money outside the conventional financial system, might as well have been written with the Tornado Cash service specifically in mind.

To be sure, in many or most cases, a money transmitter will take control of the funds that it is transmitting, and it is unsurprising that in many prior cases when courts have described the facts of the particular business at issue, it appears that those businesses did take such control. But it would invite absurd results to hold that because many or most money transmitting businesses have control over the funds while transferring them, there is an unspoken statutory requirement that the business must have control over the funds to be a money transmitter. *See Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020) (a court "may not narrow a provision's reach by inserting words Congress chose to omit"); *Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face."). If Congress had intended that control of the funds was a requirement, it could have said as much in the plain text of the statute. It did not. Indeed, Congress did use the word "control" elsewhere in Section 1960, noting that one of the ways a defendant can be liable is if he "controls" all or part of a money

29

transmitting business. 18 U.S.C. § 1960(a). This is yet another indication that Congress did not implicitly include a "control" requirement with respect to the funds in the definition of "money transmitting."

Consider the example of a business that accepts parcels of cash from criminals and moves the money by courier to locations overseas, perhaps the archetypal Section 1960 violation. Under the defendant's theory, such a business could escape liability by the simple expedient of only accepting cash in locked parcels, as long as its customers did not give it the keys to unlock the parcels. Then, it could claim, it never had "control" over the funds. Congress surely did not intend the statute to be so easily evaded—which is likely why Congress did not include the word "control" in the statute in the first place, as imposing this artificial requirement would invite evasion of the statute in just the manner described above. Or, consider a business that is otherwise identical to the Tornado Cash service, except that it designs the UI to preserve copies of the secret notes it generates. Under the defendant's theory, that business would be a money transmitter, while his business was not a money transmitter. But it would frustrate the purpose of the law to have it turn on such arbitrary distinctions, especially when the plain text of the law extends to "any and all means" of transferring funds on behalf of the public. 18 U.S.C. § 1960(b)(2).

Courts have repeatedly confronted arguments by defendants in similar cases that Section 1960 does not apply to a new technology for transferring funds, and have recognized that these arguments would undermine congressional intent. This is because "[f]rom its inception …, § 1960 sought to prevent innovative ways of transmitting money illicitly. … Congress 'designed the statute to keep pace with … evolving threats,' and this Court must accordingly give effect to the broad language Congress employed—namely, that § 1960 'appl[ies] to *any* business involved in transferring funds … by *any and all means*." *Murgio*, 209 F. Supp. 3d at 708 (quoting *Faiella*, 39

F. Supp. 3d at 546) (emphasis in original).[9]

Finally, while the defendant's rhetoric about the importance of financial privacy on the blockchain is not legally relevant to his argument here, it is worth emphasizing that nothing in this case indicates that cryptocurrency mixing services themselves are illegal. The issue is whether such services are subject to the same regulations as other money transmitting businesses, including the requirement to register their businesses and comply with FinCEN regulations for KYC and AML. The very purpose of these regulations is to allow consumers to use such services for legitimate purposes while combating the use of these services for criminal purposes.

### c. The FinCEN Guidance Does Not Suggest that Control of Funds is Required

The defendant and his *amici* also rely heavily on a section of the FinCEN Guidance that they argue supports their theory that a money transmitting business must have "control" over the funds being transmitted. But not only does the FinCEN Guidance not support the defendant's argument, it actually undermines his argument and makes it clear that neither the statute nor the regulations require the business to take control of the funds.

Specifically, the defendant cites a section of the FinCEN Guidance that discusses how to determine whether cryptocurrency wallet providers are money transmitters. In that section, the Guidance states that the treatment of wallet providers "depends on four criteria: (a) who owns the

---

[9] The *amicus* brief for the Blockchain Association offers a powerful illustration of how accepting the defendant's argument would undermine the congressional purpose in requiring money transmitters to register with FinCEN and adopt KYC/AML programs. The *amicus* argues that enforcing the money transmitting laws is unnecessary because the Government can "sanction[] digital asset wallets associated with illicit actors." (Dkt. 45 at 19). But this very case illustrates why that "solution" is toothless without enforcement of the money-transmitting licensure requirements. OFAC did impose sanctions on the Lazarus Group wallet involved in the Ronin hack, and those sanctions were completely undermined when the Tornado Cash service laundered the funds from that sanctioned wallet into new, clean wallets. (Ind. ¶ 66).

value; (b) where the value is stored; (c) whether the owner interacts directly with the payment system where the CVC [*i.e.*, cryptocurrency] runs; and (d) whether the person acting as intermediary has total independent control over the value." FinCEN Guidance, at 15. According to the defendant, this means that "control is a touchstone of what makes a party a money transmitting business." (Dkt. 37-1 at 22; *see also Amicus Curiae* Br. for Blockchain Association, Dkt. 45 at 13 (similar)).

There are at least four reasons that argument is incorrect. ***First***, the Tornado Cash service is not a wallet provider. There is a separate section of the FinCEN guidance that refers to cryptocurrency mixing services like Tornado Cash, and that section does not contain any reference to "control." Fincen Guidance at 19-20. Instead, the section about mixers is best read to include a service like Tornado Cash as a money transmitter. *See id.* at 20 ("[A] person (acting by itself, through employees or agents, ***or by using mechanical or software agencies***) who provides anonymizing services by accepting value from a customer and transmitting the same or another type of value to the recipient, in a way designed to mask the identity of the transmittor, is a money transmitter under FinCEN regulations.") (emphasis added).[10] ***Second***, even if the section on wallet providers was somehow applicable to cryptocurrency mixers (and it is not), all that would show is that control is *one* of four factors to consider in determining whether a particular service is a money transmitter. The other listed factors, including that the "value" in the Tornado Cash service is

---

[10] The defendant does not argue that he is an "anonymizing software provider," a term that is also used in the mixer section of the FinCEN guidance, although one of his *amici* suggests that he is. *See* Dkt. 45 at 13. Even if the defendant did make that argument, it would be patently meritless. A customer who initiates a transfer on the Tornado Cash website is being provided with a service, not with software, just as a Google user who conducts a search on Google is being provided with a service, not with software. *See, e.g.*, *Bennett v. Google, LLC*, 882 F.3d 1163, 1167 (D.C. Cir. 2018) (Google is a "service provider"). The fact that both businesses use software to provide the relevant service does not transform them into software providers.

stored not with the customer but within the Tornado Cash pools, and that the customers interact with the Tornado Cash service rather than with the Ethereum blockchain directly, would weigh in favor of a finding that the Tornado Cash service is a money transmitter. **Third**, there is another section in the FinCEN Guidance that makes it clear that control is not a requirement. In a section dealing with multi-signature wallet providers, the FinCEN Guidance states that "if the value is represented as an entry in the accounts of the provider, the owner does not interact with the payment system directly, **or** the provider maintains total independent control of the value, the provider will also qualify as a money transmitter." FinCEN Guidance, at 17 (emphasis added). The use of the word "or" shows that control is one of three independent ways that a multi-service wallet provider might be a money transmitter in the view of FinCEN, which means control is plainly not a requirement in all cases.

**Fourth**, even if it did support the defendant's argument, the FinCEN Guidance is not a regulation or rule and has no authoritative effect. Rather, it is "intended to help financial institutions comply with their existing obligations," and it cautions on its first page that it "covers only certain business models and necessarily does not address every potential comibination of facts and circumstances." *Id.* at 1.[11] Thus, the defendant's attempt to take one word from a multi-factor test in the guidance out of context, and use it to undermine the application of the statute to his conduct, should be rejected and does not provide a basis for dismissal of a facially valid Indictment. It is notable that the defendant does not cite a single case where a court dismissed an Indictment based solely on an agency guidance that was neither a regulation or a rule.

---

[11] FinCEN also allows any individual or business to submit facts about its business to FinCEN and ask for an administrative ruling on whether it should register as a money transmitter. *See* 31 C.F.R. § 1010.711. The defendant never sought such a ruling.

**d.  The Tornado Cash Service Does Not Fall Under the "Network Access Services" Exemption**

The defendant's final argument is that the Tornado Cash service falls under the "network access services" exemption found in 31 C.F.R. § 1010.100(ff)(5)(ii)(A). As with his other arguments based on the regulations, this would only affect the Government's 1960(b)(1)(B) theory. But this argument should also be rejected. For the most part, the defendant does not develop this argument other than to rehash his claim that a money transmitting business must have "control over the funds." (Dkt. 37-1 at 22). But the control issue is irrelevant to whether he provided "network access services."

There does not appear to be any case law interpreting the "network access services" exemption in the context of the money transmitter regulations, but that phrase is typically used in the law to refer to a provider of access to a general network such as the Internet. *See, e.g.*, *In re WorldCom, Inc.*, 371 B.R. 19, 23 (Bankr. S.D.N.Y. 2007) (describing WorldCom's provision of "network access services" to "computer networks," which were "in turn linked to other computer networks, collectively forming the global digital communications network generally described as the Internet"). In other words, network access services are the pipelines that give their customers access to the Internet or another similarly broad-based computer network. That is simply not what the Tornado Cash service did. Far from providing general access to a network, its only function was to provide transfers of funds through the Tornado Cash service.

The fact that the Tornado Cash pools—one feature of the Tornado Cash service—were immutable does not change this analysis. (*See* Dkt. 37-1 at 24). First, as discussed above, the Indictment does not merely allege that the creation and deployment of the Tornado Cash pool smart contracts violated the statute, but incorporates the overall course of conduct of the defendant and his co-conspirators in operating the interconnected features of the Tornado Cash service as a

34

money transmitting business. In addition, the immutability of the pool smart contracts does not somehow make them a "network" or make the creation of them a "network access service." The two concepts have no apparent relationship to each other. The defendant cites no authority to support his baseless interpretation of this exemption.

### 3.   Count Two Alleges the Tornado Cash Service Was Conducted as a Business for a Profit or Financial Gain

"[U]nder § 1960 a 'business' is an enterprise that is carried on for profit or financial gain." *Banki*, 685 F.3d at 114 (citing two dictionaries defining "business" as, among other things, a commercial enterprise). And while charging a fee is one way of showing that an individual or entity engaged in money transmitting was running a commercial enterprise, *id*. (citing *Velastegui*, 199 F.3d at 592), it is not the only way. The true hallmark of a business is the pursuit of profit. *United States v. Mazza-Alaluf*, 607 F. Supp. 2d 484, 489 (S.D.N.Y. 2009) ("The statute does not define the word 'business,' which should be afforded its ordinary meaning as an enterprise that operates for profit."), *aff'd*, 621 F.3d 205 (2d Cir. 2010). The Indictment clearly alleges that the Tornado Cash service was a commercial enterprise carried on for profit or finanancial gain and that the defendant himself profited from its operation through his control, with others, of key components of the integrated Tornado Cash service. The Indictment alleges, among other things, that the defendant and the other Tornado Cash founders successfully solicited approximately $900,000 in financing from a venture capital fund in exchange for an expectation that the fund would receive a share of future profits from the Tornado Cash service (Ind. ¶ 12); used a bank account to pay to host the Tornado Cash website and to pay for traffic between the UI and the Ethereum blockchain (Ind. ¶ 23); designed and promoted the Tornado Cash service's relayer feature, including its structure of charging fees for withdrawals (Ind. ¶ 27-29); created a formula for capitalizing on relayer fees to boost the value of TORN tokens, a

cryptocurrency token they created (Ind. ¶¶ 27, 30-31); and cashed out their TORN holdings for millions of dollars (Ind. ¶ 75).

Though the defendant admits that the Indictment alleges that he and the other Tornado Cash founders profited from their receipt and sale of TORN tokens, he maintains that Count Two should be dismissed because it does not allege that the defendant or the other Tornado Cash founders themselves charged a fee for each transaction in which they transmitted cryptocurrency, nor that they personally ran relayers. (Dkt. 37-1 at 24-25). As discussed above, the law requires the Government to prove that the business was a commercial enterprise, not that it charged a fee. The Indictment plainly alleges that the defendant and his co-conspirators operated the Tornado Cash service to make money, even if they did not themselves charge a per-transaction fee.

In any event, even if the Government were required to prove that the business charged fees, the fees charged by relayers to process transactions would be more than sufficient for that purpose. The Indictment alleges that the defendant was part of a conspiracy to operate a money transmitting business, not that he personally administered every last aspect of the business. The relayers were a critical part of the business, and the fees charged by the relayers were a key engine by which the defendant and his co-conspirators expected to profit from the business. As he does throughout his motion, the defendant ignores how the Tornado Cash service actually worked as a whole, and his role therein. The Indictment alleges that the defendant and the Tornado Cash founders intended to operate and in fact operated the Tornado Cash service to generate a profit and, by extension, as a money transmitting business. The defendant's motion to dismiss Count Two on this basis should be denied.

### C.  Count One Sufficiently Alleges a Conspiracy to Commit Money Laundering

The defendant's motion to dismiss Count One of the Indictment, which charges him with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h), should be denied.

### 1.  The Indictment Appropriately Alleges Section 1956's Financial Transaction Requirement Under Both Statutory Definitions of "Financial Transaction"

The defendant's first argument is that Count One of the Indictment should be dismissed for failure to allege a "financial transaction." (Dkt. 37-1 at 25). But, as he acknowledges, that argument is wholly dependent on his argument that the Tornado Cash service is not a money transmitting business. (*See id.*). If the Court rejects the defendant's motion with respect to Count Two, then it must also reject this challenge to Count One, because if the Tornado Cash service was a money transmitting business, then it was necessarily a financial institution, and all the financial transactions at issue involved the use of that financial institution. *See Mazza-Alaluf*, 621 F.3d at 210 (a money transmitting business is a "financial institution" under 31 U.S.C. § 5312(a)(2)(R)).

But even assuming *arguendo* that the Court were to accept the defendant's arguments on Count Two and hold, as a matter of law, that the Tornado Cash service was not a money transmitting business, that would form no basis to dismiss the money laundering count. The statutory definition of "financial transaction" contains two alternative definitions. Section 1956(c)(4) defines a financial transaction as "(A) a transaction which in any way or degree affects interstate or foreign commerce…*or* (B) a transaction involving the use of a financial institution …" (emphasis added). Here, the Indictment simply tracks Section 1956 in the conjuctive, alleging, among other things, that the defendant, "knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity," conspired to "conduct

such a financial transaction, which transaction affected interstate and foreign commerce **and** involved the use of a financial institution … ." (Ind. ¶ 78 (emphasis added)).

The use of the word "and" here does not obligate the Government to prove both aspects of Section 1956's definition of a financial transaction. It is common practice for indictments to track a statute in the conjunctive, and the Second Circuit has repeatedly blessed this practice. *See, e.g.*, *United States v. McDonough*, 56 F.3d 381, 390 (2d Cir. 1995) ("Where there are several ways to violate a criminal statute…federal pleading **requires** that an indictment charge in the conjunctive to inform the accused fully of the charges. A conviction under such an indictment will be sustained if the evidence indicates that the statute was violated in any of the ways charged.") (emphasis added); *see also United States v. Dzionara-Norsen*, No. 21-454, 2024 WL 191803, at *5 (2d Cir. Jan. 18, 2024) (summary order); *United States v. Mejia*, 545 F.3d 179, 207 (2d Cir. 2008); *United States v. Astolas*, 487 F.2d 275, 280 (2d Cir. 1973).

The Indictment puts the defendant on notice of the two different ways in which Section 1956 may be violated through a financial transaction, which is exactly what the Second Circuit requires. *See Dzionara-Norsen*, 2024 WL 191803, at *5; *Mejia*, 545 F.3d at 207; *McDonough*, 56 F.3d at 390; *Astolas*, 487 F.2d at 280. Moreover, the Indictment alleges repeatedly that the Tornado Cash service—and, by extension, the defendant as part of the charged conspiracy—was involved in financial transactions that affected interstate or foreign commerce, consistent with Section 1956(c)(4)(A). Thus, even if the Court were to conclude that the Tornado Cash service was not itself a financial institution, that would only affect the Government's ability to proceed on the Section 1956(c)(4)(B) definition of "financial transaction," and the defendant's motion to dismiss Count One should be denied. *See United States v. Seher*, 562 F.3d 1344, 1363 (11th Cir. 2009) ("The law is well established that where an indictment charges in the conjunctive several means

of violating a statute, a conviction may be obtained on proof of only one of the means, and accordingly the jury instruction may properly be framed in the disjunctive."); *United States v. Garcia-Torres*, 341 F.3d 61, 65-67 (1st Cir. 2003) (same and collecting cases); *United States v. Robbins*, No. 10 Cr. 268, 2015 WL 13864804, at *3 (W.D.N.Y. July 28, 2015) (applying *Mejia*, *McDonough*, and other cases to Section 1956).

> **2. The Indictment Sufficiently Alleges the Defendant's Participation in a Conspiracy to Commit Money Laundering**

> **a. Applicable Law**

Section 1956(h) makes it a crime to "conspire[] to commit ***any offense defined in this section***" (emphasis added). "Conspiring to launder money requires that two or more people agree to violate ***the federal money laundering statute***, and that the defendant knowingly engaged in the conspiracy with the specific intent to commit the offenses that are the objects of the conspiracy." *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009) (emphasis added). As the Second Circuit explained over 30 years ago:

> Section 1956 creates the crime of money laundering, and it takes dead aim at the attempt to launder dirty money. Why and how that money got dirty is defined in other statutes. Section 1956 does not penalize the underlying unlawful activity from which the tainted money is derived….[T]he particular underlying activity specified by Congress is a necessary, but ancillary, concern….[T]he focal point of the statute is the laundering process, not the underlying unlawful conduct that soiled the money.

*United States v. Stavroulakis*, 952 F.2d 686, 691 (2d Cir. 1992) (emphasis omitted). "Significantly, an individual need not have been convicted of the underlying criminal offense in order to be convicted of laundering the proceeds thereof." *United States v. Silver*, 948 F.3d 538, 576 (2d Cir. 2020); *see also United States v. Neuman*, 621 F. App'x 363, 365-66 (9th Cir. 2015) ("[A] defendant does not have to commit or be convicted of the underlying substantive specified unlawful activity that generated the illegal proceeds to be guilty of a conspiracy to commit money laundering.").

**b.   The Indictment Adequately Alleges that the Defendant Conspired with Semenov, CC-1, and Others to Violate Section 1956.**

The defendant argues that Count One must be dismissed because the Indictment fails to allege that he conspired with the hackers that laundered the proceeds of their crimes through the Tornado Cash service. (Dkt. 37-1 at 27). But the defendant's contention that the Government must show that he conspired with the criminal hackers to establish a money laundering conspiracy is unsupported by the plain text of the statute, Congress's intent in passing Section 1956, and decades of case law interpreting Section 1956. To violate Section 1956, a person need only conspire with another person to launder funds derived from specified unlawful activity. *See* 18 U.S.C. § 1956(h). The statute does not require that the defendant perpetrated the specified unlawful activity underlying the money laundering. *See id.* Nor does the statute impose any requirement that the defendant conspire with an individual engaged in the commission of the specified unlawful activity. Here, the Indictment alleges that the defendant conspired with at least Semenov and CC-1 to violate Section 1956(a)(1)(B)(i) and alleges that the conspiracy involved the proceeds of specified unlawful activity. (Ind. ¶¶ 77-78). That ends the inquiry. The cases the defendant cites are not to the contrary. Indeed, the defendant does not cite a single case that has held that to be guilty of money laundering conspiracy under Section 1956(h), the defendant must have reached a criminal agreement with those engaged in the underlying specified unlawful activity.

The defendant's proposed interpretation would run counter to the obvious intent and the plain text of the statute. If Congress had intended to limit Section 1956(h) solely to instances in which a defendant conspired with the perpetrators of the specified unlawful activity that generated the illicit funds that were subsequently laundered, it could have drafted Section 1956(h) to say as much. But the statute says no such thing. Instead, the statute criminalizes conspiring to violate "any offense defined in this section"—i.e., Section 1956 (and Section 1957), not Title 18 writ

large. 18 U.S.C. § 1956(h).

It would be bizarre indeed if Section 1956(h) only applied, as the defendant would have it, when the money launderer conspired with the perpetrators of the underlying specified unlawful activity, when Section 1956 "does not penalize the underlying unlawful activity from which the tainted money is derived." *Stavroulakis*, 952 F.2d at 691. Indeed, under the defendant's proffered interpretation, there would be a substantial and inexplicable disconnect between the knowledge requirement to be guilty of a substantive violation of Section 1956(a)(1)(B)(i) and conspiring to commit said offense. The statute does not require the Government to prove that a defendant knew that criminal proceeds were derived from any specific federal offense; rather they must simply know that the money "represents the proceeds of **some form** of unlawful activity." *United States v. Maher*, 108 F.3d 1513, 1527-28 (2d Cir. 1997) (emphasis added). But, according to the defendant, to be guilty of **conspiring** to commit a violation of Section 1956(a)(1)(B)(i), the defendant would have to be in a conspiracy with the person who committed that underlying crime. (*See* Dkt. 37-1 at 27). Merely showing that the defendant conspired with another money launderer to violate Section 1956 would not be enough. (*See id.*). Such an interpretation would effectively make proving a money laundering conspiracy substantially more difficult than proving substantive money laundering for no apparent reason. And it is telling that the defendant does not cite any authority that has adopted his proposed holding.

The defendant's interpretation is also contrary to the intent of Section 1956 and would dramatically defang the statute, which "takes dead aim at the attempt to launder dirty money." *Maher*, 108 F.3d 1513, 1527. In effect, the defendant is asking this Court to decriminalize money laundering where the launderer is not a participant in the underlying crime. Professional money launderers—who are frequently prosecuted under Section 1956(h) for offering a standalone

laundering service for other criminals and do not come near the underlying criminal activity itself—would no doubt rejoice at such a ruling. *See United States v. Gamez*, 1 F. Supp. 2d 176, 181 (E.D.N.Y. 1998) ("Those 'washing' money frequently have not engaged directly in the criminal action that dirtied the cash."). Indeed, courts have recognized that the act of marketing a laundering service to criminal actors, as the defendant allegedly did here, can be evidence of a defendant's intent to engage in money laundering. *See Sterlingov*, 573 F. Supp. 3d at 36 (evidence that cryptocurrency mixer was knowingly engaged in money laundering included that it advertised that its service "can eliminate any chance of finding your payments[,] ... making it impossible to prove any connection between a deposit and a withdraw[al] inside our service").

The defendant's argument is also in tension with the Second Circuit's reasoning in *Stavroulakis*, which held that a defendant could be convicted of a conspiracy to engage in money laundering in violation of 18 U.S.C. § 1956(a)(3) when both he and his coconspirator believed the money at issue represented the proceeds of some form of unlawful activity, but one believed the unlawful activity was narcotics trafficking and the other believed it was gambling. *Stavroulakis*, 952 F.2d at 690. The Second Circuit held that a defendant need not know precisely what specified unlawful activity produced the money, so long as he believed that the money was from a specified unlawful activity under Section 1956. *See id.* at 690-92 ("We hold that the evidence established that defendant and his co-conspirator agreed on the essential nature of a scheme to launder money, and the conviction, therefore, is affirmed."). But according to the defendant, he would have had to conspire directly with the computer hackers to be guilty of conspiring to commit money laundering. That proposition cannot be squared with the statute or the case law interpreting it.

In addition to being contrary to the text of the statute, the intent of the statute, and the case law, the defendant's motion is premised on an incorrect description of the Government's theory of

42

the alleged money laundering conspiracy. The Indictment does not allege merely that the defendant, Semenov, and CC-1 violated Section 1956(h) by developing the Tornado Cash service. To be sure, their creation of the Tornado Cash service is evidence of the money laundering conspiracy, but the Indictment does not allege that this conduct constitutes a money laundering conspiracy by itself. Indeed, the alleged money laundering conspiracy begins in September 2020, after they had developed and launched the Tornado Cash service. (Ind. ¶ 77). The heart of the conspiracy, as the Indictment alleges, was the defendant, Semenov, and CC-1's ongoing agreement to facilitate financial transactions in criminal proceeds with the Tornado Cash service, through such acts as (i) their ongoing payments to host the website after becoming aware that it was being used to launder criminal proceeds (Ind. ¶ 14), (ii) their payment for traffic between the UI and the blockchain to process transactions that they knew involved criminal proceeds (Ind. ¶ 23), (iii) their maintenance of the relayer network to execute and profit from withdrawals of funds that they knew included criminal proceeds (Ind. ¶¶ 24-25, 46-50), (iv) their refusal to implement AML programs on the Tornado Cash service despite being able to do so (Ind. ¶¶ 34, 37-38, 40, 50), and (v) their development and deployment of new features such as the relayer algorithm to further increase the anonymity of the Tornado Cash service (Ind. ¶ 50)—all of which they did after they became aware that the Tornado Cash service was being used by hackers and other criminals to launder hundreds of millions of dollars in cryptocurrency. In other words, the allegations in the Indictment defeat the motion to dismiss, which is not a vehicle to litigate factual disputes prior to trial. The Indictment alleges more than enough to allege a money laundering conspiracy.

The defendant's motion also misstates the Government's theory of his criminal intent under Section 1956. Under the object of the conspiracy charged in Count One, Section 1956(a)(1)(B)(i), the Government must allege, among other things, as the Indictment does, that the defendant

"[knew] that…property involved in a financial transaction represent[ed] the proceeds of some form

of unlawful activity" and "that the transaction [was] designed in whole or in part…to conceal or

disguise the nature, the location, the source, the ownership, or the control of the proceeds of

specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). The defendant is correct that mere

negligence would not amount to a Section 1956 violation, but the Indictment alleges far more than

that. If the defendant seeks to argue that he was merely negligent and thus cannot be held criminally

liable because he lacked the requisite criminal intent, this is, once again, an argument for the jury,

not this Court on a motion to dismiss.

Likewise, the defendant's argument that the Indictment "fails to allege that Mr. Storm had

a criminal *mens rea*" ignores the Indictment's allegations. (Dkt. 37-1 at 33). Indeed, in the statutory

allegations themselves, the Indictment alleges that the defendant "willfully and knowingly"

entered the conspiracy. (Ind. ¶ 77). That alone is more than sufficient. The Indictment is replete

with various other details evidencing the defendant's intent. But, at bottom, deciding whether the

defendant acted with the requisite criminal intent is an entirely premature question. It is well-

settled law that whether a defendant acted with the requisite *mens rea* is a jury question that cannot

and should not be resolved at the motion to dismiss stage. *See, e.g.*, *United States v. Percoco*, No.

16 Cr. 776 (VEC), 2017 WL 6314146 at *7 (S.D.N.Y. Dec. 11, 2017)  ("[T]he sufficiency of the

Government's evidence of intent cannot be considered on a motion to dismiss the indictment, and

the indictment need only track the language of the statute.") (citing *United States v. Martin*, 411

F. Supp. 2d 370, 373 (S.D.N.Y. 2006)); *United States v. Light*, No. 00 Cr. 417, 2000 WL 875846,

at *2 (N.D. Ill. June 29, 2000) ("The issue of [the defendant's] intent involves evidentiary issues

that will be addressed at trial. Thus, this argument is not properly made on a motion to dismiss.").

What the defendant's motion is really trying to accomplish, in the end, is to take away from the

jury the question of whether the Government can meet its burden to prove the defendant's knowledge at trial. The Court should not permit him to do so.

In support of his argument that the Government must show that the defendant conspired with "the alleged third-party bad actors" in order to establish a conspiracy under Section 1956(h) (Dkt. 37-1 at 28), the defendant cites to two inapposite cases that interpreted different statutes (*see id.* at 35-36). First, the defendant cites *Twitter, Inc. v. Taamneh*, which addressed whether certain social media platforms bore civil liability for aiding and abetting ISIS, under the Justice Against Sponsors of Terrorism Act. 598 U.S. 471 (2023) (analyzing 18 U.S.C. § 2333(d)(2)). The Supreme Court rejected aiding and abetting liability in those circumstances, while distinguishing it from conspiracy liability: "[C]onspiracy liability…typically holds co-conspirators liable for all reasonably foreseeable acts taken to further the conspiracy. [By contrast], aiding and abetting lacks the **requisite agreement** that justifies such extensive conspiracy liability." *Id.* at 496 (emphasis added). Here, the defendant is charged not with aiding and abetting the underlying crimes, but with conspiracy to commit money laundering—that is, his agreement with Semenov, CC-1, and others to violate Section 1956, which is adequately alleged in the Indictment for all of the reasons already articulated. He is not charged with an aiding and abetting theory. *Taamneh* is thus inapposite.

The defendant also cites this Court's decision in *Risley v. Universal Navigation Inc.*, which held that the developers of the Uniswap Protocol were not liable under the Exchange Act to plaintiffs who were defrauded via the Uniswap platform. No. 22 Civ. 2780 (KPF), 2023 WL 5609200, at *14 (S.D.N.Y. Aug. 29, 2023). But the question of the scope of civil liability under the securities laws is an entirely different question than whether the Indictment in this case alleges an agreement to conduct financial transactions in criminal proceeds under the money laundering statute. And even aside from the entirely different legal question addressed in *Risley*, the

45

Government's theory of the money laundering conspiracy in this case is consistent with the Court's reasoning in *Risley*. The defendant is not charged with liability for the underlying hacks that generated the criminal proceeds, which might be analogous to Uniswap being liable for the securities frauds alleged in *Risley*. Instead, he is charged for his role in financial transactions to conceal the proceeds of those crimes, a heartland application of the money laundering statute.

This case is more analogous the Silk Road prosecution, where the court approved a charge for conspiracy to commit money laundering based on the allegations that the defendant "purposefully and intentionally designed, created, and operated Silk Road to facilitate unlawful transactions," that such unlawful transactions in fact took place on Silk Road, and that the defendant "obtained significant monetary benefit in the form of commissions in exchange for the services he provided via Silk Road." *United States v. Ulbricht*, 31 F. Supp. 3d 540, 556 (S.D.N.Y. 2014); *see also id.* at 558 ("It is as though the defendant allegedly posted a sign on a (worldwide) bulletin board that said: 'I have created an anonymous, untraceable way to traffic narcotics, unlawfully access computers, and launder money. You can use the platform as much as you would like, provided you pay me a percentage of your profits and adhere to my other terms of service.'"). It is also analogous to the recent prosecution of Roman Sterlingov, who created a similar cryptocurrency mixer called Bitcoin Fog and was recently convicted of money laundering conspiracy. *See United States v. Sterlingov*, No. 21 Cr. 399 (RDM) (D.D.C.);[12] *see also United States v. Harmon*, No. 19 Cr. 395 (BAH) (D.D.C.), Dkt. 123 (cryptocurrency mixer operator entering statement of offense in connection with guilty plea to money laundering conspiracy).

---

[12] In both *Ulbricht* and *Sterlingov*, the jury instructions did not in any way suggest that the defendant must have conspired with the persons committing the underlying crimes. *Ulbricht,* No. 14 Cr. 68 (KBF), Dkt. 220 at 2308-14 (S.D.N.Y. Feb. 25, 2015); *Sterlingov*, No. 21 Cr. 399 (RDM), Dkt. 268 at 38-47 (D.D.C. Mar. 13, 2024).

**D. Count Three Sufficiently Alleges that the Defendant Conspired to Violate the International Emergency Economic Powers Act**

Count Three of the Indictment alleges that the defendant conspired to violate sanctions by knowingly and actively causing the Tornado Cash service to conduct transfers, payments, withdrawals, deposits, fee collection, money transmitting services, money laundering, and other financial transactions in violation of the United States sanctions relating to North Korea. In particular, Count Three alleges that the defendant conspired with others to knowingly, actively, and profitably cause the Tornado Cash service—the UI, relayer network, smart contracts, and other components of the service—to launder funds for the OFAC-designated North Korean Lazarus Group, accept deposits from that group's OFAC-sanctioned cryptocurrency wallet, and process withdrawals of those funds.

The defendant moves to dismiss Count Three on two grounds. *First*, he argues that Count Three impermissibly charges him with exporting Tornado Cash software. That argument fails because Count Three does not charge the defendant with exporting Tornado Cash software—and, even if it did, such a charge would be valid under the relevant law and regulations. *Second*, the defendant argues that Count Three insufficiently alleges willfulness. That argument fails because the defendant's state of mind is ultimately a jury question, and in any event the Indictment not only tracks the statute but also alleges multiple acts that would establish willfulness. For these reasons, set forth in detail below, the Court should deny the defendant's motion to dismiss Count Three of the Indictment.

### 1. <u>Applicable Law and Regulations</u>

#### a. <u>The International Emergency Economic Powers Act</u>

The International Emergency Economic Powers Act ("IEEPA") authorizes the President, after declaring a national emergency, to

regulate, … prevent or prohibit, any … use, transfer … of, or dealing in, … or transactions involving, any property in which any foreign country or a national thereof has any interest[,] by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. §1702(a)(1)(B).

### b.  <u>Executive Orders Regarding Cyber Threats and North Korea</u>

On June 26, 2008, pursuant to IEEPA, the President issued Executive Order 13466, finding that the "existence and risk of the proliferation of weapons-usable fissile material on the Korean Peninsula constitute an unusual and extraordinary threat to the national security and foreign policy of the United States" and declaring a national emergency to deal with that threat. On March 15, 2016, in recognition of the "the Government of North Korea's continuing pursuit of its nuclear and missile programs" the President issued Executive Order 13722. That order blocked all property and interests in property that were then or thereafter came within the United States or the possession or control of any United States person, of the Democratic People's Republic of Korea ("DPRK" or "North Korea"), and any individual or entity determined by the Secretary of the Treasury, in consultation with the Secretary of State, to meet one or more enumerated criteria.

Executive Order 13722 prohibits, among other things, (i) the transfer, payment, exportation, withdrawal, or dealing in any property or interests in property in the United States or in the possession or control of any United States person of any person whose property and interests in property are blocked pursuant to the order; (ii) "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any [such] person"; (iii) "the receipt of any contribution or provision of funds, goods, or services from any such person; (iv) "[a]ny transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order"; and (v) "[a]ny conspiracy formed to violate any of the prohibitions set forth in this order."

48

To implement Executive Order 13772, OFAC amended the North Korea Sanctions Regulations, 31 C.F.R. Part 510, on March 5, 2018. These regulations incorporate by reference the prohibited transactions set forth in Executive Order 13722. *See* 31 C.F.R § 510.201. The regulations also provide that the names of persons designated pursuant to Executive Order 13722, whose property and interests are therefore blocked, are published in the Federal Register and incorporated into the Specially Designated Nationals and Blocked Persons ("SDN") List, which is published on OFAC's website. *Id.* Note 1.

### c.  OFAC's Designations of the Lazarus Group and its Cryptocurrency Wallet

On September 13, 2019, pursuant to Executive Order 13722, OFAC designated a hacking group, commonly known within the global cyber security industry as the "Lazarus Group," as an SDN based on its perpetration of cybercrime to generate revenue for North Korea's nuclear weapons and ballistic missile programs. *See* U.S. Dep't of the Treasury, Treasury Sanctions North Korean State-Sponsored Malicious Cyber Groups, https://home.treasury.gov/news/press-releases/sm774 (last visited April 26, 2024). On April 14, 2022, OFAC identified as blocked property an ETH wallet address beginning with the characters 0x098B716 (the "Lazarus Wallet") used by the Lazarus Group to store stolen proceeds from a March 2022 hacking incident involving the Ronin Network (the "Ronin Hack"). *See* U.S. Dep't of the Treasury, North Korea Designation Update, https://ofac.treasury.gov/recent-actions/20220414 (last visited April 26, 2024).

### d.  The Informational Materials Exemption to IEEPA

Congress included in IEEPA the following exception to the President's authority, commonly called the "Informational Materials Exemption":

> The authority granted to the President by this section does not include the authority
> to regulate or prohibit, directly or indirectly—

. . .

> the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds.

50 U.S.C. § 1702(b)(3).

### e. OFAC's Software and Technology Regulation Interpreting the Informational Materials Exemption

OFAC has issued multiple regulations interpreting and implementing the Informational Materials Exemption, including the following section of the applicably North Korea Sanctions Regulations, implementing Executive Order 13772, regarding software and technology:

> [The Informational Materials Exemption] does not exempt transactions incident to … the exportation of goods *(including software) or technology* for use in the transmission of any data . . . . The exportation of such items or services . . . to a person whose property and interests in property are blocked pursuant to § 510.201(a) [is] prohibited.

31 C.F.R. § 510.213(c)(3) (the "Software and Technology Regulation") (emphasis added).

### 2. The Informational Materials Exemption Does Not Extend to the Conduct Alleged in the Indictment

The defendant argues that the sanctions underlying Count Three of the Indictment "directly or indirectly" and impermissibly regulate the exportation of Tornado Cash software, which he contends is "informational material" exempt from export regulation under the Informational Materials Exemption. (Dkt. 37-1 at 36-40). This argument fails for two reasons. *First*, Count Three alleges that the defendant conspired to facilitate and profit from the Tornado Cash service's provision of money laundering services to the Lazarus Group and transactions in funds that originated in the Lazarus Wallet; Count Three does *not* allege, as the defendant claims, that the defendant violated sanctions by exporting Tornado Cash software. *Second*, to the extent that the

allegations in Count Three could be said to include the exportation of Tornado Cash software, the

relevant case law, regulations, legislative history, and statutory context make clear that Tornado

Cash software is not informational material.

### a.   Count Three Does Not Allege that the Defendant Violated Sanctions by Exporting Tornado Cash Software

As set forth above, Count Three alleges that the defendant conspired to cause the Tornado

Cash service as a whole—the UI, relayer network, smart contracts, and other components—to

launder funds for the Lazarus Group, accept deposits from the Lazarus Wallet, and transmit

withdrawals of those funds for a profit. Specifically, Count Three alleges, among other things, that

> Throughout [the] time period [underlying Count Three], the Tornado Cash founders
> continued to operate the Tornado Cash service and facilitate the Lazarus Group's
> money laundering and sanctions evasion, including by paying the U.S.-based web
> hosting service to continue to host the Tornado Cash website, continuing to
> maintain and keep the UI accessible to customers, and promoting the Tornado Cash
> service in public statements. Moreover, [the defendant and his co-conspirators]
> maintained the relayer algorithm and the Relayer Registry, which allowed them to
> profit financially from the continued use of the Tornado Cash service by the
> Lazarus Group (and other hackers, money launderers, and sanctioned entities).

(Ind. ¶¶ 68, 83). The defendant's invocation of the Informational Materials Exemption to fight

those allegations misses the mark.

The Informational Materials Exemption prohibits regulating "the exportation to any

country . . . of . . . informational materials." 50 U.S.C. § 1702(b)(3). The defendant attempts to

jam Count Three into the scope of that exemption by misstating the relevant allegations as charging

the defendant with exporting Tornado Cash software—or, as he puts it, "making . . . Tornado Cash

software[] available on the Internet," or "publishing one piece of software." (Dkt. 37-1 at 38.).

That is not accurate. Like Counts One and Two, Count Three charges the defendant with operating

a business, which the defendant and his co-conspirators employed in order to profit handsomely

by, among other things, knowingly accepting deposits from the Lazarus Wallet and transmitting

and laundering funds for the Lazarus Group. As the Indictment alleges, the defendant knew full well that his business was accepting deposits of funds that originated in the sanctioned Lazarus Wallet, and then transmitting those funds for a profit, and did nothing about it except implement a pretextual compliance tool so that he and his co-conspirators could save face by issuing a public statement that they were complying with sanctions. (Ind. ¶¶ 59-68).[13]  Those allegations are about the defendant's conspiracy to engage in sanctions-violative financial transactions, not the exportation of software, and the Court should reject the defendant's reliance on the Informational Materials Exemption on that ground alone.

### b.  Tornado Cash Software Does Not Constitute Informational Material

Even if Count Three of the Indictment could be interpreted to allege that the defendant conspired to violate sanctions by exporting Tornado Cash software—which it cannot—that software does not constitute informational material. This is the only conclusion to draw from the relevant case law, OFAC regulations, legislative history, and statutory context. Defendant's arguments to the contrary are without merit.

#### i.  *Tornado Cash Software Is Not Informational Material Under the Relevant Caselaw and OFAC Regulation*

The Informational Materials Exemption "has not been construed by the Second Circuit." *United States v. Griffith*, 515 F. Supp. 3d 106, 116-17 (S.D.N.Y. 2021) (deferring to OFAC's

---

[13] Defendant's *amici* join him in vastly understating the charged conduct in Count Three. (*See* Brief of *Amicus Curiae* Coin Center, Dkt. 43 at 13 ("The factual allegations against the Defendants are limited to publishing open-source software and paying for web servers that communicate information related to that open-source software."); Brief of *Amicus Curiae* Defi Education Fund, Dkt. 39 at 8 (implying that Count Three charges the defendant with "violating IEEPA or conspiring to do so *without* an allegation that the defendant knew their counterparty or knew that the counterparty was several degrees away from an SDN" (emphasis in original))). The Court should not credit these obvious minimizations.

interpretation of the Informational Materials Exemption). The Government is not aware of any court—and the defendant cites none—that has held that software constitutes informational material. To the contrary, one court observed in *dictum* that "there is no support for the contention that software generally would fall within the [informational materials] exemption." *Bernstein v. U.S. Dep't of State*, 974 F. Supp. 1288, 1303 n.17 (N.D. Cal. 1997).[14]   The text of the Informational Materials Exemption contains a long list of examples that conspicuously omits software—even after Congress amended the exemption in 1994 in order to prevent, as the legislative history explains, "narrow[] and restrictive[] interpret[ations] [of] the language in ways not originally intended." H.R. Conf. Rep. No. 103-482, at 239 (1994); *see also* 50 U.S.C. § 1702(b)(3) (listing "publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds" but not software). At most, "technology and software ***are capable*** of qualifying as 'informational materials'"—but they are not necessarily informational materials in every case. *United States v. Amirnazmi*, 645 F.3d 564, 582, 588 (3d Cir. 2011) (emphasis added) (upholding the jury's determination that the software at issue did not constitute informational material). In the absence of a clear answer to whether a particular item constitutes informational material, courts routinely look to relevant interpretive regulations issued by OFAC. *See, e.g.*, *id.* at 586-87 (deferring to an OFAC interpretive regulation, not applicable here, that the agency can regulate the exportation of "informational materials not fully created and in existence at the date of the transaction"); *Griffith*, 515 F. Supp. 3d 106, 116-17 (same).

Through the Software and Technology Regulation, OFAC expressly interpreted the

---

[14]  This decision "was appealed and initially affirmed by a three-judge panel; the which affirmance was then withdrawn by the Ninth Circuit for a rehearing en banc that ultimately did not happen." *Stagg P.C. v. U.S. Dep't of State*, No. 15 CIV. 8468 (KPF), 2019 WL 1863418, at *10 (S.D.N.Y. Apr. 25, 2019).

Informational Materials Exemption to not apply to transactions incident to the exportation of software or the exportation of software to an SDN. *See* 31 C.F.R. § 510.213(c)(3). Specifically, the Software and Technology Regulation states that the Informational Materials Exemption "does not exempt transactions incident to … the exportation of goods (including software) or technology for use in the transmission of any data." *Id.* The provision further states that "[t]he exportation of such items or services . . . to a person whose property and interests in property are blocked pursuant to § 510.201(a) are prohibited" *Id.* In other words, such transactions are prohibited under Executive Order 13772 and the North Korean Sanctions Regulations, particularly when they are provided for the benefit of an entity sanctioned under those authorities, such as the Lazarus Group.

Thus, even if there were any ambiguity as to whether the defendant's conduct fell within the Informational Materials Exemption, the Software and Technology Regulation makes clear that the exemption does not apply. As explained above, Count Three does not charge the defendant with creating or exporting the Tornado Cash software. Instead, it charges the defendant with conspiring to engage in transactions with the Lazarus Wallet, in order to provide money laundering services to the Lazarus Group, which are at most transactions "incident to" any supposed "exportation" of the software underlying the Tornado Cash service to an entity whose property and interests in property are blocked. The Software and Technology Regulation thus confirms that the charges underlying Count Three are outside the scope of the Informational Materials Exemption.[15]

---

[15] Congress has tacitly blessed the Software and Technology Regulation as comporting with the purposes of the Informational Materials Exemption by leaving it intact even after having amended IEEPA to invalidate a different interpretive regulation. *See Amirnazmi*, 645 F.3d at 586.

       ii.    *The Informational Materials Exemption Does Not Reach Tornado Cash Software Based on its Legislative History and Statutory Context*

The legislative history and statutory context of the Informational Materials Exemption yield the same conclusion. The relevant legislative history states that Congress passed the Informational Materials Exemption to "establish[] that no embargo may prohibit or restrict directly or indirectly the import or export of information that is protected under the First Amendment." H.R. Conf. Rep. No. 103-482, at 239. Nevertheless, courts have decided whether the Informational Materials Exemption applies without holding that it prohibits regulation of all materials protected under the First Amendment. *See, e.g.*, *Griffith*, 515 F. Supp. 3d at 116-17 (making no mention of the First Amendment in analyzing the Informational Materials Exemption).

In this case, even if the Informational Materials Exemption could be understood to prohibit the export regulation of all items protected by the First Amendment, Tornado Cash software is not such an item. As explained in detail below, *infra* Section II. B., the Indictment alleges criminal conduct that is not protected by the First Amendment. Specifically, Count Three alleges, among other things, that the defendant conspired to use Tornado Cash software in order to accept deposits from the Lazarus Wallet and provide money laundering services to the Lazarus Group. That conduct is similar to the use of software by traditional financial institutions to process transactions and provide financial services. As discussed below, the use of software for this purpose does not even implicate the First Amendment and, even if it did, this prosecution would easily pass muster under the First Amendment.[16] Accordingly, Tornado Cash software would not qualify for the

---

[16] *Amicus curiae* Coin Center's comparison between the Tornado Cash service and the Society for

Informational Materials Exemption even if that provision could be understood to include everything that is protected by the First Amendment.

The statutory context of the Informational Materials Exemption also prohibits the conclusion that Tornado Cash software constitutes informational material. As one court has observed, the Informational Materials Exemption does not stand on its own. *See Amirnazmi*, 645 F.3d at 573. Rather, the exemption is one component in a collection of limitations on the President's IEEPA power, as follows: "regulations promulgated under IEEPA may not impinge upon transactions incident to travel or curtail the free exchange of personal communications, humanitarian aid, or information or informational materials." *Id.* at 573. Those limitations exclude from the President's regulatory purview certain specified categories relating to travel, personal communications, humanitarian aid, and information. The software underlying the Tornado Cash service—with which the defendant and his co-conspirators conspired to launder over $1 billion in illicit funds—does not fall into any of these categories. For that and the other reasons set forth above, Tornado Cash software is not informational material.

---

Worldwide Interbank Financial Telecommunications ("SWIFT") is inapt because, contrary to Coin Center's representations, SWIFT must and does comply with sanctions laws—and, in any event, SWIFT is not a money laundering, money transmitting business like the Tornado Cash service. (*See* Dkt. 43 at 16). Coin Center claims that SWIFT "is at pains to stress that it is *not* an obligated entity under sanctions laws." (*Id.* (emphasis in original)). Coin Center supports this claim by selectively quoting language from an online statement by SWIFT and leaving out the following portion of that statement: "Does SWIFT comply with all sanctions laws? Yes. Swift complies fully with all applicable sanctions laws." *Compliance: Swift and Sanctions*, Swift, https://perma.cc/6TM2-MZDX. Indeed, as Coin Center concedes, "Swift is ***only a messaging service provider***." (Dkt. 43 at 20 (emphasis in original)). But as alleged in the Indictment, the Tornado Cash service was an integrated service for transmitting and laundering funds, which the defendant used to conspire to violate sanctions—not a mere "messaging service provider." Here, as in defendant's and *amici*'s arguments, the Court should reject this reductive comparison.

iii.     *The Defendant's Arguments Concerning the Informational Materials Exemption Are Meritless*

The defendant's arguments fail even if Tornado Cash software could be understood to comprise informational material—which, as explained above, it cannot. The defendant argues that the sanctions underlying Count Three "indirectly" regulate the exportation of Tornado Cash software. (*See* Dkt. 37-1 at 39). But he does not explain how. (*See generally, id.* at 36-40). Presumably, he means that the Lazarus Sanctions indirectly regulate the exportation of Tornado Cash software insofar as they prohibit the provision of services involving that software to the Lazarus Group or transactions involving that software with the Lazarus Wallet. This interpretation of indirect regulation under the Informational Materials Exemption would have breathtakingly broad implications, immunizing the provision of services to a sanctioned group or transactions with blocked property whenever such conduct involves software that has been exported from the United States. For example, under this interpretation, the President could not prohibit foreign branches of American banks from providing financial services to a sanctioned group if that provision of services involves American software. Nor could the President prohibit individuals or entities outside the United States from using American software like Venmo or PayPal to send funds to a sanctioned group. In the modern era, when American software touches nearly everything, constraining the White House in these ways would create a gaping loophole in the President's ability to deal with the national security threats that IEEPA requires the President to address. The Court should not countenance that outcome.

The defendant's reliance on two cases concerning the social media platform TikTok, Inc. ("TikTok") (*see* Dkt. 37-1 at 39) is off base. The courts there found on summary judgment that the

sanctions at issue prohibited the exact conduct that the Informational Materials Exemption protects because, unlike the Tornado Cash service—which is a tool for hiding money on the Internet—the "TikTok app is a platform for creating and exchanging informational materials." *Marland v. Trump*, 498 F. Supp. 3d 624, 636-37 (E.D. Pa. 2020); *see also TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 81 (D.D.C. 2020) ("TikTok . . . is primarily a conduit of 'informational materials.'"). As a result of the sanctions against TikTok, users of the application would "no longer be able to export their comedy, music, and fashion videos, [or] to view videos from TikTok's substantial global user base which … consists of at least 600 million users." *Marland*, 498 F. Supp. 3d at 637. The sanctions underlying Count Three of the Indictment simply do not prohibit that kind of expressive conduct by users of the Tornado Cash service, which merely permitted its users to deposit and withdraw funds anonymously, with no further exchange of information. The TikTok cases the defendant cites are thus inapposite.

The defendant also relies on two cases in which civil plaintiffs sued the Department of the Treasury (the "Treasury Department") to invalidate OFAC's designation of the Tornado Cash service. (*See* Dkt. 37-1 at 39-40 (citing *Van Loon v. Dep't of Treasury*, No. 23 Civ. 312 (RP), 2023 WL 5313091 (W.D. Tex. Aug. 17, 2023); *Coin Ctr. v. Yellen*, No. 22 Civ. 20375 (TKW), 2023 WL 7121095 (N.D. Fla. Oct. 30, 2023)). But the subject of those cases was OFAC's designation of the Tornado Cash service (which does not underlie Count Three), not OFAC's designations of the Lazarus Wallet and the Lazarus Group (which do). Accordingly, those cases are irrelevant here. Moreover, the plaintiffs in those cases did not raise the Informational Materials Exemption. *See generally Van Loon*, 2023 WL 5313091; *Coin Ctr.*, 2023 WL 7121095. The fact that the plaintiffs suing about sanctions that directly regulate the Tornado Cash service did not raise the Informational Materials Exemption speaks volumes of that exemption's inapplicability to Count

Three, which alleges a violation of the sanctions on North Korea—not the sanctions that target the Tornado Cash service. In any event, those plaintiffs lost, and their appeals remain undecided. *See Van Loon*, 2023 WL 5313091 at *13 (upholding, on summary judgment, OFAC's designation of the Tornado Cash service); *Coin Ctr.*, 2023 WL 7121095 at *9 (same).

In sum, the Court should not dismiss Count Three of the Indictment based on the Informational Materials Exemption because the creation and exportation of Tornado Cash software is not the unlawful conduct charged in Count Three. Even if it were, the relevant case law, OFAC regulation, legislative history, and statutory context require the Court to hold that Tornado Cash Software is not informational material within the exemption.[17]

### 3.  The Indictment Alleges the Defendant's Participation in a Conspiracy to Willfully Violate IEEPA

The Indictment properly alleges that the defendant conspired to "willfully" violate IEEPA. (Ind. ¶¶ 84-87). In support of these allegations, the Indictment alleges that the defendant and his co-conspirators acted with knowledge their conduct was unlawful. Indeed, the Indictment includes direct evidence that the defendant was aware of the specific sanctions he was violating. On April 14, 2022, the day the Indictment alleges that the conspiracy to violate IEEPA began, the defendant sent the other Tornado Cash founders a link to a news article about the FBI's attribution of the Ronin Hack to the Lazarus Group. In the message, which the defendant sent while fully aware that the Tornado Cash service was laundering proceeds of the Ronin hack, the defendant wrote: "guys we are fucked." (Ind. ¶ 61). The messages among the Tornado Cash founders also show that they were specifically aware that OFAC had designated the 0x098B716 Address as blocked property

---

[17]  If the Court does not so hold, then it should, at most, put this issue to the jury. *See, e.g.*, *Griffith*, 515 F. Supp. 3d at 116 ("The government may prove ***at trial*** that the services fall outside the informational exception." (emphasis added) (original capitalizations and punctuation omitted)).

of the Lazarus Group. (*Id.*). And their response was just window dressing.

As alleged in the Indictment, the defendant and the other Tornado Cash founders discussed and implemented a change to the UI they knew would be ineffective at blocking deposits from OFAC-designated addresses in order to mislead the public into believing the Tornado Cash Service complied with the law while continuing to profit from transactions in funds originating in the 0x098B716 Address. (Ind. ¶¶ 62-64). Even though they knew the UI change would be ineffective, they made public statements suggesting they were in compliance with the law. (Ind. ¶ 64). Then, despite obtaining confirmation that the UI change was ineffective, the defendant and the Tornado Cash founders took no further action to prevent the Lazarus Group's continued use of the Tornado Cash Service to launder funds and evade sanctions, which they knew was ongoing. (Ind. ¶¶ 65-68). Instead, they continued to operate the Tornado Cash service and assist the Lazarus Group's money laundering and sanctions evasion by continuing to pay for the hosting of the Tornado Cash website and the service the founders used to facilitate the traffic between the UI and the Ethereum blockchain. The defendant and the other Tornado Cash founders also continued to maintain the UI, the relayer algorithm and the Relayer Registry, all of which they controlled and all of which allowed them to profit each and every time the Lazarus Group and others withdrew funds from the pools containing blocked property. (Ind. ¶ 68). Thus, the Indictment alleges that the defendant and the other Tornado Cash founders knew a sanctioned group was using the service they controlled to deal in and launder property subject to sanctions, they knew such activity was unlawful, and they could have done something about it, but they chose not to; instead, they deliberately chose an ineffective remedy to allow them to mislead the public about what they were doing, all the while choosing to continue to profit from knowingly participating in transactions that violated IEEPA.

In his motion, the defendant raises certain factual issues, questioning whether further

changes to the UI would have been effective in countering the Lazarus Group's use of the Tornado Cash service and arguing that the Lazarus Group could have accessed the smart contracts directly even if the defendant had effectively blocked it from using the UI. (Dkt. 37-1 at 42-43). Those arguments are largely irrelevant to the alleged crime. It is true in any sanctions case that the sanctioned entity could hypothetically have used another means of transacting in its blocked property, but that does not shield a defendant from liability for knowingly participating in such transactions.

The defendant asserts that he acted with "lack of willfullnes." (Dkt. 37-1 at 44) and makes specific factual assertions about his conduct, including that he "did not express a desire to help Lazarus Group," that he "did not attempt to deceive the government," and that he "tried to block the sanctioned Lazarus Group wallet." (Dkt. 37-1 at 44-45). But even if these factual arguments were relevant to whether the Government can prove the elements of the crime, they are not properly raised in a motion to dismiss the Indictment. By raising these factual issues, the defendant is not really questioning whether the Indictment properly alleges an element of the crime, he is questioning whether the Government can prove the crime at trial. That is inappropriate at this stage. *United States v. Perez*, 575 F.3d 164, 166–67 (2d Cir. 2009) ("Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial ... the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.").   And as noted, whether the defendant acted with the requisite *mens rea* is a question for the jury that cannot be resolved at the motion to dismiss stage. *See, e.g., Percoco*, 2017 WL 6314146 at *7 ("[T]he sufficiency of the Government's evidence of intent cannot be considered on a motion to dismiss the indictment… ."); *Light*, 2000 WL 875846, at *2.

On top of that, the defendant's characterizations of the allegations in the Indictment are

inaccurate. For instance, the Indictment alleges that the defendant did not in fact "try" to block the Lazarus Group, as he claims. (Dkt. 37-1 at 45). While the defendant put a screen in place on the UI, the Indictment expressly alleges that this was deliberately pretextual and was not a good-faith effort to block the Lazarus Group. (Ind. ¶ 62 ("The purpose of the change was to mislead the public into believing that the Tornado Cash service complied with the law, while continuing to allow and profit from transactions in funds originating in the OFAC-designated 0x098B716 Address.")). If proven, this allegation also means that the defendant attempted to conceal the truth about how the Tornado Cash service was laundering funds for the Lazarus Group from the public and, by extension, the Government. And the overall allegations in the Indictment show that the defendant designed the Tornado Cash service to generate profits for himself, which would certainly include reaping substantial profits from the more than $400 million in sanctions-violative transactions that he facilitated for the Lazarus Group.

Thus, even if the Government were only limited to the Indictment's allegations (and it is not), they would be more than sufficient to show the defendant's willful participation in a conspiracy to violate IEEPA. At best, the defendant's attempts to characterize the facts in a manner favorable to himself are tantamount to a request for summary judgment, and "summary judgment does not exist in federal criminal procedure." *United States v. Aiyer*, 33 F.4th 97, 117 (2d Cir. 2022); *see also Dawkins*, 999 F.3d at 780 ("[A]t the indictment stage, we do not evaluate the adequacy of the facts to satisfy the elements of the charged offense. That is something we do after trial."). As Count Three of the Indictment properly alleges that the defendant acted "knowingly and willfully" (Ind. ¶ 84), his motion should be denied.

## II.     The Defendant's First Amendment Arguments Are Meritless

The defendant also argues that the charges in the Indictment should be dismissed on First Amendment grounds. His arguments, however, ignore how courts have actually analyzed claims that software and computer code should be protected under the First Amendment. He does not cite even a single case in which a court has dismissed an indictment on the ground that the application of the criminal law to a crime involving software is a First Amendment violation. The defendant's unprecedented bid for sweeping First Amendment immunity for crimes involving computers should be rejected.

### A.  The Criminal Statutes at Issue Here Are Not Overbroad

The defendant's first argument is that the statutes at issue here are unconstitutionally overbroad. That is, the defendant is asking this Court to hold that the Money Laundering Control Act, the ban on unlicensed money transmitting in 18 U.S.C. § 1960, and IEEPA are all facially unconstitutional and should be struck down in their entirety. Given the alarming implications of that argument, it should come as no surprise that it finds no support in any precedent.

The overbreadth doctrine recognizes that a statute is "facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). To mount an overbreadth challenge to a statute, a defendant faces a heavy burden, especially when seeking to invalidate "a law directed at conduct so antisocial that it has been made criminal." *Id.* The Supreme Court has recognized that "[i]nvalidation for overbreadth is strong medicine that is not to be casually employed." *Id.* at 293 (2008). A defendant must show that "a statute's overbreadth [is] ***substantial***, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* at 292 (emphasis in original). The defendant has made no such showing.

The statutes in question, which criminalize money laundering, unlicensed money

transmitting, and sanctions violations, are among the central means by which Congress has sought to deter and punish the illicit movement and concealment of the proceeds of crime. These statutes seek to combat the "organized criminal groups which reap profits from unlawful activity by camouflaging the proceeds through elaborate laundering schemes." *United States v. Holmes*, 44 F.3d 1150, 1154 (2d Cir. 1995); *see also Faiella*, 39 F. Supp. 3d at 546 ("Section 1960 was drafted to address [a] gaping hole in the money laundering deterrence effort."). Indeed, because these laws do not specifically target speech or expressive activity, invalidating them as overbroad would be virtually unprecedented. *Virginia v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)."). The defendant does not cite any authority that has even suggested that these statutes are overbroad. The Government has found no such case, and in the rare instances where defendants have raised such arguments, they have been rejected with little discussion. *E.g., United States v. Awan*, 459 F. Supp. 2d 167, 183 (E.D.N.Y. 2006) (rejecting overbreadth challenge to 18 U.S.C. § 1956(a)(2)(A) and concluding that the statute "criminalizes unprotected conduct with no apparent impact on free expression").

Given the plainly legitimate sweep of these laws, the defendant would have to show a truly substantial amount of overbreadth that could not be address by as-applied challenges. He has made no such showing. In fact, the defendant has not identified any real burden on protected speech at all. Instead, his short argument relies on misstating the allegations in the Indictment to incorrectly suggest that he is being prosecuted for the "mere writing and/or dissemination of the code." (Dkt. 37-1 at 47). As discussed at length above, the Indictment alleges that the defendant and his co-conspirators did not simply "write code" or "maintain a website providing the public information

to access the Tornado Cash smart contracts" (Dkt. 37-1 at 47). Rather, the Indictment alleges far more than that, including that the defendant and his co-conspirators created, maintained, and profited from an integrated, multi-part service that provided bad actors with an easily accessible way to anonymously launder hundreds of millions of dollars in criminal proceeds. The Government has not charged the defendant with a crime that involves solely writing code or maintaining a website. Rather, the charged offenses require the Government to prove that the defendant conspired to conduct financial transactions designed to conceal criminal proceeds (Count One), operate a money transmitting business (Count Two), and receive or provide goods or services to sanctioned entities or deal in blocked property (Count Three). Accordingly, the Court should reject the defendant's overbreadth challenge.

The defendant's argument that the statutes are overbroad because they implicate the constitutionally-protected interest in privacy over financial transactions should also be rejected. Courts have upheld laws and regulations governing financial institutions and requiring various record-keeping and reporting of financial transactions for decades. *See, e.g.*, *United States v. Miller*, 425 U.S. 435, 442-43 (1976). The defendant does not cite any authority that would suggest that laws against money laundering and unlicensed money transmitting are facially overbroad because they implicate the interest in privacy over financial transactions.

### B.  The Defendant's As-Applied Challenge Is Meritless

The defendant's attempt to mount an as-applied challenge to the charges in the Indictment fares no better than his facial challenge. He asserts that the laws at issue are "content-based," and thus subject to strict scrutiny. That is directly contrary to precedent. As an initial matter, this prosecution involves the use of software to process and facilitate financial transactions, similar to the use of software by banks to process wire transfers or by brokerage houses to process trades,

which does not even implicate the First Amendment. *See, e.g.*, *CFTC v. Vatuli*, 228 F.3d 94, 110-11 (requirement to register the sale of automated trading software did not implicate "constitutionally protected speech" for First Amendment purposes). This is especially so where the software was allegedly used for criminal purposes, which is not protected speech. *United States v. Bondarenko*, No. 17 Cr. 306 (JCM), 2019 WL 2450923 at *11 (D.Nev. June 12, 2019) (prosecution of defendant who "directly facilitated criminal activity by posting on the Infraud website malware … does not burden the right to free expression"); *cf. United States v. Gasperini*, 894 F.3d 482, 486 (2d Cir. 2018) (rejecting vagueness challenge to Computer Fraud and Abuse Act and affirming conviction of defendant who wrote computer virus and "leased and operated several servers around the world that were used to host the malware and communicate with the infected computers").[18]

But even if this case implicated the First Amendment, the regulations at issue are not "content-based" and easily pass muster under intermediate scrutiny. In determining whether a restriction on software or computer code is "content-based" or "content-neutral," a court must examine "the functionality of computer code" to determine "the scope of its First Amendment protection." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 452 (2d Cir. 2001). Where a prohibition is applied to computer code "solely because of its capacity to instruct a computer," "[t]hat functional capability is not speech within the meaning of the First Amendment" and the regulation is content-neutral. *Id.* at 454. Here, the Indictment plainly targets the "functional

---

[18] Coin Center's argument that the First Amendment extends to this case because the "software published and released by the Defendants carries a deep political and cultural message" fails for this reason. (Dkt. 43 at 18). It is one thing to express a "political and cultural message" about online privacy. It is quite another to operate a business that turns a profit by accepting deposits from an OFAC-designated wallet and laundering those funds, as charged in Count Three. As the cases cited above demonstrate, the First Amendment does not protect that criminal conduct.

capability" of the Tornado Cash service. The defendant is not being prosecuted for posting computer code in a public forum or in an academic journal; he is instead being prosecuted for how the code functioned in financial transactions and his use of it in furtherance of a profitable and illicit business.

Thus, the defendant is wrong to suggest that the restriction must withstand strict scrutiny. Instead, the appropriate level of scrutiny is at most intermediate scrutiny, under which the charges in the Indictment should be upheld as long as the laws in question "serve a substantial governmental interest," the interest is "unrelated to the suppression of free expression," and the "incidental restriction on speech [does] not burden substantially more speech than necessary to further that interest." *Id.*; *see also Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) (where the "functional capabilities of source code" are at issue, the court applies "intermediate scrutiny, [and] the regulation of speech is valid, in part, if it furthers an important or substantial government interest").

The defendant makes no substantive argument that the Indictment fails under intermediate scrutiny, relegating his entire discussion of intermediate scrutiny to a cursory footnote. (Dkt. 37-1 at 50 n. 28). Thus, the Court need not consider this argument. *Phoenix Light SF Ltd. v. Bank of New York Mellon*, No. 14-CV-10104 (VEC), 2017 WL 3973951, at *12 n. 36 (S.D.N.Y. Sept. 7, 2017) ("Courts have routinely declined to consider arguments mentioned only in a footnote on the grounds that those arguments are inadequately raised"). But even if the Court were to consider the argument, it would be meritless. The Government has substantial interests in combating the laundering of criminal proceeds and restricting transactions involving property of actors that have been determined to be a threat to national security. These interests are more substantial than the interest in preventing unauthorized access to copyrighted material that the Second Circuit

recognized as substantial in *Corley*. 273 F.3d at 454; *see also Junger*, 209 F.3d at 485 (recognizing "national security interests" as a substantial government interest). And the interest in preventing the laundering of proceeds from criminals and sanctioned actors is unrelated to any interest in suppressing free expression.

Finally, the burden on speech here does not burden more speech than necessary. The very success of the Tornado Cash service in laundering enormous amounts of criminal proceeds shows the need for restrictions. The defendant contends that the Government could pursue alternate means, such as requiring individuals to document the source of funds for all their Tornado Cash transactions. (Dkt. 37-1 at 50-51). But it is hardly clear that imposing such requirements on individuals would be less restrictive or burdensome than a requirement that a large and profitable business comply with the same money laundering and KYC rules as other similar businesses. And in any event, "a content-neutral regulation need not employ the least restrictive means of accomplishing the governmental objective." *Corley*, 273 F.3d at 455. The application of the generally applicable criminal laws to the defendant's conduct does not create an unreasonable burden on protected speech.

## III.    The Defendant's Due Process Arguments Are Meritless

Principles of due process require "fair warning . . . in language that the common world will understand" as to the conduct prohibited by law. *McBoyle v. United States*, 283 U.S. 25, 27 (1931). "There are three related manifestations of the fair warning requirement": the vagueness doctrine; the rule of lenity, which "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered"; and a bar on courts "applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). Leaving no

argument behind, the defendant relies on all three to challenge the entire Indictment and the statutes referenced therein. (Dkt. 37-1 at 51). The defendant's assertions are groundless; as applied here, none of the three doctrines comes close to mandating dismissal of any of the counts in the Indictment.

### A.  The Statutes Are Not Unconstitutionally Vague

"The void-for-vagueness doctrine springs from the Fifth Amendment's due process clause," *United States v. Houtar*, 980 F.3d 268, 273 (2d Cir. 2020), and "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Morrison*, 686 F.3d 94, 103 (2d Cir. 2012). Vagueness challenges are difficult to win. To begin with, courts "presume that acts of Congress are not unconstitutionally vague." *Houtar*, 980 F.3d at 273. Accordingly, the Supreme Court has advised courts to apply the void for vagueness doctrine sparingly because it "does not invalidate every statute which a reviewing court believes could have been drafted with greater precision." *Rose v. Locke*, 423 U.S. 48, 49-50 (1975).

The Second Circuit recently described the analytical framework for a vagueness challenge:

> Vagueness challenges typically concern a statute as applied to the challenger, who professes that the law in question cannot constitutionally be applied to the challenger's individual circumstances. But a party may also challenge a statute as vague *on its face*, asserting that it is so fatally indefinite that it cannot constitutionally be applied to anyone.

*United States v. Requena*, 980 F.3d 30, 39 (2d Cir. 2020) (emphasis in original). Thus, in the typical case, before determining whether the statute is facially vague, courts first decide whether the statute is vague as applied to the defendant's conduct. This makes sense, because if a statute's application to the defendant's conduct is clear, then that defendant cannot prevail on the ground

that the statute would be vague as applied to someone else. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18-19 (2010) ("[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."). Even if warranted, a facial challenge to a statute faces long odds. Such a challenge typically requires the movant to establish that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Here, the defendant fails at the first hurdle. The counts of the Indictment actually before the Court, and the facts alleged to support them, provide ample notice that the defendant's conduct was unlawful. *See United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) ("Under the fair notice prong, a court must determine whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.").[19]

### 1.   The Defendant's Vagueness Challenge Fails as to Count One

Count One alleges that from September 2020 to August 8, 2022, the defendant conspired with others to commit concealment money laundering. The Indictment alleges that an object of the conspiracy was to conduct a financial transaction affecting interstate and foreign commerce involving the use of a financial institution engaged in and affecting interstate and foreign commerce that involved the proceeds of a specified unlawful activity. (Ind. ¶ 78). Specifically, the Indictment alleges that the specified unlawful activity was computer fraud and abuse, in violation

---

[19]  Because he cannot successfully challenge the Indictment as applied—and he doesn't really even try (*See* Dkt. 37-1 at 53-54)—Storm mounts a facial attack on an indictment that he claims charges him with crimes for merely publishing software. (Dkt. 37-1 at 52). *See Humanitarian L. Project*, 561 U.S. at 19 ("when a statute interferes with the right of free speech or of association, a more stringent vagueness test should apply"). His facial challenge recapitulates his First Amendment arguments. (Dkt. 37-1 at 46-51). They fail as explained above and they fare no better repackaged as Due Process claims.

of 18 U.S.C. § 1030, and wire fraud in violation of 18 U.S.C. § 1343. (*Id*.). The Indictment further alleges that the defendant and the Tornado Cash founders knew that the financial transaction was designed in whole or in part to conceal the nature, the location, the source, the ownership, and the control of the illicit proceeds. (*Id*.).

The facts alleged in the Indictment provide the defendant ample notice of the conduct the Government asserts is illegal. The Indictment alleges that the defendant and the Tornado Cash founders cofounded the Tornado Cash protocol and operated the Tornado Cash service. (Ind. ¶¶ 2-3). The defendant and the other Tornado Cash founders designed, developed, promoted, and/or modified and controlled key elements of the Tornado Cash service, including the Tornado Cash UI that customers of the Tornado Cash service used to effectuate financial transactions, (Ind. ¶¶ 14-16, 22), the Tornado Cash pools that helped obfuscate the link between its customers' deposits and withdrawals, (Ind. ¶¶ 17-19, 26), and the relayer network, relayer algorithm, and Relayer Registry, (Ind. ¶¶ 24, 29-31). In public and private statements, including to investors from 2019 through at least on or about August 8, 2022, the defendant and the Tornado Cash founders described and marketed Tornado Cash service as allowing its customers to conduct anonymous and virtually untraceable financial transactions that concealed the nature, source, location, ownership, and control of customer funds. (Ind. ¶¶ 10-11). Indeed, in a presentation to potential investors in or around January 2020, the defendant explained that the Tornado Cash service "improves transactions privacy by breaking the on-chain link between recipient and destination addresses…[w]henever ETH is withdrawn by the new address, there is no way to link the withdrwal to the deposit, **ensuring complete privacy**." (Ind. ¶ 11 (emphasis in original)). The defendant and the Tornado Cash founders took multiple steps to increase the ability of the Tornado Cash service to provide anonymity to its customers. (Ind. ¶¶ 20-22, 35-36). And they purposely

failed to have an effective AML program, which facilitated the ability of customers of the Tornado Cash Service to transfer criminal proceeds. (Ind. ¶¶ 34, 37-40, 43-45). The defendant and the Tornado Cash founders were aware that the Tornado Cash Service was a vehicle for laundering criminal proceeds, including proceeds of cyber crime. (Ind. ¶¶ 45-50).

In his challenge to Count One of the Indictment, the defendant claims that the statute is vague as to conducting a "financial transaction." (Dkt. 37-1 at 53). Based on the Indictment, however, the defendant has notice of what a financial transaction is, the kinds of transactions for which he is alleged to be responsible, examples of which financial transactions are alleged to be criminal and why, and his role in conspiring to effectuate those transactions. The defendant's vagueness challenge fails as to Count One.

### 2.  The Defendant's Vagueness Challenge Fails as to Count Two

As indicated above, Count Two alleges that from at least in or about March 2022, up to and including on or about August 8, 2022, the defendant and others conspired to operate an unlicensed money transmitting business in violation of Title 18, United States Code, Section 1960(b)(1)(B) and (b)(1)(C). (Ind. ¶ 80). In relevant part, Count Two alleges that the defendant and the other Tornado Cash founders knowingly controlled all or part of a money transmitting business that affected interstate and foreign commerce and failed to comply with federal registration requirements and otherwise involved transportation and and transmission of funds that were derived from a criminal offense and were intended to be used to promote and support unlawful activity. (*Id*.).

The facts alleged in the Indictment provide the defendant ample notice of the conduct the Government asserts is illegal. As set forth in more detail above, the Indictment alleges that the defendant and the Tornado Cash founders controlled key elements of the Tornado Cash service, a

72

service designed to conduct financial transactions.

In his challenge to Count Two of the Indictment, the defendant claims that the statute is vague as to "accepting" and "transmitting," which appear in one part of the definition of "money transmitting" in 31 U.S.C. § 5330. (Dkt. 37-1 at 53). That argument simply rehashes the defendant's flawed arguments in his motion to dismiss the unlicensed money transmitting count. As described above, the alleged operations of the Tornado Cash service plainly fit within the statutory definition of money transmitting found in both 18 U.S.C. § 1960 and 31 U.S.C. § 5330. Additionally, based on the detailed description of the Tornado Cash service in the Indictment, the defendant has notice of the Government's theory as to how the Tornado Cash service operated as an unlicensed money transmitting service, and his role in operating and profiting from money transmission facilitated by the Tornado Cash Service. The defendant's vagueness challenge fails as to Count Two.

### 3.   The Defendant's Vagueness Challenge Fails as to Count Three

As to Count Three, the Indictment's statutory allegations and the facts alleged in the Indictment provide the defendant with ample notice of the conduct the Government asserts is illegal. The Indictment describes the Ronin Hack, alleges that the defendant and the other Tornado Cash founders were aware of it, identifies communications in which they discuss the hack, identifies the value of the stolen funds laundered through the Tornado Cash Service ($455 million between about April 4, 2022 and at least May 19, 2022), and alleges that the defendant was aware of the laundering while it was happening. (Ind. ¶¶ 56-59). The defendant was also aware that on April 14, 2022 the FBI attributed the hack to the Lazarus group and that OFAC had designated the 0x098B716 Address as blocked property of the Lazarus Group. (Ind. ¶¶ 60-61). Indeed, as alleged, the Indictment illustrates the defendant's consciousness of guilt: "On or about April 14, 2022,

STORM sent SEMENOV and CC-1 a message through the Encrypted App with a link to a news article about the FBI's attribution of the Ronin Hack to the Lazrus Group. In the message, STORM wrote: 'guys we are fucked.'" (Ind. ¶ 61).

The Indictment describes an attempt by the defendant and the other Tornado Cash founders to implement a change to the UI they knew would be ineffective at blocking deposits from OFAC-designated addresses and that the change was made to mislead the public into believing the Tornado Cash service complied with the law while the defendant continued to profit from transactions in funds originating in the 0x098B716 Address. (Ind. ¶¶ 62-64). Despite confirmation that the UI change was ineffective, the defendant and the other Tornado Cash founders continued to knowingly facilitate and profit from these sanctions-violative transactions and took no further action to prevent them. (Ind. ¶¶ 65-68).

In his challenge to Count Three of the Indictment, the defendant focuses on the Informational Materials Exemption under 50 U.S.C. § 1702(b)(3). (Dkt. 37-1 at 53). As explained above, that exemption does not apply here. In any event, the Indictment clearly provides the defendant notice of the Government's theory and evidence regarding his knowledge of the Ronin Hack, its attribution to the Lazarus Group, the designation of the 0x098B716 Address, the Lazarus Group's use of the Tornado Cash Service to launder stolen funds, the defendant's knowledge of the wrongfulness of his conduct, and his decision to continue to allow the Lazarus Group to continue laundering funds and evading sanctions. The defendant's vagueness challenge fails as to Count Three.

### 4.  The Defendant's Facial Vagueness Challenge Must Also Fail

Because the defendant cannot show that the statutes are vague as to his conduct, the Court should not even reach the defendant's facial challenge to the Indictment. *Humanitarian L. Project*,

561 U.S. at 18-19. But if the Court decides to consider this issue, it should reject his arguments. Again, the defendant would have to show that no set of circumstances exists under which the Money Laundering Control Act, 18 U.S.C. § 1960, and IEEPA would be valid. *Requena*, 980 F.3d at 39. The defendant simply cannot do that here. These statutes have numerous valid applications that in no way implicate speech or First Amendment rights, and decades of case law construing each of the challenged statutes shows that they set forth judicially manageable standards and give fair notice of the conduct they reach. *See Lanier*, 520 U.S. 259, 266 (1997) ("clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute"); *Requena*, 980 F.3d at 40-41 (statute couldn't be facially vague where courts had previously rejected as-applied vagueness challenges to it). Examples of courts rejecting relevant void-for-vagueness challenges to the relevant statutes include *United States v. Stanton*, No. 91 Cr. 889 (CSH), 1992 WL 73408, at *5 (S.D.N.Y. Mar. 31, 1992) (rejecting a vagueness challenge to 18 U.S.C. § 1956); *Velastegui*, 199 F.3d at 595 ("Accordingly, section 1960 applies with sufficient clarity to comport with the constitutional fair notice requirement."); *United States v. Budovsky*, No. 13 Cr. 368 (DLC), 2015 WL 5602853, at *12 (S.D.N.Y. Sept. 23, 2015) (rejecting a Section 1960 vagueness challenge from the founder/owner of a virtual currency exchange); *Griffith*, 515 F. Supp. 3d at 121 (rejecting a vagueness attack on IEEPA as to sanctions against North Korea).

Finally, at best the defendant's arguments bear not upon the sufficiency of the Indictment but on the potential strength of the Government's evidence. It may be that the defendant can raise defenses to the allegations in the Indictment or attack the Government's case. That does not make the underlying statutes any less clear. As the Supreme Court put it, "[c]lose cases can be imagined under virtually any statute. The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *Williams*, 553 U.S. at 306.

### B. Neither of the Other Two Due Process Doctrines Applies

The rule of lenity "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered," while "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266. Neither principle supports dismissal here. To the extent the defendant offers a rule of lenity argument, he does so by referring back to his already discredited First Amendment argument. Outside of that, he makes no showing at all as to how the Money Laundering Control Act, 18 U.S.C. § 1960, and IEEPA are ambiguous. As explained herein, these statutes are neither vague nor ambiguous, particularly as applied to the conduct alleged in the Indictment. The mere fact that a defendant can put forward a possible narrow reading of a statute does not give rise to the rule of lenity if the best reading of the statute extends to his conduct. *See Pulsifer*, 144 S.Ct. at 737 (improper to invoke rule of lenity merely because there are multiple "permissible readings of the statute when viewed in the abstract"); *E-Gold*, 550 F. Supp. 2d at 100 (rule of lenity is reserved for "those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to 'the language and structure, legislative history, and motivating policies' of the statute") (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)).

The defendant's novel construction argument is equally unavailing. While a statute must give a defendant fair notice that his conduct is unlawful, as the statutes at issue here plainly do, there is no requirement that there have been "a factual situation that is 'fundamentally similar'" to the crime charged. *Lanier*, 520 U.S. at 269; *Ponnapula v. Spitzer*, 297 F.3d 172, 183 (2d Cir. 2002) ("Due process is not, however, violated simply because the issue is a matter of first impression."). As discussed above, the defendant's alleged conduct is closely similar to other cryptocurrency

businesses in which courts have rejected similar challenges to money laundering and unlicensed money transmitting charges. To be sure, each of those cases also raised some novel issues when they were brought. That is the inevitable result of the application of longstanding criminal statutes to new technologies. Some case has to be first. *Ulbricht*, 31 F. Supp. 3d at 566 ("The fact that a particular defendant is the first to be prosecuted for novel conduct under a pre-existing statutory scheme does not ipso facto mean that the statute is ambiguous or vague or that he has been deprived of constitutionally appropriate notice."); *United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995) ("claimed novelty of this prosecution does not help [defendant's] cause, for it is immaterial that there is no litigated fact pattern precisely in point."). The defendant's criminal conduct may not be identical in every respect to similar prior criminal schemes. That, however, does not constitute a due process violation.

## IV.   The Defendant's Disclosure Demands Should Be Denied

The defendant asks the Court to compel the Government to make certain pretrial disclosures and search separate agency files. (*See* Dkt. 25). The Court should deny these factually and legally unfounded motions.

### A.  The Government Has No Obligation to Produce Diplomatic Communications

The Government has produced in discovery to the defendant approximately 9,057 documents, consisting of approximately 51,597 pages of material, that the Government received in response to a request it submitted to Dutch authorities under the Mutual Legal Assistance Treaty ("MLAT"). Nevertheless, the defendant moves to compel the Government to produce "USAO, FBI, and DOJ communications with the authorities in the Netherlands relating to Mr. Storm, the Peppersec developers, and Tornado Cash"—in other words, all substantive communications with Dutch authorities pertaining to the Government's investigation of the Tornado Cash service. (Dkt.

25 at 6). The Court should deny this motion because the defendant provides no basis, apart from speculation, that the additional records he seeks are material to his defense, and because he seeks those records for an improper purpose.

Rule 16(a)(1)(E) requires the Government, upon a defendant's request, to disclose items "within the government's possession, custody, or control," to the extent such items are "material to preparing the defense." "Evidence is material if it could be used to counter the government's case or to bolster a defense." *United States v. Clarke*, 979 F.3d 82, 97 (2d Cir. 2020). "To obtain discovery under Rule 16, a defendant must make a *prima facie* showing of materiality." *Id.* (citing *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990) ("Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense.")). Thus, to be entitled to disclosure, a defendant must demonstrate a "strong indication" that the items in question "will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Cilins*, No. 13 Cr. 315 (WHP), 2014 WL 173414, at *4 (S.D.N.Y. Jan. 15, 2014).

Nothing but conjecture supports the defendant's claim that the records he seeks are material. He speculates that communications with Dutch authorities

> ***could help*** the defense identify witnesses[,] . . . ***often include*** . . . [helpful] declarations and exhibits[,] . . . ***may include*** exhibits the government intends to try to use against Mr. Storm at trial[,] . . . ***may also include*** substantive discussions of evidence[,] . . . ***may also reveal*** potential weaknesses in the government's case[,] . . . ***can be expected*** to include substantive portions[,] . . . and ***may constitute*** *Brady* material.

(Dkt. 25 at 6-7 (emphasis added)). The defendant provides no support whatsoever for this guesswork. He therefore fails to make the *prima facie* showing of materiality that the law requires

on all motions to compel, including those that seek communications between the Government and foreign authorities.

In *United States v. Ralston*, a money laundering case in which the defendant moved to compel the Government's MLAT requests, Judge Furman observed that, "With respect to items that the Government does not intend to use in its case-in-chief and that were not obtained from the defendant, it is a defendant's burden to make a *prima facie* showing that the documents sought . . . are material to preparing the defense." No. 19 Cr. 774 (JMF), 2021 WL 5054464, at *2 (S.D.N.Y. Nov. 1, 2021). The court denied the motion to compel because "there is no basis to Defendants' speculation that the MLATs were obtained pretextually." *Id.* Citing the same standard, in *United States v. Saltsman*, Judge Garaufis denied a motion to compel communications with foreign authorities because defendants "failed" to "articulate some specific way in which the items they request[ed] could be used to counter the Government's case or bolster a defense." No. 07 Cr. 641 (NGG), Dkt. 170 at 27 (E.D.N.Y. 2011); *see also United States v. Bases*, No. 18 Cr. 48 (JZL), 2020 WL 5909072, at *7 (N.D. Ill. Oct. 6, 2020) (denying motion to compel where defendants "have not [] shown that the documents relating to the MLAT request are material to the preparation of their defense"). The Court should deny the defendant's motion to compel the Government's MLAT requests, which amounts to a speculative fishing expedition like those in *Ralston*, *Saltsman*, and *Bases*.

In addition, the defendant expressly states that he seeks communications with Dutch authorities because they "can be expected to provide information on the government's theories of the case," which is not a proper basis to compel discovery. *See United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137 (D.D.C. 2020) (denying motion to compel MLAT requests because "Defendant's request is purely speculative and is better understood as an attempt to gain

information to understand the government's theory of the case than to obtain information relevant to the defense under Rule 16 or *Brady*"); *see also United States v. Hutchins*, No. 17 Cr. 124 (NJ), 2018 WL 1695499, at *2 (E.D. Wis. Apr. 6, 2018) (denying motion to compel MLAT request in part because "a need to understand the government's theory of the case cannot be [a] basis to compel disclosure of the request[,] as a defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved"). The defendant's request is particularly unpersuasive given that he cannot claim that he has insufficient information about the Government's theory of the case. The detailed speaking Indictment, along with the reams of voluminous document discovery provided by the Government, provide him with more than sufficient information to prepare his defense. This is not a case where the defendant can accuse the Government of hiding the ball.

In sum, the Court should deny the defendant's motion to compel communications between the Government and the Dutch authorities because the defendant fails to show that those records would be material to his defense, and he seeks them for the improper purpose of uncovering the Government's theory of the case. This Court should do what other courts faced with similar applications have done: deny the defendant's motion. *See Ralston*, 2021 WL 5054464, at *2 (denying baseless motion to compel MLAT requests); *Bases*, 2020 WL 5909072, at *7 (same); *Oseguera Gonzalez*, 507 F. Supp. 3d 137 (denying motion to compel MLAT requests that both is speculative and seeks records for the improper purpose of uncovering the Government's theory of the case); *Hutchins*, 2018 WL 1695499, at *2 (same); *United States v. Saltsman*, No. 07 Cr. 641 (NGG), Dkt. 170 at 27 (E.D.N.Y. 2011) (denying speculative motion to compel MLAT requests and other diplomatic communications).

### B. The Government Has No Obligation to Obtain or Produce Records Not in the Possession of the Prosecution Team

The Court should deny the defendant's motion to compel documents in the possession of OFAC and FinCEN because those agencies are not part of the prosecution team in this case.

#### 1. <u>Applicable Law</u>

"An individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). "Nonetheless, knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis." *Id*. at 255; *see also United States* v. *Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (rejecting imputation of knowledge of FBI reports by agents who were not involved in the investigation or trial); *United States* v. *Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting imputation of knowledge of a Florida prosecutor to an AUSA in New York). As the Second Circuit recently stated in *United States v. Hunter*, "[w]e have long rejected the notion that knowledge of any part of the government is equivalent to knowledge on the part of th[e] prosecutor." 32 F.4th 22, 36 (2d Cir. 2022).

Rather, the Government's Rule 16 and *Brady* obligations are limited to materials in the possession of the prosecution team. *United States v. Meregildo*, 920 F. Supp. 2d 434, 443–44 (S.D.N.Y. 2013); *Hunter*, 32 F.4th at 36; *Avellino*, 136 F.3d. at 255 ("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office

would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis."). Where information was independently obtained through sources outside of the prosecution team, *Brady* "is not a discovery doctrine that c[an] be used to compel the Government to gather information for the defense." *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550, at *22 (S.D.N.Y. July 24, 2014).

"[T]he relevant inquiry [for determining whether a person is a member of the prosecution team] is what the person did, not who the person is." *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006). "Individuals who perform investigative duties or make strategic decisions about the prosecution of the case are considered members of the prosecution team, as are police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (summary order). "At bottom," the determination of who constitutes the prosecution team, "involves a question of agency law: should a prosecutor be held responsible for someone else's actions?" *Meregildo*, 920 F. Supp. 2d at 443–44. "Generally, a principal is responsible for the knowledge of an agent when that agent has a duty to give the principal information or when the agent acts on his knowledge regarding a matter that is within his power to bind the principal. An agent's duty to disclose is thus linked to his power to bind the principal." *Id.*

In the context of a criminal investigation and prosecution, the individuals empowered to bind the prosecutor consist generally of those who "actively investigate[] the case, act[] under the direction of the prosecutor, or aid[] the prosecution in crafting trial strategy." *Meregildo*, 920 F. Supp. 2d at 442; *see United States v. Barcelo*, No. 13 Cr. 38 (RJS), 2014 WL 4058066, at *9 (S.D.N.Y. Aug. 15, 2014) ("To determine whether someone is a member of the prosecution team— in other words, whether the prosecution can be deemed to have constructive knowledge of

information held by that individual—the Court considers the totality of the circumstances, including whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy."), *aff'd*, 628 F. App'x 36 (2d Cir. 2015).

Applying these principles, the Second Circuit and courts in this District, including this Court, have consistently rejected efforts to impose discovery obligations on the Government related to information held by entities that do not act as agents of the prosecution, including cooperating witnesses, expert witnesses for the Government, other government agencies, and even separate components of the Justice Department. *See Chow*, No. 17 Cr. 667 (GHW) 2/9/2018 Tr. (Dkt. 69) at 87 (denying a similar motion to compel and noting that interactions between the Government and the SEC were "structured in a way to avoid the Court concluding that they had conduct a joint investigation"); *see also, e.g.*, *Barcelo*, 628 F. App'x at 38 (holding that a cooperating witness was not a part of the prosecution team where he "played no role in the investigation or in determining investigation or trial strategy," and "did no more than provide information to the government and testify at trial"); *Stewart*, 433 F.3d at 299 (holding that a civilian employee of the Secret Service who testified as an expert witness for the Government was not a member of the "prosecution team" for *Giglio* purposes); *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) (holding that for *Giglio* and Jencks Act purposes, the Government had no discovery obligation related to information filed in an unrelated bankruptcy proceeding); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (holding that the reports made by FBI agents in the course of investigations unrelated to the defendants' prosecutions were not possessed by the prosecution team); *Pina v. Henderson*, 752 F.2d 47, 49 (2d Cir. 1985) (holding that a prosecutor's constructive knowledge did not extend to a parole officer who "did not work in conjunction with

83

either the police or the prosecutor"); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting "completely untenable position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor'"); *United States v. Morgan*, 302 F.R.D. 300, 304 (S.D.N.Y. 2014) ("[T]he prosecution team does not include federal agents, prosecutors, or parole officers who are not involved in the investigation."); *Meregildo*, 920 F. Supp. 2d at 444 ("[I]n most cases, cooperating witnesses should not be considered part of the prosecution team.").

Courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession, custody or control of another agency for *Brady* evidence only where the Government conducts a "joint investigation" with another state or federal agency. *United States* v. *Rigas*, 583 F.3d 108 (2d Cir. 2009) (affirming district court opinion holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC); *SEC* v. *Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (finding that facts similar to those here "make clear that the investigations, while they may have overlapped, were not conducted jointly" in denying the defendant's request for the Court to require the SEC to access and review FBI interview notes that were not in the SEC's possession, custody or control); *United States* v. *Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (holding that the Government and the NYSE, even if it were a state actor, did not conduct a joint investigation related to the policies of the NYSE); *Ferreira* v. *United States*, 350 F. Supp. 2d 550, 556-57 (S.D.N.Y. 2004) (holding that cooperation between the Government and NYPD was "not sufficient to make the Government and the state prosecutor members of the same prosecutorial team"); *United States v. Upton*, 856 F. Supp. 727, 749-50 (E.D.N.Y. 1994) (holding that a United States Attorney's Office ("USAO") and the FAA did not conduct a "joint investigation" even though the FAA provided two inspectors to assist the criminal

investigation); *United States* v. *Guerrerio*, 670 F. Supp. 1215, 1219 (S.D.N.Y. 1987) (denying Rule 16 discovery request for grand jury minutes at the Bronx District Attorney's Office where there was no joint investigation with the USAO, which had no control over the material).

To determine whether the criminal prosecution conducted a "joint investigation" with another agency, such that the other agency should be considered part of the prosecution team, courts consider a number of factors, including whether the other agency "(1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *United States v. Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018); *see United States v. Collins*, 409 F. Supp. 3d 228, 241 (S.D.N.Y. 2019) (finding no joint investigation where SEC and Government participated in joint interviews); *United States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, at 87 (S.D.N.Y. Feb. 9, 2018) (finding no joint investigation where agencies shared information but made their own determinations regarding what documents to obtain and what facts to ask a witness); *accord SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (FBI and SEC did not conduct a joint investigation despite participating in joint interviews during which only FBI took notes); *United States v. Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008) (finding that parallel civil and criminal investigations were not "joint").

### 2.  **OFAC and FinCEN Are Not Part of the Prosecution Team**

The Government did not conduct a joint investigation with OFAC or FinCEN. It has investigated and prosecuted the defendant independently, without any meaningful contributions from either agency. Those bodies did not affect the development of the Government's investigative

or prosecutorial strategy; did not assign any employees to the prosecution team as special Assistant U.S. Attorneys; were not involved in presenting the case to the grand jury; did not receive grand jury transcripts; have not participated in the execution of search warrants or responsiveness reviews; did not obtain materials produced to the Government pursuant to grand jury subpoenas; have not attended any Government interviews; did not contribute to drafts of the Indictment or the prosecution memorandum used to make the criminal charging decision; and have not attended court proceedings in this case. *See Collins*, 409 F. Supp. 3d at 242 (citing such factors in support of a finding that the SEC and the Government did not conduct a joint investigation). OFAC and FinCEN were simply not part of the team.

Indeed, numerous courts in this District have held that the Securities and Exchange Commission (the "SEC") is not part of the Government's prosecution team even in instances where the SEC has conducted numerous joint interviews of witnesses with the United States Attorney's Office. *United States v. Kakkera*, 22-CR-398 (GHW), Dkt. 93 at 45-46 (finding that SEC was not part of the prosecution team even where the Government and the SEC conducted numerous joint interviews); *Middendorf*, 2018 WL 3956494, at *5 (same); *United States v. Blaszczak*, 308 F. Supp. 3d 736, 743 (S.D.N.Y. 2018) (same); *United States v. Velissaris*, No. 22 Cr. 105 (DLC), 2022 WL 2392360, at *2 (S.D.N.Y. July 3, 2022) ("Velissaris argues that the SEC is part of the prosecution team because it conducted joint interviews with the USAO of individuals from Velissaris's firm, among other entities. But jointly conducted interviews, standing alone, do not support a conclusion that the SEC and USAO have conducted a joint investigation, particularly where the defendant's request is not limited to information about those interviews."). Here, the Government did not conduct any joint interviews or other forms of joint fact-gathering with either OFAC or FinCEN and did not direct those agencies to take any action on behalf of the Government,

further belying the notion that either OFAC or FinCEN is part of the prosecution team.

The Government routinely requests that third-party agencies share documents relevant to an investigation, and did so here by asking the Treasury Department to share certain documents in its possession. That kind of document request does not pull a third-party agency into the prosecution team. For example, in *United States v. Alexandre*, where "defense counsel estimate[d] that roughly 99% of all documents produced by the Government to Defendant thus far have come from" third parties that the defendant alleged were part of the prosecution team, the Court found that those agencies lay outside the prosecution team. No. 22 CR. 326 (JPC), 2023 WL 416405, at *6-9 (S.D.N.Y. Jan. 26, 2023). That is surely the case here, where documents provided by the Treasury Department to the Government comprise a small proportion of the documents the Government has produced to the defendant in discovery. *See also Velissaris*, 2022 WL 2392360, at *3 (finding no joint investigation even though the Government relied "extensively on the SEC's evidence" since that evidence was not gathered at the Government's direction); *Collins*, 409 F. Supp. 3d at 242 (finding no joint investigation despite "the SEC shar[ing] some documents it obtained using subpoenas" with the Government); *Blaszczak*, 308 F. Supp. 3d at 738 (finding no joint investigation even though "[t]he SEC provided the [U.S. Attorney's Office] with all the documents it obtained during its investigation"); *United States v. Connolly*, No. 16 Cr. 370 (CM), 2017 WL 945934, at *7 (S.D.N.Y. Mar. 2, 2017) ("The fact that the Government obtained documents that had already been produced to the CFTC does not convert its fact-finding into joint fact-finding."). Accordingly, the Court should deny the defendant's motion for additional records from the Treasury Department, which is based on the defendant's inaccurate conjecture regarding the Government's minimal interactions with OFAC and FinCEN in this case.

In limited interactions before the Indictment was unsealed, at OFAC and FinCEN's

request, the Government verbally provided information about its understanding of how the Tornado Cash service worked. The Government did not share Grand Jury materials with OFAC or FinCEN. The Government also could not and did not direct OFAC or FinCEN to do anything on its behalf. The Government requested certain documents from FinCEN in the course of its investigation. But FinCEN routinely provides information to law enforcement agencies around the country without joining their prosecution teams. Indeed, to hold that FinCEN becomes part of a criminal prosecution team merely by materials when requested would be unprecedented as far as the Government is aware, and courts in this Circuit decline to find joint prosecution teams even where far more information is shared. *See Alexandre*, at *6 (standing arrangements to provide documents "between governmental agencies, which are hardly uncommon, do not indicate by themselves a joint investigation, particularly given the Government's representation that it did not direct the [other actors] to take any investigative actions"); *Collins*, 409 F. Supp. 3d at 242 (finding no joint investigation despite "the SEC shar[ing] some documents it obtained using subpoenas" with the Government); *Blaszczak*, 308 F. Supp. 3d at 738 (finding no joint investigation even though "[t]he SEC provided the [Government] with all the documents it obtained during its investigation"). Indeed, it is a routine practice for other agencies to grant access requests from DOJ prosecutors to voluntarily share records with the DOJ. The DOJ and a civil agency do not become part of the same prosecution team by mere virtue of the fact that said agency granted an access request and voluntarily shared records pursuant to the access request. In sum, the defendant cites no authority for the proposition that an independent agency becomes part of the prosecution team simply by complying with routine, voluntary information requests.

According to the defendant, the "defense understands that, before an IEEPA charge is brought . . ., the USAO consults with the DOJ's National Security Division ('NSD'), who in turn

consults with OFAC and obtains its feedback and approval." (Dkt. 25 at 9). Not so. While the U.S. Attorney's Office requires NSD's approval to bring an IEEPA charge, the Government does not require OFAC's approval to bring such a charge and did not seek or obtain OFAC's approval in this case.[20] NSD's communications with the Treasury Department in this case were limited to informing OFAC attorneys of the defendant's motions and obtaining the documents that the Government requested, as described above. OFAC has not provided any "feedback"—and nor did it "approve"—the Government's charges or its response to the motions, and the Government's request that the Treasury Department provide documents was just that—a request, not an order—and thus belies the notion that OFAC and FinCEN "submit[ted] to the direction of the prosecutor." *Barcelo*, 628 F. App'x at 38.

Nor does the fact that OFAC designated Semenov on the same day the Government unsealed the Indictment establish that there was a joint investigation, as the defendant claims. (*See* Dkt. 25 at 9). The prosecution team informed OFAC of the forthcoming Indictment and provided OFAC with certain information about Semenov so that OFAC could decide for itself whether and when to designate Semenov, and Semenov's designation had no effect on the investigation, the Indictment, or the trial strategy in this case. *See Alexandre*, 2023 WL 416405, at *5 (finding that the CFTC was not part of the prosecution team where it and the Government had conducted parallel investigations, "filed their complaints on the same day," and "issued press releases on the same day"). Moreover, OFAC independently chose to add Tornado Cash to the SDN list well in advance of the Government ever filing criminal charges, and during a period when the Government was

---

[20] Defense counsel in this case also served as defense counsel in another recent case involving IEEPA, where the Government explained, during oral argument on a motion to compel: "it's not the government's position that OFAC needs to approve prosecutions in which [IEEPA] is at issue." *United States v. Griffith*, No. 20-CR-15 (PKC), Dkt. 82 at 41:1-3.

still actively conducting its criminal investigation.

The defendant also speculates that, "before bringing an unlicensed money transmitting business charge . . ., FinCEN . . . is often consulted." (Dkt. 25 at 10). The prosecution team's charge-related interactions with FinCEN amounted to one short phone call, barely a week before the Government unsealed the Indictment, in which the Government informed FinCEN about the forthcoming charges so that FinCEN would not be surprised. At the time of the call, the train had left the station on the charges in this case. FinCEN could not and did not shape the Indictment.

The defendant predicts that the Government may call "a FinCEN representative to testify at trial." (*Id.*). It is possible the Government will call such a witness, whose testimony would focus on FinCEN's regulation of money services businesses—not the defendant's conduct as discovered by the investigative team. That testimony will be far narrower than that of cooperating and expert witnesses, which courts have found are not part of the prosecution teams in the cases in which they testify. *See, e.g.*, *Meregildo*, 920 F. Supp. 2d at 445-46 (holding that cooperating witness was not a member of the prosecution team); *United States v. Barcelo*, 628 F. App'x 36, 38-39 (2d Cir. 2015) (same); *Stewart*, 433 F.3d at 298-99 (holding that an expert witness who analyzed evidence, assisted the prosecution in preparing cross-examination questions, participated in a mock examination, and testified at trial was not a member of the prosecution team). Even absent those precedents, the prosecution team does not currently know the identity of any prospective FinCEN witness, so that person cannot possibly be part of the prosecution team. The Government will of course make all required disclosures at the appropriate juncture as to any FinCEN witness it intends to call pursuant to 18 U.S.C. § 3500 and its *Giglio* obligations.

The defendant's final pitch for the Court to find that OFAC and FinCEN are part of the prosecution team relies on certain remarks by the Chief of the U.S. Attorney's Office's Illicit

Finance and Money Laundering Unit at a New York City Bar Association event (hereinafter the "ABA Event"). (*See* Dkt. 25 at 10). As an initial matter, the defendant's request that the Court make a finding that the U.S. Attorney's Office and OFAC and/or FinCEN constitute a joint prosecution team based on remarks given at a bar association event would be without basis in fact or law. With respect to the underlying facts surrounding the ABA Event, the following bears noting: (i) the event occurred on February 23, 2024 (well after this case was already charged); (ii) the event was entitled "Emerging Technologies Symposium," and the remarks given by the Chief and Deputy Chief occurred in the context of a "fireside chat" and were general in nature; (iii) the defense relies exclusively on a news article that selectively quotes from different portions of those remarks; and (iv) at some point during her remarks, the Unit Chief mentioned the defendant's case and, later—during an entirely separate portion of the "fireside chat" and without regard to this case—the Chief referenced "collaboration" between FinCEN and OFAC on determining "what tool or what authority for what agency is going to be best suited to deal with a potential threat or issue that we're faced with." (Dkt. 25 Exhibit B). Nothing in that statement permits an inference that OFAC or FinCEN collaborated directly on this case, much less that individuals in those agencies actively contributed to the defendant's investigation or prosecution. The Court should not give credence to this argument by the defendant. *See   Connolly*, 2017 WL 945934, at *7 (finding, in a LIBOR case where the U.S. Attorney's Office and the SEC had conducted parallel investigations, that the SEC was not part of the prosecution team despite press releases evincing coordination among the relevant agencies in other LIBOR investigations).

In sum, OFAC and FinCEN have not actively participated in the investigation, prosecution, or litigation of this case. They are not part of the prosecution team. On that basis alone, the Court should deny the defendant's motion to compel documents from those agencies.

**V.     The Court Should Deny the Defendant's Motion to Suppress**

The defendant asks the Court to suppress evidence relating to cryptocurrency seized from his residence pursuant to a search warrant. (*See* Dkt. 27). That motion is meritless and should be denied.

**A.   Background**

On August 22, 2023, United States Magistrate Judge Mary Alice Theiler of the Western District of Washington issued a search warrant for the defendant's residence (the "Warrant"). The Warrant authorized the Government to search the residence for and seize (1) evidence of violations of the offenses charged in the Indictment—namely, conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1960 and 371, and conspiracy to commit sanctions violations, in violation of 50 U.S.C. § 1705 (together, the "Subject Offenses"); (2) "contraband, fruits of crime, or other items illegally possessed"; and (3) property designed for use, intended for use, or used in committing a crime." (Dkt. 27, Ex. A at 1). Specifically, the Warrant authorized the Government to search the residence for and seize, among other things, "any digital device/s or other electronic storage media found," as well as the following:

16.     Any and all cryptocurrency, to include the following:
    a.     any and all representations of cryptocurrency public keys or addresses, whether in electronic or physical format;
    b.     any and all representations of cryptocurrency private keys, whether in electronic or physical format;
    c.     any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "seed phrases," "recovery seeds," or "root keys" which may be used to regenerate a wallet.

17.     The United States is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a public cryptocurrency address controlled by the United States.

(*Id.*).

The probable cause supporting the seizure of these items included, among other things, the

following:

- "STORM used an account at Binance, a cryptocurrency exchange, to sell cryptocurrency tokens he had created with the other Tornado Cash founders, and realize profits from the operation of the Tornado Cash service. The account was in the name of a different person, a Russian national, and Storm used a VPN service, which is a service that routes a user's internet traffic through a separate server, which makes it appear to other devices on the internet that the user is accessing the internet from a different IP address than the user is actually using, to access the Binance account and execute these transactions" (*Id.* at ¶ 5(f) (citing Ind. ¶ 73)).

- "After OFAC announced the sanctions, STORM accessed the above-described Binance account and transferred approximately $8 million worth of cryptocurrency to himself and the other two Tornado Cash founders in amounts of approximately $2.6 million for each founder. He transferred these funds to unhosted cryptocurrency wallets, which is a method of storing cryptocurrency apart from any exchange or third-party hosting service. Based on [the affiant's] training and experience, owners of unhosted cryptocurrency wallets typically maintain the wallets, and the passwords needed to access and control them, which are sometimes referred to as "seed phrases," in a secure and private place, such as in their residence. After transferring these funds, on or about August 9, 2022, STORM sent a message to SEMENOV and Pertsev in which he advised them, in substance, to move the funds into multiple unhosted cryptocurrency wallets, writing: "my personal advice: create new wallets, new seed phrases, transfer money to new addresses." (*Id.* at ¶ 5(g) (quoting Ind. ¶ 75)).

- "As described above, after OFAC issued sanctions on Tornado Cash, STORM engaged in cryptocurrency transactions to transfer proceeds from the operation of the Tornado Cash service to unhosted cryptocurrency wallets held by himself and the other Tornado Cash founders. Based on my training and experience, these transactions required the use of computing devices. Additionally, I know from my participation in this investigation that law enforcement has not recovered or identified the location of the approximately $2.6 million worth of cryptocurrency representing proceeds from the Subject Offenses that STORM transferred to an unhosted wallet for himself on or about August 8, 2022. I also know that this represented only a portion of the cryptocurrency proceeds of the Subject Offenses that STORM personally obtained, as this represented the sale of only a portion of the cryptocurrency tokens that were distributed to STORM in connection with his operation of the Tornado Cash service. Law enforcement has traced other cryptocurrency proceeds of STORM's through a variety of transactions terminating in multiple cryptocurrency wallets, including unhosted wallets, and has not identified the location of those unhosted wallets. I therefore submit that there is probable cause to believe that STORM continues to possess cryptocurrency representing proceeds of the Subject Offenses, and property involved in the Subject Offenses, in the form of cryptocurrency wallets within his control." (*Id.* at ¶ 12).

On August 23, 2023, the day of the defendant's arrest, the FBI conducted its search of the residence, pursuant to the Warrant. The FBI seized, among other things, (1) two iPhones, a MacBook Pro laptop, and an iPad; (2) several cryptocurrency hardware wallets; (3) numerous USB drives and other electronic storage media; (4) three hard drives; and (5) paper records that appeared to relate to accessing cryptocurrency. Hardware wallets—sometimes referred to as "cold" wallets—do not contain actual cryptocurrency but rather safeguard an individual's private cryptographic keys that must be used to access and transact with their cryptocurrency holdings on the blockchain. As of this writing, the Government has not yet been able to access the seized hardware wallets, which are encrypted, to identify whether they relate to any cryptocurrency relevant to the charges in the Indictment, although those efforts are ongoing.

### B.  Applicable Law

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To satisfy the particularity requirement, a warrant must (i) "identify the specific offense for which the police have established probable cause; (ii) describe the place to be searched; and (iii) specify the items to be seized by their relation to designated crimes." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017), *abrogated on other grounds by Carpenter v. United States*, 138 S. Ct. 2206 (2018). "The Fourth Amendment does not require a perfect description of the data to be searched and seized." *Ulbricht*, 858 F.3d at 100. Rather, the particularity requirement is satisfied if the warrant, including its attachments, enables the executing officer to ascertain and identify with reasonable certainty those items authorized to be searched and seized. *See Groh v. Ramirez*, 540 U.S. 551, 557-59 (2004); *United States v. Rosa*, 626 F.3d 56, 58 (2d Cir. 2010).

94

"[A] search warrant does not necessarily lack particularity simply because it is broad." *Ulbricht*, 858 F.3d at 100. When a search warrant limits the scope of the search to evidence of particular federal crimes, and gives an "illustrative list of seizable items," the search warrant is sufficiently particular. *United States v. Riley*, 906 F.2d 841, 844-45 (2d Cir. 1990).

The probable cause and particularity requirements intersect in the doctrine of overbreadth. A warrant is overbroad if its "description of the objects to be seized…is broader than can be justified by the probable cause upon which the warrant is based." *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013). To that end, the Second Circuit has recognized that the line between a broad and an insufficiently particular warrant hinges on the Government's probable cause analysis. A warrant "is defective if it is broader than can be justified by the probable cause upon which the warrant is based." *Id.* at 446.

### C. The Seizure of Any and All Cryptocurrency Authorized by the Warrant Was Supported by Probable Cause that Such Cryptocurrency Was Both Evidence and Fruits of the Subject Offenses

As the Warrant makes abundantly clear, any and all cryptocurrency found at the defendant's residence was potentially the fruit of the defendant's commission of the Subject Offenses. (*See* Dkt. 27, Ex. A at ¶¶ 5(f)-(g), 12). In particular, the Warrant notes several times that, after OFAC sanctioned the Tornado Cash service, the defendant used an account he controlled at Binance to sell off approximately 8 million dollars' worth of TORN tokens, which were created by the defendant, Semenov, and CC-1 as the primary means through which they would profit from the Tornado Cash service. (*See id.*). The defendant converted these TORN tokens into other forms of cryptocurrency and transferred the cryptocurrency to unhosted wallets. (*See id.*). The defendant then distributed the proceeds of the sale to himself, Semenov, and CC-1 in thirds—approximately $2.6 million each. (*See id.*). Accordingly, there is probable cause to conclude that any and all

cryptocurrency found at and seized from the defendant's residence may constitute the fruits of the Subject Offenses and therefore was well within the bounds of the Warrant.

The Government is not yet in a position to determine which, if any, cryptocurrency that the Government may eventually access pursuant to the Warrant constitutes the fruits of the Subject Offenses and is therefore both evidence of the Subject Offenses and subject to forfeiture. Because the Government is still making efforts to access the encrypted cryptocurrency wallets, there is no way for the Government to disentangle the defendant's "non-contraband cryptocurrency" from its "intertwined…contraband counterparts." *Matter of Search of One Address in Washington , D.C., Under Rule 41*, 512 F. Supp. 3d 23, 30 (D.D.C. 2021).

Cryptocurrency found in the defendant's residence may also constitute direct evidence of the Subject Offenses. The defendant's immediate sale and transfer of a large portion of his and the other Tornado Cash developers' TORN holdings in the wake of OFAC's sanctions, and the defendant's urging of his co-conspirators to "create new wallets, new seed phrases, transfer money to new addresses" to conceal the proceeds of that sale, (Dkt. 27, Ex. A at ¶ 5(g) (quoting Ind. ¶ 75)), are evidence of the developers' consciousness of guilt. This is a reasonable inference to draw from the defendant's immediate selling off of the valuable TORN tokens, for fear they would be seized, and advising his colleagues to take extra measures to conceal the proceeds of that sale. (*Id.*).

The defendant's analogy to a warrant permitting the seizure of all currencies in a suspect's bank account based on the presence of some, non-specified currency does not hold water. It is difficult to come up with a scenario in which the Government would apply for a seizure warrant knowing only that a suspect's bank account received a specific amount of tainted money, but not knowing which currency the dirty funds were transferred in. Unlike with a "cold storage"

cryptocurrency wallet, the Government can obtain information about the funds in a bank account through subpoenas or other legal process, for example. Here, ascertaining which of the encrypted cryptocurrency wallets found in the defendant's residence contains evidence of the Subject Offenses would be difficult, if not impossible, through the use of subpoenas or other legal process. For example, the investigation has revealed that the defendant, at least, moved the proceeds of the sale of TORN tokens to an unhosted wallet, and more generally that he counseled his co-conspirators to conceal proceeds in cryptocurrency wallets. (*Id.*). There was accordingly probable cause to search for such wallets in the defendant's residence, but without actually obtaining access to those wallets, the Government is unable to precisely identify which ones contain responsive evidence. This is similar to the situation in which the Government knows that a defendant used cellphones or computers in furtherance of the Subject Offenses, and obtains a warrant to seize such devices from a premises and search them for responsive materials. Notably, the defendant does not challenge the aspect of the Warrant that authorized the Government to seize devices.

In sum, the Warrant contains adequate probable cause linking any and all cryptocurrency found in the defendant's residence to the Subject Offenses and the defendant's suppression motion should be denied.

### D. The Warrant Appropriately Authorized Seizure Of Cryptocurrency From the Defendant's Residence Under Federal Rule Of Criminal Procedure 41(b)(6)(A).

The defendant further argues that the cryptocurrency could not be seized because it exists on the blockchain and not physically within the defendant's home. But that is no different from other electronically stored information and the seizure of such information is plainly contemplated by Federal Rule of Criminal Procedure 41(b)(6)(a), which states that "a magistrate judge with authority in any district where activities related to a crime may have occurred has authority to issue a warrant to use remote access to search electronic storage media and to seize or copy electronically

stored information located within or outside that district if…the district where the media or information is located has been concealed through technological means." Fed. R. Crim. P. 41(b)(6)(A).

To be sure, as the Warrant explains through its incorporation of the Indictment, cryptocurrencies exist entirely on the Internet and are generated and controlled through computer software operating on a "peer to peer" network. (Ind. ¶ 4). Cryptocurrency transactions are processed collectively by the computers composing the network. (*Id.*). As the defendant's own purported expert states, "[u]nits of cryptocurrency reside on their associated blockchain. Blockchains are the only structures that can have 'custody' over any cryptocurrency." (Dkt. 27-3 at ¶ 7). But this does not put cryptocurrency held in unhosted wallets—as the proceeds of the TORN sale appear to be (Dkt. 27, Ex. A at ¶ 5(g))—beyond the reach of US law enforcement. Indeed, by the defendant's logic, no seizure of cryptocurrency would ever be permissible in the United States, because the only thing that exists in a physical location is the wallet, while the cryptocurrency itself only exists in digital form on the Internet.

Here, the Government lawfully seized a number of hardware wallets and is continuing its efforts to access the contents of those wallets—namely, the cryptographic keys necessary to identify and access whatever cryptocurrency those keys are linked to. The Government also seized numerous other electronic devices to be searched in accordance with the warrant, and the defendant does not contest that those seizures were unlawful. Pursuant to Rule 41(b)(6)(A), it is also lawful for the Government, once it has the cryptographic keys, to gain remote access to the cryptocurrency the keys are associated with so the Government may ascertain whether it is evidence and/or fruits of the Subject Offenses, such as the proceeds of the TORN sale, and therefore subject to seizure and, ultimately, forfeitable. That remote access is lawful because the location of Storm's

cryptocurrency holdings have been concealed through technological means. Fed. R. Crim. P. 41(b)(6)(A). Indeed, as the Warrant notes in detail, immediately after OFAC sanctioned the Tornado Cash service, the defendant moved the proceeds of the TORN sale to unhosted wallets and urged the other Tornado Cash service developers to hide their own TORN profits by "creat[ing] new wallets, new seed phrases, transfer[ring] money to new addresses." (Dkt. 27, Ex. A at ¶ 5(g) (quoting Ind. ¶ 75)). The intent here was plain: move the tainted money before law enforcement can seize it.

The defendant's suppression motion should be dismissed on these grounds.

### E.  The Government Need Not Obtain A Separate Seizure Warrant For Cryptocurrency When The Warrant Authorized The Search *And Seizure* Of Any And All Cryptocurrency From The Residence.

The defendant's final argument with respect to the Warrant is mystifying. Despite the plain language of the Warrant authorizing the search *and seizure* of any and all cryptocurrency found in his residence, the defendant asks this Court to ignore that language and to, in essence, compel the Government to seek a second, standalone seizure warrant. The seizure language in the Warrant was not "[thrown] in" as an afterthought, (Dkt. 27 at 12); it was included deliberately, it was reviewed and authorized by Judge Theiler, and it reaches not just any cryptocurrency found in the defendant's residence, but also authorizes the seizure of electronic devices and other forms of evidence. Notably, the suppression motion does not take issue with *those* seizures.

And as the defendant and this Court well know, seizure of an item is not the same as forfeiture of that item; rather, it is a lawful precursor to forfeiture to secure assets so that they may be later forfeited upon conviction in connection with sentencing. The Government did not use the Warrant as a "back door" to improperly seize property from the defendant, (Dkt. 27 at 1); forfeiture of the items seized from his residence will be duly adjudicated upon his conviction. Again, Judge

99

Theiler knew exactly what the Government was asking for and rightfully approved the Government's application. As another court recently explained at length in rejecting a similar argument:

> The search warrant, which is captioned 'Search and Seizure Warrant,' authorized law enforcement officers to 'seize' and 'search' the items listed on Attachment A to the warrant…Attachment A is captioned 'Items to be Seized'…Included in the 'items to be seized' are computers, computer hardware and software, electronic devices, media storage devices, and cellular phones. Defendant's argument that the search warrant authorized the seizure—but not the search—of his computer, phone, and computer storage media strains the bounds of logic and law. The language of a search warrant 'must be given a practical, rather than a hypertechnical, interpretation that is cabined by the purpose for which it issued. *United States v. Fiorito*, 640 F.3d 338, 347 (8th Cir. 2011). Read together, the search warrant and Attachment A to the warrant clearly permit law enforcement officers to seize and search the items listed on Attachment A, which includes Defendant's computer, phone, and computer storage media. Moreover, many of the 'items to be seized' that were listed on Attachment A—such as data, records, and correspondence contained on the computers, phones, and storage devices—could be located and seized only if the computers, phones, and storage devices were searched.

*United States v. Axelson*, No. 17 Cr. 0225 (PJS/HB), 2018 WL 614476, at *7 (D. Minn. Jan. 9, 2018), *report and recommendation adopted*, No. 17 Cr. 0225 (PJS/HB), 2018 WL 614735 (D. Minn. Jan. 29, 2018).

Finally, as already discussed, the Warrant sufficiently articulates probable cause that there is a connection between any cryptocurrency in the residence and the Subject Offenses. Accordingly, the defendant's suppression motion should be denied on these grounds, as well.

## **CONCLUSION**

For the reasons set forth above, the defendant's motions should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


By: /s/     Thane Rehn
    Ben Arad
    Benjamin A. Gianforti
    Thane Rehn
    Assistant United States Attorneys
    (212) 637-2354

    Kevin Mosley
    Special Assistant United States Attorney


Dated: April 26, 2024
       New York, New York

101