O9QESTOD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                          23 Cr. 430 (KPF)

ROMAN STORM,

                                            Decision
                    Defendant.

------------------------------x

                                            New York, N.Y.
                                            September 26, 2024
                                            4:30 p.m.


Before:

                    HON. KATHERINE POLK FAILLA,

                                            District Judge

                            APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  NATHAN M. REHN
     BEN ARAD
     BENJAMIN A. GIANFORTI
     Assistant United States Attorneys

KEVIN G. MOSLEY
     Special Assistant United States Attorney

WAYMAKER LLP
     Attorneys for Defendant
BY:  BRIAN E. KLEIN
     KEVIN M. CASEY
     KERI C. AXEL

HECKER FINK LLP
     Attorney for Defendant
BY:  DAVID E. PATTON

O9QESTOD

1                (Case called)

2                MR. REHN:  Good afternoon, your Honor.

3           This is Thane Rehn for the government.  Also on the

4      line are Ben Gianforti and Ben Arad, Assistant United States

5      Attorneys, and Special Assistant United States Attorney Kevin

6      Mosley.

7                THE COURT:  Good afternoon to everyone, and thank you.

8           And representing Mr. Storm this afternoon?

9                SPEAKER2:  Good afternoon, your Honor.

10          This is Brian Klein on the line, also my colleagues

11     Keri Curtis Axel and Kevin Casey, and then David Patton, and

12     our client is also dialed in, Mr. Storm.

13               THE COURT:  Thank you very much.

14          Good afternoon to each counsel.

15          Mr. Storm, this is Judge Failla.  Are you able to hear

16     me, sir?

17               THE DEFENDANT:  Yes, your Honor, I'm able to hear you.

18     This is Roman Storm.

19               THE COURT:  Thank you very much.

20          Mr. Klein, I thought that, given that this was going

21     to be a lengthy oral decision, it might make sense for the

22     parties to appear telephonically.  I also thought that might be

23     a convenience to you and to your client, but of course I would

24     like to obtain, if I may, your client's waiver of having this

25     proceeding take place in person.

O9QESTOD

1          SPEAKER2:  Your Honor, yes, you have that.  And we

2    greatly appreciate you letting us do this over phone.  Do you

3    need him to agree over the phone?

4          THE COURT:  I would, thank you.  And you'll excuse me,

5    there was an interruption a moment there.  Hopefully there

6    won't be multiple interruptions during this conference.

7          Mr. Storm, were you able to hear me just speaking with

8    your counsel a moment ago?

9          THE DEFENDANT:  Yes, I did.  And I do agree to

10   proceed.  Thank you.

11         THE COURT:  By that, you mean you agree to proceed

12   telephonically, and I thank you for noting that.

13         THE DEFENDANT:  Right.

14         THE COURT:  Well, then let me give folks an idea of

15   the afternoon's proceedings.  I have a long oral decision to

16   read into the record, and at times like this, I think that I

17   probably should issue it in writing, but it would get to you

18   much more quickly if I did it orally, and that's why I'm doing

19   it this way.

20         I am going to give everyone a moment or two to mute

21   themselves so that there aren't any interruptions as I give

22   this.  And just for your planning purposes, I did not time

23   myself, but I imagine that this is a 45- to 60-minute decision,

24   so I appreciate in advance all of the patience and the

25   attention that you can give me.  So I'll pause for a moment and

O9QESTOD

1    then I will begin.

2         I do begin by thanking everyone on the call, in

3    particular counsel for both sides and Mr. Storm for your

4    comprehensive submissions, which took me a while to get

5    through, and of course your oral argument presentations, but

6    also your patience.  Right after the oral argument in this

7    matter, I found out that I had very time-sensitive issues in

8    two other cases that I have with classified components to them,

9    and I've also spent most of the month of September on trial.

10   My trial finished this past Monday, so I thank for you your

11   patience.

12        I also thank those who might be listening to this call

13   or who will see the transcript of this who submitted *amici*

14   *curiae* briefs to aid me in considering the issues in this case.

15        After the oral argument in August, I was advised by

16   the parties that they had resolved the issues regarding the

17   motion to suppress.  I won't be discussing it here; instead,

18   I'll be dealing with the motion to compel and the motion to

19   dismiss.  And for the reasons that I'm about to outline, I'm

20   denying both motions.

21        I will ask the parties to obtain a copy of this

22   transcript whenever it's convenient for you.

23        I'm going to begin with the motion to compel.  And

24   Mr. Storm is moving the Court for an order compelling the

25   government to produce basically two categories of information.

O9QESTOD

 1    I'll refer to the first category as "MLAT" communications, and

 2    I know the parties know what I'm speaking of.  And at the time

 3    of the oral argument, what I had understood was that Mr. Storm

 4    had received some portion of the materials that the government

 5    had received in response to MLAT requests but not the other

 6    line communications with, for example, the Dutch authorities.

 7          I also did appreciate Mr. Klein's proviso that the

 8    defense didn't want nonsubstantive communications like

 9    transmittal letters or scheduling emails, so nothing of that

10    nature.

11          There's also the second category, which would be

12    communications with or involving the office of Foreign Assets

13    Control, which I will refer to as "OFAC," and the Financial

14    Crimes Enforcement Network, which I will refer to as "FinCEN,"

15    materials and communications regarding Mr. Storm or this case.

16    And Mr. Storm argued that the government was required to

17    produce this information in accordance with their obligations

18    under Federal Rule of Criminal Procedure 16 and cases such as

19    *Brady v. Maryland*, 373 U.S. 83, from 1963.  He argued that the

20    information was material to his defense preparation and, in

21    particular, that there was a strong indication that it will

22    play an important role in uncovering admissible evidence,

23    aiding in witness preparation, corroborating testimony, or

24    assisting impeachment or rebuttal, and in so doing he was

25    quoting from Judge Kaplan's decision in *United States v. Stein*,

O9QESTOD

1  488 F. Supp. 2d 350, from 2007.

2         The government opposed the motion and argued that

3  Mr. Storm had not made a *prima facie* showing of materiality,

4  and instead argued that these requests amounted to "a

5  speculative fishing expedition."  Their words, not mine.

6         So, looking first at the applicable law, I'm aware,

7  and I know the parties are aware, so I might proceed somewhat

8  summarily here, that pretrial discovery is governed by Rule 16

9  of the Federal Rules of Criminal Procedure, which provides, in

10 pertinent part, that a defendant is entitled to obtain from the

11 government documents and objects that are "within the

12 government's possession, custody, or control" if they are

13 either "material to preparing the defense" or will be used by

14 the government in its case in chief at trial.

15        And what makes something material is if it could be

16 used to counter the government's case or to bolster a defense.

17 And the Second Circuit and other courts have found that

18 information not meeting either of those criteria is not to be

19 deemed material.  This would include cases such as *United*

20 *States v. Stevens*, 985 F.2d 1175, from 1993, and *United*

21 *States v. Scully*, which is an Eastern District decision from

22 2015, discussing this, 108 F. Supp. 3d 59.

23        The courts are directed to consider "the logical

24 relationship between the information and the issues in the

25 case" and "the importance of the information in light of the

O9QESTOD

evidence as a whole."  "There must be some indication that the

pretrial disclosure of the disputed evidence would ... enable

[] the defendant significantly to alter the quantum of proof in

his favor."  And I am quoting here from *United*

*States v. Maniktala*, 934 F.2d 25, a Second Circuit decision

from 1991.  And in this setting, it is "a defendant who bears

the burden of making a *prima facie* showing that the information

sought is material."

There are many cases for this proposition.  One recent

one is Judge Cronan's decision in *United States v. Alexandre*,

at 2023 WL 416405, and the *United State v. Rigas*,

258 F. Supp. 2d 299, a Southern District decision from 2003.

Separately, there is the line of cases, including

*Brady* and others, that establishes "the government has an

affirmative duty under the Due Process Clause to disclose

favorable evidence known to it, even if no specific disclosure

request is made by the defense."  Cases discussing the *Brady*

and *Giglio* obligations of the government include *United*

*States v. Hunter*, 32 F.4th 22, a Second Circuit decision from

2022.

These cases also make clear, however, that "there is

no general constitutional right to discovery in a criminal

case," that *Brady* did not create such a right, and that

"Rule 16 does not entitle a criminal defendant to a broad and

blind fishing expedition among items possessed by the

O9QESTOD

government on the chance that something impeaching might turn

up."  I've been quoting from two cases here, the first is

*Weatherford v. Bursey*, 429 U.S. 545 from 1977, and the second

is the *Scully* case I mentioned earlier.

Let me now turn to my analysis of this motion.  And as

I suggested in my questioning at oral argument, I find now, and

I found then, Mr. Storm's arguments to compel production of the

MLAT communication, and that's where I'm beginning, to be too

speculative and too attenuated to satisfy his burden of showing

materiality.

Even under Judge Kaplan's *Stein* standard, Mr. Storm

has not demonstrated a "strong indication" that the information

he seeks would aid defense.  And that is because, in the papers

I read and in the discussions at oral argument, everything was

couched in terms of "may":  Disclosure of these communications

may provide insight into the government's theories of the case,

particularly if they have changed; they may particularize the

evidence the government intends to use at trial; they may give

insights into other complicit parties, or parties the

government thought were complicit earlier on; they may help the

defense identify percipient witnesses for trial.  But Mr. Storm

has not succeeded in connecting the dots and explaining

precisely how the communications sought would aid the defense.

And that's insufficient under the law that I've just listed.

Of course, the defense argues that, because it does

O9QESTOD

1    not know the precise content of the requested materials, it

2    must couch what it understands are in the requested materials

3    and communications with terms like "could" and "may."  While

4    that may be understandable, it is still insufficient.  There

5    must be some showing that the MLAT communications are, in fact,

6    and not just in theory, material to the defense.  Instead, at

7    oral argument, Mr. Klein recalled that, as a former prosecutor,

8    he had observed "MLAT requests and communications, again, can

9    often involve substantive facts about the case" or exhibits.

10    And I'm quoting from the transcript at page six.

11        I, too, am a former prosecutor, but my experiences,

12    which, as it happened, never resulted in a request for, much

13    less a disclosure of, MLAT communications, it just can't be the

14    basis for me to make a finding that such communications would

15    be material to the defense.

16        Mr. Klein also sought to analogize the MLAT

17    communications to search warrant applications, which are

18    typically disclosed.  But, as the government noted, those

19    materials do not implicate comparable "diplomatic

20    sensitivities."  And ultimately, upon looking at the little bit

21    of case law in this area, I agree with the conclusion that

22    Judge Furman reached in the *Ralston* case, *United*

23    *States v. Ralston*, 2021 WL 5054464 from 2021, that he rejected

24    a motion to compel MLAT communications after reviewing the

25    materials.  Another case in which the motion was denied was

O9QESTOD

*United States v. Hutchins*, 2018 WL 1695499, from the Eastern

District of Wisconsin.

Now, to be clear, I'm aware that there are some

factual differences.  In Judge Furman's case, for example, the

materials there were sought in order to prove that the

government had made a pretextual use of MLATs in order to toll

the relevant statute of limitations.  That's true, but as it

happened, the defendant in the *Ralston* case made a much more

detailed, even if ultimately unsuccessful argument, than

Mr. Storm makes here.

I am also aware that Judge Furman reviewed the MLAT

materials *in camera* before arriving at his decision.  In that

case, of course, the argument had been that they had been

pretextual and the government had consented to their

inspection.  There's no comparable consent or showing in this

case.  And as I'll discuss shortly, I am not going to review

these materials *in camera* simply because I've been asked to do

so.  And in part, that is because, as Mr. Klein confirmed at

oral argument, the defense was not, at this time, raising an

argument of government misconduct, the likes of which might be

discussed in cases like *Kyles v. Whitley*, 514 U.S. 419, from

1995.

I also do see that the *Hutchins* Court noted that the

government had produced all of the information it had received

from the request at issue.  I don't have that exact

O9QESTOD

1    representation in this case; I have, instead, the government's

2    representation that it has complied with its Rule 16 and its

3    disclosure obligations.

4         At oral argument, defense counsel also suggested that

5    Mr. Storm had the right to review the MLAT materials in order

6    to see what individuals or arguments were on the government's

7    radar screen when the requests were submitted, and from this,

8    Mr. Storm might learn of potential witnesses or of individuals

9    the government once thought were co-conspirators, or once

10   thought might have been involved in the underlying offense but

11   elected not to charge, but neither of these reasons suffices to

12   compel disclosure.  To the extent the defense is moving for

13   disclosure of other co-conspirators or government informants,

14   there is a different vehicle, and that would be a motion under

15   *Roviaro v. United States*, 353 U.S. 53, from 1957.

16        To the extent the government may have abandoned an

17   earlier theory of the case because, as Mr. Klein argued, it is

18   "somehow helpful to" Mr. Storm, that information would be

19   subject to disclosure, if at all, under the government's *Brady*

20   or *Giglio* obligations, it would not necessitate disclosing the

21   underlying communications with the foreign prosecuting office

22   or other state organizations.

23        Mr. Klein also suggested that, because the case "is a

24   novel, complex case of first impression … understanding the

25   government's theory would be generally helpful to us."  I'm

O9QESTOD

1    quoting here from the transcript at page 11.  But there is, in

2    fact, a 37-page speaking indictment, and defense conceded that

3    things were learned from that indictment and from the briefing

4    in this case.

5         As a fallback position, Mr. Storm asks this Court to

6    conduct an *in camera* review of the MLAT communications, and I

7    am denying this request as well.  I want to be clear, and some

8    of you know this, that I come from the appellate side of the

9    house, and I will frequently extend myself to do things that

10   aren't technically required under the law simply to stave off

11   an appellate issue.  I'm not doing that here, however, because

12   I believe it would set a bad precedent.  To conduct an *in*

13   *camera* investigation of the communications with the Dutch

14   authority, for example, on this slender a record would

15   effectively call for *in camera* reviews in all cases or nearly

16   all cases.  The defense hasn't met its burden, and I'm not

17   interested in being a data point for some later motion for an

18   *in camera* inspection on a similarly sparse record.

19        Now, there is a second prong of the motion to compel.

20   And here, Mr. Storm is seeking to compel the government to

21   produce all communications with OFAC and FinCEN relating to him

22   or to this case more broadly.  In his reply submissions and

23   then again in oral arguments, Mr. Storm had narrowed his

24   request to three, asking the Court to, first, have the

25   government confirm that it has produced everything received

O9QESTOD

1    from OFAC and FinCEN, and, of course, if it hadn't produced

2    things, to produce the materials that it held back; number two,

3    to confirm that their agents had not had separate contact with

4    OFAC and FinCEN; and number three, to order to OFAC and FinCEN

5    to conduct prudential *Brady* reviews.  As the government, at

6    oral argument, confirmed the second point, that is now moot,

7    and this Court is denying the remaining two requests.

8           At oral argument, the government confirmed that it did

9    not produce all materials received from OFAC and FinCEN, but

10    that it did fully comply with its discovery and disclosure

11    obligations.  And as with the MLAT communications, there are

12    standards for the production of discovery pursuant to Rule 16,

13    and for the disclosure of information pursuant to cases like

14    *Brady*.  There is nothing to suggest that the government wasn't

15    warranted in withholding from disclosing things outside of the

16    bounds of these obligations, and I am therefore not going to

17    compel them to turn over the withheld materials.  But as I made

18    clear at oral argument, and as the government is aware from my

19    work in other cases, if it turns out the government ultimately

20    has interpreted its obligations too narrowly, there likely will

21    be unfortunate consequences for their case.

22           This Court is also declining the invitation to issue

23    prudential search requests to OFAC and FinCEN to conduct *Brady*

24    reviews, assuming that, as the government does not but I do

25    here, that I have the jurisdiction to compel such actions in

O9QESTOD

1    the first instance.

2          And here, the issue, as the parties are aware,

3    distills to whether either of these agencies qualifies as a

4    part of the prosecution team.  Now, the notion of the

5    prosecution team is discussed in cases such as *United*

6    *States v. Avenatti*, 2022 Westlaw 457315, *United*

7    *States v. Avellino*, 136 F.3d 249, a Second Circuit decision

8    from 1998, *United States v. Meregildo*, 920 F. Supp. 2d 434, a

9    Southern District decision, from 2013, and I just looked

10    recently, and it's been discussed by Judge Oetken in *United*

11    *States v. Middendorf*, 2018 WL 3956494, from the Southern

12    District.  And the notion there is that "the prosecution's

13    obligation extends to any material in the possession of any

14    entity that has acted as an 'arm of the prosecutor' in a given

15    case."  I am quoting from the *Middendorf* decision here.  And

16    Judge Oetken set forth order of five primary factors that a

17    Court is to consider, which include "whether the entity

18    participated in the prosecution's witness interviews, was

19    involved in presenting the case to the grand jury, reviewed

20    documents gathered by or shared documents with the prosecution,

21    played a role in the development of prosecutorial strategy, or

22    accompanied the prosecution to court proceedings."

23          Here, I am accepting the government's representation

24    that OFAC and FinCEN did not affect the development of the

25    government's investigative or prosecutorial strategy; did not

O9QESTOD

1    assign any employees to the prosecution team as Special

2    Assistant United States Attorneys; were not involved in

3    presenting the case to the grand jury; did not receive grand

4    jury transcripts; have not participated in the execution of

5    search warrants or responsiveness reviews; did not obtain

6    materials produced to the government pursuant to grand jury

7    subpoenas; have not attended government interviews; did not

8    contribute to drafts of the indictment or the prosecution

9    memorandum used to make the criminal charging decision; and

10   have not attended court proceedings in this case."  And in

11   consequence, this Court will not order them to review their

12   files for *Brady* or Rule 16 material.

13          Once again, and this was a theme in the motion to

14   compel, Mr. Storm has not made a showing that these files

15   contain exculpatory material.  There is, of course, the

16   citation to the 70-page OFAC report, but to reason from this

17   that OFAC may have materials that are Brady materials, my

18   concern is that to order OFAC to review its files for such

19   material would be a complete end-run around the prosecution

20   team construct, and this Court will not do it, and therefore

21   that motion to compel production is denied.

22          I now turn to the motion to dismiss.  And here,

23   Mr. Storm is seeking dismissal of each of the three charges

24   against him.  Because the Count One dismissal arguments are

25   dependent, in part, on the Count Two, that's where the Court is

O9QESTOD

1    beginning.  So, as to Count Two, which is Conspiracy to Operate

2    an Unlawful Money Transmittal Business, Mr. Storm argues that

3    the indictment fails to allege that he or Tornado Cash had the

4    requisite control to be a money transmitting business, and,

5    additionally, that the indictment fails to allege that he or

6    Tornado Cash charged a fee for the transfer of funds.

7         Turning now to Count One, which was the Conspiracy to

8    Commit Money Laundering, that's what it charges, Mr. Storm

9    argues first that the alleged "financial transactions" do not

10   come within the ambit of Section 1956 because Tornado Cash was

11   not a "financial institution"; second, he argues that he did

12   not conspire or agree with anyone to conduct a financial

13   transaction involving the proceeds of specified unlawful

14   activity; and third, that he lacked the specific intent to

15   further an illegal purpose.

16        As to Count Three, which is the Conspiracy to Violate

17   IEEPA, Mr. Storm argues first that the "informational

18   materials" exception requires dismissal of the count, and

19   separately, that it fails to allege that he willfully conspired

20   to evade sanctions on North Korea.

21        There are also several broader grounds that I'll talk

22   about a little bit later.  There are some arguments made under

23   the First Amendment about overbroad or First Amendment

24   violations, and Mr. Storm also argues that the indictment

25   should be dismissed on Due Process grounds, and I'll talk about

O9QESTOD

1    that a little bit later.

2            Again, I'll be somewhat summarily in this area.  But a

3    defendant can move to dismiss an indictment on the grounds that

4    it is defective Rule 12(b)(3)(B) of the Federal Rules of

5    Criminal Procedure, including for lack of specificity and for

6    failure to state an offense.  And because "federal crimes are

7    solely creatures of statute, ... a federal indictment can be

8    challenged on the grounds that it fails to state or fails to

9    allege a crime within the terms of the applicable statute."

10   One case for this proposition, and there are many, is *United*

11   *States v. Aleynikov*, 676 F.3d 71.  That said, courts have found

12   that a defendant faces a "high standard" in seeking to dismiss

13   an indictment because Federal Rule of Criminal Procedure 7

14   requires only that the indictment provide "a plain, concise,

15   and definite written statement of the essential facts

16   constituting the offense charged."  As a result, courts

17   generally find that "an indictment need 'do little more than

18   track the language of the statute charged and state the time

19   and place, in approximate terms, of the alleged crime.'"  I'm

20   quoting here from *United States v. Stringer*, 730 F.3d 120, a

21   Second Circuit decision from 2013.

22           And another case that stated a similar proposition is

23   *United States v. Yannotti*, 541 F.3d 112, a Second Circuit

24   decision from 2008, which indicates that "[a]n indictment is,

25   sufficient when it charges a crime with sufficient precision to

O9QESTOD

1    inform the defendant of the charges he must meet and with

2    enough detail that he may plead double jeopardy in a future

3    prosecution based on the same set of events."

4         At the motion to dismiss stage, this Court must

5    "accept as true all of the allegations of the indictment."

6    That's stated in *United States v. Goldberg*, 756 F.2d 949, a

7    Second Circuit decision from 1985.  In addition, the Court is

8    not to "look beyond the face of the indictment and draw

9    inferences as to proof to be adduced at trial, for 'the

10   sufficiency of the evidence is not appropriately addressed on a

11   pretrial motion to dismiss[.]'"  Here, I'm quoting *United*

12   *States v. Alfonso*, 143 F.3d 772, a Second Circuit decision from

13   1998.  In another more recent case, *United State v. Dawkins*,

14   999 F.3d 767, a Second Circuit decision from 2021, the Court

15   finds that summary judgment proceedings "do[] not exist in

16   federal criminal procedure."

17        Now, before I get into the merits of Mr. Storm's

18   argument, I want to echo something that I observed at oral

19   argument, which is that, to the extent that Mr. Storm is asking

20   me to decide a controverted issue of fact, or to insert a

21   clarifying factual allegation into the government's charging

22   language, I'm just not able to do that based on the cases that

23   I've just cited.  These factual arguments that have been

24   proffered to me include, as two examples, Mr. Storm's

25   assertions regarding the nature of the Tornado Cash service,

O9QESTOD

1    and those concerning the degree to which Tornado Cash's

2    components were "open source" or "immutable."

3              As to the first, the indictment charges that Tornado

4    Cash comprised a website, a user interface, various smart

5    contracts, including those smart contracts that were referred

6    to in the indictment as "Tornado Cash pools," and a network of

7    "relayers" who provided customers with enhanced anonymity in

8    exchange for a fee.  Now, as to the second, the indictment

9    alleges that Tornado Cash's three founders controlled the user

10   interface, or UI, and had the ability to make changes to it at

11   their own discretion throughout the charged time period.  The

12   government also notes in its opposition that the Tornado Cash

13   UI wasn't announced as open source until July 2022, and argues

14   that even then, such an announcement was largely a public

15   relations move without any real effect.

16             Relatedly, Mr. Storm argues that the Tornado Cash pool

17   smart contracts were "immutable" after May of 2020, but the

18   indictment charges, and the government has argued to me, that

19   other aspects of the Tornado Cash service were not similarly

20   free from tinkering.

21             The point is, at this stage in the case, this Court

22   cannot simply accept Mr. Storm's narrative that he is being

23   prosecuted merely for writing code.  For starters, that's an

24   overstatement of what's actually charged in the indictment.

25   What is more, if the jury ultimately accepts his narrative,

O9QESTOD

 1    then it will acquit, but there is no basis for me to decide, as

 2    a matter of law, that the government hasn't alleged criminal

 3    conduct sufficient to satisfy each of the elements of the

 4    offenses charged.  But I will now turn to the legal challenges

 5    to each statute.

 6            Count Two charges an offense under 1960.  And there's

 7    a lot of discussion in the parties' submissions about what is a

 8    money transmitting business.  There are references to it in

 9    Section 1960 itself, there are references to it in Section 5530

10    of Title 31 of the United States Code, there are references to

11    a money transmitter or a money services business in the FinCEN

12    implementing regulations, which are set forth at

13    31 C.F.R. 1010.100.

14            And so on this point, I won't get into the minutia of

15    all the various definitions, except to disagree, to the extent

16    that anyone, including Mr. Storm, is arguing that the

17    definitions of "money transmitting" in Sections 1960 and 5330

18    are co-extensive.  I do not believe that to be the case.

19            Mr. Storm also reminds me that exempted from the

20    definition of "money transmitter" are individuals who merely

21    provide the delivery communication or network access services

22    used by a money transmitter to support money transmission

23    services.

24            So, getting to the meat of Mr. Storm's argument, he

25    argues that Count Two must be dismissed for two independent

O9QESTOD

1    reasons:  First, that the statute requires allegations that the

2    defendant in question had control over the funds being accepted

3    or transmitted; and second, the absence of allegations that he

4    or his colleagues charged a fee for transmitting funds.

5        And in support for the first point, Mr. Storm cites

6    various definitions about accepting and transmitting, and also

7    cites the Second Circuit's decision in *United States v.*

8    *Velastegui*, 199 F.3d 590, and *United States v. Bah*,

9    574 F.3d 106.  He also cites FinCEN guidance regarding

10   intermediaries who do not qualify as money transmitters.  And

11   in his estimation, the use of what is known sometimes in this

12   case as the "secret note," which permitted the Tornado Cash

13   user to access and use the funds, always remained with the

14   user.

15       Here, this Court agrees with the government that

16   control is not a necessary requirement of the Section 1960

17   offense.  First of all, and as a threshold matter, I am

18   required to accept at this stage the allegations of the

19   indictment that the charged money transmitting business

20   included the conduct of Tornado Cash's founders and network of

21   relayers, and not merely the pool.

22       But getting back to the issue of control, the control

23   requirement is not in the statute, and this Court is not going

24   to read it in.  Section 5330 also employs a broader definition

25   of "engag[ing] as a business in the transmission" of funds, and

O9QESTOD

1    that definition includes "any person who engages as a business

2    in an informal money transfer system or any network of people

3    who engage as a business in facilitating the transfer of money

4    domestically or internationally outside of the conventional

5    financial institutions system."

6        And let me turn for a moment to the FinCEN 2019

7    regulatory guidance.  Yes, it does speak of control, but it

8    does that in the context of setting forth a four-factor test

9    for determining whether a wallet provider is a money

10   transmitter.  The section addressing cryptocurrency mixing

11   services does not similarly require control.

12       At its core, the Section 1960 offense seeks to prevent

13   the unlicensed transmission of customer funds from one location

14   to another, irrespective of whether the transmitter obtained

15   temporary control over the funds to effectuate the transfers or

16   constructed the transfers specifically in a manner to avoid

17   such control.  Here, the value-add of Tornado Cash, or in the

18   Tornado Cash system, was that it allowed customers to send

19   cryptocurrency from one wallet to another, without an obvious

20   link between the two wallets, by pooling the customers' funds

21   in an intermediary wallet on the blockchain, and without

22   necessitating direct customer interaction with Ethereum.  That

23   is not meaningfully different from the cryptocurrency mixing

24   services recognized as money transmitting businesses in the

25   *United States v. Murgio*, 209 F. Supp. 3d 698, a Southern

O9QESTOD

District decision from 2016; *United States v. Harmon*,

474 F. Supp. 3d 76, a District of the District of Columbia

decision from 2020; and *United States v. Sterlingov*,

573 F. Supp. 3d 28, a District of the District of Columbia

decision from 2021.

I do appreciate that Mr. Klein, who I know was

involved with some of these cases, disagrees with me and

believes that all of those have control, but looking at the

actual businesses, I don't find this one to be meaningfully

different.

I also do agree that to accept Mr. Storm's argument

would frustrate the purpose of Section 1960, which was designed

to "keep pace with … evolving threats" as new methods of moving

criminal proceeds emerged over time. Quoting here from *United*

*States v. Faiella*, 39 F. Supp. 3d 544, from 2014.

So, as fallback position, Mr. Storm suggests that

Tornado Cash would fall within the exception for network access

services. Here, while acknowledging the paucity of case law,

this Court agrees with the government that the conduct alleged

in the indictment and attributed to Mr. Storm and his

co-conspirators goes far beyond the provision of access to a

network. The Court also agrees that the phrase itself is best

construed as referring to a provider of access to a general

network such as the internet, as was discussed in the *WorldCom*

decision. That's *In re WorldCom, Inc.*, 371 B.R. 19, a

O9QESTOD

1   Bankruptcy decision from 2007.

2          But the Court is also rejecting Mr. Storm's second

3   argument for dismissal, and that is that the government was

4   required to allege that he or his colleagues or Tornado Cash

5   charged a fee for money transmitting services.  To be sure, in

6   the *Velastegui* decision that they cite, the Second Circuit

7   referred to "a money transmitting business receiving money from

8   a customer and then, for a fee paid by the customer,

9   transmitting that money to a recipient in a place that the

10  customer designates, usually a foreign country."  But to the

11  extent that that description was meant to be definitive, the

12  Second Circuit later clarified, in *United States v. Banki*, a

13  2012 decision reporting at 685 F.3d 99, that "under Second

14  1960, a 'business' is an enterprise that is carried on for

15  profit or financial gain."  That was also discussed in *United*

16  *States v. Mazza-Alaluf*, 607 F. Supp. 2d 484, a Southern

17  District decision from 2009, that was then affirmed by the

18  Second Circuit in 2010.

19          As I understand the charges in the indictment, the

20  Tornado Cash enterprise was not an altruistic venture.  Among

21  other things, the indictment alleges that Mr. Storm and other

22  Tornado Cash founders solicited approximately $900,000 in

23  financing from a venture capital fund in exchange for an

24  expectation that the fund would receive a share of future

25  profits from the Tornado Cash service; that they used a bank

O9QESTOD

account to host the Tornado Cash website and to pay for traffic

between the user interface and the Ethereum blockchain; that

they designed and promoted the Tornado Cash service's relayer

feature, including its structure of charging fees for

withdrawals; that they created a formula for capitalizing on

relayer fees to boost the value of TORN tokens, the

cryptocurrency token they created; and that they cashed out

TORN holdings for millions of dollars.  To the extent that a

fee was required, this Court finds that the fees that were

charged and received by the relayer co-conspirators would

suffice.

So, I turn now to Count One, which is the Money

Laundering count and its Concealment Money Laundering count.

And I believe the parties are aware of the elements of the

offense, so I will skip over them and simply note that they are

discussed in cases that include *United States v. Gotti*,

459 F.3d 296.  And in particular, that deals with the conflict

of concealment money laundering.

Here, Mr. Storm first argues that Count Two must be

dismissed because of the failure to allege a "financial

transaction."  But for the reasons that I just discussed, the

Court finds that the government has adequately charged an

unlawful money transmitting business offense under Section

1960, the logical extension of that is that Tornado Cash also

qualified as a financial institution, and the transactions at

O9QESTOD

1    issue also involved the use of a financial institution.

2            The government offers a fallback position, noting that

3    the statutory definition of "financial transaction" contains

4    two alternative definitions; either "a transaction which in any

5    way or degree affects interstate or foreign commerce … or a

6    transaction involving the use of a financial institution[.]"

7    And they argue that, in paragraph 78 of the indictment, they

8    were charging in the conjunctive.

9            Now, that point may be somewhat academic, giving my

10   resolution of the motion, but on this point, I do find merit in

11   the arguments in the defense's reply brief that, if the

12   government is really seeking to charge an offense under

13   Section 1956(c)(4)(A), the statute contains additional elements

14   that I don't believe are clearly alleged, such as the

15   transaction might involve the movement of funds by wire or

16   involve monetary instruments, or involve the transfer of title

17   to real property, vehicle, vessel, or aircraft.  So if the

18   government is really going that route, they might want to clean

19   up confusion in a superseding charging instrument, if that's

20   the track they're pursuing at trial.

21           But Mr. Storm's second argument for dismissal

22   straddles the "financial transaction" and "conspiracy" elements

23   of the offense.  He argues that the government was required to

24   allege that he knew the property involved in a particular

25   financial transaction represented the proceeds of an unlawful

O9QESTOD

1    activity, and that's an accurate statement of the law.  But

2    from this, Mr. Storm reasons that Count One must be dismissed

3    because it does not allege either that Mr. Storm entered into

4    an unlawful agreement with any person who used Tornado Cash

5    smart contracts or the Peppersec UI for illicit purposes; or,

6    number two, that he had the specific intent to commit money

7    laundering; or, number three, that the indictment alleges, or

8    in his case, he said, fails to allege the necessary *mens rea*.

9    Let me unpack these arguments now.

10        The law is clear that, to be guilty of money

11    laundering, the defendant need not be guilty of, involved in,

12    or even aware of the specifics of, the specified unlawful

13    activity.  One case for that proposition is *United States v.*

14    *Silver*, 948 F.3d 538, a Second Circuit decision from 2020.

15    Another case in which it's discussed is *United States v.*

16    *Kozeny*, 493 F. Supp. 2d 693, and that's a Southern District

17    decision from 2007, affirmed by the Second Circuit in 2008.

18        "Conspiring to launder money requires that two or more

19    people agree to violate the federal money laundering statute,

20    and that the defendant 'knowingly engaged in the conspiracy

21    with the specific intent to commit the offenses that [are] the

22    objects of the conspiracy.'"  I'm quoting from *United States v.*

23    *Garcia*, 587 F.3d 509, a Second Circuit decision from 2009.  And

24    "transaction money laundering ... it requires proof that the

25    purpose or intended aim of the transaction was to conceal or

O9QESTOD

disguise a specified attribute of the funds."  I'm quoting here

from *United States v. Huezo*, 546 F.3d 174, a Second Circuit

decision from 2008.

Let me put this more simply.  "The government did not

have to allege that Mr. Storm conspired with any of Tornado

Cash's users to promote or further any of the illicit purposes

of their transactions.  Indeed, the government did not have to

allege that Mr. Storm was aware of the specific nature of, much

less be a participant in, the underlying criminal activity.

Instead, the government needs to prove Mr. Storm needed to know

that he was "dealing with the proceeds of some crime, even if

he [did] not know precisely which crime."  Cases for that

proposition include *United States v. Prevezon Holdings Ltd.*,

122 F. Supp. 3d 57, a Southern District decision from 2015, and

*United States v. Tillman*, 419 F. App'x 110, a Second Circuit

summary order from 2011.

So, in light of cases like *Prevezon Holdings*, I reject

Mr. Storm's argument that "whether or not an express agreement

is required, the government must show 'sufficient proof of

mutual dependence and assistance' between the perpetrators of

the underlying criminal acts and the alleged money laundering

conspirators."  I'm quoting here from the motion to dismiss

briefing at pages 28 through 29.  In some cases, "the same bad

actors are alleged to have both perpetrated the underlying

specified unlawful activity and to have conducted the financial

O9QESTOD

1    transactions in which the proceeds of that activity were

2    laundered."  It is true that is in some cases, but it is not a

3    requirement.  Stated somewhat differently, it is indeed the

4    case that the Venn diagram of the specified unlawful activity

5    and the money laundering conspiracy often involves common

6    conspirators, but it is not necessary, as my restaurant

7    hypothetical at oral argument explained.  And a contrary

8    holding would run counter to the decision that I just

9    discussed.

10           I did have a similar conversation with Ms. Axel about

11   this at oral argument, where she argued that in every money

12   laundering conspiracy case that she had seen, the defendant was

13   either a participant in the underlying crime or there was "some

14   connection or interdependence between the group conducting the

15   unlawful activity and the money laundering."  I accept that

16   these fact patterns are common, and certainly they would aid

17   the prosecution in proving both the knowledge and the

18   willfulness elements that they are required to prove in the

19   money laundering offense, but I cannot go so far as to say that

20   they are necessary to demonstrate a money laundering

21   conspiracy; they are not, in fact, elements of the money

22   laundering offense, and I will, therefore, not dismiss Count

23   One on this basis.

24           Separately, Mr. Storm made, and I reject, a timeline

25   argument that ascribes significance to the fact that the

O9QESTOD

1    development of Tornado Cash preceded the charged dates of the

2    money laundering conspiracy, because, as I understood from my

3    conversations with Mr. Rehn, the government is not alleging

4    that Tornado Cash was specifically developed as the first step

5    in that conspiracy.  And I am rejecting the related suggestion

6    that somehow the government is conflating "the agreement to

7    develop the Tornado Cash protocol and UI with a non-existent,

8    later-in-time agreement to engage in purported concealment

9    money laundering."  That's from the defense's reply brief at

10   page 15.

11            I also find unavailing the argument that the

12   government did not sufficiently allege *mens rea*.  The

13   indictment alleges that Mr. Storm "willfully and knowingly"

14   entered into the conspiracy.  I don't get to make a

15   determination of Mr. Storm's intent at this stage; and the

16   government having adequately alleged the requisite intent, the

17   decision regarding the sufficiency of the evidence of that

18   intent is for the jury and not for me.  One take for that

19   proposition is Judge Caproni's case in *United States v.*

20   *Percoco*, 2017 WL 6314146, from 2017.

21            Now, throughout his submission, Mr. Storm expresses

22   concern that he is being charged, and would be convicted, on a

23   negligence theory.  In this Court's estimation, neither is

24   true.  In terms of the offense charged, there are sufficient

25   factual allegations, and representations made in the

O9QESTOD

 1    government's opposition submission, that, if proven at trial,

 2    would allow a jury to find that Mr. Storm acted with the

 3    requisite intent.

 4           There was also no danger of Mr. Storm being convicted

 5    on the basis of negligent acts.  The money laundering

 6    conspiracy charge that I give, and I have recently given it,

 7    specifically requires the government to prove beyond a

 8    reasonable doubt that the defendant "knowingly and willfully

 9    became a member of the alleged conspiracy."  Willfulness is

10    defined as acting "knowingly and purposely, with an intent to

11    do something the law forbids, that is to say, with a bad

12    purpose either to disobey or disregard the law."  And I

13    specifically indicate in my charge that the object of the

14    conspiracy cannot be satisfied by negligence.  For this reason,

15    I am not going to dismiss Count Two.

16           I will turn now to the defendant's challenges to Count

17    Three.  He begins first by arguing that the count should be

18    dismissed because IEEPA's "informational materials" exemption

19    applies to all alleged components of Tornado Cash system.  And

20    because I don't believe these facts are in doubt, I'm not going

21    to review the history of the issuance of Executive Order 13466

22    or OFAC's designation of the Lazarus Group hacking organization

23    to the Specially Designated Nationals and Blocked Persons List.

24           Let me turn, instead, to the IEEPA violation, which

25    requires the government to prove, generally speaking, that,

O9QESTOD

1    number one, the defendant attempted to violate orders,

2    regulations, or prohibitions issued pursuant to IEEPA relating

3    to North Korea; number two, the defendant attempted to commit

4    the violation or violations willfully; and number three, the

5    defendant did not have a license issued by a part of the United

6    States Treasury Department, known as OFAC, or to engage in the

7    attempted conduct that would have violated the Executive Order

8    or corresponding regulation.

9         I'm aware of the "informational materials" exception.

10   I won't read it into the record.  I note as well that there's a

11   bit of a counterweight to that exemption, the software and

12   technology regulation that OFAC has issued.  The fact is that

13   the courts in this circuit really have not had occasion to

14   apply the informational materials exemption to the software.

15   Mr. Storm argues that it is well established that the software

16   is speech subject to the First Amendment protections.  And in

17   particular, he alleges that the IEEPA conspiracy charge

18   impermissibly seeks criminal sanctions against him for his role

19   in publishing one piece of software, Tornado Cash, on top of

20   another, the Ethereum blockchain, and making it available on

21   the internet.  For reasons similar to those outlined earlier in

22   this opinion, this Court rejects the argument.  The government

23   argues in the first instance, and the Court accepts, that the

24   software does not constitute informational materials under this

25   section.

O9QESTOD

1          Actually, let me back up a moment.  That is the

2    government's argument.  They may well be right, but I don't

3    think I need to find that finally.  The indictment doesn't

4    predicate criminal liability on the mere development of

5    software.  To the contrary, Count Three alleges that Mr. Storm

6    conspired with others to knowingly, actively, and profitably

7    cause the Tornado Cash service, the UI, the relayer network,

8    the pools, other smart contracts, and other components of the

9    service, in order to launder funds for the OFAC-designated

10   North Korean Lazarus Group, to then accept deposits from that

11   group's OFAC-sanctioned cryptocurrency wallet, and to process

12   withdrawals of those funds.  Mr. Storm is not being charged

13   with exporting Tornado Cash software, but with laundering funds

14   using the Tornado Cash service, which definitionally extends

15   beyond the software.

16          Once again, Mr. Storm challenges the indictment's

17   allegations concerning his *mens rea* on this count as well, and

18   these challenges also fail.  To begin, he is charged with

19   entering into the conspiracy knowingly and willfully, which

20   tracks the requisite statutory language.  The government has

21   also alleged facts that, if accepted by the jury, suffice to

22   demonstrate his awareness of the specific sanctions he was

23   violating.  And here, as before, a motion to dismiss the

24   indictment is an inappropriate procedural vehicle for testing

25   the strength of the government's evidence regarding intent.  So

O9QESTOD

1    for all of these reasons, I am not going to be dismissing those

2    counts on those bases.

3    　　　　But there are some broader arguments that I do want to

4    take a moment to discuss.  I really do thank the parties for

5    the analyses and these arguments.  I found them fascinating.

6    Let me spend a few moments on them.

7    　　　　Mr. Storm argues that all three statutes are overbroad

8    in the violation of the First Amendment because they

9    criminalize the writing and dissemination of computer code, as

10   well as the maintenance of a website publishing such a code.

11   And the First Amendment overbreadth doctrine, speaking

12   generally, requires the Court hold facially unconstitutional

13   statutes that punish too much protected speech despite lawful

14   applications, because such "overbroad laws 'may deter or

15   'chill' constitutionally protected speech."  I'm quoting here

16   from the Supreme Court's decision in *United States v. Hansen*,

17   599 U.S. 762 from 2023.  And there are many cases that it

18   addresses and that deal with similar things.

19   　　　　The challenger, the person offering a First Amendment

20   challenge, must demonstrate that the statute "prohibits a

21   substantial amount of protected speech" relative to its

22   "plainly legitimate sweep."  Again, I quote from the *Hansen*

23   decision.  The challenger bears the burden of demonstrating,

24   from the text of the law and from actual fact, that substantial

25   overbreadth exists.  Quoting here from *New York State Club*

O9QESTOD

1    *Association v. City of New York*, 487 U.S. 1, from 1988.

2             An overbreadth challenge is less likely to succeed

3    where Congress intended to use terms of art in order to

4    prescribe only a narrow band of speech, as opposed to the terms

5    used in every day conversation, which would encompass a broader

6    swath of speech.  Courts here are to consider not only conduct

7    clearly prohibited by the statute, but also conduct that

8    arguably falls within its ambiguous sweep.  That said,

9    ordinarily, overbreadth challenges to laws that do not target

10   speech or expressive activity do not succeed.

11            The first step in deciding whether any statute is

12   overbroad is to determine what conduct the statute covers.

13   That was discussed in the *Hansen* case I mentioned earlier.

14   Here, in relevant part, the statutes and regulations that

15   support the three counts prescribe the conducting of a

16   financial transaction to conceal the proceeds of unlawful

17   activity, the operation of an unlicensed money transmitting

18   business, and the receipt of funds from a sanctioned entity

19   without obtaining OFAC's approval.  Mr. Storm contends that

20   these provisions in fact criminalize and chill the legitimate

21   expressive activity of publishing computer code that itself

22   supports a constitutionally protected interest, to which

23   privacy over financial transaction, where specifically

24   Mr. Storm contends that Counts One and Two punish the mere

25   writing and/or dissemination of the code for smart contracts as

1   a conspiracy to commit money laundering by defining the terms

2   "conducting" and "transmission" to include this writing or

3   dissemination.  I am focusing here on pages 47 and 48 of the

4   opening brief.

5        Mr. Storm also contends that Count Three punishes, as

6   sanctions evasion, the mere retaining of the website providing

7   the public information to access the Tornado Cash smart

8   contracts.  I disagree with each of those propositions.

9   Mr. Storm has shown neither a substantial overbreadth, nor the

10  potential for it, based on the laws of purportedly ambiguous

11  sweep, and that is because these laws do not target protective

12  expressive conduct.  They do not punish coding, QUA coding, or

13  website maintenance, QUA website maintenance; they punish money

14  laundering, they punish the operation of an unlicensed money

15  transmitting business, and they punish sanctions evasion.

16       That Mr. Storm's charged conduct includes the writing

17  and dissemination of codes and the maintenance of a public

18  website is insufficient to turn these into some sort of

19  overbreadth challenge.  And to the extent that these laws could

20  be applied unconstitutionally, Mr. Storm has failed to show

21  that such instances are disproportionate to their lawful sweep.

22       And lastly, the implication of certain privacy

23  interests does not make these statutes overbroad.  Constraining

24  statutes to criminalize the alleged conduct would not chill the

25  legitimate expressive activity of publishing computer codes

O9QESTOD

     1    supporting a constitutionally protected interest in privacy

     2    over financial transactions.  Quite to the contrary, the

     3    implication of these interests is of little relevance to the

     4    Court's overbreadth analysis.  And for this reason, the

     5    overbreadth challenge fails.

     6            Now, Mr. Storm also mounts an as-applied challenge,

     7    claiming that the statutes violate the First Amendment as

     8    applied to his conduct.  Here, the threshold issue is, of

     9    course, whether Mr. Storm's conduct amounts to protected speech

    10    at all, because nonspeech conduct does not merit First

    11    Amendment protection.  There's one case that it propositions,

    12    *CFTC v. Vartuli*, 228 F.3d 94, a Second Circuit decision from

    13    2000.

    14            It is true that computer coding can be expressive

    15    conduct protected by the Frist Amendment.  One case for that

    16    proposition is *Universal City Studios, Inc. v. Corley*,

    17    273 F.3d 429, a Second Circuit decision from 2001.

    18            But when a programmer is using a code to direct a

    19    computer to perform various functions, that code is not

    20    protected speech.  Another Court noted the interaction between

    21    programming commands as triggers and semiconductors as a

    22    conduit, even though communication is not speech within the

    23    meaning of the First Amendment, and the communication between

    24    the program and a customer using it as intended was similarly

    25    not speech.  The functional capability of code is not speech

O9QESTOD

1    within the meaning of the First Amendment.

2            Here, the conduct charged in the indictment includes

3    the functional capability of code, which does not implicate the

4    First Amendment.  To the extent that the indictment alleges

5    that Mr. Storm used computer code, it was to design a program

6    that furthered money laundering and sanctions evasion scheme.

7    The use of computer coding or software to achieve these ends is

8    far from the expressive sort of coding that would merit First

9    Amendment protection.  And although the Court finds that

10   Mr. Storm's conduct does not implicate the First Amendment,

11   even assuming that it did, the Court finds that the application

12   of these laws to Mr. Storm's conduct satisfies intermediate

13   scrutiny.

14           Mr. Storm contends that the application of these

15   statutes to his conduct is a content-based restriction on his

16   freedom of speech.  More specifically, he argues that the

17   statutes underlying the charges target the function of his

18   supposed speech conduct; namely, computer code designed to

19   improve the privacy of personal financial transactions, which

20   is a constitutionally protected interest.  He also argues that

21   the indictment takes the position that there is no legitimate

22   purpose for maintaining privacy over one's financial

23   transactions on an otherwise completely transparent and

24   publically viewable blockchain.  These arguments are made in

25   the opening brief at pages 49 and 50 and in the reply brief at

O9QESTOD

1    27 and 28.

2            The Court disagrees with the arguments.  The reference

3    as to privacy in the indictment amount to allegations that

4    Mr. Storm had the requisite state of mind, not indications that

5    the government aims to punish the expression of a generalized

6    belief in promoting privacy.  I'm looking, in particular, at

7    paragraphs 11, 21, and 35 of the indictment; I believe there

8    are others that fall within this category.

9            Any restrictions of Mr. Storm's speech are content

10   neutral, and this Court, therefore, need not address the

11   argument that such restrictions fail strict scrutiny.  "A

12   content-neutral restriction is permissible if it serves a

13   substantial governmental interest, the interest is unrelated to

14   the expression of free expression, and the regulation is

15   narrowly tailored ... meaning it does not 'burden substantially

16   more speech than is necessary to further the government's

17   legitimate interests.'"  I'm quoting here from *Corley*.  I

18   realize that this is something the government bears the burden

19   on, as noted by the Second Circuit in *Cornelio v. Connecticut*,

20   32 F.4th 160, a 2022 decision.

21           The defense argued that the government has failed to

22   meet this burden, but the Court finds that the government has.

23   The government has a substantial interest in promoting a secure

24   financial system by combating money laundering, by combating

25   the operation of unregistered money transmitting services, and

O9QESTOD

by combating the evasion of sanctions.  These interests are
wholly unrelated to the suppression of free expression, and the
applicability of these laws to Mr. Storm's conduct does not
burden substantially more speech than necessary to further the
government's substantial interest, because the charged conduct
implicates the functional, rather than the expressive features,
of computer coding and software.  Accordingly, these laws, as
applied to Mr. Storm's conduct, satisfy intermediate scrutiny
to the extent that Mr. Storm's conduct implicates the First
Amendment.

          Moving on, Mr. Storm also argues that the statutes are
void for vagueness, both facially and as applied to his
conduct.  This Court disagrees.  "The void-for-vagueness
doctrine requires that a penal statute define the criminal
offense with sufficient definiteness that ordinary people can
understand what conduct is prohibited and in a manner that does
not encourage arbitrary and discriminatory enforcement."  I'm
quoting here from *Copeland v. Vance*, 893 F.3d 101, a Second
Circuit decision from 2018.  Challengers can raise an
as-applied challenge or a facial challenge to a criminal
statute.  There are different standards to both, but all
vagueness challenges, whether facial or as-applied, require the
Court to answer two separate questions:  Whether the statute
gives adequate notice, and whether it creates a threat of
arbitrary enforcement.  Indeed, Courts should proceed with

O9QESTOD

1    caution when evaluating vagueness challenges and should examine

2    the challenger's conduct before analyzing other hypothetical

3    applications of the law.  This is discussed in cases including

4    *Expression Hair Design v. Schneiderman*, 581 U.S. 37, from 2017.

5            The Second Circuit in *United States v. Houtar*,

6    980 F.3d 268, in 2020, also instructed lower courts to presume

7    that acts of Congress are not unconstitutionally vague.  So

8    although Mr. Storm conflates the reasons supporting his facial

9    challenge with those supporting his as-applied challenge, at

10   bottom, what he is arguing is that all three statutes

11   criminalize the publication of any software that may later be

12   misused by a third party, even where the author of such code is

13   not involved in or even aware of such misuse.

14           He contends that the statutory definitions of

15   "financial transaction" in Section 1956, "accepting and

16   transmitting" in Section 1960, and "informational materials" in

17   Section 1702(b)(3) are all facially vague.  He also argued that

18   these statutes invite arbitrary enforcement because there are

19   no explicit standards for their application to those

20   disseminating code and maintaining websites.  Moreover, he

21   claims that it is unclear whether the statutes extend only to

22   the writing and dissemination of the code over which the author

23   contains control or whether they extend to immutable code,

24   subjecting the author to criminal liability for third parties'

25   misuse.

O9QESTOD

1          In this case, the Court finds that the statutes at

2    issue gave Mr. Storm adequate notice that his conduct was

3    criminal and created no threat of arbitrary enforcement.  I

4    will point, as adequate notice, the indictment alleged that he

5    knowingly marketed Tornado Cash as a means of allowing

6    customers to conceal the nature and source of their unlawful

7    activity, he had adequate notice that this conduct was

8    prescribed by Section 1956.  He also had adequate notice that

9    his conduct was prescribed by Section 1960.  Because although

10   Tornado Cash is not a traditional money transmitting outfit,

11   its business fits the plain definition of money transmitting

12   such that he had adequate notice that the charged conduct was

13   criminally prescribed.

14          Finally, the indictment alleges that Mr. Storm was

15   aware that stolen funds from an OFAC-sanctioned entity were

16   laundered through Tornado Cash and continued to facilitate

17   these transactions.  Once again, the statutes afforded him

18   adequate notice that his conduct was criminal, despite that

19   fact that he may have used nontraditional technology to do so.

20          On the issue of arbitrary enforcement, Mr. Storm's

21   narrow focus on the act of disseminating code and whether the

22   statutes might extend to immutable code confuses the issue.

23   The question in a facial challenge is whether the statute is so

24   fatally indefinite that it cannot constitutionally be applied

25   to anyone.  And I'm quoting here from the *Copeland* decision.

O9QESTOD

1    That the statutes do not distinguish between mutable and

2    immutable code, or do not directly address computer coding, is

3    insufficient to show fatal indefiniteness, because these are

4    merely the means that Mr. Storm and his colleagues allegedly

5    used to achieve the ends of a conspiracy to launder money, to

6    operate an unregistered money transmitting business, and to

7    evade sanctions, all of which are clearly prescribed by the

8    statute.  Not only can these statutes be applied to the conduct

9    of others, but they can also be applied to Mr. Storm's conduct.

10    His facial vagueness challenge, therefore, falls.

11        In the end, his arguments fail not in due process

12    violation, but in the weight of the evidence as to his state of

13    mind, which, as I noted earlier, is a matter for the jury and

14    not this Court.

15        Mr. Storm argues that the counts should be dismissed

16    pursuant to the rule of lenity because the indictment alleges a

17    novel and expansive interpretation of the statutes underlying

18    the conspiracy charges, and expanding criminal liability to the

19    alleged conduct would involve a sweeping expansion of federal

20    criminal jurisdiction in the absence of a clear statement of

21    Congress.  I am quoting his brief at page 54.  The parties are

22    aware of the rule of lenity.  It ensures fair warning by so

23    resolving ambiguity in a criminal statute so as to apply it

24    only to conduct clearly covered.  I'm quoting here from the

25    Supreme Court's decision in *United States v. Lanier*, 520 U.S.

O9QESTOD

259.  And that means it's a threshold matter.  That the

challenger invoking the rule of lenity must establish that the

criminal statute is ambiguous.  And absent this showing where

the statutory language is unambiguous, a lenity challenge

fails.  The Second Circuit found this in the 2021 decision of

*United States v. Gu*, 8 F.4th 82.

Separately, there is no role for lenity to play if

there are two grammatically permissible readings of the statute

when viewed in the abstract but only one is consistent with the

statute's design.  And that is a different Supreme Court

decision, *Pulsifer v. United States*, 601 U.S. 24, from 2024.

For many of the same reasons that the Court has

rejected Mr. Storm's vagueness and First Amendment challenges,

it rejects the lenity challenge.  The statutes, as construed by

the government in the indictment, extend to Mr. Storm's alleged

conduct.  He has not made a threshold showing of statutory

ambiguity, and there is, therefore, nothing for lenity to

resolve.

The final argument being made is that the counts

should be dismissed as novel constructions.  The *Lanier* case I

mentioned a moment ago indicates the due process bars courts

from applying a novel construction of a criminal statute to

conduct that neither the statute nor any prior judicial

decision had fairly disclosed to being within its scope.  And

here, Mr. Storm has said that there's simply no precedent for

O9QESTOD

```
 1      the expansive application of the statutes to his conduct.  He

 2      urges the Court to adopt limited constructions of the statute

 3      because, he says, he has found no judicial decisions holding

 4      that the constitutionally protected activity of providing code

 5      to users who wish to protect their financial privacy can

 6      constitute money laundering, operating a money transmitting

 7      business, or evading sanctions.  But here too, Mr. Storm is

 8      confusing the issue.  Due process does not require the

 9      existence of an analogous prior prosecution.

10              The Second Circuit, in Ponnapula v. Spitzer,

11      297 F.3d 172, from 2002, found that due process is not violated

12      simply because the issue is a matter of first impression.  A

13      similar result was obtained in United States v. Ulbricht, the

14      District Court decision at 31 F. Supp. 3d 540, in 2014.  And

15      Mr. Storm has not shown that the alleged conduct is outside of

16      or not within the scope of the statutes in question, as shown

17      in the Lanier case.  Accordingly, his argument that all counts

18      be dismissed as novel constructions failed, and this Court will

19      not dismiss the three counts in the indictment.

20              I appreciate so much the fact that you've listened to

21      me speak for just over an hour.  That is my resolution of the

22      open motions to dismiss and to compel.  I will issue a

23      bottom-line order that simply notes that they have been

24      resolved.

25              I am aware that in the last 24 hours there was an
```

O9QESTOD

```
 1   opposition submission from Mr. Storm the government's request
 2   for the disclosure of information about an advice of counsel
 3   defense and some other things.
 4          Mr. Rehn, I don't know that I authorized a reply
 5   brief.  I'm not sure I got to that point.  Is the government
 6   intent on replying?
 7          MR. REHN:  I don't think it is necessary, your Honor.
 8          THE COURT:  That's fine.  Candidly, and this should
 9   not shock you, I've been working on this opinion and I haven't
10   really thought about that.  I will get to it promptly, and I
11   thank you.
12          From my perspective, I believe that's all that I need
13   to do today.  We have a trial date, we have a schedule.  Other
14   than this issue about notice, which I will look at when I can,
15   I don't think there's anything else open.
16          Mr. Rehn, from your perspective, is there anything
17   I've omitted doing?
18          MR. REHN:  No, your Honor.  We're prepared to address
19   the issues raised in our motion filed last week if the Court
20   would like to hear at some future date.  It doesn't sound like
21   the Court is ready to hear either of parties.
22          THE COURT:  No, no.  You can put this on me.  This
23   Court is not prepared to deal with that motion at this exact
24   moment in time, having just spoken to you for almost
25   70 minutes, so, no.  But I do thank you for being prepared.
```

O9QESTOD

1          Mr. Klein, I'm confident that you're prepared as well.

2     I just want a chance to look at it.  And if I need oral

3     argument, I can do what I'm doing right here and just have the

4     parties participate by phone.

5          Mr. Klein, is there anything I've omitted doing this

6     afternoon, sir?

7          SPEAKER2:  No, your Honor.

8          THE COURT:  I thank you all very much.

9          Again, I appreciate your willingness to remain on the

10    phone, and I really do appreciate the care that you've put into

11    your submissions, which I found really interesting, so thank

12    you for that.

13         I will let you all go.  You have my thanks.

14         We are adjourned.

15         (Adjourned)

16

17

18

19

20

21

22

23

24

25