UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

           Plaintiff,

      -against-

ROMAN STORM, ET AL.,

          Defendant.

Case No.: 23 Cr. 430 (KPF)

## MOTION FOR RECONSIDERATION
## OF DENIAL OF MOTION TO DISMISS

Brian E. Klein
Keri Curtis Axel
Becky S. James
Kevin M. Casey
Viviana Andazola Marquez
Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

David E. Patton
Nicholas D. Pavlis
Hecker Fink LLP
350 Fifth Ave, 63rd Floor
New York, New York 10118
(212) 763-0883
*Attorneys for Roman Storm*

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ........................................................................1

II.     BACKGROUND ..........................................................................................2

     A.     The Motion to Dismiss.................................................................2

     B.     The Fifth Circuit's *Van Loon* Opinion.........................................3

     C.     The Eleventh Circuit's *Coin Center* Case....................................5

III.    APPLICABLE LAW ....................................................................................6

IV.    ARGUMENT ..............................................................................................6

     A.     Under *Van Loon*, Count Three (the IEEPA Charge) Cannot Stand.......................6

     B.     Count One (the Money Laundering Charge) Must Also Be Dismissed .................9

     C.     Count Two (the Money Transmitting Business Charge) Also Fails for Reasons Articulated in *Van Loon* ........................................13

     D.     Applying Due Process Principles, the Indictment Should Be Dismissed.............17

V.     CONCLUSION..........................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aronshtein v. United States*,
No. 21-518-pr, 2023 WL 271045 (2d Cir. Apr. 4, 2023) ........................................11

*Bryan v. United States*,
524 U.S. 184 (1998) ..........................................................................................7, 10

*Coin Center, et al. v. Secretary, U.S. Department of the Treasury, et al.*,
No. 23-13698 (11th Cir. Nov. 7, 2023) ...................................................................5

*Dowling v. United States*,
473 U.S. 207 (1985) ............................................................................................19

*United States v. Aleynikov*,
676 F.3d 71 (2d Cir. 2012) ..............................................................................8, 19

*United States v. Banki*,
685 F.3d 99 (2d Cir. 2012) ..................................................................................16

*United States v. Bryce*,
208 F.3d 346 (2d Cir. 1999) ..................................................................................8

*United States v. Cassese*,
290 F. Supp. 2d 443 (S.D.N.Y. 2003) ....................................................................9

*United States v. Collazo*,
984 F.3d 1308 (9th Cir. 2021) ..............................................................................12

*United States v. Garcia*,
587 F.3d 509 (2d Cir. 2009) ................................................................................12

*United States v. Griffith*,
515 F. Supp. 3d 106 (S.D.N.Y. 2021) ................................................................7, 8

*United States v. Harmon*,
474 F. Supp. 3d 76 (D.D.C. 2020) ..................................................................14, 15

*United States v. Homa International Trading Corp.*,
387 F.3d 144 (2d Cir. 2004) ..................................................................................7

*United States v. Illinois Cent. R. Co.*,
303 U.S. 239 (1938) ..........................................................................................7, 10

*United States v. Lanier*,
520 U.S. 259 (1997) ............................................................................................17

*United States v. Milstein*,
   401 F.3d 53 (2d. Cir. 2005)........................................................................................10

*United States v. Munshani*,
   No. 23-6520-CR, 2024 WL 4448708 (2d Cir. Oct. 9, 2024)....................................11

*United States v. Murgio*,
   209 F. Supp. 3d 698 (S.D.N.Y. 2016).......................................................................14

*United States v. Murgio*,
   No.15-CR-769, 2016 WL 8650910 (S.D.N.Y. Dec. 22, 2016) .................................14

*United States v. Napoli*,
   54 F.3d 63 (2d Cir. 1995)..........................................................................................11

*United States v. Sterlingov*,
   573 F. Supp. 3d 28 (D.D.C. 2021).......................................................................14, 15

*United States v. Szur*,
   289 F.3d 200 (2d Cir. 2002)................................................................................10, 11

*United States v. Velastegui*,
   199 F.3d 590 (2d Cir.1999)........................................................................................16

*Virgin Atlantic Airways, Ltd. v. National Mediation Board*,
   956 F.2d 1245 (2d Cir. 1992)......................................................................................6

**Statutes**

18 U.S.C. § 1956(a)(1)....................................................................................................11, 12

18 U.S.C. § 1960..................................................................................................................13

50 U.S.C. § 1705(c) ...............................................................................................................7

**Other Authorities**

15A C.J.S. Conspiracy § 283 ...............................................................................................12

Daniel Barabander, Amanda Tuminelli, Jake Chervinsky, *Through the Looking
   Glass: Conceptualizing Control and Analyzing Criminal Liability For
   Unlicensed Money Transmitting Businesses Under Section 1960* (Int'l Acad.
   Financial Crimes Litigators Dec. 2024), available at
   https://edit.financialcrimelitigators.org/api/assets/cd682a1c-1cb0-4c99-a491-
   ac6155f4bdc2.pdf ....................................................................................................14

Jacob E. Hirshman, Matt McGuire, Kaili Wang, *Tornado Cash and the Limits of
   Money Transmission,* Stanford Blockchain Review (Dec. 13, 2024), available
   at https://review.stanfordblockchain.xyz/p/57-tornado-cash-and-the-limits-of......................14

## I.    PRELIMINARY STATEMENT

Pursuant to Local Criminal Rule 49.1(b), defendant Roman Storm seeks reconsideration of the Court's September 26, 2024 oral ruling ("Order") denying Mr. Storm's motion to dismiss pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B).  On November 26, 2024, after this Court's ruling on the motion to dismiss, the Fifth Circuit decided *Van Loon v. Department of the Treasury,* No. 23-50669 (5th Cir. 2024) (Slip op.), which is attached as Exhibit A ("*Van Loon*").[1]  In *Van Loon*, a group of Tornado Cash users challenged the OFAC sanctions imposed against Tornado Cash pursuant to IEEPA.  The Fifth Circuit held that the sanctions were unlawful because the immutable smart contracts at issue cannot be considered "property" under IEEPA.  The Fifth Circuit reasoned that "because these immutable smart contracts are unchangeable and unremovable, they remain available for anyone to use," including the "North Korean wrongdoers," and the creators are "powerless to stop them."  *Id.* at 22, 30.  The court also held that the immutable smart contracts are neither "contracts" nor "services."

The reasoning in *Van Loon* bears on the charges in this case.  The Fifth Circuit's opinion most obviously impacts Count Three, the IEEPA charge.  Any IEEPA violation must be knowing and willful, *i.e.*, deliberate, but *Van Loon* makes clear that there is no deliberate action Mr. Storm could have taken here.  Count One, the money laundering conspiracy charge, suffers from the same fundamental defect.  Moreover, the developers' lack of control over the proceeds renders them legally incapable of conspiring to commit money laundering and negates the knowledge element of a money laundering charge.  *Van Loon*'s emphasis on control, as well as its holdings that the immutable Tornado Cash smart contracts are not a "service" performed for a fee or

---

[1] *Van Loon* is available on Westlaw at 2024 WL 4891474.  All citations to *Van Loon* herein reflect the pagination in Exhibit A.

profit, also lend support to Mr. Storm's arguments for dismissal of Count Two, the money transmitting business charge.  Finally, *Van Loon* highlights the novelty and expansiveness of the government's interpretation of the criminal statutes here, supporting dismissal under principles of due process.

## II.    BACKGROUND

### A.    The Motion to Dismiss

Mr. Storm previously moved to dismiss all three counts in the indictment, which the government opposed.  (Dkts. 30 ("Mot."); 53 ("Opp."); 58 ("Reply").)  Following argument on July 12, 2024, the Court denied his motion on September 26, 2024.  (Dkt. 84 Transcript ("Tr.").)

Taking the counts in the order argued, as to Count Two, Conspiracy to Operate an Unlicensed Money Transmitting Business, Mr. Storm argued that Tornado Cash was not a money transmitting business because neither it nor its creators had the requisite control over the funds being transferred, and neither charged a fee to use it.  (*See* Mot. at 24, Reply at 11.)  In the Order, the Court concluded that control was "not a necessary requirement," (Tr. at 16:3-7), and disagreed that the government was required to allege the defendant or Tornado Cash charged a fee for the transfer of funds.  To the extent there was such a requirement, the Court held that the fees "charged and received by the relayer co-conspirators would suffice."  (*Id*. at 25:8-11.)

As to Count One, Conspiracy to Commit Concealment Money Laundering, Mr. Storm argued that there could be no such conspiracy for two reasons.  First, as explained as to Count One, Tornado Cash is not a financial institution.  (*See* Mot. at 25; Reply at 13.)  Second, there could be no agreement to commit money laundering because the Tornado Cash protocol became immutable in May 2020, four months before the alleged start of the conspiracy, and there were no allegations that Mr. Storm acted with the intent to further an illegal purpose or possessed

knowledge that any "financial transaction" included the proceeds of specified unlawful activity. (*See* Mot. at 27; Reply at 17.)

The Court rejected Mr. Storm's argument that the government failed to allege a "financial transaction" based on the Court's ruling that the government adequately charged an unlawful money transmitting business offense in Count Two. (Tr. 25:19-26:1.) The Court characterized Mr. Storm's remaining arguments as focused on the requisite *mens rea* and held that (1) conspiracy to commit money laundering does not require the defendant to be "guilty of, involved in, or even aware of the specifics of, the specified unlawful activity," (2) specific intent did not depend on Tornado Cash being specifically developed as the first step in that conspiracy, and (3) the government adequately alleged willfulness and knowledge. (*Id*. at 27:10-13; 29:24-30:5; 31:4-14.)

As to Count Three, Conspiracy to Violate the International Emergency Economic Powers Act ("IEEPA"), Mr. Storm argued that he could not be liable because Tornado Cash was subject to the "informational materials" exemption and because he did not willfully conspire to evade North Korean sanctions. (*See,* Mot. 36, Reply at 22.) The Court rejected that the informational materials exception applies. (Tr. at 33:1-12.) The Court also held that the government adequately alleged criminal knowledge and willfulness. (*Id*. at 33:16-25.)

### B.    The Fifth Circuit's *Van Loon* Opinion

On November 26, 2024—two months after this Court's ruling on the motion to dismiss— the Fifth Circuit decided *Van Loon*. *Van Loon* addresses important factual and legal issues as to Tornado Cash that bear directly on the conclusions this Court previously reached.

In its decision, the Fifth Circuit held that that the Office of Foreign Assets Control ("OFAC") overstepped its Congressional authority by blocking "Tornado Cash's immutable

smart contracts" because they "are not the 'property' of a foreign national or entity" as required to act pursuant to IEEPA.  *Van Loon* at 2.

First, the Fifth Circuit concluded that the immutable smart contracts at issue are not property under the statute's plain meaning because they lack the capacity to be owned.  In reaching this conclusion, the court explained that the immutable nature of the smart contracts means that nobody, including Lazarus Group, can be prevented from retrieving their assets:

> The immutable smart contracts at issue in this appeal are not property because they are not capable of being owned… And as a result, no one can 'exclude' anyone from using the Tornado Cash pool smart contracts. In fact, because these immutable smart contracts are unchangeable and unremovable, they remain available for anyone to use and "the targeted North Korean wrongdoers *are not actually blocked from retrieving their assets*," even under the sanctions regime.

*Id*. at 22 (emphasis in *Van Loon*).  The Fifth Circuit also emphasized that the Tornado Cash developers could not "discard, change, disconnect, or control smart contracts that are *immutable*" precisely because the smart contracts were incapable of being owned, and were not owned, by the developers.  *Id*. at 23 (emphasis in *Van Loon*).

The Fifth Circuit next considered whether the immutable smart contracts could be considered property under OFAC's regulatory definition and held that they could not.  *Id*. at 23-24.  Relying on that definition, OFAC had argued that smart contracts are analogous to patents and copyrights and therefore property.  *Id*. at 26.  But the court explained that the regulatory definition provided a mere "laundry list of 'property' examples—which are all things that are capable of being owned."  *Id*. at 25.  By contrast, (1) the Tornado Cash developers could not profit from the immutable smart contracts, unlike patent and copyright holders can; and (2) the smart contracts could not be owned, unlike patents and copyrights.  *Id*. at 26-27.

The Fifth Circuit also rejected OFAC's argument that immutable smart contracts fell within the catch-all provision of the regulatory definition, which includes "contracts of any

nature whatsoever." *Id*. at 27 (quoting 31 C.F.R. § 510.323).  The Fifth Circuit explained that "contracts require '[a]n agreement between two or more parties.' Immutable smart contracts have only one party in play." *Id*. at 28 (citation omitted).

Finally, the Fifth Circuit rejected that "the immutable smart contracts qualify as 'services of any nature whatsoever'" under the regulatory definition of property, explaining that they "are nothing more than lines of code," and "are less like a 'service' and more like a tool that *is used in performing* a service." *Id*. at 31-32 (emphasis in *Van Loon*).  Furthermore, it emphasized that "Tornado Cash, as defined by OFAC, does not own the services provided by the immutable smart contracts." *Id.*  Because the immutable smart contracts are not ownable, not contracts, and not services, they are not property and cannot be blocked under the statute. *Id.* at 33.

## C.    The Eleventh Circuit's *Coin Center* Case

Meanwhile, another parallel case is currently pending in the Eleventh Circuit.  *Coin Center, et al. v. Secretary, U.S. Department of the Treasury, et al.*, No. 23-13698 (11th Cir. Nov. 7, 2023).  There, nonprofit cryptocurrency organization Coin Center and three individual plaintiffs challenged the OFAC sanctions against Tornado Cash for similar reasons as in *Van Loon*.  (*See id.,* Dkt. 13.)  After the district court ruled in favor of the government, the plaintiffs appealed to the Eleventh Circuit, and the case has been fully briefed and argued.

On November 27, 2024, the plaintiffs filed a Rule 28(j) letter informing the Eleventh Circuit of the *Van Loon* ruling and pointing out that the Fifth Circuit decided the same "property" issue in the plaintiffs' favor and that to rule otherwise would create a circuit split. (*See id.,* Dkt. 42.)  On December 13, 2024, the government responded, arguing, first, that *Van Loon* is not dispositive because the plaintiffs' primary argument in *Coin Center* is about foreigners' "interest" in Tornado Cash, not whether it is "property," and second, that *Van Loon*

incorrectly decided the "property" issue.  (*See id.,* Dkt. 48.)  As of the date of this filing, the Eleventh Circuit has not issued an opinion.

## III.    APPLICABLE LAW

Under Local Criminal Rule 49.1, the Court has the authority to reconsider an order determining a motion.  Courts in this Circuit have reconsidered prior orders where the movant demonstrates "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citing 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478 at 790).

## IV.    ARGUMENT

### A.    Under *Van Loon,* Count Three (the IEEPA Charge) Cannot Stand

*Van Loon* vitiates the government's IEEPA charge in this case.  That charge is based on the allegation that Mr. Storm deliberately chose an ineffective remedy against Lazarus Group's alleged transactions with Tornado Cash beginning in April 2022.  (Ind. at ¶ 65.)[2]  *Van Loon* confirms, however, that there was no remedy to choose, deliberately or otherwise, because Tornado Cash is immutable, meaning that no one could prevent anyone else from using it.

As a threshold matter, in denying Mr. Storm's motion, the Court stated that it could not rule on factual matters, including whether Tornado Cash was immutable.  (Tr. 18-19.)  But *Van Loon* decided as a matter of law that the Tornado Cash smart contracts were immutable by 2020. *Van Loon* at 9.  The government here has not disputed that, and *Van Loon* establishes it.  There is

---

[2] On November 15, 2024, the government filed a superseding indictment against Mr. Storm in preparation for trial.  (Dkt. 109.)  But, as noted at the December 9, 2024 hearing, the original indictment's allegations remain operative.  Thus, this motion cites to the original indictment.

nothing left for the jury to decide on this issue. Indeed, were the jury to be given the issue, it would have to be instructed as a matter of law that Tornado Cash became immutable in 2020.

Mr. Storm cannot be criminally liable given the immutability of the Tornado Cash smart contracts at issue. To see why, the Court must consider IEEPPA's intent requirement. Willfulness is a necessary element of the government's IEEPA charge. 50 U.S.C. § 1705(c). To establish a "willful" violation of IEEPA or an IEEPA-promulgated regulation, "the [g]overnment must prove that the defendant acted with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 192 (1998) (internal quotation marks omitted); *see also United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 147 (2d Cir. 2004) (applying the *Bryan* willfulness standard to IEEPA); *United States v. Griffith*, 515 F. Supp. 3d 106, 121 (S.D.N.Y. 2021) (same). This means that Mr. Storm must have "ha[d] a free will or choice" with respect to the alleged IEEPA evasion efforts of a sanctioned person. *United States v. Ill. Cent. R. Co.*, 303 U.S. 239, 243 (1938) (defining "willfully"); *see also Bryan*, 524 U.S. at 191 (willfulness "differentiates between deliberate and unwitting conduct.").

The government previously argued that it can meet this high standard by proving that Mr. Storm "deliberately chose an ineffective remedy" to prevent transactions between Tornado Cash and a wallet allegedly used by Lazarus Group. (Opp. at 60.) The indictment alleges that Mr. Storm conspired to facilitate transactions with that wallet between April 14 and August 8, 2022. (Ind. ¶¶ 84-87.)

*Van Loon* is fatal to the government's theory. It confirms there is no effective remedy to prevent anyone from transacting with Tornado Cash because it "is unownable, uncontrollable, and unchangeable—even by its creators." *Van Loon* at 2. Tornado Cash's immutability was established in 2020 when the developers (including Mr. Storm) relinquished control over the

7

smart contracts such that they "could no longer be altered, removed, or controlled." *Id.* at 9. "And as a result, no one can 'exclude' anyone from using the Tornado Cash pool smart contracts. . . . They remain available for anyone to use," including "North Korean wrongdoers." *Id.* at 22. As *Van Loon* makes clear, Mr. Storm could not have deliberately chosen an ineffective remedy because there was no choice available to him or anyone else when Lazarus Group allegedly began using Tornado Cash two years later, in 2022. *Id.* at 29-30 ("Even if Tornado Cash did not want North Korea, Lazarus Group, or anyone else, for that matter, using the immutable smart contracts that the Tornado Cash developers created, Tornado Cash . . . would be powerless to stop them.").

The Court previously declined to probe Mr. Storm's intent, finding it sufficient that the indictment alleges Mr. Storm acted "knowingly and willfully." (Tr. at 33:18-20.) But other district courts have evaluated the government's proffered evidence of willfulness when presented with a motion to dismiss an IEEPA charge. *See, e.g.*, *Griffith*, 515 F. Supp. 3d at 121 (highlighting the government's proffered "evidence that [defendant] expressed a desire to return to the DPRK and help them utilize cryptocurrency and blockchain technology but knew that he would likely have to send someone in his place to avoid violating the law."). The challenge here can and should be resolved now because it asks whether the government's legal theory of willfulness sufficiently alleges a crime under IEEPA, even if supported by sufficient evidence at trial. *See United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (stating that an indictment must be dismissed if "it fails to allege a crime within the terms of the applicable statute"). Whether the government's proffered "choice of ineffective remedy evidence" would be sufficient, if proven, is an issue that can be resolved as a matter of law. *See, e.g.*, *United States v. Bryce*, 208 F.3d 346, 355 (2d Cir. 1999) (explaining that "uncorroborated defendant

statements evidence" is insufficient as a matter of law); *United States v. Cassese*, 290 F. Supp. 2d 443, 454 (S.D.N.Y. 2003) (citing rule that "consciousness of guilt evidence" is insufficient as a matter of law). It would not be. No court has *ever* approved the government's misguided theory that deliberately choosing an ineffective remedy satisfies IEEPA. *See* Reply at 20-21. And under *Van Loon*, that theory fails because Tornado Cash is immutable and can be used by sanctioned persons regardless of any choices made (or not made) by Mr. Storm and the other developers.

Nor can the government fall back on its baseless allegation that Tornado Cash is a "service" and that this "service" was provided to Lazarus Group's sanctioned wallet address (the "0x098B716 Address"). (*See* Ind. ¶¶ 55, 62.) *Van Loon* vitiates this allegation, too, through its holding that Tornado Cash is not a service. *Van Loon* at 33 ("Contrary to the Department's arguments, the immutable smart contracts are not services."). Rather, it is a "tool" that can be used by "an individual cryptocurrency owner." *Id.* at 31-32. To the extent the "tool" is used to perform a "service," the service is not owned or controlled by Tornado Cash. *Id.* at 32.

The IEEPA charge thus fails as a matter of law. Each of the indictment's four alleged objects of the IEEPA conspiracy is based on alleged transactions between Tornado Cash and the 0x098B716 Address. (Ind. ¶¶ 85-88.) These alleged transactions were not services, not owned or controlled by Tornado Cash, and could not have resulted from any deliberate choice by Mr. Storm because they were outside of his control. Mr. Storm could no more choose to stop them than he could choose to stop the sun from rising.

### B. Count One (the Money Laundering Charge) Must Also Be Dismissed

Although focused on IEEPA, *Van Loon's* holding requires dismissal of the government's money laundering charge for similar reasons.

*First*, criminal liability under Count One requires that Mr. Storm conspired "knowingly and willfully" with respect to Lazarus Group's alleged money laundering. Sand, et al., *Mod. Fed. Jury Instructions* §§ 3A.01, 19-4 (2024). But "willfulness" requires "deliberate" conduct, *i.e.*, an act of "free will or choice." *Bryan*, 524 U.S. at 191; *Ill. Cent. R. Co*., 303 U.S. at 243. As *Van Loon* makes clear, Mr. Storm could not have acted deliberately or with free will or choice with respect to the alleged money laundering because he was powerless to stop it.

*Second*, *Van Loon* confirms the government cannot prove that Mr. Storm or one of his alleged co-conspirators (the Tornado Cash developers) had control over the cryptocurrency (Ether) that allegedly constituted the proceeds of the specified unlawful activity. This is because they relinquished "their control over the pool smart contracts" in 2020 and, thereafter, could not control those smart contracts "or the Ether deposited in the pools." *Van Loon*. at 9, 28-29; *see also id.* at 10 (confirming that relayers also lack custody over users' Ether). Even if the alleged criminal hackers who misused Tornado Cash had control of the allegedly laundered Ether, there is no allegation that Mr. Storm conspired with the criminal hackers. Therefore, the focus of the conspiracy charge must be on the alleged acts of Mr. Storm and the Tornado Cash developers in furtherance thereof. *See, e.g., United States v. Milstein*, 401 F.3d 53, 72 (2d. Cir. 2005) ("Foreseeable acts of one co-conspirator in furtherance of the conspiracy are attributable to all co-conspirators.").

A conspiracy to commit money laundering requires proof of precisely that which the government cannot prove here—*i.e.*, that the defendant (or a co-conspirator) has control over the proceeds of the specified unlawful activity. *See, e.g., United States v. Szur*, 289 F.3d 200, 214 (2d Cir. 2002) (explaining that "the funds comprised 'proceeds' at the moment they were in control of the perpetrators, and that moment occurred as soon as [one perpetrator] received

them"); *United States v. Munshani*, 2024 WL 4448708, *3 (2d Cir. Oct. 9, 2024) (requisite control was established when defendant received proceeds in his bank account); *Aronshtein v. United States*, 2023 WL 2770145, *1 (2d Cir. Apr. 4, 2023) (Government required "to show that proceeds of the 'specified unlawful activity' were 'realized' and 'acquire[d]' before some 'further financial transaction[] involving the proceeds' took place") (quoting *United States v. Napoli*, 54 F.3d 63, 68 (2d Cir. 1995), *abrogated on other grounds by United States v. Genao*, 343 F.3d 578, 584 (2d Cir. 2003)); *see also Napoli*, 54 F.3d at 68 (finding 18 U.S.C. § 1956(a)(1) "requires the defendant to (1) acquire the proceeds of a specified unlawful activity, and then (2) engage in a financial transaction with those proceeds.").

 *Van Loon* confirms that the government will never be able to prove that Mr. Storm (or a co-conspirator) had control over the proceeds of the specified unlawful activity—*i.e.*, the Ether allegedly laundered by criminal hackers. Neither Mr. Storm nor anyone else could exclude the alleged criminal hackers from using the Tornado Cash smart contracts. Thus, the government will never be able to prove that Mr. Storm (or a co-conspirator) "conduct[ed] or attempt[ed] to conduct a financial transaction with those proceeds" because it will never be able to prove they had control over the proceeds. *Szur*, 289 F.3d at 213 (2d Cir. 2002).

 *Third*, Count One fails as a matter of law because Mr. Storm is not alleged to have conducted any "financial transaction" "knowing that the property involved in [such] financial transaction represents the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(1). Unlike the original indictment, the superseding indictment now charges not only a "financial transaction" "involving a financial institution" under Section 1956(c)(4)(B),[3] but also,

---

[3] Should the Court dismiss Count Two based on the reasons set forth below, it must also reject the claim that Tornado Cash qualifies as a "financial institution" under subsection (c)(4)(B).

alternatively, a "financial transaction" meaning a "transaction" "affect[ing] interstate commerce," under subsection (c)(4)(A).  (Dkt. 109 ¶ 5.)  As Mr. Storm previously explained, such amendment does not save Count One because, under either definition, the defendant must have conducted, or conspired to conduct, a specific financial transaction "knowing that the property involved" in such specific transaction "represent[ed] the proceeds of unlawful activity." 18 U.S.C. § 1956(a)(1).

For a defendant to be guilty of conspiracy to commit money laundering, he or she must "knowingly engage[] in the conspiracy with the specific intent to commit the offenses that [are] the objects of the conspiracy."  *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009).  A substantive money laundering charge requires a defendant to have guilty knowledge—*i.e.*, that the financial transaction contained proceeds of specified unlawful activity.  *See United States v. Collazo*, 984 F.3d 1308, 1320 (9th Cir. 2021) (money laundering conspiracy conviction requires proof that "(1) the defendant agreed with another person that some member of the conspiracy would commit the relevant underlying offense . . . and that (2) the defendant had the requisite intent necessary for a conviction of the underlying offense"); 15A C.J.S. Conspiracy § 283 (charge "requires proof that the defendant knowingly was involved with at least one other person who has agreed with the defendant to commit an act of money laundering"); Jury Instructions, *United States v. Bankman-Fried*, S6 22 Cr. 673 (LAK) (Dkt. 384, at 3198) (money laundering requires proof that (1) "*a person who is a part of the conspiracy* would have conducted a financial transaction" (*id.* at 3196) and (2) "the person would have known that the financial transactions at issue involved the proceeds of some form, though not necessarily which form, of unlawful activity").

*Van Loon* makes clear that the Tornado Cash developers—the alleged co-conspirators—never had such knowledge.  As *Van Loon* explains, the "pool smart contracts" are "self-executing" (*Van Loon.* at 9); "no one can 'exclude' anyone from using" them (*id.* at 22); they "remain available for anyone to use" (*id.*); "there is no smart-contract operator on the other side of the transaction . . . —just software code" which runs "independently and anonymously."  *Id.* at 28-29.  Accordingly, Mr. Storm could never have agreed that a co-conspirator would conduct a financial transaction with knowledge that the transaction included the proceeds of unlawful activity, because the developers were not parties to any user's interactions with Tornado Cash.

### C.    Count Two (the Money Transmitting Business Charge) Also Fails for Reasons Articulated in *Van Loon*

The *Van Loon* opinion also supports dismissal of Count Two, charging Mr. Storm with conspiring to operate an unlicensed money transmitting business in violation of 18 U.S.C. § 1960.  In his motion to dismiss, and as addressed by the *amicus curiae*, the primary flaw in the Section 1960 charge is that Tornado Cash cannot be a money transmitting business because neither it nor its creators had control over the funds.  (*See* Mot. at 20-24.)  *Van Loon* turned on this lack of control.  As the Fifth Circuit explained:

> Tornado Cash has no control over these immutable contracts. It cannot change the code, delete the code, or remove the code from the Ethereum blockchain network. In other words, Tornado Cash cannot "unplug" the immutable smart contracts. Even if Tornado Cash did not want North Korea, the Lazarus Group, or anyone else, for that matter, using the immutable smart contracts that the Tornado Cash developers created, Tornado Cash … would be powerless to stop them.

*Van Loon* at 29-30; *see also id.* at 3, 9, 22-23, 28-31, 33.  The Court should reconsider its prior ruling that control is not required to establish a money transmitting business in light of *Van*

13

*Loon.*  If Tornado Cash cannot even be subject to civil sanctions due to lack of control, its

creators cannot be criminally liable for the same reason.[4]

The cases the Court cited in its Order are not to the contrary.  In the Order, the Court

stated it did not believe this case was "meaningfully different" from *United States v. Murgio*, 209

F. Supp. 3d 698 (S.D.N.Y. 2016), *United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020),

and *United States v. Sterlingov*, 573 F. Supp. 3d 28 (D.D.C. 2021).  (Tr. at 22-23.)  But in each

of those cases, unlike here or in *Van Loon,* the defendants *did* have control.  In *Murgio*, the

defendant operated bank accounts that accepted customer deposits and used funds in those

accounts to purchase Bitcoin on the customers' behalf for a per-transaction fee.  *See* Indictment,

*United States v. Murgio*, Case No.15-CR-769, 2016 WL 8650910, ¶ 4 (S.D.N.Y. Dec. 22, 2016)

(defendants "enabled customers to exchange cash for Bitcoins, charging a fee for their service"

and "between approximately October 2013 and July 2015, Coin.mx exchanged millions of

dollars for Bitcoins on behalf of customers").  The defendant exercised direct control over the

funds—both U.S. dollars and bitcoin.  *See id.* ¶ 11 (defendant "processed and profited from

numerous Bitcoin transactions conducted on behalf of customers").  In *Harmon,* the defendant

operated a service that took custody of a customer's Bitcoin, exchanged it for Bitcoin not

---

[4] Since the Court's ruling on the motion to dismiss, commentators have also opined that control is necessary to be a "money transmitting business" under section 1960.  *See* Daniel Barabander, Amanda Tuminelli, Jake Chervinsky, *Through the Looking Glass: Conceptualizing Control and Analyzing Criminal Liability For Unlicensed Money Transmitting Businesses Under Section 1960* (Int'l Acad. Financial Crimes Litigators Dec. 2024), available at https://edit.financialcrimelitigators.org/api/assets/cd682a1c-1cb0-4c99-a491-ac6155f4bdc2.pdf (analyzing this and other cases and concluding that control is required for liability under section 1960); Jacob E. Hirshman, Matt McGuire, Kaili Wang, *Tornado Cash and the Limits of Money Transmission,* Stanford Blockchain Review (Dec. 13, 2024), available at https://review.stanfordblockchain.xyz/p/57-tornado-cash-and-the-limits-of (same and referencing *Van Loon*).

traceable to any darknet activities, and transferred that "cleaned" bitcoin to another wallet, for a per-transaction fee. *Harmon*, 474 F. Supp. 3d at 80 (finding "Helix enabled customers, for a fee, to send bitcoins to designated recipients . . . to conceal and obfuscate the source or owner of the bitcoins," and noting a "2.5 percent fee" was deducted from the amount transferred); *id.* at 104 ("A Helix customer…would send bitcoin to addresses controlled by Helix. Helix would then remit cleaned bitcoin—that is, bitcoin that 'have never been to the darknet before'—to an address or addresses designated by the customer."). And in *Sterlingov,* the defendant operated Bitcoin Fog, a *custodial* mixing service that charged a per-transaction fee and was dependent on the defendant's involvement. *Sterlingov*, 573 F. Supp. 3d at 33 ("Bitcoin Fog charges 'a variable fee' between 2% and 2.5% on each deposit."); Trial Transcript, Direct Examination of Gov't Expert Luke Scholl (Feb. 21, 2024) at 6:14-21 (describing "custodial services like Bitcoin Fog, where there's a centralized entity controlling those funds"). Indeed, as the government noted in its closing argument, Bitcoin Fog ceased functioning as soon as the defendant was apprehended. (*See* Trial Transcript, Government Closing Argument (Mar. 7, 2024) at 66:1-7.) Each of these cases involves control over the funds which *Van Loon* found absent here. *See Van Loon* at 28 (contrasting Tornado Cash with a "mutable mixer" that would be "controllable or custodial").

Indeed, it was this lack of control that convinced the *Van Loon* court that Tornado Cash could not be considered "property" because it could not be "owned." *Van Loon* at 22-23, 29-30. If Tornado Cash is not property and cannot be owned, then it cannot be a "business" at all, let alone a "money transmitting business." Businesses are by their nature property and are owned. Further, as Ms. Storm argued in his motion to dismiss, an additional reason Tornado Cash cannot be a "money transmitting business" is that it does not charge a fee. *Van Loon* speaks to this issue as well. In concluding that the immutable smart contracts are not "property," the Fifth Circuit

specifically held that "Tornado Cash doesn't profit from the immutable smart contracts at issue in this appeal." *Van Loon* at 26. If Tornado Cash does not profit, it cannot be a money transmitting "business." *United States v. Banki,* 685 F.3d 99, 113 (2d Cir. 2012) ("business" must function as an "enterprise" "conducted for a fee or profit"); *United States v. Velastegui*, 199 F.3d 590, 595 n. 4 (2d Cir.1999) ("money transmitting business" is the transmission of money "for a fee").

In denying Mr. Storm's motion to dismiss, the Court ruled that the fact that the optional relayers charged fees was sufficient to meet the "fee" requirement in *Velastegui.* (Tr. at 25:8-11.) But as *Van Loon* makes clear, the mere fact that relayers charged fees does not mean that Tornado Cash or Mr. Storm profited. After acknowledging that some relayers charged fees, the Fifth Circuit observed:

> Nor does the record suggest that Tornado Cash itself, which is the designated 'entity,' receives fees from transactions through either mutable or immutable contracts. And none of the immutable smart contracts entitle the smart-contract creators to a benefit.

*Van Loon* at 26 (footnote omitted). Likewise, here, the fact that some optional third-party relayers may have received fees does not mean that Tornado Cash did. Mr. Storm's supposed crime was not being a relayer but operating Tornado Cash, and Tornado Cash could not be a money transmitting business because it did not profit from the service it provided.

Finally, *Van Loon* held that Tornado Cash was not a "service," which further supports Mr. Storm's argument that it is not a money transmitting business. *Van Loon* at 31-32. The government's theory here is that Tornado Cash provides a set of "services" to users (indeed, the government refers to the "Tornado Cash Service" throughout the indictment). But *Van Loon* specifically rejects this claim:

> In the Department's view, a service is "the performance of some useful act or series of acts for the benefit of another, us[ually] for a

16

fee." But according to Black's Law Dictionary, "[i]n this sense, *service* denotes an intangible commodity in the form of human effort, such as labor, skill, or advice." No human effort is expended by the immutable smart contracts. And even by the Department's definition, the immutable smart contracts, which are nothing more than lines of code, are less like a "service" and more like a tool that *is used in performing a service.* That is not the same as *being* a service.

*Van Loon* at 31-32.

The Fifth Circuit's conclusion that Tornado Cash is a tool, not a service, has application here. A mere tool cannot transmit money within the meaning of the statute. It is much like the frying pan or the USB cable in the examples provided by the government in its opposition to the motion to dismiss. They do not themselves "transmit" anything—they are mere tools for a *user* to use. If a USB cable is a money transmitting business, then truly anyone could be charged with operating an unlicensed money transmitting business. That could not have been the intent of the criminal statute. The mere creation of a tool for users to use, without having control and without providing a service, cannot be enough to impose criminal liability.

### D.    Applying Due Process Principles, the Indictment Should Be Dismissed

Finally, *Van Loon* makes clear that the government's attempt to criminalize the Tornado Cash developers' conduct by expanding the interpretation of key elements of the charged statutes violates due process. Under the Due Process clause, courts have struck down criminal indictments (1) for vagueness; (2) under the rule of lenity; and (3) because they impermissibly construe criminal statutes in a novel way. *See United States v. Lanier*, 520 U.S. 259, 266 (1997).

Here, the indictment should be struck down because the government's charging theory exceeds the traditional bounds of the elements of all three charged statutes.

As to Count One, the government contends that a criminal agreement can exist: (1) even where no co-conspirator "conducted" the "financial transaction" at issue; and (2) even

where no co-conspirator had the requisite guilty knowledge, in that they "[knew] that the property involved in a financial transaction represent[ed] the proceeds of some form of unlawful activity." (*See* Opp. at 42.)  The indictment therefore seeks to expand the scope of the Section 1956 to impose vicarious liability on software developers who neither conspired with anyone to commit a money laundering transaction, nor knew that a particular transaction included criminal proceeds, merely because their software could be used to conduct transactions.

As to Count Two, the government argues that a person can be guilty of conspiring to operate a money transmitting business even if that business (1) never controlled the funds and thus neither "accepted" nor "transmitted" them; and (2) charged no "fee" for service.  (*Id.* at 24-33, 36.)

As to Count Three, the government contends that a person can be guilty of conspiring to violate IEEPA (1) by dealing in blocked property, even though the person had no control over the immutable computer software that interacted with the blocked property, and could not have stopped the transaction; and (2) by providing "services" to a blocked person even though "no human effort" (*Van Loon* at 31) is expended by the immutable software, which only provides a service autonomously when prompted by the user.  (*See* Opp. at 60-61.)

*Van Loon* makes clear that the government's contentions as to each of these elements are novel and unprecedented.  The Fifth Circuit understood that the smart contracts, which conduct the "financial transactions" at issue here, operate autonomously, are not controlled by anyone, are irrevocable, and do not charge a fee.  Relevant to whether the smart contracts control the funds and to the "services" analysis, the Fifth Circuit found that the only "service" provided happens when the "individual cryptocurrency owner makes the relevant input and withdrawal

from the [Tornado Cash] smart contract," which happens when the smart contract "is prompted" by the *user's* "deposit or entry of a key for withdrawal." *Van Loon* at 32.

These conclusions—made by the Fifth Circuit as a matter of law—undermine the government's statutory interpretation arguments and support Mr. Storm's arguments. (*See* Mot. at 53-55). Indeed, applying Mr. Storm's legal interpretation of each of these statutes shows there is no crime here. The Supreme Court has "stressed repeatedly that when a choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Dowling v. United States*, 473 U.S. 207, 214 (1985) (cleaned up). The *Dowling* Court counseled "restraint" and a "narrow interpretation" in defining federal crimes, out of deference to Congress. *Id.* at 213. In *Van Loon*, the Fifth Circuit remarked similarly: "We just uphold the statutory bargain struck (or mis-struck) by Congress, not tinker with it." *Van Loon* at 33.

Cases involving new technology often tempt the Executive Branch to seek expansion of existing laws to cover previously unimaginable factual situations. But as the Fifth Circuit concluded, the "Constitution's ingenious design demands that judges be sticklers when it comes to decoding legislative text." *Id.* (quoting *Reed v. Taylor*, 923 F.3d 411, 415 (5th Cir. 2019)). The Second Circuit agrees: "We decline to stretch or update statutory words of plain and ordinary meaning in order to better accommodate the digital age." *Aleynikov*, 676 F.3d at 79. This Court should similarly interpret the statutes narrowly, avoiding novel constructions, and conclude that the indictment must be dismissed.

19

## V.    CONCLUSION

For all the foregoing reasons, *Van Loon* makes clear that all three counts of the indictment are fatally and legally flawed.  Mr. Storm respectfully requests that the Court dismiss all the charges against him.

Respectfully submitted,

DATED: December 18, 2024

By: */s/ Brian E. Klein*
    Brian E. Klein
    Keri Curtis Axel
    Becky S. James
    Kevin M. Casey
    Viviana Andazola Marquez
    Waymaker LLP

    -and-

    David E. Patton
    Nicholas D. Pavlis
    Hecker Fink LLP

    *Attorneys for Roman Storm*