UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :

UNITED STATES OF AMERICA
                                                  :

       - v. -
                                                  :     23 Cr. 430 (KPF)

ROMAN STORM,
                                                  :

              Defendant.
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# THE GOVERNMENT'S OPPOSITION TO DEFENDANT ROMAN STORM'S MOTION TO RECONSIDER

EDWARD Y. KIM
Acting United States Attorney
Southern District of New York

Ben Arad
Benjamin A. Gianforti
Thane Rehn
Assistant United States Attorneys

Kevin Mosley
Special Assistant United States Attorney
      - *Of Counsel* -

**TABLE OF CONTENTS**

FACTUAL BACKGROUND ................................................................................................... 2
ARGUMENT ...................................................................................................................... 5
I.   The Defendant's Motion Fails to Meet the Standard Governing Motions for Reconsideration ................................................................................................... 5
II.  The Fifth Circuit's *Van Loon* Opinion Is Fully Consistent With the Allegations in the Indictment ............................................................................................................ 6
III. The IEEPA Charge (Count Three) Is Not Affected by *Van Loon* .......................... 7
IV. The Money Laundering Charge (Count One) Is Not Affected by *Van Loon* ........ 10
V.  The Unlicensed Money Transmitting Charge (Count Two) Is Not Affected by *Van Loon* ... 12
VI. The Defendant's Due Process Arguments Are Meritless .......................................... 14
CONCLUSION ................................................................................................................... 14

The Government submits this memorandum in opposition to defendant Roman Storm's motion to reconsider the Court's denial of his motion to dismiss. (Dkt. 112 ("Mot.")). The defendant's motion should be denied, as he falls far short of meeting the standard warranting reconsideration. In denying the defendant's original motion to dismiss, the Court considered the detailed allegations in the Indictment about the nature of the Tornado Cash service. First, as alleged, "Tornado Cash comprised a website, a user interface, various smart contracts, including those smart contracts that were referred to in the indictment as 'Tornado Cash pools,' and a network of 'relayers' who provided customers with enhanced anonymity in exchange for a fee." (Dkt. 99 (Transcript of September 26, 2024 Conference) ("Tr.") at 19:3-8). Second, "the Indictment alleges that Tornado Cash's three founders controlled the user interface, or UI, and had the ability to make changes to it at their own discretion throughout the charged time period." (*Id*. at 19:8-11). The Court recognized that "Mr. Storm argues that the Tornado Cash pool smart contracts were 'immutable' after May of 2020," but also recognized that "the indictment charges … that other aspects of the Tornado Cash service were not similarly free from tinkering." (*Id*. at 19:16-20). Based on these considerations, the Court concluded that "there is no basis for [the Court] to decide as a matter of law, that the government hasn't alleged criminal conduct sufficient to satisfy each of the elements of the offenses charged." (*Id*. at 19:21; 20:1-4). The Court then examined each of the Counts of the Indictment and held that they were legally sufficient.

Nearly three months later, Storm repeats arguments the Court already rejected, claiming that the Fifth Circuit's recent decision in *Van Loon v. Dept. of the Treasury*, 122 F.4th 549 (5th Cir. 2024), "bears on the charges in this case." (Mot. at 1.). But *Van Loon* has no bearing on this case. *Van Loon* rests on a factual conclusion that the Government not only does not dispute, but has affirmatively alleged in the Indictment: the Tornado Cash pools are immutable smart contracts.

1

(*See* Indictment, Dkt. 1 ("Ind.") ¶ 26). *Van Loon* then applies that fact to a legal question that is not presented in this case: whether the pools are "property" under IEEPA and thus, whether the sanctions on those particular smart contracts are lawful. But the Government does not allege—and does not need to prove—that the pools constitute "property" under IEEPA or that they are capable of being owned or controlled in order for a jury to find the defendant guilty of the charged criminal offenses. The Government also does not allege—and does not need to prove—that the defendant violated the sanctions that OFAC placed on those pools. Indeed, the Indictment only charges crimes through August 8, 2022, the date that OFAC imposed sanctions on the pools, meaning that it is irrelevant in this case whether those sanctions were legally valid.

The essence of the defendant's argument, both in his original motion to dismiss and in the motion now before the Court, is that the Indictment fails because the defendant was unable to alter or otherwise control the immutable Tornado Cash pools. But as the Court recognized, and the Indictment alleges at length, the defendant *could* and *did* actively operate numerous components of the Tornado Cash service throughout the charged period in order to launder funds, illegally transmit money, and evade sanctions. Specifically, the Indictment alleges that the defendant and his coconspirators designed, controlled, and administered the website, UI, relayer network, TORN tokens, a variety of additional smart contracts, and various back-office functions of the Tornado Cash service, among other things. Yet the defendant's motion for reconsideration says almost nothing about these allegations, and his silence about them speaks volumes about whether *Van Loon* affects the Court's prior analysis in this case. It does not. And the defendant's motion, which is predicated entirely on *Van Loon*, should be denied.

## FACTUAL BACKGROUND

As alleged in the Indictment, the Tornado Cash service included multiple connected

features that collectively provided a seamless customer experience. These features included, among other things: (i) a website, which was developed, controlled, and paid for by the defendant and the other Tornado Cash founders; (ii) the user interface ("UI"), which was developed, controlled, and paid for by the defendant and the other Tornado Cash founders; (iii) various smart contracts, including multiple smart contracts that held large volumes of commingled customer deposits (the "Tornado Cash pools" or "pools"), as well as numerous other smart contracts that were designed to interact with the pools and the other Tornado Cash features, all of which were developed by the defendant, the other Tornado Cash founders, or others working at their direction; (iv) back-office "plumbing" to facilitate significant blockchain traffic flows between the Tornado Cash service and the Ethereum blockchain, which was paid for by the defendant and the other Tornado Cash founders; (v) a network of "relayers," designed and implemented by the defendant and the other Tornado Cash founders, that provided customers with enhanced anonymity in exchange for a fee; and (vi) the TORN token and its accompanying decentralized autonomous organization or "DAO," which the defendant and the other Tornado Cash founders designed and implemented and caused to become the economic engine and profit center of the Tornado Cash service. (Ind. ¶¶ 10, 13-31).

The Tornado Cash service allowed two types of transactions: deposits and withdrawals. While it was technically feasible to make deposits into and withdrawals from the Tornado Cash pools directly on the Ethereum blockchain, this required a degree of technical sophistication that few users possessed—and would have been a laborious and inefficient method of using the Tornado Cash service, even for the most sophisticated customers. (Ind. ¶ 13). Thus, as a practical matter, customers of the Tornado Cash service accessed it through the UI. The Government expects that the evidence at trial will show that the vast majority of Tornado Cash transactions

went through the UI during the relevant time period. Moreover, even if a small number of deposits to or withdrawals from the pools were made without utilizing other features of the Tornado Cash service, those transactions were necessarily less anonymous because they did not benefit from the additional anonymity provided by the other features of the Tornado Cash service (such as the relayer network). The possibility that some people might have transacted in this way does not detract from the fact that the defendant offered the public a service comprised of multiple features designed to work together as a seamless whole. The Tornado Cash service, therefore, is properly understood to encompass all the features of the service, and the Government expects that the evidence at trial will show that the defendant and his coconspirators promoted it as an integrated protocol.

While the defendant and the other Tornado Cash founders initially had control over the pools as well as the other parts of the service, the Indictment alleges that they relinquished their ability to control the pools in May 2020, while maintaining control of other key aspects of the service. (Ind. ¶ 26). Thus, after May 2020, the Tornado Cash pools were "immutable," but other core features of the Tornado Cash service were not. Notably, the defendant and his coconspirators made multiple updates to the Tornado Cash service, including to critically important features that they controlled, during the course of the charged time period. For instance, as alleged in the Indictment, the defendant and his coconspirators implemented a relayer algorithm and a smart contract called the "Relayer Registry" in March 2022 (Ind. ¶¶ 29-31), and they incorporated a (deliberately ineffective) sanctions screening mechanism into the Tornado Cash UI in April 2022 (Ind. ¶ 64). As a practical matter, virtually all Tornado Cash transactions during the charged time period were processed through these or other features over which the Tornado Cash founders and

their coconspirators exercised control.[1] The Government expects that the evidence at trial will show that the defendant and his coconspirators continued to operate the Tornado Cash service, as defined in the Indictment, knowing that it was conducting and facilitating financial transactions involving hundreds of millions of dollars of criminal proceeds.

## ARGUMENT

### I. The Defendant's Motion Fails to Meet the Standard Governing Motions for Reconsideration

Reconsideration presents a high bar. "The standard for granting motions for reconsideration is strict, and a court may grant reconsideration only where the moving party demonstrates an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *United States v. Alvarez-Estevez*, 2014 WL 12681364, at *1 (S.D.N.Y. Nov. 6, 2014) (internal quotation marks and citation omitted).

The defendant fails to meet this standard. He alleges neither new evidence nor clear error in the Court's prior ruling. Rather, he argues that *Van Loon* constitutes an "intervening change of controlling law." (*See* Mot. at 6). But *Van Loon* is not a "change of controlling law" for two reasons. First, it does not address any of the legal issues in this case, but rather considers the meaning of the word "property" in IEEPA as applied to the Tornado Cash pools, which is irrelevant

---

[1] It remains the case to this day that most Tornado Cash transactions use these features that remain subject to ownership and control. After OFAC announced its sanctions on Tornado Cash in August 2022, the defendant and the other founders did not shut down all of the features they controlled. Instead, they transferred ownership and control of certain features, including the Tornado Cash UI, to the Tornado Cash DAO, meaning that those features continue to be maintained, updated, and controlled by a collective of individuals who own TORN tokens. Additionally, the Government expects that the evidence at trial will show that usage of the Tornado Cash service dropped tremendously after OFAC imposed sanctions, due in part to the fact that many of the other features that the defendant and his coconspirators had been maintaining were shut down by various third parties.

here. Second, even if *Van Loon* had any bearing on the facts of this case, it is a Fifth Circuit case that does not control in this District. And it is black-letter law that there is no nonmutual offensive collateral estoppel against the United States. *United States v. Mendoza*, 464 U.S. 154, 158 (1984). Thus, the Fifth Circuit's decision is relevant only insofar as it may or may not be persuasive as applied to the very different legal issues and factual record in this case. But that is not the standard for a motion for reconsideration.

**II.     The Fifth Circuit's *Van Loon* Opinion Is Fully Consistent With the Allegations in the Indictment**

As noted, the holding in *Van Loon* has to do with the definition of "property" in IEEPA, a legal issue not relevant here. To the extent that the Fifth Circuit offered a background description of the Tornado Cash service in the course of its opinion, the defendant is wrong to suggest that that factual description has any binding effect here. (*See* Mot. at 7 (erroneously suggesting that "the jury would have to be instructed" in accordance with the description of the facts in *Van Loon*)). This is especially so because of the very different procedural posture in *Van Loon*. The Fifth Circuit was tasked with ascertaining whether OFAC's administrative record supported the imposition of sanctions on the Tornado Cash pools, and its review was necessarily circumscribed by the facts in that record. *See, e.g.*, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) (explaining that review of OFAC designations "does not allow the courts to undertake their own factfinding, but to review the agency record to determine whether the agency's decision was supported by a rational basis"). Here, by contrast, the factual record will be developed in the course of a full jury trial, and neither party is bound by the factual recitations in *Van Loon*.

But in any event, the facts on which the Fifth Circuit relied in *Van Loon* are wholly consistent with the Government's theory in this case. The Fifth Circuit focused on the fact that the Tornado Cash pools were made immutable in 2020, when the defendant and the other founders

"eliminate[d] their control over the pool smart contracts." *Van Loon*, 122 F.4th at 557. That is exactly what the Government alleges in the Indictment. (Ind. ¶ 26). Moreover, as the Government previously argued to the Court, and as the Court found in denying the defendant's motion to dismiss, the Indictment does not allege that the defendant is criminally liable merely for writing the computer code that created the Tornado Cash pools. On the contrary, that conduct occurred before any of the three conspiracies charged in the Indictment. Rather, the Indictment alleges that the Tornado Cash service was more than just the Tornado Cash pools—that the Tornado Cash service in fact had many connected pieces that together with the pools provided a seamless customer experience. These features included at least the six items listed above, which are spelled out over more than *ten pages* of the Indictment. (*See* Ind. ¶¶ 10, 13-31).

As this Court previously explained, the Court is "required to accept at this stage the allegations of the Indictment that the charged money transmitting business included the conduct of Tornado Cash's founders and network of relayers, and not merely the pool." (Tr. at 21:18-21). Thus, the *Van Loon* decision, which is expressly limited to whether the immutable pools are "property" under IEEPA, *see* 122 F.4th at 571, is entirely consistent with the criminal allegations in this case.

### III. The IEEPA Charge (Count Three) Is Not Affected by *Van Loon*

The defendant's first argument is that, with respect to Count Three, he cannot be held liable for violating IEEPA with respect to transactions with the Lazarus Group that occurred after the smart contracts became immutable. (Mot. at 6-9). In particular, he argues that his deliberate choice to implement an ineffective remedy against sanctions-violating transactions cannot give rise to liability because, he contends, no remedy would have been effective to prevent the Lazarus Group

7

from accessing the pools. Even if that were accurate,[2] the defendant's argument fails for two primary reasons.

First, the defendant is not charged merely with implementing an ineffective remedy against sanctions violations. As described in the Indictment, the defendant and his coconspirators took a number of affirmative steps to facilitate and profit from the Lazarus Group's money laundering and sanctions evasion, including by continuing to pay for critical infrastructure and continuing to maintain the relayer algorithm, the Relayer Registry, and other smart contracts, which were the profit engine for the Tornado Cash service and which provided a key additional layer of anonymity for Tornado Cash customers. (Ind. ¶ 68). Those components, not only the pools, were a key mechanism that enabled the Lazarus Group to anonymously launder money though the Tornado Cash service, and the defendant continued to facilitate those transactions knowing full well that they involved blocked property of the Lazarus Group. The relevance of the ineffective remedy that the defendant implemented is primarily to show his willfulness. As alleged, the defendant knew he could be criminally liable for providing services to the Lazarus Group and for transacting in the Lazarus Group's property, and so he devised the sanctions screen for the purpose of making a "public announcement claiming that the Tornado Cash service was not violating the law," even though he knew that this was false. (Ind. ¶ 63). Put another way, it was simply window dressing.

---

[2] The suggestion in *Van Loon* that nothing could have prevented the Lazarus Group from accessing the pools is, at a minimum, overstated. In fact, it is technically difficult to access the pools without using other components of the Tornado Cash service that the defendant owned, operated, and was able to manipulate during the relevant time period. (*See* Ind. ¶ 13). As noted above in footnote 1, the defendant could have, but chose not to, disable those other features when OFAC announced its sanctions on Tornado Cash. Instead, he transferred control of certain features to the DAO, which is controlled by anonymous holders of TORN tokens. Disabling those features—or implementing KYC and AML programs in those features—would in fact make it much more difficult for any illicit actors, including sanctioned actors, to access the pools or to use the Tornado Cash service to effectively launder their funds.

The defendant's argument also proves too much. Even if the Lazarus Group could in theory have devised its own way of accessing the Tornado Cash pools regardless of what steps the defendant took, that would not alleviate his responsibility for the actions that he did take. The defendant intentionally designed and operated an efficient and user-friendly way to access the pools and paid for critical infrastructure used in accessing the pools. Additionally, through his participation in operating the relayer network, the defendant provided enhanced anonymity for Tornado Cash customers—including the Lazarus Group—in exchange for fees. As alleged, he did so to facilitate money laundering and sanctions evasion. When provided to the Lazarus Group, those services constituted a sanctions violation even if there might have been some other way for the Lazarus Group to accomplish a similar object. The defendant's argument is like a getaway driver for a bank robbery arguing that he should not be liable for his conduct because the robbers could have just driven themselves or taken the bus instead.

Finally, the defendant's argument simply misreads *Van Loon*'s description of the Tornado Cash service. While the defendant argues that *Van Loon* held that "Tornado Cash is not a service" (Mot. at 9), what the Fifth Circuit actually held was that the pools in and of themselves are not a service—they are "more like a tool that *is used in performing* a service." *Van Loon*, 122 F.4th at 570 (emphasis in original). That description is fully consistent with holding the defendant criminally liable for performing a service for the Lazarus Group, using a variety of integrated tools including the Tornado Cash pools.[3]

---

[3] The Fifth Circuit's discussion of this issue was in the context of discussing an OFAC regulation that includes "services of any nature whatsoever" within the definition of "property" for IEEPA purposes. *Van Loon*, 122 F.4th at 570; *see* 31 C.F.R. 510.323. As discussed above, *Van Loon*'s characterization of the smart contract pools as "tools used in performing a service" is fully consistent with the Indictment in this case.

9

**IV.    The Money Laundering Charge (Count One) Is Not Affected by *Van Loon***

The defendant also argues that *Van Loon* supports dismissal of Count One, which charges him with money laundering conspiracy. His actual arguments, however, have little to do with *Van Loon*, which did not address Section 1956; they are simply rehashes of his old arguments. The defendant first argues that he cannot be alleged to have acted willfully because he was purportedly "powerless" to stop money laundering. (Mot. at 10). That argument fails for the same reasons described above. The Indictment alleges that the defendant deliberately participated in and facilitated money laundering transactions—conduct for which he can be held liable regardless of whether those transactions could have happened in some other way without his willful participation.

The defendant next argues that a money laundering conspiracy requires proof that the defendant or a coconspirator has "control over the proceeds of the specified unlawful activity." (Mot. at 10). He cites no case that actually supports that argument, however. Instead, he cites a line of cases that have discussed the so-called "merger issue" for defendants who are charged with both a substantive crime such as wire fraud and a separate count for money laundering of the proceeds of that substantive crime. *See, e.g.*, *Aronshtein v. United States*, 2023 WL 2770145, at

---

It also bears noting, however, that this section of the *Van Loon* opinion contains an erroneous description of the smart contract pools, stating that it is the pool that "provides the depositor a withdrawal key, and, when provided with that key, sends the specified amount to the designated withdrawal account." 122 F.4th at 570. The defendant's own legal filings in this case disagree with that description, as the defendant has claimed that customers generate their own secret notes to be used for withdrawals. (Dkt. 37-1 at 9). In fact, as alleged in the Indictment, the UI, which the Tornado Cash founders controlled at all relevant times, generated the secret notes for almost all customers. (Ind. ¶ 15). Additionally, the pools are not "provided with that key," as *Van Loon* states. Instead, in a typical transaction, the customer provides the secret note not to the pool directly but to the Tornado Cash UI, which mathematically converts the secret note to a zero-knowledge proof and transmits that proof to a relayer, who in turn transmits the proof to the pool to initiate the withdrawal.

*1 (2d Cir. 2023). In such a case, courts have recognized that the mere act of obtaining the proceeds of the substantive offense cannot itself be the transaction that gives rise to liability for money laundering. Rather, there must be a "further financial transaction involving the proceeds." *Id.*

Those cases simply clarify that there must be a separate transaction whose purpose is to conceal the proceeds of some already completed crime—they do not purport to announce a rule that anyone charged with money laundering conspiracy must have had control of the proceeds being laundered. Such a rule would be inconsistent with many criminal prosecutions of third-party money laundering enterprises. For example, in the Silk Road prosecution, the court approved a charge for conspiracy to commit money laundering without an allegation that the defendant had control over the criminal proceeds, but based on allegations that the defendant "purposefully and intentionally designed, created, and operated Silk Road to facilitate unlawful transactions," that such unlawful transactions in fact took place on Silk Road, and that the defendant "obtained significant monetary benefit in the form of commissions in exchange for the services he provided via Silk Road." *United States v. Ulbricht*, 31 F. Supp. 3d 540, 556 (S.D.N.Y. 2014). Tellingly, the defendant does not cite any case listing control of the criminal proceeds being laundered as an element of money laundering or instructing a jury that it must find control of the proceeds.

Here, there is no "merger" issue because the Tornado Cash service laundered funds for hackers and other cyber criminals after those criminals had committed crimes to acquire those criminal proceeds. The transactions using the Tornado Cash service were clearly separate from the original substantive crimes by which the criminal proceeds were obtained. The defendant's attempt to take language courts have used in describing the "merger" issue and suggesting that those courts meant to announce a new element of a money laundering charge should be rejected.

The defendant's third argument is that the Indictment fails to charge that he conducted or

11

conspired to conduct a financial transaction. (Mot. at 11-12). That argument is similarly meritless. The Indictment alleges that the defendant and his coconspirators in the Tornado Cash service did in fact directly conduct financial transactions in criminal proceeds, even if they did not control or take custody of the proceeds. As explained in the Indictment, a cryptocurrency transaction on the Ethereum network is conducted "by sending a message announcing the transfer to the Ethereum peer-to-peer network." (Ind. ¶ 6). For the Tornado Cash service, the defendant and the other operators of the service sent and participated in sending many of these messages. (*See, e.g.*, Ind. ¶ 18 (discussing how the UI that the defendant controlled was involved in sending instructions that conducted transactions); Ind. ¶ 24 (discussing how relayers were involved in sending instructions that conducted transactions)). On top of that, the relayers paid the "gas" fees for the transactions, which was also a critical part of conducting the transactions. (Ind. ¶ 24). Moreover, the Indictment also alleges that for each withdrawal of criminal proceeds that used a relayer, the transaction included a transfer of a portion of the withdrawal to the relayer, so the defendant's coconspirators not only participated in conducting the transaction but also received a cut of the criminal proceeds as payment for their role in it. (Ind. ¶ 24). And the defendant, a significant TORN token holder, received a financial benefit from the transaction by designing a system in which the relayers kicked back a payment to TORN token holders each time the relayer earned a withdrawal fee, which in turn generated demand for TORN and supported its value. (Ind. ¶¶ 30-31).

V.  **The Unlicensed Money Transmitting Charge (Count Two) Is Not Affected by *Van Loon***

The defendant's third argument, that the unlicensed money transmitting charge should be dismissed, largely rehashes arguments that this Court already considered in detail and rejected in denying the original motion to dismiss. Nothing about *Van Loon* alters that analysis. For starters, *Van Loon* did not address Section 1960 at all, so it is simply inapposite. Yet again, the defendant

12

simply conflates the immutable smart contracts discussed in *Van Loon* with the overall Tornado Cash service alleged in the Indictment. For example, the defendant erroneously asserts that *Van Loon* held that "Tornado Cash could not be considered property" (Mot. at 14), when in fact *Van Loon* held merely that the immutable pools were not property and expressly reserved judgment on the status of "Tornado Cash" as an entity, an issue that was not before the court. *Van Loon*, 122 F.4th at 571.

The defendant then regurgitates arguments about the supposed requirement that a money transmitting business have "custody" or "control" of the funds being transferred. (Mot. 14-16). For the reasons already briefed at length, that argument is meritless and finds no support in the statute or the case law. (Dkt. 53 (Govt. Opp. to Deft. Motions) at 24-31; *see also* Tr. at 21 ("[T]he control requirement is not in the statute, and this Court is not going to read it in."). *Van Loon* did not address this issue and offers no reason for the Court to revisit its decision.

The defendant also tries to resurrect his argument about whether the Tornado Cash service was a "business" by noting some language in *Van Loon* regarding whether "Tornado Cash itself" receives fees from transactions. (Mot. 16 (quoting *Van Loon*, 122 F.4th at 567)). While it is unclear what the Fifth Circuit was referring to by the phrase "Tornado Cash itself," the Indictment in this case clearly alleges that the Tornado Cash service was a profit-making venture in at least two respects: the fees charged by relayers for conducting Tornado Cash withdrawals for customers, and the increased value of the defendant's TORN holdings attendant to the success of the relayer network. (Ind. ¶¶ 29-31, 69-75; *see* Dkt. 53 (Govt. Opp. to Deft. Motions) at 35-37). As this Court has already recognized, those allegations are more than sufficient to support the allegation that the Tornado Cash service was a business. (Tr. at 24-25 (discussing various allegations that collectively show that "the Tornado Cash enterprise was not an altruistic venture")).

Finally, as noted above, *Van Loon* did not hold that Tornado Cash on the whole was not a service, but rather that the pools in and of themselves were not a "service" sufficient to make them qualify as "property" under IEEPA and OFAC's accompanying regulations. *See* 122 F.4th at 570. Here, the Indictment alleges a set of features that together function as a money transmitting business. (Ind. ¶¶ 10, 13-31). That is fully consistent with the discussion in *Van Loon*.

**VI.    The Defendant's Due Process Arguments Are Meritless**

The Defendant's final argument has nothing to do with *Van Loon*, but simply repeats due process arguments that were raised in his prior motion. (Mot. 17-19). Those arguments are meritless for the reasons previously briefed (Dkt. 53 at 68-77), and previously discussed in detail and ruled on by the Court (Dkt. 99 at 40-45).

## **CONCLUSION**

For the reasons set forth above, the defendant's motion should be denied.

Respectfully submitted,

EDWARD Y. KIM
Acting United States Attorney for the
Southern District of New York


By: /s/     Thane Rehn
    Ben Arad
    Benjamin A. Gianforti
    Thane Rehn
    Assistant United States Attorneys
    (212) 637-2354

    Kevin Mosley
    Special Assistant United States Attorney


Dated:  January 17, 2025
        New York, New York

14