UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    -against-<br><br>ROMAN STORM, ET AL.,<br><br>        Defendant. | Case No.: 23 Cr. 430 (KPF) |

**REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION
OF DENIAL OF MOTION TO DISMISS**

Brian E. Klein
Keri Curtis Axel
Becky S. James
Kevin M. Casey
Viviana Andazola Marquez
Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

David E. Patton
Nicholas D. Pavlis
Hecker Fink LLP
350 Fifth Ave, 63rd Floor
New York, New York 10118
(212) 763-0883
*Attorneys for Roman Storm*

## **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ...........................................................................................1

II.    ARGUMENT.......................................................................................................................1

    A.    Under *Van Loon*, Count Three (the IEEPA Charge) Cannot Stand.........................2

    B.    Count One (the Money Laundering Charge) Must Also Be Dismissed ..................4

    C.    Count Two (the Money Transmitting Business Charge) Also Fails for Reasons Articulated in *Van Loon* ............................................................................9

    D.    The Indictment Should Be Dismissed on Constitutional Grounds ........................10

III.    CONCLUSION..................................................................................................................11

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Aronshtein v. United States*,
    2023 WL 2770145 (2d Cir. Apr. 4, 2023) .......................................................................... 4

*Bryan v. United States*,
    524 U.S. 184 (1998) .......................................................................................................... 2

*United States v. Bankman-Fried*,
    S6 22 Cr. 673 (LAK) ......................................................................................................... 7

*United States v. Garcia*,
    587 F.3d 509 (2d Cir. 2009) ............................................................................................... 7

*United States v. Gotti*,
    459 F.3d 296 (2d Cir. 2006) ............................................................................................... 5

*United States v. Harmon*,
    474 F. Supp. 3d 76 (D.D.C. 2020) .................................................................................... 9

*United States v. Ill. Cent. R. Co.*,
    303 U.S. 239 (1938) .......................................................................................................... 2

*United States v. Leslie*,
    103 F.3d 1093 (2d Cir. 1997) ............................................................................................ 6

*United States v. Li*,
    55 F.3d 325 (7th Cir. 1995) ............................................................................................... 6

*United States v. Munshani*,
    2024 WL 4448708 (2d Cir. Oct. 9, 2024) ......................................................................... 4

*United States v. Murgio*,
    209 F. Supp. 3d 698 (S.D.N.Y. 2016) ............................................................................ 11

*United States v. Napoli*,
    54 F.3d 63 (2d Cir. 1995) .................................................................................................. 5

*United States v. Piervinanzi*,
    23 F.3d 670 (2d Cir. 1994) ............................................................................................ 5, 7

*United States v. Sterlingov*,
    573 F. Supp. 3d 28 (D.D.C. 2021) .................................................................................... 9

*United States v. Stern*,
    No. 16-CR-525 (JGK),
    2017 WL 4676660 (S.D.N.Y. Oct. 17, 2017) .................................................................. 6

*United States v. Szur*,
    289 F.3d 200 (2d Cir. 2002) ............................................................................................ 4

*United States v. Ulbricht*,
    858 F.3d 71, 88 (2d Cir. 2017) ........................................................................................ 6

*United States v. Ulbricht*,
    31 F. Supp. 3d 540 (S.D.N.Y. 2014) ............................................................................... 6

*Van Loon v. Dep't of the Treasury*,
    122 F.4th 549, 569 (5th Cir. 2024) .......................................................................... passim

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
    956 F.2d 1245 (2d Cir. 1992) .......................................................................................... 1

**OTHER AUTHORITIES**

BALLENTINE'S LAW DICTIONARY .................................................................................................. 5

FinCen Guidance, FIN-2019-G001, *Application of FinCEN's Regulations to Certain
    Business Models Involving Convertible Virtual Currencies,* (May 9, 2019) ................... 11

*Merriam-Webster Online Dictionary* ........................................................................................ 5

Sand et al., Modern Federal Jury Instructions: Criminal ............................................................ 4

Transcript of Proceedings re: Jury Instructions, *United States v. Bankman-Fried*, No. 22-
    CR-673 (LAK) (S.D.N.Y. Dec. 12, 2023), Dkt. 384 ....................................................... 7

**STATUTES**

18 U.S.C. § 1956(a)(1) ................................................................................................................ 5

18 U.S.C. § 1956(a)(2) ................................................................................................................ 5

18 U.S.C. § 1956(c)(2) ................................................................................................................ 5

18 U.S.C. § 1960 ......................................................................................................................... 9

50 U.S.C. § 1705(c) .................................................................................................................... 2

I.     **PRELIMINARY STATEMENT**

Roman Storm's request for reconsideration rests on the premise that it would be manifestly unjust and a clear error to hold him criminally liable under government theories that were squarely rejected and found wanting even for civil sanctions in *Van Loon*. The government, in its opposition, tries to dismiss *Van Loon* as non-controlling and inapposite. But the Fifth Circuit's conclusions as to the Tornado Cash protocol bear directly on the charges here—especially so with respect to developers' inability to control how and by whom the protocol is used.

Despite *Van Loon*'s conclusions that the protocol itself was an immutable software tool that anyone could access and no one could stop, the government claims that Mr. Storm's development of ancillary tools such as a user interface (UI) and development of a system for relayers and blockchain-based tokens is sufficient to meet the elements of intent-based crimes like money laundering and sanctions evasion. Such tools that are both amenable to legitimate uses and subject to misuse by bad actors are commonplace throughout society, and criminalizing their creation would stretch the law beyond all recognition.

Mr. Storm's Motion to Reconsider ("Motion") should be granted to prevent manifest injustice, to correct clear error, and to address Due Process concerns.

II.     **ARGUMENT**

"The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l* Mediation *Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). The government notably ignores the latter grounds for reconsideration, characterizing Mr. Storm's arguments about *Van Loon* as representing a "change in controlling law." (*See* Dkt. 120

1

("Opp.") at 5). But Mr. Storm does not argue that *Van Loon*, an out-of-circuit decision, is a change in controlling law. Rather, Mr. Storm urges reconsideration in light of *Van Loon*'s factual and legal conclusions and highly persuasive reasoning, which addressed many of the same critical factual and legal issues presented here.

### A. Under *Van Loon,* Count Three (the IEEPA Charge) Cannot Stand

The IEEPA charge should be dismissed because *Van Loon* vitiates the requisite willfulness element. *See* 50 U.S.C. § 1705(c). The government's proof as to any other element is irrelevant; without willfulness, the charge cannot stand.

The government does not dispute that it must prove that Mr. Storm "ha[d] a free will or choice" with respect to the alleged IEEPA evasion efforts of a sanctioned person. *United States v. Ill. Cent. R. Co.*, 303 U.S. 239, 243 (1938) (defining "willfully"); *see also Bryan v. United States*, 524 U.S. 184, 191 (1998) (willfulness "differentiates between deliberate and unwitting conduct."). The indictment here alleges that Mr. Storm acted "willfully" because he allegedly deliberately chose an ineffective remedy when Lazarus Group began using Tornado Cash. (Ind. ¶ 65.) This "ineffective remedy" theory—which, until this case, had never been approved by any court[1]—is the lynchpin of the government's willfulness theory. In the government's own words, "the relevance of the ineffective remedy that the defendant implemented is primarily to show willfulness." (Opp. at 8.)

The government utterly fails to address *Van Loon's* finding that there was no effective remedy available to Mr. Storm (or other developers): "Even if Tornado Cash did not want North Korea or Lazarus Group [to use] the immutable smart contracts that the Tornado Cash

---

[1] *See, e.g.*, Dkt. 39-1, Amicus Br. of the DeFi Education Fund, Ex. A (chart of cases showing that IEEPA has never been used to penalize a party who did not interact directly with a sanctioned entity or its agent).

developers created, Tornado Cash … would be *powerless to stop them*." *Van Loon v. Dep't of the Treasury,* 122 F.4th 549, 569 (5th Cir. 2024) (emphasis added). Simply put, the government's willfulness theory fails because it is premised on a choice that never existed. Neither Mr. Storm nor anyone else had the power to stop the alleged use of Tornado Cash by Lazarus Group. This is exactly the point that Mr. Storm made in his original Motion to Dismiss. (*See* Dkt. 30 at 40-45.) *Van Loon* resolves the point in his favor.

The fatally flawed "ineffective remedy" theory cannot be saved by other allegations about Mr. Storm's alleged involvement in "other features" of the Tornado Cash "service." (Opp. at 9.) First, this is just another way of arguing that Mr. Storm could have chosen an effective remedy to stop Lazarus Group, an argument *Van Loon* forecloses. Second, the government concedes that the "other features" Mr. Storm allegedly continued to offer were provided to all Tornado Cash "customers." (Opp. at 9.) The government cites no authority for the proposition that generally offering a "service" to the public somehow demonstrates willfulness under IEEPA simply because bad actors can abuse that "service." In fact, the IEEPA case law discussed in detail in the Motion to Dismiss supports the opposite proposition.(*See* Dkt. 30 at 44-45.) Moreover, the government's "getaway driver" analogy actually undercuts its position. (*See* Opp. at 9.) There is no allegation that Mr. Storm had any sort of agreement with Lazarus Group or worked with them in any way to rob banks or anyone else.

Finally, the government quibbles with *Van Loon's* holding about whether Tornado Cash constitutes a service. (*See id*.). The opinion speaks for itself. It plainly holds that Tornado Cash's smart contracts are tools, not services. *Van Loon*, 122 F.4th at 571. Given these tools were publicly available on the internet and there was no way to stop anyone from using them, there is no basis to argue that Mr. Storm somehow provided a "service" to Lazarus Group (or any

3

other bad actor). Under these circumstances, dismissal is appropriate. *United States v. Pirro*, 212 F.3d 86, 88 (2d Cir. 2000) ("an indictment may be dismissed where the government's theory of liability is legally insufficient); *United States v. Aleynikov*, 737 F. Supp. 2d 173, 176 (S.D.N.Y. 2010) ("Dismissal is required where the conduct alleged in the indictment as a factual basis for the offense is not actually prohibited by the language of the statute.").

### B. Count One (the Money Laundering Charge) Must Also Be Dismissed

In the Motion, Mr. Storm explained that *Van Loon* demonstrates that there is no money laundering claim as a matter of law, for three reasons. (Dkt. 112 ("Mot.") at 9-13.)

First, *Van Loon* vitiates the requisite willfulness element. *See* Sand et al., Modern Federal Jury Instructions: Criminal ¶ 3A.01 at 3A-3 (2024); *id.* ¶ 19.01 at 19-3. The government does not dispute the necessity of this element, and its attempt to argue around this problem falls short for the reasons discussed above.

Second, *Van Loon* confirms that the government cannot prove that any co-conspirator controlled the proceeds of the specified unlawful activity—*i.e.*, the Ether allegedly laundered by criminal hackers—and the government does not dispute this. (*Compare* Opp. at 10-12 *with* Mot. at 15.) The Second Circuit has repeatedly held that, for a transaction involving proceeds of specified unlawful activity to constitute money laundering, the transaction must be separate from the underlying unlawful activity, and the moment of separateness occurs "at the moment [the proceeds] were in *control* of the perpetrators." *United States v. Szur*, 289 F.3d 200, 214 (2d Cir. 2002) (emphasis added); *see also United States v. Munshani*, 2024 WL 4448708, *3 (2d Cir. Oct. 9, 2024) (control established when defendant received proceeds in his bank account). Other Second Circuit decisions have used the term "acquire," holding that the government must "show that proceeds of the 'specified unlawful activity' were 'realized' and '*acquire[d]*' before some 'further financial transaction[] involving the proceeds' took place." *Aronshtein v. United States*,

4

No. 21-518-PR, 2023 WL 2770145, *1 (2d Cir. Apr. 4, 2023) (quoting *United States v. Napoli*, 54 F.3d 63, 68 (2d Cir. 1995)) (emphasis added).  "Acquire" requires not just taking control but also acting as owner or physical custodian of the proceeds.[2]

The government does not address any of these cases, but simply dismisses them as irrelevant because they relate to "merger."  (*See* Opp. at 11.)  The Second Circuit's statutory construction is not, however, limited to the merger context and has precedential value here.  In *United States v. Piervinanzi*, distinguishing 18 U.S.C. § 1956(a)(2), the Court explained that Section 1956(a)(1) sets forth a "clearly demarcated" two-step analysis which "requires first that the proceeds of specified unlawful activity be generated, and second that the defendant, knowing the proceeds to be tainted, conduct or attempt to conduct a financial transaction with these proceeds with the intent to promote specified unlawful activity."  23 F.3d 670, 680 (2d Cir. 1994); *see also Napoli*, 54 F.3d at 68 (the "two-step analytical process" requires a defendant "to (1) acquire the proceeds of [SUA], and then (2) engage in a financial transaction with those proceeds").  The government cannot simply dismiss these relevant interpretations of the statute.

The statutory definition of "conduct" also supports the requirement of control.  Section 1956(c)(2) defines the term "conduct" to include "initiating, concluding, or participating in initiating, or concluding a transaction."  While this sentence is interpreted in the disjunctive, the various actions courts have found to be within the term "conduct" all involve touching and controlling the proceeds being laundered.  *See, e.g., United States v. Gotti*, 459 F.3d 296, 335 (2d Cir. 2006) (accepting cash payments was participating in conclusion of a transfer and constituted

---

[2] *See Acquire*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969) (defining "acquire" to mean "[t]o become the owner of property; to make property one's own"); *Merriam-Webster Online Dictionary*, MERRIAM-WEBSTER.COM,  https://www.merriam-webster.com/dictionary/acquire (defining "acquire" to mean "to get as one's own").

"conducting" a transaction); *United States v. Li*, 55 F.3d 325, 330 (7th Cir. 1995) (initiating a bank deposit was conducting a financial transaction) (cited with approval in *United States v. Leslie*, 103 F.3d 1093, 1102 (2d Cir. 1997)); *United States v. Stern*, No. 16-CR-525 (JGK), 2017 WL 4676660, at *7 (S.D.N.Y. Oct. 17, 2017) (receiving cash was participation in transaction).

The government cites no case permitting a money laundering conviction to stand where a defendant (or his co-conspirator) lacked control of the alleged proceeds, as is the case here. The Silk Road prosecution, cited by the government, is entirely inapposite. (*See* Opp. at 11.) There, the government alleged that the defendant "own[ed], operat[ed], and *control[ed]* all aspects of [Silk Road's] operation." *United States v. Ulbricht*, 31 F. Supp. 3d 540, 562 (S.D.N.Y. 2014) (emphasis added). This included control of the cryptocurrency used to transact on the Silk Road; the government estimated "that about 89% of the Bitcoins on [defendant's] computer came from Silk Road servers located in Iceland." *United States v. Ulbricht*, 858 F.3d 71, 88 (2d Cir. 2017).[3]

Third, and fatally, Mr. Storm has demonstrated that the government cannot prove that he conspired to conduct a money laundering transaction; that is, a financial transaction *with knowledge that it contained proceeds of specified unlawful activity*. (Mot. at 13). The government misses this point, responding by pointing to alleged "financial transactions" in the indictment but failing to consider whether the indictment alleges that such transactions were performed by a co-conspirator with the requisite guilty knowledge. It does not and cannot.

---

[3] There are myriad other differences. Unlike Tornado Cash, the Silk Road was operated on the dark web by a founder who used an alias. It was run like an e-commerce site, principally used for selling drugs, fake ID's, and computer hacking software. Vendors and customers could set up accounts and Bitcoin wallets on the website and transact with each other. The Silk Road also employed administrators, support staff, software engineers, and a physician to provide drug-use advice. *See generally U.S. v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017).

Section 1956 does not criminally enjoin all "financial transactions," only those that a defendant knows contain proceeds of specified unlawful activity. The statute clearly states: "Whoever, *knowing* that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, *conducts or attempts to conduct* such a financial transaction which in fact involves the proceeds of specified unlawful activity" is guilty of a crime. Indeed, as the Second Circuit made clear in its "two-step" analysis, knowledge of dirty proceeds is the first step. *See Piervinanzi*, 23 F.3d at 680. The fact that the government has charged a conspiracy does not change this basic knowledge requirement, as a defendant charged in a conspiracy must have agreed to violate the elements of the underlying substantive offense. *See, e.g.*, *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009).

The elements of concealment money laundering require the defendant or a co-conspirator to conduct a financial transaction, with knowledge that it involved the proceeds of some form of unlawful activity *See* Transcript of Proceedings re: Jury Instructions, *United States v. Bankman-Fried*, No. 22-CR-673 (LAK) (S.D.N.Y. Dec. 12, 2023), Dkt. 384 (money laundering requires proof that (1) "a person who is a part of the conspiracy would have conducted a financial transaction" with proceeds of unlawful activity (*id.* at 81) and (2) "the person would have known that the financial transactions at issue involved the proceeds . . . of unlawful activity"(*id.* at 83)).

*Van Loon* makes clear that no alleged co-conspirator could have had this requisite criminal knowledge. (*See* Mot. at 13). The examples the government offers of alleged financial transactions involving proceeds of specified unlawful activity, focused on the UI and relayers,[4]

---

[4] In addition to the UI and relayers, the government alleges as money laundering transactions Mr. Storm's alleged receipt of an indirect financial benefit when a relayer made a payment in TORN to the Tornado Cash staking contract. (*Id.*, citing Ind. ¶¶ 30-31.) Relayer payments of TORN do not involve the proceeds of specified unlawful activity, so they do not constitute

7

only further prove this point.  As to the UI, the government alleges that it "was involved in sending instructions that conducted transactions."  (Opp. at 12, citing Ind. ¶ 18).  But the UI is just a piece of software, and it did not touch any user's funds.[5]  Nor, as the government admits, did it provide insight to Mr. Storm, or anyone not associated with the user, on the source of any funds being transferred.  (Dkt. 30 at 10.)  Accordingly, to the extent the UI's activities can be characterized as transactions at all, such transactions were not conducted by a co-conspirator who at the time of the transaction possessed the requisite guilty knowledge.

      The government's relayer allegations similarly fall short.  The government alleges that relayers were involved in sending instructions and paying gas fees.  (Opp. at 12, citing Ind. ¶ 24.)  But there is no allegation in the indictment that the relayers knew whether any transaction contained the proceeds of specified unlawful activity.  Indeed, there is no dispute that they did not have such knowledge.  (*See id.* ¶¶ 24, 50; Dkt. 30 at 13.)  In sum, the activities of the UI and relayers the government alleges to be "financial transactions" cannot satisfy the guilty knowledge element of the statute because neither the UI nor the relayers are alleged to have had the requisite guilty knowledge, and therefore the charge must be dismissed.[6]

---

money laundering transactions at all under Section 1956, much less money laundering transactions conducted with criminal knowledge.

[5] For this reason, the UI does not participate in a "financial transaction" at all.  *See* Dkt. 43, Amicus Br. of Coin Center at 5-6; Dkt. 45, Amicus Br. of Blockchain Assoc. at 9-10.

[6] As the Electronic Frontier Foundation ("EFF") notes in its amicus brief, taking the government's new argument focusing solely on "ancillary tools" such as relayers and the UI to its logical extreme: "The implication is that if Tornado Cash required users to open their computer's command line and be familiar with how to execute transactions, rather than using a web browser, the law would not have been violated. Yet criminal liability should not rise or fall based on whether a dual-use toolmaker shipped its product with a user manual in the hopes of making it easier to use."  (Dkt. 122-1 at 4-5.)

### C. Count Two (the Money Transmitting Business Charge) Also Fails for Reasons Articulated in *Van Loon*

The government's primary argument regarding Count Two is that *Van Loon* did not address 18 U.S.C. § 1960 and is therefore inapposite. (Opp. at 12.) Again, the government misses the point. *Van Loon,* to be sure, addressed a different issue than the validity of the indictment here, but key points in the *Van Loon* opinion bear on this Court's decision to deny the motion to dismiss and warrant reconsideration.

Most fundamentally, *Van Loon*'s findings on control demonstrate why control is a necessary aspect of a money transmitting business, as the FinCEN Guidance holds. (Mot. at 13-14; FinCen Guidance, FIN-2019-G001, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies,* (May 9, 2019), at 14.) Just as the lack of control means that the smart contracts are not "property," the same lack of control means that they are not a "business." Just as one cannot own "property" without controlling it, one cannot run a "business" without controlling it.

The government offers no response to the fact that the case law (*see* Mot. at 14) (discussing *United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016), *United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020), and *United States v. Sterlingov*, 573 F. Supp. 3d 28 (D.D.C. 2021)), and recent commentary (*see* Mot. at 14 n.4), all support the common sense notion that Section 1960 requires control. The government attempts to escape this conclusion by arguing that Tornado Cash encompasses more than just smart contracts. (*See* Opp. at 14.) But the ancillary tools the government contends are part of the "Tornado Cash service" do not provide the Tornado Cash developers control over the digital assets being transferred. Just because the developers may be able to make changes to the UI does not mean that they have control over the transactions being performed by others with the assistance of the UI.

The government also takes issue with *Van Loon*'s conclusion that Tornado Cash does not profit from the smart contracts, arguing that the "Tornado Cash service" did profit from the relayer fees and the increased value of the TORN holdings attendant to the relayer network. (Opp. at 13.) But the government admits the use of relayers was optional (Dtk. 53, at 22; *Van Loon,* 122 F.4th at 560), and Mr. Storm is not alleged to have been a relayer, so any profits relayers earned are irrelevant to him. Moreover, the government does not and could not allege that the relayer network is the money transmitting business. Thus, to the extent the value of Mr. Storm's TORN holdings might have increased due to the success of the relayer network, that does not establish a profit from a "money transmitting business."

In short, *Van Loon*'s analysis is consistent with case law, commentary, statutory text, and the FinCEN Guidance. Control and profits are necessary ingredients for both regulation and criminal liability; Tornado Cash has neither and therefore is not a "money transmitting business."

### D. The Indictment Should Be Dismissed on Constitutional Grounds

The government offers no response to Mr. Storm's Due Process and rule of lenity arguments. (*See* Opp. at 14.) But its efforts to avoid *Van Loon* make clear how far the government is stretching the statutes here to manufacture criminal conduct. As explained by the EFF, it is constitutionally deficient for the government to "stretch the reach of existing criminal laws beyond their breaking point to include ancillary tools even when the core functionality is not available as a basis for liability." (Dkt. 122-1 at 7.) The uncertainty created by the government's morphing theory of criminal liability demonstrates why this prosecution violates both Due Process and the rule of lenity.

### III. CONCLUSION

For the foregoing reasons, and the reasons set forth in Mr. Storm's Motion for Reconsideration, Mr. Storm respectfully requests that the Court reconsider its decision denying his Motion to Dismiss and dismiss all three counts of the Indictment.

Respectfully submitted,

DATED: January 31, 2025

By: */s/ Brian E. Klein*
 Brian E. Klein
 Keri Curtis Axel
 Becky S. James
 Kevin M. Casey
 Viviana Andazola Marquez
 Waymaker LLP

 -and-

 David E. Patton
 Nicholas D. Pavlis
 Hecker Fink LLP

 *Attorneys for Roman Storm*

11