# EXHIBIT 1



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza*
*38th Floor*
*New York, New York 10278*

September 18, 2024

**BY ECF & EMAIL**

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

>        Re:    ***United States v. Roman Storm***
>               **23 Cr. 430 (KPF)**

Dear Judge Failla:

 The Government respectfully submits this letter motion, pursuant to Federal Rules of Criminal Procedure 16.1 and 57(b), Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, requesting that the Court:

- Schedule a *Daubert* hearing no later than two weeks prior to the December 2, 2024 trial date, and order the parties to produce expert disclosures substantively consistent with the notice required by Federal Rules of Criminal Procedure 16(a)(1)(G) and 16(b)(1)(C) sufficiently in advance of the *Daubert* hearing to allow the parties to file any challenges to the proposed expert testimony in advance of the hearing; and

- Order the defendant to provide the Government with notice of his intention to assert an advice-of-counsel defense and attendant disclosures, including (a) the nature and specifics of his advice-of-counsel defense, (b) the identification of the attorney(s) who provided such advice and a proffer of facts in support of such a defense, and (c) all documents that he intends to rely on in support of such a defense, as well as any other documents relating to such a defense, by October 14, 2024.

 Since the Court's issuance of a revised scheduling order on July 15, 2024 (Dkt. 67), and pursuant to their obligations under Rule 16.1, the parties have had multiple discussions attempting to negotiate an agreed-upon schedule for these and other pretrial disclosures that the parties could jointly propose to the Court. In the Government's experience, it is the uniform practice in this District for the parties to a criminal trial to agree to a schedule for pretrial expert disclosures. Such disclosures allow the parties to prepare for trial and also to raise any *Daubert* challenges in advance of trial, so that the Court can address these issues without having to interrupt the trial after the jury

has been sworn. However, in this case, the defense has taken the position that as long as it does not ask for pretrial expert disclosures from the Government, there will be no such disclosures until each expert witness is called at trial. That is a recipe for chaos. It will necessitate a continuance in the midst of trial every time an expert witness is called, so that the parties and the Court can address any *Daubert* issues raised by that expert.

While Rule 16 provides one mechanism for ordering expert disclosure, this Court also has substantial discretion to structure the trial proceedings in a manner that enables it to exercise its gatekeeping function under *Daubert*. The Government is respectfully requesting that the Court exercise that discretion by ordering a single *Daubert* hearing to take place no less than two weeks in advance of trial rather than allowing for the possibility of multiple *Daubert* hearings during the trial, and to order the parties to make disclosures sufficiently in advance of the *Daubert* hearing to allow the parties to make any objections for the Court to resolve at the hearing. This proposed procedure will ensure that the trial is conducted with minimal interruptions and will minimize the risk that improper expert testimony is admitted at trial. Moreover, ordering disclosures sufficiently in advance of the *Daubert* hearing will be more efficient for the Court and the parties as it will afford the parties sufficient time to properly scrutinize and vet the expert disclosures so that they can raise any and all applicable challenges with the Court sufficiently in advance of trial. Particularly in a case such as this one that is likely to involve relatively complex expert testimony, this Court should exercise its discretion to ensure that the parties have sufficient time to litigate these issues and to ensure that the Court is provided with sufficient time to decide such issues based on fulsome briefing and a *Daubert* hearing.

During the parties' most recent discussion of this issue on September 17, 2024, the defense informed the Government that it does not want to receive or produce any pretrial expert disclosures that provide the degree of notice set forth in Rule 16, and that it will not agree to a deadline to disclose whether the defendant will assert an advice-of-counsel defense without agreement on the schedule for other pretrial disclosures. The Government's view is that the defense's position would seriously undermine the Court's ability to conduct a fair and efficient trial. Accordingly, the parties are at an impasse.[1]

## I.  Expert Disclosures

### a.  Relevant Law

As the Court well knows, pursuant to Federal Rule of Criminal Procedure 16, at the defendant's request, the Government must disclose to the defendant, among other things, "a complete statement of all opinions that the government will elicit from the [expert] witness in its

---

[1] In these discussions, the Government has also indicated that it is willing to agree to early production of 3500 material as part of an overall agreement on pretrial disclosures, despite the fact that it has no legal obligation to do so. *See, e.g., United States v. Bakhtiar*, 994 F.2d 970, 974, n. 4 (2d Cir. 1993) ("Essentially § 3500 bars discovery until the witness has testified on direct examination in the case, and limits discovery of such statements to material relating to the subject matter of the testimony; it operates as a limitation on the general discovery rules set forth in Fed. R. Crim. P. 16.").

case-in-chief." Fed. R. Crim. P. 16(a)(1)(G)(i), (iii). If the defendant requests expert disclosures from the Government, Rule 16 obliges the Court to "set a time for the government to make its disclosures…[that is] sufficiently before trial to provide a fair opportunity for the defendant to meet the government's evidence." Fed. R. Crim. P. 16(a)(1)(G)(ii). Rule 16(b)(1)(C) imposes reciprocal obligations on the defendant—including with respect to timing—for any expert witnesses whom he may call at trial, provided that the Government has requested such disclosures and the defendant has made the initial request for the Government's expert disclosures under Rule 16(a)(1)(G).

Rule 16's expert disclosure provisions were amended in 2022 to "address[] two shortcomings of the prior provisions on expert witness disclosure: the lack of adequate specificity regarding what information must be disclosed, and the lack of an enforceable deadline for disclosure." Fed. R. Crim P. 16, Notes of Advisory Committee on Rules—2022 Amendment. Among other things, the Advisory Committee noted that the amendments to Rule 16 were "intended to facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed." *Id.* The Advisory Committee has made plain since at least 1974 that the intent behind Rule 16's expert disclosure provisions is to "minimize[] the undesirable effect of surprise at the trial….that often results from unexpected expert testimony[,]…[to] reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed R. Crim. P. 16, Notes of Advisory Committee on Rules—1974 and 1993 Amendments.

*Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), which govern the admissibility of expert testimony, also apply squarely here. Those cases and their progeny prescribe the Court's gatekeeping power under Federal Rule of Evidence Rule 702 with respect to expert testimony. *See, e.g., United States v. Ulbricht*, 858 F.3d 71, 114-18 (2d Cir. 2017). Expert testimony can be admitted under Rule 702 only if (1) the "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"; (2) the expert is qualified by "knowledge, skill, experience, training, or education"; (3) "the testimony is based upon sufficient facts or data"; (4) "the testimony is the product of reliable principles and methods"; and (5) "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 597 (holding that Rule 702 requires trial judges to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"); *Kumho*, 526 U.S. at 147-49 (applying *Daubert* to non-scientific testimony).

A court evaluating proffered testimony under *Daubert* and *Kumho* must look beyond "bare qualifications" and an expert's conclusions to the facts, reasoning, and methodology behind those conclusions. The proponent of an expert "has the burden of establishing that [these] admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702, 2000 Advisory Committee Notes (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)). Further, in *Kumho*, the Supreme Court made clear that a judge has "considerable leeway" in evaluating the admissibility of expert testimony. *Kumho*, 526 U.S. at 152. Importantly, this discretion includes the authority both to decide "***how*** to test an expert's reliability," *id.*, and to decide "***whether or when*** special briefing or other proceedings are needed to investigate reliability." *Id.* (emphasis added).

The district court's power to order special briefing and proceedings, and to set the schedule for these proceedings, in connection with evaluating the admissibility of expert testimony accords with the authority vested by Federal Rule of Criminal Procedure 57(b), which empowers courts to "regulate practice in any manner consistent with federal law, these rules, and the local rules of the district," as well as Federal Rule of Evidence 102, which mandates that the Federal Rules of Evidence "should be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination." In applying these principles, the Second Circuit has emphasized that a trial court in a criminal case has "broad" discretion both in its "decision to admit expert testimony and the method by which the court reaches that decision." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020).

## b. Discussion

The Court should not countenance the defendant's gamesmanship and transparent efforts to conduct this trial by ambush, which will result in unnecessary and potentially substantial mid-trial delays. His reading of Rule 16 turns the purpose of the rule and Federal Rule of Evidence 702 on their heads. It is especially untenable in a case such as this, which involves sophisticated tracing of cryptocurrency transactions and analysis of the complex array of websites, computer programs, service providers, and smart contracts that makes up the Tornado Cash service. Both parties are almost certain to call multiple expert witnesses at trial.

As noted above, the defendant has pointedly declined to request expert disclosures from the Government under Rule 16(a)(1)(G) so as not to trigger his own reciprocal obligations under Rule 16(b)(1)(C). In discussions with the Government, the defense has argued that Rule 16's disclosure obligations are too onerous because they force the defense to prematurely disclose its strategy.[2] But the implications of that position would cause serious challenges to the administration of criminal trials. Essentially, the defendant is proposing to waste the Court and the jury's time by forcing the Court to do the analysis necessary to assess the admissibility of the parties' experts mid-trial. Given the sophistication and complexity of the anticipated expert testimony in this case, that analysis will be challenging to do on an abbreviated timeline, mid-trial. Indeed, the defendant's trial-by-surprise strategy suggests that he is hoping to limit the amount of time the Government and the Court have to evaluate his proposed "experts," so he can get otherwise improper expert testimony into the record without a full and fair airing of the propriety of that testimony. As this Court is likely aware, it is a regular practice of both the Government and the defense to provide the opposing party's expert disclosures to their own experts for the purpose of evaluating the adequacy of the disclosures, the proposed methodology, and whether the expert has applied the principles and methodology in a reliable fashion, among other things. This process of having other experts scrutinize the opponent's proposed expert testimony allows both the

---

[2] The defendant has expressed willingness to make minimal disclosures under the pre-2022 version of Rule 16, which required the parties to, among other things, exchange "written summar[ies]," rather than "complete statement[s]," of any expert testimony intended to be offered at trial. The Government rejected this proposal in light of the obvious concerns animating the 2022 amendments to Rule 16 about improving trial efficiency and minimizing surprise by giving both sides a full and fair opportunity to assess and challenge expert testimony well ahead of trial.

Government and the defense to identify potential deficiencies in the proposed expert testimony and, at bottom, allows the Court to decide complex expert issues based on better, more nuanced, and more sophisticated advocacy. It would be quite difficult to engage in such a process, however, if expert disclosures are being made mid-trial.

As the Advisory Committee's notes make plain, Rule 16 was not amended to encourage gamesmanship or to avoid the need to provide the opposing party with notice of proposed expert testimony. Rather, it was amended to facilitate trial preparation, to ensure that challenges to expert testimony can be aired and dealt with well ahead of time to ensure a smooth and efficient trial. This is a crucial part of the Court's ability to properly conduct its gatekeeping function under *Daubert* and its progeny. *See, e.g., Ulbricht*, 858 F.3d at 114-18.

The Government's concerns are not hypothetical. In the recent trial in *United States v. Eisenberg*, No. 23 Cr. 10 (AS), another case involving cryptocurrency for which defense counsel in this case also served as defense counsel, the defense attempted to introduce multiple categories of expert testimony that went beyond its pretrial disclosures. Judge Subramanian was forced to conduct a *Daubert* hearing in the midst of trial, expressing frustration that this resulted in "burning jury time." *See United States v. Eisenberg*, No. 23 Cr. 10 (AS), Apr. 15, 2024 Trial Tr. (attached hereto as Exhibit A), at 975. After hearing extensive testimony from a proposed defense expert outside the presence of the jury, Judge Subramanian excluded some of the proposed expert opinions on the ground that the defense had committed a "plain violation of Rule 16," and that its disclosures had been "woefully deficient." *Id.* at 994-95. The court also substantially limited other areas of the proposed expert testimony, and again noted the "woefully deficient" nature of the defense expert disclosure. *Id.* at 1025-29.[3] The next day, during redirect of the same expert, the court had to interrupt the testimony to conduct a second *Daubert* hearing, which resulted in the preclusion of additional expert testimony that the defense was attempting to elicit on redirect. *Eisenberg*, No. 23 Cr. 10 (AS), Apr. 16, 2024 Trial Tr. (attached hereto as Exhibit B), at 1242-43.

Upon the conclusion of the *Eisenberg* trial, defense counsel first informed the Government that it did not want to engage in any expert disclosures in this case.

Defense counsel in this case also sought to avoid expert disclosures in *United States v. Thompson*, No. CR19-159-RSL, 2022 WL 841133 (W.D. Wash. Mar. 21, 2022), in which the court ruled in the defense's favor. The Government respectfully disagrees with the *Thompson* court's reasoning and circumscribed view of its own powers. And, of course, *Thompson* is not binding on this Court.

At least one other district court has recognized that it retains "some discretion" under *Daubert* to order expert disclosures in advance of trial even if the defense does not make any requests under Rule 16. *United States v. Impastato*, 535 F.Supp.2d 732, 742 (E.D. La. 2008). The Government submits that the reasoning in *Impastato* is more persuasive than the reasoning in *Thompson*, and is more in line with the purposes of the Federal Rules of Criminal Procedure and

---

[3] Judge Subramanian also noted that it would have been better—and would have resulted in less delay of the trial—if the Government had "insist[ed] on a more fulsome disclosure at the outset." *Id.* at 1029-30. The Government is mindful of that admonition in making this motion in this case.

the Federal Rules of Evidence, as interpreted in *Daubert* and *Kumho Tire*. As the district court in *Impastato* recognized, the trial court has discretion to decide "**how** to test an expert's reliability," and "**whether or when** special briefing or other proceedings are needed to investigate reliability." *Kumho*, 526 U.S. at 152 (emphasis added); *see also Jones*, 965 F.3d at 161.

In *Impastato*, the court ordered the defense to make its disclosures first to the court in advance of trial, and stated that it would turn the disclosures over to the government if the expert "testimony is of such nature that immediate disclosure to the Government is warranted in order to facilitate the efficient operation of the trial." *Id.* at 744. In this case, given the obvious complexity of the issues at trial, the Government submits that there is no need for the Court to conduct an *ex parte* review before ordering disclosure to the Government. The proposed schedule for disclosures and a pretrial *Daubert* hearing two weeks prior to trial will ensure that the parties can fairly prepare for trial on an equal footing and prevent gamesmanship. *Cf. United States v. Tin Yat Chin,* 476 F.3d 144, 146 (2d Cir. 2007) (chastising Government for engaging in "sharp practice" for not making pretrial disclosures with respect to rebuttal expert testimony until one day before end of defense case because then-current version of Rule 16(a)(1)(G) only required pretrial disclosures with respect to expert testimony to be introduced in Government's case-in-chief).

In sum, consistent with its discretion and its gatekeeping function, Federal Rule of Criminal Procedure 57(b), and Federal Rule of Evidence 702, this Court should schedule a pretrial *Daubert* hearing and order the parties to make expert disclosures in advance of the hearing.

## II. Advice-Of-Counsel Defense

### a. Relevant Law

In a criminal case where the defendant's intent is at issue, "the advice-of-counsel defense is not an affirmative defense that defeats liability even if the jury accepts the government's allegations as true," but rather "is evidence that, if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an 'unlawful intent.'" *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). "That said, defendants are entitled to an advice-of-counsel instruction only if there are sufficient facts in the record to support the defense." *Scully*, 877 F.3d at 476 (citing *United States v. Evangelista*, 122 F.3d 112, 117 (2d Cir. 1997)). Specifically, "[t]here must be evidence such that a reasonable juror could find that the defendant 'honestly and in good faith sought the advice of counsel,' 'fully and honestly laid all the facts before his counsel,' and 'in good faith and honestly followed counsel's advice.'" *Id.* (quoting *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012)).

Where the defendant has not put forward a formal defense of reliance on advice of counsel, courts have limited the admission of evidence about the involvement of attorneys on relevancy grounds and pursuant to Rule 403. The decision in *S.E.C. v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013), illustrates the limited relevance of evidence of attorney involvement absent a showing of each of the elements of the advice-of-counsel defense. In that case, which was brought against a Goldman Sachs employee alleged to have violated securities laws in the offer and sale of a synthetic collateralized debt obligation, the defendant disclaimed any advice-of-counsel defense,

but sought to introduce evidence that in-house counsel had reviewed various documents, reviewed disclosure language, was copied on communications, and in some instances assisted in drafting documents. *Id.* at 682-83. The court, however, held that Rules 401 and 403 precluded evidence and references to counsel, explaining:

> a lay jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction. Likewise, the fact that lawyers saw and commented on disclosure language could be understood as 'blessing' the sufficiency of that disclosure. This misunderstanding would give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense.

*Id.* at 684. Accordingly, in *Tourre*, the court precluded as irrelevant and prejudicial (1) evidence used solely to show lawyers attended or set up meetings, (2) evidence that lawyers approved of certain documents or disclosures, and (3) the placing by the defendant of undue focus on the fact that a lawyer was present at meetings or reviewed documents or disclosures. *Id.* at 685. Although the defendant was allowed to present evidence of the attendees of meetings and to include professional descriptions for those participants, defense counsel could not mention the presence of lawyers in their opening statements or arguments. The court emphasized that this was not an inclusive list of inadmissible references to counsel and that other references may similarly be inadmissible. *Id.*

Similarly, in *S.E.C. v. Stoker*, another civil securities fraud action in which the defendant did not intend to assert an advice-of-counsel defense, but rather sought to elicit testimony about whether lawyers had reviewed certain transactions, Judge Rakoff took issue with defense counsel's efforts to highlight, through questioning, the fact that attorneys had reviewed certain offering materials. No. 11 Civ. 7388 (S.D.N.Y. July 23, 2012), Trial Tr. at 895-96. The court recognized that "absent evidence that counsel knew either the information that Mr. Stoker allegedly kept secret, at least from outsiders, or knew the information that the SEC claims were distorted misrepresentations, the role of counsel in any of this [was] totally irrelevant." *Id.* And, although the defendant proffered an alternative reason for the questioning, the court recognized that counsel's tactic was a "disguised reliance argument," *id.* at 973, and that, even if the testimony were offered for some other purpose, questioning about the role of attorneys invited "all the dangers of the jury misunderstanding the alleged purpose" of the testimony. *Id.* at 981. Similarly, in *S.E.C. v. Lek Sec. Corp.*, No. 17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019), Judge Cote precluded "references to counsel's communications" because, among other things, they were "not relevant in the absence of an advice-of-counsel defense." The court explained that "any probative value of such references is substantially outweighed" by, among other things, "the risk that such references will sow confusion and mislead the jury by suggesting that counsel … fully informed … approved" a transaction. *Id.*

Thus, where a defendant seeks to admit evidence of the involvement of attorneys, whether as a formal advice of counsel defense, or to show good faith, he must provide the Government with sufficient notice and disclosures ahead of trial. Ordering such disclosures is routine in this district. *See, e.g., United States v. Schulte*, No. 17 Cr. 548 (PAC), 2020 WL 133620, at *6

(S.D.N.Y. Jan. 13, 2020) (requiring advanced advice of counsel disclosure); *United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 461441, at *8 (S.D.N.Y. Jan. 18, 2018) (defendant should have made pertinent disclosures in advance of trial); *United States v. Rubin/Chambers, Dunhill*, 828 F. Supp. 2d 698, 711 (S.D.N.Y. 2011) (requiring notification to the Government of advice-of-counsel defense sufficiently before pre-trial conference to permit litigation over disputes). Such pretrial notice and disclosure are necessary to assess the relevance and admissibility of evidence and the permissibility of argument and to prevent confusing and unfairly prejudicial arguments from being presented to the jury.

### b. Discussion

As noted above, the defendant has refused to disclose whether he even intends to assert an advice-of-counsel defense, much less produce any materials relevant to that defense, until the parties can agree on a "holistic" pretrial schedule. For the following reasons, the Court should set a deadline of October 14, 2024, for the defendant to provide notice if he intends to assert an advice-of-counsel defense and to produce any materials relevant to that defense.

First, additional disclosure is necessary to determine whether the evidence the defendant hopes to elicit or offer will be relevant and not confusing or prejudicial. Regardless of whether the defendant intends to argue a "formal" advice of counsel defense, he will need to establish the relevance of evidence relating to any attorneys' involvement in the development of the Tornado Cash service. *See Tourre*, 950 F. Supp. 2d at 684.

Second, notice and discovery are necessary because by invoking an advice-of-counsel and/or good-faith defense, the defendant typically impliedly waives the privilege. *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). Pretrial notice is therefore necessary to conduct discovery into otherwise potentially privileged areas. A defendant's "conversations with counsel regarding the legality of his schemes" are "directly relevant in determining the extent of his knowledge and, as a result, his intent." *Id.* Because conversations with counsel can reveal an absence of good faith or advice of counsel, "the attorney-client privilege cannot at once be used as a shield and a sword." *Id.* In other words, to assess whether a defendant truly acted in good faith, it becomes necessary to understand his communications with his attorney: did he fully and honestly lay out all the facts, did the attorney provide him information that would leave him to believe he was not acting lawfully, did he in good faith and honestly follow counsel's advice? For that reason, once a defendant raises a good faith or advice of counsel defense, "any communications or evidence defendants intend to use to establish the defense are subject to disclosure" as are "otherwise privileged communications that defendants do not intend to use at trial, but that are relevant to proving or undermining the advice-of-counsel defense." *United States v. Crowder*, 325 F. Supp. 3d 131, 138 (D.D.C. 2018). In addition, in this case the attorney-client privilege may be controlled by a corporation (here, Peppersec). As a result, the Court may need to resolve whether the defendant can rely on evidence that is protected by a company's privilege. *See United States v. Milton*, 626 F. Supp. 3d 694, 702-03 (S.D.N.Y. 2022) (denying the defendant's constitutional claim that "privileged communications become discoverable simply because a defendant wishes to use those communications in his defense"). Pretrial resolution of that waiver issue is important here because it appears that the issue may implicate not only the defendant's privilege, but also Peppersec's, and therefore may require collateral litigation as to who may waive the privilege and

to what materials the Government is entitled. This additional complication underscores why a short deadline for assertion of any advice-of-counsel defense, and corresponding disclosures, is necessary.

Third, pretrial notice and disclosure are in the interest of the efficient administration of the trial and to ensure that there are no delays mid-trial. *See Schulte*, 2020 WL 133620, at *6; *Scali*, 2018 WL 461441, at *8; *Rubin/Chambers, Dunhill*, 828 F. Supp. 2d at 711.

Applying this reasoning, Judge Kaplan recently ordered similar pretrial disclosures in *United States v. Bankman-Fried*, 22 Cr. 673 (LAK). There, the Court initially ordered the defense to provide notice of its intention to present an advice-of-counsel defense approximately two months before trial. *Id*. Dkt. 173 (July 30, 2023). Initially, the defense provided a bare-bones statement that it merely intended to assert such a defense, without further elaboration. At that point, the Government moved for and the Court ordered more detailed disclosures, including "the contours of the defense," the identity of the "attorney(s) involved, the general subject matter of the communications …, the format of the communications (e.g., written or oral), the approximate dates or date range of the relevant communications," the identity of "any other individuals present for or involved in the communications," and also to disclose any "materials supporting the defense(s), as well as any materials in the defendant's possession that would tend to undermine or impeach the defense(s)." *Id.* Dkt. 248 (Sept. 5, 2023). The Government submits that similar disclosures are appropriate here.

### III. Conclusion

For all of the foregoing reasons, the Government respectfully requests that the Court order the following reasonably in advance of trial: (1) a *Daubert* hearing and pre-hearing disclosures substantively consistent with the notice required by Federal Rules of Criminal Procedure 16(a)(1)(G) and 16(b)(1)(C) for any experts to be called at trial; and (2) notice of the defendant's intention to assert an advice-of-counsel defense and attendant disclosures by October 14, 2024, including (a) the nature and specifics of his advice-of-counsel defense, (b) the identification of the attorney(s) who provided such advice and a proffer of facts in support of such a defense, and (c)

all documents that he intends to rely on in support of such a defense, as well as any other documents relating to such a defense.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Benjamin A. Gianforti
Thane Rehn
Ben Arad
Assistant United States Attorneys
(212) 637-2490
(212) 637-2354
(914) 993-1907

Kevin Mosley
Special Assistant United States Attorney

cc: Brian Klein, Esq., Keri Axel, Esq., & David Patton, Esq. (by ECF & email)

# Exhibit A

O4FMEIS1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        23 Cr. 10 (AS)

 5   AVRAHAM EISENBERG,

 6              Defendant.                Trial

 7   ------------------------------x
                                          New York, N.Y.
 8                                        April 15, 2024
                                          8:55 a.m.
 9

10   Before:

11                 HON. ARUN SUBRAMANIAN,

12                                        District Judge
                                          -and a jury-
13
                        APPEARANCES
14

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     PETER J. DAVIS
17   THOMAS S. BURNETT
     TIAN HUANG
18        Assistant United States Attorneys

19   WAYMAKER LLP
          Attorneys for Defendant
20   BRIAN E. KLEIN
     ASHLEY MARTABANO
21   RILEY SMITH
          -and-
22   TALKIN MUCCIGROSSO & ROBERTS, LLP
     SANFORD N. TALKIN
23   NOAM B. GREENSPAN

24   Also Present:  Brandon Racz, FBI
                    Ryan Sears, Paralegal Specialist-USAO
25                  Jonathan Oshinsky, Paralegal Specialist-USAO
```

O4FMEIS1

1          (Trial resumed; jury not present)

2          THE COURT:  Ms. Huang, who is going to address from

3     your side the issues with the Sheridan disclosure?

4          MS. HUANG:  I will, your Honor.

5          THE COURT:  Where are we at?  Have we come to any

6     further understandings.

7          MS. HUANG:  I think the issues are as outlined in the

8     parties' letters.  Essentially, I think -- overall, there is --

9     the theme, I think, your Honor is going to hear from us over

10    and over in this is a lot of these opinions that Mr. Sheridan

11    now wants to provide are things that should have been disclosed

12    much, much earlier.  There is no reason whatsoever that they

13    were held up at this point, and obviously that puts the

14    government in an awkward position because we now have to --

15    last night at 8 p.m., after the Court's order, learned for the

16    first time about many of these areas and have to really kind of

17    now deal with that.

18          I think the only one that was kind of arguably close

19    in terms of like timing was their argument, for example, that

20    they needed to rebut Dr. Mordecai and Mr. Jain's testimony

21    regarding certain demonstratives and exhibits.  It was only

22    from your Honor's actual order that they specified that what

23    they cared about actually wasn't Mr. Jain from their

24    supplemental disclosure.  It was regarding Mr -- Dr. Mordecai,

25    rather, and it was specifically on the topics of partial

O4FMEIS1

1    liquidations and funding payments.  As the Court probably

2    remembers, Dr. Mordecai specifically testified that as to

3    liquidations, that was an area that was outside the scope of

4    his testimony.  He was not looking into that whatsoever.  Mr.

5    Greenspan asked him over and over and that was his response.

6             So it feels really like the defense is putting up a

7    straw man here saying, this was an area that he touched on when

8    really it was an area that they kind of opened the door on.

9    And now, with no warning until literally 8 p.m., 8:08, I

10   believe, actually they let us know that this is something that

11   they want their expert to testify on.

12            THE COURT:  Understood.

13            Who is going to address this from the defendant's

14   side?

15            MR. KLEIN:  Me, your Honor.

16            THE COURT:  What's going on here?  I think the

17   government makes a fair point that prior to last night at 8

18   p.m., these opinions that are specified in the supplemental

19   disclosure were not previously disclosed.  The subject matter

20   may have been previously included, arguably, in some of the

21   prior disclosures.  The opinions themselves were not included

22   in any prior disclosure, as far as I can see.

23            To give you an example, when you were talking about

24   the repayment parameters and how that operated, you relate that

25   back to the disclosure concerning changes to the Mango Markets

O4FMEIS1

1  platform.  That's the subject matter.  But the opinion itself

2  was not previously disclosed.  Maybe you can shed some light on

3  this.  If I'm wrong about it, I have all your disclosures right

4  here.  I'm happy to take a look.  I want to understand why

5  there isn't a timeliness problem, and then we can talk about

6  the consequences of that.

7          MR. KLEIN:  Yes, your Honor.

8          Do you want me to take them in turn, or I can talk

9  about each of them?  Do you want me to focus on that one you

10  just mentioned?

11          THE COURT:  Let's start from just basics first.

12  Mr. Sheridan -- literally this that you have written in the

13  supplemental disclosure, this is what he is going to say,

14  right?

15          MR. KLEIN:  There are other things that we previously

16  disclosed.  This was out of an abundance of caution where they

17  think there are new topics, and we wanted to disclose that.

18          THE COURT:  It's not topics.

19          When Mr. Sheridan is asked questions relating to these

20  areas, what he is going to say is literally what's stated here

21  in the disclosure, right?  I understand the words will be a

22  little bit different, but this is what he is going to testify

23  to and nothing else within these areas.

24          MR. KLEIN:  Yes.  The plan is for him to talk about

25  the two repay-bad-debt proposals and to explain the mechanics

O4FMEIS1

1     of them.

2              THE COURT:  What's the relevance of that?

3              MR. KLEIN:  A couple of things, your Honor.

4              Right now the jury has only seen those slides and

5     doesn't understand necessarily how they actually operated or

6     the timing of them.  They have testimony that the second vote

7     was approved shortly after but not how shortly.  They also

8     don't know when the first vote was put up, which was within a

9     few hours of my client's trade, not days, literally I think

10    three hours.

11             THE COURT:  What's the relevance of that?

12             MR. KLEIN:  It goes directly to the heart of this case

13    that he didn't have intent to like steal something from the

14    Mango Markets users that these withdrawals happened and

15    immediately he was negotiating in a settlement.  That goes

16    right to his mental state, within three hours of this

17    happening.

18             THE COURT:  Why wasn't that in one of your prior

19    disclosures?  There is two prior disclosures.  Why wasn't that

20    specified in the prior disclosures if it goes to the heart of

21    your case?  I think that's the government's primary submission

22    here, is that whether or not they agree with you that it bears

23    on intent, it's not in these prior disclosures, and we had two

24    of them.  I bent over backwards to allow the defense to put in

25    the supplemental disclosure the last time which the government

O4FMEIS1

1    had an issue with, let you put it in.  We considered it and

2    this is not in there.

3            MR. KLEIN:  Your Honor, I think a couple of things

4    happened along the way.

5            One is -- just so you know, when we got a witness list

6    of witnesses from the government on March 25, it included

7    witnesses who -- we would have brought in this evidence, just

8    to be very clear.  And then the way the case developed, these

9    facts became more prominent and more focused.  So I understand

10   that we maybe could have been a little bit clearer back on

11   January 12 and that this precise language was not in our

12   disclosure on January 12, but I think all along it has been

13   very clear that Mr. Sheridan was going to talk about the

14   mechanics of how Mango Markets operated and the mechanics of

15   Avi, our client's trades and things that flowed from that.

16   This is not like we are talking about FTX or AscendEX.  We are

17   not going off into some total lark.  We are really focused on

18   squarely on what he did and how Mango Markets operated.

19           THE COURT:  Mr. Sheridan is not going to -- this is

20   where I think it's really important to avoid any prejudice to

21   the government.  He's literally just going to be saying, here

22   is when it happened.  The money went back here.  He is not

23   going to be saying:  And you can infer from this that people at

24   Mango Markets thought this or you can infer from this that

25   Mr. Eisenberg didn't have an intent.  He is not going to do any

O4FMEIS1

1  of that.  He is literally just going to say, these are bare

2  facts and really the issue is just that, otherwise, you would

3  not have a witness for these facts to just come through.

4  MR. KLEIN:  Yes, your Honor, that's absolutely right.

5  You made it very clear at our hearing on March 25, he can't

6  talk about the things you just mentioned, our client's intent,

7  what's in the head -- even what's in the heads of the people

8  who designed the protocol.  It's a technical thing, these

9  votes, the timing, and you need an expert to look at the code

10  and look at the protocol to see this.  That's why we had Mr.

11  Sheridan.

12  THE COURT:  Aren't the base documents in the record so

13  you can make the argument on closing, regardless of whether Mr.

14  Sheridan testified about it or not?

15  MR. KLEIN:  The base documents are, and they were put

16  in the by the government.  So that's one thing also, just to be

17  clear.

18  THE COURT:  What expertise?

19  MR. TALKIN:  Can I just have one second?

20  THE COURT:  Yes, you may.

21  MR. KLEIN:  Sorry, your Honor.

22  THE COURT:  What is Mr. Sheridan's expertise that he

23  adds to this?  That's what I'm trying to understand -- the

24  documents -- I want to make sure that neither side is

25  prejudiced here.  The documents are in the record, so on

1    closing you can certainly make the argument you are making

2    right now, that the repayment was proposed within hours of the

3    actual incident and for that reason that negates the intent

4    that the government is trying to prove.  I got that, that

5    argument.

6             How does he lend any kind of expertise to this?

7             MR. KLEIN:  Two points on that, your Honor.

8             First, the exact timing isn't in.  The testimony is

9    shortly -- after Mr. Talkin asked:  Was it within hours?  The

10   witness wasn't sure.  He just said shortly after, within days.

11   Just to be sure, that isn't precisely in.

12            Two, you need someone who is able to look at the code

13   and then translate that and then say this was posted when, and

14   that's Mr. Sheridan.  There is an expertise there.  Your Honor

15   talked about it.  Jurors aren't able -- I can't read code.

16   Jurors aren't going to be able to understand code.  That's

17   where the expertise is, your Honor.

18            THE COURT:  Is Mr. Sheridan able to read code?

19            MR. KLEIN:  Yes, he is.  He looked at the code, and he

20   can see that.  He will testify along those lines.

21            Ms. Martabano is the one doing his direct.  She can

22   share the questions in advance with your Honor if you have

23   concerns about the precise line of questioning.

24            THE COURT:  I think that if the government, and if Ms.

25   Huang was to make an application to *voir dire* the witness on

O4FMEIS1

1      his capability and ability to examine code and comprehend what

2      it means, then that would be a fair request made by the

3      government.  If that's the reason why it's important to have

4      him testify, because he can understand code and he has enough

5      to cross the threshold on Rule 702, then we can address that.

6              That's the first area.

7              MR. TALKIN:  Your Honor, just one more fact as far as

8      in relation to the discussions you just had with Mr. Klein.  We

9      are going to bring in Mr. Eisenberg's computer searches, and in

10     there is one that went to proposals, and it circumstantially

11     will show the time of the proposal.  We were talking about

12     timing and everything.  And I want the Court to be aware of

13     that fact because it seemed like it would or could affect your

14     analysis, and I did not want you not to have that when you were

15     saying to him about the timing and the argument.

16             MR. KLEIN:  That's not through Mr. Sheridan, to be

17     clear.  That's through a separate witness, summary-type witness

18     like the government uses, a private investigator who is

19     bringing in certain exhibits.

20             THE COURT:  That's a subject of separate objections

21     that the government has raised.

22             MR. KLEIN:  Yes, your Honor.

23             THE COURT:  Let's figure this out, and then we will

24     move to Mr. Dwyer.

25             MR. TALKIN:  Those objections have been resolved.

O4FMEIS1

```
1              THE COURT:  They have been resolved.
2              Then is Mr. Sheridan going to be relying on any of
3    that?
4              MR. TALKIN:  No.  You had said that there was -- we
5    were talking about the arguments and how it might affect your
6    decision.  I just wanted you to have -- let you know that that
7    was coming so that can be factored in too.
8              THE COURT:  How would you propose that it be factored
9    in?  I'm just missing something.
10             MR. KLEIN:  In our favor, your Honor.
11             MS. HUANG:  Your Honor, I think it is because in that
12   case there is no need for Mr. Sheridan, right, because there is
13   the timing that your Honor has noted.  The specific question
14   that they have said that they wanted to propose to Mr. Sheridan
15   is to just get the timing of those proposals in.  It sounds
16   like Mr. Dwyer can do that.
17             Also, your Honor, if I can just note, for I think all
18   of these areas too, one of the things that they have addressed
19   is that Mr. Sheridan has relied on 3500 material provided by
20   the government.  There is obviously a double hearsay issue
21   there because it's the statement of whatever witness and it's
22   the notes of the government on those statements.  That's yet
23   another issue.  We don't know specifically how Mr. Sheridan has
24   relied on what specific materials.  They have just broadly
25   listed it.  That's another category.
```

O4FMEIS1

1      MR. KLEIN:  Your Honor, we are talking about the

2  DeCapua testimony.  We put that in there out of an abundance of

3  caution.  He has looked at the 3500 materials.  This specific

4  testimony is not based on them.  The prosecutor is welcome to

5  ask and inquire what his basis for his knowledge is.  That's

6  regular cross-examination.

7      THE COURT:  These three areas, how many questions do

8  you actually have on this?

9      MR. KLEIN:  Ms. Martabano has prepared his direct.

10     THE COURT:  If it's like --

11     MR. KLEIN:  It's not that many questions, your Honor.

12     MS. MARTABANO:  On the repayment proposals, it's less

13  than a page of large font.

14     On the other topics -- I think, because of the Court's

15  earlier ruling, as we understood it, we do tie most of his

16  testimony to his understanding of the computer code and how if

17  the computer code bears out what's in the document.  So, for

18  example, the government has put in GX-1011, which refers to --

19  they describe it as a foundational document for Mango Markets

20  and has tons of information about how the protocol was meant to

21  function.  They have shown the FAQ section.  They have shown

22  lots of it.

23     And for us we want to be able to say with Mr.

24  Sheridan, does the code match that?  So if you've looked at the

25  code, does it actually match what that says?  This says, if you

O4FMEIS1

1    run out of your collateral, then you will be liquidated.  Does
2    the code say that?  Or does just the document say that?
3           It is sort of tying the computer code because I think
4    it's apparent to everyone in the room that we will be arguing
5    that the code really did control here.  If the code and the
6    documents, if there is a discrepancy between the code and the
7    documents, then it's important to know what the code said.
8           So my plan is mostly to walk him through much of the
9    Mango Markets documentation to say, is this how it works
10   according to the code?  Is this also how it works according to
11   the code?  My understanding is we had already litigated the
12   fact that he would be speaking strictly to how the code worked
13   and how things would execute, and I do think that that is
14   something that an average juror would not comprehend.
15          MS. HUANG:  Your Honor, I think that's yet another new
16   disclosure.
17          MR. BURNETT:  There is just no way we could possibly
18   prepare for that.  They would need to actually list out the
19   differences that they plan to opine on.
20          MR. KLEIN:  Your Honor, it has always been clear he
21   was going to testify and opine about how the smart contract
22   operated and what was permissible without going to the intent
23   of the designers or the intent of our client.  He is navigating
24   that road, and we have been very careful to follow the Court's
25   prior order and make sure that the questions stick to that

1   path, and that is the path he is going to be on throughout that

2   testimony.

3        So the smart contract portion has clearly has been

4   predisclosed, ruled on, and accepted within the parameters the

5   Court gave on the March 25 hearing and following order.

6        The last part about Dr. Mordecai's testimony, we

7   always noticed that it could develop based on what happens at

8   trial because we don't know what exhibits they are going to

9   offer in advance.  We got them a week ago.  They switched them

10  out constantly throughout their process, including the

11  demonstrative, for Mr. Mordecai in particular.

12       They are welcome to get up and the end and say:

13  Dr. Mordecai told you he wasn't looking at this, and we will

14  say:  That is not how it actually worked.  That just goes to

15  the argument at the end.

16       If they want time to call Dr. Mordecai or Jain as

17  rebuttal experts, they can do that.  They have noticed that.

18  If they want to call those people back, they can do that

19  tomorrow, as far as we are concerned.  We are not going to

20  object to that.

21       But this is really critical evidence, and we have

22  already noticed it and the Court ruled it.  How the smart

23  contract operated is something Dr -- Mr. Sheridan has always

24  been noticed to talk about.  That's what he is going to talk

25  about along the narrow pathway your Honor gave, which we were

O4FMEIS1

1    fine operating with it.

2            THE COURT:  The issue is that -- I think there is

3    problems on both sides.  The problem from the government's

4    perspective is that when we went through this exercise at

5    length previously, when there was a disclosure that was as

6    generic as how the code functioned, there could have been a

7    request at that juncture for a further disclosure to explain

8    what Mr. Sheridan was going to say in particular as his

9    opinions on how the code operated or did not operate, which we

10   didn't have.

11           There was a motion on *Daubert* grounds to preclude

12   testimony which the Court entertained, but there didn't seem to

13   be an issue as to whether what was in the disclosure, just as a

14   technical matter under Rule 16, was sufficient and whether

15   there should be a further disclosure if the testimony was going

16   to be allowed.  Because then we could have gotten all of this

17   squared away months -- a month ago maybe.  The last disclosure

18   was January 12, so this could have gotten squared away before.

19           From your perspective, I think you do have an issue

20   that the Rule 16 disclosures that were furnished do not meet

21   the substance of the rule.  It doesn't actually state the

22   opinions that Mr. Sheridan is going to offer, which leaves the

23   government in a quandary.

24           But Ms. Martabano, these three areas, which seem to be

25   the crux of the issue here, you're saying that what are we

O4FMEIS1

1    talking about, like 15 minutes?

2              MS. MARTABANO:  Yes, your Honor, I think that's right.

3              THE COURT:  Why shouldn't we have Mr. Sheridan take

4    the stand right now, and you can run through those questions,

5    so at least the government knows what you are going to raise.

6              Because what I want to avoid is that you call Mr.

7    Sheridan and it's sidebar after sidebar because it actually

8    wasn't what's stated here.  It was way outside of those

9    parameters.  That's what I think we are going to do.  I want to

10   make sure that there is not anything else that we need to do

11   when Mr. Sheridan is here.

12             Second issue, is he going to be relying on

13   Mr. Eisenberg's statements in any way, shape, or form?

14             MR. KLEIN:  No, your Honor.  This is -- the government

15   didn't know what he was talking with Mr. Eisenberg about, but

16   he can testify to that when he gets up there.  He is not

17   relying on the statements.

18             It was like two conversations.  One was just

19   introducing themselves.  Second one had just a technical thing

20   to help Mr. Eisenberg review the discovery.  So this is not

21   substantive.  He is not basing any opinion on Mr. Eisenberg's

22   statements to him.  Ms. Martabano can elicit that testimony

23   when he is up there.  It's a nothing.

24             THE COURT:  Ms. Huang, what are your reactions?  My

25   intent, my thinking right now, is to have Mr. Sheridan take the

O4FMEIS1

1    stand, Ms. Martabano can ask whatever questions she has, you
2    can inquire as to Mr. Sheridan's qualifications, or if there
3    are other issues that you just want to flesh out, and then we
4    will run it back from the top when Mr. Sheridan testifies in
5    front of the jury, absent some further issues.
6            Because at this point I think it's fair, if there is
7    testimony that Ms. Martabano seeks to elicit that is outside of
8    even this supplemental disclosure, then that will be precluded.
9            Ms. Huang, what's your reaction to that?
10           MS. HUANG:  Just one second, your Honor.
11           MR. BURNETT:  I think we are fine with that proposal,
12   your Honor.  I think we would ask that he cover not just the
13   first three topics, but all four topics that they identified in
14   the supplement, particularly --
15           THE COURT:  I'm sorry.  I missed the fourth one.
16           MR. BURNETT:  Particularly because that one doesn't
17   even have an explanation of what his basis is for that.  There
18   are like some other subsidiary foundational issues that we will
19   want to raise after he testifies; for instance, this like
20   whiskeyfries link he talks about.
21           THE COURT:  Those are just the topics, and then there
22   are some exhibit issues.
23           MR. BURNETT:  Right.  Although to the extent that his
24   basis for testifying on the topic is the exhibit, then I think
25   knocking out the exhibit would likely knock out the topic.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O4FMEIS1

1    THE COURT: Now we go back to what we explored with

2    Mr. Jain, which is that, if he's relying on some code, even if

3    it would not be admissible, maybe they can't put it into

4    evidence.  But if he says, I reviewed this code and based on my

5    review of the code I came to these expert conclusions based on

6    my experience and expertise, and then he explains to the jury

7    certain aspects -- certain opinions, wouldn't that be proper

8    under Rule 703?

9    MR. BURNETT: I think the issue, at least with respect

10   to this main document we are focused on, it's not code.  It's

11   basically, there was like some people on Discord.  We are

12   talking about a place where you could find Mango data.  It

13   seems like he found it on Discord, clicked on it, and just like

14   accepting it as true and correct Mango data; not like data as

15   in code data, like data as in trading data, so this is like --

16   it's not a code thing.  It's just purely inauthentic and

17   hearsay.

18   THE COURT: Let's figure that out.

19   Anything else other than the whiskeyfries document?

20   MR. BURNETT: The whiskeyfries one is the main one.

21   They are going to show a price chart, it seems, and talk about

22   pricing.  He was never noticed to talk about pricing, but we

23   have also never received the underlying data, which is a

24   prerequisite for admission under 1006.  We also have no basis

25   to challenge the hearsay or the authenticity of that data.

O4FMEIS1

1          THE COURT:  This is the 1006 document that I guess

2     Mr. Mordecai had -- you had disclosed.  He just never used it.

3          MR. BURNETT:  Sorry.  This is different.  This is the

4     exhibit they planned to offer.  I think it's DX-62.  It's like

5     a pricing chart about data -- it is theoretically from FTX and

6     AscendEX because we never actually received the underlying data

7     and that data, as I understand it, doesn't come from FTX and

8     AscendEX.  It comes from like other websites.  But we have not

9     gotten what those other materials are.  They have not produced

10    them to us.

11         MR. KLEIN:  Your Honor, that last part is not

12    accurate.

13         MR. BURNETT:  It is true.  You sent me a link to a

14    website, but that website does not have the data, and I do not

15    have the ability to like put code in to pull the same query you

16    do.

17         MS. HUANG:  We specifically requested the steps that

18    they took to get that data, and they have not provided that.

19         THE COURT:  I have the whiskeyfries document.  I have

20    DX-62.

21         MR. BURNETT:  The last point, your Honor, is, this

22    Court had previously ruled that the defense cannot do the line

23    of examination about the audit because it's effectively a

24    victim-blaming exercise.  The defense now seems like they plan

25    to do that.  The only basis they have is the fact that they, on

1    cross-examination, asked Brian Smith about the risk -- like the

2    do-you-accept-the-risk page in Government Exhibit 1010, which

3    refers to the code being unaudited.  On redirect Mr. Davis

4    simply showed not the audit, but the fact that there was a page

5    on Mango Markets that said the code had been audited as of

6    September 2022.

7         We don't think the defense can force the door open to

8    a full victim-blaming exercise that this Court has already

9    found was irrelevant, and this Court's ruling on the audit

10   should stand and shouldn't be reopened.

11        THE COURT:  I agree with that.  I don't believe that

12   the government opened the door.  And the way that this happened

13   was, the defense put on Exhibit 1010, I believe, that mentioned

14   the word unaudited.  All I recall the government did was to

15   refer to a page that mentioned the audit without inquiring as

16   to the circumstances of the audit and without making any

17   representations whatsoever concerning the scope of the audit,

18   what it did.  I think it was really just to meet the

19   defendant's argument on the word unaudited by showing that in a

20   document that Mango Markets had, there was a reference to an

21   audit.  I don't think that that small point would open the door

22   to now a new examination of what the audit was, which would

23   then require the government to respond.  And for the reasons we

24   explored on *Daubert* motions, I think it would be prejudicial

25   and with little probative value, if any, to bring that issue

1    in.

2             Mr. Klein.

3             MR. KLEIN:  They put in that exhibit, though, 1011,

4    originally that references the audit.  We didn't put that

5    exhibit in.  They put in an exhibit that references an audit.

6    They put that into play.  We didn't offer that 1011 in.  That

7    document that shows the audit -- and I guarantee you in close

8    they are going to bring that up.  They are going to bring that

9    up in close, and that's an incomplete story.  That's completely

10   unfair to us.

11            If they put in 1011, that references an audit, we are

12   going to show 1010, everyone knows it's in our close, and then

13   they are going to get up and say, well, you can see what he's

14   referring to as his audit here.  That leaves us completely in

15   the dark to explain to the jury what that audit was, and I

16   think that's an important point.

17            If they are not going to raise that audit in the

18   close, then maybe we are in a different place, but I believe a

19   hundred percent they are going to raise that and say that's

20   what it was referring to.

21            THE COURT:  That's a fair question.  The government

22   may raise the audit, right.  If Mr. Klein, or whoever is

23   closing for the defense, is going to talk about this software

24   being unaudited, then I imagine the government is going to

25   raise the audit to show that was not true, right?  You have not

O4FMEIS1

1    prepared your closing yet or finished preparing it.

2              MR. BURNETT:  We have not prepared or finished on that

3    point.  I don't think we would be putting it in like

4    affirmatively, and certainly there is nothing to talk about

5    substantively in the audit, because the audit is not in

6    evidence.  If they say it's unaudited and we'd say, but in fact

7    it was audited, I don't know, but if it's the difference

8    between keeping this testimony out and letting it in, we would

9    be happy to walk away from that argument on cross-examination.

10             We would have done our case differently had we known

11   that like just putting in the user manual, which says edit on

12   one page of 180, would open the door to a full line of cross or

13   line of examination on an expert that was already precluded.

14             MR. KLEIN:  There is actually a link in that document

15   to the audit, your Honor.

16             MR. BURNETT:  But the audit is not in evidence.

17             MR. KLEIN:  I want to be clear, on that page there is

18   a link to the actual audit.

19             THE COURT:  What is Mr. Sheridan going to say about

20   the audit?

21             MS. MARTABANO:  He is really just going to testify

22   that it doesn't mean like a full financial audit, and I think

23   it's the average juror who doesn't spend their time in crypto

24   or in code may not realize what the significance is of a code

25   audit.

1    You may have fixed the code, and that may mean that

2    your code functions exactly as you intend it to and that's

3    fine.  But we would just want to clarify, it doesn't mean that

4    there has been some sort of SEC equivalent audit.  We are not

5    really even planning to get into the weeds on the audit; just

6    more, they reference an audit, they say that it is audited

7    here, but what does that audit actually cover?  It covers the

8    code.  I think we would say, could you tell us categories of

9    things that it wouldn't cover.  Because, obviously, the

10   riskiness of the platform --

11            THE COURT:  That it didn't cover.  You said wouldn't.

12            MS. MARTABANO:  That it didn't.  I was the trying to

13   be more general to stay away from the specific things within

14   that audit, but I'm happy to ask specifically what didn't it

15   cover.  Based on the Court's prior ruling, I was trying to take

16   away from that.

17            THE COURT:  Let's have Mr. Sheridan take the stand and

18   let's address these four points.  To the extent the government

19   has inquiry about these two exhibits, let's talk about those,

20   and then let me think a little bit about this audit issue.

21            MR. HUANG:  Your Honor, on Exhibits 63 and 64, we also

22   had issues with those.  Those appear to be vote tallies from

23   the various Mango DAO votes.  The defendant hasn't provided any

24   foundation for authenticating those documents.

25            THE COURT:  Why are those relevant at all?

O4FMEIS1

1          MS. MARTABANO:  I think with Exhibit 64, we would just

2   use it to refresh his recollection as to the specific time of

3   the two proposals.  We don't intend to offer it.

4          THE COURT:  63 and 64 are not coming in evidence.

5          MR. KLEIN:  Correct.

6          THE COURT:  Then we are left with 62, whiskeyfries,

7   and we will pick up the audit.  We have these four issues.  So

8   let's do it.  Because we are burning jury time.

9          MR. KLEIN:  Your Honor, before we start today, there

10  was one or two other things we wanted to discuss.  One is very

11  quick, and I just wanted to flag that.

12         THE COURT:  Let's do this, because this is going to

13  raise some other issues.

14         Let's get Mr. Sheridan outside of the presence of the

15  jury.

16         MR. KLEIN:  Your Honor, can I raise one before we put

17  Mr. Sheridan on?  Sorry.  It's really quick.

18         THE COURT:  OK.

19         MR. KLEIN:  We just wanted to briefly reopen the Rule

20  29 for like 30 seconds.  There are two little points that we

21  wanted to make clear.  It will take 30 seconds for me to say

22  them on the Rule 29.

23         THE COURT:  It looks like we have 30 seconds while we

24  get Mr. Sheridan.

25         MR. KLEIN:  In reopening the Rule 29, we wanted to say

O4FMEIS1

1    that there is no evidence of an interstate wire to meet the

2    wire fraud element there.

3         And then as to the attempt for Count Two, we also

4    think that would fail for the reasons we discussed for the

5    other elements for Count Two, and that's it.

6         THE COURT:  Understood.  The Court will reserve

7    decision under Rule 29(b).

8         (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    JEREMY SHERIDAN,

2         called as a witness by the Defendant,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MS. MARTABANO:

6    Q.  Mr. Sheridan, can you tell us about your experience in

7    particular as it relates to your abilities to read computer

8    code and understand it?

9    A.  My experience is based on my training and certifications

10   in -- as an information security officer and as a certified

11   security manager through Carnegie Mellon University, and the

12   information systems and control association, as well as my

13   experience within criminal investigations as a Secret Service

14   agent.

15   Q.  And you have the ability to just read computer code from

16   GitHub?

17   A.  I have the ability to read it, yes.

18   Q.  You don't write computer code?

19   A.  I do not write computer code, I'm not a coder, I'm not a

20   software developer.  Depending on the code in question -- there

21   are obviously a large number of different computer codes.

22   Depending on the code in question, I can read it and have a

23   sense of its intended function.  I cannot audit, I cannot write

24   it, I cannot conduct security and bug identification on it.

25   Q.  And you worked with a team at FTI while you were preparing

1    for your testimony?

2    A.  Yes, ma'am.

3    Q.  And do they have the ability to read and understand

4    computer code?

5            MR. BURNETT:  Objection.

6            THE COURT:  It's overruled.

7    A.  Yes, ma'am.

8    Q.  And did you work with them in understanding the Mango

9    Markets computer code?

10           MR. BURNETT:  Objection.

11           THE COURT:  It's overruled.

12   A.  Yes, ma'am.

13           THE COURT:  What's the nature of the objection?

14           MR. BURNETT:  If he's relying on what someone at FTI

15   told him about what code said or did, that's hearsay.  The

16   person from FTI should testify, not him.

17           THE COURT:  Understood.  I'll overrule that.

18   Continue.

19   Q.  With respect to the Mango Markets code, did you review it

20   to see whether the commands in the code matched up with the

21   Mango Markets documentation in this case?

22   A.  I reviewed it in conjunction with my team.

23   Q.  And do you have the ability to explain to the jury how

24   those two things are connected so the language of the Mango

25   Markets documentation, for example, GX 1011, which I believe

1   you've seen in this case, and the code that is deposited at the

2   Mango Markets version 3 repository on GitHub?

3   A.  I'm sorry.  The question is, can I relate that exhibit --

4   Q.  Can you sort of translate the computer code to say, yes,

5   this is what it says or, no, this isn't what it says in terms

6   of how commands are called, how the contract is set up, how the

7   borrows and collateral work as compared to -- obviously there

8   are verbal representations in GX 1011, but are you able to read

9   the code and say, yep, the code comports with that, yes, the

10  code comports with that?

11  A.  I'm able to read the code for its intent in terms of

12  specific code functions and detailed code execution, that I

13  relied on the team for.

14  Q.  When you say "intent," what do you mean by that?

15  A.  The general description of the code as written code base

16  and what it relates to in terms of its function.

17  Q.  So not the intent of the programmer, but in fact what a

18  line of code is meant to do?

19  A.  From a function sense, yes.

20          THE COURT:  Can you walk me through the distinction

21  that you're drawing.  Take any example you want.  Where did the

22  line between what you can do stop and then what you have to

23  rely on your team for?

24          THE WITNESS:  So the way code is written, there are

25  certain calls within the code that I can identify if it's

O4FCeis2                           Sheridan - Direct

1  calling a user or a bid or an ask, a specific reference to a
2  function, but in terms of specific lines of code that are
3  syntax or require specific character input, that will result in
4  an error because it's not entered correctly and code that is
5  more data centric related to the nuance of writing requirements
6  as opposed to reading requirements of the code.  That is what I
7  relied on my team for.

8         THE COURT:  So give me the back and forth between you
9  and your team when this arose during your analysis.

10         THE WITNESS:  So there were questions surrounding
11  borrows versus withdrawals.  We went into the code to see if we
12  could find areas within the code related to specific amounts of
13  a settlement or an area of code that identified whether a
14  transaction was a borrow or a withdrawal.  And so, we could see
15  within the code -- I could see within the code settlement
16  functions, borrow functions, withdrawal functions, but the
17  specificity of what that borrow did in terms of amount or how
18  to write, where to point that code specifically within the
19  smart contract and to the blockchain, those were beyond my
20  capabilities.  So the team would have to tell me, yeah, this
21  doesn't call for a specific amount of this, this doesn't
22  identify a specific amount or this code base doesn't -- this
23  points to a certain location within the smart contract or
24  towards the Solana blockchain.  There's specific terminology
25  within Mango Markets, smart contracts, and the Solana

1   blockchain that I don't know because it is specific to those

2   individual protocols and they have a deeper knowledge of that

3   level of code than I do.

4           THE COURT:  And then when they gave you the answers to

5   whatever questions you had, what would you do with those

6   answers?  Meaning, you asked those questions, they fill in the

7   gaps, and then what do you do?

8           THE WITNESS:  I would review the answers related to

9   the Mango Markets documentation.  What I am more familiar with,

10  which is the blockchain explorers to see blockchain

11  transactions from individual wallet address, and plain language

12  text in terms of date, transaction time, amount, and ensure

13  that those two aligned.

14          THE COURT:  Okay.  Ms. Martabano, you may proceed.

15          MS. MARTABANO:  Yes, your Honor.

16          Does your Honor want me to cover -- I believe the

17  topics that are not in dispute, like basic blockchain

18  background and Solana background?

19          THE COURT:  Let's go through these four categories

20  now.

21          MS. MARTABANO:  Okay.

22  BY MS. MARTABANO:

23  Q.  How can you access the Mango Markets smart contracts?

24  A.  It's publicly available on GitHub.

25  Q.  And for a user who's seeking to interact with or transact

1    with Mango Markets, what ways are there for them to access the

2    blockchain and the protocol?

3    A.   There's two primary ways.  One is through the Mango Markets

4    user interface, and there are more technical ways to approach

5    it through user-inputted code and API access.

6    Q.   What is a user interface?

7    A.   It's a graphical interface.  Typically, a website is common

8    terminology.

9         MS. MARTABANO:  Your Honor, I'm going to skip forward

10   to the specific defendant's trades, if that's okay.  If you'd

11   like me to go back to some of the more general topics that I

12   don't think are in dispute, I'm happy to.

13        THE COURT:  Let's keep it moving.

14        MS. MARTABANO:  Okay.

15   Q.   When you think about GX 1011, which is the document --

16        MS. MARTABANO:  Mr. Smith, if you could bring that up

17   so that the witness could see it.

18        We've talked about parts of that document that include

19   the risk calculator.  This is just going to be summary.  If you

20   want more detail, just let me know.

21   Q.   The risk calculator, how liquidations work, how the

22   insurance fund works, and how the socialized loss works and a

23   settled P&L works, if I were to walk you through each of those,

24   does the risk calculator work as it's described?

25        MS. MARTABANO:  It's page 100, Mr. Smith, in the

O4FCeis2                          Sheridan - Direct

1    document.

2             MR. BURNETT:  Objection.  Foundation.

3             THE COURT:  Mr. Sheridan, did you review this document

4    in preparing for your testimony?

5             THE WITNESS:  Yes, sir.

6             THE COURT:  What did you do?

7             THE WITNESS:  I read the document and compared it to

8    our findings on our blockchain analysis, used as it relates to

9    the risk calculator.  We experimented with the risk calculator

10   with the inputs and trading activities that occurred in this

11   case as executed by Mr. Eisenberg, we input those exact data

12   points into the risk calculator.

13            THE COURT:  Ms. Martabano, you may proceed.

14   Q.  And this document describes it as the -- with the risk

15   calculator, you can estimate your health ratio by simulating

16   changes to an accounts, token deposits, borrows, prepositions,

17   and pricing can be useful to help traders develop strategies

18   based on their project of market movements, which may be

19   simple, such as changing the price of a token or, more complex,

20   such as developing a delta neutral strategy.

21            In your experience with the risk calculator, did it

22   enable you to do that?

23   A.  I just want to read the paragraph to ensure -- this is what

24   you just read?

25   Q.  Yes.

1    A.  Sorry.  So, the second sentence, we didn't develop

2    strategies, but we simulated changes to the account token,

3    deposits, borrows, prepositions, and pricing.

4    Q.  Did the risk calculator function as described in this

5    document when you used it, even if you didn't use it to develop

6    trade strategies, does it function as described in the

7    document?

8    A.  Yes, ma'am.

9    Q.  You mentioned that you put in Mr. Eisenberg's exact

10   parameters.  Did you receive any warnings or any notifications

11   as to the outcome of what the trade might do to the protocol?

12            MR. BURNETT:  Objection.  Relevance.

13            THE COURT:  You can answer.

14   A.  We did not.

15   Q.  Moving on to the liquidations page, which is page 110 in

16   the document.  Mr. Sheridan, please read this to yourself.  I'm

17   going to walk you through what some of the terms in here mean,

18   you'll see some of the terms are in gray and look like they're

19   sort of in very old-school computer font.  I'd like to walk you

20   through what you understand those terms to mean.

21   A.  Yes, ma'am.

22   Q.  Under the second heading, it says, "liquidations."  It

23   says:  "Every Mango account must have a maint_health above

24   zero."  What does "Mango account" mean in that line?

25   A.  A Mango account is an individual deposit of cryptocurrency

1   that users have assigned to them to be able to conduct trading

2   activities on the Mango platform.

3   Q.  What kind of information is associated with Mango accounts

4   on Mango Markets?

5   A.  Mango accounts associated -- it's the account identifier,

6   which is a cryptographic hash, and the account balance, the

7   assets and liabilities within the account.

8   Q.  So the code doesn't ask for an individual's name?

9   A.  No, ma'am.

10  Q.  No location?

11  A.  No, ma'am.

12  Q.  Their intention about the trade that they're engaging in?

13  A.  No, ma'am.

14  Q.  Does it ask them about other accounts they might have on

15  the platform, other wallets they might have on the platform to

16  link them?

17  A.  No, ma'am.

18  Q.  So the only data covered there is the wallet that it's

19  linked to and the account number that's generated by the

20  protocol itself?

21  A.  Can you repeat that question.  Sorry.

22  Q.  Correct me if I misunderstood you, but the only information

23  is the wallet that was connected to create the account and then

24  just the random crypto hash number generated that becomes the

25  account identifier?

1   A.  And what's contained in the account would be the other

2   category.

3   Q.  So if you deposit the amounts deposited in that wallet?

4   A.  Or your liabilities, not just deposits, but positions,

5   liabilities, all assets and liabilities related to that

6   account.

7   Q.  And it then says, every Mango account must have a

8   maint_health above zero.  What is maint_health?

9   A.  That is maintenance health that is the collateral ratio

10  that is required to continue trading activities on the

11  protocol.

12  Q.  It says, if it slips below zero, liquidators can start

13  liquidating the account until the init_health is above zero.

14  What is that?

15  A.  Initial health is the collateral ratio required to open the

16  account.

17  Q.  And is that different from the maintenance health?

18  A.  Yes, ma'am.

19  Q.  How?

20  A.  It's a higher collateral ratio requirement.  The initial

21  health requirement is a 120 percent collateral ratio, the

22  maintenance health is a 110 percent collateral ratio.

23  Q.  If liquidation has started on your account, the only way to

24  stop more liquidation is to actually bring yourself up not just

25  at a maintenance level, but all the way to the initial health

1    level?

2                 MR. BURNETT:  Objection.  Foundation.

3                 THE COURT:  I mean, foundation, leading.

4                 MS. MARTABANO:  Sorry, your Honor.  I don't intend to

5    be leading when the jury is here.  I was just trying to move us

6    through.

7    Q.  Can you explain, if you start liquidating, how is it that

8    you can stop liquidation?

9                 MR. BURNETT:  Objection.  Foundation.

10                 THE COURT:  Well, we've got to move this forward.

11                 MR. BURNETT:  If the point was to help us understand

12    what his code basis is and how he's comparing it, there's kind

13    of no questions here that elicit that.  We can wait until my

14    cross, we can go straight to my cross and I can ask him about

15    this stuff too.  It's not helpful if he's just him reading the

16    document.

17                 THE COURT:  Why don't you ask a few foundational

18    questions.

19                 MS. MARTABANO:  Sure.

20    Q.  Mr. Sheridan, what is your understanding of the Mango

21    Markets protocol and these documents based on?

22    A.  What is my understanding based on?

23    Q.  Yes.

24    A.  My training, experience, review of the documents provided

25    in discovery from defense and the government, as well as

1   independent research on analysis of the trades in question.

2   Q.  And did that include this particular document?

3   A.  Yes, ma'am.

4   Q.  And what about, did you review any computer code?

5   A.  Yes, ma'am.

6   Q.  And what's your basis for understanding what the terms --

7   sort of the terms in the gray awkward writing, where does that

8   come from?

9   A.  The description that was provided through the Mango Markets

10  user guide, as well as the analysis of the trades here, and

11  review of the collateral assets and liabilities, and how

12  liquidations occurred relative to maintenance health and

13  initial health.

14  Q.  If you could expand on your understanding of how

15  liquidation works, what is that based on?

16  A.  Liquidation is based on the maintenance health of an

17  individual account and --

18  Q.  Sorry to stop you.  What is your understanding of the

19  liquidation based on, anything additional to things we've

20  already discussed?

21  A.  Not additional to what we've already discussed.

22  Q.  When you worked in the risk calculator, did it warn you

23  that a liquidation would happen?  Like when you were testing

24  out the code in the risk calculator, did you have an

25  experience -- tell us about your experience about the code and

1    how it worked and why that did or didn't impact your ability to

2    understand what's going on on the protocol?

3    A.   Is this question in relation to the risk calculator?

4    Q.   Yes, but as it would bear on sort of any experience that

5    you have interacting with the protocol.  You mentioned the risk

6    calculator, if there are other experiences with version 3 of

7    the protocol.

8    A.   So my experiences with version 3 are to go to the version 3

9    user interface on Mango Markets, to observe the functionality

10   of the user interface, and the different ways in which a user

11   could interact with it, and also, as stated, utilize the risk

12   calculator to see what outputs would be generated by different

13   trading inputs.  I did review the -- specifically the

14   settlement functions that were called by Mr. Eisenberg and the

15   code associated with those in order to help assist, if I could,

16   on identifying some of the information we were trying to

17   determine from that settlement function.

18   Q.   And what did your review of those functions tell you?

19   A.   When you say those functions --

20   Q.   The settle functions, the withdrawal functions, the ones

21   you were just mentioning, what did they allow you to conclude

22   about Mr. Eisenberg's trades?

23   A.   Well, speaking to the settlement function specifically, it

24   helped inform us about the $50 million withdrawal in terms of

25   timing, how that may be considered within the P&L settlement

O4FCeis2                        Sheridan – Cross

1   category, as well as what information was available through a

2   code level analysis to see if we could find those pieces of

3   information we were looking for.

4           MS. MARTABANO:  Your Honor, avoid offer that as

5   sufficient basis to give his basic computer background on what

6   these terms mean and how they function.  If you'd like me to

7   inquire further, I'm happy to.

8           MR. BURNETT:  May I inquire?

9           THE COURT:  You may.

10  CROSS-EXAMINATION

11  BY MR. BURNETT:

12  Q.  Good morning, Mr. Sheridan.

13  A.  Good morning, sir.

14  Q.  You talked about liquidations with Ms. Martabano a few

15  minutes ago; right?

16  A.  Yes.

17  Q.  What specific code did you view about liquidations?  You.

18  A.  I did not review specific code on liquidations.

19          MR. BURNETT:  The government moves to exclude all

20  testimony about liquidations in the code from Mr. Sheridan.

21          THE COURT:  Ms. Martabano.

22          MS. MARTABANO:  Your Honor, we disclosed he would be

23  working with the team, much like Dr. Mordecai and the Brattle

24  Group.  We do not have Dr. Mordecai and the Brattle Group's

25  underlying work papers.  He has been working hand in hand with

1    FTI, which was disclosed, and he has reviewed that data such

2    that he feels sufficiently educated by them and by his work in

3    the code.

4            MR. BURNETT:  I could ask more if you need more.

5            THE COURT:  So the issue is --

6            So you didn't review the code underlying the

7    liquidation function; right?

8            THE WITNESS:  I reviewed the liquidation transactions

9    and the data of the transactions.

10           MR. BURNETT:  I can jump in there, too.

11           THE COURT:  Go for it.

12   BY MR. BURNETT:

13   Q.  That's the Whiskey Fries document that you produced;

14   correct?

15   A.  Yes, sir.

16   Q.  And your team at FTI, what they did was they went on

17   Discord and found a Discord chat for Mango Markets; right?

18   A.  Yes, sir.

19   Q.  And they found a link in that Discord chat; right?

20   A.  Yes, sir.

21   Q.  And you clicked the link and downloaded some data from it;

22   right?

23   A.  That's how -- the link was to the data that we downloaded

24   after inputting the wallets associated with Mr. Eisenberg, yes.

25   Q.  Right.  But you haven't talked to a single person at Mango

1  Markets about whether that data is like the real deal; right?

2  A.  We did not interview Mango Markets.

3  Q.  And you don't know if those are materials that are

4  regularly kept in Mango Markets' course of business because you

5  haven't talked to anyone at Mango Markets about it; correct?

6  A.  So I just want to clarify.  The materials, we pulled the

7  materials.  We used the link to go to their dataset.

8  Q.  But you don't know if it's their dataset.  You're assuming

9  it's their dataset because it appeared on a Mango Markets

10  Discord; correct?

11  A.  Yes, sir.

12         MR. BURNETT:  So I'd move to exclude any testimony

13  based on that.  There's no foundation for the data that he's

14  relying on.  It's either authentic or is satisfying any of the

15  hearsay exceptions.

16         MS. MARTABANO:  Your Honor, if I may inquire further.

17  I feel like Mr. Burnett has misled the Court as far as what

18  this download came from.  We provided the government, last

19  night at 5:15, documents relating to proof of who the

20  individuals were, the fact that they were in the Discord as

21  both admins and team members of Mango, which is the way things

22  go in this space.  One of them is literally the lead coder for

23  Mango, Maximilian.  And in these Discord chats we turned over,

24  they reflect the fact that these individuals have been asked

25  questions by users saying, I'm looking for my data from my

1    transactions, and team members of Mango say, you can get all of

2    your download history at this link.  You can check for your

3    tax -- for downloading version 3 account data for tax/records,

4    check out the same link.  Is there a way to download

5    transactions from V3 still.  I found a link, but I got an

6    error, offline for maintenance.  And then a member, who's a

7    team member and I believe an admin, two of the three are

8    admins, provides the same link.  So you have two admins and

9    another team member -- two admins who are also team members and

10   then another team member in Discord's official channel saying,

11   when you need your data, this is where to get it from.  They

12   are consistent in it, the government knows that.  We sent that

13   to them yesterday.  And Mr. Burnett is representing that FTI

14   went on and, you know, did no due diligence, didn't check, had

15   no basis to believe there was any kind of reliability in this

16   data.  These are Mango individuals representing that it is

17   their data that their users can do for tax records, right.  I

18   mean, I just think that --

19             MR. BURNETT:  Your Honor, the problem is not --

20             THE COURT:  Hold on.  Hold on.

21             So Mr. Burnett, your motion to exclude is as to what?

22             MR. BURNETT:  It's as to the documents that were

23   downloaded and as to the testimony that would be based on those

24   documents, because Mr. Sheridan testified that his knowledge of

25   liquidations doesn't come from the code, it comes from these

O4FCeis2                    Sheridan - Cross

1    things that he's downloaded from the internet.

2                THE WITNESS:  Your Honor, may I clarify one --

3                THE COURT:  No.

4            So the liquidations, that's what this is specific to?

5                MR. BURNETT:  Yes, it will move to settlement next,

6    but liquidations for starters.

7                THE COURT:  I'm going to exclude Mr. Sheridan's

8    testimony as to liquidations, both for the substantive reasons

9    that Mr. Burnett has identified, but also for procedural issue,

10   which is that neither Mr. Sheridan's opinions, nor the bases

11   for them, were previously disclosed.  I don't believe that they

12   were even disclosed in yesterday's supplemental disclosure,

13   which is why we're running to this issue on the morning of

14   testimony.  That is a plain violation of Rule 16.  For that

15   reason, Mr. Sheridan's testimony will be excluded on that

16   issue.

17               MS. MARTABANO:  Your Honor, on the record, we

18   disclosed a version of the chart that is exhibit 62 and the

19   link to that data as required on March 25th.  The government

20   has had it since then.  They did not raise it until this

21   weekend.  So we have not updated the disclosures, but they did

22   have that document in the documents we provided as things our

23   experts would be relying on.  They chose not to challenge it

24   until this weekend.  The same is true as the bad debt

25   repayments.  Those were in our disclosures, as well.

1              THE COURT:  Mr. Burnett, you want to respond to that.

2              MR. BURNETT:  Two things.  It was disclosed to us as

3      part of materials that Mr. Sheridan looked at.  It wasn't

4      marked as an exhibit.  Because it wasn't marked as an exhibit

5      and it wasn't within the scope of what he previously disclosed

6      he was going to testify about, we didn't think much of it.  We

7      thought, okay, you pulled some data from the internet and he

8      looked at it, nothing really to see here.  We didn't learn

9      until last night and now this morning that he is actually

10     planning to offer that exhibit into evidence and he's planning

11     to opine on liquidations.  We had the spreadsheet, but our

12     scope of understanding with the import of and what they were

13     going to try and do with it didn't crystalize until last night

14     and now sitting here today.

15             THE COURT:  It all comes back to these disclosures,

16     which were woefully deficient.  Even in yesterday's disclosure,

17     there was another last-minute opportunity to specifically

18     identify Mr. Sheridan's opinions and the bases for them, and

19     even that disclosure does not address what Mr. Sheridan's

20     opinions are going to be on this particular issue.

21             In addition, there are these other issues that

22     Mr. Sheridan did not review the code relating to this function.

23     Even if he did to answer specific nuance questions about the

24     code, he would need to consult with his team at FTI because

25     he's unable to do that.  So it raises a host of issues, which

1   is precisely why the rules contain this disclosure requirement,

2   so that these issues can be addressed in connection with the

3   Daubert motions that we spent a lot of time on.

4              So let's move on.  What's the next issue,

5   Ms. Martabano?

6              MS. MARTABANO:  Yes, your Honor.

7              Turning to page 111 of the document, Mr. Smith.

8   REDIRECT EXAMINATION

9   BY MS. MARTABANO:

10  Q.  Mr. Sheridan, what's your understanding of the insurance

11  fund available on Mango Markets version 3?

12  A.  The insurance fund is an amount of assets held in reserve

13  by the DAO in order to pay for accounts that become liquidated,

14  but there are not enough assets on the platform through the

15  liquidation process to cover the total liabilities.

16  Q.  And is the use of the insurance fund automatic after

17  there's been a liquidation that has emptied an account of all

18  of its collateral and other assets?

19             MR. BURNETT:  Objection to foundation.

20             THE COURT:  Can you ask a few additional questions to

21  establish foundation.

22             MS. MARTABANO:  Sure.

23  Q.  What is your understanding of the insurance fund based on?

24  A.  My understanding of the insurance fund is based on the

25  Mango Markets documentation.

1  Q.  Which documentation specifically?

2  A.  The user guide.

3  Q.  And did it involve any review of Mango Markets' smart

4  contracts in order to understand how the insurance fund would

5  be implemented?

6  A.  The insurance fund implementation is not a smart contract

7  function.  That is a determination of the DAO to use the

8  insurance fund for those purposes.  How the insurance fund is

9  distributed would be within the smart contracts in terms of a

10  functionality, but it's a DAO decision to use the insurance

11  fund.

12          MR. BURNETT:  Same objection regarding foundation.

13          THE COURT:  It's overruled.  You may proceed.

14          MS. MARTABANO:  Thank you, your Honor.

15  Q.  Here it says the insurance fund will pay off losses.  Does

16  that suggest that the DAO needs to be involved in insurance

17  funds payouts?

18  A.  No, ma'am.

19  Q.  So when you said earlier the DAO was involved, what was

20  your basis for that?

21  A.  The DAO controls the overall treasury of which part the

22  insurance fund is a part.  So the insurance fund will pay that

23  out, provided there's no objections from the DAO.

24  Q.  Moving to the next page of the document, what is your

25  understanding of socialized losses and what is it based upon?

1   A.  My understanding of socialized losses are that these are
2   losses that will occur to Mango Markets' users if, in a
3   liquidation event, the account cannot be brought back to its
4   proper health balance and there are still outstanding
5   liabilities on the account that are not covered by individual
6   liquidators or the insurance fund.  In that case, the
7   socialized losses will occur across all other users to pay off
8   the remaining liabilities of the account.
9   Q.  Based on your review of the code and the documents in this
10  case, when will the socialized losses kick in?  Is it automatic
11  or is it not?
12  A.  Yes, that would be an automatic function of the smart
13  contract.
14  Q.  And you mentioned in your testimony that there was
15  occasionally what -- it was when the liquidation was complete.
16  Is there any way -- how does the liquidation happen, as you
17  understand it, such that it's deemed complete?
18  A.  The liquidation is complete when the account balance health
19  becomes -- reaches the necessary threshold of the maintenance
20  health.
21  Q.  I see.  So there may not be a complete liquidation of an
22  account if somehow either funds are deposited or the
23  maintenance health comes back up, then the liquidation would
24  stop?
25  A.  Yes, or there's no other assets left in the account.

04FCeis2                         Sheridan - Redirect

1    Q.  I see.  In that case, the maintenance health isn't coming

2    back?

3              MR. BURNETT:  Objection.  Leading.

4              MS. MARTABANO:  Happy to rephrase, your Honor.

5              THE COURT:  Is this the level of inquiry that you --

6              MS. MARTABANO:  Yes.

7              THE COURT:  On this particular issue?

8              MS. MARTABANO:  Yes, your Honor.

9              THE COURT:  Let's move to the next one.

10   Q.  Does the Mango Markets contract code ask people for their

11   names?

12   A.  No.

13   Q.  Does it ask them for their jobs?

14   A.  No.

15   Q.  Does it ask them for their income?

16   A.  No.

17   Q.  Does it ask them what they're going to do with their money?

18   A.  No.

19   Q.  Does it ask them about any assets that aren't affiliated

20   with their account?

21   A.  No.

22   Q.  Could a smart contract be programmed to ask that,

23   technically?

24   A.  Technically.

25   Q.  Is that true for all of those questions I asked you —

1    income, location, job?

2    A.  A smart contract would ask for basically "if then"

3    information.  So it would ask for that information in a binary

4    sense, yes.

5             MS. MARTABANO:  At this point, your Honor, I'd like to

6    get into some of the rebuttal of Dr. Mordecai, really having

7    him explain what we think Dr. Mordecai's chart said so that we

8    can understand it a little bit better and point out where there

9    are pieces missing.

10            THE COURT:  Okay.

11            MS. MARTABANO:  If we could show GX 1302.

12   Q.  Mr. Sheridan, do you recognize what's already been admitted

13   as GX 1302?

14   A.  Yes, ma'am.

15   Q.  What do you recognize it to be?

16   A.  This was a graph that was presented during the government's

17   expert witness testimony.

18   Q.  The title of this slide is, "Stylized Perpetual Futures

19   Economics."  What does the X axis say?

20   A.  There are price points on the X axis.

21   Q.  And for what perpetual?

22   A.  This is for -- this is both long and short, according to

23   the graph.

24   Q.  And is it for Mango perpetual or another kind of perpetual,

25   Bitcoin perpetual?

O4FCeis2                     Sheridan - Redirect

1    A.  I'm sorry.  It's the Mango USDC perpetuals involved in this

2    case.

3    Q.  And based on your understanding of the documents in the

4    case, what does "payoff" mean, if you know?

5    A.  So, in the documents, "payoff" is used as it relates to

6    referral accounts.  It is generally not used in the context of

7    perpetual positions.

8            MR. BURNETT:  Objection.  There's no -- it's not

9    rebutting anything from Dr. Mordecai to say what "payoff" means

10   in documents.  Mr. Mordecai explained what "payoff" means.

11   It's just ships passing in the night.

12           THE COURT:  I think this is more in the way of just

13   setting the stage, but for what?

14           MS. MARTABANO:  Correct, your Honor.

15           THE COURT:  What is this --

16           MS. MARTABANO:  What's the crux of it?

17           THE COURT:  Yes.

18           MS. MARTABANO:  If I may lead a little bit for

19   expediency purposes.

20   Q.  This chart purports to show the long and the short, as you

21   mentioned; is that correct?

22   A.  Yes.

23   Q.  And this just shows them perfectly mirroring each other --

24           THE COURT:  Hold on.  Hold on.  Can't do it this way.

25           Mr. Sheridan, you've seen this graph before?

1    THE WITNESS:  Yes, sir.

2    THE COURT:  What's your testimony about this graph,

3  what opinions are you prepared to offer about this graph?

4    THE WITNESS:  My opinion is that as it relates to the

5  short position, this indicates it would be a continued loss

6  potentially, a non-ending loss event.  Whereas, in reality, a

7  short position, if there are no longer assets in the position

8  on the negative axis as it goes from top-right to bottom-left

9  would not continue forever.  It will eventually, once the

10  assets are depleted, stop, and this seems to indicate that

11  these can continue forever.

12    THE COURT:  You're not an economist; right?

13    THE WITNESS:  No, sir.

14    THE COURT:  What's your background that gives you the

15  expertise to offer an opinion along those lines?

16    THE WITNESS:  Background based on how the Mango

17  Markets perpetuals work.

18    THE COURT:  So purely a technical analysis?

19    THE WITNESS:  Yes, sir.

20    THE COURT:  You're not offering any opinion about

21  economics or anything else?

22    THE WITNESS:  No, sir.

23    THE COURT:  Mr. Burnett, do you have any inquiry?

24  RECROSS EXAMINATION

25  BY MR. BURNETT:

O4FCeis2                        Sheridan - Recross

1    Q.  Where does that technical background come from?  Did you

2    review the code for the perpetuals?  You.

3    A.  I'm sorry?

4    Q.  Did you personally review the code for how perpetuals work

5    on Mango Markets?

6    A.  I reviewed the code, parts of the code personally and in a

7    team effort with other members of my team.

8    Q.  Which part of the information you're relying on was you and

9    which part came from your team telling you stuff?

10   A.  I didn't make distinctions of "this part's you," "this

11   part's me."

12   Q.  I'm asking you to make that distinction.

13   A.  I can't do that, sir, because we looked at code in various

14   contexts as it relates to this context.  We looked at it -- I

15   looked at it individually and collectively, but I didn't parse

16   out, I'm going to look at this piece by myself over the course

17   of the several weeks we've been analyzing this.  I don't have

18   specific code sections or snippets that I analyzed

19   independently versus --

20   Q.  Fair to say there are important things about the code that

21   you wouldn't have understood if someone from your team hadn't

22   told you what they said?

23   A.  There are levels of detail that I needed my team to tell me

24   about, yes, sir.

25              MR. BURNETT:  We move to exclude that testimony on the

O4FCeis2                        Sheridan - Recross

1    ground that he cannot distinguish which is his knowledge and

2    his expertise versus what someone at FTI is telling him and he

3    is just regurgitating, which is hearsay, and also something

4    that he's clearly not qualified to opine on.

5              THE COURT:  The basis for the testimony can come in

6    the form of a conversation with his team or another individual.

7    That's under Rule 703.  The question is whether then he's

8    taking that base information and applying his expertise to then

9    offer an opinion that is his opinion born of his own experience

10   or review of the materials.

11             That's what I'm trying to figure out.  I'm not even

12   understanding from the testimony what the relevance is of any

13   of what Mr. Sheridan is going to say.  That's what I don't

14   understand.  I don't understand why this is becoming an issue

15   where we've taken an hour of the jury's time to go into any of

16   these issues, which do not seem to go to the heart of any of

17   the issues before the jury.  I mean, if the basic thing that

18   Mr. Sheridan is going to testify about is simply reiterating

19   and emphasizing the points that the defense has already made

20   about what the aspects of this platform are or aren't, which is

21   I think fairly within the prior disclosures, then great, but

22   the things we're getting into now seem far afield of

23   Mr. Sheridan's expertise and also not really relevant to

24   anything.  This is extremely problematic, especially coming in

25   the way it is.

1          Have we covered everything that is within these topics

2     or is there anything else, Mr. Burnett?

3          MS. MARTABANO:  The only thing would be walking

4     through Mr. Eisenberg's trades, which we believe is fairly

5     disclosed, that he would be walking through the technical

6     process of Mr. Eisenberg's trades, but the government takes

7     issue with that.

8          THE COURT:  And then as to the repayment of the bad

9     debt, what does Mr. Sheridan need to get on the stand and say

10    what the time of all these things are if the evidence is

11    already in the record?  What expertise is he adding to that?

12         MS. MARTABANO:  He has the specific times and how

13    close in time it is, and we think that obviously it's relevant

14    that, within hours of this transaction happening, before

15    there's been any outing or any discussion of Mr. Eisenberg as a

16    person, he comes forward and says, I'm making a proposal to

17    repay the DAO, and that includes obviously the fact that part

18    of the point of that is to make users whole.  We think that

19    that specific timing is very important.  We also think that the

20    specific --

21         THE COURT:  But is that in the record?  That's what

22    I'm trying to understand, because --

23         MS. MARTABANO:  That exact time is not currently in

24    the record.  The government has argued, as I understand it,

25    that Mr. Talkin has been handling it more, that a mere web

1    visit may not be sufficient to establish what someone did.  And

2    so --

3              THE COURT:  But he doesn't have expertise on the

4    historical facts of what occurred.  This is precisely the issue

5    that we addressed with Mr. Jain, and I excluded that testimony

6    because he can't just put in this happened at this time, this

7    happened at another time where it has no independent basis for

8    admissibility.  That has nothing to do with his expertise and

9    it would be an end run around the hearsay rule.  If you've got

10   documents in the record that make clear that aren't being

11   objected to, they're going to be in front of the jury, you're

12   going to have the opportunity at closing to get into them.

13             Is that all on topic 1 that Mr. Sheridan is going to

14   be getting into, just the timing of all this?  If I'm missing

15   something, let me know, but it seems like there's no expert

16   opinion here.

17             MS. MARTABANO:  On the timing issue, he and the team

18   at FTI pulled code, as I understand it.  But, correct me if I'm

19   wrong, Mr. Sheridan, if I'm mischaracterizing it.  Related to

20   almost all of the proposals that were ever put forth on the DAO

21   to pull data relating to who proposed it, what wallet was

22   associated with it, what the name of the proposal was, what the

23   time of the proposal was, whether it was accepted, how the vote

24   went.  So they pulled that independent data in order to be able

25   to say this is the timeline of the proposals.

1    THE COURT:  What else do we have in addition to the

2    issues you've addressed within these four categories?  There's

3    the fourth bullet concerning GX 914 and 928.  Those go to

4    specific trades?

5    MS. MARTABANO:  Yes, your Honor.  It's really that

6    these exhibits that the government put in, which are stale from

7    December 15th.  One of them is old and stale, one of them is

8    more current and it's explaining what the meaning of these

9    documents is.

10    MR. BURNETT:  Objection.

11    THE COURT:  You don't want the witness to be here

12    while she's --

13    MR. BURNETT:  I don't want her telling the witness

14    what to say.

15    THE COURT:  That's fair.  We don't need to get into --

16    let me take a step back.

17    Mr. Burnett, do you have any further inquiry for this

18    witness?

19    MR. BURNETT:  I have inquiry on this topic, on GX 914

20    and I have inquiry on -- I think it was pretty clear from his

21    description of what he can and can't do about the code, that he

22    needed to rely on his team to tell him what the code was saying

23    about the actual numbers on trades and what was being settled

24    and what was being borrowed.

25    So to the extent they're going to walk through and

1    he's going to say Mr. Eisenberg settled this, borrowed this,

2    settled this, borrowed that, I think we need to know and I

3    would like to voir dire him on what his basis is for that

4    because if he's just relaying facts that are supposedly coming

5    from FTI, but he did not have the capability to do, that's not

6    applying his expertise, it's just relaying the hearsay from

7    someone at FTI who's not in front of the Court and who we don't

8    have the opportunity to either cross examine or put materials

9    in front of.

10           THE COURT:  Mr. Martabano, subject to this issue, have

11   we basically covered the waterfront within these four topics?

12           MS. MARTABANO:  Yes, your Honor, with the documents,

13   it would just be explaining the documents to the jury the two

14   exhibits that the government put in, 914 and 932.

15           THE COURT:  Mr. Burnett, you can proceed with your

16   voir dire and then we'll take a little break and I'll think

17   about this for a few minutes.

18   BY MR. BURNETT:

19   Q.  Let's start with this, 914.  You signed the notice that

20   went out yesterday, correct, Mr. Sheridan?

21   A.  Yes, sir.

22   Q.  And that notice says you will testify that 914 and 928

23   reflect data relating to Mr. Eisenberg's account on December

24   15, 2022.  That's the first part; right?

25   A.  Again, are they being pulled up so --

1    MR. BURNETT:  Why don't we pull up 914.

2   Q.  Do you see that?  This is 914; correct?

3   A.  Yes, sir.

4   Q.  And to get the December 15th part, you're just reading the

5   date that's under the account value; correct?

6   A.  Yes, sir.

7   Q.  Now I want to talk about the next part.  You say that they

8   do not reflect how Mr. Eisenberg's accounts would have looked

9   at the times of the trades in GX 932.  That's what you said

10  your opinion is going to be?

11  A.  Yes, sir.

12  Q.  You did not review this account as of October 11, 2022;

13  correct?

14  A.  Our review of the account was based on inputting the

15  information we received through the link previously discussed

16  to see account transactions, and we did verify those

17  liquidation events.  My expertise is in blockchain tracing, so

18  I verified those events through blockchain explorers and how

19  the assets moved.

20  Q.  I'm asking you a simple question.  You didn't look at this

21  screen as of October 11th yourself; correct?

22  A.  I'm sorry.  I misunderstood.  I did not look at the screen

23  on October 11th, no.

24  Q.  So what's your basis for saying you knew how the screen

25  would have looked on October 11th?

1  A.  Because you can see how the accounts -- the transactions on

2  October 11th using blockchain analytics and blockchain

3  explorers to track and trace the funds that show fund movement,

4  fund balances, and other activity on the blockchain.

5  Q.  Did you specifically look at -- which things would have

6  been different about those?

7  A.  Different about?

8  Q.  The screen, you said it would have been different.  What

9  would have been different about it?

10  A.  It would have shown different borrows, withdrawals,

11  balances, values.

12  Q.  What would the numbers have looked like?  What would they

13  have been?

14  A.  That would have been represented in the other exhibit.

15  Q.  What other exhibit?

16  A.  The one that shows October 11.

17  Q.  What other exhibit that shows October 11?

18  A.  The one from -- I don't know the exhibit number, sir.

19  Q.  Give me a description.  What are you talking about?

20  A.  There is a screenshot of these accounts with a date from

21  October 11th, if I recall.

22          MS. MARTABANO:  It's 932.

23  Q.  You can take a look, 932.  This is a different page; right?

24  A.  It is a different page, but it shows, in my opinion, a more

25  accurate representation of the accounts because it is from the

1    date in question.

2    Q.  How do you even know it's from the date in question?

3    A.  The date is listed under the withdrawal column on the left.

4    Q.  Isn't it true that the dates under that withdrawal column

5    on the left list the date of the withdrawal, not the date the

6    screenshot is taken?  That's why they're all different times;

7    right?

8    A.  Yes, but that's --

9    Q.  So you don't know when this screenshot was taken; right?

10   A.  I don't know when the screenshot was taken.

11   Q.  You're just asserting it was taken on October 11, but you

12   have no idea?

13   A.  I don't know when the screenshot was taken.  My analysis,

14   though, is based on not the date of the screenshot, but the

15   date of the transactions that are listed.

16   Q.  What other data did you rely on?  Tell me specifically what

17   you looked at to know what that screenshot, 914 looked like on

18   October 11th.

19   A.  We validated these transactions using blockchain analysis

20   and explorers to --

21   Q.  No buzzwords.  Tell me what you actually looked at.

22   A.  We went on the blockchain and looked at these

23   transactions --

24   Q.  You could see the borrows on the blockchain?

25   A.  You could see transactions.  They're not listed as borrows

1    or withdrawals.  You can see transactions.

2    Q.  Exactly.  You can't tell what's borrowed or what's just a

3    borrow and what's a borrow and withdraw on the blockchain;

4    correct?

5    A.  So you can tell, there's two functions that are listed

6    within blockchain explorers.  It will list a borrow as a 1 or a

7    0.  So you can tell when a function is not a borrow by the 0,

8    and you can tell when a function could be a borrow by the 1.

9    Q.  And can you show me, what's the document that shows your

10   analysis of what was borrows and what wasn't borrows as of

11   October 11th?

12   A.  I don't have that document as it relates to this

13   screenshot.

14   Q.  Were you even able to do this or was this something FTI

15   folks told you?

16   A.  I'm able to conduct blockchain analysis.

17   Q.  I understand you're saying blockchain analysis, but what

18   specifically did you look at to know what was borrowed and what

19   wasn't borrowed that supports your opinion that 914 was not as

20   it looked on October 11th?

21   A.  I looked at all transactions related to these wallets

22   through a blockchain analysis tool to see how the transactions

23   were conducted in terms of the values, amounts, times, and

24   other functions.

25   Q.  Which tool?

O4FCeis2                          Sheridan - Recross

1    A.  Solscan, Solana FM, and XRAY.

2    Q.  You know that all those records from Solscan and Solana FM

3    are already in the record; right?  Can you point me to any one

4    that goes into this borrow, not borrow point you're making?

5    You were sitting here through trial.  You know they're in

6    evidence.

7    A.  Yes, sir.  The challenge is there isn't a definitive --

8    those logs are contained within Mango Markets' logs.  I can

9    show you, if you pull up DX 50 I believe is the exhibit.

10   Q.  Actually, I have an easier way to get about this.  You, in

11   preparing to testify, looked at a number of articles that were

12   about the attack; right?

13   A.  Yes, sir.

14   Q.  And some of those articles were published right after the

15   attack happened; right?

16   A.  Yes, sir.

17   Q.  Some of them had the exact same screenshot that shows up in

18   the 914 from just a day after it happened, don't they?

19   A.  I don't remember.  Can you show me 914.

20        MR. BURNETT:  Why don't we pull up 914.

21   Q.  You can see the borrows listed out here, you can see the

22   account information at the top.  Why don't we take a look at --

23        MR. BURNETT:  If we can pull up side by side,

24   Mr. Sears, that @Austerity_Sucks article, thoughts on the

25   $110 million Mango Markets exploit.  Sorry, we can stick with

O4FCeis2                        Sheridan - Recross

1    this one.  This one is fine.  We'll look at the other one.

2    Q.  This is what you looked at decoding Mango's

3    vulnerabilities?

4    A.  Yes, sir.

5    Q.  That was published October 12, 2023?

6    A.  Yes, sir.  2022.

7    Q.  2022, right.  So the day after the attack, not even a day

8    after the attack?

9    A.  Yes, sir.

10          MR. BURNETT:  Mr. Sears, can we scroll down the page

11   here, couple pages.

12   Q.  You can see a screenshot there of a borrow and withdrawal

13   page?

14   A.  Yes, sir.

15   Q.  You can see the data all is exactly the same as the data

16   that's on this December 15 chart; right?

17   A.  I can crosswalk it.

18   Q.  Go ahead.  Take your time.

19   A.  I have faith that -- I don't need to crosscheck you.  If

20   you're telling me the data is the same, then I'm willing to

21   accept that.  I see the first USDC transaction is the same

22   amount.  I don't have reason to doubt you, sir.

23   Q.  Let's take a look at the other one, the @Austerity_Sucks

24   article.

25          THE COURT:  Let's stop this right now.

1          Is there anything else, Ms. Martabano, or is that what

2    is in this supplemental disclosure?

3          MS. MARTABANO:  That's it, your Honor, other than what

4    we discussed about the proposals at the end, the repayment

5    proposals.

6          THE COURT:  And as to the repayment proposals, as I

7    understand it -- well, let's address this in a second.

8          Mr. Sheridan, thank you very much.  You can leave the

9    courtroom.

10          (Witness excused)

11          MR. BURNETT:  Formally, just to make the record, we

12    move to exclude that last testimony for lack of foundation.

13    He's just repeating buzzword blockchain analysis without any

14    explanation.  This is a new opinion.  We would have more time

15    to actually pull through the data he looked at if it was

16    something that we knew about ahead of time, but clearly, he's

17    just saying stuff.

18          THE COURT:  In the disclosures, did you have the basis

19    for Mr. Sheridan's opinion that he offered, that the screenshot

20    would not have accurately reflected the trades as they would

21    have been reflected on October 11th, and if you had just done

22    the tracing analysis, you could figure that out?

23          MR. BURNETT:  The only disclosure we've ever received

24    is the one bullet point we got last night in this from the

25    Court, and even that one doesn't have the explanation for basis

O4FCeis2

1    in it.

2              MS. MARTABANO:  Your Honor, we only received these

3    when the government proffered them, so that's why he hasn't

4    done additional analysis on them.  They came into evidence last

5    week.  We questioned them when they came into evidence as

6    unreliable and backdated.  It was not until just now that

7    Mr. Burnett offered an exhibit that has been labeled, but

8    sought to be excluded and not offered by the government, which

9    is in itself hearsay.  He's showing a photo that's a screenshot

10   in an article that is not in evidence to justify that his

11   postdated exhibit is in fact current and was current at the

12   time.  So there isn't evidence that actually establishes that

13   this particular document was current or matches what it would

14   have looked like at the time.  And showing something that is

15   not in evidence that he has not previously proffered to us as a

16   basis for 914, their case is closed to now say, well, no, we do

17   have a basis for it when we got there, 914, a week ago.  There

18   may have been an earlier version, but these were things that we

19   didn't even have at the time of the disclosure.

20             MR. BURNETT:  Few things.  We've had that exhibit

21   marked all the way out to the exhibit deadline.  Second, if

22   they want to make the point that the exhibit in 914 is dated

23   December 15th, that's perfectly fine and they're able to do

24   that.  The problem is saying that it wouldn't have looked this

25   way back on October 11th.

O4FCeis2

1     And that is where the issue lies, because all we have

2   here, we have no actual basis from this expert or supposed

3   expert in this about how he knew what it looked like back then,

4   other than him saying the word "blockchain explorer" over and

5   over again.  We actually need to see the blockchain data that

6   he is relying on to understand what he's even talking about

7   here.  This is not an adequate foundation.  He's just making

8   stuff up.

9         MR. KLEIN:  Your Honor, he's not making stuff up.

10   That's ridiculous.

11         THE COURT:  The issue is:  Do you have any authority

12   that says that this kind of undisclosed opinion, because it's

13   in rebuttal of the government's witnesses, for any other

14   reason, would be permissible?  Because if Mr. Sheridan were

15   going to testify that at the time, October 11th, using tracing

16   tools, his account would have looked differently than what was

17   reflected in the public domain, then that would seem to be

18   something that you would have to disclose — here's what

19   Mr. Sheridan is going to say and here's what he looked at, and

20   the government could go look at it.  Maybe it's true he's

21   saying all these things and he's right about it, but this is

22   the day before testimony.

23         Ms. Martabano, you referred to the fact the government

24   has rested its case.  I think that's the problem, because

25   they've rested their case.  If you had made it right when 914

O4FCeis2

1    was used or back at the exhibit deadline when it was disclosed,

2    if there was some disclosure that Mr. Sheridan was going to

3    provide this type of testimony and give the basis for it, then

4    the government could look at it.  That's the issue.

5         MR. KLEIN:  Your Honor, they didn't disclose who was

6    going to put in these exhibits until the day before.

7         THE COURT:  It doesn't matter who's going to put the

8    exhibits in.  What matters is you believe there was an exhibit

9    that was proposed by the government that was inaccurate and you

10   wanted to make a point about that.  So once you know you want

11   to make a point about that, you can go through the steps that

12   we've gone through.

13        As I said, the Court has been very lenient with

14   allowing these supplemental disclosures, but it's the morning

15   of testimony, the jury has been sitting there for over an hour

16   and a half, and we are right now understanding what the

17   testimony is through an elaborate voir dire.  It may be

18   unprecedented that I'm even entertaining that kind of inquiry

19   at this stage rather than saying this is all out.  That's what

20   I'm trying to understand, is there any authority that you can

21   cite to the Court that would suggest that this is permissible

22   under Rule 16?

23        MR. KLEIN:  Yes, your Honor.  We put it at the end of

24   our letter.

25        THE COURT:  I've got your letter here.  This is

O4FCeis2

1    *Rosario*?

2              MR. KLEIN:  Yes.  Sometimes, of course, this does

3    happen, the defense is put in a position that is difficult, and

4    we do appreciate the Court's accommodations along the way, but

5    there's a *Rosario* case in *Washington v. Schriver*.  Basically,

6    sometimes this happens and the defense should be given a little

7    more wiggle room because these things go to the core of what's

8    happening here, and reasonable doubt.

9              So the government has put in this exhibit --

10   Mr. Sheridan was very clear on his basis.  Blockchain

11   analytics, which we would get into in his direct, is the study

12   of how blockchain works.  It's just what DeCapua did.  It's the

13   exact same thing, it's the same kind of thing.  He was looking

14   at the transactions.  He said himself he went back and looked

15   at them to see how they were coded and what they were, zeros

16   and ones, and he would explain that to the jury, and this is

17   inaccurate.

18             And so, that is an important piece of testimony that

19   completely undermines their theory.  It goes to the heart of

20   their theory.  They opened with this as a $110 million borrow.

21   They put up an exhibit that claims to show that from December,

22   and then he actually looked at the analytics which is in his

23   expertise, goes in and says, hey, that's not how it was coded.

24   We said all along he was going to talk about how these trades

25   are coded.  Now he's just putting it to an exhibit.  We always

O4FCeis2

1    disclosed he was going to talk about what his trades look like,
2    whether they are enabled and how they happened.  That's been
3    disclosed since day one.  All he's doing is talking about
4    within the frame of this exhibit.  Mr. Burnett is free to cross
5    examine him like he did, and they're also free to call a
6    rebuttal expert.  We're fine if they want to call back
7    Dr. Mordecai or Mr. Jain to refute this.  There isn't
8    refutation, though, and they're trying to get it in through
9    this.

10           He wasn't using just buzzwords.  To be clear, he
11   literally said, I went in to look at the code, I examined the
12   analytics for each of these transactions, and what I saw was
13   zeroes and ones.  That's very specific, your Honor, and that's
14   something a jury could not do, period.  That's the exact kind
15   of technical expertise that an expert is needed for, and he
16   should be permitted to talk about this because they're going to
17   close and say these were all borrows, when they weren't, and
18   that goes to the heart of this matter.  And Mr. Eisenberg
19   deserves his chance to have that be heard in front of this
20   jury.

21           We wish things would have played out a little
22   differently.  We're in the position we are in, they put up
23   their witnesses, we're reviewing their exhibits as they come
24   in, we're working with our expert, and now he's ready to
25   testify about something.  This is totally fair game.

O4FCeis2

1          MR. BURNETT:  Your Honor, if I may just respond.

2          It's been clear since we filed the complaint in this

3     case that the government's theory of the case has been that

4     Mr. Eisenberg borrowed $110 million worth of cryptocurrency, it

5     was in the complaint, it was in the indictment, it's been in

6     every letter we've written to the Court, every motion we've

7     written to the Court, it's been crystal clear all along.  If

8     the defense was going to argue that these were not in fact

9     borrows and to provide some code basis or blockchain basis for

10    that, they've known all along that that's something they needed

11    to and should have done and should have disclosed.  The

12    argument that it's been the heart of the case is exactly why it

13    should have been disclosed earlier on.

14          The fundamental problem we have here is other than

15    Mr. Sheridan getting on the stand and saying, well, it's in a

16    blockchain explorer somewhere, we don't even have the

17    underlying documents that he is relying on.  I can't cross

18    examine him on what data he looked at to do those things

19    because they never even produced it.  All we have is this one

20    sentence now and Mr. Sheridan's assertion on the stand that if

21    you look, you'll find it.  That's not the way expert disclosure

22    is supposed to work, it's deeply unfair, and we can't go get a

23    new expert in the code right now at this stage of trial.  This

24    is something they knew all along.  If it's an argument they

25    wanted to make, they needed to notice it.  Fairness is just as

O4FCeis2

1     important for government as it is for the defendant in criminal

2     cases, and it's not fair for the defense to effectively sandbag

3     something that if they knew was going to be a heart of their

4     case earlier on, they should have given notice on when they had

5     multiple opportunities to do so before trial.

6          MR. KLEIN:  Your Honor, if you don't let him talk

7     about 914, he still can talk about what he did when he reviewed

8     the code and were these transactions enabled and what they

9     looked like.  That's always been the heart of his testimony.

10    They've been on notice of that from day one.  To say he can't

11    get up and say, hey, Mr. Eisenberg did some transactions and I

12    looked at the blockchain, this is what they looked like, this

13    is what the code permitted, this is how they were coded —

14    that's been very clear.  We've always said he's going to talk

15    about what was enabled and what was not enabled and how the

16    smart contract performed.  This goes to how a smart contract

17    performs.  This goes to what was enabled, what was permissible.

18    And so, this has always been -- if you say he can't talk about

19    the 914, then he'll just talk about it in general.  The

20    testimony still should come in.

21         THE COURT:  In the prior disclosures, did Mr. Sheridan

22    indicate that he could testify about Mr. Eisenberg's trades?

23         MR. KLEIN:  Yes, and your Honor ruled on March 25th

24    that he could talk about them.

25         THE COURT:  Point me to where the disclosure, because

1    I'm looking at the January 12th, 2024 disclosure, but I also
2    have the October 30th disclosure.
3           MR. KLEIN:  Sorry.  He will testify that Mango
4    Markets -- there's a couple components to this, your Honor.
5    So, one part was we disclosed that he would testify that Mango
6    Markets was designed to enable conduct and others and prevent
7    it.  So that talks about how it worked, what was enabled and
8    what could be prevented.  Then we also talked about -- you
9    specifically said, at the March 14th hearing, he could testify
10   concerning the market mechanics and whether or not what
11   Mr. Eisenberg did was consistent with the code, and whether
12   modifications to the code were undertaken or not.  He was going
13   to talk about what was enabled, what he did was consistent with
14   the code, and just explain what it looked like.
15          THE COURT:  That's true, but on the particular
16   question of whether there were borrows as opposed to
17   withdrawals, that is not something that was within that scope
18   of what you just said.
19          MR. KLEIN:  But that's how the code is enabled.  The
20   code is set up a certain way.  All he's saying is, this is what
21   the code permitted you to do and this is what it looked like.
22   When I look at it, I see this transaction -- by the way, the
23   blockchain is public, your Honor.  We can't just print out a
24   giant blockchain and bring it in and dump it on them.  They
25   have the access to the public ledge the same way we do.  And

O4FCeis2

1    so, that's not something -- to disclose the blockchain -- they

2    didn't disclose the blockchains for DeCapua's testimony when he

3    did all his tracing.

4            MR. BURNETT:  We actually did.  We printed out every

5    single exhibit that he relied on.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4FMEIS3

1    MR. KLEIN:  He printed out the exhibits, but you
2    didn't say the Blockchain is a massive Blockchain.  They didn't
3    give us the entire Blockchain.  So he's relying on a publicly
4    available Blockchain that is disclosed as a basis, and he's
5    basically doing what we understood he was permitted to do,
6    based on the March 25 hearing with your Honor.
7        I don't know what we would have done differently
8    because we thought he could always talk about the smart
9    contracts, how it worked, and Mr. Eisenberg's trades, how they
10   performed it through the smart contract.
11       THE COURT:  Understood.  We are going to take 15
12   minutes.  We are going to come back.  I'll tell you what we are
13   going to do, and then we will proceed with the testimony.
14       (Recess)
15       THE COURT:  Ms. Martabano, as to the first bullet
16   concerning the repayments, my understanding is that Mr.
17   Sheridan is going to do a little more than just recount the
18   chronology of what occurred.  Is that correct?
19       MS. MARTABANO:  Yes.  Based on data that they pulled
20   from the proposals from the Blockchain to see when exactly
21   things were done and by whom.  He's not going to get into by
22   whom.
23       THE COURT:  He is not going to say by whom.  He is not
24   going to say what people thought, what they were doing, what
25   they were imagining.

O4FMEIS3

1      MS. MARTABANO:  No.

2      THE COURT:  That is a proper subject of his testimony

3  to that limited extent.

4      As to the contracts and the code and what it was doing

5  and not doing, here is the issue, is that if Mr. Sheridan is

6  relying on other people and they are the ones who did the work

7  and he is merely recounting their opinions, then that is

8  inadmissible under, I think, clear law in this district in

9  circuit courts around the country everywhere.

10      The only testimony that would be admissible as his

11  opinion would be if he did the work, told people what to do,

12  added his experience, had a basis for his own opinion, if he

13  could do the work himself, if given enough time.  Those are the

14  types of ways in which an expert can rely on the work of a

15  team, and you can expect that on cross-examination the

16  government is going to hit that issue hard.

17      So this is a larger issue than just what was in the

18  supplemental disclosure, because if it turns out that Mr.

19  Sheridan is sitting here but actually it's the team at FTI that

20  did all the work and figured out what the code meant and that's

21  really all that Mr. Sheridan is reciting, and he is being put

22  on just because he has law enforcement background, that's going

23  to be a big problem for you because I could exclude his entire

24  opinion at the end of the day.  You should be mindful of that

25  as you're doing your direct to make sure that you are eliciting

O4FMEIS3

1    a foundation for every opinion that he's putting in.

2         With that, I am going to limit you to what's stated in

3    this supplemental disclosure to the extent you're addressing

4    all these issues.

5         As to the response to Dr. Mordecai, my understanding

6    is that Mr. Sheridan is just offering, again, an opinion about

7    how the code works.  He's only referencing Dr. Mordecai's

8    exhibit to just give the context of why he's opining what he's

9    opining.

10        Is that fair?

11        MS. MARTABANO:  Yes, your Honor.

12        THE COURT:  As to the last issue, which is the GX-914,

13   I don't think he has any reliable basis to be talking about

14   what that screenshot is or was not.  If you can have him

15   testify just based on his code analysis and his Blockchain

16   analysis as to what his understanding was of what was going on

17   on October 11, that's fair.  I don't think that he needs to

18   bring in the screenshot or explain that it was inaccurate,

19   because he simply has no basis to do that.

20        As to the audit, how many questions do you have about

21   the audit?  Because here is the issue that comes -- this is not

22   how it was initially presented.  You say the software was

23   unaudited.  The government then points to a reference in the

24   FAQs to this audit.  That presentation of the audit would be

25   relevant to, among other things, materiality, to show that

O4FMEIS3

1    investors in Mango Markets had access to that audit, they

2    looked at it and it would inform their expectations.

3           So I think it's problematic to have the government to

4    have referred to that FAQ document, referring to the audit, and

5    not have anyone be able to explain what it did or did not

6    cover.  I'll give you some leeway there, but, as I understand

7    it, all you are going to say is, at a very general level, was

8    it an audit of this, as opposed to this?  And that's it, right?

9           MS. MARTABANO:  Yes, your Honor.  What a code audit

10   means.

11          THE COURT:  You are just saying the subject matter.

12   You are not getting into the actual analysis to show what the

13   audit did or didn't, because that would blow the door open in a

14   way that I don't think the government has in its

15   cross-examination.  That's what we will do with the audit.

16          Mr. Burnett, any further issues?  You were grabbing

17   the microphone.

18          MR. BURNETT:  Just on the audit, on cross am I allowed

19   to point him to particular things in the audit that were

20   covered?

21          THE COURT:  You can do that.  The defense wants it in.

22          Again, Ms. Martabano, you know that the more you open

23   that door, the more the government is going to walk through it.

24   Just to be clear, as I understood it, when we had our long

25   colloquy, you are just pointing out this audit pertained --

O4FMEIS3

1    give it to me.  What does the audit talk about?

2              MS. MARTABANO:  It's just a code audit.  It doesn't

3    mean that it solves every potential problem that Mango, as it

4    was coded, could have created.  Obviously, for example an

5    oracle problem or any kind of outside issue that wasn't

6    strictly, does this code do what it's intended to do and does

7    it have any bugs in it.  I just think that it's important for

8    the jury to understand that a code audit strictly looks at, is

9    this contract working the way it was programmed to work and

10   not --

11             THE COURT:  He is not going to talk about why it's

12   important.  He is literally just going to say, it was a code

13   audit that was about how the code works and were there any bugs

14   in it.  He did not cover any issues regarding Mango Markets'

15   protocol.

16             MS. MARTABANO:  Correct.

17             THE COURT:  Move on.

18             Am I missing anything else, Mr. Burnett?

19             MR. BURNETT:  No, your Honor.

20             THE COURT:  I'll just say, I have an issue with why we

21   are here in this context.  And as I said before, I think the

22   issue is that the disclosures from the defendant were woefully

23   deficient.

24             On the other hand, the government did not insist on a

25   more fulsome disclosure at the outset.  There is a little mud

O4FMEIS3

1    on everyone's face I think in this issue.  So the Court has

2    tried to handle this in a way that would preserve the

3    defendant's rights while avoiding unfair prejudice to the

4    government.

5            Let's proceed, and we will take any objections as they

6    come.

7            MR. BURNETT:  One question, your Honor.

8            Mechanically, if we want to raise an objection to

9    exclude an opinion, is the proper time to do that while he's on

10   direct or after we have crossed him on it, for this like relied

11   on FTI and not his own analysis point?

12           THE COURT:  I don't know that we are going to be able

13   to do it without your cross-examination.  If we need to have an

14   instruction be delivered to the jury after the fact, then we

15   can go ahead and do that.

16           MR. BURNETT:  Thank you.

17           MS. MARTABANO:  Your Honor, I just wanted to clarify.

18   The limitations are based on just those three categories, and

19   sort of the other categories about how Blockchain works, how

20   cryptocurrency works, those were not challenged and those are

21   fair game still.

22           THE COURT:  Those were in the prior disclosures.

23           The only thing that you should be mindful of is, on

24   this issue that the government has raised of reliance on FTI,

25   that seems to be a crosscutting issue.  So if there are other

O4FMEIS3

1    aspects of Mr. Sheridan's testimony where he is going to be

2    relying on the code, then you can expect that the government is

3    going to raise an objection and say that that is an

4    impermissible inadmissible opinion unless Mr. Sheridan

5    furnishes some other basis for why he was in control of the

6    analysis, added his expertise, so it's a proper opinion coming

7    from him.

8              MS. MARTABANO:  Yes, your Honor.

9              THE COURT:  Mr. Hernandez, at long last, let's have

10   the jury come in.

11             MR. KLEIN:  Your Honor, the other witness today is a

12   private investigator.  We were going to call the investigator

13   first, who Mr. Talkin is going to lead the direct on so that

14   Ms. Martabano has a moment to go through her outline and make

15   sure she is capturing your Honor's rulings.

16             THE COURT:  Let's do it that way.  Let's proceed.

17             (Jury present)

18             THE COURT:  Welcome back, members of the jury.

19             I have to apologize for you because, obviously, I know

20   that you have been back there in the jury room for a little

21   bit.  We were not taking a break.  We were working hard to see

22   if there are ways that we could further streamline the case,

23   and I'm happy to let you know that we have found some ways to

24   shorten this up, so I think that we are making excellent

25   progress.

1       My expectation is that we will be able to have

2  closings, if not tomorrow, then on Wednesday, so we are ahead

3  of schedule, and we are exactly where we need to be.  Thank you

4  very much for all your patience.

5       With that, Mr. Talkin, you may call your first

6  witness.

7       MR. TALKIN:  Thank you, your Honor.  The defense calls

8  Ronald Dwyer.

9       THE COURT:  I assume someone is getting Mr. Dwyer?

10       MR. TALKIN:  Yes.

11       THE COURT:  I just want to make sure we are not

12  sitting here longer than we need to.

13       MR. TALKIN:  Thank you for the hint.

14

15  RONALD DWYER,

16       called as a witness by the Defendant,

17       having been duly sworn, testified as follows:

18       MR. TALKIN:  May I inquire, your Honor.

19       THE COURT:  You may.

20  DIRECT EXAMINATION

21  BY MR. TALKIN:

22  Q.  Good morning, Mr. Dwyer.  Tell the jury what you do for a

23  living.

24  A.  I'm a private investigator.

25  Q.  How long have you been doing that?

1    A.  Twenty-nine years.

2    Q.  Prior to that, what did you do?

3    A.  I was a police officer and a detective with the city police

4    department.

5    Q.  New York City?

6    A.  Yes.

7    Q.  What was your rank or grade when you left the New York City

8    Police Department?

9    A.  Detective.

10   Q.  Did there come a time when you became involved working for

11   the defense in the United States v. Avi Eisenberg?

12   A.  Yes.  Recently.

13   Q.  What were you charged with doing in this case?

14   A.  Looking over some of the discovery material.

15   Q.  Specifically, which discovery material did you look over?

16   A.  I looked at some Cellebrite records.  I believe they were

17   from a phone designated as 1B2, and I think it's Government

18   Exhibit DX-70.

19   Q.  Did you look at any other devices, or at least the data

20   from any other devices?

21   A.  I looked at HTML records from a laptop that is purported to

22   belong to the defendant.

23   Q.  You mentioned a Cellebrite records.  Can you please

24   describe very briefly what a Cellebrite record is or what

25   Cellebrite is?

O4FMEIS3                          Dwyer - Direct

1   A.  Cellebrite is a computer software that allows an individual

2   to download all of the records from a cell phone, pictures,

3   text messages, emails, web browsing history.  Just everything

4   in the phone comes out into a report that is clear, concise,

5   and organized.

6   Q.  In this case did you look at any particular Cellebrite

7   report?

8   A.  Yes.  For the phone I mentioned, the 1B2.

9           MR. TALKIN:  Your Honor, if I can ask just the witness

10  be shown DX-70.

11          THE COURT:  You may.

12  Q.  While we are doing that, the Cellebrite report that you

13  looked at in this case, what was that in reference to, meaning,

14  you just listed off a category of items a Cellebrite report can

15  report, but which one did you look at in this particular case?

16  A.  This was an extraction report of websites that were looked

17  at on this phone.

18  Q.  Is this report all that you saw on the computer or just

19  what appears in the report?  Is this report a subset of the

20  entire computer?

21  A.  Yes.

22  Q.  This report that you are looking at, DX-70, is that a fair

23  and accurate representation of the report that you looked at

24  earlier and in your preparation and investigation in this case?

25  A.  Yes.

1    MR. TALKIN:  Your Honor, I would offer DX-70 into
2    evidence.
3            THE COURT:  Objection?
4            MR. DAVIS:  No.
5            THE COURT:  That will be admitted.
6            (Defendant's Exhibit 70 received in evidence)
7    Q.  I just want to go through a couple of entries, Mr. Dwyer,
8    just starting with entry number 1.
9            THE COURT:  Do you want to publish it?
10           MR. TALKIN:  Yes.  Please publish.  Thank you.
11   Q.  The first entry, if you could just read to the jury what
12   the title is.
13   A.  SEC.gov.  SEC charges self-described promoter with microcap
14   market manipulation scheme.
15   Q.  What date of that search?
16   A.  12/6/2022.
17   Q.  And at what time?
18   A.  2:49 p.m. UTC time.
19   Q.  Now, I am going to take you all the way to the last page of
20   that document, which would be page 11.
21           MR. TALKIN:  If we can highlight number 41, first.
22   Q.  Starting on the left, can you please read for the jury what
23   this entry is about.
24   A.  It's a Mango DAO.  It's a website:
25   Https:\\apprealms.today/dao/mngo/proposal --

O4FMEIS3                         Dwyer - Direct

1   Q.  You don't have to read the numbers.  Thank you.

2            What date and time was that entry?

3   A.  October 12, 2022, at 3:01 a.m.

4   Q.  I want to go right above it, number 40.  That's the same

5   URL that was searched, but I just want you to tell the jury

6   what the date and time of that search was.

7   A.  This is October 12, 2022, at 4:14 a.m. UTC time.

8            MR. TALKIN:  If we could go to number 39, which is at

9   the bottom of the previous page.

10  A.  This one is:  Karlstack, substack,

11  https:\\karlstack.substack.com\.  Date is 10/12/2022 and time

12  is 5:24 a.m. UTC time.

13           MR. TALKIN:  If we can go to the previous page and to

14  number 34.

15  A.  This says:  Carlito on Twitter "scoop.  Who was the hacker

16  that stole more than 100 million U.S. dollars from @Mango

17  Markets last night.  Karlstack has some answers."

18  Q.  You don't have to read the site, but just please tell the

19  jury what the time and date of that was.

20  A.  This is October 12, 2022, at 1:40 p.m. UTC time.

21  Q.  Now, we started with out your testimony about this document

22  by going to a search about an SEC charging an individual.

23           Is it fair to say that throughout this document there

24  are numerous similar searches that took place after October 11

25  of 2022?

1    A.  Yes.

2              MR. TALKIN:  We can take that exhibit down.

3    Q.  Now, I want to show you what has been marked Defendant's

4    Exhibit 30D.

5              MR. TALKIN:  Mr. Smith, just Mr. Dwyer, please.

6              This is a 60-page document.  If you can just leaf

7    through a couple more pages for him.

8    Q.  Do you recognize this document?

9    A.  Yeah.  This is another document that I looked through from

10   the discovery.

11   Q.  Where was the information on these documents?  You talked

12   about you did some HTML.  Can you explain to the jury where you

13   looked at these and the difference of the HTMLs to the

14   documents you see here.

15   A.  These were documents that were from the laptop -- the

16   chrome history of the laptop of the defendant.

17   Q.  These documents that you are looking at, other than them

18   not being HTML and them being PDFs, are they a fair and

19   accurate representation of the documents you reviewed from the

20   chrome history of the defendant's laptop?

21   A.  Yes, they are.

22             MR. TALKIN:  Your Honor, I will offer DX-30D.

23             THE COURT:  Any objection?

24             MR. DAVIS:  No, your Honor.

25             THE COURT:  It will be admitted.

1   (Defendant's Exhibit 30D received in evidence)

2   MR. TALKIN:  This is a 60-page document, so obviously

3   we are not going to go through the whole thing, but if we can

4   go to the first page.

5   Q.  Looking at the first page, is it fair to say that this

6   document --

7   MR. TALKIN:  If we can go to this visit and duration.

8   You can blow up the whole top, if it's easier.  Thank you,

9   Mr. Smith.

10  Q.  Just looking at the second-to-bottom line, this visit, is

11  it fair to say that this URL visit is identifying a visit that

12  took place on October 11, 2022, at 10:46 p.m.?  Is that fair to

13  say?

14  A.  Yes, it is.

15  Q.  And now I want to go to the last page.

16  The time on this is 10/12/22 at 2:14 p.m.  You see

17  that?

18  A.  Yes.

19  Q.  You've had an opportunity to look at all 60 documents.  Am

20  I accurate when I say that all of the visits that are

21  identified in between in those 60 pages start with the time you

22  said on page 1 and end with the time you stated on the last

23  page?

24  A.  Yes.

25  Q.  You'll see on the bottom of this page it says:  Duration, 0

O4FMEIS3                          Dwyer - Direct

1   seconds?

2   A.  Yes.

3   Q.  Do you have any idea how that's calculated?

4   A.  No, I don't.

5   Q.  Just so we understand what site was looked at, looking at

6   the page that's in front of you, it says title.

7           Do you see that?

8   A.  Yes.

9   Q.  And the title is Discord, Mango, Mango Markets.

10          You see that?

11  A.  Yes, I do.

12  Q.  There is actually a picture of a mango there?

13  A.  Correct.

14  Q.  So that's on all 60 pages?

15  A.  Yes.

16  Q.  I now want to show you some very small parts of the

17  Discord -- of the Mango Discord checks.

18          MR. TALKIN:  I will start with 30A.  Please show it to

19  the witness.

20  Q.  You said that you looked at some of the discovery in this

21  case.  Did this document come from some of the discovery that

22  you looked at in the case?

23  A.  Yes, it did.

24  Q.  Is this from the Discord, the Mango Markets Discord?

25  A.  Yes.

1   Q.  Is this snippet from the Mango Discord a fair and accurate

2   representation of a snippet that you looked at prior to

3   testifying today?

4   A.  Yes, it is.

5           MR. TALKIN:  Your Honor, I'll offer 30A into evidence.

6           THE COURT:  Any objection?

7           MR. DAVIS:  No, your Honor.

8           THE COURT:  30A will be admitted.

9           (Defendant's Exhibit 30A received in evidence)

10  Q.  Mr. Dwyer, could you please read the time stamp and the

11  contents.

12  A.  Year is 2022, October 12, 4:16.  The contents:  I have a

13  friend who lost a lot of money in this hack.  He's literally

14  threatening to kill the guy if he's identified.  Laugh out

15  loud.

16          MR. TALKIN:  Can we show Mr. Dwyer 30B, please.

17  Q.  Same question for 30B.  Is this a fair and accurate

18  representation of a snippet from the Mango Markets Discord that

19  you reviewed prior to testifying today?

20  A.  Yes, it is.

21          MR. TALKIN:  I'll offer 30B, your Honor.

22          THE COURT:  Any objection?

23          MR. DAVIS:  No, your Honor.

24          THE COURT:  30B will be admitted.

25          (Defendant's Exhibit 30B received in evidence)

O4FMEIS3                          Dwyer - Direct

1   Q.  Mr. Dwyer, would you please read it to the jury.

2   A.  Year is 2022, October 12, 10:29.  Contents are:  I am in

3   PR.  Wonder if that guy is still here.

4   Q.  You can't interpret the end of that, can you?

5   A.  No, I cannot.

6          MR. TALKIN:  Can we show 30C, please, Mr. Smith.

7   Q.  Is that a fair and accurate representation of a different

8   snippet from the Mango Discord chat that you reviewed prior to

9   testifying today?

10  A.  Yes, it is.

11         MR. TALKIN:  Your Honor, I will now offer 30C into

12  evidence.

13         THE COURT:  30C will be admitted.

14         (Defendant's Exhibit 30C received in evidence)

15  Q.  Again, please read, starting from the top to the bottom,

16  both the time stamp and the contents of both entries.

17  A.  Time stamp is 2022, October 12, 11:44.  Contents:  I think

18  the best thing to do is threaten the hacker.

19         Next entry on the time stamp is 2022, October 12,

20  11:44, and the contents is:  With violence.

21  Q.  Thank you, Mr. Dwyer.  I think that's it.

22         MR. TALKIN:  Your Honor, let me just check my notes

23  for one second.

24         Thank you.  Nothing further.

25         THE COURT:  Cross-examination.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O4FMEIS3                        Dwyer - Cross

1              MR. DAVIS:  Thank you, your Honor.

2   CROSS-EXAMINATION

3   BY MR. DAVIS:

4   Q.  Good morning, Mr. Dwyer.

5   A.  Good morning.

6              MR. DAVIS:  Can we pull up Defense Exhibit 30A,

7   please, and if I can ask Mr. Smith to do that because we don't

8   have copies.  Appreciate it.

9   Q.  Mr. Dwyer, you remember speaking about this Discord?

10  A.  Yes.

11  Q.  Can I ask you a question about this.  The user name

12  exuent3745, do you see that?

13  A.  Yes.

14  Q.  Do you know this person's name?

15  A.  I do not.

16  Q.  You don't know this person's age, correct?

17  A.  Correct.

18  Q.  You don't know this person's location, correct?

19  A.  I do not.

20  Q.  You said the date was October 12, 2022, correct?

21  A.  That's what the time stamp says, yes.

22  Q.  And you were not sitting with Mr. Eisenberg on October 12,

23  2022, correct?

24  A.  I was not.

25  Q.  You have no idea whether he saw this message, correct?

O4FMEIS3                        Dwyer - Cross

1    A.  I do not.

2              MR. DAVIS:  Can we go to Defendant's Exhibit 30B.

3    Q.  This is a user name SIU#3920.

4              Do you see that, sir?

5    A.  Yes.

6    Q.  You don't know this person's name, correct?

7    A.  I do not.

8    Q.  You don't know this person's location, correct?

9    A.  I do not.

10   Q.  And you see the time stamp is October 12, 2022?

11   A.  Yes.

12   Q.  You were not sitting with Mr. Eisenberg on October 12,

13   2022, correct?

14   A.  I was not.

15   Q.  You don't know whether Mr. Eisenberg saw this message,

16   correct?

17   A.  I do not.

18   Q.  Let's talk about 30C.

19              This is user name ICHI0707.

20              Do you see that?

21   A.  Yes, sir.

22   Q.  You don't know this person's name, correct?

23   A.  I do not.

24   Q.  You don't know this person's location, correct?

25   A.  I do not.

O4FMEIS3                         Dwyer - Cross

1   Q.  You were not sitting with Mr. Eisenberg on October 12,

2   2022, correct?

3   A.  I was not.

4   Q.  You have no idea whether he saw this message, correct?

5   A.  Correct.

6           MR. DAVIS:  We can take that down.

7           Why don't we pull up Defense Exhibit 70.  Can you we

8   please go to line 35.  Thank you, Mr. Smith.

9   Q.  Do you remember speaking about this on direct examination,

10  sir?

11  A.  Yes.

12  Q.  You didn't visit this website, correct?

13  A.  I did not.

14  Q.  You don't know what this website is at all, correct?

15  A.  Correct.

16  Q.  I'd like to show you Government Exhibit 1003, please.

17          You have never seen this document before, correct?

18  A.  I did not see this.

19  Q.  Can you please read the first sentence.

20  A.  Hi, all.  The Mango treasury has about 70 million U.S. DC

21  available to repay bad debt.

22  Q.  Can you please read the next sentence.

23  A.  I propose the following:  If this proposal passes, I will

24  send the MSOL, SOL, and MNGO in this account to an address

25  announced by the Mango team.  The Mango treasury will be used

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O4FMEIS3                         Dwyer - Cross

1   to cover any remaining bad debt in the protocol, and all users

2   without bad debt will be made whole.

3          Continue?

4   Q.  I'll pause you there for a second.

5          In your review of this post, the person didn't

6   identify themselves by name, correct?

7   A.  Correct.

8   Q.  I want to now look at the last sentence.  Can you read

9   starting with:  By voting for this proposal.

10  A.  By voting for this proposal, Mango token holders agree to

11  pay this bounty and pay off the bad debt with the treasury and

12  waive any potential claims against accounts with bad debt, and

13  will not pursue any criminal investigations or freezing of

14  funds once the tokens are sent back as described above.

15  Q.  This is an anonymous post, correct?

16  A.  It appears to be.

17         MR. DAVIS:  Let's now go back to Defense Exhibit 70.

18  We can go to line 34, please.

19  Q.  Do you remember speaking about this website on direct?

20  A.  Yes.

21  Q.  Can you please read under the second column starting with:

22  Carlito on Twitter.

23  A.  Carlito on Twitter:  Scoop.  Who was the hacker that stole

24  more than 100 million U.S. dollars from @Mango Markets last

25  night?  Karlstack has some answers.

O4FMEIS3                          Dwyer - Cross

1    Q.   What was the time of this visit?

2    A.   October 12, 2022 at 1:40 p.m.

3    Q.   That's in UTC time, correct?

4    A.   That's correct.

5    Q.   I want to show you Government Exhibit 604, please.

6            MR. DAVIS:  Can we scroll down to page 2 of this,

7    please.

8    Q.   This is a flight being booked from San Juan that ends up in

9    Israel, correct?

10   A.   Yes.

11   Q.   And the date is October 12, 2022?

12   A.   Yes.

13           MR. TALKIN:  Can we go back to the top of the email,

14   please.

15   Q.   This email was sent on October 12, 2022 at 2:30 p.m. UTC,

16   correct?

17   A.   Yes.

18   Q.   That's less than an hour after the post and website visit

19   we just discussed in DX-70, correct?

20   A.   Correct.

21           MR. DAVIS:  We can take that down.

22           We can go back to Defendant's Exhibit 70.

23   Q.   Now, you reviewed search history and web history for

24   Mr. Eisenberg, correct?

25   A.   Yes.

1  Q.  And you went over searches that he did after October 11,

2  2022, correct?

3  A.  Correct.

4          MR. DAVIS:  Now, in Defense Exhibit 70, if we can

5  please pull it up.  Go to line 5.

6  Q.  Can you please read what is in the second column for line

7  5.

8  A.  Securities trader sentenced to 18 months in prison for

9  market manipulation scheme that netted more than $17 million in

10  illicit profits.

11  Q.  Now, this was after October 11, 2022, correct?

12  A.  Yes.

13  Q.  But the defendant also searched for this before October 11,

14  2022, correct?

15  A.  I'd have to see that.

16          MR. DAVIS:  Let's go to Government Exhibit 119A,

17  please.

18  Q.  You see row 2?

19  A.  Yes.

20  Q.  That's a search for statute of limitations conversion,

21  correct?

22  A.  Correct.

23  Q.  That's on October 8, 2022, correct?

24  A.  That's correct.

25  Q.  That's before October 11, is that correct?

1   A.  Yes, it is.

2           MR. DAVIS:  Can we go to line 4.

3   Q.  He searches for statute of limitations market manipulation,

4   correct?

5   A.  Correct.

6   Q.  That's before October 11, 2022, correct?

7   A.  Correct.

8           MR. DAVIS:  Can we go down to line 9.

9   Q.  That's a search for elements of fraud, correct?

10  A.  Correct.

11  Q.  That's on October 8, 2022, correct?

12  A.  Yes, it is.

13          MR. DAVIS:  Can we go to line 11.

14  Q.  That's the Wikipedia page for fraud, correct?

15  A.  Yes.

16  Q.  That was visited on October 8, 2022, correct?

17  A.  Correct.

18          MR. DAVIS:  Can we go to the last line.

19  Q.  This is the same post we just read, correct?

20  A.  Yes, it is.

21  Q.  That's from October 8, 2022, correct?

22  A.  Correct.

23  Q.  Mr. Eisenberg searched a lot of manipulation terms that you

24  went over in DX-70 before October 11, correct?

25  A.  Correct.

1    MR. DAVIS:  Let's go to Government Exhibits 800 and

2    800A.

3  Q.  This is Mr. Eisenberg's tweet from September 1, 2022,

4  correct?

5  A.  Yes.

6    MR. DAVIS:  Can we go to page 2.

7  Q.  You see it cites to a Justice Department news release?

8  A.  Yes.

9    MR. DAVIS:  Can we now pull up Government Exhibit

10  800A.

11  Q.  Can you please read the title of this press release.

12  A.  Cofounder and chief investment officer of London-based

13  hedge fund charged with FX market manipulation and fraud.

14  Q.  What's the date on this document?

15  A.  September 1, 2022.

16    MR. DAVIS:  We can take that down.

17    Can we pull up Government Exhibit 801.

18  Q.  This is a tweet from Mr. Eisenberg from September 26, 2022,

19  correct?

20  A.  Correct.  I don't see 2022 on this.  I may be missing it.

21  Q.  Can you read where it says under justice.gov what it says?

22  A.  James Patten, 63, of Winston Salem, North Carolina; Peter

23  Coker, Sr., 80, of Chapel Hill, North Carolina; and Peter

24  Coker, Jr., 53, of Hong Kong, China.  What's a retirement

25  without a bit of fun, friendly fraud.

1  Q.  Can you read the post underneath.

2  A.  Three men charged with international market manipulation

3  scheme.

4          MR. DAVIS:  Can we pull up Government Exhibit 1704,

5  please.

6  Q.  Could you please read the first sentence under paragraph 1.

7  A.  Starting with on or about July 6?

8  Q.  Yes, please.

9  A.  On or about July 6, 2022, Avraham Eisenberg, through his

10  lawyers, filed a lawsuit in the United States federal court in

11  *Avraham Eisenberg v. Numeris LTD* --

12          MR. TALKIN:  Your Honor, I object to this one.  This

13  is beyond the scope of the direct examination.

14          THE COURT:  It's overruled.

15  Q.  Do you see where it says, Avraham Eisenberg sued the

16  defendants for, among other things, price manipulation in

17  violation of the Commodities Exchange Act, Title 7, United

18  States Code, Section 91?

19          Do you see that, sir?

20  A.  Yes.

21          MR. DAVIS:  Can we please pull up Government Exhibit

22  609.

23  Q.  Do you see the first sentence where it says, Sasha Ivanov

24  is committing a $500 million fraud and market manipulation?

25  A.  Yes.

1  Q.  That's the Sasha Ivanov that was sued by Mr. Eisenberg in

2  July of '22, correct?

3  A.  I don't know that.

4  Q.  It's the same name, correct?

5  A.  It's the same name.

6         MR. DAVIS:  So let's now go to the second paragraph.

7  Q.  Do you see where it says high-level description of the

8  fraud?

9  A.  Yes.

10 Q.  I am going to read a sentence in the middle of that

11 paragraph, starting with, they spent tens of millions of

12 dollars.  OK?

13 A.  Yes.

14 Q.  They spent tens of millions of dollars buying up waves so

15 that the price went up from single digits to a high of 60.

16 They then turned those waves into USDN at this inflated price

17 and borrowed about 550 million of USDC and USDT against their

18 USDN that they had enticed to lend on buyers.

19         Did I read that correctly?

20         MR. DAVIS:  Can we zoom out for a second.

21 A.  Yes.

22 Q.  Do you see where it says specific fraudulent actions?

23 A.  Yes.

24 Q.  Can you read number 1.

25 A.  Market manipulation of the waves coin.

1    MR. DAVIS:  No further questions, your Honor.

2    THE COURT:  Mr. Talkin.

3    REDIRECT EXAMINATION

4    BY MR. TALKIN:

5    Q.  Mr. Dwyer, based on what you reviewed to testify today, is

6    it fair to say that Mr. Eisenberg reviewed several cases

7    regarding manipulation and fraud after December 11 of 2022,

8    correct?

9    MR. DAVIS:  Objection.

10   THE COURT:  You may need to rephrase the question or

11   ask some foundational questions first.

12   Q.  Based on the information that's in evidence on DX-70,

13   Defendant's Exhibit 70, you had testified on direct examination

14   that there was numerous searches.  What was the general tenor

15   of most of those searches that you saw on this document?

16   A.  Fraud and manipulation.

17   MR. DAVIS:  Objection.

18   THE COURT:  Overruled.

19   Q.  What was the time period, before or after October 11, 2022?

20   A.  After.

21   Q.  And on cross-examination you were asked about a lot of the

22   same type of searches that happened before October 11, 2022,

23   correct?

24   A.  Correct.

25   Q.  Before you heard about them today, did you know anything

O4FMEIS3

 1   about those, meaning, before you saw them in evidence here
 2   today, did you know anything about that they were in the
 3   evidence of this trial?
 4   A.  Yes.
 5              MR. TALKIN:  Nothing further.  Thank you.
 6              THE COURT:  Mr. Davis, anything further?
 7              MR. DAVIS:  No, your Honor.  Thank you.
 8              THE COURT:  Thank you very much, Mr. Dwyer.
 9              (Witness excused)
10              THE COURT:  Mr. Talkin, you may call your next
11   witness.
12              MR. TALKIN:  Thank you.
13              At this time we have a stipulation that we have agreed
14   with the government, if I can move it into evidence.  It is
15   identified, even though it's on the defense case because of the
16   timing, as a Government Exhibit 1705.  For purposes of
17   identification for the jury, should they want to hear it, we
18   will call it the same thing, if that's OK with the Court.
19              THE COURT:  The stipulation will be admitted.
20              (Government Exhibit 1705 received in evidence)
21              MR. TALKIN:  Thank you.  I am going to read the
22   stipulation into evidence now.
23              It is hereby stipulated and agreed, by and between the
24   United States of America, by Damian Williams, United States
25   Attorney for the Southern District of New York, Assistant

O4FMEIS3

1    United States Attorneys Thomas Burnett and Peter Davis, and
2    Special Assistant United States Attorney Tian Huang, of
3    counsel, and the defendant, Avraham Eisenberg, by and through
4    his counsel, Brian Klein and Sanford Talkin, that:
5            Avraham Eisenberg had an account at Circle Internet
6    Financial Limited, which I'll call Circle for the rest of this
7    reading, which is identified in GX-1104 and hereafter known as
8    Mr. Eisenberg's Circle account.
9            Circle is a U.S.-based company with headquarters in
10   Boston, Massachusetts.  Law enforcement learned that about 57
11   million USDC, all of which was traceable to the October 11,
12   2022 events on Mango Markets, was deposited into
13   Mr. Eisenberg's Circle account, but the majority of those funds
14   were soon after converted to tokens on the Ethereum and Tron
15   Blockchains sent to decentralized exchanges and then converted
16   to other cryptocurrencies, including DAI and USDB, which law
17   enforcement did not believe it could seize.
18           As of October 12, 2022, Mr. Eisenberg's Circle account
19   had remaining only about 500,000 USDC, and, at law
20   enforcement's request, that same day, Circle suspended
21   Mr. Eisenberg's circle account, without disclosing to him that
22   it was suspending it at law enforcement's request.
23           On November 4, 2022, Mr. Eisenberg, while still
24   outside the United States, served Circle with an arbitration
25   demand seeking to unsuspend that account.

O4FMEIS3

1    On November 6, 2022, after conferring with law

2  enforcement, Circle unsuspended Mr. Eisenberg's Circle account

3  without disclosing that it was doing so at law enforcement's

4  request.

5    Given the relatively small amount, about 500,000 USDC,

6  still remaining in Mr. Eisenberg's Circle account, as compared

7  to the original deposits of 57 million USDC on October 11,

8  2022, that were traceable to the October 11, 2022 events on

9  Mango Markets, law enforcement requested that the account be

10 unsuspended because they were concerned that if that were not

11 done and the arbitration proceeded, Mr. Eisenberg would learn

12 that law enforcement was investigating him and that he would

13 flee from prosecution, for example, by not returning to have

14 the United States, and/or convert the Mango Market funds that

15 are attributed to him to other kinds of cryptocurrency or

16 locations outside the government's reach.

17    It is further stipulated and agreed that this

18 stipulation that I just read can go into evidence identified as

19 Government Exhibit 1705, dated April 15.

20    Thank you, your Honor.

21    THE COURT:  The defense may call its next witness.

22 What we are going to do here is go for about 20 minutes.  Then

23 we will take our midday break.

24    MS. MARTABANO:  Yes, your Honor.

25    The defense call Mr. Jeremy Sheridan.

O4FMEIS3

1                Your Honor, while we wait for the witness, can we have

2    a brief sidebar to clarify a ruling you made earlier?

3                THE COURT:  Yes, you may.

4                (Continued on next page)

O4FMEIS3

1          (At sidebar)

2          MS. MARTABANO:  We just wanted to raise, obviously, we

3  have not had a chance to speak to Mr. Sheridan to tell him he

4  has been limited, so he is not going to be aware of the Court's

5  ruling.  I am going to do my best to keep it very narrow and

6  tight, but we just wanted to raise if there is a way that you

7  prefer that we either let him know -- I don't want to draw

8  objection after objection after objection because he doesn't

9  realize that there has been a limitation.

10         THE COURT:  What was the limitation, just to be clear

11  what we are talking about?

12         MR. KLEIN:  Your Honor, you limited some of the scope

13  of the direct based on the proffered testimony.  Our questions

14  have been narrowed to reflect your rulings.  It's possible he

15  could stray by accident.  We just don't want your Honor to get

16  mad at him because he's not aware of his rulings.

17         THE COURT:  I understand.  We will take it as it

18  comes.  Thank you.  I appreciate it.

19         (Continued on next page)

20

21

22

23

24

25

```
1              (In open court)
2     JEREMY SHERIDAN,
3          called as a witness by the Defendant,
4          having been duly sworn, testified as follows:
5     DIRECT EXAMINATION
6     BY MS. MARTABANO:
7     Q.  Good morning, Mr. Sheridan.  Can you tell us how you got
8     involved in this case?
9     A.  Good morning, ma'am.  My firm, FTI Consulting, was
10    contacted and retained by defense counsel based on our
11    expertise in digital asset currency.
12    Q.  I want to start with your background.  You just mentioned
13    FTI.  Is that where you currently work?
14    A.  Yes, ma'am.
15    Q.  What do you do there?
16    A.  I lead our investigative teams within the Blockchain and
17    digital assets practice.
18    Q.  How many people approximately do you oversee?
19    A.  There is about -- there is 32 in the practice.  Those
20    specifically focus on investigations are six.
21    Q.  About how long have you been engaged in the Blockchain and
22    cryptocurrency analysis space?
23    A.  Since 2019.
24    Q.  And how long have you been involved in cybersecurity and
25    other cyber crime issues?
```

O4FMEIS3                        Sheridan - Direct

1   A.  Since 1997, when I started my federal career.

2   Q.  Can you give me a sense of the type of clients you assist

3   at FTI.

4   A.  It runs the spectrum.  In the investigative missions that

5   we have, we do track and trace for both plaintiffs and

6   defendants of victims of fraud, theft, scam, and abuse, as well

7   as entities, whether it's exchanges or other participants in

8   the digital asset industry who are issuers or accused of not

9   protecting those who have suffered fraud theft, scam, or abuse.

10  We also do valuation through track and trace and price analysis

11  of cryptocurrency assets.  That often comes into play for

12  securities determinations as to whether or not an individual

13  token violates securities laws.

14  Q.  Thank you.

15          You kept mentioning that you do track and trace.  Can

16  you just explain to the jury what that means.

17  A.  Track and trace refers to identifying a digital asset or

18  cryptocurrency on a specific Blockchain, tracking its movement,

19  its flow of funds, and how it moves from individual owner to

20  individual owner.

21  Q.  I would like to take a step back to go to your education.

22          What's your highest level of education?

23  A.  I have a master's degree in public administration.

24  Q.  Where is that from?

25  A.  University of Arizona.

O4FMEIS3                           Sheridan - Direct

1    Q.  Do you have an underlying bachelor's degree?

2    A.  I have a bachelor's degree in criminal justice from

3    University of Arizona.

4    Q.  What was your first position in your career after you

5    received your MPA?

6    A.  I was a secret service agent for the U.S. Secret Service.

7    Q.  What did you do as a secret service agent?

8    A.  As most people know, we are known for our protective

9    mission, but we also have an investigative function where we

10   investigate financial crimes and protect payment systems.  So

11   throughout an agent's career they will phase in and out of

12   those two different respective mission sets.

13             My first assignment was in Arizona conducting criminal

14   investigations related to financial crimes.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O4FCeis4                        Sheridan - Direct

1   BY MS. MARTABANO:

2   Q.  And after you did those criminal investigations, how long

3   were you in that particular position?

4   A.  Approximately four years.

5   Q.  And after those four years, where did you move in the

6   Secret Service?

7   A.  I was on President Bush's protective detail in the

8   Presidential Protective Division.

9   Q.  How long were you in that position?

10  A.  About four years.

11  Q.  Were you doing investigation at the same time then or were

12  you strictly --

13  A.  Strictly protection.

14  Q.  After those four years, what was your next position with

15  the Secret Service?

16  A.  I was in an administrative role in headquarters.

17  Q.  What were you doing in that role?

18  A.  It was an HR function.

19  Q.  And after that?

20  A.  I was assigned to President Obama's detail, again, under

21  the Presidential Protective Division, this time as a

22  supervisor.

23  Q.  How many people did you oversee?

24  A.  Approximately 22.

25  Q.  After you were done supervising for president Obama, what

1  was your next position with the secret self?

2  A.  Bounced back into the investigative role as a supervisor

3  within the Los Angeles field office.

4  Q.  What kind of investigative cases were you looking into?

5  A.  So, those that are under our statute requirement, again,

6  financial payment systems, counterfeiting, credit card fraud,

7  as well as protective cases, protective intelligence threats

8  against people we protect.

9  Q.  I see.  So threats against the president?

10  A.  Yes, ma'am.

11  Q.  How long were you in the LA position?

12  A.  Approximately three years.

13  Q.  And after that, what position did you move to?

14  A.  Back to protection.  I was on then Vice President Joe

15  Biden's detail as a supervisor.

16  Q.  How long were you in that position?

17  A.  Approximately two years until the transition of

18  administrations to the Trump Administration.  I then assumed

19  the Special Agent in Charge position of Vice President Mike

20  Pence detail because I was on the vice president's detail.

21  Q.  After that, what was your next position?

22  A.  So then I went back into the investigations.  I was the

23  Deputy Assistant Director within the Office of Investigations

24  right oversight of a portfolio of offices, approximately 20

25  offices covering the northeast region and mid-north region of

O4FCeis4                      Sheridan - Direct

1   the country, overseeing their criminal investigative

2   operations.

3   Q.  Were you doing any cryptocurrency or blockchain work at

4   that time?

5   A.  So that was around 2019 when I started the cryptocurrency

6   work, overseeing cryptocurrency investigations conducted by

7   field personnel, field agents within my portfolio of offices.

8   Q.  How long were you in that position?

9   A.  I was in that position for two years.

10  Q.  And after that?

11  A.  I was the assistant director for training positions and

12  legislative affairs positions.

13  Q.  And what do you do as the training director of legislative

14  affairs?

15  A.  Interact with congressional members for initiatives related

16  to the Secret Service.

17  Q.  Can you give me an example?

18  A.  One of the major issues we did was an overtime salary

19  determination for our uniformed personnel.  So I advocated for

20  that bill to be included in the legislative agenda and

21  advocated for its passage.

22  Q.  Were you working directly with members of Congress or the

23  Senate?

24  A.  That's correct.

25  Q.  What was your position after that?

O4FCeis4                        Sheridan - Direct

1    A.   Became the assistant director for the Office of

2    Investigation for the Global Secret Service Investigative

3    Mission.

4    Q.   Please tell us what that entails.

5    A.   So that entails, similar to the Deputy Assistant Director,

6    I had oversight of a specific section of the United States.

7    The Assistant Director has oversight for the Global

8    Investigative Mission for all offices throughout the world.

9    That includes strategy operations, as well as administrative

10   budgetary and other work as it relates to investigations.   It

11   involves oversight of all criminal investigations.

12   Q.   And can you tell me what cryptocurrency or blockchain

13   experience you had in that role.

14   A.   Because cryptocurrency and digital assets had become the

15   payment method and means for illicit activity predominantly in

16   areas of concern related to ransomware and other network

17   intrusion-type cases which we handle, I became involved in

18   oversight of those investigations, judicial action related

19   to -- and judicial action related to those investigations.

20   Q.   At that time, did the Secret Service have any kind of task

21   force or dedicated team working on cryptocurrency and

22   blockchain investigations?

23   A.   No, not dedicated.   And that was one thing I did in my

24   position, was to establish the agency's first dedicated illicit

25   finance and digital asset tracing team within our headquarters.

1    Somewhat of a cheesy name, we called it the Crypto Knights.

2    It's bad.  So I developed the strategy, the funding, the

3    staffing, the training, and the operational agenda for that

4    team.

5    Q.  And were you involved in the training that you developed

6    for the team?

7    A.  I did not deliver the training, but I received the training

8    as a vetting and applicability determination, and then approved

9    that training for our personnel.

10   Q.  And how many crypto or blockchain investigations did you

11   partake in either as a supervisor or directly in that role?

12   A.  The investigations I was involved in were in a supervisory

13   position.  I didn't quantify them.  I would say there were,

14   directly that rose to my level because of where I was at a

15   supervisor level, I would say in the two years I was there,

16   probably 15 to 20 a year.

17   Q.  Can you tell us what your final position was at the Secret

18   Service?

19   A.  I retired as the Assistant Director.

20   Q.  When was that?

21   A.  I retired in 2021.

22   Q.  In your capacity as a Secret Service agent, did you ever

23   testify before Congress?

24   A.  I testified before Congress on three separate occasions.

25   Q.  Can you tell me about those?

O4FCeis4                    Sheridan - Direct

1   A.  Twice in front of the House of Representatives and once in
2   front of the U.S. Senate.
3   Q.  If you could tell me about the first time you testified for
4   the House of Representatives.
5   A.  So the first time was related to the use of cryptocurrency
6   in financing terrorism.
7   Q.  And when was that?
8   A.  That would have been in 2021.
9   Q.  And what was your next time testifying in front of Congress
10  and what was it about?
11  A.  Next time was also House of Representatives.  This one was
12  focused on ransomware and the use of cryptocurrency to
13  facilitate ransomware activities.
14  Q.  And were they hiring you as an expert witness or just fact
15  witness, kind of asking you questions about how things are
16  done?
17  A.  It's designated as expert testimony.
18  Q.  If you know, could they pick from anyone they wanted in the
19  federal government, or out, to come in and testify before
20  Congress?
21  A.  Yes, ma'am.
22  Q.  How do you know that?
23  A.  As displayed by all other expert witnesses they use, it
24  runs the spectrum of public and private sector participants.
25  Q.  And I believe you got one more to cover your testimony in

1    the Senate.  What was that about?

2    A.  That was also related to cryptocurrency and its use in

3    ransomware activities.

4    Q.  Approximately when was that?

5    A.  Also in '21.

6    Q.  You're no longer with the Secret Service, but do you still

7    work with lawmakers in their capacity and in your capacity as

8    an expert in crypto?

9    A.  Yes, ma'am.  I meet regularly with congressional staff, as

10   well as less frequently congressional members themselves

11   related to cryptocurrency regulatory and legislative

12   considerations.

13   Q.  Could you explain a little bit more about those regulatory

14   and legislative communications.

15            MR. BURNETT:  Objection.

16            THE COURT:  It's overruled.

17   A.  One of the biggest challenges facing the cryptocurrency

18   industry, it's almost become a cliché at this point, is the

19   concern for regulatory clarity.  What that means is --

20            MR. BURNETT:  Objection.  Move to strike.

21            THE COURT:  That motion is granted.  The witness's

22   last answer will be stricken.

23            Ms. Martabano, you may proceed.

24            MS. MARTABANO:  Thank you, your Honor.

25   Q.  After your nearly 25 years at the Secret Service, what was

O4FCeis4                          Sheridan - Direct

1   your next job?

2   A.  After I retired, I worked for a private cryptocurrency

3   company, a crypto custodian which held crypto assets called

4   PrimeTrust.

5   Q.  And what did you do there?

6   A.  I was the vice president of regulatory affairs.

7   Q.  And as the vice president of regulatory affairs, what were

8   some of your job duties?

9   A.  My job was to communicate externally from the company to

10  legislators, regulators, law enforcement entities about what

11  the company was doing to comply and operate within regulatory

12  and legislative frameworks.

13  Q.  So at that time, you weren't personally doing any kind of

14  blockchain analytics or tracing?

15  A.  No.

16  Q.  Why did you leave the company?

17  A.  The company was facing significant financial difficulties.

18  The "why" was almost concurrent that FTI contacted me from a

19  recruiting standpoint to be -- however, I was going to be laid

20  off as part of our financial difficulties because we were

21  reducing the number of force.  So it was literally the same

22  week.  I left because FTI called, but we were also reducing the

23  personnel.

24  Q.  Is PrimeTrust still in business?

25  A.  No, ma'am.

O4FCeis4                        Sheridan - Direct

1    Q.  What happened?

2    A.  So another cliché in crypto is, "Not your keys, not your

3    crypto," which means if you don't have the private key to

4    access a cryptocurrency wallet, that cryptocurrency contained

5    within that wallet is impossible to retrieve.  We had a very,

6    very high dollar value asset in cryptocurrency contained within

7    a wallet that we could not access.  And quite literally

8    overnight, that wallet went from an asset to a liability and we

9    did not have the funds to absorb that liability.

10   Q.  What, if anything, was your involvement in maintaining

11   those keys or the loss thereof?

12   A.  I had no involvement in the custody or financial

13   maintenance of those wallets.

14   Q.  And PrimeTrust, you went to FTI, I believe you just

15   mentioned?

16   A.  Yes, ma'am.

17   Q.  I apologize, but I'm going to take you through a bunch of

18   your certifications that relate to blockchain and

19   cryptocurrency.  If you can tell me what certifications you

20   have that relate to the blockchain and cryptocurrency space.

21   A.  Yes, ma'am.  Three certifications from the Blockchain

22   Council as a blockchain expert, cryptocurrency auditor,

23   cryptocurrency expert.  I have two forensic tool

24   certifications.  What these are, it's a proprietary tool by a

25   company called Chainalysis that allows you to search

O4FCeis4                         Sheridan - Direct

1  cryptocurrency transactions on the blockchain.  There are tools

2  called Reactor, I have the Chainalysis Reactor certification,

3  as well as a higher designation called the Chainalysis

4  Investigative Specialist Certification.  I also have -- those

5  are specific to more technical aspects in terms of the policy

6  and other considerations related to the blockchain.  I have a

7  blockchain for business certificate from Columbia University

8  Executive Education.

9  Q.  And are you a certified smart contract auditor?

10 A.  I am.

11 Q.  And who certified you in that?

12 A.  Also the Blockchain Council.

13 Q.  What does that entail?

14 A.  So that entails reviewing smart contracts to understand

15 underlying code and be able to evaluate the code for functional

16 purposes.

17 Q.  How long does it take to get that certification?

18 A.  I believe the course is around 16 hours, and there's a

19 certification exam associated with it.

20 Q.  Do you have any other certifications related to security or

21 leadership so it's not strictly crypto, but others from your

22 investigative history?

23 A.  So I have two other cybersecurity certifications, one from

24 Carnegie Mellon University, which is the Chief Information

25 Security Officer certificate.  I have the Certified Security

```
 1   Information Manager from the Information Systems Audit and
 2   Control Association, and I have two certifications from the
 3   General Information Insurance Certificate Program related to
 4   strategic leadership policy and cybersecurity considerations.
 5   Q.  I think I've covered anything, but anything I forgot?
 6   A.  No, ma'am.
 7   Q.  Do you give speeches about crypto?
 8   A.  Yes, ma'am.
 9   Q.  Can you give us a general sense of some of those.
10   A.  Both at industry conferences as well as professional
11   conferences.  Some examples of the industry conferences are the
12   digital asset summit here in New York, as well as it's called
13   Money 2020.  It's an industry trade show for the cryptocurrency
14   industry.  It happens annually in Las Vegas.  The professional
15   conferences I've spoken at include the International
16   Association for Financial Crimes Investigators, as well as the
17   Cambridge Symposium on Economic Crime in London.
18   Q.  And have you done any media appearances or do you have any
19   publications related to the blockchain or Cryptospace?
20   A.  Yes, ma'am.  I've been interviewed on CoinDesk TV.  On two
21   occasions, I have written several blogs and industry white
22   papers related to the industry.
23   Q.  Can you tell us what CoinDesk TV is.
24   A.  It is a dedicated cryptocurrency news outlet.
25   Q.  And have you written on the CFTC and any lawsuits against
```

O4FCeis4                        Sheridan - Direct

1  DAOs?

2  A.  I was interviewed for an article on that subject.

3  Q.  Why do you do all this cryptocurrency work?

4  A.  I have a personal fulfillment from working in the industry,

5  I think the industry is going to be transformative in many

6  ways, I think the technology is going to be transformative in

7  many ways, I think it will revolutionize finance in many ways,

8  and I find great satisfaction to be a part of that type of

9  advancement in technology.

10 Q.  Do you own any cryptocurrency personally?

11 A.  Yes, ma'am.

12 Q.  What tokens generally, not quantities, but which tokens do

13 you own?

14 A.  I have Bitcoin, Ethereum, Solana, USDC, and MANA.

15 Q.  So you have personal experience with trading all of those?

16 A.  Yes, ma'am.

17 Q.  And the last thing I'd like to cover before we get into the

18 substance here, have you ever given prior expert testimony

19 either in trial or at depositions?

20 A.  Yes, ma'am.

21 Q.  And can you tell me about that.

22 A.  I testified in the FTX bankruptcy case and I provided

23 deposition in a criminal case, the United States Securities and

24 Exchange Commission v. Putnam.

25 Q.  And you were qualified and proffered as an expert in those

1     cases?

2     A.  Yes, ma'am.

3             MS. MARTABANO:  At this time, the defense moves to

4     qualify Mr. Sheridan as an expert.

5             MR. BURNETT:  Your Honor, the government preserves its

6     continuing objection.

7             THE COURT:  Subject to those objections, the witness

8     will be qualified under Rule 702.

9             MS. MARTABANO:  Thank you, your Honor.

10    Q.  Mr. Sheridan, what did you do to prepare --

11            THE COURT:  Hold on.  Since we're at now past 12:00,

12    is this a good breaking point for us?

13            MS. MARTABANO:  Yes, your Honor.

14            THE COURT:  Let's take a break.  Let's come back at

15    12:40.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Mr. Sheridan, you will continue to be

3    under oath.  You understand you're not to speak to anyone about

4    this case or your testimony, including anyone on the defense

5    side?

6           THE WITNESS:  Yes, sir.

7           THE COURT:  With that, have a nice short lunch and

8    we'll see you back here at 12:40.

9           THE WITNESS:  Yes, sir.

10          (Witness not present)

11          THE COURT:  Anything further to take up before we come

12   back?

13          MR. DAVIS:  Yes, your Honor.  One matter.  We

14   understand this might be the defense's last witness.  And so,

15   if now's a good time, we think the Court should allocute the

16   defendant on his absolute right to testify and the defense

17   should make a decision on about whether that's going to happen.

18          THE COURT:  Mr. Talkin, is that correct, that this is

19   your last proposed witness?

20          MR. TALKIN:  Yes, it is, your Honor.

21          As far as the defendant testifying, we had informed

22   the government over the weekend that our intention is that he

23   will not testify and he's ready to be allocuted on that.

24          After I informed the government of that, something

25   came up where it wasn't -- I don't believe that changed the

1   position, but it wasn't as solid as when I had spoken to him

2   about that, and I think that's the situation that we're in now.

3   I think Mr. Eisenberg wants to see how this witness plays out

4   before the final decision on that, but I can tell you that as

5   we sit here now, our intention is for him not to testify.

6          THE COURT:  Mr. Talkin, do you have any issues with my

7   inquiring of Mr. Eisenberg?

8          MR. TALKIN:  No.  Thank you, your Honor.

9          THE COURT:  Mr. Eisenberg, do you understand that you

10  have the right to testify in this case?

11         THE DEFENDANT:  Yes.

12         THE COURT:  And you understand that if you do not

13  testify, I will inform the jury that they are not to hold that

14  fact against you?

15         Do you understand that?

16         THE DEFENDANT:  Yes, your Honor.

17         THE COURT:  Do you believe you've had sufficient time

18  to discuss with your counsel the pros and cons of testifying?

19         THE DEFENDANT:  Yes, your Honor.

20         THE COURT:  Would you like to have further discussions

21  with counsel to finalize your decision on whether or not you

22  should testify in this case?

23         THE DEFENDANT:  I would like to have a discussion

24  after Mr. Sheridan finishes testifying.

25         THE COURT:  And Mr. Davis, is there any further

1   inquiry that you'd like me to make at this time?

2           MR. DAVIS:  No.  If the decision is not going to be

3   made, I think when the decision is made, we would just ask that

4   the Court confirm that this decision is absolutely his to make

5   and that he's making that decision completely on his own.  But

6   for now, this makes sense.

7           May I raise just one logistical question before we

8   continue?

9           THE COURT:  Yes.

10          MR. DAVIS:  If the defendant does intend to testify, I

11  think we had spoke to defense counsel about starting that

12  testimony on Tuesday, given that we were under the impression

13  that the defendant would not be testifying and I believe

14  counsel would also agree to that, but we wanted to put that to

15  the Court.

16          THE COURT:  I think that everyone will need some time

17  to prepare if Mr. Eisenberg testifies, so that proposal makes

18  sense.

19          So you should continue to speak with counsel, we'll

20  have time for you to do that after Mr. Sheridan's testimony and

21  during the break that we're about to have.  So you should do

22  that and make use of the time.

23          Anything else, Mr. Davis?

24          MR. DAVIS:  No.  Thank you, Judge.

25          THE COURT:  Anything else from the defense?

O4FCeis4                         Sheridan - Direct

 1                MR. TALKIN:  No.  Thank you, your Honor.

 2                THE COURT:  All right.  We'll see everyone here at

 3      12:40.

 4                (Luncheon recess)

 5                (Continued on next page)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    AFTERNOON SESSION

2    12:54 p.m.

3    THE COURT:  Anything to pick up before Mr. Sheridan

4    takes the stand?

5    MR. BURNETT:  Yes, your Honor.  We had a chance to go

6    back and look at the *voir dire* transcript, and there's just

7    kind of one rule I want to raise and kind of preview, it's

8    going to be a basis of what some of our objections are going to

9    be to him.

10    So I know the Court pointed out that one thing the

11    government was able to explore was the extent to which

12    Mr. Sheridan was relying on his own knowledge versus FTI's

13    knowledge.  I wanted to point the Court to Federal Rule of

14    Evidence 705, which says that while an expert does not, on

15    direct examination, have to produce or show the basis for the

16    data underlying their testimony, they are required to do that

17    if asked on cross examination.

18    And that's, I think, particularly important because

19    when there was a line of the *voir dire* when I was questioning

20    Mr. Sheridan about an important point, and I asked him if he

21    could see the borrows on the blockchain, and he said you could

22    see the transactions, they're not listed as borrows or

23    withdrawals, you can see the transactions.  And then I said,

24    okay, so you can't see what's a borrow and what's a withdraw.

25    And then he responded, so you can tell there's two functions

1    that will be listed within blockchain explorers.  It will list

2    a borrow as a 1 or a 0.  So you can tell when a function is not

3    a borrow by the 0 and you can tell when the function could be a

4    borrow by the 1.  I need to actually put the documents he's

5    talking about in front of him and ask him what's the 1 and

6    what's the 0 he's referring to, because I'm looking at

7    blockchain explorer data and I'm not seeing any ones and zeroes

8    in the stuff we're looking at.  If he's making this up, that's

9    a critical point we need to be able to cross examine him on.

10   If we don't have the data that he's talking about here as being

11   ones and zeros that shows borrows or not, I can't effectively

12   cross examine him, and I think 705 requires the disclosure of

13   that.

14            THE COURT:  Ms. Martabano, do you have a response?

15            MS. MARTABANO:  I don't know the specific piece of

16   code he is talking about.  I think it's perfectly fine for the

17   government to ask what blockchain data he's relying on.

18            MR. BURNETT:  I need the paper.

19            MS. MARTABANO:  I can't produce something I don't have

20   in front of me right here.

21            THE COURT:  Let me make sure I understand.  Are you

22   asking the Court for some relief now --

23            MR. BURNETT:  If I ask him what data he relied on, he

24   says I relied on like a transaction log from blockchain

25   explorer and I say where is that data and he says I don't have

O4FCeis4                         Sheridan - Direct

1    it, I'm going to move to exclude him.

2              THE COURT:  Okay.  I understand.

3              Ms. Martabano, you understand that -- to just put

4    these rules together.  Rule 16 requires the opinions and the

5    basis for these opinions.  There also needs to be a disclosure

6    of all the documents that Mr. Sheridan relied on.  So if he's

7    providing testimony and then referring to some set of

8    documents, he's going to have to be able to point to what those

9    documents are in a way that Mr. Burnett can conduct his cross

10   examination.

11             MS. MARTABANO:  Yes, your Honor.  I believe he would

12   be able to direct him online to where it is.  Obviously, the

13   blockchain is public.  Using the blockchain explorers is

14   public.  It's something you can do from your computer.  I'm

15   obviously not an expert, so I can't do it myself, but I don't

16   think that we're going to have a printout of the blockchain to

17   hand to Mr. Burnett.  I am sure we could get one, but I don't

18   think we're going to have it right now.  So I think we would

19   ask at the very least to be given a chance to provide that to

20   him tonight because we did disclose very clearly that we would

21   be relying on the public Discord, the public blockchain, the

22   public smart contracts, and the data provided by the government

23   in this case, which was, as the Court knows, quite voluminous.

24             THE COURT:  How long is your direct examination?

25             MS. MARTABANO:  Probably another 30 minutes.

1      MR. BURNETT:  Your Honor, basically what they're

2  saying is go find the internet.  That's not what cross

3  examination is.  If he looked at something, he clearly should

4  have printed it out or saved it.  That's what the rule requires

5  him to do.

6      THE COURT:  Ms. Martabano, I just don't understand how

7  you think this is permissible.  Maybe help me out with just how

8  this works, because if Mr. Sheridan engaged in essentially a

9  tracing exercise, using data from the blockchain or any other

10  source, then, under normal circumstances, he would be required

11  to furnish that underlying information in connection with his

12  testimony.  Am I missing something?  If that was done, there

13  should be no issue here because Mr. Burnett would know what

14  he's referring to and he could ask him questions based on those

15  underlying bases.  Was that not done here?  What's going on?

16      MS. MARTABANO:  He did not provide a report to us that

17  was based on that.  I think it was in part of his research, as

18  I mentioned — and I can't speak for him, but this is my

19  understanding — that he was on the blockchain doing blockchain

20  research and looking.  He didn't -- we didn't ask him to trace

21  a specific transaction that he could then turn and show us.  My

22  understanding is that what he was testifying to earlier was

23  that the way the Mango blockchain works is that there's code

24  that represents a 0 or a 1 when something is either

25  withdrawn -- it relates to a toggle that I believe there's

1    actually testimony about in the record, but I could be wrong.

2    When that toggle is on, it's a 1 because you can be borrowing.

3    When the toggle is off, nothing you pull out can be a borrow.

4            THE COURT:  I get that and I get what he's going to

5    testify to.  I think Mr. Burnett's position is how am I

6    supposed to cross examine him about that if I don't have those

7    materials that he is using as the basis for his opinion.

8    That's a fair argument.  Again, the Court has bent over

9    backwards to help the defense navigate these disclosure

10   failures, but I think Mr. Burnett is fairly saying, I can't say

11   anything to him that would undermine his opinion if I don't

12   know what he relied on.  The most that he's going to be able to

13   say is that Mr. Sheridan can't point to that underlying basis.

14           Mr. Burnett, am I missing something?

15           MR. BURNETT:  No, that's exactly right.  Obviously, we

16   also think he only knows about the zero-one thing not from his

17   expertise, but because someone told it to him.  Separately, I

18   need to know what's actually a zero and what's actually a one,

19   and where he's seeing it to cross him on it.

20           THE COURT:  So Ms. Martabano, do you have any sort of

21   authority that would permit Mr. Sheridan to testify without

22   disclosing the actual underlying factual basis of his opinion?

23   I think that's the question, is that he's going to offer

24   testimony not in any of his prior disclosures, for the first

25   time was in his disclosure that came out on Sunday, and even

1   then wasn't laid out with any of the specificity that would

2   have given the government fair notice.  That came out during

3   the examination today.  So under these circumstances, do you

4   have any authority for me?

5            MS. MARTABANO:  I don't, your Honor, beyond what was

6   already submitted to the Court last night.

7            THE COURT:  We'll hear the testimony, but I'll

8   understand, Mr. Burnett, when you make the motion.  You can say

9   "motion to exclude" and I'll understand what you're talking

10  about.  I think that's the fair way to deal with this.

11           MR. BURNETT:  Thank you, your Honor.

12           THE COURT:  If something else comes out through the

13  testimony, some different circumstance, then we can entertain

14  it.  Otherwise, I understand the government's position.

15           Anything else?

16           MR. BURNETT:  Not from the government.  Thank you.

17           THE COURT:  Ms. Martabano, anything else?

18           MS. MARTABANO:  No, your Honor.

19           THE COURT:  If not, let's bring Mr. Sheridan, put him

20  back on the stand.

21           (Witness present)

22           Mr. Hernandez, we can get the jury.

23           THE DEPUTY CLERK:  Yes, your Honor.

24           (Continued on next page)

25

O4FCeis4                          Sheridan – Direct

1          (Jury present)

2          THE COURT:  Mr. Sheridan, you understand you're still

3     under oath?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Ms. Martabano, you may proceed.

6          MS. MARTABANO:  Thank you, your Honor.

7     BY MS. MARTABANO:

8     Q.  Mr. Sheridan, just before the lunch break, we were getting

9     into how you prepared to testify for trial today in addition to

10    your general background and education on this.

11         In connection with this case, what have you done to

12    prepare for your testimony here today?

13    A.  I reviewed the indictment, I reviewed the expert

14    disclosures of the government witnesses, I reviewed the

15    materials made available through discovery by defense and the

16    government.

17    Q.  And have you been sitting in trial, listening to the

18    testimony as it was offered?

19    A.  Yes, ma'am.

20    Q.  What kind of things did you look at in the discovery the

21    government provided to the defense and then provided to you?

22    A.  I looked at the Mango Markets user guide, reviewed the

23    Mango Markets website, reviewed the exhibits that demonstrated

24    the individual accounts owned by Mr. Eisenberg, and the

25    activity associated with those accounts.

1   Q.  And have you looked at any of the exhibits that were

2   admitted in trial?

3   A.  Yes, ma'am.

4   Q.  Are there any other types of things that you've reviewed or

5   researched?

6   A.  I researched the Mango Markets version 3 website itself

7   just to see how it functioned and operated.

8   Q.  Can you tell me what you did in connection with that.

9   A.  Accessed the user interface that connects to the Mango

10  Markets protocol and just operated the system as a traditional

11  website to see how the functionality was displayed and what

12  prompts and actions would be taken by the user and response by

13  the website.

14  Q.  And what, if any, publicly available data did you review?

15  A.  I reviewed the news articles associated with the case, as

16  well as the Mango Markets website itself that has their

17  documentation and their organizational information on it.

18  Q.  Did you review any of the Mango Markets Discord or any of

19  its social media?

20  A.  The Mango Markets Discord, yes, ma'am.

21  Q.  Is that public?

22  A.  Yes, ma'am.

23  Q.  Did you review the Mango Markets GitHub?

24  A.  Yes, ma'am.

25  Q.  Can you tell me what GitHub is?

1   A.  GitHub is a public forum for code posting for a full

2   spectrum of entities, organizations, individuals.  It's meant

3   to be an information and sharing platform so that people can

4   test code, review codes, submit code for review by others, and

5   it is a way for organizations, such as Mango Markets, to

6   publish their code to the public.

7   Q.  And is it something that's visible to anyone?

8   A.  Yes, ma'am.

9   Q.  In Mango Markets' case?

10  A.  Yes, ma'am.

11          MS. MARTABANO:  I'm going to have Mr. Smith bring up

12  exhibit 118A that's already offered in evidence in this case.

13  Please show it to Mr. Sheridan first.

14  Q.  Mr. Sheridan, please take a look at this.

15          MS. MARTABANO:  Mr. Smith, now please publish this to

16  the jury.  Thank you.

17  Q.  Just have a very simple question for you based on this

18  exhibit.  Lines 6 through 11, they show the title Releases

19  Blockworks Foundation/Mango-v3, then they have different web

20  addresses on the column C under URL search.  Do you see that?

21  A.  Yes, ma'am.

22  Q.  Can you tell me, do those link to the GitHub for Mango

23  Markets that you were just referring to?

24  A.  The ones in column C, rows 6, 7, and 8 appear to.

25          MS. MARTABANO:  Mr. Smith, you can take that down.

1    Q.  Mr. Sheridan, have you ever looked at the Mango Markets

2    risk calculator?

3    A.  Yes, ma'am.

4    Q.  What is that?

5    A.  So Mango Markets offered a tool for potential traders to

6    enter trading input into what they call a risk calculator to

7    see the outputs of what their trading activities would be,

8    given the certain parameters of and specific parameters of a

9    specific trade.

10        MS. MARTABANO:  I'm going to show you what's been

11   admitted and marked as 117A.  And you can publish that to the

12   jury, as well, Mr. Smith.

13   Q.  You'll see there, I believe in line 13, it says, risk

14   calculator-Mango Markets.  Is that the website in column C

15   where you would find the risk calculator for Mango Markets?

16   A.  Yes, ma'am.

17        MS. MARTABANO:  You can take that down, Mr. Smith.

18   Q.  You had mentioned you're the director of the team at FTI

19   for I believe blockchain and crypto investigations.  Can you

20   explain how it is that you work with your team.  I believe you

21   said six people focused in particular in preparing for a case

22   such as this?

23   A.  Yes, ma'am.  I will direct their operations strategy

24   activities related to the circumstances and facts of the case

25   in order to identify the factual information, the evidentiary

1    information related to blockchain activities.  The blockchain

2    has immutable and permanent data.  So our role is to find that

3    data and provide it to the entity requesting it.  In this case,

4    defense counsel.

5    Q.  What do you mean when you say "immutable data on the

6    blockchain"?

7    A.  It is cryptographically encoded into a blockchain or

8    database or ledger so that it is permanent in record.

9    Q.  So the blockchain itself can't be changed.  Is that what

10   you mean?

11   A.  That is correct.

12   Q.  Can a smart contract be changed?

13   A.  Yes, ma'am.

14   Q.  Before we get to that in full, I know we talked about you

15   being certified as a smart contract auditor.  Can you read

16   computer code personally?

17   A.  I could read it from a functional perspective.  I'm not a

18   programmer, I am not a developer.  So my role in reviewing

19   computer code is to understand its operations, but not its

20   technical functionality as it relates to programming language.

21   Q.  And how did you come to that understanding, how did you

22   learn to read computer code?

23   A.  Through training and practice in cases such as this.

24   Q.  About how many years ago did you start learning to read

25   computer code?

1   A.  It was approximately 12 months ago.

2   Q.  And you mentioned you can't write computer code and you're

3   not a coder?

4   A.  That is correct.

5   Q.  I'd like to talk to you now about how much you're being

6   paid to be here today.

7        Are you being paid for your testimony today?

8   A.  I am paid my salary by FTI.

9   Q.  Is it a flat salary?

10  A.  Yes, ma'am.

11  Q.  So do you get the same salary whether you bill one hour to

12  this case or 500 hours to this case?

13  A.  Yes, ma'am.

14  Q.  And the same salary regardless of the substance of your

15  testimony here today?

16  A.  Yes, ma'am.

17  Q.  Same salary regarding the outcome of your testimony today?

18  A.  Yes, ma'am.

19  Q.  Do you know how much FTI is billing the defense for your

20  time?

21  A.  $910 an hour.

22  Q.  Does FTI get paid more based on the substance of your

23  testimony?

24  A.  No, ma'am.

25  Q.  Does FTI or you get paid more based on the results in this

O4FCeis4                          Sheridan - Direct

1    case?

2    A.  No, ma'am.

3    Q.  I'd like to turn -- I believe you had some interaction with

4    Mr. Eisenberg.  Want to get into that a little bit.

5            Do you know Mr. Eisenberg personally?

6    A.  No, ma'am.

7    Q.  Have you ever spoken with him?

8    A.  Yes, ma'am.

9    Q.  When was the first time you spoke with him?

10   A.  Wednesday of last week.

11   Q.  And what did you discuss?

12           MR. BURNETT:  Objection.  Sidebar, your Honor.

13           THE COURT:  Yes, sidebar.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O4FCeis4                    Sheridan - Direct

1          (At the sidebar)

2          THE COURT:  I literally asked the question whether you

3    were going to elicit any discussions with Mr. Eisenberg and the

4    response was that you were not.

5          MS. MARTABANO:  It's just because we thought the

6    government planned to question him further about it, so we were

7    just -- if they're not going to question him about it, we're

8    happy to walk away from it.

9          THE COURT:  I don't know how you could come away with

10   that impression of the conversation.  Literally, we're in the

11   process of having a *voir dire* where the purpose was if you were

12   going to rely on those discussions, then everyone would have a

13   chance to inquire what those were.

14         MS. MARTABANO:  No, he's not relying on them.  It was

15   just to relay what we recommend to the Court.

16         THE COURT:  So, thank you for clarifying.  You do not,

17   you should not, and you may not inquire at this stage into

18   those discussions, because it's my understanding that he is not

19   relying on his conversations.

20         MS. MARTABANO:  He's not.

21         THE COURT:  He should not be testifying about those

22   discussions.

23         Anything further?

24         MR. BURNETT:  No.

25         THE COURT:  Okay.

1    (In open court)

2    BY MS. MARTABANO:

3    Q.  Mr. Sheridan, I'd like to talk to you about some background

4    on the blockchain in general.  You've heard a lot about it in

5    this case.

6         Do you know what Solana is?

7    A.  Yes, ma'am.

8    Q.  What is it?

9    A.  It is a publicly available blockchain that is, as with all

10   blockchains, an immutable ledger to record transactions.

11   Q.  Again, what do you mean by immutable ledger?

12   A.  So, blockchain technology, by its essence, is based in

13   cryptography that cannot be altered once it is recorded to the

14   ledger.

15   Q.  And is Solana similar to Bitcoin or Ether?

16   A.  So it's similar to the Bitcoin and Ethereum blockchains in

17   that they are all blockchains.  It has different functionality,

18   capabilities, and requirements.  Most notably, it is touted to

19   be faster in processing speed and cheaper in terms of cost of

20   transactions that are conducted on the blockchain.

21   Q.  How is that able to be the case?

22   A.  The way the blockchain is constructed, Solana blockchain is

23   constructed, there are several functions of the blockchain

24   code.  Specifically, it conducts simultaneous smart contract

25   processing activities so that they occur in concert with each

1   other as opposed to, for example, the Ethereum blockchain does

2   them sequentially.  It also has more redundant features built

3   into it so that the notes that validate the transactions, if

4   one were to fail, the others would operate without

5   interruption.  It breaks down information packets that are

6   processed on the blockchain into smaller quantity of data,

7   which, again, makes it faster.  It also has a -- there's

8   something called a mem pool or a memory pool in which, in other

9   blockchains, most notably Bitcoin, the transactions to be

10  validated wait in a pool for a validator to pick them up and

11  validate them.  The Solana blockchain does not have that

12  waiting time.  It sends the validations to validators ahead of

13  that waiting period.  And at its core, the consensus mechanism

14  for the Solana consensus is the way a transaction is validated

15  by all of those participating in the blockchain.  Bitcoin uses

16  a proof of work consensus mechanism.  Ethereum uses proof of

17  stake.  Solana uses a combination of proof of stake and proof

18  of history, and that proof of history allows the transactions

19  to move more quickly on the blockchain.

20  Q.  Okay.  I've got a few followup questions from that.

21          You mentioned it has more redundant features, it

22  breaks down packets to smaller size.  I just want to make sure,

23  when you said "it" there, you were talking about the Solana

24  blockchain as opposed to any others?

25  A.  Yes.

1  Q.  And when you mentioned "validation in the consensus

2  mechanism," what do you mean by "validation" or "validating

3  transactions"?

4  A.  So, all blockchains are recording data to the ledger.  That

5  data has to be confirmed and validated.  Different blockchains

6  use different methodologies in order to confirm that data to

7  ensure that the data is accurate.  That, for example, in the

8  case of financial transactions involving cryptocurrency and

9  individual cryptocurrency, cryptographic hash representing that

10 cryptocurrency isn't spent twice.  So, a spend or a financial

11 transaction has to be confirmed in that validation process.

12 Q.  And you mentioned consensus mechanisms.  Could you just

13 give us a little more detail about what that means.

14 A.  So the blockchain is a distributed ledger, which means

15 there are many entities involved.  It's not one central entity,

16 it's not one person or entity that has control over the

17 blockchain and the validating the data, that is done by all

18 participants on the blockchain in an open and transparent way.

19 So, to achieve consensus or agreement about that particular

20 transaction requires different methods to do that.

21 Q.  Do you know when the Solana blockchain was launched,

22 approximately?

23 A.  It was 2020.

24 Q.  Is that newer or older than Bitcoin or Ethereum?

25 A.  It is newer.

O4FCeis4                    Sheridan - Direct

1   Q.  If you know, when was Bitcoin launched?

2   A.  The white paper was 2009.

3   Q.  Do you have experience with blockchains or exchanges that

4   allow the trading of products called perpetuals?

5   A.  Yes, ma'am.

6   Q.  Tell me about that experience.

7   A.  As part of my investigative duties with FTI, we handle

8   cases to identify funds, track funds, trace funds, provide

9   valuation, determine attribution for individual account holders

10  and associated amounts, and tracking those funds, tracking

11  those cryptocurrency assets or digital assets, as well as

12  assigning attributions who hold those assets or transfer or

13  receive those funds requires analysis that moves into

14  decentralized exchanges that operate with perpetual options for

15  them to trade in.

16  Q.  What's a decentralized exchange?

17  A.  A decentralized exchange is one that has no central entity

18  controlling, approving, managing activities.

19  Q.  For the perpetuals, are those positions that, I think you

20  said, involved leverage?

21  A.  I did not say leverage, but leverage is an option in

22  several decentralized exchange trading platforms.

23  Q.  Can you explain what that means.

24  A.  Leverage is a way to amplify your position in a perpetual.

25  A position in a perpetual is risk exposure to an asset payer

O4FCeis4                          Sheridan - Direct

1   and the relative price movement of an underlying asset to its

2   partner asset.  So if you are going to leverage a trade, you

3   can increase how much profit you earn.  If that price movement

4   moves in the positive, but it also increases your risk and

5   increases the amount you can lose if the price movement goes in

6   the other direction against your position.

7   Q.  And can a smart contract decide what levels of leverage it

8   will allow to be used in its perpetuals?

9   A.  Yes, ma'am.

10  Q.  How does that happen?

11  A.  It is written into the smart contract code.

12  Q.  So it could, for example, say maximum 2 leverage as opposed

13  to maximum 3 times leverage?

14  A.  Yes, ma'am.

15  Q.  Is it possible to code a smart contract so that it limits

16  the maximum transaction size for any given transaction?

17  A.  Yes, ma'am.

18  Q.  And how would that work, if there was a transaction limit

19  of let's say $100 and I entered into the contract that I wanted

20  a perpetual for $200, what would happen?

21  A.  The transaction would not be executed by the code.

22  Q.  Do you know what Mango Markets is?

23  A.  Yes, ma'am.

24  Q.  Does it run on Solana?

25  A.  Yes, ma'am.

1    Q.  What is Mango Markets, as you understand it?

2    A.  It is a decentralized exchange trading platform that

3    operates on the Solana blockchain.

4    Q.  And is it a smart contract or is it something else?

5    A.  It is a smart contract application that runs on top of the

6    Solana blockchain.

7    Q.  And in terms of blockchains, what does a smart contract do

8    or what does it mean?  What is it?

9    A.  It executes the instructions that you program into the

10   contract.

11   Q.  Can you give us a little more detail?

12   A.  So, in the example of Mango Markets, the smart contract is

13   designed to provide opportunities to swap cryptocurrencies,

14   borrow cryptocurrencies, lend cryptocurrencies, open positions

15   in a perpetual futures contract, and so forth.

16   Q.  Is it automated?

17   A.  Yes, ma'am, the smart contract is automated.

18   Q.  In what way?

19   A.  Smart contracts are base of instructions that execute those

20   instructions that are programmed into the smart contract and

21   there are no ways to alter that in a discretionary sense once

22   the inputs to the smart contract are entered.

23   Q.  Have you heard the term self-enforcing?

24   A.  Yes, ma'am.

25   Q.  What does that mean to you?

1   A.  So, as it relates to smart contracts, they are a

2   self-enforcing and autonomous computer program that deliver the

3   outputs of any input that is put into them based on the

4   requirements of the smart contract.

5   Q.  Is the Mango Markets smart contract publicly available?

6   A.  Yes, ma'am.

7   Q.  How can someone view it or access it publicly?

8   A.  That would be on the GitHub links that we discussed

9   earlier.

10  Q.  Can you tell me what "permission list" means?

11  A.  As it relates to cryptocurrency, "permission list" means

12  there are no requirements for use.  Anyone can use it as long

13  as they can access the individual protocol or blockchain that

14  is being accessed.

15  Q.  You mentioned that Mango Markets is a smart contract based

16  decentralized exchange.  Is a perpetual, as that term is used

17  on Mango Markets, its own smart contract?

18  A.  Yes, ma'am.

19  Q.  What does that mean?

20  A.  So that means the trade that is entered into, the position

21  that is entered into with the perpetual smart contract is

22  executed by the parameters of the smart contract code for the

23  protocol.

24  Q.  So there's the main protocol smart contract and then my

25  trade, in and of itself, is a separate executing smart

O4FCeis4                    Sheridan - Direct

1   contract?

2   A.  It can be considered that based on the cryptography

3   involved in creating the individual trade.

4   Q.  Is there a better way to describe it?  I'm not the expert.

5   A.  I would call it -- I would call it a contract that's based

6   on the smart contract code in the cryptographic hash of the

7   individual transaction.

8   Q.  And tell me if it's true or not.  So you have a perpetual,

9   each individual's position is sort of its own subcontract.  Can

10  the terms of those, as far as the smart contract code, be

11  changed?  If I wanted to set up two different perpetuals, would

12  the same contract code control, but my inputs would make it

13  have different outputs?

14          MR. BURNETT:  Objection.  Form.

15          THE COURT:  I think you need to rephrase.

16  Q.  I'm trying to drill down sort of the distinction between

17  the two smart contracts and whether a perpetual always has the

18  same base code --

19          MR. BURNETT:  Objection.  Testifying.

20  Q.  And I'm just going to ask you:  Does the perpetual for any

21  given person have the same underlying code?

22          THE COURT:  The objection, let's resolve that first.

23  The objection is sustained.

24          Why don't you ask a new question, Ms. Martabano.

25          MS. MARTABANO:  Yes, your Honor.

O4FCeis4                    Sheridan – Direct

1  Q.  How can you access the Mango Markets smart contracts?

2  A.  Through the user interface or through direct code into the

3  blockchain itself.

4  Q.  What is a user interface?

5  A.  Basically a website.

6  Q.  Can a user interface be part of the blockchain or is it

7  always centralized?

8  A.  The user interface is centralized, it's not part of the

9  blockchain, it's how you access the blockchain.

10  Q.  Did Mango Markets have its own user interface?

11  A.  Yes, ma'am.

12  Q.  To your knowledge, was the main user interface available to

13  the public?

14  A.  Yes, ma'am.

15  Q.  And in your experience in all the investigations that

16  you've done with cryptocurrency and blockchains, how do the

17  majority of users interact with blockchains, via the user

18  interface or the more technical way you mentioned earlier?

19  A.  By the user interface.

20  Q.  Getting back to Mango Markets, what's the difference

21  between a decentralized exchange, which I believe you described

22  it as, and a centralized exchange?

23  A.  A decentralized exchange does not have one central entity

24  that controls it.  It is run by the smart contracts that are

25  established for the protocol and the instructions put within

O4FCeis4                          Sheridan - Direct

1   those smart contracts.  A centralized exchange has a central
2   entity that controls everything related to the transactions
3   that utilize that exchange.
4   Q.  Would a centralized exchange have a more traditional
5   corporate structure?
6   A.  Yes.
7           MR. BURNETT:  Objection.
8           THE COURT:  Overruled.
9   A.  Yes, ma'am.
10          THE COURT:  Mr. Sheridan, if there's an objection,
11  just stop and then we'll resolve the objection and you can
12  continue.
13          THE WITNESS:  Yes, sir.
14  Q.  And did Mango Markets have a central corporate entity
15  running its exchange?
16  A.  Yes, ma'am.
17  Q.  What was that?
18  A.  I'm sorry.  Can you repeat the question.  I was --
19  Q.  Sure.  You had mentioned a centralized exchange often has a
20  centralized entity running it.  Does Mango Markets, as a
21  decentralized exchange, have a corporate entity running it?
22  A.  I apologize.  No, it does not.
23  Q.  To your knowledge, does the Mango Markets protocol have a
24  CEO or a president?
25  A.  No, it does not.

O4FMEIS5                              Sheridan - Direct

1   Q.  And does it have brokers or branch agents that you could

2   meet with or interact with?

3   A.  No, it does not.

4   Q.  I'd like to talk to you about how someone sets up an

5   account on Mango Markets.  Would you explain how someone would

6   go about doing that?

7   A.  Yes, ma'am.  The most common way is through the user

8   interface, the Mango Markets website as we have described.  You

9   have to create an account profile through that website, you

10  have to connect a cryptocurrency wallet to that profile, and

11  you have to deposit a minimum amount of cryptocurrency assets

12  into the account.

13  Q.  You mention creating an account profile.  What kind of

14  information is collected for the account profile?

15  A.  Basically, a user name that the individual user creates.

16  Q.  Is there any description of what kind of name it has to be?

17  A.  No.

18  Q.  Does it have to be tied to your actual identity?

19  A.  No.

20  Q.  And is there any other information in that?  So there is a

21  user name, any other pieces of information?

22  A.  No, no.

23  Q.  I think that you mentioned that you have to deposit money

24  from your Solana wallet?

25  A.  Yes, ma'am.

1  Q.  What is a wallet on a Blockchain?

2  A.  So a wallet is where your cryptocurrency assets are located

3  on the Blockchain.  It consists, usually, of a public key and a

4  private key.  Your private key is what allows you to access

5  those funds or the location of those funds on the Blockchain.

6  Q.  When you connect that Solana wallet, is that the wallet

7  you're actually using or does another wallet get created?

8  A.  So that's the wallet you use to fund the account, but once

9  you fund the account, a separate account is created.

10  Q.  And what would you refer to that as, a Mango Markets

11  wallet?

12  A.  It's generally referred to as the Mango Markets account.

13  Q.  I know we said the account profile only has those two

14  pieces.  Based on your review of the publicly available data,

15  your research in this case, and the code as you understand it,

16  does Mango collect any other information when a person creates

17  that account?

18  A.  No, ma'am.

19  Q.  For the user interface does it collect any data that the

20  smart contract itself doesn't?  So if I were interacting with

21  the API versus the user interface, is there a difference in the

22  data that's collected?

23  A.  The user interface will collect and identify IP address to

24  identify the location of or the geolocation of where the

25  individual is accessing the interface from.  But absent that,

O4FMEIS5                          Sheridan - Direct

1   there is no other information.

2   Q.  Directing you to version 3 of the protocol and of the

3   interface that would have interacted with that, did that

4   collect the IP information as well?

5   A.  Yes, ma'am.

6   Q.  Do you know what geoblocking is?

7   A.  Yes, ma'am.

8   Q.  What is it?

9   A.  It is a way in which a website or access point can prevent

10  access based on the geographic location of where the IP address

11  is registered.

12  Q.  Do you know whether Mango's user interface for version 3

13  had geoblocking in place?

14  A.  It did.

15  Q.  How do you know that?

16  A.  Based on research of materials and information in

17  experimenting with the Mango Markets website.

18  Q.  I think you already said this, but does the smart contract

19  collect your IP data if you interact with it directly on the

20  API?

21  A.  It does not.

22  Q.  Returning to account creation, does a person creating an

23  account have to speak to anyone?

24  A.  No.

25  Q.  Do they have to sign any documents?

1    A.  No.

2    Q.  In terms of the user interface that we were just talking

3    about, based on your understanding of smart contracts and your

4    experience with them and Blockchains in general, is it

5    possible, as I think you described here, that a user interface

6    may collect more data from a user than the smart contract

7    itself if you went through the API?

8    A.  That is possible.

9    Q.  And here you mentioned that the Mango UI collects IP data,

10   which the smart contract doesn't?

11   A.  That is correct.

12   Q.  Does the Mango UI collect any other data that the smart

13   contract doesn't?

14   A.  No, ma'am.

15   Q.  Last one on what it collects.  Do you know whether it

16   requires you to sign any kind of loan document or documentation

17   about what you are going to be doing with your money once

18   you've -- once you create your account and deposit it on the

19   protocol?

20           MR. BURNETT:  Objection.

21           THE COURT:  Overruled.

22   A.  It does not.

23   Q.  When was Mango Markets launched?

24   A.  Version 1 was launched in February of 2021.

25   Q.  And how many versions have there been total?

1   A.  It is currently on version 4.

2   Q.  We have been talking about version 3 for the transactions

3   in this case.  Are you familiar with that version?

4   A.  Yes, ma'am.

5   Q.  How are you familiar with it?

6   A.  That was the focus of our investigation.

7   Q.  We had talked earlier about how Blockchains were immutable,

8   and you just mentioned that these smart contracts have multiple

9   versions.  Can you explain the difference between a Blockchain

10  and a smart contract and how you can have versions of the smart

11  contact?

12  A.  The Blockchains are the instructions for the application or

13  for the activities that are run on top of the Blockchain.  The

14  Blockchain is the ledger that records the data.  The smart

15  contracts are the instructions that provide the data to be

16  recorded.

17          So the different versions -- version 1 was offered

18  basic functions, borrowing and lending of a certain quantity of

19  cryptocurrency tokens.  Version 2 also had borrowing and

20  lending functions, but a higher number of cryptocurrency

21  tokens.  Version 3 introduced more advanced trading

22  opportunities, such as perpetual contracts and leverage.

23  Q.  How are these changes to the code made?  How do you get

24  from version 1 to version 2?

25  A.  In the case of Mango Markets, there is a decentralized

1   autonomous organization, a DAO, and that DAO is the collection

2   of all users on the Mango Markets protocol, and users can

3   propose changes to the smart contract for different functions

4   or different activities, and vote on those proposed changes.

5   If those proposed changes are accepted and approved, then they

6   are implemented.

7   Q.  And you mentioned all the users.  Do you need to have any

8   kind of token or register or do anything to vote in the DAO?

9   A.  Yes.  Your voting weight, how much vote your vote is given

10  credit is based on the number of tokens you hold and present as

11  part of that vote.

12  Q.  Is that Mango tokens specifically or any --

13  A.  Making Mango tokens.

14  Q.  Do you know how Mango tokens came into existence?

15  A.  As part of prior to version 3 launch, there was a token

16  offering in order to raise funds for the DAO in which these

17  tokens were created by the Mango Markets entity and sold on the

18  open market.

19  Q.  So there was an entity at some point, but now it's

20  controlled by a DAO?

21  A.  Yeah.  The entity that -- someone has to write the smart

22  contracts.  Blockworks was the organization behind creating the

23  Mango Markets protocol and established it in terms of its

24  foundation.  In terms of its operations and running, it's

25  controlled by the DAO.  But Blockworks created the Mango

1   Markets token and issued it for sale.

2   Q.  I want to focus your testimony going forward on version 3,

3   unless I say otherwise.

4          When was version 3 launched?

5   A.  In August of 2021.

6   Q.  When, if ever, was version 4 launched to replace it?

7   A.  That would have been March of 2023.

8   Q.  Is version 3 still visible or accessible?

9   A.  Yes, ma'am.

10  Q.  How and in what capacity?

11  A.  You can still access version 3 through the same user

12  interface and operate its functionality with the exception of

13  actually executing on any type of trading activity.

14  Q.  So you can still access sort of the user interface for

15  Mango version 3?

16  A.  Yes, ma'am.

17  Q.  I believe we already talked about it, but the code base is

18  deposited in that GitHub link that we showed earlier on, I

19  think, Exhibit 118A?

20  A.  Yes, ma'am.

21  Q.  What did you do to look at the version 3?  I know you said

22  you opened up the user interface.  You mentioned that you

23  reviewed the code.  Is there anything else you did in reviewing

24  Mango Markets version 3 and learning to understand how it

25  worked?

O4FMEIS5                    Sheridan - Direct

1   A.  We put parameters into the risk calculator that is offered

2   on version 3, which is a tool in order to analyze trading

3   parameters based on certain inputs.  So we put that

4   information -- we put information into the risk calculator to

5   see how those trades would perform in terms of returns of

6   profits or losses.

7   Q.  Do you remember what the main URL was for the Mango version

8   3?

9   A.  I don't want to quote it because I don't remember exactly

10  what the URL was.  If you show it to me, it was on the Mango

11  Markets.com, and then some reference to the risk calculator

12  itself.

13  Q.  Sorry.  Not for the risk calculator, but for accessing the

14  user interface to trade.

15  A.  For Mango Markets version 3?

16  Q.  Yes.

17  A.  You can just go to -- at the time or now?

18  Q.  At the time.

19  A.  It's just Mango Markets.com and then access through there.

20  Q.  Is the link different now?

21  A.  The link is different now.

22  Q.  I would like to show you what has already been marked and

23  admitted into evidence as GX-1010.

24          MS. MARTABANO:  Mr. Smith, if you can publish that to

25  the jury as well.

1   Q.  Very quickly, Mr. Sheridan, do you see Exhibit 1010?

2   A.  Yes, ma'am.

3   Q.  What is it?

4   A.  This is the splash page that a user will receive when

5   accessing version 3 and prior to conducting trading activities.

6   Q.  What's a splash page?

7   A.  It's something that comes up without user request.  It can

8   happen any time on a website.  In this case it happens upon

9   access.

10  Q.  And you'll see on here it says:  The V3 protocol is in

11  public beta.  This is unaudited software.  Use it at your own

12  risk.  Then it has a check box next to:  I understand and

13  accept the risks.  Get started.

14        In your experience, on the website, do you have to

15  check that check box in order to access the main website?

16  A.  Yes, ma'am.

17  Q.  Turning to GX-1011 --

18        MS. MARTABANO:  Mr. Smith, just show it to Mr.

19  Sheridan at this point in time.  This has already been admitted

20  into evidence.

21  Q.  This is a long document.  Do you recognize it, or would you

22  like to flip through some of the pages?

23  A.  I recognize the document from a previous demonstration of

24  this document from previous witnesses, at least the cover page.

25  I am assuming the rest of it is the same.

1    Q.  Did you review a version of this document without the

2    government exhibit Bates stamp on it in preparing to testify in

3    this case?

4    A.  Yes, ma'am.

5         MS. MARTABANO:  I'd like to direct you to page 100 of

6    the PDF, Mr. Smith, which bears a Bates label ending 18460, the

7    risk calculator.

8    Q.  Can you take a look at that and let me know what exactly is

9    the risk calculator.  I know you described earlier, it let's

10   you play around with the protocol.  But can you give us a

11   little bit more in-depth explanation of what the risk

12   calculator allows and specifically what parameters you can play

13   with.

14   A.  So, based on our experimentation with it, it will allow any

15   inputs related to a trade and it is intended to show you what

16   the consequences, either positive or negative, will be for

17   those trading inputs.

18        So you can put in -- in the case of perpetuals, like

19   we are talking in this case, you can put in your investment,

20   you can put in your leverage, you can put in all sorts of

21   different circumstances surrounding that trading activity and

22   see what the results of that trading activity will be based on

23   price movement of the underlying price for those two assets

24   that you are putting into the perpetual contract.

25   Q.  Thank you.

1          MS. MARTABANO:  Mr. Smith, you can publish this to the

2     jury.

3     Q.  I believe that you said that you played around on the risk

4     calculator directly and others on your team did it.

5          Were they doing it at your direction?

6     A.  Yes, ma'am.

7     Q.  I think you just said that it works for perpetuals too.  So

8     if you were looking into pricing a perpetual and seeing what

9     the impacts would be, you could enter that through the risk

10    calculator?

11    A.  Yes, ma'am.

12    Q.  You mentioned that you guys actually did simulate some

13    different scenarios.  Can you tell us what scenarios you

14    simulated?

15    A.  We simulated the trading activity that was conducted by

16    Mr. Eisenberg.

17    Q.  What was the output at the time you did it?

18    A.  The output reflected using the inputs that played out.  The

19    output was reflected as -- in his long position, for example,

20    when we moved the price of the Mango token up, the long

21    position moved into a positive balance and received profits.

22    For the short position, when we moved the price of the Mango

23    token down, the profits for the short position similarly moved

24    up.  Same thing for the inverse.  If we showed for the long

25    position, if the price of the Mango token -- all of these

1  prices are relative to USDC.  If we showed the price of the

2  Mango token relative to USDC to go down, the long position

3  became lost funds or was in a lost state.  And for the short

4  position, if the price of the Mango token relative to USDC went

5  up, the short position, similarly, lost assets and became in a

6  lost state.

7  Q.  I know you mentioned that you did the same parameters that

8  were used as the trades in this case.  Did you also get to the

9  same large amount of profit or accrued funds in the loan?

10            MR. BURNETT:  Objection.

11            THE COURT:  Can you rephrase.

12            MS. MARTABANO:  Sure.

13  Q.  When you entered in the same numbers, what was the amount,

14  if you remember, of your account balance on the long when you

15  entered in the prices that were at issue in the case?

16            MR. BURNETT:  Objection.  There are lots of prices in

17  the case.  Just framing.

18  Q.  The maximum price of Mango --

19  A.  For example, with the long position, we entered into the

20  Mango price relative to USDC at .0382 cents.  We put in a

21  deposit of 5 million USDC.  We put in leverage of 3.7 as a

22  leverage.  We then moved the price of Mango relative to USDC

23  to, I believe it was 54 cents and 91 cents to see how that

24  position would react.

25  Q.  And how did it react?

O4FMEIS5                              Sheridan - Direct

1    A.  It went significantly positive.  I don't know if we reached

2    exactly the 488 million results that were demonstrated in the

3    actual trading activity, but we saw that the perpetual became

4    significantly what's referred to as in the money and

5    profitable.

6    Q.  And did you get any kind of warning that it would have a

7    broader impact on the protocol?

8    A.  No, ma'am.

9    Q.  Did you simulate this with the short too?

10   A.  Yes, ma'am.

11   Q.  Did it ultimately tell you that you were going to be

12   liquidated if you entered into that trade?

13   A.  No, ma'am.

14   Q.  What was the outcome?

15   A.  So for the short trade, in the positive, we moved the Mango

16   price to .02 cents, which was what was reflected in the actual

17   trading activity.  And, similarly, we received positive and

18   in-the-money return of assets.  We moved it into the negative

19   on the short position by making the Mango -- price of the Mango

20   token those same positive amounts, 54 cents, 91 cents, and the

21   short position was then below the health value and

22   significantly in a lost status.

23   Q.  Was there any warning other than you could see it was below

24   the health value?

25   A.  No, ma'am.  The health of the account turns red, and you

1   see that the account is not healthy.  That's the warning we

2   receive.

3   Q.  What do you understand the health ratio to be in Mango

4   Markets?

5   A.  The health ratio is the ratio of your collateral, so the

6   ratio between your deposits and positions divided by your

7   liabilities.

8   Q.  For Mr. Eisenberg's trades, what collateral did he have?

9   A.  His initial deposit of 5 million USDC in his long and just

10  shy of 5 million in his short.

11  Q.  He didn't have any other assets deposited in those accounts

12  sitting on the protocol?

13  A.  No, ma'am.

14  Q.  And I know we talked earlier about opening up an account.

15  Were the long and the short position created by Mr. Eisenberg

16  in the same account or were they in separate accounts?

17  A.  Separate accounts.

18  Q.  If they were in the same accounts and one of them went

19  below the health ratio, could the protocol take from the other

20  account, from the other position?

21  A.  If they were in the same account, yes.

22  Q.  Being in separate accounts, is that possible?

23  A.  No.

24  Q.  When your health ratio goes below the stated requirement,

25  what happens in Mango Markets protocol?

1   A.  The first thing that happens is that your account goes into

2   a liquidation status.

3   Q.  What does that mean?

4   A.  That means your account can be taken over by anyone willing

5   to liquidate it.

6   Q.  Do you know what those people are called?

7   A.  Liquidators or liquors.

8   Q.  Can that be anybody?

9   A.  Yes, ma'am.

10  Q.  When you become eligible for liquidation, is there anybody

11  you can seek clemency from?

12          MR. BURNETT:  Objection.

13          THE COURT:  Can you rephrase.

14          MS. MARTABANO:  Sure.

15  Q.  If you go into a negative health ratio and you're facing

16  liquidation, is there a person at Mango Market you can go to

17  and say, stop, wait, I am going to pay you back?

18          MR. BURNETT:  Objection.

19          THE COURT:  It's overruled.

20  A.  No, ma'am.

21  Q.  Is there any way for you to reach out to the liquidator who

22  is actually doing the liquidating to ask them to stop?

23  A.  No, ma'am.

24  Q.  Are you aware of any ways to stop a liquidation on an

25  account?

1    A.  There is only one way.

2    Q.  And what way is that?

3    A.  To add more assets into the account to raise the health

4    status of your account.

5    Q.  If an account is showing losses and it's liquidated, what

6    happens when the whole thing is liquidated if there are still

7    losses showing?

8    A.  The account will go into a bankruptcy state.

9    Q.  And what does that mean?

10   A.  It means there are no more assets contained within the

11   account to take by a liquidator.

12   Q.  What will happen on the protocol when that happens?

13   A.  An insurance fund established by the DAO will be used to

14   make the account -- make the account whole by issuing funds

15   from an insurance fund.

16   Q.  Do you remember, during this time period, the size of the

17   insurance fund of the DAO?

18   A.  $5 million.

19   Q.  5 million?

20   A.  Yes, ma'am.

21   Q.  I am going to direct you to page 111 of this document.

22   Should be Bates label ending 18470.  You can take a look at

23   that, Mr. Sheridan.

24          Does that refresh your recollection about what the DAO

25   insurance fund was valued at?

1  A.  Yes.  So throughout this document there are -- there were

2  pieces of information that, in my opinion, contradict or at

3  least appear in contradiction.  The insurance fund is one of

4  them.  Earlier in the document it's referenced -- if it's not

5  in the document, it's in the website, but it's referenced that

6  the insurance fund is $5 million.  So that would be an

7  automatic payment conducted by the protocol itself.  The $70

8  million treasury is the entire inventory of available funds for

9  the DAO for all purposes.  That could be used for insurance

10 payouts if a DAO vote is put forward to use those funds for

11 that purpose.

12 Q.  Do you know what happens if somehow the insurance fund gets

13 emptied on a transaction?  What happens next?

14 A.  The next step is what's called socialized losses.

15 Q.  And what is that?

16 A.  Socialized losses is a mechanism wherein all users of the

17 exchange who have assets on the exchange will be required to

18 repay the losses in equal amounts, and the protocol will take

19 their funds to repay those losses.

20       MS. MARTABANO:  Mr. Smith, if we could go forward one

21 page.

22 Q.  Is that what's reflected and disclosed here in this user

23 document?

24 A.  Yes, ma'am.

25       MS. MARTABANO:  Turning to yet the next page, 113,

1    Mr. Smith.

2    Q.  Top of this page says settle PnL.

3         What is settle PnL?

4    A.  Settle PnL is a way to withdraw profits or have losses

5    withdrawn from the account.  It's most often used in a profit

6    scenario where a user will settle their PnL to withdraw their

7    profit from a specific account.

8    Q.  Do you know what PnL stands for?

9    A.  Profit and loss.

10   Q.  It says here when you settle the PnL it moves the profit or

11   loss.  So you could settle even a negative balance?

12   A.  Yes, in theory.

13   Q.  Then it moves it into the USDC token balance, is that

14   right?

15   A.  Yes.

16   Q.  Were all trades on Mango Markets settled in USDC?

17   A.  All trades have USDC as their base token -- as their base

18   token, so profits are settled in USDC as the base token.

19        MS. MARTABANO:  Mr. Smith, if you could take us to

20   page 133.  It bears the Bates label 18493.

21   Q.  Digging in a little bit further on this PnL idea, it says:

22   What is my unsettled PnL.

23        Can you explain to me and the jury what an unsettled

24   PnL would be.

25   A.  Unsettled PnL is an account that is in a profit status that

1    has earned profit that has not withdrawn the profit from the

2    protocol.

3    Q.  I have a question for you about the broader functioning of

4    withdrawals on the protocol.

5         If I were to engage in a transaction and that

6    transaction got me such a big profit that if I settled it and

7    withdrew it, I would take all the liquidity out of the

8    protocol, what would happen if I tried to settle it if it was

9    just the exact amount of liquidity that was available in the

10   protocol.  Would I be able to take it out?

11        MR. BURNETT:  Objection, form, foundation.

12        THE COURT:  It's overruled.

13   A.  If you were trying to take your profit that exactly matches

14   the liquidity on the protocol?

15   Q.  Yes.

16   A.  Yes, you could take that out.

17   Q.  And if, while I was trying to do that, someone else tried

18   to take out just one USDC such that the protocol would not

19   have -- would be negative liquidity, would I be able to finish

20   my transaction?

21   A.  No.

22   Q.  Why not?

23   A.  Because your transaction exceeds the amount of liquidity

24   available left in the protocol.

25   Q.  Is it possible for me to settle my transaction and only

1   take out a part of it?

2   A.  Settle your profit and loss and only take out part?

3   Q.  Yes.

4   A.  Based on our analysis, yes.

5           MS. MARTABANO:  I'd like to turn now to page 125 of

6   the PDF.  Should be the Bates label ending 18485.

7   Q.  You see this is the FAQs.  What are FAQs?

8   A.  Frequently asked questions.

9           MS. MARTABANO:  Turning to the next page, Mr. Smith.

10  Q.  You'll see a FAQ that says:  Is Mango Markets code audited?

11  This says that it has been informally reviewed.  Is that

12  audited?

13  A.  Is informally reviewed audited?

14  Q.  Yes.

15  A.  I wouldn't consider that a formal audit.  It's a review.

16  Q.  Can you tell me what a white hat hacker team is?

17  A.  It's someone who is looking for errors in the code, bugs in

18  the code that would create vulnerabilities in a particular

19  protocol.

20  Q.  This FAQ asks about Mango Markets' code being audited.

21          MS. MARTABANO:  Mr. Smith, if you could turn to page 3

22  of this document.

23  Q.  What is this referencing, if you know?

24  A.  This is a reference to a more formal audit by a designated

25  audit company, Neodyme.

1    Q.  What kind of audit is it, if you know?

2    A.  This was a specific code audit to review the Mango Markets

3    smart contracts for errors in their code.

4    Q.  Can you tell us what a code audit is.

5    A.  Code is a set of computer instructions designed to carry

6    out a specific function.  If that code is improperly written,

7    it can create errors.  Or if there are elements of that code

8    that create vulnerabilities to the protocol itself or assets

9    controlled by the protocol, a code audit is intended to

10   identify those and recommend corrections for those.

11   Q.  So in simpler terms, does a code audit review it and say

12   the code is functioning as programmed?

13           MR. BURNETT:  Objection.

14           THE COURT:  Sustained.

15   Q.  What are the kind of problems that a code audit could

16   identify?

17   A.  Any type of functional error.  So you put an input in and

18   the code doesn't understand it, so it can't execute it.  Also,

19   any type of gaps in the code that would allow someone

20   unauthorized access or allow someone to access another person's

21   funds or artificially inflate their own account.  It's meant to

22   review if the code -- for lack of a better explanation, it's

23   meant to review, does the code work as designed.

24   Q.  Is it the same thing as a financial audit?

25   A.  I would not call it a financial audit.

1  Q.  Or a tax audit?

2  A.  No, ma'am.

3  Q.  It's not about the controls at a company or at a protocol?

4  A.  No, ma'am.

5  Q.  It's just limited strictly to the code?

6  A.  That's all they look at is the code.

7  Q.  Is it possible that a protocol could have other issues that

8  aren't identified by a code audit?

9  A.  Yes.

10  Q.  Generally speaking, what kinds of issues would those be, if

11  you could give us some examples?

12  A.  Those would be factors that influenced the protocol that

13  aren't contained within the code, but perhaps the code relies

14  on for information.  In trading protocols, that's most commonly

15  a pricing input, such as in oracle or other type of feed into

16  the code that the code itself does not control.

17  Q.  Mr. Sheridan, did you review the Mango Markets audit that's

18  linked here in this document?

19  A.  Yes, ma'am.

20        MS. MARTABANO:  Mr. Smith, if you could take this down

21  and take the screen away from the jury and show just Mr.

22  Sheridan Defendant's Exhibit DX-60.

23  Q.  Mr. Sheridan, we are showing you what has been marked for

24  identification by the defense as DX-60.  Please take a look at

25  this and let me know if you need Mr. Smith to advance it

1    several pages so you can get a better read.

2    A.  Can you advance it, please.

3          Next page.

4          This appears from the first three pages to be the same

5    document I reviewed in preparation for testimony.

6    Q.  So you recognize this document?

7    A.  Yes, ma'am.

8    Q.  And what is it?

9    A.  This is the results of the Neodyme audit conducted on Mango

10   Markets.

11   Q.  How do you know that?

12   A.  Because I reviewed this information in preparation for

13   testimony, and the contents of this document explain their code

14   review.

15   Q.  You believe that DX-60, as you reviewed it, is a true and

16   correct copy of the Neodyme audit referenced in GX-1011 that we

17   were just looking at?

18   A.  Yes, ma'am.

19          MS. MARTABANO:  Your Honor, I move to admit DX-60 into

20   evidence.

21          MR. BURNETT:  No objection.

22          THE COURT:  It will be admitted.

23          (Defendant's Exhibit 60 received in evidence)

24          MS. MARTABANO:  May I publish it to the jury, your

25   Honor?

O4FMEIS5                        Sheridan - Direct

1              THE COURT:  You may.

2              MS. MARTABANO:  Please publish it, Mr. Smith.

3   Q.  I would like to turn to you page 3 of the document.

4              Can you take a moment to review the introduction.

5   This suggests that there was an audit -- how would you

6   characterize this introduction to this report?

7   A.  As a summary of their findings for the audit conducted

8   between January and April of 2022.

9   Q.  And it was of the Mango version 3, so the version we have

10  been talking about all day?

11  A.  Yes, ma'am.

12             MS. MARTABANO:  Mr. Smith, you can take that down.

13  Q.  We had talked about liquidation earlier.  If I only put $10

14  million into the platform, but I have a short that's 100

15  million under water, how much money can the protocol take from

16  me?

17  A.  $10 million.

18  Q.  It can't collect anything else from my account?

19  A.  No, ma'am.

20  Q.  Is there a collections process built into the code?

21  A.  Through liquidation.  The other -- any positive assets you

22  have on your code will be removed from your account.  Excuse

23  me.  Any positive assets you have within the protocol will be

24  removed from your account.

25  Q.  Just within that one account.  So if I had separate

1    accounts, it would just be from that one account?

2    A.  Yes, ma'am.

3    Q.  I'd like to turn you now to Mr. Eisenberg's trades, the

4    reason why we are all here, specifically about the perpetual

5    contracts he purchased.  We have talked about the long and the

6    short.  There has been other evidence offered in this case

7    which you have observed?

8              MR. BURNETT:  Objection.

9    Q.  Given how you have explained liquidation, what would happen

10   to the money in Mr. Eisenberg's accounts if his health scores

11   fell below zero?

12   A.  They would start to be liquidated.

13   Q.  And is that automatic?

14   A.  Yes, ma'am.

15   Q.  And I believe we have covered this, but based on your

16   review, is there a way in the code he could stop it other than

17   putting more assets in?

18   A.  That's the only way to stop liquidation.

19   Q.  I believe you mentioned before his 488.3 million perpetual

20   contracts.  Have you done Blockchain analytics to determine

21   whether he ever closed his perpetual positions?

22   A.  Yes, ma'am.

23   Q.  And what was the result of that?  Were they ever closed?

24   A.  No, ma'am.

25   Q.  Were they settled?

1   A.  No, ma'am.

2   Q.  How do you know that they were never closed?

3   A.  You can still access the protocol today and see those

4   accounts.

5   Q.  As you understand it, based on your research into his

6   transactions and your analytics of Mango Markets and the

7   Blockchain, would Mr. Eisenberg's long and short positions have

8   mirrored one another and completely offset each other in terms

9   of profit and loss?

10  A.  Not in complete synchronicity.

11  Q.  Why not?

12  A.  Because each individual count had liquidations that

13  occurred to it independent of the other.

14          MR. BURNETT:  Objection, your Honor.  Sidebar.

15          THE COURT:  All right.  Brief sidebar.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. BURNETT:  Your Honor, we literally just had a

3    conference where you excluded testimony about what the

4    liquidations were in his account because his background and his

5    knowledge of that comes from the whiskeyfries document.  Our

6    understanding was the whiskeyfries document is not coming in,

7    and he is not allowed to testify about the facts he learned

8    from that because it's not authentic and hearsay.  He seems to

9    be doing exactly that.

10          THE COURT:  I thought this was a different point.

11          MS. MARTABANO:  It is a different point.  He is not

12   going to be getting into the details of that data.  That was

13   the end of it.  He is just testifying to the fact that they are

14   not a straight-line analysis that there are liquidations.  As

15   the Mango Markets code works, both liquidations and funding

16   payments are transferred between positions.

17          MR. BURNETT:  Your Honor, I would ask for a readback

18   because what he testified to were that there were liquidations

19   that weren't synchronous between the two, which is factual

20   testimony about theoretical testimony.  His basis for that

21   comes from only that whiskeyfries document.

22          MS. MARTABANO:  I'm happy to clarify or have it

23   stricken and clarify it on the record.  That's not what I

24   heard, but I'm happy to --

25          THE COURT:  I think he said that the liquidations were

O4FMEIS5                          Sheridan - Direct

1   not symmetrical between the two positions, and for that reason

2   they were not in perfect synchronicity, I think is the term

3   that he used.

4           And is the basis for that the whiskeyfries document?

5           MS. MARTABANO:  No.  It is based on his understanding.

6   I was asking him -- I don't know what his basis was, if that is

7   his precise answer.  I was asking him, based on how it works,

8   positions that appear to be offsetting will have liquidation

9   payments.  It doesn't even have to be specific to

10  Mr. Eisenberg.

11          THE COURT:  Are you asking further questions along

12  this line?

13          MS. MARTABANO:  No.  I just want that point.

14          THE COURT:  If that's your only question, I am going

15  to overrule the question and move on.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1         (In open court)

2  Q.  Just one point of clarification, Mr. Sheridan, about an

3  earlier question.  You said he had never -- I believe you had

4  said he had never settled or closed the perpetuals, is that

5  correct, or were you talking about something else?

6         I'm not talking about settling a position, but just

7  closing out or selling off the perpetual positions that he had.

8  A.  He did not sell off his perpetual positions.

9  Q.  After Mr. Eisenberg opened the positions, what happened

10  next?

11  A.  After he opened the positions on Mango Markets, the account

12  values began to change based on changes in prices in the Mango

13  token.

14  Q.  And did there come a time at which Mr. Eisenberg removed

15  funds from the platform?

16  A.  Yes, ma'am.

17  Q.  Do you know how much he removed?

18  A.  Approximately $116 million.

19  Q.  And are you familiar with the sort of order of his

20  removals?

21  A.  Yes, ma'am.

22  Q.  And what was the first amount that he removed from the

23  platform?

24  A.  What we identified as a settlement of profit and loss of

25  $50 million.

1   Q.  And were you involved directly in doing that Blockchain

2   analytics and identifying the settlement that you just

3   referenced?

4   A.  Yes, ma'am.

5   Q.  What was that $50 million in, if I misheard you?

6   A.  USDC.

7   Q.  How long after the settlement was the withdrawal, if you

8   know?

9   A.  Approximately 17 seconds.

10  Q.  I think you said that Mr. Eisenberg withdrew around 110 or

11  $116 million.

12          When that was done, what happened to the protocol?

13  A.  The protocol at the time of removing the $116 million was

14  liquidating his long and short positions and attempting to

15  recover liquidity to cover the losses associated with the

16  amount.  His accounts collectively were in negative balance.

17  Q.  Did the protocol ever freeze at a given point because of

18  the liquidity that had been removed?

19  A.  The protocol was paused at a certain point.

20  Q.  And what is a pause?

21  A.  In this case it was a determination by the DAO -- excuse

22  me.  Not by the DAO; by the management team, the security

23  protocol team of Mango Markets to pause the protocol.

24  Q.  Who is the security team that you just referenced?

25  A.  It's the developers, the coders, the elements of Mango

1    Markets who create the protocol and administer functions on the

2    protocol.

3    Q.  Do you know how they did that, whether they had to write

4    code or take a vote or do anything like that?

5    A.  In order to pause the protocol, there was no vote.  It was

6    a decision not voted on by the DAO.  In terms of how

7    specifically that's done, I don't have that answer.

8    Q.  You mentioned that it was the Mango security council?

9    A.  Yes.  There are several terms, as I stated earlier, within

10   the Mango Markets documents.  There are different functional

11   elements within Mango Markets whose roles are not entirely

12   outlined.  So there is an upgrade council, there is a security

13   council, there is support team members.  Which one of those

14   specifically paused the protocol, I can't testify to.

15   Q.  Are you able to say whether Mr. Eisenberg was involved in

16   pausing the protocol?

17   A.  Mr. Eisenberg was not involved in pausing the protocol.  It

18   would have to be someone with designated rights by the protocol

19   to do such an action.

20   Q.  Do you know approximately what time that pause of the

21   protocol happened?

22   A.  I don't have the time off the top of my head.

23   Q.  After the trades and after the pause, what happened next on

24   the Mango Markets protocol?

25   A.  As it relates to this case?

O4FMEIS5                        Sheridan - Direct

1    Q.  Yes.

2    A.  There were proposals presented to repay the debt still

3    outstanding.

4    Q.  I'd like to show you and only the witness, Mr. Smith, an

5    exhibit that's already been offered and admitted as GX-1003.

6           Do you recognize this proposal, Mr. Sheridan?

7    A.  Yes, ma'am.

8    Q.  What is it?

9    A.  This was a proposal called repay bad debt which was

10   submitted to the DAO.

11          MS. MARTABANO:  Mr. Smith, if you could publish it to

12   the jury.

13   Q.  What is this proposal proposing?

14   A.  This proposal was to send Marinated SOL, SOL, and MNGO in

15   this account to an address announced by the Mango team.  It's a

16   request for approval for the Mango treasury to cover remaining

17   bad debt and bad debt to be viewed as a bug bounty or insurance

18   paid out of the Mango insurance fund.

19   Q.  I think you might have skipped over.  Does it also say that

20   all users without bad debt should be made whole?

21   A.  I'm sorry.  Did you want me to read this verbatim?

22   Q.  I just wanted to capture all the parts of the proposal.

23   A.  I apologize.  Yes.  And it proposed to make all users

24   without bad debt to be made whole.  As I stated, any remaining

25   bad debt will be viewed as a bug bounty and insurance that will

1    be paid out of the Mango insurance fund.  It continues to

2    state:  By voting for the proposal, token holders will agree to

3    pay for the bounty and pay off the bad debt with the treasury

4    and waive potential claims against accounts about bad debt and

5    not pursue any criminal investigations or freezing of funds

6    once the tokens are sent back.

7    Q.  In the course of your investigation and preparation in this

8    case, were you able to determine what time this proposal was

9    made?

10   A.  Yes.  It's in the -- I don't recognize it on this exhibit.

11   I know repay bad debt 2 has a time stamp.

12   Q.  Do you remember directing your team to identify the time of

13   the proposal?

14   A.  Yes, ma'am.

15   Q.  And were you able to do that with them?

16   A.  Yes, ma'am.

17   Q.  Do you remember what that time was?

18   A.  I don't off the top of my head.

19   Q.  If I have a document, could I refresh your recollection or

20   try to?

21   A.  Yes, ma'am.

22            MS. MARTABANO:  Mr. Smith, please remove this from the

23   screen and please remove the jury's access to the screen.

24            Please put up DX-64 and show it only to Mr. Sheridan.

25   Q.  Mr. Sheridan, why don't you take a look at that and let me

1    know if you can confirm what time that first proposal was made

2    and date, if you could.

3    A.  October 11 at 9:13, as listed on this sheet.

4    Q.  Is this Eastern time?

5    A.  Yes.

6            MS. MARTABANO:  You can remove that, Mr. Smith.

7    Q.  Going back to repay bad debt that we were just talking

8    about, Exhibit 1003, do you know whether that proposal was

9    approved?

10   A.  That proposal was not approved.

11   Q.  Was there a subsequent proposal?

12   A.  Yes, ma'am.  Repay bad debt 2.

13           MS. MARTABANO:  Mr. Smith, if you could show to Mr.

14   Sheridan and the jury what has already been marked and admitted

15   as GX-901.

16   Q.  Mr. Sheridan, what does this proposal reflect?

17   A.  This proposal is a second proposal that similarly lays out

18   suggestions for response to the events on October 11.

19   Q.  And does it list a long list of assets and an amount of

20   assets proposed to be returned?

21   A.  Yes, ma'am.

22   Q.  And you will notice, just at the bottom of that, it points

23   it will be sent to a wallet owned by the Mango upgrade council.

24           Is that the same council I think you were talking

25   about before?  I think you talked about it as the security

1   council?

2   A.  Yes, ma'am.  Again, I don't know which council paused the

3   protocol.  In this case the specific council is designated

4   related to this proposal.

5   Q.  Were you able, in your research and experience on this case

6   in conjunction with your team, to identify the date that this

7   was proposed?

8   A.  Yes, ma'am.

9   Q.  What day was that?

10  A.  That was -- I'm sorry.  Can you bring up the spreadsheet

11  again.  It's listed in the spreadsheet.  I just don't want to

12  give a bad date.

13  Q.  Sure.

14          MS. MARTABANO:  Mr. Smith, please take the view away

15  from the jury and bring back what's been marked as DX-60 for

16  Mr. Sheridan only.

17  Q.  Having looked at that, can you tell us what time it was

18  proposed?

19  A.  That would be October 14 at 4:17 p.m.

20  Q.  Eastern time?

21  A.  Yes.

22  Q.  Mr. Sheridan, do you know whether repay bad debt 2 was

23  ultimately approved?

24  A.  It was.

25  Q.  And after analyzing the Blockchain transactions that ensued

O4FMEIS5                          Sheridan - Direct

1    after that approval, do you know whether all of those tokens

2    were transferred as promised in the proposal?

3    A.   They were.

4    Q.   Do you know about how much that was worth at the time?

5    A.   Approximately $67 million.

6             MS. MARTABANO:  No further questions.

7             THE COURT:  Can we have counsel for a brief sidebar.

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1        (At sidebar)
2        THE COURT:  It looks like Ms. Martabano did not ask
3   certain questions that were relevant to some of the things that
4   came up.
5        My question for you is, to avoid any motions to
6   exclude, is there any information that, if furnished in the
7   next couple of hours, may provide you with that missing basis
8   that would then allow us to have a cross-examination where we
9   don't have to have a potential exclusion issue?
10        MR. BURNETT:  Two things, your Honor.
11        One is, Mr. Sheridan testified that there was a settle
12   of 50 million.  The rest was then followed by a withdrawal.
13   There is one exhibit that was put in during Mr. DeCapua's
14   testimony, which was DX-50, which refers to a settle that I
15   think he is referring to, but there is nothing in that that
16   mentions the amount of the settlement, 50 million.
17        To the extent there is any data of that he's relying
18   on for that 50 million number, that's one piece of it,
19   especially because during voir dire he testified he himself
20   couldn't identify things like numbers or amounts.  He needed
21   his FTI team to do it.  That's one.
22        Second, there are a number of times, and I don't know
23   if this was just his imprecision or was an argument he was
24   making, where he equated settling with withdrawing.  He made it
25   sounded like a settlement withdraws something.  The documents
```

1   very clearly say a settlement transfers money to your account

2   balance, which was not a withdrawal.

3          So if he is going to stand by the point that a settle

4   equals a withdrawal, we would ask for whatever the basis is for

5   that.  I don't know if he's making a code point or he is just

6   getting it wrong.

7          THE COURT:  Why don't we do this.  Why don't we start

8   tomorrow with your cross-examination.

9          You have heard the things that counsel thinks are

10  missing.  I'll give you the opportunity to turn that over.

11         Taking a step back, I think that based on what I

12  heard -- Mr. Sheridan's testimony presents many issues here

13  just in terms of just thinking about the probative value versus

14  any prejudice to the government to begin with.  I would like to

15  try to avoid these preclusion issues, if we can, so that if

16  there is absolutely no issue with his testimony coming in, then

17  you should acknowledge that this is -- I think this is

18  consistent with the Court's attempt to give the defense every

19  chance to put on its case, so that's why I'm doing this.  If

20  Mr. Burnett were to start his cross-examination, there is going

21  to be motions to preclude, and I want to see if we can avoid

22  that before we have to get into those issues.  Since we have

23  some additional time, that's why we will do it this way.

24         MR. DAVIS:  Judge, may I be heard very briefly on

25  that?

O4FMEIS5                        Sheridan – Direct

 1              THE COURT:  Yes.

 2              MR. DAVIS:  One procedural concern.  He is currently

 3    on the stand about to be on cross-examination.  The defense

 4    should not be able to talk to him about these issues.

 5              THE COURT:  Absolutely.  They understand that.

 6              MR. KLEIN:  We are not planning on talking to him.

 7              THE COURT:  He needs to go to some secluded location.

 8              MR. BURNETT:  So you know, right now, to the extent we

 9    move to preclude anything beyond those two narrow points.

10              THE COURT:  I don't think he testified about anything

11    else.

12              MS. MARTABANO:  May we speak to the FTI team to get

13    the data?

14              THE COURT:  Let's go back and let the jury go.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O4FCeis6

1        (In open court)

2        THE COURT:  So we're at 2:30.  We're going to adjourn

3    for the day.  We'll be back here tomorrow to get started at

4    9:00 a.m.  We're going to, again, try to make things a little

5    bit more streamline.  Still on pace to have closings probably

6    on Wednesday.  So we'll be able to give you the case after

7    closings and closing instructions.

8        Again, thank you so much for all your patience.  Enjoy

9    your afternoon.  We'll see you here tomorrow.

10        (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4FCeis6

1    (Jury not present)

2    THE COURT:  So, just to finish off the discussion from

3    sidebar.  Ms. Martabano, you can retrieve information from FTI,

4    but you should explicitly tell FTI they are not to have any

5    conversations with Mr. Sheridan, and of course you should not

6    have any conversations with Mr. Sheridan.

7    MS. MARTABANO:  Yes, your Honor.

8    THE COURT:  Anything else relating to Mr. Sheridan's

9    testimony?

10    MR. BURNETT:  Not from the government.

11    THE COURT:  What are we thinking in terms of timing?

12    I understand that you wanted to wait until Mr. Sheridan's

13    testimony is complete to make an evaluation as to whether

14    Mr. Eisenberg is going to testify.

15    MR. TALKIN:  Your Honor, I respectfully submit --

16    THE COURT:  Hold on.  Mr. Sheridan.

17    THE WITNESS:  I'm assuming that means go?

18    THE COURT:  That means go.  You're still under oath.

19    Remember, as I told your counsel, they're not to talk to you,

20    you're not to talk to them, nobody talks to anybody.  Okay?

21    THE WITNESS:  Yes, sir.

22    Can I grab a folder?  Is that okay?  I left my folder,

23    my documents that I left --

24    THE COURT:  Yes, you can.

25    (Witness not present)

O4FCeis6

1          Mr. Talkin, continue.

2          MR. TALKIN:  Thank you, your Honor.

3          I think what we're going to do is we're going to talk

4     to our client again now.  I think the way, logistically, and

5     I'm not saying this would happen, but let's say he decided he

6     wanted to testify, based on my representations and the

7     necessities really of both parties, because it would be

8     unexpected, I think the rest of tomorrow would be that

9     preparation time because we won't have access to him late

10    tomorrow, so we would probably have to do that in the

11    courthouse.  So I think it makes sense for us to make that

12    decision in the morning after the cross, and then we'll either

13    be done and we could do the charge conference -- I'm just

14    suggesting here, Judge, I'm not trying to say what should

15    happen.  And then we do the charge conference and we then come

16    in and sum up the next day or we'll proceed to the testimony,

17    the following day and then summations.  So I just think there's

18    the practical problem -- if he was out, I think it would be a

19    lot easier to deal with.

20         THE COURT:  I want to make sure that you and

21    Mr. Eisenberg have enough time to thoughtfully think of that

22    question, and I'm going to allocute Mr. Eisenberg on that issue

23    at the appropriate juncture.

24         I take it from what you're saying is you prefer not to

25    do that now because Mr. Sheridan hasn't finished testifying, so

O4FCeis6

1    you can't evaluate?

2              MR. TALKIN:  Correct.  And I haven't had that

3    discussion with him since we had heard the testimony, so it's

4    really twofold.

5              THE COURT:  Are you able to do that now?

6              MR. TALKIN:  Yes, that part I can do now.

7              THE COURT:  So then there are two scenarios.  One

8    scenario is where we do closings starting Wednesday morning,

9    the other scenario is we do it on Thursday morning; right?

10             MR. TALKIN:  That's how I see it.

11             THE COURT:  Government have any issues there?

12             MR. BURNETT:  No, your Honor.

13             THE COURT:  The only issue is going to be our one

14   juror who is heading to Marrakesh on Friday, but we'll cross

15   that road when we get to it.  Maybe I can make a call to Delta

16   Airlines and figure out how to make some adjustments.  If the

17   parties are on board with that, I think that makes sense.

18             Ms. Goldberg, why don't you hand these out.

19             These are versions of the proposed jury charge with

20   line numbers that will hopefully help us when we're at our

21   charge conference.  There are very few differences between this

22   copy of the proposed charge and the one that you received on

23   Friday.  This is all subject to discussion at the charge

24   conference.

25             So the three changes are to remove "market" from

O4FCeis6

1  "market price" with respect to Counts One and Two based on the

2  government's submissions.  I considered both parties'

3  submissions.  The government, at least at the present time,

4  points to the lack of market price in the statutory text as

5  well as Second Circuit authority that indicates that the

6  definition of "price" is not as narrow as what the defendant is

7  contending in this case is the market price, while also arguing

8  that the settlement price would be a market price properly

9  understood, but given some of the submissions that the

10  defendant has made, there may be confusion that "market price"

11  has a more narrow definition that is not consistent with the

12  usage of "price" in the governing statute and regulations here.

13  So that has been changed.

14        Second, the government seeks to include an instruction

15  on disclaimers.  I view this as similar to the terms of service

16  issue, which is just that as with terms of service, we pointed

17  out, look, you can consider this, but it doesn't kind of govern

18  the outcome of the claim.  I used verbatim the defendant's

19  submission on the terms of service instruction, and the Court

20  simply integrated in an additional couple of lines on

21  disclaimers to make that same point that, as a matter of law,

22  it does not make any representations immaterial.  The jury

23  should simply consider that along with all the other evidence

24  in the case that they want to consider, which I think is a fair

25  instruction.  But again, I'll hear both sides on that.

O4FCeis6

1        As to mix swap, which is the subject of 400 letters

2   that I received from the parties, what I've proposed at least

3   is to include the theories, the base theories of how the

4   government contends the perpetuals are swaps, and then

5   essentially adopt the defendant's instructions as to including

6   narrow-based security index mainly because it puts that issue

7   in the instructions, the jury can make its determination, both

8   sides can argue whether it is or is not a narrow-based security

9   index, whether you're talking about the funding rate or USDC.

10       Now, one question I had for Mr. Greenspan.  So in the

11   proposed instruction, as to USDC, you had added the

12   clarification, "as long as USDC is not a narrow-based security

13   index."  Explain to me how USDC could be a narrow-based

14   security index.

15       MR. GREENSPAN:  Can you give me one second and let me

16   pull out our proposal?

17       THE COURT:  Sure.  I can tell you that that's exactly

18   what it says.

19       MR. GREENSPAN:  I'll take your representation on that.

20       THE COURT:  It's not addressed in your letter.  To set

21   the stage, in your letter, you indicate that USDC is a stand-in

22   for the dollar.  So, on that basis, it could not be something

23   that the swap is based on, and you give some examples about

24   that.  However, when it comes time to actually discussing the

25   proposed instruction, you leave USDC in there and simply say,

O4FCeis6

 1    "as long as it's not a narrow-based security index."  I want to

 2    make sure the Court was understanding the defendant's position

 3    correctly.

 4              MR. GREENSPAN:  I think we were struggling to find a

 5    way to put narrow-based security index in.  We're not proposing

 6    that USDC is a narrow-based security index.

 7              THE COURT:  You're not taking the position that USDC

 8    is a security here?

 9              MR. GREENSPAN:  Correct.

10              THE COURT:  I just don't understand how it could be a

11    narrow -- if USDC is not a security, then it could not, unless

12    I'm missing something, be a narrow-based security index.  I

13    guess you could say, well, there's one security and it's an

14    index, so that one security, and so that's a narrow-based

15    security index.  That would be the way to do it.

16              If you're not taking the position that USDC is a

17    security, then it seems like the government's proposed

18    instruction on USDC, that part of it would be correct, and then

19    you, on the funding rate issue, would have the argument that

20    the rate is essentially a narrow-based security index based on

21    how that rate is put together, and both sides can make their

22    arguments on narrow-based security index.

23              MR. GREENSPAN:  That's right.  Thank you, your Honor.

24              THE COURT:  And no need for the government to have any

25    reactions to this.  We'll pick it up at the charge conference.

O4FCeis6

1    But anything as to any of the issues as I described them in two

2    seconds of detail?

3          MR. BURNETT:  No, your Honor.  That sounds good.  If

4    this is the way you're thinking about it, I think one thing we

5    may do is propose an instruction that defines the term

6    "interest" as we discussed in the letter last night because we

7    think that's important for the jury understanding what a

8    narrow-based security index is and the meaning of the term

9    "interest" there, but that would be a one-sentence addition.

10         THE COURT:  I'll hear everyone's suggestions on both

11   sides.  That's what the charge conference will be for.  I

12   expect both sides, as I mentioned in my email, to raise all

13   their objections, and we'll go page by page and get it done.

14         Anything else, Mr. Burnett?  Mr. Davis.

15         MR. DAVIS:  Just confirming, we're not summing up?  At

16   the earliest, Wednesday?

17         THE COURT:  You're not going to sum up tomorrow after

18   the charge conference.

19         Anything else from the defense?

20         MR. TALKIN:  None.  Thank you, Judge.

21         THE COURT:  Really appreciate it.  We're adjourned.

22   We'll be back here hopefully not at 8:30, but I'm going to have

23   everyone here ready at 8:30.

24         (Adjourned to April 16, 2024 at 8:30 a.m.)

25                              * * *

<pre>
 1                      INDEX OF EXAMINATION

 2   Examination of:                            Page

 3    JEREMY SHERIDAN

 4   Direct By Ms. Martabano . . . . . . . . . . 977

 5   Cross By Mr. Burnett . . . . . . . . . . . . 990

 6   Redirect By Ms. Martabano . . . . . . . . . 996

 7   Recross By Mr. Burnett . . . . . . . . . . .1002

 8   RONALD DWYER

 9   Direct By Mr. Talkin . . . . . . . . . . . .1032

10   Cross By Mr. Davis . . . . . . . . . . . . .1042

11   Redirect By Mr. Talkin . . . . . . . . . . .1052

12   JEREMY SHERIDAN

13   Direct By Ms. Martabano . . . . . . . . . .1058

14                     GOVERNMENT EXHIBITS

15   Exhibit No.                              Received

16    1705    . . . . . . . . . . . . . . . . .1053

17                     DEFENDANT EXHIBITS

18   Exhibit No.                              Received

19    70     . . . . . . . . . . . . . . . . . .1035

20    30D    . . . . . . . . . . . . . . . . . .1038

21    30A    . . . . . . . . . . . . . . . . . .1040

22    30B    . . . . . . . . . . . . . . . . . .1040

23    30C    . . . . . . . . . . . . . . . . . .1041

24    60     . . . . . . . . . . . . . . . . . .1124

25
</pre>

# Exhibit B

O4GCeis1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4               v.                        23 Cr. 10 (AS)

 5   AVRAHAM EISENBERG,

 6               Defendant.                Trial

 7   ------------------------------x
                                           New York, N.Y.
 8                                         April 16, 2024
                                           8:53 a.m.
 9

10   Before:

11                 HON. ARUN SUBRAMANIAN,

12                                         District Judge
                                            -and a jury-
13
                         APPEARANCES
14

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     PETER J. DAVIS
17   THOMAS S. BURNETT
     TIAN HUANG
18        Assistant United States Attorneys

19   WAYMAKER LLP
          Attorneys for Defendant
20   BRIAN E. KLEIN
     ASHLEY MARTABANO
21   RILEY SMITH
          -and-
22   TALKIN MUCCIGROSSO & ROBERTS, LLP
     SANFORD N. TALKIN
23   NOAM B. GREENSPAN

24   Also Present:  Brandon Racz, FBI
                    Ryan Sears, Paralegal Specialist-USAO
25                  Jonathan Oshinsky, Paralegal Specialist-USAO
```

O4GCeis1

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning, everyone.

3           First off, on juror No. 7, as the Court informed the

4    parties, there was a serious emergency with juror No. 7, so she

5    will be excused.  We will put the email that we sent to the

6    parties as well as the parties' responses in the record as a

7    sealed court exhibit.

8           Do either of the parties want to be heard further on

9    that?

10          MR. BURNETT:  No, your Honor.

11          MR. KLEIN:  No, your Honor.

12          THE COURT:  Then let's move to the motion to strike.

13          Mr. Burnett, did the additional information that the

14   defense provided at 11:00 p.m. yesterday give the government

15   enough to do their cross?

16          MR. BURNETT:  Yes, we can do the cross.  I'm sorry if

17   I was unclear in the email.  I think what we were trying to do

18   is tee up, during cross, we planned to move to strike when we

19   get what we expect the answer will be.  So we don't need to

20   strike now if the Court is not inclined to, but I didn't want

21   to have a log jam when that happens.

22          THE COURT:  Understood.

23          What's the nature of the evidentiary -- what's the

24   evidentiary defect?

25          MR. BURNETT:  The evidently defect is Mr. Sheridan

O4GCeis1

1    testified that he saw in the code a settlement for 50 million

2    USDC.  The code is very clear that there was a settlement, but

3    nothing about the amount in that code.  So it was not possible

4    for him to have seen 50 million USDC settlement in the code.

5    So that's the evidentiary defect.

6            THE COURT:  So is it really just a Rule 702 objection

7    that, to the extent that he's offering an opinion as to the

8    $50 million in settled P&L, that's just an unreliable opinion

9    that should not be admitted under 702?

10            MR. BURNETT:  That's right, your Honor.  If we had

11    known about these opinions ahead of time and been able to

12    challenge them then, we would have done it ahead of time, which

13    was what -- obviously, we're in that position, so we're going

14    to do it now.

15            THE COURT:  Ms. Martabano, this seems like an

16    objective -- like something we can just determine.  So what's

17    the defense's position?

18            MS. MARTABANO:  Your Honor, I think we'll be able to

19    clarify either on cross or redirect that I assume he meant to

20    say that the withdrawal was 50 million and the settle, which is

21    the preceding one, didn't have a dollar amount.  I think that

22    is what he will tell Mr. Burnett.  Although, obviously, I

23    haven't spoken to Mr. Sheridan about it.  The documents

24    establish that the settle command does not have a dollar

25    amount, which is in the links that we sent to the government

O4GCeis1

1  last night, which Mr. Klein forwarded onto the Court.  It shows

2  clearly there was a settle command that does not have a dollar

3  amount associated, and the withdraw command 17 seconds later

4  has a $50 million amount next to it.  So that's what I expect

5  will happen.

6       THE COURT:  If this all gets cleaned up in that way,

7  would there be the need to strike a portion of the witness's

8  testimony?  I understand, because I was on the evidence

9  committee Rule 702 was amended, that the kind of blanket, it

10 goes to weight, not admissibility.  It's not something that

11 courts are supposed to do, but in this particular context, if

12 in fact as Ms. Martabano says, either the witness — or on

13 redirect or during your cross — it gets cleaned up in this way

14 so that the reliance on the code is limited to what the code

15 actually demonstrated, it seems, under those circumstances,

16 there would not be a need to strike any portion of the

17 witness's testimony.  It would be clear that the witness,

18 whether he misspoke or, you know, witnesses often clarify

19 things on further examination, but there would be no prejudice

20 to your side and no need to strike his testimony.  But help me

21 if there's some issue that I'm missing here.

22       MR. BURNETT:  So I think it will depend exactly how it

23 comes in and if we could get a representation from the defense

24 that they won't rely on that portion of his direct during their

25 closing.  Because our concern is -- I understand that witnesses

O4GCeis1

1    have a slip of the tongue or they misremember something, but

2    there was really a double down here in the questioning.  There

3    was the initial statement.  Then Ms. Martabano said, did you

4    see that on the blockchain, he said, yes.  Then she said, what

5    was the amount, he said, 50 million.  Then he said, what was it

6    in, it was in USDC.  So I think this was not like a slip of the

7    tongue, it was like something that was like elicited and then

8    doubled down on in multiple questions, and it would be

9    prejudicial to just leave that untouched in the record.

10             THE COURT:  Well, I take it that you're not going to

11   leave it untouched in your cross.  Let's see what the witness

12   says in response, because if he tripled down on this particular

13   statement, then you might have a viable motion to strike.  If

14   he cleans up his testimony, then it may present a different set

15   of circumstances.  But I understand the issue and thank you for

16   bringing it to the Court's attention so that it's not a lengthy

17   sidebar during cross examination.

18             MR. BURNETT:  Thank you, your Honor.

19             THE COURT:  Any further issues?

20             MS. MARTABANO:  Your Honor, we have a question as to

21   the exhibits that they sent to us at 3:30 in the morning last

22   night.  One appears to be a screenshot of I think a current

23   website, but it doesn't have a way to establish that it's tied

24   to the dates in question.  It comes similarly to the Exhibit

25   914 issue.  Like, I think they went online last night, printed

O4GCeis1

1    something out.  I don't know if they plan to offer someone to

2    explain how that was done or what it is.  Mr. Sheridan

3    obviously won't have created it, won't have relied on it.  So

4    we're just looking for some sort of foundation that suggests

5    it's not going to be confusing, you know, and that it's not

6    just hearsay for them to just print out and provide.

7              MR. BURNETT:  I'm happy to explain, if it will be

8    helpful.

9              THE COURT:  Yes.

10             MR. BURNETT:  So Mr. Sheridan, both in the testimony

11   that we've been talking about and other testimony, clearly

12   suggested -- and there was suggestions that these were not

13   borrows that Mr. Eisenberg was doing.  Mr. Sheridan's been

14   sitting in this trial all along, and one of the things he's

15   seen, because he's been sitting in the trial, was Government

16   Exhibit 318, which was a screenshot from Mr. Eisenberg's

17   computer that shows that during the time of the attack, he was

18   on the Mango borrows page.  Mr. Sheridan has testified that a

19   primary way that he, like, learned about the Mango Markets

20   system and how the Mango Markets UI works is because the Mango

21   Markets version 3, while you can't, like, do trades and things

22   on it now, is still up, the UI is still, like, active.  You can

23   still go to it and everything like that.

24             So what we're going to do is have Mr. Sheridan --

25   we're going to plug in the website, the borrows website, and

O4GCeis1

1    have him authenticate that Government Exhibit 19 I think 03,

2    which is what we marked last night, is the same thing that he's

3    seeing on that Mango Markets website, and then we'll offer it

4    to the jury.  We're not offering it for any -- that will be the

5    authentication, because he's going to be able to authenticate

6    that what he's seeing on the screen is the same thing that was

7    in the website.

8            And it's not hearsay because the point is not for the

9    truth of the matter asserted, the point is to show the jury

10   that that website is a landing page that has all of the

11   cryptocurrencies listed out with borrow buttons next to all of

12   the cryptocurrencies.  It's not the hearsay purpose, it's to

13   show what Mr. Eisenberg was sitting on during the attack was

14   the webpage that had all the borrow buttons on it.

15           THE COURT:  How is that not for the truth of the

16   matter?

17           MR. BURNETT:  Because there's no statement, your

18   Honor.  The borrow is just a command function.  There's no

19   statement on the page.

20           THE COURT:  Are you saying that the page is not

21   hearsay?

22           MR. BURNETT:  No, your Honor.  A webpage itself isn't

23   hearsay.  The content of a webpage can be hearsay if there's

24   something written on it.  The webpage is just the webpage.

25           THE COURT:  But isn't "borrow" written on the page?

O4GCeis1

1          MR. BURNETT:  It's a difference between a statement

2    and a command.  So a statement like "I borrowed this," that

3    would be a statement.  If there's a command function on a page,

4    like borrow, that's not a statement because it's not -- you're

5    not, like, stating anything.  It's just to show there's a

6    functionality available on the page.

7          THE COURT:  Am I missing something?  I thought the

8    entire premise of your wire fraud charge was that he borrowed

9    money and there was a statement.  The statement was that he was

10   borrowing money.  Wasn't that one of the statements you're

11   relying on?

12         MR. BURNETT:  That is, but we're not offering this to

13   show that he, like, clicked -- that he clicked the borrow

14   button or to show -- we're offering this to show that he was on

15   a page and that page had borrow buttons on it.

16         THE COURT:  So how is it not for the truth of the

17   matter -- you're showing him a borrow page to establish that it

18   says "borrow" because he was borrowing and not withdrawing

19   those cryptocurrency assets.  That would seem to be for the

20   truth of the matter asserted.

21         MR. BURNETT:  I think what -- I think what the

22   difference is, it's not the truth -- the part of hearsay is it

23   needs to be two things.  It needs to be a statement that's

24   offered for the truth of the matter asserted.  Here, we're not

25   offering a statement, we're offering a webpage that has a

O4GCeis1

 1    functionality to borrow on it.  That's not a statement that's

 2    on the page that's being offered for the truth.  It's not the

 3    truth part, it's the statement part of the hearsay rule.

 4         And this is, I think -- I mean, if you look in the

 5    rule, there's like a number of, in the commentary sections, I

 6    believe, it goes into this point about you how, like,

 7    automatically, like generated, like things or links that's not

 8    a hearsay statement in the same way like a URL is not a hearsay

 9    statement, it's like a command you can click on, it sends you

10    somewhere.  I think the analogy in this case would be both

11    parties offered extensive evidence about websites that had URLs

12    and links in them.  Those URLs are not hearsay.  What they are

13    is command functions.  They're not -- they're not statements.

14         THE COURT:  Well, that's true.  But why are you

15    putting in the page again?

16         MR. BURNETT:  We're putting in the page to show that

17    Mr. Eisenberg was sitting, during the attack, on a page that

18    had borrow buttons on it.

19         THE COURT:  To establish that he in fact borrowed;

20    right?

21         MR. BURNETT:  The inference that a jury could draw

22    from that is that he was borrowing, but the borrows themselves

23    are not statements.

24         THE COURT:  The inference that you're seeking -- so,

25    really, what you're saying -- I mean, the crux of your position

O4GCeis1

1  that it's not for the truth of the matter asserted is that the

2  borrow buttons are functions and not statements?

3       MR. BURNETT:  Right.

4       THE COURT:  Because if they were statements, then you

5  would agree that you were putting in that exhibit for the truth

6  of the matter asserted and that it is hearsay.

7       MR. BURNETT:  Right.  It's there are two different

8  parts of the hearsay rule.  It needs to be a statement offered

9  for the truth.  We're not disputing the offered for the truth,

10  we're disputing it's not a statement point.

11       THE COURT:  Ms. Martabano, do you have a response to

12  that?

13       MS. MARTABANO:  Yes, your Honor.  I'm looking at

14  this -- first of all, there's no, like, time on this.

15       THE COURT:  Do you have this exhibit?

16       MR. BURNETT:  We can pull it up.  I think it's 1903.

17       MS. MARTABANO:  It's unclear to me.  Based on what

18  Mr. Burnett said earlier, it sounded like he was saying this

19  website is still live, so he just went on it and looked at it,

20  you know, as of last night.

21       MR. BURNETT:  And, your Honor, if I could --

22       THE COURT:  318, what's the difference between this

23  and 318?  Because 318 is in evidence.

24       MR. BURNETT:  So 318 is the page from -- we can pull

25  this up too so I don't have to try to fumble through describing

O4GCeis1

1    it.  318 looks like this from the computer.

2              MS. MARTABANO:  But Mr. Burnett, you're not

3    representing that this was the page on the date of that visit,

4    are you?

5              MR. BURNETT:  I'm representing that this is the borrow

6    page from V3.  He looked at a whole bunch of websites that are

7    the borrow pages -- that are the pages from the V3.  He

8    testified about them extensively.  We can deal with the

9    authenticity things, but I want to make sure we're getting the

10   hearsay point covered first.

11             THE COURT:  Walk me through what you're going to do

12   with 1908.

13             MR. BURNETT:  I'm going to show him 318, which is

14   already in evidence and he saw.  I'm going to ask him, what you

15   did in preparing to testify was you went to the version 3 of

16   the website, which is still up, the UI is still up and

17   available, which he did.  He testified to that extensively on

18   direct examination.  And he'll say, yes.  And I'll say, you can

19   in fact plug in the borrow information, you could plug in

20   website, you can plug in URLs and find things on that V3

21   website, which I expect he'll say yes to because that's what he

22   did to research for the case.  I'll say, you saw this link

23   here, let's plug that link into the website.  We'll plug that

24   link into the website, he'll see this page pop up.  I'll say,

25   did you see this page pop up.  I'll say, does this look like

O4GCeis1

1    one of the V3 webpages, which I expect he'll be able to say yes

2    to because there will actually be a red banner that we've

3    cropped off that will appear that will say this is the V3

4    version that was hacked, because we've been redacting that for

5    purposes of the trial, and that will authenticate that this is

6    the landing page that this link takes you to, and then we'll

7    offer it.

8              And on this hearsay point, I think it's important that

9    if you go to Rule 801 in the rules of evidence, it defines

10   "statement."  And the statement is defined to mean a person's

11   oral assertion, written assertion, or nonverbal conduct if the

12   person intended it as an assertion.  And a webpage like this

13   that just has borrow links is not any person's written or

14   non-written assertion.  It's just a webpage that has links on

15   it, and those links say "borrow" because you can click them to

16   borrow, but there's no assertion by any person on this webpage.

17             THE COURT:  Okay.  I don't think that this just has

18   functional buttons in the way that you're asserting.  I'm

19   looking at 801, which says, "statement" means a person's oral

20   assertion, written assertion, or nonverbal conduct if the

21   person intended it as an assertion.  And you would agree that

22   "person" would include corporate or institutional entities such

23   as Mango Markets; correct?

24             MR. BURNETT:  Yes, your Honor.

25             THE COURT:  This site, in addition to having

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O4GCeis1

1    functional keys, says "borrow all assets."  I mean, how is that

2    not a statement?  It's right there at the top of the page.

3    That's not a functional link or a URL or a button.  It says,

4    "borrow all assets."  And then it's got labels, too, which have

5    to be the statements of Mango Markets that described to users

6    what is being represented on the page.  That's a statement.

7    That's an assertion.  It's the entity that's telling users on

8    this page, here's what you're seeing, here's what it means, and

9    that seems to fit under the definition of "statement."

10       I'm with you if there was just like code or just is

11   like little buttons that had no -- that were not intended to be

12   asserting anything, that would be one thing, but just like to

13   just take it down to like, you know, on the human level, like

14   if a user is sitting there looking at this page and they're

15   like trying to figure out like what it means, they're relying

16   on the statements that are depicted on the page, including,

17   like, Mango Markets saying "borrow."  If you want to borrow,

18   you do this.  Okay.  You look at all these things.

19       You're right that the keys themselves and the

20   functions that are underlying those keys are not statements,

21   but there are statements on this page.

22       MR. BURNETT:  So the reason I don't think that's

23   right, this goes to kind of like a little deep into like

24   hearsay land now.  So there are -- the doctrine of verbal acts

25   is that an act, so an offer for something is not a statement.

O4GCeis1

```
1   So if I go up to you and say, hey, I'll offer to lend you this,

2   I'll offer to lend you $10, that offer is a verbal act, it's

3   not a statement.  So the fact that there is like something that

4   says, hey, here's USDC, you can click on this functionality to

5   borrow, that's a verbal offer, a verbal act to give you an

6   opportunity to borrow, but it's not itself a statement under

7   the hearsay rules.

8            THE COURT:  Okay.  But this page, the whole purpose of

9   this page is to communicate.  It's like a medium of

10  communication to users.

11           MR. BURNETT:  It's communicating offers to users to

12  borrow something, and that's a verbal act, not a statement

13  under the hearsay rules.

14           THE COURT:  Even if nonverbal conduct is covered as

15  under the definition of statement if the person intended it as

16  an assertion --

17           Okay.  Here's what I'm going to do.  Do you have any

18  grounds to get 1903 in if in fact I deem these to be

19  statements?

20           MR. BURNETT:  So if you think this is -- if you rule

21  this is hearsay, then I don't think we have any other basis to

22  put it in.

23           THE COURT:  That doesn't mean you can't use it to the

24  extent -- because what you're saying is that the witness went

25  to this page.  And so, to the extent that that bears on some
```

O4GCeis1

1    testimony that the witness gave, then you'd be able to use it.

2         Ms. Martabano, you're not saying that they can't use

3    it in connection with the testimony or are you saying that they

4    can't even use it if it's not shown to the jury and admitted

5    into evidence?

6         MS. MARTABANO:  I think a couple of things.

7    Obviously, we don't think it should be shown to the jury.  I

8    don't believe he testified that he went to the borrow page

9    specifically, the subpage of the borrow page.  He said

10   trade.mango.markets is still available.  So he may say that.  I

11   don't believe so, but I don't think he's testified to that so

12   far.

13        I think your Honor has captured our concern about the

14   statements being made here, but also, on top of that, it raises

15   a 403 issue of confusing.  There's no way to say that this is

16   what it looked like when Mr. Eisenberg traded.  They're seeking

17   to put in the fact that he visited this page to show what it

18   looks like right now.  And obviously, since Mr. Eisenberg's

19   trades, the platform, the numbers on the platform and the

20   availability on the platform have changed drastically.  That

21   was part of the argument over exhibit 914.  And the government

22   has not represented that this actually looks like the website

23   that Mr. Eisenberg was on.  And to us, the values on here are

24   obviously highly important.  So it's really going to be

25   misleading and confusing to the jury to suggest that this is

O4GCeis1

1    what it looked like when Mr. Eisenberg was on that page.  I

2    don't see that there's any way that Mr. Burnett or the

3    government could establish that this is what it looked like.

4    And given that, I just think all it's going to do is mislead

5    and confuse the jury.

6          To the extent they want to talk about the borrow or

7    withdraw, the zeros and ones, if that's what they're talking

8    about, that is a different portion of the website where I

9    believe the government may have already showed it, but you can

10   either toggle a borrow or a withdraw.  It's not that he went to

11   this website.

12         So I think, to sum up, obviously we believe that this

13   is hearsay and they're trying to get in the statements and

14   they're certainly going to argue the import of this document is

15   it was statements on a borrow page.  The page itself is stale.

16   There's no way for them to establish that this is what it

17   looked like then.  Because it is stale, it will confuse the

18   jury.  And because Mr. Sheridan wasn't the one who pulled this

19   up — and I don't believe he's testified that he's reviewed this

20   specific page as of now in the record — I think it will be that

21   much more misleading and confusing to the jury.

22         THE COURT:  And Mr. Burnett, just tell me again, why

23   are you putting in this page?

24         MR. BURNETT:  We're putting in this page because

25   Mr. Sheridan suggested during his testimony that Mr. Eisenberg

O4GCeis1

1    had not borrowed, but instead settled positions and withdrawn.

2    And the fact that Mr. Eisenberg was sitting for the entire time

3    of his attack on the page where there's the functionality to

4    borrow is strong evidence that he did not in fact do that.

5              THE COURT:  Understood.  So you are putting it in for

6    the truth of the matter asserted, you're just saying it's not

7    statement?

8              MR. BURNETT:  That's just our position.

9              THE COURT:  1903 will be excluded for that reason.

10   The Court is also sensitive to the 403 issues, but I think this

11   is hearsay.  They are statements, as I understand the document

12   and looking at the document, and as the government says, it is

13   putting it in for the truth of the matter asserted.  So 1903

14   will be excluded.

15             Anything else, Mr. Burnett?

16             MR. BURNETT:  No.  Just a quick restroom before we

17   start?

18             THE COURT:  Yes.

19             And we can get Mr. Sheridan back on the stand.

20             (Recess)

21             Can I see counsel and let's have the court reporter

22   back in the robing room.

23             (In the robing room)

24             So the issue that has come up is with respect to juror

25   No. 6.  So juror No. 6 had a serious medical issue come up last

O4GCeis1

1    night with a family member.  She thought it was okay.  It

2    appears that, based on some communication she's had this

3    morning, there may be some issues.  So Mr. Hernandez is going

4    to get juror No. 6.

5            (Juror present)

6            Good morning.  Come on in.  Take a seat.  So tell us,

7    it seems like something happened last night?

8            JUROR:  Yes.  So, it's either last night or early this

9    morning.  All I know is that when I woke up this morning, I

10   went into the bathroom, and in the garbage can, I see like a

11   whole bunch of blood, you know, tissues of blood in the garbage

12   can.  So I said, well, maybe my -- I called my youngest son

13   Cholo maybe had a nosebleed, but it's too much blood for like a

14   nosebleed, so I went into his room.  I have a photo, too, I can

15   show you of -- so I go into his room and I look at him and I

16   see like a gash and like a bump, and still like dried blood on

17   his forehead.  And I said -- I gently woke him up and I said,

18   Cholo, what happened.  And he said, I was coughing so much --

19   because I had to take him to the emergency room twice because

20   he has a cough, once on Saturday, then again on Monday.  And

21   they gave him a medicine and asthma medicine, but he said he

22   was coughing so much that he fell in the bathroom and woke up

23   on the floor.  So I said, are you okay.  He said, yeah, I'm

24   okay.  So I said, all right.  I took a picture of it.  I sent

25   it to my oldest son and to his girlfriend and I said this

1    happened to Cholo this morning, but I have jury duty.  So when

2    I came, I spoke with one of the jurors who's a nurse and she

3    said if he lost consciousness, it's better for him to go to the

4    emergency room and get his, you know, tell him to do a CT scan

5    and also to do a scan of his chest to see that the medicine is

6    not working.  I'm sorry, it's that --

7         THE COURT:  No.  No.  I'm so sorry you had to go

8    through this.  That's a horrible situation.

9         JUROR:  So I text him and I said, please get up and

10   go.  Are you okay to go because, if not, I'm going to leave.

11   He said, no, no, mom, please stay.  Then he texted when he said

12   are you available to come with me because I feel lightheaded.

13   I'm sorry.  I don't mean to put a monkey wrench on whatever,

14   but this is my son.  And I'm afraid, too, because we live in a

15   duplex, so even if I was to call my niece or somebody to say

16   here are the keys or somebody knocking on the door and they

17   don't have the top lock key, god forbid for him to fall down

18   the stairs because he feels lightheaded.

19        THE COURT:  So you need to go home to get your son?

20        JUROR:  Right.

21        THE COURT:  First of all, I'm really sorry that you

22   have to go through this.  I've been there.  You don't know,

23   there's a lot of unknowns and you want to make sure your family

24   gets medical attention as soon as possible.

25        If you could do me a favor and just wait outside the

O4GCeis1

1     door for just a second and I'll talk to the parties.

2              JUROR:  Sure.

3              (Juror not present)

4              THE COURT:  So I don't think there's anything to do

5     other than to excuse this juror, which will leave us with one

6     alternate, but I'm happy to hear from both sides to see if they

7     have any objections or issues.  I'm happy to inquire further

8     with this juror.

9              MR. DAVIS:  Nothing from the government, unless my

10    colleagues have anything to add.  She's in emotional distress.

11             MR. KLEIN:  She's clearly in emotional distress.  The

12    only concern, obviously, she should go and be with her son.  To

13    be very clear, that's our position.

14             The one juror is going to Marrakesh, so we'll be down

15    to one alternate.

16             MR. DAVIS:  So it looks like we're going to be on

17    schedule to close tomorrow.  And so, if we close tomorrow,

18    hopefully the jury has the case by Thursday.  I don't think --

19    we'll have one additional alternate for a juror who's headed

20    off to Marrakesh, but, obviously, I'm open to any and all

21    solutions.

22             THE COURT:  Well, I think that is the option.  Unless

23    someone has some other suggestion, I don't think that there's

24    any way.  I think it would be --

25             MR. KLEIN:  We have to let her go.  We're not opposing

O4GCeis1

1    that.

2                THE COURT:  That's the decision for this juncture and

3    we'll see what's going to happen.

4                Mr. Klein, has your client made a determination as to

5    whether he's going to testify or is he still thinking about it

6    and wants to see how Mr. Sheridan does?

7                MR. KLEIN:  We're in the same place as we were

8    yesterday.  That's where we are.  We think it's still unlikely,

9    but we'll have to talk to him after Mr. Sheridan gets done

10   previously.

11               THE COURT:  Understood.  Anything else?

12               MR. KLEIN:  One question, we're closing Wednesday

13   morning, you'd be charging and starting deliberations

14   Wednesday?

15               THE COURT:  Yes.

16               MR. TALKIN:  Your Honor, I have one scheduling thing,

17   but we can do it after.

18               THE COURT:  Okay.  Let's have Ms. Martinez come back

19   in.

20               (Juror present)

21               We are going to excuse you for cause because of this

22   very serious thing that happened.  I know that you need to be

23   with your son, so I wish you the best of luck.  Thank you so

24   much for all your service thus far.  I know that you're working

25   really hard and you were really invested in the case.  You even

O4GCeis1

```
1    came today, despite what happened.  Thank you for bringing it
2    to our attention because it's really important that you do so.
3    And so, everyone here wishes you the best of luck with your
4    son.  I'm sure everything will be okay, but it's best you go
5    and take care of him.
6             JUROR:  Thank you so much.  And I'm very sorry.
7             THE COURT:  No, I understand.  Don't worry about it.
8    Take care of your family, make sure everyone's safe.
9             JUROR:  Thank you so much.
10            THE COURT:  You're welcome.
11            (Juror not present)
12            MR. TALKIN:  Your Honor, based on what we heard in the
13   courtroom today about Exhibit 318, it seems like there was
14   going to be an argument that it's a website that my client was
15   on exclusively and that's not the case.  There are similar
16   documents within the computer that will refute that.  I think
17   what we can do is we can get those real quick, we can get this
18   done today, either work out a stipulation that they came from
19   the same computer that Mr. Dwyer testified or I can bring
20   Mr. Dwyer back this afternoon.  I just wanted to flag that
21   issue.  Right now, we're identifying what we want to turn in
22   the form to put into evidence and then we'll do that.
23            THE COURT:  From a scheduling standpoint, how are we
24   going to do this, because unless you have another witness,
25   you're going to rest; right?
```

O4GCeis1

| | |
|---|---|
| 1 | MR. TALKIN:  That's why I'm telling you now with the |
| 2 | scheduling.  What I would do is say there's two ways we could |
| 3 | do it.  We can say that we rest with some type of conditional |
| 4 | rest in that there may be -- |
| 5 | THE COURT:  No. |
| 6 | MR. TALKIN:  -- one more piece of evidence first thing |
| 7 | in the morning. |
| 8 | THE COURT:  No, next. |
| 9 | MR. TALKIN:  We're working on it now.  I think if |
| 10 | there's a stipulation in that it came from the computer which |
| 11 | it did -- the only vehicle would be call Mr. Dwyer again to say |
| 12 | it's the computer and here it is.  I don't think that's really |
| 13 | necessary. |
| 14 | THE COURT:  Mr. Burnett, how long is your cross? |
| 15 | MR. BURNETT:  My guess is half an hour. |
| 16 | THE COURT:  And then there's going to be some |
| 17 | redirect, so that will take us to -- what we'll probably do is |
| 18 | do an early break after Mr. Sheridan testifies.  That will give |
| 19 | you time to do two things, which is, one, speak to your client |
| 20 | and determine whether he wants to testify or not.  If not, then |
| 21 | we'll do the allocution, we'll figure that out.  During that |
| 22 | same period of time, someone should be figuring out this issue |
| 23 | and talking to the government so that we can come back and then |
| 24 | you could rest and then the government can let us know whether |
| 25 | it has any rebuttal case and we can proceed.  Make sense? |

O4GCeis1

1    MR. TALKIN:  It does.  Thank you.

2    THE COURT:  Perfect.

3    (In open court)

4    Mr. Hernandez, let's get the jury.

5    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4GMEIS2                        Sheridan - Cross

1              (Jury present)

2              THE COURT:  Welcome back, members of the jury.

3              Mr. Sheridan, you understand you are still under oath?

4              THE WITNESS:  Yes, sir.

5              THE COURT:  Mr. Burnett, you may proceed with

6    cross-examination.

7              MR. BURNETT:  Thank you.

8    JEREMY SHERIDAN, resumed.

9    CROSS-EXAMINATION

10   BY MR. BURNETT:

11   Q.  Good morning, Mr. Sheridan.

12   A.  Good morning, sir.

13   Q.  I want to start a bit with your role in this case.  OK?

14   A.  Yes, sir.

15   Q.  You were hired by the defense to testify and help them

16   prepare for trial, correct?

17   A.  We were initially hired by the defense to conduct the

18   Blockchain analysis of the trading activities associated with

19   Mr. Eisenberg's accounts.  It wasn't -- the first hire was not

20   directly to testify.  It was no conduct the analysis.

21   Q.  Since then you have been hired to testify?

22   A.  As a continuation, yes, sir.

23   Q.  And you interviewed with the defense before they hired you,

24   correct?

25   A.  Yes, sir.

O4GMEIS2                        Sheridan - Cross

1   Q.  Who did you interview with?

2   A.  Mr. Klein was there.  I don't recall who else was present.

3   Q.  Fair to say you wanted to get the job when you were

4   interviewing, right?

5   A.  Yes, sir.

6   Q.  Then they hired you and your firm, FTI, to work on this

7   matter, correct?

8   A.  Yes, sir.

9   Q.  You're billing at what?  I think it was $910 an hour,

10  right?

11  A.  For my time.  That's what my firm bills, yes, sir.

12  Q.  How many hours would you say you have spent on this case so

13  far?

14  A.  Roughly 80 to 100.

15  Q.  FTI also separately bills for work that other folks do,

16  correct?

17  A.  There are other members of my team who have different bill

18  rates.

19  Q.  What are some of those bill rates they are billing at?

20  A.  Another member of the team, there was a director and two

21  senior consultants.  The director rate -- I don't have the

22  exact numbers.  I can estimate.  I believe the director rate is

23  around $800 an hour and the senior consultants are around $600

24  an hour.

25  Q.  How much time would you say those folks at your firm have

1   billed on this case?

2   A.  The director, very little.  He is more in an administrative

3   management role.  The senior consultants were -- the ones that

4   performed more technical work related to the investigation,

5   their hours would be likely similar to mine.  I haven't checked

6   their hours.

7   Q.  Fair to say that since being hired you and the folks at FTI

8   have worked closely with the defense throughout the preparation

9   for the case and this trial?

10  A.  Yes, sir.

11  Q.  In fact, you personally have been working closely with the

12  defense throughout this trial, right?

13  A.  Yes, sir.

14  Q.  And you have been doing something a little bit different

15  than every other witness in this case, haven't you?

16  A.  Can you specify?

17  Q.  Sure.  You've been in the courtroom every delay day, right?

18  A.  Yes, sir.

19  Q.  Because you've been in the courtroom every day, you know

20  you're the only witness who has been in the courtroom every

21  day, correct?

22  A.  Yes, sir.

23  Q.  Because you've been in the courtroom every day, you've

24  gotten to see everything the defense has been doing in the

25  case, correct?

O4GMEIS2                        Sheridan - Cross

1   A.  Yes, sir.

2   Q.  So you were here for the defense's opening statements,

3   correct?

4   A.  Yes, sir.

5   Q.  You've been here for the defense's cross-examination of

6   every single witness, correct?

7   A.  Yes, sir.

8   Q.  In fact, even when the jury has left the room, you've

9   stayed around sometimes to see the arguments that the defense

10  has been making to the judge, correct?

11  A.  Yes, sir.

12  Q.  So you know every theme and every argument that the defense

13  has been making in this case, correct?

14  A.  I wouldn't say I know every theme.  I know the themes that

15  have been presented in court, sir.

16  Q.  You basically have been part of the defense team, right?

17  A.  I have been instructed by the defense team to carry out

18  activities, and I have carried out the activities they have

19  instructed me to do.

20  Q.  And you have watched them carry out their activities every

21  single day during trial, correct?

22  A.  I have observed them while I've been in the courtroom, yes,

23  sir.

24  Q.  Before the defense hired you, you had never used Mango

25  Markets, correct?

1  A.  That's correct, your Honor.

2  Q.  In fact, before this incident on October 11, 2022, had you

3  even heard of Mango Markets before?

4  A.  Yes, sir.

5  Q.  You never used it, though.

6  A.  No, sir.

7  Q.  You never had an account on the platform, correct?

8  A.  No, sir.

9  Q.  You never traded cryptocurrency on it, right?

10  A.  No, sir.

11  Q.  You never traded perpetuals, right?

12  A.  No, sir.

13  Q.  Never borrowed from Mango Markets?

14  A.  No, sir.

15  Q.  You certainly never had reviewed any of the code related to

16  Mango Markets before you were hired by the defense to start

17  working with them on this case, right?

18  A.  That is correct, sir.

19  Q.  So everything you have learned about Mango Markets has come

20  since you've been hired by the defense to start working with

21  them?

22  A.  Not everything.  I was aware of Mango Markets and the

23  trading activities at issue in this case, so I was aware of the

24  event.

25  Q.  Other than that general background and awareness of the

O4GMEIS2                          Sheridan - Cross

1    event.

2    A.  That is the extent of my knowledge prior to this.

3    Q.  Now, I want to talk about something -- you talked about a

4    distinction between centralized and decentralized platforms

5    during your direct examination.

6         Do you remember that?

7    A.  Yes, sir.

8    Q.  And one of the things you've learned is that Mango Markets

9    is a decentralized platform, correct?

10   A.  I was aware of that, again, as a general concept prior to

11   this official engagement.

12   Q.  And you testified that a decentralized platform, it works

13   through something called a smart contract?

14   A.  Yes, sir.

15   Q.  And that's basically just computer code, right?

16   A.  Yes, sir.

17   Q.  It's not so different from a software program; it just runs

18   on the Blockchain?

19   A.  I would make the distinction that it is different from a

20   software program in that smart contracts have different

21   functional execution than other types of software.

22   Q.  There are some functional differences, but basically it

23   does what a software does, you input information into it and it

24   does stuff with that information, correct?

25   A.  Yes, sir.

O4GMEIS2                        Sheridan - Cross

1   Q.  And that software program, the smart contract for Mango

2   Markets, is run by an entity called Mango DAO, correct?

3   A.  That's correct, your Honor.

4   Q.  So the folks at Mango DAO are the ones that create the code

5   for the smart contract to begin with, right?

6   A.  Yes, sir.

7   Q.  And they can make edits to it too, correct?

8   A.  So, yes.  To clarify, Mango DAO is the collection of all

9   users of Mango Markets.

10  Q.  And they are the ones who can update, change the software

11  program, that sort of thing, right?

12  A.  So everyone can suggest those changes and so forth, yes,

13  sir.

14  Q.  Fair to say that centralized exchanges also run on software

15  programs, correct?

16  A.  Yes, sir.

17  Q.  So in that case, instead of a DAO designing the software

18  program, it's the company designing the software program,

19  right?

20  A.  Yes, sir.

21  Q.  There is not someone at a centralized exchange, like

22  Robinhood or Charles Schwab or Binance, who is sitting there

23  actually approving every transaction, correct?

24  A.  That is correct, sir.

25  Q.  It runs similarly to the way the Mango Markets does, where

O4GMEIS2                        Sheridan - Cross

1   there is a software program and a group that's responsible for

2   the software program, correct?

3   A.  Similar with distinctions about a community element within

4   the DAO.

5   Q.  Right.  One is a company and the other is a community of

6   DAO members.  That's the distinction, correct?

7   A.  In a general sense, yes, sir.

8   Q.  And I want to talk a little bit now about how Mango Markets

9   worked.  When you wanted to learn about how Mango Markets

10  operated, one of the main places you turned to was the user

11  guide, correct?

12  A.  Yes, sir.

13  Q.  Fair to say that was an important place to understand how

14  Mango Markets worked and what it was supposed to do, right?

15  A.  Yes, sir.

16  Q.  So I want to take a look at some pages of that user guide.

17         MR. BURNETT:  If we can pull up Government Exhibit

18  1011, please.

19  Q.  This is the user guide we have been talking about, right?

20  A.  Yes, sir.

21         MR. BURNETT:  Let's go ahead to page 78 of the user

22  guide, please.

23  Q.  This here is the section that's about borrowing and

24  lending, correct?

25  A.  Yes, sir.

1   Q.  And this has basically a step-by-step guide for what you

2   got to do to borrow funds, right?

3   A.  This is the start of those instructions, yes, sir.

4   Q.  Right.  This user guide, this section generally tells

5   folks, here is what you have to do to borrow, right?

6   A.  Yes, sir.

7            MR. BURNETT:  Let's go ahead to page 79, so the next

8   page here.

9   Q.  And there is a sentence at the top that says:  The UI will

10  prompt you to select the assets that you wish to withdraw and

11  borrow and toggle "borrow funds" on.

12           Did I read that right?

13  A.  Yes, sir.

14  Q.  And do you see there is an image below that on the screen

15  that's an example of that borrow button?

16  A.  Yes, sir.

17  Q.  And that's the button that you have to press to represent

18  that you are borrowing funds, correct?

19  A.  Our research identified that's the button you press that

20  allows you to potentially borrow funds.

21  Q.  So that's one way you can borrow funds, right?

22  A.  That is one way you can borrow funds.

23  Q.  You got a signal to the platform that you are borrowing

24  funds if you want to borrow funds, correct?

25  A.  That's accurate.

1   Q.  Actually, you do that by like clicking this toggle, right?

2   You say you're borrowing.

3   A.  That's correct.

4   Q.  Now, we can agree that when a user borrows funds, they need

5   to have enough assets to support that borrow initially,

6   correct?

7   A.  They need to have enough assets in collateral as determined

8   by the protocol to borrow those funds.

9   Q.  Right.  The system won't let them borrow unless they have

10  enough assets to begin with to support that borrow, correct?

11  A.  That is correct.

12          MR. BURNETT:  So let's take a look at that.  We can go

13  back one page to 78.

14  Q.  Do you see there is a section that says:  Don't sell, just

15  utilize?

16  A.  Yes, sir.

17  Q.  In the second sentence, after under the hood it says:  The

18  Mango Markets risk engine permits users to take out fully

19  collateralized loans against any deposited assets, correct?

20  A.  Yes, sir.

21  Q.  And fully collateralized means you have to have enough

22  assets to do the borrow when you click that borrow button,

23  right?

24  A.  That's correct.

25  Q.  In fact, the Mango Markets smart contract will check to

1   make sure someone has enough assets before it let's them

2   borrow, right?

3   A.  Yes, sir.

4          MR. BURNETT:  Let's take a look at that.  We can go

5   down two pages to page 81.  If you could zoom in on the

6   screenshot here.

7   Q.  This is a screenshot of the confirm withdrawal page,

8   correct?

9   A.  Yes, sir.

10  Q.  And it says this includes borrows of, in this example,

11  100,000 USDC, right?

12  A.  Yes, sir.

13  Q.  So it's checking how much you're borrowing.  That's what

14  the system is doing.

15  A.  The check -- my interpretation would have already occurred.

16  This is the confirmation.

17  Q.  Got it.  Part of that confirmation is, it says there is an

18  account health check, correct?

19  A.  Yes, sir.

20  Q.  And part of what it's checking is the account value, right?

21  A.  Yes, sir.

22  Q.  That's to make sure you have enough assets to support that

23  borrow, correct?

24  A.  Yes, sir.

25  Q.  And part of what it's checking is the risk and the leverage

O4GMEIS2                        Sheridan - Cross

1    and the borrow value, right?

2    A.   My confusion is on the withdrawal versus borrow.  In this

3    screenshot, and this was a consistent theme in our

4    investigation, is identifying what was considered a withdrawal

5    and what was considered a borrow.  As you can see, the top says

6    confirm withdraw, but the borrow value is listed here.  So it's

7    difficult to make a distinction between a borrow and a

8    withdrawal.

9    Q.   Mr. Sheridan, we can agree this says includes borrow of

10   100,000 USDC, correct?

11   A.   Yes, sir.

12   Q.   So I think it's not so hard to make a distinction here to

13   understand that this is borrowing and then withdrawing, right?

14   A.   But the includes part is the challenge.  If you are about

15   to withdraw 100,000 -- the amounts equate, yes, sir.  The

16   withdrawal of 100,000 USDC, that includes the full amount of

17   that borrow, to me in this case would indicate that this full

18   amount is a borrow, yes, sir.

19   Q.   Right.  What this is showing is someone is borrowing

20   100,000 USDC and withdrawing 100,000 USDC, correct?

21   A.   Yes, sir, that's how I would interpret it.

22   Q.   Before it can do that, the system runs basically a credit

23   check on your account value to make sure you have enough assets

24   there to support that borrow before you can withdraw it.

25   A.   That's accurate.

```
 1              MR. BURNETT:  Now, let's go down to page 108.

 2              I apologize.  I sent you to the wrong spot, Mr. Sears.

 3     Let's go to page 60.

 4     Q.  To keep a borrow open on Mango Markets, a Mango Markets

 5     user has to maintain enough collateral in their account,

 6     correct?

 7     A.  To keep a borrow open.  Can you clarify what you mean by

 8     keep open?

 9     Q.  Sure.  Why don't we deal with the documents.  At the bottom

10     here it says watch your health ratio, right?

11     A.  Yes, sir.  I see that.

12              MR. BURNETT:  If we can go to the top of the next

13     page, please.

14     Q.  This says at the top:  Once a position is opened, it must

15     maintain a health ratio above zero percent.  If an account

16     falls to zero percent, it will be liquidated and the funds will

17     be lost.

18              Did I read that right?

19     A.  Yes, sir.

20     Q.  What that means is, you need to maintain enough collateral

21     to keep your health high enough if you want to keep your borrow

22     open, right?

23     A.  Yes, sir.

24     Q.  Otherwise, you are going to get liquidated.

25     A.  Yes, sir.
```

1          MR. BURNETT:  Now, this shows up in a few other
2     places, right, so page 103, why don't we go down there.  If we
3     can zoom in on the bottom.
4     Q.  This says on the second line:  Maintenance health must be
5     kept above zero to avoid liquidation, correct?
6     A.  Yes, sir.
7     Q.  To keep that borrow open you have got to keep that health
8     up, right?
9     A.  Yes, sir.
10          MR. BURNETT:  Let's take this down.
11    Q.  I want to talk about liquidations, which you touched on, I
12    think, briefly in your direct examination, correct?
13    A.  Yes, sir.
14    Q.  Now, the basic point here is that if someone has losses,
15    they can lose their collateral, right?
16    A.  By losses you mean the assets that they have borrowed on
17    the collateral are in a negative state, yes.
18    Q.  So if they have lost money on a bet, the system can go grab
19    their collateral to cover those losses, right?
20    A.  Based on the health of their account, yes.
21    Q.  If you don't have enough assets, you can go bankrupt on the
22    platform, right?
23    A.  Yes, sir.
24    Q.  Fair to say that going bankrupt typically not a good thing?
25    A.  That's an accurate statement.

1   Q.  Now, you also talked about socialized losses on the

2   platform, correct?

3   A.  Yes, sir.

4   Q.  And basically what socialized losses are is, it means if

5   your losses are so big that you don't have enough collateral to

6   cover them and the insurance fund can't cover them, then

7   everyone else on the platform is stuck holding the bag for your

8   losses, right?

9   A.  Everyone else on the platform will be contributing funds to

10  cover those losses, yes.

11  Q.  Everyone else has to chip in to pay your loss?

12  A.  Yes, sir.

13  Q.  Now, there is a way to avoid liquidation on the platform,

14  right?

15  A.  Yes, sir.

16  Q.  You could put more money into the platform, right?

17  A.  Or reduce your borrows.

18  Q.  You can cut down on borrows or you can put money in

19  yourself, correct?

20  A.  Yes, sir.

21  Q.  Mr. Eisenberg didn't reduce his borrows or put money back

22  into the platform, did he?

23  A.  No, sir.

24  Q.  Let's shift gears now and talk about a different topic.

25          You testified on direct examination that when someone

```
 1   starts using Mango Markets, they need to press a button that
 2   says the platform is unaudited and, quote, I understand and
 3   accept the risks.
 4             Do you remember that?
 5   A.  Yes, sir.
 6   Q.  That was, I think, Government Exhibit 1010, or something
 7   like that, the little screenshot, right?
 8   A.  I remember the screen.  I don't remember the number.
 9   Q.  Fair enough.
10             Now, that screenshot doesn't say what risks the person
11   is accepting, correct?
12   A.  No, sir.
13   Q.  And you are not here today testifying as a legal expert,
14   fair to say?
15   A.  Correct, sir.
16   Q.  So you are not testifying that by clicking a button that
17   says I accept the risks, every user of Mango Markets was giving
18   up protections of the criminal law, right?
19             MS. MARTABANO:  Objection.
20             THE COURT:  Overruled.
21   A.  Can you repeat the question, sir.
22   Q.  Sure.  You're not testifying that by clicking the button
23   that says, I accept the risks, every user of Mango, as a matter
24   of fact, was giving up the protections of criminal law, right?
25   A.  I'm not an attorney, sir, no.
```

1  Q.  You also understand that by the time of Mr. Eisenberg's

2  scheme in October 11 of 2022, the code actually had been

3  audited, right?

4  A.  Yes, sir.

5  Q.  And just to orient everyone, that's Government Exhibit

6  1011.  This is the user guide again, right?

7  A.  Yes, sir.

8  Q.  If we go to page 3, this is the audit section, right?

9  A.  Yes, sir.

10  Q.  Now, you were asked a few questions generally about how

11  code audits work on direct examination, right?

12  A.  Yes, sir.

13  Q.  But you weren't actually asked to go through the specific

14  things that this audit covered, were you?

15  A.  No, sir.

16  Q.  Let's take a look at Defense Exhibit 60.  This is the audit

17  that you looked at earlier, correct?

18  A.  When you say earlier, earlier in the trial?  I reviewed it

19  before trial and in trial, yes.

20  Q.  I apologize.  This is the one that's linked on that web

21  page, correct?

22  A.  Yes, sir.

23          MR. BURNETT:  Let's go ahead to page 3.

24  Q.  Now, here there is an introduction section, right?

25  A.  Yes, sir.

1          MR. BURNETT:  Let's just orient everyone.

2     Q.  This says in the first paragraph:  Mango engaged Neodyme to

3     do a detailed security analysis of their on-chain Mango V3

4     smart contract.  A thorough audit was conducted between January

5     and April 2022.

6          Right?

7     A.  Yes, sir.

8     Q.  And it says the audit revealed some vulnerabilities but

9     that Mango has released a fix for all issues except one

10    informational finding in the second paragraph?

11    A.  Yes, sir.

12    Q.  Now, let's go ahead to page 5 of the audit.  Let's zoom in

13    on the first paragraph here.  This is the methodology section,

14    right?

15    A.  Yes, sir.

16    Q.  And under the methodology section it says -- let's keep

17    that blown up.  It says:  Neodyme's audit team, which consists

18    of security engineers with extensive experience in Solana smart

19    contract security, reviewed the code of the on-chain contract,

20    paying particular attention to the following.

21         And then it has got a list of stuff they paid

22    attention to, right?

23    A.  Yes, sir.

24         MR. BURNETT:  If we could go down to the fourth bullet

25    from the bottom, if you could highlight the fourth bullet from

1   the bottom, please.

2   Q.  One of the things they focused on was ruling out economic

3   attacks, correct?

4   A.  Can I see the paragraph above it, sir?

5   Q.  Sure.

6   A.  Yes, sir.  Sorry.  I just wanted to get the full context,

7   yes, sir.

8   Q.  One of the things that security team that did the audit was

9   focus on ruling out economic attacks, correct?

10  A.  Yes, sir.

11  Q.  Now, let's switch gears a little bit.  You also testified

12  about how Mango Markets had something called a risk calculator,

13  is that right?

14  A.  Yes, sir.

15          MR. BURNETT:  We can take this down, Mr. Sears.

16  Q.  Now, basically, the risk calculator is just a way to figure

17  out when the value of a position will go up and when the value

18  will go down and how that's going to affect your health on the

19  platform, right?

20  A.  Yes, sir.

21  Q.  And you inputted some trades into that platform,

22  particularly Mr. Eisenberg's long position one time and then

23  Mr. Eisenberg's short position another time, correct?

24  A.  Yes, sir.

25  Q.  And you couldn't input the long and the short position at

1    the same time, right, because the trades were against each

2    other?

3    A.  The risk calculator only allows you to enter one trade at a

4    time.

5    Q.  So you couldn't mash the two accounts together; you had to

6    keep them separate when you did the risk calculator?

7    A.  There were two separate entries, yes.

8    Q.  When you inputted that information, you saw that when Mango

9    went up relative to USDC, the value of Mr. Eisenberg's long

10   position went up, right?

11   A.  Yes, sir.

12   Q.  And the value of the short position went down, correct?

13   A.  We had to do it in a separate -- yes.

14   Q.  You had to do it separately because you can't do both

15   accounts together, right?

16   A.  Yes, sir.

17   Q.  And you also saw that when the value of Mango went down

18   relative to USDC, the value of the long position went down,

19   right?

20   A.  Sorry.  Say it one more time.

21   Q.  Sure.  When the value of Mango went down relative to USDC,

22   the value of the long position went down, correct?

23   A.  Yes, sir.

24   Q.  And the value of the short position would go up, right?

25   A.  Yes, sir.

1  Q.  And none of that is surprising, right?

2  A.  No, sir.

3  Q.  That's just what long and short positions do, right?

4  A.  That's correct.

5  Q.  Now, all that really showed you was that Mr. Eisenberg's

6  trades were possible on the platform, right, they could

7  technologically happen?

8  A.  That's correct.

9  Q.  And you haven't heard anyone suggest otherwise during

10 trial, have you?

11 A.  Suggest that these trades were not technologically

12 possible?

13 Q.  Right.  No one has made that argument, right?

14 A.  No, sir.

15 Q.  And, again, you're not testifying as a legal expert here,

16 correct?

17 A.  No, sir.

18 Q.  So you are not testifying that just because what the

19 defendant did was possible on the platform it was legal to do

20 on the platform.  That's not your testimony, right?

21          MS. MARTABANO:  Object.

22          THE COURT:  Overruled.

23 A.  I'm not an attorney, so I can't offer testimony on legal

24 determinations.

25 Q.  Now, let's just stay on that risk calculator for one more

O4GMEIS2                        Sheridan - Cross

1   minute.

2          You were asked if there was a warning that shows up on

3   the risk calculator when you change the inputs around.

4          Do you remember that?

5   A.  Yes, sir.

6   Q.  There is a warning of sorts, isn't there?

7   A.  Can you be more specific?

8   Q.  Sure.  When the account value is positive, things show up

9   in green and it says your health is good or great on the

10  platform, right?

11  A.  That's correct.

12  Q.  When your account value goes down, things turn yellow and

13  they say you might be liquidated and it says your account value

14  is poor, right?

15  A.  Yes, sir.

16  Q.  And when things go really bad, the screen turns red and

17  says you are going to be liquidated, and your position is

18  either very poor or I think the word it used was wrecked,

19  right?

20  A.  I don't remember wrecked.  I remember the red indicator.

21          MR. BURNETT:  Why don't we show the witness Government

22  Exhibit 1907, just the witness.

23  Q.  Do you recognize this type of screen?  Do you recognize it?

24  A.  Yes.

25  Q.  Does this refresh your recollection that the screen turns

1    red and says wrecked when your account gets low enough?

2    A.  Yes, sir.

3            MR. BURNETT:  We can take that down.

4    Q.  Fair to say that things going from green to yellow to red,

5    some people interpret that as a warning to stop, right?

6    A.  I think that's accurate.

7    Q.  Now, I want to move on and clear up just a couple of things

8    from yesterday.

9            You testified about settling PnLs, one of the topics

10   of your testimony, correct?

11   A.  Yes, sir.

12           MR. BURNETT:  Let's take a look at Government Exhibit

13   1011 again.

14   Q.  This is back to that user manual again, right?

15   A.  Yes, sir.

16           MR. BURNETT:  And I want to go ahead to page 113.  You

17   can zoom in here just grab the text, please.

18   Q.  This is the section that talks about settling PnL on a

19   position, right?

20   A.  Yes, sir.

21   Q.  And this says in the first bullet that settling PnL moves

22   the profit or loss from the perp market into the USDC token

23   balance, correct?

24   A.  Yes, sir.

25   Q.  So the profit goes from the perp market into the Mango

1    Markets account, right?

2    A.  Yes, sir.

3    Q.  Going off the platform, it's going into the USDC balance in

4    your account on Mango Markets, correct?

5    A.  Yes, sir.

6    Q.  Do you see there is a warning at the bottom here?

7    A.  I see the warning, yes, sir.

8    Q.  And that warning says:  This can take up to 60 seconds to

9    complete when using this feature on the UI, right?

10   A.  Yes, sir.

11            MR. BURNETT:  Let's take this down, but I want to stay

12   on the subject of settlement.

13   Q.  You testified that you had reviewed code data about a

14   settlement on Mr. Eisenberg's long position, correct?

15   A.  Yes, sir.

16   Q.  And specifically you testified that you identified a

17   settlement of profit and loss in the amount of 50 million USDC,

18   correct?

19   A.  Yes, sir.

20   Q.  Because, Mr. Sheridan, you actually didn't see 50 million

21   USDC anywhere in that settlement, did you?

22   A.  No, sir.

23   Q.  That doesn't appear anywhere in the actual code, right?

24   A.  That's correct, sir.

25   Q.  So you did not see a settlement of 50 million USDC, right?

O4GMEIS2                        Sheridan - Cross

1   That testimony was wrong.

2   A.  I don't agree with that statement, sir.

3   Q.  You looked at a settlement, correct?

4   A.  Yes, sir.

5   Q.  Nothing in that settlement said 50 million USDC, correct?

6   A.  Yes, sir.

7   Q.  So saying that you saw a settlement and that the code

8   showed 50 million USDC was not accurate, right?

9   A.  Again, I disagree with that statement.

10  Q.  Why do you disagree with that?

11  A.  So the settlement function was called to the platform.

12  Seventeen seconds later there was a withdrawal of the $50

13  million.  By Mango Markets' own documentation, settlements have

14  to be done in the -- into USDC, so based on the timing of when

15  the settlement was called, when the withdrawal occurred, and by

16  the, I'll call it, round number as the overwhelming majority of

17  cryptocurrency transactions involve numbers that aren't even or

18  whole or round.

19          MR. BURNETT:  I am going to move to strike this

20  portion of the testimony, your Honor.

21          THE COURT:  It's overruled.

22  A.  A round number from an investigation standpoint, to me,

23  indicates a user-selected action versus an automated action by

24  the protocol.

25  Q.  Let me break that down.  We can agree from the document we

1    just looked at that settling does not withdraw tokens, right;

2    it just moves tokens to your account balance, right?

3    A.  That's accurate.

4    Q.  So clicking the settle does not withdraw that money, right?

5    A.  That's correct.

6    Q.  And you saw a settlement get clicked, right?

7    A.  Yes, sir.

8    Q.  But you didn't see the amount of that settlement, right?

9    Not in the code.  The code does not say anything about it.

10   A.  That's correct, sir.

11   Q.  So what you are doing is, you're assuming that because

12   later you saw a withdrawal that the settlement must have been

13   an equal amount to the withdrawal, right?

14   A.  I don't call it an assumption, sir.  I am trying to link

15   together the facts based on the data that I have.

16   Q.  But you don't actually have any code data about the size of

17   that withdrawal, correct?

18   A.  That is correct.

19   Q.  It could be 10,000 USDC, right?

20   A.  I don't have any data on it.

21   Q.  It could be 10 USDC, right?

22   A.  Again, based on the other pieces of information --

23   Q.  I'm just asking about the code, Mr. Sheridan.  From the

24   code you looked at, you don't know if it was one USDC, right?

25   A.  I don't know the amount.

1  Q.  You don't know if it was 50 USDC, right?

2  A.  I don't know the amount.

3  Q.  You don't know if it was 100 USDC, right?

4  A.  Correct, sir.

5  Q.  You can't tell that from the code, like you testified

6  yesterday, correct?

7  A.  My testimony yesterday was about the settlement function

8  and my connection of those other pieces of information.  I

9  cannot tell specifically from the code alone the amounts

10  involved.

11  Q.  You actually did have data about borrowing on Mango Markets

12  during this time period, didn't you?

13  A.  Can you -- in terms of amounts, can you be specific on the

14  data?

15  Q.  Sure.  You had access to the discovery in this case, right?

16  A.  Yes, sir.

17  Q.  You've been sitting here during trial, correct?

18  A.  Yes, sir.

19  Q.  So you saw data before trial about borrows on Mango Markets

20  and the amounts and the times of those borrows?

21  A.  Yes, sir.

22  Q.  And you saw data during trial about the amounts and the

23  times of those borrows in different accounts, right?

24  A.  Yes, sir.

25  Q.  But you didn't testify about any of that on your direct

O4GMEIS2                          Sheridan - Cross

1    examination with the defense, correct?

2    A.  When I was asked how much was taken off the platform, that

3    amount includes those borrows.

4    Q.  So we can agree then that there were borrows from

5    Mr. Eisenberg taking money off this platform?

6    A.  Yes, sir.

7    Q.  And on this point let's take a look.  You were here for

8    Special Agent LaGrange's testimony earlier, correct?

9    A.  Yes, sir.

10            MR. BURNETT:  Let's take a look at Government Exhibit

11   502A, which is already in evidence.

12   Q.  You saw Special Agent LaGrange testify that this was a

13   document from Mr. Eisenberg's Discord account, correct?

14   A.  I don't recall him saying that in testimony.  If that is

15   what you -- I was in and out of the courtroom, so --

16   Q.  You might have missed this one?

17   A.  I remember this document.  If you're asking me specifically

18   about where it's from, I don't --

19   Q.  Fair.  It says Discord at the bottom on the tab, right?

20   A.  Yes, sir.

21   Q.  And in the user name section it says Avraham Eisenberg with

22   a number next to it, right?

23   A.  Yes, sir.

24            MR. BURNETT:  Let's read rows 2 and 3 here, if we can

25   highlight them.

1    Q.   In 2 and 3 Mr. Eisenberg writes:  I'm looking at low cap

2    coins listed on lending markets.  The idea is buy a ton,

3    massively increase the price, and borrow on lending to lever.

4              Do you see that?

5    A.   Yes, sir.

6    Q.   We can agree that's a reference to borrowing, right?

7              MS. MARTABANO:  Objection.

8              THE COURT:  Sustained.

9              MR. BURNETT:  Let's go ahead to rows 54 to 57.

10   Q.   Here, this is the Avraham Eisenberg account writing again,

11   right?

12   A.   Yes, sir.

13   Q.   And here he writes:  First question is viability.

14   Eyeballing Mango books.  What happens if I spend 250K?  Does it

15   move 20 cents and stay there for a while?  We can pull borrows.

16             Did I read that right?

17   A.   Yes, sir.

18   Q.   Now, you also saw Special Agent LaGrange present Government

19   Exhibit 318, correct?

20   A.   I don't know of the number.

21   Q.   I apologize.  I'm just throwing exhibit numbers at you?

22             MR. BURNETT:  Here.  Why don't we go to Government

23   Exhibit 318 for the witness and the jury.

24             If we can zoom in on the box here.

25   Q.   This was a document, a search from Mr. Eisenberg's computer

O4GMEIS2                          Sheridan - Cross

1   that Special Agent LaGrange presented while you were watching

2   trial, correct?

3   A.   I don't remember this being presented.  I've been dealing

4   with other issues in other matters, so I've been stepping in

5   and out of the courtroom.

6   Q.   You have been dealing with defense stuff, but you weren't

7   watching the part where she was showing the borrow screen here?

8   A.   I don't remember this screen being presented at trial.

9   Q.   We can agree here that the title here says Mango Markets,

10  correct?

11  A.   Yes, sir.

12  Q.   And there is an URL.  That URL is to

13  HTTPS..trade.mango.markets/borrow.

14          Do you see that?

15  A.   Yes.

16  Q.   You have actually gone to visit the Mango Markets user

17  interface from the version 3 part of the program, correct?

18  A.   Yes.

19  Q.   You flipped through the pages there?

20  A.   Yes, sir.

21  Q.   That's how you got your understanding of this case, because

22  you hadn't used Mango Markets before, right?

23  A.   That's part of how I got the understanding of the case.

24  Q.   So you know there was a borrows page on Mango Markets,

25  correct?

O4GMEIS2                          Sheridan - Cross

1    A.  That's accurate, yes.

2    Q.  And that page is the one that had the place that you could

3    select all the different cryptocurrencies that you wanted to

4    borrow from, right?

5    A.  So I wasn't able to visit that page in my interaction with

6    the website, because there is limited functionality, but that's

7    a reasonable conclusion.  If you're asking me if I visited that

8    page, I did not visit that page.

9    Q.  I want to be sure.  Did you not visit it because you had

10   limited functionality?  You actually remember trying to find it

11   and you couldn't get here, or you just didn't visit it?

12   A.  I remember trying to conduct some actions on the site that

13   it wouldn't let you go to further steps.  I don't remember if

14   the borrow page was one of those or not.

15   Q.  We can agree there was a borrow page, right?

16   A.  I can agree with that, yes.

17   Q.  Let's look at the time.  You see there is this visit down

18   here at the bottom, second-to-last line?

19   A.  Yes, sir.

20   Q.  And now, the day and time there, it's October 11, 2022.

21   That's the day we have been focused on in trial, correct?

22   A.  Yes, sir.

23   Q.  And it's 10:01 p.m. UTC, right?

24   A.  That's correct.

25   Q.  That's starting at 6:00, right?

O4GMEIS2                        Sheridan - Cross

 1   A.  6 p.m. Eastern.

 2   Q.  And the duration is one hour and a little over a minute,

 3   right?

 4   A.  That's correct.

 5   Q.  From 6 to 7 p.m. on October 11, right?

 6   A.  Yes, sir.

 7   Q.  And that's the time when Mr. Eisenberg was carrying out

 8   this scheme, right, 6 to 7 p.m. on October 11, when he was on

 9   this borrow page?

10   A.  The times are close.  I would have to look at the exact

11   timeline, but yes.

12   Q.  Right around there.

13   A.  Yes, sir.

14           MR. BURNETT:  Now, let's go back quickly to Government

15   Exhibit 1011 on this topic.

16   Q.  This is the user manual again, right?

17   A.  Yes, sir.

18           MR. BURNETT:  And we can go to page 135.

19   Q.  Do you see there is actually kind of a set of FAQs with

20   borrows here?

21   A.  Yes, sir.

22   Q.  And the last one is the one I want to focus on, right.  Do

23   you see it says:  How can I tell if I have borrows?

24   A.  I see that, yes, sir.

25   Q.  And there are a bunch of stars and it says:  In the

1    accounts tab, the balances table has a borrow column.  All spot

2    borrows will show up there.

3              Did I read that right?

4    A.  Yes, sir.

5    Q.  There have been account balances that have been entered in

6    this case that show borrows listed on them, right?

7    A.  That's correct.

8              MR. BURNETT:  We can take this down.

9    Q.  You've also seen data from Mango Markets about how borrows

10   changed on the platform between 6 and 8 p.m., when

11   Mr. Eisenberg was doing this attack, right?

12   A.  Yes, sir.

13             MR. BURNETT:  Let's take a look at Government Exhibit

14   1002, which is already in evidence.

15   Q.  This is data from Mango Markets about borrows on the

16   platform, correct?

17   A.  It's data that's labeled total borrows.  I don't know the

18   source.

19   Q.  Sure.  Why don't we take a look --

20             MR. BURNETT:  Mr. Sears, this might take a minute, but

21   could you go to transcript page 364.  If we could scroll up

22   just to orient.

23             MS. MARTABANO:  Your Honor, this being shown to the

24   jury.

25             MR. BURNETT:  Testimony that's already come in, your

O4GMEIS2                           Sheridan - Cross

 1 | Honor.
 2 |              THE COURT:  It is not being shown to the jury at
 3 | present.  Do you have an objection?
 4 |              MS. MARTABANO:  That was all I wanted to know, your
 5 | Honor.
 6 | Q.  You remember that Tyler Shipe was one of the Mango
 7 | witnesses and worked at Mango Markets?
 8 | A.  Yes, sir.
 9 | Q.  Does this refresh your recollection that Government Exhibit
10 | 1002 is a set of data from Mango Markets about transactions and
11 | stats on the platform?
12 | A.  Yes.
13 |              MR. BURNETT:  You can take this down and go back to
14 | 1002.
15 | Q.  You can see we are on the tab for borrows, correct?
16 | A.  Yes, sir.
17 | Q.  We are going to do a little fun spreadsheet work here.
18 |              MR. BURNETT:  Mr. Sears, if you could create a table
19 | here, please.
20 | Q.  You see column A is date slash hour?
21 | A.  Yes, sir.
22 |              MR. BURNETT:  You can filter that to get to October
23 | 11.
24 | Q.  You see we are on October 11 now?
25 | A.  Yes, sir.

O4GMEIS2                          Sheridan - Cross

Q.  Do you also see there column B is labeled symbol?

A.  Yes, sir.

Q.  And there it has -- it says AVAX at the top.  AVAX is a

type of cryptocurrency, right?

A.  Yes, sir.

          MR. BURNETT:  Why don't we start with filtering for

USDC.

Q.  Now, in column D, do you see that it says total borrows for

USDC?

A.  Yes, sir.

Q.  Let's work through the day.  From the top of this slide it

starts out at about 41.4 million total borrows, right?

A.  Yes, sir.

Q.  If we scroll down, get down to the bottom, all the way

until 2100, that's about 5 p.m. it's at 41 million borrows of

USDC, right?

A.  Yes, sir.

Q.  You see, between 6:00, so 2200, and 7:00, it jumps from 41

to what ends up being 95.8 million borrows of USDC off the

platform, correct?

A.  Yes, sir.

Q.  So we can agree that the amount of USDC borrowed off of the

Mango Markets on October 11, between 7 and 8, increased by

about 54 million USDC, correct?

A.  According to this spreadsheet, yes.

O4GMEIS2                         Sheridan - Cross

1    Q.  According to the actual data from Mango Markets, right?

2    A.  Yes, sir.  The distinction, as I was stating earlier, is

3    that we tried to find --

4           MR. BURNETT:  Objection.  Move to strike, your Honor.

5           THE COURT:  The motion is granted.  The witness'

6    answer after the first sentence will be stricken.

7    Q.  Now, Mr. Sheridan, you can actually do this same exercise

8    for every type of cryptocurrency that Mr. Eisenberg borrowed on

9    October 11, right?

10   A.  Yes, sir.

11   Q.  Let's do some of them.  Why don't we do USDT next.  That's

12   Tether, right?

13   A.  Yes, sir.

14          MR. BURNETT:  Let's light that up.

15   Q.  We can see here -- you see that the screen is oriented to

16   USDT?

17   A.  Yes, sir.

18   Q.  And according to the Mango Markets documents, the total

19   borrows are about 2.6 million for most of the day here, right?

20   A.  Yes, sir.

21   Q.  And then you see that at 2100 it's 2.6 million still,

22   right?

23   A.  Yes, sir.

24   Q.  And by 2300 we are up to 5.9 million almost, right?

25   A.  Yes, sir.

1  Q.  So the borrows during that period, when Mr. Eisenberg was

2  carrying out his scheme, increased by about like 3.2 million

3  USDT, right?

4  A.  According to this spreadsheet, yes.

5  Q.  According to the Mango Markets data, right?

6  A.  Yes, sir.

7  Q.  Now, let's also take a look at Serum.  That was another

8  token you borrowed, right?

9  A.  Yes, sir.

10  Q.  And this is the page for Serum?

11  A.  Yes.

12  Q.  You can see again that borrows hover around somewhere in

13  the order of 550,000 for most of the day, right?

14  A.  Yes, sir.

15  Q.  And then there are 560,000 at 5 p.m., right?

16  A.  Yes, sir.

17  Q.  And by 8 p.m. they have jumped to 2.9 million, right?

18  A.  Yes, sir.

19  Q.  We can do this for Bitcoin too, that's another token that

20  he borrowed, right?

21  A.  Yes, sir.

22  Q.  Let's go to Bitcoin.  You can see that it stays -- we are

23  on the Bitcoin page now, right?

24  A.  Yes, sir.

25  Q.  You can see that borrows on this Bitcoin page are about 14

1  for most of the day, right?

2  A.  Yes, sir.

3  Q.  And you can see that they jump to 295 at the end of the

4  day, right?

5  A.  Yes, sir.

6  Q.  We can agree that Mango Markets data shows that during the

7  time when Mr. Eisenberg was carrying out his attack, these

8  borrows jumped by over 250 Bitcoin, right?

9  A.  Yes, sir.

10          MR. BURNETT:  Let's just do one last one.  Why don't

11  we do Mango, MNGO.

12  Q.  We are on the Mango page now?

13  A.  Yes, sir.

14  Q.  And you can see the total borrows there are about 530,

15  40,000 most of the day, right?

16  A.  Yes, sir.

17  Q.  And something changes at the end of the day, right?

18  A.  Yes, sir.

19  Q.  It jumps to 49.7 million by the end, correct?

20  A.  Yes, sir.

21  Q.  According to the Mango Markets data.

22  A.  Yes, sir.

23          MR. BURNETT:  No further questions, your Honor.

24          THE COURT:  Ms. Martabano.

25          MS. MARTABANO:  Yes, your Honor.  Thank you.

1              Mr. Smith, if we could pull up Exhibit 1002, which we

2      were just looking at with the jury.

3              Thank you, Mr. Sears.

4              If you could also sort for USDC on the borrows tab.

5              If you could scroll down to the 2200, 2300.

6      REDIRECT EXAMINATION

7      BY MS. MARTABANO:

8      Q.  Mr. Sheridan, while he's loading the data, do you remember

9      what time the settle command was called based on your work in

10     this case.

11     A.  I believe it was 2229, but I ask to refer to where it's in

12     documentation just to make sure I'm a hundred percent on that.

13     Q.  But it hasn't happened at 2200, is that right?

14     A.  That is correct.

15     Q.  And looking at the spreadsheet that's up on the screen, I

16     just wanted to point out, Mr. Burnett asked you that between 6

17     and 7 p.m. it went from 41 million to 100 million.  Can you

18     look at that and tell me, between 6 and 7 and 8 p.m., what was

19     the actual change?  At 2200 hours, before Mr. Eisenberg's

20     settle and before his withdrawal, how much were the total

21     borrows on the platform?

22     A.  Sorry.  There was a lot there.

23     Q.  Sure.  At 2200, the total borrow column shows what number?

24     A.  Total borrow shows 100.8 million.

25     Q.  So the increase from 41 million was between 21 and 2200

1   before Mr. Eisenberg settled his position?

2   A.  That's correct.

3   Q.  And the difference between 2200 and 2300 is actually a

4   decrease of 5 million in the borrows, approximately?

5   A.  Approximately, yes.

6           MS. MARTABANO:  You can take that down.  Thank you,

7   Mr. Sears.

8   Q.  Mr. Burnett walked you through the settle command and the

9   withdrawal and sort of clarifying how much would have been

10  settled or would not have been.  And you, I believe, testified

11  that you -- the settle command didn't actually have an amount

12  next to it, is that correct?

13  A.  That's correct.

14  Q.  And the next command was the withdrawal command.

15          Did that have a number next to it?

16  A.  It did.

17  Q.  What was that number?

18  A.  Fifty million USDC.

19  Q.  And how soon after the settle command was that pulled?

20  A.  Seventeen seconds.

21  Q.  And I believe you said that in your investigative

22  experience round numbers like that actually aren't very common.

23  Can you explain that.

24  A.  Cryptocurrency tokens are often divided into fractions of

25  wholes, and cryptocurrency values fluctuate dramatically and

O4GMEIS2                          Sheridan - Redirect

1    are not calculated in whole dollar amounts.

2                  So, in general, cryptocurrency transactions involve

3    portions of tokens in dollars and cents in terms of the

4    transactions that occur when a trade occurs or a purchase

5    occurs or a withdrawal occurs or borrow occurs.  It is an

6    unusual occurrence to see a whole round number without any --

7    certainly any cents attached, much less any variation in the

8    number itself.

9                  (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. MARTABANO:

2   Q.  I know Mr. Burnett walked you through some of the

3   documentation for Mango Markets.  Based on that documentation

4   and your research in this case, I believe in order to withdraw,

5   do you first have to settle a position?  Can you explain how

6   that works?

7   A.  In order to withdraw a profit and loss position, you have

8   to settle it.

9   Q.  And do you have to settle at least the amount of your

10  withdrawal or how does that work?  If you have no other assets

11  on the platform, would you have to settle at least the amount

12  of that withdraw in order to take it out or would you have to

13  settle -- what would happen if you would settle less?

14  A.  You're talking a P&L settlement; correct?

15  Q.  Yes.  So if you did a P&L settlement and you didn't have

16  any other assets in that account and you sought to withdraw

17  more than you had settled, would that work?

18  A.  No, ma'am.

19  Q.  Why not?

20  A.  Because it's not considered profit and you don't have

21  profit assets in your account.

22  Q.  If you were able to withdraw the $100 million, safe to say

23  the settle was at least $100 million?

24          MR. BURNETT:  Objection.

25          MS. MARTABANO:  I'll rephrase, your Honor.

O4GCeis3                         Sheridan - Redirect

 1   Q.  Safe to say that if you withdrew $50 million and you had no
 2   other assets on the platform, you must have settled at least
 3   $50 million from your P&L to be able to do that withdrawal?
 4              MR. BURNETT:  Objection.
 5              THE COURT:  It's overruled.
 6   A.  If you're settling a $50 million P&L settlement, you have
 7   to have at least $50 million of profit in your account.  Am I
 8   answering your question?
 9   Q.  A little bit.
10              If you were able to withdraw $50 million, does that
11   mean you had to settle at least $50 million of profit before
12   you were able to withdraw that if you had no other assets in
13   that account?
14   A.  If you're able to withdraw the $50 million from your
15   account -- the challenge is profit and loss -- if it's a profit
16   and loss settlement, yes, that statement is accurate.
17   Q.  And from all the documentation you've seen and as
18   Mr. Burnett so rightly pointed out, when you've been in trial,
19   the evidence you've seen in trial, do they clearly show whether
20   the October 11th withdrawals were accompanied by borrows?
21              MR. BURNETT:  Objection.  Sidebar.
22              THE COURT:  Let's have a sidebar.
23              (Continued on next page)
24
25

O4GCeis3                        Sheridan – Redirect

1          (At the sidebar)

2          THE COURT:  So, fir first of all, I'm giving you some

3  leeway with the leading questions just to get through this, but

4  you need to make the questions not leading.

5          MS. MARTABANO:  Yes, your Honor.

6          MR. BURNETT:  My main issue, your Honor, is she's now

7  leading her questions over from factual things into intruding

8  on the jury's function by asking, from all the evidence you've

9  seen, is this clear or not clear.  What she's trying to get the

10  expert to do is effectively testify whether there is or is not

11  reasonable doubt as to this particular point.  The expert can

12  testify to what he saw or didn't see, and it would allow him to

13  be here during trial, which has been fair, but he can't give a

14  broad characterization about what he thinks is clear or not

15  clear from the evidence at trial.

16          THE COURT:  And I don't know that you're trying to do

17  that.

18          MS. MARTABANO:  I wasn't.

19          THE COURT:  I think this goes along with the way the

20  question is phrased.  So what is the question?

21          MS. MARTABANO:  I'll rephrase.  Just based on the

22  evidence he has seen in the case.  Tom, you keep saying --

23          THE COURT:  Let me hear the full question.

24          MS. MARTABANO:  Has he seen any evidence that the

25  withdrawals were definitely accompanied by borrows or not.

1        MR. BURNETT:  It's the same --

2        THE COURT:  I think it's got to be a more focused

3   question because I think the issue that Mr. Burnett has is that

4   kind of broad characterization divorced from any particular

5   evidence that he is reviewing and expressing an opinion on does

6   seem to get to the ultimate issue is going to be placed in

7   front of the jury.  However, can you certainly ask him more

8   targeted questions as to the opinions he's given or the

9   evidence that he's reviewed and relied on in preparing his

10  opinion and ask him to explain the basis for his opinion, and

11  that's fair for you to do.

12       MR. BURNETT:  I think we'd just ask that this really,

13  since -- when the characterizations of clear and definite are

14  put into the question, it goes beyond a leading question into

15  just like a straight jury argument.  So in crafting these,

16  we'll be objecting any time there's a "clear" or "definite" or

17  predicate like that placed into these leading questions.

18       THE COURT:  I understand.  But your fundamental

19  objection is on the general characterization of having been in

20  the courtroom for the entire case, is there reasonable doubt as

21  to whether these are borrows or withdrawals, things like that?

22       MR. BURNETT:  Yeah, that's basically --

23       THE COURT:  I agree that the way the prior question

24  was phrased, it is very close to that, but I think that can be

25  resolved by rephrasing the way you're asking these questions.

1          MS. MARTABANO:  Yes, your Honor.

2          THE COURT:  Let's move.

3          (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court)

 2     BY MS. MARTABANO:

 3     Q.  Mr. Sheridan, I'm going to show you what has been marked as

 4     Government Exhibit 120A.

 5              MS. MARTABANO:  You can publish this to the jury,

 6     Mr. Smith.

 7     Q.  Please take a look at this, Mr. Sheridan.  It was

 8     described, I believe, while you were hearing testimony that

 9     this shows web visits and searches by Mr. Eisenberg pulled from

10     his computer on October 11th.  Please take a look.

11     A.  Yes, ma'am.

12     Q.  You were shown on cross examination exhibit 318, which

13     showed a link to viewing the borrow link at Mango Markets.  Is

14     that the link that was -- appears to be shown in line 6?  And

15     I'm just asking you if the URL is the same, not necessarily

16     that everything is identical.

17     A.  Yes, it appears to be the same URL.

18     Q.  And can you tell us what link was pulled at line 3?

19     A.  You want me to read the whole link or --

20     Q.  Just the description is fine.

21     A.  It's trade.mango.markets for Mango perpetuals.

22     Q.  And it's not the borrow?

23     A.  That is a different link.

24     Q.  And same for line 13?

25     A.  That's the same link as in line 3, trade.mango.markets for

O4GCeis3                    Sheridan - Redirect

1    Mango --

2    Q.  Same for line 16?

3    A.  That's the same as the previous two.

4    Q.  And 17?

5    A.  This is a link to the Blockworks foundation GitHub site for

6    Mango client version 3.

7    Q.  And line 18?

8    A.  This is a link for how to use the risk calculator.

9    Q.  Line 19?

10   A.  So to clarify, the previous link was for the tutorial on

11   the risk calculator.  This link is for the risk calculator

12   itself.

13   Q.  And finally, 23.

14   A.  This is Mango Markets documentation for version 2, the

15   overview of those documents.

16           MS. MARTABANO:  Thank you.

17           Mr. Smith, if you can take that down and bring up

18   GX 1011 and turn to page 133.

19   Q.  On 120A, do you know one way or another if someone is going

20   to open a perpetual position, can that be done from the borrow

21   page?  I know you testified you hadn't looked at it live at the

22   time, but do you know one way or another from your research on

23   the platform?

24   A.  Can you open a perpetual position from the borrow page?  My

25   testimony would be no, but I did not try to execute that

O4GCeis3                         Sheridan - Redirect

1     function.

2               MS. MARTABANO:  If you could bring up, Mr. Smith, what

3     is my P&L position, what is my settled P&L.

4     Q.  Please take a look and read this entire thing to yourself.

5     As far as when we were talking earlier about the settlement of

6     a P&L and withdrawing from the platform, can you explain to us

7     how, if you are able to withdraw, what your settlement -- the

8     minimum your settlement must have been at the time to

9     reflect -- if you have no other assets in your account and you

10    are going to withdraw, how does the settlement process work in

11    order to call the withdraw command?

12    A.  If you have no other assets in your account?

13    Q.  Right.  Other than the position that you are going to

14    partially settle or settle.

15    A.  If you have no other assets in your account and you are

16    looking to settle your profit and loss, your profit and loss

17    will be settled based on the account value.  If it's a profit,

18    the account value increase.  It will be settled in USDC to your

19    account balance, and then your withdrawal will be the level of

20    profit you have settled from that account.

21    Q.  And would you be able to withdraw, in the instance where

22    you don't have other assets sitting in your account, would you

23    be able to withdraw more than the value of your settlement?

24    A.  Not for a profit and loss settlement.

25              MS. MARTABANO:  Bringing down up to the last -- the

O4GCeis3                        Sheridan - Redirect

1   bottom of this.

2   Q.  For example, you buy one SOL perp at $100 using 1 BTC for

3   collateral.  Now assume the oracle drops to $80.  If no

4   settlements have happened yet on your account, you would show

5   an unsettled balance of minus $20.  If you settle your balance,

6   you will still have one BTC and your SOL perp position, but it

7   will now borrow $20 USDC.  So if you had nothing in your

8   account and you lost money and you settled it, is this

9   suggesting you would then show a borrow, but not a withdrawal?

10  A.  That's correct.

11  Q.  I believe Mr. Burnett was asking you about the risk

12  calculator and your ability to simulate multiple trades or from

13  multiple accounts at one time on the risk calculator?

14  A.  Yes, ma'am.

15  Q.  I think you said there's no way to simulate multiple

16  transactions on the risk calculator at once; is that right?

17  A.  I may have gotten hung up.  I thought he was asking me

18  simultaneously.  That's how I was answering that question.

19  Q.  I see.  So you could do it, but just not both at the same

20  time?

21  A.  That's correct.

22  Q.  I think you testified yesterday about the fact that

23  separate accounts wouldn't settle against one another anyway;

24  is that right?  So if I had two separate accounts set up on

25  Mango Markets, you can't take the collateral from account A to

O4GCeis3                          Sheridan - Redirect

1   settle a position in account B?

2            MR. BURNETT:  Objection.  Leading.

3            THE COURT:  Overruled.

4   A.  Yes.

5   Q.  Can you explain that to us, if you remember that testimony.

6   A.  That's correct.  The accounts -- all accounts within that

7   individual account have assets assigned solely to that account.

8   So any activity that occurs with that account happen only

9   within that account.

10  Q.  Was there any requirement in the documentation that you've

11  reviewed -- or what, if any, requirement was there in the

12  documentation you reviewed that you link all of your accounts

13  on Mango Markets so that you tell Mango, hey, I've got multiple

14  accounts?

15  A.  There is no requirement.

16  Q.  Was there anything in those documents that would say you

17  couldn't have separate accounts that weren't linked?

18  A.  No, ma'am.

19  Q.  I believe Mr. Burnett asked you about the health

20  requirement and showed you pieces of GX 1011 where you could do

21  the toggling for withdrawal and not withdraw.  Can you explain

22  your understanding of the impact of that toggle when you could

23  toggle on borrow?

24  A.  So, the impact of the borrow as executed on the protocol

25  was something that we could not definitively, by our analysis

1   and code, determine what was labeled a borrow versus a

2   withdraw.  What appears in the code is a borrow designation as

3   a 1 or a 0.

4   Q.  And what does the 1 or the 0 mean?

5           MR. BURNETT:  Objection.  Foundation.

6           THE COURT:  Ms. Martabano, can you ask some

7   foundational questions.

8           MS. MARTABANO:  Sure.

9   Q.  Can you tell us what you researched in the code without

10  telling us your conclusion and how you came to understand that

11  and based on your background, training, and the research you

12  did in this case.

13  A.  So our analysis of transactions was primarily done through

14  Blockchain explorers using -- pulling up the information on the

15  transactions as they reported to the Blockchain.  Within the

16  results of those searches, transactions were listed as either

17  "borrow 0" or a "borrow 1."  There was no other information

18  that we were able to identify in the code that listed anything

19  specifically designating a withdrawal as opposed to a borrow.

20  In order to try and clarify what "borrow 0" and "borrow 1"

21  meant, we contacted Mango Markets --

22          MR. BURNETT:  Objection.

23          THE COURT:  The overruled.

24  A.  We contacted Mango Markets development teams and inquired

25  about the "borrow 1," "borrow 0" designation.

O4GCeis3                        Sheridan - Redirect

1              MS. MARTABANO:  Your Honor, is that sufficient to ask

2      what they --

3              MR. BURNETT:  Sidebar, your Honor.

4              THE COURT:  Quick one.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4GCeis3                          Sheridan - Redirect

1              (At the sidebar)

2              MR. BURNETT:  So I think we're getting into the

3     heartland of the problem area that we had talked about

4     yesterday where Mr. Sheridan, for starters, is very

5     conspicuously using "we" whenever he's talking about this

6     because he's talking about what the FTI team did.  And now

7     we've added an additional level of hearsay where it sounds like

8     he's about to testify based on what some unspecified Mango

9     developer who is unclear if he talked to or an FTI person

10    talked to or told them about zeros and ones.  So not only is

11    this outside of his expertise, and therefore not an admissible

12    area of inquiry, it also relies on multiple nested levels of

13    hearsay and expertise for other people, which clearly he was

14    not capable of doing himself.  We also have not received any of

15    the underlying bases about either a zero or one point or the

16    supposed call with Mango developers.  So we have no way to

17    cross examine on this point, which is a 705 problem.

18             THE COURT:  Ms. Martabano, let me just make sure I

19    understand.  So essentially, he's leader of the team, and so he

20    knows that there is a borrow/withdraw function.  And so, he

21    goes and asks his team, go find me the code basis for the

22    borrow and the code basis for the withdraw function.  What I

23    understand his testimony is, it's that his team returned back

24    and then said, well, we have this specification of the borrow

25    function as two designations, there's a "borrow 0" and a

Case 1:23-cr-00490-KPF   Document 129-2   Filed 09/28/25   Page 289 of 393   1228

O4GCeis3                        Sheridan - Redirect

1    "borrow 1."  Those seem to equate to both the borrows and

2    withdrawals.  There's no separate withdrawal designation in the

3    code.

4         MS. MARTABANO:  Correct.

5         THE COURT:  And so, he is using his expertise at the

6    higher level of the code to say, I know how smart contracts

7    work, and so, I want to figure out what the separate basis for

8    the withdraw function is so that if there is a linkage between

9    that code and ultimately the smart contract transaction that

10   leads to either a borrow or withdraw, I'm trying to figure that

11   out.  And so that's what he's testifying to; right?

12        MS. MARTABANO:  Right.

13        THE COURT:  As to that issue, the thing I'm concerned

14   about is this underlying evidentiary that the government says

15   they just don't have what he looked at.  And so, they can't

16   actually cross examine this witness on the basis of the

17   underlying factual predicate.  So even if I'm with you on the

18   Rule 702 and the fact he's relying on his team for some of

19   this, even if I was with you on that part of the inquiry,

20   there's a basic fairness point that the government doesn't have

21   that underlying material.  So help me out with that.

22        MS. MARTABANO:  Sure.  Really, what I'm getting at

23   is -- I can't remember which page of GX 101 was showed that had

24   the withdraw, it was a borrow instead of withdraw of $100,000.

25   I think we can avoid this by pulling up that.  The issue here

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    is the government presented on cross a suggestion of a

2    screenshot that if you're clicking withdraw and you have that

3    borrow toggled and you're automatically doing a $100,000

4    withdrawal and it is $100,000 borrow, our understanding, based

5    on Mango Markets documents and their research is that it won't

6    always be the case that, just because you say I would agree to

7    borrow, that your whole position is a borrow.  So the protocol

8    works such that if I have $1,000 in my account and I want to

9    withdraw $1,500, the first thousand is my balance, not a

10   borrow.  It's not a full $1,500 borrow.  And I think it's

11   confusing based on what Mr. Burnett showed because he showed

12   where the borrow and the withdrawal were equal, and we're just

13   trying to establish that that will not always be the case.

14            THE COURT:  I'm with you.  I understand what you're

15   doing.  I'm saying that just in the way that the government

16   provided you with those exhibits so that you could inquire,

17   cross examine their witnesses, et cetera, they don't have the

18   underlying code base that the expert is now referring to that

19   his team gathered.  That's the issue that I'm trying to figure

20   out.

21            MS. MARTABANO:  That code base is public at GitHub,

22   which I believe the government knows and was disclosed as a

23   source of their analysis.  It's a Mango Markets code that he's

24   been testifying about that's come in to evidence through the

25   government's links, through everything.

1          MR. BURNETT:  There are multiple levels here.  First

2     we, need the specific code they're talking about.  Second, he's

3     very explicitly testified he couldn't figure it out from the

4     code.  So what he did is went and called Mango developers,

5     which we never received any disclosure about any notes about

6     who he talked to, what that conversation was, whether he was

7     part of the conversation, whether it was a conversation with

8     somebody at FTI or somebody at FTI that told him about the

9     conversation.  So we don't only not have the code that he's

10    talking about, we also don't have this conversation that he's

11    talking about.  The Court bent over backwards the other day to

12    let this guy talk about areas that were far beyond what they

13    initially disclosed.

14         So it's deeply, deeply unfair and prejudicial to the

15    government to put us in the spot where we're asking him about

16    the user documents that have been in this case, disclosed in an

17    exhibit a month before trial, and now we're getting into

18    questions about a set of code lines and a conversation with

19    Mango developers that we never even knew about, let alone knew

20    that he reviewed and what specific line he's talking about

21    until just now.

22         THE COURT:  Well, you did ask the witness about those

23    spreadsheets that he had not -- were not part of his

24    affirmative testimony and that you had characterized as Mango

25    Markets documents and had him walk through the borrows; right?

1           MR. BURNETT:  We disclosed those a month before trial.

2           THE COURT:  That's what I hope that I've done.  I

3    think there's an issue of whether they have what it is he's

4    relying on, because if they did -- here's what we're going to

5    do:  You're going to cross him on this; right?  Or are you not

6    going to?

7           MR. BURNETT:  I don't even know if I'm going to cross

8    him on it because I don't even know what he's talking about.

9           THE COURT:  Let's see what the testimony is and we'll

10   pick it up.  If you make a motion to exclude, then I will tell

11   the jury to disregard testimony and figure out what that's

12   going to look like.  Right now, it's unclear to me -- I mean,

13   do you have this code?  If he looked at it, how does the FTI

14   team not have this code?

15          MS. MARTABANO:  It's because it's publicly available.

16   I don't think that they downloaded every time they examined it.

17   I imagine they have a copy.  But it's the GitHub that you could

18   just click on it and access it, as I understand it.  I don't

19   think that they're creating a spreadsheet every time that they

20   examine the code because they just pick it up live, look at it

21   much like with the Blockchain, you bring it up, you analyze it,

22   and then it's always available because it's publicly available

23   to pull and apply their expertise to.

24          MR. BURNETT:  This also doesn't capture the separate

25   point about the fact that the FTI team clearly could not figure

1    this out, so they called someone who has not been identified,

2    whose notes have not been produced to tell them what the answer

3    was, that person's not here and not subject to cross

4    examination.

5              MS. MARTABANO:  Your Honor, we won't go into that.

6    That was a surprise to me.

7              THE COURT:  If I understood the testimony and context,

8    what I gather his team did is that they located the function,

9    and I agree with you that we don't know what they asked the

10   Mango development team, but they probably wanted to make sure

11   that those were the applicable functions.

12             MR. BURNETT:  But even if that's what they did, then

13   the answer, yes or no, and who it came from and what that

14   person said is not only hearsay, which would be like a second

15   or third order hearsay piece for someone we can't cross

16   examine, they never produced the underlying notes, they never

17   provided notice of the call.  I would like to cross examine him

18   of who was on the call, what specifically did you show them on

19   the call, what exactly did they say on the call.  I don't have

20   any of that underlying information because none of it was made

21   available.  In fact, it wasn't disclosed until ten seconds ago

22   when he was on the stand.

23             MS. MARTABANO:  I think there may be a way to shortcut

24   this.  The code says zeros and ones, they determined that.

25   That's for you're either borrowing or on a withdrawal you're

1  borrowing.

2          I really just want to point out because the code is a

3  zero and a one, there's no way to tell when it's toggled on

4  that you are definitely borrowing or definitely withdrawing.

5  And he did say, I believe, already, that the code is unclear as

6  to whether having the 1 on the toggle on, which is the toggle

7  they talked about, means it's all a withdrawal or all a borrow

8  or some portion.  And, in fact, you would need the screenshot

9  that comes up given during a transaction that one of which, an

10 example of which Mr. Burnett showed, which would tell you as

11 the user this portion is a borrow, this is how much you're

12 withdrawing.  We do not have any evidence in the record from

13 Mango or the government of what that screen would have looked

14 like for Mr. Eisenberg's trade.  The fact that they're

15 suggesting that it would have looked like a complete --

16          THE COURT:  That's an argument that you can make in

17 your case.  I'm sure that you will make that argument.  For

18 present purposes, if Mr. Burnett were to cross Mr. Sheridan on

19 this issue, would he be able to get on a computer and show

20 Mr. Burnett the code that he's referring to or in some way

21 provide the basis for the opinion that he's giving to the jury?

22          MS. MARTABANO:  I think so.  I don't know without

23 being able to speak to him, but I believe so.  If he clicked on

24 the Mango Markets hub, he could find it.

25          MR. BURNETT:  This should all be excluded because it's

O4GCeis3                          Sheridan - Redirect

1  not noticed, totally new, and we never received the underlying

2  basis.  That's our initial application.  If the Court is not

3  inclined to grant that application, we would ask if we could

4  *voir dire* outside the presence of the jury on it.

5          THE COURT:  Let's figure this out and see if you can

6  do it.  That's my fundamental concern, is that the government

7  doesn't have the underlying basis for this opinion and then

8  there's the other issues, but we can get to that.

9          (Continued on next page)

O4GCeis3                          Sheridan - Redirect

1             (In open court)

2             THE COURT:  Members of the jury, we're going to take a

3    quick 10-minute break, bonus break while we work things out.

4    And so, all rise for the jury.

5             (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4GCeis3                          Voir dire

1          (Jury not present)

2          THE COURT:  Mr. Burnett.

3          MR. BURNETT:  Thank you.

4          Mr. Sheridan.  Just a few questions about this

5   zero-one thing you're testifying about.

6          THE WITNESS:  Yes, sir.

7          MR. BURNETT:  Who was it that went into the code and

8   found zeros and ones?

9          THE WITNESS:  That would be members of my team.

10         MR. BURNETT:  Would you personally have been able to

11  do that yourself or you needed them to do it for you to find

12  the zeros and ones?

13         THE WITNESS:  I've never tried, so I can't -- I don't

14  know.

15         MR. BURNETT:  And if I showed you the full code today,

16  could you today point me to the zeros and ones and say what

17  they mean?

18         THE WITNESS:  So, one step back.  The zero and one in

19  the code review was conducted by members of my team.  The zero

20  and one as displayed in the Blockchain explorer is something

21  that I can do and I'm familiar with.

22         MR. BURNETT:  Sorry.  I want to make sure I

23  understand.

24         So the code base is not something that I could show

25  you today and you would be able to find for me and tell me

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O4GCeis3                         Voir dire

1    where it is in the code base and what it means, that's

2    something your FTI team did?  Or you would just be parroting

3    what your FTI team told you about it?

4         THE WITNESS:  The code base, that is, I would need to

5    rely on my team for the code review.

6         MR. BURNETT:  And this Blockchain explorer thing, do

7    you have the documents with you that you looked at for this

8    Blockchain explorer thing to find the zeros and ones?

9         THE WITNESS:  I don't have them with me.

10        MR. BURNETT:  So we'd move to preclude this entire

11   line of testimony.

12        THE COURT:  Is that something that you can find, do

13   you know what the URL is and could you find it in five seconds?

14        THE WITNESS:  We could have it in minutes, sir.  Me

15   personally, right now?

16        THE COURT:  Yes.

17        THE WITNESS:  I would need the transaction data of a

18   borrow and another transaction to be able to find it.  We have

19   specific ones.  I could make that effort, sir, if that's what

20   you're asking.

21        THE COURT:  Explain to me, you mentioned code and you

22   mentioned Blockchain explorer.  So tell me the relationship

23   between those two things and how it is the basis of your

24   opinion.

25        THE WITNESS:  So the Blockchain explorer is a product

1    that is publicly available in order to analyze and pull

2    information about the Blockchain transactions.  So in this

3    case, specific borrows or deposits or withdrawals and so forth.

4    The code -- there are elements of code within the Blockchain

5    explorer and instructions and program logs specific to the

6    transaction you are researching.  The code for the Mango

7    Markets protocol upon which those transactions are based and

8    details the instructions of what reports the 1 or the 0 as it

9    relates to borrow is that is what we've been discussing, it's

10   on GitHub and is the much broader and more extensive set of

11   instructions to allow the Mango Markets protocol to run.

12            THE COURT:  So for your opinion, are you relying on

13   what you reviewed yourself in the Blockchain explorer or

14   instead what your team reviewed in the code base?

15            THE WITNESS:  The Blockchain explorer shows the 1

16   and 0, which I've personally seen, if that's what you're

17   asking.

18            THE COURT:  So when you testified about a "borrow 1"

19   and a "borrow 0," is that from this Blockchain explorer or is

20   it from the code base?

21            THE WITNESS:  The ones and zeros are reported on the

22   Blockchain explorer.

23            THE COURT:  In what way did you rely on your team's

24   analysis to figure out what those terms meant within the

25   Blockchain explorer?

1    THE WITNESS:  So looking at the 1 and the 0 in the

2    Blockchain explorer and looking at the program log and

3    instruction logs, I could not identify what the 1 and the  0

4    meant.  Part of the objective, as requested by the defense

5    counsel, was to identify which transactions were borrows, which

6    were lends, or which were withdrawals and which were borrows.

7    So because I could not identify what that 1 and 0 meant, I

8    asked my team, can you guys go into the deeper full code base

9    upon which the program is written, or the instructions for the

10   protocol, I should say, and see if you can find information as

11   to why this is being reported as a 1 and a 0.

12        THE COURT:  So for any borrow or withdrawal in a

13   user's account, they are reflected as what in Blockchain

14   explorer?

15        THE WITNESS:  Well, that's the challenge.  As it

16   relates to this 1 and 0?

17        THE COURT:  I'm saying, is that how they're reflected,

18   either as a 1 or a 0?

19        THE WITNESS:  Yes.  The borrow designation is either 1

20   or 0.

21        THE COURT:  For any transaction.  What about a pure

22   withdrawal where there's absolutely no borrow?

23        THE WITNESS:  That's the challenge.  There's no

24   withdrawal 1 or 0.  There's only borrow 1 or 0.

25        THE COURT:  For all transactions?

O4GCeis3                        Voir dire

1           THE WITNESS:  For all transactions that I reviewed --

2      I don't know -- as it relates to this matter -- and I need to

3      clarify that, for the transactions that we reviewed related to

4      trying to identify whether a withdrawal was a borrow or not.

5      So I didn't review, personally, every transaction and looked

6      for the 1 or 0.  We looked for, as it relates to the

7      $50 million -- 50 million USDC, we looked for that 1 or 0 or

8      identified that 1 or 0 on that transaction.

9           THE COURT:  In the Blockchain explorer?

10          THE WITNESS:  In the explorer.

11          THE COURT:  Did you do that or did your team do that?

12          THE WITNESS:  They researched the activity and I

13     reviewed the results of that research.

14          THE COURT:  How is that reflected?  Did you get

15     printouts of the Blockchain explorer log or did you just view

16     it online?

17          THE WITNESS:  They sent me the transaction ID for that

18     transaction and I pulled up that transaction online and viewed

19     it.

20          THE COURT:  Okay.  Understood.

21          MR. BURNETT:  Can I inquire further, your Honor?

22          THE COURT:  Yes.

23          MR. BURNETT:  So I want to be clear about something.

24     When you asked your team to figure out what 0 and 1 means, that

25     was because you do not have the technological background to

1  figure that out; right?  It's not like they were saving you

2  time, you just don't know how to do that; right?

3          THE WITNESS:  Within the full Mango Markets code, yes,

4  I would not have the technical knowledge to be able to do that.

5          MR. BURNETT:  Even if there is this one-zero thing on

6  the Blockchain explorer as you claim, the only way you would

7  know what the 0 or 1 means is because some other person who has

8  more expertise at FTI on the code told you that; right?

9          THE WITNESS:  Yes.

10          MR. BURNETT:  And, in fact, even those FTI people

11  weren't able to figure it out.  You testified they called

12  someone from Mango developers or something?

13          THE WITNESS:  We contacted them on Discord.  We could

14  not find that code.

15          MR. BURNETT:  But you didn't even speak to someone,

16  you contacted someone on Discord?

17          THE WITNESS:  It was Discord communication.

18          MR. BURNETT:  Who was involved in that communication?

19          THE WITNESS:  Members of my team.

20          MR. BURNETT:  Who?

21          THE WITNESS:  Their specific names?

22          MR. BURNETT:  Yeah.

23          THE WITNESS:  Christopher Schroeder and Fredrix

24  Vazquez Ortiz.

25          MR. BURNETT:  Who did they speak to on Discord?

O4GCeis3                        Voir dire

 1              THE WITNESS:  I don't remember this particular
 2    development member.
 3              MR. BURNETT:  Do you remember who it could have been?
 4              THE WITNESS:  We were communicating with I think Pam
 5    and Maximillian and Microwaved Cola.
 6              MR. BURNETT:  Microwaved Cola, is that what you said?
 7              THE WITNESS:  Yes, sir.
 8              MR. BURNETT:  Those Discord things are actual
 9    messages, so they're typed out like with a screenshot?
10              THE WITNESS:  I don't know if we kept screenshots, but
11    they're typed out.
12              MR. BURNETT:  Do you have them with you?
13              THE WITNESS:  No, sir.
14              MR. BURNETT:  Your Honor, I think it's very clear --
15    we could do this outside the presence of Mr. Sheridan, is
16    probably appropriate.  Based on the Court's ruling yesterday
17    and what's been developed today, none of this is appropriate
18    testimony.
19              THE COURT:  Is it as simple as striking Mr. Sheridan's
20    testimony as to what the 1 or the 0 mean?
21              MR. BURNETT:  And no further questions on that
22    one-zero code analysis topic.
23              THE COURT:  We'll do that.  And I think just to speed
24    things up, once we finish with this, I can give the parties the
25    reasons for excluding that testimony, but I think in the

 1    interest of time, it makes sense to get the jury back in and to

 2    continue with the redirect examination and any recross.  Does

 3    that make sense to both sides?

 4             MS. MARTABANO:  Yes, your Honor.

 5             I just wanted to clarify before so we don't have any

 6    problems.  I would like to show him DX 20, he will not testify

 7    about ones and zeroes, but DX 20 which is already admitted in

 8    evidence, which is basically another shot similar to what the

 9    government showed that's in the GX 1011, the Mango Markets

10    documents.  It's just another example and I think it would cure

11    the prejudice I was mentioning earlier about the fact that what

12    they showed was a withdrawal that was a 100-percent withdraw

13    and borrow.  And DX 20 shows an instance where there is --

14             THE COURT:  Well, I don't think you can preview this

15    with the witness.  I think just do whatever you're going to do

16    and we'll take the objections up as they come.

17             MS. MARTABANO:  Okay.

18             (Continued on next page)

19

20

21

22

23

24

25

1    (Jury present)

2          THE COURT:  Before the break, you heard testimony

3    concerning what a 1 and a 0 meant.  You should disregard that

4    testimony.  It is stricken from the record.

5          Ms. Martabano, you may proceed with a different line

6    of questioning.

7          MS. MARTABANO:  Thank you, your Honor.

8          Mr. Smith, if you could bring up DX 20.  This has

9    already been admitted into evidence, so you can show it to the

10   jury.  If you could bring up next to that GX 1011, page 81.

11   BY MS. MARTABANO:

12   Q.  Mr. Sheridan, can you see the two exhibits on your screen?

13   A.  Yes, ma'am.

14   Q.  Mr. Burnett was just asking you about the one on the

15   left-hand side from GX 1011 showing a withdraw and a borrow --

16   a withdraw that says -- includes a borrow of the amount that's

17   equal to the withdraw.  Do you remember testifying about that?

18   A.  Yes, ma'am.

19   Q.  Looking at DX 20, I'm going to have Mr. Smith turn to page

20   2 of that.  Looking at this exhibit, can you explain what the

21   withdrawal string says at the bottom and what that indicates to

22   you based on your understanding of Mango Markets.

23   A.  Based on my understanding, it is a confirmation withdrawal

24   that is including both what's labeled a withdrawal and a

25   borrow.

1    Q.  Are those two numbers equal?

2    A.  They are not equal.

3    Q.  And why are they not equal based on your understanding of

4    Mango Markets?

5    A.  Because the requested withdrawal does not have enough

6    assets within the account to be withdrawn without completing a

7    borrow.

8    Q.  Is it possible to have just borrowed the whole amount?

9    A.  It would have been possible the whole amount if there's

10   enough collateral and health in the account to complete the

11   borrow.

12   Q.  But in this instance, they're withdrawing more than the

13   borrow.  So there's a distinction between the borrow and the

14   withdraw amount?

15            MR. BURNETT:  Objection.  Leading.

16            THE COURT:  Overruled.

17   A.  Yes, ma'am.

18            MS. MARTABANO:  You can take that down.  Thank you,

19   Mr. Smith.

20   Q.  I believe Mr. Burnett was talking to you about using the

21   risk calculator and simulating Mr. Eisenberg's transactions and

22   whether you received a warning or anything like that.  We've

23   talked about how a settle and a withdrawal would work on the

24   platform.

25            Based on your understanding and using the risk

O4GCeis3                           Sheridan - Redirect

1    calculator to simulate those transactions, when

2    Mr. Eisenberg -- when you entered the transaction that led to

3    the long increasing in value, do you remember what the maximum

4    account value was, the maximum balance was showing in the

5    account at that time?

6    A.   In terms of dollar amount?

7    Q.   Yeah.  And it can be a ballpark, it doesn't have to be

8    specific.

9    A.   It would have exceeded $100 million.  I don't remember the

10   exact.

11   Q.   And based on your understanding of the platform, if you had

12   taken $50 million out from that $100 million, based on your

13   understanding of how health ratios work and collateral, would

14   the account still have been healthy after a $50 million

15   withdrawal?

16   A.   If you're taking $50 million from an account that has

17   $100 million value in it, yes.

18   Q.   Why is that?

19   A.   Because you still have enough positive assets, whether it's

20   collateral or other positively valued positions as compared to

21   your liabilities.

22   Q.   Mr. Burnett asked you about the Mango DAO and how the code

23   was launched.  Who initially launched version 1 of the code?

24   Was it the DAO?

25   A.   No, that would have been the Blockworks foundation.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  He asked you about this could be a decentralized or

2    centralized, and a centralized entity could similarly propose

3    changes to the code.  For the Mango DAO, if I wanted to change

4    something right this instant, can I immediately implement that,

5    and if not, why?

6    A.  You cannot immediately implement because your proposed

7    changes have to go before the DAO as a vote.  You have to have

8    enough Mango tokens to be able to propose that vote.  The other

9    members of the DAO have to conduct the vote and it has to be

10   approved.

11   Q.  Is there a minimum amount of time that that might take?

12   A.  I believe they had a three-day minimum on their voting

13   procedures.

14   Q.  And even if it wasn't a three-day minimum, can you explain

15   a little more about how the voting works, how reaching

16   consensus, the minimum amount of votes works in order to make

17   proposals and get changes on the DAO.

18   A.  So in order to be able to participate in the voting

19   procedures, you have to stake or, for lack of better

20   explanation, lock up a volume of Mango tokens.  The volume you

21   lock up and commit to the DAO will effect certain factors about

22   voting rights and other timelines associated to the voting

23   process.  Once you have staked those tokens and are granted

24   recognition of that staking, you can then make proposals to the

25   DAO for votes.

O4GCeis3                          Sheridan - Redirect

1  Q.  And people have to have time to vote, some period of time

2  to vote on those; is that accurate?

3  A.  That's correct.

4  Q.  Going back to the discussion about going bankrupt on Mango

5  Markets, as far as you're aware, other than liquidation, is

6  there any other consequence to going bankrupt on Mango Markets

7  for the individual account that was liquidated?

8           MR. BURNETT:  Objection.  Scope.

9           THE COURT:  Overruled.

10 A.  Can you repeat the question, please.

11 Q.  Sure.  Mr. Burnett was asking you about being bankrupt on

12 Mango Markets and the impact of that, and I'm just asking you

13 on Mango Markets, if your account goes bankrupt, other than

14 becoming liquidated, is there any other consequence to you?

15 A.  The consequence is liquidation of your account, yes.

16 Q.  As far as you know, was there anything stopping you if you

17 had been bankrupted once from opening another account later on

18 Mango Markets?

19 A.  There is no stoppage of that, no.

20 Q.  What, if any, rules does Mango Markets have built in to

21 prevent repeat bankrupters from getting on the system again and

22 again?

23 A.  Due to the lack of identity requirements, they wouldn't

24 know that information.  And so, they don't put those procedures

25 in place.

O4GCeis3                        Sheridan - Redirect

1    Q.  And they also asked you about socialized loss.  In this

2    instance, in the trades at issue, did Mango Markets have to use

3    socialized loss in order to cover the losses incurred by the

4    protocol?

5    A.  We did not look into those procedures.  I don't know that

6    answer.

7    Q.  We discussed on your direct the fact that there had been a

8    bad debt repayment proposal that was passed?

9    A.  Proposal, yes.

10   Q.  $67 million repaid.  Does that affect your analysis here of

11   whether there was socialized loss?

12           MR. BURNETT:  Objection.  Leading.

13           THE COURT:  You're going to have to rephrase that

14   question.

15           MS. MARTABANO:  Sure.

16           Can we show the exhibit, which I believe is 901, just

17   to Mr. Sheridan.

18   Q.  Mr. Sheridan, while that's coming up, if you could just

19   explain your understanding of the order of how things proceed

20   on Mango Markets after a bankruptcy.  So liquidation going on

21   forward to finish off that loss up to socialized loss, which

22   Mr. Burnett was talking to you about.

23   A.  So liquidation followed by bankruptcy, followed by

24   insurance fund, followed by socialized losses.

25   Q.  And based on your understanding of the amounts at issue in

1   the case and exhibit 901, which you've already testified about,

2   what is your understanding about whether the socialized loss

3   mechanism was used in response to this transaction?

4   A.  My understanding of how the protocol works is that the

5   socialized loss mechanism would have engaged.

6   Q.  And why is that?

7   A.  Because there were still liabilities or account deficits

8   that could not be covered by the other liquidation and

9   insurance fund actions.

10  Q.  After the $67 million was repaid?

11  A.  After the -- can you ask the question again.

12  Q.  Sure.  What I'm really asking you about is this $67 million

13  was repaid.  Was this $67 million plus the insurance fund

14  sufficient to cover the losses in this case?

15  A.  So this $67 million plus the $70 million in the treasury,

16  is that what you're asking?

17  Q.  Yes.

18  A.  Yes, the $130 million amount would exceed the amounts that

19  were withdrawn, yes.

20  Q.  So given that, would the socialized loss have kicked in?

21  A.  I just don't know the timing because we didn't look into

22  the socialized loss.  I can speak to the amounts, but

23  socialized loss was not a function of what we researched.  So

24  if you're asking me if there were funds within the treasury and

25  this $67 million to cover, then that, I can testify to that.

O4GCeis3                     Sheridan - Redirect

1    Q.  And were there?

2    A.  Yes.

3            MS. MARTABANO:  Final exhibit, I hope to promise.

4    DX 60, page 3, Mr. Smith.

5    Q.  Mr. Burnett covered this with you, it's the Neodyme audit.

6    If you'd like to see page 1 to confirm that, just let Mr. Smith

7    know.

8    A.  No, I recognize the introduction.

9    Q.  Did you review this whole audit before testifying today as

10   part of your preparation in this case?

11   A.  Yes, ma'am.

12   Q.  And I believe you testified that it confirmed that the

13   code -- it was just an analysis of the code; is that accurate?

14   A.  It was a security analysis of the code.

15   Q.  And based on the findings of the audit and the timing, do

16   you have any conclusions about how Mango's code was functioning

17   on October is 1th?

18           MR. BURNETT:  Objection.  Scope.

19           THE COURT:  Ms. Martabano, can you rephrase your

20   question.

21           MS. MARTABANO:  Sure.

22   Q.  You testified earlier that the findings of the audit were

23   that there were some problems, but they were all fixed; is that

24   fair?

25   A.  According to the audit, yes.

O4GCeis3                     Sheridan - Recross

1    Q.  And so, if a code audit is done and they ultimately say all
2    the problems were fixed, what does that mean to you about the
3    functioning of the code?
4    A.  It means to me that the functioning of the code for the
5    issues that they identified were fixed and are fully
6    functioning.
7           MS. MARTABANO:  If you could turn to page 5,
8    Mr. Smith.
9    Q.  Mr. Burnett was asking you about the line that says "ruling
10   out economic attacks."  Does this audit explain anywhere else
11   in it what "ruling out economic attacks" means or what that
12   fixes?
13   A.  No, ma'am.
14          MS. MARTABANO:  That's all, your Honor.
15          THE COURT:  All right.  Any recross?
16          MR. BURNETT:  Yes, your Honor, but just a few minutes.
17          If we could pull up Government Exhibit 901.
18   RECROSS EXAMINATION
19   BY MR. BURNETT:
20   Q.  This is that repayment proposal that you were testifying
21   about a moment ago; right?
22   A.  Yes, sir.
23   Q.  In this proposal, Mr. Eisenberg agreed to pay back some
24   portion of the money he had taken; correct?
25   A.  Yes, sir.

1  Q.  And the Mango DAO was left having to chip in, what,

2  $40 million worth to cover the rest of the losses; right?

3  A.  I didn't look into what the Mango DAO paid specifically.

4  Q.  Fair to say Mr. Eisenberg didn't give it all back; right?

5  A.  Give all of what back?

6  Q.  What he took.

7  A.  Again, I didn't do a line-by-line accounting of what was

8  withdrawn and what was repaid in this repay bad debt.

9  Q.  And Mr. Eisenberg also gave it back in exchange for

10  something; right?

11  A.  There are requests for other -- there are other requests

12  made in the repay bad debt.

13          MR. BURNETT:  Right.  If we could highlight the last

14  line here.

15  Q.  One of the things that was a condition of returning the

16  money was that the Mango DAO will not pursue any criminal

17  investigations or freezing of funds once the tokens are sent

18  back as described above.

19          Did I read that right?

20  A.  Yes, sir.

21          MR. BURNETT:  We can take those down.

22  Q.  Now, I want to ask about this round number thing you

23  mentioned earlier in your testimony.  Do you remember that?

24  A.  Yes, sir.

25  Q.  If I'm understanding it right, it's the idea that, hey,

1  things move around in cryptocurrency all the time, so it's kind

2  of unexpected to see a round number because the odds that you

3  would click a button exactly when a round number is hit are

4  pretty low; right?  That's the basic idea?

5  A.  That's a very good description, yes.

6  Q.  But if you were to type in a borrow of say 50 million USDC,

7  odds would be pretty high you could have a round number, right,

8  because a person could type in 50 million as the borrow and

9  then click that; right?

10  A.  Yes, sir.

11  Q.  Now, let's also talk about just one last thing, and these

12  were the hypotheticals you were asked.  You were asked a number

13  of hypotheticals by Ms. Martabano about an assumption that an

14  account has no assets and what could they withdraw if they have

15  no assets in there; right?

16  A.  Yes, sir.

17  Q.  Mr. Eisenberg's account had a lot of assets from the

18  perpetuals; right?

19  A.  Yes, sir.

20  Q.  And you can borrow against the value of those assets on

21  Mango Markets; correct?

22  A.  Yes, sir.

23          MR. BURNETT:  No further questions.

24          THE COURT:  Okay.  Thank you very much, Mr. Sheridan.

25          THE WITNESS:  Thank you, sir.

O4GCeis3

1      (Witness excused)

2           THE COURT:  Members of the jury, we're right on time

3   for our midday break, so we will take a break.  Be back at

4   noon.  And just to not keep you in suspense, I think we're

5   going to be able to send you home early today consistent with

6   what I previously told you about when we would be kind of

7   getting closer to the finish line here.  So take your break,

8   we'll be back, and hopefully I'll have some better clarity for

9   you on the schedule moving forward.  Thank you very much.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4GMEIS4

1    (Jury not present)

2    THE COURT:  The Court struck Mr. Sheridan's testimony

3    as to the interpretation of the borrow ones and zeros.  During

4    *voir dire*, Mr. Sheridan said that his testimony about what the

5    borrow ones and zeroes meant was based on Blockchain data that

6    was never produced or identified to the government on

7    information from his coders that he could not independently

8    verify the accuracy of and on a Discord chat with someone from

9    Mango Markets who he could not identify.  That chat was also

10   never produced or identified to the government.

11   As such, there are numerous issues with Mr. Sheridan's

12   testimony about the borrow ones and zeros.

13   First, there was an inadequate disclosure, which is a

14   violation of Criminal Rule of Procedure 16.  Neither the

15   underlying Blockchain data nor the Discord chat was ever

16   identified or produced to the government, even to this very

17   moment.  The Court already granted a continuance to avoid

18   excluding Mr. Sheridan's testimony and to give the defense the

19   chance to produce everything Mr. Sheridan relied upon to the

20   government.  The defense failed to do so as to this issue.

21   Another continuance would not be practical or just at this

22   point.

23   In addition, Mr. Sheridan's testimony was serving as a

24   conduit to convey his coder's interpretation of the code.  It

25   is true that experts are permitted to rely on opinions of other

O4GMEIS4

1    experts to the extent that they are of the type that would be

2    reasonably relied upon by other experts in the field.  That's

3    from Rule 703.

4            But in doing so the expert witness must, in the end,

5    be giving his own opinion.  He cannot simply be a conduit for

6    the opinion of an unproduced expert.  That's *Mallatier v.*

7    *Dooney & Bourke, Inc.*, 525 F.Supp. 2d 558 at page 64 (S.D.N.Y.

8    2007).  Plus Mr. Sheridan testified that he was not able to

9    check or verify the interpretation of the code that was offered

10   by his team members.

11           And, finally, Mr. Sheridan testified that even his own

12   coders were unable to determine what the code meant having to

13   reach out to a Mango Markets coder, which suggests that the

14   coders were not merely acting as data gatherers or gofers but

15   were instead offering their discretionary expert judgments,

16   which is impermissible under *Faulkner v. Arista Records LLC*, 46

17   F.Supp. 3d 365, 385 (S.D.N.Y. 2014), which then quotes the

18   other applicable authorities.

19           So that's the basis for the Court's ruling.

20           Mr. Burnett, anything further?

21           MR. BURNETT:  No.  Thank you.

22           THE COURT:  Ms. Martabano, do you have any further

23   clarity on what we are looking at in terms of the afternoon?

24           MR. TALKIN:  Your Honor, I do.

25           As an initial matter, Mr. Eisenberg is prepared to be

O4GMEIS4

1    allocated about his testimony or the fact that he is not going

2    to testify.  2, the issue that I raised in the back, timing

3    wise, scheduling wise, is no longer an issue.  That's not a

4    concern for the Court.

5            THE COURT:  If I'm correct, the defense will rest.

6            Does the government have a rebuttal case?

7            MR. BURNETT:  No, your Honor.

8            THE COURT:  We can let the jury go home for the day,

9    we will have our charge conference, and we will be prepared for

10   closings tomorrow morning.  Is that right?

11           Who is going to be closing for the government?

12           MR. DAVIS:  I'll be doing the first summation for the

13   government.

14           THE COURT:  Who is doing rebuttal?

15           MR. DAVIS:  Mr. Burnett.

16           THE COURT:  Do you have a time estimate?

17           MR. DAVIS:  I think an hour, your Honor, to be safe,

18   maybe a little bit longer, but I don't anticipate much longer

19   than an hour.

20           THE COURT:  Mr. Burnett, you have about half an hour,

21   something like that?

22           MR. BURNETT:  I think that's right, unless the defense

23   closing is like two hours or something.

24           THE COURT:  On the defense side, who is going to be

25   closing, Mr. Klein?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1              MR. KLEIN:  Yes.

2              THE COURT:  Do you have a time estimate?  Is it less

3    than three hours?

4              MR. KLEIN:  I hope so, your Honor.  Yes.  It is

5    definitely less than three hours.  It's going to be, depending

6    on what they say, obviously, but an hour, hour and a half,

7    somewhere in there.

8              THE COURT:  How is the jury going to have exhibits

9    back in the jury room?  Do we have any agreement on a laptop or

10   other device that can be given to the jury, or do the parties

11   have a proposal?

12             MR. BURNETT:  In my experience, a clean laptop is a

13   lot easier.

14             MR. KLEIN:  We are fine with a clean laptop, your

15   Honor.

16             Your Honor, we would like to just review the list and

17   the exhibits one more time before they are put on the clean

18   laptop, just to double check.

19             THE COURT:  I don't have a clean laptop.  I'm assuming

20   that the parties --

21             Mr. Davis.

22             MR. DAVIS:  While we are on the real logistics of

23   tomorrow, the big issues of the day, could I make the request

24   to move the podium with the monitor in front of the jury.  The

25   reason for my request is, I anticipate having Power Point
```

O4GMEIS4

1    slides, and I need to be able to see them and read from them
2    while I'm doing that, and podium does not have a monitor.
3         THE COURT:  Mr. Hernandez, let's check with the AV
4    department and see if they can haul that lecturn over.
5         Is the defense going to have slides as well?  Do you
6    have an objection to doing this?
7         MR. KLEIN:  I don't want to be -- I liked it there and
8    I was planning to be there, so I am not trying to create an
9    unnecessary dispute.  We do have a Power Point also.  We will
10   be offering, I don't think demonstratives, but showing
11   exhibits.
12        THE COURT:  Let me ask you this.  Do you care one way
13   or another whether you're standing right in front of the jury
14   or on the side?
15        MR. KLEIN:  I kind of do, your Honor, but I am not
16   trying to be difficult about it.
17        THE COURT:  I am not sure that we can actually move
18   that entire thing over, to begin with.  We will try to figure
19   out what we are able to do, and then we can deal with it.
20        MR. DAVIS:  Sounds good.  Thank you, Judge.
21        MR. KLEIN:  Your Honor, I would just ask, if they are
22   going to have demonstratives, we be given a chance, in the
23   morning, right before, just to look at them in case there is
24   some sort of objection, like it's a fact not in evidence that
25   they are referencing or something.  I don't want to have to

O4GMEIS4

1    object in the middle of his closing.

2         THE COURT:  I don't normally have people exchange

3    demonstratives for closings.  I wouldn't ask you to disclose

4    your demonstratives either.  If you have an objection, you can

5    raise it.  I think both sides know -- we have gone over it a

6    number of times in terms of the rules of the road.  I think the

7    parties on both sides have stuck to those rules for the most

8    part, aside from a couple of issues.  I don't anticipate that

9    there will be any issues.

10        Of course, this is one of the most solemn times at a

11   trial, so I expect that the parties will be mindful of it.

12   However, if something is shown, and it's objectionable, I'll

13   expect you to raise your objections, and we will deal with it

14   in the least disruptive way possible.

15        If the parties can come to an agreement and they want

16   to agree to exchange their demonstratives, that's fine, but

17   that's the parties' agreement.

18        Otherwise, Mr. Davis, you'll understand that you may

19   be facing an objection if you have some sort of really

20   objectionable demonstrative.  I won't even try to describe what

21   it might be.  If you try to put it in, you will be facing an

22   objection.

23        MR. DAVIS:  Understood.

24        MR. KLEIN:  Your Honor, one more thing.  We are going

25   to want to renew the Rule 29 after we rest.

O4GMEIS4

```
 1                Are you going to call the jury back and then send them
 2       away and then we will renew that?
 3                What do you propose for that?
 4                THE COURT:  Do you want to renew it right now?
 5                MR. KLEIN:  We need to rest in front of the jury.
 6                THE COURT:  You want to do it after you rest?
 7                MR. KLEIN:  Yeah.
 8                THE COURT:  We will just deal with it after you rest.
 9                MR. KLEIN:  I just didn't want a surprise --
10                THE COURT:  I understand.
11                MR. KLEIN:  We are ready for Mr. Eisenberg's
12       allocution.
13                THE COURT:  Mr. Klein, may I inquire of Mr. Eisenberg?
14                MR. KLEIN:  You may, your Honor.  I am putting the
15       microphone in front of him.
16                THE COURT:  Mr. Eisenberg, how are you feeling this
17       morning?
18                THE DEFENDANT:  I'm all right.
19                THE COURT:  In the last 48 hours, have you taken any
20       drugs, medicine, pills or had any alcohol?
21                THE DEFENDANT:  No.
22                THE COURT:  Is your mind clear today?
23                THE WITNESS:  Yes, your Honor.
24                THE COURT:  Do you understand what is happening here
25       in the courtroom?
```

O4GMEIS4

1   THE DEFENDANT:  Yes, your Honor.

2   THE COURT:  You understand that as a defendant in a

3   criminal case you have the right to testify on your own behalf

4   if you want to testify?

5   THE DEFENDANT:  Yes, your Honor.

6   THE COURT:  Do you understand that you also have the

7   right not to testify?

8   THE DEFENDANT:  Yes, your Honor.

9   THE COURT:  Do you understand that if you decide not

10  to testify that no one, including the jury, could draw any

11  inference or suggestion of your guilt from the fact that you

12  did not testify?

13  THE DEFENDANT:  Yes, your Honor.

14  THE COURT:  Do you understand that whether you testify

15  or not is a decision for you to make, with the assistance of

16  your lawyers, but ultimately it is your decision to make and

17  not your lawyer's decision to make.

18  Do you understand that?

19  THE DEFENDANT:  Yes, your Honor.

20  THE COURT:  Don't tell me what you discussed, but have

21  you discussed with your lawyers whether you should or should

22  not testify in this case?

23  THE DEFENDANT:  Yes, your Honor.

24  THE COURT:  Have you had enough time to do that, to

25  talk to them and whether to testify and the advantages and

O4GMEIS4

```
 1    disadvantages of whether to testify?
 2              THE DEFENDANT:  Yes, your Honor.
 3              THE COURT:  Is it your decision not to testify in this
 4    case?
 5              THE DEFENDANT:  Yes, your Honor.
 6              THE COURT:  Is that your decision assisted by counsel,
 7    but ultimately it's your decision?
 8              THE DEFENDANT:  Yes, your Honor.
 9              THE COURT:  That is your decision that you are making?
10              THE DEFENDANT:  Yes, your Honor.
11              THE COURT:  Counsel, any further questions that I
12    should ask?
13              MR. DAVIS:  No, your Honor.
14              MR. KLEIN:  No, your Honor.
15              THE COURT:  We will be back at noon, and we should be
16    done.
17              Anything further?
18              Thank you very much.
19              (Recess)
20              THE COURT:  Mr. Hernandez, we can get the jury.
21              THE DEPUTY CLERK:  Yes, your Honor.
22              MR. KLEIN:  Your Honor, tomorrow's schedule.  Are they
23    going to be here until 5?
24              THE COURT:  Yes.  It is up to them, but they can stay
25    here later than that, if they want.  It's a full day.  It's not
```

O4GMEIS4

1   until 2:30.

2           MR. BURNETT:  We still do the 9:00 start?

3           THE COURT:  I would like to, unless anyone has an

4   issue with that.

5           (Jury present)

6           THE COURT:  Mr. Talkin, does the defense have any

7   further witnesses?

8           MS. MARTABANO:  The defense rests, your Honor.

9           THE COURT:  Does the government have any case in

10  rebuttal?

11          MR. BURNETT:  No, thank you.

12          THE COURT:  Members of the jury, that is the close of

13  the evidence in this case, so we will be back here tomorrow

14  morning at 9 a.m. for closing arguments, after which I will

15  provide to you my final instructions on the law to apply to

16  this case.  You can settle in for that.  It is going to be

17  long.  And then you will have the case for deliberations.

18          Between now and then, as I have instructed you many

19  times, do not research anything about this case, don't talk

20  about this case with anyone.  Don't talk look up any

21  information about this case on your phones, on the Internet,

22  anywhere.  Make sure that at the end of the day all you are

23  considering is the evidence that's been presented to you in

24  this courtroom and the instructions that I will provide.

25          With that, have a great rest of the day, and we will

O4GMEIS4

1     see you here for 9:00.  Thank you very much.

2              (Jury not present)

3              THE COURT:  Mr. Klein or Mr. Greenspan.

4              MR. GREENSPAN:  Your Honor, the defense renews its

5     Rule 29 application on the grounds previously stated.  Thank

6     you.

7              THE COURT:  Thank you, Mr. Greenspan.

8              The Court will reserve decision under Rule 29(b).

9              Are the parties prepared to proceed to the charge

10    conference?

11             MR. BURNETT:  Yes, your Honor.

12             MS. MARTABANO:  Yes, your Honor.

13             THE COURT:  Mr. Klein, I can see you from my

14    peripheral vision.

15             MR. KLEIN:  Some of us are going to leave from the

16    defense team.

17             THE COURT:  That's fine.  Anyone who doesn't need to

18    be here does not need to be here.  Why don't we give people a

19    chance to leave the courtroom, and then we will proceed.

20             Why don't we start with the government, and I will

21    hear your objections or proposed changes, and then we will go

22    to the defense.  If you do have an objection or any issue with

23    anything that's in here, I'll expect that you will have a

24    proposed solution as well.

25             MR. BURNETT:  For the some of the issues where there

O4GMEIS4

```
1    was a long back and forth before, can we just refer to what our
2    prior objection and proposal was rather than restating it all?
3              THE COURT:  Yes, you may.
4              MR. BURNETT:  Thank you.
5              I think the first question really is on page 14.  This
6    is the summary of the indictment section.
7              THE COURT:  Yes.
8              MR. BURNETT:  We noticed that the verdict form had
9    adopted the formulation of swap manipulation as to Count Two.
10   We just think --
11             THE COURT:  Needs to be consistent.
12             MR. BURNETT:  We should just conform things one way or
13   another.
14             THE COURT:  We will change it on the verdict form to
15   commodities manipulation.
16             Any objection to that change?
17             MR. GREENSPAN:  No objection, your Honor.
18             MR. BURNETT:  The second one is on page 18, line 426.
19             THE COURT:  OK.
20             MR. BURNETT:  I think we would propose deleting the
21   phrase, in their property rights.  I think that concept of
22   deceiving someone and their property rights has a home under
23   the wire fraud statute, where the object of the fraud needs to
24   be money or property.  But in the context of securities and
25   commodities fraud, it needs to be dishonest, but it's not in
```

O4GMEIS4

1    relation to money or property.  It's in relation to whatever

2    the scheme is.

3          THE COURT:  Mr. Greenspan, do you have an issue with

4    that proposed change?

5          MR. GREENSPAN:  No.  We don't object to that.

6          THE COURT:  That change will be made.

7          In their property rights will be removed from line 426

8    on page 18.

9          MR. BURNETT:  With respect to materiality on page 19,

10   the heart of which runs from 436 to 453, this is just two

11   preservation arguments.

12         One is, as the government briefed, we don't believe

13   the materiality element applies as to the manipulation prong of

14   this count, and, second, with respect to the substance of the

15   material instruction, we had proposed an instruction in a

16   letter to the Court that directed the jury that they could more

17   specifically -- more specifically that if they find that the

18   defendant -- the defendant's asset level or selection of the

19   borrow function is what allowed him to borrow what he borrowed

20   off of the platform, that alone is sufficient to establish

21   materiality.  That wasn't the exact wording, but this was in

22   the context of the *Rigas* submission we made.  We would just

23   note that for preservation purposes.

24         THE COURT:  Your objection is noted.

25         MR. BURNETT:  The next one, this is just another

1    preservation purpose, page 20, line 463 to 472.

2              THE COURT:  I said it was noted.  But it's noted and

3    overruled, to be very clear.

4              MR. BURNETT:  Of course.

5              463 to 472, the government had previously proposed an

6    instruction that USDC was also a commodity and proposed a

7    definition of commodity in a contract-of-sale theory.  The

8    government just preserves that proposal, understanding the

9    Court overruled that.

10             THE COURT:  Objection noted and, as previously stated,

11   it was overruled.

12             MR. BURNETT:  The next one is page 21, line 480 to 82.

13   This is in the mixed-swap definition.  If I understood the

14   discussion with defense yesterday, it sounded like there was an

15   agreement to the deletion of "from other" on line 481 through

16   "momentarily," so we would propose removing that.

17             THE COURT:  Mr. Greenspan, is that correct?

18             MR. GREENSPAN:  That's correct, your Honor.

19             THE COURT:  Just to be clear, an objection has been

20   made by the government.  They have proposed a change, which is

21   to remove the language, other than a narrow-based security

22   index which I will define momentarily, from lines 480 and 481

23   on page 21.

24             Mr. Greenspan, on behalf of the defendant, has no

25   objection to that change, so it will be made.

O4GMEIS4

 1          MR. BURNETT:  The next proposal is to the end of line

 2    487 on this page.  The government proposes adding at the end of

 3    this paragraph the following sentence:  An interest, in

 4    quotation marks, is a right, title, or legal share in

 5    something, and the basis for this addition is twofold.

 6          First, the definition of a narrow-based security index

 7    described at 485 to 86 is an index or group of minor fewer

 8    security, but then goes on to say, including any interest

 9    therein or based on the value therefrom.

10          As the government explained in its letter submitted to

11    the Court, I believe Sunday night, the phrase interest actually

12    has a meaning in the context of the securities laws and that

13    interest is that it's a right, title, or legal share in

14    something.  That's clear both from the common meaning of the

15    term interest.  It's also clear from the statutory scheme and

16    the other definitions in the securities laws which use the term

17    interest to define an interest or a share in something.  This

18    is just what the legal definition of the term is.

19          We think an instruction clarifying what interest means

20    is important for two reasons:

21          First, the word interest already appears in the

22    statute.  And because that word has kind of a special legal

23    meaning, particularly in the context of the securities and

24    commodities laws, it would be important for the jury to have an

25    understanding of what that word means.

O4GMEIS4

1    Second, I think it's kind of particularly important in
2  the context of this case because there is a chance a juror who
3  is kind of unfamiliar with this area could think of interest as
4  meaning like an interest rate, which would kind of very clearly
5  not be what this is referring to.
6    So we would propose that clarification.  We think that
7  is a legally accurate instruction that also preserves what we
8  understood the Court's goal to be, which is to allow the
9  parties to sort of argue it out as to what the funding rate
10  qualifies as under here.
11    THE COURT:  Mr. Greenspan, any objection to this
12  change, which does not -- which basically adopts your proposed
13  definition of the general terms but then provides a generic
14  definition of one of those terms at the close of the
15  instructions.
16    MR. GREENSPAN:  Can we have Mr. Burnett repeat it one
17  more time.
18    MR. BURNETT:  Sure.
19    An interest, with interest in quotation marks, with a
20  right, title, or legal share in something.
21    MR. GREENSPAN:  No objection to that, your Honor.
22    THE COURT:  We will add an interest with a right,
23  title, or legal share in something to line 489 on page 21.
24    MR. BURNETT:  Just, again, for preservation purposes,
25  the government does not think there is a basis for a

O4GMEIS4

1    narrow-based security index instruction to begin with,

2    partially because I think the relevant reference here is the

3    oracle, which includes USDC and USDT, which would take it out

4    of the realm of a narrow-based security index, because it is

5    not purely based on securities and also because a rate, by

6    definition, cannot be an index, but understanding the Court has

7    overruled that, I am just preserving it.

8              THE COURT:  Understood.

9              All right.  Next.

10             MR. BURNETT:  The next proposal --

11             THE COURT:  Before we proceed, Ms. Goldberg, you're

12   getting these down.  I want to make sure.  You're the official

13   arbiter.  You're the scrivener.

14             MR. BURNETT:  The next proposal is page 25, line 574.

15             We propose making the following change.  The sentence

16   begins:  Market -- not begins:  The line begins:  Market or by

17   actions taken.

18             THE COURT:  Which line number?

19             MR. BURNETT:  I'm sorry.  574.

20             We propose revising it to read:  Market or by actions

21   taken, including trading, and then continuing with the rest of

22   the sentence, and the rationale there.

23             THE COURT:  I must be on just the wrong line.  You're

24   on page 25?

25             MR. BURNETT:  Line 574.  I should start at the

O4GMEIS4

1     beginning of the sentence rather than --

2              THE COURT:  As we are modifying some of this, the line

3     numbers are going to move, but you're at the third element.

4              MR. BURNETT:  The sentence begins, perpetual -- the

5     sentence really begins up at 571.

6              THE COURT:  Got it.

7              MR. BURNETT:  We would propose -- there is a clause

8     that begins:  Such as making false or misleading statements to

9     the market or by actions taken, including trading, that

10    otherwise distorted estimates, and then continue the sentence.

11             And the rationale for that is this.  If you look up to

12    the sentence that precedes the one that I proposed the change

13    to, it says:  A price is not artificial merely because it has

14    been affected by a market participant's trading, even a large

15    trade, because price movements are expected to be affected by

16    orders and trades in the marketplace.

17             We think that's legally accurate and are not objecting

18    to that sentence, but, as I understand the law in this area,

19    what that sentence is trying to make clear is that the fact

20    that trading alone has moved the market around does not mean

21    the price is artificial, but there can still be trading,

22    particularly trading with the intent to manipulate a price that

23    can make an artificial price.

24             So what we wanted to do is just clarify that the

25    actions that are referred to in this next sentence can include

O4GMEIS4

1  trading actions.

2              THE COURT:  Mr. Greenspan, do you have an objection to

3  that change?

4              MR. GREENSPAN:  No, we don't object to that.

5              THE COURT:  On page 25, in the last sentence under

6  artificial price, we will add, comma, including trading comma

7  before that otherwise distorted estimates of the underlying

8  economic value of the MNGO perpetuals.

9              MR. BURNETT:  Before we move to the next one, I should

10  add, just again for preservation purposes, that we have

11  previously registered an objection to the definition of

12  willfulness that the Court adopted with respect to Count One

13  and would preserve that objection.

14              THE COURT:  Understood.

15              MR. BURNETT:  The next piece is on my page 33.  It's

16  the extraterritoriality section.

17              This is really a purely housekeeping thing.  We would

18  propose after "occurred in the United States," which I have as

19  line 749 to 750, adding, "which includes Puerto Rico,"  just to

20  avoid some possibility someone gets confused about that.

21              THE COURT:  Mr. Greenspan, do you have any issue with

22  that edit?

23              MR. GREENSPAN:  No.  We agree that Puerto Rico is part

24  of the United States.

25              THE COURT:  We will add, "which includes Puerto Rico"

O4GMEIS4

1      to the extraterritoriality instruction.

2              MR. BURNETT:  I think the last proposal from us is

3      going to be on page 40, which is in the terms of service and

4      disclaimer section.

5              THE COURT:  OK.

6              MR. BURNETT:  The proposal we have here relates to

7      something we had discussed, I think, with some level of detail

8      in the motion *in limine* stage of the case.

9              So at the motion *in limine* stage of the case the

10     government had moved to say that the defense should be excluded

11     from making arguments or introducing evidence, basically, for

12     the purpose of this code-is-law argument, the idea that just

13     because it's possible on the platform, it's legal on the

14     platform.

15             The defense, very clearly on the record there, said

16     they have no intent to make this code-is-law argument, but I

17     think it is fair to say that many of the lines of questioning

18     and examinations that have been conducted in this case have

19     been designed to suggest to the jury that if it was possible

20     technologically on the platform that it was not criminal.

21             To that end, the government proposes adding an

22     instruction in this section that is of the same ilk of the

23     terms of service and disclaimer instructions that have been

24     provided.

25             Here is what we would propose for that.  It's a little

O4GMEIS4

1    bit longer.  I'll slow down.  Let me know if you need help

2    keeping up.

3              You have heard evidence in this case concerning Mango

4    Markets' code.  Just as with terms of service and

5    disclaimers -- sorry.  Hold on a sec.  I got off track.  Let me

6    actually read what we have written down here.  I apologize.

7    That's wrong.  Let's start from the beginning.

8              You have heard evidence in this case concerning Mango

9    Markets' code.  In considering whether the defendant's conduct

10   was manipulative, fraudulent, or deceptive in violation of the

11   criminal laws at issue in this case, let me caution you that

12   Mango Markets' code cannot render any fraudulent or

13   manipulative conduct, legal, or immaterial as a matter of law.

14   Rather, it is just one of the many factors you may consider

15   when determining whether the defendant has committed any of the

16   charged offenses.

17             THE COURT:  Mr. Greenspan.

18             MR. GREENSPAN:  We object to this.  I think the

19   government has already pushed this terms of service and

20   disclaimers piece quite far beyond what's normally given.  The

21   terms of service typically starts with just being about terms

22   of service.  They have already gotten the lack of terms of

23   service, which is an unusual instruction already.  They then

24   got an instruction on a pop-up, which is also unusual.

25             And now they are suggesting -- first of all, the

O4GMEIS4

1    suggestion the government made about the lines of questioning

2    was inaccurate.  There have been no lines of questioning to

3    suggest that code is law.  All of the questioning has gone to

4    intent and materiality and it has been pretty clear.  The Court

5    set guideposts, and we have endeavored to and, I believe, have

6    followed them.

7           And this is just another piece of this that the

8    government is using to use the instructions to suggest that the

9    jury should convict.  It is not an appropriate instruction.

10   It's also legally wrong, we think under *Rigas*, where the code,

11   especially if it's a contract, could render something

12   immaterial.  We think it's legally wrong as well.

13          THE COURT:  I am going to overrule the government's

14   objection here.  At least one of the reasons is that as to the

15   terms of service and the disclaimers, those were mirror

16   instructions.  The terms-of-service instruction was one that

17   was requested by the defense because the government had put in

18   terms of service from other platforms, and we provided some

19   limiting instructions along the way about that.

20          But the defendant had requested that there be a final

21   instruction relating to terms of service, so that was included.

22          In response, and for fairness, the government, after

23   much light had been paid to -- attention paid to the

24   disclaimer, requested that a similar instruction be provided as

25   to the disclaimer, and that was fair as to two pieces of

O4GMEIS4

1    evidence that were in terms that a juror potentially could

2    be -- could misunderstand to be related to legality of the

3    underlying conduct or illegality of the underlying conduct.

4         The code generally, I think, stands on different

5    footing, so I think it's fair -- I think it would be unfair,

6    excuse me, for there to be a specific instruction focusing on

7    that.  At that point we might have to have instructions

8    focusing on every single type of evidence that was put in with

9    both sides' instructions to the jury as to what it can and

10   cannot be considered for.

11        For all those reasons, the objection will be

12   overruled, and the proposed instruction will not be given.

13        MR. BURNETT:  Thank you, your Honor.

14        That's all from the government.

15        THE COURT:  Same thing, Mr. Greenspan.  We will go

16   back up to the top.

17        MR. GREENSPAN:  Your Honor, if I may start with the

18   verdict form.

19        This is a very minor point.  But the instructions at

20   the top at the end say:  Please circle your answers.  I think

21   it would just be better if it would say:  Please check off your

22   answers, or something to that effect.

23        THE COURT:  Yes.  That's fine.

24        MR. BURNETT:  To that end, there was one other little

25   housekeeping like that at the end that I forgot to mention.

O4GMEIS4

```
 1              THE COURT:  Let's do this one at a time.
 2              Mr. Greenspan, you want:  Please check off your
 3    answers?
 4              MR. GREENSPAN:  Yes, that would be great, or the
 5    equivalent.
 6              THE COURT:  I will do whatever you want.
 7              MR. GREENSPAN:  Please check off your answers is fine.
 8              THE COURT:  Any issues with that from the government?
 9              MR. BURNETT:  No.
10              THE COURT:  Anything further, Mr. Greenspan?
11              MR. GREENSPAN:  Nothing further on the verdict form,
12    your Honor.
13              THE COURT:  Mr. Burnett, on the verdict form, since we
14    are there.
15              MR. BURNETT:  Nothing on the verdict form.
16              I realized in the instructions there was one
17    nonsubstantive thing on page 42.
18              THE COURT:  Since we are on the verdict form, neither
19    side has any further objections or other proposed edits to the
20    verdict form.
21              Correct, Mr. Burnett?
22              MR. BURNETT:  Correct.
23              THE COURT:  Correct, Mr. Greenspan?
24              MR. GREENSPAN:  Correct.
25              THE COURT:  Understood.
```

O4GMEIS4

1    Back to the jury instructions.

2    MR. BURNETT:  The thing I forgot to mention was on

3    page 42, in the section that's about the right to see exhibits.

4    In light of the fact that the jury will now be having

5    the exhibits back with them, I think it might make sense to

6    edit the paragraph just so it refers to requesting testimony

7    rather than requesting exhibits.

8    THE COURT:  The third sentence will be:  If you want

9    testimony read back to you, please try to be as specific as you

10   possibly can.  The next sentence will start with:  The court

11   reporter will have to look through the transcript and the

12   parties will have to agree on what portions of testimony may be

13   called for in response to your requests.  And if they disagree,

14   we must resolve those disagreements.  The next paragraph, your

15   request for testimony, in fact any communications with the

16   Court, should be made to me in writing.

17   That should take care of it.

18   MR. BURNETT:  That's right.  Thank you.

19   THE COURT:  Mr. Greenspan, any issues with those

20   changes?

21   MR. GREENSPAN:  No, your Honor.

22   THE COURT:  So now we will take it back up to the top.

23   Mr. Greenspan, it's your show.

24   MR. GREENSPAN:  First objection we have is on page 19

25   at line 443.  This is an objection that's on the basis of

O4GMEIS4

1    *Rigas.*

2             We initially submitted a *Rigas*-based instruction.

3    What we are touching on here is the difference between, as

4    *Rigas* finds, something that is material and something that

5    could have actually been acted on.  At the end of the sentence,

6    which ends, making a business decision, we'd like to add, and

7    could have impacted that decision.

8             THE COURT:  Just so you're looking at the right

9    version -- actually, are there any objections to -- line 439

10   says:  A decision.  Line 442 -- these are numbers that I'm just

11   looking at on my version.  It says:  Making a business

12   decision.  But I think it's proper to say "making a decision"

13   in both lines.

14            Mr. Greenspan, do you have any issues with that?

15            Then I'll get to your proposed edit.

16            MR. GREENSPAN:  Can you say that one more time.  I'm

17   sorry.

18            THE COURT:  Do you see in the preceding sentence, it

19   says:  A material fact is one that a reasonable person would

20   consider important in making a decision.  And so in the next

21   sentence, do you have an issue with making -- conforming the

22   end of that sentence to that language, so "making a decision"

23   in both sentences?

24            MR. GREENSPAN:  No, your Honor.

25            THE COURT:  We will make that change.

O4GMEIS4

```
 1              What is the proposed change?
 2              MR. GREENSPAN:  To line 43.  The fraudulent act was
 3      one that would have been important to a reasonable person in
 4      making a business decision, and we propose --
 5              THE COURT:  Making a decision, right?  You're OK with
 6      that?
 7              MR. GREENSPAN:  Yes.  Sorry.
 8              THE COURT:  That's OK.  I just wanted to make sure
 9      that --
10              MR. GREENSPAN:  And propose adding:  Could have
11      impacted --
12              THE COURT:  That could have impacted?
13              MR. GREENSPAN:  That decision.
14              THE COURT:  That decision.
15              It would be "making a decision," that could have
16      impacted that decision?
17              MR. GREENSPAN:  That's the proposal, your Honor.
18      Thanks.
19              THE COURT:  Mr. Burnett, any issues with that?
20              MR. BURNETT:  We object to that.  We object on the
21      grounds that adding that language in takes materiality -- it
22      starts to take materiality out of the objective tests of
23      whether or not information is important and starts to make it
24      sound more like a reliance test or test that looks at what
25      actually happened.
```

O4GMEIS4

1     We also think, to the extent that this is coming from

2     *Rigas*, as we briefed for the Court in the pretrial letters, we

3     think the defense's interpretation of *Rigas* is wrong, and in

4     fact the *Rigas* case supports a version of materiality that we

5     had proposed before trial, which is that if you need to click a

6     button or have a certain amount of assets in order to do what

7     the defendant did, it is effectively per se material.

8         So we propose keeping the instruction as it is written

9     rather than trying to add *Rigas*-based changes to it,

10    particularly in light of the Court's rejection of the

11    government's proposal based on that case.

12        THE COURT:  Mr. Greenspan, since we are talking about

13    it, do you have the citation for *Rigas*?

14        MR. GREENSPAN:  I do.  It's 490 F.3d 208 and pin cite

15    234.

16        Defendant's misrepresentations certainly concern a

17    variable that mattered to the banks.  The leverage ratio was

18    clearly relevant information, but relevance and materiality are

19    not synonymous.

20        Then it goes on to talk about:  For misstatements to

21    be material -- this is now on the next page.

22        THE COURT:  We are at 235?

23        MR. GREENSPAN:  Correct, your Honor.

24        However, they had to be capable of influencing a

25    decision that the bank was able to make.

O4GMEIS4

1      That's the distinction we are trying to make here, and

2 we don't think that that's captured to this point in the

3 instruction.  Previously we understood the government to object

4 to the phrasing of the *Rigas* instruction that we had, which we

5 thought was clear enough, but we understood their objection

6 that it wasn't full stop something that was incapable of

7 influencing, so we are trying to mimic that language here.  We

8 think that there is a clear distinction that *Rigas* makes that's

9 important to this case, and we are trying to do it in a way

10 that's as limited as possible in terms of altering the

11 instructions as they currently stand.

12      THE COURT:  Mr. Burnett, I guess what Mr. Greenspan is

13 saying is that he is not trying to get into the previous issues

14 that were raised by *Rigas*.  It's just *Rigas* makes kind of a

15 simple point, which is that to be a material misrepresentation,

16 it has to be at least capable of influencing someone's

17 decision.

18      So I'm happy to use the word capable, as opposed to

19 could or "that could" as proposed, but what's the substantive

20 objection to inclusion of that language as part of the

21 standard?

22      MR. BURNETT:  We think it's already fairly encompassed

23 in the paragraph.  But if the Court is inclined to add

24 something, we would ask that it actually track the language of

25 *Rigas*, that's the capable of influencing language, as opposed

O4GMEIS4

1    to this could have impacted that decision.

2            THE COURT:  Then it would be that it is capable of

3    impacting that decision.

4            MR. BURNETT:  Or influencing, I think the word was

5    from *Rigas*.

6            MR. GREENSPAN:  That's fine with the defense, your

7    Honor.

8            THE COURT:  That's the language that we will use at

9    the conclusion of that sentence, that is, capable of

10   influencing that decision.

11           Next, Mr. Greenspan.

12           MR. GREENSPAN:  Turning to page 21, the defense has --

13   I suppose we included this in our proposed instruction, but I

14   want to clarify that.  On line 480, where it starts first and

15   refers to USDC --

16           THE COURT:  Let's take a step back.  I want to just

17   make sure that we are all clear.  You should raise any

18   objections that you have at this time, so I just want to make

19   sure that you're clear about that, because I know in the swap

20   definition you had proposed excising part of this definition.

21           Have you dropped that objection, or are you still

22   asserting that?

23           MR. GREENSPAN:  No.  I missed that.

24           Let's go back to page 20.  Thank you for remind me of

25   that, your Honor.

O4GMEIS4

1    On line 467, the first sentence I think is an

2    instruction that's based on the subsection, I think it's 47,

3    Roman numeral little i, little i.

4    We don't think there has been any evidence that there

5    was any occurrence or nonoccurrence in this case.  So we just

6    don't think there is a factual predicate for even giving that

7    first instruction.  So we would propose deleting -- after the

8    word, a swap, everything starting from the word includes to the

9    word it also on the next line.  Then proceeding only on the

10   basis of subparagraph 47, little Roman numeral iii.

11           THE COURT:  Mr. Burnett, I take it the objection is

12   just that there is no evidentiary basis to give that first

13   proposed definition of swap to the jury?  Was there in fact

14   any -- I guess I did not hear previously that the government

15   was pursuing to define Mango perpetuals as a swap on that

16   basis.  It was, however, in the original proposal, so that's

17   why it's here.  Does it need to be here?

18           MR. BURNETT:  I don't think so.  I think it was

19   actually proposed by the defense originally in the definition

20   of swaps, so I don't think we have an objection to taking that

21   part out.

22           THE COURT:  Then it should read:  A swap includes any

23   agreement, contract, or transaction that provides for an

24   exchange of payments going forward.  Is that right?

25           MR. BURNETT:  That's right.

O4GMEIS4

1    THE COURT:  Mr. Greenspan, that's what you're
2    proposing?
3    MR. GREENSPAN:  That's right, your Honor.
4    THE COURT:  Now back to page 21.
5    MR. GREENSPAN:  Just further to that, as the Court
6    knows, on our Rule 29 motion, we believe, as a matter of law,
7    that the government hasn't met that instruction, but we don't
8    have a legal objection to the rest of the instruction as it is
9    given.
10    THE COURT:  Understood.
11    MR. GREENSPAN:  Turning to page 21 and the paragraph
12    first, we object to the inclusion of USDC as a potential basis
13    for a mixed swap for two reasons.
14    One is that USDC has been exchanged in this case, and
15    we don't think that something has been exchanged can be the
16    basis for a mixed swap.
17    The second is that, as we have briefed many times, we
18    think that USDC is simply a medium of exchange or medium of
19    settlement, and there has been absolutely no evidence, and even
20    definitionally we don't think that the value of the Mango
21    perpetual could depend on it, so that's our objection.
22    THE COURT:  Just as a technical matter, doesn't both
23    what's been called the market price and also the settlement
24    value of the Mango perpetuals, isn't it literally based on, at
25    least in part, the value of USDC?

O4GMEIS4

1          MR. GREENSPAN:  The settlement value is the oracle,
2     which is reported out in USD, which is part of the argument
3     here.  The market price is stated in USDC.  It was previously
4     stated, I believe, in USDT.  That was something that changed.
5     I don't think there was any particular value-based reason for
6     that change.  I think it was simply more convenient.
7          Again, we think it's the equivalent of saying that a
8     cup of coffee, the value of it is based in dollars because you
9     pay dollars.  We just don't think there is a logical or legal
10     argument to support that.
11          THE COURT:  Mr. Burnett, your response?
12          MR. BURNETT:  Yes, your Honor.
13          Both on Mango Markets and in the oracle the price of
14     Mango is relative to USDC.  It's not Mango compared to U.S.
15     dollars.  USDC is an important reference price.  Even if there
16     are times when USDC equals one dollar, it is still the USDC
17     price that's the reference price.  So USDC is a core component
18     of the value of this swap.  It's not just a medium of exchange.
19          And I would add, the defense has continued to use this
20     phrase medium of exchange.  The currency -- a foreign currency
21     is a medium of exchange and it is a commodity.  A medium of
22     exchange does not take something out of the coverage of the
23     commodities laws.
24          THE COURT:  Let me just make sure I understand
25     something.

O4GMEIS4

1        If instead of USDC the Mango Markets used a dollar,
2   just literally used a dollar, would that also just take this
3   out of the -- put it into the mixed swap definition, given how
4   broad this language is?  Because it says value of a currency or
5   a financial or economic interest or property of any kind.  Or
6   am I missing something?  It's not just a commodity.  It can be
7   all these other things.
8        MR. BURNETT:  I think the complication there is like,
9   there are special carve-outs that I think are like the treasury
10  laws for like actual U.S. dollars, but like everything else --
11       THE COURT:  Like absent those exclusions for like the
12  dollar.
13       MR. BURNETT:  Right.  If this had been say like the
14  Hong Kong dollar, just like tracks the dollar and it had been
15  the Hong Kong dollar instead of USDC, that would clearly be a
16  mixed swap.
17       THE COURT:  Understood.
18       MR. GREENSPAN:  Your Honor, if I could just make one
19  more point, just to complete the record.
20       I think your Honor's question was exactly right
21  because USDC and the dollar and Mango Markets are considered
22  one in the same.  There is no conversion in the event that USDC
23  falls off the peg.  They are literally the same.  That I think
24  is exactly the right question to be thinking about here.
25       (Continued on next page)

O4GCeis5

1          THE COURT:  Understood.  I'm going to overrule the

2     objection to the jury instructions.  However, Mr. Greenspan,

3     the defendant has obviously made this argument in connection

4     with its Rule 29 motion, and the Court will certainly consider

5     it.

6          Next.

7          MR. GREENSPAN:  One moment, your Honor.

8          Your Honor, on the narrow-based security index

9     paragraph, paragraph 485, lines 485 to 487.  We think it

10    important to instruct the jury that for purposes of this case,

11    they are to treat Mango and the Mango perpetual as a security.

12         THE COURT:  So just give me the sentence.

13         MR. GREENSPAN:  "For purposes of this case, Mango and

14    the Mango perpetual are securities."

15         THE COURT:  Any objection to that from the government?

16         MR. BURNETT:  Yes.  The instructions already define

17    what a security is, so the jury can reach a decision about

18    whether Mango is a security based on the instruction that the

19    Court has provided.  That's a fact question.

20         THE COURT:  Do you have an argument that Mango and

21    Mango perpetuals are not securities?  I take it what's going to

22    happen in closings is that Mr. Klein is going to argue that

23    Mango and Mango perpetuals are securities.  Are you going to be

24    arguing that they are not securities?  You don't need to

25    affirmatively assert that they are or are not securities, but

O4GCeis5

1   if you're not, for these purposes, objecting to the treatment

2   of those two things as securities, then, in fairness, wouldn't

3   we let the jury know that those two things are securities?

4   That's what I'm trying to figure out.

5           MR. BURNETT:  I understand.  I think that's true with

6   respect to Mango.  As to Mango perpetuals, I actually haven't

7   thought through what all of the bouncing balls are for if a

8   Mango perpetual is a mixed swap, whether it's still qualified

9   as a security or not.

10          THE COURT:  Wouldn't it not?  Mr. Greenspan, what am I

11  missing?  You're arguing that as a security-based swap.

12          Let's break this apart.  Let's say for the moment

13  there's not a dispute between the parties that Mango is a

14  security.  Maybe we put that in.  As to Mango perpetuals, isn't

15  that the dispute that we're having as to the mix swap

16  definition?  Meaning you're going to argue that it's a security

17  because it's a security-based swap, the government is saying

18  it's not, it's a mixed swap, and it falls out of that

19  definition and is governed by the commodities laws.

20          MR. GREENSPAN:  Your Honor, my understanding, and I do

21  my best to do this without the exact language, is that the

22  concept of a mixed swap is that it's both a swap and a

23  securities-based swap.  And so, a securities-based swap is

24  defined in the securities laws as a security.  So even if it's

25  a mixed swap, I still think the definition of it, statutorily,

O4GCeis5

1    is that it's a security.  The idea being that the SEC and the

2    CFTC both have jurisdiction.  I think it's still a security.

3             MR. BURNETT:  I'd agree a mixed swap is a

4    security-based swap.  I'm not 100 percent sure it's actually

5    still a security.  I think it would be extraordinarily

6    suggestive to the jury to say a Mango perpetual is a security

7    in this case when a core question for them is to figure out

8    what a Mango perpetual is.  The defense has all the pieces they

9    need to make the argument they need to make in the jury

10   instructions, including the definition of a security and a

11   mixed swap and a narrow-based security index.  The government

12   would not consent to an instruction that directs Mango

13   perpetuals are securities.

14            MR. GREENSPAN:  Your Honor, I think the government is

15   just mistaken on the law.  We cited the statute in the --

16            THE COURT:  Can you walk me through it.

17            MR. GREENSPAN:  Yes.  We cited the statute in the

18   Rule 29 motion in explaining why the oracle was a narrow-based

19   security index.  We cited the specific statute.  It's contained

20   in 15 U.S.C. -- I believe it's 78, but I have to look it up.

21   The definition of security specifically includes security-based

22   swaps.  In fact, the government is unsure about that.  We can

23   provide the citation in a letter afterwards if it clarifies

24   things.

25            THE COURT:  We're at the charge conference, so we're

O4GCeis5

1    supposed to figure out all the issues with the charge so that

2    everyone can prepare for closing arguments.  So if you can get

3    all of that in front of you and let's figure it out.

4             MR. BURNETT:  I'd add that we're trying to be

5    accommodating here on potentially agreeing to this instruction

6    that, for purposes of this case, there's not a dispute that

7    Mango is a security.  But if this is about turning also an

8    instruction and Mango are securities too, we're not going to

9    consent to any of that.  I think that's extremely suggestive in

10   the context of the instructions.

11            MR. GREENSPAN:  The statute is 15 U.S.C. 78c(a)(68).

12   It's the definition of securities-based swaps.

13            THE COURT:  Okay.

14            MR. GREENSPAN:  In our previous letter, we cited that,

15   slightly above that, in that same statute, 78c subsection

16   (a)(10), it defines securities more broadly and treats

17   securities-based swaps as a security.  This is in our April

18   14th letter on page 4.  It's a footnote, footnote 5.

19            THE COURT:  Understood.  I am not going to include an

20   instruction on MNGO as a security or Mango perpetuals as

21   securities swaps or securities.  However, as I understand it,

22   you're going to take that position in closings.  If you're

23   correct, the government is not going to dispute that

24   characterization because they've not taken the contrary

25   position.  I think, from their perspective, the additional

O4GCeis5

1    instruction that those two things are securities are not in any
2    statutory definition, they're not in the actual statutes that
3    we're instructing the jury about, and they would be confusing
4    given that, in other contexts, the parties are duking it out as
5    to what MNGO perpetuals are for purposes of the mix swap
6    definition and elsewhere.  That's a fair argument that it would
7    be confusing to the jury to hear than say Mango perpetuals are
8    securities, when there's a whole section of these instructions
9    that has other instructions relevant to the characterization of
10   those perpetuals for purposes of the swap definition in the
11   commodities laws.

12          Now, the government has offered that they may not
13   object to having MNGO as a security as part of this definition.
14   So, if you want to take them up on that and there's no dispute
15   between the parties, I'm happy to do that, just as an agreement
16   between the parties as what might be included in this
17   definition.

18          MR. GREENSPAN:  That's fine, your Honor.

19          THE COURT:  After "a security is an investment of
20   money in a common enterprise, with the expectation of profits
21   to be derived from the efforts of others," and then you wanted,
22   "for these purposes, MNGO is a security"?

23          MR. GREENSPAN:  Yes, your Honor.

24          THE COURT:  Mr. Burnett, any objection to that?

25          MR. BURNETT:  No, your Honor.  I'm only pausing

O4GCeis5

1   because this is something that I would really want to get

2   supervisory approval of.  Could I do a provisional no and we'll

3   just write in as soon as I get back to the office if there's a

4   change?

5           THE COURT:  Yes, you may do that.

6           MR. BURNETT:  Thank you.

7           What was the precise sentence?

8           THE COURT:  "For these purposes, MNGO is a security."

9           MR. GREENSPAN:  Your Honor, we included for these

10  purposes, noting that we're not trying to lock the government

11  into a position if there's additional language that would help

12  them --

13          THE COURT:  "You may assume"?

14          MR. GREENSPAN:  We wouldn't object to it.

15          MR. BURNETT:  "You may assume" would be a good

16  addition there.

17          THE COURT:  "For these purposes, you may assume

18  that..."

19          Mr. Greenspan, you're fine with that change?

20          MR. GREENSPAN:  Yes, your Honor.

21          THE COURT:  Okay.  All right, Mr. Greenspan, next.

22          MR. GREENSPAN:  Turning to Count Two, I think we

23  understood from the brief colloquy yesterday that your Honor

24  was making a ruling on the inclusion of the word "market"

25  before "price."  We've written on it extensively and we stand

O4GCeis5

```
1    on that position.
2              The only other point I'd like to make is that,
3    first -- two points, I guess.  One is that Amaranth, which is
4    the test here and which we have cited, and I know the Court
5    knows, includes the word "market" before "prices" in the
6    four-prong test.
7              The other thing we would like to note is even the
8    instruction as it's currently given, it talks about the price
9    of Mango perpetuals on Mango Markets.  The oracle settlement
10   price that the government seems to base its theory around isn't
11   even a price for the Mango perpetuals on Mango Markets.  It's a
12   price for settlement on the spot market, which is exactly why
13   all the cases they cited are not on point.
14             So that's our objection.  We think that the
15   government's theory is one that doesn't comport with the law,
16   and that's why we pushed for the inclusion of that "market"
17   before "price."
18             THE COURT:  So there's a legal objection and a factual
19   dispute between the parties.  Did you agree with
20   Mr. Greenspan's characterization of the oracle price and how it
21   functioned on Mango Markets?
22             MR. BURNETT:  No.
23             THE COURT:  The factual dispute is one that's just
24   going to be the subject of closing arguments and has been the
25   subject of testimony in this case.  Let's just make sure that,
```

O4GCeis5

1    as to the legal issue, we're coming out the right way because,

2    as I understand it, the rule and then the statute that are

3    applicable on Counts One and Two both refer to "price," they do

4    not refer to "market price," just as a pure statutory

5    interpretation as to the rule of statute at issue; is that

6    correct, Mr. Greenspan?

7            MR. GREENSPAN:  In the statute in the rule, you're

8    asking does the word "market" appear?

9            THE COURT:  Yes.

10           MR. GREENSPAN:  Correct, it does not appear in the

11   statue in the rule.

12           THE COURT:  The rule is 17 CFR 180.1, and the statute

13   is 7 U.S.C. 13a(2).  Am I right about that?  Are those the two

14   provisions?

15           MR. GREENSPAN:  I think 180.1, I believe, is relevant

16   to Count One.

17           THE COURT:  Right.  And then Count Two is 7 U.S.C.

18   13a(2); is that right?  Am I just getting that wrong?

19           MR. BURNETT:  I think the confusion, Count One, the

20   statute and rule don't even have "price" in it at all.

21           THE COURT:  This is only coming up as to Count Two,

22   and that is 7 U.S.C. 13a(2)?

23           MR. GREENSPAN:  Correct.

24           THE COURT:  Is there any case that concerns this

25   statute that says that "price," as used in this statute, refers

O4GCeis5

1    to "market price" as opposed to "price"?

2              MR. GREENSPAN:  Yes, and that's why we're citing

3    Amaranth.  The four-prong test in Amaranth uses the word

4    "market" before "price."

5              THE COURT:  Just focus me on the language that you're

6    pointing to.

7              MR. GREENSPAN:  This is In re Amaranth Natural Gas,

8    730 F.3d 170.  Amaranth lays out a four-prong test.  This is on

9    page --

10             THE COURT:  I'm there.  183.

11             MR. GREENSPAN:  Section 3 analysis.  It says

12   commodities manipulation requires, one, defendants possess an

13   ability to influence market prices.  So that's where it

14   includes the word "market" before "prices."

15             THE COURT:  This case references DiPlacido v. CFTC,

16   which is one of the cases that the government relies on.  I

17   take it your submission is that whatever that earlier case

18   said -- and to be clear, again, this is why I separated out the

19   legal objection and the factual dispute because whether the

20   term used in the instructions is "market price" or not, the

21   parties are still going to fight it out as to whether these

22   different things qualify under that definition; is that

23   correct, Mr. Greenspan?

24             MR. GREENSPAN:  I anticipate that to be correct, your

25   Honor, yes.

O4GCeis5

 1              THE COURT:  You're just making, for these purposes, a

 2    pure legal argument that under Amaranth, the way that it is

 3    explained, this test under this statute, is to refer to "market

 4    price."

 5              MR. GREENSPAN:  Correct.  And we also discussed this

 6    in our letter about ATSI and some other market manipulation

 7    cases that not only in the test, but talk about what's to be

 8    evaluated, and they talk about market prices.

 9              THE COURT:  Right.  This is a separate issue from what

10    was discussed between the parties as to whether a settlement

11    price qualifies under the statute.  The government has cases

12    that point -- or at least a case that points their way.  You

13    pointed to some district court cases that would point your way.

14    For these purposes, that's not what the Court is deciding for

15    purposes of the jury instruction.  It's a pure legal question

16    of -- that's why I asked the question.  Is there a case that

17    says under this statute, when the statute refers to "price,"

18    it's referring to "market price."  This would be the case that

19    you would point to along with cases following that four-prong

20    test; is that fair?

21              MR. GREENSPAN:  Yes.  One clarification.  We don't

22    think the government does have any cases pointing their way.

23    DiPlacido, the settlement was a market.  It was a price on that

24    market.  It was the electricity futures market.

25              THE COURT:  It's a factual dispute.  You're going to

O4GCeis5

 1    find out.  It's a heated disagreement about that issue.

 2             MR. GREENSPAN:  That's our position, is that they

 3    don't have a case and that's the reason that it's different.

 4             THE COURT:  What's the counterexample of a price that

 5    would not be a market price?  The statute says "price," I

 6    understand that Amaranth says "market price."  And so, what are

 7    the other prices that are just not covered by this statute?

 8             MR. GREENSPAN:  We think the oracle settlement price

 9    is a market price, it's just the wrong market.  It's a price of

10    the spot market, and the spot market is clearly not relevant to

11    the analysis here.

12             THE COURT:  But let me give you another example.  So

13    if you have contracts that have a market price that's

14    determined by some market reporting and then you have a private

15    discussion between two people who have contracts and they

16    decide, just negotiate a price.  Is it your submission that the

17    negotiated price between two parties would not qualify if it

18    was somehow manipulated by one of the sides and it would always

19    be what the prevailing market price would be that would be the

20    subject of the commodities manipulation statute?

21             MR. GREENSPAN:  For the purposes of the manipulation

22    statute, yes, that would be our position.

23             THE COURT:  Mr. Burnett, just help me with

24    government's position.  As I take it, I'm with you that

25    there's -- you disagree with Mr. Greenspan that they have the

O4GCeis5

1    right side of the facts.  Whether it's price or market price,

2    your position is we'll be able to show it fits under that

3    definition.  For these purposes, I'm just concerned with making

4    sure that the law is right here.  And so, Mr. Greenspan points

5    to Amaranth and just says, look, like, on this statute, the way

6    the Second Circuit has defined the standard is using "market

7    price."  So what's wrong with that?

8            MR. BURNETT:  What's wrong with it is the Second

9    Circuit was defining it in the context of a case and just

10   explaining it and talking about the law.  The way to make sure

11   you're right on the law in the jury instructions is to follow

12   what the actual statute says, which is "price."  The case I'd

13   point you to is United States v. Fuchs, which is the Fifth

14   Circuit decision that we cited in our brief on this.  I

15   apologize, I don't have the cite off the top of my head.  But

16   there, the Fifth Circuit explicitly rejected an effort to add

17   "market" before "price" because that doesn't appear in the

18   statute.  And the problem with that is that it is deeply

19   legally confusing because it is not clear what "market price"

20   means.  Given the way the defense has repeatedly tried to use

21   that phrase through trial, the jury is apt to be confused that

22   it has some special meaning that they've been referring to.  I

23   actually think Amaranth is a perfect example of this.  If you

24   go back to the Amaranth case, Amaranth was a case about

25   settlement prices.  The whole case was about manipulation of a

O4GCeis5

1    settlement price.  And it cites DiPlacido, which set the rule

2    that a settlement price is a market price.

3         THE COURT:  And so, in terms of just the pure legal

4    argument, is the issue that in Amaranth and these other cases

5    that incorporate that four-prong test, this particular issue

6    just never came up, meaning that something that was not a,

7    quote-unquote, market price was at issue, and yet, the Second

8    Circuit said no, this statute only covers market prices as

9    opposed to other prices.  That just didn't come up.  So really,

10   when we think about that four-prong test, it's like a shorthand

11   for what they used to describe what's covered by the statute.

12   It doesn't displace the language that's in the statute.

13        MR. BURNETT:  Exactly.  I think if the Court were to

14   use "market price" and in order to be legally correct, it would

15   also need to add the phrase, "a settlement price is a market

16   price," which is legally accurate and comes straight from

17   DiPlacido.  That's what the CFTC said in DiPlacido, which was

18   affirmed by the Second Circuit and is clearly what underpins

19   the decision in Amaranth, which was about settlement prices and

20   cited DiPlacido.

21        THE COURT:  I thank the parties for their patience.

22        Mr. Greenspan, we'll get back to where you started.

23   This discussion has been very helpful.  For the reasons that

24   we've discussed and that I've discussed with the parties, I

25   will overrule defendant's objection and use "price," which is

O4GCeis5

1   the language from the statute.

2          Next.

3          MR. GREENSPAN:  I appreciate the Court's indulgence

4   and allowing us to have that back and forth again.

5          On page 26, this is I think more a preservation issue,

6   but we object to the inclusion of attempted commodities

7   manipulation.  We've written on that in the past.

8          THE COURT:  Just to be clear, attempted commodities

9   manipulation was charged in the indictment; correct?

10         MR. GREENSPAN:  Correct.

11         THE COURT:  Understood, Mr. Greenspan.  Next.

12         MR. GREENSPAN:  The objection, just to recap, is

13  really a factual predicate.  We don't think there's a factual

14  predicate here distinguishing any kind of attempted commodities

15  manipulation from the regular commodities manipulation.  To the

16  extent the government was concerned about an argument that the

17  price wasn't artificial because of fundamental value, that was

18  never argued or brought out in evidence and we don't plan to

19  argue that.  So that's why we didn't think it was necessary.

20         THE COURT:  Mr. Burnett, just to make sure I'm not

21  missing something, Mr. Greenspan says there was no factual

22  predicate laid for the attempted commodities manipulation

23  charge.  I don't really follow that analysis, but maybe you can

24  help me.  The only question is just, if you can't establish

25  that there was actual manipulation of the price, you may still

O4GCeis5

1    be able to prove that there was an attempt and an intent to

2    manipulate the price.  And so, the jury could still find the

3    defendant guilty of the attempted commodities manipulation

4    charge, which was laid out in the indictment.  Obviously, the

5    evidence would be overlapping with the commodities manipulation

6    charge.  Is that all right?

7              MR. BURNETT:  That's all correct.

8              THE COURT:  I understand, Mr. Greenspan, the

9    objection, it will be overruled, but you've certainly preserved

10   it.

11             MR. GREENSPAN:  Thank you, your Honor.

12             Turning to wire fraud.  I think we'd like to conform

13   the materiality definitions, and the Court's agreements to give

14   us an instruction or clause based on Rygus in the materiality

15   instruction for Count Three.  I'm just trying to find where

16   that would go.  I think this starts on line 652.  I believe we

17   included it at the end of the equivalent of line 658.

18             THE COURT:  So we're going to make a few conforming

19   changes here absent objections from the parties.  So one, here

20   we have a business decision, which we had taken out of the

21   prior instruction.

22             Are there any issues, Mr. Greenspan, with me taking

23   those out?

24             MR. GREENSPAN:  No, your Honor.

25             THE COURT:  So we'll take those out.

O4GCeis5

 1              I believe it was, "that is capable of influencing the

 2      decision" was the addition.

 3              Here's the question I have, which is, instead of

 4      putting that addition, which we had previously discussed, at

 5      the end of this sentence, because if you look, the sentence now

 6      spans about five lines.  It may be more comprehensible to the

 7      jury if it is part of the preceding sentence.  So, "A material

 8      fact is one that a reasonable person would consider important

 9      in making a decision, and that is capable of influencing that

10      decision."

11              Mr. Greenspan, any --

12              MR. GREENSPAN:  I actually agree that that's better.

13              THE COURT:  We'll make that change here and we'll also

14      make that change in the preceding place.

15              Mr. Greenspan.

16              MR. GREENSPAN:  Page 30, at the top, 677 is the line

17      number.  It's the first full sentence.  The government is also

18      not required to prove that the defendant personally originated

19      the scheme or artifice to defraud.  We think that's legally

20      correct, we just think it has no factual basis in this case and

21      isn't necessary for the jury to hear.

22              THE COURT:  Does the government have any objection to

23      removing that sentence?  The government is also not required to

24      prove that the defendant personally originated the scheme or

25      artifice to defraud.  I'm not even sure that's an issue that's

O4GCeis5

1    surfaced in any way, shape, or form in this case.

2            MR. BURNETT:  No objection, barring something

3    unexpected in closings, in which case we might ask to add it

4    back in.

5            THE COURT:  Understood.  So that line will be removed.

6            MR. GREENSPAN:  Turning to the intent instruction for

7    Count Three, which is also on page 30, the defense previously

8    requested a willfulness instruction, noting that in the

9    Middendorf case, Judge Oetken talked about how willfulness was

10   an instruction that was generally given, even though it was not

11   specifically included in the statute.  So we renew that

12   objection.  As we pointed out, we think that it's somewhat

13   misleading to the jury to have two different intent

14   requirements that are similar, but not the same for Counts One

15   and Three.  So that's our objection.

16           THE COURT:  Understood.  As I understand it, the

17   willfulness instruction comes out of the *Sand* model

18   instructions; is that right?

19           MR. GREENSPAN:  That's right, your Honor.  I think

20   that's typically the reason judges in this district give it.

21   The proposal we gave was verbatim from the *Sand* instruction

22   regarding wire fraud.

23           THE COURT:  Understood.  And then in Middendorf and in

24   some later cases, they note there's no basis in the statute for

25   the willfulness instruction.  It's really just a vestige of it

O4GCeis5

1    coming out of the *Sand* instruction?

2            MR. GREENSPAN:  That's true, but they note it's one

3    that's generally given.  I think some judges have found it, for

4    reasons of fairness, it's appropriate to give and it's fair to

5    give because it's often given in similar cases.

6            THE COURT:  Does the government have an objection to

7    providing the jury with a willfulness instruction as to this

8    count?

9            MR. BURNETT:  Yes, your Honor.

10           THE COURT:  Mr. Greenspan, I understand and have noted

11   the objection and you certainly preserved it.

12           MR. GREENSPAN:  Thank you, your Honor.

13           Your Honor, turning to extraterritoriality briefly,

14   page 33.  We believe the instruction is correct for Counts One

15   and Two, but that the last clause, that the government can

16   prove an activity related to the trading had a direct and

17   significant connection with activities in commerce in the

18   United States, we don't think that would apply to Count Three,

19   the wire fraud.

20           THE COURT:  Okay.  Mr. Burnett.

21           MR. BURNETT:  So I think that's right.  I'm trying to

22   think of what to do.  I don't actually understand what the

23   factual basis is for an extraterritoriality instruction.  But,

24   in any event, I think maybe the way to do this is --

25           THE COURT:  Or, "The government can prove that the

O4GCeis5

1  conduct relevant to the offense has occurred in the United

2  States, which includes Puerto Rico."  Or, "With respect to

3  Counts One and Two only, the government can prove that an

4  activity related to the trading had a direct and significant

5  connection with activities in commerce of the United States."

6  Would that do it?

7      MR. BURNETT:  Yes.  Although, I realize it should be

8  "related to the offense."

9      THE COURT:  Okay.  So after the colon, it would read:

10  "The government can prove that the conduct relevant to the

11  offenses occurred in the United States, which includes Puerto

12  Rico or with respect to Counts One and Two only, the government

13  can prove that an activity related to the offense had a direct

14  and significant connection with activities in commerce of the

15  United States."

16      Mr. Burnett, any issues there?

17      MR. BURNETT:  No, your Honor.

18      THE COURT:  Mr. Greenspan.

19      MR. GREENSPAN:  No, your Honor.

20      THE COURT:  All right.

21      MR. GREENSPAN:  We have a similar objection to the

22  venue instruction.  Much of this has already been addressed by

23  the Court's willingness to accept the parties' instructions.

24  In line 754, starting on 753, it says, in addition to all of

25  the elements I just described, you must also consider the issue

O4GCeis5

```
 1    of venue, namely -- and after that, it says, whether an act in
 2    furtherance of each of the charged crimes occurred within the
 3    Southern District of New York.  We think that's confusing as to
 4    the wire fraud because it's not an act in furtherance, it must
 5    be a wire, as the Court clarified.
 6              MR. BURNETT:  Your Honor, we would object to that
 7    because a wire is an act.  The Court's instructions with
 8    respect to the wire fraud specify that there needs to be a
 9    wire.
10              THE COURT:  Mr. Greenspan, do you have a proposed edit
11    here?  This is repeated essentially twice, then there's a
12    clarification that, "With respect to Count Three, the wire must
13    be an interstate wire was transmitted into or out of the
14    district."  So if you have a proposal on how to edit this in a
15    way that would not do violence to the general legal
16    instruction, I'm happy to hear it.
17              MR. GREENSPAN:  I think we propose the following.  So
18    on line 754.  Venue, namely whether an act, we propose
19    inserting constituting the charged crime and eliminate "in
20    furtherance of each of the charged crimes."  I actually stated
21    it exactly the opposite.  The issue is that the wire fraud
22    venue charge is broader than under the Commodities Exchange
23    Act.  So that, I flipped it.  The issue is the opposite of what
24    I originally said, and I apologize for that.
25              MR. BURNETT:  So that instruction would be legally
```

O4GCeis5

1    wrong.  It does not need to be an act constituting the crime.

2             THE COURT:  Just so I'm clear, the objection is not as

3    to the impact on this instruction on the wire fraud count, it's

4    that with respect to Counts One and Two, Mr. Greenspan, you're

5    saying it is legally incorrect to use "in furtherance," is that

6    fair?

7             MR. GREENSPAN:  Correct.

8             THE COURT:  Do you have any case you want to point me

9    to that reflects that?  I thought this instruction was

10    literally out of numerous prior instructions that have been

11    provided by this court, but I'm happy to learn that those other

12    instructions are wrong, if you've got a cite for me.

13             MR. GREENSPAN:  We believe this has come up only in

14    the securities context.  The case we have United States v.

15    Tzolov, but I've misplaced it and I don't have the citation.  I

16    have it here somewhere, so I'll try to find it.

17             MR. BURNETT:  I could explain why the securities laws

18    are just different, too, if it would help.

19             MR. GREENSPAN:  I do have the citation, so I'll give

20    it to you.  It's 642 F.3d 314.  There is some reliance in this

21    case on language specific to the securities fraud statute.

22    Specifically, this is on page 318 of the case.  It says any

23    criminal proceedings may be brought in the district wherein any

24    act or transaction constituting the violation occurred, and it

25    cites to 15 U.S.C. 78a(a).  We acknowledge that there's no

O4GCeis5

1    corresponding text in the commodities fraud statute or in the

2    CEA, but we think the principle is the same.  We would advocate

3    for that same principle in the commodities space.

4                THE COURT:  Mr. Burnett.

5                MR. BURNETT:  Yes.  It's not a principle, it's the

6    text of the statute is different.  So the securities laws have

7    a purchase or sale requirement, and the venue provision is tied

8    to the purchase or sale requirement in securities laws.  So

9    when you're proving venue in the securities context, you need

10   to prove something constituting part of the sale was happening

11   in the district.  There's no purchase or sale requirement in

12   the context of the commodities fraud, it's just a scheme

13   liability.  It says a scheme to defraud in connection with a

14   swap is fraud, which is more akin to the language of the wire

15   fraud statute, which also says that it's a scheme to defraud.

16   Just like any wire, in furtherance of a wire fraud, regardless

17   of whether it was a scheme, regardless of whether that wire was

18   fraudulent or not can be a wire in furtherance to wire fraud to

19   establish venue.  So too can an any act in furtherance of a

20   commodities fraud scheme be something that can establish venue

21   for a commodities fraud scheme.

22               MR. GREENSPAN:  So just one quick response to that.

23   The wire fraud statute includes the language "in furtherance

24   of," the CA does not.

25               MR. BURNETT:  The wire fraud statute just doesn't have

O4GCeis5

1    the language "in furtherance of," which is not true.

2              MR. GREENSPAN:  Sorry.  Let me doublecheck.

3              The government's right and we withdraw that.

4              THE COURT:  So you're withdrawing the objection to the

5    venue language here; is that fair?

6              MR. GREENSPAN:  Not the objection, but the final point

7    statutorily.

8              THE COURT:  So I'm going to overrule the objection and

9    the instruction will remain as is, "in furtherance."

10             MR. GREENSPAN:  Understood, your Honor.

11             Turning to the terms of service instruction.  Our

12   request is just a simple one.  We think that the instruction is

13   about terms of service.  We think it would make more sense to

14   talk about the platforms that did have terms of services before

15   talking about the one that didn't.  We would suggest flipping

16   the order of the sentences that start on 915 and 918 without

17   any change to the text itself.

18             THE COURT:  So you're saying, "you have heard evidence

19   that various platforms," and then right after that, "you have

20   also heard evidence," and then that first sentence; is that

21   correct?

22             MR. GREENSPAN:  Yes.

23             THE COURT:  So it would read:  "You have heard

24   evidence that various platforms the defendant allegedly used,

25   including FTX, AscendEX, and Switchboard did have terms of

O4GCeis5

1    service.  You have also heard evidence in this case that at the

2    time of the events at issue, Mango Markets did not have terms

3    of service."  And then it proceeds as stated in the proposed

4    jury charge.

5         MR. GREENSPAN:  Right.  And then the corresponding

6    sentences, starting "in considering" on 915.  And similarly on

7    918, we would request that the order of those be inverted, as

8    well.

9         THE COURT:  So it would read, "in considering whether

10   the defendant's conduct was manipulative, fraudulent, or

11   deceptive in violation of the criminal laws in this case, let

12   me caution you that the fact that the defendant violated terms

13   of service on certain platforms does not by itself mean that

14   the defendant has committed a crime."

15        Then read me the next sentence, as you would propose

16   it.

17        MR. GREENSPAN:  "similarly," I would have it, again,

18   starting the sentence, "In considering whether the defendant's

19   conduct was manipulative, fraudulent, or deceptive in violation

20   of the criminal laws at issue in this case, if you find that

21   the defendant violated terms of service on certain platforms,

22   that does not by itself mean that the defendant has committed a

23   crime.  Similarly, let me caution you that the lack of terms of

24   service cannot render any fraudulent or manipulative conduct

25   legal or immaterial as a matter of law," and then finishing the

O4GCeis5

1    way it is now at the end of 919.

2              THE COURT:  Any objection from the government?  I'll

3    read it for you, just so you understand what's being proposed.

4              "In considering whether the defendant's conduct was

5    manipulative, fraudulent, or deceptive in violation of the

6    criminal laws at issue in this case, if you find that the

7    defendant violated terms of service on certain platforms, that

8    does not by itself mean that the defendant has committed a

9    crime.  Similarly, let me caution you that the lack of terms of

10   service cannot render any fraudulent or manipulative conduct

11   legal or immaterial as a matter of law.  In determining whether

12   the defendant has committed any of the charged offenses, you

13   are to apply the instructions I have given you today."

14             MR. BURNETT:  No objection from us.

15             THE COURT:  Mr. Greenspan, does that meet with your

16   approval?

17             MR. GREENSPAN:  That's right, your Honor.

18             I think that's all we have, but if you'll permit us to

19   speak just for one moment.

20             THE COURT:  Of course.

21             MR. BURNETT:  While they're talking, your Honor, I

22   realize we have two more things, I apologize, to cover on the

23   way through when they're done.

24             THE COURT:  That's fine.

25             Do you have a case that makes clear that, aside from

O4GCeis5

1    the securities context -- I think even in the securities

2    context, the "in furtherance" instruction is typically given.

3    Do you have a case you can point me to to confirm that that's

4    correct outside of the securities context?

5              MR. BURNETT:  I think it's Svoboda.

6              THE COURT:  That's the case that I pulled up.  That's

7    the insider trading case?

8              MR. BURNETT:  I think that's the insider trading case.

9    That has the "in furtherance" language.  I know Judge Liman

10   gave this like exact same instruction in Phillips.

11             THE COURT:  He gave this exact instruction on venue,

12   which is where the Court obtained it.  I just want to confirm.

13             In U.S. v. Svoboda, 347 F.3d 471, which I believe is

14   an insider trading case.  The Second Circuit approved the "in

15   furtherance" instruction, even in the securities context.  So

16   that, in addition to the fact that this instruction has been

17   given in a number of prior cases, including in Phillips, I just

18   wanted to make sure that was something that was reflected in

19   the cases.  There are also a number of other cases that have

20   reviewed instructions, including the in furtherance

21   instruction, without having any issues or errors with those

22   instructions.

23             Mr. Greenspan, anything further on your end?

24             MR. GREENSPAN:  Not on that issue, your Honor.

25             MR. BURNETT:  For another securities fraud venue case,

O4GCeis5

1   it looks like Lange, 834 F.3d 58.

2           THE COURT:  Understood.  Thank you.

3           MR. GREENSPAN:  Is your Honor waiting on the defense?

4           THE COURT:  Yes.

5           MR. GREENSPAN:  We rest on this procedure.  We're

6   done.

7           THE COURT:  No further objections?

8           MR. GREENSPAN:  No further objections.

9           THE COURT:  So I have two additional points, which is

10  one on alternate jurors, the second sentence reads:  "The final

11  two," and it should be:  "The final juror who is an alternate

12  won't deliberate at this time," hoping that we don't lose an

13  additional juror.

14          Any issues with that change?

15          MR. GREENSPAN:  No, your Honor.

16          MR. BURNETT:  Fingers crossed.

17          THE COURT:  So we'll make that change.

18          And then, at the end, very end of the instruction, on

19  the point that was raised earlier today, I would add:  "One

20  final note on timing.  At this point onward, you are free to

21  continue your deliberations as you see fit, and as all jurors

22  agree, so if everyone is in agreement, you may stay until

23  5:00 p.m. to continue your deliberations, or even later if all

24  jurors agree, but please be mindful of other jurors' time

25  constraints after in making your determination of how long each

O4GCeis5

1    day to deliberate.  Meals will be provided and you can let the

2    marshal and Mr. Hernandez know if you have any questions in

3    that regard."

4         Any issues with that proposed addition at the end of

5    the instructions?

6         MR. GREENSPAN:  No, your Honor.

7         MR. BURNETT:  No, your Honor.

8         THE COURT:  Mr. Burnett, you had two additional

9    issues?

10        MR. BURNETT:  Yes, your Honor.  I apologize.

11        The first is on our venue instruction, which is page

12   33, line 756.  We would just propose adding, "north of the

13   Bronx, including Poughkeepsie."

14        MR. GREENSPAN:  Shouldn't it be Dutchess County?

15   Isn't Poughkeepsie in Dutchess County?

16        MR. BURNETT:  I'm not sure if the jurors will know

17   that Poughkeepsie is in Dutchess County.

18        THE COURT:  Let's be accurate.  "The Southern District

19   of New York includes Manhattan, the Bronx, Dutchess County,

20   including Poughkeepsie, and several other counties north of the

21   Bronx."  Is that accurate?  Am I going to get yelled at by the

22   folks in Westchester that I'm misrepresenting --

23        MR. BURNETT:  To be honest, I don't know Westchester

24   well enough.

25        That was the first thing.

O4GCeis5

1        MR. GREENSPAN:  No objection.

2        THE COURT:  Understood.  "The Southern District of New

3   York includes Manhattan, the Bronx, Dutchess County, including

4   Poughkeepsie, and several other counties north of the Bronx."

5        Mr. Greenspan, any issues with that?

6        MR. GREENSPAN:  No, your Honor.

7        THE COURT:  Mr. Burnett.

8        MR. BURNETT:  So that was one thing.  The other thing

9   is back on page 20, our definition of swap.

10       THE COURT:  Okay.

11       MR. BURNETT:  So we're still fine with deleting the

12  sentence that the defense had requested be deleted.  Our

13  request would be that the remaining instruction actually be

14  revised to more closely track what the statute says here.  I

15  think when this was originally proposed, there were some things

16  that had been left out because we didn't necessarily think that

17  securities were going to be at issue in the case and some of

18  these risk transfer issues weren't as crystalized.  I think the

19  easiest way to go through our proposal would be for us to pull

20  the text of the statute up so you can see it.  Basically, our

21  proposal is going to be tracking the text of the statute here

22  more closely.

23       THE COURT:  Okay.

24       MR. BURNETT:  So the statute is 7 U.S.C.

25  1a(47)(A)(iii).

O4GCeis5

1        THE COURT:  You're still pulling that up; right?

2        MR. BURNETT:  Do you want us to pull it up for you on

3   the screen here?

4        THE COURT:  I can certainly pull it up.  I thought

5   that's what you were doing.

6        MR. BURNETT:  The instruction that we have is page 20.

7   So right now, we keep the phrase that says, "a swap includes

8   any agreement, contract, or transaction that provides for an

9   exchange of payment based on the value of one or more rates,

10  currencies, commodities, securities, indices, quantitative

11  measures, or economic interests, or property of any kind that

12  transfers in whole or in part the risk of changes in value of

13  the things underlying the swap without actually exchanging an

14  asset that incorporates the financial risk so transferred."

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O4GMEIS6

1          THE COURT:  Do you have that proposal in a way -- can
2    you put that proposal up on the screen?  Maybe you can type it
3    up and put it on the screen.

4          Mr. Greenspan, any issues with modifying that sentence
5    in the way proposed by the government?

6          MR. GREENSPAN:  I just need one more second to study
7    it, versus the language.

8          THE COURT:  Of course.

9          MR. GREENSPAN:  We are OK with this, but I think this
10   incorporates the issue we had with USDC on the next page.  So
11   we would ask for a corresponding instruction on the next page
12   about -- in the first -- that Mango perpetuals are based in
13   part on the value of USDC and that USDC has a currency or
14   financial or economic interest or property of any kind -- the
15   addition -- and is not exchanged between the parties.

16         MR. BURNETT:  We would object to that.  That is just
17   legally wrong.

18         THE COURT:  Mr. Greenspan, let's do it step by step.

19         As to subpart 2, Count One, commodities fraud, second
20   element, swap, the second paragraph would be replaced with what
21   is reflected on the screen and what was read by Mr. Burnett,
22   which is a swap includes any agreement, contract, or
23   transaction that provides for an exchange of payments based on
24   the value of one or more rates, currencies, commodities,
25   securities, indices, quantitative measures, or economic

O4GMEIS6

1    interest or property of any kind and that transfers, in whole

2    or in part, the risk of changes in value of the things

3    underlying the swap without actually changing an asset that

4    incorporates the financial risk so transferred.

5              As to just that change, Mr. Greenspan, any objection?

6              MR. GREENSPAN:  No, your Honor.

7              THE COURT:  We will exchange those sentences and put

8    in the government's proposal.

9              Now let's go to USDC.  So you say, in the mixed

10   swap --

11             MR. GREENSPAN:  The issue here is that USDC is being

12   exchanged between the parties.  If it's being exchanged between

13   the parties and it's the basis -- the value of it is the basis

14   for the perpetual, then it either can't be a swap in the first

15   place or it can't be an exception to move the Mango perpetual

16   into the category of mixed swaps.

17             THE COURT:  Can you just point me to where in 47(d)

18   the definition -- the mixed-swap exception portion of this rule

19   where you would see the analogous language that the government

20   pointed to in the definition of swap?

21             MR. GREENSPAN:  We acknowledge that it's not in (d).

22   We just think that this is a logical reading of (a) in the

23   first place.  If we are talking about -- I think they are

24   taking contradictory positions, basically.  The USDC is a

25   basis -- its value is a basis for the Mango perpetual and it is

O4GMEIS6

1    being exchanged, and therefore it's not even a swap.

2              MR. BURNETT:  Your Honor, we are not taking

3    inconsistent positions.  We are following the statutory

4    language of both statutes.  If they want to make an argument

5    about this to the jury, they can do that, but they shouldn't

6    get a legally wrong instruction on mixed swaps because he

7    thinks it's logically inconsistent.

8              THE COURT:  I am just trying to literally understand

9    the argument at this point.

10             Mr. Greenspan, can you just walk me through it.

11             Government says, we are putting this swap definition

12   into the instructions in a way that is consistent with the

13   statutory text.  I don't know what their position is on what

14   those swaps would be, so I take it your argument is, if they

15   take the position that the thing being swapped, that if --

16   maybe you just need to tell me.  You need to characterize it

17   for me.

18             MR. GREENSPAN:  This is in the definition for swap in

19   47, subparagraph (A)(iii).

20             At the end, and this is part of what their definition

21   was on the screen, it talked about:  Without also conveying a

22   current or future direct or indirect ownership interest in an

23   asset, and I'm skipping, that incorporates the financial risks

24   so transferred.

25             If they are relying on an argument for the mixed-swap

O4GMEIS6

1    definition that USDC --

2             THE COURT:  Let's just stop there.  You are saying

3    that, for the reasons that you have explained, these are not

4    swaps under the swap definition, right?

5             MR. GREENSPAN:  Correct.  We just think that it's

6    logically inconsistent to rely on USDC as being a basis for

7    Mango perpetuals, which USDC has exchanged.  If that's the

8    case, we don't even get to mixed swaps because it's not a swap

9    in the first place.

10            THE COURT:  Mr. Burnett, if I'm understanding it, I

11   think Mr. Greenspan is saying, it doesn't make sense,

12   especially given the change that you are proposing to the swap

13   definition, to have a discussion of USDC here on the

14   defendant's argument that USDC is exchanged, so there is no --

15   either this isn't a swap or you shouldn't have been proposing

16   that change that you did, if I'm understanding things right.

17   Maybe I'm not.

18            MR. BURNETT:  I don't really understand what the

19   argument is, but we are asking for what is a legally -- we are

20   tracking the language of the statute for a swap.  We are

21   tracking the language of a statute for the mixed swap.  We are

22   going to make our argument about why it's a swap.

23            THE COURT:  The only issue is that with respect to

24   mixed swap, we are specifying that things -- the things that

25   the jury should focus its attention to.

O4GMEIS6

1    And I think Mr. Greenspan is saying, because of the

2    definition of swap that we are putting in, that the government

3    is proposing, there is an inconsistency because of the actual

4    fact in evidence that we are suggesting would be the thing for

5    the jury to look at on the mixed-swap definition.  I am just

6    trying to understand this.

7         MR. BURNETT:  I'm struggling to understand what the

8    inconsistency is.

9         THE COURT:  Mr. Greenspan, what's the inconsistency?

10        MR. GREENSPAN:  Sure.  The inconsistency is that

11   factually USDC is exchanged, right.  So if USDC is part of the

12   transfer, part of what is the swap here, then we don't have a

13   swap at all because it doesn't meet the definition of

14   47(a)(iii).

15        THE COURT:  Stop right there.

16        Is that right, Mr. Burnett?

17        MR. BURNETT:  No.  That's wrong.

18        THE COURT:  Why?

19        MR. BURNETT:  Think about this outside the context of

20   crypto.  Say you have like a Japanese stock that trades on the

21   Nikkei and like the yen, and you have a swap that's based on

22   the value of the stock and the yen, the relative value there,

23   and it settles in yen too, so it doesn't settle in dollars; it

24   settles in yen.

25        What the swap definition is referring to, are you

O4GMEIS6

1    exchanging any asset that incorporates -- the financial risk

2    that you are transferring there, is that the risk of the

3    relative value of the yen and the stock.  So it's not asking,

4    are you transferring yen at the end of the day.  It's asking,

5    are you transferring some other asset that would actually

6    incorporate the same value as the relative risk of yen and

7    Nikkei.  It's analogous.

8          The yen makes it a mixed swap too because the yen

9    would be, under the mixed-swap definition, a currency that this

10   is also based on the value of.  The fact that it's settling in

11   yen does not make it not a mixed swap.  This is actually right

12   out of the total return swap stuff that they cited the other

13   day.  But that's what it is.

14         The fact that you are transferring USDC does not make

15   it not a swap, because the swap is what you're swapping, is the

16   relative value of Mango USDC, and USDC itself does not

17   incorporate the risk of the relative value of Mango USDC.  It's

18   one component of that risk.

19         THE COURT:  If you had just a straight Mango USDC

20   swap, let's just imagine that you did, and under the terms of

21   the agreement, at the end of three months, you would exchange

22   MNGO for USDC.  That's just the terms of the parties'

23   agreement.  That is not a swap, right?

24         MR. BURNETT:  That's just a future there.

25         THE COURT:  Right.

O4GMEIS6

1    MR. BURNETT:  Here that's because you have like a
2    definite end date, and you're like swapping the things back and
3    forth at the end.  A future has like a special carve-out.  A
4    future actually technically is a swap, but is like explicitly
5    carved out of the statute.  It's not that a future is not a
6    swap; it's just a carved-out swap.

7    THE COURT:  In your view, it's irrelevant whether any
8    USDC is transferred here for purposes of either the swap
9    definition or the application of the mixed-swap exception.

10   MR. BURNETT:  That's right.

11   THE COURT:  Now, let's go back to what your proposed
12   change was, Mr. Greenspan.

13   So you wanted to add what to this language on USDC?

14   MR. GREENSPAN:  Just I wanted to add, at the end,
15   after any kind and is not exchanged between the parties.

16   Just to respond to what the government just said, I
17   think this has been our issue all along with the way they have
18   treated USDC and mixed swaps.  The rule making is very clear
19   that this is supposed to be a very narrow category.  We have
20   got the CFTC on one side that has jurisdiction over things and
21   the SEC, and those are supposed to be split, and narrowly we
22   have this category of mixed swaps.

23   What I just heard from the government is just about
24   any stock that's traded in a foreign currency is a mixed swap,
25   and they talked about total return swaps, which the rule making

O4GMEIS6

1  specifically says are securities-based swaps.

2          This is the issue with including this USDC here in the

3  first place, is that it explodes the definition of mixed swaps.

4  It's antithetical to the way the statute is written and the

5  rule making, and that's really the problem here.  That's what

6  we are trying to address.

7          MR. BURNETT:  Your Honor, their argument is this is

8  inconsistent with the statute, but their instruction has no

9  basis in the statute.

10         THE COURT:  Mr. Greenspan, the issue is that in the

11  mixed-swap exception there is no basis for this particular

12  language that you're proposing to be added.  I take it that

13  what you're saying is, there is a problem now with the proposed

14  definition of swap because, on your argument, if USDC is

15  transferred, then this cannot be a swap, right?

16         MR. GREENSPAN:  Yes.  The problem is this USDC

17  component, we think.  This USDC basis for a mixed swap just

18  makes no sense.  It's not consistent with the statute.  It's

19  not consistent with the facts of this case.

20         I don't want to belabor the point, because your Honor

21  has been very patient with us, and we have written umpteenth

22  letters about this, but this is really the sort of stumbling

23  block for us.

24         MR. BURNETT:  Your Honor, I appreciate their position,

25  and they have been repeating it, but we are asking for an

O4GMEIS6

 1    instruction that tracks the language of the statute for both of

 2    these pieces.

 3              They have made their Rule 29 argument, they can

 4    reraise it after, but Mr. Greenspan asserting that it doesn't

 5    logically make sense to him does not make the instructions we

 6    have requested legally wrong and also doesn't make his

 7    instruction legally right.

 8              MR. GREENSPAN:  To be clear, that's not what I

 9    asserted.  I asserted it's not consistent with the statute, not

10    that it doesn't logically make sense to me, and that's a

11    misrepresentation.

12              THE COURT:  Mr. Greenspan, if on the swap

13    definition -- you are going to be making this argument full

14    throated in your closing, right?

15              MR. GREENSPAN:  Mr. Klein will be.

16              THE COURT:  Mr. Klein.  You'll be doing it in

17    solidarity from your chair.

18              MR. GREENSPAN:  Yeah.  That's fair.

19              THE COURT:  Now it seems like the government has

20    essentially done you a favor, because they have proposed that

21    this swap definition track the language of the statute, which

22    then puts that language that you are going to be relying on,

23    which wasn't previously there, into the instruction, without

24    actually exchanging those things.  So now you are going to be

25    able to rely on that language to try to establish that because

O4GMEIS6

1    USDC has transferred this, Mango perpetuals do not fall under

2    the definition of swap.

3           You're happy with that change, right?

4           MR. GREENSPAN:  Yes, your Honor.

5           THE COURT:  So then the instructions continue that if

6    the jury, for whatever reason, based on the government's

7    arguments or based on their own evaluation of the evidence,

8    rejects your submission and finds that the government has

9    proven beyond a reasonable doubt that Mango perpetuals are

10   swaps, then we fall out of that swap definition and move into

11   the mixed-swap exception, and there the government is just

12   giving you a heads-up as to what it's going to be arguing if it

13   is under that mixed-swap exception.

14          In that regard, what Mr. Burnett is saying is they are

15   simply just tracking the language of the statute in terms of

16   what the exception says, and I'm not seeing in the exception

17   the language that you are pointing to about the exchange of

18   things -- not exchanging those things, that's simply not in the

19   mixed-swap exception, whereas the language that we have

20   included here concerning currency or a financial or economic

21   interest or property of any kind, or the narrow-based security

22   index, those that are used in this mixed-swap exception.

23          Unless I'm missing anything, the proposed addition

24   that you are making does not have a basis in the mixed-swap

25   exception.  However, you have full license here to make any

O4GMEIS6

1    arguments that you want to make.

2            And in fact, as to the swap definition, it seems like

3    the government's proposed instruction would be favorable to

4    your efforts to make that argument.

5            I am going to overrule and not include the proposed

6    language on the mixed-swap definition.  However, we will

7    proceed with the government's proposed edit to the swap

8    definition, which the defendant has consented to.

9            Any further issues, Mr. Greenspan?

10           MR. GREENSPAN:  No, your Honor.

11           THE COURT:  Mr. Burnett, having gone through this

12   whole exercise, any further issues from your end, any

13   objections that the Court has not heard or has not ruled on

14   that you would like to raise?

15           MR. BURNETT:  No.

16           Thank you for letting me reraise things.  On that

17   Mango securities sentence, the Court can assume that we are OK

18   with it.  If we are not, we will write something within an hour

19   of when I get back to the office.

20           THE COURT:  That's fine.

21           Mr. Greenspan, are there any issues, edits, objections

22   that you have not raised or that the Court has not heard and

23   ruled upon?

24           MR. GREENSPAN:  No, your Honor.

25           THE COURT:  The Court has one remaining issue that I

O4GMEIS6

1    don't think will be an issue for either side.

2             We changed the alternative jurors' language to make it

3    singular.  I think some conforming changes to those paragraphs

4    need to be made to make sure it's singular.

5             Any issues with that?

6             MR. BURNETT:  Nope.

7             MR. GREENSPAN:  None, your Honor.

8             THE COURT:  The Court will make these edits.  We will

9    remove the line numbers, and we will send the parties the final

10   jury charge and verdict form.  You should closely review those

11   to make sure they reflect what we have discussed today.  And if

12   there are any issues, you should promptly get back to the

13   Court.

14            Otherwise, any issues to raise, Mr. Burnett?

15            MR. BURNETT:  No, your Honor.

16            THE COURT:  Mr. Greenspan, anything from your side?

17            MR. GREENSPAN:  No.  Thank you.

18            THE COURT:  Thank you very much.  We will see everyone

19   back at 9 a.m. tomorrow.  We are adjourned.

20            (Adjourned to April 17, 2024, at 9:00 a.m.)

21                             *  *  *

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

JEREMY SHERIDAN

Cross By Mr. Burnett . . . . . . . . . . . .1174

Redirect By Ms. Martabano  . . . . . . . . .1212

Recross By Mr. Burnett . . . . . . . . . . .1252