

Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
T 424.652.7800

February 26, 2025

**Brian E. Klein**
Direct (424) 652-7814
bklein@waymakerlaw.com

***Via ECF***

Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

**Re: United States v. Roman Storm**
23 Cr. 430 (KPF)

Dear Judge Failla:

Defendant Roman Storm respectfully asks this Court to order the government to comply fully with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. Despite this Court repeatedly emphasizing to the government the importance of fulfilling its *Brady* obligations, the defense has good reason to believe that the government has not and is not doing so. In response to two recent *Brady* requests, the government produced a number of witness statements (all in its possession for many months if not over a year) that are favorable to Mr. Storm's defense and meet the definition of *Brady* material, but which it claimed were not *Brady* and were only being produced as a "courtesy." This has only amplified the defense's grave concerns. For these reasons, Mr. Storm seeks a detailed *Brady* order from this Court requiring the government to conduct a thorough *Brady* review and produce all *Brady* materials immediately and, depending on what the government produces, Mr. Storm reserves his rights to seek appropriate remedies.

As part of the requested *Brady* order, this Court should specifically order the government to produce any and all material known to it, or which through due diligence may be learned from the investigating officers of the government or the witnesses or persons having knowledge of this case, that is exculpatory in nature or favorable to Mr. Storm, concerning: (1) any statements made by Tornado Cash users, relayers, token holders, developers, or others connected to Tornado Cash in which the person denies they were engaged in a criminal conspiracy with Mr. Storm or his alleged coconspirators, believed in good faith that their involvement with Tornado Cash was lawful, and/or made statements that support defense theories as articulated in Mr. Storm's various motions; and (2) any statement made by Chainalysis personnel in which they discuss any errors related to their analysis of Tornado Cash, and/or made statements that support any defense theories articulated in Mr. Storm's various motions, and any and all work product in which the government has relied on Chainalysis for attribution of hacks to the DPRK.


**Relevant Background**

The government has repeatedly claimed that Mr. Storm was engaged in a criminal conspiracy not only with his co-founders but with those who "participated in the overall service, such as the relayers." For example, in its opposition to Mr. Storm's motion to dismiss, the government stated the following:

> To begin with, the conspiracy charge in Count Two extends not only to the defendant's own actions, but **also to the actions of his co-conspirators, which include his fellow Tornado Cash founders and others who participated in the overall service, such as the relayers**. The relayers in particular played a key part in the service, as they paid the gas fees and obtained a fee from the customer in return, a portion of which was returned to the holders of TORN tokens, including the defendant.

(*See* Gov't Opp. to Pretrial Motions ("Gov't Opp."), Dkt. 53 at 22 (emphasis added); *see also id.* at 12 ("Relayers were third parties who—acting in concert with the founders—paid to set up "relayer nodes" that would transmit the instructions for the customer withdrawal along with the gas fee.").) And the government has alleged that at least $1 billion in criminal proceeds were laundered through the Tornado Cash service between its launch and August 8, 2022. (*See* Ind. ¶ 45, Dkt. 1; Gov't Opp. at 11, 66.) In its opposition to the motion to dismiss, the government claimed this was done "for a host of cyber criminals, including a sanctioned cybercrime organization that used the service to launder hundreds of millions of dollars' worth of cryptocurrency for North Korea's weapons of mass destruction program." (Gov't Opp. at 11.)

On January 14, 2025, the defense sent the government a letter explaining that it was concerned that the government was withholding *Brady* materials related to alleged co-conspirators, requesting:

> Any and all material known to the government, or which through due diligence may be learned from the investigating officers of the government or the witnesses or persons having knowledge of this case, that is exculpatory in nature or favorable to Mr. Storm, including any statements made by Tornado Cash users, relayers, token holders, developers, or others connected to Tornado Cash in which the person denies that they were involved in a criminal conspiracy with Mr. Storm or his alleged coconspirators, believed in good faith that their involvement with Tornado Cash was lawful, and/or made statements that support defense theories as articulated in Mr. Storm's various motions.

(Ex. A.) A few days later on January 17, the parties met and conferred, with the government promising to respond to the defense's letter by January 24. When the defense did not hear



WAYMAKER

from the government, it followed up with another letter on January 27. This letter included an additional specific *Brady* request relating to how the government reached its conclusion that at minimum $1 billion was laundered through Tornado Cash during the relevant time period because Chainalysis, a prominent blockchain tracing company that the defense understands the government has relied on, had recently acknowledged that it had wrongfully attributed over $300 million to North Korean ("DPRK") cybercriminals in 2023.[1] This request asked for:

> Any and all material known to the government, or which through due diligence may be learned from the investigating officers of the government or witness or persons having knowledge of this case, that is exculpatory in nature or favorable to Mr. Storm, including any statement made by Chainalysis personnel in which they discuss any errors related to their analysis of Tornado Cash, and/or made statements that support any defense theories articulated in Mr. Storm's various motions, and any and all work product in which the government has relied on Chainalysis for attribution of hacks to the DPRK.

(Ex. B at 2.) On January 29, the government responded and produced interview memoranda and notes for three individuals and one attorney proffer. The government claimed that none of the material was *Brady*, and that the defense requests "stretch[ed] beyond recognition what constitutes *Brady* material." (Ex. C at 1.) It said it was producing the material merely as a "courtesy." (*Id.* at 3.)

**<u>The Government's Belated "Courtesy" Production of *Brady* Materials</u>**

The following is a portion of what the government produced on January 29, 2025 in response to the defense's *Brady* demand. They are memorialized statements made to law enforcement agents and prosecutors on this case that are "favorable to the accused" and thus requiring disclosure under *Brady*:

> [redacted]

---

[1] On December 19, 2024, Chainalysis issued a report stating: "Note that, in last year's report, we published that the DPRK stole $1.0 billion across 20 hacks. Upon further investigation, we determined that certain large hacks we had previously attributed to the DPRK are likely no longer related, hence the decrease to $660.50 million. However, the number of incidents remains the same, as we identified other smaller hacks attributed to the DPRK. We aim to constantly re-evaluate our assessment of DPRK-linked hacking events as we acquire new on-chain and off-chain evidence." *See* "$2.2 Billion Stolen from Crypto Platforms in 2024, but Hacked Volumes Stagnate Toward Year-End as DPRK Slows Activity Post-July," Chainalysis (Dec. 19, 2024), https://www.chainalysis.com/blog/crypto-hacking-stolen-funds-2025/.


January 22, 2024 - FBI 302:

August 15, 2024 – FBI 302

November 11, 2024 – Proffer Notes[2]

February 24, 2023 – FBI 302

[2] These proffer notes, in the form of an email, are heavily redacted. The defense requests an unredacted version to ensure nothing else that is *Brady* (or discoverable) has been withheld.



August 1, 2024 – Attorney Proffer Notes

July 31, 2024 - FBI 302:

**This Court Has Emphasized the Importance of *Brady* Disclosures**

The government has repeatedly told this Court that it understands and will comply with its *Brady* obligations. On September 6, 2024, at Mr. Storm's initial appearance, the government acknowledged its obligations under Federal Rule of Criminal Procedure 5(f).[4] (9/6/23 Transcript 3:21-25-4:1-2 (Dkt. 6).) At the July 12, 2024 hearing on the pretrial motions, this Court noted during a colloquy with one of the prosecutors about the then-pending motion to compel: "I am a little bit concerned in light of recent, what I will call hiccups in this district, in cases like *Jain* and *Nejad*, that the government might, just by accident, by inadvertence, not produce everything

[3] The defense requests that the Court order the government to produce a copy of this binder.

[4] Although this Court noted it would enter an order with respect to the government's obligations under Rule 5(f), the docket only shows a minute entry reflecting there was a "Rule 5(f) colloquy." (*Id.* at 4:3-4.)

that they are supposed to." (7/12/24 Tr. 17:9-13 (Dkt. 69).) Later, the prosecutor replied: "I can confirm for the Court that the government has fully complied with its discovery obligations under Rule 16, *Brady* and its progeny." (*Id.* 21:17-19)

Since then, this Court has re-emphasized the importance of *Brady*, noting on September 26, 2024, as part of its oral decision on the pretrial motions:

> Separately, there is the line of cases, including *Brady* and others, that establishes "the government has an affirmative duty under the Due Process Clause to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense." Cases discussing the *Brady* and *Giglio* obligations of the government include *United States v. Hunter*, 32 F.4th 22, a Second Circuit decision from 2022. (9/26/24 Tr. 7:13-20 (Dkt. 84).)
>
> But as I made clear at oral argument, and as the government is aware from my work in other cases, if it turns out the government ultimately has interpreted its obligations too narrowly, there likely will be unfortunate consequences for their case. (*Id.* 13:17-21)

Pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the government has a duty to disclose information "favorable to the accused" in a timely manner. *Brady* material "includes not only evidence that is exculpatory . . . but also evidence that is useful for impeachment, *i.e.*, having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998); *see United States v. Mahaffy*, 693 F.3d 113, 131 (2d Cir. 2012) (stating that *Brady* material includes material that "would be an effective tool in disciplining witnesses during cross-examination"). Further, *Brady* material must be disclosed, even where such material is included with other evidence that aligns with the government's case. *Mahaffy*, 693 F.3d at 130. The government's obligation to seek—and to produce—*Brady* material is continuing.

The government's "broad duty of disclosure" under *Brady* is due, in part, to the notion that the obligation of the government in a criminal prosecution "is not that it shall win a case, but that justice shall be done." *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (*quoting Berger v. United States*, 295 U.S. 78, 88 (1935)); *see United States v. Rodriguez*, 496 F.3d 221, 225 (2d Cir. 2007) ("This obligation is designed to serve the objectives of both fairness and accuracy in criminal prosecutions."). Because the government has failed on its own accord to mind that justice be done, the defense requests that this Court intervene to ensure that the government produces all *Brady* materials.


**Given the Belated "Courtesy" Production, this Court Should Order the Government to Conduct a *Brady* Review and Produce All *Brady* Materials Immediately**

As described above, only after repeated demands from the defense did the government produce statements that contradict the government's stated theory of this case and are on their face exculpatory. Not only did the government fail to produce the statements as this Court earlier instructed, but it did so while claiming that it was producing them only as a "courtesy" and describing the defense request as an improper demand for 3500 materials in disguise.

The government characterized the defense request as "stretch[ing] beyond recognition what constitutes *Brady* material." (Ex. C at 1.) But as the statements themselves show, the government has been withholding information from the defense that would tend to undercut its theory of the case with respect to the operations of Tornado Cash and whether anyone conspired with Mr. Storm. For example, [redacted] appear to have confirmed [redacted] view that Peppersec, which launched Tornado Cash and developed a UI, was not a money transmitter because it never took custody of funds and was operating within the law. As another example, [redacted] who the government considers to be a co-conspirator with Mr. Storm [redacted] has told the government in essence [redacted]

As for the defense's *Brady* request relating to Chainalysis, the government responded that the requested *Brady* materials are not "material to preparing to the defense," it does not intend to use them in its case-in-chief, and the Chainalysis error relates to 2023 after this case's relevant time period. (Ex. C at 2.) Notably, the government did not say that it would not rely on Chainalysis or whether it knows if Chainalysis made any errors in its DPRK blockchain tracing of the relevant time period. Further, it is possible that the government experts who it has disclosed it intends to call at trial to testify about blockchain tracing, Philip Werlau, IRS-CI Agent Stephan George, and FBI Special Agent Joel DeCapua, relied on Chainalysis. Neither of their disclosures specifies what particular blockchain tracing tools they used.[5]

Given the government's lapses in judgment and seriously belated *Brady* production, an order from this Court requiring the government to conduct a review for *Brady* materials and to produce all *Brady* materials forthwith, including in the specific categories set forth on page one above, is necessary to ensure the "fairness and accuracy" of this criminal prosecution. *Rodriguez*, 496 F.3d at 225; *see also, e.g.*, *United States v. Gatto*, 316 F. Supp. 3d 654, 659 (S.D.N.Y. 2018)

---

[5] Agent George's, for example, states: "For the cryptocurrency transactions, Special Agent George initially followed the movement of cryptocurrency using a commonly used, commercially available blockchain analysis tool. These tools, like those developed by companies like TRM Labs, are generally considered to be reliable in tracing cryptocurrency transactions and in identifying the individuals or entities associated with certain cryptocurrency addresses. He then verified that analysis and obtained information regarding various wallet addresses using well-regarded, commonly used public blockchain explorers and indicies, such as Etherscan.io."

(stating that "[t]rial courts in this Circuit . . . have the latitude to require pretrial disclosure of evidence as a matter of sound case management[,]" including to "remedy an otherwise avoidable *Brady* violation"); *United States v. Nguyen*, No. 05-CR-0205E(F), 2007 WL 1111237, at *3 (W.D.N.Y. Apr. 13, 2007) (collecting cases ordering pretrial disclosure of *Brady* materials).

***

For all of the above reasons, the defense respectfully requests that this Court grant its request for a detailed *Brady* order.

Respectfully submitted,

Brian E. Klein
Keri Curtis Axel
Becky S. James
Kevin M. Casey
Waymaker LLP

-and-

David E. Patton
Hecker Fink LLP

*Attorneys for Roman Storm*