# Exhibit E

NAK5phi1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                          22 Cr. 138 (LJL)

5   NEIL PHILLIPS,

6           Defendant.

7                                       Trial
    ------------------------------x
8
                                        New York, N.Y.
9                                       October 20, 2023
                                        9:10 a.m.
10

11  Before:

12
                    HON. LEWIS J. LIMAN,
13
                                        District Judge
14
                        APPEARANCES
15
    DAMIAN WILLIAMS
16       United States Attorney for the
         Southern District of New York
17  BY:  THOMAS S. BURNETT
         KIERSTEN A. FLETCHER
18       ANDREW M. THOMAS
         Assistant United States Attorneys
19
    KAPLAN HECKER & FINK LLP
20       Attorneys for Defendant
    BY:  SEAN HECKER
21       JENNA M. DABBS
         DAVID N. GOPSTEIN
22       ANNE R. YEARWOOD

23

24

25

NAK5phi1

1          (Trial resumed; jury not present)

2          THE COURT:  I assume that there is a still live issue

3    in dispute with the parties with respect to summary charts; is

4    that correct?

5          MR. THOMAS:  That's correct, your Honor.

6          MR. HECKER:  It is, your Honor.

7          THE COURT:  I am prepared to give you my ruling on

8    that.

9          The defense moves to exclude Government Exhibit 650 to

10   652 which are three summary charts the government proposes to

11   offer through the FBI case agent under Rules 1006 and 403.  The

12   motion to exclude is granted and the charts are excluded under

13   Rule 403.

14         Under Rule 1006, a proponent of evidence "may use a

15   summary, chart, or calculation to prove the content of

16   voluminous writings, recordings, or photographs that cannot be

17   conveniently examined in Court." Fed. R. Evid. 1006.  The

18   Second Circuit has long approved the use of charts in complex

19   trials and has allowed the jury to have the charts in the jury

20   room during its deliberations, so long as the long properly

21   instruct the jury that it is not to consider the charts as

22   evidence.  See *United States v. Ho*, 984 F.3d 191, 209-10

23   (2d Cir. 2020); *United States v. Casamento*, 887 F.2d 1141, 1151

24   (2d Cir. 1989).

25         The proposition that the Court has the power to permit

1    the receipt of the summary charts does not mean that it should

2    exercise that power.  The first chart is headed:  "ANC Election

3    and OT Option Timeline."  The second and third are headed:

4    "December 26 Trading and December 28 Trading," respectively.

5    They contain excerpts from a total of five exhibits.  None of

6    the exhibits is particularly lengthy.  Each has been the

7    subject of extensive testimony in this case.  The Court

8    permitted the government to walk slowly through one of the

9    exhibits with a lay witness, although that witness gave

10   permissible testimony regarding the industry meaning of certain

11   terms.  His testimony also gave the jury the opportunity to

12   study the text messages carefully in a chronological order.

13   The government's expert also walked slowly through the time

14   sequence at issue here.  There is nothing in the summary charts

15   that the Court would not expect the government to replicate

16   when it does its summation in this case.  The main value of the

17   charts seems to be that they can be carried into the jury room

18   as a summary of the government's theory of the case.

19          The charts resemble those in *Ho* in that they are a

20   timeline, but that is where the resemblance ends.  The charts

21   in *Ho* summarized numerous exhibits.  The Second Circuit stated

22   that those exhibits comprised hundreds of pages.

23          Assuming that the charts would be admissible under

24   Rule 1006, their probative value in helping the jury is

25   marginal.  They are not a true summary.  And that value is

substantially outweighed by a number of risks:  (1) that the

charts will be used in the jury room not as a substitute for

voluminous records that the jury would otherwise need to spend

time reviewing, but as a summary of the government's summation

without the defense having the opportunity of a summary of its

summation also being sent into the jury room; (2) that the

jury's time will be wasted; and (3) that the evidence is

needlessly cumulative to what has already been presented.

      Thus, the charts' legitimate value in proving the

contents of voluminous writings is substantially outweighed by

their prejudicial effect of permitting the jury to have the

government's summation during deliberations but not the

defense's, so defendant's motion to exclude them in granted.

      I gather that there are there some other issues

between the parties?

      MR. THOMAS:  The issues have been narrowed since the

government wrote the Court this morning but there are two

issues we just want to put on the record.

      THE COURT:  And I should tell you that if you wrote me

this morning, I did not have a chance to look at what you

wrote.  So if you want to summarize whatever you need me to

address, go ahead.

      MR. THOMAS:  Yes, your Honor.

      As we raised a few times throughout the trial, the

26.2 productions in this case have been extremely meager, there

1    is essentially no substantive notes from either expert, and the

2    problem with that was compounded by the production of about 50

3    charts that were not associated with any particular person or

4    identified to one expert or the other, and only really last

5    night did we learn that they're associated, at least in part,

6    with Mr. Newman.  For purposes of making sure that we are able

7    to conduct the cross-examination of Mr. Newman and Mr. Froot,

8    we just ask the Court to direct defense counsel to identify

9    which of the charts Mr. Newman has adopted and which ones

10   Mr. Froot has adopted.  We are prepared to start today and to

11   go forward.  We think we are entitled to that under the rules.

12           THE COURT:  That does not seem like a heavy lift,

13   Mr. Hecker.

14           MR. HECKER:  It is not, your Honor.  And just so the

15   record is clear, we hadn't anticipated that the government

16   would be done so early so last night we worked, with our

17   experts, to try to streamline the presentation and are now

18   intending only to call Mr. Newman, and hence some of the

19   confusion last night with our trying to get the government, as

20   quickly as we could, which of the exhibits we were going to

21   propose having Mr. Newman testify about.  I told the government

22   this morning that if they didn't have enough time and wanted to

23   postpone the examination until Monday we were open to that but

24   I think we can get them what they need in time to do it if the

25   government wants to go forward.

1          So, we are not intending any unfair surprise, it is

2    really a function of our attempting to streamline our case and

3    to get it to the jury more quickly and reduce the number of

4    witnesses.

5          THE COURT:  So if you spent time last night figuring

6    out which charts Mr. Newman is going to adopt, do you know that

7    now?

8          MR. HECKER:  We have been in discussion with them in

9    real-time all morning telling them exactly which ones aren't

10   going to be used and which ones are, and -- I am looking to my

11   colleague.

12         MR. GOPSTEIN:  We are close, your Honor.

13         THE COURT:  So, my expectation is really two-fold.

14   First of all, I think we will take two breaks this morning, we

15   will take a break at around 10:45 and take another break around

16   12:15.  That obviously depends on where we are with respect to

17   witnesses.  My expectation is that by the time I come out on

18   the bench at the end of the first break, you will have provided

19   to the government what those exhibits are.

20         MR. HECKER:  For sure, your Honor.  And the only -- I

21   don't know how long the government thinks their last two

22   witnesses will take.  It may be that it's quite quick, so just

23   putting that on the record, and if we need to take a break and

24   use that time to get everyone comfortable, we will do that.

25         THE COURT:  My ruling will be whenever the end of the

1    first break is.  At that point you will have provided the

2    government which are charts Mr. Newman is adopting.

3              MR. HECKER:  We absolutely will.

4              THE COURT:  Does that take care of it?

5              MR. THOMAS:  I think, your Honor, but just to be

6    absolutely clear, we are not asking which ones he will use.  We

7    want to know which ones he adopted but isn't using as well to

8    make use of them on cross-examination the same way they did

9    yesterday with our expert but that timing works for the

10   government and we would be --

11             THE COURT:  What, exactly, does that mean?  With

12   respect to their cross-examination of your expert, what I

13   permitted them to do was if, to use a chart that your expert

14   had -- or information, opinions that your expert had previously

15   provided as a prior inconsistent statement if they were able to

16   establish the predicate for there being a prior inconsistent

17   statement.  I'm not sure exactly how that maps onto the charts

18   here.  Tell me a little bit more precisely what you are looking

19   for.

20             MR. THOMAS:  Yes, your Honor.  I think it is actually

21   pretty simple.  We just want to know which of the charts are

22   Mr. Newman's statements, whether those charts happened to end

23   up being used or not, and if the answer is only the ones that

24   are used are his statements, we are prepared to accept that.

25   We are just entitled, under 26.2, to know which statements

1   Mr. Newman has made to the defense.  That's all that we are

2   seeking.

3          MR. HECKER:  And I think it will be a null set, it

4   will be the ones he is using.

5          MR. THOMAS:  One point of clarification on the charts

6   issue, Judge.  Absolutely hear the Court on its ruling.  May we

7   be permitted to use them purely as demonstratives and not offer

8   them?

9          THE COURT:  Yes.  I think you can.

10          MR. THOMAS:  Thank you, your Honor.

11          MR. HECKER:  On that, just so the record is clear, I

12   don't think they're intending to put it in through a case agent

13   but maybe I am wrong about that.

14          MR. THOMAS:  He is an FBI agent.  He is not the case

15   agent in the sense that he is the agent who worked on this

16   case.

17          MR. HECKER:  So that goes to a separate 403 issue

18   about our ability to cross-examine someone who is going to put

19   in a selection and only a selection of the government's

20   exhibits and not be able to opine about any of the other

21   information that might render that information misleading to

22   the jury.  And so, it is a separate 403 issue to have someone

23   with no knowledge put up demonstratives of the government's

24   closing slides and I have no ability to cross-examine him.  I

25   mean, I could do it but on things he has never seen and say,

NAK5phi1

1     did the government give you this?  Did the government give you

2     that?  I can do a whole song and dance, I can do it for a long

3     time.

4              THE COURT:  And they're all in evidence, right.

5              MR. HECKER:  They are.  They are.  We can do that --

6              MR. THOMAS:  Not yet, but.

7              MR. HECKER:  We can do that but, respectfully, I think

8     it is prejudicial and I think it is confusing.  I mean, it will

9     literally be me arguing with someone who knows nothing about

10    the case, about evidence they haven't seen, so that I can make

11    the point to the jury that the presentation is missing things.

12    I mean if they want to do that I suppose we could go through

13    that.  I think it is not helpful to the jury's decision and it

14    really prejudices the defense to have someone they can't

15    cross-examine because they have only give him a handful of

16    things they like.  That is literally what they are doing.

17             MR. THOMAS:  May I respond, your Honor?

18             THE COURT:  Yes.

19             MR. THOMAS:  First of all, no requirement that a

20    witness be knowledgeable about all aspects of the case.  And

21    even in this sort of publishing to the jury function, routinely

22    in this building and in the courts of this Second Circuit --

23             THE COURT:  Just tell me what he is going to be doing.

24             MR. THOMAS:  So, for the most part, I think what we

25    will do is we will have him put up for the jury a number of

NAK5phi1

exhibit they have not seen, and listen to audio recordings they

have not seen, and then point out the time comparison between

them.  *This message precedes this audio recording by 3 minutes,*

*5 minutes.  This message begins here, ends there.  That's a*

*total span of 45 minutes.*  That kind of thing.

I think we, you know, in some alternate universe we

could put up a paralegal but the cross-examination that

Mr. Hecker is describing is sufficient to demonstrate the point

that the defense would want to make, that this witness' role

essentially is to be a conduit for documentary evidence that

has not been shown to the jury.  There is no prejudice to that.

Whatever prejudice exists there is cured by the very fact of

such a cross-examination.  It is manifestly helpful to the jury

because for a lot of these recordings, especially those that

relate to that December 28th timeline, the jury has not heard,

they have not seen the transcripts, they haven't seen the

associated chat, and we are in a circumstance here where the

case primarily relates to the defendant who obviously is

unavailable to the government as a witness, and a

co-conspirator who is deceased.  There is no special prejudice

that attaches for being a defendant in that posture.  We are

trying to make use of the evidence we have got and the jury

should know it.

MR. HECKER:  Respectfully, I wasn't aware that -- the

3500 were the slides so we understood that was what they

NAK5phi1

1    planning to do with the witness.  I didn't know he was going to

2    play and publish tapes that the jury hasn't heard that aren't

3    in evidence yet -- they haven't been published yet.  I agree

4    that is permitted.  What I disagree is that he can be used to

5    make the government's argument and not be cross-examinable in

6    that context.  They're different, they're argumentative slides

7    as opposed I am playing for you this tape, here is when that

8    happened.  That's different.  I agree.

9            THE COURT:  The defense's objection is overruled.  I

10    will give an instruction that the charts are just being used as

11    demonstrative aids and they're not evidence and that they have

12    only the value that the jury ascribes to the underlying

13    evidence.

14            Anything else from the government?

15            MR. THOMAS:  No, your Honor.

16            THE COURT:  Anything else, Mr. Hecker?

17            MR. HECKER:  Just a scheduling issue.  We would like

18    to be heard on the Rule 29 issue at the close of the

19    government's case.  I understand the Court has indicated what

20    its intention is, but we would like to be heard on that before

21    we go to a defense case.

22            THE COURT:  I think I indicated that you would be

23    heard, that I will give you as much time as you need to be

24    heard so that's how we will proceed.

25            MR. HECKER:  OK.  Thank you.

1          (In open court; jury present)

2          THE COURT:  Mr. Hecker, we'll take our break shortly

3    before 11:00, so keep that in mind.

4    CROSS-EXAMINATION

5    BY MR. HECKER:

6    Q.  Good morning, Agent Salemme.

7    A.  Good morning.

8    Q.  Could you just remind the jury about what type of financial

9    crimes you investigate in your day job.

10   A.  Complex financial crimes and securities fraud.

11   Q.  Is it fair to say that, as part of your work, you

12   investigate a variety of different kinds of fraud?

13   A.  Yes.

14   Q.  Is it further fair to say that, in fraud cases, you're

15   often investigating representations that are made to groups of

16   people to determine whether or not they're accurate?

17   A.  Could you repeat the question.

18   Q.  Sure.

19          MR. HECKER:  Can we read it back.

20          THE COURT:  Yes.  You may have the court reporter do

21   so.

22          I'll tell both counsel that, if there are requests for

23   readbacks, the request comes to me, not the court reporter.

24          MR. HECKER:  I apologize, your Honor.

25          (Record read)

1           THE COURT:  Sorry, I'm not sure I 100 percent

2    understand the question.

3    BY MR. HECKER:

4    Q.  In cases of fraud, are you often investigating whether

5    someone has made statements or representations to groups of

6    people that are misleading?

7    A.  Yes.

8    Q.  Or false; correct?

9    A.  Yes.

10   Q.  And in determining whether something is misleading, is it

11   fair to say that something could be misleading because it's

12   simply inaccurate on its face?

13   A.  Could you repeat the question again.

14   Q.  Let me try it differently.

15          Something could constitute fraud if a statement is

16   made that's false; correct?

17   A.  Correct.

18   Q.  But another kind of fraud is when someone misleads a group

19   of people by presenting certain information and then omitting

20   material information that's not included in the statement.

21          Do you agree with me?

22          MR. THOMAS:  Objection, your Honor, 403.

23          THE COURT:  Overruled.

24          THE WITNESS:  I'm not sure I 100 percent understand

25   the question.

1    BY MR. HECKER:

2    Q.  I think I tried a simple one.

3    A.  Yeah.

4    Q.  Fraud can consist of making false statements to someone;

5    right?

6    A.  Yes.

7    Q.  It can also consist of making statements to someone that is

8    misleading because they omit or don't include material

9    information that you would need to understand the statement?

10   A.  Yes, yes.

11   Q.  And I just want to be really clear about this, you weren't

12   the case agent who investigated this case; right?

13   A.  No.

14   Q.  There is a case agent, yes?

15   A.  Yes, there is a case agent.

16   Q.  Is that Special Agent Patrick Zielinski?

17   A.  Yes.

18   Q.  Do you understand why you were asked to testify today in

19   this courtroom rather than the case agent?

20   A.  No, I'm not sure.

21   Q.  Just so the jury understands, the questions and answers we

22   just went through in order for you to create these

23   demonstratives, am I correct that you did no independent

24   investigation?

25   A.  I did no independent investigation.

1    Q.  When you do independent investigations, you interview

2    witnesses; right?

3    A.  You could.

4    Q.  I mean, do you ordinarily interview witnesses in connection

5    with your investigations?

6    A.  Yes.

7    Q.  You would want to talk to the people who participated in

8    the events that are relevant to the jury's considerations;

9    right?

10   A.  Yes.

11   Q.  You would review documents; right?

12   A.  Yes, you would review documents.

13   Q.  And when you review documents in cases where you are the

14   case agent, do you make it a practice to simply ask the

15   prosecutors to give you those documents that they think are

16   helpful to their case?

17   A.  Could you repeat the question.

18          MR. HECKER:  Your Honor, can we have that question

19   read back.

20          THE COURT:  Yes, you may do so.

21          (Record read)

22          THE WITNESS:  No.

23   BY MR. HECKER:

24   Q.  You would want all of the relevant information; right?

25   A.  Yes.

NAKGphi2                          Salemme – Cross

1    Q.  And you wouldn't rely on the prosecutors who are trying to

2    persuade a jury of something to just tell you which pieces of

3    evidence they think would be of interest; right?

4    A.  No.

5    Q.  But that is exactly what happened in this case; correct?

6    A.  Correct.

7    Q.  That's because you are not the agent who investigated the

8    facts of the case; right?

9    A.  I am not the agent that investigated the facts of the case.

10   Q.  You didn't speak to a single witness who is represented on

11   any of the demonstratives that you just talked about in front

12   of the jury; right?

13   A.  No.

14   Q.  You didn't interview Jonny Fayman; right?

15   A.  I did not interview him.

16   Q.  Do you know that Jonny Fayman was the co-Chief Investment

17   Officer for Glen Point?

18   A.  No.

19   Q.  Do you know that he was working with Mr. Phillips in

20   creating the strategy that the fund employed to invest around

21   issues relating to the South Africa elections?

22   A.  No, I do not know that.

23   Q.  You know nothing about that?

24   A.  No.

25   Q.  Do you know if the government spoke to Mr. Fayman?

1    A.  I do not know.

2    Q.  Is that something you would want to know if you were case

3    agent?

4    A.  Yes.

5    Q.  Do you know who Mr. Henderson is from the broker who

6    actually brokered the option at issue in this case?

7    A.  I do not know who Mr. Henderson is.

8    Q.  You mentioned on one of your charts a Mr. Daniels.  Do I

9    have that right?

10   A.  There's a Daniels in one of the charts.

11   Q.  Do you know who he is?

12   A.  I do not.

13   Q.  Have you ever spoken to him?

14   A.  I have never spoken to him.

15   Q.  Do you know if the case agent spoke to him?

16   A.  I do not know if the case agent spoke to him.

17   Q.  I believe you testified about trading activity across a

18   variety of different days.

19          Do you recall some of that testimony?

20   A.  Yes.

21   Q.  It includes trading instructions that were given by folks

22   at Glen Point to people at other banks to execute the trades;

23   am I right?

24   A.  Correct.

25   Q.  Have you spoken to a single one of those people?

1  A.  I have not spoken to any of them, no.

2  Q.  Do you know if the case agent has?

3  A.  I do not know if the case agent has or not.

4  Q.  Do you know if a single witness who participated in any of

5  the trading in this case have testified in this case?

6  A.  I do not know if they have testified in the case.

7  Q.  Would it surprise you if none of them have testified?

8  A.  I don't know if it would surprise me.

9  Q.  If I were to show you information related to Government

10  Exhibit 650, the timeline regarding the 2017 ANC election and

11  one-touch option timeline that you testified about that was

12  very significant information that was excluded from the

13  timeline, would you want to see that?

14  A.  I'm not -- I'm not sure if I can talk about what's

15  significant or not in the timeline.

16  Q.  Well, I guess, I just want to understand, when you

17  testified to this jury, did you have any concern that there was

18  a possibility that there was significant information that would

19  be material to them that would make it helpful to them to

20  understand the facts in this case that was omitted from your

21  timeline?

22  A.  I don't -- I didn't know enough about what was significant

23  outside of what I was shown.

24  Q.  Did you take it on faith that the government would give you

25  everything that you needed to present a picture to this jury

NAKGphi2                     Salemme - Cross

1    that was true and accurate and not misleading?

2    A.  I think I reviewed the documents that I was shown, and I

3    can't testify to what a complete picture would be.

4    Q.  That wasn't my question, sir.

5           MR. HECKER:  Your Honor, may I have my question read

6    back.

7           THE COURT:  Yes.

8           (Record read)

9           THE WITNESS:  I don't know if I would know what was a

10   true and accurate picture.

11   BY MR. HECKER:

12   Q.  Right.  Because you don't know any of the facts relating to

13   this case yourself; correct?

14   A.  I don't know any of the facts, other than what I reviewed

15   in the specific documents.

16   Q.  You didn't want to paint a misleading picture to the jury,

17   though; right?

18   A.  No.

19   Q.  So you necessarily relied on the government to give you all

20   the information you would need in order not to mislead the jury

21   in your presentation; is that fair?

22          THE WITNESS:  Can I have the question read back,

23   please.

24          THE COURT:  The court reporter can read back the

25   question.

1           (Record read)

2           THE WITNESS:  I relied on the prosecutors to give me

3    all documents that I would need.

4    BY MR. HECKER:

5    Q.  To avoid making it misleading?

6    A.  I can't really judge what would be misleading or not.

7    Q.  Well, isn't it part of your job in investigating fraud

8    cases to try to determine whether someone omitted material

9    information that someone would need to have a complete picture?

10   A.  It is.

11   Q.  So you're familiar with the concept?

12   A.  Yes, but it -- yes.

13   Q.  So I'll just ask you again.

14          You necessarily relied on the government and had faith

15   in the government not to put you in a position of presenting

16   this timeline to the jury in a way that would be materially

17   misleading because it omitted important information; correct?

18          MR. THOMAS:  Objection, your Honor, argumentative.

19          THE COURT:  Overruled.

20          THE WITNESS:  I don't know what a complete and/or

21   misleading picture would be.  I only know that -- the documents

22   that I was given and I reviewed them for accuracy.

23   BY MR. HECKER:

24   Q.  I just want to make sure I understand what you are saying.

25          You are saying you don't know what the accurate

NAKGphi2                          Salemme - Cross

1    picture would look like because you didn't investigate; right?

2    A.  Yes.

3    Q.  So sitting here now, you can't know whether this is

4    materially misleading because it omits important information;

5    right?

6    A.  I -- I don't know if that's true.

7    Q.  Right.  And so you necessarily relied on the government not

8    to put you in the position of misleading the jury by omitting

9    important information; is that fair?

10           MR. THOMAS:  Objection, your Honor, asked and

11   answered.

12           THE COURT:  Overruled.  It's not answered.

13           THE WITNESS:  Yes.  I relied on the documents the

14   prosecutors gave me.

15   BY MR. HECKER:

16   Q.  Have you ever testified in another criminal trial where you

17   had no independent knowledge of the facts that you were

18   testifying about?

19   A.  No.

20   Q.  Is that a role that exists at the FBI, someone who will

21   show up at trials in which they didn't investigate but provide

22   testimony based entirely on the information that the government

23   gives them?

24   A.  My understanding is that agents do, time to time, serve as

25   summary witnesses in cases they haven't investigated.

NAKGphi2                              Salemme - Cross

1    Q.  Do they have to have any background relevant to the subject

2    matter?

3    A.  I don't know completely, but -- I don't know to answer

4    that.

5    Q.  You have never done this before?

6    A.  I have not done this before, no.

7    Q.  It's unusual, isn't it?

8              MR. THOMAS:  Objection, your Honor.

9              THE COURT:  Sustained.

10             Mr. Hecker, whenever you get to a convenient breaking

11   point.

12             MR. HECKER:  Let's pause now.

13             THE COURT:  Members of the jury, we're going to take

14   one of two breaks now.  We will take a 15-minute break.  And

15   then we'll take another break before the end of the day.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

NAKGphi2

1          (In open court; jury not present)

2          THE COURT:  See you all back here in 15 minutes.

3          (Recess)

4          (Continued on next page)

NAK5phi3                          Salemme - Cross

 1                 THE COURT:  Be seated.  Let's bring in the jury.

 2                 (Jury present)

 3                 THE COURT:  Mr. Hecker, you may continue.

 4                 MR. HECKER:  Thank you, your Honor.

 5      BY MR. HECKER:

 6      Q.  Mr. White, can you pull up the first page of the

 7      government's demonstrative, Exhibit 650?

 8                 Mr. Salemme, the title of this slide is 2017 ANC

 9      Election and OT Option Timeline.  Do you see that?

10      A.  Yes, I do.

11      Q.  What is the ANC?

12      A.  I'm not a hundred percent sure.

13      Q.  You don't know what the ANC is?

14      A.  I don't know what the ANC is.

15      Q.  Did you ask the government what the ANC was?

16      A.  I did not.

17      Q.  Do you know what the ANC election is a reference to?

18      A.  I don't know.

19      Q.  Do you know what country it relates to?

20      A.  I don't know.

21      Q.  Sitting here now you are not aware that the ANC election

22      relates to the country of South Africa?

23      A.  I'm not a hundred percent sure of that.

24      Q.  Are you comfortable giving testimony to this jury to

25      support a demonstrative that you have no idea what the title of

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300

NAK5phi3                          Salemme - Cross

1   it means?

2   A.  Yes.  I reviewed documents that I reviewed and they're

3   accurate.

4   Q.  Are you comfortable now?

5          MR. THOMAS:  Objection, your Honor.

6          THE COURT:  Sustained.

7   Q.  Would it surprise you to know that the 2017 ANC election is

8   a reference to the election to head the African National

9   Congress, the overwhelming majority party in South Africa?

10  A.  I don't know if it would surprise me or not.

11  Q.  It wouldn't surprise you if that's what it is a reference

12  to?

13  A.  No, it would not surprise me.

14  Q.  Do you know what the OT Option Timeline is?

15  A.  I know what the timeline is, that's time as it goes by.

16  Q.  We can agree on that.

17          Do you know what an option is?

18  A.  In this, in the financial sense?

19  Q.  Yes, in the financial sense.

20  A.  Yeah, I have a general understanding of them.

21  Q.  What is an option?

22  A.  It's the option to buy or sell something.

23  Q.  Are you aware that this case relates to an option for which

24  the reference asset was a foreign currency exchange rate?

25  A.  Yes.

1   Q.  And you are aware that the foreign currency exchange rate

2   that was relevant was the dollar/ZAR exchange rate?

3   A.  Yes.

4   Q.  So you knew it related to the exchange rate between the

5   dollar and the South African currency; yes?

6   A.  Yes.

7   Q.  And you are testifying about a demonstrative exhibit that

8   includes 2017 ANC Election and OT Option Timeline but you

9   didn't know that that was communicating to the jury some

10  connection between the South African ANC election and an option

11  that relates to the foreign currency of the South African

12  country?

13  A.  No, I don't know enough about the case to know how all the

14  various things are connected.

15  Q.  Do you know when the ANC election was?

16  A.  No.  Not for sure.

17  Q.  Well, do you think it might be December 18th, the date that

18  the first three items on your timeline relate to?

19  A.  Yeah.  Unconfirmed reports coming in that Cyril Ramaphosa

20  is prevailing in all five positions except the deputy president

21  position.  Sounds like an election-type headline.

22  Q.  Relating to the ANC election in South Africa.

23  A.  Yes.

24  Q.  You know that, right?

25  A.  Yes, I know it.

NAK5phi3                        Salemme - Cross

1   Q.  You know who Cyril Ramaphosa is, yes?

2   A.  I do not know who he is.  I see his name but I don't know

3   who he is.

4   Q.  You don't know that he became the leader, eventually, of

5   the ANC and the country South Africa?  Do you know that?

6   A.  I did not know that.

7   Q.  The first item on here which references Government Exhibit

8   407 includes one snippet from a hefty exhibit; is that fair?

9   A.  Yes.

10  Q.  You had to review this exhibit in order to get comfortable

11  with the idea of putting this snippet in the first box and then

12  the second snippet in the second box; right?

13  A.  Yes.  I reviewed 407.

14  Q.  What's that?

15  A.  I reviewed GX- 407.

16  Q.  And you wanted to make sure that you were putting the two

17  items that are here in the right order?

18  A.  Yes.

19  Q.  I mean, you wouldn't want to flip them and get it wrong and

20  create a misleading impression about which came first; right?

21  A.  No.

22  Q.  And this slide is designed to suggest that there might be

23  activity relating to this option that relates, in some way, to

24  the ANC election.  Can we agree on that?

25  A.  Could you repeat the question?

1            MR. HECKER:  May I have that read back, your Honor?

2            THE COURT:  Yes, you may.

3            (Record read)

4   A.  Yeah.  I don't know if the option and the election are

5   connected.  They could just be talking about politics.

6   Q.  I'm going to ask you again.  Did you not want to know,

7   before you testified about this slide, what was being

8   communicated to the jury and why it had some relevance to our

9   case?

10  A.  I wanted to make sure that everything was accurate that was

11  in the exhibits that appeared on the slides; if there were

12  communications and that it was audio that it was fair and what

13  I heard.

14  Q.  And you wanted to make sure that those communications were

15  put in the right order; right?

16  A.  Yes.

17  Q.  And you wanted to make sure that what you are quoting in

18  these boxes was an accurate reflection of what's in the

19  underlying exhibit; correct?

20  A.  It depends on what you mean by accurate but I wanted to

21  make sure that the thing that is on the page was in the actual

22  exhibit.

23  Q.  I just want to understand.  When you say "accurate," can we

24  agree that there are a couple different ways of something being

25  inaccurate?  Do you agree with me as a general proposition?

1  A.  Yes, I agree there are multiple ways for something to be
2  inaccurate.
3  Q.  One way it can be inaccurate is that you could actually
4  have words in this chart that aren't actually in the exhibit;
5  right?
6  A.  Yes, that's a way it could be inaccurate.
7  Q.  Or another way would be if there was a taped call and you
8  listened to the call and what is said on the call is different
9  from what is in the exhibit; right?  That would be inaccurate?
10  A.  I -- could you repeat the question?
11  Q.  The way something could be inaccurate is if you played a
12  recording, like those that you testified about, and then you
13  put in a box words that weren't actually on the recording; that
14  would be inaccurate, yes?
15  A.  Yes, but I will say that sometimes it's hard to completely
16  transcribe.  One person might hear one thing, one person might
17  hear slightly different -- an um or a pause or something like
18  that.
19  Q.  In fact, some of the recordings in this case are difficult
20  to decipher; agreed?
21  A.  Yeah.  I think they did a good job of identifying areas
22  that were not decipherable.
23  Q.  And sometimes they used lingo that is not familiar to you,
24  right?
25  A.  Yes.  That's correct.

```
1    Q.  Do you know what a lekker is?
2    A.  I don't know what lekker is.
3    Q.  Did you look it up when you were listening to the recording
4    that included that expression?
5    A.  It's a slang term in South Africa, is my understanding,
6    when I looked it up.
7    Q.  Do you recall what it means?
8    A.  It is like good cheer kind of, generally.
9    Q.  Good cheer.
10   A.  Yeah.
11   Q.  Can we agree that another way that something could be
12   misleading or inaccurate is that while the quote that is in the
13   box is an accurate transcription of what is in the exhibit but
14   there are other things in the exhibit that render what is here
15   misleading to the jury?
16   A.  Do you mean if something were omitted?
17   Q.  That would be an example.
18   A.  Yeah.  I, you know -- yeah, I agree.
19   Q.  That can happen?
20   A.  Yeah, things -- obviously the entire exhibit is not in the
21   box, yeah.
22   Q.  And I just want to make sure I understand your role.  Did
23   you inquire of the government whether there might be other
24   evidence that would render these boxes misleading to the jury
25   before you testified?
```

NAK5phi3                    Salemme - Cross

A.  No.  I don't know of other evidence that could contradict
this.

Q.  You took it on faith that they wouldn't put you in that
position of failing to give you information that might render,
what is here, misleading to the jury?

            MR. THOMAS:  Objection, your Honor.

            THE COURT:  Overruled.

A.  You know, I understand there is a lot of information that
could be in this and I didn't have the time to review every
piece of information, so.

Q.  My question was whether you took it on faith that the
government would give you everything you needed to avoid
misleading the jury.

A.  I don't think I took it on faith.  I don't think there's --
I could have been presented with everything to --

Q.  But you don't know?

A.  I don't know, no.

Q.  So you relied on the government for that?

A.  Yes, I relied.  I relied on the prosecutor team.

Q.  You didn't just rely on them but you took it on faith that
they wouldn't mislead you; right?

A.  I'm having trouble with this took it on faith way of
phrasing the question.

Q.  You don't understand what that means?

A.  Not a hundred percent, no.

1    Q.  You had a belief that the government would give you

2    everything you needed to make sure that these boxes and what

3    they communicate to the jury would be accurate.

4    A.  Accurate in the sense that what is on the box is in the

5    communication that it said it is.

6    Q.  But not that it's rendered misleading by omitting material

7    information.

8    A.  I don't know what is material to this case.  There is a lot

9    of information and I was not part of investigating it so I

10   don't know what would be -- would render a complete case or --

11   I don't know.

12   Q.  We agree on that.  My question is, you therefore had to

13   rely on the government to make sure that you weren't put in

14   that position because you wouldn't be able to tell on your own

15   because you don't know anything about the facts of the case.

16   A.  Yes, I had to rely on the documents that were furnished to

17   me.

18   Q.  I would like to -- we can take this down for a second and

19   pull up Government Exhibit 407, which was the document that was

20   the source of the information in the very first box.  Am I

21   right if we go to the time stamp 16:06:22, I believe the Bates

22   ends in 37 -- yes, that's it.

23            Do you know who Patrick Lamaa is?

24   A.  I don't know who Patrick -- actually, I was sent a

25   transcript describing that he was an analyst.

1    Q.  Do you know where?

2    A.  I can't recall but I could be refreshed.

3    Q.  It's fine.

4            Am I right that this is the snippet that you confirmed

5    is the source for the first box in your timeline:  Just in,

6    unconfirmed reports coming in that Cyril Ramaphosa is

7    prevailing in all five positions except the deputy president

8    position; they are recounting it.

9            Do you see that?

10   A.  Yes.

11   Q.  That last clause, "they are recounting it," do you know

12   what that means?

13   A.  Not a hundred percent sure.

14   Q.  Is it possible that they meant that there was an initial

15   counting of the election ballots and then there was a

16   subsequent plan to recount them?

17           MR. THOMAS:  Objection, your Honor.  Personal

18   knowledge.

19           THE COURT:  Overruled, but I will remind the jury that

20   the questions are not evidence, only the answers are evidence.

21           Go ahead, Mr. Hecker.

22           THE WITNESS:  Yeah, I don't know the exact election

23   proceedings or how they, if there was a recount or not.

24   BY MR. HECKER:

25   Q.  My question is why does the first box -- and perhaps we can

1   pull it up side by side, the timeline of the demonstrative that

2   is marked Government Exhibit 650 -- do you see the first box

3   you have a quoted statement from this text?  Do you see that?

4   A.  Yes.

5   Q.  Did you decide to delete the end of the sentence that says

6   "they are recounting it"?

7   A.  I did not decide to delete it.

8   Q.  Who decided to delete that?

9   A.  I relied on the prosecution.

10  Q.  So the prosecutors deleted the portion of this exact

11  communication that says they're recounting the election

12  results?

13  A.  I don't think deleting and ending a quote earlier is the

14  same thing.

15  Q.  Ending the quote earlier could be rendered misleading by

16  omitting what came after it.  Do you agree with me?

17  A.  Yeah.  In theory.

18  Q.  In theory.

19  A.  I mean, there are a lot of things that are omitted, you

20  know, these are long things.

21  Q.  Do a lot of the things that are omitted matter to

22  understanding the communications and whether they're accurate?

23  A.  Yes, I think there are some things that are omitted.  You

24  know, for example, on the next page there is a message from

25  Phillips that says use someone we don't have an option with, or

NAK5phi3                          Salemme - Cross

1   something like that, that I think is relevant as well.

2   Q.  I just want to make sure I understand your testimony.  You

3   have studied this exhibit?

4   A.  I have reviewed it.

5   Q.  Carefully enough to recall something that Mr. Phillips said

6   in the same chat later?

7   A.  It is on the next page, so.

8   Q.  But it is not in the timeline?

9   A.  It's not in the timeline.

10  Q.  But you are representing to the jury that you think that

11  piece of the chat would be relevant to them?

12  A.  I was just saying that there are a lot of -- these are long

13  documents, not everything could make it onto the

14  representation, not the whole chat.

15  Q.  Any other things you remember, just off the top of your

16  head, that you think might be of interest to the jury that

17  aren't in your timeline?

18          MR. THOMAS:  Objection, your Honor.

19          THE COURT:  Overruled.

20  A.  No.  I mean there is a lot of, like I said, these chats are

21  very long and I -- I'm not in a position to say what would make

22  a completely relevant representation of what is on the chats.

23  Q.  Understood.

24          Why don't we move forward in the timeline and pick up

25  at 12/19/2017 -- I am still back in Government Exhibit 407

1    which is in evidence, we can take the timeline down for just a

2    second.  At 8:18:14, I believe it ends in Bates 53.  If we

3    could pull up just the bottom?

4            This is a communication, do you agree, between

5    Jonathan Fayman and Neil Phillips in the same exhibit we were

6    just looking at?

7    A.  I agree.

8    Q.  And it is dated December 19; correct?

9    A.  Correct.

10   Q.  And you see it starts with Mr. Fayman saying:  I think Ace

11   Magashule is in big trouble?

12   A.  I agree.

13   Q.  Do you know who that is?

14   A.  Ace Magashule, I don't know who that is.

15   Q.  Do you know him to be a figure that was relevant to the ANC

16   election in South Africa?

17   A.  I don't know for sure.  I have seen his name a few times in

18   the chats.

19   Q.  So in response to that Neil Phillips says:  It is over for

20   him too.

21           Do you see that?

22   A.  Yes, I see that.

23   Q.  And then the very next thing says:  Some fker has stolen

24   ballots.

25           Do you see that?

NAK5phi3                          Salemme - Cross

1    A.  I see that.

2    Q.  Then let's go to the next line on the next page, the top,

3    first line, Neil Phillips:  And they will go through

4    everything -- misspelling -- everything now forensically.

5          Do you see that?

6    A.  Yes, I see.

7    Q.  Can we agree that that is Mr. Phillips telling Jonathan

8    Fayman that there were reports that ballots for the ANC

9    election were stolen and that they were going to do a forensic

10   review of the election results on December 19?

11          MR. THOMAS:  Objection, your Honor.

12          THE COURT:  Overruled.

13   A.  I agree that that is what it says.  I don't know the

14   surrounding circumstances.

15   Q.  If we could go back to the timeline Government Exhibit 650,

16   is there any entry for December 19?

17   A.  No, there is not.

18   Q.  If I told you that there were reports that Mr. Phillips was

19   reviewing, in real-time, that the election results were being

20   forensically examined because of reports that ballots had been

21   stolen for the ANC election in 2017, do you think that would be

22   a relevant thing to put in this timeline so that the jury

23   understood what the facts were relating to the election on this

24   timeline?

25   A.  I can't a hundred percent make a judgment on what would be

1    relevant to put in the timeline or not.

2    Q.  You don't have a basis for disagreeing with me that it

3    sounds pretty relevant to a slide that is called 2017 ANC

4    Election and Option Timeline that on the 19th, Mr. Phillips is

5    reporting that there was a recount because of alleged fraud?

6            MR. THOMAS:  Objection, your Honor.  Counsel is just

7    testifying.

8            THE COURT:  Sustained.  Sustained.

9    Q.  You read this whole chat, right?

10   A.  I read the chat.

11   Q.  And you read this piece of the chat in the way I am reading

12   it, yes?

13   A.  Yes.

14   Q.  Did you ask the prosecutors whether It was relevant that

15   there was a recount and a forensic evaluation of the election

16   results on December 19 which is not on your slide?

17           MR. THOMAS:  Objection, your Honor.  May we be heard

18   at side bar?

19           THE COURT:  No, I am going to permit this question but

20   we will see how much longer it goes.

21           THE WITNESS:  Could you repeat the question?  Sorry, I

22   just lost the thread.

23           MR. HECKER:  May I have that read back?

24           THE COURT:  Yes.

25           (Record read)

NAK5phi3                            Salemme - Cross

1   A.  I did not ask them, no.

2   Q.  As you sit here now, did you have any concerns that

3   omitting that information could render this demonstrative

4   misleading to this jury?

5   A.  I don't know if I am in a position to opine on what makes

6   it misleading or not.  This is a very complicated case and I'm

7   not sure I would know what would make it misleading or not.

8   Q.  You don't want to mislead them.

9   A.  I don't want to mislead them, no.

10  Q.  So if it were material, you would want it included here;

11  yes?

12          MR. THOMAS:  Objection, your Honor.

13          THE COURT:  Overruled.

14  A.  Again, I don't know what would make -- what is material or

15  not in this case.  These financial matters are very complex.

16  Yes, I don't know exactly what would be considered material or

17  not.

18  Q.  You said financial cases like this can be very complex;

19  right?

20  A.  Something to that nature, yeah.  I don't know if I said

21  those exact words.

22  Q.  And there is often a risk of trying to oversimplify cases

23  like that; yes?

24          MR. THOMAS:  Objection, your Honor.

25          THE COURT:  Sustained.

1              MR. HECKER:  Your Honor, should we be heard at side

2    bar if the government has an objection?

3              THE COURT:  Yes, we will have a side bar.

4              (Continued next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At side bar)

2          MR. THOMAS:  Your Honor, the government has a number

3    of concerns.  I think for framing, Mr. Hecker here seems to be

4    wasting THE Court's and the jury's and the witness' time in

5    order to delay the start of the defense case, but along the way

6    what he is doing is putting before the jury an issue that is

7    legally irrelevant, which is the government's investigation.

8    The government would request that the Court give the Sand

9    instruction that the government's investigation is not on trial

10   and that Mr. Hecker be prohibited from continuing to invite the

11   witness to opine on what the prosecutors selected.  Obviously,

12   Mr. Hecker can inquire about the witness' work, his knowledge,

13   the accuracy of the chart, but to go further, as Mr. Hecker did

14   and to expressly invite the jury to conclude that the

15   prosecution team did something wrong or that we committed an

16   act of fraud, is both outrageous and also not proper as a

17   matter of law.

18         MR. HECKER:  First thing, I take issue with the

19   explicit suggestion that what I am trying to do is delay things

20   or try to buy time for our expert.

21         THE COURT:  Yeah, I put credit on that, frankly.

22         MR. HECKER:  I am exploring this issue which was

23   created by strategic decision that the government made here,

24   and I think we all understand the significant risk of

25   misleading a jury by putting up a witness who knows nothing

NAK5phi3                         Salemme - Cross

1    about the case who is difficult to cross-examine although I

2    think that we are effectively making some points.  If the

3    government is sensitive in particular about its own conduct I

4    understand why, but my point is going to focus on evidence

5    that's in the record that this witness either saw and chose not

6    to put on the chart or didn't ask be put on the chart or that

7    wasn't given to him because of strategic decisions that were

8    made by the government.  It is a focus on the evidence in this

9    case, it is not focused on the government's conduct, per se.

10   It is about the choices they are making about what evidence to

11   put in front of the jury and which to highlight in this

12   demonstrative which we submit is extremely misleading.

13            I will stop there.

14            THE COURT:  I think it is proper cross-examination.

15   My concern would be if there wasn't a basis for Mr. Hecker

16   asking about things that were omitted and I sustained the

17   objections when the questions were framed in the form of "Would

18   you agree with me when I said the following" because those

19   questions do have Mr. Hecker testifying.  It is proper, given

20   what was presented to the jury for Mr. Hecker to say -- to

21   establish two propositions; one is that the witness did not

22   exercise any independent judgment and that the judgment was

23   exercised by a party that has a stake in the outcome of this

24   case regardless of what justice may have said about the

25   government's interest being in the right outcome rather than a

NAK5phi3                        Salemme - Cross

1    victory.  I think it is fair for Mr. Hecker to point out that

2    judgments were made not by this witness but by a party with a

3    stake.  Number two, I think it is fair to point out the holes.

4          So, you have got my ruling.

5          MR. HECKER:  Thank you, your Honor.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2   BY MR. HECKER:

3   Q.  Mr. Salemme, we were focused on the boxes on Government

4   Exhibit 650 relating to the timeline entries December 18 and

5   December 20 but where there is no box for December 19.  Do you

6   recall that?

7   A.  Yes.

8   Q.  With respect to other evidence that's in the record

9   relating to what occurred on December 18, I would ask that at

10  this time we publish Government Exhibit 408.

11          Are you familiar with Bloomberg chats?

12  A.  Yes.

13  Q.  This is a Bloomberg chat from December 18, the same day as

14  the first couple boxes on your -- on the government's

15  demonstrative slide.  Did you review this chat in connection

16  with preparation of Government Exhibit 650?

17  A.  I will have to refresh my memory if I have seen this one

18  before.

19  Q.  Why don't we scroll down to the second page and ask you to

20  just review it to yourself.  My first question is really going

21  to be whether this was shown to you at all.  You can keep

22  scrolling if you have had a chance to read that.

23  A.  I am almost done.  OK.

24  Q.  If we can now scroll to 12/18/2017, 14:15:59, and just the

25  whole bottom of the page, if we could pull that out.

1          Did you review this as part of your work in preparing

2     the timeline reflected in Government Exhibit 650?

3     A.  I'm not sure a hundred percent if I have seen this before

4     but I could check my e-mail if I have received it before.

5     Q.  Mr. White, I apologize.  Can you also capture -- there you

6     go.

7          Do you agree with me that at 14:15:59 UTC Phillip

8     Costa posts:  Mpumalanga delegates are said to be urged to back

9     Ramaphosa.

10         Do you see that?

11         And then it says:  Hit BBG now.

12         Do you see that?

13    A.  I see that.

14    Q.  Do you agree that is a reference to that news hitting

15    Bloomberg now?

16    A.  I don't know if hit BBG now means -- I don't know exactly

17    what that means.  That could mean hit the Bloomberg terminal or

18    something.  I'm not sure what it means.

19    Q.  Do you see in response Mr. Phillips said:  But ioots over

20    five hours ago.

21         And then the next one said:  It's done.

22         And then it says:  CR by a lot.

23         Then it says:  Recounting fourth time as DP too close.

24    Right?

25    A.  I see it says that.

1  Q.  Now, in this you agree with me Mr. Phillips is saying Cyril

2  Ramaphosa by a lot; yes?

3  A.  I don't know exactly what he is referring to.  Cyril

4  Ramaphosa is "CR" but I am not sure exactly what this is

5  referring to.

6  Q.  But we know this is on the 18th and on the 19th based on

7  what we reviewed a moment ago, there was discussion by

8  Mr. Phillips about a recount and forensic evaluation because of

9  ballots being stolen; right?

10  A.  Yes, I do remember those chats that we just went over.

11  Q.  Now, at the 17:25:12 mark do you see it say:  12.52 low

12  print in ZAR Nomura.

13          Do you see that?

14  A.  I see that.

15  Q.  Do you, as someone with experience in this industry, do you

16  agree that that is a statement that the dollar ZAR traded at

17  12.52 on December 18?

18  A.  I agree that's what it says, yeah.

19  Q.  You are not aware with any trading conducted by Glen Point

20  on December 18th, when the dollar ZAR traded all the way down

21  to 12.52; are you?

22  A.  I'm not aware of the trading, I just -- I am aware that

23  says 12:52 low print in ZAR Nomura.

24  Q.  You weren't informed, in preparing for your testimony, that

25  the dollar ZAR priced all the way down to 12.52 on December

NAK5phi3                        Salemme - Cross

1    18th, and that there was no trading by Glen Point or

2    Mr. Phillips relating to that move in the dollar Rand?

3    A.  Could you repeat the question?  Which trading are you

4    specifically asking about?

5    Q.  Any trading done by Glen Point in dollar ZAR.

6    A.  I am aware they made trades in dollar ZAR.  Which date are

7    you asking about?

8    Q.  December 18.

9    A.  December 18.  I did not review all of the trades on the

10   18th.

11   Q.  Would you agree with me that the fact that the dollar ZAR

12   traded all the way down to 12.52 on December 18, would be

13   important information if you are trying to understand the

14   connection between the 2017 ANC election and the OT Option

15   Timeline?

16   A.  I don't know exactly how those two things are related.

17   Q.  In the title of the slide.

18   A.  Yeah.  I don't understand exactly how the election would

19   affect the exchange rate.

20   Q.  It seems like we are reviewing a lot of evidence that

21   suggests that the news relating to the election was being

22   monitored by Glen Point and had some relevance to the price of

23   the dollar Rand.  Can we agree that that's the nature of the

24   evidence we are looking at?

25           MR. THOMAS:  Objection, your Honor.

1     THE COURT:  Sustained.

2   Q.  If we can go back to Government Exhibit 650 for a moment?

3   I just want to tie your prior testimony to this slide.  The

4   entry on December 18 in which Fayman writes something to the

5   Glen Point macro distribution list, we agree you never spoke to

6   Mr. Fayman, right?

7   A.  No, I never did.

8   Q.  So you have no idea what his understanding was or what he

9   was trying to say in connection with the middle box in this

10  chart?

11  A.  No.

12  Q.  Would you want to know what he, himself, would say about

13  that?

14     MR. THOMAS:  Objection, your Honor.

15     THE COURT:  Sustained.

16  Q.  And if I could go to the next box which references two

17  different government exhibits and includes just a snippet, the

18  one with:  Drax is on the 2nd of Jan.

19     Do you see that?

20  A.  I see that box, yes.

21  Q.  Do you know what that is a reference to?

22  A.  Not a hundred percent for sure.  I did review JPM confirm

23  that had an expiration on the 2nd of January.

24  Q.  Do you believe that the Jan 2nd date on the confirm is a

25  reference to the OT option that is in the title of the slide?

1  A.  The confirm is for an OT option but I can't -- I don't a

2  hundred percent know if this is -- they're talking about the

3  same thing.

4  Q.  And you don't know who Drax is?

5  A.  I do not know who Drax is.

6  Q.  The next box, on December 20th, includes the statement,

7  Phillips tells Costa:  I need you to start fucking around in

8  dollar/Rand tonight.

9        Do you see that?

10 A.  Yes, I see that.

11 Q.  You have no idea what that means, right?

12 A.  No.

13 Q.  You do know, don't you, that there was no trading by

14 Glen Point on December 20th?

15 A.  I don't know the trading specifically on December 20th.  I

16 don't know the details of that trading.

17 Q.  You don't know that it happened, right?

18 A.  I don't know if it happened or not.

19 Q.  You haven't seen any evidence that it did happen, right?

20 A.  No, not on the 20th.

21 Q.  If there had been trading on the 20th, would you think it

22 would be relevant to the box on the far right about a

23 discussion about trading in the Rand?

24 A.  Again, I don't know what would be completely relevant or

25 not.

NAK5phi3                          Salemme - Cross

1    Q.  And I think you testified earlier that you have heard some

2    South African slang but you don't have an independent

3    understanding of what it might mean, right?

4    A.  No, I don't have an independent understanding of South

5    African slang.

6    Q.  You don't know what "lash" means?

7    A.  I don't have a complete understanding.  I know in soccer

8    matches sometimes they will say give it a lash, like give it a

9    try if someone takes a wild shot from the 20 yard line or

10   something.

11   Q.  Right.  That's just from the soccer context?

12   A.  Yes.  I don't know exactly what it means in this context.

13   Q.  You have not heard it in the trading context?

14   A.  I have not heard it personally in the trading context.

15   Q.  And you agree with me it is possible if someone were to

16   listen to the actual call that they might have a different

17   interpretation of what was said on the call including because

18   this one, in particular, is actually hard to decipher?

19   A.  I agree that what -- that I heard:  Let's then go just

20   fucking lashes through 50 tonight.  I agree that's what it

21   said, what I listened to.

22   Q.  That wasn't my question.  I said that one was particularly

23   hard to understand.  There were a lot of distortions, you spoke

24   earlier about the sound quality not always being great.  That

25   was one of the calls that has that, correct?

1   A.  I don't remember which call specifically had voiceovers or

2   unintelligibles, or not.

3   Q.  OK.

4   A.  But we can look at the transcript if --

5   Q.  Well, the transcript actually is not evidence.

6   A.  Or listen to the audio.

7   Q.  I want to go to the next page of your timeline.  You

8   have -- the first page ended at -- do you know if anything

9   happened on December 21st of relevance to this case?

10  A.  I do not know.

11  Q.  What about December 22nd?

12  A.  I don't know what else happened other than these

13  conversations.

14  Q.  And you don't know if these conversations are actually

15  relevant either, do you?  You just took the ones the government

16  gave you to put on the slide and tried to make sure that what

17  is written here is what is in the underlying documents; right?

18  A.  Correct.

19  Q.  And if there are things missing that aren't included, you

20  won't know why they were missing or not included; right?

21  A.  Correct.

22  Q.  In the middle of this page there is one box for Saturday,

23  December 23rd to Monday December 25th, and it says Weekend and

24  Christmas holiday.

25          Do you see that?

1    A.   Yes.

2    Q.   Anything happen that weekend that might be relevant to the

3    jury's understanding of the relationship between the ANC

4    election and the OT Option Timeline to your knowledge, sir?

5    A.   I'm not sure if anything happened.

6    Q.   Were you provided any documents that spoke about

7    developments in the ANC election over that holiday weekend by

8    the government?

9    A.   No, I was not.

10   Q.   Did you ask them whether anything happened between December

11   22nd and December 26th that might be of interest to this jury?

12   A.   I did not.

13   Q.   I'm going to show you what's in evidence as Defendant's

14   Exhibit 511 and we will start just on the -- well, no, show the

15   whole page.

16          Sir, will you agree with me that this document is

17   dated December 23rd, 2017?

18   A.   Yes, I agree.

19   Q.   And the subject is:  SA weekend read ST on Zumxit.

20   A.   Yes, I agree that's what it says.

21   Q.   Do you agree with me that Zumxit is relating to Jacob Zuma,

22   the then president of South Africa?

23   A.   I don't know that for sure.

24   Q.   Would it surprise you that Zumxit related to the question

25   of whether Jacob Zuma was going to leave office or not?

1    A.  It would not surprise me.  Z-U-M are the first three

2    letters of his name.

3                 (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAKGphi4                        Salemme - Cross

1   BY MR. HECKER:

2   Q.  And if we read the beginning of this email, it says,

3   Article via link and below from Sunday Times.

4               Do you see that?

5   A.  I see that.

6   Q.  And it says, Yes, out today given Christmas on zumexit

7   logistics through January in line with my thinking.

8               Do you see that?

9   A.  I see that text, yes.

10  Q.  And this was sent by Peter Montalto at Nomura; correct?

11  A.  Yeah, now that it's been boxed out, I see that, it's

12  from --

13  Q.  Is that a research analyst's name that is familiar to you?

14  A.  It is not familiar.  I don't know who that is.

15  Q.  This section says, My baseline is zumexit occurs more at

16  end of Jan NEC legkotla just before state of the nation, but is

17  risk of delay.

18              Do you see that?

19  A.  I see that text, yes.

20  Q.  So this is relating to the question of when zumexit occurs;

21  correct?

22  A.  Yeah, they're talking about when it occurs.

23  Q.  And this analyst is predicting that it will happen more at

24  end Jan.

25              Do you see that?

 1   A.  I see end Jan, yes.

 2   Q.  Before state of nation, but is risk of delay.

 3           Do you see that?

 4   A.  I see that text, yes.

 5   Q.  And then next sentence says, It will be a complex process

 6   involving NEC deals.

 7           Do you see that?

 8   A.  I see that text, yes.

 9   Q.  Do you know what the NEC is?

10   A.  I remember it being the acronym, but I don't remember what

11   it is.  I could refresh, though.

12   Q.  It relates to a committee that's responsible for running

13   the party, do you know that?

14   A.  I don't know that.

15   Q.  If we go to the next section below this, ANC and secret

16   talks on early Jacob Zuma exit.

17           Do you see that?

18   A.  I see that text, yes.

19   Q.  It appears the article relates to secret discussions that

20   are getting reported at this time about an early Jacob Zuma

21   exit, yes?

22   A.  I don't know what the exact article is about.  But I agree

23   that the title is what you said it is, but...

24   Q.  And it says, Defiance of party on state inquiry adds fuel

25   to push for managed departure.

1              Do you see that?

2   A.  I see the text, yes.

3   Q.  And the report says that the Sunday Times has learnt that

4   secret meetings are planned after Christmas to discuss ways to

5   manage Jacob Zuma's exit.

6              Do you see that?

7   A.  I see the text, yes.

8   Q.  And the next sentence says that senior ANC leaders are

9   engaged in urgent secret talks to negotiate an exit for

10  President Jacob Zuma, possibly as early as next month.

11             Do you see that?

12  A.  Yes, I see that.

13             MR. HECKER:  Next page, please, at the top.

14  Q.  With Cyril Ramaphosa having been elected ANC president this

15  week, concerns are growing among people close to Zuma that

16  there will be immediate attempts to recall him.

17             Do you see that?

18  A.  I see the sentence, yes.

19  Q.  And the next paragraph says, Tomorrow, Anglican Church

20  Archbishop Thabo Makgoba is expected to exert pressure on

21  Ramaphosa to force Zuma out.

22             Do you see that?

23  A.  I see the text, yes.

24  Q.  Do you know what the Anglican Church is?

25  A.  No.

1   Q.  Are you aware that it is a significant player in South

2   African politics?

3   A.  I am not aware of that, no.

4   Q.  Are you aware that this article is connecting an expected

5   speech to exert pressure to force Zuma out?

6   A.  I don't know about a speech.  I don't see the word speech

7   in there.  I see exert pressure and then a Christmas sermon,

8   but I don't know about a speech.

9   Q.  I guess I was conflating a sermon with a speech, and I

10  could understand why that might cause some confusion.

11          But is a sermon a form of a speech or an address?

12  A.  Yes, a sermon is someone talking and a speech is someone

13  talking.

14  Q.  And it was going to happen on Christmas, might that be

15  Christmas Eve?

16  A.  Or Christmas Day, I'm not sure which.

17  Q.  Seems to be a suggestion in this news article that that

18  sermon on either Christmas Eve or Christmas Day might be

19  relevant to when zumexit occurs; is that a fair interpretation,

20  sir?

21          MR. THOMAS:  Objection, your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  I agree that the -- that it says

24  insiders say Makgoba would use his Christmas sermon to call on

25  the National Executive Committee backed by the party's MPs to

1    act boldly and quickly to remove Zuma, I agree that text is

2    there.

3    Q.  And an investment banking analyst at Nomura was sending

4    this around to Glen Point; right?

5    A.  Yes.

6    Q.  And this was the 22nd, right before the Christmas weekend,

7    even though the date of the article that is cited is the 23rd;

8    is that correct?  And if we pull back, you can look at that.

9          MR. HECKER:  Go back one page.

10   Q.  So let me just try that again.  The date of the Bloomberg

11   says Saturday, 12/23?

12   A.  Yeah.

13   Q.  This was sent on the 23rd, yes?

14   A.  Yes, I agree.

15         MR. HECKER:  Now, go back to government demonstrative

16   650, second page.

17   Q.  If this were relevant to the jury's consideration of the

18   issues in this case, it would go in that middle box that covers

19   that three-day period, weekend and Christmas holiday, yes?

20   A.  It occurred in that time frame.

21   Q.  The 23rd?

22   A.  It occurred on the 23rd, yes.

23   Q.  So if you were doing the job that you were asked to do here

24   of putting into the timeline information that was relevant to

25   the 2017 ANC election and OT option timeline and you determined

1  that it was relevant, you would put it in this box, yes?

2  A.  I wasn't asked to determine what was relevant or not.

3  Q.  Let me try it differently.

4        If the government had given you this and said, add it

5  to your timeline, can we agree it would go in that middle box?

6  A.  Yeah, it would -- it happened on Saturday, December 23rd,

7  so it would be in a box labeled Saturday, December 23rd.

8  Q.  But the government didn't give this to you?

9  A.  No, I didn't see this one.

10        MR. HECKER:  Can we show this witness defense

11  Exhibit 811.

12        Your Honor, we would ask to publish this to the jury.

13  It is not yet in evidence, but it's not being offered for the

14  truth at this time.  It's offered for impeachment.

15        THE COURT:  No.  You can read it, you can tell them

16  what --

17        MR. HECKER:  Fair enough.

18        THE COURT:  You can't publish it to the jury.

19  BY MR. HECKER:

20  Q.  Sir, are you aware that, on December 24th, there were news

21  reports that South Africa's ruling ANC was going to ask Zuma to

22  step down that day?

23  A.  I was not aware of this.

24  Q.  Were you aware that this report was that ruling party's

25  leaders have been discussing a conflict free exit for Zuma

1    after his term of president came to an end with Deputy

2    President Cyril Ramaphosa taking the helm?

3    A.   I was not aware of these discussions.

4    Q.   If you were aware of them and this information had been

5    provided to you as something to put on your chart --

6            MR. HECKER:   Let's pull back up the chart.

7    Q.   -- can we agree that that too would go in the box in the

8    middle that covers a three-day period, since I'm representing

9    that that happened on the 24th of December?

10   A.   Yes, that's where it would go in the timeline.

11   Q.   You saw reference in Defendant's Exhibit 511, which was in

12   evidence, to a Christmas sermon, yes?

13   A.   That's the document we just looked at?

14   Q.   Yes.

15   A.   Yes, the Christmas sermon, there was reference to that.

16   Q.   Sir, are you aware that, in fact, there was a Christmas

17   sermon that was published on December 24th, Christmas Eve that

18   included an explicit call for Zuma to step down and allow --

19           MR. THOMAS:   Objection.

20   Q.   -- a transition of power?

21           THE COURT:   Overruled.

22   A.   I'm not aware of the sermon being published.

23   Q.   If it had been provided to you as a document that was

24   relevant to the question of when Jacob Zuma would exit, would

25   it have gone in the middle box of Government Exhibit 650, since

NAKGphi4                        Salemme - Cross

1   that occurred on Christmas Eve, December 24?

2   A.  Yes, it would go there in the timeline.

3           MR. HECKER:  At this time, I'd like to show the

4   witness what's in evidence as defense Exhibit 653.

5   Q.  Sir, is this a document, a chat that you reviewed that's

6   dated December 26th, 2017?

7   A.  I have not seen this before.

8           MR. HECKER:  Can we turn to the second page, pull up

9   lines 11:43:04 and the next line.

10  Q.  This is PCosta, My feel is we go lower this afternoon but

11  who knows.

12          Do you see that?

13  A.  I see that text.

14  Q.  You see, NCroix -- do you know who Mr. Croix is?

15  A.  No.

16  Q.  Are you aware that he's a research analyst at Glen Point?

17  A.  I am not aware of that.

18  Q.  He responds, Yeah makes sense after any remaining hedges

19  taken off associated with the 12.50 barriers considering the

20  good news over the weekend with zumexit on the horizon.

21          Do you see that?

22  A.  I see that text.

23  Q.  You see that is a reference to the good news over the

24  weekend with zumexit, yes?

25  A.  I see that's what it says.  I don't know if that's exactly

1    the good news.

2    Q.  You don't know what the good news is?

3    A.  No.

4    Q.  Might be that sermon that called for Zuma to step down on

5    the topic of zumexit; is that a reasonable inference?

6            MR. THOMAS:  Objection, call for speculation.

7            THE COURT:  Sustained.

8    BY MR. HECKER:

9    Q.  Sir, if there was good news over the weekend of Christmas

10   and the government had given you that information to put on

11   your chart --

12           MR. HECKER:  Can we go back to Government Exhibit 650,

13   second page, middle box.

14   Q.  -- it would have gone there; right?

15   A.  If it was on the 25th.

16   Q.  Over the weekend, the 23rd, 4th or 5th; right?

17   A.  Yeah, but I wouldn't be able to say what good news that was

18   or what that means in overall context.

19   Q.  The government would have to decide that that was something

20   that you should put on your chart in order to make this chart

21   not misleading to the jury for you to have included this on the

22   chart, yes?

23   A.  Again, I don't know about what would make it misleading or

24   not, but --

25   Q.  Right.  If they had given it to you, it would have gone in

1    the middle box, yes?

2    A.  Yes.

3    Q.  So we have now reviewed a number of both exhibits and facts

4    that occurred over that weekend that aren't in this

5    demonstrative.

6            Can we agree on that?

7    A.  Correct.

8    Q.  If those facts are material to the jury's consideration,

9    would you agree with me that they ought to be in that box?

10           MR. THOMAS:  Objection, your Honor.

11           THE COURT:  Sustained.

12           MR. HECKER:  One moment, your Honor.

13           (Conferring)

14           MR. HECKER:  I don't have further questions at this

15    time.

16           THE COURT:  Any redirect?

17           MR. THOMAS:  Yes, your Honor.

18    REDIRECT EXAMINATION

19    BY MR. THOMAS:

20    Q.  Good afternoon, Special Agent Salemme.

21    A.  Good afternoon.

22    Q.  How many times have you testified in court before?

23    A.  One other time.

24    Q.  How long have you been at the FBI?

25    A.  Two and a half years.