UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

                                                   :

UNITED STATES OF AMERICA

                                                   :

            - v. -

                                                   :     S1 23 Cr. 430 (KPF)

ROMAN STORM,

                                                   :

                         Defendant.

                                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

# THE GOVERNMENT'S MOTIONS *IN LIMINE*

JAY CLAYTON
United States Attorney
Southern District of New York

Ben Arad
Benjamin A. Gianforti
Thane Rehn
Assistant United States Attorneys

Kevin Mosley
Special Assistant United States Attorney
     *- Of Counsel -*

i

# TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................................ 1

ARGUMENT .................................................................................................................... 3

I.   Statements of the Defendant's Co-conspirators and Agents Are Not Barred by the Rule Against Hearsay .......................................................................................................... 3

A. Applicable Law ...................................................................................................... 3

B. Discussion .............................................................................................................. 6

1.   Statements by the Other Tornado Cash Founders Are Not Hearsay ...................... 6

2.   Statements by Tornado Cash Developers and Marketers Are Not Hearsay ............ 8

II.  The Defendant's Own Statements May Be Offered by the Government but Not the Defendant, Subject to the Rule of Completeness .................................................... 9

III. The Court Should Permit the Authentication of Certain Records Under Rules 902(11), (13), and (14) ........................................................................................................ 12

A. Certain Third-Party Business Records May Be Authenticated under Rule 902(11) ....... 13

B. Screenshots from the Wayback Machine May Be Authenticated Under Rules 902(13) and (14) ..................................................................................................... 15

C. Records from Publicly Available Blockchains May Be Authenticated Under Rules 902(11) and (13) ................................................................................................. 17

IV. Witness Testimony and Corroborating Evidence Authenticate the Contents of a Cellphone Seized from Alexey Pertsev .................................................................... 20

A. Background ......................................................................................................... 20

B. The Pertsev Telegram Chats Are Authenticated by Witness Testimony and Corroborating Information from Other Sources .................................................... 20

1.   Applicable Law ................................................................................................... 20

2.   Discussion ......................................................................................................... 21

C. Special Agent Dickerman's Testimony and Accompanying Exhibits Comport with the Confrontation Clause .................................................................................... 23

1.   Applicable Law ................................................................................................... 23

2.   Discussion ......................................................................................................... 24

V.  Certain Evidence is Admissible as Direct Evidence and Pursuant to Rule 404(b) ................. 26

A. Applicable Law ...................................................................................................... 26

1.   Other Acts Evidence as Intrinsic or Direct Proof ................................................ 26

2.   Other Acts Evidence Pursuant to Rule 404(b) .................................................... 28

3.   Rule 403 and Evidence of Other Bad Acts ........................................................ 29

i

B. Discussion ........................................................................................... 30

    1.   Evidence of the Defendant's Profits from the Tornado Cash Service Is Admissible ............................................................................................. 30

    2.   Evidence of the Defendant's False Statements to a Financial Services Company Through Which the Defendant Paid for Aspects of the Tornado Cash Service Is Admissible ............................................................................................. 32

    3.   Evidence of the Defendant's Efforts to Keep the Tornado Cash Service Operating After the Imposition of OFAC Sanctions Is Admissible ....................................... 35

VI. The Defendant's Paltry Advice-of-Counsel Disclosures Violate the Court's March 3, 2025 Order and Any Advice-of-Counsel Defense or Reference to the Presence of Counsel Should Be Precluded Without Further Disclosures ................................................ 37

    1.   Background ........................................................................................... 37

    2.   Applicable Law .................................................................................... 39

    3.   Discussion ........................................................................................... 40

VII. The Court Should Preclude the Defendant from Introducing Evidence and Arguments That Are Irrelevant and Unfairly Prejudicial ............................................................... 43

A. The Court Should Preclude Evidence and Claims That Victims Were Negligent In Being Defrauded or Hacked ........................................................................... 43

    1.   Applicable Law .................................................................................... 43

    2.   Discussion ........................................................................................... 44

B. The Court Should Preclude Evidence Regarding Purportedly Lawful Uses of the Tornado Cash Service ..................................................................................... 45

    1.   Applicable Law .................................................................................... 45

    2.   Discussion ........................................................................................... 47

C. The Court Should Preclude the Defendant from Making Arguments Aimed at Jury Nullification, Including That His Charged Conduct Was Protected by Free Speech and Privacy Rights ....................................................................................... 48

D. The Court Should Exclude Evidence And Other Argument Concerning Other Cryptocurrency Mixing Services That Have Laundered Stolen Funds ........................... 49

E. The Court Should Exclude Evidence and Argument Concerning Hypothetical Other Means By Which the Lazarus Group Could Have Accessed the Tornado Cash Pools ... 51

F. The Court Should Exclude Evidence and Argument Relating to Cryptocurrency Regulations or Policy, or Opinions From Witnesses on These Issues ........................... 52

G. The Court Should Preclude Evidence Concerning the Defendant's Personal Background, Any Other Personal Factor Unconnected to Guilt, or Discussion of Potential Punishment or Collateral Consequences from a Potential Conviction ........... 54

H. The Court Should Preclude Evidence Concerning the Defendant's Failed Attempt to

Cooperate ............................................................................................ 56

    1.    Applicable Law ................................................................... 57

    2.    Discussion .......................................................................... 58

I.  The Court Should Preclude Evidence Concerning the Fifth Circuit's *Van Loon* Decision or Any Evidence or Argument Regarding the Legality of OFAC's Sanctions on the Tornado Cash Service ........................................ 59

CONCLUSION ............................................................................................ 61

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abu Dhabi Comm. Bank v. Morgan Stanley & Co.,*
    2013 WL 1155420 (S.D.N.Y. Mar. 20, 2013) ................................................................. 54

*Arlio v. Lively,*
    474 F.3d 46 (2d Cir. 2007) ................................................................................................. 51

*Bourjaily v. United States,*
    483 U.S. 171 (1987) ............................................................................................................. 4

*Bullcoming v. New Mexico,*
    564 U.S. 647 (2011) ...................................................................................................... 23, 24

*Costantino v. Herzog,*
    203 F.3d 164 (2d Cir. 2000) ......................................................................................... 28-29

*Feis v. United States,*
    394 F. App'x 797 (2d Cir. 2010) ........................................................................................ 4

*Foster v. Lee,*
    93 F.Supp.3d 223 (S.D.N.Y. 2015) .................................................................................. 16

*George v. Celotex Corp.,*
    914 F.2d 26 (2d Cir. 1990) ................................................................................................. 3

*In re Initial Pub. Offering Sec. Litig.,*
    174 F. Supp. 2d 61 (S.D.N.Y. 2001) ................................................................................ 54

*In re Reserve Fund Sec. Litig.,*
    2012 WL 12354233 (S.D.N.Y. Oct. 3, 2012) ..................................................................... 8

*In re United States,*
    945 F.3d 616 (2d Cir. 2019) ............................................................................................. 49

*Klayman v. Judicial Watch, Inc.,*
    299 F. Supp. 3d 141 (D.D.C. 2018) ................................................................................. 16

*Masters v. UHS of Delaware, Inc.,*
    2008 WL 5600714 (E.D. Mo., October 21, 2008) ........................................................... 16

*Melendez-Diaz v. Massachusetts,*
    557 U.S. 305 (2009) .......................................................................................................... 25

*Pappas v. Middle Earth Condo. Ass'n,*
    963 F.2d 534 (2d Cir. 1992) ............................................................................................... 4

*Parker v. Randolph,*
    442 U.S. 62 (1979) ............................................................................................................ 30

*Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*,
   38 F.3d 627 (2d Cir. 1994) ................................................................... 14

*S.E.C. v. Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................................... 39

*Samia v. United States*,
   143 S. Ct. 2004 (2023) ........................................................................... 23

*SEC v. Coinbase, Inc.*,
   726 F. Supp. 3d 260 (S.D.N.Y. 2024) ................................................... 18

*Shannon v. United States*,
   512 U.S. 573 (1994) ............................................................................... 57

*Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*,
   2004 WL 2367740 (N.D. Ill. Oct. 15, 2004) ......................................... 16

*United Sates v. Terry*,
   702 F.2d 299 (2d Cir. 1983) .................................................................. 11

*United States v. Adelekan*,
   567 F. Supp. 3d 459 (S.D.N.Y. 2021) ................................................... 44

*United States v. Al Kassar*,
   660 F.3d 108 (2d Cir. 2011) .................................................................. 49

*United States v. Amico*,
   486 F.3d 764 (2d Cir. 2007) .................................................................. 44

*United States v. Arce*,
   49 F.4th 382 (4th Cir. 2022) ................................................................. 24

*United States v. Atilla*,
   966 F.3d 118 (2d Cir. 2020) ........................................................... 35, 52

*United States v. Ayelotan*,
   917 F.3d 394 (5th Cir. 2019)(A) ........................................................... 13

*United States v. Bailey*,
   444 U.S. 394 (1980) ............................................................................... 44

*United States v. Bakhtiari*,
   913 F.2d 1053 (2d Cir. 1990) ................................................................ 43

*United States v. Banki*,
   685 F.3d 99 (2d Cir. 2012) .................................................................... 32

*United States v. Bankman-Fried*,
   2023 WL 6283509 (S.D.N.Y. Sept. 26, 2023) ................................. 53-54

*United States v. Bankman-Fried*,

2024 WL 477043 (S.D.N.Y. Feb. 7, 2024) ................................................................ 40, 41

*United States v. Battaglia,*
   2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) .......................................................... 55

*United States v. Biaggi*,
   909 F.2d 662 (2d Cir. 1990) ................................................................................. 58

*United States v. Bondars,*
   2018 WL 9755074 (E.D. Va. Aug. 20, 2018) ....................................................... 17

*United States v. Bout,*
   651 F. App'x 62 (2d Cir. 2016) ............................................................................ 20

*United States v. Cheung Kin Ping,*
   555 F.2d 1069 (2d Cir. 1977) ............................................................................... 53

*United States v. Cirillo,*
   468 F.2d 1233 (2d Cir. 1972) ............................................................................... 30

*United States v. Connolly,*
   2018 WL 2411216 (S.D.N.Y. May 15, 2018) ................................................. 59, 60

*United States v. Connolly,*
   2019 WL 2125044 (S.D.N.Y. May 2, 2019) ......................................................... 50

*United States v. Coonan,*
   938 F.2d 1553 (2d Cir. 1991) ............................................................................... 27

*United States v. Curley,*
   639 F.3d 50 (2d Cir. 2011) ................................................................................... 28

*United States v. Damti,*
   109 F. App'x 454–56 (2d Cir. 2004) ........................................................ 47, 47, 48

*United States v. Davidson,*
   308 F. Supp. 2d 461 (S.D.N.Y. 2004) ................................................................. 10

*United States v. Dorrell,*
   758 F.2d 427 (9th Cir. 1985) ............................................................................... 12

*United States v. Dupree,*
   706 F.3d 131 (2d Cir. 2013) ................................................................................... 3

*United States v. Dupree,*
   870 F.3d 62 (2d Cir. 2017) ..................................................................................... 5

*United States v. Edwards*,
   101 F.3d 17 (2d Cir. 1996) ................................................................................... 56

*United States v. Ellisor,*
   522 F.3d 1255 (11th Cir. 2008) ........................................................................... 46

*United States v. Figueroa*,
   618 F.2d 934 (2d Cir. 1980) ............................................................. 29

*United States v. Gasperini*,
   894 F.3d 482 (2d Cir. 2018) ............................................................. 16

*United States v. Gigante*,
   166 F.3d 75 (2d Cir. 1999) ................................................................ 4

*United States v. Glover*,
   101 F.3d 1183 (7th Cir. 1996) .......................................................... 11

*United States v. Goffer*,
   531 F. App'x 8–22 (2d Cir. 2013) ..................................................... 59

*United States v. Golfo*,
   2020 WL 2513445 (E.D.N.Y. May 15, 2020) .................................... 48

*United States v. Gonzalez*,
   110 F.3d 936 (2d Cir. 1997) ........................................................ 27-28

*United States v. Gonzalez*,
   399 Fed. App'x 641 (2d Cir. 2010) ................................................... 11

*United States v. Gupta*,
   747 F.3d 111 (2d Cir. 2014) .............................................................. 4

*United States v. Halak*,
   78 F. App'x 758 (2d Cir. 2003) ....................................................... 27

*United States v. Harris*,
   491 F.3d 440 (D.C. Cir. 2007) ........................................................ 55

*United States v. Hatfield*,
   685 F. Supp. 2d 320 (E.D.N.Y. 2010) ............................................. 33

*United States v. Hill*,
   63 F.4th 335 (5th Cir. 2023) ....................................................... 24, 25

*United States v. Hsu*,
   669 F.3d 112 (2d Cir. 2012) ............................................................ 27

*United States v. Inserra*,
   34 F.3d 83 (2d Cir. 1994) ............................................................... 27

*United States v. Jackson*,
   180 F.3d 55 (2d Cir. 1999) ......................................................... 10, 11

*United States v. Jean-Claude*,
   2022 WL 2334509 (S.D.N.Y. June 27, 2022) ............................... 24, 25

*United States v. Johnson*,

507 F.3d 793 (2d Cir. 2007) ................................................................................ 10, 11

*United States v. Josephberg*,
562 F.3d 478 (2d Cir. 2009) ................................................................................ 53

*United States v. Kwong*,
69 F.3d 663 (2d Cir. 1995) .................................................................................. 43

*United States v. Lange*,
834 F.3d 58 (2d Cir. 2016) .................................................................................. 12

*United States v. Liera-Morales*,
759 F.3d 1105 (9th Cir. 2014) ............................................................................ 12

*United States v. Livoti*,
196 F.3d 322 (2d Cir. 1999) ................................................................................ 29

*United States v. Loera*,
24 F.4th 144 (2d Cir. 2022) ................................................................................ 51

*United States v. Lumpkin*,
192 F.3d 280 (2d Cir. 1999) ................................................................................ 54

*United States v. Maldonado-Rivera*,
922 F.2d 934 (2d Cir. 1990) ................................................................................ 21

*United States v. Marin*,
669 F.2d 73 (2d Cir. 1982) .................................................................................. 10

*United States v. Mejia*,
2016 WL 6662265 (S.D.N.Y. Nov. 10, 2016) .................................................. 56, 57

*United States v. Mendlowitz*,
2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) .................................................. 50

*United States v. Mercado*,
573 F.3d 138 (2d Cir. 2009) ................................................................................ 27

*United States v. Miller*,
626 F.3d 682 (2d Cir. 2010) ................................................................................ 43

*United States v. Mizrahi*,
2024 WL 3824104 (S.D.N.Y. Aug. 15, 2024) .................................................. 35

*United States v. Moran-Toala*,
726 F.3d 334 (2d Cir. 2013) ................................................................................ 28

*United States v. Motovich*,
2024 WL 3303723 (E.D.N.Y. July 2, 2024) ...................................................... 32

*United States v. Nekritin*,
2011 WL 2462744 (E.D.N.Y. June 17, 2011) .................................................. 47-48

*United States v. Oldbear,*
  568 F.3d 814 (10th Cir. 2009) ................................................................................. 50

*United States v. O'Connor,*
  580 F.2d 38 (2d Cir. 1978) ...................................................................................... 29

*United States v. Paccione,*
  949 F.2d 1183 (2d Cir. 1991) .................................................................................. 55

*United States v. Padilla,*
  203 F.3d 156 (2d Cir. 2000) .................................................................................... 4

*United States v. Paul,*
  110 F.3d 869 (2d Cir. 1997) ................................................................................ 43-44

*United States v. Persico,*
  645 F.3d 85 (2d Cir. 2011) ...................................................................................... 5

*United States v. Persing,*
  436 F. App'x 13 (2d Cir. 2011) ............................................................................... 7

*United States v. Pitre,*
  960 F.2d 1112–19 (2d Cir. 1992) ........................................................................... 28

*United States v. Pluta,*
  176 F.3d 43 (2d Cir. 1999) ...................................................................................... 21

*United States v. Quinones,*
  511 F.3d 289 (2d Cir. 2007) .................................................................................... 27

*United States v. Reed,*
  639 F.2d 896 (2d Cir. 1981) .................................................................................... 29

*United States v. Rigas,*
  490 F.3d 208 (2d Cir. 2007) .................................................................................... 26

*United States v. Rivera,*
  22 F.3d 430 (2d Cir. 1994) ................................................................................... 5, 7

*United States v. Roldan-Zapata,*
  916 F.2d 795 (2d Cir. 1990) ............................................................................... 28, 29

*United States v. Rom,*
  528 F. App'x 24 (2d Cir. 2013) ............................................................................... 13

*United States v. Rossy,*
  2023 WL 8237055 (S.D.N.Y. Nov. 28, 2023) ....................................................... 46

*United States v. Russo,*
  302 F.3d 37 (2d Cir. 2002) ...................................................................................... 7

*United States v. Santos,*

201 F.3d 953 (7th Cir. 2000) ............................................................................ 47

*United States v. Scarpa,*
913 F.2d 993 (2d Cir. 1990) ............................................................................ 47

*United States v. Scott,*
677 F.3d 72 (2d Cir. 2012) ............................................................................. 28

*United States v. Scully,*
877 F.3d 464 (2d Cir. 2017) ............................................................................ 39

*United States v. Tarantino,*
846 F.2d 1384 (D.C. Cir. 1988) ........................................................................ 5

*United States v. Thomas,*
116 F.3d 606 (2d Cir. 1997) ....................................................................... 49, 51

*United States v. Thomas,*
377 F.3d 232 (2d Cir. 2004) ............................................................................ 44

*United States v. Thompson,*
359 F.3d 470 (7th Cir. 2004) ..................................................................... 29-30

*United States v. Tin Yat Chin,*
371 F.3d 31 (2d Cir. 2004) ............................................................................. 20

*United States v. Tussa,*
816 F.2d 58 (2d Cir. 1987) ............................................................................. 30

*United States v. Vallejos,*
742 F.3d 902 (9th Cir. 2014) ..................................................................... 11-12

*United States v. Walker,*
191 F.2d 326 (2d Cir. 1999) ............................................................................ 46

*United States v. Weaver,*
860 F.3d 90 (2d Cir. 2017) ............................................................................. 44

*United States v. Weigand,*
2021 WL 568173 (S.D.N.Y. Feb. 14, 2021) .......................................................... 13

*United States v. Williams,*
205 F.3d 23 (2d Cir. 2000) ........................................................................ 19, 28

*United States v. Wilson,*
201 F.3d 433 (2d Cir. 1999) ............................................................................ 59

*United States v. Winograd,*
656 F.2d 279 (7th Cir. 1981) ............................................................................ 46

*United States v. Yousef,*
327 F.3d 56 (2d Cir. 2003) ............................................................................. 10

x

*United States v. Zackson,*
 12 F.3d 1178 (2d Cir. 1993) .................................................................. 28

*Van Loon v. Dep't of the Treasury,*
 122 F.4th 549 (5th Cir. 2024) ............................................................... 60

*Williamson v. United States*,
 512 U.S. 594 (1994) ............................................................................... 5

## Statutes

18 U.S.C. § 1960 ............................................................................ 41, 42, 55

Fed. R. Civ. P. 23.1 ................................................................................. 53

Fed. R. Evid. 104 ..................................................................................... 4

Fed. R. Evid. 106 ............................................................................... 10, 11

Fed. R. Evid. 401 ................................................................ 27,  40, 45, 58, 60

Fed. R. Evid. 402. ......................................................................... 27, 28, 43

Fed. R. Evid. 403. ........................ 28, 29, 40, 43, 45, 48, 57, 58, 59, 60

Fed. R. Evid. 404 ........................................... 26, 27, 28, 29, 32, 35, 37

Fed. R. Evid. 801 ........................................................... 3, 4, 7, 8, 9-10

Fed. R. Evid. 802 ..................................................................................... 3

Fed. R. Evid. 803 ......................................................... 7, 12, 14, 18, 19

Fed. R. Evid. 804 ..................................................................................... 5

Fed. R. Evid. 901 ................................................................. 20,21, 26

Fed. R. Evid. 902 ...................................... 12, 13, 14, 15, 16, 17, 19

The Government respectfully submits these motions *in limine* in advance of the trial of defendant Roman Storm scheduled to begin on July 14, 2025.

## FACTUAL BACKGROUND

On November 15, 2024, a grand jury in this District returned a three-count superseding indictment charging the defendant with conspiracy to commit money laundering, conspiracy to operate an unlicensed money transmitting business, and conspiracy to violate United States sanctions relating to the Democratic People's Republic of Korea (the "DPRK" or "North Korea"). The charges arise out of the defendant's ownership, development, marketing, and operation of a cryptocurrency mixing service known as Tornado Cash (the "Tornado Cash service").[1]

The Tornado Cash service combined multiple unique features to execute anonymous financial transactions in various cryptocurrencies for its customers. Claiming to offer the Tornado Cash service as a "privacy" service, the defendant in fact knew that it was a haven for criminals to engage in large-scale money laundering and sanctions evasion. Indeed, as the defendant well knew, a substantial portion of the funds the Tornado Cash service processed were criminal proceeds that were passed through the Tornado Cash service for purposes of concealment. The defendant also knew that the Tornado Cash service received funds from, and provided services to, the Lazarus Group, a U.S.-sanctioned North Korean cybercrime organization, by receiving, transferring, and dealing in cryptocurrency from an Ethereum wallet that was publicly attributed to the Lazarus Group and designated as blocked property by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC").

---

[1] The Indictment charges two objects of the unlicensed money transmitting charge—that the business failed to register with FinCEN and that it knowingly transmitted criminal proceeds. The Government is only proceeding on the second of these charges.

The Government expects to call, among other witnesses, witnesses who participated in the operation of the Tornado Cash service, vendors who provided critical support for the Tornado Cash service, a cooperating witness who used the Tornado Cash service to launder proceeds of a fraudulent scheme, and victims of various criminal exploits whose stolen funds were laundered through the Tornado Cash service, including victims who directly contacted the defendant to notify him that the Tornado Cash service was being used to launder criminal proceeds and ask for his help.

The Government will also introduce extensive documentary evidence of the defendant's crimes, including text messages and email messages in which he coordinated and directed the operation of the Tornado Cash service, documents in which he received notice of and expressed his knowledge that he was facilitating large-scale money laundering and sanctions violations and continued to profit from these crimes, and financial and business records documenting his operation of the service and payment for certain features of it. In addition, the Government will introduce expert testimony, including the testimony of a special agent with the Federal Bureau of Investigation who has traced more than $1 billion in criminal proceeds into the Tornado Cash service during the charged time period, the testimony of a cryptocurrency and computer code expert who will explain how the Tornado Cash service operated and which features the defendant and his co-conspirators controlled and profited from, and the testimony of a special agent with the Internal Revenue Service-Criminal Investigation ("IRS-CI") who has traced millions of dollars of proceeds from the Tornado Cash service into purchases made by the defendant and cryptocurrency wallets controlled by the defendant.

**ARGUMENT**

I.    **Statements of the Defendant's Co-conspirators and Agents Are Not Barred by the Rule Against Hearsay**

At trial, the Government will seek to introduce for their truth out-of-court statements by the defendant's two Tornado Cash co-founders, Roman Semenov and Alexey Pertsev, as well as certain software developers, marketers, and others who worked for the three Tornado Cash founders. Such statements are not barred by the rule against hearsay.

**A. Applicable Law**

1. The Rule Against Hearsay

The Federal Rules of Evidence define hearsay as a declarant's out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is admissible only if it falls within an enumerated exception. Fed. R. Evid. 802. However, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) advisory committee's note. Thus, a statement offered to show its effect on the listener is not hearsay. *Id.*; *see also United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice."); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.").

2. Rule 801(d)(2)(D)

Federal Rule of Evidence 801(d)(2)(D) provides that "[a] statement is not hearsay if … the statement is offered against an opposing party and … was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." To admit a statement under

3

this rule, the court must find "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Feis v. United States*, 394 F. App'x 797, 799 (2d Cir. 2010) (quoting *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992)). As the Second Circuit has explained, "admissibility under this rule should be granted freely," and there is a "liberal" standard for admissibility rooted in the understanding that agents and employees are usually the people "best informed about certain acts committed in the course of [their] employment." *Pappas*, 963 F.2d at 537.

### 3.  Rule 801(d)(2)(E)

Federal Rule of Evidence 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if … the statement is offered against an opposing party and … was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: (1) that a conspiracy that included the defendant and the declarant existed; and (2) that the statement was made during the course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). When determining whether the predicate conspiracy has been established, the district court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181). "To be in 'furtherance' of a conspiracy, a statement must in some way

4

have been designed to promote or facilitate achievement of the goals of that conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Under this standard, a co-conspirator statement is admissible if it "can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

4. Rule 804(b)(3)

Federal Rule of Evidence Rule 804(b)(3) excepts from the hearsay rule a statement by an unavailable declarant that: "(A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability; and (B) is supported by corroborating circumstances that clearly indicate its trustworthiness." This rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

In evaluating whether a particular statement is admissible pursuant to Rule 804(b)(3), "the court conducts an adequately particularized analysis to determine whether a reasonable person in the declarant's shoes would have perceived the statement as detrimental to his or her own penal interest in light of all the surrounding circumstances." *Dupree*, 870 F.3d at 80. "A statement will satisfy [the Rule's] requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011).

B. **Discussion**

1. <u>Statements by the Other Tornado Cash Founders Are Not Hearsay</u>

The Government intends to offer into evidence documents, including text messages and emails, made contemporaneously with the conduct at issue in this trial by the defendant's two co-founders of the Tornado Cash service, Roman Semenov and Alexey Pertsev, in furtherance of the charged conspiracies. These materials are therefore not precluded by the rule against hearsay.

As an initial matter, the evidence at trial will readily show by a preponderance that the defendant conspired with Semenov and Pertsev to operate the Tornado Cash service, and that the operation of the Tornado Cash service during the charged time period was in furtherance of the conspiracies charged in the Indictment.[2] As alleged in the Indictment, the defendant, Semenov, and Pertsev jointly developed, marketed, and operated the Tornado Cash service. That allegation will be supported by abundant trial evidence, including, among other things: an investment presentation prepared by the defendant that identified himself, Semenov, and Pertsev as the "team" behind the Tornado Cash service; the defendant's various public statements identifying himself and the other two founders; documents identifying the three founders as the owners of the Tornado Cash service's code repositories, the website, the domain for the user interface, the bank account used to pay business expenses for the Tornado Cash service, and other aspects of the service; and dozens of emails and text messages in which the three founders communicate about their day-to-day operation of the Tornado Cash service.

The statements of Semenov and Pertsev that the Government will seek to admit are

---

[2] Pertsev has been convicted in Dutch court for money laundering as a result of his operation of the Tornado Cash service with the defendant and Semenov. The Government's understanding is that Pertsev's conviction is currently on appeal in the Dutch courts.

statements made in furtherance of the operation of the Tornado Cash service during the period in which the Tornado Cash service was being developed and operated in furtherance of the conspiracies charged in the Indictment, such as statements in which Semenov and Pertsev communicated with each other, with Storm, and with others about the fact that the service was being used to transmit and conceal the proceeds of various crimes, and about various business operations, such as plans to upgrade the service, ongoing performance issues with the service, and hiring and supervision of employees and contractors who worked for the service. Statements such as these are clearly "designed to promote or facilitate achievement of the goals of [the] conspiracy." *Rivera*, 22 F.3d at 436; *see also United States v. Persing*, 436 F. App'x 13, 19 (2d Cir. 2011) (affirming the trial court's conclusion that co-conspirator's notes, which were "designed to assist him in conducting his loan-shark business . . . were taken during the course of and in furtherance of that conspiracy"). Statements in which the co-founders acknowledge that the business is engaged in transactions in criminal proceeds are also admissible as statements against interest under Rule 804(b)(3).

To the extent the defense were to argue that the statements of his fellow Tornado Cash founders document legitimate business discussions as opposed to discussions designed to further a criminal scheme, that fact (which the Government disputes) would not undermine the admissibility of those materials under Rule 801(d)(2)(D), because the rule authorizes the admission of statements designed to further a joint venture with the defendant, whether or not the goal of that venture is criminal. *See United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002) ("the objective of

the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all.").[3]

        2.  <u>Statements by Tornado Cash Developers and Marketers Are Not Hearsay</u>

Statements made by individuals who were employed by the Tornado Cash service, such as software developers and marketers, as reflected in documents or as described during trial testimony, are statements of the defendant's agents under Rule 801(d)(2)(D) and therefore not hearsay.

The Tornado Cash service was developed under the auspices of Peppersec Inc., a corporation that was incorporated in Delaware and headquartered in Seattle, at the defendant's residence. The defendant, Semenov, and Pertsev were equal shareholders, and the defendant was the CEO. While the Tornado Cash service itself was not a formally incorporated entity, nothing in Rule 801(d)(2)(D) requires any particular type of entity structure to establish an agency relationship. Here, the evidence at trial will show that the three Tornado Cash founders, under the auspices of Peppersec, hired and supervised a number of people to perform functions for the Tornado Cash service. For instance, the defendant and his two co-founders recruited and employed software developers to maintain, update, and improve the features of the Tornado Cash service, including the user interface and various other features that were deployed over time, and paid their employees out of a Peppersec bank account. The evidence will include messages in which the defendant and his co-founders instructed the developers on how to update the Tornado Cash service, as well as messages in which the developers describe the work they are doing and the changes to the functionality of the service. These statements by the developers, even if the

---

[3] Certain of these materials may well also be covered by the so-called business records exception to the hearsay rule embodied in Federal Rule of Evidence 803(6).

developers were not viewed as co-conspirators (which in many cases they were), are plainly statements of agents of the defendant as one of the three executives overseeing the Tornado Cash service. *See In re Reserve Fund Sec. Litig.*, No. 09 Civ. 4346 (PGG), 2012 WL 12354233, at *7-8 (S.D.N.Y. Oct. 3, 2012) (statements made by an employee of an entity are admissible when offered against the person who controls the entity).

In addition, the evidence at trial will show that the defendant recruited others to perform other functions for the Tornado Cash service. For example, the defendant recruited one individual (the "signatory") to serve as one of several signatories for a cryptocurrency wallet that was used to pay various business expenses in connection with the Tornado Cash service, and the signatory communicated both with the defendant and with the wallet's other signatories regarding various Tornado Cash service business operations. In addition, the defendant and his co-founders informally contracted with two people (the "marketers") who engaged in marketing and promotional efforts for the Tornado Cash service, and the defendant instructed the signatory to make payments to the marketers for their work promoting the Tornado Cash service. In turn, the marketers published articles announcing upgrades to the service and providing information to customers about how to use the service. Those statements by the paid marketers—made under the oversight of the defendant in connection with the Tornado Cash service—are therefore admissible against the defendant under Rule 801(d)(2)(D).

## II.    **The Defendant's Own Statements May Be Offered by the Government but Not the Defendant, Subject to the Rule of Completeness**

The Government anticipates offering evidence of certain of the defendant's out-of-court statements, including in Telegram messages and emails with his co-conspirators, victims, and third parties and in public interviews. The Government will confer with defense counsel prior to trial and endeavor to resolve any rule-of-completeness issues without the need for Court resolution. To

9

the extent the parties are unable to come to an agreement on their own, under the legal framework set forth below, the defendant should be precluded from offering additional portions of out-of-court statements, and from eliciting testimony regarding the defendant's statements.

Pursuant to Rule 801(d)(2)(A) of the Federal Rules of Evidence, a defendant's out-of-court statement is not hearsay when offered by the Government. Fed. R. Evid. 801(d)(2)(A) ("A statement is not hearsay if … [it] is offered against a party and is the party's own statement."); *see also*, *e.g.*, *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("[U]nder Rule 801(d)(2)(A)," a defendant's statement offered by the Government "is not hearsay, because it is simply a statement of the opposing party."). The defendant, however, does not have a parallel ability to offer his own statement into evidence. "When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *Marin*, 669 F.2d at 84; *see also United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) (holding that defendant "could have testified to everything asserted in his statement, [but] he could not offer the document itself for the truth of the matter asserted"); *United States v. Davidson*, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004) (in general, a defendant may not "attempt to get his side of the . . . story in front of the jury without himself testifying and opening himself up to cross-examination.").

Notwithstanding the hearsay bar,[4] a defendant may in some limited circumstances invoke the "rule of completeness" to require the introduction of additional portions of his own out-of-court statement when the Government offers excerpts of it. *See* Fed. R. Evid. 106. "Under this principle, even though a statement may be hearsay, an 'omitted portion of [the] statement must be

---

[4] Federal Rule of Evidence 106 clarifies that the rule of completeness trumps the hearsay rules; though the defendant must still demonstrate that the statement is required under the rule of completeness.

placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.'" *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (quoting *United States v. Castro*, 813 F.2d 571, 575–76 (2d Cir. 1987)); *see also United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999) (same).

The Government is under no obligation to offer all portions of a statement when it offers inculpatory admissions. "The completeness doctrine does not . . . require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages.'" *Johnson*, 507 F.3d at 796 (quoting *Jackson*, 180 F.3d at 73). This rule is strictly applied, leading the Second Circuit to hold, for example, that a defendant could not introduce a portion of his confession relating "to the execution of a robbery," where the portion introduced by the Government concerned only "plans to execute the robbery." *Johnson*, 507 F.3d at 796; *United States v. Lumiere*, 16 Cr. 483 (JSR) (S.D.N.Y), Dkt. No. 62 at 6 (Jan. 6, 2017) (describing the rule of completeness as a "narrowly drawn rule" and granting Government motion to preclude prior defendant out-of-court statements). Ultimately, the burden rests with the defendant to demonstrate that the portions of the statement he seeks to offer are necessary to clarify or explain the portions the Government intends to offer. *United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996) ("[T]he proponent of the additional evidence sought to be admitted must demonstrate its relevance to the issues in the case, and must show that it clarifies or explains the portion offered by the opponent.").

Put another way, a defendant is not entitled to introduce the exculpatory portions of a communication in order to "complete" the story simply because the Government offered an incriminating portion of that communication. *See United Sates v. Terry*, 702 F.2d 299, 314 (2d Cir. 1983) ("Rule 106 does not render admissible evidence that is otherwise inadmissible"); *United*

11

*States v. Gonzalez*, 399 Fed. App'x 641, 645 (2d Cir. 2010) ("[T]he rule of completeness is not a mechanism to bypass hearsay rules for any self-serving testimony."); *Jackson*, 180 F.3d at 73 (affirming district court's ruling that Rule 106 did not justify admission of defendant's "own self-serving statements"); *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014) (court properly excluded redacted portions offered to show the jury the "flavor of the interview," to "humanize" the defendant, to prove his "character," and to convey to the jury the voluntariness of the statement); *United States v. Liera-Morales*, 759 F.3d 1105, 1111 (9th Cir. 2014) (agent testified about incriminating statements made by defendant in interview; court properly precluded defense from introducing exculpatory statements from the same interview); *United States v. Dorrell*, 758 F.2d 427, 435 (9th Cir. 1985) ("[R]emoving [defendant's] explanation of the political and religious motivations for his actions did not change the meaning of the portions of his confession submitted to the jury. The redaction did not alter the fact that he admitted committing the acts with which he was charged."). In particular, defendants are not entitled to introduce statements that are merely "post-hoc explanations for prior conduct, which [do] not alter the meaning" of the admitted statements. *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016).

## III.    The Court Should Permit the Authentication of Certain Records Under Rules 902(11), (13), and (14)

During meet-and-confer conferences, the defendant has not yet committed to the authentication of routine business and electronic records by stipulation. Accordingly, the Government intends to authenticate certain records that were created and maintained in the regular course of business by certain third parties pursuant to certifications that comply with Federal Rule of Evidence 902(11), and certain other records through records custodians, who, for the reasons set forth below, should be subject to limited cross-examination only, consistent with the Rules of Evidence.

12

## A. Certain Third-Party Business Records May Be Authenticated under Rule 902(11)

Records of regularly conducted activity that meet the necessary conditions to qualify under the hearsay exception in Federal Rule of Evidence 803(6) may be authenticated, among other methods, by a certification that complies with Federal Rule of Evidence 902(11) for records stored domestically. Fed. R. Evid. 803(6)(D). "Rule 902(11) extends Rule 803(6) by allowing a written foundation in lieu of an oral one." *United States v. Rom*, 528 F. App'x 24, 27 (2d Cir. 2013); *see also United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019) ("Records are self-authenticating if they include a custodian certification that the records 'meet[] the requirements of Rule 803(6)(A)-(C).'"). Specifically, Rule 902(11) provides, in relevant part, that "[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person" is self-authenticating and requires no extrinsic evidence of authenticity to be admitted. Prior to trial, "the proponent must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them." *Id.*[5]

A record of regularly conducted activity meets the necessary conditions to qualify as a business record under Rule 803(6) when (1) "the record was made at or near the time by—or from information transmitted by—someone with knowledge," (2) "the record was kept in the course of a regularly conducted activity of a business," and (3) "making the record was a regular practice of that activity." Fed. R. Evid. 803(6). "A business record may include data stored electronically on

---

[5] "[A] custodian's certification pursuant to Federal Rule of Evidence 902(11) is not testimonial," and therefore use of such certifications to authenticate business records does not violate the Confrontation Clause. *United States v. Weigand*, No. 20 Cr. 188 (JSR), 2021 WL 568173, at *1 (S.D.N.Y. Feb. 14, 2021).

computers and later printed out for presentation in court, so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice." *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994).

The Government expects to offer into evidence certain records that were created and maintained in the regular course of business by certain third parties, including, at a minimum, the following records that were provided to the Government pursuant to a subpoena or warrant or voluntarily:

- Communications, public posts, subscriber records, access logs, and IP logs maintained by certain internet service providers, including Google LLC ("Google") and X Corp. (formely known as "Twitter");

- Transaction records and account records produced by certain financial institutions, including Rho, JPMorgan Chase, and Evolve Bank & Trust;

- Transaction records, account records, IP logs, and access logs produced by certain other companies, including Infura, Alchemy, GitHub, Piñata, BitMart, and the Ronin Network; and

- Documents from a venture capital firm that invested in the Tornado Cash service ("Venture Capital Fund-1"), regarding the investment and ongoing communications with the Tornado Cash founders about the business.

The Government has generally produced the relevant certifications for these records in discovery in this case and is unaware of any basis to challenge these records' status as business records. To the extent there are any records that the Government intends to use at trial for which the certification has not yet been produced, the Government will produce the relevant certification in advance of trial. In the event that no stipulations as to authenticity are reached, such evidence

14

may be authenticated through the produced certifications under Rule 902(11) and Rule 803(6).

**B. Screenshots from the Wayback Machine May Be Authenticated Under Rules 902(13) and (14)**

The Federal Rules of Evidence were amended in 2017 to add Rule 902(13) and 902(14), to allow the use of a certification to authenticate certain electronic evidence, without requiring a live witness. Rule 902(13) addresses the authentication of "a record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)." Just as business records are certified by Rule 902(11), an electronic record is also deemed to be self-authenticating and requires no extrinsic evidence of authenticity for it to be admitted into evidence, as long as there is a "certification of a qualified person" that is consistent with the requirements of Rule 902. *See* Fed. R. Evid. 902(13) (2017 amendment). Similarly, Rule 902(14) provides for self-authentication of copied data if it is certified by a qualified person as "[d]ata copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification." The purpose of the rule, as described by the Advisory Committee, is to set out "a procedure by which parties can authenticate data copied from an electronic device, storage medium, or an electronic file, other than through the testimony of a foundation witness." Fed R. Evid. 902(14) advisory committee note to 2017 amendment. As the Committee reasoned, "the expense and inconvenience of producing an authenticating witness for this evidence is often unnecessary." *Id*. To satisfy the requirements of the rule, the proponent "must present a certification containing information that would be sufficient to establish authenticity were that information provided by a witness at trial." *Id*. These new rules did not change the standard of authentication but instead made it easier for parties to authenticate certain types of electronic evidence and to provide "a procedure under which the parties can determine in advance of trial whether a real challenge to authenticity will be made,

15

and can then plan accordingly." Fed. R. Evid. 902(13) advisory committee's note to 2017 amendment.

The Government intends to introduce at trial records from the Internet Archive's Wayback Machine, which documents and stores copies of websites archived at various points in time and allows users to retrieve and view those records, offering a snapshot of the website's contents at a given point in time. This will include preserved versions of the Tornado Cash website as it appeared at different points in time during the charged conspiracy. To support the admission of the records, the Government will obtain a certification complying with Federal Rules of Evidence 902(11) and 902(13). The information from the Wayback Machine is freely and publicly available, but the Internet Archive requests a subpoena to produce the necessary certification. Absent a stipulation between the parties, the Government will issue a trial subpoena to obtain the certification from an official of the Internet Archive.

Before the 2017 amendments that added Rules 902(13) and 902(14), courts routinely admitted screenshots from the Wayback Machine based on testimony or affidavit from a representative of the website. *See, e.g.*, *United States v. Gasperini*, 894 F.3d 482, 490 (2d Cir. 2018) (affirming the district court's decision to allow the government to introduce screenshots from the Wayback Machine after authentication by a witness representing the website) (citing *United States v. Bansal*, 663 F.3d 634, 667-68 (3d Cir. 2011)); *Foster v. Lee*, 93 F.Supp.3d 223, 232 (S.D.N.Y. 2015).[6]   As noted above, the amendments adding Rules 902(13) and 902(14) were

---

[6] *See also Klayman v. Judicial Watch, Inc.*, 299 F. Supp. 3d 141, 147-48 (D.D.C. 2018); *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02 C 3293, 2004 WL 2367740, *6 (N.D. Ill. Oct. 15, 2004); *Masters v. UHS of Delaware, Inc.*, No. 4:06CV1850-DJS, 2008 WL 5600714, at *2 (E.D. Mo., October 21, 2008). Citing to the proposed Rule 902(13) in a handbook setting out the best practices for authenticating electronic evidence, the authors—including The Honorable Paul

enacted to create a procedure to authenticate documents like screenshots from the Wayback Machine for the purpose of eliminating the often unnecessary "expense and inconvenience of producing a witness to  authenticate an item of electronic evidence." Fed. R. Evid. 902(13) advisory committee note to 2017 amendment. Indeed, at least one other court has utilized this process to authenticate screenshots from the Wayback Machine. *See United States v. Bondars*, No. 1:16-CR-228, 2018 WL 9755074, at *2 (E.D. Va. Aug. 20, 2018) (Order on Motion in Limine). ("[T]he Wayback Machine screenshots introduced by the Government comport with the requirements and purpose of Rule 902(13).").

### C.  Records from Publicly Available Blockchains May Be Authenticated Under Rules 902(11) and (13)

Cryptocurrency transactions are recorded on a distributed ledger known as the blockchain. Transactions are processed electronically by the computers that compose the peer-to-peer network, which are referred to as "nodes." A transfer of cryptocurrency is conducted by transmitting an instruction to a node on the network, which then announces the transfer to the other nodes on the network. Each node stores the entire blockchain and updates it when new transactions are announced in blocks. Typically, and for the cryptocurrencies at issue at this trial, the entire blockchain is publicly available and can be inspected by downloading it from the network that maintains the blockchain.

Due to these characteristics of the blockchain, records of cryptocurrency transactions can

---

W. Grimm, a widely respected authority in the field of electronic evidence—recognized a printout from the Wayback Machine as a means of authenticating website postings and advised, "[T]he reliability of the Wayback machine process could be established by a certificate of the Internet Archive official, rather than in-court testimony." Hon. Paul Grimm, Gregory Joseph & Daniel Capra, Best Practices for Authenticating Digital Evidence, pp. 16-17, n. 50, West Academic Publishing (2016).

be admitted through a certification that satisfies Rules 902(11) and 902(13). Blockchain records readily meet the requirements of Rule 803(6)(A)-(C). As explained above, a blockchain is a publicly accessible digital ledger composed of blocks of cryptographically signed transactions combining to form a historical record of every transaction that has utilized that blockchain's technology. *See, e.g.*, *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 271 (S.D.N.Y. 2024), *motion to certify appeal granted*, No. 23 Civ. 4738 (KPF), 2025 WL 40782 (S.D.N.Y. Jan. 7, 2025) ("A blockchain is a database spread across a network of computers that utilizes a complex software protocol to track every transaction on that network, providing a decentralized ledger that operates as a record of the ownership and transfer of all tokens in that network.").

New blocks are added to the blockchain after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. This activity takes place, is stored on, and is run by, the nodes that make up the network. Each node contains and runs a copy of the software that operates a blockchain's primary protocol; and the blockchain itself is shared across every node operating the network. Nodes are fundamental components of the blockchain, in that they validate, record, and broadcast each transaction on the network, and they ensure that the blockchain is functioning properly. The operation of the nodes makes it clear that blockchain records are "made at or near the time by—or from information transmitted by—someone with knowledge." Fed. R. Evi. 803(6)(A). As with other types of financial transactions, the person executing a blockchain transaction sends an instruction to effectuate the transaction. While records of traditional financial transactions are typically maintained by financial institutions, records of cryptocurrency transactions are recorded and maintained on the blockchain. Blockchain records are also kept in the course of the regularly conducted activity of the nodes, and making the record is a regular practice of their activity. Fed. R. Evid. 803(6)(B)-(C).

18

Rule 902(11) allows the certification under Rule 803(6)(D) to be completed by "the custodian or *another qualified person*." Fed. R. Evid. 902(11) (emphasis added). According to the advisory committee notes to Rule 803(6), "[w]holly acceptable records may involve matters merely observed;" thus, records may be admitted by a person with no first-hand knowledge of the creation of the record. *Williams*, 205 F.3d 23, 34 (2d Cir. 2000) ("The custodian need not have personal knowledge of the actual creation of the document to lay a proper foundation for the [record]." (internal quotation marks and citation omitted)). As applied in the blockchain context, one does not need to validate blockchain transactions or otherwise operate a blockchain node to be qualified to provide a certification under Rule 902(11). Indeed, a qualified person could include a law enforcement official who obtains a copy of the relevant blockchain records from the network, is familiar with the process by which these records are created and maintained, and otherwise meets the requirements under Rule 803(6).

Rule 902(13) permits admission of records generated by an electronic process or system based on a certification that complies with Rule 902(11). And because the Government can certify, by virtue of the process involved in validating and recording blockchain transactions, that the blockchain is "[a] record generated by an electronic process or system that produces an accurate result," the Government can establish a basis to authenticate blockchain records under Rule 902(13). The Government has produced to the defense extensive transactional records from the blockchain, including records for thousands of transactions involving the Tornado Cash service. In the event that the parties do not reach a stipulation, these records are admissible through a certification from a qualified witness, in this case most likely a law enforcement official with extensive training and experience in how transactions are recorded on the blockchain and who has confirmed that the transactions records are taken from a reliable custodian of the blockchain.

19

IV.    **Witness Testimony and Corroborating Evidence Authenticate the Contents of a Cellphone Seized from Alexey Pertsev**

   **A. Background**

In August 2022, Dutch law enforcement arrested Storm's co-conspirator and Tornado Cash co-founder Alexey Pertsev in the Netherlands and created an extraction, or digital copy, of Pertsev's cellphone (the "Pertsev Phone Extraction") using the forensic tool, GrayKey. The Pertsev Phone Extraction contained communications over the encrypted communication application, Telegram,[7] in which Storm participated (the "Pertsev Telegram Chats"). Those communications should be admitted into evidence for the reasons set forth below.

   **B. The Pertsev Telegram Chats Are Authenticated by Witness Testimony and Corroborating Information from Other Sources**

      1. Applicable Law

"[T]he requirement of authenticati[on] . . . [is satisfied by] evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). The bar for authentication "is not particularly high." *United States v. Bout*, 651 F. App'x 62, 63 (2d Cir. 2016). Indeed, evidence is properly authenticated as long as a reasonable juror could find in favor of authenticity. *See United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004). The proponent need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be. Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood." *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999).

---

[7] The Telegram application allows users to communicate with each other in encrypted "chats," which are conversations involving two or more interlocutors. Chat participants can send text messages, audio messages, and attachments.

As described in Rule 901, a proponent may authenticate evidence in multiple ways, including, for example, "[t]estimony that an item is what it is claimed to be"; "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances"; and "[e]vidence describing a process or system and showing that it produces an accurate result." Fed. R. Evid. 901(b)(1), (4), (9). In other words, evidence of authenticity "may be direct or circumstantial, and the latter category may include distinctive characteristics of the document itself." *United States v. Maldonado-Rivera*, 922 F.2d 934, 957 (2d Cir. 1990). "With respect to a document attributed to the defendant, the prosecution need only provide a rational basis from which the jury could infer the document did, in fact, belong to him." *Id.*

2.  <u>Discussion</u>

The Government intends to authenticate the Pertsev Telegram Chats by, among other things, calling to the stand Special Agent Peter Dickerman of the Internal Revenue Service, who traveled to the Netherlands in November 2024 to obtain portions of the Pertsev Phone Extraction relevant to this case, including the Pertsev Telegram Chats. Special Agent Dickerman will testify as follows:

1)  Special Agent Dickerman has more than twelve years of experience conducting, copying, and analyzing cellphone extractions and has worked extensively with GrayKey since approximately 2018;

2)  GrayKey is a mobile forensic access tool developed by Grayshift and used by law enforcement to unlock and extract data from iOS and Android devices;

3)  When a cellphone extraction is created using GrayKey, a report is automatically generated that reflects certain identifying information of the cellphone. This information includes, among other things, the date of the extraction, the device's "Device Name," "Owner Name," and "Accounts."

4)  The Device Name and Owner Name on an iPhone's GrayKey report typically reflect the corresponding subscriber information of the device owner's Apple iCloud account;

5)  The Accounts on an iPhone's GrayKey report are typically email addresses used to log into various online services on the device;

6)  When Special Agent Dickerman traveled to the Netherlands in November 2024, he reviewed and obtained a copy of the GrayKey report that was generated when the Pertsev Phone Extraction was created;

7)  The report reflects that it is derived from an extraction of a mobile device that was conducted in August 2022, that the device had the Device Name "Pertsev iPhone," the Owner Name "Alexey Pertsev," and the Accounts "peppersec@yandex.ru," "pertsev.one@icloud.com," "peretsmobil@gmail.com," "pertsev.one@gmail.com," and "alexey@tornado.cash;"

8)  While in the Netherlands in November 2024, Special Agent Dickerman obtained a copy of a subset of the Pertsev Phone Extraction relevant to this case, from which the Pertsev Telegram Chats were obtained;

9)  In the Pertsev Telegram Chats, Pertsev's display name appears as "Alexey Pertsev," and the chats include chats with a another Telegram user whose name appears as "Roman Storm"; and

10) Special Agent Dickerman saw photographs of Pertsev in the Pertsev Phone Extraction.

Separately, the Government intends to introduce records obtained from sources other than the Pertsev Phone Extraction whose contents match both the information contained in the above-referenced GrayKey report and records that Special Agent Dickerman obtained from the Pertsev Phone Extraction. For example, records obtained from Google identify the subscriber for the accounts "pertsev.one@gmail.com" and "alexey@tornado.cash" as "Alexey Pertsev." In addition, an email from Google to "pertsev.one@gmail.com" requests confirmation that "peretsmobil@gmail.com" should be the recovery email address for the "pertsev.one@gmail.com" account. Additionally, Telegram chats obtained from sources other than the Pertsev Phone Extraction match the Pertsev Telegram Chats. For instance, Pertsev communicated over Telegram with principals at Venture Capital Fund-1, which provided the Government with its own copies of certain of the Pertsev Telegram Chats, which, as noted above,

can be authenticated as business records of Venture Capital Fund-1.   Similarly, the Pertsev Phone Extraction contains Telegram messages that an attorney for a cryptocurrency exchange that was the victim of a hacking incident sent to Pertsev, Storm, and Semenov, and the attorney who sent those messages will testify as to their authenticity.

In sum, the abundant information in the Pertsev Phone Extraction GrayKey report that identifies the provenance of the extraction as Pertsev's phone, the presence on that extraction of photos of Pertsev, and the copies of Pertsev Telegram Chats obtained from other sources that match the chats on the Pertsev Phone Extraction establish a more than sufficient basis to authenticate that the Pertsev Telegram Chats were indeed obtained from Alexey Pertsev's phone.   Accordingly, the Court should admit them into evidence.

### C.   Special Agent Dickerman's Testimony and Accompanying Exhibits Comport with the Confrontation Clause

#### 1.   Applicable Law

The Sixth Amendment's Confrontation Clause generally "forbids the introduction of out-of-court testimonial statements unless the witness is unavailable and the defendant has had the chance to cross-examine the witness previously." *Samia v. United States*, 143 S. Ct. 2004, 2012 (2023). Although the Supreme Court has held that a report containing an absent witness's specialized opinion is "testimonial," *see Bullcoming v. New Mexico*, 564 U.S. 647, 658 (2011), courts in this District and elsewhere have drawn a distinction between such reports and mere printouts of electronic data—holding that the latter are non-testimonial and do not require the opportunity for cross-examination under the Confrontation Clause and routinely admitting cellphone extraction evidence without the testimony of the person who originally operated the extraction software. *See, e.g.*, *United States v. Jean-Claude*, No. S1 18 Cr. 601 (PGG), 2022 WL 2334509, at *21-24 (S.D.N.Y. June 27, 2022); *United States v. Gayle*, No. 16 Cr. 361 (CS), Trial

Tr. 1084-85 (S.D.N.Y. Sept. 14, 2017); *see also United States v. Hill*, 63 F.4th 335, 359 (5th Cir. 2023) (cellphone extraction reports are "non-testimonial, raw machine created data," and may be admitted without the testimony of the person who performed the cellphone extraction); *United States v. Arce*, 49 F.4th 382, 392 (4th Cir. 2022) (cellphone extraction report containing "downloaded information" such as "texts, browser history, and videos and images" is not testimonial and does "not typically implicate the Confrontation Clause").

  2.  Discussion

   The Pertsev Phone Extraction and associated GrayKey report are mere "non-testimonial, raw machine created data," *Hill*, 63 F.4th 335, 359, and are therefore nothing like the written expert opinion whose admission violated the Confrontation Clause in *Bullcoming*. There, the Supreme Court concluded that a report containing an absent expert witness's specialized opinion (in that case, a chemist's conclusion regarding intoxication testing results) is "testimonial" and cannot be introduced in the absence of cross-examination of the expert who reached the conclusions and rendered the opinions at issue. *Bullcoming*, 564 U.S. at 658. The expert report in *Bullcoming* included certifications by the absent expert witness that the expert had received the relevant blood sample intact, had checked that the sample corresponded to the correct report number, and had performed a particular test following a specified protocol. *Bullcoming*, 564 U.S. at 660 (citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009)). The report at issue also included a portion where the analyst who conducted the testing could identify any "circumstance or condition" that "affected the integrity of the sample or the validity of the analysis." *Id*. The Supreme Court concluded that those representations as to the presence or absence of such circumstances conveyed "past events and human actions not revealed in raw, machine-produced data" and are therefore

core testimonial statements of the absent expert witness that should be subject to cross-examination. *Id*.

In stark contrast to the *Bullcoming* blood alcohol content expert report, the Perstev Phone Extraction and associated GrayKey report are not written expert opinions at all and contain no express certifications, representations, or statements of any kind by an absent witness; they are merely the contents of Pertsev's cellphone and a machine-generated report of those contents, respectively. They contain no written results of an absent witness's expert evaluation or opinion of other evidence or a certification of testing that the absent witness had conducted and they are otherwise a far cry from the "core class of testimonial statements," such as affidavits, prior *ex parte* testimony, and the like. *Melendez-Diaz*, 557 U.S. 305 at 309-10 (citing *Crawford v. Washington*, 541 U.S. 36, 51-52 (2004)). It is of no moment that the person who transferred the data from the cellphone itself into document format (a member of Dutch law enforcement) will not testify; unlike in *Bullcoming*, no testimonial statements of that person will be offered at trial. Indeed, neither the Pertsev Phone Extraction nor the associated GrayKey report contains "statements" of that person at all; they are merely a copy and a printout, respectively, of electronic data. *See, e.g., Jean-Claude*, 2022 WL 2334509, at *21-24; *United States v. Gayle*, Trial Tr. 1084-85; *see also Hill*, 63 F.4th at 359 ("Key differences exist between test reports generated by a person's analysis and test reports which are the result of machine analysis. . . . Here, the raw cellphone extraction reports contained only machine-generated results, and were thus non-testimonial."). Because the extraction is not testimonial, there is no Confrontation Clause violation in admission of the Pertsev Phone Extraction or the GrayKey report.

Nor will Special Agent Dickerman's testimony violate the Confrontation Clause. That testimony will be based on Special Agent Dickerman's own experience and direct observations of

the characteristics of the Pertsev Phone Extraction, *see United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007), and will serve only to explain the nature of a cellphone extraction, which will provide the jury with a reasonable basis to conclude that the Pertsev Phone Extraction is a true and accurate copy of the contents of Pertsev's cellphone for authentication purposes under Rule 901. By contrast, Special Agent Dickerman will not testify, for example, as to the circumstances under which Pertsev's cellphone was seized from Pertsev because he was not there. Accordingly, because Special Agent Dickerman's testimony will not relay testimonial statements of an absent witness, the Confrontation Clause requires only that Special Agent Dickerman himself be available for cross-examination, which he will be.

## V. Certain Evidence is Admissible as Direct Evidence and Pursuant to Rule 404(b)

The Government seeks to admit at trial evidence of certain conduct of the defendant both as direct evidence of the charged crimes or, in the alternative, as evidence of other acts under Rule 404(b). Specifically, the Government seeks to admit: (1) evidence that the defendant personally profited from the operation of the Tornado Cash service; (2) evidence that the defendant made false statements to a financial institution in connection with a bank account used to operate the Tornado Cash service; and (3) evidence that the defendant took steps to keep the Tornado Cash service operating after OFAC imposed sanctions on Tornado Cash on August 8, 2022, including by transferring ownership of certain features of the Tornado Cash service to a smart contract.

### A. Applicable Law

#### 1. Other Acts Evidence as Intrinsic or Direct Proof

If evidence is relevant to a charged offense, it is generally admissible at trial. Fed. R. Evid. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable

than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

If evidence is admissible as direct evidence, it is not "subject to consideration under Rule 404(b) at all . . . ." *United States v. Halak*, 78 F. App'x 758, 760 (2d Cir. 2003). Uncharged acts are admissible where they are used to, among other things, (i) provide background for the events alleged in the charging instrument, (ii) explain the mutual trust that existed between crime participants; and/or (iii) complete the story of the crime charged. *See United States v. Mercado*, 573 F.3d 138, 141-42 (2d Cir. 2009). In other words, evidence of uncharged criminal activity is admissible "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012) (citation and internal quotation marks omitted); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007).

Even if the evidence does not directly establish an element of the offense charged, it can be admitted "in order to provide background for the events alleged in the indictment." *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (citation omitted). "In particular, evidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense." *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (citations omitted); *see also United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime.").

27

2.  <u>Other Acts Evidence Pursuant to Rule 404(b)</u>

The Federal Rules of Evidence provide, in relevant part, that: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.   This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."   Fed. R. Evid. 404(b).   Evidence of uncharged crimes, wrongs, or other acts is admissible under Rule 404(b) as long as the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; (3) has probative value that is not substantially outweighed by any unfair prejudicial effect; and (4) if requested, is admitted with limiting instructions to the jury.   *See United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012); *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Pitre*, 960 F.2d 1112, 1118–19 (2d Cir. 1992).

The Second Circuit "follows the 'inclusionary' approach, which admits all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (quoting *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996)); *see also United States v. Moran-Toala*, 726 F.3d 334, 345 (2d Cir. 2013).   Any "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial.   *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *United States v. Williams*, 205 F.3d 23, 33–34 (2d Cir. 2000); *cf. Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.").

Finally, it is proper for a trial court to admit "other crimes, wrongs, or acts" evidence if it helps to prove the existence of a common scheme or plan. *See* Fed. R. Evid. 404(b) (establishing that "[e]vidence of any other crime, wrong, or act . . . may be admissible" to prove a "plan"); *United States v. Reed*, 639 F.2d 896, 906 (2d Cir. 1981) ("[E]vidence of the [other] transactions was . . . admissible to show a common scheme or plan."); *see also United States v. O'Connor*, 580 F.2d 38, 41 (2d Cir. 1978) ("The rubric of scheme or plan has been used to cover a multitude of particular situations, which do not fall into simple categories.").

### 3. Rule 403 and Evidence of Other Bad Acts

Regardless of whether the evidence is admitted as direct evidence or as other acts evidence under Rule 404(b), the evidence is, like all other evidence, admissible under Federal Rule of Evidence 403 if its probative value is not substantially outweighed by the danger of unfair prejudice. Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Other crimes evidence is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged. *Roldan-Zapata*, 916 F.2d at 804; *see also United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (noting that evidence is not unduly prejudicial under Rule 403 when it is not "more inflammatory than the charged crime[s]"); *United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004) ("Evidence is unfairly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or

29

otherwise may cause a jury to base its decision on something other than the established propositions in the case." (citation and internal quotation marks omitted)).    The fact that evidence may be "damning" does not render it inadmissible.   *See United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972).

To the extent there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crime charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice to defendant); *see generally Parker v. Randolph*, 442 U.S. 62, 75 n.7 (1979) ("The 'rule'—indeed, the premise upon which the system of jury trials functions under the American judicial system—is that juries can be trusted to follow the trial court's instructions.").

**B.  Discussion**

### 1.  Evidence of the Defendant's Profits from the Tornado Cash Service Is Admissible

The Government anticipates offering evidence, including financial records and expert cryptocurrency tracing testimony from IRS-CI Special Agent Stefan George, that when the defendant and his co-conspirators created TORN tokens in December 2021, the defendant received a substantial share of TORN tokens as a founder of the Tornado Cash service, and also received additional TORN tokens because he had been one of the earliest users of the Tornado Cash service. In addition, the defendant moved funds through the Tornado Cash service, which had the effect of commingling his funds with criminal proceeds, increasing the overall size of the Tornado Cash pools and facilitating the use of the Tornado Cash service for money laundering by criminal actors. The defendant used the proceeds from his TORN tokens, as well as funds he withdrew from the Tornado Cash pools, which therefore included commingled criminal proceeds, toward his purchase

of, among other things, two homes in the greater Seattle area. In addition, the defendant used an account at a cryptocurrency exchange in the name of another Russian national to liquidate TORN tokens, ultimately converting his and the other founders' TORN tokens into other cryptocurrency worth approximately $12 million in August 2022.

This evidence is directly relevant to each of the charged offenses. The fact that the defendant helped create the TORN token and received a substantial amount of them both through the special distribution to the founders of the Tornado Cash service and through the distribution to the early users of the Tornado Cash service is evidence of how the service functioned and demonstrates that he did in fact exercise ownership and control of the Tornado Cash service and that he was financially motivated to make changes to the Tornado Cash service (or not make changes that he could have, as the case may be) during the charged time period that would increase the value of his TORN holdings. The defendant has vigorously disputed these facts, as well as disputing whether the Tornado Cash service can be characterized as a business for purposes of Count Two, which charges him with operating a money transmitting business knowing that it involves the transmission of funds that are derived from a criminal offense or intended to be used to promote unlawful activity. This makes the evidence of his personal profits from the Tornado Cash service especially relevant and probative to establish that the Tornado Cash service was an "enterprise that is carried on for profit or financial gain," which is an element of the money transmitting offense. *United States v. Banki*, 685 F.3d 99, 114 (2d Cir. 2012).

In addition, this evidence is relevant and admissible pursuant to Rule 404(b). The evidence is highly probative of the defendant's intent and financial motives in operating the Tornado Cash service. Indeed, the defendant's substantial profits from the Tornado Cash service explain why he continued to market and operate the service, and to make only cosmetic changes to its features

31

even after he became aware that its business model was little more than operating as a haven for money laundering. *See, e.g., United States v. Motovich*, No. 21 Cr. 497 (WFK), 2024 WL 3303723, at *2 (E.D.N.Y. July 2, 2024) (money laundering and unlicensed check-cashing business case in which the court noted its agreement with the Government that evidence of the defendant's "wealth, spending, and lifestyle," including expenditures on, among other things, "luxury items…[and] renovations to [d]efendant's penthouse apartment" was "direct evidence of his committing the charged crimes, as well as his overarching motive for the criminal conduct") (internal quotation marks omitted); *United States v. Hoey*, No. 15 Cr. 229 (PAE), Dkt. No. 60 (Tr. of Mar. 9, 2016 Conf.) at 19-20 (court noting that defendant's spending of proceeds of offense were "proof of [his] motive" and tended to show that his "good faith" defense was "false").

Furthermore, the evidence will show that the defendant intentionally concealed his realization of profits from the Tornado Cash service. For some of the TORN tokens, he used a cryptocurrency exchange account in the name of another person, while for others, the cryptocurrency tracing analysis will show that he engaged in an array of complex transactions and transfers before moving the funds to his personal account. The contortions that the defendant engaged in with funds that were derived from the offenses charged in this case are direct evidence of the charged conspiracies, and are also powerful evidence of his consciousness of guilt. *See United States v. Hatfield*, 685 F. Supp. 2d 320, 327 (E.D.N.Y. 2010) (evidence of defendant's transfer and concealment of assets overseas admissible as tending to show consciousness of guilt).

 2.  <u>Evidence of the Defendant's False Statements to a Financial Services Company Through Which the Defendant Paid for Aspects of the Tornado Cash Service Is Admissible</u>

In or about July 2020, the defendant, along with co-defendant Roman Semenov and co-conspirator Alexey Pertsev, opened an account at Rho for Peppersec (the "Peppersec Account").

32

Rho is a New York-based "fintech" company that offers various financial services, including management of bank accounts and payments, for businesses. The defendant and his co-conspirators used the Peppersec Account at Rho to receive investments for the Tornado Cash service, including Venture Capital Fund-1's nearly $1,000,000 investment, and they used those invested funds to pay for various expenses relating to their operation of the Tornado Cash service, including payroll for the team of developers the founders used to continuously develop and refine the service. The defendant also used the Peppersec Account to pay regular bills from Infura and Alchemy, two online service providers that facilitate blockchain requests or "calls." Put simply, Infura and Alchemy offer their customers (and by extension their customers' customers) reliable, high-volume access to the Ethereum blockchain. These service providers were a critical part of the Tornado Cash service's infrastructure. Without this infrastructure, the Tornado Cash service would not have been able to offer high volumes of reliable service for its customers and would have been a far less effective and popular money laundering tool.

In March 2022, Rho, as part of its compliance processes, contacted the defendant and Pertsev and asked them to fill out a "Crypto questionnaire." In April 2022, the defendant filled out the questionnaire after Rho followed up with him and stated that the questionnaire had to be filled out within the next week or the Peppersec Account would be closed. The defendant's responses to this questionnaire contained several materially misleading statements about the nature of Peppersec's business, which largely consisted of operating the Tornado Cash service. For instance, the defendant expressly denied that the company operated on a blockchain, that it offered any products or services related to a digital wallet, that it derived any money from cryptocurrency, or that it accepted deposits. And in response to the more open-ended question of how the company

33

was "directly or indirectly related to cryptocurrency," the defendant simply wrote "donations, payments, expenses."[8]

Given that Peppersec's flagship project was a cryptocurrency mixing service, these responses were plainly false or, at a minimum, misleading under the circumstances. Indeed, the defendant opened the Peppersec Account specifically for the purpose of operating the Tornado Cash service, and the money in the account came almost entirely from Venture Capital Fund-1's investment into the Tornado Cash service. When he solicited those funds from Venture Capital Fund-1, the defendant described the Tornado Cash service as operating on the Ethereum blockchain, explained that it "uses a smart contract that accepts ETH deposits," and described plans to "monetize" the "business," including by creating a Tornado Cash token (what became TORN), a plan that he had implemented by the time he responded to the Rho questionnaire. Indeed, what Venture Capital Fund-1 got in exchange for its investment in the Tornado Cash service was TORN, a cryptocurrency token created by the defendant. Storm's misleading statements to Rho cannot be squared with his description of the business to his investors.

Evidence of the defendant's misleading statements to Rho is admissible as direct evidence of the charged offenses. The Peppersec Account was of critical importance to the Tornado Cash service's operations, as it was where investor funds were maintained and used to pay for critical business expenses. Accordingly, the defendant's false statements made in an effort to keep the account open are acts directly in furtherance of the charged conspiracies. For the same reason,

---

[8] The defendant also made certain admissions to Rho that the Government may seek to introduce at trial, including acknowledging that the company did not have any anti-money laundering policies.

these statements are inextricably intertwined with the charged crimes, as they represent bad conduct perpetrated by the defendant in furtherance of those crimes.

This evidence is also admissible pursuant to Rule 404(b). The defendant's statements to Rho evidence, at a minimum, the defendant's preparation and planning to keep the Tornado Cash service running, his intent to conceal the true nature of the Tornado Cash service, and his consciousness of guilt. *See, e.g., United States v. Atilla*, 966 F.3d 118, 129 (2d Cir. 2020) ("The jury could reasonably infer, based on the fact that Atilla lied to and concealed information from U.S. officials charged with sanctions enforcement [at the United States Treasury Department], that he was aware that the scheme involved international payments through U.S. banks that were violations of U.S. sanctions."); *United States v. Mizrahi*, No. 22 Cr. 650 (JPO), 2024 WL 3824104, at *2 (S.D.N.Y. Aug. 15, 2024) (finding that the defendant's lies to a financial institution about certain wire transfers supported jury verdict on money laundering and unlicensed money transmission charges, as they evidenced the defendant's knowledge that "the piles of cash he was laundering were proceeds of unlawful activity").

### 3. Evidence of the Defendant's Efforts to Keep the Tornado Cash Service Operating After the Imposition of OFAC Sanctions Is Admissible

On August 8, 2022, OFAC announced sanctions on Tornado Cash, and many of its U.S.-based service providers stopped providing services to it. In the aftermath of the announcement of OFAC sanctions, the defendant and the other Tornado Cash founders took a number of steps to keep the business operating. Most notably, the primary way for customers to find and access the Tornado Cash UI was through the tornadocash.eth domain that the founders owned and controlled. Without the domain, finding the existing version of the UI would have been difficult, and there would have been no centralized way to release new upgraded versions over time. Rather than take down the domain, however, the founders instead transferred control of that domain on August 8,

2022 to the decentralized Tornado Cash Governance smart contract, which was controlled by anonymous holders of TORN tokens like the defendant. That critical decision was essential to preserving the operation and accessibility of the Tornado Cash service for customers, despite the OFAC sanctions. Not only did it preserve access to the UI, which was how approximately 99% of all Tornado Cash transactions were executed, but it also gave TORN token holders the ability to continue to upgrade and refine the UI over time. The defendant also exchanged messages with his co-founders in which they expressed concern that service providers for the Tornado Cash service were cancelling those services due to the sanctions, and discussed how to keep the service operational despite those cancellations.

The evidence of the defendant's efforts to preserve and transfer ownership of the tornadocash.eth domain is plainly direct evidence of the charged conspiracies. This transfer of ownership on August 8, 2022 moved control of the domain where the UI was accessed from the three Tornado Cash founders to the collective and anonymous group of holders of TORN token holders, frustrating the ability of regulators or law enforcement to seize or shut down the domain and thereby limit access to the UI. In other words, it was an act intended to keep the Tornado Cash service operating and widely accessible to customers, thereby furthering the ongoing money laundering, unlicensed money transmitting, and sanctions violations that are charged in the Indictment. These acts are also evidence of the defendant's state of mind and refute any good-faith defense he may try to assert. Although the defendant has claimed that he acted in good faith and made efforts to comply with applicable laws and sanctions, his brazen attempts to facilitate widespread use of the Tornado Cash service in the face of OFAC's imposition of sanctions on the service directly contradicts those claims.

36

As for the defendant's further efforts to prevent service providers from cutting off the Tornado Cash service, even if those acts took place after the charged time period and after the defendant and his two co-founders were no longer exercising almost exclusive authority in operating the service, they are still evidence of his financial interest in the continued operation of the service, which is direct evidence of the charged offenses.

This evidence is also admissible pursuant to Rule 404(b). In affirmatively continuing to ensure the continued operation of the Tornado Cash service after it was sanctioned, the defendant demonstrated his intent to continue to profit from the service.

**VI.    The Defendant's Paltry Advice-of-Counsel Disclosures Violate the Court's March 3, 2025 Order and Any Advice-of-Counsel Defense or Reference to the Presence of Counsel Should Be Precluded Without Further Disclosures**

1.    Background

On September 18, 2024, when the trial in this matter was still scheduled for December 2024, the Government filed a motion requesting that the Court order the defendant to provide notice of his intent to assert an advice-of-counsel defense. (Dkt. 79 at 9-10). On October 10, 2024, the Court ordered the defense to provide the Government with notice of any advice-of-counsel defense by October 28, 2024. (Dkt. 88 at 17-19). That deadline was later adjourned to February 18, 2025, when trial was adjourned to April 2025. (Dkt. 126).

On February 18, 2025, the defense provided the Government with a two-sentence advice-of-counsel disclosure that stated, in sum total, the following: "We write to provide you notice that at his trial Roman Storm may assert an advice of counsel defense and/or a good faith defense based in part on communications with and information received from attorneys. As is permitted by the case law, Mr. Storm will not make a final decision about whether to assert such defenses until after the government rests its case in chief." (Dkt. 128-3). After failed attempts to resolve the inadequacy

of this disclosure with the defense, the Government moved this Court on February 25, 2025 for

more robust disclosures. (Dkt. 128). On March 3, 2025, the Court issued the following order:

> [T]he Court will require the defense to produce privileged documents twenty-four
> hours in advance of unequivocally asserting an advice-of-counsel defense through
> opening statements. Otherwise, the Court will not require the defense to produce
> such privileged documents until the earlier of (i) its unequivocal assertion of an
> advice-of-counsel defense through cross-examination during the Government's
> case or (ii) the close of the Government's case-in-chief. Taking a page from the
> defense's book, the Court uses "advice-of-counsel defense" in this context to
> encompass "an advice of counsel defense and/or a good faith defense based in part
> on communications with and information received from attorneys." (Dkt. #128-3).
> In addition, the Court hereby ORDERS the defense promptly to disclose (without
> waiving privilege) (i) the names of the lawyers from whom Mr. Storm received the
> legal advice at issue; (ii) the subject matter of that advice; and (iii) the timeframe
> in which Mr. Storm received the advice; and to direct the Government to certain
> non-privileged documents and/or communications that the Government produced
> in discovery that reference the discussions with counsel at issue and sufficiently
> preview the defense.

(Dkt. 138).

In a March 7, 2025 letter to the Government, attached hereto as Exhibit A, the defendant

stated that he "may assert an advice-of-counsel and/or good faith defense, based on his reliance on

advice from his/Peppersec's attorneys as well as his knowledge of the advice and involvement of

other counsel at various stages during the charged timeframe." The letter lists three attorneys who

furnished legal advice and a number of "legal topics" to which that legal advice apparently

pertained. Notably, the letter does not identify which attorneys provided advice on which topics,

to whom the advice was given (e.g., Peppersec vs. the defendant in his individual capacity, or a

third party), and the specific timeframes in which the advice was provided.

On March 10, 2025, the Government raised this and other concerns with the defense in a

letter that is attached hereto as Exhibit B. Specifically, the Government asserted that these

additional disclosures, though an improvement on the inadequate February disclosures, still fell

short of the specificity required by the Court's March 3, 2025 Order. (Dkt. 138). On April 4, 2025, the defense responded to the Government's letter, stating, among other things, that the defense does not agree with the Government's reading of the March 3, 2025 order and would provide no further specificity as to the contours of any potential advice-of-counsel defense. That letter is attached hereto as Exhibit C.

      2.  <u>Applicable Law</u>

The advice-of-counsel defense is a specific form of the defense of good faith, and to establish a colorable defense based on the advice of counsel, the defendant must be able to identify evidence that, before acting, he in good faith sought the advice of counsel, conveyed all material facts accurately to the attorney, and acted strictly in accordance with the attorney's advice. *See United States v. Scully*, 877 F.3d 464, 478 (2d Cir. 2017). Where such a showing has not been made, a defendant may not introduce evidence of attorneys' other involvement in the events at issue—for example, "that lawyers attended meetings or set up meetings"—to "suggest that counsel blessed the relevant [materials or actions]." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013). Such evidence "would be confusing and unduly prejudicial" because a "jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction." *Id.* "Such a misunderstanding would unfairly prejudice the government because it would 'give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense.'" *United States v. Bankman-Fried*, No. S5 22-CR-0673 (LAK), 2024 WL 477043, at \*3 (S.D.N.Y. Feb. 7, 2024) (quoting *Tourre*, 950 F. Supp. 2d at 684).

Accordingly, even those courts that have permitted such evidence have required detailed pretrial disclosures and, consistent with Rules 401 and 403, carefully policed references to counsel

or other professionals in testimony and argument to ensure that the defendant does not unfairly attempt to mount a "disguised reliance argument." *SEC v. Stoker*, No. 11 Civ. 7388 (JSR) (S.D.N.Y. July 23, 2012), Trial Tr. at 973; *see also Bankman-Fried*, 2024 WL 477043, at *2 (permitting certain lines of evidence and argument and precluding others after hearing testimony outside the presence of the jury); *United States v. Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y. 2014), Trial Tr., Dkt. No. 63 at 83-85 (limiting defendant's testimony regarding the presence of counsel to avoid the "misleading impression" that the defendant relied upon the advice of counsel).

3.  Discussion

In this case, Storm has disclosed to the Government: (i) ten broad "legal topics" about which he "may" assert an "advice-of-counsel and/or good faith" defense; (ii) the names of three lawyers who represented Peppersec during the charged time period; (iii) months- or years-long timeframes during which those lawyers provided unspecified advice; and (iv) a list of potentially relevant non-privileged documents relating to the advice-of-counsel defense. *See* Exhibit A. That information is insufficient to assess whether Storm can satisfy any element of the advice-of-counsel defense—let alone all of them. Indeed, Storm has provided no information establishing that he (1) "made a complete disclosure to counsel concerning the matter at issue," (2) "sought advice as to the legality of his conduct" before engaging in that conduct, (3) "received advice that his conduct was legal," or (4) "relied on that advice in good faith." *Bankman-Fried*, 2024 WL 477043, at *2 (internal modifications and citation omitted). Nor has he provided enough information for the Court to assess whether any reference to the involvement of counsel that he might be contemplating would be more probative than prejudicial.   Accordingly, and consistently with its prior orders in this case, the Court should "order[] the defendant to provide prior notice to the Court and government before offering any evidence relating to the involvement of attorneys,"

40

as Judge Kaplan did in *Bankman-Fried*. *Id.* at *1. Only then, with sufficiently detailed notice, can the Court properly assess whether there exists a viable advice-of-counsel defense and, if not, whether Storm's contemplated references to attorney involvement are more probative than prejudicial.

Careful policing of the defendant's potential advice-of-counsel defense is especially warranted here in light of the Government's decision not to proceed on its Section 1960(b)(1)(B) (federal registration) theory of Count Two of the Superseding Indictment. Several of the "legal topics" listed in the defendant's March 7, 2025 letter appear to pertain exclusively to this withdrawn part of the case, including:

- Whether Tornado Cash qualified under the software provider exemption set forth in the 2019 FinCEN Guidance, and thus would not be deemed a "money services business";

- "Money Service Business and Money Transmitter Regulatory Analysis" issues addressed in an August 24, 2020 legal memorandum drafted by an attorney in connection with the prospective venture capital investment in Tornado Cash;

- Decentralization of the Tornado Cash user interface and website, based in part on the 2019 FinCEN Guidance; and

- Governance issues with respect to the TORN DAO, including Mr. Storm's role in proposals, community forums, and other governance-related issues.

The second item on this list—the August 24, 2020 attorney memorandum (the "Attorney Memo")—is of particular concern. The Government has a copy of this memorandum because it is not privileged, and it is attached hereto as Exhibit D. It was commissioned by Venture Capital Fund-1 ahead of its investment in the Tornado Cash service and shared with the defendant and his co-founders.

By its own terms, the Attorney Memo addresses topics that are no longer relevant to the issues at trial, namely "the potential applicability of federal money service business regulations

41

and state money transmission laws" to Peppersec as the provider of the Tornado Cash service. (Ex. D at 1). The memo further states that is is "*limited to* an analysis under the federal Bank Secrecy Act ('BSA') and the regulations promulgated thereunder (the 'BSA Regulations') in addition to an overview of potentially applicable state money transmission laws." (*Id.* (emphasis added)). Almost the entirety of the Attorney Memo is devoted to a discussion of these regulatory issues. The memo does contain a short section on money laundering, but that section expressly acknowledges that "PepperSec May Still be Subject to Money Laundering Liability Risk," and that "irrespective of PepperSec's status as a money transmitter, criminal penalties for money laundering and related crimes may obtain." (*Id.* at 17). The memo is entirely silent as to potential sanctions risk.

Not only is the Attorney Memo expressly directed to legal and regulatory issues that are no longer at issue for this trial, but it was drafted in August 2020, prior to any of the charged conduct in this case. It does not address subsequent developments such as the defendant's receipt of notice from multiple victims and law enforcement officers that he was laundering criminal proceeds through the Tornado Cash service, or the defendant's introduction of the TORN tokens and the Relayer Algorithm, which combined became the economic engine of the Tornado Cash service and the source of the defendant's millions of dollars in profits from operating the service. The defendant has never identified any purported legal advice he received in connection with those later developments, which are the actual focus of this trial. Thus, if the defendant were permitted to introduce the Attorney Memo, it would serve only to confuse and mislead the jury, and it should be precluded.

Accordingly, the Court should order more detailed disclosures about the contours of the defendant's advice-of-counsel defense, so that the Government and the Court can properly assess

whether there exists a viable advice-of-counsel defense or something more akin to a mere-presence-of-lawyers defense that courts in this District have consistently prohibited.

## VII.    The Court Should Preclude the Defendant from Introducing Evidence and Arguments That Are Irrelevant and Unfairly Prejudicial

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010).

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

### A.  The Court Should Preclude Evidence and Claims That Victims Were Negligent In Being Defrauded or Hacked

The Court should preclude any suggestion, cross examination, or argument by the defendant that any victims of fraud or hacking were negligent or gullible, or could have been more diligent. It is well settled that a victim's purported negligence is no defense to a fraud charge. By the same token, a victim's purported negligence is no defense to a charge that a defendant conspired to launder that victim's funds.

1.  Applicable Law

43

In *United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004), the Second Circuit held that the negligence of a victim of a fraud in detecting that fraud cannot be used as a defense. The *Thomas* court made clear that federal anti-fraud statutes prohibit schemes to defraud and that to establish a scheme to defraud, there is no requirement that the victim act as a person of ordinary prudence would. *See id.* at 241-42 n.5. The *Thomas* Court emphatically "refuse[d] to accept the notion that 'the legality of a defendant's conduct would depend on his fortuitous choice of a gullible victim.'" *Id.* at 243 (citing *United States v. Benson*, 548 F.2d 42, 46 (2d Cir. 1977)); *see also United States v. Adelekan*, 567 F. Supp. 3d 459, 470 (S.D.N.Y. 2021) ("The Court of Appeals routinely has rejected a gullible victim defense for wire-fraud charges.") (citing *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007), and *United States v. Weaver*, 860 F.3d 90, 96 (2d Cir. 2017)). That is because "reliance is not an element of criminal fraud," and "the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent." *Weaver*, 860 F.3d at 95-96.

## 2. Discussion

The Government expects that several victims will testify to being defrauded or hacked and then seeing their funds being laundered through the Tornado Cash service, never to be recovered. Collectively, the victims' losses in this case are staggering. Whether these victims should have been more vigilant or practiced better cybersecurity is irrelevant under Rule 401 and unduly prejudicial and potentially confusing to the jury under Rule 403.   In light of the well-established prohibition against any defense that involves blaming victims, the Government respectfully submits that this Court should direct that defense counsel not suggest—in opening statements, cross-examination, summation, or otherwise—that the victims in this case could have, or should have, been more diligent in avoiding being defrauded or hacked.

### B.  The Court Should Preclude Evidence Regarding Purportedly Lawful Uses of the Tornado Cash Service

The defendant may seek to offer evidence that some customers of the Tornado Cash service used the service for purportedly lawful or sympathetic purposes. This Court should preclude such evidence. Such irrelevant "good acts" evidence that a defendant did not engage in a money laundering, unlicensed money transmission, or sanctions evasion conspiracy in *all* instances is not probative of whether the defendant committed those crimes. To the extent that such evidence would have any probative value, it should nonetheless be excluded under Federal Rule of Evidence 403, which provides that evidence is inadmissible if the probative value of such evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, and waste of time. Fed. R. Evid. 403.

#### 1.  Applicable Law

The Second Circuit has long recognized that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions." *United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020) (quoting *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990)). "The reasoning behind this rule is straightforward: A single occurrence of lawful conduct is simply irrelevant to other occurrences of unlawful conduct." *Id.* (citation omitted). The Second Circuit's decision in *United States v. Walker*, 191 F.2d 326, 336 (2d Cir. 1999), is instructive. In that case, the defendant was charged with making false statements in connection with an immigration business and sought to introduce evidence that he had prepared other, non-fraudulent asylum applications. The Second Circuit upheld the district court's exclusion of this "good acts" evidence, holding that "[w]hether [the defendant] had prepared other, non-fraudulent [asylum] applications was simply irrelevant to whether the applications charged as false

45

statements were fraudulent." *See also United States v. Rossy*, No. 22-CR-550-02 (NSR), 2023 WL 8237055, at *2 (S.D.N.Y. Nov. 28, 2023) (defendant cannot offer as evidence to disprove the charged offenses of witness tampering and drafting a falsified report that she did not previously draft a falsified report or cover up an assault of an inmate, and quoting *United States v. Boykoff*, 68 F. App'x 15, 20–21 (2d Cir. 2003) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant.").)

Circuit courts elsewhere have similarly held that evidence that a defendant did not commit crimes on other occasions is irrelevant. *See United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008) (affirming district court's ruling precluding the defendant from offering evidence of his legitimate business activities in order to negate evidence of his fraudulent intent as to the charged conduct); *United States v. Winograd*, 656 F.2d 279, 284 (7th Cir. 1981) (finding defendant's performance of some legitimate trades irrelevant to his knowledge of illegal trades).

The so-called "ceaseless criminal conduct" exception to the above rule is not applicable here. In *United States v. Damti*, 109 F. App'x 454, 455–56 (2d Cir. 2004), the Second Circuit noted that while "evidence of past 'good acts' by a defendant is generally not probative," it may be probative if a defendant is alleged to have "'always' or 'continuously' committed 'bad acts,'" *United States v. Scarpa*, 913 F.2d 993, 1010 (2d Cir. 1990) (observing that "good acts" evidence "would only be relevant if the indictment charged [defendants] with ceaseless criminal conduct"), or where the evidence of "good acts" would undermine the underlying theory of a criminal prosecution, *United States v. Santos*, 201 F.3d 953, 962 (7th Cir. 2000). In *Damti*, the defendants were convicted on charges stemming from alleged schemes to defraud and extort money from customers of their various moving businesses. *Damti*, 109 F. App'x at 455. The Second Circuit

affirmed the District Court's exclusion of evidence of non-fraudulent moves for allegedly satisfied

customers, explaining that:

> The Government did not allege to the jury that the defendants engaged in "ceaseless" criminal conduct, that "all of the defendants' customers were defrauded, or that the defendants' business was 'permeated with fraud." Instead, it argued that ten specific moves were fraudulent and therefore were representative of a substantial portion of the more than four-thousand moves performed by the defendants during the period relevant at trial. Even if many or most of these moves were fraudulent, it follows that a substantial portion also presumably were legitimate. Evidence of "good moves," therefore, would not have been probative of the key issue during trial.

*Damti*, 109 F. App'x at 456; *see also United States v. Nekritin*, No. 10 Cr. 491 (KAM), 2011 WL

2462744, *5 (E.D.N.Y. June 17, 2011) (noting that, where the Government did not seek to prove

that all of the defendants' Medicare and Medicaid billings were fraudulent, evidence of

defendants' legitimate billing practices was not relevant to whether they fraudulently billed

Medicare and Medicaid as charged); *United States v. Golfo*, No. 19 Civ. 95 (KAM), 2020 WL

2513445, *2 (E.D.N.Y. May 15, 2020) (reasoning that, in prosecution for submission of fraudulent

therapy session invoices to the New York State Department of Health, evidence that defendant

also provided some accurately documented and invoiced therapy sessions was irrelevant to

whether defendant sought and received payment for phantom or embellished therapy sessions).

2. <u>Discussion</u>

Here, evidence that the defendant's business transmitted funds that were not illicit is

irrelevant to whether the defendant committed the crimes charged. The Indictment does not allege,

and the Government does not intend to argue, that the defendant, Semenov, and their conspirators

engaged in "ceaseless" criminal conduct or that "all" of the defendant's financial transactions were

unlawful, *see Damti*, 109 F. Appx. at 455. Thus, as in the cases cited above, evidence of non-

criminal activities, including financial transactions, simply would not be probative of whether the defendant committed the charged offenses. In addition, an attempt by the defendant to "drown out" evidence of the charged offense by introducing irrelevant instances in which he engaged in lawful conduct would also lead to a confusion of the issues, undue delay, and waste of time, and is independently excludable on this basis. *See* Fed. R. Evid. 403. Accordingly, this Court should preclude the defendant from introducing evidence of lawful acts in order to negate the charged conspiracies.

Finally, even if the existence of otherwise lawful financial transactions using the Tornado Cash service were at all relevant (which they are not), any probative value of that evidence "is substantially outweighed" by the likelihood of jury confusion, the risk of nullification, and wasting time at trial, as the obvious purpose of such evidence is to undermine the defendant's intent as to the charged conduct, which is improper. *See* Fed. R. Evid. 403; *United States v. Al Kassar*, 660 F.3d 108, 123-24 (2d Cir. 2011).

### C. The Court Should Preclude the Defendant from Making Arguments Aimed at Jury Nullification, Including That His Charged Conduct Was Protected by Free Speech and Privacy Rights

The defendant has repeatedly argued that his charged conduct is protected by constitutional rights to freedom of speech and privacy. *See, e.g.*, Mot. to Dismiss, Dkt. No. 30 at 48 (arguing that, "[n]ot only is computer code protected by the First Amendment, but privacy over financial transactions is itself a constitutionally protected interest"). These are legal arguments, which were properly considered (and properly rejected) in the context of Storm's motion to dismiss but which are not appropriate for trial. (*See* Denial of Mot. to Dismiss, Dkt. No. 84). Indeed, the only purpose Storm could have in making such arguments—and eliciting testimony in support of them—before the jury is to induce jury nullification, whereby "juries act[] as judges of the law as well as the

evidence." *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997). "[T]rial courts have the duty to forestall or prevent such conduct," which the Second Circuit has described as a "sabotage of justice." *Id.* (internal quotation marks and citation omitted); *see also In re United States*, 945 F.3d 616, 627 (2d Cir. 2019) (granting the Government's mandamus petition because the district court "abdicated its duty by ruling that defense counsel could argue jury nullification"). Accordingly, in an abundance of caution, the Court should preclude mention of legal arguments about rights to freedom of speech and privacy—and other appeals to jury nullification.

### D. The Court Should Exclude Evidence And Other Argument Concerning Other Cryptocurrency Mixing Services That Have Laundered Stolen Funds

Like the Tornado Cash service, there are, or have been, other cryptocurrency services, operated by various entities, that have facilitated anonymous cryptocurrency transactions for their customers. A number of these services have been subject to civil or criminal enforcement for, among other things, facilitating money laundering and sanctions evasion. Such conduct includes, but is not limited to, processing transactions in cryptocurrencies stolen in various hacking incidents and laundering funds attributed to the Lazarus Group. Storm should be precluded from introducing evidence, eliciting on cross-examination, or otherwise referencing or making arguments regarding the existence, structure, function, or use of any similar service. Such evidence is irrelevant, is unduly prejudicial, and would confuse the jury.

Here, evidence, arguments, or cross-examination regarding the existence of other cryptocurrency mixing services, their components, their relationship with, or contrast to the Tornado Cash service, and their possible use by the same or similar illicit actors at issue in this trial are simply not relevant to any of the issues that the jury must decide in connection with the three counts of the Indictment. As courts in this District have noted in the wire fraud context, "the

49

fact that certain conduct may be common or general practice in an industry was not relevant to the jury's consideration of the conduct of [the defendant]." *United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120, at *5 (S.D.N.Y. Dec. 20, 2019); *United States v. Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2125044, at *13 (S.D.N.Y. May 2, 2019) ("'everyone speeds' is not a defense if your car happens to get picked up on the radar."). *See also United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) (affirming exclusion of evidence of "sloppy or corrupt" practices because such evidence could not "shed any light on [defendant's] state of mind.") (internal quotation marks omitted).

Accordingly, evidence regarding the structure, function, and activity of other cryptocurrency mixers is irrelevant to whether Storm and his co-conspirators knowingly facilitated transactions through the Tornado Cash service that were proceeds of unlawful activity or whether they willfully facilitated transactions involving the sanctioned cryptocurrency address in violation of the International Emergency Economic Powers Act. And evidence about the structure and operation of other services has no bearing on whether the relevant elements of the Tornado Cash service constitute an unlicensed money transmitting business.

Evidence, arguments, or cross-examination about the conduct of these other cryptocurrency mixing services is also inadmissible because any probative value such evidence might have is substantially outweighed by the prospect of undue delay, unfair prejudice, confusion of the issues, and misleading the jury. Evidence about other cryptocurrency mixing services is, at best, tangential to any element or material fact at issue in the charged offenses. Introducing this evidence at trial would force the Government to offer rebuttal evidence to contextualize the defense evidence. This would distract and confuse the jury. *Cf. Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007) ("Admitting evidence about previous cases 'inevitably result[s] in trying those cases before

the jury,' and 'the merits of the other cases would become inextricably intertwined with the case at bar'"). In addition, the introduction of such evidence carries with it the possibility of defense arguments implying selective prosecution or suggesting jury nullification. Such arguments are improper and should not be permitted. *United States v. Loera*, 24 F.4th 144, 161 (2d Cir. 2022). ("arguments concerning prosecutorial bias amount to claims of selective prosecution and outrageous Government conduct, both of which must be decided by the trial court, not the jury"). *Thomas*, 116 F.3d at 616 ("trial courts have the duty to forestall or prevent" jury nullification). Because such risk of prejudice and confusion plainly outweighs the limited to nonexistent probative value of the evidence, Storm should be precluded from offering it.

E.   **The Court Should Exclude Evidence and Argument Concerning Hypothetical Other Means By Which the Lazarus Group Could Have Accessed the Tornado Cash Pools**

As the Court has recognized, "at trial, the Government will bear the burden to prove that Defendant conspired with others to violate IEEPA by means of the features [of the Tornado Cash service] over which they had control." (Dkt. 127 at 3). The evidence at trial will meet that burden, as the defendant knowingly and willfully participated in and facilitated transactions in sanctioned property of the Lazarus Group through features of the Tornado Cash service that he and/or his co-conspirators had the ability to control.

The defendant's expert disclosures indicate that he will attempt to introduce evidence that the Lazarus Group could in theory have figured out other ways of making deposits or withdrawals "directly" to or from the immutable Tornado Cash pools, without using features that he controlled. Such evidence is irrelevant and prejudicial and would serve only to confuse the issues at trial. It is of course true in any sanctions-violation case that the sanctioned person could in theory have used some other means of violating sanctions. But that is not the test for criminal culpability. The

51

Government need only prove that the defendant "was a knowing participant in the sanctions evasion scheme," *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020), not that the scheme could not have been accomplished without his participation.[9] Accordingly, any evidence or argument that the Lazarus Group could have achieved a similar result even without the defendant's direct participation is factually irrelevant and confusing, because that hypothetical possibiltiy is immaterial under the law.

### F. The Court Should Exclude Evidence and Argument Relating to Cryptocurrency Regulations or Policy, or Opinions From Witnesses on These Issues

The defendant and his counsel have made a number of public statements that suggest he may attempt to turn the trial into a referendum on cryptocurrency policy and regulations. For example, in a recent Wall Street Journal article, defense counsel was quoted as saying that this case would not have been brought now, and that it was "brought when Biden had declared war on crypto."[10] Arguments attempting to shift the focus from whether the defendant committed the crimes alleged in the Indictment to broader policy questions about cryptocurrency are improper and should be precluded.

The Second Circuit has recognized that a defendant may not argue for acquittal "on the basis of extraneous public policy considerations." *United States v. Cheung Kin Ping*, 555 F.2d 1069, 1074 (2d Cir. 1977); *see id.* at 1073 (affirming instruction to jury that "law enforcement

---

[9] For instance, a bank could not defend itself against a sanctions violations charge by introducing evidence that the sanctioned entity could have instead used an informal money transmitting network like a hawala to engage in the same transactions.

[10] *Wall Street Journal*, "A Crypto Coder's Invention Was Used by North Korean Hackers. Did He Commit a Crime?" Mar. 24, 2025. The Government notes that defense counsel's comments appear to run afoul of the Court's Local Rule 23.1, in that they express an opinion as to the merits of the case and therefore will presumptively interfere with a fair trial and otherwise prejudice the due administration of justice.

policy was not its concern," and that the jury should "focus its attention on the real issue, namely, whether the government had proved the facts alleged in the indictment beyond a reasonable doubt"); *see also United States v. Josephberg*, 562 F.3d 478, 497 (2d Cir. 2009) (affirming district court's finding that it was improper for defendant to argue in summation "that the Internal Revenue Service was 'arrogant,' … and that because of this, Defendant should be acquitted"). This evidence would not only be irrelevant to the defendant's criminal intent, it would also be confusing to the jury to turn the trial into a referendum on the role of government in addressing cryptocurrency. *See United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 6283509, at *5 (S.D.N.Y. Sept. 26, 2023) (precluding argument about the "role of regulatory agencies in responding to recent cryptocurrency market events" as having "no probative value" and "creat[ing] a substantial risk of confusing the issues and misleading the jury"); *Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*, No. 08 Civ. 7508 (SAS), 2013 WL 1155420, at *7 (S.D.N.Y. Mar. 20, 2013) (precluding evidence about general failures by credit rating agencies leading up to financial crisis and noting that court will not "let this trial become an inquiry into the role of the Rating Agencies in the financial crisis"). Because such evidence and argument would have no probative value, and would serve only to create a danger of undue prejudice, confusion of the issues, and misleading the jury, it should be precluded.

Likewise, the defendant should be precluded from examining government or defense witnesses about their opinions regarding the law, the government's enforcement decisions, or the legal theories underlying this case. Whether a witness is offering lay or expert testimony, it is a fundamental principle that it is the Court's job to instruct the jury on the law, and the jury's job to apply the facts to that law. *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999). Indeed, "[t]he rule prohibiting experts from providing their legal opinions or conclusions is 'so well-

established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle.'" *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (citations omitted). The defendant should not be permitted to invite any such legal or policy opinions from any witness.

In addition, any reference to FinCEN regulations or guidance about those regulations, or any claim that there was regulatory uncertainty about how FinCEN regulations applied to a business like the Tornado Cash service, should be precluded. While such evidence may have potentially been relevant to the defendant's state of mind with respect to the charge that he failed to register the Tornado Cash service pursuant to 18 U.S.C. § 1960(b)(1)(B), the Government is not proceeding with that theory and does not intend to introduce evidence or argument about the defendant's failure to comply with his regulatory obligations. Thus, permitting the defendant to introduce evidence about the purported uncertainty of those regulations, pertaining at most to a charge no longer in play, would essentially invite a mini-trial on that issue, which is irrelevant to any issue for the jury to decide.

### G. The Court Should Preclude Evidence Concerning the Defendant's Personal Background, Any Other Personal Factor Unconnected to Guilt, or Discussion of Potential Punishment or Collateral Consequences from a Potential Conviction

The defendant should be precluded from offering evidence or argument concerning his personal background, family relationships, or any other similar personal factors unconnected to guilt. Such evidence is routinely excluded. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy); *United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *United States v. Harris*, 491 F.3d

440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man"). There is a risk of this in this case, as the defendant has repeatedly brought up in public statements that his young daughter was home when he was arrested and the house was searched pursuant to a lawfully issued warrant.[11] He has also made public comments identifying himself as an asylum seeker who fled political persecution in Russia. *See, e.g.*, *United States v. Mejia*, No. 16 Cr. 45 (RWS), 2016 WL 6662265, at *1 (S.D.N.Y. Nov. 10, 2016) (precluding evidence of defendant's personal circumstances as "irrelevant to the merits of this case"); *United States v. Edwards*, 101 F.3d 17, 20 (2d Cir. 1996) (approving district court's decision to prohibit any argument in support of jury nullification).

Similarly, the defendant should be precluded, as irrelevant and prejudicial, during all phases of the trial from offering evidence or argument concerning the punishment or collateral consequences he faces if convicted, including potential incarceration, denaturalization and deportation. It is well established that the jury's function is to find the facts and to determine whether, based on those facts, the defendant is guilty of the crimes charged. Where, as here, the jury has no role at sentencing, or with respect to any immigration proceeding, it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* Moreover, information regarding the potential consequences

---

[11] *See, e.g.*, *Roman Storm Speaks – Tornado Cash Developer on What's at Stake*, Bankless, at 7:27, 9:03, 22:39 (Nov. 21 2024) https://podcasts.apple.com/us/podcast/roman-storm-speaks-tornado-cash-developer-on-whats-at-stake/id1499409058?i=1000677788161.

of a guilty verdict is irrelevant to the jury's task, and threatens to confuse the jury and risk nullification. *See id.* There is real risk of this, as well, as the defendant frequently brings up in public statements the maximum possible sentence he could receive.[12]

By contrast, the Government should be permitted to introduce records evidencing the defendant's concern about being arrested and incarcerated. For example, the Government may seek to introduce records produced by Google that indicate that, on August 20, 2022, the defendant searched "best federal prison ratings" and "list of minimum security federal prisons." This pre-charge conduct is obvious evidence of the defendant's state of mind and consciousness of guilt and therefore should be admitted.

Even if any such evidence concerning the defendant's personal background, factors unconnected to guilt, or range of punishment and collateral consequences arising from the charges were relevant (they are not), any potential probative value would be substantially outweighed by the unfair prejudice it would cause to the Government. *See* Fed. R. Evid. 403 advisory committee's notes ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."); *Mejia*, 2016 WL 6662265, at *2. Accordingly, references or testimony about any of these sorts of sympathetic factors should be precluded.

### H.  The Court Should Preclude Evidence Concerning the Defendant's Failed Attempt to Cooperate

On November 15, 2022—after OFAC imposed sanctions on Tornado Cash but before the defendant was charged—the defendant proffered with the Government pursuant to a proffer agreement. The defendant's proffer, however, was highly limited. While the defendant was willing

---

[12] *See id.*

to answer basic questions about his background and  technical aspects of the Tornado Cash protocol, he declined to answer any questions about, for example, his knowledge of the service's use by criminal actors or how much money he made from his operation of the service—in other words, he refused to address core matters that the Government had to assess in determining whether to seek charges against the defendant or others.

As described below, permitting the defendant to put on evidence or argument concerning his failed attempt at cooperation would be an impermissible application of the "consciousness of innocence" doctrine, which the Second Circuit has made clear is extremely limited in scope.

>    1.   <u>Applicable Law</u>

As noted above, evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Even if relevant, evidence is always subject to the strictures of Rule 403, which precludes evidence that is, among other things, unfairly prejudicial and/or liable to confuse or mislead the jury.

In *United States v. Biaggi*, 909 F.2d 662, 690-93 (2d Cir. 1990), the Second Circuit held that the district court erroneously excluded evidence of defendant John Mariotta's rejection of an immunity offer made by the Government. In so holding, the Second Circuit noted the following:

> When a defendant rejects an offer of immunity on the ground that he is unaware of any wrongdoing about which he could testify, his action is probative of a state of mind devoid of guilty knowledge. Though there may be reasons for rejecting the offer that are consistent with guilty knowledge, such as fear of reprisal from those who would be inculpated, a jury is entitled to believe that most people would jump at the chance to obtain an assurance of immunity from prosecution and to infer from rejection of the offer that the accused lacks knowledge of wrongdoing….

> Rejection of an offer to plead guilty to reduced charges could also evidence an innocent state of mind, but the inference is not nearly so strong as rejection of an opportunity to preclude all exposure to a conviction and its consequences. A plea

57

rejection might simply mean that the defendant prefers to take his chances on an acquittal by the jury, rather than accept the certainty of punishment after a guilty plea.

*Id*. at 690-91. The Second Circuit later held that exclusion of a defendant's rejection of a plea offer, *United States v. Goffer*, 531 F. App'x 8, 21–22 (2d Cir. 2013), and a deferred prosecution agreement, *United States v. Wilson*, 201 F.3d 433 (2d Cir. 1999), did not fall within the limited ambit of the *Biaggi* consciousness of innocence doctrine and was thus not erroneous. *see also United States v. Connolly*, No. 16 Cr. 370 (CM), 2018 WL 2411216, at *12 (S.D.N.Y. May 15, 2018) (12-13) (holding that a defendant's consent to extradition did not fall within the *Biaggi* doctrine, as it did not amount to the same "get-out-of-jail-free card" presented in *Biaggi*).

### 2.  Discussion

Here, any evidence or argument as to the defendant's failed attempt to cooperate with the Government is irrelevant, as it bears on no element of any of the crimes charged. Even if such evidence or argument were relevant (which it plainly is not), it falls far outside the heartland of the *Biaggi* consciousness of innocence doctrine. Here, the defendant accepted the Government's proffer agreement—which conferred so-called "use immunity" on the defendant's statements—and then strategically chose to discuss certain topics but not others. In particular, the defendant refused to answer any questions about certain potentially incriminating topics, despite the protections of the proffer agreements. In other words, the defendant's tacit rejection of the immunity he was granted does not indicate innocence, it betrays guilt.

Nor can the defendant's potential consciousness of innocence evidence survive Rule 403 scrutiny. Telling the jury that the defendant attempted to cooperate—even if the jury is provided with the appropriate context that this attempt was half-hearted at best, which it should be if this evidence is admitted—would only confuse and mislead the jury. *See Connolly*, 2018 WL 2411216,

at *13 ("[I]f the court were to allow Black to argue 'consciousness of innocence' based on his decision to waive extradition, the court would necessarily have to permit the Government to present evidence and argue that the defendant's decision had nothing to do with 'consciousness of innocence,' but rather was motivated by other non-exculpatory factors, such as, avoiding the cost of a futile extradition fight, and the possibility of being detained either in the United Kingdom or the United States pending trial.").

It would be unduly prejudicial to the Government because it would be an obvious bid to win the jury's sympathy and distract it from the merits. In other words, such evidence or argument invites jury nullification and should thus be precluded.

## I. The Court Should Preclude Evidence Concerning the Fifth Circuit's *Van Loon* Decision or Any Evidence or Argument Regarding the Legality of OFAC's Sanctions on the Tornado Cash Service

As the Court is well aware from the defendant's abortive attempt to convince the Court to reconsider its denial of his motion to dismiss (Dkt. 112, 127), the Fifth Circuit invalidated OFAC's sanctions on the Tornado Cash pools in *Van Loon v. Dep't of the Treasury*, 122 F.4th 549 (5th Cir. 2024). To the extent that the defendant attempts to make arguments based on *Van Loon*, or more generally attempts to introduce argument or evidence about the validity of the sanctions on Tornado Cash, such evidence is irrelevant to the crimes charged and is therefore excludable under Rule 401. Even were it relevant, it would not pass muster under Rule 403, as it would be unfairly prejudicial to the Government, misleading to the jury, and a waste of time.

Count Three of the Superseding Indictment, which charges the defendant with conspiring to violate IEEPA, relies on OFAC's still-valid sanctions against the Lazarus Group, not the Tornado Cash pools. As the Court noted in denying the defendant's motion for reconsideration,

*Van Loon* has no bearing on the validity of that charge (or on the validity of Counts One and Two). (*See* Dkt. 127 at 1-3).

As the Indictment indicates at paragraphs 74-75, evidence of the Tornado Cash sanctions will be introduced principally to demonstrate the defendant's consciousness of guilt. Immediately after OFAC announced its sanctions on the Tornado Cash pools on August 8, 2022, the defendant took affirmative steps to liquidate his and the other founders' TORN holdings and made suggestions about how to hide these funds. Ind. ¶ 75. In other words, confronted with the potential illegality of his operation of the Tornado Cash service and the possibility of criminal action against himself and his assets, the defendant's first instinct was to secret away the proceeds of his crimes, presumably for fear that they could be seized by law enforcement. That an appeals court in Texas would invalidate the Tornado Cash sanctions *more than two years later* simply has no relevance to the defendant's guilt or innocence with respect to the crimes charged. At the *relevant* time—that is, August 2022—the defendant rightly thought he was in trouble and that is relevant to the charges in the Superseding Indictment. Accordingly, *Van Loon* and any similar decisions that may be issued prior to trial are irrelevant and any evidence or argument with respect to those decisions should be excluded.

Even if *Van Loon* were relevant to the charged crimes, introduction of any evidence or argument regarding those decisions would be unfairly prejudicial to the Government. For example, the defense could use these decisions to impermissibly garner sympathy for the defendant and thus would invite jury nullification. The defense might also use these decisions to muddy the waters on the defendant's state of mind in August 2022 based on events that took place over two years later, which would be misleading and confusing to the jury. And because evidence or argument with

60

respect to these decisions would be both unfairly prejudicial and confusing, they would also be a waste of time.

For all of these reasons, the court should exclude any reference whatsoever to *Van Loon* or any similar decisions at trial.

## **CONCLUSION**

For the reasons set forth above, the Court should grant each of the Government's motions *in limine*.

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York

By: /s/  Thane Rehn
     Ben Arad
     Benjamin A. Gianforti
     Thane Rehn
     Assistant United States Attorneys

     Kevin Mosley
     Special Assistant United States Attorney
     (212) 637-2354

Dated: June 6, 2025
     New York, New York