UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                              :

UNITED STATES OF AMERICA

                                              :

        - v. -

                                              :    S1 23 Cr. 430 (KPF)

ROMAN STORM,

                                              :

                   Defendant.

                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# THE GOVERNMENT'S MOTIONS TO EXCLUDE THE TESTIMONY OF THE DEFENDANT'S EXPERT WITNESSES

JAY CLAYTON
United States Attorney
Southern District of New York

Ben Arad
Benjamin A. Gianforti
Thane Rehn
Assistant United States Attorneys

Kevin Mosley
Special Assistant United States Attorney
    *- Of Counsel -*

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 1

BACKGROUND .................................................................................................. 1

LEGAL STANDARD ........................................................................................... 3

ARGUMENT ...................................................................................................... 6

  I.  The Court Should Exclude Matthew Green's Proposed Testimony in Its Entirety ............ 6

      A.  Green's Background Testimony on the Cryptocurrency Industry and General Overview of "Privacy-Preserving" Tools Fails the "Fit" Test of Rule 702, Is Irrelevant Under Rule 402, and Should Be Precluded Under Rule 403 ................. 7

      B.  Green's Proposed Testimony on Legal Issues Usurps the Role of the Jury and Court, and Is Unreliable Under Rule 702 ................................................................. 9

      C.  Green's Proposed Testimony Concerning the Intentions of the Cryptocurrency Industry Fails to Meet the *Daubert* Standard or Comply With the Rule 16 Disclosure Requirements, and Is Irrelevant ...................................... 11

  II.  The Court Should Exclude Stephanie Hurder's Proposed Testimony in its Entirety ....... 14

      A.  Hurder's Proposed Background Testimony About Blockchain and Token Ecosystem Design Should Be Excluded ................................................................. 15

      B.  Hurder's Proposed Testimony that the Price of TORN Tokens Was Unaffected by the Level of Deposit and Withdrawal Activity through the Tornado Cash Service and that TORN Token Holders Did Not Benefit from the Use of the Tornado Cash Service by Illicit Actors Should Be Excluded ....... 17

      C.  Hurder's Proposed Testimony About Founder Compensation from Smart Contract Activity and UI Activity (or the Purported Lack thereof) and the Defendant's Token Sales Should Be Excluded .................................................... 22

  III.  The Court Should Exclude Portions of Matthew Edman's Proposed Testimony ............. 24

  IV.  The Court Should Exclude Douglas Jacobson's Proposed Testimony in its Entirety ...... 28

  V.  The Court Should Exclude Mike Carter's Proposed Testimony In its Entirety .............. 30

      A.  Carter's Proposed Rebuttal of FinCEN Is Irrelevant to the Issues in This Case .. 31

      B.  Carter's Proposed Rebuttal of the Government's Tech Expert Should Be Excluded ........................................................................................................ 32

      C.  The Substance of Carter's Purported Testimony Should Be Excluded ................ 32

  VI.  The Court Should Exclude Jeremy Sheridan's Proposed Testimony in its Entirety ........ 35

      A.  Sheridan's Proposed Testimony Is Not Proper Lay Opinion .............................. 37

      B.  Sheridan's Proposed Testimony Should Be Precluded Under Rule 16 and Rule 702 ........................................................................................................ 39

CONCLUSION ................................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. National Railroad Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ............................................................................ 5, 21

*CCM Rochester, Inc. v. Federated Invs., Inc.*,
2016 WL 11617452 (S.D.N.Y. Aug. 31, 2016) ................................................. 18

*City of Provid., R.I. v. Bats Glob. Mkts.*,
2022 WL 902402 (S.D.N.Y. Mar. 28, 2022) ................................................. 4, 7, 15, 24, 32

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993) ........................................................................................ 4, 5

*Diaz v. United States*,
602 U.S. 526, 535 (2024) ................................................................................. 13, 14

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ......................................................................................... 5

*Highland Cap. Mgmt., L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005) ............................................................ 12-13

*Hous. Works, Inc. v. Turner*,
362 F. Supp. 2d 434 (S.D.N.Y. 2005) ............................................................ 9

*Hygh v. Jacobs*,
961 F.2d 359 (2d Cir. 1992) ........................................................................... 9

*In re 650 Fifth Ave. & Related Properties*,
2017 WL 6419014 (S.D.N.Y. May 30, 2017) ................................................. 29

*In re Initial Pub. Offering Sec. Litig.*,
174 F. Supp. 2d 61 (S.D.N.Y. 2001) ............................................................... 9

*In re Rezulin Prods. Liability Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................................ 4, 9, 12, 13-14

*Marx & Co. v. Diners' Club Inc.*,
550 F.2d 505 (2d Cir. 1977) ........................................................................... 9

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) ........................................................................... 5

*Red Rock Commodities, Ltd. v. Standard Chartered Bank*,
140 F.3d 420 (2d Cir. 1998) ........................................................................... 9

*SEC v. Ripple Labs, Inc.*,
2023 WL 5670711 (S.D.N.Y. Mar. 6, 2023) ................................................... 22

*Shatkin v. McDonnell Douglas Corp.*
727 F.2d 202 (2d Cir. 1984) ........................................................................... 20

*TORN. Boucher v. U.S. Suzuki Motor Corp*,
  73 F.3d 18 (2d Cir. 1996) ............................................................................... 20

*United States v. Amirov*,
  2025 WL 636088 (S.D.N.Y. Feb. 27, 2025) ............................................ 8, 15, 27

*United States v. Amuso*,
  21 F.3d 1251 (2d Cir. 1994) ........................................................................... 13

*United States v. Atilla*,
  966 F.3d 118 (2d Cir. 2020) ........................................................................... 27

*United States v. Bankman-Fried*,
  2023 WL 6162865 (S.D.N.Y. Sept. 21, 2023) ............................................ 8, 26

*United States v. Berg*,
  710 F. Supp. 438 (E.D.N.Y. 1989) ................................................................. 14

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991) ............................................................... 9, 10, 30

*United States v. Bronston*,
  658 F.2d 920 (2d Cir. 1981) ............................................................................. 9

*United States v. Chastain*,
  2023 WL 2966643 (S.D.N.Y. Apr. 17, 2023) ............................ 8, 9, 15-16, 26, 36

*United States v. Collins*,
  581 F. App'x 59 (2d Cir. 2014) ....................................................................... 29

*United States v. Cuti*,
  720 F.3d 453 (2d Cir. 2013) ........................................................................... 29

*United States v. Garcia*,
  413 F.3d 201 (2d Cir. 2005) ........................................................................... 38

*United States v. Gatto*,
  986 F.3d 104 (2d Cir. 2021) ............................................................................. 3

*United States v. Grinage*,
  390 F.3d 746 (2d Cir. 2004) ........................................................................... 38

*United States v. Kaufman*,
  2021 WL 4084523 (S.D.N.Y. Sept. 8, 2021) ................................................. 3, 6

*United States v. Kwok*,
  2024 WL 1773143 (S.D.N.Y. Apr. 24, 2024) ................................................... 12

*United States v. Lumpkin*,
  192 F.3d 280 (2d Cir. 1999) ................................................................... 4, 9, 34

*United States v. Mahaffy*,
  2007 WL 1213738 (E.D.N.Y. Apr. 24, 2007) ..................................................... 6

*United States v. Mendlowitz, No. 17 Cr. 248*
    2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) .................................................. 29

*United States v. Sanders,*
    2013 WL 1421487 (S.D.N.Y. Mar. 27, 2013) .................................................. 14

*United States v. Scop*,
    846 F.2d 135 (2d Cir. 1988) ........................................................................... 9

*United States v. Valle,*
    2013 WL 440687 (S.D.N.Y. Feb. 2, 2013) .................................................. 6, 32

**Statutes**

Fed. R. Evid. 401 .......................................................................................... 16, 24
Fed. R. Evid. 402 ...................................................................................... 5, 6, 7, 31, 32
Fed. R. Evid. 403 ............................................................... 5, 6, 7, 16, 31, 32, 37, 40
Fed. R. Evid. 701 .......................................................................................... 37, 38
Fed. R. Evid. 702 ............................... 3-7, 9, 16, 18, 21, 25, 31, 32, 37, 38, 39, 40
Fed. R. Evid. 704 .......................................................................................... 22, 24
Fed. R. Evid. 1006 ............................................................................................ 37
Federal R. Crim. P. 16 ...................... 1, 5, 6, 8, 11, 12, 15, 17, 22-24, 28-32, 34, 35, 37, 39, 40
18 U.S.C § 1960 ................................................................................................. 32
31 C.F.R. § 1010.100 ......................................................................................... 33
31 U.S.C. § 5330 ............................................................................................... 32

## INTRODUCTION

The defendant has noticed his intention to call five expert witnesses and has provided notice of an additional witness to offer opinion testimony that the defendant erroneously characterizes as non-expert testimony. The defense's proposed expert and lay opinion witnesses and accompanying disclosures suffer from an array of deficiencies that warrant preclusion of five of his proposed witnesses in their entirety and significant limitations on the sixth. In many instances, the disclosures fail at the most basic level to set forth the expert's opinions, as required by Federal Rule of Criminal Procedure 16, and instead disclose broad topics on which the witness will testify. Where the defendant does disclose the expert's opinions, there are multiple deficiencies in the proposed testimony, including that they are inappropriate subjects for expert testimony, lack a reliable methodology or basis in facts and data, or are irrelevant, unfairly prejudicial, and confusing to the jury. Several of the experts propose to offer legal conclusions that invade the purview of the Court and the jury, or their testimony would serve no other purpose than as a Trojan horse to provide conclusory assertions about the defendant's supposed lack of criminal knowledge or intent under the guise of expert testimony. The Court should exercise its gatekeeping authority and preclude such impermissible expert testimony.

## BACKGROUND

On November 15, 2024, a grand jury in this District returned a three-count superseding indictment charging the defendant with conspiracy to commit money laundering, conspiracy to operate an unlicensed money transmitting business, and conspiracy to violate United States sanctions relating to the Democratic People's Republic of Korea (the "DPRK" or "North Korea"). The charges arise out of the defendant's ownership, development, marketing, and operation of a

cryptocurrency mixing service known as Tornado Cash (the "Tornado Cash service"). Trial on these charges is scheduled to begin on July 14, 2025.

On March 5, 2025, the defendant provided his initial expert notice, identifying five witnesses that the defendant may call as experts during his case and one additional witness that the defendant claims would not provide expert testimony. *See* Ex. 1, 1A, 1B, 1C (expert notices by the defendant). Those witnesses are: (1) Matthew Green; (2) Stephanie Hurder; (3) Matthew J. Edman; (4) Douglas Jacobson; (5) Mike Carter; and (6) Jeremy Sheridan.[1] According to the defendant's notice, if permitted by the Court, the witnesses would opine on the following topics:

- Green would testify principally about the "importance of online privacy," the tools available to ensure privacy, privacy-related vulnerabilities in traditional finance and certain cryptocurrency platforms, and would opine, among other things, that, in general, people who fund "cryptocurrency privacy tools … do not want to promote or engage in criminal activity." Ex 1A at 1, 3.

- Hurder would testify about "blockchain and token economics," including by opining that the founders of cryptocurrency projects "frequently seek to maximize something other than short-term founder profit." Ex. 1B at 5. Hurder would also testify about the price of TORN tokens and other cryptocurrencies at various points in time.

- Edman would opine about "blockchain technology and transaction tracing, smart contracts, and internet applications." Ex. 1C at 1.

- Jacobson is designated as a "rebuttal expert" to the Government's lay fact witness

---

[1] The defendant's cover letter, which also contains the entire disclosure for Douglas Jacobson, Mike Carter, and Jeremy Sheridan, is Exhibit 1; the notice of Matthew Green is Exhibit 1A; the notice of Stephanie Hurder is Exhibit 1B; and the notice of Matthew J. Edman is Exhibit 1C. The defendant, like the Government, also provided notice that he may call a Russian translator to introduce translation of certain chats if the parties cannot reach agreement on translations.

from OFAC. The defendant's disclosure says that Jacobson will "rebut" the Government's OFAC witness testimony based on his "extensive experience with OFAC regulations," but does not otherwise identify any opinions that Jacobson would offer. Ex. 1 at 2.

- Carter would opine about know-your-customer ("KYC") "obligations and processes," including "the applicability or inapplicability of KYC tools to Tornado Cash" as well as "the outcome and effectiveness of KYC tools" and a comparison of the Tornado Cash platform with other non-bank financial institutions. Ex. 1 at 2.

- Sheridan would "respond" to the "analysis and conclusions" offered by the Government's cryptocurrency tracing expert witness. Ex. 1 at 2-3. The defendant's disclosure provides no information about what Sheridan would say about these topics or how he would "respond" to the detailed expert analysis disclosed in the Government's disclosure, and provides no underlying transactional data or other information.

## LEGAL STANDARD

"An expert may be permitted to testify if he or she 'is qualified, reliable, and helpful.'" *United States v. Kaufman*, No. 19 Cr. 504 (LAK), 2021 WL 4084523, at *18 (S.D.N.Y. Sept. 8, 2021) (citing *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021), and Fed. R. Evid. 702). "This inquiry is 'guided' by Federal Rule of Evidence 702," *id.*, which provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if "the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is the product of reliable facts and methods that the expert has reliably applied to the case. Fed. R. Evid. 702. Districts courts play a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a

reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993).

The first requirement—that the "expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"—serves a dual purpose. First, "in requiring that expert testimony be directed to 'scientific, technical, or specialized' knowledge," the requirement "ensures that expert witnesses will not testify about lay matters" that are properly left for the jury, such as "facts or opinions stated by other potential witnesses" or "interpretations of conduct or views as to the motivation of parties." *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541, 546 (S.D.N.Y. 2004). Second, even testimony that is properly based on scientific, technical, or specified knowledge must "'fit' . . . the facts of the case." *City of Provid., R.I. v. Bats Glob. Mkts.*, No. 14 Civ. 2811 (JMF), 2022 WL 902402, at *8 (S.D.N.Y. Mar. 28, 2022). This requires the expert testimony to stay in bounds: the testimony must be directly pertinent to an issue that the jury has to resolve, but it must not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *accord Rezulin Prods.*, 309 F. Supp. 2d at 541.

Rule 702 also requires that the proffered expert testimony "is the product of reliable principles and methods" that are reliably applied to the facts of the case. Fed. R. Evid. 702. In *Daubert*, the Supreme Court set out a list of non-exclusive factors that the trial court may consider in determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique used by the expert can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the

theory or method has been generally accepted within the relevant scientific community. *Daubert*, 509 U.S. at 593-94. The Court is not required "to admit opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citations omitted).

Expert testimony may also be excluded under Federal Rules of Evidence 402 and 403 if it is irrelevant or its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). Rule 403 has a "uniquely important role . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberation." *Id.*

Finally, Federal Rule of Criminal Procedure 16(b)(1)(C) was recently amended to require the defendant, for each expert witness, to provide "a complete statement of all opinions that the defendant will elicit from the witness," along with "the bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C)(iii). While this "does not require a verbatim recitation of the testimony the expert will give at trial," it requires more than the "written summary" previously required under the Rules. Fed. R. Crim. P. 16 Adv. Comm. Notes, 2022 Amendment. Even before Rule 16(b)(1)(C) was amended in 2022, the advisory notes to the Rule recognized that the purpose of this requirement is "to provide the opponent with a fair opportunity to test the merit[s] of the expert's testimony through focused cross-examination" and "to permit more complete pretrial preparation," Rule 16 Adv. Comm. Notes, 1993 Amendment, and this Court observed that "[m]erely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal

the expert's actual opinions." *Kaufman*, 2021 WL 4084523, at *19 (collecting cases); *see also United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) (same). "If a defendant fails to provide disclosures in accordance with Rule 16(b)(1)(C), the district court may exclude the expert's testimony at trial." *Kaufman*, 2021 WL 4084523, at *19; *see also United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007) (same).

## ARGUMENT

### I.    The Court Should Exclude Matthew Green's Proposed Testimony in Its Entirety

The defendant intends to call Matthew Green, a professor and one of the creators of a cryptocurrency privacy blockchain called ZCash, as an expert to offer opinions on a variety of topics relating to, among other things, "the importance of online privacy," various online tools relating to privacy, the legality of certain types of privacy tools, and what actors in the cryptocurrency industry generally intend regarding criminal activity. Ex. 1A.

Green's testimony should be precluded in its entirety on several grounds. *First*, almost all of his testimony amounts to nothing more than a general survey of different types of "privacy-preserving cryptocurrency blockchains … and protocols." Ex. 1A at 1-3. This general overview of topics does not adequately disclose Green's opinions, as required by Fed. R. Crim. P. 16, fails the "fit" test of Fed. R. Evid. 702, is irrelevant under Fed. R. Evid. 402, and should be precluded under Fed. R. Evid. 403 because it will serve only to confuse and distract the jury. *Second*, Green proposes to opine that certain types of software are "legal" and "designed to protect legitimate users," which is an impermissible attempt to introduce expert opinions on questions of law. Ex. 1A at 3. *Third*, Green's opinions about what cryptocurrency developers, operators, and investors generally "intend" are not based on any reliable methodology, inadequately disclosed, and an impermissible attempt to offer opinion as to the defendant's mental state, which is the sole province

of the jury. Ex. 1A at 3-4. Stripped of these impermissible opinions, there is nothing left of Green's disclosure. He should be precluded from testifying or, at a minimum, the Court should conduct a *Daubert* hearing on Green's qualifications, methodology, and the relevance and reliability of his proposed testimony before he is permitted to testify before the jury.

### A. Green's Background Testimony on the Cryptocurrency Industry and General Overview of "Privacy-Preserving" Tools Fails the "Fit" Test of Rule 702, Is Irrelevant Under Rule 402, and Should Be Precluded Under Rule 403

Expert testimony must be directly pertinent to an issue that the jury has to resolve, and "fit" the facts of the case. *City of Provid.*, 2022 WL 902402, at *8. Here, the bulk of Green's disclosure is devoted to a general survey of the landscape of privacy features in both the cryptocurrency and traditional financial worlds. None of that testimony is relevant to whether this particular defendant committed the offenses charged in this case. The lessons that Green draws from this background information cannot be "reliabl[y] appli[ed] ... to the facts of the case," Fed. R. Evid. 702, and are certain to confuse the jury.

Green's disclosure is so wide-ranging that it is difficult to articulate any limits. The first paragraph setting forth the substance of his testimony generally proposes to offer "background testimony on online cryptography, open-source software ..., cryptocurrency blockchains/protocols ..., the history of privacy in electronic payment and networking systems ..., the history of cryptocurrency privacy," and, just in case those topics did not give him enough room to generally opine, the overall "history of online information privacy and security, including financial privacy and security." Ex. 1A at 1. That is a disclosure of broad topics, not specific opinions, and essentially would give Green latitude to offer any opinion regarding anything relating to financial technology, computer software, cryptocurrency, or privacy. His testimony on these topics should be precluded on that ground alone. "Listing the subjects on which a witness might testify does not

qualify as providing a Rule 16-compliant expert report." *United States v. Amirov*, No. S8 22 CR. 438 (CM), 2025 WL 636088, at *2 (S.D.N.Y. Feb. 27, 2025).

Moreover, none of the above-listed topics are relevant to any fact at issue in this case. The only part of the initial paragraph of Green's disclosure that might be a fit topic for expert testimony in this case is "the Tornado Cash protocol (including how its smart contracts work and the role of ETH and TORN)." Ex. 1A at 1. But that description fails to disclose any opinion Green might offer, much less explain the relevance of any such opinion to this case. Courts have precluded experts from testifying even when the disclosures were far more tailored to the case than anything Green proposes here. *See United States v. Bankman-Fried*, No. S6 22-CR-0673 (LAK), 2023 WL 6162865, at *2 (S.D.N.Y. Sept. 21, 2023) (precluding similar expert testimony and noting that "whether or not FTX was innovative or combined aspects of traditional and decentralized finance in its services is not at issue in this case"); *United States v. Chastain*, No. 22 Cr. 305 (JMF), 2023 WL 2966643, at *9 (S.D.N.Y. Apr. 17, 2023) (precluding expert testimony about the academic definitions of certain finance terms and a comparison between those terms and the information in the case because such testimony had "limited or no bearing on the issues in this case," and any probative value was "substantially outweighed by the dangers of confusing or misleading the jury").

The same is true for the testimony proposed in the remaining paragraphs of the Green disclosure, in which he expresses his own views on online privacy, offers a survey of tools to address online privacy ranging from VPNs to Apple Pay, and proposes to discuss an array of criminal activity that is not relevant to this case. *See* Ex. 1A at 1-4. Abstract questions of policy about privacy have no bearing on the facts at issue in this trial, and it will be especially irrelevant and confusing to the jury to hear about the "many exploits by bad actors" of banks and credit

reporting agencies, the instructions for setting up an Ethereum node, the "dangerous gangs" who have committed home invasions, the "many privacy-preserving cryptocurrency blockchains … and protocols," and Green's view that some of these privacy tools are "legal and widely distributed." *Id.* Such testimony will unnecessarily prolong the trial, misdirect the jury to issues not relevant to trial, and would also be improper by inviting the jury to decide this case based on its views about the desirability of privacy rather than the facts proven at trial and the legal instructions provided by the Court.

### B. Green's Proposed Testimony on Legal Issues Usurps the Role of the Jury and Court, and Is Unreliable Under Rule 702

Several aspects of Green's proposed testimony are blatant attempts to offer expert opinions on legal questions and are thus inadmissible. A fundamental principle underlying Rule 702 is that it is the court's job to instruct the jury on the law, and the jury's job to apply the facts to that law. *Lumpkin*, 192 F.3d at 290. For that reason, "[a]s a general rule an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). The Second Circuit has repeatedly held that such expert testimony should be excluded. *See, e.g.*, *Red Rock Commodities, Ltd. v. Standard Chartered Bank*, 140 F.3d 420, 423-24 (2d Cir. 1998); *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992); *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988); *United States v. Bronston*, 658 F.2d 920, 930 (2d Cir. 1981); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977). So has this Court. *See, e.g.*, *Hous. Works, Inc. v. Turner*, 362 F. Supp. 2d 434, 448 (S.D.N.Y. 2005); *Rezulin Prods.*, 309 F. Supp. 2d at 541. Indeed, "[t]he rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle.'" *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (citations omitted).

The defendant makes no secret of the fact that he intends to have Green offer legal opinions. The disclosure states that Green will express the view that software code that uses zero-knowledge proofs is "legal and widely distributed." Ex. 1A at 3. That type of opinion is exactly what the "axiomatic principle" prohibiting experts from offering legal conclusions is designed to prevent. Other aspects of Green's testimony may not be so blatant, but nonetheless can only be understood as an attempt to parade legal conclusions before the jury, by asserting that cryptocurrency privacy tools are a "necessary and logical outgrowth of the legitimate need for online financial privacy," and that the Tornado Cash service in particular "helps provide privacy to legitimate Ethereum users." Ex. 1A at 3. There is no way to interpret the disclosure's repeated reference to the purportedly "legitimate" nature of the service provided by Tornado Cash other than as an attempt to suggest to the jury that the business was legal, which is an impermissible purpose for expert testimony. *See, e.g.*, *Hygh*, 961 F.2d at 364 ("Even if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury."); *Bilzerian*, 926 F.2d at 1294 (holding expert testimony "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it"); *id.* at 1295. ("[T]estimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice."). On top of that, Green offers no methodology supporting these opinions, which are simply his own personal views and are inadmissible for that reason as well.

Not only are these opinions impermissible legal opinions, but they are also, in the Government's view, incorrect, or at a minimum in need of significant clarification regarding

exactly what Green means by "legitimate." As the Court is aware, there is a significant legal and factual dispute about whether the Tornado Cash service, even if it had not been used for money laundering and sanctions violations, was required to register with the United States Treasury and comply with the same anti-money laundering and know-your-customer rules that are required of other financial institutions. While the Government has elected not to proceed to trial on that issue, it would be patently unfair to permit the defendant to offer a naked legal opinion that his business was perfectly "legal" and "legitimate." That would either prejudice the jury, or waste time by inviting a side trial in which the Government would be compelled to respond to claims that the Tornado Cash service was a "legitimate business" by introducing evidence about the various regulatory issues surrounding the Tornado Cash service and the defendant's failure to comply with the Bank Secrecy Act ("BSA") and its implementing regulations. Those issues, however, are irrelevant to the questions that the jury will be asked to decide. Green's testimony regarding these issues should be excluded.

**C. Green's Proposed Testimony Concerning the Intentions of the Cryptocurrency Industry Fails to Meet the *Daubert* Standard or Comply With the Rule 16 Disclosure Requirements, and Is Irrelevant**

Finally, Green's proposed testimony regarding what people involved in cryptocurrency businesses "want" or "intend" is inadmissible. In particular, Green proposes to testify that:

- "Cryptocurrency privacy tools" are "funded by respected venture capitalists, … who do not want to promote or engage in criminal activity." (Ex. 1A at 3).

- "U.S.-based companies and software developers generally do not post software tools … intending for them to be used in criminal activity; rather, they intend for them to be used for legitimate purposes." (Ex. 1A at 3).

- "U.S.-based venture capital firms generally do not invest in companies that intend to promote or facilitate criminal activity." (Ex. 1A at 4).

Green's testimony is based on his personal "experience" in the cryptocurrency industry, Ex. 1A at 1, and he does not claim to have conducted any study or research relating to what participants in the industry intend. There is no way to evaluate his subjective impressions of what the industry "wants" or "intends" by reference to any field of study, which means that these opinions fail to meet the *Daubert* standard. *See Rezulin Prods.*, 309 F. Supp. 2d at 547 ("[T]he opinions of these witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise."). And because these opinions fail to explain their basis, they also do not comply with the notice requirement of Rule 16. "An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *United States v. Kwok*, No. 23 Cr. 118 (AT), 2024 WL 1773143, at *1 (S.D.N.Y. Apr. 24, 2024) (quoting *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006)).

These opinions are not the product of scientific, technical, or specialized knowledge, nor are they based on reliable principles and methods. Green's opinions about what other people "want" do not appear to be based on anything other than conjecture, surmise, and (perhaps) some past statements to Green by some unspecified set of people he happens to have interacted with in the course of his work in the cryptocurrency industry. In short, Green has not presented any reliable basis on which he can opine regarding the subjective state of mind of any other person, much less make categorical statements about an entire industry. *See Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005) (rejecting expert's attempt to speculate "regarding the state of mind and motivations of certain parties" and as to the "knowledge possessed by

defendants and non-parties"). There is also no probative value to such testimony about what other participants in the industry "generally" intend, which says nothing about what the defendant intended and is likely to confuse and complicate issues for the jury unnecessarily, if not invite jury nullification.

The defense disclosure for Green twice uses the word "generally" to describe what crypto industry participants intend. Ex. 1A at 3-4. The use of that word appears to be an effort to suggest that Green's proposed opinions comport with the Supreme Court's ruling in *Diaz v. United States*, 602 U.S. 526, 535 (2024), which held that it was permissible for an expert on drug-trafficking organizations to testify that drug couriers "generally transport drugs knowingly." However, there are key differences between this disclosure and the testimony at issue in *Diaz*, which underscore why Green's opinions about the mental state of others are inadmissible. First, the expert witness in *Diaz* provided detailed reasoning that was testable on cross-examination about the basis for his conclusion that most drug couriers know what they are transporting. *Id.* at 530 (describing expert's basis for his opinion). Here, by contrast, there is no explanation for Green's opinion aside from his own *ipse dixit*.

Second, the expert opinion in *Diaz* related to an issue, the internal operations of international drug-trafficking organizations and the typical role and knowledge of particular types of participants in those organizations, that would not be known to lay jurors. *See United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994) (noting that "the operational methods of organized crime families are still beyond the knowledge of the average citizen"). Here, by contrast, Green's opinions amount to a general observation that most people are not criminals and do not want to fund criminals. That is not a fit subject for an expert opinion and threatens to distract the jury from the direct evidence regarding the defendant's intent. *Rezulin Prods.*, 309 F. Supp. 2d at 541, 546

(expert witnesses should "not testify about lay matters" that are properly left for the jury, such as "facts or opinions stated by other potential witnesses" or "interpretations of conduct or views as to the motivation of parties"). And attempting to couch Green's "people generally obey the law" testimony in the context of a particular industry does not save it. It is irrelevant to this defendant's state of mind whether most people in the same industry attempt to comply with their legal obligations. *See United States v. Berg*, 710 F. Supp. 438, 445 (E.D.N.Y. 1989) ("[T]he custom of other arms dealers in complying with arms export laws is irrelevant to the state of mind of [the defendants] … ."), *aff'd in part, rev'd in part on other grounds sub nom. United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991); *cf. United States v. Sanders*, No. 12 Cr. 574 (LAK), 2013 WL 1421487, at *2 (S.D.N.Y. Mar. 27, 2013) (precluding proposed expert testimony as to "custom and usage in the insurance industry" as irrelevant to the question of whether "inaccurate information allegedly supplied by the defendant was not material to the insurance carriers"). Finally, even if the Court permitted Green to offer an opinion about what people in the cryptocurrency industry "intend" (and it should not), he should be barred from expressing any categorical view, which is plainly barred by *Diaz. See* 602 U.S. at 536 (Fed. R. Evid. 704(b) bars testimony that "defendant was part of a group of people that *all* have a particular mental state") (emphasis added).

## II.    The Court Should Exclude Stephanie Hurder's Proposed Testimony in its Entirety

The defendant intends to call Stephanie Hurder as an expert to testify (1) about "[b]lockchain and [t]oken [e]cosystem [d]esign;" (2) that "any gains in TORN token price were not due to expectations of token holders receiving ETH distributions from Tornado Cash smart contract activity;" (3) that "TORN token holders did not benefit from the use of Tornado Cash by illicit actors [and that] illicit use resulted in a large decrease in TORN token price;" and (4) about the Tornado Cash service "[f]ounders' token allocation structure and defendant Storm's token

sales." Ex. 1B at 2, 5, 10, 11. For the reasons set forth below, Hurder's proposed testimony should be excluded in its entirety.

### A. Hurder's Proposed Background Testimony About Blockchain and Token Ecosystem Design Should Be Excluded

As set forth in Section 1 of Hurder's expert disclosure—which contains no reference whatsoever to the Tornado Cash service, the defendant, or his conduct—Hurder, like Green, intends to opine on a host of wide-ranging topics, including: the field of "cryptoeconomics;" "decentralized application[s]" and their "distinct tokenomics;" the "price of a blockchain-based token" as a "function of both . . . supply . . . and demand;" "[b]lockchain projects" and their purported tendency to "frequently set goals for decentralization . . . of control;" the decentralized autonomous organization ("DAO") as a supposedly "common model" for developers who wish to encourage decentralization by diffusing "voting power to eventually override the founding team"; the supposed tendency of DAOs to "frequently seek to maximize something other than short-term founder profit"; and the need for "[a]ll blockchain-based projects . . . to determine how they will fund start-up and ongoing costs." Ex. 1B ¶¶ 1-7.

As noted above with respect to Green's proposed testimony, expert testimony must be directly pertinent to an issue that the jury has to resolve, and "fit" the facts of the case. *City of Provid.*, 2022 WL 902402, at *10. Moreover, "[l]isting the subjects on which a witness might testify does not qualify as providing a Rule 16-compliant expert report." *Amirov*, 2025 WL 636088, at *2. Hurder's expected pronouncements about the multitude of topics set forth above are largely if not entirely irrelevant to whether the defendant committed the crimes with which he is charged. Indeed, neither a detour through the esoteric field of cryptoeconomics and token pricing, nor a primer on Hurder's general observations of the cryptocurrency industry, are probative of any contested fact and will confuse and waste the time of the jury. *See Chastain*, 2023

WL 2966643 at *9 (expert testimony about the academic definitions of certain finance terms had "limited or no bearing on the issues in this case," and any probative value was "substantially outweighed by the dangers of confusing or misleading the jury").

For example, Hurder's opinions that "[b]lockchain projects . . . frequently set goals for decentralization . . . of control" and that "[m]any" DAOs provide diffuse participants with "sufficient voting power to eventually override the founding team" are so broad that they have no place at trial. These opinions are untethered to any facts in this case and thus plainly irrelevant under Rules 401 and 402; what blockchain projects and DAOs do in general tells the jury nothing about what happened with the Tornado Cash service specifically. These opinions thus fail the "fit" test of Rule 702. They also would unduly prejudice the Government under Rule 403 by confusing the jury. Whether certain, unspecified blockchain projects have achieved decentralized control or overridden the control of their founding teams has no relevance whatsoever to whether the defendant's project—the Tornado Cash service—achieved the same things—or, more to the point, whether the defendant's degree of involvement in the Tornado Cash service was sufficient to find that he participated in the charged conspiracies.

The same is true of Hurder's proposed testimony that the developers of decentralized applications "frequently seek to maximize something other than short-term founder profit" and that "[a]ll blockchain-based projects . . . need to determine how they will fund start-up and ongoing costs." The profit-seeking intent (or lack thereof) of certain, unspecified decentralized application developers and their need for start-up and operating capital simply have no bearing on the issues in this case, which pertains to just one blockchain application: the Tornado Cash service. Hurder's general observations about decentralized application developers' attempts (or lack thereof) to turn their projects into profitable businesses has no bearing on the defendant's intent with respect to his

own project. Hurder should not be permitted to share these irrelevant, confusing, and prejudicial observations that invite the jury to draw conclusions about the defendant's intent from the purported intent of other, unrelated actors.[2]

Nor should Hurder be permitted to define the more than two dozen terms of art that her disclosure states she "will define," but whose definitions are absent from the disclosure—in violation of the notice requirements of Rule 16(b)(1)(C). *See* Ex. 1B at 2. Without advance notice of those definitions, the Government cannot adequately challenge Hurder's proposed testimony in a *Daubert* motion or adequately prepare to cross-examine Hurder at trial. The Government respectfully submits that this deficiency warrants exclusion of Hurder's proposed term-of-art definitions, even if there were some relevance to these terms, which is not apparent as to many of them. At a minimum, the defense should not be permitted to frustrate the Court's gatekeeping function under *Daubert* by resting on the barebones notice it has provided with respect to these definitions.

### B. Hurder's Proposed Testimony that the Price of TORN Tokens Was Unaffected by the Level of Deposit and Withdrawal Activity through the Tornado Cash Service and that TORN Token Holders Did Not Benefit from the Use of the Tornado Cash Service by Illicit Actors Should Be Excluded

Sections 2 and 3 of Hurder's disclosure relate to the price of TORN tokens. Section 2 opines that "any gains in TORN token price were not due to expectations of token holders receiving ETH distributions from Tornado Cash smart contract activity." Ex. 1B at 5. Section 3 opines that "TORN token holders did not benefit from the use of Tornado Cash by illicit actors; in fact, illicit use resulted in a large decrease in TORN token price." Ex. 1B at 10. However, the disclosure completely fails to provide an adequate basis for either conclusion.

---

[2] To the extent the defendant suggests that these opinions are permissible under *Diaz*, that is wrong for the same reasons discussed above with respect to Green's testimony.

With respect to Section 2, the heading of that section states Hurder's opinion that there was no connection between the TORN token's price and Tornado Cash smart contract activity. One might expect, then, some sort of analysis comparing these two variables. That expectation is not fulfilled. On the contrary, Hurder does not even feign to provide a basis for her opinion. Aside from a throwaway reference to "[a]cademic research," Ex. 1B ¶ 15(d), which is not identified, the only gestures at empirical analysis are discussions of the highest prices that TORN reached during certain periods and the correlation between the price of TORN tokens and the price of ETH and BTC. Ex. 1B ¶¶ 16, 17. That analysis fails on two grounds. First, this sort of simple correlation, "without a regression or other similar analysis," is an insufficient basis for economic expert testimony. *CCM Rochester, Inc. v. Federated Invs., Inc.*, No. 14 Civ. 3600 (VEC), 2016 WL 11617452, at *5 (S.D.N.Y. Aug. 31, 2016). Hurder fails to identify adequate data or a methodology that is recognized in her field, as required under *Daubert*. And even if this type of simple correlation analysis were sufficient to show a relationship between TORN and ETH and BTC, that would say nothing about whether TORN prices *also* correlated with Tornado Cash smart contract activity, and thus would not provide any support for Hurder's opinion in Section 2. Hurder never even attempts to measure Tornado Cash smart contract activity, much less compare it to TORN prices. Thus, the opinion expressed in Section 2 should be excluded because it is not based on "scientific, technical, or other specified knowledge" as required by Rule 702(a).

In addition to these flaws, much of Section 2 of Hurder's disclosure is devoted to making a point—that "owners of the TORN token could not expect profit or revenue distributions of ETH from Tornado Cash smart contract activity as a benefit of token ownership"—that is irrelevant and appears to be deliberately confusing. Ex. 1B ¶¶ 13-15. None of the Government's witnesses— expert or lay—will suggest that TORN holders could expect distributions of ETH. As explained

in the Government's disclosure of Werlau's testimony, the Tornado Cash founders designed the relayer registry so that TORN holders could receive distributions of TORN tokens (not ETH) from the relayers, which created an ongoing need for relayers to purchase TORN tokens in the market. Allowing an expert witness to testify that no ETH distributions (as opposed to TORN distributions) were made to TORN owners would serve no purpose other than to mislead the jury into thinking that the relayer registry provided no economic benefit to TORN holders, by denying the existence of an economic benefit that no one has ever claimed existed. Hurder might as well claim that TORN token holders could not expect a distribution of gold bars either. Accordingly, this testimony would be irrelevant, confusing (indeed, misleading), and unduly prejudicial.

Section 2 also contains Hurder's opinions about TORN as a "governance token," i.e., a token with voting power that could be used to "participate in the decision-making process" for the Tornado Cash service. Ex. 1B ¶ 10. But as with the other opinions in this section of the Hurder declaration, Hurder leaps from an unremarkable fact to a conclusion that is neither supported by reliable methodology nor apparently relevant to any issue in this case. Here, she starts with the basic fact that TORN holders could participate in decision-making, and then seeks to downplay the value of TORN as a means of monetizing the Tornado Cash service, asserting that "TORN as a standalone governance token had value to buyers." Ex. 1B ¶ 11(d). But that claim is (a) unsupported by anything other than speculation about why buyers were purchasing TORN at any point in time; and (b) irrelevant in any event, because whether TORN had governance value says nothing about whether it could *also* be used to generate profits from monetizing the fees charged by the Tornado Cash service. Regarding the basis for her opinion, Hurder compares TORN tokens to UNI and COMP tokens, which she says—without any supporting analysis or data—"are used

only for participation in their project's DAO," *i.e.*, only as governance tokens. Ex. 1B ¶ 10(d)(ii).[3] But no explanation is on offer for why Hurder identifies those tokens; the UNI and COMP tokens are components of blockchain projects that are distinct from the Tornado Cash service (and not commonly known outside cryptocurrency circles, and therefore confusing to the jury). This testimony would be "in essence an 'apples and oranges comparison'" calculated to mislead the jury that, because Hurder thinks the UNI and COMP tokens are solely governance tokens, the same is true of TORN. *Boucher v. U.S. Suzuki Motor Corp*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Shatkin v. McDonnell Douglas Corp.* 727 F.2d 202, 208 (2d Cir. 1984)). But again, there is no dispute that TORN can be used in governance, and there is no reason offered by Hurder to suggest that governance value is in any way inconsistent with monetization value.

Section 3 of Hurder's disclosure suffers from similar problems. Hurder opines that "TORN token holders did not benefit from the use of Tornado Cash by illicit actors; in fact, illicit use resulted in a large decrease in TORN token price." Ex. 1B at 10. Again, as with Section 2, this would suggest that Hurder attempted to analyze or measure the relationship between illicit use of Tornado Cash and the TORN token's price. But she did nothing of the sort. Instead, she focuses primarily on the fact that the imposition of sanctions on the Tornado Cash pools in August 2022 "was devastating for the TORN token price." Ex. 1B ¶¶ 20-22. But that does not indicate that illicit use was bad for TORN prices; instead, it indicates that attempts by the Government to address illicit use was bad for TORN prices. Hurder's apparent reasoning is that the defendant did not intentionally participate in the charged crimes because he knew the price of TORN would fall if

---

[3] Perhaps Hurder does not offer any support for this assertion because if she did an actual analysis, it would reveal that the price of these tokens is in fact highly responsive to their potential monetization value. *See, e.g.*, Bessie Liu, "Uniswap Token Pumps Following Governance Fee Switch Proposal," *Blockworks*, Feb. 23, 2024, available at https://blockworks.co/news/uniswap-token-pumps-fee-switch-proposal (discussing "price jump" in UNI tokens after announcement that Uniswap was "proposing an upgrade … so that its fee mechanisms will reward UNI token holders").

Tornado Cash were sanctioned, which presupposes that he knew he would get caught and that sanctions would be imposed. Similarly, she points to the SEC's lawsuit against Ripple for securities law violations in December 2020 as an indication that regulatory scrutiny hurt the value of Ripple's token. Ex. 1B ¶ 18. Again, while that suggests that Government enforcement may detrimentally impact a token's price, it does not afford a reliable basis to opine that illicit activity itself has the same impact. Moreover, she does not cite any evidence that the defendant was aware of that lawsuit, which would be necessary for it to be relevant to her opinions about whether he expected to benefit from his own involvement in criminal activity.

The Ripple example also illustrates the fundamental flaws in this entire section of Hurder's disclosure. Just as she does not consider whether Ripple benefitted from the alleged securities law violations, she does not actually analyze whether Tornado Cash's involvement with illicit activity financially benefitted TORN token-holders like the defendant. Instead, she opines that it was bad for the business when the Government tried to stop the illicit activity. By that logic, no one would ever participate in any illegal activity, even if profitable, because a company that gets sanctioned or sued by a regulator ultimately suffers consequences. The limited data points on which Hurder relies are simply inadequate to support that sweeping and illogical conclusion. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) ("Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

Similar problems plague paragraph 19, where Hurder uses a single incident—the Ronin hack—to render an opinion regarding causation—that public knowledge of the Ronin hack "did not benefit the TORN token price." Ex. 1B ¶ 19(c). Courts have recognized that this sort of simple correlation cannot permissibly be used to render an expert opinion on causation of market prices

21

"[w]ithout additional analysis controlling for confounding factors, or an appeal to academic literature to support a determination of causation." *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT), 2023 WL 5670711, at *13 (S.D.N.Y. Mar. 6, 2023). Lacking any such support, Hurder simply has her "*ipse dixit*, which is insufficient under *Daubert*." *Id.*

## C. Hurder's Proposed Testimony About Founder Compensation from Smart Contract Activity and UI Activity (or the Purported Lack thereof) and the Defendant's Token Sales Should Be Excluded

Section 4 of Hurder's disclosure states that she will testify that, among other things: (i) the "founders structured the delivery of their founders' token allocations to incentivize sustained token price growth and long-term investment in the project;" (ii) the Tornado Cash service "founders received no compensation from the Tornado Cash smart contract activity or UI activity;" (iii) she "analyze[d] Mr. Storm's vesting, claims, and sales of TORN;" and (iv) "[n]one of [the defendant's] purchases [of two residences and a Tesla] could have plausibly been funded by sales of Defendant Storm's founders allocation of TORN tokens." Ex. 1B ¶¶ 23, 25-27. All of these items of proposed testimony should be excluded because they are not supported by any expert analysis whatsoever. In addition, item (i) is irrelevant and impermissibly goes to the ultimate issue of the defendant's intent, items (ii) and (iii) are confusing and prejudicial, and items (iii) and (iv) fail to meet the disclosure requirements of Rule 16(b)(1)(C). Moreover, (iv) is entirely irrelevant.

Hurder posits that the founders structured their TORN allocations to incentivize sustained token price growth and long-term investment in the Tornado Cash service. That speculation about the founders' intent not only lacks any basis in expert analysis (Hurder merely lists certain vesting terms in support of her claim) but goes to the ultimate issue of the defendant's intent, in violation of Rule 704(b). And Hurder's point is irrelevant to boot. The Government does not allege that the defendant sacrificed long-term profits for short-term gains (which would not be a crime). Instead, the allegation is that he knowingly conspired to engage in money laundering, sanctions violations,

and transmitting criminal proceeds. Whether he intended those crimes to reap profit in the long term, the short term, or both is simply not at issue.

Hurder's opinion that the founders "received no compensation" from deposits and withdrawals through the Tornado Cash smart contracts and the UI is supported only by her barebones statement that "[n]either had a protocol fee to fund such compensation." Ex. 1B ¶ 25. Although that observation is so sparse that it is difficult to understand (and deficient under Rule 16 for that reason alone), Hurder appears to be saying that the UI and the smart contracts did not have a "protocol fee" that was payable directly to the founders each time they were used. As with many of Hurder's other points, that is irrelevant to any allegation in this case. The Government alleges that the founders set up the Tornado Cash service to generate value by having TORN holders receive distributions of TORN that had been staked by relayers. Indictment, Dkt. 1, ¶¶ 30-31. Those relayers, in turn, had to purchase and stake the TORN in order to secure the opportunity to process withdrawals for users of the Tornado Cash Service—*i.e.*, to process what Hurder refers to as "smart contract activity," including through the UI. There is no claim of any "protocol fee," whatever Hurder means by that, and Hurder's attempt to treat the absence of such a fee as evidence that the founders "received no compensation" from the Tornado Cash service is a non sequitur. Accordingly, this proposed testimony should be excluded as confusing and unduly prejudicial.

As for Hurder's intention to "analyze Mr. Storm's vesting, claims, and sales of TORN," the disclosure provides no information whatsoever regarding the nature of the analysis, its conclusions, or even the data on which it is based—except to say that the data is "provided by NAXO." Ex. 1B ¶ 26. But the defense did not produce any such data along with Hurder's disclosure. In other words, the disclosure announces that Hurder intends to provide expert testimony regarding the defendant's use of TORN—based on data that has not been disclosed—

but says nothing further about the contents of that testimony. Rule 16(b)(1)(C) requires that far more information be disclosed. The Government respectfully submits that this deficiency warrants exclusion of the proposed analysis. But at a minimum, the defense should not be permitted to frustrate the Court's gatekeeping function under *Daubert* by resting on the barebones notice it has provided.

Finally, Hurder's proposed testimony that the defendant's purchases of two homes could not "have plausibly been funded by sales of Defendant Storm's founders allocation of TORN tokens" is entirely irrelevant. Ex. 1B ¶ 27. The defendant and his co-founders designed the initial release of TORN tokens, including both the founders' allocation and the early adopters' allocation, and the defendant obtained TORN tokens from both allocations. It is irrelevant which of the two simultaneous allocations of TORN tokens—both of which the defendant essentially issued to himself—were the ones he later liquidated for his own financial benefit. The only apparent purpose of this testimony would be to confuse the jury and distract it from the relevant issue—namely, that the defendant profited from the Tornado Cash service.

## III.    The Court Should Exclude Portions of Matthew Edman's Proposed Testimony

The proposed expert testimony of Matthew Edman about blockchain technology should be excluded in substantial part for three reasons: the proposed testimony is neither relevant under Rules 401 and 402, nor permissible under Rule 704; and the notice disclosing his opinions and the reasons for them is insufficient.

First, as described above with respect to Green and Hurder, expert testimony must "fit" the facts of the case, meaning that it must be "sufficiently tied" to the facts and relevant to a "pertinent issue *in this case*." *City of Provid.*, 2022 WL 902402, at *10 (emphasis in original). Edman's meandering testimony about general aspects of blockchain technology, and his discussion of other cryptocurrency businesses in particular, are largely irrelevant to, and in any event ill-fitted for, a

case about the defendant's alleged participation in conspiracies to commit money laundering and sanctions violations. To be sure, some expert testimony to explain those aspects of the blockchain and cryptocurrency that are relevant to this case is appropriate, and to the extent Edman proposes to provide expert opinion to assist the jury in understanding relevant concepts, the Government does not object. But given the broad nature of Edman's disclosure, the purpose of much if not most of this background information is unclear, and cannot be reliably applied to the facts of the case, as required by Rule 702.

In particular, Edman's repeated invocations of other types of business models and specific businesses is irrelevant and certain to confuse the jury. For example, Edman intends to opine about:

- The difference between "proof-of-work" and "proof-of stake" blockchains, even though there does not appear to be anything relevant to this case that is captured by that distinction, and descriptions of changes to the Ethereum blockchain that took place in September 2022, after the time period charged in this case. Ex. 1C at 3, ¶¶ 13-14.

- The "diverse set of applications on the Ethereum blockchain" enabled by smart contracts, and the "variety of purposes" served by these "decentralized finance or DeFi" applications, including references to Uniswap, a trading application, and Aave, a lending application, neither of which is relevant to this case. Ex. 1C at 3, ¶¶ 17-18.

- The way users "typically interact" not only with Tornado Cash but with "other DeFi applications." Ex. 1C at 4, ¶ 20.

- The purported "similar[ity]" between Tornado Cash and "decentralized exchanges like Uniswap or OpenSea." Ex. 1C at 4, ¶ 22.

- The purported "similar[ity]" between Tornado Cash's relayer service and "other services like 0x's gasless API." Ex. 1C at 5, ¶ 27.

These opinions are irrelevant. Whether or not there are a "diverse set of applications" that use smart contracts, and whether or not the Tornado Cash service has any similarity to other applications, is irrelevant to the issues at trial. A detour through the landscape of "decentralized finance" applications is not probative of any contested fact and will certainly confuse and waste the time of the jury. *See Bankman-Fried*, 2023 WL 6162865, at *2 (precluding similar expert testimony and noting that "whether or not FTX was innovative or combined aspects of traditional and decentralized finance in its services is not at issue in this case"); *Chastain*, 2023 WL 2966643, at *9. For instance, even if a lay jury could be expected to learn anything from hearing that Tornado Cash's relayer network is "similar to … 0x's gasless API," that would not illuminate any issue at trial. It could serve only to confuse the jury, or improperly suggest that the Tornado Cash service was lawful merely because it bore a resemblance to some other "DeFi" company that has not been prosecuted.

Edman's disclosure also includes an improper attempt to opine on what sanctioned actors such as the North Korean Lazarus Group hypothetically could have done if the defendant had not facilitated their sanctions evasion. In particular, Part F of the Edman disclosure is entirely dedicated to opining that certain changes to the Tornado Cash service "would not have prevented deposits to the Tornado Cash protocol from sanctioned addresses." Ex. 1C at 9. That section contains hypothetical speculation that "it would likely have been no more effective" if the defendant and his co-conspirators had taken certain additional steps to address the sanctions violations that were ongoing through the Tornado Cash service. Ex. 1C at 10, ¶ 51. And Edman also further proposes to opine about what a "threat actor" would have been able to do in the event that the defendant had prevented the threat actor from using the portions of the Tornado Cash service that the defendant controlled. Ex. 1C at 10, ¶ 52.

None of this testimony is relevant to the issues at trial. Its only apparent purpose would be to argue to the jury that, even if the defendant had stopped facilitating and profiting from the sanctions evasion, the Lazarus Group would probably have figured out another way to violate sanctions. That would be an impermissible argument. Indeed, permitting such an argument would prevent the Government from ever bringing a sanctions violation case, as it is presumably always possible for a sanctioned entity to find another way to engage in prohibited transactions. That is not the law. The Government must prove that the defendant "was a knowing participant in the sanctions evasion scheme," *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020), not that the scheme could not have been accomplished without his participation.

Finally, Edman's disclosure is woefully inadequate in many respects. The defendant's notice says Edman will testify about when particular TORN tokens were sold, when particular TORN tokens were used to participate in governance proposals, and generally provide "testimony regarding proposals," including unspecified "updates" to certain features of the Tornado Cash service. Ex. 1C at 9 ¶ 45. But his disclosure fails to specify what transactions, dates, proposals, or updates he intends to testify about. As with so many of the defendant's other disclosures, this is just a general disclosure of topics, not opinions, and it gives the Government no ability to prepare for Edman's testimony, assess whether it is relevant to any issues in dispute, or challenge the basis for that testimony. Accordingly, it should be precluded. *Amirov*, 2025 WL 636088, at *2.

Equally problematic is the ambiguous disclosure that Edman intends to criticize the methodology used by the Government's expert, Philip Werlau, to identify which deposits used the Tornado Cash UI and CLI. Ex. 1C at 10, ¶ 54. Edman simply states that Werlau did not provide the results of any testing or verification of his methodology, or "consistently apply that methodology." *Id.* But that is an insufficient disclosure—Edman is merely expressing his general

disagreement with the Government's expert without any specific bases for criticism.[4] These deficiencies warrant exclusion of Edman's testimony on these topics, *see* Fed. R. Crim. P. 16(d)(2)(C), but at a minimum, the defense should not be permitted to frustrate the Court's gatekeeping function under *Daubert* by resting on the barebones notice it has provided.

## IV.    The Court Should Exclude Douglas Jacobson's Proposed Testimony in its Entirety

The defendant intends to call Douglas Jacobson as "solely a rebuttal expert to [the Government's lay fact witness from OFAC, John] Pisa-Relli," to testify "regarding the same topics that the government's identified for Mr. Pisa-Relli in its February 18, 2025 disclosure letter." Ex. 1 at 2. Jacobson's proposed testimony should be rejected because it is unnecessary, the opinions being offered are not adequately disclosed, and it pertains to issues of law on which expert testimony is inadmissible.

*First*, as the Government explained to the defense in a letter dated March 10, 2025, expert testimony regarding issues pertaining to OFAC is unnecessary. At trial, the Government will call Pisa-Relli to "provide an overview of OFAC's administration of United States sanctions on specially designated nationals," testify "that OFAC designated the Lazarus Group and designated as blocked property a certain ETH wallet address," and establish "that the following individuals and entities did not obtain licenses to conduct any transactions with or services for the Lazarus Group: Roman Storm, Roman Semenov, Alexey Pertsev, Tornado Cash, and Peppersec." *Id.* at 1-2 (internal modifications, quotation marks, and citation omitted). That testimony simply establishes that a particular entity and ETH wallet address were in fact designated by OFAC, and that neither the defendant, his co-conspirators, nor his companies obtained a license from OFAC

---

[4] After receiving the Edman disclosure, the Government produced a more detailed rebuttal disclosure containing extensive information about Werlau's methodology, including testing and verification procedures he employed. The defense has not provided any responsive disclosure.

to transact with that sanctioned entity and property. These are facts that are necessary to make out an element of the offense, not opinions. It is therefore the province of lay—not expert—witnesses. *See United States v. Cuti*, 720 F.3d 453, 457-58 (2d Cir. 2013) (the "initial question" in distinguishing between fact- and expert testimony is "whether the contested testimony should be characterized as fact or opinion"); *In re 650 Fifth Ave. & Related Properties*, No. 08-cv-10934 (KBF), 2017 WL 6419014, at *1 (S.D.N.Y. May 30, 2017) (denying defense motion to compel expert report in connection with testimony of OFAC witness, similar to the OFAC testimony expected in this case, "regarding areas about which [the witness] has first-hand knowledge based on her expertise," where she "is not going to offer opinions of any sort or legal conclusions").

To the extent the defendant has questions about OFAC and related matters, he may put them to Pisa-Relli during cross-examination. There is no need for a separate "expert" witness to testify on such matters—especially when, as here, such testimony would duplicate the testimony of a non-expert witness. *See United States v. Collins*, 581 F. App'x 59, 60 (2d Cir. 2014) (summary order) (upholding the district court's exclusion of expert testimony from an attorney-witness regarding a fact issue where the defendant "could alternatively [make his case as to that issue] through cross-examination of government witnesses," and the issue "was within the competence of a jury unassisted by opinion testimony"); *United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120, at *7 (S.D.N.Y. Dec. 20, 2019) ("Because many of these witnesses had prior experience working for credit card processors or had knowledge generally about the industry because of their work history, there was no need for expert testimony related to industry practice.").

*Second*, even assuming that rebuttal expert testimony on OFAC's basic functioning would be appropriate here (which it would not), the defendant's expert notice is plainly deficient because it does not state the anticipated opinions of the witness or what those opinions are based on other

29

than Jacobson's general professional experience, as reflected in his CV, which was provided to the Government apparently in lieu of an expert disclosure. Jacobson's expert disclosure states the following—and nothing more—about the substance of his proposed testimony: "Given that Mr. Jacobson is solely a rebuttal expert to Mr. Pisa-Relli, he would testify regarding the same topics that the government's identified for Mr. Pisa-Relli in its February 18, 2025 disclosure letter. In the event that more fulsome or complete disclosures are made by Mr. Pisa-Relli before trial, Mr. Jacobson would respond to those disclosures." Ex. 1 at 2. That notice is plainly insufficient.

Jacobson's notice does not state what, if any, analysis he has conducted or, more importantly, what opinions he has formed from that analysis. Indeed, while the defendant casts Jacobson as "solely a rebuttal expert," the defendant's disclosure makes no attempt to identify which parts of Pisa-Relli's expected testimony Jacobson will respond to, what his opinions are of that testimony, or where, if anywhere, he disagrees with Pisa-Relli.

*Third*, to the extent Jacobson's proposed testimony concerns the interpretation and application of U.S. sanctions laws, such as IEEPA—which it well may, given that Jacobson's experience seems to derive principally from his many years of employment as a private attorney and professor of law—it is inadmissible. *See Bilzerian*, 926 F.2d at 1294 ("[A]n expert's testimony on issues of law is inadmissible.").

For all of these reasons, Jacobson's proposed testimony should be excluded in its entirety.

## V.    The Court Should Exclude Mike Carter's Proposed Testimony In its Entirety

The defendant intends to call Mike Carter, a senior managing director at a business consulting and global advisory firm, as a rebuttal expert to offer opinions on a variety of topics relating to, among other things, the Tornado Cash service as compared to non-bank financial institutions ("NBFIs"), particularly with respect to privacy features, third-party blockchain monitoring tools, and the existence and effectiveness of KYC tools. *See* Ex. 1 at 2.

Carter's testimony should be precluded on several grounds. First, he is primarily designated as a rebuttal witness to Theodore Vlahakis, who is a FinCEN employee that the Government no longer intends to call and whose testimony was only related to the allegation that the defendant failed to register his business with FinCEN, which is no longer relevant at trial. Second, the notice offers only very general, broad, and vague statements about Carter's proposed testimony, lists topics rather than opinions, and fails to offer the bases for whatever opinions he is to offer. To the extent inferences can be drawn from the paucity of information in the notice, his proposed opinions appear to primarily involve legal conclusions such as the "obligations" of Tornado Cash under the Bank Secrecy Act, the "applicability or inapplicability of KYC tools to Tornado Cash," and the claim that privacy features "are not inherently illicit or suspicious." Ex. 1 at 2. Any such legal opinions are inadmissible for the reasons discussed above, in addition to being irrelevant under Rule 402 or excludable under Rule 403 because they would be cumulative, would confuse the jury, or would waste time. Carter's testimony should be precluded in its entirety.

### A. Carter's Proposed Rebuttal of FinCEN Is Irrelevant to the Issues in This Case

To the extent Carter was "designated as a rebuttal expert to [government lay witness] Theodor Vlahakis," Ex. 1 at 2, any such testimony should be excluded under Rules 702, 402, and 403. Vlahakis is a FinCEN employee who the Government initially disclosed to testify as to the fact that "Roman Storm, Roman Semenov, Alexey Pertsev, Tornado Cash, and Peppersec" "were not registered as MSB's with FinCEN." Ex. 5 (Government's Expert Disclosure (Feb. 18, 2025)) at 2. On May 15, 2025, the Government notified the Court that the United States "will not proceed to trial on Title 18, United States Code, Section 1960(b)(1)(B) ... the first object of the conspiracy charged in Count Two of the superseding Indictment," Dkt. 144, charging the defendant with conspiring to operate a money transmitting business that was not federally registered as required by 31 U.S.C. § 5330 and its implementing regulations. Because the only purpose for calling

Vlahakis was to establish that the defendant, his co-conspirators, and entities he controlled were in fact not registered with FinCEN, the Government will not be calling him. Thus, there is no need to rebut any testimony he might have provided, and any such testimony should be excluded, as it no longer meets the requirement under Rule 702 that proffered expert testimony "fit" the facts of the case *City of Provid.*, 2022 WL 902402, at *8. The proffered testimony is also irrelevant and should be excluded under Rule 402, and even if relevant, it should be excluded under Rule 403 because it would waste time and confuse the jury.

### B. Carter's Proposed Rebuttal of the Government's Tech Expert Should Be Excluded

The defendant also purports to call Carter to rebut "portions of the expert report of Philip A. Werlau, to the extent such testimony deals with implementation of Know Your Customer ("KYC") obligations and processes." Ex. 1 at 2. To the extent the defendant intends to offer Carter as a rebuttal witness for this purpose, his testimony should be excluded for inadequate notice. While the notice generally describes his testimony, it does not articulate any disagreement with the Government's expert, the basis for any such disagreement, or any methodology supporting any opinion Carter might offer. *United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) ("Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions"). Indeed, as described in further detail below, it is not clear from the six general topics included in the defendant's notice whether Carter can offer any permissible testimony relevant to the Government's expert.

### C. The Substance of Carter's Purported Testimony Should Be Excluded

Taking the topics by subject, the defendant proposes to have Carter provide "a comparison of the structure and design of the Tornado Cash platform against non-bank financial institutions ('NBFI'), intermediaries, and software service providers and their respective obligations under the Bank Secrecy Act and its components" and "an overview of privacy features available for NBFI,

payment intermediaries, and software service industries." Ex. 1 at 2. There is no indication that Carter has any knowledge of the "structure and design of the Tornado Cash platform," and the notice sheds no light on how he might have gained such knowledge. The notice fails to define NBFI, but if the defendant intends to define the term as any financial institution that is not a bank, that categorization is so broad as to be meaningless. Take, for example, the definition of "financial institution" in the regulations accompanying Title 31 of the United States Code. Non-bank financial institutions include broker dealers, casinos, money services businesses, card clubs, futures commission merchants, commodities brokers, and mutual funds. 31 C.F.R. § 1010.100(t)(1)-(10). In addition to money transmitters, money services businesses include, among others, check cashers, dealers in foreign exchange, issuers of traveler's checks, sellers of prepaid access, and the postal service. *See* 31 C.F.R. § 1010.100(ff)(1)-(7). These institutions serve vastly different purposes, have varied structures, operate using fiat and virtual assets, and are subject to different requirements under the Bank Secrecy Act. It is not clear from the notice whether Mr. Carter intends to testify about one of them, all of them, or some subset of them.[5] And it is not clear how any privacy features pertinent to any single NBFI or any group of NBFIs is relevant to the privacy features included in the Tornado Cash service.

In any event, the obligations of NBFIs under the Bank Secrecy Act as compared to the Tornado Cash service are not relevant to the resolution of any fact at issue in this case. Because the Government is no longer pursuing the theory that the defendant violated the registration requirements in the BSA, it will not offer evidence regarding whether the Tornado Cash service was required to register or had any other BSA obligations. The Government does not assert, and Mr. Werlau will not opine, that the BSA *required* the defendant to implement KYC or anti-money

---

[5] The term "intermediaries" is more vague and less edifying than NBFI.

laundering compliance measures. He will merely testify, that according to his reading of the relevant code, that the defendant and his co-conspirators *could* have implemented processes to identify customers of the Tornado Cash service and address the rampant money laundering through the service. Whether and to what extent other financial institutions are required to comply with the BSA is simply not relevant to the issues in this case. And even if the defendant's obligations under the BSA were still at issue, Carter's testimony about those obligations should be precluded because they would "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Lumpkin*, 192 F.3d at 289.

The defendant also expects Carter to testify regarding "third-party blockchain monitoring software, including their limitations and the need for human review and involvement, and the impracticality of applying third-party blockchain monitoring software to decentralized blockchains or cryptocurrency projects." Ex. 1 at 2. This notice is also deficient and should be precluded on that ground alone. The notice fails to specify the relevant limitations of third-party blockchain monitoring software, why or how human review or involvement is required, the basis for the opinion that applying third-party blockchain monitoring software to decentralized blockchains or cryptocurrency projects is impractical, or why it would be impractical to implement in the Tornado Cash service.

Mr. Carter's opinions related to the existence, function, and efficacy of KYC tools should also be excluded for the same reason. The mere disclosure of a general opinion about the "available KYC tools and how [they] work," Ex. 1 at 2, provides no information about which tools Carter is referencing and which functions are relevant to this case, or how his opinion (whatever it may be) would aid the jury in determining any fact at issue here. This applies equally to the purported opinion about "the outcomes and effectiveness of KYC tools." *Id*. Because there is no opinion

disclosed, much less any explanation of what if any expertise Carter has to render any such opinion or what methods he has used to arrive at any such opinion, Carter's testimony regarding this topic should be precluded.

Carter's purported opinion regarding "the applicability or inapplicability of KYC tools to Tornado Cash," *id.*, is similarly unenlightening. It is not clear which opinion Carter means to express. What does "applicability" mean in this context? Are KYC tools applicable to Tornado Cash? Or are they inapplicable? And which tools? Are some applicable and some not? On top of these problems, this topic appears to relate to legal opinions that are inadmissible for the reasons discussed above.

The only clearly stated opinion in Carter's notice is "that cryptocurrency transactions that possess privacy features are not inherently illicit or suspicious." Ex. 1 at 2. But testimony about what is or is not "illicit" is an improper legal opinion and should be precluded. And this testimony is irrelevant and risks undue prejudice. The Government has not alleged that privacy features are *per se* illicit or suspicious. Rather, the Indictment alleges that "the defendant in fact knew that [the Tornado Cash service] was a haven for criminals to engage in large-scale money laundering and sanctions evasion." Superseding Indictment, ¶ 1, ECF No. 109. A general statement that privacy features could be implemented legally has nothing to do with the operative privacy features of the Tornado Cash service as implemented by the defendant and his co-conspirators. *See Chastain*, 2023 WL 2966643, at *9.

## VI.    The Court Should Exclude Jeremy Sheridan's Proposed Testimony in its Entirety

The defense discloses that it may call Jeremy Sheridan, a senior managing director at the same business consulting and global advisory firm that employs Carter, to "introduce charts summarizing, the flow of cryptocurrency between accounts and wallets relevant to the charges

alleged in the superseding indictment, and in response to the testimony of Special Agents Stephan George and Joel DeCapua." Ex. 1 at 2. Sheridan's testimony may include the following:

- "[T]he identification of accounts Mr. Storm allegedly used [and] a description of the flow of funds through those accounts;"

- "[A]n analysis of the TORN Vesting Contracts and the flow of Mr. Storm's founders' TORN;"

- Testimony regarding "compliance reports related to the transactions at issue in the Expert Disclosures by Special Agent Stephan George dated February 18, 2025;" and

- An analysis of "the unaggregated data provided by Special Agent DeCapua and respond to Special Agent DeCapua's analysis and conclusions."

Ex. 1 at 2-3. But the defendant is not offering Sheridan as an expert, as "[t]he defense does not believe this type of testimony would constitute expert testimony pursuant to Federal Rule of Evidence 702." *Id.* at 3. Based on the disclosure, it appears Sheridan is being offered to provide a lay opinion under Rule 701. This is not appropriate testimony under Rule 701. To the extent Sheridan's testimony will help the jury "determine[e] a fact in issue;" Fed. R. Evid. 701(b), it is through the application of his "technical or other specialized knowledge within the scope of Rule 702," and must be offered as expert testimony. Rule 701(c).[6]

---

[6] Neither is Mr. Sheridan's testimony appropriate as part of a summary under Rule 1006. It is not clear what voluminous material he is to summarize, but any summary he would offer would not meet the "balancing test of Rule 403." Fed. R. Evid. 1006 advisory committee's note to 2000 amendment. For example, if he is summarizing evidence offered by the Government, that would duplicate any such summary offered by the Government and should be precluded because it would waste time, confuse the jury, and would be unduly argumentative. *Id.* ("if the summary does not accurately reflect the underlying voluminous evidence, or if it is argumentative, its probative value may be substantially outweighed by the risk of unfair prejudice or confusion.").

If Sheridan's testimony is offered under Rule 702, the Court should preclude it. The disclosure regarding his testimony fails to meet the threshold of Rule 16(b)(1)(C)(iii) in multiple respects and otherwise should be excluded under Rule 403. If the Court is not prepared to exclude Sheridan's testimony on this record, the Court should order a *Daubert* hearing.

### A. Sheridan's Proposed Testimony Is Not Proper Lay Opinion

Lay opinion testimony under Rule 701 is limited to testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 701 was amended in 2000 "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing" and requires lay opinion testimony to "be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701 advisory committee's note to 2000 Amendments. Mr. Sheridan's proposed testimony is not proper lay opinion because his opinions would not be based on his perception, and to the extent it would be helpful to determine a fact at issue, it is only helpful to the extent he can rely on specialized knowledge.

"Rule 701 requires lay opinion testimony to be based on the witness's personal perceptions …. to afford the trier of fact an accurate reproduction of the event at issue." *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005) (internal citations omitted). The defendant does not offer any evidence to suggest that Sheridan has any personal knowledge of any of the events addressed in the disclosure or any events at issue in this trial. To the extent he can offer any perceptions based on his personal observation, that can only occur at trial after observing the testimony of the Government's experts or by offering opinions based on a review of evidence collected by others.

This is not the basis for proper lay opinion testimony. *Id.* at 212 ("when an agent relies on the 'entirety' or 'totality' of information gathered in an investigation to offer a 'lay opinion' as to a person's culpable role in a charged crime, he is not presenting the jury with the unique insights of an eyewitness's personal perceptions."). *See also United States v. Grinage*, 390 F.3d 746, 751 (2d Cir. 2004) (a government agent providing lay opinion testimony as a summary witness to events he did not witness was not permitted under Rule 701(b) and "usurped the jury's function").

Proper lay testimony under Rule 701(c) "must be the product of reasoning processes familiar to the average person in everyday life." *Garcia*, 413 F.3d at 215 (internal citations omitted). This is "to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements." *Id.* It is difficult to see how Sheridan can offer any value to the jury without resort to specialized knowledge. Special Agents DeCapua and George relied on years of experience in investigations involving virtual asset tracing to perform the complex cryptocurrency tracing that supports their opinions. In addition, Special Agent George, who has training as an accountant, used that knowledge to implement the "last in, first out" accounting methods used to account for the flow of funds to the various assets described in his expert disclosure. Given that the underlying testimony relies on specialized knowledge, it is hard to see how Sheridan can summarize or offer opinions about that testimony without relying on the same. Indeed, the disclosure suggests that his opinions will be based on specialized knowledge. For example, Sheridan is expected to provide "an analysis of the TORN Vesting Contracts and the flow of Mr. Storm's founders' TORN" and to "analyze the unaggregated data provided by Special Agent DeCapua and respond to Special Agent DeCapua's analysis and conclusions." Analyzing contracts related to the vesting of a proprietary digital asset and the

subsequent flow of funds from a holder of that asset and analyzing unaggregated data from "approximately 400 different spreadsheets," Ex. 1 at 3 n.1, is not within the experience level of the average person and is clearly expert testimony that must be evaluated under Rule 702. And based on Sheridan's disclosure, the Court should exclude his testimony because it fails to meet Rule 16's requirements and the proposed testimony would confuse the jury and waste time. If Sheridan's testimony is offered under Rule 702, the Court should preclude it. The disclosure regarding his testimony fails to meet the threshold of Rule 16(b)(1)(C)(iii) in multiple respects and otherwise should be excluded under Rule 403. If the Court is not prepared to exclude Sheridan's testimony on this record, the Court should order a *Daubert* hearing.

### B. Sheridan's Proposed Testimony Should Be Precluded Under Rule 16 and Rule 702

The defendant's disclosure of Sheridan's proposed testimony fails to meet the Rule 16 requirements in several respects. The disclosure fails to specify which of Special Agent DeCapua's or Special Agent George's opinions Mr. Sheridan is to rebut. The disclosure does not contain any of the charts on which Mr. Sheridan is to rely. While some of them may depend on the Government's experts' actual testimony, charts addressing issues like "the flow of cryptocurrency between accounts and wallets relevant to the charges alleged in the superseding indictment" or "the identification of accounts Mr. Storm allegedly used" do not. It is not at all clear what "compliance reports" will be part of Mr. Sheridan's testimony. Not only are the individual compliance reports unidentified, they are also undefined. It is not clear what "compliance report" means in the context of Mr. Sheridan's proposed testimony. The disclosure does not describe Mr. Sheridan's opinion(s) about the TORN Vesting Contracts, does not explain his analysis of the data provided by Special Agent DeCapua or his opinion(s) regarding Special Agent DeCapua's conclusions, and does not describe his analysis of "the flow of Mr. Storm's founders' TORN." For these reasons, the Court should exclude Sheridan's testimony.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should exclude the testimony of (1) Matthew Green; (2) Stephanie Hurder; (3) Matthew Edman (in substantial part); (4) Douglas Jacobson; (5) Mike Carter; and (6) Jeremy Sheridan.

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York


By: /s/ Thane Rehn
    Ben Arad
    Benjamin A. Gianforti
    Thane Rehn
    Assistant United States Attorneys

    Kevin Mosley
    Special Assistant United States Attorney
    (212) 637-2354

Dated: June 6, 2025
       New York, New York