UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

ROMAN STORM, ET AL.,

Defendants.

Case No. 23 Cr. 430 (KPF)

Final Pretrial Conference: July 8, 2025

## DEFENDANT ROMAN STORM'S
## OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE*

Brian E. Klein
Keri Curtis Axel
Becky S. James
Kevin M. Casey
Viviana Andazola Marquez
Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

David E. Patton
Nicholas D. Pavlis
Hecker Fink LLP
350 Fifth Ave, 63rd Floor
New York, New York 10118
(212) 763-0883

*Attorneys for Roman Storm*

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ..................................................................................1

II.    ARGUMENT ........................................................................................2

    A.    Gov't MIL No. I – The Government's Request To Admit Unspecified Statements from Alleged Co-Conspirators and Agents Fails To Meet the Requirements of Any Hearsay Exception ...................................................2

        1.    Out-of-Court Statements of Alleged Co-Conspirators ...............................3

            (a)    The Government Has Not Met the Requirements of Rule 801(d)(2)(e) .................................................................................3

            (b)    The Government Has Not Met the Requirements of Rule 804(b)(3) ...................................................................................5

            (c)    The Government Has Not Met the Requirements of Rule 801(d)(2)(D) ...............................................................................7

        2.    Out-of-Court Statements of Alleged Employees or Agents ........................7

    B.    Gov't MIL No. II – The Defense Should Be Permitted to Offer Additional Portions of Roman Storm's Statements Under the Rule of Completeness and To Show Intent ..................................................................9

    C.    Gov't MIL No. III – The Government's Request to Admit Documents Under Rules 803(6) and 902(11), (13) and (14) Is Premature and Cannot Be Addressed Without Examining the Records Specifically ...............................11

    D.    Gov't MIL No. IV – The Government's Proposed Method of Authenticating and Admitting the Purported Contents of a Cellphone Allegedly Seized from Alexey Pertsev Violates the Sixth Amendment ...............14

        1.    The Government's Proposed Method of Authentication Is Inadequate .................................................................................15

        2.    The Government's Proposed Method of Authentication Violates Roman Storm's Sixth Amendment Rights .........................................18

            (a)    The Pertsev Phone Extract and GrayKey Report Are Testimonial Hearsay and Subject to the Confrontation Clause ...................................................................................18

            (b)    The Government's Cited Authority Is Inapplicable, Inconsistent with *Smith*, or Simply Irrelevant ...............................20

    E.    Gov't MIL No. V – The Government's Proposed Evidence Is Not Admissible as Direct Evidence or Under Rule 404(B) .......................................24

        1.    Legal Standards .....................................................................25

        2.    Evidence of Mr. Storm's Receipt and Sales of TORN Should Not Be Admitted ........................................................................26

3.      Evidence of Allegedly False Statements Made on a Financial
        Services Company Questionnaire Are Irrelevant and Prejudicial
        and Should Not Be Admitted ........................................................33

4.      Evidence Regarding Alleged Activities of the Tornado Cash
        Founders After the Imposition of the Illegal OFAC Sanctions
        Should Not Be Admitted ..............................................................35

F.   Gov't MIL No. VI – This Court Should Not Preclude Roman Storm's
     Potential Advice-of-Counsel Defense .................................................37

G.   Gov't MIL No. VII – The Government's Purported "Irrelevant" And
     "Unfairly Prejudicial" Evidence and Arguments ................................42

     1.   Gov't MIL No. VIIA – Any Evidence About Alleged Victims of
          Third-Party Hacks is Irrelevant and Unduly Prejudicial ...........42

     2.   Gov't MIL No. VIIB – Evidence of Lawful Uses of Tornado Cash
          Are Admissible ...........................................................................44

     3.   Gov't MIL No. VIIC – Roman Storm Should Be Permitted to
          Testify About Privacy, If He Testifies ......................................45

     4.   Gov't MIL No. VIID – Other Cryptocurrency Mixing Services .............46

     5.   Gov't MIL No. VIIE – The Lazarus Group's Access to Tornado
          Cash Pools ..................................................................................47

     6.   Gov't MIL No. VIIF– Regulations, Policy, and Opinions Relating
          to Cryptocurrency ......................................................................48

     7.   Gov't MIL No. VIIG – This Court Should Deny the Government's
          Motion to Exclude Evidence About Roman Storm's Personal
          Background and Should Preclude the Government from
          Introducing Google Searches About Incarceration ...................49

          (a)   Evidence Regarding Roman Storm's Personal Background
                Is Admissible ....................................................................49

          (b)   Evidence of Roman Storm's Google Searches Should Be
                Precluded ...........................................................................50

     8.   Gov't MIL No. VIIH – Mr. Storm's Cooperation ....................52

     9.   Gov't MIL No. VIII – *Van Loon* ..............................................53

III.   CONCLUSION ..........................................................................................55

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>CASES</u>

*Anderson v. United States*,
    417 U.S. 211 (1974)................................................................................ 18

*Bullcoming v. New Mexico*,
    564 U.S. 647 (2011)............................................................................ 19, 23

*Crawford v. Washington*,
    541 U.S. 36 (2004)................................................................ 6, 18, 19, 23

*Fischl v. Armitage*,
    128 F.3d 50 (2d Cir. 1997)...................................................................... 4

*In re Dana Corp.*,
    574 F.3d 129 (2d Cir. 2009).................................................................. 53

*Melendez-Diaz v. Massachusetts*,
    557 U.S. 305 (2009)...................................................................... 18, 19, 23

*New York v. Hendrickson Bros.*,
    840 F.2d 1065 (2d Cir. 1988).................................................................. 4

*Old Chief v. United States*,
    519 U.S. 172 (1997)............................................................................... 51

*Pierre v. Dyer*,
    208 F.3d 394 (2d Cir. 2000).................................................................. 53

*S.E.C. v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013)................................................... 39

*SEC v. Stoker*,
    No. 11 Civ. 7388 (S.D.N.Y. filed Oct. 19, 2011) ................................ 39

*Smith v. Arizona*,
    602 U.S. 779 (2024)................................................................ 18, 19, 20, 22

*Tardif v. City of New York*,
    991 F.3d 394 (2d Cir. 2021).................................................................. 49

*TVT Records v. Island Def Jam Music Grp.*,
    250 F. Supp. 2d 341 (S.D.N.Y. 2003)................................................... 49

*United States v. Adelekan*,
    567 F. Supp. 3d 459 (S.D.N.Y. 2021)................................................... 45

*United States v. Araujo,*
    539 F.2d 287 (2d Cir. 1976)..................................................................... 43

*United States v. Arce,*
    49 F.4th 382 (4th Cir. 2022) .................................................................... 21

*United States v. Atilla,*
    966 F.3d 118 (2d Cir. 2020)............................................................... 34, 35

*United States v. Bankman-Fried,*
    2023 WL 6283509 (S.D.N.Y. Sept. 26, 2023).................................. 2, 5, 9, 47

*United States v. Bankman-Fried,*
    2024 WL 477043 (S.D.N.Y. Feb. 7, 2024)................................................ 38

*United States v. Blackwell,*
    853 F.2d 86 (2d Cir. 1988)....................................................................... 49

*United States v. Bout,*
    651 F. App'x 62 (2d Cir. 2016) ................................................................ 15

*United States v. Casamento,*
    887 F.2d 1141 (2d Cir. 1989)..................................................................... 6

*United States v. Castro,*
    813 F.2d 571 (2d Cir. 1982)..................................................................... 10

*United States v. Collorafi,*
    876 F.2d 303 (2d Cir. 1989)..................................................................... 46

*United States v. Connolly,*
    2018 WL 2411216 (S.D.N.Y. May 15, 2018) ........................................... 52

*United States v. Connolly,*
    2019 WL 2125044 (S.D.N.Y. May 2, 2019) ............................................. 46

*United States v. Cruz,*
    981 F.2d 659 (2d Cir. 1992)..................................................................... 44

*United States v. Curley,*
    639 F.3d 50 (2d Cir. 2011)....................................................................... 25

*United States v. Daly,*
    842 F.2d 1380 (2d Cir. 1988).............................................................. 45, 46

*United States v. Detrich,*
    865 F.2d 17 (2d Cir. 1988)....................................................................... 11

*United States v. Elfgeeh,*
    515 F.3d 100 (2d Cir. 2008).............................................................. 40, 41

*United States v. Farhane,*
    634 F.3d 127 (2d Cir. 2011)....................................................................... 3

*United States v. Fratello*,
    44 F.R.D. 444 (S.D.N.Y. 1968) ............................................................. 1, 42

*United States v. Fulford*,
    980 F.2d 1110 (7th Cir. 1992) ................................................................... 53

*United States v. Garcia*,
    291 F.3d 127 (2d Cir. 2002) ...................................................................... 26

*United States v. Gayle*,
    No. 16-cr-00361-CS,
    Trial Tr. at 1085 (S.D.N.Y. Sept. 14, 2017) ........................................... 21

*United States v. Gigante*,
    166 F.3d 75 (2d Cir. 1999) ........................................................................ 3

*United States v. Glover*,
    2025 WL 1580848 (S.D.N.Y. June 3, 2025) .......................................... 2, 5

*United States v. Goldstein*,
    2023 WL 3662971 (E.D.N.Y. May 25, 2023) ............................................ 8

*United States v. Guo*,
    2024 WL 1939221 (S.D.N.Y. May 2, 2024) .............................................. 9

*United States v. Gupta*,
    747 F.3d 111 (2d Cir. 2014) ....................................................................... 5

*United States v. Harmon*,
    19 Cr. 395 (D.D.C. Dec. 3, 2019) ............................................................ 42

*United States v. Hatfield*,
    685 F. Supp. 2d 320 (E.D.N.Y. 2010) ..................................................... 30

*United States v. Hill*,
    63 F.4th 335 (5th Cir. 2023) ............................................................... 19, 22

*United States v. James*,
    712 F.3d 79 (2d Cir. 2013) ......................................................... 19, 32, 50

*United States v. Jean-Claude*,
    2022 WL 2334509 (S.D.N.Y. June 27, 2022) ...................................... 20, 21

*United States v. Johnson*,
    469 F. Supp. 3d 193 (S.D.N.Y. 2019) ...................................................... 26

*United States v. Kahale*,
    789 F. Supp. 2d 359 (E.D.N.Y. 2009) ...................................................... 26

*United States v. Klein*,
    2017 WL 1316999 (E.D.N.Y. Feb. 10, 2017) .......................................... 54

*United States v. Lawal*,
    736 F.2d 5 (2d Cir. 1984) ......................................................................... 52

*United States v. Maldonado-Rivera*,
   922 F.2d 934 (2d Cir. 1990)..................................................................... 15, 17

*United States v. Martoma*,
   2014 WL 31191 (S.D.N.Y. Jan. 6, 2014) ............................................... 25, 26

*United States v. McCallum*,
   584 F.3d 471 (2d Cir. 2009)........................................................... 25, 34, 36

*United States v. Mendlowitz*,
   2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) .............................................. 46

*United States v. Mi Sun Cho*,
   713 F.3d 716 (2d Cir. 2013)........................................................................ 1

*United States v. Mizrahi*,
   2024 WL 3824104 (S.D.N.Y. 2024).................................................... 34, 35

*United States v. Nachamie*,
   101 F. Supp. 2d 134 (S.D.N.Y. 2000)....................................................... 26

*United States v. Oldbear*,
   568 F.3d 814 (10th Cir. 2009) .................................................................. 46

*United States v. Rajaratnam*,
   2014 WL 2696568 (S.D.N.Y. June 10, 2014) ........................................... 26

*United States v. Ray*,
   2022 WL 558146 (S.D.N.Y. Feb. 24, 2022)............................................... 11

*United States v. Rioux*,
   97 F.3d 648 (2d Cir. 1996)......................................................................... 7

*United States v. Rivera*,
   22 F.3d 430 (2d Cir. 1994)......................................................................... 4

*United States v. Russo*,
   302 F.3d 37 (2d Cir.2002).......................................................................... 4

*United States v. Saneaux*,
   365 F. Supp. 2d 493 (S.D.N.Y. 2005)......................................................... 4

*United States v. Scott*,
   677 F.3d 72 (2d Cir. 2012)....................................................................... 31

*United States v. Scully*,
   877 F.3d 464 (2d Cir. 2017)..................................................................... 40

*United States v. Segui*,
   No. 19-CR-188 (KAM),
   2019 WL 8587291 (E.D.N.Y. Dec. 2, 2019) .............................................. 51

*United States v. Silker*,
   751 F.2d 477 (2d Cir. 1984)..................................................................... 15

*United States v. Sliker*
    751 F.2d 477 (2d Cir. 1984).......................................................... 17

*United States v. Smith,*
    198 F.3d 377 (2d Cir. 1999).......................................................... 52

*United States v. Stahl,*
    616 F.2d 30 (2d Cir. 1980)............................................................ 32

*United States v. Tagliaferri,*
    No. 13 Cr. 115 (RA) (S.D.N.Y. June 26, 2014)....................... 38, 39

*United States v. Thomas,*
    377 F.3d 232 (2d Cir. 2004).......................................................... 43

*United States v. Ulbricht,*
    858 F.3d 71 (2d Cir. 2017)........................................................ 5, 6

*United States v. Van Putten,*
    2005 WL 612723 (S.D.N.Y. Mar. 15, 2005) ................................ 1

*United States v. Vargas,*
    2018 WL 6061207 (S.D.N.Y. Nov. 20, 2018) ...................... 11, 50

*United States v. Vayner,*
    769 F.3d 125 (2d Cir. 2014)...................................................... 15, 17

*United States v. Velsategui,*
    199 F.3d 590, 592 (2d Cir. 1999).................................................. 28

*United States v. Weigand,*
    2021 WL 568173 (S.D.N.Y. Feb. 14, 2021) ............................... 14

*United States v. Wexler,*
    522 F.3d 194 (2d Cir. 2008)........................................................... 5

*United States v. Williams,*
    930 F.3d 44 (2d Cir. 2019)........................................................... 10

*United States v. Yu,*
    697 F. Supp. 635 (E.D.N.Y. 1988) .............................................. 52

*Van Loon v. Dep't of Treasury*, 122 F.4th 549 (5th Cir. 2024) ............................................. passim

*Washington v. Texas,*
    338 U.S. 14 (1967)......................................................................... 1

*Zaken v. Boerer,*
    964 F.2d 1319 (2d Cir. 1992)......................................................... 8

## **STATUTES**

18 U.S.C. § 1960....................................................................... 40, 41, 48

18 U.S.C. § 3505.11 .................................................................................................... 11

**RULES**

Fed. R. Evid. 106 ...................................................................................................... 10

Fed. R. Evid. 29 ........................................................................................................ 34

Fed. R. Evid. 4 .......................................................................................................... 36

Fed. R. Evid. 401 ............................................................................................... 45, 53

Fed. R. Evid. 402 ...................................................................................................... 26

Fed. R. Evid. 403 ................................................................................................ passim

Fed. R. Evid. 404 ................................................................................................ passim

Fed. R. Evid. 611 ...................................................................................................... 10

Fed. R. Evid. 801 ................................................................................................ passim

Fed. R. Evid. 802 ........................................................................................................ 2

Fed. R. Evid. 803 ......................................................................................... 3, 11, 13, 14

Fed. R. Evid. 804 ............................................................................................... 3, 5, 6

Fed. R. Evid. 901 ................................................................................................ 13, 15

Fed. R. Evid. 902 ......................................................................................... 11, 13, 14

## I.    INTRODUCTION

The government's motions *in limine*, if granted, would effectively strip Roman Storm of his right to a fair trial.  The government seeks to (1) prematurely admit broad categories of evidence (*e.g.,* unspecified statements of alleged co-conspirators, unspecified unauthenticated third-party documents, and Rule 404(b) evidence), (2) prematurely force Mr. Storm to reveal defense theories and strategy (*e.g.,* the substance of legal advice contrary to this Court's previous order), and (3) improperly limit Mr. Storm's defenses (*e.g.,* precluding evidence of the lawful purposes of Tornado Cash).

Not only does "[a] defendant ha[ve] a fundamental due process right to present a defense," *United States v. Mi Sun Cho*, 713 F.3d 716, 721 (2d Cir. 2013) (citing *Washington v. Texas*, 338 U.S. 14, 19 (1967)), but "[e]vidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *United States v. Van Putten*, 2005 WL 612723, at *3 (S.D.N.Y. Mar. 15, 2005).  Further, until the government has established its prima facie case, a defendant "is not called upon to determine whether to produce documents and material normally privileged.  It imposes a price on the exercise of a constitutional right to require a pre-trial decision regarding trial tactics which are normally determined by a defense lawyer following the completion of the prima facie case." *United States v. Fratello*, 44 F.R.D. 444, 452 (S.D.N.Y. 1968).

For the detailed reasons discussed below, this Court should deny the government's motions *in limine*.

## II.    ARGUMENT

### A.    <u>Gov't MIL No. I</u> – **The Government's Request To Admit Unspecified Statements from Alleged Co-Conspirators and Agents Fails To Meet the Requirements of Any Hearsay Exception**

This Court should deny the government's vague and overbroad motion to admit hearsay statements from Mr. Storm's alleged co-conspirators and purported agents.  (Gov't Motions *in Limine* ("Gov't MILs"), Dkt. 157 at 3-5.)  The government's request fails to cite a single statement it wishes to admit and fails to provide sufficient foundation under any hearsay exception to admit the unspecified statements.

Federal Rule of Evidence ("Rule") 802 prohibits the admission of hearsay, which Rule 801 defines as an out-of-court statement offered for the truth of the matter asserted, unless such statement is deemed "not hearsay" under Rule 801(d), or falls under an enumerated exception to the hearsay rule.  *See* Fed. R. Evid. 801(c), 802.  Without specifying any statement it wishes to admit, the government asserts it can introduce statements of Mr. Storm's alleged co-conspirators and purported agents under Rule 801(d)(2)(E) (statements by a co-conspirator), Rule 801(d)(2)(D) (statements by an employee or agent), and as exceptions to the rule against hearsay under Rule 804(b)(3) (statements against interest).  (Gov't MILs at 3-5.)  Because the government fails to identify the particular statements it seeks to admit, however, no statements can be admitted under these exceptions, as the "bases of admissibility cannot be applied in the abstract" and "[a]dmissibility must turn on characteristics of the particular items of evidence[.]" *United States v. Bankman-Fried*, 2023 WL 6283509, at *3 (S.D.N.Y. Sept. 26, 2023); *see also United States v. Glover*, 2025 WL 1580848, at *10-11 (S.D.N.Y. June 3, 2025).  The government's motion should be denied.

### 1.    Out-of-Court Statements of Alleged Co-Conspirators

The government prematurely seeks a ruling allowing it to admit into evidence hearsay statements, including "documents, including text messages and emails," from Roman Semenov (an absent co-defendant and alleged Tornado Cash co-founder) and Alexey Pertsev (an alleged Tornado Cash co-founder) under Rules 801(d)(2)(E), 804(b)(3), and 801(d)(2)(D).  (Gov't MILs at 6-7.)[1]  The government has not satisfied the requirements of any of these evidentiary rules, and its motion should be rejected.

### (a)    The Government Has Not Met the Requirements of Rule 801(d)(2)(e)

To admit an alleged co-conspirator statement as non-hearsay under Rule 801(d)(2)(E), a "district court must find by a preponderance of the evidence (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011) (internal quotation marks omitted). The government has not met these elements.

As an initial matter, the government must show that there was a "unity of interest stemming from" the pursuit of "some specific criminal goal[.]"  *See United States v. Gigante*, 166 F.3d 75, 83 (2d Cir. 1999).  In its motion, the government claims in conclusory fashion that it will meet this burden by showing that "the defendant conspired with Semenov and Pertsev to operate the Tornado Cash service," but fails to identify what the alleged criminal goals were amongst them or when that alleged unity of interest transpired.  (*See* Gov't MILs at 6.)

---

[1] The government claims in a footnote that "[c]ertain of these materials may well also be covered by the so-called business records exception to the hearsay rule embodied in Federal Rule of Evidence 803(6)."  (Gov't MILs at 8 n. 3).  But the information proffered by the government in its motion is insufficient to assess the applicability of the business records exception.

The government must also show that the statements were (1) made during the course of the conspiracy and (2) in furtherance of that conspiracy. *United States v. Saneaux*, 365 F. Supp. 2d 493, 499 (S.D.N.Y. 2005). The requirement that the statements be made during the course of the conspiracy is a "temporal requirement," meaning co-conspirator "statements cannot be made after the cessation of the conspiracy or before its formation." *Id*. Further, for the statements to be made in furtherance of the conspiracy, "the conspiratorial objective being furthered by the declarant's statement *must in fact be the objective of a conspiracy between the defendant and the declarant*." *Id*. at 500 (citing *United States v. Russo*, 302 F.3d 37, 45 (2d Cir.2002)) (emphasis in the original).[2] Relatedly, "[t]he touchstone of the 'in furtherance' requirement is that the statement be designed to promote the accomplishment of the conspiracy's goals." *Id*. at 500; *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994) (to be in furtherance of a conspiracy, a statement "must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy").

Without identifying any specific statement it wishes to admit, the government cannot provide an adequate basis to determine whether the unidentified statements fall under Rule 801(d)(2)(E). The government's gross generalizations about the content of the communications—which lack credibility, as they include terms that will not be found in the

---

[2] The government cites *Russo* to suggest that no conspiracy need be shown at all, but rather only a joint venture need be shown for the statement to be admissible pursuant to Rule 801(d)(2)(D). (Gov't MILs at 7-8.) This is wrong. *Russo* was not addressing Rule 801(d)(2)(D) at all but rather Rule 801(d)(2)(E), and its point was only that the conspiracy need not be criminal. *See Russo*, 302 F.3d at 45 (citing cases involving civil conspiracies: *Fischl v. Armitage,* 128 F.3d 50, 58 (2d Cir. 1997) (civil rights conspiracy); *New York v. Hendrickson Bros.,* 840 F.2d 1065, 1073 (2d Cir. 1988) (antitrust conspiracy)). *Russo* went on to make clear that "the conspiratorial objective being furthered by the declarant's statement must in fact be the objective of a conspiracy between the defendant and the declarant." 302 F.3d at 45.

Peppersec developers' (Messrs. Storm, Semenov and Pertsev's) communications, such as "Tornado Cash service" and "employees . . . who work for the service" (Gov't MILs at 7)—are entirely insufficient to show that the communications were designed to promote a specific criminal objective.  Because the "bases of admissibility cannot be applied in the abstract" and "[a]dmissibility must turn on characteristics of the particular items of evidence," this Court should deny the government's motion.  *Bankman-Fried*, 2023 WL 6283509, at *3 (denying admission of co-conspirator statements where the government provided only "general categories of out-of-court statements as well as excerpted out-of-court statements of which the [c]ourt [was] provided only with portions"); *see also Glover*, 2025 WL 1580848, at *11 (denying government motion to admit out-of-court statements where government's testimony summaries failed to "include the 'circumstances surrounding the statement[s]'") (quoting *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014)).

### (b) The Government Has Not Met the Requirements of Rule 804(b)(3)

Rule 804(b)(3) provides an exception to the rule against hearsay for a statement against the penal interest of an unavailable declarant.  To admit a statement pursuant to Rule 804(b)(3), the proponent of the statement "must show (1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable [person in the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Ulbricht*, 858 F.3d 71, 122 (2d Cir. 2017) (citing *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008)) (internal quotations omitted)).  The government cannot and does not make the necessary showings.

First, the government fails to provide any facts to demonstrate Semenov's or Pertsev's unavailability. "[A] declarant is unavailable when the declarant 'is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance ... by process or other *reasonable* means.'" *United States v. Casamento*, 887 F.2d 1141, 1169 (2d Cir. 1989) (quoting Fed. R. Evid. 804(a)(5)). The government makes no assertions about Semenov's unavailability. Although he is a named defendant who apparently has not been arrested, there are no assertions about any efforts to obtain his appearance. As to Pertsev, the government indicates in a footnote that he has been convicted "in Dutch court." (Gov't MILs at 6.) But that does not mean he is unavailable to testify here. Without information about the government's efforts to procure Semenov and/or Pertsev's attendance, neither can properly be said to be "unavailable."

Second, once again, the government has failed to identify the statements it intends to offer, much less show their "reliability" and any "corroborating circumstances indicat[ing]" their "trustworthiness," as required by the rule. The government has indicated that the alleged co-conspirator statements consist of text messages and emails, but without examining particular messages and evaluating them in context, it is not possible to determine whether the statements are "sufficiently reliable to warrant an inference that a reasonable [person in the declarant's] position would not have made the statement unless he believed it to be true" or whether there are "corroborating circumstances" indicating "trustworthiness." *Ulbricht*, 858 F.3d at 122. As such, the government fails to provide an adequate basis to determine whether the statements could meet Rule 804(b)(3)'s requirements.[3]

---

[3] Mr. Storm may also further have objections, including under *Crawford v. Washington,* 541 U.S. 36 (2004).

#### (c)  The Government Has Not Met the Requirements of Rule 801(d)(2)(D)

Rule 801(d)(2)(D) provides that a statement is not hearsay if it "is offered against an opposing party and was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  To establish that the statement falls under Rule 801(d)(2)(D), the government must show "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency."  *United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996) (citation omitted).

Other than reciting the elements, the government provides no discussion of Rule 801(d)(2)(D) and does not seek to apply its elements to the facts.  (*See* Gov't MILs at 3-4, 7-8.) There is no legal or factual basis for this Court to find that any agency relationship existed between Messrs. Storm, Semenov, and Pertsev, and this Court should simply reject this hollow argument.

### 2.  Out-of-Court Statements of Alleged Employees or Agents

The government also seeks a ruling allowing the admission of "[s]tatements made by individuals who were employed by the Tornado Cash 'service,' such as software developers and marketers."  (Gov't MILs at 8.)  Yet again, the government's motion utterly lacks the necessary specificity and support because it fails to identify any of these individuals, their roles, and their statements.

As outlined above, to meet Rule 801(d)(2)(D), the government must first show the existence of an agency relationship.  But the government's vague claim that "the three Tornado Cash founders" hired unidentified "software developers and marketers" cannot establish such a relationship.  (*See id.* at 8.)

The government's proffered reasons for admitting these statements include the general assertion that the Tornado Cash founders, as executives, hired and supervised several employees, including software developers. (*Id.*) Treating Mr. Storm as an executive, however, does not necessarily mean that all employee statements are admissible under Rule 801(d)(2)(D). Instead, "[w]here a party-opponent occupies a higher rank within the same organization as a hearsay declarant, the Second Circuit has applied a functional test to determine whether the declarant was an 'agent or employee' under Rule 801(d)(2)(D)." *United States v. Goldstein*, 2023 WL 3662971, at *6 (E.D.N.Y. May 25, 2023) (citing *Zaken v. Boerer*, 964 F.2d 1319, 1322-23 (2d Cir. 1992)). *Zaken* and other courts have deemed statements by an employee admissible under the Second Circuit's "functional test" where there was a "direct reporting relationship" or facts showing that the "declarant depended on the defendant for her position and job instructions." *Goldstein*, 2023 WL 3662971, at *7.

Here, the government argues, rather vaguely, that statements it seeks to admit include messages where Mr. Storm "and his co-founders instructed the developers on how to update the Tornado Cash service" and that the developers sent messages to "describe the work they [were] doing and the changes to the functionality of the service." (Gov't MILs at 8.) But this information is not sufficient to show, for example, that the unnamed developers reported directly to Mr. Storm or that they "depended" on him for their "position and job instructions," as the law requires. *Goldstein*, 2023 WL 3662971, at *7 (finding defendant's "immediate subordinate" to be an agent for purposes of Rule 801(d)(2)(D) but reserving judgment on other employees because it was unclear whether those employees were "sufficiently responsible" to the defendant).

The government also argues that Mr. Storm recruited a "signatory" to perform certain business functions and that he and his co-founders "informally contracted with two people (the 'marketers') who engaged in marketing and promotional efforts" for Tornado Cash.  (Gov't MILs at 9.)  However, the government does not provide sufficient information to evaluate, for example, whether an agency or employment relationship existed with any of these unnamed individuals referenced in the government's motion.  Indeed, it is unclear whether the unnamed signatory was an employee or agent or whether Mr. Storm is alleged to have exercised any supervision or control over the signatory's purported work.  It is equally unclear what "oversight" Mr. Storm is alleged to have exercised over the "marketers" with whom he and his co-founders "informally contracted."  (*See* Gov't MILs at 9.)  These are fatal problems.  *See Bankman-Fried*, 2023 WL 6283509, at *3; *see also United States v. Guo*, 2024 WL 1939221, at *3 (S.D.N.Y. May 2, 2024) (denying motion to admit statements of purported agents where the government failed to "offer[] any specific statements or details about the purported agency and employment relationships").

Because of all these failings, the government's motion should be denied.

**B.    Gov't MIL No. II – The Defense Should Be Permitted to Offer Additional Portions of Roman Storm's Statements Under the Rule of Completeness and To Show Intent**

The government intends to offer evidence of some of Mr. Storm's out-of-court statements, including Telegram messages and emails with Mr. Storm's alleged co-conspirators, victims, and third parties, and statements in public interviews.  (Gov't MILs at 9.)  At the same time, the government moves to preclude the defense from offering additional portions of these out-of-court statements and from eliciting testimony regarding those statements.  (*Id.* at 9-10.)  Again, the government's motion is premature because the defense does not yet know the specific statements the government will seek to offer at trial.  Accordingly, the defense reserves the right

to counter-designate any contextual statements the defense believes are admissible under the rule of completeness doctrine.[4]

When the government seeks to introduce a defendant's out-of-court statements under Rule 801(d)(2)(A), a defendant may offer additional portions for context via the "completeness doctrine" of Rule 106.  Rule 106 states: "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  In other words, "the omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion."  *United States v. Castro*, 813 F.2d 571, 575-76 (2d Cir. 1982).  Moreover, "[t]he adverse party may do so over a hearsay objection."  Fed. R. Evid. 106.

Rule 106 codifies the "overarching principle that it is the trial court's responsibility to exercise common sense and a sense of fairness to protect the rights of the parties while remaining ever mindful of the court's obligation to protect the interests of society in the 'ascertainment of the truth.'"  *Castro*, 813 F.2d at 576 (quoting Fed. R. Evid. 611(a)).  Statements admitted under Rule 106 help "explain and ensure the fair understanding of the evidence that has already been introduced."  *United States v. Williams*, 930 F.3d 44, 60 (2d Cir. 2019).  These statements can be admitted either "contemporaneous[ly] or on cross-examination."  *Id.* at 59.

In the event that the parties are unable to reach agreement about rule-of-completeness issues, this Court should (1) require the government to designate the statements it intends to

---

[4] The government states that it will, prior to trial, "endeavor to resolve any rule-of-completeness issues without the need for Court resolution."  (Gov't MILs at 9.)  The defense is also willing to meet and confer, once the proffered statements are provided for consideration.

introduce, (2) permit the defense to counter-designate statements the defense believes admissible

for completeness (or otherwise), and (3) rule upon any objection the parties have to those

designations. *See United States v. Ray*, 2022 WL 558146, at *15 (S.D.N.Y. Feb. 24, 2022)

(reserving ruling on rule of completeness issue "[u]ntil the Court sees the statement and the

portions that the [g]overnment seeks to offer as well as the portions that the defense seeks to

offer"). For instance, the defense reserves the right to object to any attempt by the government

to frame statements of Mr. Storm in ways that mislead the jury or fail to present the admitted

portion in a fair way. *See, e.g.*, *United States v. Vargas*, 2018 WL 6061207, at *2 (S.D.N.Y.

Nov. 20, 2018) (admitting additional portions of the defendant's post-arrest statements, noting

that "since the statements the [g]overnment seeks to preclude will likely form part of

[d]efendants' defense at trial, their omission could lead the jury to conclude they are a recent

fabrication, inaccurately undercutting his credibility").

In addition to designating statements of Mr. Storm that should be admitted under the rule

of completeness, the defense should also be permitted to offer portions of Mr. Storm's statements

not for the truth of the matter asserted but because they bear on intent. *United States v. Detrich*,

865 F.2d 17, 21-22 (2d Cir. 1988) (finding district court committed reversible error in refusing to

admit statement about a third-party's marriage plans which was "offered as circumstantial

evidence of [defendant's] state of mind" and not to prove the truth of the matter asserted).

### C.  Gov't MIL No. III – The Government's Request to Admit Documents Under Rules 803(6) and 902(11), (13), and (14) Is Premature and Cannot Be Addressed Without Examining the Records Specifically

The government asks this Court to rule that various documents, including certain third-

party records, screenshots from the Wayback machine, and blockchain transaction records, be

admitted as self-authenticating business records under Rules 803(6) and 902(11) and 18 U.S.C. §

3505.11.  (Gov't MILs at 12-19.)  This request is premature since the government has not—as it

acknowledges—even provided many of the documents it intends to offer, nor the certifications to support them.  (*See id.* at 14.)

The government requests this Court's intervention presumably because "the defen[se] has not yet committed to the authentication of routine and electronic records by stipulation."  (Gov't MILs at 12.)  In fact, the defense has already indicated its willingness to discuss the evidence and potential stipulations with the government and was indeed awaiting specific information to meet and confer further.  But Mr. Storm cannot agree to a blind stipulation based on the government's mere description of the categories and its argument that the documents are business records, that it has or will produce the certifications, and that the documents meet the criteria for self-authentication.

By way of background, on October 21, 2024, prior to the original date for filing motions *in limine*, the government asked the defense to meet and confer on a potential records stipulation.  On October 25, 2024, the parties met and conferred on several pretrial issues, including the records issue.  At that time, the government indicated that the custodians included: Alchemy, Infura (Consensys), Piñata, Rho Technologies, Mercury Bank (Evolve Trust & Bank), X (Twitter), GitHub, Amazon Web Services, and Google.  The parties also discussed the issue of public blockchain data.  The defense responded that Mr. Storm would likely be able to reach stipulations on many of these types of documents and requested clarification on the precise records the government wanted to authenticate by stipulation, at least by Bates range of type of record.  The government indicated it would follow up with specifics but did not do so.

On June 10, 2025, after receipt of this government motion, the defense followed up with a letter and requested specific information by June 12, but the government did not respond.  The defense followed up again on June 12 with a letter, and the government only responded on June

17, explaining that it is "still refining [its] exhibit list and will confirm closer to the deadline whether any of the records you reference in your letter will be on our exhibit list." (*See* June 17, 2025 letter, Exhibit A.)

Against this backdrop, it is hard to fathom how the government now complains that the defense has not agreed to stipulations regarding the admissibility of documents the government refuses to identify.  At present, neither Mr. Storm nor this Court has sufficient information as to many of these types of records to consider whether they are admissible under Rule 902(11).  This Court should understand that many of the records at issue are not standard business records, and in some cases, it is not clear what they are at all.  Under these circumstances, and without specific identification of documents, the defense cannot analyze whether the documents meet the requirements of Rule 803(6)(A)-(3), which requires that the records be made at or near the time by someone with knowledge and kept in the course of a regularly conducted activity and that the making of which was a regular practice.  Indeed, as to some records, the defense does not even have sufficient information to determine whether they are authentic under Rule 901 because it does not know what they purport to be.  This is true for various native files and unidentified .csv or .xls documents.

For example, the government has turned over several .csv files that were produced by Infura, one of the custodians discussed, that appear to consist entirely of computer code.  (*See* Exhibit B, USAO_SDNY_00454657.) .  To the extent they purport to be records of regularly conducted business activity, it must at least be clear what activity they apparently reflect.

Further, without further specification, the government's list of types of record custodians on page 14 likely lumps together traditional business records (such as bank records) with records that are not business records at all, such as text messages or other types of instant messages that

13

courts have routinely held not to be business records. *See, e.g.*, Larsen, Navigating the Federal Trial § 9:24 (2024 ed.) ("Attempts to authenticate chat room conversations and instant messages as certified business records under Rule 902(11) have largely failed because chats and messages are not records of regularly conducted activity required by Rule 803(6) as an exception to the hearsay rule."). Until the government provides more information about what documents it seeks to admit, the defense cannot even start to analyze the issues.

As to the Wayback machine and blockchain records requests, the government itself acknowledges that it has either not provided the records it seeks to admit, or the proposed certifications, or both.[5] The defense expert reports also rely on publicly-available blockchain data, so this issue should be able to be worked out by the parties, but it is simply not ripe for the Court to address at this time. *See United States v. Weigand*, 2021 WL 568173, at *2 (S.D.N.Y. Feb. 14, 2021) (declining to find materials to be self-authenticating under Rule 803(6) where purported business records and their certifications had not yet been presented).

**D.    Gov't MIL No. IV – The Government's Proposed Method of Authenticating and Admitting the Purported Contents of a Cellphone Allegedly Seized from Alexey Pertsev Violates the Sixth Amendment**

This Court should deny the government's motion to authenticate the contents of a cellphone seized from Alexey Pertsev (the "Pertsev Telegram Chats") because the proposed method of authentication, via an agent who had no role in the seizure of the phone or the

---

[5] The government states that it "has produced to the defense extensive transactions records from the blockchain, including records for thousands of transactions involving [Tornado Cash]." (Gov't MILs at 19). The government provides no citation for this statement, and the defense does not know to what it is referring. To the extent the government is referring to blockchain data relied upon by its experts, which are in fact massive Excel spreadsheets, then the defense believes that the experts themselves will testify as to their extraction and organization of such data and this discussion of certifications is inapplicable.

extraction of the data from it, is inadequate and violates the Sixth Amendment's Confrontation Clause.

### 1. The Government's Proposed Method of Authentication Is Inadequate

The government's proposed method of authenticating the Pertsev Telegram Chats is patently insufficient.

"[A]uthentication is a condition precedent to admitting evidence." *United States v. Vayner*, 769 F.3d 125, 129 (2d Cir. 2014) (quoting *United States v. Silker*, 751 F.2d 477, 497 (2d Cir. 1984)) (cleaned up). "In general, a document may not be admitted into evidence unless it is shown to be genuine." *United States v. Maldonado-Rivera*, 922 F.2d 934, 957 (2d Cir. 1990). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Although Rule 901(b) lists several examples "of evidence that satisfies the requirement," the "simplest (and likely most common) form of authentication is through the testimony of a witness with knowledge that a matter is what it is claimed to be." *Vayner*, 769 F.3d at 130 (cleaned up). While the government argues that the "bar for authentication 'is not particularly high,'" it is nowhere near as low as the government suggests. (*See* Gov't MILs at 20 (quoting *United States v. Bout*, 651 F. App'x 62, 63 (2d Cir. 2016).)

The Pertsev Telegram Chats were derived from a digital extract allegedly copied from a cell phone that was, in turn, allegedly seized from Alexey Pertsev (the "Pertsev Phone Extraction"). (Gov't MILs at 20.) Yet the government does not intend to offer *any* testimony regarding the seizure of the phone allegedly belonging to Mr. Pertsev or the process of extracting data from it. (*Id.* at 21-22.) Instead, the government proposes authenticating the Pertsev Telegram Chats through the testimony of IRS-CI Special Agent Peter Dickerman, who has no knowledge of the seizure of the phone, the chain of custody following seizure, or the process by

which data was extracted from it.  (*Id.*)  This is nowhere near sufficient under Rule 901, and this Court should not permit the Pertsev Telegram Chats to be authenticated through such a fundamentally flawed method.

The government states that it will rely solely on Agent Dickerman's testimony, which will consist of an explanation of his experience with GrayKey, "a mobile forensic analysis tool developed by Grayshift and used by law enforcement to unlock and extract data from iOS and Android devices," and his review of "the GrayKey report that was generated when the Pertsev Phone Extraction was created."  (Gov't MILs at 21-22.)  What the government rather conspicuously attempts to gloss over is the fact that Agent Dickerman has no personal knowledge of the provenance of the Pertsev Phone Extraction; he merely "traveled to the Netherlands in November 2024" and "reviewed and obtained a copy of the GrayKey report." (*Id.* at 22.)  He will not—because he cannot—offer testimony regarding the actual seizure of the phone nor the chain of custody following its seizure.  He will not—because he cannot—offer testimony regarding the process by which the Dutch authorities obtained the Pertsev Phone Extraction and created the GrayKey report—or, indeed, who imaged it, how many times it was imaged, whether the phone was imaged in its entirety or whether the analyst targeted certain data and, if so, why.[6]  In fact, he cannot even identify the model of the mobile device that was imaged, much less make any attempt to match that model with the mobile device that was allegedly seized from Mr. Pertsev.  In other words, the government seeks to rely solely on the contents of a GrayKey report, the provenance and creator of which are unspecified, and Agent Dickerman's (lay) assessment of the contents of the report to establish the authenticity of the

---

[6] Agent Dickerman intends to testify that he "obtained a copy of a subset of the Pertsev Phone Extraction relevant to this case."  (Gov't MILs at 22.)  Who created the subset?  Who determined relevance?  Agent Dickerman will not—because he cannot—offer testimony on these points.

Pertsev Phone Extraction, without *any* corroborating evidence that the Pertsev Phone Extraction was, in fact, extracted from a phone seized from—or, indeed, is in any way connected to—Mr. Pertsev.  That is clearly insufficient under Second Circuit precedent.

In *Vayner*, the Second Circuit held that the district court erred in admitting a profile page from "the Russian equivalent of Facebook" based on purportedly "distinctive features" consisting of the defendant's photographs, contact information, and employment information. 769 F.3d at 128, 131.  The Second Circuit explained that "a document can be authenticated by 'distinctive characteristics of the document itself, such as its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, *taken in conjunction with the circumstances*.'"  *Id.* at 130 (quoting *Maldonado-Rivera*, 922 F.2d at 957) (emphasis added).  In finding the district court had erred, the Second Circuit noted: "Had the government sought to introduce, for instance, a flyer found on the street that contained [defendant's] Skype address and was purportedly written or authorized by him, the district court surely would have required some evidence that the flyer did, in fact, emanate from [the defendant]."  *Id.* at 132; *see also id.* at 130 (citing *United States v. Sliker*, 751 F.2d 477, 488 (2d Cir. 1984) for the proposition that holding that the "contents of alleged bank records, *in conjunction with their seizure at purported bank office*, provided sufficient proof of their connection to allegedly sham bank.") (emphasis added).

The same logic applies here.  The government is essentially seeking to authenticate communications derived from a forensic report that may as well have been found on the street. This Court should not permit the Pertsev Telegram Chats (or any other part of the Pertsev Phone Extraction) to be authenticated absent testimony from a witness who (unlike Agent Dickerman) has firsthand knowledge of the process by which the Pertsev Phone Extraction was created and

who can, at the very least, attest that the data used to create the Pertsev Phone Extraction was extracted from a phone that was seized from Mr. Pertsev.

### 2. The Government's Proposed Method of Authentication Violates Roman Storm's Sixth Amendment Rights

The government's proposed method of authenticating the Pertsev Telegram Chats (and anything else on the Pertsev Phone Extraction) would also deprive Mr. Storm of his Sixth Amendment right to cross-examination on their provenance and accuracy.

#### (a) The Pertsev Phone Extract and GrayKey Report Are Testimonial Hearsay and Subject to the Confrontation Clause

"The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him." *Smith v. Arizona*, 602 U.S. 779, 783 (2024). "The Clause bars the admission at trial of 'testimonial statements' of an absent witness unless she is 'unavailable to testify, and the defendant ha[s] had a prior opportunity' to cross-examine her." *Id.* (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)). The Clause applies to "testimonial hearsay"—evidence that is testimonial in that it was created "under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial," *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009), and constitutes hearsay, or "out-of-court statements offered 'to prove the truth of the matter asserted,'" *Smith*, 602 U.S. at 785 (quoting *Anderson v. United States*, 417 U.S. 211, 219 (1974)). So long as those requirements are met, the Confrontation Clause's "prohibition *applies in full to forensic evidence*." *Id.* (emphasis added).

The Pertsev Telegram Chats and anything else on the Pertsev Phone Extraction are similar to other types of evidence the Supreme Court has held is subject to the Confrontation Clause. In *Melendez-Diaz*, the Supreme Court held that prosecutors violated the Confrontation Clause by introducing forensic evidence identifying a substance seized from the defendant as

cocaine without calling as a witness the analyst who had conducted the test and signed the certificate included with the report.  557 U.S. at 308, 311.  Similarly, in *Bullcoming v. New Mexico*, the Supreme Court held that a State could not introduce one forensic analyst's findings through the testimony of another because such "surrogate testimony" "could not convey [what the person who conducted the actual forensic analysis] knew or observed," including the "process he employed."  564 U.S. 647, 661 (2011).  The government makes no attempt to distinguish *Melendez-Diaz*, but it argues that *Bullcoming* is distinguishable because the forensic evidence at issue there "included certifications by the absent expert witness" as well as "a portion where the analyst who conducted the testing could identify any 'circumstance or condition' that 'affected the integrity of the sample or the validity of the analysis.'"  (Gov't MILs at 24.)  The government also argues that this is different from the Pertsev Phone Extraction, which it characterizes as consisting of "non-testimonial, raw machine created data," citing out-of-circuit authority.  (*Id.* (quoting *United States v. Hill*, 63 F.4th 335, 359 (5th Cir. 2023).)

The government's argument ignores that the key inquiry "focuses on the 'primary purpose' of the statement, and in particular on how it relates to a future criminal proceeding." *Smith*, 602 U.S. at 800.  This is consistent with the Supreme Court's prior description of the "class of testimonial statements covered by the Confrontation Clause" as including "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  *Melendez-Diaz*, 557 U.S. at 309-310 (quoting *Crawford*, 541 U.S. at 51-52); *see also United States v. James*, 712 F.3d 79, 96 (2d Cir. 2013) ("[A] statement triggers the protections of the Confrontation Clause when it is made with the primary purpose of creating a record for use at a later criminal trial.").

The government does not, and cannot, argue that the Pertsev Phone Extraction and the GrayKey report were created for some purpose other than "a future criminal proceeding." *Smith*, 602 U.S. at 800. And the evidence is clearly offered for the truth of the matters asserted therein; the government makes no argument otherwise.[7] The Pertsev Phone Extraction and GrayKey report thus clearly constitute testimonial hearsay, triggering Mr. Storm's Sixth Amendment right to cross-examine the forensic analyst(s) who prepared them.

### (b)    The Government's Cited Authority Is Inapplicable, Inconsistent with *Smith*, or Simply Irrelevant

The government relies on several cases for the proposition that courts "routinely admit[] cellphone extraction evidence without the testimony of the person who originally operated the extraction software" but those cases either predate *Smith* or are distinguishable. (Gov't MILs at 23-24.)

In *Jean-Claude*, which the government cites and which predates *Smith*, cell phone extraction evidence performed by "Croatian analysts" was properly authenticated because the testifying agent had possession of the seized phones, and the government offered the testimony of the Croatian National Police officer who had firsthand knowledge of the seizure of the phones. (*See* Gov't MILs at 23, 25; *United States v. Jean-Claude*, 2022 WL 2334509, at *16 (S.D.N.Y. June 27, 2022).) Because he had possession of the seized phone, the testifying agent could compare the "IMEI numbers listed on the extraction reports to those engraved on the cell phones" and was thus "able to match each extraction report to the corresponding cell phone."

---

[7] Nor could it; in *Smith*, the Supreme Court held that the forensic evidence was offered for the truth of the matter asserted because the expert who *did* testify relied upon it in offering his opinion. *See* 602 U.S. 795 ("If an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts. How could it be otherwise?"). Likewise here, the government is seeking to authenticate and admit the Pertsev Phone Extraction for the truth of the matters asserted. (Gov't MILs at 20.)

*Jean Claude, 2022* WL 2334509 at *18. The agent "could testify regarding whether the cell phones at issue belonged to [d]efendants; whether the extraction reports were derived from these cell phones; and the likelihood as to whether the data contained on these cell phones had been altered or manipulated." *Id.* at *25.

Here, the government does not—and cannot—offer such testimony; it does not appear to be in possession of Mr. Pertsev's phone, and Agent Dickerman does not offer any testimony regarding the IMEI number of the devices seized (nor could he, because he was not involved in the seizure) or even the IMEI number of the devices from which the Pertsev Phone Extraction and the GrayKey report were derived. He also cannot offer any evidence regarding potential alteration or manipulation because he lacks any personal knowledge of how the data was extracted and maintained between the time of the "extraction of a mobile device that was conducted in 2022" and when he "traveled to the Netherlands in November 2024" and "obtained a copy of the GrayKey report." (*See* Gov't MILs at 22.)

*Gayle* is similarly unavailing; there, too, the government at least had a unique identifier matching the phone to the report and could prove complete chain of custody aside from a single break. (*See* Gov't MILs at 23-25; *United States v. Gayle*, No. 16-cr-00361-CS, Trial Tr. at 1085 (S.D.N.Y. Sept. 14, 2017).) Even then, the district court noted that the government was "inviting an appellate issue" by offering the extraction report through an agent who did not have personal knowledge of the extraction. *Id.* at 1082:21-23.

*Arce* is simply inapposite because, there, the testifying agent himself conducted the extraction. (*See* Gov't MILs at 24; *United States v. Arce*, 49 F.4th 382, 389 (4th Cir. 2022) ("Agent Montoya . . . used the Cellebrite software to extract files and data from the phone."); *id.* at 391 ("Agent Montoya, testifying as a lay witness, introduced several Cellebrite Reports that

reflected information extracted from [defendant's] electronic devices.").)  The Confrontation

Clause issue there involved the attribution of certain photographs on the device as "likely child

pornography" based on a software program's comparison of the hash value of the images against

a database of known child-pornography images, which was "created using input from law

enforcement officers."  *Id.* at 392.  *Arce* thus addresses a thoroughly different issue.

Finally, the government's reliance on *Hill* is misplaced for several reasons.  (*See* Gov't

MILs at 24-25.)  There, the Fifth Circuit found that "the cell-phone extraction reports that [the

agent] testified about were not testimonial statements triggering the Confrontation Clause"

because it found the "reports are raw, machine produced data that contained no independent

analysis or opinion."  *Hill*, 63 F.4th at 358.  In doing so, it noted that "multiple other circuits

have also held that 'machine statements aren't hearsay,'" citing decisions from other circuits—

except, of course, the Second Circuit.  *Id.*  The Second Circuit has not adopted any such rule.  In

addition, *Hill* is distinguishable because the testifying agent "testified to versions of the

extraction reports that he had himself edited down to those portions he deemed relevant."  63 F.

4th at 357.  In contrast, Agent Dickerman's proposed testimony is based on a "copy of a subset

of the Pertsev Phone Extraction relevant to this case," and the government offers no testimony

regarding how this subset was prepared, who prepared it, and what factors were used to

determine relevance.  (*See* Gov't MILs at 22.)

Most importantly, *Hill* was decided without the benefit of the Supreme Court's opinion in

*Smith*.  In *Smith*, the State of Arizona argued that the testifying agent could rely on the work of a

non-testifying agent who conducted the actual forensic analysis because the latter "came into

evidence not for their truth, but instead to 'show the basis' of the in-court expert's independent

opinion"—in other words, because it was not hearsay.  *Smith*, 602 U.S. at 793.  The Supreme

Court rejected that argument, noting that "[a]pproving that practice would make our decisions in *Melendez-Diaz* and *Bullcoming* a dead letter, and allow for easy evasion of the Confrontation Clause." *Id.* at 798. In other words, the Supreme Court rejected the idea that "every testimonial lab report could come into evidence through any trained surrogate" without allowing the defendant to "cross-examine the testing analyst about what she did and how she did it and whether her results should be trusted." *Id.* at 798-99.

The Supreme Court's reasoning squarely applies here. The government is seeking to "end run" the Confrontation Clause by having Agent Dickerman introduce evidence based on forensic work he himself did not perform and which he "merely replicates," denying Mr. Storm his constitutional right to cross-examination on what was done, how it was done, and whether the results should be trusted. Mr. Storm has the right "to probe 'what tests the analysts performed,' whether those tests 'present[ed] a risk of error,' and whether the analysts had the right skill set to 'interpret[ ] their results.'" *Id.* at 786 (quoting *Melendez-Diaz*, 557 U.S. at 320); *see also id.* at 785 (Cross-examination has "plenty to do in cases involving forensic analysis" because "lab tests are 'not uniquely immune from the risk of manipulation' or mistake" (quoting *Melendez-Diaz*, 557 U.S. at 318)). This is particularly true where the extraction was done by a foreign agent in a foreign country, where it is unclear whether the same authentication and chain-of-custody rules apply. Authenticating and admitting the Pertsev Telegram Chats—or any data derived from the Pertsev Phone Extraction—without giving Mr. Storm the opportunity to ask these important questions of a witness with firsthand knowledge is, as was the case in *Melendez-Diaz*, a violation of the Sixth Amendment under a "straightforward application of *Crawford*." *Id.* at 785. This Court should not entertain it.

E.      **Gov't MIL No. V** – The Government's Proposed Evidence Is Not Admissible as Direct Evidence or Under Rule 404(B)

The government seeks to admit three different categories of evidence as direct evidence or under Rule 404(b).  First, the government seeks to introduce what it claims to be evidence of Mr. Storm's alleged profits from Tornado Cash, but in fact, the government is seeking to sweep in as profits other resources of Mr. Storm that have nothing to do with the founding and development of Tornado Cash.  (*See* Gov't MILs at 30-32.)  Second, the government seeks to introduce evidence that Mr. Storm supposedly made false statements in response to a "crypto questionnaire" from a financial institution, but these statements are true and, in any event, do not show motive, intent, or opportunity to engage in any of the alleged crimes.  (*Id*. at 32-35.)  Third, the government seeks to introduce evidence that, when the U.S. Treasury's Office of Foreign Assets Control ("OFAC") imposed sanctions on Tornado Cash, Mr. Storm and the other Tornado Cash founders transferred control of the tornadocash.eth domain to the decentralized Tornado Cash Governance smart contract, allowing Tornado Cash to continue operating.  (*Id* at 35-37.)  This latter evidence should be excluded because it is confusing, simply wrong, and invites a trial-within-a-trial.

In general, as to all three categories of proffered evidence and as to the crimes charged, the proposed evidence is irrelevant, whether considered direct evidence or considered "other acts" evidence under Rule 404(b), and should not be admitted.  Even if there could be any probative value to the evidence, it would be outweighed by its prejudicial effect, particularly as the evidence will tend to confuse the jury into believing that developing a cryptocurrency mixer

like Tornado Cash was in and of itself illegal, and this Court should also exclude the evidence under Rule 403.[8]

### 1.    Legal Standards

Rule 404(b)'s "other acts" evidence "is not admissible to prove a person's character in order to show that on a particular occasion, the person acted in accordance with the character." Fed. R. Evid. 404(b)(1); *see also United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) ("'Other act' evidence serves a proper purpose" only if "it is not offered to show the defendant's propensity to commit the offense.")  Such evidence "tends to distract the trier of fact from the main question of what actually happened on the particular occasion.  It subtly permits the trier of fact . . . to punish the bad man because of [his] . . . character[] despite what the evidence in the case shows actually happened."  Fed. R. Evid. 404(a) advisory committee's note to 1972 proposed rule (quotation omitted).  The rule recognizes the danger that this type of evidence will overly influence the finder of fact and "undermine the presumption of innocence." *United States v. McCallum,* 584 F.3d 471, 475 (2d Cir. 2009).

Evidence of other acts therefore may be admitted only in limited circumstances, namely: (1) if the evidence is "intrinsic" to the crime charged and so not a separate act at all, *see United States v. Martoma*, 2014 WL 31191, at *2 (S.D.N.Y. Jan. 6, 2014); or (2) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," without requiring impermissible propensity reasoning, Fed. R. Evid. 404(b)(2). Courts in this District employ a "narrow construction" in determining whether other acts are direct evidence of charged offenses. *United States v. Johnson,* 469 F. Supp. 3d 193, 204

---

[8] If this Court is inclined to admit any of this evidence, Mr. Storm will request a limiting instruction to the jury to consider this evidence only for a permissible purpose and not for any impermissible purpose, as well as an instruction that developing and operating a cryptocurrency mixer is not per se illegal.

(S.D.N.Y. 2019).  "Where it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)."  *Martoma,* 2014 WL 31191, at *2.  The government "bears the burden of demonstrating the admissibility of evidence under Rule 404(b)."  *United States v. Nachamie,* 101 F. Supp. 2d 134, 137 (S.D.N.Y. 2000).

Of course, whether considered direct evidence or evidence admitted pursuant to Rule 404(b), the evidence must be relevant under Rule 402 to be admissible.  And, pursuant to Rule 403, any probative value must substantially outweigh any prejudicial effect.  *See Martoma,* 2014 WL 31191, at *4; *United States v. Rajaratnam,* 2014 WL 2696568, at *3 (S.D.N.Y. June 10, 2014).  Thus, in determining whether to admit other act evidence, trial courts consider (1) whether the evidence is offered for a proper purpose; (2) whether the evidence is relevant to a disputed issue; (3) whether the probative value of the other act evidence substantially outweighs the danger of its unfair prejudice; and (4) whether a limiting instruction would be appropriate. *See United States v. Garcia,* 291 F.3d 127, 136 (2d Cir. 2002); *see also United States v. Kahale,* 789 F. Supp. 2d 359, 385 (E.D.N.Y. 2009) ("[O]ffering [] other act evidence for an admittedly proper purpose . . . does not end the inquiry.  Rather, the court must also determine whether the proffered evidence is relevant to that proper purpose . . . and if so, whether that probative value is substantially outweighed by any risk of unfair prejudice.")

### 2.    Evidence of Mr. Storm's Receipt and Sales of TORN Should Not Be Admitted

The government seeks to introduce evidence that Mr. Storm received an allocation of TORN tokens in December 2020[9] in his capacity as a co-founder and an allocation of vouchers

---

[9] The government states that TORN was created in December 2021 (Gov't MILs at 30), but that is likely a typo, as the announcement of the governance proposal for Tornado Cash, which included a proposal to create TORN tokens, was made on December 17, 2020.  *See* Tornado Cash, Medium, *Tornado Cash Governance Proposal* (Dec. 17, 2020), https://tornado-cash.medium.com/tornado-cash-governance-proposal-a55c5c7d0703 ("Governance Proposal").

to redeem TORN in his capacity as an early user of Tornado Cash; that he moved his own personal funds through Tornado Cash; and that he used some of those tokens to purchase two homes and sold others for cryptocurrency worth approximately $12 million in August 2022. (Gov't MILs at 30-31.)

The government first argues that Mr. Storm's receipt of TORN is directly relevant to show that Mr. Storm exercised ownership and control over what it alleges is the "Tornado Cash service"[10] and that he was financially motivated to make (or not make) changes to it that would increase the value of his TORN holdings. (*Id.* at 31.) This evidence is not intrinsic, or even relevant, to the crimes charged and should not be admitted. While the government argues that "evidence of [Mr. Storm's] personal profits" is "directly relevant" to the money transmitting charge (and not the money laundering and IEEPA charges) (*id.*), the relevant inquiry under Section 1960 is whether Tornado Cash was a business that transmitted or transferred funds for a fee, and there were no fees to use Tornado Cash.[11]

The government identifies two categories of TORN tokens that it contends are evidence of Mr. Storm's ownership and control of what it calls the "Tornado Cash service": (1) an allocation of TORN Mr. Storm received "as a founder"; and (2) an allocation of vouchers that could be used to redeem TORN, which Mr. Storm received as "one of the earliest users" of the protocol. (*Id.* at 30.) Neither represents profits or proceeds derived from or are otherwise connected to, any "fee" charged for the use of the Tornado Cash protocol.

---

[10] As Mr. Storm has argued in his own motions *in limine*, the "Tornado Cash service" does not exist and is a term the government made up. (*See* Dkt. 155 at 29-34.) Obviously, Mr. Storm cannot exercise ownership or control over an entity that does not exist.

[11] Mr. Storm has also addressed the inadmissibility of evidence regarding TORN sales in his fifth motion *in limine*, and he incorporates those arguments by reference here. (Dkt. 155 at 16-21.)

The mere fact that Mr. Storm received vouchers to redeem TORN tokens in an "airdrop" distribution to over 7,500 wallet addresses that had interacted with the Tornado Cash smart contracts[12] does not reflect in any way his ownership or control over what the government calls the "Tornado Cash service."  Mr. Storm received these in his capacity as an early user of the Tornado Cash protocol, not in his capacity as a founder, and any profits derived from the sale of such TORN cannot be described as profits or proceeds from the Tornado Cash protocol.  The same is true of the allocation of TORN tokens that Mr. Storm received in his capacity as a co-founder; his possession of such TORN does not render him an "owner" of what the government alleges is the "Tornado Cash service."  The fact that the developers were granted TORN, which rose and fell based on various market factors, and allegedly sold some portion for gains, does not mean that the "Tornado Cash service" itself earned a profit or made a financial gain, as is required.  (*See* Dkt. 155 (Storm Motions i*n Limine*) at 16-17 (citing *United States v. Velsategui*, 199 F.3d 590, 592 (2d Cir. 1999).).[13]

The government also suggests that Mr. Storm' s mere use of the Tornado Cash smart contracts "had the effect of commingling his funds with criminal proceeds, increasing the overall size of the Tornado Cash pools and facilitating the use of the Tornado Cash service for money laundering by criminal actors."  (Gov't MILs at 30.)  The government does not suggest that it intends to offer any evidence that Mr. Storm used the Tornado Cash smart contracts while sanctions were in place; nor does the government really expound upon this argument.  For good

---

[12] The Tornado Cash GitHub site shows which early adopter wallet addresses received TORN vouchers.  *See* https://github.com/tornadocash/airdrop/blob/master/airdrop.csv.

[13] Indeed, Dr. Hurder's testimony speaks directly to the government's claims here, as she is expected to testify that in fact Mr. Storm did not benefit from the alleged illicit use of Tornado Cash.  (*See* Dkt. 159-3 ¶¶ 18-27.)  Should this Court permit the government to put in evidence of Mr. Storm's sales TORN on the theory that they are pertinent to alleged profit or financial gain, her testimony is critical to assist the jury and respond to that the government's claims.

reason—under such a preposterously broad theory, *any* user of Tornado Cash would be liable as a co-conspirator. In any event, evidence that Mr. Storm received and eventually sold TORN is irrelevant to the government's contention that Mr. Storm exercised ownership and control over Tornado Cash—which in any event, is contrary to the findings of the Fifth Circuit in *Van Loon v. Dep't of Treasury*, 122 F.4th 549 (5th Cir. 2024).

As the Fifth Circuit correctly held in *Van Loon*, the Tornado Cash smart contracts, which are the heart of Tornado Cash, are immutable and available for anyone to use, and as such, they cannot be owned, and for that reason are not "property" that can be sanctioned. *See* 122 F4th at 565 ("The immutable smart contracts at issue in this appeal are not property because they are not capable of being owned.") The Fifth Circuit also concluded that the Tornado Cash developers "cannot discard, change, disconnect, or *control* smart contracts that are immutable." *Id.* (emphasis added). And the smart contracts became immutable before the start date of any of the charged conspiracies. Thus, Mr. Storm and the thousands of others who indisputably received TORN tokens cannot be said to have "owned" Tornado Cash simply by virtue of their possession of the tokens.

To the extent the government argues that the decision to allocate TORN to the founders and to early adopters shows Mr. Storm's ownership and control of the purported "Tornado Cash service," that, too, is inaccurate because the decision was not Mr. Storm's. To the contrary, TORN tokens were created only after the community of Tornado Cash users voted to adopt a governance structure involving a decentralized autonomous organization ("DAO"), with TORN acting as a governance token allowing those who possessed and "staked" TORN to vote on various proposals and governance issues. *See Van Loon*, 122 F.4th at 557-58. The public statement announcing the proposal made clear that TORN was designed to allow holders to

"make proposals and vote to change the protocol via governance" and was "not a fundraising device or investment opportunity," noting TORN would not be transferrable until the community elected to vote otherwise.[14]  The announcement also made it clear that the decision of whether to implement the proposed governance structure, including the creation and allocation of TORN tokens, was up to the users.  (*Id.* ("At the end of the day, this is just a proposal. We don't control Tornado Cash—its users do, so if the community adopts this proposal, then it will become the way forward for privacy on Ethereum.").)

Moreover, the government's argument that Mr. Storm's possession of TORN tokens somehow evidences his "financial motive" to change (or not change) Tornado Cash misses the mark.  The government fails to explain how changing or not changing the software protocol (even assuming that was possible) would have affected the value of Mr. Storm's TORN tokens.  Most notably, the evidence the government proposes does nothing to prove that Mr. Storm somehow personally profited from the illicit use of Tornado Cash.  *See United States v. Hatfield*, 685 F. Supp. 2d 320, 326 (E.D.N.Y. 2010) (denying motion to introduce evidence concerning the defendant's "lavish personal spending" because the evidence was irrelevant to the issues in the case).  Indeed, as noted above, one of the defense's experts, Dr. Hurder, intends to offer testimony explaining the negative impact that illicit use of the protocol had on the value of TORN.  (*See supra* note 13.)

For similar reasons, evidence of Mr. Storm's receipt and sale of TORN is not admissible pursuant to Rule 404(b).  The government claims such evidence is probative of Mr. Storm's "intent and financial motives in operating the Tornado Cash service."  (Gov't MILs at 31.)  The government fails to explain, however, how the mere fact that Mr. Storm obtained TORN tokens

---

[14] *See* Governance Proposal, supra note 9.

for developing and using Tornado Cash gave him the "intent" or "motive" to commit the crimes with which he is charged.  *See United States v. Scott,* 677 F.3d 72, 81 (2d Cir. 2012) ("[R]elevance is not the end of the inquiry: evidence admitted under 404(b) must be relevant to an issue *in dispute*.") (emphasis in original).  Instead, the government offers the conclusory assertion that Mr. Storm's alleged "substantial profits from the Tornado Cash service explain why he continued to market and operate the service, and to make only cosmetic changes to its features even after he became aware[15] that its business model was little more than operating as a haven for money laundering."  (Gov't MILs at 32.)  But even under the government's theory of profit, Mr. Storm received all of the TORN he possesses in December 2020 (with a three-year lock-up), so the only basis for the government's contention is the assumption, for which the government provides no support, that continued illicit use of the Tornado Cash protocol was somehow good for the price of TORN and thus profitable for Mr. Storm when, in fact, an analysis of the historical movement of TORN prices suggests otherwise, as Dr. Hurder intends to testify.

Even if the evidence regarding Mr. Storm's possession and use of TORN tokens had relevance under any theory, its probative value is outweighed by its prejudicial effect in violation of Rule 403.  First, there is a serious risk that the jury will be confused into believing that there was something wrong with simply developing a cryptocurrency mixer, which, as the government has acknowledged, is not the case.  (*See* Dkt. 53 (Gov't Opp. to Mot. to Dismiss) at 31.)  Second, the jury will also be prejudiced by evidence suggesting Mr. Storm is wealthy; specifically, his

---

[15] Assuming the "cosmetic changes" are a reference to what it contends were "ineffective" changes to Peppersec's UI, the government here appears to concede that Mr. Storm did not have an intent to run a money laundering operation until such changes were made to that UI in April 2022.  (*See* Dkt. 1 ¶ 65.)

alleged purchase of two homes and sale of $12 million in TORN.  Without any connection between Mr. Storm's purported wealth and the crimes with which he is charged, the admission of this evidence would risk vilifying Mr. Storm for being wealthy.  There is, of course, nothing illegal about being wealthy, but the jury may become biased against Mr. Storm if they hear evidence that he has two homes and made the equivalent of $12 million.  *See United States v. Stahl*, 616 F.2d 30, 33 (2d Cir. 1980) ("appeals [to class prejudice] are improper and have no place in a court room"); *see also United States v. James*, 607 F. Supp. 3d 246, 264 (E.D.N.Y. 2022) (declining to give government "carte blanche" to introduce evidence of defendant's wealth and cautioning government to "narrow down" wealth evidence).

Finally, the government wishes to present evidence that Mr. Storm "concealed" his realization of profits from the "Tornado Cash service" by using other accounts before moving the funds to his personal account, which it claims evidences his consciousness of guilt.  (Gov't MILs at 32.)  As the defense and various amicus parties have explained, there are many legitimate reasons to keep large financial transactions private; indeed, that was the whole point of Tornado Cash.  (*See* Dkt. 39 at 5-6 (amicus curiae DeFi Education Fund explaining unique importance of privacy-preserving technology for blockchain-based transactions); Dkt. 45 at 4-5 (amicus curiae Blockchain Association explaining concerns with financial privacy in context of blockchain technology); Dkt. 43 at 11-12 (amicus curiae Coin Center explaining other tools that provide financial privacy).  This evidence is therefore irrelevant.  It is also unfairly prejudicial, in violation of Rule 403, because it would tend to suggest that there was something wrong with (1) making money and (2) keeping that fact private.  Neither is true, and the jury should not be confused into thinking otherwise.

**3.    Evidence of Allegedly False Statements Made on a Financial Services Company Questionnaire Are Irrelevant and Prejudicial and Should Not Be Admitted**

The government next proposes putting in evidence that Mr. Storm supposedly made materially misleading statements about the nature of his and Messrs. Semenov and Pertsev's business, Peppersec, in response to a questionnaire provided by the financial services company that issued Peppersec an account.  (Gov't MILs at 32-35.)  Specifically, the government intends to prove that in April 2022, Mr. Storm denied that Peppersec operated on a blockchain, offered any products or services related to a digital wallet, derived any money from cryptocurrency, or accepted deposits, and that in response to a question about how the company was "directly or indirectly related to cryptocurrency," Mr. Storm wrote "donations, payments, expenses."  (Gov't MILs at 33-34.)  The government argues that these statements are direct evidence of Mr. Storm's participation in the charged conspiracies because they helped keep Peppersec's account open and therefore kept Tornado Cash operating.  (*Id.* at 34.)

As a threshold matter, the statements referenced by the government are not false. Peppersec, the company Mr. Storm co-owned with Messrs. Semenov and Pertsev, did not operate on a blockchain.  The Tornado Cash smart contracts were immutable.  Peppersec did not offer any products or services related to a digital wallet.  The Peppersec UI is not a digital wallet. It did not derive any money from cryptocurrency, or accept deposits.  Peppersec itself did not charge for the UI (or the website) and it did not receive any TORN tokens ever. It was also accurate to say that Peppersec's relation to cryptocurrency was "donations, payments, expenses" because that is all that Peppersec received or did with cryptocurrency.

Moreover, even to the extent the statements could be viewed as attempting to keep the Peppersec account open, there was nothing wrong with that.  Thus, there is simply no connection

between the statements made on the questionnaire and the illegal conduct charged in the Superseding Indictment.

In addition to being inadmissible direct evidence, the allegedly false statements are inadmissible under Rule 404(b). The government argues that the statements evidence Mr. Storm's "preparation and planning to keep the Tornado Cash service running, his intent to conceal the true nature of the Tornado Cash service, and his consciousness of guilt." (Gov't MILs at 35.) But these are just conclusory arguments belied by the facts as discussed above.

In reality, the evidence is nothing more than character evidence, which is not permitted under Rule 404(b)(1). Fed. R. Evid. 404(b)(1) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."). The government wants to (falsely) paint Mr. Storm as a liar and therefore of bad character. But that is precisely the inference the jury is not permitted to make. *See McCallum,* 584 F.3d at 475 (inference that defendant committed crime based on bad character "undermines the presumption of innocence").

For the same reason, the evidence should be excluded under Rule 403. There is a substantial risk that the jury will be unfairly prejudiced against Mr. Storm based on evidence of other acts that have no real connection to the charges in this case. Since the probative value is minimal at best, this Court should exclude it under Rule 403.

The two cases the government cites do not support admission of the evidence here. (*See* Gov't MILs at 35.) Neither *United States v. Atilla,* 966 F.3d 118, 129 (2d Cir. 2020), nor *United States v. Mizrahi,* 2024 WL 3824104, *2 (S.D.N.Y. 2024), evaluated the admissibility of allegedly false statements at all. Instead, the district court in each case was evaluating the sufficiency of the evidence under Rule 29. Under that standard, the evidence is viewed in the

light most favorable to the government, and the court asks whether any rational juror could have found the defendant guilty. That is a far different inquiry than the weighing of probative value and possible prejudicial effect in which a Court must engage in determining the admissibility of evidence.

Moreover, the allegedly false statements in those cases were far more closely connected to the charged conduct than the allegedly misleading statements here. In *Atilla,* the false statements were made directly to Treasury officials and directly refuted the defendant's scheme to make international payments through U.S. banks in violation of U.S. sanctions. 966 F.3d at 129. In *Mizrahi,* the false statements were about certain wire transfers and directly evidenced the defendant's knowledge that he was laundering the proceeds of unlawful activity. 2024 WL 3824104 at *2. Here, in contrast, the statements made to the financial service company were only about Peppersec's business generally and did not relate at all to the alleged conspiracies in this case.

Thus, the statements are neither directly relevant nor relevant as other acts evidence under Rule 404(b), and in any event are more prejudicial than probative and should be excluded pursuant to Rule 403.

### 4. Evidence Regarding Alleged Activities of the Tornado Cash Founders After the Imposition of the Illegal OFAC Sanctions Should Not Be Admitted

Finally, the government seeks to introduce evidence that Mr. Storm and his alleged co-conspirators purportedly took steps to keep Tornado Cash operating after OFAC imposed sanctions on Tornado Cash on August 8, 2022. (Gov't MILs at 35-37.) Even assuming that was true, it has no bearing on the charges here.

Contrary to the government's claim, evidence regarding supposed efforts to keep Tornado Cash operating after sanctions were imposed has no direct relevance to the charged

conspiracies. (*See* Gov't MILs at 36.) Mr. Storm is not charged with violating the OFAC sanctions placed on Tornado Cash; he is charged with conspiring to commit money laundering, to operate an unlicensed money transmitting business, and to evade the International Emergency Economic Powers Act ("IEEPA") sanctions on the Lazarus Group. (*Id.* at 59.) The government nevertheless claims that the evidence shows Mr. Storm's generally bad intent (even though it was developed after the fact) and his financial motive to keep Tornado Cash operating. (*See id.* at 35-36.) As discussed above, Mr. Storm's purported intent to keep Tornado Cash operating is not the same as an intent to engage in concealment money laundering, to operate an unlicensed money transmitting business, or to evade the IEEPA sanctions on the 0x098B716 Address.

Even if this evidence had any relevance either as direct evidence or under Rule 404(b), it should be excluded pursuant to Rule 403. The evidence is unfairly prejudicial because there is a high risk that the jury would become confused about either the timing of the conspiracies or whether Mr. Storm is being charged with violating the sanctions on Tornado Cash (which he is not). It is also misleading because the Tornado Cash contracts were always immutable and unstoppable, and nothing Mr. Storm did post-sanctions had any effect on whether they kept operating as they have and will always keep operating. And of course, the alleged evidence potentially gives rise to the impermissible inference that because Mr. Storm purportedly did something else wrong, he must have committed the crimes charged. *See* Fed. R. Evid. 4(b)(1); *McCallum,* 584 F.3d at 475.

This evidence is further unduly prejudicial because the OFAC sanctions were themselves illegal. As discussed in Mr. Storm's seventh motion *in limine,* the Fifth Circuit overturned the OFAC sanctions on Tornado Cash in *Van Loon* because the immutable Tornado Cash smart contracts are not "property." (Dkt. 155 at 24-27.) The jury should not be left with the

misimpression that OFAC properly found Tornado Cash to be subject to sanctions when it did not. Thus, evidence regarding Mr. Storm's conduct allegedly tied to the imposition of the illegal OFAC sanctions should be excluded.[16]

The evidence should further be precluded because it would result in a trial-within-a-trial about the relationship between the website, Peppersec's UI, and the domain Tornadocash.eth, and the role of the community in the UI post-sanctions, further in violation of Rule 403.

For all the foregoing reasons, the government's proposed evidence regarding TORN sales, allegedly misleading statements, and conduct after OFAC imposed sanctions should not be admitted.

### F.    Gov't MIL No. VI – This Court Should Not Preclude Roman Storm's Potential Advice-of-Counsel Defense

The government seeks to relitigate the parties' dispute about the scope of Mr. Storm's advice-of-counsel disclosures and to prematurely have this Court decide whether Mr. Storm can satisfy the elements of an advice-of-counsel defense at trial. In doing so, it seeks to preclude any advice-of-counsel defense. The government does all of this under the guise of challenging the sufficiency of information Mr. Storm provided to the government months ago in response to this Court's March 3, 2025, order (the "Order"). (*See* Dkt. 138 at 9.) This Court should reject what amounts to a pretextual attempt to force Mr. Storm to disclose defense strategy well in advance of trial, in circumvention of the Order, and not preclude any advice-of-counsel defense.

As an initial matter, the disclosures Mr. Storm made—over three months ago—satisfy the plain language of the Order. (*Compare* Dkt. 138 at 9 (Mar. 3, 2025 Order), *with* Dkt. 157-1 at 1-

---

[16] That said, if any reference to the OFAC sanctions is permitted, then Mr. Storm must be permitted to introduce evidence that the OFAC sanctions were improperly imposed and were subsequently overturned and lifted. This would include both at trial and in proposed jury instructions. (*See* Dkt. 155 at 24-25, 27)

2 (Mar. 7, 2025 Def. Disclosures), and Dkt. 157-3 at 2 (Apr. 4, 2025 Def. Supp. Disclosures).)
In a March 7, 2025 letter, the defense provided the government with the names of the attorneys
retained by Mr. Storm and Peppersec, the date ranges during which they provided advice, and a
detailed list of 10 substantive topics about which advice was rendered.  (*See* Dkt. 157-1.)
Several weeks later, the defense followed up with another letter answering certain questions the
government had about the disclosures and declining to provide other information outside the
scope of the Court's Order.  (*See* Dkt. 157-3.)

　　　In complaining about the sufficiency of those disclosures now, the government appears to
seek information that is plainly not contemplated by the Order, including information that is
obviously privileged and thus, by definition, outside the scope of what this Court ordered.  (*See,
e.g.*, Dkt. 157 at 40 (demanding, for example, "information establishing that [Mr. Storm] 'made a
complete disclosure as to the legality of his conduct' . . . [and] 'received advice that his conduct
was legal'").)

　　　While the relief the government seeks in its motion is somewhat vague, the authorities it
cites do not support its position.  Indeed, the government's cases address the question of whether,
based on evidence proffered or introduced *at trial*, a defendant may be entitled to introduce
testimony related to attorneys or receive an advice-of-counsel jury instruction.  (Dkt. 157 at 39-
40 (citing *United States v. Bankman-Fried*, 2024 WL 477043, at *1 (S.D.N.Y. Feb. 7, 2024)
(explaining reasons for the court's *in-trial* ruling to exclude certain testimony related to
involvement of counsel by the defendant after defendant proffered such testimony outside
presence of jury); *United States v. Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y. June 26, 2014),
ECF No. 63 at 83-85 (declining, *at trial*, to issue advice-of-counsel jury instruction and limiting
"testimony or argument that [the defendant] relied on his attorney's advice" where the evidence

would not "show that [he] sought specific legal advice on any particular legal issue").[17]  The

government also cites *SEC v. Stoker*, No. 11 Civ. 7388 (S.D.N.Y. filed Oct. 19, 2011), but that

case, too, does not support preclusion of the advice-of-counsel defense at this stage; there,

"Judge Rakoff declined to issue a general preclusion order [on an advice-of-counsel defense] and

instead stated that particular evidentiary issues on that topic would be dealt with at trial."

*Tourre*, 950 F. Supp. 2d at 683 (discussing *Stoker*, 11 Civ. 7388 (S.D.N.Y. filed Oct. 19, 2011)).

Accordingly, none of these cases stand for the proposition that the defense must

specifically identify for the government, weeks before trial, any and all possible evidence that

might support such a defense or prove such a defense to the prosecution's satisfaction before the

trial even starts.  This is particularly true where, as here, Mr. Storm has not yet asserted that

defense.[18]

In its motion, the government goes on to nitpick subject matter in Mr. Storm's disclosures

to suggest that any advice he received on those topics is not relevant to the government's

charges.  (*See* Gov't MILs at 41-42.)  But it bears emphasis that Mr. Storm made these

disclosures months before the government shifted its theory on Count Two last month.  (*See* Dkt.

144.)  The government's choice to do so—only two months before trial—should not require Mr.

Storm to revise or supplement his disclosures.

---

[17] In *Tagliaferri*, Judge Abrams did, however, "permit the defendant to elicit testimony that
attorneys were involved in the transactions [at issue]" and "to argue that this involvement
affected his state of mind, thus bearing on whether he acted with fraudulent intent."  *Id.* at 83-84.
The only case cited by the government where a court precluded attorney-related evidence
*pretrial* was in a civil action where Judge Forrest found that "much of th[e] [proposed]
testimony" relating to legal advice "would . . . be irrelevant, given [the defendant's] intention not
to present a reliance on counsel defense."  *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y.
2013).  Not so here, where Mr. Storm has consistently preserved his right to mount such a
defense.
[18] Nor should Mr. Storm be expected to have fully settled on his defenses, when he has not even
received the government's witness list, exhibits, or 3500 material.

But in any event, the topics the government lists remain relevant.  For example, the "Attorney Memo" cited by the government was commissioned by a reputable venture capital firm and drafted by a lawyer "who specializes in advising crypto enterprises."[19]  (*See* Gov't MILs at 41-42.)  The memo includes substantial analysis interpreting laws and regulations, including with respect to money laundering and the 2019 guidance from the U.S. Treasury's Financial Crimes Enforcement Network ("FinCEN"), regarding whether Peppersec qualified as a "money transmitting business" under "the applicable federal regime for money service businesses."  (*See* Dkt. 157-4 at 8-18.)  The extent to which Mr. Storm received and considered this advice is directly relevant to Mr. Storm's knowledge for purposes of Count Two, including in connection with 18 U.S.C. § 1960(b)(1)(C).  (*See* Dkt. 154 at 29, 32 & n.67 (citing *United States v. Elfgeeh*, 515 F.3d 100, 133 (2d Cir. 2008)); *see also United States v. Scully*, 877 F.3d 464, 478 n.6 (2d Cir. 2017) ("Reliance on the advice of counsel . . . is a defense that tends to refute the government's proof of . . . intent.").)

As discussed in prior defense filings, the definition of "money transmitting" in Section 1960(b)(2) also applies to (b)(1)(C), and the term is defined to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  (*See, e.g.*, Dkt. 148 at 6-7; Dkt. 150 at 2-3.)  18 U.S.C. § 1960(b)(2).  In considering what constitutes "transferring funds on behalf of the public," it would be reasonable for Mr. Storm or his counsel to consult

---

[19] Sabrina Toppa, THESTREET ROUNDATABLE, *SEC launches 'crypto clarity' roundtable series as Trump administration shifts approach*, (Mar. 20, 2025) available at https://www. thestreet.com/crypto/policy/sec-launches-crypto-clarity-roundtable-series-as-trump-administration-shifts-approach.

regulatory guidance on what counts as a money transmitting business under another statute explicitly referenced in Section 1960.

Further, all money services businesses ("MSBs") are required to be licensed. (*See* Dkt. 164.) Licensed MSBs are required to implement Bank Secrecy Act regulations requiring, among other things, "KYC" and "AML" screening. The fact that FinCEN had exempted software providers from registration as MSBs would have been relevant to whether Mr. Storm believed that he had an obligation to implement any of these screening procedures.[20]

Thus, the extent to which Mr. Storm acted on such guidance from lawyers, or attempted to comply in good faith with the FinCEN guidance, is still highly probative, notwithstanding the government's new theory. (*See* Dkt. 150 at 2-3.[21]) And it goes to the heart of whether Mr. Storm conspired to engage in unlicensed money transmitting.

As to money laundering, the government cherry-picks statements from the "Attorney Memo," but conveniently ignores language favorable to Mr. Storm. (*See* Gov't MILs at 42.) For example, the government omits one of the memo's key points that Peppersec was distinguishable from other crypto-mixers subject to prosecution by the DOJ, like the defendant charged in *United States v. Harmon*, 19 Cr. 395 (D.D.C. Dec. 3, 2019):

---

[20] The government asserts that Mr. Storm's failure to implement KYC and AML procedures is a fact that can support all three of the charged offenses. (*See, e.g.*, Dkt. 1 ¶¶ 32-42.) Accordingly, the 2019 FinCEN guidance, and Mr. Storm's reliance on it, is relevant to his good faith in evaluating his intent to commit any of the alleged crimes.

[21] This Court's discussion at the May 30, 2025 conference of the *Samourai* prosecution team's communications with FinCEN is instructive. Specifically, this Court questioned whether "the views of FinCEN employees . . . matter" as to "the reasonableness . . . of [Mr. Storm's] views, if [Mr. Storm] [was] not aware of these employees' views." (Dkt. 160 5/30/25 Tr. at 19.) The circumstances here are the opposite: potential evidence showing that Mr. Storm *was* aware of and/or acted on legal views as to whether Tornado Cash qualified as a "money transmitting business" would certainly be probative of "whether the defendant had 'know[ledge]' that the business was 'an *unlicensed* money transmitting business.'" *See Elfgeeh*, 515 F.3d at 132 (quoting 18 U.S.C. § 1960(a)) (alteration and emphasis in original).

> [W]e believe there are reasonable grounds to view [Peppersec] as qualitatively different from instances like the Harmon Case. In the Harmon Case, the defendant operated a custodial mixer as a for profit enterprise to conceal illicit transactions on the darknet. In contrast, PepperSec has no access to user funds, does not operate Tornado Cash as a business, and has no insight into who uses the tool. Further, our prior discussion established that PepperSec has strong arguments that its current activities do not constitute money transmission activities under the 2019 Virtual Currency Guidance. The defendant in the Harmon case clearly accepted and transmitted funds on an ongoing basis to enrich themselves.

(Dkt. No. 157-4 at 19.)

For all these reasons, this Court should reject the government's effort to preclude the "Attorney Memo" or any other advice-of-counsel defense argument and exhibits or require Mr. Storm to supplement his already thorough disclosures at this time.

### G. Gov't MIL No. VII – The Government's Purported "Irrelevant" And "Unfairly Prejudicial" Evidence and Arguments

The government takes a kitchen-sink approach in seeking to exclude all manner of evidence and arguments it speculates the defense might offer at trial. (*See* Gov't MILs at 43-60.) The government's transparent attempt to gain an improper preview of the defense strategy should be rejected. *Fratello*, 44 F.R.D. at 452. Once again, the government's motion is premature and lacks support. To the extent Mr. Storm intends to present evidence on the following topics, the evidence is neither irrelevant nor unfairly prejudicial and would be admissible.

#### 1. Gov't MIL No. VIIA – Any Evidence About Alleged Victims of Third-Party Hacks is Irrelevant and Unduly Prejudicial

The government moves to preclude any suggestion by the defense at trial that victims of third-party hacks "were negligent or gullible, or could have been more diligent." (Gov't MILs at 43.)

As an initial matter, the defense does not anticipate arguing that such victims were negligent at trial. That said, the government's motion suggests that it may seek to elicit

testimony from such victims; as set forth in Mr. Storm's second motion *in limine* (Dkt. 155 at 11), this Court should preclude any evidence related to (or from) alleged victims because their testimony has no bearing on the charges against Mr. Storm.  Mr. Storm had nothing to do with the alleged hacks, and the government does not claim he did.

The government states that it "expects that several victims will testify to being defrauded or hacked and then seeing their funds being laundered through the Tornado Cash service, never to be recovered," and that "the victims' losses in this case are staggering."  (Gov't. MILs at 44.) These vague and conclusory statements do not tie Mr. Storm to the hacks or the hackers, nor does the government even allege the victims themselves were users of Tornado Cash.[22]  As such, mention of third-party hackers or hacks, and any victim impacts related to them, is irrelevant, and therefore inadmissible.  *See United States v. Araujo*, 539 F.2d 287, 289 (2d Cir. 1976) (holding that with respect to proving the participation of each defendant in criminal conduct, "proof of criminal acts not involving [the defendants] would be irrelevant.").

Even if this Court were to find this evidence relevant, it would nonetheless be inadmissible under Rule 403.  As set forth in Mr. Storm's corresponding motion *in limine* on this topic, victim testimony about hacks would risk inflaming the jury and misleading them into believing that Mr. Storm was somehow working in coordination with the hackers, which the government has not alleged.[23]  (Dkt. 155 at 12-13.)  Additionally, any suggested affiliation with

---

[22] Further, the government has conceded that Mr. Storm is not charged with conspiring with any such hackers.  (Dkt. 53 at 40.)

[23] The government's reliance on *United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004), is particularly misplaced.  In *Thomas*, the defendant who sought to raise a victim's negligence was the individual alleged to have defrauded the victim.  *Id*. at 243.  The Second Circuit held that the district court properly prohibited the defendant from cross examining the victim and rejected a jury instruction that the victim had acted negligently in succumbing to the fraud.  *Id*. Here, the alleged perpetrator of the fraud—the hacker—is not on trial, and the government's suggestion

hackers, let alone with the Lazarus Group, would be extraordinarily prejudicial in this case, and as noted risks both misleading and confusing the jury.  (*See id.* at 9-10.)

## 2. Gov't MIL No. VIIB – Evidence of Lawful Uses of Tornado Cash Are Admissible

The government seeks to preclude Mr. Storm from presenting "evidence that some customers of the "Tornado Cash service" used the service for purportedly lawful or sympathetic purposes," arguing that such evidence is "irrelevant 'good acts' evidence" that "is not probative of whether [Mr. Storm] committed [the charged] crimes."[24]  (Gov't MILs at 45.)  The government is wrong.  Evidence about the lawful functioning of the "Tornado Cash service" is not character evidence at all, much less "good acts" evidence.  It is direct evidence to rebut the government's erroneous allegations.

Contrary to the government's characterization, evidence of the lawful use of the Tornado Cash protocol is not improper "good acts" evidence. The authorities cited by the government discuss "good acts" evidence in the context of improper *character* evidence that is generally inadmissible under Rule 404(b)(1).[25]  Under Rule 404(b)(1), evidence of any "crime, wrong, or act is not admissible *to prove a person's character* in order to show that on a particular occasion the person acted in accordance with the character."  Evidence of lawful uses of Tornado Cash, to the extent Mr. Storm seeks to admit such evidence, would not pertain to his character.  Instead, it

---

that *Thomas* controls only confirms its plan to conflate Mr. Storm and the hackers.  That would be impermissible under Rule 403.

[24] Mr. Storm rejects that any evidence of the use (lawful and unlawful alike) of the Tornado Cash protocol constitutes evidence of "acts" which can be imputed to Mr. Storm.  *See, e.g.*, *United States v. Cruz*, 981 F.2d 659, 663 (2d Cir. 1992) ("[G]uilt may not be inferred from the conduct of unrelated persons.").  Mr. Storm likewise rejects the government's characterization of the challenged evidence constituting "evidence that [Mr. Storm's] business transmitted funds that were not illicit" because it assumes facts that the government has yet, and is required, to prove. (Gov't MILs at 47.)

[25] Tellingly, the government does not request exclusion of the evidence pursuant to Rule 401(b)(1), which governs "good acts" evidence.

is direct evidence of the very product the government claims is illegal and of the mental state of those who developed it, including Mr. Storm.  Because it is not character evidence at all, Rule 404(b) is not applicable, and the evidence should be admitted as highly relevant to rebut the government's claims that Tornado Cash "was a haven for criminals to engage in large-scale money laundering and sanctions evasion." (Gov't MILs at 1.)

Even if Rule 404(b) were applicable to evidence of Tornado Cash having lawful uses, the evidence would be admissible under Rule 404(b)(2).  Rule 404(b)(2) permits the introduction of "prior act evidence" that "bears on Defendants' knowledge and intent."  *See, e.g.*, *United States v. Adelekan*, 567 F. Supp. 3d 459, 469 (S.D.N.Y. 2021) (finding that "[e]vidence of non-criminal transactions may be admitted because it bears on Defendants' knowledge and intent").  In addition, such evidence would be admissible as background evidence.  *See, e.g.*, *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("Background evidence may be admitted to show…the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

### 3.    Gov't MIL No. VIIC – Roman Storm Should Be Permitted to Testify About Privacy, If He Testifies

It is not necessary for this Court to enter a blanket order prohibiting discussions of free speech and/or privacy rights.  (*See* Gov't MILs at 48-49.)  Mr. Storm does not intend to make arguments aimed at jury nullification.  And he does not intend to introduce or make any arguments to the jury about free speech.  However, if Mr. Storm testifies, he may decide to discuss privacy, which is an issue that is essential to discussing the background and context of the Tornado Cash project.  Discussion of privacy is additionally vital to a key element of each charged offense: intent.

As discussed above, background evidence can be admitted to show "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Daly*, 842 F.2d at 1388. Further, courts liberally permit evidence regarding a defendant's intent. *United States v. Collorafi*, 876 F.2d 303, 305 (2d Cir. 1989) ("[T]rial courts should follow a liberal policy in admitting evidence directed towards establishing the defendant's state of mind.").

In sum, Mr. Storm: (1) will not make arguments aimed at jury nullification; (2) does not intend to make arguments about free speech; and (3) should be allowed to present evidence and arguments about privacy as background and as related to his state of mind. As such, this Court should decline the government's request to act "in an abundance of caution" and deny the motion. (Gov't MILs at 48.)

### 4.    <u>Gov't MIL No. VIID – Other Cryptocurrency Mixing Services</u>

The government's request to exclude evidence and arguments about other cryptocurrency mixing services is overbroad and premature. (*See* Gov't MILs at 49-51.)

The authorities cited by the government to preclude such evidence are highly distinguishable—they all pertain to evidence amounting to an "everybody-is-doing-it defense" in the context of wire fraud. (*Id.* at 49-50 (citing *United States v. Mendlowitz*, 2019 WL 6977120, at *5 (S.D.N.Y. Dec. 20, 2019); *United States v. Connolly*, 2019 WL 2125044 (S.D.N.Y. May 2, 2019); and *United States v. Oldbear*, 568 F.3d 814 (10th Cir. 2009).)

Here, Mr. Storm could use such evidence for other uses apart from an "everybody-is-doing-it defense," such as to negate the government's theories as to knowledge and intent. For instance, the government intends to argue that the purported "ineffective remedy" implemented by Mr. Storm to block sanctioned property demonstrates his "willfulness" to conspire to violate the IEEPA under Count Three. (*See* Dkt. 120 (Gov't Opp. to Renewed Mot. to Dismiss) at 8.)

The government intends to use such evidence as circumstantial evidence of intent, which makes it even more important that Mr. Storm be allowed to introduce evidence about other cryptocurrency mixers.  Thus, because this request is premature and the evidence can be introduced to disprove intent or knowledge, the Court should deny the government's request. *See, e.g.*, *Bankman-Fried*, 2023 WL 6283509, at *4 (S.D.N.Y. Sept. 26, 2023) (denying a similar request from the government because, among other things, there could be relevant and proper uses of such evidence).

     **5.**     <u>**Gov't MIL No. VIIE – The Lazarus Group's Access to Tornado Cash Pools**</u>

This Court should reject the government's motion to exclude evidence and argument concerning hypothetical other means by which the Lazarus Group could have accessed the Tornado Cash smart contract pools.  (*See* Gov't MILs at 51-52.)

The government's theory underlying all charges is that Tornado Cash was a "fully integrated service" made up of (1) the Tornado Cash pools; (2) the user-interface; (3) the website; and (4) the relayer network.  In other words, Mr. Storm is facing criminal charges for the "fully integrated service," rather than any one component.  Evidence that the Lazarus Group could have accessed the Tornado Cash pools by other means outside of the "fully integrated service," therefore is relevant because it completely undermines the government's theory that the Lazarus Group used what the government characterizes as the "Tornado Cash service."  The evidence the government seeks to exclude is critical to Mr. Storm's defense for this reason and others (*e.g.,* it shows the Lazarus Group did not coordinate with Mr. Storm; it also contextualizes Mr. Storm's statement that an update to the Peppersec UI following OFAC sanctions on the Lazarus Group wallet would be "easy to evade"—the fact that the Lazarus Group could access the pools directly, without the use of the UI, undermines the government's claim that the update

was made "to mislead the public into believing that the Tornado Cash service complied with the law, while continuing to allow and profit from" illicit activity (Dkt. 1, ¶¶ 62-64)).  Just because the government does not like that there is evidence that undermines a key prosecutorial theory is not grounds to exclude it.[26]

### 6.  Gov't MIL No. VIIF– Regulations, Policy, and Opinions Relating to Cryptocurrency

The government broadly seeks to preclude evidence regarding "cryptocurrency regulations, policy, and opinions from witness."  (Gov't MILs at 52.)  Mr. Storm does not currently intend to present evidence or arguments regarding "extraneous policy considerations" or "the government's enforcement decisions."  (*Id.*)  But Mr. Storm should not be precluded from asking witnesses about the government's theories underlying this case or making references to FinCEN regulations or guidance.  Indeed, those regulations lie at the heart of this case.  FinCEN provided guidance, which Mr. Storm *followed*.  That fact is directly relevant to rebut the government's claims about his intent and willfulness.

Despite the government's recent decision to no longer proceed under Section 1960(b)(1)(B), FinCEN regulations and guidance remain relevant to this case, as discussed in the recent motion to dismiss.  (Dkt. 164 at 1-3.)  To violate Section 1960(b)(1)(C), the business at issue still must have been a "money transmitting business," defined as one that "transfer[s] funds on behalf of the public."  18 U.S.C. § 1960(a), (b)(2).  The FinCEN regulations and guidance are directly relevant because they further explain what it means to be a "money transmitting business."

---

[26] The defense has requested that this Court enter an order precluding any reference to the Lazarus Group in its motions *in limine.*  (*See* Dkt. 155 at 2-11.)  Accordingly, if the defense chooses to present evidence of the Lazarus Group's access to the Tornado Cash pools, it would seek to introduce that evidence without reference to the group's name, assuming the government is also precluded from naming the group.

This Court should deny this premature and overbroad request.

7. **Gov't MIL No. VIIG – This Court Should Deny the Government's Motion to Exclude Evidence About Roman Storm's Personal Background and Should Preclude the Government from Introducing Google Searches About Incarceration**

(a) **Evidence Regarding Roman Storm's Personal Background Is Admissible**

This Court should deny the government's motion to preclude the defense from offering evidence about Mr. Storm's personal background, family relationships, or other similar personal factors. (*See* Gov't MILs at 54.) Yet again, the government's motion lacks specificity and prematurely attempts to foreclose what may be perfectly legitimate evidence.

District courts generally have "wide discretion concerning the admissibility of background evidence." *See United States v. Blackwell*, 853 F.2d 86, 88 (2d Cir. 1988); *see also Tardif v. City of New York*, 991 F.3d 394, 409 (2d Cir. 2021) ("Background evidence may provide necessary context to a witness's substantive testimony . . . ."). Courts generally exercise that discretion to admit basic background information, such as "education and employment," *Blackwell*, 853 F.2d at 88, but sometimes exclude testimony about a defendant's personal characteristics and circumstances when irrelevant under Rule 401 or unfairly prejudicial under Rule 403, *Tardif*, 991 F.3d at 409.

Here, the government's request is premature. Indeed, the government's motion is a "preemptive weapon[ ] with which [it] endeavor[s] to strike in shotgun fashion at whole topics and sources of prospective evidence, out of context and before any specific objection against its proper backdrop is raised." *TVT Records v. Island Def Jam Music Grp.*, 250 F. Supp. 2d 341, 344 (S.D.N.Y. 2003). While Mr. Storm does not intend to offer evidence concerning his personal background to garner sympathy, there are reasons why such evidence may become admissible at trial, including if Mr. Storm decides to testify. For example, Mr. Storm would

49

likely need to explain his background and story to contextualize his involvement with Tornado

Cash and his alleged co-conspirators.  The government's attempt to impose a "blanket

prohibition on such evidence and arguments is unwarranted at this stage."  *James*, 607 F. Supp.

3d at 256; *see also Vargas*, 2018 WL 6061207, at *3 (declining to "bar [d]efendant from

presenting character witness or testimony about his personal circumstances to the extent they

rebut facts brought into issue in the [g]overnment's case in chief").

      Accordingly, this Court should deny the motion.

### (b) Evidence of Roman Storm's Google Searches Should Be Precluded

      Oddly, in the same section of its brief in which it seeks to preclude Mr. Storm from

offering evidence or making arguments about the consequences he would face if convicted,[27] the

government moves to admit records, including Google searches about federal prisons,

purportedly evidencing Mr. Storm's concerns about being incarcerated and his "state of mind

and consciousness of guilt."  (*See* Gov't MILs at 56.)  This Court should deny that request for

two independent reasons.

      First, to the extent the government seeks to introduce this evidence under Rule 404(b),

the government's request is untimely.  This Court ordered that Rule 404(b) disclosures be made

by February 18, 2025.  (Dkt. No. 126.)  The government's request to admit Mr. Storm's alleged

searches is almost 4 months after the deadline and, notably, is buried within its request to

preclude evidence about his personal background.  This Court should decline to entertain this

request.

---

[27] Mr. Storm does not intend to introduce evidence or make arguments about the consequences of a conviction absent some unforeseen argument at trial by the government.

Second, the searches lack any probative value and, indeed, would be highly misleading and would require the introduction of precisely the sort of evidence from the defense that the government seeks to exclude.  In support of its motion, the government points to two searches Mr. Storm allegedly ran on August 20, 2022: a search for "best federal prison ratings" and a search for "list of minimum security federal prisons."  (Gov't MILs at 56.)  Both searches postdate the charged conspiracies and come on the heels of OFAC's August 8, 2022, imposition of sanctions against Tornado Cash – which have now been found to be unlawful and repealed, a fact the government seeks to exclude.  (Dkt. 109, ¶¶ 4, 7, 10 (indicating period "up to including on or about August 8, 2022" as relevant period for each charge); *Van Loon*, 122 F.4th at 557-58.)  Mr. Storm's purported concern about incarceration *after* the federal government initiated enforcement actions is probative of nothing other than his awareness that the government initiated enforcement actions.

The risk of unfair prejudice and misleading the jury that would result from the admission of these records is high, violating Rule 403.  Jurors may incorrectly interpret these searches as admissions of guilt and thus "lure the factfinder into declaring guilt on a ground different from proof specific to the offense[s] charged."  *Old Chief v. United States*, 519 U.S. 172, 180 (1997); *see also United States v. Segui*, 2019 WL 8587291, at *13 (E.D.N.Y. Dec. 2, 2019) (excluding under Rule 403 a search, among others, about Rikers Island because the search "risk[ed] unfair prejudice and confusing the jury").  In addition, the searches invite the jurors to speculate about the consequences of a conviction, which is yet another issue the government itself has moved to preclude Mr. Storm from introducing at trial.  The admission of these records would therefore be inconsistent with an order precluding Mr. Storm from referring to the consequences of a conviction, including imprisonment.

Accordingly, because the probative value of the searches is nonexistent, and they carry a high risk of unfair prejudice and misleading the jury, the Court should preclude them.

### 8.    <u>Gov't MIL No. VIIH</u> – Mr. Storm's Cooperation

The government seeks to preclude any evidence regarding Mr. Storm's efforts to cooperate with the government immediately after OFAC sanctions were imposed against Tornado Cash in November 2022.  (*See* Gov't MILs at 56-59.)  The defense does not intend to elicit such evidence through other witnesses.  But should Mr. Storm testify, the defense should be allowed to elicit testimony from Mr. Storm regarding his good-faith efforts to cooperate and proffer with the government.

The government's claim that such testimony would be irrelevant is wrong.  "The significance of a decision to cooperate, for purposes of relevancy, lies not in the fact that cooperation was offered but in the motivation behind the decision to render such assistance." *United States v. Yu*, 697 F. Supp. 635, 638 (E.D.N.Y. 1988).  Accordingly, "testimony concerning an accused's decision to cooperate may be relevant to establishing that he lacked the requisite knowledge to commit the crime."  *Id.* (citing *United States v. Lawal*, 736 F.2d 5, 9 (2d Cir. 1984)).  Unlike the defendant in *United States v. Connolly*, a case repeatedly cited by the government (Gov't MILs at 58-59), Mr. Storm's decision to proffer with the government was *not* "motivated by other non-exculpatory factors, such as avoiding the cost of a futile extradition fight," but rather consistent with a "consciousness of innocence" and probative of intent. *See* 2018 WL 2411216, at *13 (S.D.N.Y. May 15, 2018).  Indeed, courts in this District have permitted defendants to elicit "consciousness of innocence" testimony regarding their efforts related to cooperation.  *See, e.g.*, *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) (affirming that "the district court gave defendant ample opportunity to elicit consciousness of innocence testimony and argue that theory to the jury during summation," since "he denied any

wrongdoing when the police offered him immunity in exchange for his cooperation"); *see also United States v. Fulford*, 980 F.2d 1110, 1116 (7th Cir. 1992) (noting the "[defendant] testified that after his arrest, he sought to cooperate with the police," and affirming district court's ruling allowing rebuttal testimony of same). Finally, while the government may consider testimony on this topic a "bid to win the jury's sympathy," (Gov't MILs at 59), any purported "self-serving nature of a witness's statements goes to the statements' weight, not to their admissibility." *In re Dana Corp.*, 574 F.3d 129, 153 (2d Cir. 2009) (quoting *St. Pierre v. Dyer,* 208 F.3d 394, 405 (2d Cir. 2000)).

If Mr. Storm decides to testify, he should be permitted to discuss his cooperation.

### 9.    Gov't MIL No. VIII – *Van Loon*

The government seeks to preclude Mr. Storm from introducing evidence or arguments about OFAC's lack of authority to impose sanctions on Tornado Cash under *Van Loon v. Dep't of the Treasury*, 122 F. 4th 549, 558 (5th Cir. 2024), while simultaneously requesting that this Court permit it to introduce OFAC's imposition of unlawful sanctions in August 2022. (Gov't MILs at 60.) The government argues that *Van Loon* is irrelevant under Rule 401, and reference to it would violate Rule 403 by being "unfairly prejudicial to the [g]overnment's case," as well as mislead the jury and waste time. (*Id.*) But, as the defense has explained more fully in its seventh motion *in limine*, reference to any sanctions on Tornado Cash without the context that the sanctions were unlawful in *Van Loon* would be far more prejudicial to Mr. Storm and will confuse and mislead the jury. (*See* Dkt. 155 at 24-27.)

The government claims that the imposition of the "Tornado Cash sanctions will be introduced principally to demonstrate [Mr. Storm's] consciousness of guilt," because Mr. Storm's subsequent sales of TORN reflect "secret[ing] away proceeds of his crimes." (Gov't MILs at 60.) The government, however, overstates any relevance evidence of the unlawful

OFAC sanctions may have to the charges.  First, Mr. Storm sold TORN before the sanctions were announced and TORN itself was not sanctioned by OFAC.  Second, the government does not tie any of the purported sales (what they claim are "liquidations") to knowledge by Mr. Storm of the OFAC sanctions.  This lack of a causal link is fatal to the government's argument, rendering the purported sales irrelevant for the purpose the government relies on.

This Court should also reject the government's claims that the introduction of evidence or arguments referencing *Van Loon* will "impermissibly garner sympathy" for Mr. Storm, and thereby "unfairly prejudic[e]" the government.  (*See id*. 60-61.)  Rather, reference at trial to the Tornado Cash sanctions (to the extent this Court finds the sanctions relevant) without the information that they were subsequently determined to be unlawful, could improperly suggest to the jury that they should reach the same (erroneous) conclusion as OFAC when it first imposed the sanctions—that Tornado Cash knowingly dealt with sanctioned property, specifically that of the Lazarus Group.  *See, e.g.*, *United States v. Klein*, 2017 WL 1316999, at *8 (E.D.N.Y. Feb. 10, 2017) (declining to allow the introduction of an SEC complaint under Rule 403 because it would be suggestive to the jury that they should reach the same conclusion the agency did as to the charged conduct).  It also is critical that the jury not be misled or confused into believing that Mr. Storm's sale of TORN, assuming this Court permits the government to introduce such evidence, was an illegal violation of OFAC sanctions. It was not, and there is no allegation otherwise.

As such, if this Court permits the government to introduce evidence of the unlawful sanctions placed on Tornado Cash, then it should permit the introduction of evidence that those sanctions were unlawful.

## III.    CONCLUSION

For the foregoing reasons, Mr. Storm respectfully requests that this Court deny the

government's motions *in limine*.

DATED: June 18, 2025                              Respectfully submitted,


                                                 By: */s/ Brian E. Klein*
                                                     Brian E. Klein
                                                     Keri Curtis Axel
                                                     Becky S. James
                                                     Kevin M. Casey
                                                     Viviana Andazola Marquez
                                                     Waymaker LLP

                                                     -and-

                                                     David E. Patton
                                                     Nicholas D. Pavlis
                                                     Hecker Fink LLP

                                                     *Attorneys for Roman Storm*