UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA
:
- v. -
:     S1 23 Cr. 430 (KPF)
ROMAN STORM,
:
                Defendant.
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# THE GOVERNMENT'S SECOND SET OF MOTIONS TO EXCLUDE THE TESTIMONY OF THE DEFENDANT'S EXPERT WITNESSES

                                                  JAY CLAYTON
                                                  United States Attorney
                                                  Southern District of New York

Ben Arad
Benjamin A. Gianforti
Thane Rehn
Assistant United States Attorneys

Kevin Mosley
Special Assistant United States Attorney
    *- Of Counsel -*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

ARGUMENT .............................................................................................................................. 1

    I.    The Court Should Exclude Matthew Green's Proposed Supplemental Testimony in its Entirety ................................................................................................................. 1

    II.    The Court Should Exclude Stephanie Hurder's Proposed Supplemental Testimony in its Entirety ................................................................................................................. 2

        A.    Hurder's Proposed Testimony that Demand for TORN Was Driven in Part by the Desire of Users to Participate in Tornado Cash Governance Should Be Excluded ................................................................................................................... 2

        B.    Hurder's Testimony that the Price of TORN Is Significantly Correlated with the Prices of BTC and ETH Should Be Excluded .................................................... 7

        C.    Hurder's Proposed Testimony Regarding the Ronin Hack's Effect on the Price of TORN Should Be Excluded ...................................................................... 8

    III.    The Court Should Exclude Michael Carter's Proposed Testimony in its Entirety. .......... 10

        D.    The Court Should Exclude Carter's Proposed Legal Opinions ............................ 11

        E.    The Court Should Exclude Carter's Proposed Testimony that it Was Impossible for the Tornado Cash Service to Implement KYC Procedures and ABM Tools and Processes ................................................................................. 12

    IV.    The Court Should Exclude Jeremy Sheridan's Proposed Supplemental Testimony ........ 14

CONCLUSION ............................................................................................................................ 16

## Table of Authorities

**Cases**

*24/7 Records, Inc. v. Sony Music Ent., Inc.*,
   514 F. Supp. 2d 571 (S.D.N.Y. 2007) ................................................................................... 6

*In re Freddie Mac Sec. Litig.*,
   281 F.R.D. 174 (S.D.N.Y. 2012) ................................................................................... 9, 10

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017) ............................................................................................... 9

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005) ......................................................................................... 4, 10

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ........................................................................................... 11

**Statutes**

Fed. R. Evid. 403 ..................................................................................................................... 4, 12

Fed. R. Evid. 702 ................................................................................................................... 11, 12

## INTRODUCTION

More than three months after expert disclosure deadlines passed and less than one month before trial, the defendant on June 18, 2025, filed five new expert disclosures containing more than 40 pages' worth of proposed testimony. (*See* Dkt. 176-1–Dkt. 176-5). The defense had not given the Government or the Court any prior notice that it intended to file lengthy new expert disclosures in violation of the Court's scheduling order. (*See* Dkt. 134). Despite the fact that the defendant produced these disclosures long after the Court-ordered deadline and had months to prepare them, they still suffer from an array of deficiencies that warrant preclusion. In many instances, the disclosures fail to provide information that the Government would need to replicate the proposed expert analysis, propose inappropriate subjects for expert testimony, or are irrelevant, unfairly prejudicial, and confusing to the jury and wasteful of its time. Such impermissible expert testimony, noticed at the last minute and without leave of the Court, should be excluded.

## ARGUMENT

**I.      The Court Should Exclude Matthew Green's Proposed Supplemental Testimony in its Entirety**

The defendant's opposition to the Government's *Daubert* motion represents that, "because the government claims it is not clear what [Green's] opinions are, the defense is providing a supplemental disclosure (with redline to the prior disclosure)." (Dkt. 176 at 21 (internal citation omitted)). But the defense did not provide a redline comparing Green's disclosures, so the Government generated one. (*See* Ex. 1). Based on the redline, there appear to be no substantive differences between Green's disclosures. Rather, nearly all the differences are slight changes to typography or phrasing—*e.g.*, correcting "user's" to "users'" and changing "testify about how" to "opine the following." (Ex. 1 at 2). The only quasi-substantive edit appears to be the addition of "information and documentation regarding venture capital fundraising (including reviewing

Crunchbase)" to the sources of information on which Green intends to rely, although the new disclosure does not identify what "information and documentation" is referenced. (Ex. 1 at 1).[1] These edits plainly do not correct (or even address) the deficiencies pointed out in the Government's original *Daubert* motion. Accordingly, the Government relies on that motion with respect to Green's proposed testimony—which, for the reasons the Government previously provided, should be excluded in its entirety. (*See* Dkt. 159 at 6-14).

## II. The Court Should Exclude Stephanie Hurder's Proposed Supplemental Testimony in its Entirety

Stephanie Hurder's supplemental disclosure proposes that she testify: (1) that "demand for TORN was in part driven by the desire of users to participate in the Tornado Cash DAO governance;" (2) that "price movements of TORN are significantly correlated with the movements in the price of BTC and ETH;" and (3) that "the Ronin Hack is a significant event that is informative regarding the dynamics of the price of the TORN token," and "[r]egression analysis confirms the conclusions from the original Expert Disclosure" with respect to the Ronin Hack's effect on the price of TORN. (Dkt. 176-2 at 2-6). Hurder's proposed amended testimony should be excluded in its entirely both because it is untimely and for the reasons set forth below.

### A. Hurder's Proposed Testimony that Demand for TORN Was Driven in Part by the Desire of Users to Participate in Tornado Cash Governance Should Be Excluded

As set forth in Section 1 of Hurder's supplemental disclosure, Hurder intends to testify that (a) TORN "derives value from the governance process it is incorporated with . . . [because] the Tornado Cash DAO had a substantial scope of decision-making authority;" (b) "TORN token holders were willing to incur substantial capital and opportunity costs in order to participate in

---

[1] Crunchbase is a company that provides a searchable database of corporate information, so the disclosure's reference to "information and documentation regarding venture capital fundraising (including reviewing Crunchbase)" is roughly equivalent to a legal motion relying on a citation to "case law and legal documents (including from Westlaw)."

2

governance voting, indicating the private benefits that voting provided;" and (c) "[t]he malicious hack of the DAO in May 2023, which temporarily disabled the governance functionality of the DAO, had a substantial negative impact on the TORN token price, indicating the governance value of the TORN token." (Dkt. 176-2 § 1 ¶¶ 3-5). The Court should exclude this testimony because it is irrelevant, confusing, and largely devoid of analysis—expert or otherwise.

As an initial matter, and in contrast to Hurder's first disclosure, Hurder now expressly concedes that "demand for TORN was *in part* driven by the desire of users to participate in the Tornado Cash DAO governance." (*Compare* Dkt. 176-2 § 1 ¶ 1 (emphasis added) *with* Dkt. 159-3 § 2 ¶ 10b (analogizing to other tokens that are purportedly "used *only* for participation in their project's [sic] DAO," thus implying that the same is true of TORN) (emphasis added)). But that concession essentially undermines any relevance to Hurder's testimony, as none of the Government's experts or other evidence have suggested that governance played no role in the demand for TORN. Rather, as set forth in the Government's first *Daubert* motion, even if the value of TORN may have been driven in part by its utility as a governance token, that says nothing about whether TORN *also* was used to monetize the fees charged by the Tornado Cash service. (Dkt. 159 at 19-20).

Hurder's supplemental disclosure attempts to address this point by flatly stating the conclusion that "[u]nderstanding the governance value of the TORN token is essential to understanding whether the government's claim of 'monetization' is true" and restating her opinions about the opportunity cost of staking TORN. (Dkt. 176-2 2 § 1 ¶ 6). But Hurder offers no explanation, much less a reason rooted in any expertise, for why the existence of governance value is at all inconsistent with the existence of monetization. That suggestion is simply *ipse dixit*, and again, undercut by her own recent concession that governance alone cannot explain the demand

3

for TORN. Hurder might have attempted to establish that TORN's value as a governance token—either alone or together with other value drivers—accounted for the entirety of the token's value, to the exclusion of fee monetization. But she now acknowledges that is not the case, concluding only that governance accounted for an unspecified portion of TORN's value. As such, her testimony is neither here nor there in addressing evidence that TORN was used to monetize the Tornado Cash service, and as such would simply be confusing to the jury. Accordingly, this testimony should be excluded as irrelevant and unduly prejudicial. *See Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (Rule 403 has a "uniquely important role . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberation").

Even if it were relevant (it is not), Hurder's opinion that TORN purchases were motivated in part by the Tornado Cash DAO's "power to make and enforce impactful decisions" is not supported by any empirical analysis. (Dkt. 176-2 § 1 ¶ 3). Hurder merely recites certain powers of the Tornado Cash DAO, counts 13 governance votes over an 18-month period that implemented measures on "numerous topics," adds up the value of TORN allocated by certain governance proposals, and notes the value of TORN held by voters in another governance proposal. (Dkt. 176-2 § 1 ¶ 3a-c). This summary testimony contains no analysis whatsoever and could easily be delivered by a lay witness. Indeed, Hurder does not even attempt to explain what in her supposed expertise regarding decentralized organizations leads her to conclude that the Tornado Cash governance proposals were "substantial [in] scope." (Dkt. 176-2 § 1 ¶ 3). Substantial in comparison to what, she does not say.[2] Hurder then provides a history of Tornado Cash governance

---

[2] This further belies the relevance of Hurder's proposed background testimony, set forth in her initial disclosure, regarding "decentralized application[s]" and their "distinct tokenomics." (*See*

4

proposals, (*see* Dkt. 176-2 § 1 ¶ 4), without any apparent connection to any issue in dispute, to support the conclusion that there was an "opportunity cost" to participating in these proposals. Again, however, none of this apparently relates to any issue in dispute; it is simply irrelevant and will serve only to spark jury confusion.

These mere summaries and observations do not constitute expert analysis, could be recounted by a lay summary witness, and are irrelevant in any event because they lead, at most, to the conclusion that there was some value to having voting power for Tornado Cash governance proposals, which is of dubious relevance to evidence (uncontroverted by Hurder) that the defendant monetized the Tornado Cash service through structuring a system whereby Tornado Cash relayer fees were converted into distributions to TORN token holders. The Court should preclude Hurder from couching this testimony as expert analysis, which would prove nothing, but which the jury might mistakenly believe is relevant because it comes from a speaker qualified as an expert.

The next section of Hurder's disclosure addresses the May 2023 hack that disabled the Tornado Cash DAO, but the defense has essentially already conceded that the opinion offered here is unsupported. (*See* Dkt. 176-2 § 1 ¶ 5). In the disclosure, Hurder states that the hack "had a substantial negative impact on the TORN token price." (Dkt. 176-2 § 1 ¶ 5). But when the Government requested additional information regarding Hurder's disclosure, the defense responded that Hurder "does not conclude that [the relationship between the hack and the price of TORN] is causal." (Ex. 2 at 2). That dooms her proffered opinion. Since Hurder cannot say that

---

Dkt. 159-3 § 1). Hurder's purported knowledge of those topics cannot be relevant if she is not going to even attempt to measure the Tornado Cash service against any benchmark or industry standard (to the extent one even exists). Her background testimony thus merely would serve to distract the jury, without providing any context relevant to the defendant, the Tornado Cash service, or the charged conduct.

there was a causal relationship between the May 2023 hack and the price of TORN, she should not be permitted to testify, as she said in her disclosure, that "the hack had a substantial negative impact" on the price. (Dkt. 176-2 § 1 ¶ 5). Those statements flatly contradict each other. And even if this proposed testimony were internally consistent (which it is not), it is based on events of May 2023, more than eight months after the charged time period and after the imposition of sanctions on Tornado Cash—*i.e.*, at a time when there were different variables logically connected to the value of TORN. Hurder makes no attempt to address this.

Moreover, Hurder's disclosure is insufficient for the Government to recreate her purported analysis. While Hurder claims to have conducted "regression analysis to control for market movements," she does not provide the analysis itself, much less explain how she determined what variables to include or exclude in her analysis. (Dkt. 176-2 § 1 ¶ 5f). Indeed, the day after the defendant filed Hurder's supplemental disclosure, the Government requested the analysis—not just Hurder's conclusions—which would have included Hurder's regression model. The defense's response did not provide Hurder's analysis, instead conceding that Hurder does not conclude there was any causal relationship between the May 2023 hack and the price of TORN. (*See* Ex. 2). This alone is a basis to exclude her testimony. *See 24/7 Records, Inc. v. Sony Music Ent., Inc.*, 514 F. Supp. 2d 571, 576 (S.D.N.Y. 2007) (precluding a valuation opinion where the expert did not "explain how he valued [certain] factors nor how he assessed their relative significance"). Accordingly, as (1) the defense has acknowledged that Hurder cannot testify to any causal relationship between the May 2023 hack and the value of TORN, (2) the defense has failed to account for other variables potentially influencing TORN's value, and (3) the defense has failed to produce any analysis, the Court should excluded Hurder's opinion concerning the impact of the May 2023 hack on the value of TORN.

### B. Hurder's Testimony that the Price of TORN Is Significantly Correlated with the Prices of BTC and ETH Should Be Excluded

Hurder's initial disclosure contained the opinion that TORN prices did not reflect expected gains from Tornado Cash revenues, and she cited the fact that TORN prices were correlated with other cryptocurrencies in support of that opinion. (Dkt. 159-3 at 7). The Government's initial *Daubert* motion explained that this opinion should be precluded for two reasons: first, the purported correlation analysis lacked empirical support in part because there was no regression analysis and second, "even if this type of simple correlation analysis were sufficient to show a relationship between TORN and ETH and BTC, that would say nothing about whether TORN prices *also* correlated with Tornado Cash smart contract activity." (Dkt. 159 at 18). In her amended disclosure, Hurder attempts to address the first point with a regression analysis, but provides nothing to address the second point, which is sufficient to preclude her testimony.

The only relevance of this entire subject matter is to support the apparent defense argument that TORN token prices were not related to the monetization of Tornado Cash revenues. But as the Government has previously explained, Hurder has never actually attempted to compare Tornado Cash revenues (or a proxy for revenues such as overall Tornado Cash volumes) with TORN token prices. (*See* Dkt. 159 at 18). Instead, she merely provides data showing a correlation between TORN token prices and other cryptocurrencies. But the price *correlation* between TORN and other cryptocurrencies is fully consistent with TORN prices having a *causal* relationship with Tornado Cash revenues. There is nothing unusual about two variables being correlated with each other, and for one of those variables to also have a causal relationship with some other factor. To take a simple example, Hurder's opinion is the equivalent of an expert saying that a person's diet does not have a causal effect on the person's risk of obesity, and in support of that opinion, citing data showing that there is a correlation between a family history of obesity and risk of obesity. The

7

conclusion does not follow from the premise, as it is plainly possible for a person's diet and a person's family history both to have an independent relationship with risk of obesity. In short, Hurder cannot use the correlation of two variables (TORN prices and other cryptocurrency prices) to say anything about the relationship between one of those variables (TORN prices) and a third factor (Tornado Cash revenues or volumes), when she has made no attempt to actually analyze that relationship. Hurder's analysis appears to be designed to obscure this point and confuse the jury, and so it should be excluded.

Indeed, after Hurder revised her disclosure in an apparent attempt to respond to the Government's arguments on this point, the Government asked the defense to produce the analysis and information underlying Hurder's supplemental disclosure concerning the relationship between TORN and other cryptocurrencies. It was only then that the defense conceded that Hurder's correlation analysis does not connect to any opinion about what affects TORN prices at all. Rather, the defense conceded that Hurder's analyses merely show that the prices of TORN, BTC, and ETH "have a relationship, *without implying causality*." (Ex. 2 at 2 (emphasis added)). But if Hurder cannot say anything about causality, then her regression analyses of those correlations cannot possibly bear on whether other variables actually drove TORN price changes—including TORN's utility as a vehicle for monetizing the Tornado Cash service—which was the original purported basis for this testimony. Thus, it can serve no purpose other than to confuse the jury. This testimony should be excluded.

C. **Hurder's Proposed Testimony Regarding the Ronin Hack's Effect on the Price of TORN Should Be Excluded**

The rest of Hurder's supplemental disclosure suffers from similar flaws. Hurder's initial disclosure asserted that TORN prices dropped slightly more than crypto prices in the two-week period after public announcement of the Ronin hack. After the Government's initial *Daubert*

8

motion pointed out the methodological deficiencies in the initial disclosure, the supplemental disclosure attempts to address those flaws by opining that (a) "the Ronin Hack is a significant event that is informative regarding the dynamics of the price of the TORN token," and (b) "regression analysis confirms that the public announcement of the Ronin Hack did not benefit the TORN token price, but in fact appears to have harmed it" and "that alleged deposits of Ronin Hack proceeds did not appear to explain variation in the price of TORN." (Dkt. 176-2 at 6). But even after this supplemental disclosure, the proposed testimony suffers from fatal methodological flaws, and the disclosure continues to be so lacking in detail as to make evaluation impossible.

While broader event studies can be admissible, courts have expressed caution about expert testimony that purports to estimate the market effect of a single event based on a simple analysis of market prices after the event. As the Second Circuit has explained, such analyses have significant "methodological constraints," and "it can be extremely difficult to isolate the price impact of any one piece of information in the presence of confounding factors." *In re Petrobras Sec.*, 862 F.3d 250, 279 (2d Cir. 2017). Thus, while such studies can be admissible if constructed appropriately, they must be carefully scrutinized to evaluate whether they meet the *Daubert* standard. *See In re Freddie Mac Sec. Litig.*, 281 F.R.D. 174, 178 (S.D.N.Y. 2012) (detailing methodological flaws in market-price "event study" and precluding it under *Daubert*).

Here, Hurder has done none of the work necessary to demonstrate that the introduction of such testimony is justified. She has not identified her criteria for deciding what events should be considered to be "significant events" (Dkt. 176-2 at 6), and appears to have only looked at the Ronin Hack without looking at the price impact of any other events or news regarding Tornado Cash. Indeed, the only proffered basis for considering the Ronin Hack as an event of market-level significance to the TORN market is that it was identified as a significant criminal exploit by the

9

Government's tracing expert. That is the sole extent of her "reasoning," and she offers no methodological basis whatsoever to support her decision to conduct a single-event study of market prices for TORN tokens based on the Government's tracing analysis. Qualifying her analysis as expert testimony would artificially imbue it with far more probative weight in the eyes of the jury than it is truly worth. *See Nimely*, 414 F.3d at 397.

Moreover, Hurder fails to explain why she chose a two-week window from the announcement of the Ronin Hack on March 29, 2022 to analyze price changes, as opposed to some other time frame. *See In re Freddie Mac*, 281 F.R.D. at 178 (discussing need for expert to provide "the parameters for the 'event window,' i.e., the period in which the news may affect the price"). Simply put, Hurder's supplemental disclosure fails to supply a sufficient basis to support her opinion and is otherwise substantially flawed. The defense has now had multiple bites at the apple to generate some explanation of this testimony that is grounded in reliable expertise, and has failed to do so. It should be precluded.

### III. The Court Should Exclude Michael Carter's Proposed Testimony in its Entirety.

Michael Carter proposes to provide the following opinions: (1) the Tornado Cash service was akin to "information sharing intermediaries, not financial institutions or money transmitters," and therefore not subject to the Bank Secrecy Act ("BSA") or its implementing regulations; (2) "[t]ransactions that possess privacy features either by intent or technical application should not be viewed as inherently illicit;" and (3) it was "impossible for Tornado Cash to apply [Know Your Customer (KYC)] procedures" and "Automated Blockchain Monitoring (ABM) tools and processes." (Dkt. 176-3 at 1, 2, 7, 10). The Court should exclude this proposed testimony as untimely, because it would impermissibly introduce expert opinions on questions of law, and because it is otherwise irrelevant, confusing, and would waste the jury's time.

### D. The Court Should Exclude Carter's Proposed Legal Opinions

As set forth in the Government's first *Daubert* submission, "a fundamental principle underlying Rule 702 is that it is the court's job to instruct the jury on the law, and the jury's job to apply the facts to that law." (Dkt. 159 at 9 (citing cases, including *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) ("The rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle.'") (citations omitted))). Unbowed by that axiomatic principle, Carter proposes to provide the following legal opinions: (1) the BSA and its implementing regulations "do not apply" to the Tornado Cash service because it is an "organization[] that merely transmit[s] information;" (2) "[s]oftware developers have no legal or ethical duty to act in the interests of their users;" and (3) "[t]ransactions that [involve] privacy features . . . should not be viewed as inherently illicit." (Dkt. 176-3 at 1-2, 5, 10-11). Those naked legal opinions—which undergird the entirety of Sections 1 and 4 of Carter's supplemental disclosure, as well as a portion of Section 2—are obviously out of bounds for expert testimony, and the Court should exclude them for that reason. *See United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[T]estimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice.").

Moreover, even if legal opinion testimony were permissible (it is not), Carter's proposed testimony about whether the BSA and its implementing regulations apply to the Tornado Cash service is irrelevant now that the Government has abandoned the failure-to-register object of Count Two of the Superseding Indictment. Following that development, there is simply no way that an opinion concerning the applicability of the BSA and its implementing regulations to the Tornado Cash service can "help the trier of fact to understand the evidence or to determine a fact in issue."

11

Fed. R. Evid. 702. Indeed, such testimony would be likely to confuse the jury and certainly would waste its time and invite a side trial on BSA regulatory issues that are no longer relevant, such that the Court should exclude it under Rule 403 as well.

    **E. The Court Should Exclude Carter's Proposed Testimony that it Was Impossible for the Tornado Cash Service to Implement KYC Procedures and ABM Tools and Processes**

Sections 2 and 3 of Carter's disclosure propose testimony that the Tornado Cash service was unable to implement KYC and ABM measures. (Dkt. 176-3 at 2-10). Specifically, Carter argues that the Tornado Cash service "did not possess—nor was it practically able to possess—the structure, staffing, or oversight by qualified persons to implement a . . . KYC system" or the "structure, staffing, or oversight to be able to . . . operate an ABM system." (Dkt. 176-3 at 6, 10). The Court should exclude this testimony as irrelevant and unsupported by any relevant expertise.

As an initial matter, the Government has not raised—and does not intend to raise at trial—ABM measures. Accordingly, Section 3 of Carter's disclosure attacks a straw man from start to finish. There is simply no reason for Carter to testify that the Tornado Cash service could not have implemented ABM measures when the Government does not intend to suggest otherwise. Any such testimony may confuse the jury and certainly would waste its time. Accordingly, it should be excluded.

With respect to KYC measures, Carter's testimony is largely irrelevant to the issues at trial and is also non-responsive to the Government's evidence. Carter's entire discussion of "KYC" plainly refers to the BSA and other regulations around KYC and AML policies. For instance, Carter references the filing of suspicious activity reports ("SARs"), and data privacy rules for financial institutions. (Dkt. 176-3 at 5-6). But the jury is not being asked to consider whether Tornado Cash is a financial institution or whether it was obligated to comply with any such regulations applicable to financial institutions, and this testimony will simply be a distraction.

Nor are Carter's opinions sufficiently reliable to support admission, as they are largely conclusory and unsupported. When Carter refers to the proposed testimony of the Government's expert, Philip Werlau, he merely argues that "[a]ny attempt to simply try to bolt a third-party KYC solution onto" the Tornado Cash service would have been impracticable "without appropriate structure, evaluation, and operation." (Dkt. 176-3 at 6-7). There are two problems with this testimony. First, Werlau's disclosure says nothing about third-party KYC solutions, which appear to be the focus of Carter's disclosure. (*See, e.g.*, Dkt. 176-3 at 4, 6 (opining that KYC measures by "third-party vendors" would not work and opining that the Tornado Cash service is not "practically capable of making [the necessary] evaluations or implementing appropriate controls over a third-party KYC tool")). Second, even if certain "structure, evaluation, and operation" (whatever that means) were required to implement particular KYC measures, Carter offers no explanation for why the Tornado Cash service could not have implemented whatever "structure" Carter believes to be necessary in order to install KYC measures, or how or why it lacked the staffing or oversight he believes are necessary. Indeed, the only basis for Carter's conclusion is his assertion that Tornado Cash was simply "open-source software with no actual employees or owners." (Dkt. 176-3 at 6). But he offers no basis for that conclusion, which is simply a repetition of defense talking points. Carter does not claim to have analyzed the Tornado Cash service's actual operations, and does not engage at all with Werlau's analysis or the other evidence in the case of how the service actually worked and was controlled. Carter does not point to anything on which he bases his (false) assumption that Tornado Cash had "no actual employees or owners," but that unsupported assumption is the entire foundation for his assertions that it could not have adopted "third-party" KYC. These opinions are unsupported by reasoning or analysis, and should therefore be excluded.

Finally, Carter is not qualified to opine that the "Tornado Cash structure, as an open-source software protocol (essentially just code), and not a company or organization with a defined structure, would likely preclude it from entering into the required contract with any KYC service providers." (Dkt. 176-3 at 4). Carter apparently has a background as a compliance advisor, but he does not appear to have any training or experience in coding, reviewing code, or understanding how cryptocurrency mixers like the Tornado Cash service actually function. Nor does he explain how he came to the view—which is really the only apparent purpose of his testimony—that Tornado Cash did not have a "defined structure." Carter has no apparent expertise, and has not identified any apparent basis, to opine about the "structure" of Tornado Cash—let alone that it is "essentially just code"—or whether it had the ability to contract with third-party service providers. (Dkt. 176-3 at 4, 10).

In short, Carter's proposed opinions regarding the feasibility of implementing KYC and ABM measures is simply not targeted, as it claims to be, at the Government's expert testimony or otherwise germane to the jury's task. His opinions are otherwise generalized and conclusory in nature, and thus insufficiently reliable. For those reasons, and because Carter is not qualified to offer these opinions, they should be excluded.

### IV. The Court Should Exclude Jeremy Sheridan's Proposed Supplemental Testimony

The Court should exclude Sheridan's supplemental proposed testimony regarding the distinction between what he calls "Founders' TORN" and TORN obtained by "Early Adopter Vouchers" as irrelevant, confusing, and wasteful of the jury's time. (Dkt. 176-5 at 1-2).

The distinction between Founders' TORN and TORN obtained by Early Adopter Vouchers is irrelevant. Both allocations of TORN were part of the initial formula that the defendant and his confederates designed, and he benefitted from both as part of the same initial release of TORN. The fact that some of the defendant's subsequent profits are traceable to TORN he obtained as part

14

of the Founders' allocation, and some are traceable to TORN he obtained as part of the Early Adopter distribution that happened at the same time, is irrelevant; what matters is that the defendant's TORN, no matter the label he put on it when he issued it to himself, provided an incentive for him to operate the Tornado Cash service as profitably as possible—including if that meant conspiring to launder money, transmit money illegally, and evade sanctions—because TORN was the vehicle through which he reaped millions of dollars from his efforts in furtherance of the Tornado Cash service. Accordingly, the distinction between Founders' TORN and Early Adopter Voucher TORN has no bearing, let alone any probative value, on the issues in this case, and the defendant has not shown otherwise. For these reasons, testimony regarding that irrelevant distinction will likely confuse the jury and undoubtedly will waste the jury's time. Accordingly, any such testimony should be excluded.[3]

---

[3] The Sheridan disclosure also includes a cryptic comment that there "may be issues" with a code script used by the Government's expert Joel DeCapua, and that Special Agent DeCapua's tracing numbers do not exactly match the tracing attributions of a product released by Chainalysis. (Dkt. 176-5 at 11-12). After the Government asked for more information, the defense informed the Government on June 25 that it would not present the Chainalysis data after all, and then, on July 2, 2025, that it was still in the process of preparing yet another "amended disclosure" for Sheridan to respond to the analysis that the Government produced to the defense in February. The Government will address the "amended disclosure" if and when it is produced.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should exclude in its entirety the proposed supplemental testimony of (1) Matthew Green; (2) Stephanie Hurder; (3) Michael Carter; and (4) Jeremy Sheridan.

>
> Respectfully submitted,
>
> JAY CLAYTON
> United States Attorney for the
> Southern District of New York
>
>
> By: /s/ Thane Rehn
>     Ben Arad
>     Benjamin A. Gianforti
>     Thane Rehn
>     Assistant United States Attorneys
>
>     Kevin Mosley
>     Special Assistant United States Attorney
>     (212) 637-2354

Dated: July 2, 2025
      New York, New York