UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
               :

UNITED STATES OF AMERICA
               :
   - v. -
               :   S1 23 Cr. 430 (KPF)

ROMAN STORM,
               :
        Defendant.
              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPPOSITION OF THE UNITED STATES OF AMERICA TO DEFENDANT ROMAN STORM'S SUPPLEMENTAL AND ADDITIONAL MOTIONS *IN LIMINE*

                                             JAY CLAYTON
                                             United States Attorney
                                             Southern District of New York

Ben Arad
Benjamin A. Gianforti
Thane Rehn
Assistant United States Attorneys

Kevin Mosley
Special Assistant United States Attorney
    - *Of Counsel* -

**TABLE OF CONTENTS**

ARGUMENT .................................................................................................................... 1

I. Opposition to Supplemental MIL No. 2: The Court Was Correct to Deny the Defendant's Initial Motion to Preclude the Government from Introducing Victim Testimony or "Referencing Victim Impacts," and The Defendant's Supplemental Motion Offers Nothing New to Upset that Ruling. ................................................. 1

II. Opposition to Additional MIL No. 15: Testimony from the Perpetrator of a Fraud Scheme Is Admissible to Prove the Specified Unlawful Activities Underlying Count One. .............................................................................................................................. 7

III. Opposition to Additional MIL No. 16: The Court Should Confirm Its Ruling Deeming the Defendant's False Statements to Rho Admissible............................................. 10

IV. Opposition to Additional MIL No. 17: The Court Should Not Exclude the Government's Venue Evidence.................................................................................................... 12

CONCLUSION............................................................................................................... 16

The Government submits this memorandum in opposition to defendant Roman Storm's supplemental and additional motions *in limine*, which were filed on the eve of yesterday's final pretrial conference in this matter. (Dkt. 189). For the reasons discussed below, the defendant's supplemental and additional motions should be denied.

## ARGUMENT

I. **Opposition to Supplemental MIL No. 2: The Court Was Correct to Deny the Defendant's Initial Motion to Preclude the Government from Introducing Victim Testimony or "Referencing Victim Impacts," and The Defendant's Supplemental Motion Offers Nothing New to Upset that Ruling.**

At yesterday's pretrial conference, the Court correctly denied the defendant's second motion *in limine* (at least preliminarily), ruling that the introduction of testimony from victims[1] of certain frauds and hacks whose funds were laundered through the Tornado Cash service would be admissible at trial and not unfairly prejudicial to the defendant. (Tr. 120-21). Specifically, the Court noted that, among other things, such testimony would appropriately be heard by the jury as evidence of the specified unlawful activities underlying Count One and, to the extent that victims put the defendant on notice of those crimes, as evidence of the defendant's knowledge of them. (*Id.*). The defendant's supplement to his second motion *in limine* is more of the same arguments that the Court has already rejected and thus the Court should confirm its preliminary ruling that that motion is denied.

First, the supplemental motion again repeats arguments this Court has properly rejected.

---

[1] Here and at trial, the Government intends to use the term "victim" to describe these witnesses because that is what they are—they are victims of crimes that are alleged as specified unlawful activity in the Indictment. Referring to these witnesses as victims is fully appropriate, and the defendant's attempt to preclude use of the term victim based on whether they qualify as victims of his crimes for purposes of the CVRA and MVRA misses the mark. (*See* Dkt. 189 at 5). The degree to which victims are entitled to restitution in this case is an issue that will be addressed, if necessary, at the time of sentencing.

The defendant persists in his claims that in order to convict the defendant at trial, the Government must prove that he either participated in the specified unlawful activities underlying Count One—namely, wire fraud and computer access fraud—or conspired with those who committed these crimes. As the Court has recognized, that simply is not the law, and the Government incorporates by reference here its analysis from its opposition to the defendant's (first) unsuccessful motion to dismiss. (Dkt. 53 at 39-46). The defendant has identified no new case law that was previously overlooked on this point. Indeed, this section of the supplemental motion—which runs over 10 pages—cites hardly any case law at all, let alone case law that is on point. That is because there is none.

      To prove the defendant guilty of Count One, the Government must prove either that the defendant participated in a conspiracy to launder funds that were in fact the proceeds of specified unlawful activity and that he believed the funds were the proceeds of some form of unlawful activity, or that the defendant participated in a conspiracy to launder funds that he believed were the proceeds of specified unlawful activity. *See* Dkt. 156 at 13-14 (government request to charge and sources cited therein). Accordingly, evidence that proves that a specified unlawful activity did in fact happen is definitionally relevant to proving a money laundering conspiracy, even if other evidence is necessary to connect the specified unlawful activity to the subsequent laundering of the proceeds through the Tornado Cash service or the defendant's knowledge or belief regarding the same. Victim testimony will accomplish that in part, as the Court has already recognized.

      Such testimony is not unfairly prejudicial; it is highly probative of an element of money laundering conspiracy, and there is nothing particularly inflammatory about the anticipated testimony, nor is it more sensational than the offenses charged. Moreover, that the Government must introduce evidence to prove particular crimes that the defendant was not directly implicated

2

in, such as Witness No. 5's communications with the fraudster that stole her money, does not mean that the jury's time will be wasted or that the proceedings will devolve into "mini-trial." (Dkt. 189 at 10). Rather, that is simply the nature of a money laundering conspiracy charge. *See, e.g.*, *United States v. Rahmankulov*, No. 20-CR-653 (RA) Trial Tr. at 117-53 (S.D.N.Y. 2022) (where, as in this case, the Government introduced victim testimony regarding hacking to prove the existence of an SUA that was not perpetrated by the defendant); *United States v. Huezos*, 546 F.3d 174, 181-82 (2d Cir. 2008) (discussing "abundant evidence" that proved that money involved in transactions "constituted the proceeds of criminal activity (namely, drug trafficking)," and then separately discussing evidence of defendant's involvement in particular transactions to show his knowledge and intent to participate in money laundering conspiracy, where defendant was not charged with involvement in drug trafficking); *United States v. Maher*, 108 F.3d 1513, 1528 (2d Cir. 1997) (noting that even if government proved that the defendant knew laundered money was "proceeds of some form of unlawful activity," the government also had to introduce evidence that the "proceeds in fact came from narcotics trafficking," the specified unlawful activity charged in the indictment); *United States v. Prevezon Holdings, Ltd.*, 251 F.Supp.3d 684, 689 (S.D.N.Y. 2017) (discussing government's evidence of a fraud committed by a Russian criminal organization as necessary to show existence of specified unlawful activity to prove money laundering by defendant entity that was not alleged to be involved in the underlying fraud).

      Second, the defendant is wrong to suggest that the Government is using the victims to admit hearsay connecting the crimes in question to the Tornado Cash service. Rather, for each victim there will be evidence to connect the testimony to Tornado Cash. For five of the six victim witnesses, there will be testimony from Special Agent Joel DeCapua from the Federal Bureau of Investigation regarding his tracing of the proceeds of the particular hacks, which will prove that

3

those victims' proceeds were sent through Tornado Cash. Witness 22 is a victim of the ▮▮▮▮▮▮, Witness 23 is a victim of the ▮▮▮▮▮▮, Witnesses 15 and 16 are an employee of and attorney for ▮▮▮▮, and Witness 24 is an employee of the victim of the ▮▮▮▮▮▮. (Dkt. 189 at 3-4). All of these incidents have been disclosed as part of DeCapua's tracing analysis. Thus, it is irrelevant whether any of these witnesses would be able to testify that the proceeds went to Tornado Cash, as there will be independent evidence of each of these.

Additionally, for all four of the incidents covered by these five witnesses, there will be evidence in the form of the defendant's chats with his co-conspirators, emails, and otherwise, that the defendant had knowledge of these incidents. For instance, the defendant and his co-conspirators exchanged multiple chats about the ▮▮▮▮▮▮ both when it happened and over the subsequent weeks as they facilitated the laundering of the proceeds through Tornado Cash. They also received notice from multiple sources, including reporters who sent them links to blockchain data showing the proceeds of the hack flowing into Tornado Cash. And for the ▮▮▮▮ hack, as the defendant's own motion makes clear, one of the witnesses that the defendant challenges will specifically testify that he contacted the defendant and informed him that the money had been traced to Tornado Cash. (Dkt. 189 at 4). This is plainly relevant evidence both of the existence of a specified unlawful activity and of the defendant's knowledge of the laundering of the proceeds of that activity through his business.

As to the sixth victim challenged by the defendant, Witness No. 5, she is an individual victim of a scam, and she specifically reached out to Tornado Cash—at an email address used by the defendant—to tell him that the proceeds of the scam were laundered through Tornado Cash. As part of that communication, she also sent the defendant blockchain data identifying the deposit tied to her funds (which data can be used to independently verify the relevant deposit of the

criminal proceeds). While she may have initially heard about the tracing from a third party she retained, the Government would only elicit that information to explain why she reached out to Tornado Cash. This would not be offered for the truth of the matter asserted, but rather to explain her motivation in reaching out to the defendant. Such evidence is routinely admitted to explain both why a victim contacted a defendant and that the defendant was on notice of the facts that the victim communicated. *See, e.g.*, *United States v. Iotova*, 2024 WL 5198747, at *2 (2d Cir. Dec. 23, 2024) (affirming district court's admission of victim testimony that the victim believed, based on what he was told by a third party, that a house the victim had rented from the defendant was a "scam," because this testimony "explained why he had contacted [the defendant] to demand his money back," and further holding that victim's "testimony that he had told [the defendant] that the house 'was a scam' was relevant because it showed that [the defendant] had been put on notice"). Excluding such evidence would be confusing for the jury, which would be left wondering how the victim knew to reach out to Tornado Cash for help in the first place, and an appropriate limiting instruction would address any potential unfair prejudice.

The defendant attempts to downplay the significance of this testimony, by claiming that "there is no evidence that Mr. Storm was made aware of" an email that Witness No. 5 sent to hello@tornado.cash, a sort of corporate inbox for the Tornado Cash service. (Dkt. 189 at 7). That is incorrect. There is ample evidence that the hello@tornado.cash inbox was set up to forward automatically to the defendant's personal email address, including multiple emails where an individual emails the hello@tornado.cash email account and the defendant responds from his personal address. Moreover, with respect to Witness No. 5's email in particular, the Government has marked as a trial exhibit metadata showing that her email was in fact delivered to the defendant's personal email address. If the defendant wishes to make arguments about why even

5

that evidence does not demonstrate his knowledge of particular crimes, he is free to do so. But there is plainly a sufficient basis for the Government to introduce this testimony showing that the defendant was placed on notice of this crime and its connection to Tornado Cash.

Third, as to the scope of victims' losses, the Government does not intend to elicit extensive discussion of victim impact, but some limited discussion of the size of the losses is necessary to establish the nature and existence of the specified unlawful activity. The fact that individual victims did actually lose money is part and parcel of the proof of the unlawful activity, and is therefore admissible. Such evidence also connects the victim's testimony to DeCapua's tracing analysis. For instance, the victims of the ▮▮▮▮ and ▮▮▮▮ hack will testify as to the size of the losses, which is relevant information on which DeCapua may rely as part of his tracing analysis.

Fourth, the defendant's suggestion that such evidence is cumulative should be rejected. As the parties made clear at the pretrial conference, one of the issues in dispute is the degree to which the defendant was aware of the scale of money laundering through the Tornado Cash service, which goes to his knowledge and willful participation in a conspiracy to commit money laundering. There will be evidence in the form of the defendant's communications with others that he was in fact aware that Tornado Cash was laundering large amounts of money; the fact that he received notice after notice from multiple victims is further evidence of his overall knowledge of how the service was in fact being used and his intent in refusing to make any efforts to address the problem. Moreover, that the defendant may not have been made aware of a particular money laundering incident until after it occurred is not the point. Rather, the question for the jury is whether the defendant willfully conspired to launder crime proceeds, and his continued operation of the website in the same way in the face of learning of repeated acts of laundering is directly relevant to his intent. *See United States v. Ulbricht*, 31 F. Supp. 3d 540, 558 (S.D.N.Y. 2014) (in

money laundering conspiracy case involving website used for money laundering, defendant's "continued operation of the site" after knowing about its use for money laundering "evinces an enduring intent to be bound with those who 'accept' his offer and utilize the site for its intended purpose").

The Government has interviewed a large number of victims in this case (and produced its notes of these interviews to the defense), and does not intend to call all or even a significant fraction of the victims it has interviewed or the victims who contacted the defendant.[2] There will be a number of emails and other messages to the defendant from victims regarding criminal incidents that the Government will seek to admit at trial to show his knowledge. But live testimony from some of these victims is also helpful for the jury to understand and place these events in context, and in particular will provide direct evidence of the fact of particular specified unlawful activities, the proceeds of which the defendant and his conspirators laundered. Thus, this evidence is appropriate and admissible.

In sum, the Court should adhere to its denial of the defendant's second motion *in limine* and permit victim testimony.

## II. Opposition to Additional MIL No. 15: Testimony from the Perpetrator of a Fraud Scheme Is Admissible to Prove the Specified Unlawful Activities Underlying Count One.

As with the Government's victim witnesses, testimony from the perpetrator of the ▮▮▮ rug pull fraud (Witness No. 6) should be permitted because it is evidence of the specified unlawful activities underlying Count One and the role of the Tornado Cash service in those crimes. With

---

[2] Indeed, one of the two "new" witnesses mentioned at the pretrial conference was another individual fraud victim who contacted the defendant, and the Government has since decided not to call that witness.

7

respect to the ▇▇▇▇ rug pull, the Government expects that Witness No. 6 will testify that he personally laundered the proceeds of the fraud through the Tornado Cash service, using the website and the user interface that (other evidence will show) the defendant controlled.

The defendant again claims that the ▇▇▇▇ rug pull's only possible relevance would be if the defendant conspired with Witness No. 6. (Dkt. 189 at 12). Again, however, that is simply not the law. The Government can put on evidence of the specified unlawful activities—regardless of the defendant's involvement in them—to establish an element of the money laundering that is an object of the conspiracy, and as cited above, there is no legal requirement that the defendant conspired with the perpetrator of that specified unlawful activity or even knew about it. (Dkt. 53 at 39-46). The defendant's argument that the Government may only introduce evidence of laundering transactions that the defendant was personally aware of at the time is directly contrary to the case law described above, in which money laundering trials routinely involve the admission of evidence of the specified unlawful activity whose proceeds are being laundered as probative of the laundering, separate and apart from the defendant's individual knowledge and participation in the laundering conspiracy. *Rahmankulov*, No. 20-CR-653 (RA) Trial Tr. at 117-53; *Huezos*, 546 F.3d at 181-82; *Maher*, 108 F.3d at 1528; *Prevezon Holdings*, 251 F.Supp.3d at 689. The defendant does not cite any case to the contrary.[3]

The defendant's argument is especially inapt in this case, where there will be evidence that

---

[3] One of the only cases that the defendant cites in his motion is *United States v. Araujo*, 539 F.3d 287, 289 (2d Cir. 1976). *Araujo* involved a counterfeiting conspiracy, not a money laundering conspiracy, but the defendant argues that it stands for the proposition that evidence of incidents in which a defendant did not participate is not admissible to show the defendant's participation in the conspiracy. But *Araujo* actually affirmed the admission of such evidence, holding that it was "properly admitted" to show "the existence of the charged conspiracy," even if it could not be used to show the defendant's participation. *Id.* at 289-90. Thus, to the extent it is applicable here, *Araujo* is further authority in support of the admissibility of such evidence.

8

the defendant was aware that his service was broadly popular with cyber criminals and that he viewed this popularity as good publicity for Tornado Cash. Indeed, throughout 2022, when particular incidents became public, the defendant and his co-conspirators routinely speculated about the likelihood that the criminals would use Tornado Cash. Thus, the jury could certainly conclude that the use of Tornado Cash by Witness No. 6 was foreseeable to the defendant as part of his ongoing participation in the charged money laundering conspiracy. Indeed, in *United States v. Sterlingov*, No. 21 Cr. 399 (D.D.C. Feb. 26, 2024) Dkt. 284, the district court rejected a similar defense argument and allowed similar testimony from a cooperating witness who had not communicated with the defendant but who had laundered funds through the defendant's cryptocurrency mixer. As in *Sterlingov*, this evidence is directly probative both of specified unlawful activity and the laundering of proceeds of such activity, and of the overall operation of the mixer service and features of it that made it especially attractive for such laundering.

The defendant also argues that Witness No. 6 should not be permitted to testify about his understanding of the Tornado Cash service or about why his co-conspirator chose to use the service to launder the proceeds of the ▮▮▮▮ rug pull, including that he researched the service by viewing a Youtube video and other sources. Again, these statements would not be offered for the truth of the matter asserted, but to show the reason for Witness No. 6 and his co-conspirators' decision to launder the Frosties proceeds through the defendant's business, and an appropriate limiting instruction would address any unfair prejudice. *Iotova*, 2024 WL 5198747 at *4 (discussing the "strong presumption that juries follow limiting instructions"). Additionally, the incident in question took place in January 2022, and the Government intends to elicit testimony from other witnesses regarding the defendant's role in the publicity for the Tornado Cash service prior to that time, including his promotion and encouragement of Youtube videos promoting the service. While

Witness No. 6 does not remember the specific videos he saw, the evidence will supply a sufficient basis for the jury to draw the inference that the type of promotional materials Witness No. 6 viewed were either known to the defendant or encouraged by the defendant. However, to the extent the Court is concerned about testimony about what Witness No. 6 observed on such videos, he could be instructed not to testify about the substance of anything he heard or saw on them. The primary evidence the Government intends to elicit about the Witness's understanding of the Tornado Cash service is the information that Witness No. 6 gleaned from the Tornado Cash website itself.

Finally, the defendant argues that Witness No. 6 is cumulative of the victim witnesses. That is incorrect. Witness No. 6 will testify about his experience using the Tornado Cash service, including accessing the website and the user interface that the defendant controlled. This will provide the jury with critical information about how the service actually functioned for its customers, information that is highly probative and relevant even apart from the fact that Witness No. 6 used the service to launder criminal proceeds. Accordingly, the Court should permit the Government to call Witness No. 6 and deny the defendant's motion *in limine* with respect to this witness.

### III. Opposition to Additional MIL No. 16: The Court Should Confirm Its Ruling Deeming the Defendant's False Statements to Rho Admissible.

At yesterday's final pretrial conference, the Court properly granted the Government's motion *in limine* to introduce the defendant's false responses to a "crypto questionnaire" that Rho asked the defendant to complete as part of Rho's KYC protocols. (Tr. 129). The Rho account was the principal account out of which the defendant and his co-founders paid for the Tornado Cash service's expenses, such as payroll and other overhead. The defendant's false responses to Rho's questions about Peppersec's exposure to cryptocurrency constitute both an act in furtherance of the Tornado Cash conspiracy—namely, to keep its operating account open so it could keep the

business running smoothly—and evidence of his consciousness of guilt. The jury is free to infer that the defendant's refusal to be honest with his banking partner betrays his knowledge that his conduct was illegal.[4] And, the defendant is free to argue that his responses were not inaccurate, but this goes to the weight of the evidence and the inferences to be drawn from it, rather than to its admissibility.

The defendant also misstates the record surrounding the defendant's representations to Rho and Rho's actions. As the notes say, Rho's counsel's statement about certain information being "not necessarily false" was in regard to a question about account *onboarding* information in 2020, *not* the defendant's responses to the crypto questionnaire in 2022. (Dkt. 189, Ex. 8). When the Government asked Rho's counsel whether Rho's decision to *offboard* Peppersec had to do with the defendant's responses to the crypto questionnaire, Rho's counsel said his understanding was that Rho's general cryptocurrency risk tolerance went down in early 2022, and that the defendant's response to the crypto questionnaire about Peppersec receiving cryptocurrency donations may have been enough for Rho to close the account. (*Id.*). Subsequently, the Government interviewed a Rho compliance official based in Serbia, who confirmed that the decision to close the account was indeed based principally on Rho's general cryptocurrency de-risking and did not suggest that Rho made any determination on whether the defendant's responses were false. In other words, the record in fact reflects that Rho did not know one way or the other if the defendant's overall

---

[4] The defendant argues in his motion *in limine* that the account documents show that Rho was aware of Peppersec's relationship with Tornado Cash through the SAFE agreement with the venture capital company that memorialized its investment in Tornado Cash. (Dkt. 189 at 15). The documents do not show anything of the sort, as the SAFE agreement does not even mention Tornado Cash aside from the defendant's tornado.cash email address, and certainly provides no information about the nature of the business. (GX 904). What the documents actually show is that Rho knew there was some sort of venture capital investment and was seeking more information about the nature of the defendant's business.

11

responses to the questionnaire were true. The defendant's motion is based entirely on conflating attorney proffer notes regarding a response to a question about *onboarding* with a response to a question about *offboarding*.

But more importantly, it is irrelevant whether Rho thought or knew that the defendant had lied to them. Indeed, the fact that Rho sent the crypto questionnaire to begin with shows that it had limited visibility into the nature of the defendant's business. By contrast, the jury will not be so limited. It will see extensive evidence about the Tornado Cash service including the role of Peppersec, which will allow it to determine whether the defendant's answers to the Rho questionnaire indicate that he made false statements to Rho in an effort to keep the bank account open. Contrary to the defendant's argument, this is not character evidence; it is direct evidence of the charged conspiracies and is inextricably intertwined with the facts that will be presented at trial. Accordingly, the Court should confirm its ruling that this evidence is admissible.

## IV.   Opposition to Additional MIL No. 17: The Court Should Not Exclude the Government's Venue Evidence.

The defendant seeks to exclude testimony from Special Agent William Lopez of the FBI, who will analyze cell site data for one of the principals of Venture Capital Firm-1 who was involved in the investment into Tornado Cash (the "VC Principal"), the VC Principal's American Express records during a key timeframe, and records from Bloomberg demonstrating the presence of a particular journalist in Manhattan in March 2022 (the "Bloomberg Reporter"), arguing that they are irrelevant and are not sufficient to prove venue. The defendant's arguments fail.

The proper forum for a criminal prosecution is the district in which the crime was committed. *See* U.S. Const. art. III § 2; Fed. R. Crim. P. 18. When "the acts constituting the crime and the nature of the crime charged implicate more than one location, the Constitution does not command a single exclusive venue." *United States v. Miller*, 808 F.3d 607, 616 (2d Cir. 2015).

Furthermore, the venue statutes provide that any offense "committed in more than one district" may be "prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a); *see also United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007). Thus, where an offense is continuing, a defendant may be tried in any district in which some part of the offense occurred. *See*, *e.g.*, *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994). "[W]hen a defendant is charged in more than one count, venue must be proper with respect to each count." *United States v. Smith*, 198 F.3d 377, 382 (2d Cir. 1999) (internal citation and quotation marks omitted).

It is well established, moreover, that, conspiracy is a continuing offense. *Rutigliano*, 790 F.3d at 395-96. With respect to venue for a charge of conspiracy, the Second Circuit "has held that venue may lie in any district in which the conspiracy was formed or in any district in which a conspirator committed an overt act in furtherance of the criminal scheme." *See Rommy*, 506 F.3d at 119–20 (citations omitted). Accordingly, "a defendant need not himself have ever been physically present in a district for a conspiracy charge against him to be venued there." *Id.* (citing *Naranjo*, 14 F.3d at 147 (holding with respect to venue that conspiracy defendant "need not have been present in the district as long as an overt act in furtherance of the conspiracy occurred there")). Venue for a conspiracy charge "is [thus] proper in [any] district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue [and it does]." *United States v. Royer*, 549 F.3d 886, 894 (2d Cir. 2008) (alteration in original) (quoting *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003)); *see also Rommy*, 506 F.3d at 119 (2d Cir. 2007).

With respect to the VC Principal, the Government expects that the evidence will show that

he was living and working in Manhattan at certain key points in 2022. That evidence will consist of his Telegram chats with the defendant, cell site analysis for his cellphone, and records from American Express showing him spending money in this District on relevant dates. Those relevant dates include dates on which the defendant was communicating with the VC Principal, who was advising the defendant and his co-founders on the business aspects of the Tornado Cash service. The jury can easily find that those are acts in furtherance of the Tornado Cash conspiracy. Among other things, the VC Principal participated in conversations about how to respond to press inquiries about Tornado Cash and received questions from the defendant about whether they should make changes to the service that would address money laundering issues. These discussions took place while the VC Principal was in Manhattan, as the cell site records and American Express records show.

Furthermore, the VC Principal's presence in this District was foreseeable because, on at least one occasion, the VC Principal announced to the defendant and others that he was in "New York"—i.e., New York City. Just as the Government has the burden with respect to the elements of each offense, it also has the burden with respect to venue and must be given latitude to prove it to a preponderance of the evidence. The defendant is free to argue to the jury why he believes this evidence with respect to the VC Principal does not suffice to establish venue, but the evidence is sufficient for a jury to conclude that it does.

With respect to the Bloomberg Reporter, the Government expects that the evidence at trial will show that, in early March 2022, the Bloomberg Reporter interviewed co-defendant Roman Semenov in connection with an article about the Tornado Cash service. A few days later, the Bloomberg Reporter emailed the defendant and Semenov with a few follow-up questions. The Bloomberg Reporter's signature line includes her office and cellphone numbers, both of which

14

have New York City area codes. *See, e.g.*, *United States v. Mosquera-Prado,* 554 F. App'x 54 (2d Cir. 2014) (evidence of venue included phone call where "[t]hat number began with an area code that was within the Southern District of New York"). Additionally, it is well known that Bloomberg is based in New York.

The next day, Bloomberg published the article, which quoted Semenov as stating, in sum and substance, that the Tornado Cash service did not need to comply with U.S. sanctions. Chats between the defendant and Semenov indicate that they were concerned that the article would draw scrutiny of the Tornado Cash service and that it did not convey their narrative that they could not make changes to the service. Semenov told the defendant, for example, that it was "better not to give non-technical interviews while this topic is hot." The defendant then told Semenov that he had "found a manager" at Bloomberg and would contact her. Emails between the defendant and Bloomberg indicate that on or about March 14, 2022, the defendant spoke with the Bloomberg Reporter by telephone in an attempt to get the article "corrected" and shouted at her. The defendant and Semenov exchanged emails with the Bloomberg Reporter's editor over the ensuing days, leading up to Bloomberg issuing a revised version of the article on or about March 20, 2022.[5] Semenov then sent out a Tweet trumpeting the revision and telling his followers they could stop harassing the Bloomberg reporter.

Bloomberg's office swipe records indicate that the Bloomberg Reporter was at Bloomberg's Manhattan headquarters at the time of the various emails and phone calls described above. Based on the facts described above, a jury could reasonably conclude that the defendant and Semenov's successful attempt to get the original article "corrected" was in furtherance of the

---

[5]     https://www.bloomberg.com/news/articles/2022-03-10/crypto-obfuscator-tornado-says-sanctions-cant-affect-smart-contracts

conspiracy because the "corrected" article softened Semenov's statement to say that U.S. sanctions could not affect the Tornado Cash pools due to their immutability and thus was an effort to fend off U.S. regulatory scrutiny. In other words, the article was revised to repeat the defendant's narrative claiming that he could not control Tornado Cash, an important part of his overall cover story to fend off scrutiny of the business. This was a public relations effort to preserve the ongoing operation of Tornado Cash, and a successful one, and it squarely involved acts in this District. That is appropriate venue evidence, and the Court should so find.

## CONCLUSION

For the reasons set forth above, the Court should deny each of the Defendant's supplemental and additional motions *in limine*.

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York

By: /s/ Thane Rehn
    Ben Arad
    Benjamin A. Gianforti
    Thane Rehn
    Assistant United States Attorneys

    Kevin Mosley
    Special Assistant United States Attorney
    (212) 637-2354

Dated: July 9, 2025
      New York, New York