

Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
T 424.652.7800

July 11, 2025

**Brian E. Klein**
Direct (424) 652-7814
bklein@waymakerlaw.com

*Via ECF*

Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

**Re:    United States v. Storm, 23 Cr. 430 (KPF)**

Dear Judge Failla:

On behalf of our client, defendant Roman Storm, we write to provide information in support of a renewed motion to exclude evidence obtained from what the government claims is an extraction of Alexey Pertsev's phone. (*See* Dkt. 174 at 14-23; *see also* 7/8/25 Transcript ("Tr.") 85-91.) In reviewing the government's exhibits, the defense has discovered serious issues that further demonstrate the pitfalls of the government's cherry-picked, partial extraction of the purported Pertsev phone, and its failure to produce Dutch officials who seized the phone and performed an extraction of it.

Following the July 8, 2025 conference, the defense determined (and the government has tacitly acknowledged) that the government's self-selected extraction does not show the author of forwarded Telegram messages. This results in the misleading appearance that the person who forwarded the message authored it. And there is no way to tell from the government's extraction itself who was the true author. Thus, among other problems, we can now see that the Indictment contains at least one material error and, additionally, the government wrongfully attributed a message to Pertsev to this Court on the record as recently as the July 8, 2025 conference.

Making matters worse, the government's production of 3500 materials last night revealed two additional problems. First, IRS-CI Special Agent Peter Dickerman, who went to the Netherlands in November 2024 to do the extraction, did *not* return to the United States with all the files he sought to have extracted from what is purported to be the entire extraction of Pertsev's phone based on searches he ran (contrary to the government's representations at the July 8, 2025 conference). In short, the government's extraction does not even include every file he deemed relevant. Second, Agent Dickerman has now acknowledged the possibility that the extraction report (*i.e.,* the GrayKey report) could have been modified by Dutch personnel, such that what the report claims is Pertsev's phone is not.

These issues underscore the significant authentication and Confrontation Clause problems that the defense has raised. They also raise questions about whether false information was provided

to the grand jury, since the Indictment misrepresents the author of a Telegram message. This Court should now exclude all exhibits from the government's extraction and order the disclosure of the grand jury transcripts so the defense can review them for erroneous statements and exhibits.

- **The Government's Cherry-Picked Extraction is Unreliable and Misleading[1]**

The government's exhibits in the GX 2000 series are almost entirely Telegram chats obtained from Agent Dickerman's extraction of what is alleged to be Pertsev's phone. In Telegram, when a user forwards a message from another user, it is clearly shown that the message is forwarded and who authored it. (*See, e.g.*, Ex. 1 (sample of such a Telegram message).)

Following the July 8, 2025 conference, in reviewing the government's exhibits found in the GX 2000 series, containing Telegram message from its extraction, the defense realized that the format of those messages fails to identify and mischaracterizes who actually wrote the messages. (The government's exhibits were first produced on June 30, 2025.) The chats show forwarded messages as coming "from" the individual forwarding the messages, not the original writer of the message.

One prominent example, GX No. 2044-T, appears to attribute the following forwarded chat message as coming from Pertsev:

[redacted]

(*See* Ex. 2 at PDF p. 10 [red boxes added].) Previous government discovery also attributed this statement to Pertsev, without noting that it was a forwarded message. (*See* Ex. 3 at PDF pp. 3-4.) In fact, however, from other government discovery, it can be ascertained that the actual writer of the chat was ***not*** Pertsev, but a reporter from CoinDesk. (*See* Ex. 4 at PDF pp. 2, 7.)

That chat is just one example of many. The government's exhibits are riddled with chats containing forwarded messages. (*See, e,g.,* GX 2035-T, GX 2036-T, GX 2054-T, GX 2056-T, GX 2057-T.)[2] Because of the sheer number of forwarded messages sprinkled throughout the

---

[1] The background on Agent's Dickerman's phone extraction, including his use of search terms after the Dutch had engaged in "parsing," are contained in the prior filings and were discussed at the July 8, 2025 conference. (*See, e.g.,* Dkt. 174.) In addition, the defense understands that the government is providing this Court with Agent Dickerman's 3500 materials and the government exhibits that it intends to show him at trial. The defense will not revisit that background here but will be ready to discuss it at the hearing on July 11, 2025.

[2] The defense is disputing the translation of certain of these exhibits, including the inflammatory language contained in a forwarded message in GX-2035-T on page 2 that the government misattributes to one of the alleged co-conspirators.

Telegram messages, it is impossible to have confidence in these government exhibits. They are plagued by this problem, severely undercutting their reliability.

On July 9, 2025, the defense emailed the government inquiring about this issue, asking the government to:

> Please confirm whether the government's native version of [Exhibit GX 2044-T] and the other Telegram chats obtained allegedly from an image of Pertsev's phone reflect the source of forwarded messages (which are on multiple exhibits in the GX 2000 series).

The defense requested a response by noon on July 10, 2025. In an email from the government that evening (almost exactly twenty-four hours later), the government implicitly admitted that its extraction does not include information about the author of a forwarded message:

> We can confirm that these are the chats as they were collected from the original phone extraction by Special Agent Dickerman, and that the exhibits accurately reflect Special Agent Dickerman's extraction.

In a master class of Orwellian non-responsiveness, the government failed to answer the defense's simple inquiry. But in doing so, it tacitly acknowledged that its extraction is missing critical information, namely, the author of forwarded messages.

The misleading nature of the extracted Telegram chat messages is demonstrated by the fact that the government itself has wrongfully attributed the origin of the purported message in GX No. 2044-T. In the Indictment, the government attributes this message to "CC-1" (Pertsev), when in fact it was authored by a reporter. (*See* Dkt. 1 at ¶ 57.) And at the July 8, 2025 pretrial conference, the government again wrongly attributed the forwarded message to Pertsev. (*See* Ex. 5, Tr. at 31:10-19.)[3] If the government is confused, the jury surely will be—or worse, misled.

The identity of the writer of a forwarded message makes all the difference, as GX No. 2044-T demonstrates. Because the message was not written by Pertsev, but rather a reporter, it is not a co-conspirator statement (as the government has claimed) and says nothing about the intent of Mr. Storm or any of the other alleged co-conspirators, including Pertsev.

These exhibits are unreliable and misleading on their face, and the government cannot meet its burden for authentication, which requires a showing "sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). This case is similar in this regard to

---

[3] Government: "In the defendant's own statements during the charged time period and those of his co-conspirators show that they knew at the time they were doing something wrong. For example, when the Ronin hack happened, one of the co-conspirators asked, sum and substance, I'd like to ask you some questions about how you go about laundering $600 million worth of stolen crypto."

*United States v. Vayner,* 769 F.3d 125, 131-33 (2d Cir. 2014). There, the Second Circuit reversed a conviction where the government failed to properly authenticate a webpage it claimed to have been authored by one of the defendants because there was insufficient evidence to establish that he was in fact the author. *Id.* Here, the government cannot establish who was the author of forwarded messages. This case is distinguishable in this regard from *United States v. Encarnacion-LaFontaine,* 639 F. App'x 710, 713-14 (2d Cir. 2016), which this Court cited in support of its July 8, 2025 decision, where there were multiple pieces of evidence showing that the defendant had written certain threatening communications, and there was no evidence suggesting anyone else had made the statements. (*See* Ex. 5, Tr. at 128.)

This situation is also distinguishable from the other cases relied upon in this Court's initial decision. (*See* Ex. 5, Tr. at 128-129.) In *United States v. Balouchzehi,* 2024 WL 4586526 (2d Cir. Oct. 28, 2024), the data in the phone extraction report the agent received from the DEA "did not appear to be altered or manipulated in any way." Here, critical information from the Telegram messages extracted from a phone is missing, suggesting manipulation.[4] And this case is unlike *United States v. Jean-Claude*, 2022 WL 2334509, at *16 (S.D.N.Y. June 27, 2022), where cell phone extraction evidence performed by "Croatian analysts" was properly authenticated because the testifying agent had possession of the seized phones, and the government offered the testimony of the Croatian National Police officer who had firsthand knowledge of the seizure of the phones.

The Confrontation Clause problem is even more glaring due to these critical problems with the government's exhibits from its extraction. If the defense could examine the originally seized phone, or at least the original extractions of it, and the Dutch witnesses who performed the extraction, the defense would be able to demonstrate the flaw in identifying the writer of the forwarded messages. But without the phone, the original extraction, or the Dutch individuals who performed it, the defense is deprived of the opportunity to determine where and why this serious problem occurred, and what it might suggest about the reliability of the extraction.

As such, these circumstances are highly distinguishable from the Confrontation Clause authorities considered and relied upon by this Court at the conference. (*See* Ex. 5, Tr. at 129.) In *United States v. Lamons*, the Eleventh Circuit held that machine-generated data did not pose a Confrontation Clause problem because "no human intervened at the time the raw billing data was 'stated' by the machine." 532 F.3d 1251, 1264 (11th Cir. 2008). Here, however, there have been several layers of human intervention that suggest fatally flawed government exhibits, and the defense needs to be able to cross-examine the relevant witnesses if the exhibits are to have any reliability at all.

Likewise, *United States v. Arce*, is inapposite because, there, the testifying agent conducted the extraction, and was subject to cross-examination. 49 F.4th 382, 389 (4th Cir. 2022). Similarly, in *United States v. El-Gammal*, the government produced a witness from Facebook and the original

---

[4]Further, as discussed below, the government just disclosed a July 9, 2025 interview with Agent Dickerman where he reveals that Dutch analysts could have modified the extraction report.

records from Facebook, enabling the defense to cross-examine that witness about the methods utilized for producing the documents.[5] 831 F. App'x 539, 541-44 (2d Cir. 2020).

The misleading nature of the government's exhibits also present a problem under Federal Rule of Evidence 403. This is another separate basis for exclusion.

Finally, the fact that the government inaccurately attributed the chat message in its Indictment calls into question the integrity of the government's presentation to the grand jury. (Dkt. 1 at ¶ 57.) Accordingly, the defense also requests disclosure of the grand jury transcripts so that it can investigate whether the grand jury was provided false information. The defense reserves its right to bring a motion to dismiss based on what it learns.

- **The Government Has Now Disclosed That Its Extraction is More Incomplete than Previously Known and Conveyed to this Court**

In considering the Confrontation Clause issue at the July 8, 2025 pretrial conference, this Court directly asked the government: "Did [Agent Dickerman] receive a copy of the full extraction or some subset of it?" (Ex. 5, Tr. at 49:16-17.) The government responded:

> He received a subset of the extraction, but I shouldn't say received. He took an extraction of the subset himself, because he personally searched for information within the entire extraction and pulled out what he wanted to bring back to the United States.

(Ex. 5, Tr. at 49:18-22.) Later, this Court stated its understanding that "[Agent Dickerman] was given access to the extraction from which he then extracted what he believed he needed for this case," and the government responded, "Exactly." (*Id.* 50:11-14.) Still later, this Court addressed one more time the completeness of the extraction Agent Dickerman received: "I suppose for the extraction he can at least say that came from -- I myself extracted from what I understood to be a *complete extraction* of the Pertsev phone, the stuff that I thought I needed." (*Id.*, Tr. at 51:10-14 (emphasis added).) The government responded: "*Yes.*" (*Id.* (emphasis added).)

The evening of July 9, 2025, the government disclosed new 3500 material relating to Agent Dickerman, including notes of an interview with him in which he  (Ex. 6.)

*Id.* at 1 (emphasis added).)

The information that Agent Dickerman did not receive all the extraction files was previously unknown to the defense and directly contradicts the government's response to this Court on July 8, 2025. As this Court's questions at the hearing suggest, whether Agent Dickerman received the

---

[5] In *El-Gammal*, the Second Circuit did not even analyze the issue under the Confrontation Clause but rather analyzed it as raising questions of authentication and hearsay. *See id.*

complete extraction he compiled is relevant to Confrontation Clause considerations. Agent Dickerman never had an entire extract, and now it is known that he did not obtain even all that he deemed relevant. This is another reason the defense must have the ability to cross-examine the Dutch witnesses and the government's partial extraction should be excluded.

Lastly, the government's failure to obtain access to the full extraction—or even the full subset of the extraction Agent Dickerman wanted to bring back to this country—means that the government cannot conduct a thorough *Brady* review. The defense will never know, and it will not have the opportunity to find out, if there is exculpatory material on the purported Pertsev phone. In a case that largely turns on Mr. Storm's state of mind, it is a serious issue to only have a curated set of messages between Mr. Storm and his alleged co-coconspirators. This is a stand-alone reason to exclude the partial extraction.

- **The Newly Disclosed 3500 Material Also Makes Clear That the Government's Extraction Report Could Have Been Modified**

The July 9, 2025 3500 materials of Agent Dickerman also have him discussing the possibility that the extraction report could have been modified. (Ex. 6.) Agent Dickerman states ███████████████████████████████████████████████████████████████████████████ (*Id.* at 2.) While Agent Dickerman notes that "there is a forensic tool that can be used to analyze whether PDFs have been altered," the defense is aware of no evidence that such a tool was used, and in any event, Agent Dickerman also explains that "[t]he reliability of that tool also depends at least in part on the sophistication of the person making the modification." (*Id.*)

The fact that the Dutch analyst could have modified the extraction report is directly relevant to both the authentication issue and the Confrontation Clause issue. Indeed, the Court itself noted in making its ruling on the Pertsev phone extraction that "[w]hether Agent Dickerman can authenticate the Graykey extraction report likely depends on whether he can testify that the report cannot have been manipulated." (Ex. 5, Tr. at 127:21-23.) If the report is able to be modified, then Agent Dickerman cannot say that the report is what the government claims it to be. The only person or persons who would have the information about whether and how the report had been modified at the time it was given to Agent Dickerman are the Dutch officials who created and had possession of the report. The defense has a right under the Confrontation Clause to cross-examine such individuals about any such modifications. Permitting Agent Dickerman to introduce the government's extraction without the government calling the relevant Dutch witnesses would deprive Mr. Storm of that right.

---

[6] In new 3500 material for Agent Dickerman produced late on July 10, 2025 ████████ ████████████████████████████████████████████████████ (*See* 3540-018.)

Hon. Katherine Polk Failla<br>
July 11, 2025<br>
Page 7 of 7

\* \* \*

For all the foregoing reasons, this Court should not permit the introduction of the Pertsev phone extraction exhibits and grant the defense's request for disclosure of the grand jury transcripts.

Respectfully submitted,

*[signature]*

Brian E. Klein
Keri Curtis Axel
Becky S. James
Kevin M. Casey
Viviana Andazola Marquez
Waymaker LLP

-and-

David E. Patton
Christopher Morel
Hecker Fink LLP

*Attorneys for Roman Storm*