# EXHIBIT 5

P78DStoC

1    arguing consciousness of guilt for something you haven't

2    charged him with and that your department writ large has

3    withdrawn.

4          MR. ARAD:  That brings us to the next part, your

5    Honor, consciousness of guilt.  Here, the government's view is

6    that the imposition of the OFAC sanctions told the defendant

7    there will now be scrutiny on Tornado Cash at an unprecedented

8    level, and not only with respect to these sanctions but also

9    with respect to Tornado Cash's other conduct.

10          In the defendant's own statements during the charged

11    time period and those of his co-conspirators show that they

12    knew at the time they were doing something wrong.  For example,

13    when the Ronin hack happened, one of the co-conspirators asked,

14    sum and substance, I'd like to ask you some questions about how

15    you go about laundering $600 million worth of stolen crypto.

16    That doesn't have anything to do with the OFAC sanctions,

17    except once the OFAC sanctions came down, these co-conspirators

18    who knew they had been doing wrong now knew that people were

19    watching.

20          And so the consciousness of guilt is not about their

21    guilt with respect to the new OFAC sanctions.  It's about their

22    guilt with respect to the charged offenses.  Now, the

23    government would also, your Honor --

24          THE COURT:  But, sir, understand, and I'm not saying

25    I'm going to do this, if that comes in, the withdrawal of the

P78DStoC

```
1   found both in the extraction itself and on the Graykey report

2   of the extraction.

3            THE COURT:  Did he receive the totality of the Graykey

4   report while in the Netherlands from which he then himself took

5   subsets of the Graykey report, or did he take -- did he take

6   the Graykey report, duplicate it in its entirety, and bring it

7   back here?

8            MR. ARAD:  He received a copy of the Graykey report,

9   which is just a two-page document, your Honor, that, as I said

10  earlier, operates almost like a receipt, contains identifying

11  information about the device, and some information about, for

12  example, when it was extracted.

13           THE COURT:  All right.

14           MR. ARAD:  Separate and apart from that, there is the

15  extraction itself.

16           THE COURT:  Yes.  Did he receive a copy of the full

17  extraction or some subset of it?

18           MR. ARAD:  He received a subset of the extraction, but

19  I shouldn't say received.  He took an extraction of the subset

20  himself, because he personally searched for information within

21  the entire extraction and pulled out what he wanted to bring

22  back to the United States.

23           THE COURT:  You've mentioned to me that the Graykey is

24  a receipt, but he -- could he himself have generated his own

25  Graykey report of that phone?
```

P78DStoC

1          MR. ARAD:  I don't know whether that would have been
2     possible.  That's something I could ask him.
3          THE COURT:  He didn't make a copy -- I received a copy
4     of the receipt report, but he didn't himself make that report.
5          MR. ARAD:  The Gray -- he did not himself generate the
6     Graykey report.
7          THE COURT:  Right.
8          MR. ARAD:  But he did generate the reports of evidence
9     that the government seeks to admit at trial here, which were
10    subsets of the extraction.
11         THE COURT:  I understand.  He was given access to the
12    extraction from which he then extracted what he believed he
13    needed for this case.
14         MR. ARAD:  Exactly.  Now, he did see on the
15    extraction, which he interacted with and observed firsthand,
16    information that allowed him to verify the authenticity of the
17    Graykey report, even though he himself didn't generate the
18    Graykey report.  There were a number of pieces of information
19    that allowed him to draw this conclusion, but the main one is
20    there are two different kinds of hash values listed on a
21    Graykey report that should match the hash values on the
22    extraction.  And Special Agent Dickerman himself ran an
23    algorithm to check those hashes values and confirm that they
24    did match.
25              Another example, your Honor, is that the Graykey

1  report specifies what kind of extraction was taken, and the

2  file name of the extraction itself specifies that same

3  information.  In this case, both of them show that an entire

4  extraction of the phone was taken.  So it's another way that

5  Special Agent Dickerman knows that the Graykey report is, in

6  fact, an authentic match to the extraction.

7          THE COURT:  Do you believe that neither the Graykey

8  report nor the extraction poses *Crawford* or Confrontation

9  Clause issues, *Bullcoming* issues?  I'd like to understand that

10  a little more.  I suppose for the extraction he can at least

11  say that came from -- I myself extracted from what I understood

12  to be a complete extraction of the Pertsev phone, the stuff

13  that I thought I needed.

14          MR. ARAD:  Yes.

15          THE COURT:  But the Graykey report, might that be

16  testimonial?

17          MR. ARAD:  No, your Honor.

18          THE COURT:  Why?

19          MR. ARAD:  The Graykey report contains

20  machine-generated data.  It doesn't contain any analysis or any

21  recounting of past events done by a human.  And the *Bullcoming*

22  line of cases simply dealt with facts that were different from

23  those.  In *Bullcoming*, and *Melendez Diaz*, and *Smith v. Arizona*,

24  the courts were dealing with drug test analyses and blood

25  alcohol level analyses that were conducted and reported on in

P78DStoC

1    stand alone statements.  Therefore, my intern's really awesome

2    research on this subject remains with me, and I'll use it for

3    another day.  I know you're appreciative of it.

4            We now move to authentication of certain records under

5    Rules 902(11), 902(13), and 902(14).  I am aware of where

6    things stand.  I will wait for the stipulations.  What isn't

7    stipulated to, I understand.  My initial research, and there is

8    another Judge Liman case on this as well, suggests that the

9    certifications of custodians will suffice.  But, again, I can't

10   decide it until I know what's to decide.

11           The fourth government motion in limine regards the

12   authentication of Mr. Pertsev's cell phone contents and their

13   introduction at trial.  This is a long one, so please excuse

14   me.

15           On the issue of authentication, I'm advised and I was

16   advised today about Agent Dickerman's travels to the

17   Netherlands to obtain portions of the Pertsev phone extraction,

18   which was done via Graykey by Dutch authorities.  Excuse me.

19   Let me say that differently.  He reviewed the Graykey report.

20   There was an extraction.  He took pieces of the extraction.

21   Whether Agent Dickerman can authenticate the Graykey extraction

22   likely depends on whether he can testify that the report cannot

23   have been manipulated.

24           The government doesn't have the phone.  They don't

25   know who created the extraction report, and those do count

P78DStoC

against finding that it could be authenticated, but it doesn't

exclude the possibility.  That is because the Second Circuit

has found that Rule 901 does not erect a particularly high

hurdle to the admission of evidence.  Cases for this

proposition:  *United States v. Balashane*, 2024 WL 4586526; and

*U.S. v. Dinsa*, 235 F.3d 645.  An item is properly authenticated

under Rule 901 if a proponent produces evidence sufficient to

support a finding by a reasonable juror that the item is what

the proponent claims it is, such as appearance, contents,

substance, internal patterns, or other distinctive

characteristics of the item, taken together with all of the

circumstances.  Evidence can be authenticated in many ways,

discussed in cases such as the *Balashane* case, and *United*

*States v. Vayner*, 769 F.3d 125 (2014), and *United States v.*

*Encarnacion-La Fontaine*, 639 F. App'x 710 (2016).

        I do believe there is enough here, based upon the

representations provided by the government, to authenticate

that this data came from Mr. Pertsev's cell phone.  There have

been chain of custody arguments made to me.  Those typically go

to the weight and not the admissibility of evidence.  One case

discussing that is *United States v. Reed*, 650 F. Supp. 3d 182

(2023), citing *United States v. Boot*, 651 F. App'x 62 (2016).

        I do find that this case is analogous to and in some

respects stronger, though in one respect weaker, than the

*Jean-Claude* case before Judge Gardephe, so I do find that is

P78DStoC

1    and can be authenticated.  There is a separate issue with

2    respect to the Confrontation Clause, and I believe, you know,

3    there's a question about whether machine generated forensic

4    data constitutes testimonial hearsay.  I am aware of the *Smith*

5    *v. Arizona* case.  I am aware of *Melendez Diaz v. Massachusetts*,

6    and of the *Bullcoming* case, and the *Williams* case.

7            It's not clear to me that such a report is

8    testimonial.  I think the better way of looking at it is that

9    it's not hearsay, because it is a machine generated record

10   rather than a statement.  But to me the machine generated

11   record nature of it takes it from the Confrontation Clause.

12   Whether you look at it from the testimonial side or the

13   statement or hearsay side, it's not violative of the

14   Confrontation Clause.  Examples for that, case reports for that

15   includes *United States v. El Gammal*, 831 F. App'x 539; *United*

16   *States v. Laman* (11th Cir. 2008);  *United States v. Arce*, 49

17   F.4th 382.

18           So now we have a long list of the admissibility of

19   certain evidence as direct evidence.  Defendants profits,

20   admissible.  False statements to the financial institution,

21   admissible as direct acts in furtherance of the conspiracy.

22   Efforts to keep Tornado Cash operating post sanction, it is

23   admissible.  It is probative of the defendant's intent to

24   facilitate money laundering, the operation of an unlicensed

25   money transmitting business, and to commit continued sanctions