

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

July 22, 2025

**By Electronic Mail**

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:   *United States v. Roman Storm*,
              23 Cr. 430 (KPF)

Dear Judge Failla:

      The Government writes respectfully to address the Court's concerns about the admission of Government Exhibits 2036-T, 2043-T, and 2246, in which Storm discusses the possibility of implementing measures to address money laundering on Tornado Cash. As the Court recognized at the pretrial conference, the Government should be permitted to introduce evidence that "there could have been a way of identifying the source of something, or preventing folks from using Tornado Cash, and then everybody would have known how to do it, and that, **in fact, Mr. Storm knew how to do it but deliberately elected not to**." (FPTC 58 (emphasis added)). The most direct evidence of this is the defendant's own chats with his co-conspirators regarding their consideration and then rejection of ideas to implement such features into Tornado Cash.

      These discussions are highly probative of the defendant's intent to continue to engage in a conspiracy to commit money laundering and his knowledge of steps he could have taken to prevent the ongoing money laundering in Tornado Cash. The chats contain references to AML and KYC, but they do not discuss any specific legal significance of these terms, nor do they contain any suggestion that the Bank Secrecy Act applied to Tornado Cash or that there was any existing regulatory obligation on Tornado Cash. Moreover, the introduction of the defendant's own messages is fully consistent with the Court's rulings at the pretrial conference regarding the permissible scope of testimony of the Government's expert witness, Philip Werlau. The chats are not part of Werlau's testimony. Rather, they are an admission by the defendant that anti-money laundering features were in fact technologically feasible to implement.

In a case charging a conspiracy to commit money laundering, the Government should be permitted to introduce the defendant's own communications with his co-conspirators regarding his decision not to take measures against money laundering, which is the most direct evidence of the defendant's state of mind.

## I. Background

### A. This Court's Pretrial Rulings

As the Court is aware, Storm is charged in three counts with participating in conspiracies to: (1) commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count One); (2) operate an unlicensed money transmitting business, in violation of 18 U.S.C. § 371 (Count Two); and (3) violate the International Emergency Economic Powers Act, in violation of 50 U.S.C. § 1705, Executive Order 13722, and 31 C.F.R. § 510.201, each arising out of Storm's ownership, development, marketing, and operation of a cryptocurrency mixing service known as Tornado Cash. While Count Two charges two objects—that Tornado Cash (1) failed to register with FinCEN and (2) knowingly transmitted proceeds—the Government is only proceeding on the latter theory. (Dkt. 157 at 1 n.1).

In light of the Government's decision not to proceed on a BSA theory, this Court drew a line. On the one hand, the Court understood that, because "[t]his isn't a negligence case[; i]t's a willfullness case," the Government would have to be able "to argue … that it would be a feature … or a patch, or a thing that Mr. Storm must have known about—one might say most people in his position would have known about it—that he could have implemented and that he deliberately elected not to." (FPTC Tr. 58). As the Court explained: "There could have been a way of identifying the source of something, or preventing folks from using Tornado Cash, and then everybody would have known how to do it, and that, in fact, Mr. Storm knew how to do it but deliberately elected not to." (FPTC Tr. 58).

On the other hand, the Court ruled that the Government's expert, Philip Werlau, would not be permitted to "talk[] about know your customer rules or know your customer protocols" because Storm "didn't have a legal or regulatory obligation to implement 'know your customer' protocols," and the Court was "troubled by the idea of [Storm] being convicted for not doing what he was legally required to do." (FPTC Tr. 59). Accordingly, the Court limited the testimony of Werlau, explaining that, if Werlau discussed BSA concepts—such as AML and KYC—it might open the door to a larger discussion of the BSA regulatory structure:

> Let me please put a finer point on it. To me, the issue is whether the technology is feasible and not whether it was required by statute or regulation, and then whether Mr.

> Storm's conscious decision not to employ it or to employ something that he knew was going to fail is somehow indicative of willfulness. So, as I was hinting at, if you start using—if I hear KYC or AML, or I know you're not going to use ABM, but who knows, you might, I think the door might be opened for Mr. Carter to testify about the BSA regulatory structure and how the terms that the government is using pertain to a different system that's not being charged here. I think that's going to mess up everything for everyone, but I'm telling you, you will really run the risk of opening that door.
>
> Secondly, and this is the thing my clerk told me not to mention, I'm warning both of you that I think you, government, are walking a really fine line regarding Count Two, and even though you think you've excluded a lot of evidence by just proceeding on what I'll call prong two of Count Two, I'm not convinced you have. I think there are a number of ways that somehow wittingly or unwittingly a lot of evidence that you're asking me to exclude is going to come in, and that's not to mention the craziness of what the charge looks like.
>
> So, for Werlau, help me feel better that he's not going to be a vehicle for BSA terms that you don't want me to talk about.

(FPTC Tr. 59–60). The Government agreed that it did "not intend to have [Werlau] use that term [KYC] or similar terms, AML, anything like that, anything relating to any sort of regulatory obligation." (FPTC Tr. 61). In discussing this line with the Government—between being able to argue and present evidence of Storm's deliberate decisions not to prevent or deter money laundering through Tornado Cash on the one hand, and precluding discussion by the Government's expert witness of BSA/regulatory requirements on the other—the Court explained that it was allowing the former to go to the jury as evidence of willfulness.

The Court again clarified that there was this important line in Mr. Werlau's testimony:

> I will let him testify about the connections between changes made to Tornado Cash and the impact on the demand for TORN. I will let him testify about the types of changes that the defendant and his putative co-

> conspirators could make and made—excuse me, could make based on the changes they did make and the structure of Tornado Cash services. In my mind, Mr. Werlau is connecting the dots along aspects of Tornado Cash, such as the UI, the CLI, and smart contracts.
>
> To be clear, Mr. Werlau cannot testify that because Mr. Storm did not make changes he could have made, that somehow he was acting willfully, because that's getting way too close to testify about a defendant's mental state. He could I suppose, under DX, testify about what most people in similar situations would have known about their ability to add the features that he could have added, but as I hope I made clear to the folks at the front table, the words "know your customer," KYC, AML, ABM, should not be coming from his lips.

(FPTC Tr. 133–34).

At trial, the Government and Mr. Werlau have followed the Court's instructions.

### B. The Telegram Chats

In light of the requirement that the Government demonstrate willfulness, and the relevance to willfulness of—as this Court put it—whether there was "a feature … or a patch, or a thing that Mr. Storm must have known about—one might say most people in his position would have known about it—that he could have implemented and that he deliberately elected not to" (FPTC Tr. 58), the Government is offering a number of chats in which Storm and his co-conspirators discuss whether there are features or patches that Storm could have implemented and deliberately elected not to; three of those conversations mention AML or KYC without discussing the regulatory framework.

#### 1. Government Exhibit 2036-T

This is a November 16, 2021 chat in which the Tornado Cash founders discussed a publicly available tool that could be used to prevent money laundering on a platform like Tornado Cash, and Storm then said that the suggestion of implementing such a tool made him "scream with laughter." The relevant portion begins on page 4 of the exhibit, when Storm forwarded to Semenov and Pertsev a link to a "module"—that is, a unit of computer code—described as being "for PureFI decentralized AML protocol." Storm forwarded additional messages that said: "Maybe you should install

it at your site? … Anonymity of clients is preserved, and you can set the risk score threshold to enter yourselves." After receiving these messages, Semenov asked Storm: "Would you like to install KYC on Tornado?" Storm responded: "Such suggestions … make me fucking scream with laughter."

At the pretrial conference, the Court held that evidence of a "feature" or "patch" that Storm "could have implemented and that he deliberately elected not to," would be proper evidence of willfulness. (FPTC 58). This exhibit, in which Storm forwards a link to a specific tool and a message suggesting that the Tornado Cash founders install it, and then he and Semenov summarily reject it with "laughter," is exactly in line with the Court's ruling.

### 2. Government Exhibit 2043-T

This is a March 15, 2022, chat. The relevant section begins on page 20, when Semenov forwarded a Financial Times article to Storm discussing a proposal by the United Kingdom's National Crime Agency (the NCA) to regulate "sophisticated mixing technology used by criminals to avoid detection when laundering money through cryptocurrencies. Notably, the article plainly described this as a proposal from British law enforcement, and there is no indication of any existing United States regulatory obligation. On the contrary, the only reference to United States action has to do with a criminal money laundering charge against the Helix mixer, exactly the sort of charge at issue here.

This article prompted a discussion among the founders about the risk of law enforcement action against Tornado Cash: "For now they just got to Bitcoin mixers but soon they'll get to Tornado too and they'll start fucking messing with us." (GX 2043-T at 22). Semenov and Storm then discussed their control over the UI, and various options for making changes, including the idea of "releas[ing] ui with kyc", which Storm rejected:

> STORM: We should probably hand over the key to governance, keeping just the update access key.
>
> SEMENOV: But to approve releases through the multisig, 1. It has to be open source, and 2. It slows down releases.
>
> STORM: Yes, it would be fucking tough. We need to hand over the primary access and then we can yell that the worker is not the owner.
>
> SEMENOV: Well, like we'll keep access to release ui with kyc.

> STORM: We should fucking throw it away and move on to v3.

(GX 2043-T at 24-25).

This chat is another example of the founders discussing their concern with law enforcement, their control over Tornado Cash, and their ability to make changes to the service in light of the widespread money laundering in Tornado Cash.

### 3. Government Exhibit 2246

On May 2, 2022, Storm sent a message to Haseeb Qureshi, a principal at Dragonfly Capital, about Dragonfly's—and, by extension, the market's—appetite for a compliant mixer; Qureshi made clear that the market would not tolerate such a thing, and Storm complied, again declining to put into place any patches or features that could have prevented or at least reduced money laundering through Tornado Cash.

Storm wrote: "folks, we are brainstorming an idea. Privacy for blockchain with full compliance. We want your opinion and help us to see if this is something that market needs + legality of such venture. … has to be under new brand name … basically fork of tornado cash but with KYC/AML in it." (GX 2246 at 228). Qureshi replied: "I'm not a fan of this tbh [to be honest]. Legally it seems fine, but I just don't know if anyone will actually want this. Market need seems quite thin." (GX 2246 at 229). Storm asked Qureshi if he "personally use[d] tornado cash? Or Dragonfly as a business?" (GX 2246 at 229). Qureshi told Storm that "Dragonfly doesn't, our auditors would kill us." (GX 2246 at 230). Qureshi explained that "we use centralized exchanges all the time, so that's our effective mixer," and Storm advocated for Tornado Cash, saying that Dragonfly was "quite limited" and such exchanges are "not easy to use." (GX 2246 at 231). Qureshi concluded: "I know what you mean. But TBH it would be unlikely that as a fund we'd use a 'compliant mixer.' As a venture fund we are relatively low velocity." (GX 2246 at 231).

As with the prior chats, this is direct evidence that Storm considered and rejected a proposal to implement anti-money laundering features in Tornado Cash, and it also rebuts the defense's attempts to suggest that Tornado Cash was "immutable" or that Storm had no way to respond to money laundering.

## II. Discussion

To the extent that Government Exhibits 2036-T, 2043-T, and 2246 reference AML or KYC, they only do so by introducing AML or KYC as, in the Court's words, "a feature … or a patch, or a thing that Mr. Storm must have known about—one might say most people in his position would have known about it—that he could have

implemented and that he deliberately elected not to" (FPTC Tr. 58). The Telegram chats do not discuss whether Storm "ha[d] a legal or regulatory obligation to implement 'know your customer' protocols." (FPTC Tr. 59). Rather, they focus on his decision not to implement any such features.

In Government Exhibit 2036-T, Storm forwarded a series of chats where someone else had suggested to Storm that he implement an "AML protocol" on Tornado Cash, and described the utility of such a protocol and ways Storm could implement it. (GX 2036-T at 22–23). Semenov asked if Storm "[w]ould … like to install KYC on Tornado," and Storm replied that "[s]uch suggestions make me fucking scream with laughter." (GX 2036-T at 23–24). In other words, someone had suggested "a feature … or a patch, or a thing that Mr. Storm must have known about," and Storm explained "that he deliberately elected not to." (FPTC Tr. 58). There was no discussion of whether there was "a legal or regulatory obligation to implement 'know your customer' protocols." (FPTC Tr. 59).

Government Exhibit 2043-T occurred well after Storm learned that criminals were using Tornado Cash. Semenov forwarded an article indicating *not* that there was "a legal or regulatory obligation to implement 'know your customer' protocols" (FPTC Tr. 59), but rather that the United Kingdom was considering imposing such obligations to keep criminals off of mixers (GX 2043-T at 40–41). In response, Storm and Semenov discussed ways to change the user interface to avoid scrutiny by law enforcement, while actually maintaining control over Tornado Cash. (GX 2043-T at 50–53). As one example, Storm suggested that they "hand over the key to governance," but still "keep[] just the update access key." (GX 2043-T at 52). Semenov was concerned that there were issues with doing so, because approval of releases "ha[d] to be open source" and would "slow[] down releases." (GX 2043-T at 52). Storm agreed that "it would be f*cking tough," and Semenov suggested "keep[ing] access to release ui [user interface] with kyc." (GX 2043-T at 53). That was a bridge too far: Storm wanted to "fucking throw it away and move on" to the next version. (GX 2043-T at 53). In other words, Storm and Semenov were discussing "a feature … or a patch" to the user interface and explained why they "deliberately elected not to." (FPTC Tr. 58). There was no discussion of whether there was "a legal or regulatory obligation to implement 'know your customer' protocols" in place; to the contrary, Storm and Semenov were trying to figure out how to avoid the implementation of any such obligations. (FPTC Tr. 59).

Government Exhibit 2246 occurred on May 4, 2022, well after Storm and his co-conspirators learned about the Ronin hack, and while the Lazarus Group was in the midst of laundering hack proceeds through Tornado Cash. Storm asked a group of co-conspirators, as well as Qureshi, whether he and his co-conspirators should implement a "fork of tornado cash but with KYC/AML in it," asking not about whether

it was required by regulation, but rather whether it was "something that market needs." (GX 2246 at 228). Qureshi understood what Storm was asking: while he said that "[l]egally it seems fine" (but did not say it was required by regulation), he was concerned about "if anyone will actually want this" because the [m]arket seems quite thin." (GX 2246 at 229). Qureshi concluded that it was "unlikely that as a fund we'd use a 'compliant mixer.'" (GX 2246 at 231). In other words, Storm was consulting with co-conspirators and Qureshi about whether a version or off-shoot of Tornado Cash with "a feature … or a patch" would appeal to the market; Qureshi's doubt that the market would use a compliant mixer explained why Storm and his co-conspirators "deliberately elected not to." (FPTC Tr. 58). This chat makes plain that Storm's decision not to implement such features was a financial decision. While they discussed the concept of creating a "compliant mixer" as a marketing tool, there was no discussion of whether there was "a legal or regulatory obligation to implement 'know your customer' protocols." (FPTC Tr. 59).

At the pretrial conference, the Court's concern about these terms was directed at the issue of expert witness testimony. As the Court explained, if Werlau discussed "know your customer rules or know your customer protocols," or the concepts of "KYC or AML," as an expert, he would implicate "the degree to which the defense expert gets to talk about the regulatory structure under the BSA that [the Government is] not charging [Storm] with and how that would all come in." (FPTC Tr. 59). Accordingly, Werlau did not discuss "know your customer rules or know your customer protocols" or the concepts of "KYC or AML." Indeed, the witnesses and evidence have steered clear of questions of what Storm was, and was not, required to do under the BSA. However, the mere mention of "KYC" or "AML" does not trigger the Court's concerns. For example, the Court permitted Joe Evans to discuss "AML" in describing the demand letter he sent to Storm's company when that testimony did not imply that Storm had a regulatory obligation to implement AML protocols. (Tr. 141). And the Telegram chats at issue here do not imply that Storm had an independent BSA obligation that he violated such that he might "be[] convicted for not doing what he was not legally required to do." (FPTC Tr. 59).

Rather, as this Court explained quite simply: "the issue is … not whether [the technology to implement KYC/AML protocols] was required by statute or regulation"; rather, "the issue is whether the technology is feasible … and then whether Mr. Storm's conscious decision not to employ it or to employ something that he knew was going to fail is somehow indicative of willfulness." (FPTC Tr. 59). The Telegram chats at issue do not discuss whether the technology was required by statute or regulation; rather, they discussed whether it was feasible, and indicate Storm's conscious decision not to employ that technology, which was rooted in financial considerations. That is relevant to willfulness and does not implicate this Court's concerns.

Hon. Katherine Polk Failla
July 22, 2025
Page 9 of 9

      The Court should admit Government Exhibits 2036-T, 2043-T, and 2246.

                                    Respectfully submitted,

                                    JAY CLAYTON
                                    United States Attorney

by:   _____

                      Ben Arad
                      Thane Rehn
                      Benjamin A. Gianforti
                      Assistant United States Attorneys
                      (212) 637-6521 / -2490 / -2354

                      Kevin Mosley
                      Special Assistant United States Attorney