*CX 1*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v.-

ROMAN STORM,

Defendant.

23 Cr. 430 (KPF)

**JURY CHARGE
JULY 30, 2025**

## I.    GENERAL INTRODUCTORY CHARGES

### A.    Introductory Remarks

Members of the jury, you have now heard all of the evidence in the case, as well as the final arguments of the parties.  We have reached the point where you are about to undertake your final function as jurors.  You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict in this case.

My duty at this point is to instruct you as to the law.  It is your duty to accept these instructions of law and to apply them to the facts as you find them, just as it has been my duty to preside over the trial and to decide what testimony and evidence was proper under the law for your consideration.  On these legal matters, you must take the law as I give it to you.  If any attorney or witness has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

The Indictment in this case charges the Defendant, Roman Storm, in three counts with conspiring (or agreeing with others) to commit money laundering; conspiring to operate an unlicensed money transmitting business; and conspiring to violate the International Economic Emergency Powers Act (the "IEEPA").  I want to emphasize that you must consider each count separately and render a verdict on each count.

My instructions to you today are in several parts.  *First,* I will instruct you about the trial process, including the burden of proof.  *Second,* I

1

will give you instructions concerning evaluation of the evidence.  *Third,* I will describe the law to be applied to the facts that you find to be established by the evidence.  *Fourth* and finally, I will instruct you regarding your deliberations.

Because my instructions cover many points, I have given you a copy of them so that you may follow along.  In addition, you may take your copy of the instructions with you for reference during your deliberations.  You should not single out any instruction as alone stating the law; instead, you should consider my instructions as a whole when you retire to deliberate in the jury room.

### B.     **The Role of the Jury**

As members of the jury, you are the sole and exclusive judges of the facts.  You evaluate the evidence.  You determine the credibility of the witnesses.  You resolve any conflicts in the testimony.  You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

### C.     **Equality of the Parties**

In reaching your verdict, you must remember that all parties stand equal before a jury in the courts of the United States.  The fact that the prosecution is brought in the name of the United States does not entitle the Government or its witnesses to any greater, or lesser, consideration than that accorded to any other party.  The Government and Mr. Storm stand on equal footing before you.

It would likewise be improper for you to consider, in reaching your decision as to whether the Government has sustained its burden of proof as to any count in the Indictment, any personal feelings you may have about Mr. Storm's race, ethnicity, national origin, sex, age, or other personal characteristic. All persons are entitled to the same presumption of innocence and the Government has the same burden of proof with respect to all persons. Your verdict must be based solely on the evidence developed at trial.

**D.    Sympathy or Prejudice**

Under your oath as jurors you are not to be swayed by sympathy or prejudice. You are to be guided solely by the evidence in this case, and the crucial question that you must ask yourselves as you review the evidence is: Has the prosecution proved Mr. Storm's guilt of each charge in the Indictment beyond a reasonable doubt? It is for you and you alone to answer this question, and you must do so based solely on the evidence at trial, or the lack of evidence, and subject to the law as I have instructed you.

You will recall my prior instructions on unconscious or implicit biases. It must be clear to you that once you let fear, prejudice, bias, or sympathy interfere with your thinking, there is a risk that you will not arrive at a true and just verdict. If you find that the Government has met its burden of proving Mr. Storm's guilt on a particular charge in the Indictment beyond a reasonable doubt, then you should not hesitate because of sympathy or any other reason to render a verdict of guilty on that count. If, on the other hand,

you have a reasonable doubt as to Mr. Storm's guilt of that charge, then you must render a verdict of not guilty on that count.

I also caution you that, under your oath as jurors, you cannot allow a consideration of any punishment that may be imposed upon Mr. Storm if he were to be convicted of one or more counts in the Indictment to enter into your deliberations. The duty of imposing a sentence in the event of conviction rests exclusively upon the Court and the issue of punishment may not affect your deliberations as to whether the Government has proven Mr. Storm's guilt of a particular count beyond a reasonable doubt.

Similarly, it would be improper for you to allow any feelings you might have about the nature of the crimes charged to interfere with your decision-making process. Your verdict must be based exclusively upon the evidence, or the lack of evidence, in this case.

### E.     **The Court's Rulings on Evidence and Objections**

You should draw no inference or conclusion for or against any party by reason of lawyers making objections or my rulings on such objections. Counsel have not only the right, but the duty, to make legal objections when they think that such objections are appropriate.

Nothing that I say is evidence. If I commented on the evidence at any time, do not accept my statements in place of your recollection or your interpretation. It is your recollection and interpretation that govern.

4

Also, do not draw any inferences from any of my rulings. The rulings I made during trial are no indication of any view on my part. You should not seek to find any such view or opinion on my part, nor should you otherwise speculate as to what I may think.

Further, do not concern yourself with what was said at any side bar conferences or during my discussions with counsel outside of your presence. Those discussions related to rulings of law.

At times I may have admonished a witness or directed a witness to be responsive to questions, to keep his or her voice up, or to slow down. At times I may have asked a question myself. Any questions that I asked, or instructions that I gave, were intended only to clarify the presentation of evidence and to bring out something that I thought might be unclear. You should draw no inference or conclusion of any kind, favorable or unfavorable, with respect to any witness or any party in the case, by reason of any comment, question, or instruction of mine. Nor should you infer that I have any views as to the credibility of any witness, as to the weight of the evidence, or as to how you should decide any issue that is before you. That is entirely your role.

Finally, the personalities and the conduct of counsel are not in any way in issue. If you formed opinions of any kind about any of the lawyers in the case, favorable or unfavorable, those opinions should not enter into your deliberations.

### F.    **Persons Not on Trial**

You may not draw any inference, favorable or unfavorable, from the fact that no person other than Mr. Storm is on trial here. You also may not speculate as to the reasons why other persons are not on trial. Those matters are wholly outside your concern and have no bearing on your function as jurors.

Similarly, you are being asked to decide whether the Government has proven Mr. Storm's guilt of each count in the Indictment beyond a reasonable doubt. You are not being asked whether any other person has been proven guilty. Your verdict should be based solely upon the evidence, or lack of evidence, as to Mr. Storm, in accordance with my instructions and without regard to whether the guilt of any other person has, or has not, been proven.

### G.    **The Presumption of Innocence**

I will now instruct you on the presumption of innocence and the Government's burden of proof in this case. Mr. Storm has pleaded not guilty to the charges in the Indictment. In so doing, he has denied every allegation charged against him. As a result of Mr. Storm's plea of not guilty, the burden is on the prosecution to prove his guilt of each charge in the Indictment beyond a reasonable doubt. This burden never shifts to Mr. Storm for the simple reason that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

6

The law presumes Mr. Storm to be innocent of the charges against him. I therefore instruct you that he is to be presumed by you to be innocent throughout your deliberations.

Mr. Storm began the trial here with a clean slate. This presumption of innocence alone is sufficient to acquit him unless you as jurors are unanimously convinced beyond a reasonable doubt of his guilt of a particular charge, after a careful and impartial consideration of all the evidence in this case. If the prosecution fails to sustain its burden as to a particular charge in the Indictment, then you must find Mr. Storm not guilty of that charge. This presumption of innocence was with Mr. Storm when the trial began; it remains with him even now as I speak to you; and it will continue with him during your deliberations unless and until you are convinced that the prosecution has proven him guilty of that particular charge beyond a reasonable doubt.

### H.    <u>Proof Beyond a Reasonable Doubt</u>

Now, the next question naturally is, what is reasonable doubt? The words almost define themselves. It is a doubt that a reasonable person has after carefully weighing all of the evidence. It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs. A

reasonable doubt is not caprice or whim. It is not speculation or suspicion. It is not an excuse to avoid the performance of an unpleasant duty. And it is not sympathy.

In a criminal case, the burden is at all times on the prosecution to prove guilt beyond a reasonable doubt. That said, the law does not require that the prosecution prove guilt beyond all possible doubt; rather, proof beyond a reasonable doubt is sufficient to convict. The burden never shifts to Mr. Storm. Even if a defendant has presented evidence in his or her defense, it is not his or her burden to prove themselves not guilty. It is always the prosecution's burden to prove each of the elements of the crime with which a defendant has been charged beyond a reasonable doubt.

If, after fair and impartial consideration of all the evidence, you are convinced of Mr. Storm's guilt of a particular charge in the Indictment beyond a reasonable doubt, then you must convict him of that charge. On the other hand, if, after fair and impartial consideration of all the evidence, you have a reasonable doubt as to Mr. Storm's guilt of that charge, then you must acquit him of that charge.

## II.  **EVALUATION OF THE EVIDENCE**

### A.  **The Nature of the Evidence**

In determining the facts, you must rely upon your own recollection of the evidence. What is evidence? Evidence consists of the testimony of

witnesses, the exhibits that have been received, and the stipulations of the parties.

A stipulation is simply an agreement between the parties. At trial, the parties introduced two types of stipulations. *First*, you have seen evidence in the form of stipulations of testimony. A stipulation of testimony is an agreement between the parties that, if called as a witness, the person would have given certain testimony. You must accept as true the fact that the witness would have given that testimony. However, it is for you to determine the weight, if any, to be given that testimony. *Second*, you have seen stipulations that contained facts that the parties agreed were true. You must accept as true the facts contained in these stipulations. Again, however, it is for you to determine the weight, if any, to be given those facts.

Let me now give you some instructions about exhibits. The only exhibits that are evidence in this case are those that were received in evidence. Exhibits marked for identification but not admitted are not evidence, nor are materials that were used only to refresh a witness's recollection.

During the course of the trial, we have seen, among the exhibits received in evidence, materials that have been redacted. "Redacted" means that part of the item was taken out. You are to concern yourself only with the part of the item that has been admitted into evidence. You should not speculate as to any reason why any other portions have been redacted.

Some evidence has been admitted for a limited purpose only. If I have instructed you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other purpose.

And let me remind you of certain things that are not evidence. The statements and arguments made by the lawyers are not evidence. Their arguments are intended to convince you of what conclusions you should draw from the evidence or lack of evidence in this case. Now, those arguments are important. You should weigh and evaluate them carefully. But you must not confuse them with the evidence. As to what the evidence was at this trial, it is your recollection that governs, not the statements of the lawyers.

You should also bear in mind that a question put to a witness is never evidence. It is the answer to the question that is evidence. One exception to this is that you may not consider any answer that I directed you to disregard or that I ordered to be stricken from the record. You are not to consider such answers.

B.      **Direct and Circumstantial Evidence; Inferences**

There are two types of evidence that you may properly use in deciding whether the Government has proven beyond a reasonable doubt that Mr. Storm is guilty of a particular crime with which he has been charged.

One type of evidence is called direct evidence. Direct evidence of a fact in issue is presented when a witness testifies to that fact based on what he

or she personally saw, heard, or observed.  In other words, when a witness testifies about a fact in issue on the basis of that witness's own knowledge — by virtue of what he or she sees, feels, touches, or hears — that is direct evidence of that fact.

The second type of evidence is circumstantial evidence. Circumstantial evidence is evidence that tends to prove a disputed fact indirectly by proof of other facts.  There is a simple example of circumstantial evidence that is frequently used in this courthouse.

Assume that when you came into the courthouse this morning, the sun was shining and it was a nice day outdoors.  Assume that the courtroom windows were covered over and you could not look outside.  Assume further that as you were sitting here, someone walked in with an umbrella that was dripping wet and then, a few moments later, somebody else walked in with a raincoat that was also dripping wet.

Now, because you could not look outside the courtroom and you could not see whether it was raining, you would have no direct evidence of that fact.  But, on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it was raining.

That is all there is to circumstantial evidence.  You infer on the basis of your reason, experience, and common sense from one established fact the existence or the nonexistence of some other fact.

11

Many facts, such as a person's state of mind, can only rarely be proven by direct evidence.  Circumstantial evidence is of no less value than direct evidence.  It is a general rule that the law makes no distinction between direct and circumstantial evidence, but simply requires that in order to convict a defendant, the jury must be convinced of that defendant's guilt beyond a reasonable doubt from the evidence in the case.

The matter of drawing inferences from facts in evidence is not a matter of guesswork or speculation.  An inference is a deduction or conclusion that you, the jury, are permitted to draw — but are not required to draw — from the facts that have been established by either direct or circumstantial evidence.

You do not leave your common sense, good judgment, or life experiences behind you when you walk into the courtroom.  You carry that background into the jury room during your deliberations.  While you are considering the evidence presented to you, you are permitted to draw, from the facts that you find to be proven, the reasonable inferences that would be justified in light of your experience.  Please remember, however, that you may not use your experience and common sense to fill in or create evidence that does not exist.  You use them only to draw reasonable inferences from proven facts or to weigh and evaluate the evidence provided during the trial.

There are times when different inferences may be drawn from facts, whether proved by direct or circumstantial evidence.  The Government

may ask you to draw one set of inferences, while Mr. Storm may ask you to draw another. Some inferences, however, are impermissible. For example, you may not infer that a defendant is guilty of participating in criminal conduct if you find merely that he or she was present at the time the crime was being committed and had knowledge that it was being committed. Likewise, you may not infer that a defendant is guilty of participating in criminal conduct merely from the fact that he or she may have associated with other people who were guilty of wrongdoing, or merely because he or she may have had knowledge of the wrongdoing of others. Nor may you use evidence that I have instructed you was admitted for a limited purpose for any inference beyond that limited purpose.

Here again, let me remind you that, whether based upon direct or circumstantial evidence, or upon the logical, reasonable inferences drawn from such evidence, you must be satisfied that the Government has met its burden of proving Mr. Storm's guilt of a particular charge in the Indictment beyond a reasonable doubt before you may convict him of that charge.

Ultimately, it is for you, and you alone, to decide what inferences you will draw.

### C.    **Charts and Summaries**

During the trial, certain summary charts were admitted into evidence as exhibits in order to save time and avoid unnecessary

inconvenience.  All of these exhibits will be provided for you in electronic form during your deliberations.

In addition, during the trial, including during the arguments of counsel, the parties have used other charts and summaries as demonstrative aids in order to make other evidence more meaningful and to aid you in considering the evidence.  Those demonstrative aids were not admitted in evidence and therefore you cannot ask for them in the course of your deliberations.  They are no better than the testimony and the documents upon which they are based, and therefore, you are to give them no greater and no lesser consideration than you would give to the evidence upon which they are based.  It is for you to decide whether these demonstrative aids correctly presented the information contained in the testimony and in the exhibits on which they were based.  You are entitled to consider these demonstrative aids if you find that they are of assistance to you in analyzing and understanding the evidence.

### D.    **Evidence Obtained by Law Enforcement**

You have heard testimony about, and have seen introduced as exhibits, certain evidence obtained by law enforcement officers.  This evidence includes (i) items seized in connection with certain searches conducted by law enforcement officers; and (ii) information (including documents, electronic records, and recordings) obtained from banks, cellphone service providers, internet service providers, and social media platforms pursuant to subpoena or

court order.  I instruct you that the evidence in each of these categories was obtained lawfully and that it may be considered by you during your deliberations.

In addition, English translations of Russian-language recordings and communications were admitted into evidence.  The English-language translation of any Russian-language conversation is evidence.  Even if you may know the Russian language, it is important that all jurors consider the same evidence.  Therefore, you must accept the evidence presented in the English translations.

### E.    Credibility of Witnesses

I am now going to give you a few general instructions as to how you may determine whether witnesses are credible and reliable; whether the witnesses told the truth at this trial; and whether they knew what they were talking about.  How do you determine that?  It is really just a matter of using your common sense, your good judgment, and your experience.

First, consider how well the witness was able to observe or hear what he or she testified about.  The witness may be honest, but mistaken.  How did the witness's testimony impress you?  Did the witness appear to be testifying honestly or candidly?  Were the witness's answers direct or were they evasive?  Consider the witness's demeanor, manner of testifying, and the strength and accuracy of the witness's recollection.  Consider whether any outside factors might have affected the witness's ability to perceive events.

15

Consider also the substance of the testimony. How does the witness's testimony compare with other proof in the case? Does it seem implausible or otherwise unworthy of belief? Is it corroborated or is it contradicted by other evidence? If there is a conflict, does any version appear reliable, and if so, which version seems more reliable?

In addition, you should specifically note any evidence of hostility or affection that the witness may have had for or against the Government or Mr. Storm. Likewise, you should consider evidence of any interest or motive that the witness may have had in cooperating with or helping either party. It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony. If you find that a witness is biased or interested, you should view his or her testimony with caution, weigh it with care, and subject it to close and searching scrutiny.

Of course, the mere fact that a witness has an interest in this case does not mean the witness has not told the truth. It is for you to decide from your observations, applying your common sense and experience, and all the other considerations mentioned, whether an interest has intentionally or otherwise colored or distorted the witness's testimony. You are not required to believe or disbelieve a biased or an interested witness; you may accept as much of the testimony as you deem reliable and reject as much as you deem unworthy of belief.

If a witness made statements in the past that are inconsistent with his or her trial testimony concerning facts that are at issue here, you may consider that fact in deciding how much of the witness's testimony, if any, to believe. In making this determination, you may consider whether the witness purposely made a false statement, or whether it was an innocent mistake. You may also consider whether the inconsistency concerns an important fact or merely a small detail, as well as whether the witness had an explanation for the inconsistency, and, if so, whether that explanation appealed to your common sense.

If you find that a witness has testified falsely as to any material fact, or if you find that a witness has been previously untruthful when testifying under oath or otherwise, you may reject that witness's testimony in its entirety or you may accept only those parts that you believe to be truthful or that are corroborated by other independent evidence in the case.

### F.    Witnesses Testifying Pursuant to Cooperation Agreements or Non-Prosecution Agreements

You have heard testimony from several witnesses, including Justin Bram, Andre Llacuna, and Shakeeb Ahmed, who testified pursuant to agreements with the Government. Mr. Llacuna and Mr. Ahmed testified pursuant to cooperation agreements with the Government, and Mr. Bram testified pursuant to a non-prosecution agreement with the Government. The law allows the use of testimony from witnesses who testify pursuant to cooperation or non-prosecution agreements. Indeed, it is the law in federal

17

courts that the testimony of such a witness may be enough in itself for conviction, if the jury finds that the testimony establishes guilt beyond a reasonable doubt. But it is also the case that testimony from individuals who testify pursuant to cooperation or non-prosecution agreements must be scrutinized with great care and viewed with particular caution. The fact that a witness is testifying pursuant to a cooperation or non-prosecution agreement can be considered by you as bearing upon the witness's credibility. It does not follow, however, that simply because a person has admitted to participating in a crime, that person is incapable of giving a truthful account of what happened.

Like the testimony of any other interested witness, testimony from a witness who is testifying pursuant to a cooperation or non-prosecution agreement should be given such weight as it deserves in light of the facts and circumstances before you, taking into account the witness's demeanor, candor, the strength and accuracy of the witness's recollection, the witness's background, and the extent to which the witness's testimony is or is not corroborated by other evidence in the case. You may also consider whether the witness has an interest in the outcome of the case, and if so, whether it has affected the witness's testimony. For instance, you may consider whether the witness believes the Government has provided him or her with any benefits or promises, and whether that belief provides the witness with a motive to testify either falsely or truthfully at this trial. Let me emphasize that you must

18

scrutinize the testimony of these witnesses with great care. If you believe the testimony to be true, and determine to accept it, you may give it such weight, if any, as you believe it deserves.

You are to draw no conclusions or inferences of any kind about the guilt of Mr. Storm from the fact that a witness pleaded guilty to charges arising out of or related to their use of Tornado Cash. The decision of a witness to plead guilty is a personal decision that witness made about his or her own guilt. It may not be used by you in any way as evidence against or unfavorable to Mr. Storm.

Finally, you have heard testimony about written agreements between the Government and these witnesses. Your concern is whether each of these witnesses has given truthful testimony in this courtroom. In addition to using all of the other considerations that I have described to evaluate testimony, in evaluating the testimony of a witness who has signed a cooperation or a non-prosecution agreement, you should also consider what effect, if any, the agreement has had on the witness's motive to tell the truth.

As with all witnesses, you may accept or reject the testimony of these witnesses in whole or in part.

### G.    Law Enforcement Witnesses

You have heard testimony from law enforcement officers. The fact that a witness may be employed by a federal, state, or city government as a law enforcement officer does not mean that his or her testimony is necessarily

deserving of more or less consideration, or greater or lesser weight, than that of an ordinary witness.

It is your decision, after reviewing all the evidence, whether to accept the testimony of each law enforcement officer and to give to that testimony the weight you find it deserves.

## H.   **Expert Witnesses**

You have heard testimony from what we call expert witnesses, someone who by education or experience has acquired learning or expertise in a science or a specialized area of knowledge.  Such a witness is permitted to give his or her opinions as to relevant matters in which he or she professes to be expert and give his or her reasons for those opinions.  Expert testimony is presented to you on the theory that someone who is experienced in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

Now, your role in judging credibility applies to experts as well as to other witnesses.  You should consider the expert opinions that were received in evidence in this case and give them as much or as little weight as you think they deserve.  If you should decide that the opinion of a particular expert witness was not based on sufficient education or experience or on sufficient data, or if you should conclude that the trustworthiness or credibility of the expert is questionable for any reason, or if the opinion of the expert was

20

outweighed, in your judgment, by other evidence in the case, then you may disregard the opinion of the expert in whole or in part.

On the other hand, if you find that the opinion of a particular expert witness is based on sufficient data, education, and experience, and the other evidence does not give you reason to doubt the expert's conclusions, then you may accept that testimony.

## I.    **Preparation of Witnesses**

You heard evidence during the trial that one or more witnesses may have discussed the facts of the case and their testimony with the attorneys for the parties before the witnesses appeared in court. Although you may consider that fact when you are evaluating a witness's credibility, I should tell you that there is nothing unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects about which he or she will be questioned, focus on those subjects, and have the opportunity to review relevant exhibits before being questioned about them. Such consultation helps conserve your time and the Court's time.

Again, the weight you give to the fact or the nature of the witness's preparation for his or her testimony, and what inferences you draw from such preparation, are matters completely within your discretion.

## J.    **Number of Witnesses**

The number of witnesses testifying concerning any particular dispute is not controlling. You may decide that the testimony of a smaller

number of witnesses concerning any fact in dispute is more believable than the testimony of a larger number of witnesses to the contrary. By the same token, you do not have to accept the testimony of any witness who has not been contradicted or impeached, if you find the witness not to be credible. You also have to decide which witnesses to believe and which facts are true. To do this, you must look at all the evidence, drawing upon your own common sense and personal experience.

I have already instructed you on the criteria for evaluating the credibility of witnesses. You should keep in mind that the burden of proof is always on the Government, and that Mr. Storm is not required to call any witnesses or offer any evidence, since he is presumed to be innocent.

## K.     **Uncalled Witnesses**

There are people whose names you heard during the course of this trial, but who did not appear here to testify. I instruct you that all parties have an equal opportunity, or lack of opportunity, to call any of these witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called. Their absence should not affect your judgment in any way.

You should remember my instruction, however, that the law does not impose on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. It is the Government's burden to prove

beyond a reasonable doubt each and every element of the crime charged in the Indictment.

**L.    A Defendant's Right Not to Testify**

Mr. Storm did not testify in this case.  Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the Government's burden to prove a defendant guilty beyond a reasonable doubt.  That burden remains with the Government throughout the entire trial and never shifts to the defendant.  A defendant is never required to prove that he or she is innocent.

You may not attach any significance to the fact that Mr. Storm did not testify.  No adverse inference against him may be drawn by you because he did not take the witness stand.  You may not consider this against Mr. Storm in any way in your deliberations in the jury room.

**III.   SUBSTANTIVE INSTRUCTIONS**

**A.    Overview of the Charges**

Mr. Storm has been formally charged in an Indictment.  The Indictment in this case contains three counts, each of which constitutes a separate crime or offense.  You must consider each count of the Indictment separately, and you must return a separate verdict on each count.

As I instructed you at the outset of this case, the Indictment is a charge or accusation.  It is not evidence.  You will have a copy of the

Indictment with you in the jury room and you can read each count in its entirety.  I am going to provide only a brief summary now.

Count One of the Indictment charges that Mr. Storm conspired, or agreed, with others to commit money laundering from at least in or about September 2020, up to and including on or about August 8, 2022.

Count Two of the Indictment charges that Mr. Storm conspired with others to operate an unlicensed money transmitting business from at least in or about February 2022, up to and including on or about August 8, 2022.

Count Three of the Indictment charges that Mr. Storm conspired with others to violate the International Emergency Economic Powers Act, which I have previously referred to as the "IEEPA," from at least on or about April 14, 2022, up to and including on or about August 8, 2022.

Mr. Storm denies that he is guilty of these three charges.  Mr. Storm is not charged with committing any crime other than the three offenses alleged in the Indictment.  You are here only to determine whether the Government has proven Mr. Storm guilty beyond a reasonable doubt of one or more of the three specific charges in the Indictment.

All three charges against Mr. Storm are conspiracy charges.  I will instruct you as to the elements of each charge in just a moment, but before I do, I want to explain the difference between conspiracy charges and substantive charges.

24

A conspiracy charge, generally speaking, alleges that two or more persons agreed together to accomplish an unlawful objective. The focus of a conspiracy count, therefore, is on whether there was an unlawful agreement. There can be no conspiracy unless at least two people reached such an agreement, whether express or implied, to commit another crime. A substantive charge, by contrast, alleges that one or more persons actually committed an offense.

A conspiracy to commit a crime is an entirely separate and different offense from a substantive crime, even if that substantive crime is the object of the conspiracy. And because the essence of the crime of conspiracy is an agreement or understanding to commit a crime, it does not matter if the crime that was the object of the conspiracy was ever committed. In other words, if a conspiracy exists and certain other requirements are met, it is punishable as a crime even if its purpose is not accomplished. Consequently, a conspiracy charge does not require proof that the crime that was the object of the conspiracy was actually committed.

**B.    Definitions**

Let me also instruct you on three terms that will come up repeatedly throughout these instructions, particularly when you are evaluating Mr. Storm's state of mind: unlawfully, knowingly, and willfully.

25

The term "unlawfully" simply means contrary to law; a defendant need not have known that he or she was breaking any particular law, but he or she must have been aware of the generally unlawful nature of his or her acts.

A person acts "knowingly" when they act voluntarily and deliberately rather than mistakenly or inadvertently. In other words, a person acts knowingly if he acts intentionally and voluntarily and not because of ignorance, mistake, accident, or carelessness.

To act "willfully" means to act knowingly and with a wrongful purpose to either disobey or disregard the law. A defendant need not have known that he or she was breaking a specific law or a specific statute — he or she need only have been aware of the generally unlawful nature of their act, and must act with the intent to do something the law forbids.

The question of whether a person acted unlawfully, knowingly, or willfully is a question of fact for you to determine, like any other fact question. This question involves one's state of mind. Direct proof of knowledge is almost never available. It would be a rare case where it could be shown that a person wrote or stated that as of a given time in the past they committed an act with the requisite state of mind. Such direct proof is not required. The ultimate facts of knowledge and criminal intent, though subjective, may be established by circumstantial evidence, based upon a person's outward manifestations, their words, their conduct, their acts, and all the surrounding circumstances

26

disclosed by the evidence and the rational or logical inferences that may be drawn therefrom.

What is referred to as drawing inferences from circumstantial evidence is no different from what people normally mean when they say, "use your common sense." Using your common sense means that, when you come to decide whether Mr. Storm possessed or lacked a certain state of mind, you do not limit yourself to what he said, but you also look at what he did and what others did in relation to him and, more generally, everything that occurred. As I have previously instructed you, circumstantial evidence, if believed, is of no less value than direct evidence. But in any case, the essential elements of the particular crime charged against Mr. Storm must be proven by the Government beyond a reasonable doubt.

Related to the question of whether a person acted unlawfully, knowingly, or willfully are the concepts of "conscious avoidance" and "good faith." I will instruct you further on those concepts later in this charge. Let me add that the Government need not prove that a criminal intent was a defendant's only intent. A defendant may have the required criminal intent even if the defendant was motivated by other lawful purposes as well. The Government must prove beyond a reasonable doubt, however, that Mr. Storm acted with the requisite intent.

### C.    Count One: Conspiracy to Commit Money Laundering

#### 1.    The Indictment and the Statute

Count One charges Mr. Storm with participating in a conspiracy to commit money laundering between in or around September 2020 and on or about August 8, 2022, in violation of Title 18, United States Code, Section 1956(h).  The relevant provision of the money laundering statute, Title 18, United States Code, Section 1956(a)(1)(B)(i), states that:

> Whoever, knowing that the property involved in the financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of a specified unlawful activity ...[,] knowing that the transaction is designed in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified lawful activity, [commits a crime].

Section 1956(h) of the statute further provides in relevant part that "[a]ny person who conspires to commit any offense defined in this section ... [commits a crime]."

#### 2.    The Elements

In order to satisfy its burden of proof on Count One, the Government must prove the following two elements beyond a reasonable doubt:

*First*, that the conspiracy charged in Count One of the Indictment existed — that is, that there was an agreement or understanding between two or more people to commit the crime of money laundering; and

*Second,* that Mr. Storm knowingly and willfully became a member of the charged conspiracy with the intent to further its illegal purpose, that is, with the intent to achieve the object of the charged conspiracy.

I will now separately instruct you on each of these elements.

### 3.     Count One, First Element: Existence of a Conspiracy

#### a.     The Agreement

To begin, the Government must prove beyond a reasonable doubt that there was an agreement between at least two people to accomplish the money laundering offense that was charged as the object of the Count One conspiracy.

To show that there was such an agreement, the Government is not required to provide evidence that two or more people sat around a table and entered into a solemn pact, orally or in writing, stating that they had formed a conspiracy to violate the law and spelling out all the details. It would be quite extraordinary if there were such a formal document or specific oral agreement in most conspiracies.

Common sense will tell you that when people in fact undertake or agree to enter into a criminal conspiracy, much is left to the unexpressed understanding. Conspirators do not usually reduce their agreements to writing. They do not typically publicly broadcast their plans. By its very nature, a conspiracy is almost always secret in its origin and execution. Thus,

it is rare that a conspiracy can be proven by direct evidence of an explicit agreement.

Similarly, express language or specific words are not required to indicate assent or agreement to form the conspiracy. Instead, it is enough if two or more people, in some way or manner, explicitly or implicitly, came to an understanding to violate the law.

In determining whether there was an agreement as charged in Count One, you may infer the existence of the conspiracy from the circumstances of the case and the conduct of the parties involved if you find that the evidence justifies such an inference.

For the crime of conspiracy, actions often speak louder than words. In this regard you may, in determining whether an agreement existed, consider the actions and statements of each alleged co-conspirator as proof of whether a common design existed to act together to accomplish an unlawful purpose. This is because when people enter into a conspiracy, they become agents or partners of one another in carrying out this crime. Therefore, as I just said, in determining the factual issues before you, you may take into account any acts done or any statements made by any of the alleged co-conspirators during the course of the conspiracy, even if such acts or statements were made outside of Mr. Storm's presence or without his knowledge.

However, before you may consider the statements or acts of an alleged co-conspirator in deciding the issue of Mr. Storm's guilt of Count One, you must first determine that the acts were done and the statements were made during the existence, and in furtherance, of the charged conspiracy. If the acts were done, or the statements made, by someone whom you do not find to have been a member of the conspiracy, or if any such acts or statements were not done or said in furtherance of the conspiracy, then you may not consider them as evidence against Mr. Storm as to the charged conspiracy.

It is sufficient to establish the existence of the conspiracy if, after considering all of the relevant evidence, you find beyond a reasonable doubt that the minds of at least two alleged conspirators met in an understanding way, and that they agreed, as I have explained, to work together to accomplish the money laundering object charged in Count One. In short, the Government must prove beyond a reasonable doubt that at least two alleged conspirators came to a mutual understanding, either spoken or unspoken, to violate the law.

### b.    The Object of the Conspiracy

The second part of the first element relates to the object, or goal, of the conspiracy. As I noted earlier, you may find a defendant guilty of the crime of conspiracy even if you find that the substantive crime that was the object of the conspiracy was not actually committed. The Government must prove beyond a reasonable doubt, however, that the conduct on which conspirators

31

agreed included all of the elements of the substantive crime, even if the substantive crime did not actually occur.

The object of the conspiracy charged in Count One is money laundering. As I mentioned a few moments ago, the object of the conspiracy charged in Count Two is operating an unlawful money transmitting business; the object of the conspiracy charged in Count Three is the violation of the IEEPA. I will explain the law regarding each of these objects later in my instructions.

### 4. Count One, Second Element: Participation in the Conspiracy

If you conclude that the Government has proven beyond a reasonable doubt that the conspiracy charged in Count One of the Indictment existed, and that the conspiracy had as its object the money laundering offense charged in the Indictment (which I will address shortly), then you must determine the second question: whether Mr. Storm participated in the conspiracy with knowledge of its unlawful purpose and with the intent of furthering its objective.

The Government must prove beyond a reasonable doubt that Mr. Storm unlawfully, knowingly, and willfully entered into the conspiracy charged in Count One and that he agreed to take part in the conspiracy to promote and cooperate in its unlawful objective. I have defined these terms for you previously.

It is not necessary for the Government to show that a defendant was fully informed as to all the details of the conspiracy in order for you to infer knowledge on his or her part. To have guilty knowledge, a defendant need not have known the full extent of the conspiracy or all of the activities of all of its participants. It is not even necessary for a defendant to know every other member of the conspiracy.

The duration and extent of a defendant's participation has no bearing on the issue of his or her guilt. He or she need not have joined the conspiracy at the outset. The defendant may have joined it for any purpose at any time in its progress, and he or she will be held responsible for all that was done before he or she joined and all that was done during the conspiracy's existence while he or she was a member.

Each member of a conspiracy may perform separate and distinct acts and may perform them at different times. Some conspirators may play major roles, while others play minor roles in the scheme. An equal role or an important role is not what the law requires. In fact, even a single act can be sufficient to make a defendant a participant in an illegal conspiracy.

However, I want to caution you that a person's mere association with a member of the conspiracy does not make that person a member of the conspiracy, even when that association is coupled with knowledge that a conspiracy is taking place. Mere presence at the scene of a crime, even coupled with knowledge that a crime is taking place, is not sufficient to support

33

a conviction. In other words, knowledge without agreement and participation is not sufficient. What is necessary is that Mr. Storm joined in the conspiracy with knowledge of its unlawful purpose, and with an intent to aid in the accomplishment of that purpose.

In sum, the prosecution must prove beyond a reasonable doubt that Mr. Storm — with an understanding of the unlawful character of the conspiracy — knowingly and willfully engaged, advised, or assisted in the conspiracy for the purpose of committing money laundering. He thereby became a knowing and willing participant in the unlawful agreement — that is to say, a conspirator.

### 5.    Count One, Object of the Conspiracy: Money Laundering

Count One charges Mr. Storm with conspiring to violate Title 18, United States Code, Section 1956(a)(1)(B)(i). That statute makes it illegal to participate in a financial transaction that involves the proceeds of a specified unlawful activity — here, (a) computer fraud and abuse and (b) wire fraud — knowing that the transaction involves the proceeds of some form of unlawful activity, and knowing that the transaction was designed to conceal or disguise the nature, location, source, ownership or control of those proceeds. This type of money laundering is known as "concealment" money laundering.

In order to prove the existence of the conspiracy to commit money laundering charged in Count One, the Government must establish beyond a reasonable doubt that Mr. Storm agreed with one or more people:

34

*First*, to conduct a financial transaction that in some way or degree affected interstate or foreign commerce;

*Second*, to conduct the financial transaction with property or funds that involved the proceeds of a specified unlawful activity;

*Third*, to engage in the financial transaction with knowledge that the transaction involved the proceeds of some form of unlawful activity; and

*Fourth*, to engage in the financial transaction knowing that the transaction was designed in whole or in part either to conceal or to disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity.

### a.  Money Laundering Object, First Element: Financial Transaction

The Government must first prove beyond a reasonable doubt that Mr. Storm conspired with one or more people to conduct a financial transaction.

To "conduct" includes initiating, concluding, or participating in initiating or concluding a transaction.

The term "financial transaction" means a transaction that involves the movement of funds by wire or other means and in any way or degree affects interstate or foreign commerce.

The term "funds" includes any currency, money, or other medium of exchange that can be used to pay for goods and services, including digital or cryptocurrency.

35

The term "interstate or foreign commerce" means commerce between any combination of states, territories, or possessions of the United States, or between the United States and a foreign country. In determining whether a defendant is engaged in, or whether his or her activities affected, interstate or foreign commerce, the involvement in interstate or foreign commerce can be minimal. Any involvement at all will satisfy this element. In addition, you do not have to decide whether the effect of a transaction on interstate or foreign commerce was harmful or beneficial to a particular business or to commerce in general. The Government satisfies its burden of proving an effect on interstate or foreign commerce if it proves any effect, whether it was harmful or not.

In addition, it is not necessary for the Government to show that the conspirators actually intended or anticipated an effect on interstate or foreign commerce by their actions or that commerce was actually affected. All that is necessary is that the natural and probable consequences of their acts would affect interstate or foreign commerce.

### b. Money Laundering Object, Second Element: Proceeds of a Specified Unlawful Activity

The Government must next prove beyond a reasonable doubt that Mr. Storm conspired with one or more people to conduct a financial transaction that involved the proceeds of a specified unlawful activity. The term "proceeds" means any property derived, directly or indirectly, from some form of unlawful activity, including the gross receipts of such activity. Proceeds can be any kind

36

of property, not just money. Proceeds can be in the form of funds, which, as I defined for you earlier, includes digital or cryptocurrency.

The term "specified unlawful activity" means any one of a variety of offenses defined by the money laundering statute. In this case, the Government has alleged that the funds in question stemmed from certain cybercrimes, including hacking and Internet fraud schemes, and were the proceeds of computer fraud and abuse and wire fraud. I instruct you as a matter of law that both computer fraud and abuse and wire fraud fall within the definition of a specified unlawful activity. However, it is for you to determine whether the funds at issue here were the proceeds of computer fraud and abuse or wire fraud. The Government must prove that the financial transaction in fact involved the proceeds of one or both of these specified unlawful activities.

If the Government proves that the proceeds of a specified unlawful activity were mixed or commingled in the Tornado Cash pools with other funds that did not derive from criminal activity, and that the mixing or commingling of these funds facilitated the concealment of the criminal proceeds, then any financial transaction involving the Tornado Cash pools while they contained mixed or commingled criminal proceeds is a transaction involving the proceeds of a specified unlawful activity.

37

### *Computer Fraud and Abuse as a Specified Unlawful Activity*

I will now instruct you on the elements of computer fraud and abuse, which is the first specified unlawful activity alleged in Count One. The elements of computer fraud and abuse are:

*First,* that a person knowingly accessed a protected computer without authorization;

*Second,* that the person did so with the intent to defraud; and

*Third,* that in furtherance of the scheme, the person obtained something of value.

The first element of computer fraud and abuse is that the person knowingly accessed a protected computer without authorization. I have defined the term "knowingly" for you previously, and you should use that definition here. "Computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

The computer accessed must be a "protected computer." A protected computer means any computer that is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States. I have previously defined

38

"interstate or foreign commerce," and you should apply that definition here. This definition of "protected computer" includes any computer that is connected to the internet.

"Accessing" a computer includes both obtaining information from a computer and making use of a computer and its capabilities.

A person acts "without authorization" under this element where he *or she* accesses a computer without any right or permission to do so.

The second element of computer fraud and abuse is that the person accessed the protected computer with the intent to defraud. To act with the intent to defraud means to act willfully, a term I have previously defined, and with the intent to deceive, for the purpose of causing some loss of money or property to another.

The third element of computer fraud and abuse is that the person used the computer to further the fraud, and as a result obtained something of value.

I instruct you, however, that if all the person obtained was the use of the computer and that the value of such use is not more than $5,000 in any one-year period, the Government has not proven that the person committed computer fraud and abuse.

### *Wire Fraud as a Specified Unlawful Activity*

I will next instruct you on the elements of wire fraud, which is the second specified unlawful activity alleged in Count One. The elements of wire fraud are as follows:

*First*, that there was a scheme or artifice to defraud or to obtain money or property by materially false or fraudulent pretenses, representations, or promises;

*Second*, that one or more persons knowingly and willfully participated in this scheme or artifice with knowledge of its fraudulent nature and with the specific intent to defraud; and

*Third*, that in the execution of that scheme, the person or persons involved in the scheme used, or caused others to use, interstate or foreign wire communications.

The first element of wire fraud is the existence of a scheme or artifice to defraud others of money or property by means of false or fraudulent pretenses, representations, or promises. A "scheme or artifice to defraud" is any plan, device, or course of action to obtain money or property by means of false or fraudulent pretenses, representations, or promises.

"Fraud" is a general term. It is a term that includes all the possible means by which a person seeks to gain some unfair advantage over another person by intentional misrepresentations, false suggestion, or false pretenses. The unfair advantage sought must involve money or property; that

40

is, the Government must prove that the alleged scheme contemplated depriving another of money or property. Thus, a scheme to defraud is merely a plan to deprive another of money or property by trick, deceit, deception, or swindle. The scheme to defraud here is alleged to have been carried out by making false or fraudulent statements, representations, and promises.

A statement, representation, or promise is false if it was untrue when made and was then known to be untrue by the person making it or causing it to be made. A representation or statement is fraudulent if it was falsely made with the intention to deceive. Deceitful statements or representations of half-truths may also constitute false or fraudulent statements under the statute.

The false representations and pretenses must be material. We use the word "material" to distinguish between the kinds of statements we care about and those that are of no real importance. A material fact is one that reasonably would be expected to be of concern to a reasonable and prudent person relying on the representation or statement in making a statement. That means if you find a particular statement of fact to have been untruthful, before you can find that statement to be material, you must also find that the statement was one that would have mattered to a reasonable person in making such a decision.

It is not necessary, however, for the Government to establish that any particular person actually relied on or actually suffered damages as a

41

consequence of any false statement or omission of any material fact. That is, it is not necessary for the Government to establish that the scheme actually succeeded, that persons realized any gain from the scheme, or that the intended victim suffered any losses. You must concentrate on whether there was such a scheme, not on the consequences of the scheme.

A scheme to defraud need not be shown by direct evidence, but may be established by all the circumstances and facts in the case.

The second element of wire fraud requires the Government to prove that the person or persons involved in the fraud knowingly and willfully devised or participated in the scheme or artifice to defraud with a specific intent to defraud others of money or property. To "devise" a scheme to defraud is to concoct or plan it. To "participate" in a scheme to defraud means to associate oneself with it with a view and intent toward making it succeed. I have previously defined the terms "knowingly," "willfully," and "intent to defraud" earlier in this charge, and you should apply those definitions equally here.

The third element of wire fraud requires the Government to prove the use of interstate or foreign wire communications. Wires include telephones, faxes, e-mail, internet communication, radios, and television. A wire communication also includes a wire transfer of funds between banks in different states. "Interstate" just means that a wire communication passes between two or more states. And "foreign" just means that a wire communication passes between the United States and somewhere outside the

42

United States.  That is, a "foreign" wire communication still has a domestic connection to the United States.

The use of the wire need not itself be fraudulent.  Stated another way, the wire communication need not contain any fraudulent representation, or even any request for money.  It is sufficient if a wire is used to further or assist in carrying out the scheme to defraud.

With regard to the two specified unlawful activities charged in Count One, I instruct you that it is unimportant whether a victim might have discovered the fraud had he or she probed further.  If you find that a scheme or artifice to defraud existed, it is irrelevant whether you believe that a victim was careless, gullible, or even negligent.  Negligence, carelessness, or gullibility on the part of the victims is no defense to a charge of such fraud.

### c. Money Laundering Object, Third Element: Knowledge That the Transaction Involved the Proceeds of Some Unlawful Activity

The third element of the money laundering offense that is the object of the conspiracy charged in Count One is that Mr. Storm knew that the property involved in the financial transaction was the proceeds of some form of unlawful activity.  That is, Mr. Storm must have known that the property involved in the transaction represented proceeds from some form of activity that constitutes a felony under state, federal, or foreign law.

To satisfy this element, the Government does not need to prove that Mr. Storm participated in committing the unlawful activity.  In addition,

43

the Government does not need to prove that Mr. Storm specifically knew that the property involved in the transaction represented the proceeds of computer fraud and abuse, wire fraud, or any other specific offense. The Government only has to prove that Mr. Storm knew that it represented the proceeds of some illegal activity that was a felony. I instruct you as a matter of law that computer fraud and abuse and wire fraud are felonies under federal law.

### d. Money Laundering Object, Fourth Element: Knowledge of the Purpose of the Transaction

Finally, the Government must prove beyond a reasonable doubt the Mr. Storm conspired with one or more people to conduct the financial transaction at issue knowing that the transaction would be designed in whole or in part to either conceal or disguise a specific attribute of the funds, such as their nature, location, source, ownership, or control.

In other words, the purpose — and not merely the effect — of the transaction must be, in whole or in part, to conceal or disguise the proceeds' nature, location, source, ownership, or control. Thus, if Mr. Storm knew that the transaction was designed, at least in part, either to conceal or disguise the true nature, location, source, ownership, or control of the property in question, this element is satisfied. However, if you find that Mr. Storm knew of the transaction, but did not know that it was designed, in whole or in part, to conceal or disguise the true origin of the property in question, then this element has not been satisfied.

Here, too, Mr. Storm need not know which "specified unlawful activity" he was agreeing to help conceal. He need only know that a purpose of the financial transaction was concealing the nature, location, source, ownership, or control of the funds.

### D. Count Two: Conspiracy to Operate an Unlicensed Money Transmitting Business

#### 1. The Statute and the Indictment

Count Two charges Mr. Storm with conspiring to operate an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 371, which makes it unlawful to conspire to violate Title 18, United States Code, Section 1960(a). That latter section reads:

> Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, [commits a crime].

#### 2. The Elements of the Offense

In order to sustain its burden of proof with respect to the conspiracy charged in Count Two, the Government must prove each of the following three elements beyond a reasonable doubt:

*First*, that the charged conspiracy existed — that is, there was an agreement or understanding between two or more people to commit the object of the conspiracy, which, for Count Two, is the operation of an unlicensed money transmitting business;

*Second*, that Mr. Storm knowingly and willfully became a member of the conspiracy with the intent to further its illegal purpose; and

45

*Third*, that any member of the conspiracy knowingly committed at least one overt act in furtherance of the conspiracy.

### 3. Count Two, First and Second Elements: Existence of a Conspiracy and Participation in the Conspiracy

I previously instructed you, in connection with Count One, on the law relevant to determining whether a conspiracy existed and whether a defendant became a member of such a conspiracy.   You should apply those instructions in considering the first two elements of the conspiracy charged in Count Two as well.

### 4. Count Two, Object of the Conspiracy: Operation of an Unlicensed Money Transmitting Business

The object of the conspiracy charged in Count Two is operating an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960.  Thus, in order to prove that Mr. Storm is guilty of the conspiracy offense charged in Count Two, the Government must establish beyond a reasonable doubt that Mr. Storm agreed with one or more people to operate an unlicensed money transmitting business.  I remind you that the Government must prove beyond a reasonable doubt that the conduct on which the conspirators agreed included all of the elements of the substantive crime, even if the substantive crime did not actually occur.

The crime of operating an unlicensed money transmitting business has three elements:

*First*, that an unlicensed money transmitting business existed;

46

*Second*, that Mr. Storm or a co-conspirator controlled, conducted, managed, supervised, directed, or owned all or part of that business with knowledge that it was used as a money transmitting business; and

*Third*, that operation of the money transmitting business affected interstate or foreign commerce.

I will now explain each of these elements.

### a. Unlicensed Money Transmitting Object, First Element: Unlicensed Money Transmitting Business

The first element of the object of the conspiracy charged in Count Two is that the business in question was an unlicensed money transmitting business. The term "money transmitting" includes transferring funds on behalf of the public by any and all means, including but not limited to transfers within the United States or to locations abroad by wire, check, draft, facsimile, or courier.

As I instructed you earlier, the term "funds" includes any currency, money, or other medium of exchange that can be used to pay for goods and services, including digital or cryptocurrency.

A "business" is an enterprise that is carried on for profit or financial gain. Thus, a single isolated transmission of money is not a business under this definition. However, a business need not have a physical storefront, be formally incorporated, or otherwise operate in a conventional manner in order to be a money transmitting business. There is also no requirement

47

under the law that the business exist solely for the purpose of engaging in money transmitting.

The money transmitting business must also be unlicensed.  Under Section 1960, a money transmitting business is "unlicensed" if the business involves the transportation or transmission of funds that are known to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.  The Government has the burden to prove that Mr. Storm knew that the business involved the transportation or transmission of funds that were derived from a criminal offense or intended to be used to promote or support unlawful activity.

### b.    Unlicensed Money Transmitting Object, Second Element: Operation of the Business

The second element of the object of the conspiracy charged in Count Two is that Mr. Storm agreed with others to "operate" such an unlicensed money transmitting business.  In this context, to "operate" an unlicensed money transmitting business means to conduct, control, manage, supervise, direct, or own all or part of an unlicensed money transmitting business.

The Government need not prove that Mr. Storm, in fact, actually operated an unlicensed money transmitting business, only that he knowingly and willfully joined a conspiracy knowing that the object of the conspiracy was to conduct, control, manage, supervise, direct, or own all or part of an unlicensed money transmitting business.

48

### c.    Unlicensed Money Transmitting Object, Third Element: Effect on Commerce

The third and final element of the object of the conspiracy charged in Count Two is that the operation of the unlicensed money transmitting business had some effect on interstate or foreign commerce.  I have previously instructed you on the meaning of interstate or foreign commerce and you should apply that instruction here.

### 5.    Count Two, Third Element: Overt Act

If you conclude that the Government has proven beyond a reasonable doubt that the conspiracy to operate an unlicensed money transmitting business charged in Count Two of the Indictment existed, and that Mr. Storm knowingly and willfully joined the conspiracy with knowledge of its unlawful purpose and in furtherance of its unlawful objective, then you must consider the third element of the conspiracy charged in Count Two: whether the Government has proven beyond a reasonable doubt that at least one of the conspirators committed at least one overt act in furtherance of the conspiracy.

The overt act element is a requirement that the agreement went beyond the mere talking stage, that one or more actual steps was taken in furtherance of the conspiracy's illegal object.  You need not find that each and every member of the conspiracy committed or participated in the overt act, or that Mr. Storm personally did so; it is enough to find that at least one overt act was committed by at least one member of the conspiracy.

49

For the Government to satisfy the overt act requirement, it is not necessary for the Government to prove all of the overt acts alleged in the Indictment or even any of the overt acts contained in the Indictment. Indeed, you may find that overt acts were committed that were not alleged at all in the Indictment. It is sufficient for the Government to show that Mr. Storm or one of his alleged co-conspirators knowingly committed an overt act — whether specifically charged in the Indictment or not — in furtherance of the conspiracy. You also need not be unanimous as to which particular overt act was committed in furtherance of the conspiracy; however, you need to be unanimous that at least one overt act was so committed.

The overt act must have been knowingly done by at least one conspirator in furtherance of some unlawful object of the conspiracy. In considering this element, you should bear in mind that an overt act, standing alone, may be an innocent, lawful act. Frequently, however, an apparently innocent act sheds its harmless character if it is a step in carrying out, promoting, aiding, or assisting the conspiratorial scheme. You are therefore instructed that the overt act does not have to be an act that, in and of itself, is criminal or constitutes an object of the conspiracy.

E.   **Count Three: Conspiracy to Violate the IEEPA**

   1.   **The Statute and the Indictment**

Count Three of the Indictment charges Mr. Storm with conspiring to violate the International Emergency Economic Powers Act, which I have

previously referred to as the IEEPA. This charge is brought under Title 50, United States Code, Section 1705, which prohibits conspiracies to violate the IEEPA.

### 2.    The Elements of the Offense

There are two elements to the conspiracy charged in Count Three.

*First*, the Government must prove beyond a reasonable doubt that the conspiracy charged in Count Three existed; and

*Second*, the Government must prove beyond a reasonable doubt that Mr. Storm knowingly and willfully became a member of the conspiracy with the intent to further its illegal purpose.

I instruct you that, like Count One, and unlike Count Two, there is no requirement that the Government prove that any co-conspirator committed an overt act in furtherance of the conspiracy charged in Count Three.

Once again, I remind you that the Government must prove beyond a reasonable doubt that the conduct on which the conspirators agreed included all of the elements of the substantive crime, even if the substantive crime did not actually occur.

### 3.    Count Three, Elements One and Two: Existence of a Conspiracy and Membership in the Conspiracy

I have previously instructed you, in connection with Count One, on the law relevant to determining whether a conspiracy existed and whether a defendant became a member of such a conspiracy. You should apply those

instructions in considering the first two elements of the conspiracy charged in Count Three as well.

### 4.    Count Three, Object of the Conspiracy: Violation of the IEEPA

As noted, the object of the conspiracy charged in Count Three is to violate the IEEPA.

As charged in the Indictment, the Government must prove beyond a reasonable doubt that Mr. Storm conspired with one or more people to provide, or to cause other U.S. persons to provide, funds, goods, or services to, by, or for the benefit of the Lazarus Group.  "U.S. persons" in this setting includes any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), and any person in the United States.

This object, in turn, has the following elements:

*First,* the violation of any license, order, regulation, or prohibition issued pursuant to the IEEPA;

*Second,* that the violation was committed willfully; and

*Third,* that during the period alleged in the Indictment, Mr. Storm and his co-conspirators had not obtained authorization from the U.S. Government to provide services to the Lazarus Group.

### 5.    Count Three, Object of the Conspiracy: Relevant Regulations and Licensing

The object of the conspiracy charged in Count Three is alleged to have involved a violation of a regulation or prohibition issued pursuant to the IEEPA. I am now going to describe for you the regulations and prohibitions that are relevant in this case, particularly to the first and third elements of the object of the conspiracy.

You have heard a stipulation of facts between the parties that bears on Count Three. I instruct you that at all times relevant to the conspiracy charged in Count Three, regulations issued pursuant to the IEEPA provided certain restrictions on U.S. persons in dealing with persons that the Secretary of the Treasury had determined to be an agency, instrumentality, or controlled entity of the Government of North Korea, in part by placing certain individuals and entities on what is known as a Specially Designated National, or "SDN," list. I further instruct you that at all times relevant to the conspiracy charged in Count Three, the Secretary of the Treasury's Office of Foreign Assets Control, or "OFAC," had designated the Lazarus Group as an agency, instrumentality, or controlled entity of the Government of North Korea and placed it on the SDN list. On April 14, 2022, OFAC publicly announced that it was updating its designation of the Lazarus Group as an SDN to include a cryptocurrency wallet address beginning with the characters 0x098B716 (the "0x098B716 Address"). Finally, the parties have stipulated that, at all times relevant to the conspiracy charged in Count Three, OFAC had not issued a

license to Roman Storm, Roman Ganchenko, Roman Semenov, Alexey Pertsev, Tornado Cash, or Peppersec, that would allow the recipient of the license to engage in transactions that would otherwise be prohibited under the IEEPA.

I further instruct you that, under these regulations, U.S. persons may not provide, or cause others to provide, funds, goods, or services to the Lazarus Group, or to the 0x098B716 Address, without authorization from the U.S. Government.

### F.    Conscious Avoidance

At various points in this charge, I have instructed you that the Government was required to prove beyond a reasonable doubt that Mr. Storm acted "knowingly."  In determining whether he acted knowingly, you may consider whether Mr. Storm deliberately closed his eyes to what otherwise would have been obvious.

For example, if you find that Mr. Storm was aware of a high probability that the object of the particular conspiracy he joined was to commit money laundering (for Count One), or to operate an unlicensed money transmitting business (for Count Two), or to violate the IEEPA (for Count Three), but that he acted with deliberate disregard of that fact, you may find that Mr. Storm acted knowingly.  The law calls this "conscious avoidance." However, if you find that Mr. Storm actually believed that he and his co-conspirators were acting in a lawful manner, he may not be convicted of the particular conspiracy charge you are considering.

A person cannot look at all sorts of things that make it obvious to any reasonable person what is going on and then claim in court that because he or she deliberately avoided learning explicitly what was obvious anyway, he or she did not actually know the incriminating fact.

I want to be very clear about what this means and does not mean. For starters, there is a difference between knowingly participating in the conspiracy and knowing the objects of the conspiracy. "Conscious avoidance," as I have described it, cannot be used as a basis for finding that Mr. Storm knowingly joined the conspiracy. It is logically impossible for a person to join a conspiracy unless he or she knows the fact that the conspiracy exists. However, if you find beyond a reasonable doubt that Mr. Storm chose to participate in a joint undertaking, you may consider whether he deliberately avoided confirming an otherwise obvious fact or facts.

If you find beyond a reasonable doubt that Mr. Storm was aware that there was a high probability that the objective of his alleged co-conspirator(s) was to commit money laundering (when you are considering Count One), *or* to operate an unlicensed money transmitting business (when you are considering Count Two), or to violate the IEEPA (when you are considering Count Three), but that he deliberately avoided confirming this fact, you may treat this deliberate avoidance of positive knowledge as the equivalent of knowledge of the object of the charged conspiracy, unless you find that Mr.

55

Storm actually believed that he and his co-conspirator(s) were acting in a lawful manner.

Again, the last point is important. The necessary knowledge on the part of Mr. Storm regarding the object of the conspiracy cannot be established by showing that he was merely careless or negligent or stupid or foolish, or that he should have known what was going on. If Mr. Storm actually believed that what the Government has charged as a conspiracy was something else entirely — or if he was merely foolish, careless, or even reckless about the risk that he was wrong — then you cannot find him guilty. Conscious avoidance can only be established where a defendant deliberately decided not to confirm a key fact, when it was obvious or highly probable that the fact was true. One may not willfully and intentionally remain ignorant of important facts in order to escape the consequences of the criminal laws.

If you find that Mr. Storm was aware of a high probability that the object of his conduct and that of his co-conspirator(s) was to violate a federal law, and that he acted with deliberate disregard of these facts, then you may find that he acted knowingly. However, if you find that Mr. Storm actually believed that the object of his conduct and that of his co-conspirator(s) was lawful, then he may not be convicted. It is entirely up to you whether you find that Mr. Storm deliberately closed his eyes based on any inferences to be drawn from the evidence.

56

### G.    **Good Faith**

Conversely, because the Government must prove that Mr. Storm acted "willfully" in order to establish his guilt of each count of the Indictment, his good faith is a complete defense to each count. "Good faith" means having a state of mind that is honest and absent of criminal intent. I say it is a "defense," but I want to make it clear that a defendant has no burden of establishing his or her good faith. The burden remains on the Government to prove beyond a reasonable doubt that a defendant acted willfully and, consequently, that he or she lacked good faith.

A person who acts or causes another person to act based on a belief that the intended action complies with the law cannot be punished under the statutes relevant to this case merely because that belief turns out to be inaccurate, incorrect, or wrong. If a defendant believed in good faith that he or she was acting lawfully, even if he or she was mistaken in that belief, and even if others were harmed by his or her conduct, there has been no crime. Again, the burden of proving good faith does not rest with Mr. Storm because he does not have an obligation to prove anything in this case.

Whether a person acted in good faith, like whether he acted knowingly or willfully, is a question of fact for you to determine like any other question of fact.

**H.**     **Defense Theory of the Case**

Mr. Storm has pleaded not guilty to all three charges.  Mr. Storm contends that he did not agree with anyone to violate the law.  Instead, Mr. Storm contends that he agreed with the Peppersec cofounders to develop privacy software for lawful purposes, and that he never willfully engaged in a conspiracy with anyone with the goal of furthering money laundering, operating an unlicensed money transmitting business, or evading international sanctions.

**I.**     **Venue**

In addition to all of the elements I have just described, you must consider the issue of venue, namely, whether any act in furtherance of the charged offenses occurred within the Southern District of New York.  The Southern District of New York includes Manhattan, the Bronx, and Westchester, Rockland, Putnam, Sullivan, and Dutchess Counties.

Venue must be examined separately for each count in the Indictment.  Venue on one count does not establish venue on another count, although, if applicable, you may rely on the same evidence to establish venue on multiple counts.

With respect to the conspiracy offenses charged in Counts One through Three, it is sufficient to establish venue if the Government proves that any act in furtherance of the charged conspiracy you are considering occurred in the Southern District of New York, and that it was reasonably foreseeable to

Mr. Storm that the act would occur in this District.  The act in furtherance of the charged conspiracy need not be taken by Mr. Storm or a co-conspirator, so long as the act was caused by the conduct of Mr. Storm or a co-conspirator.

I should note that on this issue — and this issue alone — the Government's burden is not proof beyond a reasonable doubt, but only proof by a preponderance of the evidence.  A preponderance of the evidence means the greater weight of the evidence.  To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true.  If you find that the Government has failed to prove venue by a preponderance of the evidence as to any count, you must return a verdict of not guilty as to that count.

### J.     **Variance in Dates**

For each count in the Indictment, various date ranges are alleged. Specifically, the Indictment alleges that the conspiracy charged in Count One existed between in or about September 2020 and in or about August 2022; that the conspiracy charged in Count Two existed between in or about February 2022 and in or about August 2022; and that the conspiracy charged in Count Three existed between in or about April 2022 and in or about August 2022.  It is not essential that the Government prove that the conspiracies alleged started and ended within the specific time periods identified in the Indictment. However, you must find, with regard to each count, that a conspiracy was

formed and that it existed for some time within the relevant periods set forth in the Indictment.

This is also a good opportunity to instruct you that it does not matter if a specific event or transaction is alleged to have occurred on or about a certain date, and the evidence indicates that in fact it occurred on another date. The law only requires a substantial similarity between the dates alleged in the Indictment and the dates established by the evidence at trial.

### K.    **Particular Investigative Techniques Not Required**

You have heard references to certain investigative techniques that were used or not used by the law enforcement authorities in this case. There is no legal requirement that the Government prove its case through any particular means. While you are to consider carefully the evidence presented by the Government, you need not speculate as to why certain techniques were used or why others were not used.

Your concern is to determine whether, based on the evidence or lack of evidence, the Government has proven the guilt of Mr. Storm of a particular charge in the Indictment beyond a reasonable doubt.

## IV.    **DELIBERATIONS OF THE JURY**

### A.    **Right to Hear Testimony; Communications with the Court**

You are about to go into the jury room and begin your deliberations. Lists of the witnesses who testified at trial and of the exhibits introduced into evidence will be sent to you in the jury room, along with hard

copies of the Indictment and electronic copies of all of the exhibits that have been admitted. In addition, you may take with you your copy of these instructions on the law.

If you want any of the testimony read to you, or given to you in hard copy, that can be done. But please remember that it is not always easy to locate what you might want, so be as specific as you possibly can in requesting portions of testimony.

Your requests for testimony — in fact, any communications with the Court — should be made to me in writing, signed by your foreperson, and given to one of the Marshals. I will respond to any questions or requests you have as promptly as possible, either in writing or by having you return to the courtroom so that I can speak with you in person. In any communication, please do not tell me or anyone else how the jury stands on the issue of Mr. Storm's guilt until after a unanimous verdict is reached.

**B.** **Foreperson**

Juror Number One, Mr. Lopez, will be the foreperson of the jury unless for any reason he prefers not to act in that capacity. In that event, your first order of business will be to send me a note, signed and dated, identifying the new foreperson. The foreperson will send out any notes, and when the jury has reached a verdict, he or she will notify the Marshal that the jury has reached a verdict, and when you come into open court, the foreperson will be asked to state what the verdict is. Again, notes should be signed and should

61

include the date and time they were sent. They should also be as clear and precise as possible. Any notes from the jury will become part of the record in this case, so please be as clear and specific as you can be in any notes you send.

### C.    <u>**Note-Taking**</u>

Some of you have taken notes during parts of the trial. Please recall my earlier instruction regarding note-taking. Notes can be useful to focus a note-taker's attention, and may aid the recollection of the note-taker. Note-taking may, however, distract a note-taker from hearing or seeing other important evidence. Notes should be used solely to refresh the note-taker's recollection of the testimony, and they are not a substitute for the transcript of the testimony, which has been taken down verbatim by the court reporters. Just because one juror has taken notes does not mean the notes are any more accurate than any other juror's recollection. And please remember that if notes were taken during the lawyers' arguments, the lawyers' arguments are not evidence.

### D.    <u>**Verdict Form and Return of Verdict**</u>

We have prepared a verdict form for you to use in recording your decision. After you have reached a verdict, the foreperson should fill in the verdict sheet and note the date and time. Each of you should then sign the verdict sheet. The foreperson should then give a note to the Marshal outside your door stating simply that you have reached a verdict. <u>Do</u> <u>not</u> specify what

the verdict is in your note, and do not give the verdict sheet to the Marshal.
Instead, the foreperson should retain the verdict sheet, and hand it to us in
open court when you are all called in.

I will stress again that each of you must be in agreement with the
verdict that is announced in court.  Once your verdict is announced by your
foreperson in open court and officially recorded, it cannot ordinarily be
revoked.

### E.    **Closing Comments**

The most important part of this case, members of the jury, is the
part that you as jurors are now about to play as you deliberate on the issues of
fact.  It is for you, and you alone, to decide whether the Government has
proven beyond a reasonable doubt each of the essential elements of each crime
with which Mr. Storm is charged.  If the Government has succeeded, it is your
duty to find Mr. Storm guilty of that charge; if the Government has failed, it is
your duty to find Mr. Storm not guilty of that charge.

I know that you will try the issues that have been presented to you
according to the oath that you have taken as jurors.  In that oath, you
promised that you would well and truly try the issues joined in this case and a
true verdict render.  Your function is to weigh the evidence, or the lack of
evidence, in the case and determine whether Mr. Storm is guilty or not guilty of
each charge in the Indictment solely upon the basis of such evidence.

As you deliberate, please listen to the opinions of your fellow jurors, and ask for an opportunity to express your own views. Every juror should be heard. No one juror should hold center stage in the jury room and no one juror should control or monopolize the deliberations. If, after listening to your fellow jurors and if, after stating your own view, you become convinced that your view is wrong, do not hesitate because of stubbornness or pride to change your view. On the other hand, do not surrender your honest convictions and beliefs solely because of the opinions of your fellow jurors or because you are outnumbered. Your final vote must reflect your conscientious belief as to how the issues should be decided.

Your verdict must be unanimous. If at any time you are not in agreement, you are instructed that you are not to reveal the standing of the jurors — that is, the split of the vote — to anyone, including the Court, at any time during your deliberations. Finally, I say this not because I think it is necessary, but because it is the custom in this courthouse to say this: You should treat each other with courtesy and respect during your deliberations.

All litigants stand equal in this room. All litigants stand equal before the bar of justice. All litigants stand equal before you. Your duty is to decide the issues before you fairly and impartially, and to see that justice is done.

Before you retire into the jury room, I must excuse our alternate jurors with the thanks of the Court. You have been very attentive and very

patient. I'm sorry that you will miss the experience of deliberating with the jury, but the law provides for a jury of 12 persons in this case. So before the rest of the jury retires into the jury room, if you have any clothing or items there, you are asked to pick them up and to withdraw before any deliberations start. For the next few days, please refrain from discussing the case with anyone or conducting any research on anything you have heard about at this trial. In the event that one of the jurors is unable to complete the deliberation process, you may be called back.

Members of the jury, I ask your patience for a few moments longer. It is necessary for me to spend a few moments with counsel and the reporter at the side bar. I will ask you to remain patiently in the jury box, without speaking to each other, and we will return in just a moment to submit the case to you. Thank you.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **INDICTMENT** |
| v. | S1 23 Cr. 430 |
| ROMAN STORM, | |
| Defendant. | |

**COUNT ONE**
**(Conspiracy to Commit Money Laundering)**

The Grand Jury charges:

1.      From at least in or about September 2020 up to and including on or about August 8, 2022, in the Southern District of New York, and elsewhere, ROMAN STORM, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Sections 1956(a)(1)(B)(i).

2.      It was a part and an object of the conspiracy that ROMAN STORM, the defendant, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which transaction affected interstate and foreign commerce and involved the movement of funds by wire and other means, and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, (i) computer fraud and abuse, in violation of Title 18, United States Code, Section 1030, and (ii) wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the

transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## COUNT TWO
### (Conspiracy to Operate an Unlicensed Money Transmitting Business)

The Grand Jury further charges:

3.      From at least in or about February 2022, up to and including on or about August 8, 2022, in the Southern District of New York and elsewhere, ROMAN STORM, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, operation of an unlicensed money transmitting business, in violation of Title 18, United States Code, Section (b)(1)(C).

4.      It was a part and an object of the conspiracy that ROMAN STORM, the defendant, and others known and unknown, would and did knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business, which affected interstate and foreign commerce, and involved the transportation and transmission of funds that were known to the defendant to have been derived from a criminal offense and to be intended to be used to promote and support unlawful activity, to wit, STORM conducted, controlled, managed, supervised, directed, and owned all or part of the Tornado Cash service, a business that transferred funds on behalf of the public, knowing that the business involved the transportation and transmission of funds that were derived from a criminal offense and were intended to be used to promote and support unlawful activity.

2

<u>Overt Act</u>

5.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere: Between in or about February 2022 and May 2022, ROMAN STORM, the defendant, using an account he and his co-conspirators controlled at a financial services company located in the Southern District of New York, on multiple occasions paid two companies for facilitating traffic between the Tornado Cash service and the Ethereum blockchain.

(Title 18, United States Code, Section 371.)

**<u>COUNT THREE</u>**
**(Conspiracy to Violate the International Emergency Economic Powers Act)**

The Grand Jury further charges:

6.     From at least on or about April 14, 2022, up to and including on or about August 8, 2022, in the Southern District of New York, and elsewhere, ROMAN STORM, the defendant, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to violate orders, regulations, and prohibitions in and issued under the International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701 et seq., Executive Order 13722, and 31 C.F.R. § 510.201.

7.     It was a part and an object of the conspiracy that ROMAN STORM, the defendant, and others known and unknown, would and did knowingly and willfully provide, and cause others to provide, funds, goods, and services to, by, and for the benefit of the Lazarus Group, a sanctioned entity, to wit, transfers, payments, money transmitting services, and money laundering of funds in

the 0x098B716 Address, which constituted blocked property and interests in property of the Lazarus Group, without first obtaining the required approval of OFAC, in violation of 50 U.S.C. § 1705(a), Executive Order 13722, and 31 C.F.R. §§ 510.201.

(Title 50, United States Code, Section 1705; Executive Order 13722; 31 C.F.R. § 510.201.)

Court Exhibit 3

| Government Witnesses |
|:---:|
| Hanfeng Lin |
| Joe Evans |
| Andy Ho |
| Justin Bram |
| Andre Llacuna |
| Jocelyn Reyes |
| Jeremy Henry |
| Emiline Stewart |
| Peter Dickerman |
| Joel DeCapua |
| E.G. Galano |
| Ben Gibbs |
| Shakeeb Ahmed |
| Austin Dever |
| Kurush Dubash |
| William Lopez |
| Philip Werlau |
| Moz Mirbaba |
| Stephan George |
| Conor O'Sullivan |
| Angelica Cotto |

| Defense Witnesses |
|:---:|
| Preston Van Loon |
| Matt Edman |
| Tyler Almeida |
| David Wuollet |
| Omid Malekan |
| Stephanie Hurder |
| Matthew Green |
| Mariah Mizbani |

Court Exhibit 4

| GX |
|----|
| 0 |
| 1 |
| 2 |
| 3 |
| 4 |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 200 |
| 208 |
| 209-21 |
| 209-22 |
| 209-46 |
| 209-49 |
| 209-53 |
| 209-54 |
| 209-55 |
| 209-58 |
| 209-59 |
| 209-61 |
| 209-62 |
| 231 |

| |
|---|
| 233 |
| 234 |
| 235 |
| 237 |
| 238 |
| 239 |
| 243 |
| 245 |
| 246 |
| 247 |
| 248 |
| 249 |
| 251 |
| 253 |
| 256 |
| 261 |
| 275 |
| 279 |
| 321 |
| 400 |
| 402 |
| 403 |
| 413 |
| 414 |
| 415 |

| |
|---|
| 416 |
| 417 |
| 418 |
| 419 |
| 420 |
| 421 |
| 422 |
| 423 |
| 424 |
| 425 |
| 426 |
| 427 |
| 428 |
| 429 |
| 430 |
| 431 |
| 432 |
| 433 |
| 434 |
| 435 |
| 436 |
| 437 |
| 438 |
| 440 |
| 441 |

| |
|---|
| 442 |
| 500 |
| 553 |
| 556 |
| 562 |
| 600 |
| 602 |
| 650 |
| 652 |
| 654 |
| 655 |
| 659 |
| 660 |
| 665 |
| 667 |
| 669 |
| 670 |
| 671 |
| 700 |
| 703 |
| 720 |
| 722 |
| 750 |
| 752 |
| 800 |

| |
|---|
| 802 |
| 803 |
| 803-1 |
| 803-2 |
| 810 |
| 813 |
| 814 |
| 815 |
| 816 |
| 817 |
| 818 |
| 819 |
| 821 |
| 823 |
| 825 |
| 827 |
| 829 |
| 831 |
| 833 |
| 835 |
| 837 |
| 839 |
| 841 |
| 843 |
| 845 |

| |
|---|
| 847 |
| 849 |
| 851 |
| 852 |
| 853 |
| 854 |
| 855 |
| 856 |
| 858 |
| 860 |
| 862 |
| 867 |
| 900 |
| 902-A |
| 902-B |
| 902-C |
| 902-D |
| 902-E |
| 902-F |
| 902-G |
| 902-H |
| 902-I |
| 902-J |
| 902-K |
| 902-L |

| |
|---|
| 903 |
| 910 |
| 912 |
| 913 |
| 914 |
| 916 |
| 917 |
| 918 |
| 919 |
| 923 |
| 924 |
| 950 |
| 950 |
| 951 |
| 1000 |
| 1001 |
| 1005 |
| 1006 |
| 1008 |
| 1009 |
| 1011 |
| 1100 |
| 1103 |
| 1104 |
| 1105 |

| |
|---|
| 1106 |
| 1150 |
| 1152 |
| 1200 |
| 1213 |
| 1276 |
| 1281 |
| 1300 |
| 1303 |
| 1304 |
| 1309 |
| 1345 |
| 1346 |
| 1347 |
| 1348 |
| 1350 |
| 1367 |
| 1368 |
| 1369 |
| 1372 |
| 1376 |
| 1500 |
| 1501 |
| 1502 |
| 1503 |

| |
|---|
| 1505 |
| 1514 |
| 1516 |
| 1517 |
| 1520 |
| 1522 |
| 1523 |
| 1600 |
| 1608 |
| 1700 |
| 1701 |
| 1701-T |
| 1702 |
| 1702-T |
| 1703 |
| 1703-T |
| 1704 |
| 1704-T |
| 1705 |
| 1705-T |
| 1706 |
| 1706-T |
| 1707 |
| 1707-T |
| 1708 |

| |
|---|
| 1708-T |
| 1710 |
| 1710-T |
| 1712 |
| 1713 |
| 1715 |
| 1717 |
| 1718 |
| 1900 |
| 1901 |
| 1904 |
| 1915 |
| 1916 |
| 1931 |
| 1936 |
| 1936-A |
| 1979 |
| 2000 |
| 2001 |
| 2001-T |
| 2003 |
| 2003-T |
| 2004 |
| 2004-T |
| 2006 |

| |
|---|
| 2006-T |
| 2007 |
| 2007-1 |
| 2007-T |
| 2008 |
| 2008-T |
| 2010 |
| 2010-T |
| 2014 |
| 2014-T |
| 2015 |
| 2015-1 |
| 2015-1-T |
| 2015-T |
| 2016 |
| 2016-1 |
| 2016-1-T |
| 2016-T |
| 2017 |
| 2017-T |
| 2031 |
| 2031-T |
| 2032 |
| 2032-T |
| 2033 |

| |
|---|
| 2033-T |
| 2034 |
| 2034-T |
| 2036 |
| 2036-T |
| 2037 |
| 2037-T |
| 2038 |
| 2038-T |
| 2039 |
| 2039-T |
| 2040 |
| 2040-T |
| 2041 |
| 2041-T |
| 2043 |
| 2043-T |
| 2044 |
| 2044-2 |
| 2044-T |
| 2047 |
| 2047-1 |
| 2047-4 |
| 2047-T |
| 2048 |

| |
|---|
| 2048-1 |
| 2048-T |
| 2049 |
| 2049-T |
| 2050 |
| 2050-T |
| 2052 |
| 2052-T |
| 2053 |
| 2053-T |
| 2055 |
| 2055-T |
| 2058 |
| 2058-T |
| 2059 |
| 2059-1 |
| 2059-1-T |
| 2059-2 |
| 2059-2-T |
| 2059-T |
| 2060 |
| 2060-T |
| 2061 |
| 2061-T |
| 2062 |

| |
|---|
| 2062-T |
| 2063 |
| 2063-T |
| 2064 |
| 2064-T |
| 2067 |
| 2067-T |
| 2069 |
| 2069-T |
| 2070 |
| 2101 |
| 2101-T |
| 2120 |
| 2120-T |
| 2121 |
| 2121-T |
| 2122 |
| 2122-T |
| 2124 |
| 2124-T |
| 2127 |
| 2127-T |
| 2129 |
| 2129-T |
| 2130 |

| |
|---|
| 2130-T |
| 2135 |
| 2135-T |
| 2210 |
| 2211 |
| 2245 |
| 2247 |
| 2261 |
| 2261-T |
| 2262 |
| 2262-T |
| 2295 |
| 2295-T |
| 2300 |
| 2300-A |
| 2301 |
| 2311 |
| 2311-1 |
| 2320 |
| 2500 |
| 2512 |
| 2513 |
| 2514 |
| 2516 |
| 2518 |

| |
|---|
| 2519 |
| 2521 |
| 2526 |
| 2550 |
| 2551 |
| 2552 |
| 3000 |
| 3001 |
| 3002-1 |
| 3002-2 |
| 3002-3 |
| 3002-4 |
| 3002-5 |
| 3002-6 |
| 3002-7 |
| 3002-8 |
| 3002-9 |
| 3002-10 |
| 3002-11 |
| 3002-12 |
| 3002-13 |
| 3002-14 |
| 3002-16 |
| 3002-17 |
| 3002-18 |

| |
|---|
| 3002-19 |
| 3002-20 |
| 3002-21 |
| 3002-22 |
| 3002-23 |
| 3002-24 |
| 3002-25 |
| 3002-26 |
| 3002-27 |
| 3002-28 |
| 3002-29 |
| 3002-30 |
| 3002-32 |
| 3002-33 |
| 3002-34 |
| 3002-35 |
| 3002-36 |
| 3002-37 |
| 3002-38 |
| 3002-39 |
| 3002-40 |
| 3002-41 |
| 3002-42 |
| 3002-43 |
| 3002-44 |

| |
|---|
| 3002-45 |
| 3002-48 |
| 3002-49 |
| 3002-50 |
| 3002-51 |
| 3002-52 |
| 3002-53 |
| 3002-54 |
| 3002-55 |
| 3002-56 |
| 3002-57 |
| 3002-58 |
| 3002-59 |
| 3002-60 |
| 3002-61 |
| 3003-B-B |
| 3003-C-B |
| 3003-G-B |
| 3003-M-B |
| 3005-6 |
| 3005-18 |
| 3005-28 |
| 3006-2 |
| 3007 |
| 3008 |

| |
|---|
| 3009 |
| 3100 |
| 3101 |
| 3102 |
| 3103 |
| 3104 |
| 3105 |
| 3106 |
| 3107 |
| 3108 |
| 3109 |
| 3110 |
| 3111 |
| 3112 |
| 3113 |
| 3114 |
| 3115 |
| 3116 |
| 3117 |
| 3118 |
| 3119 |
| 3120 |
| 3121 |
| 3122 |
| 3123 |

| |
|---|
| 3124 |
| 3200 |
| 3202 |
| 3400 |
| 3402 |
| 3500 |
| 3509-009 |
| 3600 |
| 3601-1 |
| 3601-2 |
| 3601-3 |
| 3601-4 |
| 3601-5 |
| 3602 |
| 3603 |
| PX [Physical Exhibit Placeholders] |
| PX-1-A |
| PX-1-B |
| PX-1-C |
| PX-3 |
| PX-4 |

| PX-5 |
|------|
| S |
| S-2 |
| S-3 |
| S-4 |
| S-5 |
| S-6 |
| 4000 |
| 4027 |

Court Exhibit 5

| DX |
|---|
| 3535-002 |
| 6001 |
| 8701 |
| 8785-36 |
| 8786 |
| 8788 |
| 8790 |
| 8791 |
| 8852 |
| 8852-A |
| 9050-13 |
| 9050-17 |
| 9050-18 |
| 9050-19 |
| 9050-20 |
| 9050-21 |
| 9050-22 |
| 9050-24 |
| 9051 |
| 9052 |
| 9053 |
| 9851 |
| S-10 |
| S-9 |
| S-7 |
| S-8 |

# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK
### 40 FOLEY SQUARE
### NEW YORK, NEW YORK 10007

**KATHERINE POLK FAILLA**
**DISTRICT JUDGE**

# JURY NOTE

We will retire for tonight
& will resume tomorrow @ 9AM

DATE: _7·30·25_

TIME: _5¹⁷ pm_

_____
FOREPERSON'S SIGNATURE

*Court Exhibit 1*

# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK
### 40 FOLEY SQUARE
### NEW YORK, NEW YORK 10007

**KATHERINE POLK FAILLA**
**DISTRICT JUDGE**

# JURY NOTE

Did the gov't had to
submit proof of the
charges in order to
get the indictment?
(For Venue)

DATE: 7/31/25

TIME: 926 A

_____
FOREPERSON'S SIGNATURE

1/25/2025
9:50 am

Good morning, Members of the Jury —

As I instructed you at page 23 of the Charge, the Indictment is a charge or accusation; it is not evidence. You are not to consider what the Government did, or did not, submit in order to obtain the Indictment. You are to decide the issues in this case, including the issue of venue, based solely on the evidence admitted at this trial and on my instructions on the law.

Kather Pull Faile

Court Exhibit 8

Court Exhibit 9

# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK
### 40 FOLEY SQUARE
### NEW YORK, NEW YORK 10007

**KATHERINE POLK FAILLA**
**DISTRICT JUDGE**

# JURY NOTE

Is there a table of
contents or a way to
see everything that happened
on a specific date of
the trial?

are we able to get transcripts of
specific witnesses?

DATE: 7/31/25

TIME: 10:54

FOREPERSON'S SIGNATURE

7/31/2025
11:32 pm
Ct Ex 10

Members of the Jury -

In response to your note, I am enclosing
pages from the trial transcript that show the
particular day of trial, the witnesses who testified
on that day, and the exhibits that were introduced
on that day. You can request portions of the testimony of specific
witnesses, but as I instructed you, please be as specific as you can in
requesting testimony.

K Failla

```
P7F1STO1
```

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                        23 Cr. 430 (KPF)

5   ROMAN STORM,

6               Defendant.               Jury Trial
    ------------------------------x

7
                                         New York, N.Y.
8                                        July 15, 2025
                                         2:11 p.m.
9

10  Before:

11                  HON. KATHERINE POLK FAILLA,

12                                       District Judge

13                          APPEARANCES

14
    JAY CLAYTON
15      United States Attorney for the
        Southern District of New York
16  BY:  NATHAN M. REHN, ESQ.
         BEN ARAD, ESQ.
17       BENJAMIN A. GIANFORTI, ESQ.
         KEVIN G. MOSLEY, ESQ.
18       TARA M. LA MORTE, ESQ.
         Assistant United States Attorneys
19
    WAYMAKER LLP
20      Attorneys for Defendant
    BY:  BRIAN E. KLEIN, ESQ.
21       KERI CURTIS AXEL, ESQ.
         KEVIN M. CASEY, ESQ.
22       VIVIANA ANDAZOLA MARQUEZ, ESQ.

23       -and-

24  HECKER FINK LLP
        Attorneys for Defendant
25  BY:  DAVID E. PATTON, ESQ.
         CHRISTOPHER MOREL, ESQ.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   HENFENG LIN

 4   Direct By Mr. Rehn . . . . . . . . . . . . .81

 5                    GOVERNMENT EXHIBITS

 6   Exhibit No.                         Received

 7    1701 through 1708, 1710, 1701-T through . . . .84

 8           1708-T and 1710-T

 9    1712   . . . . . . . . . . . . . . . .93

10    1713   . . . . . . . . . . . . . . . 102

11    1715   . . . . . . . . . . . . . . . 100

12    1717   . . . . . . . . . . . . . . . .98

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P7G1STO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                         23 Cr. 430 (KPF)

ROMAN STORM,

               Defendant.          Jury Trial
------------------------------x

                            New York, N.Y.
                            July 16, 2025
                            9:06 a.m.

Before:

                HON. KATHERINE POLK FAILLA,

                            District Judge

                   APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  NATHAN M. REHN, ESQ.
    BEN ARAD, ESQ.
    BENJAMIN A. GIANFORTI, ESQ.
    KEVIN G. MOSLEY, ESQ.
    TARA M. LA MORTE, ESQ.
    Assistant United States Attorneys

WAYMAKER LLP
    Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
    KERI CURTIS AXEL, ESQ.
    KEVIN M. CASEY, ESQ.
    VIVIANA ANDAZOLA MARQUEZ, ESQ.

    -and-

HECKER FINK LLP
    Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
    CHRISTOPHER MOREL, ESQ.

```
 1                      INDEX OF EXAMINATION

 2     Examination of:                            Page

 3      HANFENG LIN

 4     Direct By Mr. Rehn . . . . . . . . . . . 117

 5     Cross By Mr. Patton  . . . . . . . . . . 131

 6      JOSEPH B. EVANS

 7     Direct By Mr. Arad . . . . . . . . . . . 134

 8     Cross By Mr. Klein . . . . . . . . . . . 160

 9     Redirect By Mr. Arad . . . . . . . . . . 166

10     Recross By Mr. Klein . . . . . . . . . . 167

11      SYVIET ANH HO

12     Direct By Mr. Mosley . . . . . . . . . . 168

13     Cross By Ms. Axel  . . . . . . . . . . . 184

14      JUSTIN BRAM

15     Direct By Mr. Rehn . . . . . . . . . . . 202

16     Cross By Mr. Klein . . . . . . . . . . . 266

17     Redirect By Mr. Rehn . . . . . . . . . . 282

18     ANDRE MARCUS QUIDDAOEN LLACUNA

19     Direct By Mr. Rehn . . . . . . . . . . . 285

20     Cross By Mr. Patton  . . . . . . . . . . 331

21      JOCELYN REYES

22     Direct By Mr. Gianforti  . . . . . . . . 339

23

24

25
```

```
 1                      GOVERNMENT EXHIBITS

 2     Exhibit No.                              Received

 3     253    . . . . . . . . . . . . . . 129

 4     950    . . . . . . . . . . . . . . 172

 5     951    . . . . . . . . . . . . . . 181

 6     1001   . . . . . . . . . . . . . . 143

 7     1005   . . . . . . . . . . . . . . 138

 8     1006   . . . . . . . . . . . . . . 148

 9     1008   . . . . . . . . . . . . . . 152

10     1009   . . . . . . . . . . . . . . 136

11     1011   . . . . . . . . . . . . . . 146

12     1501   . . . . . . . . . . . . . . 233

13     1502   . . . . . . . . . . . . . . 211

14     1503   . . . . . . . . . . . . . . 240

15     1505   . . . . . . . . . . . . . . 243

16     1514   . . . . . . . . . . . . . . 247

17     1516   . . . . . . . . . . . . . . 252

18     1517   . . . . . . . . . . . . . . 255

19     1520   . . . . . . . . . . . . . . 258

20     1522   . . . . . . . . . . . . . . 217

21     1523   . . . . . . . . . . . . . . 209

22     1718   . . . . . . . . . . . . . . 118

23     1901   . . . . . . . . . . . . . . 218

24     1904   . . . . . . . . . . . . . . 232

25     1931   . . . . . . . . . . . . . . 215
```

| | | |
|---|---|---|
| 1 | 1979 | . . . . . . . . . . . . . . . . . . . 320 |
| 2 | 2070 | . . . . . . . . . . . . . . . . . . . 150 |
| 3 | 2512 | . . . . . . . . . . . . . . . . . . . 318 |
| 4 | 2513 | . . . . . . . . . . . . . . . . . . . 322 |
| 5 | 2514 | . . . . . . . . . . . . . . . . . . . 311 |
| 6 | 2516 | . . . . . . . . . . . . . . . . . . . 294 |
| 7 | 2518 | . . . . . . . . . . . . . . . . . . . 297 |
| 8 | 2519 | . . . . . . . . . . . . . . . . . . . 316 |
| 9 | 2521 | . . . . . . . . . . . . . . . . . . . 327 |
| 10 | 2526 | . . . . . . . . . . . . . . . . . . . 304 |
| 11 | 3509-009 | . . . . . . . . . . . . . . . . . 288 |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

P7H5sto1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        23 Cr. 430 (KPF)

5    ROMAN STORM,

6              Defendant.               Jury Trial
     ------------------------------x

7
                                        New York, N.Y.
8                                       July 17, 2025
                                        9:03 a.m.
9

10   Before:

11                 HON. KATHERINE POLK FAILLA,

12                                      District Judge

13
                         APPEARANCES
14
     JAY CLAYTON
15        United States Attorney for the
          Southern District of New York
16   BY:  NATHAN M. REHN, ESQ.
          BEN ARAD, ESQ.
17        BENJAMIN A. GIANFORTI, ESQ.
          KEVIN G. MOSLEY, ESQ.
18        TARA M. LA MORTE, ESQ.
          Assistant United States Attorneys
19
     WAYMAKER LLP
20        Attorneys for Defendant
     BY:  BRIAN E. KLEIN, ESQ.
21        KERI CURTIS AXEL, ESQ.
          KEVIN M. CASEY, ESQ.
22        VIVIANA ANDAZOLA MARQUEZ, ESQ.

23        -and-

24   HECKER FINK LLP
          Attorneys for Defendant
25   BY:  DAVID E. PATTON, ESQ.
          CHRISTOPHER MOREL, ESQ.

```
                      INDEX OF EXAMINATION

Examination of:                              Page

JOCELYN REYES

Direct By Mr. Gianforti  . . . . . . . . . . 361

Cross By Ms. Axel  . . . . . . . . . . . . . 378

Redirect By Mr. Gianforti  . . . . . . . . . 407

  JEREMY HENRY

Direct By Mr. Gianforti  . . . . . . . . . . 409

  EMILINE STEWART

Direct By Mr. Arad . . . . . . . . . . . . . 419

Cross By Mr. Patton  . . . . . . . . . . . . 434

PETER DICKERMAN

Direct By Mr. Arad . . . . . . . . . . . . . 439

Cross By Mr. Klein . . . . . . . . . . . . . 467

  JOEL DeCAPUA

Direct By Mr. Rehn . . . . . . . . . . . . . 475
```

```
 1                      GOVERNMENT EXHIBITS

 2    Exhibit No.                              Received

 3     902A, 902B, 902C, 902D, 902E, 902F, . . . . . 359

 4             902G, 902H, 902I, 902J, 902K,

 5             902L, 903, 910, 912, 913, 914,

 6             916, 918, 919, 923, 924, 3101,

 7             3102, 3103, 3104, 3105, 3106,

 8             3107, 3108, 3109, 3110, 3111,

 9             3112, 3113, 3114, 3115, 3116,

10             3117, 3118, 3119, 3120, 3121,

11             3122, 3123, 3124

12    1103, 1104, 1105, 1106 . . . . . . . . . . 359

13    PX 1A, PX 1B, PX 1C  . . . . . . . . . . . 418

14    S2, 402, 403, 413, 414, 415, 416, 417,  . . . 438

15             418, 419, 420, 421, 422, 423,

16             424, 425, 426, 427, 428, 429,

17             430, 431, 432, 433, 434, 435,

18             436, 437, 438, 440, 441, 442

19    PX 5, GX 2301  . . . . . . . . . . . . . 467

20    S4 and 3003-G-B  . . . . . . . . . . . . 489

21    2001, 2001-T, S5 . . . . . . . . . . . . 530

22    2007 and 2007-T  . . . . . . . . . . . . 550

23    3002-3, 3002-4, 3002-5, 3002-6, 3002-7, . . . 557

24             3002-8, 3002-9, 3002-10,

25             3002-11, 3002-12, 3002-13
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1   3002-18, 3002-19, 3002-20, 3002-21, . . . . . 573

 2            3002-22, 3002-23, 3002-24,

 3            3002-25, 3002-26, 3002-27,

 4            3002-28, and 3002-29

 5   3002-34, 3002-35, 3002-36, 3002-37, . . . . . 583

 6            3002-38, 3002-39, 3002-40

 7   1 . . . . . . . . . . . . . . . . . . . 429

 8   2 . . . . . . . . . . . . . . . . . . . 428

 9   S2, 208 . . . . . . . . . . . . . . . . 509

10   PX 3 . . . . . . . . . . . . . . . . . . 416

11   S3, 1916 . . . . . . . . . . . . . . . . 526

12   PX 4 . . . . . . . . . . . . . . . . . . 428

13   209-62 . . . . . . . . . . . . . . . . . 510

14   209-59 . . . . . . . . . . . . . . . . . 521

15   209-58 . . . . . . . . . . . . . . . . . 522

16   209-53, 209-54, 209-55 . . . . . . . . . 523

17   209-49 . . . . . . . . . . . . . . . . . 527

18   209-46 . . . . . . . . . . . . . . . . . 527

19   209-21 . . . . . . . . . . . . . . . . . 548

20   231 . . . . . . . . . . . . . . . . . . 512

21   233, 209-61 . . . . . . . . . . . . . . 514

22   235 . . . . . . . . . . . . . . . . . . 522

23   562 . . . . . . . . . . . . . . . . . . 547

24   2007-1 . . . . . . . . . . . . . . . . . 551

25   2008, 2008-T . . . . . . . . . . . . . . 533
```

1    2044, 2044-T   . . . . . . . . . . . . 536

2    2044-2   . . . . . . . . . . . . . . . 541

3    2048 and 2048-T   . . . . . . . . . . 542

4    2048-1   . . . . . . . . . . . . . . . 544

5    2300   . . . . . . . . . . . . . . . . 445

6    2300-A   . . . . . . . . . . . . . . . 462

7    2551   . . . . . . . . . . . . . . . . 414

8    2552   . . . . . . . . . . . . . . . . 415

9    3002-1   . . . . . . . . . . . . . . . 504

10   3002-2   . . . . . . . . . . . . . . . 507

11   3002-14   . . . . . . . . . . . . . . 568

12   3002-52   . . . . . . . . . . . . . . 569

13   3002-16   . . . . . . . . . . . . . . 571

14   3002-17   . . . . . . . . . . . . . . 572

15   3002-30   . . . . . . . . . . . . . . 580

16   3002-32   . . . . . . . . . . . . . . 581

17   3002-33   . . . . . . . . . . . . . . 582

18   3002-41   . . . . . . . . . . . . . . 587

19   3007   . . . . . . . . . . . . . . . . 373

20   3008   . . . . . . . . . . . . . . . . 431

21

22

23

24

25

```
P7L1STO1
```

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4               v.                        23 Cr. 430 (KPF)

 5   ROMAN STORM,

 6                Defendant.              Jury Trial
     ------------------------------x
 7
                                         New York, N.Y.
 8                                       July 21, 2025
                                         8:55 a.m.
 9

10   Before:

11                    HON. KATHERINE POLK FAILLA,

12                                            District Judge

13
                            APPEARANCES
14
     JAY CLAYTON
15        United States Attorney for the
          Southern District of New York
16   BY:  NATHAN M. REHN, ESQ.
          BEN ARAD, ESQ.
17        BENJAMIN A. GIANFORTI, ESQ.
          KEVIN G. MOSLEY, ESQ.
18        TARA M. LA MORTE, ESQ.
          Assistant United States Attorneys
19
     WAYMAKER LLP
20        Attorneys for Defendant
     BY:  BRIAN E. KLEIN, ESQ.
21        KERI CURTIS AXEL, ESQ.
          KEVIN M. CASEY, ESQ.
22        VIVIANA ANDAZOLA MARQUEZ, ESQ.

23        -and-

24   HECKER FINK LLP
          Attorneys for Defendant
25   BY:  DAVID E. PATTON, ESQ.
          CHRISTOPHER MOREL, ESQ.
```

INDEX OF EXAMINATION

Examination of:                                    Page

  JOEL DeCAPUA

Direct By Mr. Rehn . . . . . . . . . . . . . 638

Cross By Mr. Patton  . . . . . . . . . . . 673

Redirect By Mr. Rehn . . . . . . . . . . . 726

  ELEAZAR GALANO III

Direct By Mr. Gianforti  . . . . . . . . . 729

Cross By Ms. Axel  . . . . . . . . . . . . 754

```
 1                        GOVERNMENT EXHIBITS

 2      Exhibit No.                              Received

 3      3002-42, 3002-43, 3002-44, 3002-45, . . . . . 644

 4              3002-48, 3002-49, 3002-50

 5      2047 and 2047-T  . . . . . . . . . . . . . 651

 6      2062 and 2062-T  . . . . . . . . . . . . . 658

 7      3002-53, 3002-54, 3002-55, 3002-56, . . . . . 666

 8              3002-57, 3002-58, and 3002-59

 9      802, 803, 803-1, 810, 813, 814, 815,  . . . . 739

10              816, 817, 818, 819, 821, 823,

11              825, 827, 829, 831, 833, 835,

12              837, 839, 841, 843, 845, 847,

13              849, 851, 852, 853, 854, 855,

14              856, 858, 860, 862, and 867

15      279  . . . . . . . . . . . . . . . . . . 648

16      2047-1  . . . . . . . . . . . . . . . . 654

17      2047-4  . . . . . . . . . . . . . . . . 656

18      2311  . . . . . . . . . . . . . . . . . 640

19      2311-1  . . . . . . . . . . . . . . . . 642

20      3002-51  . . . . . . . . . . . . . . . . 663

21      3002-60  . . . . . . . . . . . . . . . . 671

22      3002-61  . . . . . . . . . . . . . . . . 673

23

24

25
```

P7M5sto1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                          23 Cr. 430 (KPF)

 5   ROMAN STORM,

 6             Defendant.                  Jury Trial
     ------------------------------x

 7

 8                                         New York, N.Y.
                                           July 22, 2025
 9                                         8:50 a.m.

10   Before:

11                 HON. KATHERINE POLK FAILLA,

12                                         District Judge

13                        APPEARANCES

14
     JAY CLAYTON
15        United States Attorney for the
          Southern District of New York
16   BY:  NATHAN M. REHN, ESQ.
          BEN ARAD, ESQ.
17        BENJAMIN A. GIANFORTI, ESQ.
          KEVIN G. MOSLEY, ESQ.
18        TARA M. LA MORTE, ESQ.
          Assistant United States Attorneys
19
     WAYMAKER LLP
20        Attorneys for Defendant
     BY:  BRIAN E. KLEIN, ESQ.
21        KERI CURTIS AXEL, ESQ.
          KEVIN M. CASEY, ESQ.
22        VIVIANA ANDAZOLA MARQUEZ, ESQ.

23        -and-

24   HECKER FINK LLP
          Attorneys for Defendant
25   BY:  DAVID E. PATTON, ESQ.
          CHRISTOPHER MOREL, ESQ.
```

INDEX OF EXAMINATION

Examination of:                                              Page

ELEAZAR GALANO

Cross By Ms. Axel  . . . . . . . . . . . 827

Redirect By Mr. Gianforti  . . . . . . . . 838

BENJAMIN GIBBS

Direct By Mr. Rehn . . . . . . . . . . . 841

Cross By Ms. Axel  . . . . . . . . . . . 868

Redirect By Mr. Rehn . . . . . . . . . . 886

 SHAKEEB AHMED

Direct By Mr. Arad . . . . . . . . . . . 888

Cross By Mr. Patton  . . . . . . . . . . 906

Direct By Mr. Gianforti  . . . . . . . . . 914

Cross By Mr. Casey . . . . . . . . . . . 931

 KURUSH DUBASH

Direct By Mr. Gianforti  . . . . . . . . . 936

Cross By Mr. Casey . . . . . . . . . . . 950

 WILLIAM LOPEZ

Direct By Mr. Arad . . . . . . . . . . . 956

Cross By Mr. Patton  . . . . . . . . . . 998

Redirect By Mr. Arad . . . . . . . . . . .1021

 PHILIP WERLAU

Direct By Mr. Rehn . . . . . . . . . . . .1025

```
 1                      GOVERNMENT EXHIBITS

 2     Exhibit No.                          Received

 3      3 through 9   . . . . . . . . . . . . . 810

 4      652, 655, 659, 660, 665, 667, 669, 670, . . . 918

 5            671

 6      2038 and 2038-T   . . . . . . . . . . . .1059

 7      2032 and 2032-T   . . . . . . . . . . . .1068

 8      261   . . . . . . . . . . . . . . . . .1051

 9      275   . . . . . . . . . . . . . . . . .1053

10      321   . . . . . . . . . . . . . . . . . 980

11      602   . . . . . . . . . . . . . . . . .1054

12      703   . . . . . . . . . . . . . . . . . 944

13      720   . . . . . . . . . . . . . . . . . 945

14      722   . . . . . . . . . . . . . . . . . 949

15      752   . . . . . . . . . . . . . . . . .1067

16      803-2   . . . . . . . . . . . . . . . . 830

17      1152   . . . . . . . . . . . . . . . . . 991

18      1608   . . . . . . . . . . . . . . . . . 861

19      2245   . . . . . . . . . . . . . . . . . 983

20      2247   . . . . . . . . . . . . . . . . . 995

21      3001   . . . . . . . . . . . . . . . . . 959

22      3003-M-B   . . . . . . . . . . . . . . .1057

23      3202   . . . . . . . . . . . . . . . . . 965

24      3402   . . . . . . . . . . . . . . . . . 981

25      3535-002   . . . . . . . . . . . . . . .1009
```

P7N1STO1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4               v.                          23 Cr. 430 (KPF)

 5    ROMAN STORM,

 6               Defendant.                  Jury Trial
      ------------------------------x
 7
                                             New York, N.Y.
 8                                           July 23, 2025
                                             9:03 a.m.
 9

10    Before:

11                    HON. KATHERINE POLK FAILLA,

12                                           District Judge

13
                          APPEARANCES
14
      JAY CLAYTON
15         United States Attorney for the
           Southern District of New York
16    BY:  NATHAN M. REHN, ESQ.
           BEN ARAD, ESQ.
17         BENJAMIN A. GIANFORTI, ESQ.
           KEVIN G. MOSLEY, ESQ.
18         TARA M. LA MORTE, ESQ.
           Assistant United States Attorneys
19
      WAYMAKER LLP
20         Attorneys for Defendant
      BY:  BRIAN E. KLEIN, ESQ.
21         KERI CURTIS AXEL, ESQ.
           KEVIN M. CASEY, ESQ.
22         VIVIANA ANDAZOLA MARQUEZ, ESQ.

23         -and-

24    HECKER FINK LLP
           Attorneys for Defendant
25    BY:  DAVID E. PATTON, ESQ.
           CHRISTOPHER MOREL, ESQ.
```

1344

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3      PHILIP WERLAU

 4    Direct By Mr. Rehn . . . . . . . . . . . .1143

 5    Cross By Mr. Klein . . . . . . . . . . . .1190

 6      MAZYAR MIRBABA

 7    Direct By Mr. Arad . . . . . . . . . . . .1231

 8      STEPHAN GEORGE

 9    Direct By Mr. Mosley . . . . . . . . . . .1237

10    Cross By Ms. Axel  . . . . . . . . . . . .1306

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    GOVERNMENT EXHIBITS

 2     Exhibit No.                          Received

 3      2058, 2058-T  . . . . . . . . . . . . . .1270

 4      2055, 2055-T  . . . . . . . . . . . . . .1274

 5      654   . . . . . . . . . . . . . . . . . .1237

 6      1213    . . . . . . . . . . . . . . . . .1236

 7      1276    . . . . . . . . . . . . . . . . .1237

 8      1281    . . . . . . . . . . . . . . . . .1283

 9      3003-B-B  . . . . . . . . . . . . . . . .1163

10      3003-C-B  . . . . . . . . . . . . . . . .1164

11      3005-28   . . . . . . . . . . . . . . . .1173

12      3006-2    . . . . . . . . . . . . . . . .1261

13      3009    . . . . . . . . . . . . . . . . .1165

14                    DEFENDANT EXHIBITS

15     Exhibit No.                          Received

16      6001    . . . . . . . . . . . . . . . . .1315

17

18

19

20

21

22

23

24

25
```

P7OVSTO1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                   v.                        23 Cr. 430 (KPF)

5   ROMAN STORM,

6                   Defendant.               Jury Trial
    ------------------------------x

7
                                             New York, N.Y.
8                                            July 24, 2025
                                             9:55 a.m.
9

10  Before:

11                  HON. KATHERINE POLK FAILLA,

12                                           District Judge

13                         APPEARANCES

14
    JAY CLAYTON
15       United States Attorney for the
         Southern District of New York
16  BY:  NATHAN M. REHN, ESQ.
         BEN ARAD, ESQ.
17       BENJAMIN A. GIANFORTI, ESQ.
         KEVIN G. MOSLEY, ESQ.
18       TARA M. LA MORTE, ESQ.
         Assistant United States Attorneys
19
    WAYMAKER LLP
20       Attorneys for Defendant
    BY:  BRIAN E. KLEIN, ESQ.
21       KERI CURTIS AXEL, ESQ.
         KEVIN M. CASEY, ESQ.
22       VIVIANA ANDAZOLA MARQUEZ, ESQ.
         BECKY S. JAMES, ESQ.
23       -and-
    HECKER FINK LLP
24       Attorneys for Defendant
    BY:  DAVID E. PATTON, ESQ.
25       CHRISTOPHER MOREL, ESQ.

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1656

```
1                        INDEX OF EXAMINATION
2    Examination of:                             Page
3     STEPHAN GEORGE
4    Cross By Ms. Axel  . . . . . . . . . . .1364
5     CONOR O'SULLIVAN
6    Direct By Mr. Arad . . . . . . . . . . .1406
7    Cross By Ms. Axel  . . . . . . . . . . .1427
8     ANGELICA COTTO
9    Direct By Mr. Rehn . . . . . . . . . . .1448
10   Cross By Mr. Patton  . . . . . . . . . .1557
11    PRESTON VAN LOON
12   Direct By Mr. Klein  . . . . . . . . . .1565
13   Cross By Mr. Mosley  . . . . . . . . . .1570
14                      GOVERNMENT EXHIBITS
15   Exhibit No.                            Received
16    3601-1, 3601-2, 3601-3, 3601-4, 3601-5  . . .1416
17    2031, 2031-T  . . . . . . . . . . . . . . .1471
18    2014, 2014-T  . . . . . . . . . . . . . . .1473
19    2121, 2121-T  . . . . . . . . . . . . . . .1474
20    2122, 2122-T  . . . . . . . . . . . . . . .1476
21    2124, 2124-T  . . . . . . . . . . . . . . .1477
22    2127, 2127-T  . . . . . . . . . . . . . . .1477
23    2262, 2262-T  . . . . . . . . . . . . . . .1479
24    2129, 2129-T  . . . . . . . . . . . . . . .1480
25    2130, 2130-T  . . . . . . . . . . . . . . .1483
```

1    2135, 2135-T . . . . . . . . . . . . . .1484

2    2101, 2101-T . . . . . . . . . . . . . .1485

3    2261, 2261-T . . . . . . . . . . . . . .1486

4    2037 and 2037-T . . . . . . . . . . . .1490

5    2120 and 2120-T . . . . . . . . . . . .1497

6    2015 and 2015-T . . . . . . . . . . . .1499

7    2016 and 2016-T . . . . . . . . . . . .1501

8    2017 and 2017-T . . . . . . . . . . . .1504

9    2010 and 2010-T . . . . . . . . . . . .1505

10   2034 and 2034-T . . . . . . . . . . . .1506

11   2043 and 2043-T . . . . . . . . . . . .1507

12   2049 and 2049-T . . . . . . . . . . . .1511

13   2036 and 2036-T . . . . . . . . . . . .1514

14   2059 and 2059-T . . . . . . . . . . . .1519

15   2059-1 and 2059-1-T . . . . . . . . . .1520

16   2059-2 and 2059-2-T . . . . . . . . . .1523

17   2060 and 2060-T . . . . . . . . . . . .1525

18   234, 239, 243, 246, 247, 248, 249, 256 . . .1548

19   2069, 2069-T, 1367, 2039, 2039-T, 2040, . . .1549

20          2040-T, 2003, 2003-T, 2004,

21          2004-T, 2061, 2061-T, 2062,

22          2062-T, 2063, 2063-T, 2006,

23          2006-T, 2052, 2052-T, 2295,

24          2295-T

25   2033, 2033-T . . . . . . . . . . . . . .1550

 1   2041, 2041-T . . . . . . . . . . . . . .1551

 2   2064, 2064-T . . . . . . . . . . . . . .1552

 3   2067, 2067-T . . . . . . . . . . . . . .1553

 4   2050, 2050-T . . . . . . . . . . . . . .1554

 5   2053, 2053-T . . . . . . . . . . . . . .1556

 6   S-6 . . . . . . . . . . . . . . . .1451

 7   209-22  . . . . . . . . . . . . . .1555

 8   237 . . . . . . . . . . . . . . .1532

 9   238 . . . . . . . . . . . . . . .1534

10   245 . . . . . . . . . . . . . . .1535

11   251 . . . . . . . . . . . . . . .1537

12   553 . . . . . . . . . . . . . . .1538

13   556 . . . . . . . . . . . . . . .1540

14   917 . . . . . . . . . . . . . . .1527

15   923 . . . . . . . . . . . . . . .1528

16   1303 . . . . . . . . . . . . . . .1453

17   1304 . . . . . . . . . . . . . . .1454

18   1309 . . . . . . . . . . . . . . .1467

19   1345 . . . . . . . . . . . . . . .1456

20   1346 . . . . . . . . . . . . . . .1457

21   1347 . . . . . . . . . . . . . . .1457

22   1348 . . . . . . . . . . . . . . .1459

23   1350 . . . . . . . . . . . . . . .1466

24   1368 . . . . . . . . . . . . . . .1468

25   1369 . . . . . . . . . . . . . . .1469

1    1372    . . . . . . . . . . . . . . . . .1517

2    1376    . . . . . . . . . . . . . . . . .1419

3    1376    . . . . . . . . . . . . . . . . .1470

4    1915    . . . . . . . . . . . . . . . . .1451

5    1936    . . . . . . . . . . . . . . . . .1423

6    1936-A    . . . . . . . . . . . . . . . .1424

7    2015-1    . . . . . . . . . . . . . . . .1500

8    2015-1-T    . . . . . . . . . . . . . . .1500

9    2016-1    . . . . . . . . . . . . . . . .1502

10    2016-1-T    . . . . . . . . . . . . . . .1502

11    2210    . . . . . . . . . . . . . . . . .1488

12    2211    . . . . . . . . . . . . . . . . .1496

13    2320    . . . . . . . . . . . . . . . . .1534

14    3602    . . . . . . . . . . . . . . . . .1408

15    3603    . . . . . . . . . . . . . . . . .1409

16

17

18

19

20

21

22

23

24

25

P7S5sto1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        23 Cr. 430 (KPF)

5   ROMAN STORM,

6              Defendant.               Jury Trial
    ------------------------------x
7
                                        New York, N.Y.
8                                       July 28, 2025
                                        9:00 a.m.
9

10  Before:

11              HON. KATHERINE POLK FAILLA,

12                                      District Judge

13
                        APPEARANCES
14
    JAY CLAYTON
15       United States Attorney for the
         Southern District of New York
16  BY:  NATHAN M. REHN, ESQ.
         BEN ARAD, ESQ.
17       BENJAMIN A. GIANFORTI, ESQ.
         KEVIN G. MOSLEY, ESQ.
18       TARA M. LA MORTE, ESQ.
         Assistant United States Attorneys
19
    WAYMAKER LLP
20       Attorneys for Defendant
    BY:  BRIAN E. KLEIN, ESQ.
21       KERI CURTIS AXEL, ESQ.
         KEVIN M. CASEY, ESQ.
22       VIVIANA ANDAZOLA MARQUEZ, ESQ.

23       -and-

24  HECKER FINK LLP
         Attorneys for Defendant
25  BY:  DAVID E. PATTON, ESQ.
         CHRISTOPHER MOREL, ESQ.

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                         Page

 3   MATTHEW EDMAN

 4   Direct By Ms. Axel . . . . . . . . . . . .1742

 5   Cross By Mr. Rehn  . . . . . . . . . . . .1868

 6   Redirect By Ms. Axel . . . . . . . . . . .1926

 7    TYLER ALMEIDA

 8   Direct By Mr. Klein  . . . . . . . . . . .1939

 9   Cross By Mr. Mosley  . . . . . . . . . . .1942

10   Redirect By Mr. Klein  . . . . . . . . . .1944

11                   GOVERNMENT EXHIBITS

12   Exhibit No.                          Received

13    S-8   . . . . . . . . . . . . . . . . .1947

14    3005-6   . . . . . . . . . . . . . . . .1879

15    3005-18   . . . . . . . . . . . . . . . .1880

16    4027   . . . . . . . . . . . . . . . . .1921

17    8788   . . . . . . . . . . . . . . . . .1811

18                   DEFENDANT EXHIBITS

19   Exhibit No.                         Received

20    8701   . . . . . . . . . . . . . . . . .1804

21    8785-36   . . . . . . . . . . . . . . . .1856

22    8786   . . . . . . . . . . . . . . . . .1784

23    8791   . . . . . . . . . . . . . . . . .1858

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7T1STO1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4                    v.                      23 Cr. 430 (KPF)

 5    ROMAN STORM,

 6                    Defendant.             Jury Trial
      ------------------------------x

 7
                                             New York, N.Y.
 8                                           July 29, 2025
                                             8:55 a.m.
 9

10    Before:

11                    HON. KATHERINE POLK FAILLA,

12                                             District Judge

13                            APPEARANCES

14
      JAY CLAYTON
15         United States Attorney for the
           Southern District of New York
16    BY:  NATHAN M. REHN, ESQ.
           BEN ARAD, ESQ.
17         BENJAMIN A. GIANFORTI, ESQ.
           KEVIN G. MOSLEY, ESQ.
18         TARA M. LA MORTE, ESQ.
           Assistant United States Attorneys
19
      WAYMAKER LLP
20         Attorneys for Defendant
      BY:  BRIAN E. KLEIN, ESQ.
21         KERI CURTIS AXEL, ESQ.
           KEVIN M. CASEY, ESQ.
22         VIVIANA ANDAZOLA MARQUEZ, ESQ.

23         -and-

24    HECKER FINK LLP
           Attorneys for Defendant
25    BY:  DAVID E. PATTON, ESQ.
           CHRISTOPHER MOREL, ESQ.
```

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3      DAVID WUOLLET JR.

4    Direct By Mr. Patton . . . . . . . . . . .2008

5    Cross By Mr. Gianforti . . . . . . . . . .2013

6      OMID MALEKAN

7    Direct By Mr. Klein  . . . . . . . . . . .2017

8    Cross By Mr. Gianforti . . . . . . . . . .2021

9      STEPHANIE HURDER

10   Direct By Ms. Axel . . . . . . . . . . . .2024

11   Cross By Mr. Arad  . . . . . . . . . . . .2090

12   Redirect By Ms. Axel . . . . . . . . . . .2125

13     MATTHEW D. GREEN

14   Direct By Mr. Klein  . . . . . . . . . . .2159

15   Cross By Mr. Arad  . . . . . . . . . . . .2194

16   MARIA MIZBANI

17   Direct By Ms. Andazola Marquez . . . . . .2205

18

19

20

21

22

23

24

25
```

```
 1                    DEFENDANT EXHIBITS

 2   Exhibit No.                              Received

 3    9050-19, 9050-20, 9050-21, 9050-22, . . . . .2133

 4            9050-24

 5   8852 and 8852-A  . . . . . . . . . . . . .2202

 6   8790  . . . . . . . . . . . . . . . . . .2213

 7   9050-13  . . . . . . . . . . . . . . . . .2059

 8   9050-17  . . . . . . . . . . . . . . . . .2070

 9   9050-18  . . . . . . . . . . . . . . . . .2076

10   9051  . . . . . . . . . . . . . . . . . .2041

11   9052  . . . . . . . . . . . . . . . . . .2042

12   9053  . . . . . . . . . . . . . . . . . .2064

13   9851  . . . . . . . . . . . . . . . . . .2010

14   S-10  . . . . . . . . . . . . . . . . . .2202

15   S-9   . . . . . . . . . . . . . . . . . .2202

16

17

18

19

20

21

22

23

24

25
```

Ct Ex 11

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF NEW YORK
40 FOLEY SQUARE
NEW YORK, NEW YORK 10007

KATHERINE POLK FAILLA
DISTRICT JUDGE

# JURY NOTE

Can we obtain the trial transcripts
of the following witnesses:
   1) Mr. DeCapua
   2) Mr. Werlau fr 7/22 – 7/23
   3) Ms. Hurder
   4) Mr. Green

DATE: 7/31/25

TIME: ~~11:3 AM~~ (x)

2:32 pm

FOREPERSON'S SIGNATURE

Ct Ex 12

# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK
### 40 FOLEY SQUARE
### NEW YORK, NEW YORK 10007

**KATHERINE POLK FAILLA**
**DISTRICT JUDGE**

# JURY NOTE

Hi Judge,

We will be leaving @
3:30 pm today & will
return on Monday @
9:30 AM.

Have a
great
weekend

DATE: 7/31/25

TIME: 2:35 pm

_____
FOREPERSON'S SIGNATURE

Ct Ex. 13
8/4/2025
9:32 a.m.

Good morning, Members of the Jury —

   We hope you all had great weekends. Enclosed
with this note are six sets of the transcripts you
requested. As I have previously instructed you, you
are to consider all of the evidence at this trial
without unduly emphasizing any portion of it,
and it is your recollection of the evidence at trial
that governs.

                              K.P Faulk

P7H5sto1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                         23 Cr. 430 (KPF)

 5   ROMAN STORM,

 6              Defendant.                 Jury Trial
     ------------------------------x

 7
                                           New York, N.Y.
 8                                         July 17, 2025
                                           9:03 a.m.
 9

10   Before:

11                  HON. KATHERINE POLK FAILLA,

12                                         District Judge

13
                          APPEARANCES
14
     JAY CLAYTON
15        United States Attorney for the
          Southern District of New York
16   BY:  NATHAN M. REHN, ESQ.
          BEN ARAD, ESQ.
17        BENJAMIN A. GIANFORTI, ESQ.
          KEVIN G. MOSLEY, ESQ.
18        TARA M. LA MORTE, ESQ.
          Assistant United States Attorneys
19
     WAYMAKER LLP
20        Attorneys for Defendant
     BY:  BRIAN E. KLEIN, ESQ.
21        KERI CURTIS AXEL, ESQ.
          KEVIN M. CASEY, ESQ.
22        VIVIANA ANDAZOLA MARQUEZ, ESQ.

23        -and-

24   HECKER FINK LLP
          Attorneys for Defendant
25   BY:  DAVID E. PATTON, ESQ.
          CHRISTOPHER MOREL, ESQ.
```

1

2

3    DIRECT EXAMINATION

4    BY MR. REHN:

5    Q.  Good afternoon, Special Agent DeCapua.

6    A.  Good afternoon.

7    Q.  Where do you currently work?

8    A.  The Federal Bureau of Investigation.

9    Q.  What is your title there?

10   A.  Special Agent.

11   Q.  How long have you worked at the FBI?

12   A.  So now it's approximately been 16 years.

13   Q.  Are you part of a specific group?

14   A.  I am.

15   Q.  What is the name of that group?

16   A.  We call ourselves CY3.

17   Q.  And do you have a more formal title as well?

18   A.  CY3 is our formal title.

19   Q.  Is there—have you ever heard the term cybercrime

20   investigators?

21   A.  Yes, so our job is to investigate cybercrimes.

22   Q.  So what does that mean?

23   A.  So in general, it means that whenever there's a complaint

24   that we receive from someone from the public saying, our

25   network was hacked or a hacker took over my computer, it would

P7H1STO4                         DeCapua - Direct

1    come to my desk and we would investigate to see if a federal

2    crime was committed.  We gather evidence and make a

3    determination whether it's something we can bring to a

4    prosecutor's office.

5    Q.  And how long have you been doing that kind of work?

6    A.  So it would have been since 2014, so a little over 10

7    years.

8    Q.  During your time at the FBI have you worked on

9    investigations that relate to cryptocurrency?

10   A.  I have.

11   Q.  And beyond cryptocurrency have you worked on the

12   investigations related to digital currencies more generally?

13   A.  I have.

14   Q.  When did you first begin working on matters relating to

15   digital currencies?

16   A.  So I first began in 2005 as an investigator with the State

17   of Indiana, working different types of virtual currencies.

18   This is before cryptocurrency was even invented yet.

19   Q.  What was the type of digital asset that was being used

20   then?

21   A.  It was called eGold.

22   Q.  And that was, you said, before what we now call crypto even

23   existed?

24   A.  That's correct.

25   Q.  When did you first begin on working on investigations

P7H1STO4                         DeCapua - Direct

1   related to cryptocurrency?

2   A.   It would have been 2014 or 2015.

3   Q.   Approximately how many investigations involving

4   cryptocurrency have you been involved with?

5   A.   Hard to put an exact number.  I've worked a lot of

6   investigations.  I would——I would say it's somewhere in the

7   high double digits.

8   Q.   In your work with the FBI, what's the primary focus of the

9   investigations that you typically do?

10  A.   Investigating hackers, cybercriminal, ISMA violation.

11  Q.   What is hacking?

12  A.   Where someone breaks into someone else's computer.

13  Q.   Do people sometimes obtain money or other types of property

14  from hacking?

15  A.   They do.

16  Q.   Do they sometimes obtain cryptocurrency?

17  A.   They do.

18  Q.   As part of your investigative work, have you traced the

19  proceeds of hacks?

20  A.   I have.

21  Q.   And have you traced the proceeds of other types of criminal

22  incidents?

23  A.   I have.

24  Q.   Could you give us some examples of other types of criminal

25  incidents for which you have traced the proceeds.

1    A.   So there's the investment fraud schemes, there's been——so

2    in addition to where cryptocurrency is, what is the goal to the

3    hacker to steal, there's also a lot of situations where the

4    hacker buys their tools using cryptocurrency, so I would also

5    trace cryptocurrency associated with any type of servers that

6    the hacker buys and those types of things.

7    Q.   And in addition to your primary work investigating hacking,

8    do you sometimes get called in to do cryptocurrency tracing for

9    other types of law enforcement investigations?

10   A.   I do.

11   Q.   For approximately how many criminal incidents have you done

12   this type of cryptocurrency tracing work?

13   A.   Again, it's really hard to put a number on it, but maybe a

14   dozen.

15   Q.   And do you have certain——well, we've been using the term

16   "criminal proceeds."  Are you familiar with what that term

17   means?

18   A.   I am.

19   Q.   What does that mean?

20   A.   At its simplest level, it means the money that a criminal

21   gets based off of their crime.

22   Q.   And does that include money in the form of cryptocurrency?

23   A.   It does.

24   Q.   And is it a regular occurrence for you to see that crimes

25   result in the criminal's obtaining cryptocurrency?

P7H1STO4                    DeCapua - Direct

1    A.  It is.

2    Q.  And so is it a regular part of your job duties to trace

3    that cryptocurrency?

4    A.  It is.

5    Q.  Could you explain at a high level what cryptocurrency

6    tracing is.

7    A.  So it's where you look at something called a blockchain and

8    you try to determine the source of funds or the destination of

9    funds in order to collect evidence.

10   Q.  And are you familiar with the tools and methods that are

11   generally used to conduct cryptocurrency tracing?

12   A.  I am.

13   Q.  What are some of the tools and methods?

14   A.  Well, at the most basic level, there's just manually

15   looking at the blockchain and determining the source or the

16   destination of cryptocurrencies.  There's also commercial

17   vendors that the FBI uses to make that process a little bit

18   more simple.  I'm familiar with both the manual version and

19   relying on vendors.

20   Q.  And have you actually developed some tools that the FBI

21   uses to conduct cryptocurrency tracing?

22   A.  I have.

23   Q.  What sort of tools?

24   A.  So it's automation tools that just, instead of making the

25   tracing of virtual currency a very slow, manual process, prone

P7H1STO4                      DeCapua - Direct

1    to human error, it automates it using scripting.

2    Q.  And so when you use those tools, do you create computer

3    programs to essentially pull data from the blockchain?

4    A.  It pulls data from another entity that has pulled data from

5    the blockchain.  So any tool that I build isn't directly

6    talking to the blockchain; it's talking to some blockchain

7    explorer.

8    Q.  And is that a material that has been——is that a tool that's

9    been widely used within the FBI?

10   A.  So not the automated tracing one, just because we didn't

11   have licenses for the API keys that it relied on.

12   Q.  What is a blockchain explorer?  That's a term you just

13   mentioned.

14   A.  It's a——I know it as a public place where someone can go

15   and review raw blockchain data, that doesn't require me to

16   become a full node and download the entire blockchain from a

17   specific network.

18   Q.  Does anyone aside from you do cryptocurrency tracing?

19   A.  Yes.

20   Q.  Does that include other law enforcement officers?

21   A.  Yes.

22   Q.  Is there also a private sector industry that does

23   cryptocurrency tracing?

24   A.  There is.

25   Q.  Are the basic tools and methods that you used in this case

P7H1STO4                    DeCapua - Direct

1    generally used by others who do cryptocurrency tracing?

2    A.  Yes.

3            MR. REHN:  Your Honor, the government offers Special

4    Agent DeCapua as an expert witness.

12           THE COURT:  Okay.  Thank you.

13           Agent DeCapua is so qualified.  Thank you.

14           Let me be sure what I'm qualifying him as an expert

15   on.

16           MR. REHN:  To testify as to cryptocurrency tracing.

17           THE COURT:  Yes.  He is so qualified.  Thank you.

18   BY MR. REHN:

19   Q.  Special Agent DeCapua, have you done any work on a case

20   related to a cryptocurrency mixer called Tornado Cash?

21   A.  I have.

22   Q.  What sort of work did you do?

23   A.  I analyzed cryptocurrency transactions to determine the

24   amount of cryptocurrency associated with particular criminal

25   incidents to determine how much of those proceeds ultimately

P7H1STO4                    DeCapua - Direct

1    ended up at Tornado Cash mixer.

2    Q.  And what time period did you focus on?

3    A.  So I believe it was September of 2020 through August of

4    2022.

5    Q.  And in doing that work, at a high level, what sources did

6    you rely on, or what materials?

7    A.  So a lot.  I relied on raw blockchain data from the

8    Ethereum and Binance blockchains; I relied on some materials

9    that were provided from the prosecution team that showed

10   certain communications that were made that included the

11   defendant; and some Google searches that the defendant made; I

12   also relied on some public statements that were made from

13   certain cryptocurrency exchanges as they announced why the

14   customer's money went missing.  That sums it up.

15   Q.  And you mentioned blockchain data.  How do you get the

16   blockchain data that you analyze?

17   A.  I used a blockchain explorer called Etherscan.

18   Q.  And I think you testified earlier that a blockchain

19   explorer essentially allows you to pull sort of the raw

20   transactional data from the blockchain itself?

21   A.  That's exactly right.

22   Q.  Beyond the work you did to prepare to testify at this

23   trial, have you done any other work on the investigation

24   relating to Tornado Cash?

25   A.  No.

1    Q.  Do you have any personal knowledge of the facts about this

2    case, other than what you've learned over the course of your

3    expert work on this matter?

4    A.  I don't.

5    Q.  So in your typical work, what steps do you take when you

6    are tracing the proceeds from a particular criminal incident?

7    A.  So the first thing I'd want to do is make sure I'm starting

8    in the right place, which is identifying, for instance, a

9    victim address, and then from there I would look at all the

10   transactions on that victim address and determine where the

11   cryptocurrency is being sent.  From there——that would be the

12   first wallet.  Then I would move on to wallet 2 or address 2

13   and etc., etc., as I just follow the bouncing ball of

14   transactions from one address to the next address to the next

15   address to the next address, looking for a service that I

16   recognize, such as Tornado Cash.

17   Q.  Is there typically a source that you rely on to identify

18   that victim address as a first step?

19   A.  So I'll get that victim address from a lot of different

20   places.  In general, it's usually from a victim complaint that

21   we will receive.  But for this investigation, there was a wide

22   variety of different sources.

23   Q.  And did that include statements made by victims at the time

24   of the incidents that you examined?

25   A.  Yes.

P7H1STO4                         DeCapua - Direct

1   Q.  Special Agent DeCapua, are you familiar generally with the

2   sort of online crypto community?

3   A.  I am.

4   Q.  And when incidents happen involving the theft of

5   cryptocurrency, are those incidents typically widely discussed

6   within that community?

7   A.  They are.

8   Q.  Is there any particular attributes of that community that

9   you've identified that contribute to that?

10  A.  Yes.  Usually people who are into cryptocurrencies are also

11  highly connected individuals in terms of the different internet

12  social media services, and it's a small community that requires

13  specialized knowledge, and normally when there is any type of

14  incident where an exchange gets hacked or some type of major

15  incident affecting the community occurs, it is highly discussed

16  on social media.

17  Q.  And does the public nature of the blockchain contribute to

18  that?

19  A.  It does.

20  Q.  Have you ever heard of something called a postmortem?

21  A.  I have.

22  Q.  What is that?

23  A.  In Latin, it means after death, and in general, it just

24  means——in the context of cryptocurrency incidents, it's where

25  the victim will publish publicly their analysis of what

P7H1STO4                        DeCapua - Direct

1   happened, why they were victimized.

2   Q.  And so is that one of the things you might look at to

3   identify a victim address to investigate further?

4   A.  Yes.

5   Q.  And once you have an address to investigate, does that

6   allow you to begin looking at the blockchain data itself?

7   A.  Can you repeat that question.

8   Q.  Once you have that victim address to investigate, does that

9   allow you to start looking at the blockchain data itself?

10  A.  It does.

11  Q.  And when you're looking at the blockchain data, are there

12  any particular characteristics that are common to criminal

13  incidents?

14  A.  Yes, there's lots.

15  Q.  Could you name some examples of what you're looking at when

16  you're analyzing the blockchain data.

17  A.  So it depends on the type of incidents, but in general, if

18  we're talking exchanges, so what a normal exchange hot wallet

19  looks like, in my experience, is you'll see transactions going

20  in and out every day, small transactions.  It always holds a

21  balance.  Something that would be characteristic of an incident

22  is if somebody—all the money from that wallet just gets sucked

23  out and now it's a zero balance.  That tells me that maybe

24  something nefarious happened right there.  And that applies for

25  wallets that have Ether in them and then wallets that have

1   other types of cryptocurrency, such as tokens.  That's one

2   thing.

3           Another thing is just the pattern of, I guess you

4   would say, liquidation.  So for instance, if an exchange has a

5   lot of tokens that are stolen, it's hard to cash out tokens or

6   exotic cryptocurrencies, so you'll see those cryptocurrencies

7   start consolidating into something that is more liquid, such as

8   Ether.  So if I saw hundreds of different cryptocurrencies

9   stolen and then I see them being transferred into Ether, that

10  tells me that, oh, you know, this looks very odd; this doesn't

11  look like a normal day-to-day activity of a——of an exchange and

12  maybe something criminal has happened.

13  Q.  And did you observe those sorts of patterns in some of the

14  incidents that you analyzed in connection with this case?

15  A.  I did.

16          And one more pattern is, when you see that, that money

17  quickly moving from address to address to address to address,

18  it's something that you normally would not see a large exchange

19  or cryptocurrency service do.  It has the characteristics of

20  someone trying to hide the location of the funds.  That's

21  usually another red flag for me.

22          And I did——I saw all three of those in my analysis.

23  Q.  So there were a few terms you used in those answers that I

24  just want to make sure we all understand.

25          You mentioned an exchange.  What is an exchange?

P7H1STO4                          DeCapua - Direct

1    A.  The exchange is a public service where someone can buy

2    cryptocurrencies and exchange cryptocurrencies, so if you want

3    to use U.S. dollars, you can buy some Ether at an exchange and

4    vice versa.  You can also trade your Ether for U.S. dollars.

5    Q.  And then you mentioned something called tokens.  What are

6    tokens?

7    A.  Tokens just mean other cryptocurrencies that happen to

8    operate on a blockchain.  So for the Ethereum blockchain, you

9    have Ether, which is the main cryptocurrency, and then you have

10   lots of different cryptocurrencies that you can trade using the

11   Ethereum blockchain, and they're referred to in common parlance

12   as tokens.

13   Q.  Are there a large number of different kinds of tokens?

14   A.  There are.

15   Q.  And so you said something about those being less liquid

16   than something like Ether itself.

17   A.  Yes.

18   Q.  Why would that be?

19   A.  Because for cryptocurrency to be liquid, you have to have

20   buyers and sellers, and because there's so many tokens that

21   just don't have a lot of people buying and selling them, it's

22   hard to liquidate them without crashing the price.

23   Q.  And is it relatively easier to liquidate Ether?

24   A.  Yes.

25   Q.  And is that because Ether is much more widely bought and

P7H1STO4                    DeCapua - Direct

1    sold among a larger group?

2    A.   Yes.

3    Q.   Special Agent DeCapua, you mentioned earlier that you

4    reviewed data from the blockchain in your analysis.

5    A.   That's correct.

6    Q.   So I'd like to show you what is marked as Government

7    Exhibit 3003-G-B.  Do you recognize this document?

8    A.   I do.

9            MR. REHN:  And before I inquire about it, I'd like to

10   read a stipulation.

11           THE COURT:  Okay.

12           MR. REHN:  This will be marked as S4, a stipulation

13   regarding blockchain data.

14           It is hereby stipulated and agreed, by and between the

15   United States of America, by Jay Clayton, United States

16   Attorney for the Southern District of New York, by the

17   undersigned counsel, and Roman Storm, the defendant, by and

18   with the consent of his attorneys, that, as relevant here:

19           Government Exhibit 3003-G-B is a true and accurate

20   spreadsheet containing data from the Ethereum blockchain;

21           The data in the spreadsheet accurately reflects

22   information about the blockchain transactions listed on the

23   exhibit.

24           And it is signed by counsel for both parties this

25   morning, July 17, 2025.

1           And so the government offers, pursuant to this

2    stipulation, Government Exhibit 3003-G-B.

3           THE COURT:  As well as S4, sir?

4           MR. REHN:  As well as S4, your Honor.

5           THE COURT:  Yes.  Both are admitted into evidence.

6    Government Exhibit 3003-G-B can be shown to the jury.  Thank

7    you.

8           (Government's Exhibits S4 and 3003-G-B received in

9    evidence)

10   BY MR. REHN:

11   Q.  Special Agent DeCapua, do you have that in front of you?

12   A.  I do.

13          MR. REHN:  And so Ms. Sebade, if we can widen the

14   columns a little bit, in particular the Transaction, the column

15   B, and so forth, yes.

16   BY MR. REHN:

17   Q.  Just to give us a sense of what the actual data that you

18   were analyzing looks like, I'd like to walk through some of

19   these fields.

20          Do you see, first off, column A, it says Blockchain

21   and Token?

22   A.  I do.

23   Q.  What is that a reference to?

24   A.  So it's a reference to which specific blockchain the data

25   is from.  I believe for all of these it's Ethereum.  The ETH

P7H1STO4                        DeCapua - Direct

1    stands for Ethereum, and then the second ETH stands for Ether

2    in particular.

3    Q.  And are all of the transactions on 3003-G-B transactions

4    involving Ether, the primary cryptocurrency of the Ethereum

5    blockchain?

6    A.  They are.

7    Q.  And the next column is something called Transaction Hash.

8    What is that?

9    A.  Transaction hash is just a unique identifier for a

10   particular transaction.  You'll never find two of the same

11   transaction hashes for different transactions.

12   Q.  So if you have the transaction hash, which is the strings

13   of letters and numbers here in column B, are you able to go to

14   the blockchain and get information about that transaction?

15   A.  Yes.

16   Q.  Does that include information about what the originating

17   wallet is and what the destination wallet is?

18   A.  It does.

19   Q.  Is that reflected here in any columns of the spreadsheet?

20   A.  It is column F and column G.

21   Q.  And so I see those labeled From and To.  Do you see that?

22   A.  I do.

23   Q.  So focusing first on the entries in the From column, what

24   are those entries?

25   A.  So the From, this is the Ethereum address that sent value

P7H1STO4                        DeCapua - Direct

1    for a specific transaction.

2    Q.  And so you said the Ethereum address.  Is that sometimes

3    also referred to as a wallet address?

4    A.  They're semi-interchangeable, yes.

5    Q.  And is that basically a unique string of letters and

6    numbers?

7    A.  Yes.  Hexadecimal.

8    Q.  I won't ask you to define that one.

9    A.  Thank you.

10    Q.  So for that unique string of letters and numbers, does

11    that—if you have that, can you identify any particular address

12    on the Ethereum blockchain?

13    A.  Yes.  The addresses are unique and so—

14    Q.  Okay.  And so if you have one, you can identify that

15    particular address.

16    A.  That's correct.

17    Q.  And is an address essentially a place where the owner of

18    that address can store and hold cryptocurrency?

19    A.  It is.

20    Q.  And the owner can receive or transmit cryptocurrency from

21    that address?

22    A.  That's right.

23    Q.  And is that sometimes called a wallet address?

24    A.  Yes.

25            MR. REHN:  And if we could scroll over a little bit

P7H1STO4                    DeCapua - Direct

1    more to the right, I guess.

2    Q.  Do you see there's a column marked Value?

3    A.  I do.

4    Q.  And what does Value represent?

5    A.  That represents how much Ether was transferred in that

6    particular transaction.

7    Q.  And so here, do we see that the values of these particular

8    transactions tend to have the same value?

9    A.  Yes.

10   Q.  And what is the most common value of the transactions on

11   this spreadsheet?

12   A.  Is 100 Ether.

13   Q.  And does this spreadsheet generally include transactions

14   from that date range you discussed earlier, from September 2020

15   through around July or August of 2022?

16   A.  It does.

17   Q.  And focusing in particular on late 2021 and into 2022, what

18   was the general range of the price of Ether during that time?

19   A.  So it was very volatile.  I think it was between 1,000 U.S.

20   dollars to maybe 3,000 U.S. dollars during that time period.

21   Q.  And so if you make a transaction of 100 ETH when the price

22   of ETH is let's say $2,000, how much—what is the U.S. dollar

23   value of that transaction?

24   A.  So it would—if the price of ETH is 2,000 and it's 100 ETH,

25   then it's just going to be 2,000 times 100, which I believe is

1    $200,000.

2    Q.  And so each of these deposits could be in the hundreds of

3    thousands of dollars.

4    A.  That's correct.

5             MR. REHN:  We can bring that down.

6             Now just for the witness, Ms. Sebade, if you could

7    show him what has been marked as Government Exhibit 3003-G.

8             This is still G-B.  Oh, now it's up.  Sorry.

9    Q.  So Special Agent DeCapua, do you recognize this

10   spreadsheet?

11   A.  I do.

12   Q.  Is this a spreadsheet that you created?

13   A.  It is.

14   Q.  And with respect to this spreadsheet, does it contain all

15   of the transactional data from the transactions that we were

16   looking at on Government Exhibit 3003-G?

17            THE COURT:  G-B.

18   Q.  G-B.  I apologize.  Does that include within it, what we're

19   looking at now, the transactional data from the transactions

20   that are on 3003-G-B?

21   A.  It does.

22   Q.  And I apologize for my──the question.  I will try to make

23   it as clear as possible here.

24            Does this also contain some additional transactions?

25   A.  It does.

1    Q.  And are those additional transactions either involving

2    tokens other than Ether or blockchains other than the Ethereum

3    blockchain?

4    A.  They do.

5    Q.  Does this also contain some additional information that you

6    attributed to these transactions?

7    A.  It does.

8    Q.  And is that in column A of this spreadsheet?

9    A.  It is.

10   Q.  And generally speaking, did you attribute these

11   transactions to any particular incidents?

12   A.  Yes, for each transaction I attributed it as the value came

13   from ultimately one of the incidents that I analyzed.

14   Q.  And are all of these transactions deposits to a particular

15   place?

16   A.  They are.

17   Q.  And what is that place?

18   A.  The Tornado Cash mixer.

19           MR. REHN:  And we can now bring down 3003-G and bring

20   back up 3003-G-B.

21           THE COURT:  You're not seeking the admission of

22   3000-G, sir?

23           MR. REHN:  We are not.

24           THE COURT:  Thank you.

25   BY MR. REHN:

1    Q.  So for 3003-G-B, based on what you just said, is it your

2    testimony that all of these transactions represent deposits

3    into the Tornado mixer originating in a criminal incident that

4    you identified?

5    A.  That's correct.

6    Q.  And if one wanted to ascertain which criminal incident you

7    attributed these transactions to, one could look at Government

8    Exhibit 3003-G to determine that.

9    A.  Yes.

10   Q.  Now was this the only spreadsheet that you looked at or

11   created in the course of this case?

12   A.  No.

13   Q.  Approximately——well, before I get to that, how many

14   transactions are listed on this spreadsheet?

15          MR. REHN:  If we could scroll to the bottom.

16   A.  You have to go down to the bottom.

17          5,499, but that includes the header, maybe, so maybe

18   5,498.

19   Q.  And all of those are the deposits into Tornado Cash that

20   you identified as originating in a criminal incident?

21   A.  Yes.

22   Q.  Now beyond those particular transactions, did you look at a

23   number of other transactions?

24   A.  I did.

25   Q.  This number of transactions, what is this in terms——is this

P7H1STO4                      DeCapua - Direct

1    like a significant percentage of the total transactions you

2    looked at, a small percentage?

3    A.    This is the small——a small percentage because these are

4    just the final leap from the hacker's wallet into Tornado Cash.

5    There's a whole journey I took for each of my analyses that

6    oftentimes included multiple hops through different addresses.

7    Q.    So would it be fair to say that you looked at at least many

8    tens of thousands of transactions?

9    A.    I don't know the exact number, but it's probably that.

10   Q.    And for purposes of your testimony today, when we're

11   talking about these Ethereum deposits into the Tornado Cash

12   mixer, did you convert that ETH value to a dollar value?

13   A.    I did.

14   Q.    How did you do that?

15   A.    So I used the value that Etherscan attributed for that

16   specific day.

17   Q.    So does Etherscan have dollar values for ETH that are

18   listed?

19   A.    Yes.

20   Q.    And so for each deposit you identified how much Etherscan

21   said ETH was worth on that day and then you attributed that as

22   the dollar value for that deposit?

23   A.    That's correct.

24   Q.    So deposits of 100 ETH might have different dollar values,

25   depending on when they were made.

P7H1STO4                         DeCapua - Direct

1    A.   Depending on which day and what the value of ETH was on

2    that specific day.

3              THE COURT:  Counsel, in the next five minutes, I want

4    to break for lunch, so——

5              MR. REHN:  We were about to turn to his exhibits, so

6    this may actually be a good time.  That was sort of the setup

7    for getting into these exhibits, so this may be the right time.

8              THE COURT:  So the next section is not a five-minute

9    section is what you're telling me, sir.

10             No, it is not.

11             MR. REHN:  I would say no, it is not.

12             THE COURT:  Okay.  That is fine.  Then now seems like

13   a great time to break for lunch.  And we will break for lunch

14   and we'll start up again at 25 after 1.  I'm trying to get very

15   technical here.

16             As always, do not discuss this case with each other or

17   anyone else.  Keep an open mind until all of the evidence is

18   in.  Have a great lunch.  We'll see you in 45 minutes.  Thank

19   you.

20             THE DEPUTY CLERK:  All rise.

21             (Continued on next page)

22

23

24

25

P7H5sto5                          DeCapua - Direct

1                    A F T E R N O O N   S E S S I O N

2                                1:25 p.m.

3              THE COURT:  Thank you.  Please be seated.

4              Agent DeCapua, I remind you, you remain under oath.

5              Counsel, you may continue.

6              MR. REHN:  Thank you, your Honor.

7    BY MR. REHN:

8    Q.  Good afternoon, Special Agent DeCapua.

9    A.  Good afternoon.

10   Q.  Special Agent DeCapua, in the witness box there should be a

11   binder containing some exhibits.  Do you see that?

12   A.  I do.

13   Q.  Could you look in there and see if there are a set of

14   exhibits that are marked as Government's Exhibits 3002-1

15   through 3002-61?

16   A.  3002-1 to 3002-61?

17   Q.  Yes.

18   A.  I see them.

19   Q.  At a high level, what are these documents?

20   A.  These are a PowerPoint presentation that summarizes the

21   work that I did.

22   Q.  And does this summarize the blockchain tracing analysis

23   that you did?

24   A.  It does.

25   Q.  And the opinions that you drew from that blockchain tracing

1  analysis?

2  A.  It does.

3          MR. REHN:  Your Honor, the government offers

4  Government Exhibit 3002-1 --

5          THE COURT:  Through 3002-61, sir?

6          MR. REHN:  I could read all 61.  I don't actually know

7  if we are going to use all of them in the direct.

8          THE COURT:  I see.

9          MR. REHN:  So we have labeled them separately.

10         THE COURT:  OK then.

11         Mr. Casey, I imagine that you are going to be

12  continuing the objection you made previously, sir, to the

13  admission of 3002-1?

14         MR. CASEY:  Yes, your Honor.  And if it is just -1

15  that is the only objection, your Honor.

16         THE COURT:  That is what we are being told, sir, yes.

17         I am admitting Government Exhibit 3002-1 over the

18  defense objection and it may be shown to the jury.  Thank you.

19         (Government's Exhibit 3002-1 received in evidence)

20  BY MR. REHN:

21  Q.  Looking at this -- and Special Agent DeCapua we will be

22  able to display them on the screen for you, although you are

23  welcome to review in whichever manner you prefer.

24         I would like you to begin by giving us an overview of

25  the work that you did and the conclusions that you reached.

P7H5sto5                         DeCapua - Direct

1    A.  So, initially the prosecution team reached out to me to ask

2    for me to assist with some crypto tracing pertaining to their

3    investigation on Tornado Cash, and my job was essentially to

4    look at all the different criminal heists and incidents that

5    happened, all the hacks where the proceeds of any of those

6    crimes ultimately was sent to Tornado Cash for mixing.  I

7    started out looking at a wide variety of incidents and then

8    over time, as we got closer to trial, things were narrowed

9    based on the time range I was looking at and specific loss

10   amounts to 16 specific incidents that I focused on.

11          Using the blockchain tracing that I described before I

12   concluded that just a little over $1 billion of cryptocurrency

13   was ultimately transferred to Tornado Cash that were proceeds

14   of one of these 16 incidents.

15   Q.  And was there a particular criteria you used at the

16   beginning to determine what types of incidents you were going

17   to be investigating?

18   A.  There was, because it was -- there was a lot, and so I had

19   to filter it somehow just to have a reasonable amount of work

20   to do so I -- it was limited to $5 million or up.  So, any type

21   of scheme that was under $5 million I didn't include in my

22   analysis.

23   Q.  So just to take an example, suppose there was an incident

24   where someone made a fraudulent NFT sale for $1 million and

25   deposited the funds into Tornado Cash.  Would that be included

P7H5sto5                          DeCapua - Direct

1    in this number?

2    A.  It would not.

3    Q.  And suppose there was an incident where an individual

4    victim was defrauded of a few hundred thousand dollars and that

5    money was deposited into Tornado Cash.  Would that be included

6    in this number?

7    A.  It would not.

8    Q.  And that is because you only looked at incidents where the

9    losses were greater than $5 million?

10   A.  That's exactly correct.

11   Q.  And when you did your tracing work, did you actually

12   identify more than the 16 incidents you will be testifying

13   about today?

14   A.  I did.

15   Q.  And what did you use to narrow it down to the 16 incidents

16   that will be the subject of your testimony today?

17   A.  So, initially I looked at 31 incidents and it was narrowed

18   down because the focus was the prosecution team said these are

19   the 16 we are going to look at

20

21   Q.  And did they provide you with documents relating to that?

22   A.  Yes.

23   Q.  So, do you see this number saying that more than $1 billion

24   in criminal proceeds went into Tornado Cash?

25   A.  I do.

P7H5sto5                      DeCapua - Direct

1   Q.  Does this $1 billion number represent all of the criminal

2   proceeds that were deposited into Tornado Cash?

3   A.  No.

4   Q.  Based on what you have just described that was excluded

5   from your analysis, would the actual number be higher than this

6   or lower than this?

7   A.  It would be higher.

8           MR. REHN:  The government now offers Government

9   Exhibit 3002-2?

10          THE COURT:  Mr. Casey, the same objection?

11          MR. CASEY:  Same objection, your Honor, but with

12  regard to -2, to the extent the government is also seeking to

13  admit the referenced exhibits on that slide, we would object.

14          MR. REHN:  We will be seeking to admit those shortly

15  but not at this moment.

16          THE COURT:  OK.  Then with that understanding, I am

17  admitting Government Exhibit 3002-2 over the defense objection.

18  Thank you.

19          (Government's Exhibit 3002-2 received in evidence)

20          THE COURT:  It may be shown to the jury.

21  BY MR. REHN:

22  Q.  Special Agent DeCapua, you mentioned there were 16

23  complaints you are focusing on for your testimony today; is

24  that right?

25  A.  That's right.

P7H5sto5                              DeCapua - Direct

1    Q.  What are we seeing on the screen now?

2    A.  This is a list of the 16 that I referenced.

3    Q.  Is there a date of each incident?

4    A.  There is.

5    Q.  And what does that date represent?

6    A.  The date represents the date that the incident occurred.

7    Q.  And at the bottom do you see that there is a list of

8    sources?

9    A.  I do.

10   Q.  And you mentioned a moment ago that the prosecutors asked

11   you to look at some documents and narrow down the list of

12   incidents?

13   A.  That's correct.

14   Q.  Are those the documents you looked at to do that?

15   A.  They are.

16          MR. REHN:  Your Honor, at this time the government

17   would like to read a stipulation.

18          THE COURT:  You may.

19          MR. REHN:  This is called Stipulation Regarding

20   Business Records, it is Government Exhibit S2, and I will omit

21   the "hereby stipulated" part because we have heard that twice

22   now.

23          Paragraph 1.  Government's Exhibits 203 through 277,

24   282 through 288, 304 through 306, and 1272 through 1277,

25   contain authentic copies of records from Google.  The records

P7H5sto5                         DeCapua - Direct

1    contained in Government's Exhibits 209, 212, and 1276 pertain

2    to the Google account rstormsf@gmail.com.  Government's

3    Exhibits 203 to 212 are business records pursuant to Federal

4    Rule of Evidence 803(6).

5            I would offer Government Exhibit 209 -- or I'm sorry

6    Government Exhibit 208 -- I believe it is actually 209, and

7    stipulation S2.

8            THE COURT:  I do want to be sure I am saying the right

9    thing.  Am I admitting into evidence Government's Exhibits 203

10   to 277, 282 to 288, 304 to 306 and 1272 to 1277 in addition to

11   S2?

12           MR. REHN:  We are not at this moment moving those into

13   evidence, only 208 -- 209.

14           THE COURT:  209?

15           MR. REHN:  209.

16           THE COURT:  Please make up your mind.

17           MR. REHN:  Let me just make sure, your Honor.

18           THE COURT:  Yes.

19           MR. REHN:  It is 208.  My apologies, your Honor.

20           THE COURT:  Thank you.

21           Government's Exhibits S2 and 208 are admitted into

22   evidence and may be shown to the jury.

23           (Government's Exhibits S2, 208 received in evidence)

24           MR. REHN:  So if we could show Government Exhibit 208.

25   BY MR. REHN:

1    Q.  Special Agent DeCapua, do you recognize what kind of

2    document this is?

3    A.  I do.

4    Q.  And could you describe generally what it is?

5    A.  This is -- it's Google subscriber information.  So, when

6    law enforcement is doing an investigation and they need to get

7    records from Google, we can send them legal process that they

8    will then provide records associated with a specific account to

9    us and the records that we get from Google look like this.

10           MR. REHN:  Ms. Sebade, if you could expand the text

11   underneath Google subscriber information?

12   Q.  What is the e-mail associated with this particular account?

13   A.  It's rstormsf@gmail.com.

14   Q.  Who is the subscriber of this e-mail?

15   A.  It says the name is Roman Storm.

16           MR. REHN:  If we can bring that down?

17           Now the government offers, pursuant to stipulation S2,

18   Government Exhibit 209-62.

19           THE COURT:  209-62.  Government Exhibit 209-62 is

20   admitted into evidence, may be shown to the jury.

21           (Government's Exhibit 209-62 received in evidence)

22           MR. REHN:  Ms. Sebade, if we can bring up Government

23   Exhibit 209-62 beside Government Exhibit 208?

24           I will read again the relevant text from the

25   stipulation:

P7H5sto5                          DeCapua - Direct

1              The records contained in Government Exhibit 209

2      pertain to the Google account rstormsf@gmail.com.

3      BY MR. REHN:

4      Q.  Special Agent DeCapua, do you see on the left side of the

5      screen there is a portion of Government Exhibit 209?

6      A.  I do.

7      Q.  And does that exhibit look familiar to you?

8      A.  It does.

9      Q.  What sort of an exhibit is that?

10     A.  So, again, when law enforcement is investigating a crime,

11     we can request specific records from different companies,

12     including Google, and so what I am looking at here, this is

13     actually a search history, a Google search history.  Because

14     when someone is logged into Google and they go into Google and

15     they start typing searches, that type of information is logged

16     by Google, and then pursuant to a search warrant, law

17     enforcement can obtain it if it is relevant to their

18     investigation.

19     Q.  Based on the stipulation I just read, do you understand

20     that Government Exhibit 209 is records from that

21     rstormsf@gmail.com?

22     A.  I do.

23     Q.  If we look at portions of Government Exhibit 209, will you

24     understand if I refer to those as the Roman Storm Google

25     history records?

P7H5sto5                              DeCapua - Direct

1    A.  Yes.

2              MR. REHN:  Ms. Sebade, we can bring down Government

3    Exhibit 208 and if we could expand the text that is in

4    Government Exhibit 209-62?

5    Q.  So I think you said this would be the search history for

6    the user of the Roman Storm account; is that right?

7    A.  The Google search history, correct.

8    Q.  Google search history.

9              So, what did the Roman Storm account search for on

10   October 23, 2020 at 8:17 p.m.?

11   A.  The word "KuCoin hacker."

12             MR. REHN:  All right.  If we can bring up Government

13   Exhibit 231, which is not yet in evidence so just for the

14   witness, and this is actually within the range that I read

15   earlier from the stipulation so we offer Government

16   Exhibit 231.

17             THE COURT:  231 admitted into evidence and may be

18   shown to the jury.  Thank you.

19             (Government's Exhibit 231 received in evidence)

20             MR. REHN:  Ms. Sebade if we can expand this?

21   BY MR. REHN:

22   Q.  Special Agent DeCapua, do you recognize what kind of a

23   document this is?

24   A.  I do.

25   Q.  And what does this document appear to be to you?

1    A.  This is an e-mail.

2    Q.  And who is the e-mail from?

3    A.  It is from Amber Itigo with an e-mail address@kucoin.com.

4    Q.  Who is it to?

5    A.  To hello@tornado.cash.

6    Q.  What is that the date of this e-mail?

7    A.  October 26, 2020.

8    Q.  If I could ask you to read the text of the e-mail?

9    A.  It says:  Dear Sirs/Madams.  Thanks for reading my e-mail.

10   This is Amber from KuCoin Exchange.  We found that the hacker

11   of KuCoin has transferred the ETH to your platform.  Please

12   kindly check the info on blockchain.

13          And then there is a link from etherscan.io that

14   appears to share a transaction hash.

15   Q.  Can you read the last line?

16   A.  Please help us block these tokens and let me know if there

17   is any update.  Regards, Amber.

18          MR. REHN:  And if we can bring that down and bring

19   back up Government Exhibit 3002-2?

20   Q.  What is the first incident that you had identified as part

21   of your tracing analysis?

22   A.  The first incident, chronologically, is KuCoin.

23   Q.  And did we just look at a couple of documents relating to

24   that incident?

25   A.  We did.

P7H5sto5                         DeCapua - Direct

1   Q.   What is the next incident on your tracing analysis?

2   A.   Chronologically it is Compounder Finance.

3          MR. REHN:   The government now moves into evidence the

4   two exhibits listed at the bottom by Compounder Finance,

5   Government Exhibit 233 and Government Exhibit 209-61.

6          THE COURT:   233 and 209-61 are admitted into evidence

7   and may be shown to the jury.

8          (Government's Exhibits 233, 209-61 received in

9   evidence)

10         MR. REHN:   Ms. Sebade if you can bring up Government

11  Exhibit 233?   And if we could expand the top portion and just

12  get the text of the e-mail?

13  BY MR. REHN:

14  Q.   Special Agent DeCapua, is this an e-mail to that same

15  hello@Tornado.cash email address we looked at earlier.

16  A.   Yes.

17  Q.   What is the date of this e-mail?

18  A.   December 2, 2020.

19  Q.   If we could read the first portion of the e-mail through:

20  Into the team...?

21  A.   *Dear Tornado team.  We are writing to you as there has been*

22  *recently a scam and a rug pull from a project called*

23  *Compounder.Finance.  The project has scammed approximately*

24  *$13 million and we are investigating further into the team.*

25  *Here is a post we wrote in public about it.*

P7H5sto5                           DeCapua - Direct

1    Q.  I can stop you there, Special Agent DeCapua, and in the

2    interest of time we can go down to the lower part of the e-mail

3    beginning with "moreover" and if you can read that?

4    A.  *Moreover, we expect that the thief will also be using*

5    *Tornado Cash to mix/hide the trace of the stolen funds, which*

6    *are currently at the following two wallets.*

7    Q.  Do you see there are two wallets identified in the e-mail?

8    A.  I do.

9              MR. REHN:  We can bring that down.

10             The government now offers -- 209-61 is already in

11   evidence, if we can bring that up and expand?

12   BY MR. REHN:

13   Q.  Special Agent DeCapua, did the Roman Storm Google account

14   search for any terms on December 8, 2020?

15   A.  It did.

16   Q.  And what are the terms that are represented in this

17   exhibit?

18   A.  The first term that was searched was "Compounder Finance"

19   and the second term that was searched just a few seconds later

20   was "Compounder Finance scam."

21             MR. REHN:  We can bring that down and go back to

22   Government Exhibit 3002-2, and if we can go to the third

23   incident that is listed here?

24   Q.  What is the name of that incident?

25   A.  Alpha Homora.

P7H5sto5                        DeCapua - Direct

1    Q.   What is the date of that incident?

2    A.   February 13, 2021.

3    Q.   And at the bottom is there an exhibit listed connected to

4    that incident?

5    A.   There is.

6              MR. REHN:   The government offers 209-59.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P7H5sto5                          DeCapua - Direct

1          (In open court)

2                MR. REHN:  Ms. Sebade, if you can bring up Government

3     Exhibit 209-59?  And if you could expand that?

4                THE COURT:  Sir, did we admit 209-59?

5                MR. REHN:  The government offers 209-59.

6                MR. CASEY:  Subject to prior objection, your Honor.

7                THE COURT:  Sir.

8                Government Exhibit 209-59 is admitted into evidence

9     and may be shown to the jury.  Thank you.

10               (Government's Exhibit 209-59 received in evidence)

11    BY MR. REHN:

12    Q.  Special Agent DeCapua, on February 15, 2021, what did the

13    Roman Storm Google account search for?

14    A.  Searched for the words:  Alpha Homora hack.

15               MR. REHN:  We can bring that down and bring back up

16    Government Exhibit 3002-2.

17    Q.  What was the next incident that you considered in your

18    tracing analysis, chronologically?

19    A.  It was an incident for an entity called Furucombo.

20    Q.  Was that on February 27 of 2021?

21    A.  It is.

22               MR. REHN:  Your Honor, the government now offers

23    Government Exhibit 235, pursuant to stipulation S2.

24               MR. CASEY:  Subject to prior objection, your Honor.

25               THE COURT:  Government Exhibit 235 is admitted into

P7H5sto5                         DeCapua - Direct

1   evidence, and may be shown to the jury.

2            (Government's Exhibit 235 received in evidence)

3            MR. REHN:  Ms. Sebade, if you can expand that?

4   BY MR. REHN:

5   Q.  Is this another e-mail to that hello@tornado.cash account?

6   A.  It is.

7   Q.  If you can read this e-mail, please?

8   A.  *To Tornado Cash.  Dear sir/ma'am.  This is Chun Lin Li from*

9   *Ministry of Justice Investigations Bureau, Taiwan (ROC).  We*

10  *are investigating the Furucombo's proxy smart contract*

11  *compromised event on 2021/2/28.  As the hacker used your*

12  *service to swap tokens, we need your help to provide the*

13  *hacker's IP address or any information that hacker's identity*

14  *that could be identified.  The hacker used the Ethereum wallet*

15  *as below.*

16           And then there is two Etherscan links that appear to

17  show an Ethereum wallet.

18           MR. REHN:  We can bring that down and if we could go

19  to Government Exhibit 209-58, which the government offers?

20           MR. CASEY:  Subject to prior objection, your Honor.

21           THE COURT:  Government Exhibit 209-58 is admitted into

22  evidence and may be shown to the jury.

23           (Government's Exhibit 209-58 received in evidence)

24  BY MR. REHN:

25  Q.  Special Agent DeCapua, what did the Roman Storm Google

P7H5sto5                         DeCapua - Direct

1   account search for on February 27 of 2021?

2   A.   The word:  Furucombo.

3            MR. REHN:  We can bring that down and bring back up

4   Government Exhibit 3002-2.

5   Q.   What was the next incident, chronologically, that you

6   looked at?

7   A.   Uranium finance.

8   Q.   And if we could offer Government's Exhibits 209-53, 209-54

9   and 209-55 at this time?

10           MR. CASEY:  Subject to prior objection, your Honor.

11           THE COURT:  Government's Exhibits 209-53, 209-54 and

12  209-55 are admitted into evidence and may be shown to the jury.

13           (Government's Exhibits 209-53, 209-54, 209-55 received

14  in evidence)

15           MR. REHN:  Ms. Sebade, if you could bring up

16  Government Exhibit 209-53?

17  BY MR. REHN:

18  Q.   Special Agent DeCapua, did the Roman Storm Google account

19  search for a particular term on April 28, 2021?

20  A.   It did.

21  Q.   And what was the term that it searched for?

22  A.   The words:  Tornado Cash.

23  Q.   What do you see appearing three seconds later in the Google

24  history?

25  A.   I see the actual visitation of a link.

P7H5sto5                         DeCapua - Direct

1   Q.  And so, does that indicate that the Roman Storm Google

2   account visited the article at that link?

3   A.  Yes.  It indicates that the storm account searched for this

4   term, got the search results, and then clicked on this link.

5   Q.  Does the link indicate to you a particular incident related

6   to your tracing analysis?

7   A.  It does.

8   Q.  And what is that?

9   A.  It is the Uranium Finance exploit.

10        MR. REHN:  We can take that down and bring up

11  Government Exhibit 209-54.

12  Q.  Special Agent DeCapua, did the Roman Storm Google account

13  search for another term on April 28, 2021?

14  A.  It did.

15  Q.  What was that term?

16  A.  The words:  Uranium Finance.

17  Q.  Is there an entry shortly thereafter in the Google history?

18  A.  There is a couple seconds after.

19  Q.  And what does that indicate from the Google search history?

20  A.  It indicates that the term "Uranium Finance" was searched,

21  Google provided search results, and then this link was clicked

22  by the user of that account.

23        MR. REHN:  We can bring that down and bring up

24  Government Exhibit 209-55.  And if we could expand that?

25  Q.  Did the Roman Storm Google account search for another term

P7H5sto5                         DeCapua - Direct

1    on April 28, 2021?

2    A.  It did.

3    Q.  What was that term?

4    A.  The term:  Uranium hack.

5    Q.  Is there an entry shortly thereafter?

6    A.  There is.

7    Q.  If you could read the title of that entry?

8    A.  BSC Protocol Uranium Finance Hacked for $50 million.

9    Q.  Did the Roman Storm Google account visit that link on

10   April 28, 2021?

11   A.  It did.

12          MR. REHN:  Your Honor, I would now like to read

13   another stipulation.

14          THE COURT:  You may, sir.

15          MR. REHN:  This is entitled Stipulation Regarding

16   Publicly Available Materials, Government Exhibit S3, and it

17   says:  The exhibits set forth below consist of true and correct

18   copies of materials that were publicly available on the dates

19   listed below.  And, as relevant here, Government Exhibit 1916

20   was available on April 28, 2021.

21          The government offers Government Exhibit 1916.

22          THE COURT:  And, as well, S3, sir?

23          MR. REHN:  S3 as well, your Honor.

24          MR. CASEY:  Objection, subject to the prior objection

25   to the exhibit, your Honor.

P7H5sto5                         DeCapua - Direct

1              THE COURT:  Government's Exhibits S3 and 1916 are

2     admitted into evidence and may be shown to the jury.

3              (Government's Exhibits S3, 1916 received in evidence)

4              THE COURT:  Just so I am not misdescribing it, are the

5     stipulations marked as "Government Exhibit" or just "S3".

6              MR. REHN:  They do say "Government Exhibit."  I

7     apologize, your Honor.

8              THE COURT:  That's fine.  I want to be precise.  Thank

9     you.  They are both admitted.  1916 may be shown to the jury.

10    BY MR. REHN:

11    Q.  Does the title of this exhibit match the title that the

12    Roman Storm Google account visited on this date?

13    A.  It does.

14    Q.  And if you could just read the headline and the

15    sub-headline?

16    A.  *BSC Protocol Uranium Finance Hacked for $50 million.  The*

17    *project is in contact with Binance's security team, but the*

18    *funds have already been sent to privacy protocol Tornado Cash.*

19             MR. REHN:  We can bring that down and bring back up

20    Government Exhibit 3002-2.

21    Q.  What was the next incident you will be focusing in on your

22    testimony, chronologically?

23    A.  Liquid.com.

24    Q.  What was the date of that incident?

25    A.  August 19, 2021.

P7H5sto5                        DeCapua - Direct

1          MR. REHN:  The government now offers Government

2   Exhibit 209-49.

3          MR. CASEY:  Subject to prior objection, your Honor.

4          THE COURT:  Government Exhibit 209-49 is admitted into

5   evidence and may be shown to the jury.

6          (Government's Exhibit 209-49 received in evidence)

7          MR. REHN:  If we could expand that?

8   BY MR. REHN:

9   Q.  Special Agent DeCapua, is there a term that the Roman Storm

10  Google account searched for on August 19, 2021?

11  A.  There is.

12  Q.  What is that term?

13  A.  Liquid hacker.

14         MR. REHN:  We can bring that down and bring back up

15  Government Exhibit 3002-23.

16  Q.  What was the next incident that you analyzed?

17  A.  Vee Finance.

18  Q.  What was the date of that incident?

19  A.  September 20, 2021.

20         MR. REHN:  Your Honor, the government now offers

21  Government Exhibit 209-46.

22         MR. CASEY:  Prior objection, your Honor.

23         THE COURT:  Government Exhibit 209-46 is admitted into

24  evidence over defense objection and may be shown to the jury.

25         (Government's Exhibit 209-46 received in evidence)

P7H5sto5                    DeCapua - Direct

1    BY MR. REHN:

2    Q.   Special Agent DeCapua, is there a term that the Roman Storm

3    Google account searched for on September 21, 2021?

4    A.   Yes.

5    Q.   What is that term?

6    A.   Vee Finance.

7            MR. REHN:   We can bring that down and if we could

8    bring back up Government Exhibit 3002-2?

9    Q.   What was the next incident you looked at?

10   A.   BitMart.

11   Q.   What was the date of that incident?

12   A.   December 4, 2021.

13           MR. REHN:   If we could bring up Government

14   Exhibit 1010, which is in evidence?   Let's actually bring up

15   Government Exhibit 1005 and if we could expand the top portion

16   of this document?

17   Q.   And if I could ask you to read this, just the first line of

18   this e-mail -- letter, I should say.

19   A.   *Dear Tornado Cash.   We represent BitMart in connection with*

20   *the cyber security incident that occurred on December 4,*

21   *2021...*

22   Q.   And if we could read the sentence beginning:   Our

23   investigation?

24   A.   *Our investigation, to date, reveals that certain assets*

25   *were transferred to Tornado Cash and that a significant portion*

P7H5sto5                          DeCapua - Direct

1    *of those assets remain at Tornado Cash.  We demand that --*

2    Q.  I think that's enough.

3         MR. REHN:  We can bring that down and if we could go

4    back to Exhibit 3002-2?

5    Q.  What was the next incident, chronologically, that you

6    looked at?

7    A.  Crypto.com.

8    Q.  What was the date of that incident?

9    A.  January 17, 2022.

10        MR. REHN:  The government now -- we now have an

11   exhibit, your Honor, that was -- it is 2001 and 2001-T.  I'm

12   going to read a stipulation regarding Russian translations

13   which is marked as Government Exhibit S5.  With the usual

14   preamble, stipulation S5 reads:  Government's Exhibits in the

15   2000 series with -T in the exhibit number contain true and

16   accurate English translations of the portions of the

17   corresponding numbered exhibits that are in Russian.

18        Your Honor, the government offers -- actually, can we

19   bring up Government Exhibit 2001, just for the witness?

20        THE COURT:  Just for the witness.

21   BY MR. REHN:

22   Q.  Special Agent DeCapua, do you see Roman Storm's name on

23   this document?

24   A.  I do.

25        MR. REHN:  Your Honor, the government offers

P7H5sto5                    DeCapua - Direct

1    Government Exhibit 2001, which is one of the records that were

2    authenticated by Special Agent Dickerman earlier today.

3             MR. CASEY:  Subject to prior objection, your Honor.

4             THE COURT:  Government Exhibit 2001, 2001-T and S5 are

5    admitted into evidence.

6             MR. REHN:  Thank you, your Honor.

7             (Government's Exhibits 2001, 2001-T, S5 received in

8    evidence)

9             MR. REHN:  So we will be focusing on the English

10   translations today, your Honor.

11            THE COURT:  Sir.

12            MR. REHN:  If you can bring up Government

13   Exhibit 2001-T?

14   BY MR. REHN:

15   Q.  Special Agent DeCapua, do you recognize what kind of a

16   document this is?

17   A.  I do.

18   Q.  What is it?

19   A.  This is the type of report that a company called Cellebrite

20   generates when you extract information from an Apple IOS

21   system.

22   Q.  And do you see that there is a -- it says Chats and

23   Telegram at the top?

24   A.  I do.

25   Q.  What does that indicate to you?

P7H5sto5                          DeCapua - Direct

1   A.  It indicates on this specific device this is an extraction

2   of particular chats from the messaging service called Telegram.

3   Q.  Does each chat in Telegram have a name or a title?

4   A.  It does.

5        MR. REHN:  Ms. Sebade, if we can expand the box at the

6   middle, at least down through Roman Storm's name?

7   Q.  Do you see there is a name here?

8   A.  I do.

9   Q.  What is the name?

10  A.  1inch; and then there is a less than/greater than sign

11  Tornado.cash.

12  Q.  Do you see that Roman Storm is one of the participants in

13  the chat?

14  A.  I do.

15       MR. REHN:  Could we now go to page 2 of this document

16  and if we could expand the message at the top of page 2, just

17  the text of the message?  We don't have to look at the

18  attachments.  Actually, if we could go down to the bottom first

19  and get the date on this message?

20  Q.  What was the date of the message we are looking at here?

21  A.  January 18, 2022.

22  Q.  And if we can go to the top, Special Agent DeCapua, who is

23  this message -- is this a forwarded message or an original

24  message?

25  A.  It says forwarded at the top so it was a forwarded message.

P7H5sto5                          DeCapua - Direct

1  Q.  And who was the person who forwarded this message?

2  A.  Anton Bukov.

3  Q.  Can you read the message that Anton Bukov forwarded on this

4  date?

5  A.  *Crypto.com is spinning in a tornado.  Click.  There is*

6  *$15 million in Ethereum (and that's a total of 4,600 ETH!!)*

7  *being laundered right now through Tornado Cash, Ethereum mixer.*

8  *This is what the on-chain data tells us.  In brief,*

9  *Tornado Cash and Ethereum mixer are these things for privacy.*

10 *They mix the funds and hide the path from wallet A to wallet B.*

11 *Neat things, aren't they?  And how are you doing?*

12          MR. REHN:  We can bring that down and if we can go

13 back to Government Exhibit 3002-2?

14 Q.  What was the next incident after that crypto.com incident

15 you looked at?

16 A.  Qubit Finance.

17          MR. REHN:  Your Honor, the government offers

18 Government Exhibit  -- well, let's bring up Government

19 Exhibit 2008-T.

20          THE COURT:  Is that what you are seeking to admit?

21          MR. REHN:  First, if we can show just the witness and

22 the Court Government Exhibit 2008?

23          THE COURT:  Thank you.

24 BY MR. REHN:

25 Q.  Special Agent DeCapua, does this look similar to the chat

P7H5sto5                         DeCapua - Direct

1    we looked at previously?

2    A.   It does.

3    Q.   And is Roman Storm on this document?

4    A.   He is.

5           MR. REHN:   Your Honor, the government now offers

6    Government Exhibit 2008 and 2008-T.

7           MR. CASEY:   Subject to prior objection, your Honor.

8           THE COURT:   Government's Exhibits 2008 and 2008-T are

9    admitted into evidence and may be shown to the jury.

10          (Government's Exhibits 2008, 2008-T received in

11   evidence)

12   BY MR. REHN:

13   Q.   Special Agent DeCapua, is this another section of that same

14   1inch Tornado Cash chat?

15   A.   It is.

16   Q.   Can we go to page 2 of this document -- oh, I'm sorry.

17   Let's actually do this in English, so if we can bring up

18   Government Exhibit 2008-T?

19          THE COURT:   May I ask a question, sir?   The title of

20   the chat, is that picked by the participants in the chat or the

21   person who originates the chat, the 1inch less than/greater

22   than Tornado Cash, who named that?   If you know.   And if you

23   don't, that's fine by me.

24          THE WITNESS:   I don't know for sure so I don't feel

25   comfortable saying.

P7H5sto5                         DeCapua - Direct

1         THE COURT:  I don't want you to speculate, so thank

2    you.

3         Would you please?

4         MR. REHN:  Do we have the English version?  So if we

5    can go to page 2 and if we can expand the top message?

6    Q.  And what is the date on this message?

7    A.  January 31, 2022.

8    Q.  Does this message have a -- who is the sender of this

9    message?

10   A.  It is Roman Semenov.

11   Q.  Is this a forwarded message or a message authored by Roman

12   Semenov?

13   A.  It is a message authored by Roman Semenov.

14   Q.  Could you read the message, please?

15   A.  *It turns out that Qubit had an audit done and then decided*

16   *that they are the smartest and can finish a bunch of features*

17   *without checking them.*

18         And then there is a link to a Twitter post.

19   Q.  Is the text of that Twitter post a little lower down in the

20   message?

21   A.  It is.

22   Q.  And if you could read just the first sentence of that

23   Twitter post?

24   A.  *Follow up on @Qubit.Fin's post about the recent attack,*

25   *here's our brief postmortem.*

P7H5sto5                    DeCapua - Direct

1   Q.  I can stop you there.  Do you recognize that term

2   "postmortem?"  I think you testified about that earlier?

3   A.  I do.

4   Q.  Can you remind us what that is?

5   A.  It is where someone explains what the problem was that

6   caused them to be subject to a hack or an exploit.

7          MR. REHN:  Ms. Sebade, if we can now go to the bottom

8   of page 5 of this exhibit?

9   Q.  Is there a message here from Roman Storm?

10  A.  There is.

11  Q.  What is the date on that message?

12  A.  It's February 1, 2022.

13  Q.  Does that contain a link to a YouTube video?

14  A.  It does.

15         MR. REHN:  Then if we could scroll down a little bit

16  further?

17  Q.  Is there another message on the screen now?

18  A.  There is.

19  Q.  Who is the author of that message?

20  A.  Roman Storm.

21  Q.  Could you read that message, please?

22  A.  *It's a good idea.  You take an ancient hack and promote it*

23  *again.*

24         MR. REHN:  If we could bring that down and if we could

25  bring back up Government Exhibit 3002-2?

P7H5sto5                        DeCapua - Direct

1   Q.   Now, Special Agent DeCapua, I believe we were just looking

2   at the Qubit Finance incident; is that correct?

3   A.   That's correct.

4   Q.   What is the next incident that you analyzed as part of your

5   tracing work?

6   A.   Ronin Network.

7           MR. REHN:  If we could bring up just for the witness

8   and the Court Government Exhibit 2044?

9   Q.   Special Agent DeCapua, do you recognize this as a similar

10  Telegram chat to the ones we have been looking at?

11  A.   I do.

12  Q.   And if you could tell us whether Roman Storm is on this

13  chat?

14  A.   He is.

15          MR. REHN:  Your Honor, the government offers

16  Government Exhibit 2044 and 2044-T.

17          MR. CASEY:  Subject to prior objection, your Honor.

18          THE COURT:  Government's Exhibits 2044 and 2044-T are

19  admitted into evidence and may be shown to the jury.

20          (Government's Exhibits 2044, 2044-T received in

21  evidence)

22          MR. REHN:  If we could bring up Government

23  Exhibit 2044-T?  Actually, Ms. Sebade, if I can ask you to

24  first expand sort of the top portion of this as the information

25  about the chat?  That whole box, I guess.

P7H5sto5                         DeCapua - Direct

1    Q.  Special Agent DeCapua, what is the title of this chat?  Or

2    the name of this chat.  I should say.

3    A.  It is:  Bablo Peppersec.

4    Q.  Is there a group photo for this chat?

5    A.  There is.

6    Q.  What does the chat appear to be?

7    A.  It is like a bag of cash.

8    Q.  Who are the participants in this chat?  And we may just

9    scroll down a little bit.

10   A.  So, I see test ICO bot, I see Roman Storm, I see Tornado

11   monitor, I see Alexey Pertsev, and I see Roman Semenov.

12              MR. REHN:  If we could go to page -- give me one

13   second -- page 4 of this exhibit -- I'm sorry.  I have the

14   wrong notes here.  Go to page 10 of the exhibit at the bottom.

15   And if we could expand just the very bottom message here?

16   BY MR. REHN:

17   Q.  Special Agent DeCapua, what is the date of this message?

18   A.  It's March 29, 2022.

19   Q.  And who is the author of this message?

20   A.  Roman Semenov.

21   Q.  Could you please read the message?

22   A.  *Did you already see the $600 million hack today?  Shit*

23   *might seriously hit the fucking fan now.*

24              MR. REHN:  Can we scroll down to the next page?

25   Q.  Special Agent DeCapua, was there a reply to that message?

P7H5sto5                         DeCapua - Direct

1    A.  There was.

2    Q.  And who was that reply from?

3    A.  Roman Storm.

4    Q.  And what did Roman Storm write in reply?

5    A.  *No.  What happened there?*

6            MR. REHN:  Can we scroll down to the next message?

7    Q.  Could you read the next two messages?  Are those also

8    authored by Roman Storm?

9    A.  They are.

10   Q.  Could you please read those?

11   A.  *What kind of hack?  How is it different from others?  Why*

12   *might shit hit the fucking fan?*

13   Q.  And was there a response to that from Roman Semenov?

14   A.  There was.

15   Q.  Could you please read that message?

16   A.  *A private key was fucking stolen from a bridge.*

17           MR. REHN:  Can we scroll to the next page?

18   Q.  Did Roman Storm reply to that?

19   A.  He did.

20   Q.  What did he say?

21   A.  *From which one?*

22           MR. REHN:  Can we scroll to the next message?

23   Q.  Then is there a reply to an earlier message from Roman

24   Storm?

25   A.  There is.

P7H5sto5                         DeCapua - Direct

1  Q.  Is that the earlier message where Roman Storm said *what*

2  *kind of a hack?  How is it different from others.*

3  A.  It is.

4  Q.  What did Roman Semenov say in response to Roman Storm's

5  question?

6  A.  He said:  *By the fucking amount of the hacked.*

7          MR. REHN:  If we can scroll down?

8  Q.  Did Roman Storm respond?

9  A.  He did.

10  Q.  What did he say?

11  A.  *Could you be more specific?*

12          MR. REHN:  Can we go to the next page, please?

13  Q.  What was Roman Semenov's response?

14  A.  *Half a billion.*

15          MR. REHN:  Can we go down to the next message?

16  Q.  Was there a reply to the original message now from Roman

17  Storm?

18  A.  Yes.

19  Q.  And what did Roman Storm say?

20  A.  *Oh.  I thought it's 600,000.*

21  Q.  Was there a message shortly thereafter from Roman Storm?

22  A.  There was.

23  Q.  That did he say?

24  A.  *Send me the info, please.*

25  Q.  And what was the response from Roman Semenov?

P7H5sto5                        DeCapua - Direct

1    A.  The word:  *Ronin Bridge.*

2              MR. REHN:  And if we could go to the next page?

3    Q.  Is there a further message from Roman Semenov?

4    A.  There is.

5    Q.  What did he say?

6    A.  He said:  *173K ETH.*

7    Q.  And if we could look at the next message, what does that

8    appear to be?

9    A.  It's Roman Semenov sending a Twitter link for the Twitter

10   account Ronin_network.

11   Q.  Does that look like a link to a Tweet?

12   A.  It does.

13             MR. REHN:  Your Honor, I would like to read another

14   portion of Government Exhibit S3.

15             THE COURT:  Yes.  Previously admitted as a

16   stipulation?

17             MR. REHN:  Yes.

18             THE COURT:  You may.

19             MR. REHN:  I just want to make sure I have the right

20   number, your Honor.  Give me one moment?

21             THE COURT:  Yes.

22             MR. REHN:  So, S3 was about publicly available

23   materials and it includes Government Exhibit 2044-2 at the date

24   March 22, 2022.

25             And if we could bring up government exhibit, just for

P7H5sto5                          DeCapua - Direct

1    the Court and the witness at this time, Government

2    Exhibit 2044-2.

3    BY MR. REHN:

4    Q.   Special Agent DeCapua, does that appear to be the Tweet

5    that Roman Semenov sent on March 29?

6    A.   Can you switch back to the prior exhibit, please?

7              MR. REHN:   Can we bring back up the government

8    exhibit?

9    A.   Yes, it does.

10             MR. REHN:   The government offers Government

11   Exhibit 2044-2?

12             MR. CASEY:   Prior objection, your Honor.

13             THE COURT:   Government Exhibit 2044-2 is admitted into

14   evidence and may be shown to the jury.

15             (Government's Exhibit 2044-2 received in evidence)

16   BY MR. REHN:

17   Q.   Special Agent DeCapua, if you could read the larger tweet,

18   the second one on the screen here?

19   A.   *The Ronin Bridge has been exploited for 173,600 Ethereum*

20   *and 25.5 million USDC.   The Ronin Bridge and Katana Dex have*

21   *been halted.*

22             MR. REHN:   If we can go back now to Government

23   Exhibit 3002-2?

24   Q.   After the Ronin Network incident, when was the next

25   incident you looked at in your analysis?

P7H5sto5                          DeCapua - Direct

1    A.   Inverse Finance.

2              MR. REHN:  For Inverse Finance, if we could bring up,

3    just for the witness, Government Exhibit 2048-T?

4              THE COURT:  And not 2048, sir?

5              MR. REHN:  I apologize, your Honor.  The sequencing of

6    these translations, I will pick it up eventually, I'm sure.

7    Government Exhibit 2048, please, just for the witness and the

8    Court.

9    BY MR. REHN:

10   Q.   Special Agent DeCapua, is this another section of this

11   Bablo Peppersec we have been looking at?

12   A.   It is.

13             MR. REHN:  The government offers Government Exhibit

14   2048 and Government Exhibit 2048-T?

15             MR. CASEY:  Subject to prior objection, your Honor.

16             THE COURT:  The objections are overruled.

17   Government's Exhibits 2048 and 2048-T are admitted into

18   evidence and may be shown to the witness.

19             (Government's Exhibits 2048 and 2048-T received in

20   evidence)

21             MR. REHN:  Again, I think it is probably more

22   productive to focus on the English version.

23             THE COURT:  It is.

24             MR. REHN:  So we will bring up Government

25   Exhibit 2048-T.

P7H5sto5                        DeCapua - Direct

1    BY MR. REHN:

2    Q.  Special Agent DeCapua, is this that same Bablo Peppersec

3    chat with the money bag group photo we looked at before?

4    A.  Yes, it is.

5    Q.  And is Roman Storm on this chat?

6    A.  He is.

7         MR. REHN:  Could we go to page 4 of this exhibit,

8    please?  And if we could expand the text in the middle here.

9    Q.  Was there a message sent on April 30 of 2022?

10   A.  There was.

11   Q.  And is that -- who was that message from?

12   A.  It's from Roman Semenov.

13   Q.  What did Roman Semenov say in that message?

14   A.  It says:  *That moron spoiled all the stats with Ronin and*

15   *Beanstalk*.  And then there is a Twitter link.

16   Q.  And is there some text from that Twitter link below?

17   A.  There is.

18        MR. REHN:  If I could ask you to look at that text,

19   and then if we can bring up just for the witness Government

20   Exhibit 2048-1 and I will just read from stipulation S3, again,

21   as to Government Exhibit 2048-1, the date is April 29 of 2022

22   and the government offers Government Exhibit 2048-1?

23        MR. CASEY:  Subject to prior objection, your Honor.

24        THE COURT:  Government Exhibit 2048-1 is admitted into

25   evidence and may be shown to the jury.

P7H5sto5                         DeCapua - Direct

1           (Government's Exhibit 2048-1 received in evidence)

2   BY MR. REHN:

3   Q.  Special Agent DeCapua, do you recall we were talking about

4   the Inverse Finance incident as one of the incidents in your

5   analysis; is that right?

6   A.  That's correct.

7   Q.  And first could we read what the text of this Tweet is?

8   A.  *15 percent of Tornado deposits are from the Ronin*

9   *exploiter.*

10  Q.  And if we could look at the graphic -- and Ms. Sebade, if

11  you could expand the graphic a little bit -- do you see

12  something that says wallet profiler?

13  A.  I do.

14  Q.  Is there an address associated with that?

15  A.  Yes.

16  Q.  What is the address that's listed in this Tweet?

17  A.  Tornado Cash router.

18  Q.  And below that does that say:  Incoming ETH?

19  A.  It does.

20  Q.  If you could read the top three sources of incoming ETH to

21  Tornado Cash router, according to this Tweet?

22  A.  Unknown, 75 percent; Ronin Bridge exploiter, 15 percent;

23  Beanstalk flashloan, exploit 7.17 percent.

24  Q.  Can we actually go down to the next one as well?

25  A.  Inverse Finance exploiter, 1.32 percent.

P7H5sto5                          DeCapua - Direct

1   Q.  And with respect to -- now, we have already talked about

2   the Ronin Bridge is one of the incidents you investigated; is

3   that correct?

4   A.  That is correct.

5   Q.  And was Inverse Finance the next one that we were looking

6   at?

7   A.  Yes.

8   Q.  Was Beanstalk another incident you investigated?

9   A.  It was.

10         MR. REHN:  If we can go back to the message associated

11  with this Tweet, 2044 -- do I have that right or is it 2048?  I

12  think we are at 2048 -- actually, at page 4 of 2048.

13  Q.  Did Roman Semenov, is he the one who sent this Tweet?

14  A.  That's correct.

15  Q.  And in his message he referenced just the Ronin and

16  Beanstalk incidents but the Tweet itself also mentioned the

17  Inverse; is that right?

18  A.  It does, yes.

19         MR. REHN:  If we can go back now to Government

20  Exhibit 3002-2.

21  Q.  Do we see those three incidents as incidents you analyzed

22  in March and April of 2022?

23  A.  I do.

24  Q.  If we can go now to Government Exhibit  -- I'm sorry if I

25  could ask you, what is the next incident, chronologically, you

P7H5sto5                          DeCapua - Direct

1    investigated?

2    A.   RARI Capital.

3              MR. REHN:  And with respect to Rari Capital, if we

4    could look at, just for the witness, Government Exhibit 23-11?

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P7H1STO6                    DeCapua - Direct

1          MR. REHN:  Actually, you know, I think we'll skip that

2    one.  Let's go to the next one.

3          Let's go ahead and go back to 3002-2.

4    BY MR. REHN:

5    Q.  And Special Agent DeCapua, if we could do Harmony Protocol.

6    Is that the next incident you looked at chronologically?

7    A.  It was.

8    Q.  And what was the date of that incident?

9    A.  June 3, 2022.

10         MR. REHN:  And if we could now——I'd like to read

11   another portion of stipulation S2, your Honor.

12         THE COURT:  You may, sir.

13         MR. REHN:  Government Exhibits 552-563 contain

14   authentic copies of records from X, formerly known as Twitter.

15         And the government offers Government Exhibit 562.

16         MR. CASEY:  Subject to prior objection, your Honor.

17         THE COURT:  Government Exhibit 562 is admitted into

18   evidence and may be shown to the jury.  Thank you.

19         (Government's Exhibit 562 received in evidence)

20   BY MR. REHN:

21   Q.  Special Agent DeCapua, if I could ask you to read the three

22   messages after the blue heart.

23   A.  "Hey, Roman, our Harmony to ETH bridge got exploited today

24   and the hacker is holding it in ETH.  He may use Tornado Cash.

25   The hacker may use Tornado Cash.  Is there any patterns we can

P7H1STO6                          DeCapua - Direct

1    learn?"

2    Q.  And what were the date of those messages?

3    A.  June 24, 2022.

4              MR. REHN:  All right.  We could bring that down.  And

5    if we could go to——the government offers Government

6    Exhibit 209-21, which is another portion of Government

7    Exhibit 209.

8              MR. CASEY:  Subject to prior objection, your Honor.

9              THE COURT:  Government Exhibit 209-21 is admitted into

10   evident and may be shown to the jury over the defense

11   objection.

12             (Government's Exhibit 209-21 received in evidence)

13   BY MR. REHN:

14   Q.  And Special Agent DeCapua, if I could ask you to read the

15   searches from the Roman Storm Google account that took place on

16   July 1st of 2022.

17   A.  The term "Tornado Cash" was searched twice.

18   Q.  And then after those searches was there a particular

19   website that was visited?

20   A.  Yes.  Of the search results, the website that was visited

21   was, "Harmony ropes in FBI after losing 100 million in

22   exploited one token," and then it trails off.

23             MR. REHN:  All right.  I think we just have one more.

24   If we go back to Government Exhibit 3002-2.

25   Q.  What's the last incident you looked at as part of your

1   tracing analysis, Special Agent DeCapua?

2   A.  Uniswap Phishing.

3   Q.  What was the date of that incident?

4   A.  July 11, 2022.

5   Q.  So this was the last in time that you looked at?

6   A.  It is.

7   Q.  And Special Agent DeCapua, if I could bring up for you and

8   the Court Government Exhibit 2007.

9           And Special Agent DeCapua, does this look similar to

10  some of the chats we've looked at to date?

11  A.  It does.

12  Q.  And is this another portion of that 1inch Tornado Cash

13  chat?

14  A.  It is.

15  Q.  And do you see Roman Storm in this chat?

16  A.  I do.

17          MR. REHN:  Your Honor, the government offers

18  Government Exhibits 2007 and 2007-T.

19          MR. CASEY:  Subject to prior objection, your Honor,

20  and an additional objection on rule of completeness grounds.

21          THE COURT:  I missed the last thing that you said,

22  sir.

23          MR. CASEY:  On rule of completeness grounds, your

24  Honor.

25          THE COURT:  All right.  Government Exhibits 2007 and

P7H1STO6                    DeCapua - Direct

1    2007-T are admitted into evidence and may be shown to the jury.

2              (Government's Exhibits 2007 and 2007-T received in

3    evidence)

4              MR. REHN:  Ms. Sebade, if we could now bring up

5    Government Exhibit 2007-T.  And if we could go to page 1 of

6    this exhibit and if we could expand the top message.

7    BY MR. REHN:

8    Q.  And Special Agent DeCapua, what is the date of this

9    message?

10   A.  It's July 12, 2022.

11   Q.  And who is reported as the author of this message?

12   A.  Sergej, and then there's the word 1inch after his name.

13   Q.  And what is the text of the message?

14   A.  "Our threat intel detected a potential exploit on Uniswap

15   V3 on the ETH blockchain.  The hacker has stolen 2,295 ETH so

16   far, and they are being laundered through Tornado Cash.  Can

17   someone notify @uniswap?  We can help.  Thanks."

18   Q.  So Special Agent DeCapua, was what you just read a portion

19   of a tweet?

20   A.  Yes.

21             MR. REHN:  And if we could offer Government

22   Exhibit 2007-1, and I'll read from stipulation S3 again.

23             As to Government Exhibit 2007-1, it was publicly

24   available on July 12, 2022.

25             THE COURT:  Same objection, sir?

1          MR. CASEY:  Yes, your Honor.

2          MR. REHN:  Could we please bring up——

3          THE COURT:  Oh.

4          MR. REHN:  Sorry.

5          THE COURT:  Yes.  You do have to let me actually admit

6    the exhibits, sir.  Thank you.

7          Government Exhibit 2007-1 is admitted into evidence

8    and may be shown to the jury.

9          (Government's Exhibit 2007-1 received in evidence)

10   BY MR. REHN:

11   Q.  Special Agent DeCapua, is this the tweet that we were

12   looking at?

13   A.  It was.

14   Q.  And I see CZ here as the author of this tweet.  Do you

15   happen to know who that is?

16   A.  I do.

17   Q.  Is that person a prominent person in the crypto community

18   that you were describing earlier?

19   A.  It is.

20          MR. REHN:  If we could bring that down and go back to

21   Government Exhibit 2007-T.

22   Q.  And that links to that tweet in this chat that we were

23   looking at a moment ago; is that right?

24   A.  That's correct.

25          MR. REHN:  Ms. Sebade, if we could scroll down and

P7H1STO6                    DeCapua - Direct

1    look at the next two messages.

2    Q.  Special Agent DeCapua, are these messages authored by the

3    person who sent that tweet, Sergej?

4    A.  Yes.

5    Q.  Could you please read that, those messages.

6    A.  "Fuck, guys, you don't need to spend anything on

7    marketing."  And then there's what appears to be a smiley face

8    emoji.  "Even CZ has written about you."

9            MR. REHN:  All right.  And if we could now go to

10   page 6 of this exhibit.

11           And if we could actually go to page 5, I believe.  And

12   if we could expand the top chat.

13   Q.  Is this another message from Sergej?

14   A.  It is.

15   Q.  And is this on July 16, 2022?

16   A.  It is.

17   Q.  And if you could read that message.

18   A.  "Fuck, you are being advertised for free."  And then again,

19   there's smile emojis.

20   Q.  And then what's the next message?

21   A.  @rstormsf.

22   Q.  Can we scroll down to the next message.

23           Who's the author of this message?

24   A.  Roman Storm.

25   Q.  Could you read that message.

1    A.  "It's fucking funny."

2    Q.  And then did Roman Storm reply to the "you are being

3    advertised for free" message?

4    A.  He did.

5    Q.  What did he say?

6    A.  "Thanks, guys——"

7    Q.  And if we could go to the next message.

8            And if you could read the next message from Roman

9    Storm.

10   A.  "——for making a video clip like this."

11   Q.  And then was there a message from Sergej?

12   A.  There was.

13   Q.  And could you read that message.

14   A.  Smile emoji.  "None of this would have happened without

15   you."

16           MR. REHN:  Scroll down.

17           Go up just a little bit.

18   Q.  If we could read the next two messages from Sergej.

19   A.  "No one would have been able to launder fucking stolen

20   tokens through Tornado."

21   Q.  And then the next?

22   A.  "I am joking, of course."  And then smiley face emoji.

23           MR. REHN:  We can bring that down.

24           Okay.  Could we go back to Government Exhibit 3002-2.

25   Q.  I believe we've been through these incidents now

P7H1STO6                    DeCapua - Direct

1    chronologically, Special Agent DeCapua; is that right?

2    A.   That is right.

3              MR. REHN:   Okay.  So the rest of the slides won't take

4    quite that long, your Honor.

5              THE COURT:   That's fine.  I do think our jurors might

6    want a break in a few moments.  So I don't know whether we

7    should take that five-minute break—five-minute break, yeah—

8    now or whether there's another section you want to cover.

9              MR. REHN:   We're going to start getting into the

10   tracing, so it's probably a good spot to take that break.

11             THE COURT:   All right.  Let's take our brief afternoon

12   break now and then we'll come back in as quick as you can.

13   Five minutes, hopefully, ten minutes maximum.  Do not discuss

14   this case with each other or anybody else.  Keep an open mind

15   until all the evidence is in.  Thank you very much.

16             THE DEPUTY CLERK:   All rise.

17             (Continued on next page)

18

19

20

21

22

23

24

25

P7H1STO6                          DeCapua - Direct

1          (Jury present)

2          THE COURT:  Please be seated.  Thank you.

3          Counsel, you may continue.

4   BY MR. REHN:

5   Q.  Special Agent DeCapua, I'd now like to turn to look at some

6   of the actual cryptocurrency tracing work that you did in this

7   case.

8          So was the first incident that you traced that KuCoin

9   hacking incident that we discussed earlier?

10  A.  Chronologically, yes.

11  Q.  And if you look in that binder, I'd like to direct your

12  attention to Government Exhibits 3002-3 through 3002-13.  And

13  as you look at those, the question will be:  Are these

14  summaries of the tracing work based on the data from the

15  blockchain that you've reviewed?

16  A.  It is.

17         MR. REHN:  Your Honor, the government offers

18  Government Exhibits 3002-3 through 3003-13.

19         MR. CASEY:  Subject to prior objection, your Honor.

20         THE COURT:  Government Exhibits 3002-3 through 3002-13

21  are admitted into evidence and may be shown to the jury.

22         (Government's Exhibits 3002-3, 3002-4, 3002-5, 3002-6,

23  3002-7, 3002-8, 3002-9, 3002-10, 3002-11, 3002-12, 3002-13

24  received in evidence)

25         MR. REHN:  And I'm realizing I broke my own rule and

P7H1STO6                    DeCapua - Direct

1    did not read all of them.

2              THE COURT:  I can do it.

3              MR. REHN:  Again, in an abundance of caution.

4              THE COURT:  No.  In the interest of completeness,

5    Government Exhibits 3002-3, 3002-4, 3002-5, 3002-6, 3002-7,

6    3002-8, 3002-9, 3002-10, 3002-11, 3002-12, and 3002-13, for

7    completeness.  Thank you.

8              MR. REHN:  Thank you, your Honor.

9              Ms. Sebade, could we bring up Government

10   Exhibit 3002-3.

11   BY MR. REHN:

12   Q.  Special Agent DeCapua, I see on the left side of the screen

13   a green square with a logo.  What is that representing in terms

14   of your analysis?

15   A.  It represents accounts owned by KuCoin.

16   Q.  And what is KuCoin?

17   A.  It's a Bitcoin exchange.

18   Q.  And then I see an arrow that's pointing to something

19   that——I guess I'll let you describe what it's pointing to.

20   A.  It's pointing to a graphic that looks like a big wallet

21   that's labeled KuCoin Hacker Wallet 1.

22   Q.  And what is that meant to represent?

23   A.  It represents the address into which the KuCoin criminal

24   proceeds that were stolen were transferred into initially.

25   Q.  And so instead of putting that string of letters and

1  numbers we talked about earlier, you're just representing that

2  with this graphic; is that right?

3  A.  Yes.

4  Q.  And then there's some numbers and a date underneath the

5  arrow.  Could you just explain what the arrow and the numbers

6  represent.

7  A.  So the arrow represents the funds actually leaving the

8  KuCoin wallet and going to the hacker's wallet, so that's what

9  the arrow means.  The direction is the direction of the funds.

10  And then the actual numbers underneath it, it says specifically

11  how much cryptocurrency was moved.  So in this case it's 11,486

12  ETH and 19.83 million USDT, which is another type of

13  cryptocurrency.

14  Q.  And when we see an arrow like this, does that represent

15  just one transaction or is that more of a flow of funds that

16  involved multiple transactions?

17  A.  It represents multiple transactions, a flow of funds.

18  Q.  And then the date, does that mean that all of the

19  transactions included in those numbers happened on that

20  particular date?

21  A.  Yes.

22  Q.  So just based on all of that, if you can just explain what

23  happened on September 25, 2020, as represented by this

24  illustration.

25  A.  On September 25, 2020, a hacker was able to move 11,486 ETH

1    into a wallet that they controlled that I've labeled KuCoin

2    Hacker Wallet 1, and also 19.83 million USDT into the same

3    wallet.

4    Q.  Okay.  And then did you engage in some work to trace what

5    happened to the crypto that went into that wallet?

6    A.  I did.

7            MR. REHN:  And if we could bring up Government

8    Exhibit 3002-4.

9    Q.  So what does this represent?

10   A.  So it represents the USDT cryptocurrency being transferred

11   into multiple different intermediary wallets controlled by the

12   same hacker.

13   Q.  And if I remember correctly, you testified earlier today

14   about something called tokens?

15   A.  Yes.

16   Q.  Is USDT an example of a token?

17   A.  It is a token on the Ethereum blockchain, yes.

18   Q.  And so the USDT that came out of KuCoin was transferred to

19   these intermediary wallets; is that right?

20   A.  That's correct.

21           MR. REHN:  Could we now look at Government

22   Exhibit 3002-5.

23   Q.  Special Agent DeCapua, what is represented on this exhibit?

24   A.  So from those intermediary wallets where the hacker's

25   stolen funds were sitting, the hacker swapped those funds, the

P7H1STO6                         DeCapua - Direct

1    USDT, for the Ether, and so the arrows that you see in the

2    circle that says Crypto Swap, that's a swap service that

3    exchanges different types of cryptocurrencies for other types

4    of cryptocurrencies, and the arrows going back and forth

5    represents that the person controlling those multiple

6    intermediary wallets used that swap service and swapped the

7    USDT for ETH.

8    Q.  And what was the date that that happened?

9    A.  September 28, 2020.

10   Q.  And just to make sure I understand what you mean by crypto

11   swap, so is that similar to sort of like a currency exchange

12   you might see at an airport for regular money, where you'd go

13   and swap one kind of money for another?

14   A.  In a very simplified manner, yes.

15   Q.  And so at a crypto swap, could you exchange USDT for ETH?

16   A.  You can.

17   Q.  And that's what's represented here on September 28, 2020?

18   A.  That's correct.

19        MR. REHN:  All right.  Let's go to Government

20   Exhibit 3002-6.

21        And I'm sorry, Ms. Sebade——oh, okay.  It's there.

22   Q.  So what happened after that?

23   A.  So now the proceeds of that swap, some of that ETH that

24   they traded the USDT for, now they're moving it back into the

25   original wallet, which I labeled KuCoin Hacker Wallet 1.

P7H1STO6                          DeCapua - Direct

1    Q.  And then if we—so the ETH now has gone back to the wallet

2    that originally got the other kinds of tokens from KuCoin; is

3    that what you're saying?

4    A.  That's correct.

5    Q.  And if we could now go to Government Exhibit 3002-7.

6         What happened next?

7    A.  Now there were two transfers of ETH from the KuCoin Hacker

8    Wallet 1 into another wallet which I am calling KuCoin Hacker

9    Wallet 2.

10   Q.  And what was the date that that happened?

11   A.  October 23, 2020.

12   Q.  Let's take a look then at Government Exhibit 3002-8.

13        What was the next step in the flow of funds?

14   A.  From KuCoin Hacker Wallet 2, there was 115 deposits of ETH

15   going into wallets associated with the Tornado Cash mixer, to

16   the tune of about 11,500 ETH, which is most of the ETH that was

17   left over in that wallet.

18   Q.  Now I just wanted to make sure I understand.  I see there's

19   actually a little bit more ETH flowing into the mixer than

20   originally came from KuCoin.  Do you see that?

21   A.  I do see that.

22   Q.  Is there an explanation for why there's more ETH at the

23   end?

24   A.  Because if you remember, some of the USDT was swapped for

25   ETH, so the hacker swapped the USDT, got some extra ETH, that

P7H1STO6                          DeCapua - Direct

1    ended up in KuCoin Wallet 1 and then was transferred over to

2    Wallet 2, and then all but 20 ETH from Wallet 2 is transferred

3    into the Tornado Cash mixer.

4    Q.  Now you testified earlier today about some of the

5    characteristics that you look at on the blockchain that are—

6    that sort of signify a criminal incident.  Do you recognize any

7    of those characteristics in the flow that we're looking at

8    here?

9    A.  Yes.  So the big flow—the big characteristic here was just

10   an exchange's hot wallet suddenly had an enormous amount of

11   money disappear from it, and so that indicates that something

12   potentially serious has happened at that exchange.

13   Q.  And then are there other attributes that you look at as

14   well?

15   A.  To a lesser extent, the liquidation of USDT into ETH.

16   Q.  And looking at this flow of funds—

17              MR. REHN:  And if we could go to Government

18   Exhibit 3002-9.

19   Q.  Do you recall testifying earlier that each wallet on the

20   blockchain has an address?

21   A.  That's correct.

22   Q.  And so what is—did you identify the address for the wallet

23   that's listed here as KuCoin Hacker Wallet 2?

24   A.  I'm sorry.  Can you repeat the question.

25   Q.  And so is what's on the screen now the beginning of the

P7H1STO6                    DeCapua - Direct

1    wallet address for KuCoin Hacker Wallet 2?

2    A.  It is.

3    Q.  Is that the full address or just the first few letters and

4    numbers?

5    A.  That's just the first few letters and numbers.

6         MR. REHN:  So if we could bring up, Ms. Sebade,

7    Government Exhibit 231 side by side with Government

8    Exhibit 3002-9.

9         And Ms. Sebade, if you could expand the Etherscan link

10   that's in the email on Government Exhibit 231, and if you could

11   also expand the first letters and numbers of the wallet

12   address, that's the address for KuCoin Hacker Wallet 2 on

13   Government Exhibit 3002-9.

14   BY MR. REHN:

15   Q.  So Special Agent DeCapua, what do you notice about these

16   wallet addresses?

17   A.  They're the same.

18   Q.  So what is the date of this email?

19   A.  October 26, 2020.

20        MR. REHN:  And Ms. Sebade, if you could de-expand.

21   Q.  What was the date of the flow of funds into the Tornado

22   mixer?

23   A.  It is between October 23rd of 2020 and October 26 of 2020.

24   Q.  And so was this email identifying this wallet sent to the

25   Tornado—the hello@tornado.cash address during the time frame

P7H1STO6                          DeCapua - Direct

1    in which you identified funds flowing into the Tornado mixer?

2    A.  It was.

3              MR. REHN:  All right.  We can bring that down.

4    Q.  And if I could ask you now to look at Government

5    Exhibits 3002-10 through 3002-13 in your binder, Special Agent

6    DeCapua.

7    A.  Okay.

8    Q.  Did you identify some additional proceeds from the KuCoin

9    hack that flowed into Tornado Cash?

10   A.  I did.

11   Q.  And are these some charts that identify those additional

12   flow of funds?

13   A.  They are.

14             MR. REHN:  If we could pull up—or if we could offer

15   Government Exhibits 3002-10, 3002-11, 3002-12, and 3002-13.

16             THE COURT:  I thought I had previously admitted

17   through 3002-13.

18             MR. REHN:  Oh, I'm sorry.  I got ahead of myself

19   before.  So they're already in.

20             We could bring up Government Exhibit 3002-10.

21             THE COURT:  They are in.  Thank you, sir.

22   BY MR. REHN:

23   Q.  So Special Agent DeCapua, is this some additional

24   transactions involving that same wallet that we were discussing

25   in the previous set of exhibits?

P7H1STO6                    DeCapua - Direct

1   A.  It is.

2   Q.  And so in addition to the transfers we were talking about

3   before, was there additional crypto that was taken from the

4   KuCoin exchange?

5   A.  There was.

6   Q.  What was the date of those withdrawals?

7   A.  September 25th of 2020.

8   Q.  And did you then follow and trace the proceeds of those

9   funds?

10  A.  I did.

11  Q.  So if we could go to Government Exhibit 3002-11.

12          So what was the next thing that happened after the

13  withdrawals from KuCoin?

14  A.  So it went through a series of multiple transactions with

15  the middleman addresses and wallets.  And that all happened

16  around the time period September 27th of 2020 through March 3rd

17  of 2021.

18          MR. REHN:  And then if we could bring up Government

19  Exhibit 3002-12.

20  Q.  And then what happened after the crypto was deposited into

21  those intermediary wallets?

22  A.  So from that web of intermediary wallets, the attacker

23  started swapping that——those various types of crypto for ETH.

24  Q.  And then if we could go to Government Exhibit 3002-13.

25          What do we see there?

1    A.  So finally, the fruits of those swaps, the ETH that is in

2    the final hop in the chain of wallets, was deposited into

3    Tornado mixer accounts between October 15th of 2020 and

4    March 3rd of 2021.

5    Q.  And so does that represent all of the original crypto that

6    you identified as having been taken in the KuCoin hack?

7    A.  A small portion of it.

8    Q.  Were you able to trace the other——the rest of the crypto

9    that was taken?

10   A.  I was to a certain extent.  A lot of it just is still

11   sitting in addresses right now.  It was never actually cashed

12   out.

13            MR. REHN:  So if we could bring that down.

14   Q.  And Special Agent DeCapua, if I ask you to take a look at

15   Government Exhibit 3002-14.

16            MR. REHN:  And we can just show it to the witness on

17   the screen.

18   Q.  And Special Agent DeCapua, what does this exhibit

19   represent?

20   A.  This is just a very broad summary of my tracing for the

21   KuCoin incident.

22            MR. REHN:  And the government offers Government

23   Exhibit 3002-14.

24            MR. CASEY:  Subject to prior objection, your Honor.

25            THE COURT:  Objection is overruled.  Government

P7H1STO6                          DeCapua - Direct

1    Exhibit 3002-14 is admitted into evidence and may be shown to

2    the jury.

3              (Government's Exhibit 3002-14 received in evidence)

4    BY MR. REHN:

5    Q.  So Special Agent DeCapua, just, can you provide a general

6    overview of what your tracing analysis revealed about the

7    KuCoin hack.

8    A.  So it revealed that the proceeds of the KuCoin hack were

9    deposited into Tornado Cash through a series of 512 deposits

10   between the dates October 15, 2020, through March 3, 2021.  The

11   total ETH deposited from those wallets into Tornado Cash was

12   50,930, which has an approximate dollar value at that time of

13   21.3 million U.S. dollars.  And the majority of the deposits

14   were made in a shorter time period; specifically, 49,710 of the

15   50,930 ETH was deposited between October 15th and October 26th

16   of 2020.

17   Q.  All right.  So Special Agent DeCapua, I'd like you to look

18   at Government Exhibit 3002-52.

19             MR. REHN:  Which we can just show to the witness.

20   Q.  Do you recognize this chart?

21   A.  I do.

22   Q.  And does this chart contain a summary of data that you

23   pulled from Etherscan regarding the overall volume of Tornado

24   Cash deposits?

25   A.  It does.

P7H1STO6                        DeCapua - Direct

1          MR. REHN:  Your Honor, the government offers

2     Government Exhibit 3002-52.

3          MR. CASEY:  Subject to prior objection, your Honor.

4          THE COURT:  Government Exhibit 3002-52 is admitted

5     into evidence and may be shown to the jury.

6          (Government's Exhibit 3002-52 received in evidence)

7     BY MR. REHN:

8     Q.  So Special Agent DeCapua, could you explain what this chart

9     represents.

10    A.  Sure.  So one thing I was asked to look at through my

11    analysis was the four Tornado Cash contracts that were part of

12    their mixing service for Ether, and so these lines represent——

13    each line represents a different day, and each line represents

14    the amount of volume of Ether deposits into a Tornado Cash

15    wallet during that specific day.  So when you see a really tall

16    line, that means that on that specific day, Tornado Cash had a

17    lot of deposits.  When you see a smaller line, that means that

18    that day was a little bit slower for Tornado Cash and not as

19    many people deposited Ether.

20    Q.  And so what's the date range of the chart?

21    A.  It's September 1st of 2020 through August 8th of 2022.

22    Q.  Now on this chart I see——you mentioned that the longer

23    lines represent a day with higher deposits?

24    A.  That's correct.

25    Q.  And so if it's about two years, are you telling me there's

1    about 700 blue lines on this chart?

2    A.  That's correct.

3    Q.  And so for example, I see one especially large line that

4    goes over 30,000.  What does that represent?

5    A.  That represents one day of a lot of business at Tornado

6    Cash.

7    Q.  And so for that day, for example, is that the only day

8    where there's more than 30,000 ETH going into Tornado Cash?

9    A.  Yes.  There's another day where it gets very close, but

10   this was the only day where it was above 30,000.

11   Q.  And so on this chart can we identify particular date ranges

12   in connection with the dates of the tracing that you did?

13   A.  That's correct.

14   Q.  And did you actually look at this chart and identify the

15   tracing you did in connection with the KuCoin incident?

16   A.  I did.

17          MR. REHN:  And if we could show the witness Government

18   Exhibit 3002-16.  And before we offer it——

19   Q.  Special Agent DeCapua, is this a chart that just identifies

20   that date range from the prior chart?

21   A.  It is.

22          MR. REHN:  Your Honor, the government offers

23   Government Exhibit 3002-16.

24          MR. CASEY:  Subject to prior objection, your Honor.

25          THE COURT:  Government Exhibit 3002-16 is admitted

P7H1STO6                        DeCapua - Direct

1    into evidence and may be shown to the jury.

2                (Government's Exhibit 3002-16 received in evidence)

3    Q.  Special Agent──

4                THE COURT:  Counsel, may I ask a question of the

5    witness.

6                Sir, perhaps it's old age, but it looks to be two

7    different shades of blue.  Is that simply because you have so

8    many days that you're trying to fit into the graph?

9                THE WITNESS:  I used Microsoft Excel for this and so I

10   think it's a quirk of Excel, but the shades of blue don't

11   represent anything.  It all should be the same shade of blue.

12               THE COURT:  Thank you.  Sorry to ask.

13               Okay.  Counsel, you may continue.

14   BY MR. REHN:

15   Q.  Special Agent DeCapua, I believe you testified a moment

16   ago, do you recall, that most of the proceeds of the KuCoin

17   hack were deposited into Tornado Cash from October 15th through

18   October 26th of 2020?

19   A.  I do recall.

20   Q.  And so have you circled that date range on the chart here?

21   A.  Yes, I did.

22   Q.  And looking at that, do you notice anything noteworthy

23   about Tornado Cash volumes during that time period?

24   A.  Yeah, there was a gigantic spike.

25   Q.  So prior to that time period and that incident, had Tornado

1  Cash volumes ever reached 10,000 ETH in a single day?

2  A.  No.

3  Q.  And during that incident did they reach 10,000 ETH?

4  A.  It did.

5  Q.  And so relative to prior patterns, what would you say about

6  the period during which the KuCoin hack's deposits were going

7  into Tornado Cash?

8  A.  It was suddenly like a doubling of Tornado Cash's business.

9           MR. REHN:  We can bring that down.  And if we could

10  show the witness Government Exhibit 3002-17.

11  Q.  And Special Agent DeCapua, what does this represent?

12  A.  This represents the proportion of KuCoin proceeds, or this

13  represents——looking at all the Tornado Cash ETH deposits for

14  that time period in October of 2020, this shows which

15  proportion came from KuCoin as opposed to what part I just

16  didn't know where it came from.

17           MR. REHN:  The government offers Government

18  Exhibit 3002-17.

19           MR. CASEY:  Subject to prior objection, your Honor.

20           THE COURT:  Yes, sir.  Government Exhibit 3002-17 is

21  admitted into evidence and may be shown to the jury.

22           (Government's Exhibit 3002-17 received in evidence)

23  BY MR. REHN:

24  Q.  So looking at this exhibit, Special Agent DeCapua, what

25  does the total volume of the circle represent?

1  A.  It represents all the deposits during the October 15th

2  through the 26th time period of ETH into Tornado Cash.

3  Q.  And so if we look at all of the deposits that went into

4  Tornado Cash during that time period, what percentage of them

5  represent the proceeds of that KuCoin hack that you identified?

6  A.  61 percent.

7          MR. REHN:  All right.  We can take that down.

8  Q.  Special Agent DeCapua, can we take a look at another

9  example.  I'd like to ask you about the BitMart hack.

10          And so if I can ask you to take a look in your binder

11  at Government Exhibits 3002-18, 3002-19, 3002-20, 3002-21,

12  3002-22, 3002-23, 3002-24, 3002-25, 3002-26, 3002-27, 3002-28,

13  and 3002-29.

14          And what are those charts, generally?

15  A.  They're a summary of my work tracing the BitMart criminal

16  proceeds to Tornado Cash.

17          MR. REHN:  The government offers the aforementioned

18  exhibits.

19          MR. CASEY:  Subject to prior objection, your Honor.

20          THE COURT:  Yes.  They are admitted.  And since

21  Mr. Rehn was kind enough to list them, I won't relist them, but

22  they are all admitted and may be shown to the jury.

23          (Government's Exhibits 3002-18, 3002-19, 3002-20,

24  3002-21, 3002-22, 3002-23, 3002-24, 3002-25, 3002-26, 3002-27,

25  3002-28, and 3002-29 received in evidence)

P7H1STO6                          DeCapua - Direct

 1              MR. REHN:  So Ms. Sebade, if you could bring up
 2       Government Exhibit 3002-18.
 3       BY MR. REHN:
 4       Q.  Now this looks familiar, so I don't know if we need the
 5       full explanation, but if you just give us a general summary of
 6       what we're seeing here on the screen.
 7       A.  BitMart is hacked on December 4, 2021, and multiple types
 8       of cryptocurrencies are transferred into a wallet that I
 9       labeled the BitMart Hacker Wallet 1.
10       Q.  And then did you subsequently trace what happened to that
11       cryptocurrency?
12       A.  I did.
13              MR. REHN:  So could we bring up Government
14       Exhibit 3002-9.
15              THE COURT:  -19?
16              MR. REHN:  I'm sorry.  -19.
17       Q.  So what happened after the crypto was taken out of BitMart?
18       A.  So as I mentioned, lots of different types of
19       cryptocurrencies are transferred into this wallet and then the
20       hacker goes ahead and swaps it, kind of like what the KuCoin
21       hacker did, and exchanges all those different types of
22       cryptocurrencies for Ether.
23       Q.  All right.  And if we could go to Government
24       Exhibit 3002-20.
25              What happened after that?

P7H1STO6                        DeCapua - Direct

1    A.  So now some of the Ether that the hacker had just traded

2    the other cryptocurrencies for is transferred into a second

3    wallet controlled by the hacker, BitMart Hacker Wallet 2.  He

4    also transfers some other cryptocurrencies aside from Ether.

5    Q.  Okay.  And then if we could look at Government

6    Exhibit 3002-21.

7           What happened next?

8    A.  So again, the hacker repeats the process where all the

9    other crypto aside from Ether is swapped for Ether and so now

10   there's even more Ether in Hacker Wallet 2 and less of the

11   other cryptos.

12   Q.  And then if we could go to Government Exhibit 3002-22.

13          What does that represent?

14   A.  And so the final hop in the chain is the hacker

15   transferring all this ETH into Tornado Cash mixer.

16   Q.  And what was the value of the ETH that the hacker

17   transferred into the Tornado mixer?

18   A.  It's about $88.9 million.

19   Q.  And if we could go to Government Exhibit 3002-23.

20          What does that represent?

21   A.  So this was an additional deposit into Tornado mixer that

22   didn't come from BitMart Hacker Wallet 2; it actually came from

23   BitMart Hacker Wallet 1, for some reason.

24   Q.  Okay.  So if we could now go to Government Exhibit 3002-24.

25          And as with the previous example, did you identify the

P7H1STO6                    DeCapua - Direct

1    wallet, the actual wallet address for the wallet that is

2    represented here by BitMart Hacker Wallet 2?

3    A.  Yes.

4    Q.  And is that the first set of letters and numbers in that

5    wallet address?

6    A.  It is.

7           MR. REHN:  And so if we could pull up Government

8    Exhibit 1005 alongside this exhibit.  This is another exhibit

9    that's in evidence.

10   Q.  And do you recall we looked at this before?  This was that

11   letter to Tornado Cash?

12   A.  Yes.

13          MR. REHN:  And if we could take——Ms. Sebade, if you

14   could expand the second full paragraph of this letter.

15          And if you could highlight the address that comes

16   after the words "following digital address."

17   Q.  Do you see that, Special Agent DeCapua?

18   A.  I do.

19   Q.  And do you see that——if you could just read that sentence

20   from that letter.

21   A.  "Between December 4, 2021 and December 5, 2021, we have

22   identified 211 separate 100 ETH transactions and 7 separate 10

23   ETH transactions originating from the following digital

24   address," and then it lists the Ethereum address 0x4bb7d and

25   then it continues on.

P7H1STO6                        DeCapua - Direct

1   Q.  And is that the same Ethereum address that you identified
2   in your tracing analysis?
3   A.  It is.
4   Q.  And so around the time that these funds were being
5   deposited into Tornado Cash, was this letter sent to the people
6   listed here on the letter?
7   A.  It was.  Few days after, but it was.
8           MR. REHN:  We could bring that down.
9           And is 3002-25 in evidence?
10          THE COURT:  It is.
11          MR. REHN:  Government Exhibit 3002-25.
12          THE COURT:  Yes, it is.
13          MR. REHN:  So if we could bring up Exhibit 3002-25.
14  BY MR. REHN:
15  Q.  So in addition to the proceeds we were looking at a moment
16  ago, did you identify some additional proceeds from the BitMart
17  hack that were deposited into Tornado Cash?
18  A.  I did.
19  Q.  And does this next set of charts represent those proceeds?
20  A.  They do.
21  Q.  And was there a different——did this involve a different
22  type of cryptocurrency?
23  A.  Yes.
24  Q.  What was the difference?
25  A.  So it was actually a different blockchain.  Everything that

P7H1STO6                         DeCapua - Direct

1    we've been looking at previously has been on the Ethereum

2    blockchain, but for the BitMart hack, there was funds stolen

3    from a different blockchain called the Binance Smart Chain

4    blockchain.  So now I've shifted gears from looking at the

5    Ethereum blockchain to the Binance blockchain for the rest of

6    this analysis on BitMart.

7    Q.  Okay.  Is there anything different about tracing using the

8    Binance Smart Chain versus the Ethereum smart chain?

9    A.  I used a different wallet explorer service.

10   Q.  In terms of the methods that you use, are there any

11   significant differences?

12   A.  No different.

13   Q.  So if we look at this, are we again seeing a flow of funds

14   out of BitMart on December 4th of 2021?

15   A.  Yes.

16          MR. REHN:  Can we bring up Government Exhibit 3002-27.

17   Q.  And so could you explain what we're seeing on this one.

18   A.  So this is just, again, the general flow of stolen

19   cryptocurrency as it goes from BitMart to Tornado Cash.

20   Q.  And so was this similar to the other ones we've looked at

21   in terms of the swap followed by the large transfer?

22   A.  That's correct.  A lot of different types of

23   cryptocurrencies were stolen from BitMart, but then the hacker

24   swapped it to the main cryptocurrency of the Binance Smart

25   Chain blockchain, which is something abbreviated BNB.

1    Q.  And based on your analysis did Tornado Cash also accept BNB

2    deposits?

3    A.  Yes.

4    Q.  Could we go to the next slide, 3002-28.

5         And so what does this show?

6    A.  So this shows that the ultimate destination of the stolen

7    BitMart cryptocurrencies on this particular blockchain goes to

8    Tornado Cash in a series of 258 deposits on December 5, 2021.

9    It was BNB, deposits of BNB into Tornado Cash mixer.  And the

10   approximate U.S. dollar amount at that time was $14 million.

11   Q.  And if we could go to Government Exhibit 3002-29.

12        And what does that show?

13   A.  So this shows that there's additional deposits from BitMart

14   Hacker 3, and so it shows that also on December 5th, the wallet

15   labeled BitMart Hacker 3 sends 317 different deposits again of

16   BNB——specifically, 31,700 BNB——to Tornado Cash, with the

17   approximate value of $17.7 million.

18        MR. REHN:  And so if we could bring that down.  And if

19   we could show the witness only what's been marked as Government

20   Exhibit 3002-30.

21   Q.  And what does this represent?

22   A.  This represents just a very general overview of the BitMart

23   hack, and how I traced it to Tornado Cash.

24        MR. REHN:  The government offers Exhibit 3002-30.

25        MR. CASEY:  Subject to prior objection, your Honor.

P7H1STO6                        DeCapua - Direct

```
 1            THE COURT:  The objection is overruled.  Government
 2   Exhibit 3002-30 is admitted into evidence and may be shown to
 3   the jury.
 4            (Government's Exhibit 3002-30 received in evidence)
 5   BY MR. REHN:
 6   Q.  And if we bring that up.  Again, Special Agent DeCapua, if
 7   you could just summarize what we've learned from the analysis
 8   you did on the charts you've shown us.
 9   A.  So my analysis showed that the criminal proceeds from
10   BitMart was transferred ultimately to Tornado Cash, and
11   particularly, there was 219 ETH deposits, 575 BNB deposits from
12   the BitMart hacker to Tornado Cash.  The deposits occurred on
13   December 4th and 5th.  The total ETH deposited was 21,270.  The
14   total BNB deposited was 56,690.  And combined, they had—at the
15   time that they were deposited into Tornado Cash, they had an
16   approximate U.S. value of $121 million.
17   Q.  And so all of those deposits took place on December 4th and
18   5th of 2021?
19   A.  Yes.
20            MR. REHN:  Could we bring up Government
21   Exhibit 3002-52.
22            THE COURT:  This is for the—excuse me.
23            MR. REHN:  3002-52 I believe is in evidence.
24            THE COURT:  Okay.  Yes.  The chart, yes.
25   Q.  Special Agent DeCapua, do you recall discussing this chart?
```

P7H1STO6                          DeCapua - Direct

1   A.  I do.

2   Q.  And do you recall you testified a moment ago about that,

3   the largest-volume day, you noticed that one blue spike there?

4   A.  Yes.

5   Q.  Did you identify on this chart the date of all those

6   deposits from the BitMart hack that you were just discussing?

7   A.  Yes, December 5th.

8           MR. REHN:  And if we could show the witness only

9   what's been marked as Government Exhibit 3002-32.

10  Q.  And is this that same chart with the date of the BitMart

11  incident circled?

12  A.  It is.

13          MR. REHN:  The government offers Government

14  Exhibit 3002-32.

15          MR. CASEY:  Subject to prior objection, your Honor.

16          THE COURT:  The objection is overruled.  Government

17  Exhibit 3002-32 is admitted into evidence and may be shown to

18  the jury.

19          (Government's Exhibit 3002-32 received in evidence)

20  BY MR. REHN:

21  Q.  So Special Agent DeCapua, that date we discussed earlier,

22  the single highest-volume day for Tornado Cash during this time

23  period, what date was that?

24  A.  It was December 5th of 2021.

25  Q.  And did you analyze all of the deposits that went into

1    those Tornado Cash Ethereum contracts on that date?

2    A.  I did.

3    Q.  And did you also examine the proportion of all of those

4    deposits that came from this one single incident?

5    A.  I did.

6           MR. REHN:  And if we could take a look at Government

7    Exhibit 3002-33, just for the witness for now.

8    Q.  And what does this represent, Special Agent DeCapua?

9    A.  This is the proportion of the BitMart hack proceeds that

10   make up all the ETH deposits between December 4th and

11   December 5th of 2021.

12          MR. REHN:  The government offers Exhibit 3002-33.

13          MR. CASEY:  Subject to prior objection, your Honor.

14          THE COURT:  Of course.  The objection is overruled.

15   Government Exhibit 3002-33 is admitted into evidence and may be

16   shown to the jury.

17          (Government's Exhibit 3002-33 received in evidence)

18   BY MR. REHN:

19   Q.  And Special Agent DeCapua, we looked at a version of this

20   before, so if you could just try a summary again of the basic—

21   what we learned from this chart in looking at it.

22   A.  It shows that on December 4th and 5th, 2021, that giant

23   day, that 54 percent of the volume of ETH deposited into

24   Tornado Cash was proceeds from the BitMart hack.

25          MR. REHN:  All right.  We can bring this down.

P7H1STO6                    DeCapua - Direct

1  Q.  Special Agent DeCapua, I'd like to ask you about another

2  example, and if I could ask you to look in your binder at

3  Government Exhibits 3002-34, 3002-35, 3002-36, 3002-37,

4  3002-38, 3002-39, and 3002-40.

5  A.  I see those.

6  Q.  And what do these represent?

7  A.  Again, these are summaries of my cryptocurrency tracing for

8  the Furucombo hack.

9          MR. REHN:  The government offers Government

10  Exhibits 3002-34 through 3002-40?

11          MR. CASEY:  Subject to prior objection, your Honor.

12          THE COURT:  Yes, of course.  The objection is

13  overruled.  Government Exhibits 3002-34, -35, -36, -37, -38,

14  -39, and -40 are admitted into evidence and may be shown to the

15  jury.

16          (Government's Exhibits 3002-34, 3002-35, 3002-36,

17  3002-37, 3002-38, 3002-39, 3002-40 received in evidence)

18          THE COURT:  Mr. Rehn, it happens that I have a

19  sentencing this afternoon, so I'd ask you to go for about 10

20  minutes more and then we'll finish for the day.  Thank you,

21  sir.

22          MR. REHN:  Yes, your Honor.  Hopefully we can make it

23  through this one.

24          THE COURT:  That is what we're aiming for, yes, sir.

25  Thank you.

P7H1STO6                    DeCapua - Direct

1    BY MR. REHN:

2    Q.   Special Agent DeCapua, if we could bring up Government

3    Exhibit 3002-34, and again, we're familiar with this, but if

4    you could explain again what this represents.

5    A.   Furucombo is a decentralized exchange that suffered a hack

6    on February 27th, and this represents all the different types

7    of cryptocurrencies that were stolen from that exchange and

8    sent to the wallet controlled by the hacker.

9    Q.   And again, did you look at blockchain data relating to this

10   incident to trace where that money went?

11   A.   I did.

12   Q.   Let's look at 3002-35.

13            And what happens during this date range?

14   A.   So like the hacks before it, now we see the hacker swapping

15   the various types of cryptocurrency for ETH between the time

16   period of February 27th and March 9th of that year and then

17   transferring, swapping the ETH into the original wallet.

18   Q.   And if we could look at Government Exhibit 3002-36.

19            And what happened here?

20   A.   So now the hacker transferred the ETH into a second wallet.

21   He transferred the ETH and then he transferred also some of the

22   other cryptocurrencies that were stolen from Furucombo.

23   Q.   And if we could look at Government Exhibit 3002-37.

24            What happened here?

25   A.   Once again, the hacker swaps some of the other crypto for

P7H1STO6                        DeCapua - Direct

1    ETH.

2    Q.   And if we could go to Government 3002-38.

3         And what happens here?

4    A.   And ultimately the hacker, in a series of 76 deposits,

5    sends the ETH to Tornado Cash mixer.  Specifically, there was

6    6,628 ETH with approximate U.S. dollar value of 15.3 million

7    U.S. dollars.

8    Q.   Could we go to Government Exhibit 3002-39.

9         And what happened here?

10   A.   The Furucombo hacker also happened to make 20 deposits from

11   Hacker 1 also to Tornado Cash.  Those 20 deposits added up to

12   about 2,000 ETH, which had an approximate U.S. dollar value at

13   the time of those transactions of 3.05 million U.S. dollars.

14        MR. REHN:  And if we could now go to Government

15   Exhibit 3002-40.

16   Q.   And if you could explain what this represents.

17   A.   So the only thing that changed is now in the top left in

18   and the lower right you see the wallet addresses suddenly

19   appear, which gives you the actual address of those specific

20   wallets.

21        MR. REHN:  And now let's bring up an exhibit we looked

22   at earlier, Government Exhibit 235.  And if we could bring up

23   alongside Government Exhibit 3002-40.

24        And Ms. Sebade, if you could highlight in the email

25   the sentence, "The hacker used the Ethereum wallet as below,"

P7H1STO6                    DeCapua - Direct

1   and then the two links below that.

2           And if you could also highlight the wallet addresses

3   on the 3002-40.

4   BY MR. REHN:

5   Q.  Special Agent DeCapua, if we look at the Ether links, where

6   do we see the wallet addresses on these links?

7   A.  So it's at the very end of the link.

8   Q.  So I see it says "address" and then there's a slash, and

9   then there's a long string of letters and numbers?

10  A.  That's correct.

11  Q.  So the one on the top there begins with what?

12  A.  0xb624.

13  Q.  And is that a wallet that you identified as part of your

14  cryptocurrency tracing?

15  A.  Yes, it's a Furucombo Hacker Wallet 1.

16  Q.  And then the next one down, if you could read the first few

17  letters on that one.

18  A.  0Xfd94.

19  Q.  And Special Agent DeCapua, what was the date range of the

20  deposits into Tornado mixer that you identified from these two

21  wallets?

22  A.  It was between February 27th and May 22nd of 2021.

23  Q.  So was this email on the left sent during that date range?

24  A.  Yes.

25           MR. REHN:  We could bring that down.

P7H1STO6                    DeCapua - Direct

1          And if we could show the witness what's been marked as

2    Government Exhibit 3002-41.

3    Q.   Special Agent DeCapua, what is this slide?

4    A.   This is a summary of my analysis on the Furucombo hack.

5          MR. REHN:  The government offers Exhibit 3002-41.

6          MR. CASEY:  Subject to prior objection, your Honor.

7          THE COURT:  Of course.  The objection is overruled.

8    Government Exhibit 3002-41 is admitted into evidence and may be

9    shown to the jury.

10          (Government's Exhibit 3002-41 received in evidence)

11   BY MR. REHN:

12   Q.   And Special Agent DeCapua, if you could just explain the

13   overall results of your tracing analysis with respect to this

14   incident.

15   A.   So I found that through tracing the Furucombo criminal

16   proceeds, I found that they were sent to Tornado Cash,

17   specifically in 96 Ether deposits that occurred between

18   February 27th and May 22nd of 2021, for a total ETH deposited

19   of 8,828 and a total approximate dollar value of 18.35 million

20   U.S. dollars.

21          MR. REHN:  We can bring that down.

22          Your Honor, I can assure you we do not intend to do

23   this much detail with all 16 incidents.  We're going to focus

24   in particular on one more incident during Special Agent

25   DeCapua's testimony, but it is a longer section, and so I could

P7H1STO6

1    begin now or this would be a good time to break.

2                THE COURT:  Only because I have the sentencing today,

3    I think we should break for the day, although I do appreciate

4    it.  I know you're ready to go forward, but I don't want to

5    keep someone waiting.  So let us break for the day.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P7L1STO1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                    v.                      23 Cr. 430 (KPF)

5    ROMAN STORM,

6                    Defendant.              Jury Trial
     ------------------------------x
7
                                             New York, N.Y.
8                                            July 21, 2025
                                             8:55 a.m.
9

10   Before:

11                   HON. KATHERINE POLK FAILLA,

12                                           District Judge

13
                              APPEARANCES
14
     JAY CLAYTON
15        United States Attorney for the
          Southern District of New York
16   BY:  NATHAN M. REHN, ESQ.
          BEN ARAD, ESQ.
17        BENJAMIN A. GIANFORTI, ESQ.
          KEVIN G. MOSLEY, ESQ.
18        TARA M. LA MORTE, ESQ.
          Assistant United States Attorneys
19
     WAYMAKER LLP
20        Attorneys for Defendant
     BY:  BRIAN E. KLEIN, ESQ.
21        KERI CURTIS AXEL, ESQ.
          KEVIN M. CASEY, ESQ.
22        VIVIANA ANDAZOLA MARQUEZ, ESQ.

23        -and-

24   HECKER FINK LLP
          Attorneys for Defendant
25   BY:  DAVID E. PATTON, ESQ.
          CHRISTOPHER MOREL, ESQ.

P7L1STO1                    DeCapua - Direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23      JOEL DeCAPUA, resumed.

24   DIRECT EXAMINATION CONTINUED

25   BY MR. REHN:

P7L1STO1                          DeCapua - Direct

1   Q.  Good morning, Special Agent DeCapua.

2   A.  Good morning.

3          MR. REHN:  Could we please bring up Government

4   Exhibit 3002-2.

5   Q.  Special Agent DeCapua, do you remember looking at this

6   exhibit on Thursday?

7   A.  I do.

8   Q.  And could you remind us, at a high level, what this exhibit

9   was.

10  A.  These are the lists of hacks or incidents that I analyzed

11  and traced the criminal proceeds of each into Tornado Cash.

12  Q.  And do you recall that we looked at many of the exhibits

13  that are listed at the bottom of this screen?

14  A.  I do.

15         MR. REHN:  I believe we may have missed one, so I'd

16  like to ask Ms. Sebade to bring up Government Exhibit—

17  Q.  Actually, first, before we do that, do you see an incident

18  listed as Rari Capital, April 30, 2022?

19  A.  I do.

20  Q.  And do you see below that the exhibit assigned to that is

21  2311 and 2311-T?

22  A.  I believe it's 2311-1.

23         MR. REHN:  Okay.  Could we bring up Government

24  Exhibit 2311.

25         THE COURT:  For the witness only or is this in

P7L1STO1                          DeCapua - Direct

1    evidence, sir?

2              MR. REHN:  Just for the witness, your Honor.

3    Q.  Special Agent DeCapua, do you recognize what kind of a

4    document this is?

5    A.  I do.

6    Q.  And could you explain what it is, please.

7    A.  This is a Telegram group chat.

8    Q.  What is the title of this group chat?

9    A.  DeFi.

10             MR. REHN:  And if we go to, Ms. Sebade, page 110.

11   Q.  Special Agent DeCapua, do you see if Roman Storm is in this

12   chat?

13   A.  I do.  It's third from the bottom.

14             MR. REHN:  Your Honor, the government offers

15   Government Exhibits 2311 and 2311-T pursuant to the Russian

16   translation stipulation.

17             MR. PATTON:  You have our continuing objection, your

18   Honor.

19             THE COURT:  All right.  Overruled, and the exhibits,

20   2311 and 2311-T, are admitted into evidence.  They may be shown

21   to the jury.

22             (Government's Exhibit 2311 received in evidence)

23             MR. REHN:  Ms. Sebade, if you could bring down 2311

24   and bring up 2311-T.

25             Oh, I apologize, your Honor.  I realize that this one

P7L1STO1                          DeCapua - Direct

1    actually doesn't have a translation.  This is just the original

2    exhibit.

3              THE COURT:  It is in fact 2311-1, sir, that you're

4    seeking to admit?

5              MR. REHN:  That would be the attachment, which we'll

6    look at momentarily.

7              THE COURT:  Okay.  I'm not admitting then 2311-T,

8    inasmuch as there is no translation.  You have not yet moved

9    for the admission of 2311-1.

10             Go ahead, sir.

11             MR. REHN:  Thank you, Ms. Sebade.

12             First, is this visible for the Court now?

13             And if we could go to page 166, and if you could

14   expand the message there.

15   BY MR. REHN:

16   Q.  Special Agent DeCapua, do you see this message?

17   A.  I do.

18   Q.  And could you read what the message is sending.

19   A.  So someone is sending a link to a Twitter post by Twitter

20   user Fei Protocol.

21             MR. REHN:  And your Honor, we would now offer

22   Government Exhibit 2311-1 pursuant to stipulation S3, which

23   says that this is a link that was publicly available on

24   April 30, 2022.

25             THE COURT:  Mr. Patton, to that, do you agree?

P7L1STO1                    DeCapua - Direct

1          MR. PATTON:  Your Honor, that's likewise subject to

2     our continuing objection.

3          THE COURT:  I see.  So you've stipulated to it being

4     publicly available, but you object to it being admitted.

5          MR. PATTON:  Well, pursuant to our previous

6     discussion, yes.

7          THE COURT:  I understand.

8          All right.  I'm overruling the objection and I am

9     admitting Government Exhibit 2311-1, which can be shown to the

10    jury.

11         (Government's Exhibit 2311-1 received in evidence)

12         MR. REHN:  Ms. Sebade, if you could bring up 2311-1

13    and expand the tweet.

14    BY MR. REHN:

15    Q.  And Special Agent DeCapua, if you could please read the

16    tweet that was in that chat.

17    A.  "We are aware of an exploit on various Rari Fuse pools.  We

18    have identified the root cause and paused all borrowing to

19    mitigate further damage.

20         "To the exploiter, please accept a $10m bounty and no

21    questions asked if you return the remaining user funds."

22    Q.  What was the date of this tweet?

23    A.  April 30, 2022.

24         MR. REHN:  Ms. Sebade, if we could now go back to

25    Government Exhibit 3002-2.

P7L1STO1                       DeCapua - Direct

1   Q.  Special Agent DeCapua, what was the date that you

2   identified in your tracing analysis as tied to the Rari Capital

3   incident?

4   A.  Was April 30, 2022.

5   Q.  Okay.  All right.  So I would now like to ask you some

6   questions about the incident that's third from the top on the

7   right-hand column, the Ronin Network.  Do you see that?

8   A.  I do.

9   Q.  Is that an incident that you investigated as part of your

10  analysis?

11  A.  It is.

12  Q.  So in the witness box with you, you should have Government

13  Exhibits 3002-42, 3002-43, 3002-44, 3002-45, 3002-48, 3002-49,

14  and 3002-50.  Have you had a chance to review those exhibits?

15  A.  Yes.

16  Q.  What are these exhibits?

17  A.  These are slides created as a summary of my work tracing

18  the Ronin hack.

19          MR. REHN:  Your Honor, the government offers the

20  aforementioned exhibits.

21          THE COURT:  With a continuing objection, sir?

22          MR. PATTON:  Yes, your Honor.

23          THE COURT:  Thank you.

24          The objection is overruled, and the Court admits

25  Government Exhibits 3002-42, -43, -44, -45, -48, -49, and -50.

P7L1STO1                        DeCapua - Direct

1   Each may be shown to the jury.  Thank you.

2                (Government's Exhibits 3002-42, 3002-43, 3002-44,

3   3002-45, 3002-48, 3002-49, 3002-50 received in evidence)

4                MR. REHN:  If we could bring up Government

5   Exhibit 3002-42 for the court.

6   BY MR. REHN:

7   Q.  Special Agent DeCapua, could you explain for us what we're

8   seeing on this chart.

9   A.  So this chart represents the initial transfer from the

10  victim, Ronin, into what I'm naming the Ronin Hacker Wallet.

11  And you'll see that on March 23, 2022, there was a large

12  movement of cryptocurrency, in particular 173,600 ETH, and some

13  other types of cryptocurrencies as well.

14  Q.  And Special Agent DeCapua, you have experience looking at

15  Ethereum transactions generally?

16  A.  I do.

17  Q.  And is that an unusually large transaction, in your

18  experience?

19  A.  It is.

20               MR. REHN:  I'd like to look at an exhibit we looked at

21  briefly on Thursday.

22               If we could bring up Government Exhibit 2044-T and go

23  to page 10.  And if we could expand the message at the bottom

24  of this page.

25  Q.  Special Agent DeCapua, do you recall looking at this on

P7L1STO1                    DeCapua - Direct

1    Thursday?

2    A.  I do.

3    Q.  And if I could ask you just to read that message again.

4    A.  "Did you already see the $600,000,000 hack today?  Shit

5    might seriously hit the fucking fan now."

6    Q.  Special Agent DeCapua, we were just looking at a slide that

7    said there was a transfer of 173,600 ETH.  What was the

8    approximate dollar value of that in March of 2022?

9    A.  So sitting here today, I don't know the exact amount, but

10   it was a very, very large amount.

11             MR. REHN:  If we could now go to page 14 of 2044-T.

12             And Ms. Sebade, if you could move that to the side and

13   also bring up 2044-2.

14             And if you could expand the central message on the

15   left and the tweet on the right.

16   Q.  Special Agent DeCapua, do you recall looking at these

17   documents on Thursday?

18   A.  I do.

19   Q.  And do you see a reference——if I could just ask you to read

20   the larger text in the tweet on the right-hand side of the

21   screen.

22   A.  "The Ronin Bridge has been exploited for 173,600 Ethereum

23   and 25.5 million USDC.  The Ronin bridge and Katana Dex have

24   been halted."

25   Q.  Special Agent DeCapua, do you recognize this transaction

 1    from your tracing analysis?

 2    A.  I do.

 3    Q.  And is this the transaction we were looking at on

 4    Government Exhibit 3002-42?

 5    A.  Yes, the initial transfer from the Ronin Bridge into the

 6    hacker's wallet.

 7            MR. REHN:  All right.  We can bring that down.

 8            And if we could go back to Government Exhibit 3002-42.

 9    Q.  And so this is that initial transfer we were just looking

10    at that was described in that tweet.

11    A.  That's exactly correct.

12            MR. REHN:  Could we now bring up Government

13    Exhibit 3002-43.

14    Q.  Special Agent DeCapua, could you explain what, if any,

15    tracing analysis you did following from that initial transfer.

16    A.  So I wanted to ask the question where the value went after

17    it landed in the Ronin hacker wallet, and so I discovered that

18    the value was transferred to multiple intermediary wallets

19    between the dates of March 23, 2022, and May 19, 2022.

20    Q.  And did you conduct additional tracing to see what happened

21    to the ETH and other crypto that was transferred to those

22    intermediary wallets?

23    A.  I did.

24            MR. REHN:  And if we could bring up Government

25    Exhibit 3002-44.

P7L1STO1                              DeCapua - Direct

1    Q.  Special Agent DeCapua, could you explain what is depicted

2    on this chart.

3    A.  So one of the things I found in those intermediary wallets

4    is the Ronin hacker was swapping some of the extra

5    cryptocurrencies and transferring them into ETH, and so this

6    additional bubble saying crypto swap represents those swaps

7    where additional ETH was being traded out for the other

8    cryptocurrencies that were stolen.

9    Q.  And when that was traded out, was that coming back to the

10   intermediary wallet?

11   A.  It was.

12   Q.  And in what form was it coming back to the intermediary

13   wallets?

14   A.  As ETH.

15          MR. REHN:  And if we could now bring up Government

16   Exhibit 3002-45.

17   Q.  And Special Agent DeCapua, could you explain what we're

18   seeing in this chart.

19   A.  So from those intermediary wallets I then saw a series of

20   1,751 transactions where the value was then sent into Tornado

21   Cash.  This took place over a period of time from April 4th to

22   May 19th of 2022, and it was for 175,100 ETH, with an

23   approximate U.S. dollar value of 449 million.

24   Q.  Special Agent DeCapua, what was the first date that the

25   funds from the Ronin hack were transferred into Tornado Cash?

P7L1STO1                          DeCapua - Direct

1    A.  April 4, 2022.

2            MR. REHN:  Could we bring up Government Exhibit 279.

3            THE COURT:  In evidence, sir?

4            MR. REHN:  Just for the witness.  I apologize.

5            THE COURT:  Thank you.

6    Q.  Special Agent DeCapua, just looking at this document, can

7    you describe what it appears to be.

8    A.  It's an email from *The Wall Street Journal* to

9    hello@tornado.cash.

10           MR. REHN:  And your Honor, the government offers

11   Government Exhibit 279, pursuant to the business records

12   stipulation.

13           MR. PATTON:  Continuing objection.

14           THE COURT:  All right.  You're admitting it for its

15   truth, sir, or for its effect on the recipient?

16           MR. REHN:  For its effect on the recipient.

17           THE COURT:  All right.  This exhibit is admitted into

18   evidence, but let me explain to you the limited purposes for

19   which you may consider it.  You may not consider it for the

20   truth of the contents of the statements that are made in it,

21   but the effect that these statements might have on the person

22   who received it.

23           Thank you very much.  It may be shown to the jury.

24           (Government's Exhibit 279 received in evidence)

25           MR. REHN:  Thank you, your Honor.

P7L1STO1                      DeCapua - Direct

1    BY MR. REHN:

2    Q.  Special Agent DeCapua, could you please tell us who this

3    email was sent from.

4    A.  It's from David Uberti from——whose email address is

5    david.uberti@wsj.com.

6    Q.  And what's the date of this email?

7    A.  April 4, 2022.

8    Q.  And could you remind us how that date relates to the

9    tracing analysis that we were just looking at.

10   A.  It's the first date where value was sent from one of the

11   hacker's wallets into Tornado Cash.

12   Q.  And who was this email sent to?

13   A.  The email address hello@tornado.cash.

14   Q.  And if I could ask you to read this email.

15   A.  "Hi Tornado.cash.  I'm a cybersecurity reporter for *The*

16   *Wall Street Journal.*  I'm following the digital assets stolen

17   from the Ronin Bridge hack that was revealed last week.

18          "Etherscan suggests that the attackers moved 2,001 ETH

19   to an address this morning and subsequently have been

20   transferring it to tornado.cash in a series of transactions.

21          "I was curious if you'd like to comment at all on

22   this, as it appears that these hackers are trying to use

23   Tornado Cash to launder stolen funds.  You say here that

24   'maintaining privacy and preserving financial freedom should

25   never come at the expense of noncompliance.'  Do you see this

P7L1STO1                          DeCapua - Direct

1   sort of activity in conflict with that statement at all?

2           "Would love to chat more.  Thanks in advance for your

3   time.

4           "Dave."

5           MR. REHN:  And we can bring that down and go back to

6   Government Exhibit 3002-45.

7   Q.  Special Agent DeCapua, for what period of time——over what

8   period of time was the Ronin hacker depositing funds into

9   Tornado Cash?

10  A.  It was from April 4th to May 19th, so a month and a half,

11  approximately.

12  Q.  And was that span of time after the email that we were just

13  looking at was sent?

14  A.  It was after.

15  Q.  And I see that there is a number of deposits.  Do you see

16  that?

17  A.  I do.

18  Q.  How many deposits in total were made into Tornado Cash over

19  that period?

20  A.  1,751 deposits.

21  Q.  And what was the total amount of ETH that was deposited

22  into Tornado Cash over that time period?

23  A.  175,100 ETH.

24  Q.  So based on those numbers, what can you conclude about the

25  nature of those deposits, in terms of the amount of each

1    deposit?

2    A.  That they were 100 ETH each.

3            MR. REHN:  All right.  If we could bring that down and

4    bring up Government Exhibit 3002-48.

5            Special Agent DeCapua, in your tracing analysis, did

6    you determine any information about the wallet that was

7    connected to the initial exploit of the Ronin network?

8    A.  I did.

9    Q.  And what did you determine?

10   A.  That it was sanctioned by the U.S. government on April 14,

11   2022.

12           MR. REHN:  If we could now bring up just for the

13   witness Government Exhibit 2047.

14   Q.  Special Agent DeCapua, what kind of a document is this?

15   A.  This is a Telegram group chat.

16   Q.  What's the name of this chat?

17   A.  Bablo Peppersec.

18   Q.  Is Roman Storm in this chat?

19   A.  He is.

20           MR. REHN:  Your Honor, the government offers

21   Government Exhibits 2047 and 2047-T.

22           MR. PATTON:  Continuing objection.

23           THE COURT:  Government Exhibits 2047 and 2047-T are

24   admitted into evidence and may be shown to the jury.

25           (Government's Exhibits 2047 and 2047-T received in

P7L1STO1                         DeCapua - Direct

1   evidence)

2           MR. REHN:  Can you make this now visible, Ms. Sebade.

3   Thank you.

4   BY MR. REHN:

5   Q.  Special Agent DeCapua, do you recall that we looked at some

6   other portions of this Telegram group chat on Thursday?

7   A.  I do.

8   Q.  And just to reorient us, what was the name of this chat?

9   A.  Bablo Peppersec.

10  Q.  Was there a group photo associated with this chat?

11  A.  There was.

12  Q.  What was the group photo?

13  A.  A big bag of cash with a dollar bill sign.

14  Q.  And who are the participants in the chat?

15  A.  Test_ico_bot, you have Roman Storm, with admin next to it,

16  Tornado Monitor, Alexey Pertsev, and Roman Semenov.

17          MR. REHN:  And if we could now bring up Government

18  Exhibit 2047-T, which we offer pursuant to the Russian language

19  stipulation.

20          THE COURT:  2047-T has been admitted into evidence.

21  Thank you.

22          MR. REHN:  Oh, thank you, your Honor.

23          And if we could go to page 2 of this document.  And

24  Ms. Sebade, if you could just expand the top message on this

25  page.

P7L1STO1                    DeCapua - Direct

1    BY MR. REHN:

2    Q.  Special Agent DeCapua, can I ask you to tell me who that

3    message is sent by?

4    A.  Sent by Roman Storm.

5    Q.  And what was the date of this message?

6    A.  April 14, 2022.

7    Q.  And what is being sent in this message?

8    A.  There's a Twitter link from a user called web3isgreat, and

9    then there is a message after the Twitter link.

10   Q.  And what does that message read?

11   A.  "Guys, we are fucking done for."

12   Q.  Special Agent DeCapua, do you see in the message there's

13   something that says Telegram cloud photo size?

14   A.  I do.

15   Q.  What does that indicate to you?

16   A.  It indicates that—it's a link to something.

17           MR. REHN:  And if we can bring up just for the witness

18   Government Exhibit 2047-1.

19   Q.  Special Agent DeCapua, what does this appear to be?

20   A.  This is an article that was written about the Ronin hack.

21   Q.  Does this appear to be the thing that was linked to in that

22   message we were just looking at?

23   A.  Yes.

24           MR. REHN:  Your Honor, the government offers

25   Government Exhibit 2047-1.

P7L1STO1                    DeCapua - Direct

1          MR. PATTON:  Continuing objection.

2          THE COURT:  All right.  The exhibit is admitted over

3   the defense's objection.  2047-1 is admitted into evidence and

4   may be shown to the jury.

5          (Government's Exhibit 2047-1 received in evidence)

6   BY MR. REHN:

7   Q.  Special Agent DeCapua, what is the date on this article?

8   A.  April 14, 2022.

9   Q.  And if I could ask you to read the title of this article.

10  A.  "FBI links Axie Infinity hack to North Korean Lazarus

11  hacking group."

12  Q.  And Special Agent DeCapua, if I could just ask you to read

13  the article for us.

14  A.  "According to the FBI, infamous cybercrime group Lazarus

15  was behind the March Axie Infinity exploit that saw

16  $625 million taken from the game's blockchain bridge.  Lazarus

17  are a criminal group with strong ties to North Korea, and are

18  suspected of being behind infamous cyberattacks including the

19  WannaCry ransomware that impacted a wide number of industries

20  including hospitals and manufacturing, as well as legislative

21  and justice systems.  The U.S. Treasury Department has added

22  the crypto wallet that received the stolen funds to its

23  sanctions list, which may make it substantially harder for the

24  attackers to withdraw the money.  The wallet still contains

25  around 150,000 ETH, valued at around $445 million, but has been

P7L1STO1                      DeCapua - Direct

1   slowly siphoning it out to various other wallets, exchanges,

2   and tumblers over the past weeks."

3              And then there are some links.

4              MR. REHN:  Ms. Sebade, if we can bring that down and

5   go back to Government Exhibit 2047-T.

6              And go to that message we were looking at.

7   Q.  Special Agent DeCapua, who sent this article in this chat?

8   A.  Roman Storm.

9              MR. REHN:  If we could now go to page 6 of this

10  document.  And if we could expand the middle two messages.

11  Q.  Special Agent DeCapua, what is the date on these messages?

12  A.  April 15, 2022.

13  Q.  So are these the following day?

14  A.  That's correct.

15  Q.  I ask you to read the first message.

16  A.  "A guy got five years of prison for sanctions."

17  Q.  Who sent that message?

18  A.  Roman Storm.

19  Q.  And is there a message that was sent a few minutes later?

20  A.  Yes.

21  Q.  Who sent that message?

22  A.  Roman Storm.

23  Q.  Special Agent DeCapua, could I ask you to describe what

24  that second message is.

25  A.  It's a link to a tweet by someone named Mike Burgersburg.

P7L1STO1                        DeCapua - Direct

1    Q.  And is there some text sort of what that tweet said

2    underneath?

3    A.  There is.

4             MR. REHN:  Your Honor, I'd now ask to bring up just

5    for the witness Government Exhibit 2047-4.

6    Q.  Special Agent DeCapua, does this appear to be that tweet

7    that you were just looking at?

8    A.  Yes.

9             MR. REHN:  And your Honor, the government offers this

10   pursuant to the stipulation regarding publicly available

11   records.

12            THE COURT:  Mr. Patton, is there still an objection?

13            MR. PATTON:  There is, your Honor.

14            THE COURT:  All right.  Thank you.

15            This is admitted over the defense objection.

16   Government Exhibit 2047-4 is admitted into evidence and may be

17   shown to the jury.

18            (Government's Exhibit 2047-4 received in evidence)

19   BY MR. REHN:

20   Q.  Special Agent DeCapua, if I could ask you to read this

21   tweet that Roman Storm sent on April 15th of 2022.

22   A.  "@TornadoCash laundered 26,300 Ether ($72.9 million) for

23   the North Korean government over the last two weeks.  Every

24   holder of $TORN is an accomplice to violating sanctions.  All

25   Ether held in or withdrawn from @TornadoCash wallets is

P7L1STO1                        DeCapua - Direct

1    sanctionable."  And it says "1/n."

2              MR. REHN:  If we could bring that down and go back to

3    Government Exhibit 2047-T at page 6.

4              And if we could expand that message we were just

5    looking at and then the next message down, Ms. Sebade.

6    Q.  Special Agent DeCapua, after Roman Storm sent that tweet,

7    did he send another message?

8    A.  Yes, a couple seconds later.

9    Q.  Could you please read that message.

10   A.  "Shit!"

11             MR. REHN:  We can bring that down.

12             And now we can go to——just for the witness, if we

13   could show Government Exhibit 2062.

14   Q.  Special Agent DeCapua, what does this document appear to

15   be?

16   A.  Again, this is a Telegram group chat.

17   Q.  Was this in that same Bablo Peppersec chat we've been

18   discussing?

19   A.  It is.

20   Q.  And is Roman Storm in this chat as well?

21   A.  He is.

22             MR. REHN:  Your Honor, government offers Government

23   Exhibit 2062 and also 2062-T pursuant to the Russian language

24   stipulation.

25             MR. PATTON:  Continuing objection.

1        THE COURT:  Government Exhibits 2062 and 2062-T are

2   admitted into evidence over the defense objection and may be

3   shown to the jury.

4        (Government's Exhibits 2062 and 2062-T received in

5   evidence)

6        MR. REHN:  Ms. Sebade, if we could now bring up

7   Government Exhibit 2062-T.

8        And if we could go to page 2.  And if I could ask you

9   to expand the third message on this page.

10  BY MR. REHN:

11  Q.  Special Agent DeCapua, do you see a message on the screen?

12  A.  I do.

13  Q.  Could you please give me the date of that message.

14  A.  April 15, 2022.

15  Q.  Is that the same date as the earlier messages we were

16  looking at?

17  A.  It is.

18  Q.  And who is this message sent by?

19  A.  Roman Semenov.

20  Q.  Could I ask you to read that message.

21  A.  "Regarding Telegram chats, we also have to bear in mind

22  that law enforcement is reading them too and can use them

23  against us later."

24       MR. REHN:  And we can now go to page 5 of this

25  exhibit.

P7L1STO1                      DeCapua - Direct

1              And if you could expand the bottom message on this

2    page.

3    Q.  Special Agent DeCapua, did anybody reply to that message we

4    were just looking at?

5    A.  Yes.

6    Q.  Who replied to that message?

7    A.  Roman Storm.

8    Q.  And when did he reply?

9    A.  April 15, 2022, several hours later.

10   Q.  Special Agent DeCapua, can I ask you to read how Roman

11   Storm replied to that message.

12   A.  "Cleaned it up."

13              MR. REHN:  All right.  If we can bring that down.

14              And if we could go back to Government Exhibit 3002-48.

15   Q.  So Special Agent DeCapua, we were talking about this slide

16   earlier, and is this wallet that's labeled Ronin Hacker Wallet,

17   is that the wallet that was sanctioned on that date,

18   April 14th?

19   A.  It is.

20   Q.  And earlier we looked at some tracing analysis from that

21   crypto from the Ronin network.  Did you also break down your

22   tracing analysis to look if any of those deposits were made

23   after those sanctions were imposed?

24   A.  I did.

25              MR. REHN:  Could we look at Government

P7L1STO1                    DeCapua - Direct

1    Exhibit 3002-49.

2    Q.   Special Agent DeCapua, based on your tracing analysis,

3    what, if anything, did you learn?

4    A.   That after sanctions, still a large amount of Ether was

5    sent to the Tornado Cash mixer.

6    Q.   Approximately how many deposits were made following the

7    announcement of sanctions on that wallet?

8    A.   1,442 deposits.

9    Q.   And approximately how much ETH was deposited into Tornado

10   Cash after the announcement of sanctions on that wallet?

11   A.   144,200 ETH.

12   Q.   And based on those numbers, what can you determine about

13   the amount of each of those deposits?

14   A.   100-ETH increments.

15   Q.   Special Agent DeCapua, did you analyze what the dollar

16   value was at the time of those deposits that were made after

17   the announcement of those sanctions?

18   A.   I did.

19   Q.   What was the dollar value?

20   A.   Approximately 351 million U.S. dollars.

21   Q.   And did you look at the date range over which those

22   deposits were made?

23   A.   I did.

24   Q.   And what was that date range?

25   A.   It was between April 22nd of 2022 and May 19th of 2022.

P7L1STO1                              DeCapua - Direct

1   Q.  And approximately how long of a time period is that?

2   A.  Less than a month.

3   Q.  So over that time period of a little less than a month, did

4   you calculate approximately how many deposits per day on

5   average were being made?

6   A.  I did.

7   Q.  And what was that?

8   A.  About 50 deposits per day.

9   Q.  And so do those all represent deposits that were made

10  originating in that wallet labeled here as Ronin Hacker Wallet

11  after the announcement of sanctions?

12  A.  Yes.

13          MR. REHN:  We can bring that down.

14          Could we now bring up Government 3002-50.

15  Q.  Special Agent DeCapua, did you examine what percentage of

16  overall Tornado Cash deposits during that time period

17  originated from that Ronin hacking incident?

18  A.  I did.

19  Q.  And could you explain for us what you learned from that

20  analysis.

21  A.  That during that time period, about 55 percent of all the

22  deposits into Tornado Cash were from the Ronin hack.

23  Q.  And that's over a period of almost one month?

24  A.  That is correct.

25  Q.  Is that what's depicted on Government Exhibit 3002-50?

P7L1STO1                    DeCapua - Direct

1    A.  It is.

2                MR. REHN:  We can bring that down.

3    Q.  Special Agent DeCapua, I'd like to now show you something

4    we looked at on Thursday, Government Exhibit 3002-51.

5                MR. REHN:  Oh, I think that is actually not in yet.

6    Sorry.  I'll do that first.

7                Was that one admitted earlier?

8                THE COURT:  I don't believe so.

9    Q.  Special Agent DeCapua——

10               MR. REHN:  If we could show just the witness

11   Government Exhibit 3002-51.

12   Q.  Do you recognize this?

13   A.  I do.

14   Q.  And what is this?

15   A.  This is my final tabulation of all the various hacks and

16   exploits that I looked at and the total dollar amount value of

17   criminal proceeds from those incidents that ended up at Tornado

18   Cash.

19   Q.  Does this summarize all that blockchain transactional data

20   you were describing over the last bit of your testimony?

21   A.  It does.

22               MR. REHN:  The government offers Government

23   Exhibit 3002-51.

24               MR. PATTON:  Continuing objection.

25               THE COURT:  The objection is overruled.  The Court

P7L1STO1                    DeCapua - Direct

1    admits Government Exhibit 3002-51.  It may be shown to the

2    jury.

3              (Government's Exhibit 3002-51 received in evidence)

4    BY MR. REHN:

5    Q.  And Special Agent DeCapua, how many incidents are listed on

6    this chart?

7    A.  16.

8    Q.  Are those the same 16 incidents that we've discussed

9    before?

10   A.  They are.

11   Q.  And did you tabulate the total amount that you were able to

12   attribute to those 16 incidents that was deposited into Tornado

13   Cash?

14   A.  I did.

15   Q.  And what was that total amount?

16   A.  A little more than 1 billion U.S. dollars.

17   Q.  And I think you talked about this on Thursday, but just to

18   remind me, is that the total amount of all criminal proceeds

19   that were deposited into Tornado Cash?

20   A.  No.

21   Q.  Were there criteria you used to exclude incidents from your

22   analysis?

23   A.  Yes.

24   Q.  So would the true number be higher than this or lower than

25   this?

P7L1STO1                     DeCapua - Direct

1    A.   Higher.

2                MR. REHN:  We can bring that down.

3                And now I will ask to show you something which I

4    believe is in evidence, Government Exhibit 3002-52.

5    Q.   Special Agent DeCapua, do you recall looking at this chart

6    on Thursday?

7    A.   I do.

8    Q.   And could you just remind us what this chart is.

9    A.   These blue lines represent the daily volume of Tornado

10   Cash, Ethereum, ETH contracts.  The days where there's a very

11   tall blue line, that means that Tornado Cash received a lot of

12   ETH that day; on days with a smaller blue line, that means

13   that's a day where there was a little less business for Tornado

14   Cash.

15   Q.   Does this span approximately two years?

16   A.   It does.

17   Q.   And so each of those lines references a day, so

18   approximately how many lines are on the chart?

19   A.   I would have to do the full calculation, but it's going to

20   be over 600.

21   Q.   Special Agent DeCapua, just looking at the chart, do you

22   observe anything about sort of the nature of the deposit flow?

23   Would you describe it as a smooth flow or as having peaks and

24   valleys?

25   A.   It has peaks and valleys.

P7L1STO1                        DeCapua - Direct

1    Q.  And when we see some of these taller blue lines, do those

2    represent individual days?

3    A.  They do.

4    Q.  And I believe we looked on Thursday at the single biggest

5    day in this chart.  Do you recall that?

6    A.  I do.

7    Q.  And could you remind us if you were able to identify one of

8    the incidents you traced that was associated with that day.

9    A.  I was.

10   Q.  And which incident was that?

11   A.  It was the BitMart hack.

12   Q.  So let's take a look at whether——were you able to also

13   identify whether other incidents aligned with any of the large

14   days on this chart?

15   A.  I was.

16          MR. REHN:  So I'd first ask to show the witness

17   Government Exhibit 3002-53.

18   Q.  And actually, if you have the charts there with you,

19   Special Agent DeCapua, could I just ask you to look at charts

20   3002-52, 3002-53, 3002-54, 3002-55, 3002-56, 3002-57, 3002-58,

21   and 3002-59.

22   A.  Okay.

23   Q.  And Special Agent DeCapua, can you just describe what these

24   charts represent.

25   A.  They are summaries of my work tracing the volume of Tornado

P7L1STO1                        DeCapua - Direct

1    Cash ETH flows during this time period and then tracing the

2    criminal proceeds from different hacks into Tornado Cash.

3           MR. REHN:  Your Honor, the government offers the

4    aforementioned exhibits.

5           MR. PATTON:  Continuing objection.

6           THE COURT:  All right.  Government Exhibits 3002-53,

7    3002-54, 3002-55, 3002-56, 3002-57, 3002-58, and 3002-59 are

8    admitted into evidence over the defense objection.  They may

9    all be shown to the jury.

10          (Government's Exhibits 3002-53, 3002-54, 3002-55,

11   3002-56, 3002-57, 3002-58, and 3002-59 received in evidence)

12          MR. REHN:  So if we could first bring up Government

13   Exhibit 3002-53.

14   BY MR. REHN:

15   Q.  And Special Agent DeCapua, I believe we looked at this date

16   range on Thursday, but could you just remind us what date range

17   is marked out on 3002-53.

18   A.  It's between September 1st of 2020 and August 8th of 2022.

19   Q.  For the whole chart?

20   A.  For the whole chart, yes.

21   Q.  And is this a version of the chart that we were looking at

22   just a moment ago?

23   A.  It is.

24   Q.  What information has been added to this particular chart?

25   A.  There's a little arrow in a box pointing to the days that

P7L1STO1                    DeCapua - Direct

1    the KuCoin criminal proceeds were being sent to Tornado Cash.

2    Q.  And I believe you testified about this on Thursday.  Do you

3    recall that testimony?

4    A.  I do.

5    Q.  Could you just remind us what you observed about the volume

6    on that date range as opposed to earlier date ranges.

7    A.  Well, on that specific date range is the highest volume

8    that Tornado Cash had ever seen.  You can see just in the bars

9    how much business doubled during that—the time that the KuCoin

10   hackers were sending their—their ETH to Tornado Cash.

11          MR. REHN:  Okay.  Could we bring up Government

12   Exhibit 3002-54.

13   Q.  And I think we talked about this on Thursday.  Could you

14   just remind us what you observed about that highest-volume day.

15   A.  This is that—that day, December 5th, where the BitMart

16   hackers sent all of their stolen ETH into Tornado Cash, and it

17   was by far the highest-volume day that Tornado Cash had ever

18   seen.

19          MR. REHN:  Could we bring up Government

20   Exhibit 3002-55.

21   Q.  Was there anything about your tracing analysis that

22   connected to April 2nd of 2022?

23   A.  Yes.  For the—for the incidents that happened at Vee

24   Finance and Inverse Finance, April 2nd was the day that—that

25   those hackers sent the value into Tornado Cash, and that's

P7L1STO1                        DeCapua - Direct

1    represented by that tall blue line.

2              MR. REHN:  Could we bring up Government

3    Exhibit 3002-56.

4    Q.  What date range is indicated here?

5    A.  So this is between April 4th and May 19, 2022, and if you

6    recall, the Ronin hackers, they spread out the amount of time

7    that they took to send their stolen ETH into Tornado Cash, and

8    so this entire area right here that's indicated between these

9    two arrows represents that period of time.

10   Q.  And do you notice anything about sort of the average daily

11   volume during that period as opposed to other periods?

12   A.  Yes.  So just compared to the daily volume in the preceding

13   couple weeks and the——and the couple weeks coming afterwards,

14   you can see that there's a——there's much higher volume during

15   the time period that the Ronin hacker was sending value to

16   Tornado Cash.

17             MR. REHN:  Could we please bring up Government

18   Exhibit 3002-57.

19   Q.  Special Agent DeCapua, are we now indicating the second

20   highest blue line on this chart?

21   A.  We are.

22   Q.  Did that connect to any of the incidents you traced?

23   A.  Yes.

24   Q.  And could you remind us what incident was associated with

25   the deposits made on that date.

1   A.  It was the Beanstalk incident.

2           MR. REHN:  And if we could now bring up Government

3   Exhibit 3002-58.

4   Q.  Are there two additional dates indicated on this chart,

5   Special Agent DeCapua?

6   A.  There are.

7   Q.  And did you identify deposits traced to any of the

8   incidents you traced on those dates?

9   A.  I did.

10  Q.  And what incident was connected with deposits on those

11  dates?

12  A.  This is the Rari Capital incident that occurred in 2022,

13  the——it was sent to Tornado Cash in two separate days, and so

14  that's why there's the double peak.

15  Q.  And do you notice anything about those days as compared to

16  the general volume of Tornado Cash?

17  A.  They're high-volume days.

18           (Continued on next page)

19

20

21

22

23

24

25

P7L5sto2                        DeCapua - Direct

1       MR. REHN:  Can we now bring up Government

2   Exhibit 3002-59?

3   Q.  Special Agent DeCapua, what's identified on this chart?

4   A.  This is the handful of days that the Harmony hacker was

5   sending the stolen ETH into Tornado Cash.

6   Q.  So for this particular incident was it a range of dates as

7   opposed to a single date where the deposits were made?

8   A.  Range of days.

9   Q.  What do you notice about the range of days associated with

10  those deposits from the Harmony hack?

11  A.  Again, compared to the preceding time period and the time

12  period coming after, it is some of the highest volume days that

13  Tornado Cash had during that time period.

14  Q.  So, based on the analysis that you did of the overall

15  Tornado Cash volume, did you draw any conclusions about, any

16  associations between volume and some of the incidents you

17  traced?

18  A.  The conclusion I drew is whenever one of the hackers that

19  was responsible for one of the incidents that I was looking at,

20  whenever they transferred cryptocurrency into Tornado Cash,

21  that was always a banner day for Tornado Cash, the volume was

22  extremely high that day as compared to all the other days.

23  Q.  Special Agent DeCapua, do you also look at the overall

24  volume of deposits into Tornado Cash over particular periods of

25  time as compared to the criminal proceeds that you traced?

P7L5sto2                    DeCapua - Direct

1    A.  I did.

2              MR. REHN:  If we could show the witness what's been

3    marked for identification purposes as Government

4    Exhibit 3002-60?

5              THE COURT:  60, sir?

6              MR. REHN:  Yes, your Honor.

7              THE COURT:  Thank you.

8    Q.  So Special Agent DeCapua, what does this chart represent?

9    A.  This represents for all of the ETH that was deposited into

10   the Tornado Cash contracts between the specified time period at

11   the top of the page, this shows what proportion of those, of

12   the total were actually tied to identified criminal proceeds

13   for the 16 incidents that I analyzed.

14             MR. REHN:  Your Honor, the government offers

15   Government Exhibit 3002-60.

16             MR. PATTON:  Continuing objection.

17             THE COURT:  Government Exhibit 3002-60 is admitted

18   into evidence, over defense objection, and may be shown to the

19   jury.

20             (Government's Exhibit 3002-60 received in evidence)

21   BY MR. REHN:

22   Q.  Special Agent DeCapua, over the time period of February 25

23   to August 8, 2022, what percentage of Tornado Cash deposits

24   were traceable to the criminal incidents that you analyzed?

25   A.  37 percent.

P7L5sto2                          DeCapua - Direct

1   Q.  Now, does that represent -- does that mean that everything

2   that is on the blue side is not a criminal deposit?

3   A.  No.

4   Q.  What can we say about what is on the blue side of the

5   chart?

6   A.  We don't know where those proceeds came from.

7   Q.  What can we say about what is on the gray side of the

8   chart?

9   A.  Those resolve to the 16 incidents that I specifically

10  looked at.

11  Q.  So just those 16 incidents represented 37 percent of all

12  Tornado Cash volumes over this time period?

13  A.  That's correct.

14  Q.  Special Agent DeCapua, did you also look at a narrower time

15  range within this time period?

16  A.  I did.

17          MR. REHN:  If we could show the witness what's been

18  marked Government Exhibit 3002-61?

19  Q.  What time range did you analyze for the purposes of this

20  chart?

21  A.  April 2 to July 2 of 2022.

22  Q.  So, is that an approximately three-month time period?

23  A.  That's correct.

24          MR. REHN:  The government offers Government

25  Exhibit 3002-61.

1          MR. PATTON:  Continuing objection.

2          THE COURT:  Government Exhibit 3002-61 is admitted

3    into evidence and may be shown to the jury.

4          (Government's Exhibit 3002-61 received in evidence)

5    BY MR. REHN:

6    Q.  Special Agent DeCapua, over the three months between

7    April 2 and July 2 of 2022, focusing just on the 16 incidents

8    you have described in your testimony, what percentage of

9    Tornado Cash deposits were attributable to these 16 incidents?

10   A.  About 50 percent.

11         MR. REHN:  Nothing further, your Honor.

12         THE COURT:  Thank you.

13         Mr. Patton, cross?

14         MR. PATTON:  Yes, your Honor.

15   CROSS-EXAMINATION

16   BY MR. PATTON:

17   Q.  Good morning, Agent DeCapua.

18   A.  Good morning.

19   Q.  You testified last week, I believe, that you have been

20   investigating crypto since before people used the word crypto;

21   right?

22   A.  I think I would say it was before cryptocurrencies were

23   actually invented.

24   Q.  You talked about something called E-gold?

25   A.  I would call that a virtual currency and not a crypto.

P7L5sto2                          DeCapua - Cross

1    Q.  For about the past 15 years you have been an investigator

2    with the FBI; right?

3    A.  That's correct.

4    Q.  And a decent portion of that time has been focused on cyber

5    and crypto; right?

6    A.  That's correct.

7    Q.  Fair to say you are one of the most knowledgeable FBI

8    agents when it comes to cyber and crypto?

9    A.  I wouldn't -- I wouldn't put it that way.  There is very

10   knowledgeable people within the FBI on both cryptocurrencies

11   and cybercrime.

12   Q.  And you are one of the most knowledgeable; correct?

13   A.  Some people would say that, I suppose.

14   Q.  Crimes involving crypto come in all shapes and sizes;

15   right?

16   A.  That's correct.

17   Q.  You have talked a lot about hacking incidents here in

18   court; right?

19   A.  Yes.

20   Q.  That's one big category of crimes involving crypto; right?

21   A.  It is.

22   Q.  Frauds and scams is another category; right?

23   A.  Yes.

24   Q.  There is something called ransomware is another big

25   category; right?

P7L5sto2                          DeCapua - Cross

1    A.   Yes.

2    Q.   What is ransomware?   Sorry.

3    A.   So, ransomware --

4             MR. REHN:   Objection, your Honor.   Beyond the scope.

5             THE COURT:   I will allow the one question, but

6    counsel, really we ought to move to the substance of his

7    direct.

8             Go ahead.

9             MR. PATTON:   Your Honor --

10            THE WITNESS:   So, ransomware is a type of cybercrime

11   where a hacker will take over a computer network and render it

12   inoperable, and then they would say to the victim if you want

13   to get your computer systems back, you have to pay me a ransom,

14   which is almost always in some form of cryptocurrency.   So

15   really it is just a -- it is like a ransom just using high-tech

16   means.

17            MR. PATTON:   Your Honor, if I may, I just have one

18   more on this line.

19            THE COURT:   You can ask it.   I'm not sure I will allow

20   it.

21            MR. PATTON:   OK.

22   BY MR. PATTON:

23   Q.   So the crimes that you were talking about there are

24   involving people going online, typically, but they're also

25   crimes involving crypto that happen in person; correct?

P7L5sto2                          DeCapua - Cross

1            MR. REHN:  Objection, your Honor.

2            THE COURT:  I will allow.

3            Yes or no?

4            MR. PATTON:  Your Honor, may I offer an example?

5            THE WITNESS:  I am trying to think.  In-person crimes

6    involving crypto.

7    BY MR. PATTON:

8    Q.  So, for instance, somebody might have their private key or

9    pass code robbed or stolen from them; correct?

10           THE COURT:  I will let you answer that.

11           THE WITNESS:  Hypothetically?  That could happen.  I

12   haven't been involved in any of those types of investigations.

13           THE COURT:  Then let's please move on.

14   BY MR. PATTON:

15   Q.  You are aware -- you have talked a lot about the blockchain

16   tracing tools that you have used in your investigation; right?

17   A.  Yes.

18   Q.  One thing is called Etherscan; right?

19   A.  That's correct.

20   Q.  And this is a publicly available resource to follow where

21   transactions go on the blockchain; right?

22   A.  It is.

23   Q.  It is something you use; right?

24   A.  That's correct.

25   Q.  It is something people in private industry use; correct?

P7L5sto2                          DeCapua - Cross

1    A.  I believe so, yes.

2    Q.  It can also be used by criminals; correct?

3    A.  It could.

4    Q.  They can identify where big wallets might exist; correct?

5    A.  So I'm just thinking about my use of Etherscan and my

6    understanding of it, and I don't think there is a way to just

7    ask the question:  Show me where big wallets exist.

8    Q.  I wasn't suggesting that, Agent.  My apologies if that was

9    confusing.

10          People, both for non-criminal purposes and criminal

11   purposes can use publicly available tools to see how much

12   money, how much crypto is in someone's wallet and transfers in

13   and out of those wallets; correct?

14          MR. REHN:  Objection.

15          THE COURT:  I will allow.

16   A.  Yes.

17   Q.  And you mentioned in your testimony last week that some of

18   the crypto that was stolen in some of the hacks you testified

19   is still sitting in certain wallets out there; right?

20   A.  That's correct.

21   Q.  Sometimes a significant amount; correct?

22   A.  Yes.

23   Q.  Can you explain for us, if it is known where the crypto is

24   sitting, in what wallet address the crypto is sitting in why

25   can't law enforcement or, say, the victim of the hack just go

1    get it?

2    A.   Because in order to transfer the cryptocurrency from any

3    specific address you would need custody of the private key

4    which is something that, in general, is going to be kept in

5    whoever the owner of the address is, in their phone or computer

6    or whatever wallet software that they use.

7    Q.   So without that private key you just can't get into the

8    wallet; correct?

9    A.   Correct.

10   Q.   And that is also why you sometimes are aware that some

11   people who've, say, forgotten their private key, there are well

12   known stories of people who can't access their own money;

13   right?

14   A.   Yes.

15   Q.   When you were doing some of the flowcharts for some of the

16   specific hacks you looked at do you recall that in some of

17   those charts you had arrows going to, I believe you called

18   them, multiple intermediary wallets?  Do you remember those

19   graphics?

20   A.   I do.

21   Q.   What types, just generally speaking, what types of wallets

22   are those, those intermediary wallets?

23   A.   Types of wallets?

24   Q.   Well, there are different types of wallets; correct?

25   A.   When I think of types of wallets I'm thinking there is

P7L5sto2                          DeCapua - Cross

1  paper wallets, there is wallets that are -- there is different

2  types of wallet software that you can use.

3  Q.  So maybe we will start at a very basic level.  I'm not

4  trying to get too in the weeds on the tech but, for instance,

5  there are wallets in real life like actual hardware wallets;

6  right?  That's one type of wallet; right?

7  A.  That's correct.

8  Q.  Sometimes those are called ledger wallets?

9  A.  That is one type of hardware wallet.

10 Q.  Often times they're referred to colloquially as cold

11 wallets; right?

12 A.  Sometimes colloquially.

13 Q.  And there are wallets that are maintained online; correct?

14 A.  Correct.

15 Q.  And the multiple intermediary wallets, let's just start at

16 a basic level, what sort of wallets are we talking about there?

17 A.  Those are going to be wallets that are stored online.

18 Q.  And how -- maybe this is obvious, but how easy is it to

19 just create those wallets?

20 A.  Very easy.

21 Q.  Fair to say one can create many of those wallets in a very

22 short period of time?

23 A.  Yes.  To be a little specific with the language, within a

24 wallet you can easily create additional addresses.

25 Q.  And you use "wallet" as sort of a colloquial term for

P7L5sto2                         DeCapua - Cross

1    what's an account; right?

2    A.   I would say address.  But I would think of it as like a

3    bank account, yes.

4    Q.   And there is a public-facing address; right?

5    A.   Address, yes.

6    Q.   Which is how, you know, if you wanted to tell somebody

7    where to send me crypto, you would give them that public-facing

8    address; right?

9    A.   That's correct.

10   Q.   As opposed to the private key which only you have and which

11   is the only way to access the wallet; right?

12   A.   That's correct.

13   Q.   And you testified that one -- there are various things you

14   look for to sort of suss out whether or not a hack has

15   occurred, various blockchain data in addition to other data?

16   A.   That's correct.

17   Q.   And one is that if there has been a big drain out of a

18   location and then quick disbursing into multiple wallets,

19   that's a sign of a hack; right?

20   A.   Correct.

21   Q.   And hackers can move proceeds, as we have seen from some of

22   your flowcharts, to many different wallets very quickly; right?

23   A.   Yes.

24   Q.   And this can create sort of -- I will use a very technical

25   term -- this can be a little bit of a game of Whac-A-Mole?

P7L5sto2                          DeCapua - Cross

1    A.   A little bit, yes.

2    Q.   You can look one day at where proceeds are held in a wallet

3    and the next day they might be in five different wallets;

4    right?

5    A.   That's correct.

6    Q.   Over the weekend the prosecutors here gave you some

7    transcripts of witnesses who testified here at the trial to

8    review; right?

9    A.   Yes.

10   Q.   They gave you a copy of Joe Evans' testimony?

11   A.   I don't remember the name of that individual.  I believe he

12   was the attorney that represented BitMart.

13   Q.   Exactly.

14        And they gave you the testimony of a gentleman named

15   Andy Ho.  Do you recall that?

16   A.   I do.

17   Q.   And he is an executive at a company called Sky Mavis?

18   A.   Yes.

19   Q.   And they operate a gaming program called Axie Infinity?

20   A.   I don't know if they still operate it but I think he

21   testified that they did operate it.

22   Q.   They did at the time of the Ronin hack; right?

23   A.   That's exactly right.

24   Q.   And they also developed the Ronin Network; correct?

25   A.   That's correct.

P7L5sto2                            DeCapua - Cross

1   Q.  So, Mr. Evans was the attorney for BitMart, which was one

2   of the victims of the hack that you have talked about; right?

3   A.  Yes.

4   Q.  That you say traced some of the proceeds of that were

5   traced into Tornado Cash; right?

6   A.  Yes.

7   Q.  And same thing with Ronin, you have just gone over that

8   this morning; right?

9   A.  Yes.

10  Q.  Agent, did the prosecutors share with you the transcript of

11  the very first witness they called, a woman named Henfeng Lin

12  who said she was scammed and sent money to a place called

13  NTU Capital?

14  A.  No.

15  Q.  Are you aware, Agent DeCapua, that the money that Ms. Lin

16  talked about being scammed out of, never actually went to

17  Tornado Cash?

18          MR. REHN:  Objection, your Honor.

19          THE COURT:  You are either aware or not, sir.

20          THE WITNESS:  Not aware.

21  BY MR. PATTON:

22  Q.  Did you trace that, the money from NTU Capital or Ms. Lin's

23  scammed money?

24  A.  I did not.

25  Q.  And you didn't -- you weren't asked by these prosecutors to

P7L5sto2                          DeCapua - Cross

1    trace that money; right?

2    A.  I was asked to trace all the money if it met that threshold

3    of $5 million within a specific time frame, etc.

4    Q.  Are you aware that NTU Capital has been accused by the

5    government of running roughly a hundred million worth of crypto

6    scams?

7    A.  No.

8    Q.  The various charts and graphs and things that you have gone

9    over, who made the decision about what to share with the jury?

10   A.  The prosecutors.

11   Q.  You testified last week, I think, that the prosecutors came

12   to you and said we want you to take a look at these particular

13   hacks and trace them; right?

14   A.  So it started out just in general to look at all the

15   incidents and then the prosecution team gave me --

16             THE COURT:  One moment, please.

17             Counsel, we had discussions about this this morning.

18   Are you ready for the answer?

19             MR. PATTON:  Absolutely, your Honor.  I mean, I'm

20   happy to discuss this at side bar.

21             THE COURT:  No, no.  I will let him answer.

22             Please answer the question, sir.  Thank you.

23             THE WITNESS:  The prosecution team gave me a list of

24   incidents that they had identified and said look into these,

25   and then anything else you can find where the proceeds were

1   transferred into Tornado Cash.  And then, as the months went by

2   and trial came closer and closer, then it was, well, of all the

3   incidents that you have identified, let's narrow it down just

4   to a specific time period.

5   BY MR. PATTON:

6   Q.  And I believe all of your tracing occurred sometime in the

7   time frame -- pardon me.  I will start over.

8          Remember that line graph chart you were reviewing this

9   morning shows the lines of high volume deposits?

10  A.  Yes.

11  Q.  That time frame was September 1, 2020 to August 8, 2022;

12  right?

13  A.  Yes.

14  Q.  And one of your criteria for that time period was hacks of

15  above $5 million; right?

16  A.  Yes.

17  Q.  And you were focused on hacks above $5 million where you

18  did tracing that showed there were deposits made to

19  Tornado Cash; correct?

20  A.  Yes.

21  Q.  But, Agent, you are aware that during that time frame there

22  were many, many other hacks of greater, or scams greater than

23  $5 million; right?

24  A.  I found a lot of scams that were under that threshold that

25  I did not count.  I'm not sure if there were any above

P7L5sto2                        DeCapua - Cross

1   $5 million.  The other criteria was I had to be able to

2   positively trace it into Tornado Cash and so I took a

3   conservative approach.  Sometimes I wouldn't be sure and so I

4   would just move on to the next one.

5   Q.  Understood, Agent.

6           You didn't include, say for example, a February 2022

7   Wormhole Bridge hack to the tune of $320 million; right?

8   A.  I have never even heard of that one.

9   Q.  How about the BXH Exchange hack in November of 2021 to the

10  tune of $139 million?

11  A.  I didn't include it.

12  Q.  How about Badger DAO in December of 2021 to the tune of

13  $119 million?

14  A.  What was the date on that again?

15  Q.  December 2021.

16  A.  Not included.

17

18

19

20

21

22           (Continued next page)

23

24

25

1          (In open court)

2    BY MR. PATTON:

3    Q.  Agent, you testified that you sometimes do tracing

4    yourself; right -- I will clarify where this is going -- and

5    sometimes you use third-party vendors; correct?

6    A.  Yes.

7    Q.  Are you familiar with a private company called Chainalysis?

8    A.  I am.

9    Q.  Fair to say they're one of the more well-known, reputable

10   private firms in the space?

11   A.  Yes.

12   Q.  They often partner with the FBI and other law enforcement

13   agencies?

14   A.  I won't say partner.  I know that they offer their tool, it

15   is one of the vendors that offers blockchain tracing tools for

16   the FBI that the FBI subscribes to.

17   Q.  You, yourself, in your own tracing, will sometimes check

18   your results against what Chainalysis is doing just sort of as

19   a gut check; correct?

20   A.  I will.

21   Q.  Let's talk a little bit about the first hack that you

22   reviewed on your list of 16.

23          MR. PATTON:  Could we please, Mr. Demarco, pull up

24   Government Exhibit 3002-9?

25   Q.  Agent, you recognize this as one of your slides?

P7L5sto2                        DeCapua - Cross

1    A.  I do.

2    Q.  And fair to say you had broken these slides up into

3    component pieces but this contains the full information; right?

4    A.  That's correct.

5    Q.  And what we are looking at here is the initial hack on the

6    far left in ETH and USDT going into KuCoin hacker Wallet 1;

7    right?

8    A.  That's correct.

9    Q.  And in a minute we will look at -- you did a separate chart

10   for different types of cryptocurrency that was hacked; right?

11   A.  That's correct.

12   Q.  But for now just focusing on this hack, from Wallet 1 on

13   the same day of the hack and the next day we have one of those

14   arrows going to multiple intermediary wallets; right?

15   A.  That's correct.

16   Q.  And that's what we were talking about earlier as sort of

17   this thing hackers like to do in terms of the game of

18   Whac-A-Mole; right?

19   A.  Hackers will often, when they're moving money or laundering

20   it, create additional wallets and then move value into those

21   wallets.

22   Q.  And this is one of those standard things you look for that

23   they're disbursing into multiple different wallets; correct?

24   A.  That's correct.

25   Q.  And then they go into this crypto swap a few days later;

1    right?

2    A.  Yes.

3    Q.  Explain the crypto swap.  What does that mean and, in

4    particular, how does that happen?

5    A.  So, for this case in particular it was the USDT was the

6    extra crypto that was stolen from KuCoin that the KuCoin hacker

7    now had in their possession.  So, in order to transfer that

8    USDT into ETH, you would have to use a service called a swap

9    service where you essentially will be able to offer your USDT

10   in exchange for some ETH.

11   Q.  And these are typically what are known as decentralized

12   exchanges; correct?

13   A.  Yes.

14   Q.  And from your tracing that you did on KuCoin, you know that

15   there were three decentralized exchanges that were used in this

16   crypto swap; right?

17   A.  I don't remember exactly.  I remember there was more than

18   one.

19   Q.  Do you recall that Uniswap was one?

20   A.  I don't recall specifically.  Uniswap is one of the most

21   popular ones.  And so, when you are moving this amount of

22   USDT -- I would be making an assumption.  I would have look at

23   my actual tracing analysis to tell you which specifically which

24   swap services were used.

25   Q.  Is there something in your notes that you could take a look

P7L5sto2                      DeCapua - Cross

1   at?

2   A.  I can check.  So, these seem to be evidence exhibits, not

3   my note.

4   Q.  Do you have your notes available to you?

5   A.  Not sitting here.

6   Q.  Does another one of the exchanges called Kyber Networks

7   ring a bell?

8   A.  It does.

9   Q.  And how about 1inch?

10  A.  Yes.

11  Q.  And you are familiar, generally, with these decentralized

12  exchanges; right?

13  A.  I am.

14  Q.  And these are basically automatic smart contracts; right?

15  A.  I don't know for sure.

16  Q.  Well, nobody is actually going up to a teller; right?

17  A.  No.

18  Q.  These are blockchain protocols that happen automatically;

19  correct?

20  A.  What I can tell you is you can go to the service, the swap

21  service, and you can give it your order and the order happens

22  automatically.

23  Q.  And none of these decentralized exchanges -- Uniswap, Kyber

24  Networks, 1inch -- they don't have anything like a user

25  registry; correct?

P7L5sto2                         DeCapua - Cross

1   A.  I have no idea.

2   Q.  You don't have to give them your name to engage in this

3   transaction; right?

4   A.  I don't know.

5   Q.  After this swapping occurs it goes back into the multiple

6   intermediary wallets; right?

7   A.  That's correct.

8   Q.  And then back to Wallet 1; right?

9   A.  That's correct.

10  Q.  And then to yet another wallet that you have marked as

11  Wallet 2; right?

12  A.  That's correct.

13  Q.  Although, if we were to count the multiple intermediary

14  wallets, it might be fair to describe it as however many

15  wallets there have been now, Wallet 10, 20, 30; right?

16  A.  That's correct.

17  Q.  And you have a wallet address associated with that

18  Wallet 2; right?

19  A.  Yes.

20  Q.  And then the deposits are made between October 23rd and

21  October 26, 2020; right?

22  A.  That's correct.

23  Q.  And you recall you testified last week about an e-mail that

24  was sent to this hello@tornado.cash talking about the KuCoin

25  hack; right?

P7L5sto2                        DeCapua - Cross

1    A.  I do.

2    Q.  And it contained that wallet address that you have marked

3    here?

4    A.  Yes.

5            MR. PATTON:  Could we pull up Government Exhibit 231

6    that is in evidence?

7    Q.  And that e-mail giving that wallet, that was sent on

8    October 26; right?

9    A.  I see that.

10           MR. PATTON:  If we can go back to the flowchart,

11   3002-9?

12   Q.  And after October 26 there were no more deposits into

13   Tornado Cash; correct?

14   A.  Correct.

15   Q.  In one sense, though, Agent, is it fair to say because of

16   this multiple wallets dynamic, the Whac-A-Mole dynamic, that

17   even if, say, Tornado Cash or any other exchange blocked a

18   particular wallet, the hacker could simply pretty quickly move

19   things into a different wallet; correct?

20   A.  That is correct.

21   Q.  And within a fairly short period of time, circumvent any

22   sort of blocking on a particular wallet; correct?

23   A.  If the blocking was just a block on one particular wallet

24   then, yeah, it would be very easily circumvented.

25   Q.  And the e-mail we looked at gave one particular wallet;

P7L5sto2                        DeCapua - Cross

1   correct?

2   A.  That's correct.

3          MR. PATTON:  Could we look at now Government

4   Exhibit 3002-13?

5   Q.  This is that second chart we talked about with different

6   types of cryptocurrency; right?

7   A.  Yes.

8   Q.  So same hack but different blockchain; right?

9   A.  Same blockchain, different cryptocurrency.

10  Q.  Different cryptocurrency; to the tune of about

11  $150 million?

12  A.  That's how much was originally stolen from KuCoin.

13  Q.  Right.

14         Roughly $16 million or just a bit above 10 percent

15  ended up being deposited into Tornado Cash?

16  A.  That's correct.

17  Q.  Here we see that it is a slightly different pattern than

18  the first chart we were looking at; right?

19  A.  That's correct.

20  Q.  Here over a period of about a week Wallet 1 is transferring

21  to these multiple intermediary wallets; right?

22         I'm sorry.  My apologies.  I was looking at a

23  different date.

24         Over a period of about six months; right?

25  A.  That's correct.

P7L5sto2                         DeCapua - Cross

1    Q.  It is going into multiple intermediary wallets; correct?

2    A.  Yes.

3    Q.  And again, this is in, given the speed at which things can

4    happen, right, on the blockchain and online, this is a fairly

5    extended period of time; correct?

6    A.  It is.

7    Q.  But the challenge for KuCoin or law enforcement goes back

8    to what we were talking about earlier which is even though you

9    may know it is sitting in Wallet 1, you can't actually get at

10   it without the private key; right?

11   A.  That's correct.

12   Q.  And so then we see more crypto swapping going on from all

13   these multiple intermediary wallets; right?

14   A.  That's correct.

15   Q.  And now, instead of it going to a single wallet like we saw

16   in the first flow chart, now all these multiple intermediary

17   wallets are depositing into Tornado Cash; right?

18   A.  Not all of them but it wasn't a single wallet for the

19   KuCoin case in particular.  So, I think you said all the

20   intermediary wallets.  Some of the intermediary wallets were

21   depositing into Tornado Cash.

22   Q.  My apologies.  I was imprecise in my language.

23        On the earlier chart we saw the multiple intermediary

24   wallets eventually put the crypto that was in those wallets

25   into what you had marked as Wallet 2; right?

P7L5sto2                          DeCapua - Cross

1            MR. PATTON:  Can we go back to the earlier chart,

2     Mr. Demarco?

3     Q.  You see here on 3002-9 we don't have the multiple

4     intermediary wallets going directly to Tornado, it went to

5     Wallet 2 first; right?

6     A.  That is correct.

7     Q.  Now if we can go back, so here we have a slightly different

8     pattern; right?

9     A.  Yes.

10    Q.  Here multiple wallets are making deposits and to be clear

11    not nearly all of the money that was hacked; right?

12    A.  That's correct.  I think it is five or six.

13    Q.  Are making deposits, so five or six different wallets,

14    right, are making deposits into Tornado Cash?

15    A.  That's correct.

16    Q.  And you don't have the addresses for those wallets up on

17    the chart; correct?

18    A.  Correct.

19    Q.  And that wasn't included in the e-mail that we looked at

20    earlier; right?  From KuCoin?

21    A.  No.

22    Q.  Let's talk about the similar chart you did for BitMart.

23            MR. PATTON:  Can we pull up 3002-24?

24    Q.  BitMart, if you will recall, this was the highest line on

25    that line graph chart; right?

P7L5sto2                         DeCapua - Cross

1     A.   That's correct.

2     Q.   Pretty sizeable hack here; right?

3     A.   Yes.

4     Q.   And it occurred on December 4; right?

5     A.   Yes.

6     Q.   And I won't go through all of the details that we have done

7     with KuCoin but, in essence, we see swapping from one wallet

8     going to a second wallet; right?

9     A.   That's correct.

10    Q.   And then in that second wallet there is more swapping going

11    on; right?

12    A.   Correct.

13    Q.   And here we have a wallet address; right, for that

14    Wallet 2?

15    A.   We do.

16    Q.   And deposits are made from that address on December 4 and

17    5; right?

18    A.   That's correct.

19    Q.   So the day of the hack and the day after the hack; right?

20    A.   Yes.

21    Q.   And there was even some on December 5 that came from the

22    first wallet; right?

23    A.   That's correct.

24    Q.   We don't have an address for that wallet on this chart;

25    right?

P7L5sto2                        DeCapua - Cross

1   A.  Correct.

2   Q.  And you also testified about and you have reviewed

3   Mr. Evans, the BitMart lawyer's testimony, right, and he sent a

4   letter to Roman Storm and Semenov and Pertsev; correct?

5   A.  I believe it was to hello@tornado.cash.

6           MR. PATTON:  Can we pull up GX 1005?

7   Q.  Do you see up at the top there that he names a few people

8   and there is an additional one named Dementev?

9   A.  I do.

10  Q.  Do you see that the date of this letter is December 14?

11  A.  I do.

12  Q.  And you see that's nine days after the last deposit from

13  that flowchart we were just looking at?

14  A.  Yes.

15  Q.  You are aware from reviewing Mr. Evans' testimony that he

16  also sent them a Telegram chat; correct?

17  A.  I don't specifically remember that in that testimony.

18          MR. PATTON:  Could we please pull up Government

19  Exhibit 1006 which is in evidence and could we expand that?

20  Q.  Do you see that this is entitled:  Joe Evans created the

21  group BitMart, McDermott Will & Emery, Tornado Cash?

22  A.  I do see that.

23  Q.  And he says:  Tornado Cash, this is Joe Evans from

24  McDermott Will & Emery.  We represent BitMart.  Please see the

25  attached correspondence.  Feel free to ask me any questions

P7L5sto2                        DeCapua - Cross

1    here via e-mail, and he gives his contact information; right?

2    A.  I do see that.

3    Q.  There is a response from the title Poma that says:  *Our*

4    *company does not have any ability to affect any change or take*

5    *any action with respect to the Tornado Cash protocol.  It is a*

6    *decentralized software protocol that no one entity or actor can*

7    *control.  For that reason, we are unable to assist with respect*

8    *to any issues relating to the Tornado Cash protocol.*

9            Do you see that?

10   A.  I do.

11

12

13

14

15

16   Q.  You know that he testified that he had no reason to think

17   that anything about this was incorrect; right?

18   A.  I don't recall seeing that.

19   Q.  But you reviewed his testimony?

20   A.  I reviewed the portion of the testimony that was relevant

21   to my direct examination.  I didn't review the entire

22   transcript.

23   Q.  You didn't think this was relevant?

24   A.  I didn't think this Telegram chat I have never seen is

25   relevant?

1   Q.  Correct.  And his view of it.

2          MR. REHN:  Objection, your Honor.

3   A.  I have never seen this Telegram chat.  I didn't know it

4   existed.

5          MR. PATTON:  Can we pull up Government

6   Exhibit 3002-45?

7   Q.  This, again, is one of these flowcharts and you testified

8   about this one this morning; right?

9   A.  I did.

10  Q.  This is from the Ronin hack; right?

11  A.  It is.

12  Q.  And again, we see the same pattern of the hack going into

13  one wallet, and then on the day of the hack and then continuing

14  for about two months, the crypto going into multiple

15  intermediary wallets; right?

16  A.  That's correct.

17  Q.  And then again going through these decentralized exchanges

18  in the crypto swap; right?

19  A.  That's correct.

20  Q.  Do you know which of the decentralized exchanges were

21  swapping the crypto here?

22  A.  I don't know for sure.  Again, that type of information is

23  going to be in my notes.

24         MR. PATTON:  Could we pull up Government

25  Exhibit 3002-49?

P7L5sto2                         DeCapua - Cross

1    Q.  This is the same hack; right?

2    A.  Correct.

3    Q.  But now you've added a tag here that that first wallet had

4    sanctions placed on it on April 14; correct?

5    A.  Yes.

6    Q.  And that was before it -- well, I will be more precise.

7             It was sanctioned, it looks like, maybe midway between

8    the time frame when money was going from that wallet to

9    multiple different wallets?

10   A.  Yes.

11   Q.  And you don't have a tag for any of those multiple

12   intermediary wallets about sanctions; correct?

13   A.  Correct.

14   Q.  We also looked at some chats and an article that attributed

15   this hack to something called the Lazarus Group; right?

16   A.  Yes.

17   Q.  You are aware that they are known as a very sophisticated

18   hacking group; right?

19             (Discussion off record)

20   Q.  You are aware that the Lazarus Group is a well-known,

21   sophisticated hacking group; correct?

22   A.  Correct.

23             MR. PATTON:  Your Honor, this might be a decent moment

24   for a short break, if I am not violating your rule too badly.

25             THE COURT:  All right.  We will take the morning

P7L5sto2                          DeCapua - Cross

1    break.  Let's be as quick as we can because you know we are

2    leaving early today, so we will break for 10 minutes maximum

3    but if it can be shorter, all the better.

4              I don't want you guys to be uncomfortable.  Do not

5    discuss the case with each other or anyone else, keep an open

6    mind until all the evidence is is in.   We will see you in 10

7    minutes.

8              Thank you.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P7L5sto2                         DeCapua - Cross

1          (Jury present)

2          THE COURT:  Please be seated.

3          Thank you.  We had some legal issues we wanted to

4    address during the break.  Those are now addressed.  We will

5    now continue with the cross-examination of Mr. Patton.

6          MR. PATTON:  Thank you, your Honor.

7    BY MR. PATTON:

8    Q.  Agent, throughout your testimony you have testified about a

9    number of chats involving Mr. Storm; correct?

10   A.  That's correct.

11   Q.  And in your work as an investigator you understand that it

12   is important, when you're reviewing communications, whether it

13   is e-mails or chats or anything else and you are trying to sort

14   of suss out the meaning of those things, that context matters;

15   right?

16   A.  That's correct.

17   Q.  Different contexts can change the meaning of the same

18   words; right?

19   A.  That's correct.

20   Q.  Do you recall that the government showed you those chats

21   where Semenov was saying to Mr. Storm have you heard about this

22   $600 million hack; right?

23   A.  Yes.

24   Q.  And there is -- I'm not trying to be precise here but there

25   is a back and forth where Mr. Storm is kind of like, *What are*

P7L5sto2                          DeCapua - Cross

1    *you talking about?* And, *Oh.  I thought you said 600,000, not*

2    *600 million.*

3              Do you recall that exchange?

4    A.  I do recall it.

5

6

7

8

9              MR. PATTON:  Well, your Honor -- could we please put

10   up Government Exhibit 2044-T?  It is in evidence.

11   Q.  You recognize this is one of the chats that you have been

12   testifying about, the Bablo Peppersec that Mr. Storm is a part

13   of; right?

14   A.  Yes.

15   Q.  If we could scroll down to the next page, this is a message

16   from Roman Storm to the others on March 29, 2022; right?

17   A.  Yes.

18   Q.  And he is attaching a Tweet; right?

19   A.  Yes.  So the entire message is just the link of the Tweet.

20   Q.  Well, in fact he typed something below what he has

21   forwarded there, right, starting with:  *A cool idea...*

22   A.  Yes.

23   Q.  So he types into the others:  *A cool idea on how to stop*

24   *hackers*.  Right?

25   A.  Yes.

P7L5sto2                          DeCapua - Cross

1  Q.  Now you have reviewed this exchange; right?

2  A.  So, I have reviewed this group chat, yes.  This specific

3  exchange, I don't remember this specific exchange.

4  Q.  Well, you understand that they then have a series of back

5  and forth about technical aspects of this idea to help stop

6  hacks; right?

7  A.  So I don't remember seeing that.

8  Q.  And you know that that all precedes the discussion about

9  the 600 -- Semenov informing Mr. Storm of what turns out to be

10 the Ronin hack; right?

11             MR. REHN:  Objection.

12             THE COURT:  Do you recall, sir?

13 A.  I don't remember reviewing any of those chats.

14 Q.  So you were testifying about what Mr. Storm, his response

15 to learning of the Ronin hack, but you weren't aware of the

16 context surrounding it?

17 A.  So I --

18             THE COURT:  I think he wasn't aware of your

19 description of the context surrounding it, sir, but go ahead.

20 BY MR. PATTON:

21 Q.  What is your recollection of the context surrounding it?

22 A.  So we are talking about the Ronin hacks now?

23 Q.  Correct.

24 A.  Talking about the Telegram group chat for the Ronin hacks.

25 Q.  This series of conversations involving Mr. Storm and

P7L5sto2                            DeCapua - Cross

1    Semenov and some of the others in this group chat that you have

2    talked about a number of times --

3    A.  Yes.

4    Q.  -- and on the same day, March 29, where Semenov says to

5    the others, whoa, there has been this enormous hack, right, and

6    Mr. Storm has some questions for him about it; right?

7    A.  Can you just repeat what you just said?

8    Q.  Sure.

9            THE COURT:  Will it aid you, sir, in reviewing the

10   full chat?

11           THE WITNESS:  Absolutely.

12           THE COURT:  Is that necessary?  He can, but I --

13           MR. PATTON:  I'm happy to let him do that.

14   BY MR. PATTON:

15   Q.  But if you don't recall, that's fine, but you testified

16   about that particular piece of the exchange; right?  Semenov

17   informing Mr. Storm of that?

18   A.  Yes.  Semenov informing Mr. Storm of the hack.

19   Q.  Right.  And you recall that there was a lot of discussion

20   leading up to it; right?

21   A.  I didn't read all the discussions leading up to it.

22   Q.  Fair enough.

23           MR. PATTON:  If we could pull up Government

24   Exhibit 2047-4?

25   Q.  Do you recall that this was part of a separate -- this is

P7L5sto2                          DeCapua - Cross

1    the substance of a link that was sent in a different one of

2    these chats, same Bablo chat; right?

3    A.   Yes.

4    Q.   And it's sent from somebody called Dirty Bubble Media?

5    A.   I see that.

6    Q.   And it's a public Tweet, right, saying that holders of TORN

7    are accomplices to violating sanctions.

8    A.   I see that.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P7L1STO3                          DeCapua - Cross

1    Q.  And you recall that Mr. Storm's reaction in that chat upon

2    seeing this was—pardon my French— "Shit," right?

3    A.  I would have to see—we talked about a lot of chats over

4    the past few days so I would have to see the exact chat.  That

5    sounds about right, but I'm not 100 percent certain.

6    Q.  I'm just talking about what you testified to this morning,

7    right, about an hour ago?

8    A.  But there was other chats on Thursday.

9    Q.  I'm talking about the ones this morning associated with

10   this tweet, right?

11   A.  I don't know if he responded "Shit" to this specific tweet.

12   Q.  Do you recall that there were conversations between

13   Mr. Storm and the others in that chat group essentially about

14   concerns now about law enforcement, right?

15           MR. REHN:  Objection, your Honor.

16           THE COURT:  I'll allow it.

17   A.  Concerns about law enforcement reading the Telegram chats.

18   Q.  Correct.  In response to all this public discussion about

19   the Ronin hack, right?

20   A.  That's correct.

21           MR. PATTON:  If we could pull up Government

22   Exhibit 2017.

23   Q.  You recall that last week you testified—

24           MR. PATTON:  If we could blow up the sort of name, the

25   header up front.  Yeah, thank you.

P7L1STO3                          DeCapua - Cross

1    Q.  You testified about a number of chats with this name of

2    1inch > < tornado.cash, right?

3    A.  I do.

4    Q.  Going back to this notion of context in trying to discern

5    meaning in what people are saying, are you familiar with a term

6    called trolling?

7    A.  I am.

8    Q.  What does that mean, generally?

9    A.  So it's where people post stuff sarcastically in a way

10   to—either for self-amusement or to sow confusion.

11   Q.  Fair to say sometimes it's to like give somebody else a

12   hard time?

13   A.  Yes.

14   Q.  And that can happen in social media, right?

15   A.  That's correct.

16   Q.  That can happen in group chats, right?

17   A.  Yes.

18          MR. PATTON:  Could we scroll down to the next page on

19   this.  And—yeah, there we go.

20   Q.  It's this guy Sergej, or Sergej, from 1inch, right?

21   A.  I see that.

22   Q.  And he's forwarding along a tweet that you testified about

23   last week, right?

24   A.  Yes.

25   Q.  He's forwarding along this tweet from a guy named CZ?

P7L1STO3                      DeCapua - Cross

1   A.  Yes.

2   Q.  And CZ is kind of a very big name in the crypto world,

3   right?

4   A.  He is.

5   Q.  He's a famous person in crypto circles, right?

6   A.  Yes.

7   Q.  And his tweet is saying that his product has been hacked

8   and they're laundering it—the hackers are laundering it

9   through Tornado Cash, right?

10  A.  I don't know if it was his product that was hacked, but

11  he's tweeting and saying that Uniswap V3 on the ETH blockchain

12  has been hacked.  Hacker has stolen 4295 ETH so far, and it's

13  being laundered through Tornado Cash.

14  Q.  Regardless, he's saying money is going to Tornado Cash that

15  is illicit proceeds, right?

16  A.  Correct.

17  Q.  And Sergej is sending this to Roman Storm and Semenov and

18  Pertsev, right, and whoever else is on this group chat, right?

19  A.  Yes.

20  Q.  And along with forwarding it, saying, "Fuck, guys, you

21  don't need to spend anything on marketing," right?

22  A.  Yes.

23  Q.  With some smiley faces after it?

24  A.  Yes.

25          MR. PATTON:  And if we could just keep scrolling

P7L1STO3                         DeCapua - Cross

1    through these chats.

2    Q.  And you testified about these particular texts, right?

3    A.  I did.

4    Q.  He goes on to say, "Even CZ has written about you," right?

5    A.  Yes.

6         MR. PATTON:  Keep scrolling down.

7    Q.  And by the way, these are on July 12th, right?

8    A.  Yes.

9         MR. PATTON:  Keep scrolling.

10   Q.  And then the next one up at the top, this is the first time

11   somebody is responding to this, right?  It's Pertsev

12   responding, and he says, "It would be necessary to spend twice

13   as much to change the opinion from 'a money laundering tool' to

14   a 'privacy solution for everyone.'"  Right?

15   A.  Yes.

16

17

18

19   Q.  And then if we go on down to a few more chats, Semenov

20   chimes in with a question, right?  "What kind of exploit is

21   there?"  And then he goes on to say, "Ah, shit, it's just

22   phishing.  I wonder if CZ wrote such a bad headline on purpose

23   to hype it up."  You see that?

24   A.  I do.

25   Q.  So he refers to what CZ has said as a bad headline,

P7L1STO3                          DeCapua - Cross

1   correct?

2   A.   So he says, "I wonder if CZ wrote such a bad headline on

3   purpose to hype it up."

4   Q.   Yes.  And it goes on.  The next person says yes, right?

5   A.   Yes.

6   Q.   "I guess he lost money himself."  It goes on.

7            And then Sergej chimes in to the Pertsev chat about it

8   costing twice as much money to change opinions from money

9   laundering to privacy solution.  He says, "Nothing is needed,"

10  right?

11  A.   Yes.

12           MR. PATTON:  And then if we could keep scrolling down.

13  Q.   These are all on July 12, right?

14  A.   Right.

15  Q.   He says, "Bad PR is also PR," referring to it as bad PR,

16  right?

17           MR. PATTON:  Sorry.  We skipped over that.  If we

18  could just scroll back up to the bad PR.

19  Q.   You see that?

20  A.   I do.

21  Q.   And again, that's on July 12th, right?

22  A.   Yes.

23  Q.   And then if we keep scrolling to the very next one, right,

24  we see there that that's July 16th, correct?

25  A.   Correct.

P7L1STO3                    DeCapua - Cross

1   Q.  That's four days later, right?

2   A.  Yes.

3   Q.  And I believe when you testified, you read the Sergej

4   talking about free marketing, and then you read Roman's

5   tweet——if we scroll down a little bit here——in response to

6   Sergej again saying——

7          MR. PATTON:  Sorry.  Go back up just a little bit.

8   Q.  Now, four days later, saying, "Fuck, you are being

9   advertised for free," right?

10  A.  Correct.

11  Q.  And you read Mr. Storm's response, "It's fucking funny,"

12  right?

13  A.  Correct.

14  Q.  You have no idea what this four-day-later text, the

15  advertising for free, was referring to, do you?

16  A.  I'm assuming it's referring to CZ's tweet.

17  Q.  And that's why you suggested that Mr. Storm was responding

18  to it with, "It's fucking funny," right, referring to CZ's

19  tweet?  That was your understanding?

20  A.  I——just within the context of this conversation, it looks

21  like Roman Storm's responding "It's fucking funny" to the

22  assertion that it's free advertising, that CZ is giving them

23  free advertising.

24  Q.  Agent, are you aware that Sergej actually sent a different

25  video on July 16th that had nothing to do with that CZ tweet?

P7L1STO3                        DeCapua - Cross

1    A.  I didn't see it in the texts.

2    Q.  Agent, I want to talk now about that graph you made, those

3    line graphs.  You recall the chart I'm talking about?

4    A.  I do.

5         MR. PATTON:  If we could pull up Government

6    Exhibit 3002-32.

7    Q.  And you did a whole variety, variations on this, circling

8    different points in time, right?

9    A.  Correct.

10   Q.  So the one we're looking at here, it's the same general

11   line graph, but this particular one has a red circle around the

12   BitMart hack, right?

13   A.  Correct.

14   Q.  Which was December 4-5, right?

15   A.  Correct.

16   Q.  And I think you testified, and it's sort of apparent from

17   the chart, that this was the biggest single day of deposits

18   into Tornado Cash that you traced from a hack, correct?

19   A.  That's correct.

20   Q.  And then you created various pie charts to associate with

21   some of these time periods, correct?

22   A.  Yes.

23   Q.  Right?  You did one for KuCoin?

24   A.  Yes.

25   Q.  Did one for Ronin, right?

P7L1STO3                    DeCapua - Cross

1   A.  That's correct.

2   Q.  I'm not going to go through all of them, but let's take

3   this BitMart example.

4            MR. PATTON:  If we could pull up Government

5   Exhibit 3002-33.

6   Q.  So these are the pie charts you did associating with

7   certain slices of time around these hacking incident deposits,

8   right?

9   A.  That's correct.

10  Q.  And so this was, as you testified to, the biggest line on

11  that chart, right?

12  A.  It was.

13  Q.  And in this instance 54 percent came from BitMart and

14  46 percent came from what you titled all other Tornado Cash

15  deposits, correct?

16  A.  That's correct.

17  Q.  And you said you don't know what those deposits are; they

18  could be everyday, ordinary, noncriminal people or they could

19  be──some portion of it could also be illicit funds, right?

20  A.  Correct.

21  Q.  You don't know, right?

22  A.  Correct.

23  Q.  But what you did was, you created pie charts just for the

24  periods of these spikes, correct?  Certain of these spikes,

25  correct?

P7L1STO3                          DeCapua - Cross

1   A.  I'm not sure if there's a one-to-one correlation, but of

2   the tie periods that I examined, it was more——there are certain

3   pie charts where there are specific date ranges.

4   Q.  Right.

5          MR. PATTON:  So let's go back to the line graph,

6   3000——yeah, there we go.

7   Q.  The total time period you studied was September 1, 2020, to

8   August 8, 2022, right?  A little shy of two years.

9   A.  That's correct.

10  Q.  And you did pie charts——I don't know, you tell me; roughly

11  five or six different pie charts?

12  A.  Probably something close to that.  I don't know exactly how

13  many.

14  Q.  And some of them, like KuCoin and BitMart and Ronin, were

15  the dates when those hacks were deposited into Tornado Cash,

16  right?

17  A.  Yes.

18  Q.  And others were broader time frames around this, like,

19  early 2022 period, right?

20  A.  That's correct.

21  Q.  But you didn't do a pie chart for the whole period of time,

22  did you?

23  A.  There was one pie chart that had a pretty broad period of

24  time.

25  Q.  You have a pie chart that covers the full period of time

P7L1STO3                          DeCapua - Cross

1    that you——

2    A.   I don't think it was the full period of time.  I mean, we

3    could just look at the pie charts.  I don't remember sitting

4    here right now exactly the time periods for all the different

5    pie charts that I made, but I suppose we could look through

6    them and refresh my memory and then talk about them.

7    Q.   Agent, are you aware that if you did a pie chart for this

8    full period of time, the hacks that you've been talking about,

9    these biggest lines throughout this period, would take up

10   10 percent of that——

11   A.   I'm not aware of that.

12   Q.   ——of that pie chart?  You didn't look into that?

13   A.   I——I sliced up the data in many different ways.  I don't

14   remember that the specific 16 that I looked up only made

15   10 percent, as you say, of the whole.

16   Q.   You sliced it to the time periods that the prosecutors

17   asked you to slice it to, correct?

18   A.   Correct.

19   Q.   Agent, in your work as an investigator, you're called upon

20   at times to distinguish between suspicious and nonsuspicious

21   activity, correct?

22   A.   Yes.

23   Q.   And there are lots of things that ordinary people, regular

24   folks not committing crimes do in life that don't necessarily

25   raise red flags, right?

P7L1STO3                          DeCapua - Cross

1    A.  Yes.

2    Q.  Forgive the basic question.

3             And a lot of those things involve very common privacy

4    applications online, correct?

5             MR. REHN:  Objection, your Honor.

6             THE COURT:  I'll allow it.

7    Q.  So for instance, VPNs, right?  You know what a VPN is,

8    right?

9    A.  So I do know what a VPN is.

10   Q.  It stands for virtual private network, right?

11   A.  That's correct.

12   Q.  And it's something that both everyday folks and businesses

13   use, and it's something that criminals sometimes use, right?

14   A.  So I think you're conflating two things.  There's virtual

15   private networks, where someone has to log into work, so they

16   log in through the virtual private network created from their

17   personal laptop to their work's network.

18   Q.  Right.

19   A.  That is the common type of VPN.  I think what you're

20   referring to is the VPN proxies, which basically allow people

21   to browse the internet anonymously.

22   Q.  Well, let's stick with the former type that you were

23   talking about, right?

24   A.  Okay.

25   Q.  Those are extremely common, correct?

P7L1STO3                         DeCapua - Cross

1      A.  Yes.

2      Q.  Businesses sometimes encourage their employees to use them,

3      right?

4      A.  Correct.

5      Q.  And individuals choose to use them, right?

6              MR. REHN:  Your Honor, objection as to scope at this

7      point.

8              THE COURT:  I'll allow it.

9      A.  So if someone needs to log into their work network, you

10     would use the VPN that's set up to allow you to do that.

11             THE COURT:  Sir, I believe he's asking whether an

12     individual can use a VPN just in their individual

13     communications.

14             THE WITNESS:  It would be very strange.  I don't think

15     a regular person would use a VPN in their regular

16     communications.

17             THE COURT:  All right.  Counsel, please move on.

18     BY MR. PATTON:

19     Q.  Well, let's take a really common example then.  Encrypted

20     messaging applications, right?  Things like, say, WhatsApp and

21     Apple's iMessaging, those are encrypted messaging applications,

22     right?

23     A.  They are.

24     Q.  And what that means is that not even the people at WhatsApp

25     or Apple have access to the substance of the messages, right?

1          THE COURT:  If you know.  If you don't, that's fine.

2    A.  Correct.

3    Q.  This is something you know from law enforcement because in

4    your investigations, you can only get those messages if you

5    actually have the hardware, correct, like the phone?

6    A.  So I know it more from just being a user of WhatsApp and

7    Apple products.

8    Q.  That they're encrypted, correct?

9    A.  End-to-end encryption.

10   Q.  And that is useful for everyday noncriminals, but it's also

11   something sometimes criminals use, correct?

12   A.  Yes.

13          MR. PATTON:  Nothing further, your Honor.

14          THE COURT:  Thank you.

15          Brief redirect?

16          MR. REHN:  Very brief, your Honor.

17   REDIRECT EXAMINATION

18   BY MR. REHN:

19   Q.  Special Agent DeCapua, if I could have Ms. Sebade show you

20   Government Exhibit 3002-9 again.

21          And do you recall being asked some questions about

22   this slide on your cross-examination?

23   A.  I do.

24   Q.  And in particular, do you recall there were some questions

25   about the crypto swaps at the bottom of the slide?

1  A.  Yes.

2  Q.  Special Agent DeCapua, in your tracing analysis were you

3  able to trace the flow of funds through those crypto swaps?

4  A.  I was.

5  Q.  Special Agent DeCapua, you were also asked about an email

6  that was sent to hello@tornado.cash in connection with these

7  transactions.  Do you recall that?

8  A.  Yes.

9  Q.  And if I could show you Government Exhibit 231.

10        And Special Agent DeCapua, does the email that was

11  sent identify a particular wallet?

12  A.  It does.

13  Q.  And is that a wallet beginning in 34a174?

14  A.  It is.

15  Q.  And if we could go back to Government Exhibit 3002-9.

16        Special Agent DeCapua, was that the wallet that was

17  being used to make deposits into Tornado Cash at this point in

18  time?

19  A.  It was.

20  Q.  So did the recipient of the email at Government Exhibit 231

21  have information that would have allowed him to identify the

22  wallet that made those deposits?

23  A.  Yes.

24  Q.  Did the recipient of that email need to engage in any

25  tracing through any intermediary wallets to identify those

P7L1STO3                         DeCapua - Redirect

1    deposits?

2    A.   No.

3              MR. REHN:  Nothing further, your Honor.

4              THE COURT:  Thank you.  Sir, you may step down.

5

6

7              (Witness excused)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P7M5sto1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                           23 Cr. 430 (KPF)

 5   ROMAN STORM,

 6              Defendant.                   Jury Trial
     ------------------------------x

 7
                                            New York, N.Y.
 8                                          July 22, 2025
                                            8:50 a.m.
 9

10   Before:

11                  HON. KATHERINE POLK FAILLA,

12                                          District Judge

13                          APPEARANCES

14
     JAY CLAYTON
15        United States Attorney for the
          Southern District of New York
16   BY:  NATHAN M. REHN, ESQ.
          BEN ARAD, ESQ.
17        BENJAMIN A. GIANFORTI, ESQ.
          KEVIN G. MOSLEY, ESQ.
18        TARA M. LA MORTE, ESQ.
          Assistant United States Attorneys
19
     WAYMAKER LLP
20        Attorneys for Defendant
     BY:  BRIAN E. KLEIN, ESQ.
21        KERI CURTIS AXEL, ESQ.
          KEVIN M. CASEY, ESQ.
22        VIVIANA ANDAZOLA MARQUEZ, ESQ.

23        -and-

24   HECKER FINK LLP
          Attorneys for Defendant
25   BY:  DAVID E. PATTON, ESQ.
          CHRISTOPHER MOREL, ESQ.
```

 1  PHILIP WERLAU,

 2      called as a witness by the Government,

 3      having been duly sworn, testified as follows:

 4          THE DEPUTY CLERK:  Please be seated, and into the

 5  microphone please state and spell your full name for the

 6  record.

 7          THE WITNESS:  My name is P-H-I-L-I-P, Werlau,

 8  W-E-R-L-A-U.

 9          THE COURT:  Counsel, you may inquire.

10          MR. REHN:  There is something on my screen --

11          THE COURT:  Can we?

12          MR. REHN:  Thank you.

13  DIRECT EXAMINATION

14  BY MR. REHN:

15  Q.  Good afternoon, Mr. Werlau.

16  A.  Good afternoon.

17  Q.  Where do you work?

18  A.  I work at a company called AnChain.AI.

19  Q.  What is AnChain?

20  A.  AnChain is a blockchain analytics and investigations firm.

21  Q.  What is a blockchain analytics and investigation firm?

22  A.  We produce data analysis on blockchain data, certain

23  statistics.  We also perform investigations into blockchain

24  crime.

25  Q.  Are you contracted with any other companies in connection

P7M5sto5                        Werlau - Direct

1    with your testimony today?

2    A.  I am.  BlockTrace.

3    Q.  And what is BlockTrace?

4    A.  BlockTrace is also a blockchain investigations firm.

5    Q.  What is your title at AnChain.AI?

6    A.  Senior investigator.

7    Q.  What sort of work do you do as senior investigator?

8    A.  Primarily investigate cryptocurrency crime into

9    exploitation, as well as stolen funds.

10   Q.  What was your title before you were a senior investigator?

11   A.  I was engineering manager.

12   Q.  Do you have any particular focus at AnChain.AI?

13   A.  Yes.  I have a specialization in smart contracts and

14   decentralized finance.

15   Q.  How long have you been doing smart contract investigations,

16   in particular?

17   A.  A little over three years.

18   Q.  So what sort of work do you do on a day-to-day basis?

19   A.  It depends on the case.  Sometimes I will be doing asset

20   tracing, tracing assets as they go from one wallet to another.

21   Sometimes I will be doing investigations to into exploitation

22   where certain programs are exploited and funds are stolen.

23   Q.  Have you ever had to analyze a smart contract?

24   A.  Yes.  Often.

25   Q.  How many smart contracts have you analyzed, approximately?

P7M5sto5                          Werlau - Direct

1   A.   It's hard to say.   It is certainly in the hundreds.   I

2   would ballpark it at somewhere between 500 to 1,000.

3   Q.   What is a smart contract?

4   A.   A smart contract is a program that is deployed to a

5   blockchain.

6   Q.   Now is that different from a computer program that runs on

7   an ordinary computer?

8   A.   They're different in a couple of different ways.   Firstly,

9   a smart contract is executed on multiple computers

10  simultaneously, whereas a traditional program is executed on

11  one computer, a smart contract is executed on every computer

12  that's on the blockchain network.   Yes.

13  Q.   And have you ever had to do something called a code audit?

14  A.   I have.

15  Q.   What is a code audit?

16  A.   So, a code audit, it depends.   There are certain, different

17  types of code audits.   They typically involve reviewing code

18  related to a program usually looking for things like

19  vulnerabilities or certain other requirements.

20  Q.   Just so we are clear, when we talk about code, is that

21  computer code?

22  A.   That's correct.

23  Q.   Is there something called source code?

24  A.   Yes.

25  Q.   Is there any other kind of code?

P7M5sto5                        Werlau - Direct

1   A.  Yes.

2           So, source code is usually the code that a developer

3   of a program will read and use, it is more understandable.

4   This is as opposed to compiled code which is usually what

5   computers run.  Not every language is compiled but many are and

6   the source code is what the developers would use --

7           THE COURT:  We do need you to speak up a little bit

8   and be a little slower.  Thank you so much.  If you could

9   repeat that part of your answer, sir?

10          THE WITNESS:  Sorry.

11          So, the source code is what the developers use,

12  whereas the compiled code is what the computer typically uses.

13  Q.  When you are doing a code audit, what are you looking at?

14  A.  That would be the source code.

15  Q.  Have you done code audits of smart contracts?

16  A.  I have.

17  Q.  Have you done code audits for other kinds of computer

18  programs?

19  A.  I have.

20  Q.  What sorts of computer programs?

21  A.  So, as a web developer I also was involved in code audits

22  of websites as well, as well as some compiled code.

23  Q.  Do you write source code in addition to auditing it?

24  A.  I do.

25  Q.  Have you ever written the code for a smart contract

P7M5sto5                        Werlau - Direct

1    yourself?

2    A.  I have.

3    Q.  What type of a smart contract?

4    A.  There were a couple.  One was an NFT platform, so there

5    were two contracts, one was for a non-fungible token for

6    artwork, there was an associated contract for a storefront to

7    sell that artwork.

8    Q.  So, could you just describe that overall project in a

9    little more detail?

10   A.  Sure.

11          So, we were contracted out by an organization that

12   sells artwork for charitable funds.  We would create an NFT to

13   represent this artwork to be sold to customers and we built a

14   storefront that would allow the sale of these artwork to

15   customers as well.  And this was all done on the blockchain.

16   Q.  So the blockchain featured the NFTs, those are sort of

17   artworks that exist on the blockchain?

18   A.  That's correct.

19   Q.  And then where was the storefront located?

20   A.  The storefront was broken into two parts.  Part of it was

21   deployed to the blockchain to do the sales, the other part of

22   it was a traditional website or web application to interface

23   with the storefront which users navigate to purchase the

24   artwork.

25   Q.  So when you say that it was associated -- the smart

P7M5sto5                        Werlau - Direct

1  contract was associated with the storefront, what exactly does

2  that mean?

3  A.  So there was a connection between them.  The website would

4  communicate with the blockchain smart contract.

5  Q.  Do most websites connect with smart contracts and

6  communicate with them?

7  A.  No.

8  Q.  Let me ask the question a different way.  Do most smart

9  contracts interact with websites of some sort?

10  A.  That, yes.

11  Q.  Is there a reason for that?

12  A.  So, smart contracts on the blockchain, they are a little

13  less user friendly, you might need more technical

14  sophistication, things like a wallet by having a web

15  application --

16  Q.  Mr. Werlau, if I can ask you to speak more slowly?  There

17  is a lot of information but we have plenty more time?

18           THE COURT:  She is telling you again where she

19  stopped:  Things like a wallet by having a web application --

20  please, finish.

21  A.  It allows easier access to the website -- a website allows

22  easier access to the blockchain smart contract to interface and

23  interact with it.

24  Q.  Do most users have the ability to interact with smart

25  contracts directly?

1   A.  No.

2   Q.  Now, we have used the terms "website" and "web

3   application."  Is there a difference between those two terms?

4   A.  I would say yes.  Usually when I say a website I'm talking

5   about a static page to display content, whereas a web

6   application is more dynamic and interactive.

7   Q.  So that web application that you designed, the NFT project

8   you were talking about earlier, so could that interact with the

9   blockchain?

10  A.  That's correct.

11  Q.  Could the web application read information that was on the

12  blockchain?

13  A.  That's correct.

14  Q.  Could it also write information to the blockchain?

15  A.  In this case the website did not interact directly with the

16  blockchain, the user would, so the website would prompt the

17  user to take an action and their wallet would go directly to

18  the blockchain.

19  Q.  Do some web applications work in that manner?

20  A.  Yes.

21  Q.  And do some web applications that interact with the

22  blockchain actually write directly to the blockchain as well?

23  A.  Yes, they do.

24  Q.  Besides that NFT project, have you worked on any other web

25  projects that interact with the blockchain?

P7M5sto5                          Werlau - Direct

1   A.   Yes.

2   Q.   Could you describe another one?

3   A.   So, I was responsible for developing a piece of software

4   called web3soc.  This was for performing monitoring and

5   alerting for security incidents that occurred on the

6   blockchain.

7   Q.   And did that also interact with smart contracts?

8   A.   It read from smart contracts but it did not write to any

9   smart contracts.

10  Q.   Was that, again, a typical like a web application and it

11  could read information on the blockchain?

12  A.   That's correct.

13  Q.   For that web3soc web project, did that website have any

14  sort of a login system?

15  A.   It did.

16  Q.   What is a login system?

17  A.   A login system is a -- most users are familiar with this.

18  It is a way of adding user name and password, and logging into

19  an account associated with you.

20  Q.   Did the NFT project have a login system?

21  A.   Not a traditional one, not a user name and password, but

22  you could log in using your wallet.

23  Q.   Now, I think you said earlier -- how long have you been

24  working with AnChain.AI?

25  A.   Three and a half years.

P7M5sto5                          Werlau - Direct

1  Q.  So that is since about 2021?

2  A.  That's correct.

3  Q.  What did you do immediately before your work with AnChain?

4  A.  Before working with AnChain I worked in a security

5  operation center.

6  Q.  What type of work did you do while you were doing that?

7  A.  I started as an analyst during my time there.  I became the

8  manager of the soc and then worked as an engineering -- senior

9  engineer.

10  Q.  What sort of work were you doing in senior engineering?

11  A.  Configuring our network to determine detections, adding

12  support for new features and new vendors.

13  Q.  Prior to that, what sort of work were you doing?

14  A.  So, as the analyst I was reviewing security incidents and

15  responding to them.

16  Q.  Then, before you were working at that company, what sort of

17  work were you doing?

18  A.  So, before working in cyber security I was a developer -- a

19  web developer.

20  Q.  What kind of a web developer were you?

21  A.  Specifically what is called a full-stack web developer.

22  Q.  What is a full-stack web developer?

23  A.  In web development we usually break it down into two

24  different categories, front-end and back-end.  Front-end is

25  what users typically see, it is on their computer, what they

P7M5sto5                        Werlau - Direct

interact with.  The back-end is typically what is going on on the servers, it is happening in a remote location.  Typically engineers will work as one or the other; a full-stack engineer is one that works both front-end and back-end.

Q.  Are you familiar with the front-end design of websites and user interfaces?

A.  That's correct.

Q.  Are you also familiar with the back-end, sort of what's going on underneath the hood?

A.  Yes, that's correct.

Q.  In your time as a web developer, was that more traditional website development?

A.  Can you rephrase the question?

Q.  As opposed to these blockchain-related web applications we have been talking about, was sort of the kind of website you were more familiar with?

A.  Yes.  That's correct.

Q.  Did you ever work on web applications with login systems?

A.  Yes, I did.

Q.  In your experience as a web developer, would you say those are fairly common?

A.  Would.

Q.  How long were you a web developer?

A.  I would say 18 years if you include my time to this point. Sorry.  Let me take that back.  Specifically as a web

1   developer, I spent seven years.

2   Q.  And how long, overall, have you been working with computer

3   and software?

4   A.  Overall, 15 years.

5   Q.  Do you have a degree in computer science?

6   A.  I do not.

7   Q.  Do you have a college degree?

8   A.  I do not.

9   Q.  So how did you get into this line of work?

10  A.  So, while I do not have a college degree, I did study

11  computer science.  During my time in college I did have a

12  medical issue that made me take time off, it kind of derailed

13  my college experience.  And I had already started working as a

14  developer at that time and I felt I knew what I needed and

15  decided to continue working.  Since then I have picked up most

16  of what I have known through experience on my job.

17          MR. REHN:  Your Honor, at this time the government

18  moves to qualify Mr. Werlau as an expert regarding blockchain

19  technology, smart contracts, and internet applications.

20          THE COURT:  Does the defense want to do any voir dire?

21          MR. KLEIN:  No, your Honor; subject to previous

22  objections.

23          THE COURT:  All right.

24          MR. REHN:  May I inquire on that basis, your Honor?

25          THE COURT:  I'm sorry.  I'm asking if they wanted to

P7M5sto5                        Werlau - Direct

1    ask any questions.  They don't wish to, so now you are asking

2    me to qualify him, yes, sir?

3              MR. REHN:  Yes.

4              THE COURT:  He is so qualified, over the defense

5    objection, as an expert on blockchain technology, smart

6    contracts, and internet applications.  Thank you.

7              And counsel, perhaps now that I have done that, let's

8    take our break now.  I am looking at my computer, I don't want

9    to deprive the jurors of their afternoon break.  We will break

10   for 10 minutes and come back and continue with your direct.

11             Thank you all very much.  Let me remind you in case

12   you have thought about this:  Don't discuss this case with each

13   other on anyone else, keep an open mind until all the evidence

14   is in.  We will see you in 10 minutes.

15             Thank you.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

P7M5sto5                         Werlau - Direct

1           (Jury present)

2           THE COURT:  Please be seated.

3           Counsel, you may continue.  Thank you.

4    BY MR. REHN:

5    Q.  Mr. Werlau, I would like to ask you a few preliminary

6    questions about your involvement in this case before we get to

7    the substance.

8    A.  OK.

9    Q.  To your knowledge, have you met any of the witnesses who

10   are testifying in this case?

11   A.  I have not.

12   Q.  Have you ever met the defendant Roman Storm?

13   A.  I have not.

14   Q.  Do you have any personal knowledge of the facts of this

15   case other than what you have learned over the course of your

16   expert work on this matter?

17   A.  I do not.

18   Q.  Is there anyone who assisted you with the work you have

19   done in this case?

20   A.  Yes.

21   Q.  Who is that?

22   A.  That would be Marshall Yale and Jim Daniels, both

23   consultants with the IRS.

24   Q.  Does Marshall Yale also work for BlockTrace?

25   A.  That's correct.

P7M5sto5                              Werlau - Direct

1    Q.   I think you said earlier BlockTrace is a similar analytics

2    company to AnChain.AI?

3    A.   That's correct.

4    Q.   What kind of work did these personnel do to assist you?

5    A.   They assisted me in some of the blockchain analytics work

6    that we did with the use of blockchain data, as well as

7    productions of some of the graphs showing that data.

8    Q.   Did they help with your review of the source code?

9    A.   Yes.

10   Q.   When you conduct smart contract investigations and other

11   types of code audits and the similar work you have described,

12   is it typical for you to be assisted by others?

13   A.   Yes, it's very common.

14   Q.   Have you been compensated for your work on this case?

15   A.   Yes, I have.

16   Q.   How have you been compensated in this case?

17   A.   So, in two parts.  At the beginning of this case I was

18   contracted as a part of my position at AnChain, at which I was

19   compensated as part of my salary.  For the end of this case I

20   am contracted through BlockTrace, and which I am being paid a

21   fixed fee for my time.

22   Q.   How much is that fee?

23   A.   That would be $5,000.

24   Q.   You said you worked with BlockTrace personnel to prepare

25   for today; is that right?

P7M5sto5                          Werlau - Direct

1    A.  That's correct.

2    Q.  Aside from that fee for your contract with BlockTrace, are

3    you being compensated for the work that BlockTrace does or has

4    done in this case?

5    A.  No, I am not.

6    Q.  Is your pay dependent in any way on the opinions you give

7    in this courtroom?

8    A.  It's not.

9    Q.  Is your pay, in any way, dependent on the outcome of this

10   case?

11   A.  It is not.

12   Q.  Mr. Werlau, have you analyzed some source code in

13   preparation for your testimony today?

14   A.  Yes.

15   Q.  And some other materials as well?

16   A.  That's correct.

17   Q.  At a very high level, what was the topic of your analysis?

18   A.  Understand how Tornado Cash worked.

19   Q.  And what was the time frame that you reviewed?

20   A.  The time frame ranged from September of 2020 until August 8

21   of 2022.

22           MR. REHN:  Before we talk about your findings I want

23   to ask you about some of the materials you reviewed, and in

24   connection with that, your Honor, the government asks to use

25   Government Exhibit 3005-1 as a demonstrative aid for the jury.

P7M5sto5                           Werlau - Direct

1          THE COURT:  You may.

2          MR. REHN:  So, if we could bring up 3005-1?

3   Q.  Mr. Werlau, have you reviewed the different pages of this

4   exhibit before?

5   A.  I have.

6   Q.  Generally speaking, what do these slides represent?

7   A.  So this slide represents the GitHub organization for the

8   Tornado Cash, so this is where source code related to the

9   Tornado Cash UI NCLI, was stored.

10  Q.  So, you analyzed some source code in connection with this

11  case?

12  A.  That's correct.

13  Q.  And did you collect that from this particular GitHub

14  organization?

15  A.  Yes.  That's correct.

16  Q.  If we look at this, I see on the left-hand side it says:

17  Site admin/tornado cash.

18          Do you see that?

19  A.  Yes.

20  Q.  Below there are three owners listed.  Do you see that?

21  A.  Yes, I do.

22  Q.  Could you read those names for me?

23  A.  Yes.  So the first one is Alexey Pertsev, the second is

24  Roman Semenov, and the third is Roman Storm.

25  Q.  Mr. Werlau, in your review of the documents and materials

P7M5sto5                      Werlau - Direct

1    for this case, did those three names come up frequently?

2    A.  They did.

3    Q.  Based on your experience as a web developer, did you form

4    any conclusions about their role with respect to Tornado Cash?

5    A.  Yes.  Their role was as founders.  They developed the

6    original program and were responsible for updates.

7    Q.  So, during my questions today when I refer to the

8    Tornado Cash founders, will you understand that I am referring

9    to Roman Storm, Roman Semenov, and Alexey Pertsev?

10   A.  Yes, I will.

11   Q.  And on the right-hand side of the screen there is two

12   boxes, one says Tornado Cash UI.  Do you see that?

13   A.  I do.

14   Q.  Was that a source, a bunch of the source code that you

15   looked at?

16   A.  That is correct.

17   Q.  Another said Tornado-cli.  Do you see that?

18   A.  I do.

19   Q.  Are both of these collections of source code that exist

20   within this Tornado Cash organization?

21   A.  Yes.  That's correct.

22           MR. REHN:  If we could go to page 2 of Government

23   Exhibit 3005-1.

24   Q.  Mr. Werlau, did you also look at blockchain records in

25   connection with this case?

1    A.  Yes.  That's correct.

2    Q.  Generally speaking, what are the types or categories of

3    information you can get from blockchain records?

4    A.  So, you can typically get things like transactions or

5    transfers of assets, interactions with smart contracts so

6    understanding how they're interacting with it, what function

7    they're calling and what information they're passing to it, as

8    well as things like event data any time certain actions are

9    taken, certain events are admitted.

10   Q.  So, in addition to sort of transactional information, is

11   there additional information about the events that went into

12   the transaction?

13   A.  Yes.  That's correct.

14   Q.  Is there something called internal logs?

15   A.  Yes.  So, internal transactions are communications that

16   occur in between smart contracts.

17   Q.  Is there code for smart contracts on the blockchain?

18   A.  Yes.  That's correct.

19   Q.  Did you analyze some of the code for some of the contracts

20   at issue today?

21   A.  I did.

22   Q.  So earlier we were looking at source code from GitHub.

23   Where would you go to get the source code for a smart contract?

24   A.  So, the smart contract source code would be stored on

25   Etherscan, which is the same thing as we are seeing here, a

P7M5sto5                        Werlau - Direct

 1   transaction.  This website that showed transaction information

 2   was also the repository for the source code.

 3            MR. REHN:  Can we go to page 3 of this exhibit?

 4   Q.  Mr. Werlau, what is this?

 5   A.  So this is the Tornado.cash landing page website.

 6   Q.  Did you review historical versions of this website as part

 7   of your preparation?

 8   A.  Yes.  That's correct.

 9   Q.  Did you review documentation regarding the

10   Tornado Cash.cash website?

11   A.  Yes.  That's correct.

12   Q.  Let's go to page 4 of this exhibit.  Can you describe what

13   we are looking at here?

14   A.  So, this is the Tornado Cash.ETH web application.

15   Q.  I see that for the web application, unlike the website, the

16   address is Tornado Cash.ETH.  Do you see that?

17   A.  Yes, I do.

18   Q.  What is the difference between a .ETH website and a .cash

19   and another kind of traditional website?

20   A.  Sure.

21            So, traditional websites use what is called domain

22   names.  This is part of what is called the DNS service, Domain

23   Name Service.  On blockchain like Ethereum they have the

24   similar network called the Ethereum Name System or ENS, and

25   this .ETH domain served a similar role.

1    Q.  So just like a traditional website, can somebody own a

2    domain in the Ethereum Name Service?

3    A.  Yes.  That's correct.

4    Q.  Let's go to page 5 of the exhibit.  Did you review any

5    communications in preparation for your testimony?

6    A.  I did.

7    Q.  What sort of communications?

8    A.  Private communications between the founding members.

9            MR. REHN:  We can take that exhibit down.

10   Q.  So once you have all of this information, what types of

11   analyses did you do?

12   A.  So, we performed a code analysis, code audits of the source

13   code itself to understand how it functioned.  We reviewed

14   blockchain records to understand transactions that were made,

15   for example deposits and withdrawals from Tornado Cash, things

16   like proposals and governance, as well as changes to their

17   Ethereum name system for the domain name changes.

18   Additionally, we also looked at financial records like invoices

19   and IPFS records as well.

20   Q.  So, there is a lot there, we are going to start with kind

21   of a more general question.  Did you first determine sort of

22   what the function of Tornado Cash was?

23   A.  Yes.

24           MR. REHN:  Your Honor, the government seeks to use

25   Government Exhibit 3005-2 as a demonstrative aid.

P7M5sto5                    Werlau - Direct

1          THE COURT:  Mr. Klein, I didn't know whether you were

2    speaking.

3          MR. KLEIN:  No objection.

4          THE COURT:  No objection.  OK.

5          3005-2 may be shown as a demonstrative aid.

6    BY MR. REHN:

7    Q.  Mr. Werlau, can you just provide an overview of what

8    Tornado Cash did, functionally, during the time period in

9    question?

10   A.  So, the primary purpose of Tornado Cash was to break the

11   connection between deposits and withdrawals.  In a blockchain

12   transaction information is typically public, you can very

13   easily see the sender and recipient of funds, and Tornado Cash

14   allowed users to break that connection; deposits funds with one

15   address, withdraw them from another, without having a

16   connection between those two.

17   Q.  So just trying to understand that with reference to the

18   chart here, if we look up the people on the left, what is

19   represented by the people on the left?

20   A.  So, the four people on the left represent four different

21   depositors into Tornado Cash.

22   Q.  And what about the people on the right?  What are they

23   doing?

24   A.  The four people on the right represent withdrawers of

25   Tornado Cash.

1    Q.  And I see that every deposit and every withdrawal is in the

2    same increment of 100 ETH.  Do you see that?

3    A.  Yes.  That's correct.  I do.

4    Q.  And what is the significance of that?

5    A.  So this is basically to make them all look the same.

6    They're forced to deposit the same denomination, to make it so

7    that no deposit is uniquely identifiable.

8    Q.  So, just for example, if the person at address 1 deposits

9    100 ETH into Tornado Cash, are you able to tell which of the

10   addresses on the right-hand side are withdrawing in connection

11   with that person 1 deposit?

12   A.  No, we are not.

13           MR. REHN:  We now ask to use Government Exhibit 3005-3

14   as a demonstrative.

15           MR. KLEIN:  No objection.

16           THE COURT:  3005-3 may be used as a demonstrative.

17   BY MR. REHN:

18   Q.  So, Mr. Werlau, at a high level, did you identify some

19   different parts of Tornado Cash?

20   A.  Yes, I did.

21   Q.  Can you explain what the parts of Tornado Cash were?

22   A.  The first part I identified was the website and web

23   application, the portion that the users would be interacting

24   with.  The second part was the relayer network.  And the

25   third-party was a collection of smart contracts.

1   Q.  At a very high level, what was the function of the website

2   and web application?

3   A.  The website and the web application served as an entry

4   point and allowed users to connect to and interact with the

5   Tornado Cash system from a website or a computer.

6   Q.  At a very high level, what was the function of the relayer

7   network?

8   A.  The relayering network was a collection of third-parties

9   that were there to pay the transaction fees or gas fees, as

10  they're called, for users to initiate a withdrawal.

11  Q.  At a very high level, what was the function of the smart

12  contracts?

13  A.  The smart contracts took a number of different roles from

14  actually storing the funds themselves to routing transactions

15  to their appropriate pool, as well as making other checks for

16  the transaction's validity.

17  Q.  Of these three parts, do any of them exist on the

18  blockchain?

19  A.  Yes.  Those would be the smart contracts.

20  Q.  So the smart contracts are the part of Tornado Cash that is

21  on the blockchain?

22  A.  That's correct.

23  Q.  Are the other two parts on the blockchain?

24  A.  No.

25  Q.  OK, so we are going to work from left to right.  I would

1   like to start by asking you a little bit about the website and

2   web application.

3            MR. REHN:  We now offer Government Exhibit 3005-4 as a

4   demonstrative.

5            THE COURT:  Mr. Klein, may I understand you have no

6   objection to demonstratives and you will let me know if you do?

7            MR. KLEIN:  I will, your Honor.

8            THE COURT:  Thank you so much.

9            3005-4 is not admitted but may be used as

10  demonstrative exhibit.

11  BY MR. REHN:

12  Q.  Let's talk about the website and web application.  Can you

13  give a general overview of your findings regarding the website

14  and web application?

15  A.  Yes.

16           First, I saw that the founders, Roman Storm, Roman

17  Semenov, and Alexey Pertsev, were in control of the website,

18  the landing page, as well as the web application.

19           My analysis of the deposit activity during the period

20  between September of 2020 and August of 2022 determined that

21  approximately 96 percent of users making deposits into

22  Tornado Cash did so using the web application interface.

23           In addition to this web application, the founders also

24  created a CLI or a command line interface for more advanced

25  user to access the platform.

 1              And, in addition during this time, the founders

 2      regularly made updates to both the website, web application,

 3      and the CLI.

 4              MR. REHN:  Let's start with the website.  We will

 5      bring up Government Exhibit 3005-5.

 6      Q.  What are we looking at here?

 7      A.  This is the Tornado.cash website also called the landing

 8      page?

 9      Q.  You used the term landing page.  What do you mean by that?

10      A.  So this would be the first object that users of the

11      platform would come in contact with, so when they went to

12      Tornado.cash, this is the website that they would be greeted

13      with.

14      Q.  Would they be able to access the web application from the

15      landing page?

16      A.  Yes.  That's correct.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1    BY MR. REHN:

2    Q.  So this was accessible at tornado.cash; is that right?

3    A.  Yes.

4    Q.  And I think you testified earlier that a person can own a

5    domain for a website like that?

6    A.  Yes, that's correct.

7    Q.  How does someone obtain ownership of a website?

8    A.  There are multiple what are called domain registrars,

9    companies that allow you to pay them for the service of

10   registering your domain name.  In this case this domain was

11   registered by a service called Google Domains, so it would be

12   as simple as navigating to the website and, as long as that

13   domain is available, you could purchase it.

14   Q.  Did you take steps to investigate who was the owner of the

15   tornado.cash domain?

16   A.  Yes.

17          MR. REHN:  If we could now bring up just for the

18   witness Government Exhibit 261, which is covered by the

19   stipulation regarding business records, at S2.

20          And the government offers this document.

21          MR. KLEIN:  No objection.  It is covered by a

22   stipulation, your Honor.

23          THE COURT:  Government Exhibit 261 is admitted into

24   evidence and may be shown to the jury.

25          (Government's Exhibit 261 received in evidence)

P7M1STO6                          Werlau - Direct

1    BY MR. REHN:

2    Q.  Mr. Werlau, do you recognize this document?

3    A.  I do.

4              MR. REHN:  If we could expand sort of the top half of

5    the document.

6    Q.  What is the date of this document?

7    A.  It is dated Wednesday, July 17, 2019.

8    Q.  And what is the subject?

9    A.  The subject reads, "Your Google Domains Purchase Receipt."

10   Q.  And who is it addressed to?

11   A.  The email is addressed to rstormsf@gmail.com.

12   Q.  And if you could just read the first line of the email.

13   A.  The first line reads, "Hello Roman Storm."

14   Q.  And the next line?

15   A.  "Thanks for making a purchase from Google Domains."

16   Q.  Does the document indicate which domain Roman Storm

17   purchased?

18   A.  Yes, it indicates tornado.cash.

19   Q.  And is that the domain for the website we've been

20   discussing?

21   A.  Yes, that's correct.

22   Q.  And this was in July of 2019; is that right?

23   A.  Yes.

24             MR. REHN:  Okay.  We now offer Government Exhibit 275

25   pursuant to the same stipulation.  If we could bring that up

P7M1STO6                          Werlau - Direct

1     for the witness first.

2                 And we move this into evidence, your Honor.

3                 MR. KLEIN:  It's covered by a stipulation, your Honor.

4     No objection.

5                 THE COURT:  Government Exhibit 275 is admitted into

6     evidence, may be shown to the jury.

7                 (Government's Exhibit 275 received in evidence)

8     BY MR. REHN:

9     Q.  Mr. Werlau, if I could ask you to——

10                MR. REHN:  And again, Mr. Iannuzzelli, if we could

11    expand sort of the top half of the document.

12    Q.  What's the date of this particular email?

13    A.  The date is listed as Saturday, July 2nd of 2022.

14    Q.  And what is the subject of this email?

15    A.  The subject reads, "Reminder:  Keep your info up-to-date

16    for tornado.cash."

17    Q.  Okay.  And is that addressed also to rstormsf@gmail.com?

18    A.  Yes, that's correct.

19                MR. REHN:  Could we scroll down.

20    Q.  Does this document indicate who the registrant for this

21    tornado.cash domain was?

22    A.  Yes, it lists the email rstormsf@gmail.

23    Q.  So does this indicate——based on the two documents we've

24    looked at, what does this indicate to you about the time range

25    during which Roman Storm was the owner of tornado.cash?

P7M1STO6                          Werlau - Direct

1    A.  Restate the question?

2    Q.  For this email in particular, does this indicate to you who

3    was the owner of tornado.cash as of July 2, 2022?

4    A.  Yes, that would be Roman Storm.

5         MR. REHN:  We could bring that down.

6    Q.  When someone visits a website, where are the contents of

7    the website typically stored?

8    A.  Typically that would be on a web server.

9    Q.  What's a web server?

10   A.  A web server is a computer who's responsible for taking

11   requests for a specific page and returning the contents of that

12   page.

13        MR. REHN:  And if we could offer now Government

14   Exhibit 602 pursuant to a stipulation, S2, business records of

15   Amazon.

16        THE COURT:  Government Exhibit 602 is admitted into

17   evidence and may be shown to the jury.

18        (Government's Exhibit 602 received in evidence)

19        MR. REHN:  If we could expand just the logo and the

20   text underneath it in the middle of the page.

21   BY MR. REHN:

22   Q.  Mr. Werlau, are you familiar with AWS?

23   A.  Yes, I am.

24   Q.  What's AWS?

25   A.  AWS stands for Amazon Web Services.

P7M1STO6                         Werlau - Direct

1    Q.  Is that a provider of a particular type of services?

2    A.  Yes.  They're a cloud service, provider of cloud computing,

3    of which web servers are one of them.

4              MR. REHN:  And if we could go to page 2 of this

5    document.

6    Q.  What account and domain is this web server record related

7    to?

8    A.  So it's listed as being related to the tornado.cash domain.

9    Q.  And who's listed as the payer for this website hosting

10   service?

11   A.  The account holder under the payment method is listed as

12   Alexey Pertsev.

13   Q.  What's the email address associated with the account?

14   A.  The email address is listed as hello@tornado.cash.

15   Q.  All right.  I'd like to go back to Government

16   Exhibit 3005-5 and look at page 2.

17             And is this that tornado.cash website we were looking

18   at earlier?

19   A.  Yes, this is the landing page.

20   Q.  Now there's a red circle.  Could you explain what that is.

21   A.  So in the red circle is the Launch App button.  When you

22   click that button, this would redirect you to the web

23   application.

24   Q.  Was there another term that was used for the web

25   application?

P7M1STO6                           Werlau - Direct

1   A.  User interface is another one that's used often.

2   Q.  So it was called——is there a shorthand for user interface?

3   A.  Oh, yes.  UI is typically what's used, UI.

4   Q.  So in the course of my questions will you understand if we

5   use web application and UI or user interface all as synonyms

6   for each other?

7   A.  Yes, I'm using them synonymously.

8   Q.  And why is it called a user interface?  What do those words

9   actually mean?

10  A.  So it is——the purpose of the user interface, as the name

11  suggests, is for——to allow a user to interface with the

12  application.  So in this case, it provides visuals and buttons

13  to be able to interact more natively and intuitively with the

14  application.

15  Q.  And did you review the web application that came up when

16  someone clicked on this link?

17  A.  Yes, I did.

18          MR. REHN:  If we could bring up Government

19  Exhibit 3005-6.

20          THE COURT:  As a demonstrative?

21          MR. REHN:  As a demonstrative, your Honor.

22          THE COURT:  All right.  Thank you.

23  Q.  So what is this, Mr. Werlau?

24  A.  So this is the tornadocash.eth web application or also

25  referred to as the user interface, or UI.

P7M1STO6                          Werlau - Direct

1    Q.  And at the top of the slide I see that the address is

2    tornadocash.eth; is that right?

3    A.  Yes, that's correct.

4    Q.  So we talked a little bit before about how somebody can

5    obtain ownership of a traditional website.  How can somebody

6    obtain ownership of a .eth website?

7    A.  So this is a somewhat similar process, but .eth domains are

8    sold by ENS.  In this case you would make a purchase by making

9    a blockchain transaction to purchase this domain name, or ENS

10   name in this case.

11   Q.  And where is the information about who owns a particular

12   ENS located?

13   A.  All of that information is recorded on the blockchain.

14            MR. REHN:  The government offers Government

15   Exhibit 3003-M-B pursuant to a stipulation regarding blockchain

16   data.

17            MR. KLEIN:  Yes, your Honor, there was a stipulation.

18   We don't object.

19            THE COURT:  All right.  Government Exhibit 3003-M-E?

20            MR. REHN:  -B.

21            THE COURT:  B.  Thank you so much.  ──is admitted into

22   evidence and may be shown to the jury.

23            (Government's Exhibit 3003-M-B received in evidence)

24            MR. REHN:  Spreadsheets sometimes give us a little bit

25   of trouble.

P7M1STO6                          Werlau - Direct

 1          THE COURT:  Yes.  It's probably because I misdescribed
 2   it, but yes.
 3          MR. REHN:  Expand this a little bit like you just did.
 4   And if we could scroll over to the far left of this tab.
 5   BY MR. REHN:
 6   Q.  So Mr. Werlau, what do these blockchain records represent?
 7   A.  On the screen are a list of registrant changes for the ENS
 8   records.
 9   Q.  The ENS record for which domain?
10   A.  That would be the tornadocash.eth domain.
11   Q.  So for the tornadocash.eth, do these records tell you when
12   it was first registered?
13   A.  Yes, that's listed as August 7th of 2019.
14   Q.  And are you able to tell who the owner was when it was
15   first registered?
16   A.  Yes.  It was registered by an address which itself had an
17   ENS name, poma.eth.
18          MR. REHN:  And if we could scroll over to the column
19   H, I believe.
20   Q.  Does that say who the new owner was when it was first
21   registered?
22   A.  Yes, that's correct, poma.eth.
23   Q.  Did you take some steps to investigate who poma.eth was?
24   A.  I did.
25          MR. REHN:  So Mr. Iannuzzelli, let's keep this open

P7M1STO6                        Werlau - Direct

1    because we're going to come back to it, but is it possible to

2    pull up—and the government offers Government Exhibits 2038 and

3    2038-T.

4            THE COURT:  Sir, a stipulation, or is there an

5    objection from the defense?

6            MR. KLEIN:  Objection, your Honor.

7            THE COURT:  Over the defense's objection, Government

8    Exhibits 2038 and 2038-T are admitted into evidence and may be

9    shown to the jury.

10            (Government's Exhibits 2038 and 2038-T received in

11    evidence)

12    BY MR. REHN:

13    Q.  Do you see what's on the screen in front of you,

14    Mr. Werlau?

15    A.  Yes, I do.

16            MR. REHN:  And if we could expand the top half,

17    Mr. Iannuzzelli.

18            Let's try one more time.  Could we expand the top half

19    of this page.

20    Q.  Mr. Werlau, do you recognize what this document is?

21    A.  Yes, I do.

22    Q.  What is it?

23    A.  This is a private communication, a Telegram communication

24    between the founders.

25    Q.  And what's the name of this communication among the

P7M1STO6                        Werlau - Direct

1   founders?

2   A.  The name is listed as Bablo Peppersec.

3   Q.  And what's the group photo?

4   A.  The group photo is a cartoon money bag.

5   Q.  All right.  If we could scroll down to page 2 and if we

6   could just read through the chat.  And if I could ask you to

7   read the messages from Roman Storm and I'll read the messages

8   from others.

9   A.  First message from Roman Storm, dated November 25, 2021,

10  reads:  "Send me the addresses."  And follows up with a message

11  that says, "I'll give you two Ether each."

12          The next message from Roman Storm reads, "For your

13  work."

14          MR. REHN:  Okay.  If we could skip the next message.

15  And I'm going to——if we could pull up the bottom two messages.

16  Q.  I actually will not read this message.  But is it fair to

17  say that's a long string of letters and numbers?

18  A.  Yes, that's correct.

19  Q.  What does that appear to you to be?

20  A.  This appears to me to be an Ethereum wallet address.

21  Q.  So who is that message being sent back to Roman Storm from?

22  A.  That message is being sent from Alexey Pertsev.

23  Q.  Then is there a message from Roman Storm?

24  A.  Yes, Roman Storm replies "poma.eth?"

25          MR. REHN:  Let's go to the next page, and expand the

P7M1STO6                        Werlau - Direct

```
 1    top three messages.
 2    Q.   And if you could read the two messages from Roman Storm.
 3    A.   Yes.  Roman Storm replies, "Semenov, I think."  Follows up
 4    and says, "Or what is it there?"
 5    Q.   And then Roman Semenov responds, "poma.eth."
 6              So based on this, did you make any conclusions about
 7    who poma.eth was?
 8    A.   Yes.
 9    Q.   And who was that?
10    A.   Roman Semenov.
11              MR. REHN:  So if it's possible to go back to the
12    spreadsheet.  And go back to that same tab we were looking at.
13    Q.   Do you see that there's actually two lines on this
14    spreadsheet?
15    A.   Yes, I do.
16    Q.   And the first line there's an identified human readable new
17    owner; is that right?
18    A.   That's correct.
19    Q.   And that's Roman Semenov?
20    A.   That's correct.
21    Q.   For the second line, is there a new owner that's listed as
22    a wallet address?
23    A.   Yes, that's correct.
24    Q.   So is it your understanding that there was a transfer of
25    ownership at some point?
```

1   A.  Yes, that is my understanding.

2           MR. REHN:  And if we could go over to the far left

3   column.

4   Q.  When did Roman Semenov transfer ownership of the

5   tornadocash.eth domain?

6   A.  This occurred on August 8th of 2022.

7   Q.  So between August of 2019 and August 8th of 2022, who was

8   the owner of tornadocash.eth?

9   A.  The owner of tornadocash.eth during that time period was

10  Roman Semenov.

11  Q.  So if Roman Semenov was the owner of the tornadocash.eth

12  domain, what does that mean, practically?

13  A.  He could control the contents that were rendered when a

14  user went to that——that page.

15  Q.  So could he make changes to the website himself?

16  A.  Yes, that's correct.

17  Q.  Could he also authorize others to make changes to the

18  website?

19  A.  Yes.

20  Q.  Could anyone else make changes to that website without

21  authorization from Roman Semenov?

22  A.  No, they could not.

23  Q.  So if we could go to the tab on the left, tornadocash.eth

24  IPFS deployment.  Do you see that?

25  A.  I do.

P7M1STO6                        Werlau - Direct

```
 1   Q.  Mr. Werlau, when somebody makes a change to a website
 2   that's on the .eth system, is that change recorded on the
 3   blockchain?
 4   A.  That's correct.
 5   Q.  And is that what is visible here on this tab?
 6   A.  Yes.
 7   Q.  And so from this tab, are you able to determine how often a
 8   website was changed?
 9   A.  Yes, that's correct.
10   Q.  And how does somebody actually execute a change to the
11   contents of a .eth website?
12   A.  So they would initiate a transaction on the blockchain to
13   change the value that is recorded in that ENS record.
14   Q.  And so does that value then direct a computer to where to
15   find the contents of the website?
16   A.  Yes, that's correct.
17   Q.  And here I see in column C that there's two changes at the
18   beginning from poma.eth.  Is that Roman Semenov?
19   A.  Yes.
20   Q.  And then are the rest of the changes from someone else?
21   A.  Yes, that's correct.
22   Q.  Would that be somebody else authorized by Semenov to make
23   those changes?
24   A.  I believe so, yes.
25   Q.  So if we go over to the A column, what does this represent?
```

P7M1STO6                        Werlau - Direct

1    A.  The A column is the block time.  This was the time at which

2    this transaction was executed.

3    Q.  So when was the first change to tornadocash.eth?

4    A.  This is listed at February 26th of 2020.

5    Q.  And if we could scroll down.  From February 26, 2020, until

6    August of 2022, how many changes to that website were made?

7    A.  There's listed 255 updates.

8    Q.  How many of them are listed before August of 2022?

9    A.  Before August.  Give me one second.

10   Q.  Before August 8th, I should say.

11   A.  That would be 250.

12   Q.  So what does that indicate to you?

13   A.  There were regular updates being made to the——to the

14   website that's listed at that domain.

15   Q.  And the total was at least 250?

16   A.  That's correct.

17           MR. REHN:  All right.  We can bring that down.

18   Q.  So Mr. Werlau, I believe you testified about regular

19   websites, that they're typically hosted on web servers, like

20   AWS; is that right?

21   A.  Yes.

22   Q.  Is that also true of websites like .eth websites?

23   A.  They can be, but not always; not necessarily.

24   Q.  Is there another place where .eth websites are typically

25   hosted?

1    A.  Yes, they're typically hosted in a system called IPFS.

2    That's the InterPlanetary File System.

3    Q.  And I think we looked earlier at some payment records for

4    the traditional website tornado.cash; is that right?

5    A.  Yes.

6    Q.  Is there a similar way to pay to host the contents of a

7    website on IPFS?

8    A.  Yes, there are third-party services that offer similar

9    services.

10   Q.  So is it a similar service to what AWS does?

11   A.  Similar in that you're——you're uploading content to IPFS

12   and it's making sure it's accessible, so it's somewhat

13   analogous.

14   Q.  So for IPFS, could anybody on an IPFS network host that

15   content?

16   A.  Rephrase the question?

17   Q.  What is an IPFS network, or what exactly is IPFS?

18   A.  Sure.  IPFS is a decentralized peer-to-peer file server.

19   If you're familiar with file-sharing services like Napster or

20   LimeWire from many years ago, it functions in a similar way,

21   where multiple users can make a file available, and as long as

22   one of them are connected to the network, that file is still

23   accessible, so individual users can go off the network, and as

24   long as one is available, the file is still accessible.

25   Q.  So could anyone who's operating on a peer-to-peer network

1    like that host particular content?

2    A.  Yes.

3    Q.  So if that's true, why would somebody pay for hosting

4    services on IPFS?

5    A.  So while multiple people can host a file, there's a

6    requirement that there's at least one person holding——hosting

7    that file to——for it to be accessible when you go to request

8    it.  So there's this concept called pinning.  Pinning is making

9    sure that at least one node on the network has the file

10   available when it's needed.

11   Q.  And what would be the value of that for somebody posting

12   content?

13   A.  To assure that it's accessible and that there's no down

14   time.

15           MR. REHN:  The government offers Government

16   Exhibit 752.

17           Well, first, if we could bring up Government

18   Exhibit 752 just for the witness.

19   Q.  Do you recognize what this is?

20   A.  Yes, I do.

21   Q.  And what is it?

22   A.  This is——

23   Q.  At a high level.

24           THE COURT:  Excuse me.  I'm not seeing it.

25           MR. REHN:  Oh, sorry.

P7M1STO6                        Werlau - Direct

1           THE COURT:  Now it's up.  Thank you.

2           Is everyone seeing this document who should be seeing

3   the document?

4           Thank you.  Counsel, you may ask your foundational

5   questions.  Thank you.

6           MR. REHN:  Yes, your Honor.  Thank you.

7   BY MR. REHN:

8   Q.  At a high level, could you describe what kind of a document

9   this is.

10  A.  Yes.  This is a payment receipt from Pinata Cloud.

11          MR. REHN:  Your Honor, the government offers

12  Government Exhibit 752.  The certification associated with this

13  is at GX 751 on page 4.

14          MR. KLEIN:  Objection, your Honor.

15          THE COURT:  Government Exhibit 752 is admitted into

16  evidence and may be shown to the jury.

17          (Government's Exhibit 752 received in evidence)

18  BY MR. REHN:

19  Q.  So Mr. Werlau, I'd like to direct you to the portion on the

20  right-hand side where it says Statement Descriptor and Last

21  Updated.  Do you see that?

22  A.  One second.  On the left-hand side?

23  Q.  Right-hand side.

24  A.  Oh, on the right-hand side.  Statement Descriptor, yes.

25  That reads Pinata Cloud.

P7M1STO6                        Werlau - Direct

1   Q.  And is that the sort of Pinata Cloud hosting services you

2   were describing before?

3   A.  Yes, that's Pinata Cloud, the IPFS service.

4   Q.  And I'd like to direct your attention to the upper

5   left-hand corner.  Who is being billed for hosting services on

6   Pinata?

7   A.  This is being billed to the address hello@tornado.cash.

8          MR. REHN:  We could bring that down.

9          And if we could now bring up just for the witness

10  Government Exhibit 2032-T.

11  Q.  Mr. Werlau, do you recognize this document?

12  A.  Yes.

13  Q.  Is this a portion of that same founder's chat we were

14  looking at earlier?

15  A.  Yes, that's correct.

16         MR. REHN:  The government offers Government Exhibits

17  2032 and 2032-T.

18         MR. KLEIN:  Your Honor, could we just have a quick

19  sidebar on this, or I object under the rule of completeness.

20         THE COURT:  Oh, because we haven't——I'm letting it in,

21  but we do have to discuss these other issues this afternoon, so

22  we may return to this document.

23         Government Exhibit 2032 and Government Exhibit 2032-T

24  are admitted into evidence and may be shown to the jury.

25         (Government's Exhibits 2032 and 2032-T received in

1    evidence)

2    BY MR. REHN:

3    Q.  So Mr. Werlau, is this that same chat we were looking at

4    before?

5    A.  Yes, that's correct.

6    Q.  If we could go to page 3, and if we could read the first

7    two chats.  Or it may be page 4, perhaps.  Oh, no, yes, that's

8    right.

9            If you go to page 3 and read the first two chats.

10   I'll ask you, who is the first chat from?

11   A.  The first chat is from Alexey Pertsev.

12   Q.  And what does he say?

13   A.  He writes, "DeFi Pulse wants us to add him to our UI."

14   Q.  Do you understand what UI he's referring to?

15   A.  Yes, that's the web application user interface.

16   Q.  For Tornado Cash?

17   A.  Yes, that's correct.

18   Q.  And how does Roman Semenov respond?

19   A.  Roman Semenov replies, "He can fuck off."

20   Q.  Let's go to page 5.  And I see three messages here.  Let's

21   actually read them.  Look at the middle one.  Do you see a link

22   here?

23   A.  Yes, I do.

24   Q.  What's that a link to?

25   A.  This link is to gateway.pinata.cloud.

P7M1STO6                        Werlau - Direct

1   Q.   Is that that Pinata Cloud service we were looking at

2   before?

3   A.   Yes, and specifically this is their gateway service.

4   Q.   Is there a way to interface with that service to upload

5   contents to it?

6   A.   Through the gateway?  You would interface through Pinata

7   through their API keys.  The gateway would be used to request

8   content after it's uploaded.

9   Q.   Could you explain what that API key is.

10  A.   Yes.  So the API key is how you would basically log into

11  the system to interact with it.  So instead of using a user

12  name and password, the API key is a long string of characters

13  that access your keys to access the service.

14       MR. REHN:  All right.  Could we go to the next page.

15  And actually go to the next page.

16       Page 7.  And if we could expand the top message there.

17  Q.   Is this that API key you were talking about?

18  A.   Yes, that's correct.

19  Q.   So if somebody shares an API key with other people, would

20  any of them be able to update the contents there?

21  A.   That's correct.

22  Q.   So Mr. Werlau, we've been talking about the ownership of

23  that web application, the user interface; is that right?

24  A.   Correct.

25  Q.   Aside from the UI, was there another way to access the

P7M1STO6                    Werlau - Direct

1    Tornado Cash?

2    A.  Yes.  The CLI also, the command line interface.

3           MR. REHN:  If we could bring up Government

4    Exhibit 3005-7 for demonstrative purposes.

5           THE COURT:  It may be used as a demonstrative.

6    Q.  Could you, at a high level, explain what the CLI was.

7    A.  Yes.  The CLI, also known as the command line interface,

8    was another way of interfacing with Tornado Cash.  Unlike the

9    web application UI, which was built for human beings, users to

10   navigate to a web page and interact with it, the CLI is more

11   meant for automation or for use with computers.  It requires a

12   little bit more technical sophistication to understand and use,

13   but can be useful when you want to automate interactions.

14   Q.  Was that Tornado Cash CLI also contained within the GitHub

15   repository?

16   A.  Yes, that is correct.

17   Q.  And were there changes made to the CLI over time?

18   A.  Yes.

19   Q.  How do you know that?

20   A.  I reviewed the commit history, which is the history of

21   changes that was made to the code over time.

22   Q.  Do you recall who made some of those changes?

23   A.  Yes, those would be the founders.

24   Q.  In your experience as a website developer, would you expect

25   the UI or the CLI to be more commonly used?

P7M1STO6                    Werlau - Direct

1    A.  Typically in an application like this, I would expect the

2    web application UI to be more used.

3    Q.  Why is that?

4    A.  Because it is meant for human beings, it is user friendly,

5    whereas the CLI is meant more for advance users that have

6    particular, you know, considerations when using the platform.

7            MR. REHN:  All right.  So if we could bring that down

8    and go back to Government Exhibit 3005-3.

9    Q.  So Mr. Werlau, I think you said earlier there were these

10   three parts of Tornado Cash; is that right?

11   A.  That's correct.

12   Q.  So we've talked about the website and the web application.

13   Remind us what the next major part of Tornado Cash was.

14   A.  Yes.  The next major component was the relayer network.

15   Q.  And can you remind us again what the relayer network did.

16   A.  Sure.  So at a high level, the relayer network was a

17   network of third parties which would execute a withdrawal on

18   behalf of users.  This was important for users if they would be

19   using a U wallet, a wallet which had no funds and no

20   transaction history, and thus had no way to pay for the gas or

21   transaction fees to execute the withdrawal.

22           MR. REHN:  All right.  If we could bring up Government

23   Exhibit 3005-8.

24   Q.  And if you could give us just a general overview of what

25   your findings were with respect to the relayer network.

1        THE COURT:  And again, this is being introduced as a

2   demonstrative, sir.

3        MR. REHN:  Yes, your Honor.

4   A.  So again, the relayers were a network of third parties.

5   They would pay the transaction fees on behalf of users

6   executing withdrawal.  This was important as most users making

7   withdrawal would do so from a new wallet which had no

8   transaction history, had no tokens in their account, and thus

9   didn't have the funds to pay to execute the withdrawal.  And so

10  the relayers would execute the withdrawal, and they would keep

11  a portion of the withdrawal funds to compensate them for their

12  service as well as compensate them for the gas that this paid.

13  Q.  So that bottom part, is that what you're referring to as

14  relayer fees, the part where the relayer would take a portion

15  of the withdrawal?

16  A.  Yes, that's correct.

17  Q.  And on the top it says Transaction Fees.  Is that unique to

18  Tornado Cash?

19  A.  No.  Those transaction fees are to the Ethereum network

20  itself.  So any transaction that occurs on the Ethereum network

21  requires a transaction fee called a gas fee.

22  Q.  Why does the Ethereum network charge gas fees?

23  A.  Yeah, so there's a couple of different reasons.  The first

24  is to prevent any single transaction from basically going into

25  an infinite loop and causing the entire network to halt, so

1    there are certain limitations to how many actions can be

2    accomplished in any given transaction.  It also prevents spam

3    on the network, causes, you know—there has to be some cost

4    there so people don't flood the network with transactions.

5    Additionally, those gas fees are also used to compensate miners

6    and validators, those who maintain and, you know, work on the

7    network.

8         MR. REHN:  Let's bring up Government Exhibit 3005-9

9    for demonstrative purposes.

10   Q.  So could you just give us a basic explanation of how gas

11   fees work on the Ethereum network.

12   A.  So on this diagram we have a user, an owner of one wallet

13   wanting to send Ether to another wallet.  They're going to

14   initiate a transaction with the blockchain, and when they do

15   so, an associated amount of gas will be charged to their

16   account as well.  And when that happens, the fees will then be

17   transferred.  So the initiator of this transaction is

18   responsible for paying the fees to execute the transaction.

19   Q.  Would gas fees also be needed to make deposits, deposits

20   into and withdrawals from Tornado Cash?

21   A.  Yes.

22   Q.  So I'm showing you Government Exhibit 3005-10 for

23   demonstrative purposes.  Could you explain what this is.

24   A.  Yes.  So this diagram shows, at a high level, a deposit of

25   ETH into Tornado Cash and shows, much like the transfer, when

1  you make a deposit, you also have to pay a gas fee to execute

2  that transaction.

3  Q.  So when a user is making a deposit to Tornado Cash, does

4  the user have funds in their wallet already?

5  A.  Yes, typically that would be the case.

6  Q.  And so are they able to pay the gas fee?

7  A.  Yes.

8  Q.  Is it the same situation for a withdrawal?

9  A.  No.

10  Q.  So I'm showing you Government Exhibit 3005-11 for

11  demonstrative purposes.  What does this show?

12  A.  So this shows a diagram of a withdrawal of ETH from Tornado

13  Cash.

14  Q.  And so what's different about a withdrawal than a deposit?

15  A.  When making a withdrawal, it's very common for a user to

16  have no funds in that wallet and thus no way to pay the gas

17  fees to execute that transaction, and that's where the relayers

18  come in.

19  Q.  So why would the wallet receiving the withdrawal not have

20  any funds in it?

21  A.  Because to have funds, they would have to have some type of

22  transaction history, someone would have had to send them funds,

23  and by doing so, they would have created a link to other

24  addresses, which could have revealed their identity.

25  Q.  And so the relayer pays the gas fee?

1   A.  That's correct.

2   Q.  Does the relayer get anything for doing that?

3   A.  Yes.  The relayer is compensated both as a flat fee, which

4   they can determine up to a certain value, a percentage of the

5   transaction, as well as to compensate them for the price they

6   paid for the gas.

7   Q.  Let's go back and look at Government Exhibit 3005-3, the

8   demonstrative we've been talking about.

9           Do you remember this slide?

10  A.  Yes.

11  Q.  All right.  We've talked about the website and the web

12  application, and we've talked about the relayer network.  So

13  what's the third major part of Tornado Cash?

14  A.  That would be the collection of smart contracts deployed at

15  the blockchain.

16  Q.  So this is the part of Tornado Cash that's actually on the

17  blockchain?

18  A.  Yes, that's correct.

19  Q.  Let's go to Government Exhibit 3005-12 for demonstrative

20  purposes.

21          Can you give us an overview of the findings you

22  reached with respect to the smart contracts involved in Tornado

23  Cash.

24  A.  So I broke the smart contracts down into three categories,

25  primary categories which were used to execute a deposit or a

1    withdrawal on Tornado Cash.

2            The first one was the router.  This was a smart

3    contract which was responsible for directing deposits and

4    withdrawals to the appropriate pool.  I also determined that

5    the router——during the period that I analyzed the code, the

6    router was updated on multiple occasions, a new router was

7    deployed, and the UI directed to it.

8            In addition to the router, there were a set of

9    registries which contained information necessary to process the

10   transaction and can be used to invalidate it or stop it.  In

11   addition, these registries were used for the relayer system, in

12   monetizing them.

13           And the last component were a set of pools, and these

14   are where the funds ultimately were sent to, where they were

15   deposited to and withdrawn from.

16           MR. REHN:  So let's go to Government Exhibit 3005-13,

17   again, for demonstrative purposes, your Honor.

18   Q.  So let's start with the router.  Can you tell me a little

19   bit about what the router does.

20   A.  The router serves as an entry point to the smart contracts

21   of Tornado Cash.  When a user wants to initiate a deposit or a

22   withdrawal, they would send it to the router and the router

23   would determine which of the appropriate pools that transaction

24   needs to be sent on to.  In addition, the router would also

25   check the registries to confirm that the transaction was valid.

1  Q.  So I see on the screen here on the left-hand side there's a
2  computer, and it seems to be showing the website application,
3  the web application; is that right?
4  A.  Yes, that's correct.
5  Q.  So what is the significance of the connection between the
6  web application and the router?
7  A.  So what this shows is that the user interfaced the web
8  application, served as an entry point, and so wherever the user
9  interface pointed to is where would be our entry point onto it.
10  So the user interface determined which router we were going to
11  be using.  And as I mentioned earlier, that I determined that
12  the router had been updated at various points.  The way that
13  was done was by updating the UI to point to a new router.
14  Q.  So everything that happens after this point could be
15  changed by releasing a new router; is that what you're saying?
16  A.  Yes, that's correct.
17  Q.  And were there changes made to the smart contract process
18  from time to time?
19  A.  Yes, on at least two occasions during my—my analysis.
20  Q.  Now we talked a moment ago about the web application.  Do
21  you recall that?
22  A.  Yes.
23  Q.  Remind me who was in control of the web application.
24  A.  That was Roman Semenov was in control of the .eth domain,
25  and generally the founders collectively were involved with

P7M1STO6                        Werlau - Direct

1   controlling the web application.

2   Q.  And so were they able to make any changes they wanted to

3   that web application?

4   A.  Yes, that's correct.

5   Q.  Would that include deciding to direct it to a new router?

6   A.  That's correct.

7   Q.  And did you look at some of the changes that the founders

8   made to Tornado Cash over time?

9   A.  I did.

10  Q.  Actually, before we get to that, was the router sometimes

11  referred to as a proxy?

12  A.  Yes, in some of the internal documentation they——it was at

13  times referred to as a proxy.

14  Q.  The founders would refer to it sometimes that way?

15  A.  That's correct.

16  Q.  So if we see references to either a proxy or a router,

17  we're talking about this same entry point either way?

18  A.  In certain contexts, yes.  We need to be careful 'cause

19  that term has a broader usage in blockchain, but in certain

20  documentation, this router is referred to as a proxy.

21  Q.  And that's documentation among the founders discussing it?

22  A.  That's correct.

23  Q.  So I think you said you looked at some of the changes that

24  the founders made to Tornado Cash?

25  A.  Yes.

P7M1STO6                          Werlau - Direct

1   Q.  Did you focus on any particular changes of significance?

2   A.  Yes, a couple.

3   Q.  All right.  Let's go to Government Exhibit 3005-14.

4           What does this show?

5           THE COURT:  Also for demonstrative purposes, sir?

6           MR. REHN:  Yes, your Honor.

7           THE COURT:  All right.

8   A.  So this shows the implementation of a new router that

9   occurred in December of 2020, and this was done for the

10  introduction of the anonymity mining system.

11  Q.  What was the anonymity mining system?

12  A.  Anonymity mining was a system used to reward users who made

13  deposits.  The longer they held their deposit within Tornado

14  Cash, the more anonymity points they received.  These points

15  could later be used to redeem TORN tokens.

16  Q.  So people were being paid in something called TORN tokens?

17  A.  Yes.

18  Q.  And why would they want to pay people to leave deposits in

19  Tornado Cash?

20  A.  So the service as a whole benefited by having more users

21  having deposits in the system and for having them leave the

22  deposits in there for longer.  So by incentivizing them to

23  leave their deposits deposited, it increased the anonymity of

24  all users of the platform.

25          MR. REHN:  Let's bring that down, and I'm showing

P7M1STO6                          Werlau - Direct

1    you——I'd like to show you Government Exhibit 1904, which I

2    believe this is in evidence.

3              THE COURT:  You believe it is, sir?

4              MR. REHN:  I believe it is, yes.

5              THE COURT:  All right.

6    BY MR. REHN:

7    Q.  Mr. Werlau, do you recognize this document?

8    A.  Yes.  This is the tornado.cash governance proposal.

9    Q.  Was this released in connection with that December 2020

10   update that you were just discussing?

11   A.  Yes, that's correct.

12   Q.  And does this announce the creation of these TORN tokens?

13   A.  Yes.

14             MR. REHN:  So let's just bring that down for a moment.

15   I want to establish some groundwork before we talk about the

16   TORN tokens.

17   Q.  Can somebody just create a cryptocurrency?

18   A.  Yes.  It's actually surprisingly simple to do so.

19   Q.  How does somebody create a cryptocurrency?

20   A.  So tokens are——cryptocurrencies on the Ethereum blockchain

21   are controlled by smart contracts, so creating a new token is

22   as simple as deploying a new contract to the network.  There

23   are open-source templates that people can use; you can copy

24   them and deploy them with minimal changes to things like name

25   and market cap, for the number of total supply of tokens.

P7M1STO6                           Werlau - Direct

1   Q.  And does it really—does it cost anything to create a
2   cryptocurrency?
3   A.  The only cost you pay is the gas fees associated with
4   deploying a contract.
5   Q.  And so is that what the founders did in December of 2020?
6   A.  Yes, that's correct.
7   Q.  If somebody creates a new kind of cryptocurrency, can they
8   decide how to distribute it?
9   A.  Yes.
10  Q.  It's up to the creator how it goes out.
11  A.  That's correct.
12          MR. REHN:  All right.  Let's bring back up Government
13  Exhibit 1904, and if we could scroll to page 2, perhaps.
14          There we go.
15  Q.  What does this portion of this document describe?
16  A.  This document shows the initial distribution of TORN
17  tokens.
18  Q.  How many TORN tokens did the founders create?
19  A.  There were 10 million TORN tokens initially minted.
20  Q.  And how were those TORN tokens distributed?
21  A.  So they were distributed:
22          5 percent, or 500,000 TORN tokens, were allocated to
23  early users of the platform.
24          10 percent of the tokens, or 1 million TORN tokens,
25  were allocated to the anonymity mining system that we just

1   spoke about.

2          55 percent, or 5.5 million TORN tokens, were allocated

3   to the DAO treasury.  The DAO is the Decentralized Autonomous

4   Organization.  This is the governance entity for the protocol.

5          And 30 percent, or 3 million TORN tokens, were

6   allocated to founder developers and early supporters, which was

7   unlocked over a period of time.

8   Q.  So practically speaking, how many actually distributed out

9   from Tornado Cash as opposed to in the treasury?

10  A.  So that would be 4.5 million were distributed to

11  nontreasury members.

12  Q.  That's 45 percent?

13  A.  That's correct.

14  Q.  And how many of those went to the founders and the early

15  supporters?

16  A.  So that would be 2.5 million was sent to the founders,

17  vested over a period of time.

18  Q.  So was that the majority of the distribution?

19  A.  Of the nontreasury distribution, yes.

20  Q.  And what are early supporters here; are those investors?

21  A.  In fact I don't——I don't actually know which members were

22  included in early supporters.

23  Q.  How about the founding developers; who are they?

24  A.  Oh, the founding developers included the founders that

25  we've been discussing——Roman Storm, Roman Semenov, and Alexey

P7M1STO6                          Werlau - Direct

Pertsev.

Q.  Do you see on the red part of the pie chart, there's a—it says 30 percent?

A.  I do.

Q.  And then there's a little text over that arrow.

        MR. REHN:  If we could expand that, Mr. Iannuzzelli.

Q.  What does that read?

A.  That reads "Team & investors."

Q.  So what does that indicate to you about who made up that 30 percent?

A.  Those would be the other early investors in the protocol.

        THE COURT:  Counsel, when you come to a convenient stopping point, I think we'll break for the day.

        MR. REHN:  I was just wrapping up the 2020 and we're going to move into the February 2022, so this might be a good time, actually.

        THE COURT:  This right now might be a good time.

        MR. REHN:  Yes.

        THE COURT:  I must have been psychic.

        Okay.  Great.

        All right.  Well, then we have had a productive day. Thank you, members of the jury, for agreeing to stay late so that we can be productive today.

        And we will see you tomorrow.  Be here by 8:45 so we can begin at the crack of 9.

P7M1STO6

1           Have a wonderful evening.  Do not discuss this case

2   with each other or with anyone else.  Keep an open mind until

3   all of the evidence is in.

4           All rise, please, for the jury.

P7N1STO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                      23 Cr. 430 (KPF)

ROMAN STORM,

            Defendant.        Jury Trial
------------------------------x

                               New York, N.Y.
                               July 23, 2025
                               9:03 a.m.

Before:

               HON. KATHERINE POLK FAILLA,

                               District Judge

                     APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  NATHAN M. REHN, ESQ.
     BEN ARAD, ESQ.
     BENJAMIN A. GIANFORTI, ESQ.
     KEVIN G. MOSLEY, ESQ.
     TARA M. LA MORTE, ESQ.
     Assistant United States Attorneys

WAYMAKER LLP
     Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
     KERI CURTIS AXEL, ESQ.
     KEVIN M. CASEY, ESQ.
     VIVIANA ANDAZOLA MARQUEZ, ESQ.

     –and–

HECKER FINK LLP
     Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
     CHRISTOPHER MOREL, ESQ.

1    PHILIP WERLAU,

2         called as a witness by the Government,

3         having been previously duly sworn, testified as follows:

4    DIRECT EXAMINATION (continued)

5    BY MR. REHN:

6    Q.  Good morning, Mr. Werlau.

7    A.  Good morning.

8         MR. REHN:  If we could pull up again Government

9    Exhibit 3005-3.

10   Q.  Mr. Werlau, do you recall testifying about this

11   demonstrative exhibit yesterday?

12   A.  I do.

13   Q.  And you had identified the three different parts of Tornado

14   Cash?

15   A.  Yes, that's correct.

16   Q.  I believe we left off when we were talking about the third

17   part; correct?

18   A.  Yes, the smart contracts.

19   Q.  So I'd like to just go back into where we were talking

20   about the smart contracts before, and I believe we were looking

21   at 3005-14.

22        Do you recall testifying about the December 2020

23   router yesterday?

24   A.  Yes, I do.

25   Q.  And could you remind us what the purpose of the

1    December 2020 router was.

2    A.  Yes.  The December 2020 router implemented anonymity

3    mining.  Anonymity mining was a system that rewarded users for

4    leaving deposits deposited for longer.  This was important

5    because the longer a deposit stayed in the system, the more

6    anonymity it granted the user — not just the one who deposited,

7    but all other users of the protocol.  And so they were rewarded

8    with anonymity points which they could later redeem for TORN

9    tokens.

10   Q.  So was Tornado Cash actually making payments to induce more

11   people to leave deposits in the pools?

12   A.  "Payments" may not be the term I'd use, but they were

13   distributing a system to receive tokens that had a monetary

14   value.

15   Q.  Mr. Werlau, did you examine another change to Tornado Cash

16   that took place after December 2020?

17   A.  Yes, I did.

18   Q.  What was the date of that change?

19   A.  On the second page.

20          MR. REHN:  If we could go to Government Exhibit

21   3005-15.

22   Q.  And I didn't want the exact date, just the general range.

23   A.  Yes.  So that was on February of 2022.

24          THE COURT:  Mr. Rehn, just one moment please.

25          I think I know this, but I just want to be sure.  All

1    of the exhibits in the 3005 series are being introduced solely

2    for demonstrative purposes?

3             MR. REHN:  Your Honor, I believe there will be one we

4    will seek to admit as a summary chart, and I will identify it.

5             THE COURT:  You will let us know.  But, absent that,

6    we understand it's being admitted for demonstrative purposes.

7             And, Mr. Klein, sir, may I also understand that you

8    are not objecting to not -- I've used the term "admitted"

9    incorrectly.  That these are being used for demonstrative

10   purposes, meaning they are not being admitted into evidence,

11   and you're not contesting their use as demonstratives.

12            MR. KLEIN:  That is correct, your Honor.

13            THE COURT:  Thank you so much.

14            We'll both know when there's the one that Mr. Rehn

15   seeks to admit.  Thank you.

16            And, jurors, you now understand that as well.  These

17   are demonstrative aids; they are not exhibits in the case.

18            Thank you so much.  Counsel, you may continue.

19            MR. REHN:  Thank you, your Honor.

20   BY MR. REHN:

21   Q.  So, Mr. Werlau, could you explain what the function of the

22   February 2022 router was?

23   A.  The February 2022 router introduced the concept of the

24   relay registry.  This required relayers to register on the

25   platform in order to be recommended to users.

P7NVSTO2                        Werlau - Direct

1   Q.  Did relayers have to make any payments to be included in

2   that registry?

3   A.  Yes, that is correct.  Relayers would have to stake a

4   certain number of tokens in a governance contract, basically

5   lock up those tokens in order to be registered on the registry.

6   Q.  And did the Tornado Cash founders need any approval from

7   anyone else to release a new router and connect it to the UI or

8   the web application?

9   A.  No.  Control of the UI and CLI could change the path of

10  entry so they were able to deploy a new router unilaterally.

11  Q.  Mr. Werlau, did you investigate the code for the smart

12  contracts as it existed after the February 2022 router was

13  released?

14  A.  Yes, I did.

15  Q.  And did you investigate how Tornado Cash deposits and

16  withdrawals worked after that router was released?

17  A.  I did.

18  Q.  So I'd like to start with deposits.

19          MR. REHN:  So if we could look at Government Exhibit

20  3005-16.

21  Q.  So I want to start at the web application or UI level.

22          What are we looking at on the screen here first?

23  A.  On the screen we see the deposits page within the web

24  application.  This is the screen in which they would use to

25  make deposits.

1    Q.  So could you just explain for us step-by-step how a

2    customer would initiate a deposit into Tornado Cash.

3    A.  Sure.

4         So on the screen we see a label set token, and under

5    that is a drop-down that lists ETH.  This is where we would

6    pick the token that we want to deposit, supported ETH tokens,

7    as well as others.

8         Second we would choose the denomination of the tokens

9    to deposit.  Here, we see .1 ETH, 1 ETH, 10 ETH, and 100 ETH.

10   We would then click the connect button to connect it to our

11   wallet, and this would then allow us to initiate a transaction.

12   Q.  What, if anything, did the user receive from Tornado Cash

13   when they clicked that connect button?

14   A.  So upon making a deposit, they would receive a secret note

15   which would be used when making a withdrawal.

16   Q.  Did Tornado Cash retain a copy of the secret note?

17   A.  They did not.

18   Q.  What, if anything, is the significance of that?

19   A.  This means that only the user had access to their deposit,

20   not Tornado Cash.

21   Q.  Could the web application have been designed to keep a copy

22   of the secret note?

23   A.  Yes.

24   Q.  So was the decision not to retain a copy a design choice?

25   A.  That's correct.

1          MR. REHN:  Okay.  Let's go to Government Exhibit

2    3005-17.

3    Q.  So, Mr. Werlau, if you could explain for us what this chart

4    represents after that customer initiated that deposit.

5    A.  So this diagram represents the flow of transaction

6    information for a deposit, showing that the deposit first goes

7    from the UI to the router.  The router then references the

8    instance registry, and ultimately then deposits into the

9    associated pool.

10   Q.  So the first communication from the router is to the

11   instance registry?

12   A.  That is correct.

13   Q.  What is the instance registry?

14   A.  The instance registry holds a list or a registry of active

15   and valid instances.  Those instances are the pools.  So making

16   sure that if you're depositing into, for example, the 1 ETH

17   pool, that that pool is present and valid.

18   Q.  So is a registry just a list of pools?

19   A.  Basically, yes.

20   Q.  Could that list be revised?

21   A.  Yes, updates could be made to the list.

22   Q.  Even though it was a smart contract?

23   A.  That's correct.

24   Q.  What would be the effect of revising that list?

25   A.  So updates could be made to add support for new

P7NVSTO2                    Werlau - Direct

cryptocurrency tokens, as well as new denominations of those

tokens.  Additionally, pools could be deactivated, restricting

access to those pools from the router.

Q.  So if a pool wasn't included in that list, would the router

allow the deposit to go through?

A.  No, it would not.

Q.  Now, at this point in time, did the founders have the

ability to control the instance registry?

A.  Control of the instance registry was controlled by the

governance.

Q.  And what does that mean?

A.  That means changes to the instance registry, as in adding

new instances or disabling existing instances, required

approval of the governance system.  So votes had to be made, a

proposal had to pass, in order for that to be done.

Q.  I want to unpack that.

        Who had the ability to vote on a proposal?

A.  Proposals are voted on by holders of TORN tokens who had

staked or locked up their tokens in the governance vault.

Q.  Did you investigate any votes that took place in February

of 2022?

A.  Yes, proposal 10.

Q.  And in connection with that proposal, how many TORN tokens

voted?

A.  I believe it's approximately 35,000.

1  Q.  And did you investigate how many TORN tokens the founders

2  were in possession of at that time?

3  A.  Yes, approximately 800,000.

4  Q.  So what, if anything, does that tell you?

5  A.  Had the founders chosen to lock up their TORN tokens in the

6  governance, they had enough tokens to swing a vote completely.

7  Q.  So aside from actually changing the instance registry that

8  way, is there anything the founders could have done to replace

9  the instance registry with a new version?

10  A.  Yes.  So as they had done in the times that they had

11  deployed new routers, deploying an entirely new router, an

12  entirely new instance registry, and then having the UI connect

13  to these new instances would, in effect, replace the old ones.

14  So that could be done unilaterally without directly a

15  governance vote.

16  Q.  Okay.  What happens after the router connects to the

17  instance registry?

18  A.  So once the router checks with the instance registry that

19  the instance is valid, assuming it is, it then proceeds with

20  the deposit.  Funds would be transferred from the user to the

21  router, and then from the router to the instance pool.

22  Q.  Okay.  And I see at the bottom of the screen there's

23  something called the pool.  Is that where the funds ultimately

24  end up when they go through the router?

25  A.  Yes, that is correct.

P7NVSTO2                    Werlau - Direct

1   Q.  And so what is the function of the pool in this system?

2   A.  The pool ultimately holds the funds; it is also responsible

3   for the associated verification of withdrawals.

4   Q.  Now, I think you said that the deposit goes through the

5   router and then into the pool; is that right?

6   A.  Yes.  A review of the code shows that for a very momentary

7   instance the funds transfer from the user to the router, and

8   then instantaneously directed from the router to the pool

9   itself.

10  Q.  When that happens, is that visible on the blockchain?

11  A.  Yes.  Any transfer of assets emits an event that can show

12  who the sender and recipient of those assets were.

13  Q.  Does that allow you to distinguish between deposits that go

14  through the router and deposits that go through some other

15  mechanism?

16  A.  Yes, that is correct.

17  Q.  So when we were looking at the web application earlier, you

18  noted that there were four denominations of ETH listed on the

19  web application?

20  A.  Yes.  Correct.

21  Q.  Was there a separate pool for each of those?

22  A.  Yes, that's correct.  So each denomination had its own

23  pool.

24  Q.  Were those pools able to be changed in February of 2022?

25  A.  No.

P7NVSTO2                          Werlau - Direct

1    Q.  Why not?

2    A.  Those pools at that time were immutable.

3    Q.  What does that mean?

4    A.  It means that no changes could be made to the contracts

5    controlling those pools after that time.

6    Q.  I believe you testified a moment ago that the instance

7    registry could disable a pool.  If that was done, what would be

8    the effect, if any, on a customer making a deposit using the

9    UI?

10   A.  So to clarify, the instance registry disables the router's

11   ability to communicate with the pool.  The pool is still

12   present and, theoretically, you could go directly to the pool,

13   circumventing the router.  But since the UI and the CLI direct

14   it to the router, disabling the instance registry would disable

15   your ability to access those pools from the UI.

16   Q.  Does that mean that the founders could create new pools?

17   A.  Yes, they could create new pools, add them to the instance

18   registry, and have the router connect to those.

19   Q.  Now, I'd like to ask you about withdrawals.

20            Let's look at slide 3005-18.

21            What are we looking at now?

22   A.  What we're looking at here is the web application UI page

23   for withdrawals.

24   Q.  And could you explain for us, looking at this image here,

25   how the customer would withdraw funds from Tornado Cash?

P7NVSTO2                          Werlau - Direct

A.   Sure.

           So the first thing the customer would do is they would
provide the secret note.  This was the note that was provided
when they made a deposit and how the system associates the
withdrawal with their deposit.

           Next, they would establish the recipient address, the
address that's going to receive these funds.

           And then they could select a relayer, if they chose.
One would be chosen by default for them, and then they could
initiate the withdrawal.

Q.   I want to focus in on that last part where you're talking
about the relayer.  Here, below where it says "recipient
address," I see it says "current relayer."  Do you see that?

A.   Yes.

Q.   So were there more than one relayer in the network?

A.   Yes, that's correct.

Q.   Typically, how was the relayer selected for any particular
withdrawal?

A.   It changed over time; but once the relayer registry system
was introduced, relayers were chosen through what was called a
random weighted sampling.  So it was randomized, but with
greater odds that your relayer would be picked.  The more you
staked and the lower you charged those fees, to within certain
limits, the higher your likelihood of being chosen to be
recommended to the user.

1  Q.  I think you said that one of the factors was the more the

2  relayer staked, the more likely they were to be chosen?

3  A.  Yes, that's correct, to a certain degree.

4  Q.  And could you remind us what you mean by "relayer staking"?

5  A.  So this involved the relayer locking their tokens up for a

6  certain period of time.

7  Q.  Okay.  So after the customer clicks "withdraw," what does

8  the web application do?

9  A.  So first on the UI side, the user interface will take that

10  secret note and will use that to generate what's called a zero

11  knowledge proof.  This is a way that we can prove to the system

12  that we made the deposit associated with this withdrawal

13  without revealing which deposit exactly.  So this information

14  would then be sent to the relayer, and the relayer would bring

15  this information onto the blockchain to communicate with the

16  router and the smart contracts.

17  Q.  So let's look at 3005-19.

18          And I see on the left-hand side of the screen the web

19  application connecting to the relayer.  Is that the first step

20  you just described?

21  A.  Yes.

22  Q.  So is it the relayer that actually moves that information

23  onto the blockchain?

24  A.  That's correct.  The communication between the interface

25  and the relayer happens over traditional web connections.

1    Q.  And so what happens after the relayer connects to the

2    blockchain?

3    A.  So the relayer will submit it to the router.  Much like

4    when we made a deposit, the router will check the instance

5    registry to confirm that the pool we're interacting with is

6    valid.  Next, it will check the relayer registry to confirm

7    that the relayer in this case has, in fact, staked the

8    recommended amount of TORN and has registered in the registry.

9           If they are not registered, this transaction -- there

10   is a way to do customs, but through this process, this relayer

11   would be rejected if they did not have the necessary TORN.

12          At this point, I believe we'll discuss this later, a

13   certain number of their TORN tokens would be debited from their

14   account.  And then finally, the withdrawal would be sent to the

15   pool where the funds would be withdrawn, a portion would be

16   sent to the relayer to compensate them for their service, and

17   the rest of the funds would go on to the recipient.

18   Q.  I want to unpack that a little more.

19          So on the withdrawal side, if the pool is not listed

20   in the instance registry, what happens?

21   A.  The transaction would fail.

22   Q.  That's the same as you describe on the deposit side?

23   A.  Correct.

24   Q.  And in the relayer registry, what happens if the relayer is

25   listed there, but they don't have enough TORN tokens deposited?

P7NVSTO2                          Werlau - Direct

1   A.  Again, they would also have their transaction rejected.

2   Q.  So both of those registries are programmed to be able to

3   block the transaction?

4   A.  That's correct.

5   Q.  When was that relayer registry released?

6   A.  That relayer registry was involved in the February of 2022

7   update.

8   Q.  So was that released around the same time as the

9   February 2022 router?

10  A.  That's correct.

11  Q.  And you said the recipient, they get some of the money back

12  out of the pool; is that right?

13  A.  Yes.  Correct.  So the relayer will take a portion of the

14  funds to compensate them for their services, both to reimburse

15  them for the gas that they paid for, as well as a certain fixed

16  fee.

17  Q.  Okay.  So we've talked through how the Tornado Cash deposit

18  and withdrawal process actually worked.

19          Did you also evaluate some potential changes that

20  could have been made to the process?

21  A.  Yes, I did.

22  Q.  And can you remind us, in general, what would be the

23  mechanism for implementing changes to this process?

24  A.  The mechanism would require a deploying use more contracts,

25  such as a router, registries, and redirecting the UI and CLI to

P7NVSTO2                          Werlau - Direct

1    connect to these new contracts.

2    Q.  When you were evaluating some potential changes, what were

3    the design objectives that you were considering?

4    A.  The primary design objective was to prevent bad actors from

5    depositing and withdrawing from the network.

6    Q.  And did you identify any changes that could have achieved

7    those design objectives?

8    A.  Yes, I did.

9    Q.  Based on your years of experience in web development, would

10   the changes you identified have been apparent to a typical web

11   developer in 2022?

12   A.  I believe they would.

13   Q.  Could you describe the changes that you identified.

14   A.  Yes.  So at a high level, the changes would involve

15   establishing two new registries for user registry.  In

16   addition, they would involve maintaining an off-chain database

17   maintaining the connection between deposits and withdrawals.

18           MR. REHN:  So if we could go to demonstrative 3005-20.

19   Q.  And I see in a different color now something called "User

20   Registry."  Is that what you were just describing?

21   A.  Yes, that's correct.

22   Q.  So to be clear, this is something that's an alternative;

23   this wasn't implemented.  Is that right?

24   A.  That's correct.

25   Q.  If you could just explain, again, what the user registry

1    function would be in this process.

2    A.   Yes.  So the user registry, in our proposal, we would have

3    the user create an account in the user interface.  This would

4    be like any social media account, have a user name and

5    password, and allow you to log in.

6            Once you did that, you would be able to associate

7    wallets with your account.  And these wallets would then -- the

8    Tornado Cash UI would update a user registry on the blockchain

9    saying that this wallet is allowed to make a deposit.

10           MR. REHN:  And if we could go to 3005-21.

11   Q.   Mr. Werlau, could you explain how the user registry would

12   work on the withdrawal side.

13   A.   Right.  So much like deposits, a user would log into their

14   account on the user interface, associate a new wallet that they

15   want to make a withdrawal to.  This would be recorded in an

16   off-chain database, and then that address would be submitted to

17   the user registry to approve withdrawals from that address.

18   Q.   Mr. Werlau, are web applications with user names and

19   passwords a widely known concept in web development?

20   A.   Yes, it's a very common design pattern.

21   Q.   Could you give us an example of a web application that has

22   like a user name and password system?

23   A.   Most social media.  Gmail, Spotify, these all have user

24   name/password systems.

25   Q.   And is keeping records of user activity a common feature in

P7NVSTO2                          Werlau - Direct

1   web development?

2   A.  Yes, very common.

3   Q.  Give us an example of that sort of a tracking user activity

4   concept.

5   A.  Sure.  So going off the example of Spotify earlier, Spotify

6   keeps tracks of things like user and listener behavior and, for

7   example, at the end of the year can give you a summary of your

8   listening behavior across the year.  So that information is

9   drawn from tracking data throughout the year.

10  Q.  And was that a concept that was commonly understood in

11  2022?

12  A.  Yes, it was.

13  Q.  Now, this alternative you've described, would that still

14  allow a Tornado Cash user to send money without revealing their

15  transaction history publicly?

16  A.  Yes.

17  Q.  Why is that?

18  A.  Because the connection -- the information connecting

19  deposit and withdrawal addresses would be maintained privately

20  off the blockchain.

21  Q.  And was there anything about the way the design of the

22  withdrawals was implemented that suggested to you that a user

23  registry would have been an apparent solution?

24  A.  Can you repeat the question?

25  Q.  So looking at the diagram here, we see -- the contracts

1  that are in the black circles, are those examples of what

2  actually existed?

3  A.  Yes, I understand.

4      So, yes, the existence of other registries which had

5  the ability to deny transactions suggested that something like

6  this could have been implemented.

7  Q.  If a system like this were implemented, what would that

8  system allow Tornado Cash to do?

9  A.  So the system would allow Tornado Cash to both prevent bad

10  actors from using the system, both on deposits and withdrawals;

11  and if for some reason they were able to use the system, they

12  would be able to reveal this information if they needed to.

13  Q.  So if Tornado Cash received an inquiry about a particular

14  deposit, would they be able to provide information about that

15  inquiry?

16  A.  Under the system I propose, yes, that's correct.

17  Q.  What sort of information?

18  A.  It would depend on what they collected.  At a minimum, they

19  would be able to connect deposits and withdrawals, but they

20  could also collect other information if they chose, such as IP

21  address.

22  Q.  Okay.  Let's shift gears a little bit.

23      MR. REHN:  I'd like to bring up Government Exhibit

24  3005-22.

25  Q.  So, Mr. Werlau, what does this represent?

1    A.   This represents an example of deposits and withdrawals of

2    the 100 ETH denomination, going through the February 2022

3    router.

4    Q.   And I think you described earlier that the deposits would

5    go through the router into the pool?

6    A.   Yes, that's correct.

7    Q.   What about on the withdrawal side, would the withdrawals

8    interact with the router as well?

9    A.   Yes, the request for the withdrawals would transit the

10   router.

11   Q.   So on both the deposit side and the withdrawal side, are

12   interactions with the router visible in the blockchain data?

13   A.   Yes, that's correct.

14   Q.   So from the user's perspective, is there a value to making

15   a deposit that looks like other deposits based on blockchain

16   data?

17   A.   Yes.  The main goal with using Tornado Cash is to blend in

18   as much as possible with other users, blending in with the

19   crowd.  And so by going through the router, you are making your

20   transaction ununique and unremarkable from other transactions.

21   Q.   Did you look at some blockchain data for deposits and

22   withdrawals after the February 2022 router was released?

23   A.   Yes, I did.

24   Q.   So I want to ask you about the idea of making a deposit

25   directly to the pool without using the router.  Would it be

P7NVSTO2                    Werlau - Direct

1    possible for someone to do that?

2    A.  Yes, it would.

3    Q.  Would it be something that the typical user of a web

4    application would be able to do?

5    A.  No.  Using the web application, you would not be able to

6    directly interact with the pool; it would go through the

7    router.  You would have to take additional steps to interact

8    directly with the pool.

9    Q.  Would those steps require any degree of technical

10   sophistication?

11   A.  Yes, I believe they would.

12   Q.  But if someone managed to figure out how to do that, would

13   you be able to identify that transaction from blockchain data?

14   A.  Yes.  If a user interacted directly with the pool, that

15   transaction data would not show an interaction with the router,

16   and that fact would make it unique from other transactions.

17   Q.  So I'd like to show you what's been marked as Government

18   Exhibit 3003-B-B.

19        MR. REHN:  And, your Honor, this has been stipulated

20   as blockchain records pursuant to the blockchain stipulation.

21        THE COURT:  All right.

22        The designation again, please, sir.

23        MR. REHN:  3003-B-B.

24        THE COURT:  Oh, that is what you said.

25        Okay.  Thank you.

1          Mr. Klein, we've stipulated to this?

2          MR. KLEIN:  That's right, your Honor.

3          THE COURT:  Thank you so much.

4          Government Exhibit 3003-B-B is admitted into evidence

5    and may be shown to the jury.

6          (Government's Exhibit 3003-B-B received in evidence)

7    BY MR. REHN:

8    Q.  Mr. Werlau, if you could just explain for us what this

9    document is.

10   A.  This represents deposits into the Ethereum pool.

11   Q.  Into all four Ethereum pools?

12   A.  Yes, it's a combination of all four deposits,

13   denominations.

14   Q.  And is this -- what's the time range on this document?

15         MR. REHN:  And, Mr. Iannuzzelli, you can start at the

16   stop and scroll down.

17   A.  All right.  So the beginning time range starts September

18   1st of 2020, and ends August 8th of 2022.

19   Q.  So does this exhibit have blockchain data for all deposits

20   that were made to those four ETH pools during that time period?

21   A.  Yes, that's correct.

22   Q.  How many deposits were there?

23   A.  There was over 140,000.

24         MR. REHN:  You can bring that down.

25   Q.  And now I'd like to show you Government Exhibit 3003-C-B,

1    which is also subject of stipulation.

2            THE COURT:  All right.  Government Exhibit 3003-C-B is

3    admitted into evidence and may be shown to the jury.

4            (Government's Exhibit 3003-C-B received in evidence)

5    Q.  Mr. Werlau, what does this represent?

6    A.  This represents withdrawals to those same pools.

7    Q.  Withdrawals from the pools?

8    A.  Yes, withdrawals from the pool -- I mean the activity is

9    going to the pools, but the withdrawal is coming from the pool.

10   Q.  I see.  I see.

11   A.  The funds are coming from the pool; the withdrawal

12   transaction is going to the pool.

13   Q.  I see.  Because the user initiates the transaction.

14   A.  Yes.  Correct.

15   Q.  And does this represent that same time period we looked at?

16   A.  Yes, it does.

17           MR. REHN:  So, Mr. Iannuzzelli, if you could scroll

18   down.

19   Q.  And, Mr. Werlau, if you could tell us approximately how

20   many withdrawals there were from all four of those pools during

21   the time period.

22   A.  There are listed over 130,000.

23           MR. REHN:  You can bring that down.

24   Q.  So, Mr. Werlau, is it safe to say this is voluminous data?

25   A.  I think that's a fair statement.

1    Q.  I'd like to show you just for the witness and for the Court

2    and the parties what's been marked for identification purposes

3    as Government Exhibit 3009.

4            Do you recognize this document?

5    A.  I do.

6    Q.  Does this document contain a summary of some data that was

7    in those two exhibits we just looked at?

8    A.  Yes.

9            MR. REHN:  Your Honor, the government offers

10   Government Exhibit 3009.

11           MR. KLEIN:  Objection.

12           THE COURT:  The objection is overruled.

13           Government Exhibit 3009 is admitted into evidence; may

14   be shown to the jury.

15           (Government's Exhibit 3009 received in evidence)

16           MR. REHN:  Mr. Iannuzzelli, if you could expand the

17   portion towards the top here, just the portion where we see the

18   chart.

19   Q.  Mr. Werlau, if I could ask you to explain what this chart

20   represents.

21   A.  Sure.  So this chart represents deposits and withdrawals to

22   the 100 ETH denomination pool from the time period of February

23   22nd of 2022 to August 8th of 2022.

24   Q.  Why did you pick that time frame?

25   A.  Specifically, this was the period after the relayer

P7NVSTO2                        Werlau – Direct

1    registry was implemented.

2    Q.   And after that, February 2022 router was released?

3    A.   Yes.  Correct.

4    Q.   And so were you able to identify how many of those deposits

5    and withdrawals involved the router and how many went directly

6    to the pool?

7    A.   I was.

8    Q.   What were you able to identify?

9    A.   For the 100 ETH denomination during this time period, 100

10   percent of both deposits and withdrawals went through the

11   router.

12   Q.   So did anybody come up with that idea of depositing

13   directly to the pools during this time period?

14   A.   No.

15   Q.   Did anybody come up with the idea of withdrawing directly

16   from the pools during this time period?

17   A.   Not from this specific pool.

18   Q.   Did you look at the similar data for the other pools during

19   this time period?

20   A.   Yes, I did.

21   Q.   What was the general numbers for those pools?

22   A.   So we did find a handful of incidents in which there was

23   direct interaction with the pool; but in all instances of all

24   of the denomination pools, over 99 -- well over 99 percent of

25   all transactions transited the router.

1          MR. REHN:  So let's bring back up Government Exhibit

2     3005-22.

3     Q.  Do you recall we were talking about this a few minutes ago?

4     A.  I do.

5     Q.  And is what's represented here users going through the

6     router to access the pool?

7     A.  Yes, that's correct.

8          MR. REHN:  If we could go to page 2 of this exhibit.

9     Q.  What does this represent?

10    A.  So what this shows is the same numbers that we quoted

11    earlier of the number of deposits and withdrawals that

12    transited the router.  This is the example of those for the

13    time period for the 100 ETH denomination pool.

14    Q.  And so if there are over 7,000 deposits and over 7,000

15    withdrawals, would that make it difficult to connect any

16    particular deposits with any particular withdrawal?

17    A.  Yes, that's correct.

18    Q.  Why is that?

19    A.  Because all of these transactions look like each other;

20    there's no uniquely identifying information that could allow

21    you to pick one out from the others.

22    Q.  And, Mr. Werlau, in reference to that summary chart we were

23    looking at a moment ago, I believe you said that there were no

24    deposits that went directly to the pool during this time

25    period?

P7NVSTO2                    Werlau - Direct

1   A.  Yes, that's correct.

2   Q.  If someone had deposited directly to the pool, would the

3   blockchain data look the same as all of these deposits?

4   A.  No, it would be uniquely identifiable.

5        MR. REHN:  So let's go to page 3.

6   Q.  What does this show?

7   A.  This represents hypothetical transactions that would occur

8   directly to the pool; and in this case shows that none such

9   events actually occurred.

10  Q.  And if somebody had done that, would they be able to obtain

11  the value of blending in with the crowd that you described

12  earlier?

13  A.  No.  If they were to both deposit and withdraw from the

14  pool directly, they would be uniquely identifiable and

15  distinguishable from other transactions.

16  Q.  Effectively speaking, wouldn't they actually be mixed with

17  all those other deposits and withdrawals?

18  A.  No.

19        MR. REHN:  Okay.  We can bring that down.

20  Q.  And if we can change topics.

21        Mr. Werlau, did you also analyze the code to determine

22  whether there was a way to monetize the service?

23  A.  Yes, I did.

24        MR. REHN:  Let's put up Government Exhibit 3005-23 for

25  demonstrative purposes.

P7NVSTO2                      Werlau - Direct

Q.  Mr. Werlau, can you provide us with an overview of your

conclusions regarding monetization.

A.  Sure.

        So a cryptocurrency token called TORN was created for

Tornado Cash.  This token served a purpose for the governance

system, allowing holders to vote on proposals.  This token also

held a value on the open market, so was a monetary reward for

users of the system.  There were originally 10 million TORN

tokens minted, of which a quarter or 2.5 million were

distributed to the founders over a vesting period.

        Later, these tokens were used in the relayer registry

system, requiring relayers to lock up or stake their tokens in

order to be registered.  As mentioned earlier, as relayers

executed withdrawals, they would be compensated through a

portion of the funds withdrawn; but, at the same time, they

would also have a portion of their locked-up TORN tokens

"burned" was the term used, but really they were moved to a

governance folder for distribution to other TORN token holders

who had locked up their tokens up for governance.

Q.  So I think what you testified yesterday about the first two

points there, about the creation and distribution of the TORN

tokens, do you recall that testimony?

A.  Correct.  Yes.

Q.  So let's just focus on the last three points.  We're

dealing with the relayer registry.

1           Were you able to go back and look at historical

2    versions of that web application to determine when the relayer

3    registry was implemented?

4    A.  Yes, I was.

5           MR. REHN:  And if we go to Government Exhibit 3005-24

6    for demonstrative purposes.

7    Q.  What does this represent?

8    A.  So this represents the IPFS update to the ENS name that

9    hosted the website.  And specifically what's highlighted by the

10   red line is the update to the introduction of the relay

11   registry.

12   Q.  What was the date that that was introduced?

13   A.  Yes.  The date for that entry is February 25th of 2022.

14   Q.  And was that close in time to the release of that

15   February 2022 router we were discussing earlier?

16   A.  Yes, that's correct.

17   Q.  So let's look at Government Exhibit 3005-25, again, for

18   demonstrative purposes.  Could you explain how a relayer would

19   be included in the relayer registry?

20   A.  Yes.  So in order to be included in the relayer registry,

21   there was a minimum number of TORN tokens that they were

22   required to submit and lock up as a part of their registration

23   process.

24   Q.  How many tokens did they have to purchase and put into the

25   relayer registry?

1    A.  Without the number in front of me, I don't recall.  I

2    believe it changed over time.

3    Q.  Was there any reason for the relayers to pay more than the

4    minimum number of tokens?

5    A.  Yes.  As mentioned earlier, their chances of being selected

6    for recommendation to a user was partially dependent on how

7    many tokens they had locked up.

8    Q.  If we could look at Government Exhibit 3005-26, again, for

9    demonstrative purposes.

10            Could you explain what this represents.

11   A.  So this shows the relayer algorithm which was run by the UI

12   web application to determine which relayer was going to be

13   recommended by default to the user.

14   Q.  And so when a user opened this page, would a relayer be

15   populated by default?

16   A.  Yes.  That's correct.

17   Q.  And would a relayer's amount of TORN staked increase their

18   chance of being the default relayer for that withdrawal?

19   A.  Yes, within certain limits.

20   Q.  So let's look at Government Exhibit 3005-27, again, for

21   demonstrative purposes.

22            Could you just walk us through what this chart

23   represents.

24   A.  So what this chart represents is the movement of TORN

25   tokens from the relayers to the governance, and ultimately

1    distribution to TORN token holders.

2    Q.  And could you just walk us through how that works

3    step-by-step.

4    A.  Sure.  So users of the relayer would pay fees to the

5    relayer for their services for making withdrawal on their

6    behalf.  Similarly, relayers would lock up their TORN with the

7    relayer registry; and every time they made a withdrawal, a

8    portion of those locked funds would be moved to the governance

9    vault.  These funds were then eligible for distribution to

10   other users who had staked or locked up their TORN tokens in

11   the governance.

12   Q.  So if somebody owned TORN tokens, could they take advantage

13   of this?

14   A.  Yes, that's correct.  If you own TORN tokens, you could

15   lock them in the governance vault and receive distributions of

16   TORN tokens.

17   Q.  Mr. Werlau, I believe you may have testified about this

18   earlier, but did Tornado Cash users have to use a relayer to

19   make a withdrawal?

20   A.  No.

21   Q.  Did you analyze any blockchain data to determine how many

22   withdrawals did, in fact, use a relayer?

23   A.  Yes, in fact, I did.

24   Q.  Is that based on that same 3003-C-B exhibit that we looked

25   at a few minutes ago?

1    A.  Yes, that's correct.

2              MR. REHN:  I'd like to now show just the witness and

3    the Court and the parties Government Exhibit 3005-28.

4    Q.  Mr. Werlau, is this a chart that summarizes data that's in

5    that government exhibit?

6    A.  Yes, that's correct.

7    Q.  And what's the date range here?

8    A.  The date range is listed as February 25th of 2022, until

9    August 8th of 2022.

10   Q.  And was February 25th the day that that web app was updated

11   to include the relayer registry?

12   A.  That is correct.

13             MR. REHN:  Your Honor, the government offers

14   Government Exhibit 3005-28 as a summary chart.

15             MR. KLEIN:  Objection, your Honor.

16             THE COURT:  The objection is overruled.

17             Government Exhibit 3005-28 is admitted into evidence

18   and may be shown to the jury.

19             (Government's Exhibit 3005-28 received in evidence)

20   Q.  Mr. Werlau, I'd ask you to describe what we're looking at

21   on this summary chart.

22   A.  So the summary chart shows a breakdown of transactions that

23   used the relayer, did not use the relayer, or, as we are

24   calling it, self-relayed their transaction, which means that

25   the address sent as the relayer was the same as the recipient.

P7NVSTO2                        Werlau - Direct

1    Q.   So of these transactions, which would be the ones that

2    would generate those relayer fees and those relayer payments of

3    TORN tokens to Tornado Cash?

4    A.   Right.  Those would be the transactions that used the

5    relayer.

6    Q.   And so what percentage of overall withdrawals were those?

7    A.   94 percent of transactions utilized a relayer.

8         MR. REHN:  Bring that down.

9    Q.   I'd like to shift topics again.

10        Mr. Werlau, did you analyze the code and some

11   blockchain data to determine how users accessed Tornado Cash?

12   A.   I did.

13   Q.   So I'd like to show you -- and this is -- show us all for

14   demonstrative purposes Government Exhibit 3005-35.

15        So I see here sort of a big gray rectangle.  Do you

16   see that?

17   A.   I do.

18   Q.   And are there some numbers along the bottom?

19   A.   Yes.  On the bottom on the X axis we have date and time

20   listed, and that ranges from August of 2020 until September of

21   2022.

22   Q.   And so does this essentially represent values over time?

23   A.   Yes, that's correct.

24   Q.   And then what are the values that are represented on the

25   left side of the chart?

1    A.  On the Y axis or the left-hand side of the chart is the gas

2    limit.

3    Q.  What's the gas limit?

4    A.  So we have spoken recently -- previously about gas, this

5    concept of any transaction on the blockchain requires a fee to

6    be paid to the network.  This fee is dependent on the number of

7    actions taken in transactions; so more complicated transactions

8    require more gas.

9         There can be some variability in how much gas is

10   required for a given transaction.  So the gas limit sets an

11   upper bound on how many actions should be taken and, thus, how

12   much it would cost to execute this transaction, essentially

13   creating a cap preventing over-expense.

14   Q.  And for deposits to Tornado Cash, how was the gas limit

15   typically set?

16   A.  So deposits to Tornado Cash, if they went through the UI or

17   CLI, those limits would be set by the code in those programs.

18   Q.  Did you analyze the code for both the UI and the CLI?

19   A.  I did.

20   Q.  I want to start on the left-hand side of this chart.  I see

21   towards the lower part a dotted red line.

22        MR. REHN:  And, Mr. Iannuzzelli, if we could just

23   expand that.

24   Q.  It looks like it's the 1.2 million mark.  Do you see that?

25   A.  Yes, I do.

P7NVSTO2                          Werlau - Direct

1    Q.  What does that represent?

2    A.  This line represents a value of 1.2 million gas limit

3    recorded.  And, specifically, this line represents the gas

4    limit we'd expect from the UI during this time period.

5    Q.  Why would we expect the UI to have the deposits with a gas

6    limit of 1.2 million during this time period?

7    A.  Our analysis of the source code during this time period

8    revealed that the gas limit was set at a static value of 1.2

9    million.

10   Q.  Did there come a time where that changed in the UI code?

11   A.  Yes.

12          MR. REHN:  And so, Mr. Iannuzzelli, if we could bring

13   down that expansion.

14   Q.  And after that point in time, I see some solid red lines,

15   do you see that?

16   A.  Yes.

17   Q.  What did those represent?

18   A.  The solid red lines represent the ranges of values that we

19   would expect a gas limit to be.  So after a certain period of

20   time, it went from being a static value to a range of values;

21   and those red lines indicate the boundaries, the upper and

22   lower bounds of those values.

23   Q.  And how were those upper and lower bounds identified?

24   A.  So an analysis of the source code revealed that at this

25   time the code calculated the gas limit by estimating the amount

1  of gas that was going to be used in the transaction and then

2  multiplying it by a factor.

3          Additionally, the exact ranges were determined by

4  performing simulations.  My colleague Marshall Yale and I

5  performed simulations to determine the upper and lower bounds

6  of deposits using the code for that time period.

7  Q.  And I see that those red lines shift at different points in

8  time.  At a high level, what do those shifts represent?

9  A.  The shifts represent changes that we determined either in

10  the underlying protocol that changed the amount of gas that was

11  used or in Tornado Cash that changed how that limit was

12  calculated or the actions that were taken.

13  Q.  So we talked about the red lines.  I want to ask you about

14  the green lines.

15          MR. REHN:  And, Mr. Iannuzzelli, if we could expand

16  the dotted green line on the left-hand side so we can see the

17  limit and the green line.

18  Q.  Do you see that, Mr. Werlau?

19  A.  Yes, I do.

20  Q.  What do the green lines represent on this chart?

21  A.  The green lines represent transactions that were initiated

22  through the CLI or command line interface.  And so the dash

23  line represents a static value of two million gas limit; and

24  the solid green lines similarly represent a range of gas limit

25  values, upper and lower bound.

1  Q.  So was the gas limit originally hard-coded into the CLI?

2  A.  Yes, that is correct.

3  Q.  Is that the two million there?

4  A.  That's correct.

5       MR. REHN:  You can bring down that expansion.

6  Q.  And then was there a period where there was calculation of

7  a range, similar to what you've described with the user

8  interface?

9  A.  Yes, that's correct.  At a certain period of time it was

10  updated from a static value to similarly a multiple of the

11  estimate of the gas use.

12  Q.  And is that what's represented by the solid green lines?

13  A.  That is correct.

14  Q.  So taking this chart, are we able to map any particular

15  deposit that was made into Tornado Cash onto this chart?

16  A.  Yes.  Transaction information for deposits reports both the

17  date and time, as well as the gas limit.

18  Q.  So let's take a look at Government Exhibit 3005-36, again,

19  for demonstrative purposes.

20       Mr. Werlau, what kind of a document is this?

21  A.  This is an example of an Ethereum transaction.

22  Q.  And is certain information on this highlighted?

23  A.  Yes.  We have highlighted the time stamp, so the date and

24  time this transaction took place.  And at the bottom we have

25  circled the gas limit reported for this transaction.

P7NVSTO2                        Werlau - Direct

1    Q.   And does every transaction have a date and time and also a

2    gas limit?

3    A.   Yes, that's correct.

4    Q.   And can we use those two pieces of information to place

5    that on the chart?

6    A.   Yes, we can.

7    Q.   So let's look at Government Exhibit 3005-37.

8         What does this represent?

9    A.   The dot represents an example transaction mapped onto our

10   graph for the date and time and gas limit.

11   Q.   And for this particular one, does it fall within the range

12   you identified as being generated by the web application during

13   that time period?

14   A.   Yes, that's correct.

15   Q.   So I think we've looked at some blockchain data a few

16   moments ago for all the deposits into Tornado Cash during the

17   time period.  Do you recall that?

18   A.   I do.

19   Q.   Can you remind us approximately how many deposits there

20   were between September 2020 and August 2022?

21   A.   There were approximately 140,000 deposits.

22   Q.   So were you able to collect the date and the gas limit for

23   every one of these transactions from the blockchain data?

24   A.   Yes.

25   Q.   And if you do that, would you be able to place a similar

1   dot like this on the chart for every single deposit?

2   A.  That is correct.

3   Q.  What would you generally expect that to tell you with

4   reference to these lines?

5   A.  So we would expect that to tell us what distribution of

6   users utilized the UI or CLI when interacting with Tornado

7   Cash.

8   Q.  And if a majority of users were using the UI, what would

9   you expect the dots to look like?

10  A.  Right.  So if the majority of users were using the UI, we

11  would expect when it was a dash line, for that value to fall

12  basically exactly on that line; and when they were solid lines,

13  we would expect that value to fall somewhere in between those

14  two red lines.

15  Q.  All right.  And did you actually do that exercise?

16  A.  Yes, I did.

17          MR. REHN:  So if we could bring up Government Exhibit

18  3005-38 for demonstrative purposes.

19  Q.  What does this represent?

20  A.  This graph represents the same visual we've been seeing,

21  but with all of the transaction history mapped onto the graph.

22  Q.  So just in terms of eyeballing it, what do you observe?

23  A.  So we see a very close association with the lines that we

24  had drawn earlier.  So when we had dash lines, we see a solid

25  line representing the dots falling perfectly within that value.

P7NVSTO2                        Werlau – Direct

1    And when they switch to two lines, we see a spread of values

2    almost perfectly within the bands.

3    Q.  And so, again, looking at where that dotted red line was

4    before, that $1.2 million mark -- 1.2 million gas mark, I

5    should say --

6          MR. REHN:  Mr. Iannuzzelli, if you could just expand

7    that.

8    Q.  Now, it looks like now to me is just a thick dark line.

9    What does that actually represent?

10   A.  There are so many dots placed on this dash line, it looks

11   like a solid black line, but those are simply many, many, many

12   deposits overlapping.

13   Q.  And those are all deposits at the level that was fixed by

14   the web application?

15   A.  Yes, that's correct.

16         MR. REHN:  And we can bring that down.

17   Q.  So just eyeballing it, I see what you're saying.  But were

18   you able to actually quantify that information to determine how

19   users access Tornado Cash?

20   A.  Yes.  We didn't just eyeball it.  My colleague and I,

21   Marshall Yale, ran simulations of transaction information to

22   determine what the upper and lower bound of these deposits

23   would be.  So we ran those simulations using the code during

24   these different time periods, and we simulated 1,000

25   transactions per denomination pool on the Ethereum ether pools.

1  Q.  And then were you able to compare that to this historical

2  data that we're looking at?

3  A.  Yes, that's correct.

4  Q.  And so did you make a determination as to the percentage of

5  users who use the web application?

6  A.  Yes.

7  Q.  So let's look at Government Exhibit 3005-39.

8         What does this show?

9  A.  So this shows a breakdown of the number of deposits that

10  utilize the Tornado Cash UI, the CLI, and the percent that were

11  unidentified.

12  Q.  And if you could just tell us what those percentages were.

13  A.  Yes.  Percentage that used the UI was 96.2 percent;

14  percentage that used the CLI was 2.8 percent; and the

15  percentage unknown was one percent.

16  Q.  And, again, is the UI the web application?

17  A.  Yes, that's correct.

18  Q.  Mr. Werlau, did you review some work done by another expert

19  witness named Special Agent Joel DeCapua?

20  A.  I did.

21  Q.  And, in particular, did you look at a list of Tornado Cash

22  deposits that Special Agent DeCapua identified as originating

23  in certain criminal exploits?

24  A.  Yes, in fact, I did.

25  Q.  Were you able to map those particular deposits onto these

P7NVSTO2                    Werlau - Direct

1    charts we've been looking at?

2    A.  I was.

3    Q.  And in doing that, were you able to identify whether those

4    deposits were made using the web app, the CLI, or some

5    unidentified method?

6    A.  Yes, that's correct.

7    Q.  So I'm showing you what's been marked as Government Exhibit

8    3005-40.  And could you tell us what this represents.

9    A.  So here we see the chart from earlier with the values for

10   the UI and CLI mapped out.  Additionally, all of these deposit

11   transactions --

12        THE COURT:  Slow down.  Slow down, sir.  Thank you.

13   A.  Specifically, what we see is these incidents mapped and

14   highlighted directly on the graph.

15   Q.  And so just looking at this, do the transactions from these

16   criminal incidents resemble other deposits on Tornado Cash?

17   A.  Yes, they resemble any other transaction that we

18   identified.

19   Q.  Is there any -- do they appear to you to generally fall

20   within the ranges that we've been looking at?

21   A.  That's correct.  They align very closely with the ranges

22   that we identified.

23   Q.  So, Mr. Werlau, I'd like to focus your attention on the

24   area on the right that says Ronin.  Do you see that?

25   A.  I do.

1          MR. REHN:  I think we've actually managed to zoom in

2     on that part of the chart.  So if we could bring up Government

3     Exhibit 3005-42.

4     Q.  What are we looking at here?

5     A.  We are looking at a zoomed-in section of the graph

6     specifically related to highlight the Ronin hack deposits.

7     Q.  And are those deposits differentiated from the other

8     deposits on this chart in some way?

9     A.  Yes.  The deposits related to the Ronin hack are

10    highlighted in yellow to contrast them from other deposits that

11    are blue.

12    Q.  So were you able to identify any patterns with respect to

13    the Ronin hack?

14    A.  Yes, we identified two patterns:  The first was that all

15    transactions fell within the boundaries of either the UI or the

16    CLI; and the second was that at a certain period, the

17    transactions went from lining up with activity with the UI to

18    activity with the CLI, suggesting that their behavior shifted

19    in which application they used, whether the web application or

20    the CLI.

21    Q.  And so the red lines are the ones using the web

22    application?

23    A.  Yes, the red lines are the web application, the green lines

24    are the CLI.

25          MR. REHN:  If we go to page 2 of this exhibit.

P7NVSTO2                      Werlau - Direct

1   Q.  Was there something that happened on April 14th of 2022?

2   A.  Yes.  On April 14th of 2022, sanctions were announced on

3   the Ronin wallet.

4   Q.  Did you go back and look at versions of the web application

5   from this time to identify if any changes were made?

6   A.  Yes, I was.  I did.

7        MR. REHN:  And if we could go to Government Exhibit

8   3005-43.

9   Q.  Did you observe any changes of note around this time?

10  A.  Yes.  So this change which occurred on April 15th of 2022,

11  has a note that reads:  Chainalysis Sanctioned Oracle

12  introduced.

13  Q.  What does that mean?

14  A.  So the Chainalysis Sanctions Oracle was a source of

15  information for sanction data.  So you could pull down a list

16  of wallets which had been sanctioned.

17  Q.  And does the timing of that change in the web application

18  correspond to the shift in behavior that you identified

19  earlier?

20  A.  Yes, that's correct.

21        MR. REHN:  If we could go to 3005-44.

22  Q.  Could you explain how that change to the web application

23  worked.

24  A.  Sure.  So when a user went to interact with Tornado Cash

25  and perform a deposit, the UI would reference the Chainalysis

P7NVSTO2                          Werlau - Direct

1    Oracle to determine if the address in question was sanctioned

2    on the sanction list.  And if it was, it would reject the

3    transaction.

4    Q.  So I believe you testified earlier that there was an option

5    to put changes into the smart contract architecture, is that

6    right?

7    A.  Correct.

8    Q.  Do you recall we looked at a slide with a user registry

9    here between the instances registry and the pool?

10   A.  I do.

11   Q.  For the change that was actually made in April, was it done

12   that way?

13   A.  No, the changes that occurred here occurred purely on the

14   UI side, not on the blockchain side.

15   Q.  Did you investigate the source code for the CLI?

16   A.  Yes, I did.

17   Q.  Was that same change implemented in the CLI?

18   A.  It was not.

19            MR. REHN:  So if we could look at Government Exhibit

20   3005-45.

21   Q.  So for deposits using the CLI, was there any change

22   implemented whatsoever?

23   A.  No.

24   Q.  So did you form any opinions about the effect of the web

25   application change in terms of ability to access Tornado Cash?

P7NVSTO2                        Werlau - Direct

1    A.  Yes.  The changes that were made to the UI were minimally

2    effective.  They could be fairly easily circumvented by using

3    the CLI.

4            MR. REHN:  And if we could go to Government Exhibit

5    3005-46.

6    Q.  What does this represent?

7    A.  This represents the idea that, you know, if there are two

8    doors to a building and you only close one, you're not

9    preventing access.  And so they closed the UI door, but left

10   the CLI door open.

11   Q.  Are there any other problems you identified with the change

12   that was implemented to the web application?

13   A.  Repeat your question.

14   Q.  Besides this ability to shift to the CLI, would there be

15   another way to avoid that change to the web application?

16   A.  Yes, you could go directly to the router.

17           MR. REHN:  And so I'd like to bring back up Government

18   Exhibit 3005 — give me one moment — dash 20.

19   Q.  Do you remember we looked at this earlier?

20   A.  Yes, I do.

21   Q.  Can you remind us what this represents.

22   A.  This represents the user registry on deposits.

23   Q.  And this is an alternative that you identified; is that

24   right?

25   A.  That's correct.  This is my proposed system to prevent bad

1    actors from using the system.

2    Q.  So if this had been implemented, would somebody be able to

3    go to the router to avoid any changes that were implemented at

4    the user registry level?

5    A.  No.  Since this change occurs at the blockchain level, you

6    could not circumvent it by going directly to the router.  This

7    change is made after the router, and so it would be effective

8    at blocking any transactions attempting to circumvent the UI or

9    CLI.

10   Q.  Just to explain in a little more detail, how would the

11   information in the user registry be populated?

12   A.  In my proposal, the owners of Tornado Cash, while also

13   maintaining a database of this transaction information, would

14   be responsible for maintaining updates to the user registry.

15   Q.  And so if they were aware that a particular user was

16   identified with particular deposits, what would they be able to

17   do?

18   A.  They would be able to invalidate their entry in their user

19   registry and, thus, block their ability to interact with the

20   protocol.

21   Q.  What if the deposit had already been made from that user,

22   would they be able to do anything?

23   A.  If the deposit was already made, there was a user registry

24   for withdrawals which would allow us to prevent a withdrawal of

25   a misdeposit that we didn't catch.

P7NVSTO2                          Werlau - Direct

1  Q.  And what if the withdrawal had already been made, would

2  they be able to do anything?

3  A.  I don't know if I understand the question.

4  Q.  I'm sorry, I spoke a little fast.

5          If the withdrawal had already been made, would they be

6  able to do anything with the information from the user

7  registry?

8  A.  I see what you're saying.

9          Yes, because they would maintain transactions records

10  connecting deposits and withdrawals, they could at least reveal

11  the information of the source of those funds.

12  Q.  And, again, were user registries a common concept in web

13  development at this time?

14  A.  Yes, I believe they were.

15          MR. REHN:  So we could bring that down.

16  Q.  Looking at the change that was actually made to the web

17  application in April, in your opinion, was that change easy to

18  bypass?

19  A.  Yes.

20  Q.  In your opinion, would that fact have been apparent to

21  someone who is familiar with how Tornado Cash worked?

22  A.  I believe it would.

23          MR. REHN:  Nothing further, your Honor.

24          THE COURT:  All right.

25          Mr. Klein, thank you very much.

1          Just for myself, I'm just going to stand for a moment.

2     My back is giving me a little trouble.  So if anyone wants to

3     stand, you're welcome to.  Apparently no one else does.  You're

4     very kind, those of you who are just doing it in sympathy for

5     me.  All right.  Thank you very much.  Thank you, sir.

6          Mr. Klein, when you are ready.  Thank you, sir.

7          MR. KLEIN:  Just one second, your Honor.

8          THE COURT:  Of course.

9     CROSS-EXAMINATION

10    BY MR. KLEIN:

11    Q.  Good morning, Mr. Werlau.

12    A.  Good morning.

13    Q.  I want to step back and start at some basic concepts you

14    were discussing scuffing with the prosecutor.

15    A.  Okay.

16    Q.  So you talked a lot about how -- I want to start off with

17    some basics, just to re-center everybody.  And you talked a lot

18    about how users engage with Tornado Cash, right?

19    A.  Yes.

20    Q.  And it's something you've described as a mixer; correct?

21    A.  Yes.

22    Q.  That's in your slide, the word "mixer"?

23    A.  Yes.  It's an ill-defined term, but, yes.

24    Q.  It's a term you used though?

25    A.  It is.  It is.

P7NVSTO2                          Werlau - Cross

1   Q.  And you talked about ways people engage with Tornado Cash,

2   right?

3   A.  Correct.

4   Q.  And, in essence, you said the most common way to engage was

5   to go to the website, then engage with the UI, and then deposit

6   the ETH into a pool; correct?

7   A.  My analysis of transaction history did, yes, reveal that

8   the UI was the most common method of interaction.

9   Q.  And the website was public to anybody?

10  A.  Yes, it was publicly accessible.

11  Q.  Here in the U.S.?

12  A.  Yes.

13  Q.  Yes?

14  A.  Sorry.  Yes.

15  Q.  Okay.  And then you could use a relayer, but that was

16  optional, right?

17  A.  Optional.  But if you wanted to maintain anonymity, it was

18  necessary to do if you weren't going to use a new wallet

19  without transaction history.

20  Q.  Okay.  And then you would deposit your funds into the pool

21  if you used this process, right?

22  A.  Say that one more time.

23  Q.  If you used the UI, that was one way to deposit funds in

24  the pool; correct?

25  A.  Yes.  Correct.

P7NVSTO2                        Werlau - Cross

1   Q.  And there was other ways to access the pools though, wasn't

2   there?

3   A.  Yes, you could use the CLI --

4   Q.  I'd ask you just to answer my question yes or no.

5   A.  Yes, sir.

6   Q.  There were other ways to access the pool, weren't there?

7   A.  Correct.

8   Q.  One other method was the CLI, right?

9   A.  Correct.

10  Q.  That's short for command line interface?

11  A.  Yes, it's short for command line interface.

12  Q.  And the user -- there was a third way, too; correct?

13  A.  A user could interact --

14  Q.  Just --

15              THE COURT:  I'm sorry.

16              Just so that both the witness and the judge know, are

17  you only asking him to answer your questions yes or no, unless

18  it's obvious from the question?

19              MR. KLEIN:  I'll make that clear, if I need to, your

20  Honor.

21              THE COURT:  We didn't know.  We now know.

22              Sir, he wants his questions to be answered yes or no

23  or I don't know.

24              THE WITNESS:  Understood.

25              THE COURT:  Thank you so much.

1            Thank you, counsel.

2    BY MR. KLEIN:

3    Q.  Yes or no, there was a third way to access the pools;

4    correct?

5    A.  Yes.

6    Q.  And that way was to directly deposit funds into the pool?

7    A.  Correct.

8    Q.  You don't have to use the UI?

9    A.  Correct.

10   Q.  You don't have to use the command line interface?

11   A.  Correct.

12   Q.  Now, the user who's doing that, whatever method they

13   choose, the UI, the CLI, the command line interface, or deposit

14   directly, they control their ETH the whole time; correct?

15   A.  Can you elaborate on what you mean by that?

16   Q.  Sure.  It's in a wallet they have, right?  Is that right?

17   A.  Yes.  Yes.

18   Q.  And from their wallet it goes directly to the pool;

19   correct?

20   A.  That is incorrect.

21   Q.  From their wallet if they deposit directly into the pool?

22   A.  Correct.  If they were in turn track directly with the

23   pool.

24   Q.  And if they use the UI, it -- does the ETH get deposited

25   into the UI?  It doesn't, does it?

1    A.  It doesn't get deposited into the UI, but it is -- sorry.

2    Q.  Okay.  The ETH doesn't get deposited into the command line

3    interface, does it?

4    A.  It does not.

5    Q.  And once the ETH goes into the pool — so whatever way they

6    choose, it's in that pool — the only way to access it is with

7    the secret note; correct?

8    A.  Yes.

9    Q.  And the user who deposits their ETH into the pool has that

10   secret note, right?

11   A.  Yes.

12   Q.  And unless they share it with somebody, no one else can get

13   access to that ETH; correct?

14   A.  That is correct.

15   Q.  And so when they want to withdraw it, they need that secret

16   note to withdraw the ETH; correct?

17   A.  Correct.

18   Q.  And they are the only one who can withdraw it if they are

19   the only one who has the secret note, right?

20   A.  Yes, that is correct.

21   Q.  Now, these pools we've been talking about, they became

22   what -- I'm going to use this term "immutable" in May 2020;

23   correct?

24   A.  I do not recall the specific date they became immutable.

25   Q.  You know they are immutable, right?

1    A.  Yes, I know they are immutable.

2    Q.  You spent a lot of time researching Tornado Cash; correct?

3    A.  I did.

4    Q.  And one of the key features of Tornado Cash, if you looked

5    at all the postings and all the Medium, was the fact that they

6    were immutable; correct?

7    A.  Yes.

8    Q.  And you don't know that date?

9    A.  I do not recall off the top of my head what the date they

10   became immutable.

11   Q.  Well, do you remember that it was sometime in 2020?

12   A.  Again, I do not recall the specific date.

13   Q.  Let's talk about what it means to be immutable and let's

14   talk about the pools.

15          So on this date they became immutable, which I'll just

16   for purposes say it's May 2020, that means there can't be

17   changes to the pools; correct?

18   A.  There cannot be changes to the instructions of the pools.

19   Q.  It can't be modified?

20   A.  There needs to be some caveat here.  When we say

21   "immutable," the instructions are immutable, the data is not,

22   and the flow of the instructions is dependent on the data.

23   Q.  The founders couldn't change the pools, could they?

24   A.  No, after they became --

25   Q.  That's my question.

1       A DAO vote, a governance vote, couldn't change the

2   pools, could it?

3   A.  I don't know.

4   Q.  No one could change the pools after May 2020; correct?

5   A.  I don't know definitively the access the governance had to

6   the pools.

7   Q.  But you spent time researching this?

8   A.  I did.

9   Q.  Now, a lot of people talk about blockchains as being

10  trustless.  You've heard that concept before, haven't you?

11  A.  I've heard the term.

12  Q.  What does "trustless" mean to you?

13  A.  "Trustless" means a reduction -- I mean, fully means no

14  trust, but I take it to mean a reducing or minimizing of the

15  number of parties you must trust to take an action.

16  Q.  Ethereum is described as a trustless protocol, isn't it?

17  A.  I have heard it described as such.

18  Q.  And that's one of the largest protocols?

19  A.  I believe so.  I don't know, but I believe, yes, it is one

20  of the largest --

21  Q.  If I said it was the number two largest cryptocurrency

22  blockchain, would that surprise you?

23          MR. REHN:  Objection.

24  A.  It would not surprise me.

25          THE COURT:  I'll allow it.

P7NVSTO2                          Werlau - Cross

1              Sorry, I really don't want you testifying.  Thank you.

2

3

4

5    Q.   Ethereum is used by lots of people?

6    A.   I can speak to myself, but --

7    Q.   Sure.

8    A.   I use it, yes.

9    Q.   Now, your background includes a number of things in

10   cryptocurrency, and one of them is doing code audits; correct?

11   A.   That's correct.

12   Q.   And one reason you do code audits -- well, explain what a

13   code audit is.

14   A.   So they have different purposes, depending.  Typically, I'm

15   doing a code audit for a vulnerability detection, finding

16   vulnerabilities in the code and trying to repair them before it

17   is launched.

18   Q.   And that's to prevent hacks and thefts?

19   A.   Correct.

20   Q.   And you do code audits for smart contracts; correct?

21   A.   That is correct.

22   Q.   And what's at issue here, the Tornado Cash, that's a series

23   of smart contracts, right?  Part of it, the pools?

24   A.   Yes, that portion of it is smart contracts.

25   Q.   And so would one reason you would make the pools immutable

P7NVSTO2                        Werlau - Cross

1    is to make them safe from hacks?

2              MR. REHN:  Objection.

3              THE COURT:  I'll allow.

4    A.  Can you reask the question.

5    Q.  Is one reason you would make the pools immutable to make

6    them safe from hacks?

7    A.  I take issue with the word "safe."  It can reduce the

8    attack surface within a protocol.

9    Q.  And the reason it does that is because they are immutable;

10   correct?

11   A.  Correct.

12   Q.  And so one thing when these pools became immutable in

13   May 2020, they became less subject to hacks, right?

14   A.  Yes, it reduced one of the ways it could be attacked.

15   Q.  So that means the founders couldn't go into the pools,

16   right?

17   A.  That is correct.

18   Q.  In fact, no one could go into the pools except for the

19   person with the secret note, right?

20   A.  Can you define "into the pool"?

21   Q.  No one could -- if I deposited my ETH into a pool and I had

22   the secret note, I'm the only one who can withdraw it, right?

23   A.  That is correct.

24   Q.  So the founders -- there was no back door into these pools

25   for the founders, right?

P7NVSTO2                        Werlau – Cross

1    A.   That I'm aware of.

2    Q.   There's no back door for anyone other than -- period.  The

3    only person who could access was the person with the secret

4    note, right?

5    A.   Correct.

6    Q.   So by making these pools immutable and providing just the

7    user with the secret note, didn't that make the pools safer

8    from hacks?

9             MR. REHN:  Objection.

10            THE COURT:  I'll allow.

11            Yes, no, or I don't know.

12   A.   Can you repeat the question.

13   Q.   By making the pools immutable -- sorry.  I'm going to

14   rephrase my own question, it was a little long.

15            But by making the pools immutable and having the user

16   be the one with the secret note, wasn't that making the user's

17   deposit safer from hacks?

18   A.   Yes.

19   Q.   Let's talk for a minute about some of the things you

20   reviewed.

21   A.   Okay.

22   Q.   You looked at GitHub; correct?

23   A.   Yes.

24   Q.   And you saw a number of repositories, right?

25   A.   Yes.

P7NVSTO2                      Werlau – Cross

1    Q.  And part of that you saw this was a Peppersec repository

2    for Tornado Cash, wasn't there?

3    A.  I do not recall specifically a Peppersec repository.

4    Q.  Do you recall whether that's where the Tornado Cash

5    governance proposals were held, code?

6    A.  I do not recall.

7    Q.  Or the relayer registry coding was held?

8    A.  The repositories I looked at were for the UI and the CLI

9    specifically.

10   Q.  You didn't look at other repositories?

11   A.  I did not.

12   Q.  You didn't look at the Tornado Cash governance repository?

13   A.  I didn't look at the repository, but I was given examples

14   of proposals.

15   Q.  Now, you talked about there were changes made to the UI and

16   the CLI, right?

17   A.  Yes.

18   Q.  You said, I think, there were many changes, right?

19   A.  That's correct.

20   Q.  So you must know that not all the changes were made by the

21   founders; correct?

22   A.  I did see certain commits made by other members.

23   Q.  In fact, there were many changes made to those by other

24   people; correct?

25   A.  I focused on the ones by the founders, but I did see

P7NVSTO2                        Werlau - Cross

1    others.

2    Q.  Okay.  And you must know, because you looked at all this,

3    that the DAO actually paid other community members to make

4    changes to the UI and CLI, right?

5    A.  That I have no knowledge of.

6    Q.  You didn't see that?

7    A.  Again, I focused on the portion that was related to my

8    testimony, so, no, I did not see that.

9    Q.  So you didn't look to see if other people were making

10   changes?

11   A.  I saw some of the changes, but my focus was on the changes

12   made by the founders.

13   Q.  And was that because the prosecutors directed you just to

14   look at what the founders did?

15   A.  No.

16   Q.  You just didn't look at others?

17   A.  Because it was specifically what I was looking at for,

18   yeah.

19   Q.  There was a large community of people involved with Tornado

20   Cash, wasn't there, beyond the founders?

21   A.  I personally don't know how large that community was, but I

22   know there were others beyond the founders.

23   Q.  Well, you said you studied Tornado Cash, right?  So you

24   must have seen the discussion boards?

25   A.  No, I had seen one or two postings for proposals, but I did

P7NVSTO2                          Werlau - Cross

1    not generally see the form or look at general discussion on

2    Tornado Cash.

3    Q.  You looked at --

4              THE COURT:  Let him finish his answer, sir.

5              Thank you.

6              THE WITNESS:  I was finished.

7              THE COURT:  Thank you.

8              Now you may ask your next question.

9              MR. KLEIN:  Yes, your Honor.

10   Q.  You looked at Medium posts; correct?

11   A.  Yes, I looked at Medium posts.

12   Q.  Those are publicly posted; that's public, right?

13   A.  That's correct.

14   Q.  There was a lot of public information about Tornado Cash,

15   wasn't there?  The website was public?

16   A.  The website was public.

17   Q.  There was Medium posts about it?

18   A.  There was Medium posts about it.

19   Q.  There were discussion boards that were public?

20   A.  Yes.

21   Q.  Now, turning back to GitHub for a second, since the code

22   that you looked at, the CLI and UI, was on GitHub, people could

23   see it, right?

24   A.  Just to clarify, the UI code for a large period of the time

25   period we examined, only the minified version of the code was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7NVSTO2                      Werlau - Cross

1    available; we had to get a warrant process to get the full

2    source code.

3    Q.  Glad you brought that up.

4              MR. KLEIN:  I'm going to object to the last part of

5    that response.

6    Q.  But the minified code is still reviewable by someone like

7    you, right?

8              THE COURT:  The objection is overruled, but go ahead.

9    A.  Reviewable, but more difficult.

10   Q.  But it's reviewable?

11   A.  Yes, but significantly more difficult.

12   Q.  It wasn't always minified either, was it?

13   A.  No.  Later the full source code did become publicly

14   available.

15   Q.  Now, one thing you talked about with the prosecutor was

16   design choices made by the founders; correct?

17   A.  Correct.

18   Q.  Now, and one thing you said was they could have made

19   choices to require users to provide a lot of information;

20   correct?

21   A.  Correct.

22   Q.  And you talked about how that's, in your experience,

23   common; correct?

24   A.  Yes.

25   Q.  But you're aware a lot of things on the web don't require

P7NVSTO2                          Werlau - Cross

1   you to enter your personal information, right?

2   A.  Yes.

3   Q.  Things you use every day?

4   A.  A static website doesn't require login.

5   Q.  Let's talk about crypto for a minute.  You have a MetaMask

6   wallet, don't you?

7   A.  I do.

8   Q.  Noncustodial wallet?

9   A.  Correct.

10  Q.  And what that means is that it's a place you can hold your

11  crypto, right?

12  A.  Correct.

13  Q.  There's no registry required for that, right?  You don't

14  have to provide your name or any information for that, do you?

15          MR. REHN:  Objection, your Honor.

16          There's multiple questions pending at this point.

17          THE COURT:  Let's break it down, please.  Ask a

18  question.

19  Q.  You don't have to provide your personal information for

20  your MetaMask wallet, do you?

21  A.  That's correct.

22  Q.  You use Signal, don't you?

23  A.  Yes.

24          MR. REHN:  Objection, your Honor.

25          THE COURT:  I'll allow.

1  Q.  What is Signal?

2  A.  Signal is a private messaging purpose.

3  Q.  It's encrypted, too, isn't it?

4  A.  Yes.

5  Q.  And that is encrypted so that the messages, when you send a

6  message to someone else, it can be secured and no one else can

7  look at it; correct?

8  A.  I'm not specifically familiar with all of the details of

9  Signal.

10  Q.  You know it's encrypted?

11  A.  I believe so.  But, again, I'm not familiar with the

12  details on exactly --

13  Q.  You don't have to give any information when you sign up for

14  Signal, do you?

15  A.  I'm sorry, repeat that.

16  Q.  You don't have to give any information when you sign up for

17  Signal, do you?

18  A.  I don't remember the sign-up process for Signal, so I can't

19  say.

20  Q.  WhatsApp?

21          THE COURT:  Move on, counsel.

22

23

24

25  Q.  To use Ethereum, do you have to provide any information?

1   A.   I would say yes.

2   Q.   Ethereum protocol requires you to enter your name?

3   A.   Well, I -- I would say that to use Ethereum, I need Ether.

4   And to obtain Ether --

5   Q.   The Ethereum protocol, I'm not talking about Ether.

6   A.   Okay.  No, the underlying protocol does not require your

7   name.

8   Q.   No information from you?

9   A.   I don't know if I would say no information; but no personal

10   information I think would be accurate.

11   Q.   There's nothing like the user registry you describe for

12   Tornado Cash, is there?

13   A.   That is correct.

14   Q.   There's nothing like that for Signal, is there?

15   A.   Again, I don't know the sign-up process for Signal, so I

16   can't speak to that.

17   Q.   Let's talk for a minute about the governance proposal

18   that's marked as Government Exhibit 1904.

19        MR. KLEIN:  And that's admitted into evidence, your

20   Honor, so I'd like to pull that up.

21   Q.   Do you see that, Mr. Werlau?

22   A.   Yes, I see that.

23   Q.   So this describes Tornado Cash as a privacy solution;

24   correct?

25   A.   Yes, I see it.  It says it on the first line.

1   Q.  And this was publicly posted?

2   A.  Yes, that's correct.

3   Q.  And it talks about one of the things you discussed was

4   anonymity mining, right?  On page -- sorry, I'll flip over.

5   A.  Unfortunately, I don't see anything on this page.

6   Q.  Sorry, I thought --

7   A.  Yes, on this page -- oh, sorry.

8   Q.  Mr. DeMarco is not a mind reader, so I apologize.  That's

9   my fault?

10  A.  I see a reference to anonymity mining on this page.

11  Q.  And the DAO has a role in anonymity mining, right?

12          The DAO has a role in that mining process; correct?

13  A.  I'm unaware.  I'm not sure.  I'm unsure of the DAO's role

14  in anonymity mining.

15  Q.  Governance pays for that, doesn't it?

16  A.  Again, I am unsure.

17  Q.  And you talked about -- I'm going to flip through here.

18  And I'm sorry, I'm going to say the page in a minute.

19          I think that's it for the moment on that, actually.

20          Let's talk about the Tornado Cash website, which is

21  Government Demonstrative 3005-5.  Do you recognize this?

22  A.  I do.

23  Q.  And you had concluded that Roman Storm controlled the

24  website, right?

25  A.  That's correct.  Sorry.  Correction.  I determined that the

1    founders collectively controlled the website.

2    Q.  And you're aware the founders had a company called

3    Peppersec, right?

4    A.  Yes.

5    Q.  And you tied this to Mr. Storm because it was in his name,

6    right?

7    A.  That's correct.

8    Q.  He also had a Twitter account in his name, didn't he?

9    A.  I didn't review that personally.

10   Q.  Let's talk about the router.

11               Remember your discussion about the router?

12   A.  I do.

13               MR. KLEIN:  There were a lot of demonstratives here,

14   so give me a second.  We can turn to, please, Mr. DeMarco,

15   3005-12.

16   Q.  So that's one of the three smart contracts you talked

17   about?

18   A.  Repeat that.  What was?

19   Q.  The router is one of the three smart contracts you talked

20   about?

21   A.  Yes.  Categories of contracts, but, yes.

22   Q.  And the router just -- in essence, just pick which pool the

23   user's ETH goes to; correct?

24   A.  Not just.  Again, it also referenced registries.  But its

25   main purpose was to direct transactions to their appropriate

P7NVSTO2                          Werlau - Cross

```
 1    pools.
 2    Q.   And what is the Tornado Cash DAO?
 3    A.   The DAO -- again, I did not look specifically at the DAO
 4    part, but a DAO, typically — it stands for decentralized
 5    autonomous organization — is the governance of a protocol, and
 6    it makes certain decisions and configuration changes.
 7    Q.   You talked about a DAO proposal, right?
 8    A.   Correct.
 9    Q.   So you did look at some of it?
10    A.   Yes, in a specific instance, but not in its entirely.
11    Q.   Are you aware it came into existence in December 2020?
12    A.   I'm sorry, repeat the question.
13    Q.   Are you aware that it came into existence in December 2020?
14    A.   I don't recall the specific date it came into existence.  I
15    would have to reference my notes.
16    Q.   Who controls the DAO?
17    A.   The DAO is controlled by all of the governance voters; so
18    people who vote in the DAO, that would be TORN token holders
19    who have locked their tokens up in the governance contract.
20    Q.   So not just the founders, anyone who has TORN?
21    A.   Correct.
22    Q.   And --
23              THE COURT:  Please let him finish his answers.
24              Thank you.
25    A.   But as mentioned earlier, the founders had enough tokens to
```

P7NVSTO2                          Werlau – Cross

1   make a swing vote in many of the proposals, had they wanted to.

2   Q.  You never saw the founders' vote, did you?

3   A.  Again, I only observed certain proposals of note, so I

4   can't talk about all of them.

5   Q.  And in none of those they voted, did they?

6   A.  Again, I only reviewed specific examples, so I can't speak

7   to the entirety of --

8           MR. KLEIN:  Sorry, your Honor.

9   Q.  I'm asking about the examples you viewed.  The founders

10  didn't vote in any of those.

11  A.  Yes.  In the example that I reviewed, the founders did not

12  vote.

13  Q.  Examples or just one example?

14  A.  Sorry.  The example proposal 10 for the introduction of the

15  relayer registry which we discussed earlier.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7N1STO3                        Werlau - Cross

1   BY MR. KLEIN:

2   Q.  Were you only asked to look at one example?

3   A.  That was the one I focused on for my disclosure.  Again, I

4   wouldn't feel comfortable discussing in detail any other

5   proposal because I did not review it to the detail I did that

6   one.

7   Q.  So are you aware that there were a number of DAO proposals?

8   A.  Yes.

9   Q.  And it was the governance mechanism for Tornado Cash,

10  correct, for many of the things you talked about that could be

11  changed, correct?

12          MR. REHN:  Objection.

13          THE COURT:  I'll allow.

14  A.  I'm sorry.  Can you repeat the question.

15  Q.  The DAO was the governance mechanism for many components of

16  Tornado Cash, correct?

17  A.  Correct.

18  Q.  You only looked at one proposal.

19  A.  In detail.

20  Q.  Okay.  Did you look at proposal 13?

21  A.  I don't recall.

22  Q.  Would it refresh your memory if I showed it to you?

23  A.  Sure.

24          MR. KLEIN:  I'd like to show what's marked as Defense

25  Exhibit 8011.

P7N1STO3                    Werlau - Cross

1          THE COURT:  Just for the witness and the parties?

2          MR. KLEIN:  Yes, your Honor.  I'm sorry.

3          THE COURT:  Thank you.

4          MR. KLEIN:  Just for the witness.

5   A.  Do not recall seeing this proposal.

6   Q.  Let's talk about the relayers for a minute.

7          MR. KLEIN:  And we can turn to——and I hope I got this

8   page right——3005-28.  Please.

9          No, that's not the page I was looking for, but——sorry.

10  3005-8.  My own handwriting is horrible.

11  Q.  Do you remember discussing this slide with the prosecutor?

12  A.  I do.

13  Q.  So the user picks a relayer, correct, through the registry?

14  A.  They can, but it is chosen for them by default.

15  Q.  It's optional to use a relayer, though.

16  A.  Again, if you're using a new wallet, no, but if you have

17  existing Ethereum in the account, then yes, it's optional.

18  Q.  It's optional if you just deposit right into the smart

19  contract, right?

20  A.  Deposits, yes.

21  Q.  And relayers are run by third parties, right?

22  A.  I believe so, yes.

23  Q.  And by that you meant not the user; the user doesn't also

24  run the relayer, right?

25  A.  We report in our stats self-relayed.  We believe these were

1    just kind of people who reported the relayer as their own

2    address, but yes, in essence, you wouldn't relay your own.

3    Q.  You used the term "we."  Who's the "we"?

4    A.  Sorry.  Marshall Yale and Jim Daniels help me put together

5    some of the analytics, as I mentioned earlier.

6    Q.  You saw no evidence that the founders ran a relayer, did

7    you?

8    A.  I saw no evidence to that.  I mean, but I——I also didn't

9    look for that evidence.

10   Q.  That wasn't my question.  You saw no evidence they ran a

11   relayer, did you?

12   A.  That's correct.

13   Q.  And the relayers set their own fees; isn't that right?

14   A.  To within limits, yes.

15   Q.  And the fees go to that relayer, not the founders, correct?

16   A.  That's correct.

17   Q.  You're aware that Tornado Cash had geoblocking, right?

18   A.  I'm aware that they had geo; they had the information.  I'm

19   not specifically aware of blocking.

20   Q.  You're not aware that they blocked IP addresses——

21   A.  No.

22   Q.  ——from sanctioned countries?

23   A.  I know they included the chain link oracle, but that

24   wasn't——that was for transactions, not necessarily visitation.

25   If there was geoblock for visitation, I did not see that.

1   Q.  You didn't see it as instituted in June 2020?

2   A.  Again, I focused on the changes that were relevant to the

3   portions of my disclosure, so while I reviewed everything, I

4   didn't focus on every detail.

5   Q.  So you missed that.

6   A.  It might not have come up in my analysis.

7   Q.  You talked about a user registry as something—it's your

8   proposal, correct?

9   A.  Correct.

10  Q.  And you talked about how this information could have

11  collected personal identifying information, right?

12  A.  Correct.

24  Q.  You talked about this UI, right?

25          MR. KLEIN:  Oh, I might take a sip of water, too, your

P7N1STO3                        Werlau - Cross

1    Honor.  I was just——

2                THE COURT:  Of course, of course.  It seems to be the

3    break for that, yes.

4                THE WITNESS:  Thank you very much.

5                THE COURT:  Of course.

6                MR. KLEIN:  Thank you.

7    BY MR. KLEIN:

8    Q.  You're aware that there were other——that Peppersec didn't

9    have the only UI, correct?

10   A.  I don't know.

11   Q.  As part of your looking at this, did you look to see if

12   there were other UIs?

13   A.  No.

14   Q.  You talked about an ENS name.  Do you remember that?

15   A.  Yes.

16   Q.  Can you remind the jurors what an ENS name is?

17   A.  ENS stands for Ethereum Name Service.  It is a

18   plain-English readable, human readable name that can be used in

19   place of things like a wallet address or, for example, a

20   website, like the Tornado Cash web application.

21   Q.  And you yourself have an ENS name, don't you?

22   A.  I do.

23   Q.  And so if you know someone's ENS name, you can learn a lot

24   about that person, correct, their ETH holdings?

25   A.  I mean, you can learn that from a wallet address.

1

2

3

4

5    Q.  I want to talk about the gas ratio.

6              MR. KLEIN:  I want to turn to Exhibit 3005-35.  And

7    again, I hope my penmanship is not horrible here.

8              Yes.

9    Q.  You talked about——do you recognize this?

10   A.  Yes, I do.

11   Q.  This is the chart the prosecutor showed you before it got

12   filled in with a lot of info?

13   A.  Correct.

14   Q.  And this relates to this, I'll call it the gas ratio

15   analysis; is that a fair way to talk about it?

16   A.  Sure.  Gas limit, gas ratio.

17   Q.  Gas limit?  Sure.

18              Now who helped you?  Who did you work with on this?

19   A.  I was assisted by Marshall Yale.

20   Q.  And where is he from?

21   A.  He's from BlockTrace.  He's also another consultant with

22   the IRS.

23   Q.  And did he come up with this methodology?

24   A.  I believe this method——well, I don't want to speak to the

25   methodology.  I——I can say what I believe, but I'm not for

1    sure.

2            THE COURT:  Do you recall which of the two, was it you

3    or was it he, was it somebody else?

4            THE WITNESS:  It wasn't me.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P7N1STO3                          Werlau - Cross

1   BY MR. KLEIN:

2   Q.  So Mr. Yale, that's Marshall Yale, correct?

3   A.  Correct.

4   Q.  So he came up with this methodology?

5   A.  Again——

6          THE COURT:  I think he's saying Mr. Yale told him

7   about it, sir.

8          THE WITNESS:  That is correct.  Mr. Yale informed me

9   about this methodology.

10  Q.  And he learned it from someone else.

11         THE COURT:  Careful.  Yes or no.

12  A.  I don't know.

13         THE COURT:  Thank you.

14  Q.  You're not aware of this gas limit or gas ratio methodology

15  being published in any journals, are you?

16  A.  Can you repeat the question one more time.

17  Q.  You're not aware of this gas——I'm going to call it the gas

18  ratio analysis.  Is that okay if we just call it that——

19  A.  Sure.

20  Q.  ——for simplicity?  This gas ratio analysis hasn't been

21  published in any journals, has it?

22  A.  Not that I'm aware of.

23  Q.  Or any peer-reviewed articles?

24  A.  Again, I don't know.

25  Q.  This is the first time you've used it?

1  A.  That's correct.

2  Q.  Do you know what the error rate is?

3  A.  No.

4  Q.  Have you subjected this to any type of scientific inquiry?

5  Have you scrutinized it in any way?

6  A.  Yes.

7  Q.  Did you check for the error rate?

8  A.  No.

9  Q.  And you yourself have described this as an approximation,

10  correct?

11  A.  That's correct.

12  Q.  Not exact?

13  A.  It is a conservative approximation.

14  Q.  Now one way to check if something like this methodology is

15  accurate is to do a test of its reliability, right?

16  A.  Can you repeat that.

17  Q.  Were any tests done of the reliability of this?

18  A.  As I mentioned earlier, we ran simulations to determine the

19  range so——

20  Q.  When you say "we," who's the "we"?

21  A.  Again, Marshall Yale, who assisted me in putting this

22  information together.

23  Q.  Did you run the simulations?

24  A.  Yes.

25  Q.  And how many——you did 12 transactions.

P7N1STO3                          Werlau - Cross

1    A.   No.   Again, we did a thousand simulations per denomination

2    pool per range.

3              THE COURT:   Counsel, if I may inquire.

4              Sir, you say per denomination pool per range.   What do

5    you mean by the range, sir?

6              THE WITNESS:   I'm sorry.   So when I say denomination,

7    there were pools for 1, 10, and a hundred, and per range, there

8    were multiple bands, different time periods, so as the time

9    period changed, we had to use different code to simulate it.

10             THE COURT:   So range is a temporal range.

11             THE WITNESS:   That's correct.

12             THE COURT:   Thank you for the clarification.

13             Counsel, you may continue.

14             MR. KLEIN:   Can I have a second, your Honor?   Sorry.

15             THE COURT:   Of course.

16             MR. KLEIN:   Thank you for your patience, everybody.

17   BY MR. KLEIN:

18   Q.   I guess I was asking about testing the transactions, with

19   the gas ratio.

20   A.   What do you mean by testing them?

21   Q.   You tested it out 12 times, correct, or 12 transactions?

22   A.   Can you explain what you mean by test.

23             THE COURT:   Sir, are you distinguishing actual

24   transactions from simulated transactions?

25             MR. KLEIN:   Yes.   He was confirming it based on 12

P7N1STO3                     Werlau – Cross

1    transactions.  Sorry if I wasn't clear.

2    A.  Right.  Yes, I did not perform transactions.  I personally

3    did not perform any transactions.

4    Q.  You didn't test it actually?

5    A.  No.  I did not perform actual transactions onto the

6    blockchain, personally.

7    Q.  So you never tested it?

8    A.  When you say tested, I did not actually execute a deposit

9    onto the blockchain.  We simulated the code.  So when you say

10   execution, this means running it locally.  It is the real code,

11   it is actually running, it is——

12           THE COURT:  You didn't actually sign up for Tornado

13   Cash and start doing transactions on Tornado Cash.

14           THE WITNESS:  That's correct.  I did not.

15           THE COURT:  Okay.  But you did simulations of

16   transactions.

17           THE WITNESS:  That is correct.

18           THE COURT:  I don't want to speak for you, Mr. Klein,

19   and you'll excuse me, you'll tell me if I'm wrong, but——I think

20   what he's asking you is whether you actually took a transaction

21   that really happened in real life and did some test to see if

22   you knew through what medium it was implemented, whether you

23   went and like, if you thought it was done through the UI,

24   you're going to use your test and see whether it shows up on

25   UI.

1          Mr. Klein, am I saying correctly what you're asking?

2          MR. KLEIN:  Yes, your Honor.

3          THE COURT:  Okay.  So that was a long question, but I

4    think you know what I'm saying.  Okay.  Did you do any tests

5    using transactions that had actually happened to see if,

6    knowing whether they were UI, CLI, or directly, whether they

7    ended up falling into the mechanism that you had set up?

8          THE WITNESS:  And we used real data.  That's what's

9    plotted.  That's 140,000 transactions.  But are you asking if

10   we actually ran a transaction and saw where it landed in our

11   graph?

12         THE COURT:  Yes.

13         THE WITNESS:  I personally did not.  I believe

14   Marshall Yale or someone assisting him did.

15         THE COURT:  Okay.  But you're also telling us, sir,

16   that neither you nor Mr. Yale ever set up a Tornado Cash

17   account to actually do a transaction.

18         THE WITNESS:  I can't speak for Marshall Yale.  I

19   personally did not do an actual Tornado Cash transaction on the

20   live network.

21         THE COURT:  Okay.  Sir, I thank you so much, and

22   please continue.

23         MR. KLEIN:  Yes.

24   BY MR. KLEIN:

25   Q.  You talked about your user registry, right?

P7N1STO3

1    A.  In the proposal, yes.

2    Q.  Yes.  And that would require handing over a certain amount

3    of personal information, correct?

4    A.  User name and password at a minimum.

5    Q.  So whatever it was.  One design choice the founders made

6    was not to collect people's personal data, correct?

7    A.  I don't know the design decisions they made at the

8    beginning.

9    Q.  Well, there was no—you suggested this as a proposal

10   because that wasn't happening, right?

11   A.  Right.

12   Q.  So one design choice they made was not to collect people's

13   personal information, correct?

14         THE COURT:  I think the dispute, sir, is:  Do you mean

15   at the beginning of the founding of Tornado Cash or at the time

16   he's looking at it?

17         MR. KLEIN:  At any point.

18   Q.  They weren't collecting people's personal information, were

19   they?

20   A.  Not to my knowledge.

21         MR. KLEIN:  Nothing further, your Honor.

22         THE COURT:  Okay.  Brief redirect?  Briefest of

23   redirect?

24         MR. REHN:  Just one moment, your Honor.

25         Nothing further, your Honor.

P7N1STO3

1          THE COURT:  You may step down, with your water.

2          (Witness excused)

P7T1STO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                       23 Cr. 430 (KPF)

ROMAN STORM,

             Defendant.         Jury Trial
------------------------------x

                              New York, N.Y.
                              July 29, 2025
                              8:55 a.m.


Before:

                 HON. KATHERINE POLK FAILLA,

                              District Judge


                     APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  NATHAN M. REHN, ESQ.
     BEN ARAD, ESQ.
     BENJAMIN A. GIANFORTI, ESQ.
     KEVIN G. MOSLEY, ESQ.
     TARA M. LA MORTE, ESQ.
     Assistant United States Attorneys

WAYMAKER LLP
     Attorneys for Defendant
BY:  BRIAN E. KLEIN, ESQ.
     KERI CURTIS AXEL, ESQ.
     KEVIN M. CASEY, ESQ.
     VIVIANA ANDAZOLA MARQUEZ, ESQ.

     -and-

HECKER FINK LLP
     Attorneys for Defendant
BY:  DAVID E. PATTON, ESQ.
     CHRISTOPHER MOREL, ESQ.

P7T1STO1                          Hurder - Direct

9                    (Witness sworn)

10                    THE DEPUTY CLERK:  Please be seated and into the

11      microphone, please state and spell your full name for the

12      record.

13                    THE WITNESS:  My name is Stephanie Hurder.  It's

14      spelled S-T-E-P-H-A-N-I-E; Hurder, H-U-R-D as in David, E-R.

15                    THE COURT:  Thank you.

16                    Counsel, you may inquire.

17                    MS. AXEL:  Thank you.

18       STEPHANIE HURDER,

19            called as a witness by the Defendant,

20            having been duly sworn, testified as follows:

21      DIRECT EXAMINATION

22      BY MS. AXEL:

23      Q.  Good morning, Dr. Hurder.

24      A.  Good morning.

25      Q.  Are you currently employed?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  I am.

2    Q.  Where do you work?

3    A.  I am a partner and founding economist at Prysm Group.

4    Q.  And what is Prysm Group?

5    A.  Prysm Group is an economics advisory firm focused on

6    blockchain and cryptocurrency projects and other emerging

7    technologies.

8    Q.  Were you retained as an expert in this case?

9    A.  I was.

10   Q.  Who retained you?

11   A.  Mr. Storm's counsel and Mr. Storm.

12   Q.  Are you being compensated?

13   A.  I am.

14   Q.  Does your compensation depend on the outcome of this case?

15   A.  It does not.

16   Q.  Did you prepare certain slides to help the jury follow

17   along with your testimony?

18   A.  I did.

19   Q.  Did you receive any assistance in preparing your slides?

20   A.  I did.  I received assistance from Mr. Storm's counsel as

21   well as an outside graphic design firm.

22            MS. AXEL:  Permission to display DX 9050.

23            THE COURT:  As a demonstrative aid?

24            MS. AXEL:  Yes.  Your Honor, I will be seeking at the

25   end to submit summary charts but that won't come up for a

P7T1STO1                          Hurder - Direct

1    while.

2              THE COURT:  May I know from the government whether

3    there will be objections to those slides?

4              MR. ARAD:  If they are as we've seen them before, no

5    objection.

6              THE COURT:  Okay.  We'll see if they are as you've

7    seen them before.  Thank you, counsel.

8    BY MS. AXEL:

9    Q.  Okay.  Dr. Hurder, can you describe for the jury your

10   educational background.

11   A.  Sure.  I have a PhD in business economics, a master's

12   degree in economics, and a bachelor's degree in mathematics and

13   economics, *magna cum laude* and Phi Beta Kappa, all from Harvard

14   University.

15   Q.  As part of your educational background, does that include

16   statistics?

17   A.  It does.

18   Q.  How?

19   A.  In addition to standard graduate-level training in

20   statistics and econometrics, I also completed PhD-level

21   qualifying exams in frequentist and Bayesian econometrics.

22   Q.  Oh, I think we may have to spell that later.

23   A.  Okay.

24   Q.  And would you describe for us your professional history, in

25   brief.

P7T1STO1                           Hurder - Direct

1  A.  For the past——since 2018, I've co-founded and been with

2  Prysm Group.  Prior to that I was a consultant and project

3  leader at the Boston Consulting Group.  Prior to that I was a

4  postdoctoral research associate at the Massachusetts Institute

5  of Technology.

6  Q.  And did some of this particular professional experience

7  relate to cryptocurrency and blockchain technologies?

8  A.  I would say the experiences that are most relevant were, I

9  was an advisor to the World Economic Forum's blockchain and

10  digital currency group.  And I've also been affiliated with the

11  Center for Cyber-Physical Systems and the Internet of Things at

12  the University of Southern California.

13         THE COURT:  Counsel, hold on, please.  Thank you.

14         Can I ask you to just slow down a little bit.  Thank

15  you so much.  The jury has heard this so many times.  It's not

16  you, it's this courtroom.  Thank you.

17  Q.  And how does your work as an economist at Prysm relate to

18  blockchain technology specifically?

19  A.  Oh, we work with blockchain and cryptocurrency-based

20  projects to help them design economic systems, so things like

21  designing the economics of tokens, how incentives work, how

22  marketplaces function, and governance.

23  Q.  And what do you mean by governance?

24  A.  Governance is typically a collective decision-making within

25  a blockchain project.

P7T1STO1                          Hurder - Direct

1    Q.  And how many blockchain projects have you provided such

2    economic advisory services to?

3    A.  Several dozen.

4    Q.  Does your work involve the use of any publicly available

5    blockchain tools?

6    A.  It does.

7    Q.  Such as?

8    A.  We use tools like CoinMarketCap and CoinGecko for data; we

9    use Etherscan when necessary; we will use public code

10   repositories such as DUNE.

11   Q.  And have you published in any areas relevant to also this

12   cryptocurrency and economics work that you do?

13   A.  I have.

14   Q.  Can you provide some examples.

15   A.  I am a co-author of a book chapter published by Palgrave

16   Macmillan on cryptoeconomics and blockchain governance; I've

17   also co-authored game theory papers on blockchain governance

18   that have been presented at universities like Stanford and

19   Berkeley.

20   Q.  And do you speak on these topics?

21   A.  I do.

22   Q.  Can you provide some examples for us.

23   A.  I've been a guest lecturer in courses at Stanford, the

24   University of Chicago, the University of California Los

25   Angeles; I've spoken at major crypto conferences such as South

P7T1STO1                          Hurder - Direct

1    x Southwest and Consensus; and I also give plenary talks at

2    different major conferences.

3    Q.  Have you testified as an expert before?

4    A.  I have not.

5    Q.  Have you previously been engaged as an expert in litigation

6    matters?

7    A.  I have.

8    Q.  How many times?

9    A.  Three, including this one.

10            MS. AXEL:  The defense moves to qualify Dr. Hurder as

11   an expert on economics of blockchain and blockchain projects,

12   including cryptocurrency design.

13            MR. ARAD:  No objection.

14            THE COURT:  She is so qualified.  Thank you.

15   Q.  Have you reviewed various materials to prepare for your

16   testimony today?

17   A.  I have.

18   Q.  And showing you slide 2, would you summarize for the jury

19   the key materials that you've considered.

20   A.  Sure.  I reviewed documentation related to the Tornado Cash

21   project.  This included Medium posts, project documentation,

22   and the governance website.

23            I reviewed token price data for various tokens.

24            I reviewed data from Etherscan.

25            I reviewed selected academic literature that was

P7T1STO1                          Hurder - Direct

1   related to tokens and cryptocurrency governance.

2           I reviewed, investigated Peppersec corporate records.

3           I reviewed selected government expert disclosures and

4   selective trial materials.

5   Q.  And does that include some exhibits introduced at trial and

6   some testimony that took place here in this trial already?

7   A.  I believe, yes.

8   Q.  And have you then come to certain opinions that you'll

9   testify about today?

10  A.  I have.

11  Q.  Okay.  Would you tell the jury what opinions you've

12  reached.

13  A.  In my opinion, the TORN token was created as a governance

14  token to facilitate the operation of what's called the Tornado

15  Cash DAO.

16          In my opinion, upon reviewing it, the Tornado Cash DAO

17  was well designed, it was active, and had significant power.

18          The founders of TORN allocated a significant number of

19  TORN tokens to the community in order to bootstrap and support

20  the DAO.

21          I found that the price of the TORN token generally

22  rose and fell with the overall crypto market movements.

23          And that the Ronin hack did not benefit the price of

24  the TORN token.

25  Q.  So let's turn to a few background definitions to get to

P7T1STO1                         Hurder - Direct

1    your opinions here.

2              Would you describe for the jury what "tokenomics"

3    means.

4    A.   Tokenomics is the economic design and analysis of

5    blockchain-based tokens.  It uses tools like economic theory,

6    research, and data analysis.

7    Q.   Are there any synonymous terms?  Are there other things you

8    say instead of tokenomics?

9    A.   It's sometimes called cryptonomics.

10   Q.   What is a decentralized application, or dApp for short?

11   A.   A dApp, or decentralized application, is built on top of a

12   blockchain protocol.  DApps can do all kinds of different

13   things.  They'll frequently have their own token that's

14   different than the native token of the blockchain protocol.

15   Q.   And the word "decentralization," on its own, how would you

16   define that?

17   A.   Something is decentralized when it's not controlled by a

18   single entity or individual, so there's a collective group that

19   together controls the project or the item or whatever you're

20   talking about.

21   Q.   How is that different than a traditional corporate

22   structure?

23   A.   So corporate structures vary, but we typically think of

24   corporate structures as being one or a couple of legal entities

25   that are frequently hierarchical.  Decentralized projects don't

1    necessarily have that structure.

2    Q.  And another term we may encounter here is "protocol fee."

3    How would you define the term "protocol fee"?

4    A.  In this context, a protocol fee is a fee that a blockchain

5    project charges to users that the project then collects for

6    itself.  So protocol fees can be used for things like funding

7    research and development, you know, paying for hosting, doing

8    other types of ongoing maintenance.

9    Q.  And is it then the software protocol itself that would

10   charge this fee?

11   A.  Yes, it's typically programmed into a smart contract.

12   Q.  And how does it direct it in that instance?

13   A.  The smart contract will direct the fee to, for example, the

14   project treasury, if that's where it's supposed to go.

15   Q.  And we didn't have it on here, but what is the role of

16   tokens in tokenomics?

17   A.  I mean, a token is a digital asset.  It's a digital

18   representation on a blockchain.  The role of tokenomics is to

19   figure out how to create tokens that have use and value.

20   Q.  So in your experience have you worked with a lot of

21   blockchain startups?

22   A.  I have.

23   Q.  And who typically launches a blockchain-based project?

24   A.  It can be a person; it could be a group of people; they

25   could be affiliated with a small startup; they could have no

1    legal entity at all; they could be part of a big company.  It's

2    typically just a founder or founding team.

3    Q.  And is decentralization something that happens at the

4    beginning or over time?

5    A.  Projects frequently are launched by the founding team, and

6    then many founding teams will choose to decentralize part or

7    all of a project over time.

8    Q.  Okay.  Have you prepared a slide to just talk about startup

9    funding?

10   A.  I have.

11   Q.  Okay.  And Dr. Hurder, is this based on your experience

12   with blockchain, or startups in general?

13   A.  It is.

14   Q.  Okay.  So what are the types of costs that you often see?

15   And if you could particularize it to blockchain startups as

16   you're describing that, that would be helpful.

17   A.  So blockchain startups experience many of the same startup

18   costs that you'd think of for any type of software project,

19   right?  They typically need technical talent to be able to

20   develop the project.  They may need legal advice.  They need

21   marketing.  In the time period that we're talking about, it was

22   particularly important to attend conferences, especially in the

23   blockchain space, to meet other people and tell them what you

24   were working on.  And some projects would engage experts and

25   things like security audits to check for bugs in their code.

1    Q.  And so what are the types of funding sources that you've

2    often seen to fund these types of startup costs?

3    A.  There's a variety.  Some blockchain-based projects will

4    sell equity, like any startup would; some will engage in token

5    sales; many protocols will offer grants to projects that choose

6    to build on them, so that's a common source of funding; and

7    some projects will have early revenue from operations that they

8    can use to pay for costs.

9    Q.  And when you're referring to funding sales here, do you

10   mean that a founding entity might just simply sell tokens for

11   cash?

12   A.  Could you repeat the question, please?

13   Q.  Yes.  When you're talking about a funding source here for a

14   startup entity, do you mean some projects might just take the

15   tokens and sell them for cash?

16   A.  Yes.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1    BY MS. AXEL:    (Continuing)

2    Q.   What are the ongoing costs then, that you would say, after

3    a startup has gotten off the ground?

4    A.   Similar to any software project there is going to be

5    ongoing maintenance, there is going to be research and

6    development.   There may just be ongoing fees like any business,

7    right, they might need Zoom, or GitHub, or many of these

8    services.

9    Q.   If an entity were to ultimately decentralize over time, who

10   would pay these types of costs?

11   A.   Figuring out funding sources to pay for ongoing costs is a

12   key part of a decentralization plan.   Some projects will

13   allocate a pool of tokens to something like a treasury so they

14   can be sold over time for funding.   Other projects will have

15   ongoing revenues so, for example, from a protocol fee.

16   Q.   And what is the role, then, of the founding entity as the

17   project goes forward towards decentralization, or does that

18   vary?

19   A.   It varies by project.   Many founding teams in the

20   blockchain space have the goal that the project is eventually

21   independent of the founding team that it can basically run

22   without the founding team controlling it.

23   Q.   Have you looked at the entity Peppersec, Inc.?

24   A.   I have.

25   Q.   And what is Peppersec, Inc.?

P7T5sto2                          Hurder - Direct

1    A.  Peppersec, Inc. is a Delaware corporation.

2    Q.  And are you familiar with Peppersec's funding for

3    Tornado Cash development and startup costs?

4    A.  I have reviewed some of their funding documents, yes.

5    Q.  Starting at the top, what is one source of their funding?

6    A.  Peppersec engaged in what is called crowdfunding.  They

7    received a grant from a platform called Gitcoin.

8    Q.  And what is Gitcoin?

9    A.  Gitcoin is an online platform where developers can propose

10   projects and the community can contribute funds.  I believe the

11   platform also has a matching program to match contributions

12   from the community.

13   Q.  And have you looked at the GitHub -- sorry, not GitHub --

14   have you looked at the Gitcoin website concerning the

15   crowdfunding that Peppersec did there?

16   A.  I have seen snapshots from the Wayback Machine.

17   Q.  Showing you what has been marked just for the counsel and

18   the witness as DX 9051, do you recognize this document?

19   A.  I do.

20   Q.  And what is it?

21   A.  This is a snapshot of the fundraising page for Tornado Cash

22   on Gitcoin.

23             MS. AXEL:  We would offer it in evidence, your Honor.

24             MR. ARAD:  Objection, your Honor.

25

P7T5sto2                          Hurder - Direct

1           (In open court)

2           MS. AXEL:  May I continue, your Honor?

3           THE COURT:  The exhibit is admitted over the

4    government's objection and it may be shown to the jury.

5           (Defendant's Exhibit 9051 received in evidence)

6    BY MS. AXEL:

7    Q.  Dr. Hurder, tell us again, now that we can see it, where

8    this document came from?

9    A.  This is from a crowdfunding site called Gitcoin.  This is a

10   snapshot from the Wayback Machine of a page from a project -- a

11   website called Gitcoin.

12   Q.  And what is the date of this document?

13   A.  The date of the snapshot is -- go back to the top, please

14   so I can see the date?

15          It is 12/18/2019 is the snapshot date.

16   Q.  Let me show you, have you pulled another way back

17   screenshot?

18   A.  I have.

19   Q.  Let me show you what is marked as 9052.

20          THE COURT:  Government is objecting to the

21   introduction?

22          MR. ARAD:  Yes, your Honor.

23          THE COURT:  Thank you.  The objection is overruled and

24   Defendant's Exhibit 9052 is also admitted into evidence and may

25   be shown to the jury.

1          (Defendant's Exhibit 9052 received in evidence)

2     BY MS. AXEL:

3     Q.  Dr. Hurder, what is the date of this snapshot?

4     A.  This snapshot is dated April 1, 2020.

5     Q.  Were you able to determine from the Gitcoin public records

6     approximately how much was raised?

7     A.  The Wayback Machine records were not complete.  According

8     to this page they had, as of this date, raised about 5,500 DAI

9     which is approximately $5,500.

10    Q.  But at this point the materials were no longer complete,

11    you said?

12    A.  Right.

13    Q.  What is another source of funding -- turning back to slide

14    6 -- what is another source of funding that you were able to

15    review in the corporate records?

16    A.  There is a $50,000 investment from a group called The LAO.

17    Q.  And do you know what The LAO is?

18    A.  The LAO is a -- they call themselves an investment group

19    run like a DAO, they're sort of a dApp that invests in

20    startups.

21    Q.  What type of funding did the LAO provide?

22    A.  They signed a convertible note.

23    Q.  And what is another source of funding then that you

24    reviewed?

25    A.  I reviewed a SAFE and a warrant with Dragonfly.

P7T5sto2                        Hurder - Direct

1    Q.   And what did you understand Dragonfly to be?

2    A.   Dragonfly is a venture capital firm that I believe

3    specializes in blockchain and crypto projects.

4    Q.   What type of funding did Dragonfly provide?

5    A.   Dragonfly signed, agreed to what is called a SAFE with a

6    warrant.   A SAFE is a Simple Agreement for Future Equity.

7    Q.   Showing you what is in evidence as GX 1303, is that the

8    SAFE?

9    A.   That is the SAFE.

10   Q.   And recognizing that you are not a lawyer, can you

11   describe, generally, what you understand, in your experience, a

12   SAFE to be?

13   A.   A SAFE is an agreement that is commonly used with

14   early-stage startups.   It allows the investor to acquire equity

15   at a future date.

16   Q.   And so what entity did Dragonfly get equity in?

17   A.   This is an agreement with Peppersec, Inc.

18   Q.   And in addition to the SAFE, was there another agreement

19   between Dragonfly and Peppersec?

20   A.   Yes.   There was a warrant.

21   Q.   And showing you exhibit GX 1304, is that the warrant?

22   A.   I'm now looking at the warrant; yes.

23   Q.   Again, just generally, what do you understand the warrant

24   to provide for?

25   A.   The warrant, in general, states that if Peppersec is

1    involved in the issuance of one or more network tokens, that

2    the investor has the option to acquire some of those tokens.

3    Q.  So, does this warrant specifically say that Tornado Cash

4    tokens, TORN tokens are issued, that Dragonfly would have an

5    option for those?

6    A.  I believe it gives Dragonfly the right to any network

7    token.

8    Q.  Any network token that Peppersec was involved in?

9    A.  Yes.

10   Q.  How much funding did Dragonfly provide to Peppersec in

11   total?

12          MS. AXEL:  Can we go back to slide 5 now, Mr. Demarco?

13   A.  All together, approximately $900,000.

14   Q.  Are you familiar with how Peppersec used this funding?

15   A.  I reviewed selected financial statements.

16   Q.  And so, how did they use it?

17   A.  They used it in a way that I found very similar for a

18   typical startup.  There were payroll expenses, there were

19   expenses for things like GitHub.  There were registered agent

20   fees, just typical startup expenses.

21   Q.  And, did Peppersec earn any fees or revenues through

22   Tornado Cash to fund these ongoing costs?

23   A.  They did not.

24   Q.  Now let's go back a page to page 5.  How did Peppersec's

25   funding then compare to your startup costs up here?

P7T5sto2                          Hurder - Direct

1   A.   Could you repeat the question?

2   Q.   How, after your review of Peppersec's financial records,

3   how did their expenditures compare to your example costs?

4   A.   I saw expenses for development and I saw expenses for

5   technical infrastructure.

6   Q.   On the funding sources side, how did Peppersec's funding

7   sources compare?  For example, were there token sales?

8   A.   There was the warrant that gave the option of token sales,

9   yes.

10  Q.   The warrant to Dragonfly?

11  A.   Yes.

12  Q.   But Peppersec didn't issue its own token directly and get

13  revenue directly for that?

14  A.   No.

15  Q.   So how did that warrant work then?  What did it get from

16  Dragonfly?

17  A.   The warrant was for $18,000.

18  Q.   And what did Peppersec then do for that $18,000?

19  A.   Peppersec gave Dragonfly the option to pay a fee to acquire

20  some tokens in the future.

21  Q.   Did you ever see any operating revenue?

22  A.   I did not.

23  Q.   Have you also reviewed Peppersec's bank accounts?

24  A.   Selected, yes.

25  Q.   Did you see anything different there or is it as you have

1    already testified?

2    A.  It is as I have already said.

3         MS. AXEL:  Let's go to page 7.

4    Q.  Now, you talked a little bit before about decentralization.

5    So, what are common goals that blockchain projects have when

6    seeking decentralization?

7    A.  So, projects seem to become decentralized for a number of

8    reasons.  One of the main ones is the community ethos, just

9    blockchain as a community that values decentralization and

10   community involvement.  Sometimes they become decentralized in

11   order to distribute work among the community and sometimes to

12   comply with securities laws.

13   Q.  And how did these types of concerns then affect your token

14   design?

15   A.  Some projects want to ensure that --

16        MR. ARAD:  Objection.

17        THE COURT:  Would you please reask the question?

18   Thank you.

19   Q.  How do the concerns that you have outlined impact your

20   design of tokens?

21        THE COURT:  This is what is confusing to me.  Are you

22   saying your token design?

23   Q.  Dr. Hurder, in the process of working with blockchain

24   projects, do you engage in, do you assist in DAO design?

25   A.  I do.

P7T5sto2                          Hurder - Direct

1    Q.  As part of DAO design, do you consider perhaps how tokens

2    are distributed in the community or to founders?

3    A.  Yes.

4    Q.  So returning to the question of reasons for your

5    decentralization, do those reasons come into mind when you are

6    out designing, helping design a DAO or token project?

7    A.  Some projects we work with I do want to ensure that token

8    allocations are sufficiently decentralized for securities laws

9    reasons.

10            MR. ARAD:  Objection.

11            THE COURT:  I'm not sure why we are talking about the

12   securities laws here.  I will allow that question.  I am sure

13   we are going to move on.

14   BY MS. AXEL:

15   Q.  And when you are working with a project on these DAO and

16   token design aspects, who is deciding these matters at the

17   outset?

18   A.  Typically it is the founding team that has a vision for

19   what they want their project in the community to look like in

20   the future.

21   Q.  Is the goal that you have described as decentralization in

22   conflict at all with founders wanting to have profits?

23   A.  There are sometimes tradeoffs between seeking

24   decentralization and founder profits.  For example, projects

25   that are aiming to be decentralized may take a significant

1    fraction of their tokens and distribute them to the community

2    rather than keeping them with the founding team.

3    Q.  And why do they do that, in your experience?

4    A.  They can use the tokens in various ways to incentivize

5    community members to actively participate.

6    Q.  How does the goal of decentralization affect profits a

7    founder may receive from their own intellectual property?

8            MR. ARAD:  Objection.

9            THE COURT:  I will allow.

10   A.  It depends on the project.  Many blockchain projects employ

11   open source technology, and so to the extent they have revenues

12   it would not be from licensing that technology specifically.

13   Q.  And why do you think decentralization is often a goal in

14   blockchain projects?  What is unique about this community?

15   A.  Blockchain, itself, is a technology that is a ledger that

16   is communally maintained by multiple entities.  Right?  The

17   entire point is there is not a single locus of control and I

18   think that type of technology attracts people who are

19   interested in that type of project.

20   Q.  And you mentioned governance before.  What are the goals of

21   a decentralized governance system?

22   A.  A decentralized governance system typically, the goal is to

23   enable the community, whether of users or of other people, to

24   have meaningful control over the ongoing operations and

25   direction of a project.

1   Q.  And what is the role of a DAO in that?

2   A.  A DAO was particularly, in this time period, a very popular

3   form of decentralized governance for blockchain projects.

4   Q.  Are tokens required to create a DAO?

5   A.  A DAO almost always has a token affiliated with it, yes.

6   Q.  And what is the role of the token and the DAO?

7   A.  In general, the token is typically required in order to

8   participate in the DAO.  It depends exactly on how the DAO is

9   designed, but the general idea is that people who want to vote

10  or submit proposals or whatever need to have some skin in the

11  game, and so having the token enables them to do that.

12          MS. AXEL:  Can I have the next slide?

13  Q.  Dr. Hurder, would you describe for us what, sort of

14  pictorally, is depicted here?

15  A.  Right.  So this is a picture representation of a DAO,

16  Decentralized Autonomous Organization.  Around the outside you

17  have pictures of individuals or users and they each have some

18  of the, what is called the governance token of the DAO.  In the

19  center is meant to depict the smart contract or smart contracts

20  that run the DAO.

21  Q.  And that is what is depicted in the center with the

22  computer?

23  A.  With the computer, yes.

24  Q.  And in your professional experience, how do you think about

25  designing a well-functioning DAO?

P7T5sto2                          Hurder - Direct

1          MS. AXEL:  We can move to the next slide.

2     A.  So, DAO design is actually quite difficult.  If you think

3     about any committee or community decision process that you have

4     ever been a part of, there is a lot of pieces that need to be

5     in place for it to work effectively so you need to think about

6     things like what are the types of topics that the DAO is going

7     to have decision-making authority over.  How do members of the

8     community submit proposals for changes or upgrades or whatever

9     the group might decide to do.  You have to decide who can

10    participate.  You have to have a way to vote and -- collect and

11    aggregate votes.  And you need to find a way to make sure that

12    whatever the community decides is actually implemented.

13    Q.  And when a strong DAO, what can token holders do?

14    A.  Typically, a well functioning DAO, users can submit

15    proposals for change they want to see to the project and they

16    can vote on proposals submitted by other people or by

17    themselves.

18    Q.  So was there a DAO for the Tornado Cash community?

19    A.  Yes, there was.

20    Q.  And how was that created?

21    A.  There was a Medium post in December of 2020 that outlined

22    both the plan for the TORN token, the plan for governance which

23    turned into the Tornado Cash DAO.

24          MS. AXEL:  And can we look at that Medium post which

25    is in evidence as GX 1904?

P7T5sto2                    Hurder - Direct

1    Q.  Dr. Hurder, is this the proposal you were referring to?

2    A.  It is.

3    Q.  And looking at page 2 -- first of all, is it common to

4    publish these types of proposals on Medium?

5    A.  Medium is a common place for blockchain projects to lay out

6    their plans, yes.

7    Q.  So turning to page 2, looking at the structure of the

8    proposed TORN token allocation here, how were the tokens to be

9    allocated?

10   A.  So, there will be 10 million TORN tokens created, 5 percent

11   of them or 500,000 are going to be used for airdrops to early

12   users of Tornado Cash ETH pools.  10 percent or 1 million TORN

13   are going to be used for something called anonymity mining

14   awards.  55 percent or 5.5 million TORN are going to be given

15   to the treasury of the DAO.  And, 30 percent or 3 million TORN

16   are going to be given to the founding team and investors.

17   Q.  And based on your professional experience designing these

18   projects and looking at allotments, what are your observations

19   on this breakdown?

20   A.  One thing that stands out to me is that the allocation to

21   the DAO treasury is more than half of the tokens, so this

22   allocation is going to be given to the DAO and the DAO users

23   can vote on how it will be used.  And, allocating 55 percent of

24   tokens to the DAO for the community to allocate is quite big.

25   Q.  Was this document publicly available?

P7T5sto2                          Hurder - Direct

1    A.  It was.

2    Q.  So looking at then, we will take it at the top, the

3    airdrop, what do you understand that is?

4    A.  An airdrop is a distribution of tokens to a set of people

5    where they don't pay for them, they just receive them.

6    Q.  Is that common?

7    A.  This is extremely common.

8    Q.  And what would be the purpose, in your experience, of

9    airdropping to people based on early users?

10   A.  Depending on the project, airdrops are used either for

11   marketing or to encourage the recipients of the airdrops to

12   engage with the project that the token is affiliated with.

13   Q.  And then, looking at anonymity mining, do you have an

14   understanding of what that is?

15   A.  Yes.  My understanding is that these were rewards for users

16   who made deposits into the Tornado Cash ETH pools.

17   Q.  And is this a common concept in blockchain projects?

18   A.  Mining is a common concept.  There is a concept in

19   decentralized exchanges called liquidity mining where

20   decentralized exchanges will frequently give rewards to users

21   who deposit their tokens into the decentralized exchanges.  The

22   reason is that this increased liquidity makes the exchanges

23   function better.  So, in this case, these mining rewards had a

24   very similar feel to them.

25   Q.  And then looking at the founding team, founding developers

P7T5sto2                          Hurder - Direct

1   and early supporters, so it indicates that the tokens would be

2   unlocked linearly over three years with a one-year cliff.  Are

3   those types of provisions common with respect to allotment to

4   founders?

5   A.  Yes.  This was very common type of vesting schedule at this

6   time.

7   Q.  So what is a cliff?

8   A.  A cliff is a period of time in which the founders, in this

9   case the founders will receive no tokens that they can access

10  so they have to wait a year before they can trade, sell,

11  access, give away any of their founders tokens.

12  Q.  And was a one-year cliff common at this time?

13  A.  Yes.

14  Q.  And why would founders provide this sort of delay and then

15  vesting?

16  A.  One reason for vesting is to provide long-term incentives

17  for participation, so very similar to how founders in regular

18  startups, if you are an employee at a company you may get

19  vesting of stock or options over time, it is meant to encourage

20  you to invest in the long term development of the project and

21  this has a similar intent.

22  Q.  And with respect to the cliff, are founders able to vote

23  these tokens prior to the cliff?

24  A.  It depends on the design of the contract.

25  Q.  As to this one, could founders vote prior to the cliff?

P7T5sto2                              Hurder - Direct

1    A.  I believe they could not.

2    Q.  And looking at the next page, page 2, what do you

3    understand this chart to be?

4    A.  This is a chart, so the horizontal axis is the number of

5    months since the launch of the tokens so you will see it goes

6    from zero to 60, so that is about five years, and this is meant

7    to represent the release of TORN tokens into what is called the

8    circulating supply.

9         So, when tokens -- frequently when tokens are created,

10   they create a whole bunch of them at once but they release them

11   over time, so this is basically showing how many tokens will be

12   circulating at a given period of time and the different colors

13   correspond to the different sections of the pie chart.

14   Q.  So, for example, the airdrop tokens are available right

15   away?

16   A.  That's correct.

17   Q.  And what do you understand it to show -- it is just a

18   little confusing.  So, did a team and investors have any tokens

19   available prior to the 12 month mark?

20   A.  My understanding is they do not.

21   Q.  And so, is this common to depict it this way with the red

22   line on top of the yellow line?

23   A.  Yes.  Well, this is a stacked area chart.  I think what

24   might be a bit confusing is that the slope upstarts a little

25   bit before 12.  I think that is just a choice that the graph

P7T5sto2                          Hurder - Direct

1    maker made whether they made this graph.

2    Q.  But it doesn't mean that they vested prior to the one-year

3    mark?

4    A.  That's right.

5    Q.  Did the governance proposal include a way to enable the

6    TORN token?

7    A.  It did.

8    Q.  And what was that?

9    A.  At the end of the Medium post --

10            MS. AXEL:  If we can go to page 10?

11   A.    -- there is the section called Governance Initiation and

12   it outlines a website where the community can go and complete,

13   I believe it was 62 tasks, that would enable the TORN token and

14   the governance.

15   Q.  And is this a common way to start a DAO or do voting to

16   start a DAO?

17   A.  I would say that this -- some projects will just launch the

18   DAO.  I would say this is unusual in already including the

19   community.

20   Q.  Why not just have a vote on-chain at this point?

21   A.  At this point there is no on-chain voting system, you need

22   to launch it, which is what this does.

23   Q.  So, with respect to these 62 tasks, just what kinds of

24   tasks were they?

25   A.  Things like allocating tokens, creating and launching smart

P7T5sto2                          Hurder - Direct

1   contracts.

2   Q.  Were the 62 tasks completed?

3   A.  They were.

4           MS. AXEL:  OK.  I think we can turn to page 11 --

5   sorry, slide 11 we can go back to.  There we go.

6   Q.  Do you know when they were completed?

7   A.  I believe they were completed within a day.

8   Q.  When did the DAO launch?

9   A.  So the smart contracts for the DAO would have been launched

10  on December 18 of 2020.

11  Q.  So when the proposal was adopted, did that create TORN?

12  A.  Could you repeat the question?

13  Q.  When the proposal then was adopted, is that what created

14  the TORN?

15  A.  The completion of these tasks, yes.

16  Q.  What is the TORN token?

17          MS. AXEL:  You can go to page 12.

18  A.  So, the TORN token is what I would consider to be a

19  governance token because its primary purpose upon launch was to

20  be used within the governance system.

21  Q.  Did users of the Tornado Cash pools need to buy and use

22  TORN to use those pools?

23  A.  No.  The Tornado Cash pools existed and operated before the

24  TORN token was ever created and it was not -- TORN was not

25  needed afterwards to use the pools.

P7T5sto2                          Hurder - Direct

1   Q.  So at the time of launch here, December 2020, what could

2   the TORN token be used for?

3   A.  The TORN token could be used to, in theory, to integrate

4   with the DAO.  There was a proposal in early March of 2021 that

5   needed to pass in order for it to be traded.

6   Q.  So it couldn't be traded at all until March 2021?

7   A.  Forgive me.  February 2021.

8   Q.  And you previously discussed there was a vesting schedule

9   for the founders; correct?

10  A.  That's correct.

11  Q.  And have you also prepared a slide demonstrating how that

12  vesting schedule worked?

13  A.  Yes.

14          MS. AXEL:  Can we go to page 13?

15  Q.  Is this the vesting schedule you created?

16  A.  It is.

17  Q.  Describe the text bubble that you put there and what that

18  means.

19  A.  The one referring to the cliff period ending?  So, the

20  vesting schedule for the founders allocated approximately

21  22,845 tokens to each founder per month.  However, because of

22  this so-called cliff, for the first year each founder was not

23  able to actually access those tokens, they couldn't sell them,

24  trade them, give them away.  So, when the cliff period ends and

25  we designate this by the bars from going from gray to green,

P7T5sto2                        Hurder - Direct

1    that's when the founders are able to access the tokens that

2    have been accruing over time.  So, on the 13th of December of

3    2021, each founder has access to approximately 274,000 of the

4    tokens they were allocated.

5    Q.  So at the periods of gray the amounts are accruing but not

6    accessible?

7    A.  That's correct.

8    Q.  Did you review any evidence concerning any sales by the

9    founders from the vesting contracts?

10   A.  I did.

11   Q.  Did any of those sales go to Peppersec, Inc., the company?

12   A.  They did not.

13   Q.  Where did they go?

14   A.  The founders sold tokens for themselves.

15   Q.  So when the TORN token was launched, did that create the

16   Tornado Cash DAO?

17   A.  It did.

18              MS. AXEL:  Let's turn to slide 14.

19              Sorry, your Honor.  Before I exit, I would like to

20   offer page 13 in evidence as a summary sheet created.

21              THE COURT:  Mr. Arad?

22              MR. ARAD:  No objection, your Honor.

23              THE COURT:  Slide 13 is admitted into evidence.  What

24   are we then calling it please?  9050-13?

25              MS. AXEL:  It is.

P7T5sto2                        Hurder - Direct

 1              THE COURT:  Thank you.  Defendant's Exhibit 9050-13 is
 2   now admitted into evidence as an Exhibit.  Thank you.
 3              (Defendant's Exhibit 9050-13 received in evidence)
 4   BY MS. AXEL:
 5   Q.  Showing you 14, what could members of the Tornado Cash do
 6   then?
 7   A.  Once the DAO was created, Tornado TORN holders could
 8   primarily do two things.  So, both of them involved what is
 9   called staking TORN.  So, when you stake TORN or any token, you
10   acquire the token and then you lock it up in a smart contract
11   and it is inaccessible for a period of time.  So, TORN token
12   holders who staked a sufficient amount of TORN into the
13   governance contract could make proposals, so they could say
14   here is a proposal I think the community should vote on, or
15   they could vote on proposals proposed by themselves or by
16   others.
17   Q.  How many votes did each TORN token holder have?
18   A.  So, a TORN token holder received one vote for each TORN
19   token that they staked.
20   Q.  What are the types of things they could vote on?
21   A.  The topics that the Tornado Cash DAO addressed were quite
22   varied, so some of them had to do with the allocation of the
23   DAO treasury, that big group of tokens that the DAO allocated
24   that there were votes about, how to spend and handle that.
25   There were votes around the governance process itself so the

1    DAO could propose to change that, and there were proposals to

2    address certain ancillary smart contracts.

3    Q.  How does the voting process work?  How does the proposal

4    process work?

5          Let me ask a different question.  How does the

6    proposal process work?

7    A.  Yes.  With the caveat that I'm not a technical expert, the

8    proposal process worked where if a user had staked a sufficient

9    number of tokens, they could submit a proposal to the DAO.  The

10   proposal had to be accompanied by what is called executable

11   code.  So, there are some DAOs that are not this one where you

12   could submit a suggestion to vote on.  Here you actually had to

13   submit the code that you wanted implemented.  Once the proposal

14   was proposed there was a period of voting, I believe it was

15   five days, where members of the community could vote for or

16   against the proposal.

17   Q.  Did you review then the voting history of the Tornado Cash

18   DAO?

19   A.  I did.

20   Q.  And showing you slide 15, is that something that you have

21   prepared?

22   A.  It is.

23   Q.  Would you explain for us what the columns are here and what

24   they show?

25   A.  Right.  So, this shows the first 13 proposals that were

P7T5sto2                         Hurder - Direct

1    submitted to the Tornado Cash DAO.  The Proposal column is a

2    brief description of the topic of the proposal.  The Start Date

3    is the start date of the voting period, so the voting period

4    would have been approximately five days.  The Total Votes is

5    the total number of TORN tokens that voted either for or

6    against the proposal.  Total Voters is the total number, I

7    believe, of addresses that participated.  And the State is

8    whether the proposal was either executed or defeated.

9    Q.  And I would say, did you also rely on certain data from

10   Dr. Edman to compute the votes in total voter columns?

11   A.  Yes.  That's correct.

12   Q.  Based on your review of the DAO activity, did you reach any

13   opinions about the Tornado Cash DAO?

14   A.  I did.  In my opinion, the Tornado Cash DAO was well

15   designed, it was active, and it had significant power over

16   various systems.

17   Q.  And why did you believe it was well designed?

18   A.  As I said, there is a lot of design that goes into making a

19   well-designed decision-making system and some of the things

20   that stood out to me were just the fact that the process by

21   which individuals or users could participate in the DAO was

22   very well laid out, the instructions were very clear.  The fact

23   that proposals had to be accompanied by code is something that

24   was not always true but in this case it wasn't just you could

25   make a casual suggestion, it is that you had to submit the code

P7T5sto2                        Hurder - Direct

1   you wanted implemented so people could review it.

2              The voting period was very clear.

3              And, the designers also made it so that once a

4   proposal was approved by the DAO, there is a period of time

5   where anyone in the community could then implement that code.

6   Q.  Why did you believe it was an active DAO?

7   A.  So, if we look here, the very first proposal is the

8   proposal that allows TORN to be transferred from one account to

9   another and we are looking at a period of about 16 months, give

10  or take, and you see that there are a number of different

11  proposals, they're on different types of topics and you see,

12  you know, total -- you see total votes and total voters.

13  Q.  Is there anything particularly significant about the first

14  vote?

15  A.  So the first vote I thought was quite interesting.

16             So, at the time of the first vote users were not able

17  to go buy tokens.  Right?  They could receive them from

18  airdrops and they could receive them, I believe, from anonymity

19  mining, but you couldn't go buy them.  So, to me, it is very

20  impressive that you have a brand-new DAO with a token that

21  hasn't been around very long and you have 111 different

22  addresses participating in this vote.

23  Q.  What was the scope of the DAO's decision making authority?

24  A.  In general, from what I reviewed, the DAO was able to

25  address issues around the DAO governance processes.  It was

P7T5sto2                           Hurder - Direct

1    able to address issues around token allocation, particularly

2    around the DAO treasury, and it was able to address certain

3    technical issues.  For example, proposal 4 has to do with, I

4    believe, with the Merkle trees related to anonymity.

5              THE COURT:  M-E-R-K-L-E?

6              THE WITNESS:  Yes.

7              MR. ARAD:  Objection.

8              THE COURT:  To my spelling?  I have an objection to

9    that.  Sorry.

10             There was an application to admit this slide?  Is that

11   correct?  I am trying to figure out what you are not objecting

12   to, sir.

13             MR. ARAD:  My apologies, your Honor.

14             THE COURT:  That's fine.  Got it.

15             MR. ARAD:  I thought the Court was cuing me.

16   BY MS. AXEL:

17   Q.  Did the DAO have the authority to change the pool smart

18   contracts?

19   A.  No.

20   Q.  And if there were technical -- let me see.

21             MS. AXEL:  Let me show you what has been marked as

22   Defendant's Exhibit 9053, just for counsel and the witness.

23   Q.  Dr. Hurder, do you recognize this document?

24   A.  This is the summary of the governance process from the

25   Tornado Cash GitHub.

P7T5sto2                          Hurder - Direct

1   Q.  Did you pull this excerpt from the GitHub?

2   A.  I did.

3   Q.  Is it something you relied on in your testimony?

4   A.  I did.

5             MS. AXEL:  Defense would offer Exhibit 9053.

6             MR. ARAD:  Objection, your Honor; 802.

7             THE COURT:  I will allow, given that she is an expert

8   using it in her testimony.

9             Defendant's Exhibit 9053 is admitted into evidence and

10  may be shown to the jury.

11            (Defendant's Exhibit 9053 received in evidence)

12  BY MS. AXEL:

13  Q.  Dr. Hurder, what is this, exactly?  What does it tell you?

14  A.  This is a set of what I would call instructions to the

15  community of how to use the governance system.

16  Q.  And what is the support for your statement that the lawn

17  of -- person launching a proposal would have to provide the

18  code?

19  A.  If you could scroll down further?  Please continue?  Please

20  continue scrolling?

21            So, if you go to the previous page, the pagination

22  might make this a little bit difficult to understand but this

23  is an example of a proposal.  And so, this is a mockup and you

24  can see here that as part of the proposal, there is a proposal

25  address which is the link to, I believe, the Etherscan page

P7T5sto2                              Hurder - Direct

1    that contains the code.  And you can see on the bottom it says:

2    Look for the contract address on Etherscan and make sure that

3    the source code is verified and readable.

4    Q.  Is that an address then you could follow over to Etherscan

5    and look at the actual code?

6    A.  That's correct.

7           MS. AXEL:  Can we go back to page 15 of 9050, please?

8    Q.  Dr. Hurder, have you looked at proposal no. 10, Relayer

9    Registry?

10   A.  I have.

11   Q.  Can you provide a basic description of the relayer registry

12   proposal?

13   A.  The relayer registry proposal proposes to allow users who

14   would like to serve as relayers to stake a certain number of

15   TORN tokens and then be included in the registry.  And then, a

16   user of the UI who would like to engage a relayer would be

17   assigned a relayer as a function of an algorithm.

18   Q.  What was decentralized about the relayer registry proposal?

19   A.  The relayer registry proposed that the relayers would be

20   assigned via an algorithm and that in order to qualify as a

21   relayer, a relayer simply had to acquire and stake the

22   appropriate amount of TORN.  There was no single person or

23   entity who had to give signoff that you could be in the

24   registry.

25   Q.  And how does that affect decentralization or relate to

P7T5sto2                          Hurder - Direct

1   decentralization?

2   A.   It eliminates the single point of control.  So, in previous

3   Medium posts prior to relayer registry, my understanding is the

4   founders would be asked who are the reliable relayers, and so

5   in this case relayers can make themselves available by

6   interacting with the code and by staking TORN.

7   Q.   And so then was the entire process achieved through code?

8   A.   That's my understanding, yes.

9   Q.   And what is staking?

10  A.   Staking is taking a token and depositing it in a smart

11  contract where it is held and you can't access it for a period

12  of time.

13  Q.   How was the relayer registry proposed?

14          Sorry.  Let me do this a different way.  Given what

15  you have testified with regard to Defendant's Exhibit 9053 and

16  the process for proposing proposals, how was the relayer

17  registry proposed?

18  A.   Well, whoever proposed the relayer registry would need to

19  stake, I believe it is 1,000 TORN, and submit the proposal.

20          MS. AXEL:  Let's look at 9053 again.

21  Q.   Dr. Hurder, in this manner would they propose the code and

22  would that exist on Etherscan?

23  A.   Yes.  That's my understanding.

24  Q.   Did you review relayer registry proposal 10 and look at why

25  it was posted on Etherscan?

P7T5sto2                          Hurder - Direct

1    A.  I did.

2          MS. AXEL:  Showing you Government Exhibit 4027.

3    Q.  Dr. Hurder, this is a transaction on February 9, 2022.  Do

4    you recognize it?

5    A.  With the caveat that I have not memorized every string of

6    letters affiliated with this project, I believe this is the

7    transaction hash for the creation of relay registry smart

8    contracts.

9    Q.  Understood.

10          And with that caveat, though, you did, yourself, go to

11   Etherscan and look at the fact that there was code posted for

12   this proposal, did you not?

13   A.  I did.

14   Q.  Turning back to your Exhibit 9050-15, so was the relayer

15   registry start date February 14, 2022?

16   A.  I believe that's the day voting started; yes.

17   Q.  So what is the difference between voting starting and then

18   actually implementation?

19   A.  So, based on my review of those governance instructions

20   that you showed earlier, typically the community would have

21   five days to vote on a proposal and then the proposal, if it

22   met quorum, if enough people voted either for or against, the

23   side that was victorious would win.  And if a proposal was

24   passed, there was a latency period which I believe was two days

25   and then there was a three-day period where anyone in the

1    community could execute the code that had been proposed.

2    Q.  And so the actual implementation would occur after this

3    vote, after this start date?

4    A.  That's correct; yes.

5    Q.  To your knowledge, did the founders vote their founders'

6    TORN on Proposal 10?

7    A.  Based on my review of Mr. Werlau's testimony, they did not.

8    Q.  Could the founders have voted on proposals 1 through 9?

9    A.  Not with their founders' TORN.  They could have voted if

10   they got airdrops or bought some TORN on an exchange, but not

11   with their founders' TORN.

12   Q.  And in your review of documents and items, is there other

13   evidence that the founders didn't control all the voting

14   process?

15   A.  Yes.  Proposal 13.

16   Q.  Showing you Defendant's Exhibit 9050-16, the next page, did

17   you prepare this summary slide, Dr. Hurder?

18   A.  I did.

19   Q.  And what does it show?

20   A.  Well, this is a depiction of a DAO and it shows

21   proposals -- the title of Proposal 13, treasury diversification

22   proposal.

23   Q.  Was there anything unique about this proposal?

24   A.  So, this proposal was interesting because my understanding

25   is that the founders were in favor of this proposal.  However,

1    the proposal failed.

2    Q.  And how did that vote go down?

3    A.  If we can wait for the animation?  If we were to go back to

4    that chart you would see that this, at this time period, this

5    was a relatively large number of total votes and what was

6    particularly interesting about this is that there was an

7    address -- so the voting records for all of these proposals are

8    public, they're available on websites.  There was an address

9    that was affiliated with 73,000 -- approximately 73,000 votes

10   against this proposal.

11            MS. AXEL:  Let's go to page 17.

12            THE COURT:  Counsel, when you come to a convenient

13   breaking point in the next few minutes, we will take our

14   morning break.

15            MS. AXEL:  Thank you.

16   Q.  Were proposals that were passed by the DAO, implemented?

17   A.  Yes.  My understanding is that all of the proposals that

18   were passed by the DAO were executed, that means they were

19   implemented.

20            MS. AXEL:  I would move this page, 17, in evidence.

21            MR. ARAD:  Is it the one currently on the screen or

22   the other one?

23            THE COURT:  The one currently on the screen, the

24   proposals.

25            MR. ARAD:  No objection.

P7T5sto2                          Hurder - Direct

1           THE COURT:  Defendant's Exhibit 9050-17 is admitted

2    into evidence.

3           (Defendant's Exhibit 9050-17 received in evidence)

4           MS. AXEL:  This would be a good time for a break.

5           THE COURT:  Let's take our morning break.  We will get

6    back together in about 10 minutes.  I will ask you please not

7    to discuss this case with each other or with anyone else.  Keep

8    an open mind until all the evidence is received.

9           Thanks, everyone.  Please rise.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  Please be seated.  Thank you.

3        Counsel, you may continue.

4        MS. AXEL:  Thank you, your Honor.

5        Mr. DeMarco, if I could have back 9050.

6   BY MS. AXEL:

7   Q.  Dr. Hurder, did you form any opinions as to the TORN

8   token's value based on its uses in governance?

9   A.  Yes.  One of the things that stood out to me about the data

10  on voting in the DAO was the value of the TORN that users were

11  willing to lock up in order to participate in voting.

12        So the chart that we have in front of us here looks

13  very similar to the one we've been seeing before, but it has a

14  couple of new columns.  It shows the total votes for each

15  proposal, and it also has the price of TORN at the time that

16  the proposal started, like the voting period started.  And so

17  you can see, on the right-hand side, the column, what I call

18  the value of voting TORN.  So in order for a user to

19  participate in voting in the DAO, they had to do what—they had

20  to do what's called staking their TORN, and once they staked

21  their TORN, their TORN was unavailable to them for over a week.

22  So if they locked it up in staking and the price crashed and

23  they wanted to sell it, there was nothing they could do about

24  it.  And so what struck me was that, you know, if you look at

25  proposal 5, that's almost $5.7 million worth of TORN that users

1  have staked in order to participate in voting.  And so what

2  this indicates to me is that the user base was willing to put

3  substantial capital, even in the short term, towards being able

4  to participate in the DAO.

5  Q.  And Dr. Hurder, is it common for voting rights to be

6  valuable?

7  A.  It is.  This is also a topic that is related to voting

8  rights in equities as well.

9  Q.  What is the concept of opportunity cost?

10  A.  An opportunity cost is basically the cost of what you forgo

11  when you choose what to do with the resource.

12  Q.  And how does that relate to this chart?

13  A.  So this chart itself does not display an opportunity cost,

14  but the participants in voting are incurring an opportunity

15  cost, right?  They are taking their TORN that they have paid

16  valuable money to receive and they've chosen to use it by

17  locking it up for a week in the Tornado Cash DAO.  That means

18  they can't do things like stake it somewhere else in a rewards,

19  they can't sell it, they can't give it away.

20          MS. AXEL:  First of all, I would offer this page,

21  page 18, in evidence.

22          MR. ARAD:  No objection.

23          THE COURT:  Defense Exhibit 9050-18 is admitted into

24  evidence.

25          (Defendant's Exhibit 9050-18 received in evidence)

P7T1STO3                          Hurder - Direct

1    BY MS. AXEL:

2    Q.  Are there certain tokens that you're aware of that have

3    only the governance use case and have sustained value?

4    A.  There are many.  Especially during this period, governance

5    tokens were a very popular form of token.

6    Q.  Okay.  Let me show you what is in evidence as 3603.

7             MS. AXEL:  3603?

8    Q.  Dr. Hurder, do you recognize 3603?

9    A.  I do.

10   Q.  What is it?

11   A.  This is a spreadsheet of the prices of five different

12   blockchain-based tokens, as well as computations on these

13   prices.

14   Q.  And do you understand that the government put this in

15   evidence based on data you had provided?

16   A.  That's correct.

17   Q.  And so Dr. Hurder, why did you provide data on what is

18   listed there as UNI and COMP?

19   A.  So UNI and COMP are short for——UNI is the governance token

20   of Uniswap, which is a decentralized exchange; and COMP is the

21   governance token of a project called Compound Finance.  So

22   these are two well-known governance tokens.

23   Q.  And have those tokens sustained value over time?

24   A.  They have.

25   Q.  What was the value as of this period of time, February

1    2022?

2    A.   You can see here that at the start of the time period, if

3    you look on the left-hand side, there's the price list.  Column

4    F is UNI, and column G is COMP.  And you can see, as of

5    February 1, 2022, UNI is trading at $11.25 per token, and COMP

6    is trading at $125.65 per token.

7    Q.   Okay.  And let's go back to our page 18.

8              And before we leave this, can you describe, what makes

9    someone a DAO voter?

10   A.   What makes someone a DAO voter?

11   Q.   Yes.  How does one vote?

12   A.   In order to vote, one needs to acquire a certain amount of

13   TORN, in this case, whatever the governance token is for the

14   DAO; they need to stake the token, in this case the TORN; and

15   then they need to participate.  They need to look at the

16   proposal and hopefully read it and decide to vote for or

17   against it.

18   Q.   And how does this relate, if at all, to users of the

19   Tornado Cash pools?  Are those the same thing?

20   A.   No.  Those are different.

21   Q.   From your perspective, what influences the price of a

22   blockchain-based token?

23   A.   Blockchain-based tokens' prices are driven by supply and

24   demand.  Demand for tokens can be driven by many things.  You

25   know, blockchain-based tokens are a relatively new asset class

P7T1STO3                          Hurder - Direct

1    compared to things like equities and bonds.  The types of

2    things that can impact them are their uses, it can be general

3    crypto market sentiment, it can be momentum, it can be social

4    media activity, a variety of different things.

5    Q.  And what is a token use case?

6    A.  A use case is a purpose of a token, so it's the purpose of

7    a token within a project.

8    Q.  What causes the most variation in the prices of token?

9    A.  In my experience and according to some research, a

10   significant portion of token price variation is due to crypto

11   market sentiment.

12   Q.  And did TORN have a use case when it was first implemented?

13   A.  Yes.  TORN was a governance token.  It was launched with

14   the governance system in mind.

15   Q.  Was there ever any other use case?

16   A.  Yes, when the relayer registry was introduced.

17   Q.  How was that a use case?

18   A.  In order for a potential relayer to be listed in the

19   registry, one of the things the relayer had to do was I believe

20   acquire 300 TORN and stake 300 TORN.

21   Q.  Are there certain cryptocurrency tokens that you use as a

22   baseline to measure market sentiment?

23   A.  Yes.  The classic that you probably hear about if you

24   follow financial news is Bitcoin.  Bitcoin's price is

25   frequently used as a proxy for the condition of the general

P7T1STO3                           Hurder - Direct

1   market.  ETH, Ethereum is also frequently used, especially when

2   you're talking about projects that are built on Ethereum.

3   Q.  Okay.  And I'll show you page 19.  Did you prepare this

4   chart?

5   A.  I did.

6   Q.  And what does it show?

7   A.  So this is a graph of the prices of ETH and Bitcoin over a

8   relevant period of time, from June '21 through August of '22.

9   The orange line is Bitcoin and the blue line is ETH.  And what

10  you can see from this overlay is that while their prices don't

11  move exactly in tandem, there's a lot of similarity in how the

12  prices move together, right?  So if you start on the left-hand

13  side, they're kind of flat, and then they go down into this

14  sort of W shape, and then they go up for a while, and then they

15  come down and they sort of peak near the middle of the graph,

16  then they come down and they're sort of in the middle for a

17  while, they go up, and then they go down again.  So there's

18  substantial co-movement in the prices.

19  Q.  What does it mean for movements to be correlated?

20  A.  It means that the——a change in one variable is associated

21  with a change in the other variable.

22  Q.  Does one cause the other one to move?

23  A.  Not necessarily.

24  Q.  And what methods do you use to determine that BTC and ETH

25  are correlated with one another?

P7T1STO3                         Hurder - Direct

1    A.  There are different forms of statistical analysis.

2    Correlation analysis is a common form.

3    Q.  What are some of the factors that might cause these to move

4    together?

5    A.  Crypto market sentiment, just generally similar to, you

6    know, if you invest in tech stocks, general tech sentiment is a

7    thing.  There's crypto market sentiments.

8    Q.  Have you also compared the price of TORN to these other

9    indexes?

10   A.  I did.

11   Q.  And showing you page 20, is that your comparison?

12   A.  It is.

13   Q.  What does it suggest about TORN?

14   A.  So looking at this picture, the blue and orange lines are

15   the same ones that we saw on the previous graph, so those are

16   the prices of Bitcoin and ETH, and you can see they're

17   following the same pattern that I described before.  The green

18   line is the price of TORN, and what you can see if you go

19   through the graph is that while TORN is not as closely

20   correlated with Bitcoin and ETH, as Bitcoin and ETH are with

21   each other, there are periods of substantial co-movement,

22   right?

23           So all the way to the left, you can see that the price

24   of TORN goes up temporarily.  That's right around the time that

25   TORN is listed on Binance, which is a very, very well-known

1    exchange.  Then you can see that TORN sort of rejoins, it goes

2    down a little bit, it follows up, goes across, and then there's

3    a period in the middle where Bitcoin and Ethereum keep going up

4    but TORN starts going down, but you can see that they're moving

5    downwards sort of in parallel.

6            Then you get around to February of '22, TORN goes up a

7    little bit, they meet up together, and then you can see at the

8    end they kind of fall and move together before raising slightly

9    at the end.

10   Q.  Did you use statistical analysis to determine whether over

11   this period TORN was highly correlated with BTC and ETH?

12   A.  Yes, I found that TORN——the price movements of TORN were

13   highly correlated with the price movements of Bitcoin and ETH.

14   This was particularly true in sort of the latter third of this

15   time period.

16   Q.  Late 2022, or mid-2022.

17   A.  Mid-2022.

18   Q.  Did you also look at specific Tornado Cash events on the

19   price of TORN?

20   A.  I did.

21   Q.  Showing you page 21, what events did you note in your

22   analysis?

23   A.  I looked at two events.  One of them was the introduction

24   of the relayer registry, and the other was the announcement of

25   the Ronin hack and its relationship to Tornado Cash.

1    Q.  And what did you observe about those events?

2    A.  So my analysis around when the Ronin hack was announced

3    was, there was a period afterwards where there was constant

4    news about the Ronin hack and the amount and its affiliation

5    with Tornado Cash, and I found that in the two-week period

6    after that news became public, the price of the TORN token fell

7    19 percent, and this was a greater decrease than was seen by

8    Bitcoin and Ethereum at the same time.

9    Q.  And what did you conclude about the relayer registry's

10   impact on the price and the value of TORN?

11   A.  I did not find evidence that the relayer registry

12   positively impacted the price of TORN.

13   Q.  Did you conduct any statistical analysis there?

14   A.  I compared the price movements of TORN after the launch of

15   the relayer registry to the price movements of Bitcoin and

16   Ethereum over the same time.

17   Q.  And what did you find?

18   A.  I found that after the launch of the relayer registry, the

19   price of TORN fell approximately 50 percent between the launch

20   period and the end of this graphical period, which was a

21   greater decrease than was exhibited by either Bitcoin or

22   Ethereum's price.

23   Q.  Showing you page 22.  Can you walk us through that

24   analysis.

25   A.  Yes.  So the green line, again, is the price of TORN.  And

1   on the 1st——the 1st of March of 2022 is the day that there is a

2   Medium post that announces that the relay registry has passed

3   and that it is up.  It has been announced.

4       Shortly after that, there is a price spike where it

5   reaches——TORN reaches a local high of almost $60.  That's

6   labeled on the left.  But from then on, the price of TORN

7   remains relatively flat.

8       And by the time we reach the end of this period, on

9   August 7th of 2022, the price of TORN has fallen 50 percent.

10  Q.  And why did you pick this two-week period?

11  A.  Could you repeat the question, please.

12  Q.  I'm sorry.  It's not two weeks.

13      Why did you pick this period for your analysis?

14  A.  This was——I wanted to be able to look at the——the full

15  period where the relayer registry was in full force.

16  Q.  And you understand the relayer registry is active

17  throughout this period.

18  A.  Yes.

19  Q.  Have you reviewed Government Exhibit 3601-5, which is in

20  evidence?

21      MS. AXEL:  You may put it on the screen.

22  A.  I have.

23  Q.  What do you understand it to show?

24  A.  So this is a graph of looking at price changes of five

25  different blockchain-based tokens.  So you can see on the right

1    they've labeled the colors.  Orange is TORN; light blue is ETH,

2    green is Bitcoin; the purply-brown color is UNI; and the other

3    blue is COMP.

4            And what this graph shows is it starts on

5    February 1st.  It takes February 1st as its start date.  And it

6    plots the changes in the prices of the token compared to each

7    token's price on the 1st of February.

8    Q.  So these are absolute prices.

9    A.  No.  These are relative changes compared to a specific

10   start date.

11   Q.  Okay.  And what is the most significant factor in this type

12   of analysis?

13   A.  This type of analysis relies crucially on the choice of the

14   start date.

15   Q.  And what is significant about the start date that the

16   government chose?

17   A.  If we can move back to the graph of the three prices.

18           MS. AXEL:  And that's the next one, Mr. DeMarco, 23.

19   A.  So this is, again, the graph of the prices of the three

20   tokens we've been talking about.  This is ETH, Bitcoin, and

21   TORN.  The green line is TORN.

22           And if you look at the start date chosen in that

23   graph, it's February 1st of '22, which isn't labeled on here,

24   but it's right about that bottom point, around 2/7, you see

25   where the token price in the green reaches its lowest.  It's

P7T1STO3                          Hurder - Direct

1    right around there.

2    Q.  And so that's fair to say that's near the bottom of the

3    price on this entire period?

4    A.  It's among the lowest prices in this entire period, yes.

5    Q.  So looking back at the other date on 3601-5, do you think

6    this is accurate to show the registry's effect on the TORN

7    price?

8    A.  I think that this is a very advantageous choice of start

9    date.  You can see from the picture that the price of TORN at

10   this start date is relatively low.  So if it's going to go up,

11   it's going to exhibit or, you know, be depicted as having this

12   big increase.  I think if a different start date had been

13   chosen, the graph might look quite different.

14   Q.  Can you rule out that the announcement in the tweet and the

15   article caused an increase in the price?

16   A.  Could you clarify, please.

17   Q.  Can you rule out that the announcement, which is depicted

18   as the March 1st event, caused the rise in the price?

19   A.  It's possible that there was a reaction.

20   Q.  But why do you focus on a longer period of time, going back

21   to your chart, which is at page 22?

22           MS. AXEL:  One more back.

23           THE WITNESS:  Different one.

24           MS. AXEL:  Yeah.

25   A.  I think there's a couple of reasons.  If we could actually

1    go back to the government's exhibit.

2    Q.  Okay.

3    A.  I think first, you know, the government has highlighted

4    this two-week period between the teal and the purple.  I think

5    one thing to note there is that even though the relayer

6    registry was proposed on February 14th, it wasn't approved

7    until voting was over on the 19th, right?  So there wouldn't

8    have been news that the relay registry was approved until

9    halfway through this period.

10          And I also think that, you know, it's entirely

11   possible that the market for TORN anticipated the launch of the

12   relayer registry, but if the relayer registry had a fundamental

13   effect on the demand of TORN, I would also expect to see price

14   movements after the relayer registry had launched.  And as

15   we've shown on the previous graphs, once the relayer registry

16   launched, the price stayed flat and then fell to a greater

17   degree than the market comparables.

18   Q.  Going back to your chart 22, do you believe proposal 10 had

19   the effect of driving up the price of TORN?

20   A.  I don't see conclusive evidence that it did.

21   Q.  Is there another event you looked at to analyze the value

22   and price of TORN?

23   A.  I looked at the announcement of the Ronin hack.

24   Q.  What did you understand was the Ronin hack?

25   A.  The Ronin hack was a hack, I believe it was conduct──it

1    turned out to be conducted by the Lazarus Group, but it was a

2    hack of several hundred million dollars' worth of stolen coins.

3    Q.  And what did you—well, let me show you.  Let's look at

4    what you prepared as page 24.

5           What did you conclude was the effect of the Ronin hack

6    on TORN's price?

7    A.  So in this instance, I was interested in looking at whether

8    news that Tornado Cash was—the Tornado Cash pools was

9    affiliated with this enormous hack had on the token price, and

10   what I found was that the token price decreased 19 percent in

11   the two weeks after the announcement of this relationship,

12   which was greater than the relative price decrease of the

13   comparables.  And what this indicates to me is that the TORN

14   price is not benefiting from news of alleged association with

15   this hack activity.

16   Q.  And why did you pick this period of two weeks for your

17   analysis?

18   A.  So I felt that two weeks was sufficient for, you know, news

19   to travel and potentially be incorporated into the price.

20          In addition, in any analysis like this, events

21   happening over and over and over again, right, so lots of stuff

22   is happening, and it can be difficult to sort out all the

23   different confounding factors, so I felt that this was a time

24   period that was sufficiently long but there weren't other

25   affiliated events that could potentially also have effects of

1    their own.

2    Q.   And are there any other reasons——before I leave this one,

3    are there any other reasons to suggest that the Ronin hack

4    would not benefit the price of TORN?

5    A.   Yes.  I also looked at the alleged deposits of Ronin hack

6    proceeds into the Tornado Cash smart contracts.  This was data

7    provided by Agent DeCapua.

8    Q.   And what did you conclude by looking at that?

9    A.   There was no correlation between the volume of these

10   alleged Ronin hack proceed deposits and changes in the price of

11   TORN.

12   Q.   Anything else you relied on that I'm forgetting?

13   A.   No.  I conducted a variety of statistical analyses.

14   Q.   And looking at page 25.  You indicated before that——well,

15   let me ask you, the highest TORN price on this particular time

16   period was when?

17   A.   The highest TORN price during this time period was the 1st

18   of September of 2021, where it was approximately $79 a token.

19   Q.   And what does that event correlate with?

20   A.   This was just a post-price high.  The time period I'm

21   looking at here is the time period during which TORN is listed

22   on an exchange called Binance.  So this is when the token is

23   going to have plenty of liquidity, plenty of exposure, and is

24   not going to suffer from sort of, you know, un——arbitrary jumps

25   in price due to mechanical problems.

P7T1STO3                        Hurder - Cross

1    Q.   And do you attribute the June 11th peak in that period to

2    the Binance listing?

3    A.   It could be related, yes.

4    Q.   How?

5    A.   Frequently when tokens are listed on prestigious exchanges,

6    there is a short-term bump in their price due to things like

7    increased liquidity and the marketing exposure from the

8    listing.

9    Q.   And this period that you've shown here is only June 2021

10   through August 2022.  Is this the highest price that TORN ever

11   sold for?

12   A.   No.  During the very initial launch, when there was very

13   little TORN in circulation, there was maybe less liquidity, I

14   believe TORN reached a price of over $400 a token.

15           MS. AXEL:  No further questions, your Honor.

16           THE COURT:  Cross-examination.

17   CROSS EXAMINATION

18   BY MR. ARAD:

19   Q.   Hello, Dr. Hurder.

20   A.   Good morning.

21   Q.   We have not met before, correct?

22   A.   I believe we have not.

23   Q.   I'm Ben Arad.  I'm one of the members of the prosecution

24   team.

25   A.   Good to meet you.

P7T1STO3                          Hurder - Cross

1    Q.  You as well.

2            Let's start with the scope of your testimony here

3    today.

4            I want to be clear.  You don't know what was in the

5    defendant's head when he and his co-founders started Tornado

6    Cash, right?

7    A.  Are you referring to the pools?

8    Q.  Any part of Tornado Cash.

9    A.  No, I don't.

10   Q.  You weren't there with him at the time, right?

11   A.  No.

12   Q.  And you didn't talk to him about his intentions at the

13   time, right?

14   A.  No.

15   Q.  About the pools?

16   A.  No.

17   Q.  About any part of Tornado Cash?

18   A.  No.

19   Q.  You weren't there when the defendant promoted the relayer

20   network, were you?

21   A.  I was not.

22   Q.  And so you don't know what he was thinking when he promoted

23   the relayer network, do you?

24   A.  I don't.

25   Q.  You don't know what his motivations were.

P7T1STO3                          Hurder - Cross

1    A.  I don't.

2    Q.  And can we agree that Tornado Cash hid criminal proceeds?

3    A.  I'm sorry.  You're going to have to be more specific.

4    Q.  At some point in time are you aware that criminals used

5    Tornado Cash to hide their money?

6    A.  According to, among other things, the data provided by the

7    prosecution, I would have to say yes, based on that.

8    Q.  So we agree, criminals used Tornado Cash to hide their

9    money.

10   A.  Based on the available information, yes.

11   Q.  Do we agree that North Korean hackers used Tornado Cash to

12   hide their money?

13   A.  According to—give me one second.

14          Based on what I've reviewed, if we affiliate the Ronin

15   hack proceeds with North Korean hackers and rely on the data

16   from Agent DeCapua, then yes.

17   Q.  And you don't know, do you, whether the defendant thought

18   that was a good thing?

19   A.  I don't.

20   Q.  You didn't discuss it with him.

21   A.  I've never met the defendant.

22   Q.  Let's talk about that.  In fact, you started working on

23   this case after the defendant was indicted, right?

24   A.  That's correct.

25   Q.  When exactly did you start working on this case?

1    A.  I would need to check my engagement letter, but I believe

2    it was October of last year.

3    Q.  And you work at a paid consulting firm called Prysm Group,

4    right?

5    A.  That's correct.

6    Q.  You're a founding economist there?

7    A.  I am.

8    Q.  Clients pay you and your firm to do work for them.

9    A.  They do.

10   Q.  Clients like the defendant?

11   A.  Blockchain-based projects.

12   Q.  How about the defendant?

13   A.  To my knowledge the defendant has never engaged Prysm

14   Group.

15   Q.  Or you?

16   A.  No.

17   Q.  And the defense team?

18   A.  I'm sorry?

19   Q.  Did the defense team engage you or Prysm Group?

20   A.  The defense team has engaged me as an individual in one

21   prior case as an expert.

22   Q.  So Prysm Group is not engaged——

23   A.  No.  In this case I am an individual.  I'm engaged as an

24   individual expert.

25   Q.  You're making a lot of money to work on this case, right?

P7T1STO3                         Hurder - Cross

1    A.  I'm being compensated.

2    Q.  I can rephrase.  Your billing rate is $500 per hour,

3    correct?

4    A.  That's correct.

5    Q.  And so far the defense has paid at least $120,000 for your

6    work on this case, correct?

7    A.  I believe that's correct.

8    Q.  Is there an outstanding balance that you're owed for your

9    work on this case?

10   A.  I have been paid all of the invoices I've submitted.

11   Q.  And have you been paid $120,000 or more than that?

12   A.  That's approximately the sum total of the invoices I've

13   submitted and been paid.

14   Q.  Now part of the time that you spent working on this case

15   has been spent meeting with the defense, right?

16   A.  That's correct.

17   Q.  How many times did you meet with the defense?

18          THE COURT:  You mean in person, telephonically, by

19   Zoom, or any communications?

20          MR. ARAD:  That was going to be my next question.

21          THE COURT:  Excuse me.  Then I won't ask it.

22          MR. ARAD:  I mean in any form.

23   A.  Let me think about it for a second.  It's been several

24   months.

25   Q.  Sure.

P7T1STO3                          Hurder - Cross

1    A.  Without being able to consult my calendar, I'm going to say

2    it's approximately 10.

3    Q.  And did you see some of their legal filings in this case.

4            Dr. Hurder, didn't you testify earlier that you saw

5    some of their legal filings in this case?

6    A.  I did.

7    Q.  Did you speak with the defense about the positions that it

8    was taking in this case?

9    A.  To a limited extent.  I'm not—not in detail about the—

10   Q.  Just answer the questions yes or no, please.

11   A.  Okay.

12   Q.  Did you speak with the defense about the positions that it

13   was taking in this case?

14   A.  Some of them related to the topics I was analyzing.

15   Q.  I'll ask you to answer yes or no, please.

16   A.  Yes.

17   Q.  So you got a sense of some of the arguments they were

18   making?

19   A.  Yes.

20   Q.  Some of the positions they were taking?

21   A.  Yes.

22   Q.  Let's talk more about your meetings with the defense.

23            Were these in-person or remote meetings?

24   A.  The bulk of them were remote.

25   Q.  And during any of these meetings did you notice whether

P7T1STO3                        Hurder - Cross

1    anybody on the defense team was taking notes?

2    A.  They were mostly audio only, so no.

3    Q.  On any video calls or any in-person meetings, you didn't

4    see anybody taking notes?

5    A.  I don't recollect what—witnessing someone taking notes.

6    Q.  And there were times you sent emails to the defense about

7    your anticipated testimony, right?

8    A.  That is correct.

9    Q.  Since the time you began working on this case,

10   approximately how many emails?

11   A.  Again, without being able to access my email, I would say

12   one—maybe one to two dozen, if that many.

13   Q.  And how about other written communications, texts or chat

14   messages?

15   A.  I have a logistical chat with one member of the team so I

16   know what room to go to.

17   Q.  Nothing substantive there?

18   A.  No.

19   Q.  Now you prepared slides in anticipation of today's

20   testimony, I think you testified, along with a design group and

21   with the defense team, right?

22   A.  That's correct.

23   Q.  So you prepared some of the slides?

24   A.  I provided the data for many of the slides.

25   Q.  And who actually made the slides?

P7T1STO3                        Hurder - Cross

1    A.  The graphic design team and counsel.

2    Q.  Counsel meaning defense counsel?

3    A.  Yes.

4    Q.  When were these slides prepared?

5    A.  Over the course of several weeks.

6    Q.  And are there drafts of those slides that the defense did

7    not show the jury?

8    A.  Yes.

9    Q.  Are there other charts and slides that you and your team

10   prepared that were not shown to the jury?

11   A.  Could you clarify, please.

12   Q.  Are there any other charts or slides that you prepared in

13   preparation for your testimony here that were not shown to the

14   jury?

15   A.  I made a couple of draft text slides.

16          THE COURT:  I believe the question he's asking is,

17   might there have been slides that you were considering talking

18   about but then ultimately didn't make it into the final cut?

19          THE WITNESS:  Yes, that is true.

20          THE COURT:  Okay.

21   Q.  Now were all the charts or slides that you prepared

22   disclosed to the government?

23          THE COURT:  I don't know how she would know.

24   A.  I don't know the answer to that question.

25   Q.  All right.  Let's switch gears.  Let's talk about TORN.

1    A.  Okay.

2    Q.  We can agree that TORN was the way the defendant and his

3    co-founders intended to profit from Tornado Cash, right?

4    A.  I think you'll have to be more specific.

5    Q.  TORN was part of the plan to make a profit off Tornado

6    Cash; isn't that right?

7    A.  I think if you're referring to the Tornado Cash smart

8    contracts, that's not necessarily the case.

9    Q.  I'm referring to Tornado Cash overall.  TORN was part of

10    the plan to make money off Tornado Cash overall, correct?

11    A.  Tornado Cash has different parts.  There's the smart

12    contracts, there's the UI, there's the CLI, there's the DAO.

13    Q.  I'd appreciate it if you'd answer my questions yes or no,

14    please.

15            Tornado Cash as a whole.  Was TORN part of the plan to

16    profit from Tornado Cash as a whole?

17            MS. AXEL:  Objection.

18            THE COURT:  I'll allow.

19    A.  I think that the founders hoped that the asset would be

20    profitable.

21    Q.  What about their investors?

22    A.  I think investors generally hope that their investments are

23    profitable.

24    Q.  And here, one way that investors planned to profit off

25    Tornado Cash was through TORN, right?

P7T1STO3                    Hurder - Cross

1    A.  Yes, the—

2              THE COURT:  I'm sorry.  I just need to know this.  Do

3    you want yes or no answers, do you not want yes or no answers?

4              MR. ARAD:  Yes or no answers, please.

5              THE COURT:  All right.  I'm going to ask you to

6    respond yes or no, and the defense counsel may ask you

7    questions on redirect for more information.  Thank you so much.

8    A.  Could you repeat your question, please.

9    Q.  One way the investors planned to profit off of Tornado Cash

10   was through TORN, correct?

11   A.  Yes.

12   Q.  They gave the defendant real money to invest in Tornado

13   Cash, correct?

14   A.  They gave the defendant real money to invest in the TORN

15   token.

16   Q.  And they stood to profit from that token that they paid

17   real money for, correct?

18   A.  Yes.

19   Q.  They invested about $900,000 in Tornado Cash, right?

20   A.  The token grant was for $18,000.

21   Q.  The investors invested about $900,000 in Tornado Cash,

22   correct?  And I'll ask you to answer yes or no.

23   A.  That's not correct.

24              MS. AXEL:  Objection.

25   Q.  Did Dragonfly Capital not invest approximately $900,000 in

1   Peppersec?

2   A.  They invested it in Peppersec.

3            THE COURT:  Yes or no, please.

4   A.  Okay.  Then could you repeat the question.

5   Q.  Did Dragonfly invest $900,000 in Peppersec?

6   A.  Yes.

7   Q.  And in return for that investment, one of the things that

8   it got was TORN tokens, right?

9   A.  That's correct.

10  Q.  And TORN was a way to profit off Tornado Cash, as a whole,

11  right?  That was your testimony?

12           MS. AXEL:  Objection.

13           THE COURT:  Overruled.  You may answer.

14  A.  It was a way to profit from——

15           THE COURT:  No, no.  Please, yes or no.  Or yes, no,

16  or I don't know.  Those are your choices.

17  A.  Yes.

18  Q.  Now when the defendant started Tornado Cash, he set it up

19  so that he would get a bunch of TORN up front and he couldn't

20  use it for a while, right?

21  A.  That's correct.

22  Q.  But eventually he would be able to use it.

23  A.  That's correct.

24  Q.  And he would get more over time, correct?

25  A.  Yes.

P7T1STO3                          Hurder - Cross

1    Q.   And if that TORN ended up being worthless, he wouldn't make

2    money on it, right?

3    A.   That's correct, if the token wasn't worth anything.

4    Q.   But if the TORN ended up being really valuable, he could

5    make a profit, right?

6    A.   That's correct.

7    Q.   So we can agree that the more valuable TORN became, the

8    bigger the profit the defendant would have made, right?

9    A.   That's correct.

10   Q.   And ordinary folks out in the world, they could also buy

11   TORN, right?

12   A.   They could.

13   Q.   One thing they could do with that TORN is they could hold

14   it to see if it went up in value, right?

15   A.   Correct.

16   Q.   So let's talk now about the value of TORN.

17             We can agree that one important part of the value of

18   TORN is the supply of TORN, right?

19   A.   That's correct.

20   Q.   And another important part of the value of TORN is the

21   demand, right?

22   A.   Correct.

23   Q.   And the supply is how much TORN is out there, right?

24   A.   Correct.

25   Q.   And the demand is how much people want TORN, right?

P7T1STO3                           Hurder - Cross

1    A.  Correct.

2    Q.  All else equal, if the supply of TORN stays the same and

3    more people want it, the value goes up, right?

4    A.  Yes.

5    Q.  You testified that one reason TORN is valuable is because

6    people who hold TORN can vote on things that Tornado Cash does,

7    right?

8    A.  On topics related to the DAO, yes.

9    Q.  And you call those governance rights, correct?

10   A.  Yes.

11   Q.  We can agree that governance rights are not the only reason

12   that TORN is valuable, right?

13   A.  I would agree with that.

14   Q.  I'm sorry?

15   A.  Yes.

16   Q.  Okay.  So we can agree that more than one thing drove the

17   value of TORN, correct?

18   A.  Yes.

19   Q.  One way governance rights can be valuable is that people

20   think it's fun or useful to vote on governance matters,

21   correct?

22   A.  That's correct.

23   Q.  And if a lot of people want to participate, demand goes up,

24   correct?

25   A.  That's correct.

1   Q.  And all else equal, the price goes up, right?

2   A.  If the increase in demand is sufficiently large, yes.

3   Q.  Now another way that governance rights can be valuable is

4   if they give people authority over how TORN can be used, right?

5   A.  That's correct.

6   Q.  And whether it can be sold?

7   A.  That's correct.

8   Q.  So let's look at the DAO proposal slide that you just

9   testified about.

10          MR. ARAD:  Mr. Iannuzzelli, can you please put up

11  slide 17.

12  Q.  Now you tallied the number of voters for each of these

13  proposals, right?

14  A.  That's correct.

15  Q.  And when you say voters, by the way, do you mean individual

16  people?

17  A.  I believe it's counting the number of addresses.

18  Q.  But you think that that's a good proxy for individual

19  people, right?

20  A.  Sure.

21  Q.  And I think you testified that proposal No. 1 here got more

22  votes—sorry—had more voters than any other proposal; isn't

23  that right?

24  A.  From this chart, that's true.

25  Q.  And by a lot, right?

1   A.  That's true.

2   Q.  I mean, the next highest proposal is proposal 4 with 61

3   votes, right?

4   A.  That's correct.

5   Q.  So let's talk about this proposal that a lot of people

6   voted on, proposal 1.

7   A.  Yes.

8   Q.  You described it as a proposal to enable TORN transfers,

9   right?

10  A.  That's right.

11  Q.  And earlier you testified that this proposal was necessary

12  because holders of TORN couldn't transfer it before the

13  proposal, right?

14  A.  That's correct.

15  Q.  That also means they couldn't sell it, right?

16  A.  I believe that's correct.

17  Q.  And so this proposal allowed TORN holders to sell TORN,

18  right?

19  A.  Yes.

20  Q.  And if somebody wants to profit off of TORN, they have to

21  sell it, right?

22  A.  Yes.  Or they need a very fancy alternative contract.

23  Q.  I'll ask you to answer yes or no, please.

24  A.  Yes.

25  Q.  So one reason governance rights are valuable is that they

P7T1STO3                              Hurder - Cross

1   gave people the ability to vote on measures that would affect

2   their ability to profit off of Tornado Cash, right?

3   A.  Yes.

4   Q.  And in fact, this particular proposal had more voters than

5   any other proposal, right?

6   A.  Yes.

7          MR. ARAD:  We can take this down, Mr. Iannuzzelli.

8   Q.  I want to switch now to talk about the relayer registry.

9   You're familiar with that, correct?

10  A.  I am.

11  Q.  You testified about it in your direct examination?

12  A.  I did.

13  Q.  We can agree that TORN token holders voted to adopt the

14  relayer registry, right?

15  A.  That's correct.

16  Q.  And that relayer registry made people pay TORN to the DAO

17  if they wanted to be a relayer, right?

18  A.  They were required to stake DAO.

19  Q.  Let's walk through an example.

20          Someone wants to register as a relayer.

21  A.  Mm-hmm.

22  Q.  That person needs——

23          THE COURT:  Please excuse me.  Can I just ask you to

24  answer yes or no, please.  It's easier for the court reporter.

25          THE WITNESS:  Okay, sure.

P7T1STO3                              Hurder - Cross

1    Q.  That person needs to go out and get TORN, right?

2    A.  Yes.

3    Q.  So all else equal, that increases the demand for TORN,

4    right?

5    A.  It can.

6    Q.  It can or it does, all else equal?

7    A.  It does.

8    Q.  And then the relayer needs to stake that TORN, stake,

9    right?

10   A.  That's correct.

11   Q.  In order to register.

12   A.  Yes.

13   Q.  And then they also need to stake more TORN to increase

14   their odds of being chosen as the relayer, right?

15   A.  That's correct.

16   Q.  And so all else equal, demand for TORN goes up again,

17   right?

18   A.  That's correct.

19   Q.  Now the relayer registry also made Tornado Cash even more

20   effective at concealing money, right?

21   A.  I'm sorry.  You'll have to clarify.

22   Q.  The relayer registry—actually, let's start more basic than

23   that.

24           Tornado Cash conceals money, right, the source of

25   funds?

1           THE COURT:  Do you want to ask the question

2    differently, sir.

3           MR. ARAD:  Sure.

4    Q.  Earlier, you testified that Tornado Cash has been used by

5    criminals to conceal the source of funds, did you not?

6    A.  According to the evidence that's put in, yes.

7    Q.  Yes, according to the evidence.  And so one of the things

8    that Tornado Cash does, the main thing, is hide the source of

9    funds, right?

10   A.  It can.

11   Q.  Now the relayer registry made it even better at that,

12   right?

13   A.  You'll have to explain further.

14   Q.  You studied the relayer registry, right?

15   A.  I did.

16   Q.  You know generally how it works, right?

17   A.  Mm-hmm.  Yes.

18   Q.  So you know that it enables a customer to withdraw funds

19   into a completely new wallet, right?

20   A.  Yes.

21   Q.  Clean wallet?

22   A.  Yes.

23   Q.  And that that address would be untraceable to the user on

24   the blockchain, right?

25   A.  Yes.

P7T1STO3                        Hurder - Cross

1   Q.  And so I'll ask again.  Does the relayer network make

2   Tornado Cash more effective at concealing funds?

3   A.  I would say the answer is no.  Relayers were already——

4           THE COURT:  All right.  I think he just wanted a yes

5   or no answer.

6           MR. ARAD:  I did just want a yes or no answer.

7   Q.  Without a relayer, could a user of Tornado Cash withdraw

8   money into a new clean wallet?

9   A.  No.

10  Q.  So a relayer was necessary to withdraw money into a new

11  clean wallet, right?

12  A.  That's correct.

13  Q.  That would be untraceable, right?

14  A.  That's correct.

15  Q.  Is your answer still no, that the relayer network did not

16  help Tornado Cash conceal money?

17  A.  I——I stay with the same answer.

18  Q.  Let's talk about motivations again.

19          The voters who voted on the relayer network proposal,

20  you didn't poll them, did you?

21  A.  No, I did not.

22  Q.  So you didn't ask them what their intentions were?

23  A.  No.

24  Q.  You didn't ask them if they were voting because they

25  thought it was fun to participate in governance or because they

1    wanted to make a profit off of TORN, did you?

2    A.  No.

3    Q.  So you don't know what their motivations were, do you?

4    A.  I don't.

5    Q.  But you do know that the relayer registry governance vote

6    caused a huge spike in the price of TORN, don't you?

7            THE COURT:  Time period, sir?

8            MR. ARAD:  Right after the relayer registry governance

9    vote, February 2022.

10            THE COURT:  All right.  Thank you.

11    A.  Would it be possible to be more specific about the time

12    period?

13    Q.  Sure.  Let's look at the data.

14            MR. ARAD:  Mr. Iannuzzelli, could you please put up

15    Government Exhibit 3601-5, which is in evidence.

16    Q.  This time period, where TORN goes up.

17    A.  The vote is taking place during part of that period.

18    Q.  And after that period do you see that the price of TORN

19    goes up?

20    A.  It does.

21    Q.  And what happens to the prices of all of the other coins on

22    this chart?

23    A.  They have remained relatively steady compared to the price

24    of those tokens on the 1st of February.

25    Q.  Let's get straight to the point, and I'll ask you to answer

P7T1STO3                          Hurder - Cross

1   this one yes or no.  Do they go down?

2   A.  Some of them do, some of them don't.  It varies over the

3   time period.

4   Q.  You testified earlier that the meaning of the data in this

5   chart is that every day's price is compared to the price on

6   February 1st, right?

7   A.  That's correct.

8   Q.  And so do you see that TORN ends 123 percent higher than it

9   was on February 1st?

10  A.  Yes, that's right.

11  Q.  And do you see that every other coin here ends lower than

12  it was on February 1st?

13  A.  On that end date, yes.

14  Q.  So I'll ask the question one more time.  Did the prices of

15  the other coins decrease during this period?

16         MS. AXEL:  Objection, your Honor.

17         THE COURT:  I will allow.

18  A.  Yes.

19  Q.  Now, Dr. Hurder, would you say that the price increases

20  here are notable?

21  A.  Are——could you repeat, please?

22  Q.  Would you say that the price increases in TORN here are

23  notable?

24  A.  Yes.

25  Q.  What's notable about them?

P7T1STO3                          Hurder - Cross

1    A.   I mean, a price increase of 123 percent is large.

2    Q.   More than a doubling, right?

3    A.   That's correct.

4    Q.   And you testified earlier that in general, TORN was

5    correlated with Bitcoin and ETH, right?

6    A.   Yes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. ARAD:

2    Q.  Is it correlated during this time period?

3    A.  If you look at the period from --

4    Q.  Yes or no, please.

5         MS. AXEL:  Objection, your Honor.

6         THE COURT:  No.  I will allow.

7    A.  It actually is for part of the period.

8    Q.  For the entire period, which was my question, is the price

9    of TORN correlated with the price of BitCoin and ETH?

10   A.  Without having run the correlation for this specific time

11   period I would say it still is.

12   Q.  So your testimony is that for this time period, when TORN

13   went up by 123 percent and Bitcoin went down by 10 percent and

14   ETH went down by negative 6 percent, they were all correlated

15   to each other?

16   A.  Correlation is a number that comes in a range.

17   Q.  Yes or no, please.

18   A.  Yes.

19        MR. ARAD:  We can take this down.  Mr. Iannuzzelli,

20   can you please pull up slide 18 of Dr. Hurder's slides?

21   Q.  Dr. Hurder, it was your testimony that governance rights

22   were valuable because people staked valuable TORN in order to

23   vote; right?

24   A.  That's correct.

25   Q.  And you pointed to Proposal 5 on this slide; right?

P7T5sto4                            Hurder - Cross

1    A.  That's correct.

2    Q.  And you pointed to the fact that people staked about

3    $5.69 million worth of TORN in order to vote on that proposal;

4    right?

5    A.  That's correct.

6    Q.  Did they lose $5.69 million worth of TORN?

7    A.  No.

8    Q.  Did they get it back?

9    A.  They did.  Well, they --

10   Q.  After how many days?

11   A.  They received the same tokens back.

12   Q.  After how many days did they get the TORN back?

13   A.  It is approximately 8.25, I believe.

14   Q.  So they had to give up about $5.6 million worth of TORN for

15   approximately 8.25 days?

16   A.  That's correct.

17   Q.  And what do you think that's worth?

18   A.  It -- the price of TORN was extremely volatile during this

19   period.  It's potential that the price of those tokens could

20   have fallen significantly during that week-long period.

21   Q.  So you don't know what it is worth that people gave up

22   $5.6 million worth of TORN for 8.25 days?

23   A.  I haven't run the specific calculation, no.

24   Q.  That would be the opportunity cost, wouldn't it?

25   A.  That would be the opportunity cost.

P7T5sto4                          Hurder - Cross

1    Q.  And you testified earlier about the opportunity cost,

2    didn't you?

3    A.  I did.

4    Q.  You said that the opportunity cost is what you give up for

5    not doing the next best thing to whatever you do; right?

6    A.  That's correct.

7    Q.  And your whole point here is that people were giving up a

8    lot in order to do this; right?

9    A.  They were incurring an opportunity cost; yes.

10   Q.  Is your point here that people were giving up a lot in

11   order to vote on governance proposals?

12   A.  Yes.

13   Q.  But you don't know what the opportunity cost was, do you?

14   That was your testimony a moment ago, wasn't it?

15   A.  I would need to run the numbers for the specific proposals.

16   Q.  So you didn't run the numbers?

17   A.  Not for all the specific proposals.

18   Q.  So you don't know?

19           MS. AXEL:  Objection, your Honor.

20           THE COURT:  No, I will allow.

21   A.  I don't know the specific numbers.

22   Q.  Let's keep talking about the value of TORN?

23           MR. ARAD:  We can take this down, Mr. Iannuzzelli.

24   Q.  You analyzed how the price of TORN changed after the Ronin

25   hack; right?

P7T5sto4                        Hurder - Cross

1   A.   After the announcement of the Ronin hack, yes.

2   Q.   Important distinction and we will get to that in a minute.

3        The Ronin hack was when North Koreans hacked the Ronin

4   network; right?

5             MS. AXEL:  Objection, your Honor.

6             THE COURT:  I'm not sure she knows.

7        Do you have knowledge of what the Ronin hack is?  And

8   if you don't, that's fine?

9             THE WITNESS:  Basic knowledge.

10            THE COURT:  Counsel, ask very specific questions.

11            MR. ARAD:  Sure.

12  BY MR. ARAD:

13  Q.   The hackers who used the Ronin hack used Tornado Cash to

14  hide their funds; correct?  You testified to that earlier?

15  A.   According to the evidence provided by the prosecution, yes.

16  Q.   And you concluded that the Ronin Hack was not good for the

17  price of TORN; right?

18  A.   That's correct.

19  Q.   In fact, what you are getting at is it was bad for the

20  price of TORN; right?

21  A.   Yes.

22            MR. ARAD:  But I want to get into the specifics of

23  your analysis so can we please pull up slide 24?

24  Q.   Now, you testified that news of the Ronin hack went public

25  on March 29; right?

1    A.  That's correct.

2    Q.  And earlier, when I asked you if you analyzed the price of

3    the effect of the Ronin Hack on the price of TORN, you said --

4    you corrected that you focused on when the news was announced;

5    right?

6    A.  That's correct.

7    Q.  You made that distinction; right?

8    A.  Yes.

9    Q.  Because March 29 was an important input to your analysis;

10   right?

11   A.  It was the date of the first news of the Ronin hack.

12   Q.  That's right.

13          And it wasn't the date that the Ronin hackers first

14   deposited funds into Tornado Cash; right?

15   A.  That's correct.

16   Q.  That date was April 4; right?

17   A.  Correct.

18   Q.  So, let's look at how the price of TORN changed beginning

19   on April 4 when the hackers started actually using

20   Tornado Cash.  Did you analyze that?

21   A.  I did.

22   Q.  OK, let's do it together?

23          MR. ARAD:  Mr. Iannuzzelli, can you please display

24   Government Exhibit 3602, which is in evidence?

25   Q.  Dr. Hurder, this is the pricing data that you relied on for

P7T5sto4                          Hurder - Cross

1   your analysis; right?

2   A.  That's correct.

3   Q.  You pulled this data yourself; right?

4   A.  Yes.

5   Q.  Do you see that the spreadsheet shows the prices of TORN,

6   Bitcoin and ETH in tabs on the bottom?

7   A.  That's correct.

8   Q.  And a few other cryptocurrencies too?

9   A.  Yes.

10  Q.  Let's focus on the first three.  We can start with the

11  price of TORN on April 4, which is the date that hackers from

12  the Ronin hack started using Tornado Cash.

13          MR. ARAD:  Mr. Iannuzzelli, could you please scroll

14  down to cell B 423?

15  Q.  Do you see the price there?

16  A.  Yes.

17  Q.  What is it?

18  A.  $45.76.

19  Q.  And what is the date?

20  A.  That is the 4th of April of 2022.

21  Q.  So, let's check out the price on May 19 when Tornado Cash

22  finished mixing the Ronin hackers' funds, that is cell B 468.

23          MS. AXEL:  Objection, your Honor.

24          THE COURT:  I will allow.

25  A.  $37.49.

P7T5sto4                          Hurder - Cross

1    Q.  So that's gone down; right?

2    A.  Yep.

3    Q.  About 18 percent?

4    A.  That's about right.

5    Q.  So now let's compare the price drops in Bitcoin and in ETH.

6         MR. ARAD:  Mr. Iannuzzelli, if you could please go to

7    the Bitcoin tab and go to cell B 4286.

8    Q.  What is the date there?

9    A.  That is the 4th of April of 2022.

10   Q.  And the price?

11   A.  $46,014.87.

12        MR. ARAD:  Mr. Iannuzzelli can you please go to cell

13   B 4331?

14   A.  $29,579.09.

15   Q.  And so that went down; right?

16   A.  It did.

17   Q.  About 35 percent?

18   A.  It did.

19        MR. ARAD:  So for ETH now, Mr. Iannuzzelli, if you

20   could please go to the ETH tab?  Let's compare cell B 2437.

21   Q.  What is the date there?

22   A.  That is the 4th of April of 2022.

23   Q.  And what is the price?

24   A.  $34,077.68.

25        MR. ARAD:  And Mr. Iannuzzelli, if you can go to cell

1   B 2482?

2   A.  That's $1969.92.

3   Q.  And that went down; right?

4   A.  It did.

5   Q.  About 43 percent?

6   A.  I'll take your word for the percentage.

7   Q.  So let's recap.  TORN went down 18 percent; right?

8   A.  OK.

9   Q.  Bitcoin went down 35 percent; right?

10  A.  OK.

11  Q.  And ETH went down 43 percent; right?

12  A.  Yes.

13  Q.  Fair to say that during the time period when the Ronin

14  hackers were depositing funds into Tornado Cash, TORN performed

15  notably better than Bitcoin and ETH?

16  A.  There were also others.

17  Q.  Yes or no, please.

18  A.  Yes.

19        MR. ARAD:  Mr. Iannuzzelli, could you please go to the

20  last slide in Dr. Hurder's deck?  I am actually looking for the

21  slide with the 50 percent drop in the price of TORN.  Sorry if

22  it is not the last one.  There we go.

23  Q.  Dr. Hurder, earlier you used the words "advantageous choice

24  of start date" to describe one of the government's charts;

25  right?

1    A.  Yes.

2    Q.  And you thought it was advantageous because the government

3    started at a low point; right?

4    A.  Yes.

5    Q.  Where is the price of TORN highest on this chart?

6    A.  The 3rd of March.

7    Q.  Is that where you started your analysis?

8    A.  That's correct.

9    Q.  Is that how it got to 50 percent down?

10   A.  That is the numerical calculation.

11   Q.  I want to switch topics now from advantageous start dates

12   to control.

13              MR. ARAD:  We can take this down, Mr. Iannuzzelli.

14   Q.  You testified earlier that DAOs decentralized control;

15   right?

16   A.  That's correct.

17   Q.  That just means basically that decisions about the entity

18   or the project involved are made by a group of people that may

19   or may not know one another; right?

20   A.  Yes.

21   Q.  We can agree that not all DAOs are built the same way;

22   right?

23   A.  That's correct.

24   Q.  And they exist on a spectrum; right?

25   A.  Yes.

P7T5sto4                         Hurder - Cross

1   Q.  Some DAOs are more decentralized than others; right?

2   A.  Yes.

3   Q.  And DAOs that have tokens, some people who have tokens can

4   vote on pretty much everything and other DAOs that have tokens,

5   people can vote on just a few things; right?

6   A.  Right.

7   Q.  And how much power the DAO has depends on how the project

8   is set up; right?

9   A.  That's correct.

10  Q.  We can also agree that how powerful a DAO is depends on how

11  many votes the founders have compared to everybody else; right?

12  A.  Let me think about that for a second?

13  Q.  Sure.

14  A.  Yes.

15  Q.  So let's walk through an example.  Suppose a DAO has issued

16  a thousand tokens, each with one vote; OK?

17  A.  Yes.

18  Q.  Imagine the founder has 900 tokens?

19  A.  Yes.

20  Q.  Imagine 100 other investors have one token each.

21  A.  OK.

22  Q.  And imagine that majority vote wins.  Can we agree that

23  everybody can vote but really the founder has the power to

24  decide any one of those votes?

25  A.  If he chooses to exercise his votes.

P7T5sto4                        Hurder - Cross

1    Q.  The question was whether the founder has the power, not

2    whether he chooses to exercise it.

3    A.  Yes.

4    Q.  And I will ask you to please answer the questions yes or

5    no.

6            So, let's turn to talk about Tornado Cash.  Roman

7    Storm and his co-founders had about 2.5 million TORN, right?  A

8    little bit under that?

9    A.  I'm multiplying.  Hold on.  Approximately.

10   Q.  I admire your mental math.

11           And about 800,000 of TORN that they had vested in

12   December of 2021; right?

13   A.  Across the three of them you mean?

14   Q.  Yes.

15   A.  That's correct.

16   Q.  Now, the total number of votes on a particular proposal

17   reflected the amount of TORN that was staked for that vote;

18   right?

19   A.  Yes.

20           MR. ARAD:  Mr. Iannuzzelli, could you please put up

21   slide 15 of Dr. Hurder's deck?

22   Q.  Looking at the total votes column, the highest number of

23   votes cast on any of these proposals was 173,829; right?

24   A.  That's correct.

25   Q.  That's the one on the bottom?

1  A.  Yes.

2  Q.  And the founders collectively had about 800,000 vested TORN

3  by that time; right?

4  A.  That's correct.

5  Q.  And so, each one of them had -- and you are better at

6  mental math than I am -- but well over 200,000 TORN; right?

7  A.  That's correct.

8  Q.  So any one of those could have potentially decided this

9  election, right, and together they definitely could have?

10  A.  Yes.

11  Q.  And that was also true of Proposal 12; right?

12  A.  Yes.

13  Q.  And it was also true for Proposal 11; right?

14  A.  Yes.

15  Q.  And it was also true for Proposal 10; right?

16  A.  Yes.

17  Q.  But it wasn't true of Proposals 1 through 9; was it?

18  A.  I can't fully answer that with a yes or no.

19  Q.  Let's break it down.  The founders had 800,000 TORN that

20  vested in December of 2021; right?

21  A.  Yes.

22  Q.  And you testified earlier that the fact that their TORN

23  hadn't vested until then meant that they couldn't use it to

24  vote on governance proposals; right?

25  A.  That's right.

1    Q.  So the founders were not able to use their TORN to vote on

2    Proposals 1 through 9; right?

3    A.  That's correct.

4    Q.  But the way that they designed the system, their TORN

5    vested in December 2021; right?

6    A.  Yes.

7    Q.  And all of a sudden they had all of this power to decide

8    every proposal; right?

9    A.  They did.

10   Q.  So Tornado Cash became less decentralized over time, not

11   more; isn't that right?

12   A.  The distribution of tokens became less decentralized.

13   Q.  Please answer yes or no.

14   A.  Yes.

15   Q.  Dr. Hurder, I want to shift back to TORN.  We have talked a

16   lot about it and you testified that TORN is a governance token;

17   right?

18   A.  That's correct.

19   Q.  But at the end of the day, Dr. Hurder, Roman Storm and his

20   co-founders created TORN; right?

21   A.  No.

22   Q.  Roman Storm and his co-founders designed TORN and turned it

23   into a proposal; right?

24   A.  Yes.

25   Q.  So Roman Storm and his co-founders designed the TORN token;

P7T5sto4                     Hurder - Redirect

1   right?

2   A.  I believe that's true.

3   Q.  And they got a bunch of it; right?

4   A.  Yes.

5   Q.  And they sold it for millions of dollars; right?

6   A.  Based on the sales data I have been --

7   Q.  Please answer yes or no.

8   A.  Yes.

9   Q.  They sold it for millions of dollars; right?

10  A.  They did.

11          MR. ARAD:  No further questions.

12          THE COURT:  Redirect.

13  REDIRECT EXAMINATION

14  BY MS. AXEL:

15  Q.  Dr. Hurder, can we look at your slide deck 9050-1 and can

16  we look at, for example, page 2?

17          Dr. Hurder what was your role in preparing this slide

18  deck?

19  A.  I provided the information on the slides.

20  Q.  And does this relate to the disclosure that you provided to

21  us and to the government?

22  A.  Yes.

23  Q.  So you have extensively reviewed this document?

24  A.  Many, many, many times.

25  Q.  Does it appropriately capture your conclusions and

P7T5sto4                        Hurder - Redirect

1   opinions?

2   A.  It does.

3   Q.  Have you made personal edits to it?

4   A.  Many, many, many times.

5   Q.  For example, page 5 of this document, Dr. Hurder, where did

6   this come from?

7   A.  That is taken from a slide that I made and sent to you.

8   Q.  And the data underlying all of the charts, where did that

9   data come from?

10  A.  I downloaded it.

11  Q.  And with respect to the pricing, let's take a look at

12  page 19.  How were these charts derived, Dr. Hurder?

13  A.  I provided the data that counsel had shown on that

14  spreadsheet and a graphic designer graph of it.

15  Q.  Is this a summary chart of the data that you gathered?

16  A.  Yes.

17  Q.  And have you reviewed it?  I mean is it prepared

18  automatically, essentially, through software?

19  A.  Yes.

20  Q.  Yes.

21          And so, have you reviewed this and does this summarize

22  the data that you provided and the conclusions that you had?

23  A.  Yes.

24  Q.  Let me go back, actually, let's just start with page 15,

25  and you testified about this and it is in evidence.

1    A.  That's correct.

2    Q.  Dr. Hurder, what evidence did you see that the founders did

3    not in fact control the voting here?

4    A.  There were two pieces.  First, Mr. Werlau testified that

5    the founders did not vote their founding TORN on Proposal 10,

6    which as was just asked, this was during the period when their

7    founders TORN had vested but they did not vote it, according to

8    Mr. Werlau.

9    Q.  And what other evidence?

10   A.  Proposal 13, which is the proposal that I discussed earlier

11   where it failed, I have seen founders chats where the founders

12   discussed that they really wanted this proposal to pass but it

13   nonetheless failed.

14   Q.  And have you seen other evidence that it was an active

15   community?

16   A.  I have.

17   Q.  You were asked about ownership of TORN.  Did Peppersec ever

18   own any TORN?

19   A.  Not to my knowledge.

20   Q.  And so, when you were referring to the founders TORN, who

21   owned that TORN?

22   A.  That was TORN that was owned by the three individuals.

23   Q.  And you can, in fact, trace on the blockchain whether or

24   not the founders voted their TORN; is that right?

25   A.  It can be done.  It is not my area of expertise but, yes,

1    it can be done.

2    Q.  Which is why you relied on Mr. Werlau for that point?

3    A.  Yes.

4    Q.  And you were asked a question about decentralization.  What

5    was your observation about decentralization at the time of the

6    relayer registry?  What aspects of Tornado Cash were

7    decentralized?

8    A.  I think -- I mean there is, again, as we have talked about,

9    there are multiple participants in the DAO.  The relayer

10   registry, in my opinion, increased decentralization because

11   rather than having to rely on recommendations from founders or

12   single Medium posts, the available set of relayers was

13   determined by the individual choices of the relayers and the

14   code.

15   Q.  You were asked a question about what participants in the

16   relayer registry had to do in order to participate in it.  Do

17   you recall that?

18   A.  Yes.

19   Q.  And what did they have to do?

20   A.  So, participants who wanted to be listed in the relayer

21   registry had to acquire somehow some TORN, I believe it was at

22   least 300 TORN, and then they had to stake it, and then I

23   believe they had to specify some information like whether they

24   were going to charge a fee and how much it would be.

25   Q.  And you were asked whether that created demand for TORN?

1   A.  That's correct.

2   Q.  So, have you looked at whether or not you thought that that

3   need for TORN would in fact increase the price of TORN?

4   A.  I thought it wasn't obvious that it necessarily would.

5   Q.  Why is that?

6   A.  So, at the time that the relayer registry was introduced,

7   there were millions of TORN in circulation and a relayer was

8   required to stake 300.  So, in order for demand for TORN from

9   the relayer registry to meaningfully impact the price, you

10  would need quite a bit of TORN to be staked.

11  Q.  And given the circulating supply, what was your conclusion?

12  A.  That it's not obvious that people staking 300 tokens is

13  going to meaningfully change the price when the circulating

14  supply is millions.

15  Q.  Mr. Arad also asked you whether the relayer registry helped

16  to conceal money.  Do you remember that?

17  A.  I did.

18  Q.  Why?

19  A.  In my opinion, I mean, relayers were already available.  So

20  it is true that the relayer registries may have made it easier

21  for some people to find a relayer but relayers were already in

22  use beforehand and even during the relayer registry period you

23  could get a relayer without using the registry.

24  Q.  Let's take a look at your chart 9050-22.

25          So why did you focus your analysis at this period of

1  time, starting on 3/3/22?

2  A.  I included 3/3/22 to take into account what might have been

3  considered the announcement price spike, the anticipatory price

4  spike.

5  Q.  And how do you separate out that anticipatory price spike

6  from your analysis about whether or not the relayer registry

7  increased the price?  How does it factor into your analysis?

8  A.  I think it's possible that there was an anticipatory price

9  spike but, as I said, I would anticipate that if the relayer

10  registry were generating meaningful changes and demand, that

11  you would see changes in improvements in price for more than --

12  I mean to be generous -- two days.

13  Q.  So, as Mr. Arad said, people needed more TORN in order to

14  participate in a relayer registry.  You would expect that

15  effect to continue over time?

16  A.  Yes.

17  Q.  And in fact to increase?

18  A.  Yes.

19  Q.  OK.  Let's look at your page 23.  Did you prepare this

20  based on -- or was this prepared using software based on the

21  data that you have and have you checked it?

22  A.  I have, yes.

23  Q.  You were asked about comparing certain prices of Bitcoin,

24  Ethereum, and TORN from April through May 19.  Do you recall

25  that?

1   A.  Yes.  That's correct.

2   Q.  And, to your knowledge, was it a public matter exactly when

3   the Ronin hackers were putting proceeds through Tornado Cash?

4   A.  To my knowledge those -- the timing of those deposits was

5   not public.

6   Q.  And so, what was the public issue that you focused on?

7   A.  I focused on when relevant news sources were covering the

8   association between the hack and Tornado, the pools.

9   Q.  And what date was that?

10  A.  That first announcement came out on the 29th of March and

11  continued to be in the news for weeks.

12  Q.  And you were asked about a particular period of time --

13  that particular period of time from April through mid-may and

14  the differences between Bitcoin and the TORN price; correct?

15  A.  Yes.

16  Q.  I believe that you also began a question that you weren't

17  allowed to finish.  So, what other factors do you think were

18  not considered when with Mr. Arad walked you through those

19  numbers for that period of time?

20  A.  I mean, one piece that was an event in that time period was

21  the introduction of, I believe, the Chainalysis sanctions tool

22  was introduced in mid-April, and that's another, as I

23  mentioned, one of the challenges of time series data, is that

24  lots of things happen and it is hard to disentangle what causes

25  what, and introducing that sanctions tool might have been

1   important as well.

2   Q.  So the sanctions tool might have in fact increased the

3   value of TORN as compared to ETH and BTC?

4   A.  That's right.

5   Q.  Your overall conclusion that during this period of time

6   TORN remained highly correlated with BTC and ETH?

7   A.  Yes.

8   Q.  Was that based on statistical analysis that you ran?

9   A.  Yes, it was.

10  Q.  You have training and experience as an economist to run

11  that statistical analysis?

12  A.  I do.

13              MS. AXEL:  One second?

14              (Counsel conferring)

15              MS. AXEL:  Your Honor, I said at the outset that I was

16  going to move into evidence the last five pages.

17              THE COURT:  Oh.  I thought you had moved in things --

18  I thought you were speaking of individual pages that we had

19  admitted in.

20              MS. AXEL:  I mentioned those because I had not flagged

21  them to begin with.  I had flagged the last five pages and I do

22  think at the end I forgot to mention pages 19 through 25 were

23  the summary charts that I intended to admit.

24              THE COURT:  Mr. Arad?

25              MR. ARAD:  Could I just see exactly which ones they

P7T5sto4                            Hurder - Redirect

1    are?

2                MS. AXEL:  Sure.

3                (Counsel confer)

4                MS. AXEL:  There are duplicates, so let's clarify.

5    19, 20, 21, 22 -- this is the same -- 19 through 22 and 24.

6                (Counsel conferring)

7                MS. AXEL:  Through 19 through 22 and 24.

8                MR. ARAD:  No objection.

9                THE COURT:  Thank you.

10               Defendant's Exhibit 9050-19, 9050-20, 9050-21,

11   9050-22, and 9050-24 are admitted into evidence.

12               (Defendant's Exhibits 9050-19, 9050-20, 9050-21,

13   9050-22, 9050-24 received in evidence)

14               MS. AXEL:  No further questions.

15               THE COURT:  Thank you.

16               Dr. Hurder, you may step down.  Thank you very much.

17

18

19

20

21

22

23

24

25

P7T1STO1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                  23 Cr. 430 (KPF)

5   ROMAN STORM,

6              Defendant.        Jury Trial
    ------------------------------x

7                            New York, N.Y.
8                            July 29, 2025
                            8:55 a.m.
9

10  Before:

11                HON. KATHERINE POLK FAILLA,

12                            District Judge

13                    APPEARANCES
14

    JAY CLAYTON
15      United States Attorney for the
        Southern District of New York
16  BY:  NATHAN M. REHN, ESQ.
        BEN ARAD, ESQ.
17      BENJAMIN A. GIANFORTI, ESQ.
        KEVIN G. MOSLEY, ESQ.
18      TARA M. LA MORTE, ESQ.
        Assistant United States Attorneys
19

    WAYMAKER LLP
20      Attorneys for Defendant
    BY:  BRIAN E. KLEIN, ESQ.
21      KERI CURTIS AXEL, ESQ.
        KEVIN M. CASEY, ESQ.
22      VIVIANA ANDAZOLA MARQUEZ, ESQ.

23      -and-

24  HECKER FINK LLP
        Attorneys for Defendant
25  BY:  DAVID E. PATTON, ESQ.
        CHRISTOPHER MOREL, ESQ.

P7T1STO5                         Green - Direct

9               (Witness sworn)

10              THE DEPUTY CLERK:  Thank you.  Please be seated and

11      into the microphone, state and spell your full name for the

12      record.

13              THE WITNESS:  Matthew D. Green.  M-A-T-T-H-E-W, D,

14      G-R-E-E-N.

15              MR. KLEIN:  And your Honor, we have some demonstrative

16      slides.  Can I pull up the first slide to——

17              THE COURT:  You may.

18              May I know, is there any objection to the

19      demonstrative slides?

20              MR. ARAD:  Prior objection, your Honor.

21              THE COURT:  Okay.  That's been overruled, so thank

22      you.

23              MR. KLEIN:  Mr. DeMarco, would you please pull up

24      DX 8951, the first slide.

25

P7T1STO5                          Green - Direct

1      MATTHEW D. GREEN,

2          called as a witness by the Defendant,

3          having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. KLEIN:

6    Q.  Dr. Green, where do you work?

7    A.  I'm a professor of computer science at Johns Hopkins

8    University.

9    Q.  And what do you do there?

10   A.  Well, I teach students, undergraduate students and graduate

11   students, and I do research as well with my graduate students.

12   Q.  And what topics do you teach?

13   A.  I mostly teach the field of cryptography, computer

14   security, and I work specifically on privacy topics as well.

15   Q.  Can you talk a little bit your educational background.

16   A.  Well, I have an undergraduate degree in computer science; I

17   have, after that, a master's degree in computer science; and I

18   received my PhD in computer science focused on cryptography and

19   privacy topics, also at Johns Hopkins University.

20   Q.  And have you received grants in connection with your work?

21   A.  Yes.

22   Q.  Can you talk about the DARPA grant.

23   A.  Well, I've worked on more than one DARPA grant, but one

24   DARPA grant, which is on the slide, is called Securing

25   Information for Encrypted Verification and Evaluation, and it

1   is a way to basically compute on data that's encrypted so we

2   can do the computation without having anyone see the data that

3   you are actually computing on.

4   Q.  What is DARPA?

5   A.  Oh, sorry.  DARPA is the Defense Advanced Research Projects

6   Agency.  It's an agency of the U.S. government that does

7   research for the Defense Department.

8   Q.  Have you written papers on various academic topics?

9   A.  Yes.

10  Q.  Please describe in general the topics you've written

11  academic papers on.

12  A.  I've written papers on many different topics, but most of

13  them deal with the field of cryptography, which is a way to

14  protect information mathematically; computer security; privacy;

15  cryptocurrency; blockchains; and probably missing some, but

16  those are some of the topics.

17  Q.  And have you in fact created a cryptocurrency or helped to

18  create one?

19  A.  I helped to design a cryptocurrency, which is called Zcash.

20  It was about a decade ago.

21  Q.  And do you have professional experience with online

22  security and privacy?

23  A.  Yes.  I also, some time ago, in the 2000s, co-founded a

24  company which did security evaluation, and we were looking at

25  real companies' security products, trying to find bugs in them

P7T1STO5                          Green - Direct

1    and fix those bugs.

2    Q.  And have you given speeches about the topics of your

3    research?

4    A.  Yes.

5              THE COURT:  Can you just move the microphone a little

6    closer to you.

7              THE WITNESS:  Oh, yes.  I will.

8              THE COURT:  Thank you very much.

9              Thank you, counsel.

10             MR. KLEIN:  Yes, your Honor.

11   BY MR. KLEIN:

12   Q.  Have you given speeches about similar topics?

13   A.  Yes.  I've given talks, I've given some small talks and

14   large talks about all of these topics.

15   Q.  At conferences?

16   A.  Yes.

17   Q.  Have you testified before Congress?

18   A.  Yes.

19   Q.  What did you testify about?

20   A.  I testified about encryption and law enforcement access and

21   the relation between those two problems.

22   Q.  Do you have patents?

23   A.  I do.

24   Q.  Generally speaking, what do your patents cover?

25   A.  Oh, I have some patents dealing with different ways of

P7T1STO5                          Green - Direct

1    securing data with encryption and some older patents that deal

2    with video.  I used to work for AT&T Labs, and we worked on

3    video there.

4    Q.  In connection with your work have you received honors and

5    awards?

6    A.  I have.

7    Q.  Could you talk for a moment about the Test of Time Award.

8    A.  So I worked on cryptocurrency back in 2000——2014.  We

9    published a paper, which was about how to build private

10   cryptocurrencies, and about 10 years later, the conference that

11   published that paper has a thing called the Test of Time Award,

12   where they go back 10 years and they say, which of these papers

13   were relevant to the real world, and if they think your paper

14   is relevant, they give you this Test of Time Award, and we

15   received that last year, I think.

16   Q.  And what organization is that?

17   A.  That is——I'm sorry.  That's the IEEE.  The IEEE stands

18   for——and I'm sorry about this, I'm always missing a word——the

19   International Electrical and Electronic Engineers.  I think

20   that's it.  That is what it is.  Okay.  I'm sorry.  I'm

21   probably missing a word there.

22   Q.  That's okay.  And what does that organization do,

23   generally?

24   A.  They're kind of a big organization of people who do

25   technology.  They started just with electrical engineers, but

P7T1STO5                      Green - Direct

1  they also focus on computer science, and they have conferences

2  on computer security topics, and this happened to be one of

3  those conferences.

4  Q.  Are you a member of any organizations related to the topics

5  of your studies?

6  A.  Yes.  I'm also a member of the International Association of

7  Cryptologic Engineers——sorry——International Association of

8  Cryptologic Researchers, which is the IACR, and they are

9  another organization of researchers that work on cryptography.

10 Q.  And have you testified before as an expert?

11 A.  I have testified, yes.

12         MR. KLEIN:  Your Honor, I move to qualify Dr. Green as

13 an expert in cryptocurrency, cryptography, online information

14 security and privacy.

15         MR. ARAD:  No objection.

16         THE COURT:  He is so qualified.  Thank you.

17 Q.  Dr. Green, in connection with this case, have you reviewed

18 certain things?

19 A.  Yes.

20 Q.  Can you give the jury a general sense of the things you've

21 reviewed.

22 A.  Well, I reviewed a lot of documents.  Some of them were

23 public articles in places like Medium.  We've seen some of

24 those here.

25         I reviewed academic papers about cryptography and

P7T1STO5                        Green - Direct

1    cryptocurrency.  I have read many of those over the years, so

2    those were kind of included.

3             I reviewed the source code for Tornado Cash.

4             I reviewed GitHub repositories for Peppersec.

5             I reviewed a lot of blockchain data from places like

6    Etherscan.

7             And I think that's the majority of it.  There may be

8    some other things I've looked at in the past.

9    Q.  And you've been present here for some of the testimony?

10   A.  Some of it, yes.

11   Q.  For example, Mr. Werlau?

12   A.  Yes.

13   Q.  Are you being paid for your time?

14   A.  No.

15   Q.  Is your travel and lodging being reimbursed?

16   A.  I hope so.

17   Q.  The answer is yes.

18   A.  Yes.

19            MR. KLEIN:  Can we move to the next slide, please,

20   Mr. DeMarco.

21   Q.  I want to talk to you for a moment about tools for online

22   privacy.

23            Are there technologies that help people protect their

24   private information online?

25   A.  Yes.

P7T1STO5                          Green - Direct

1    Q.  I'd like you to talk about a few of those.

2           What is encryption?

3    A.  Well, every time you make a connection using an app or you

4    go visit a website, the data you send is encrypted, and the

5    reason it's encrypted is, especially if you're using WiFi, but

6    any time you communicate over the internet, people can listen

7    in on the data you're sending, so whether it's typing your

8    password into a website or typing your credit card into a

9    website, we have to make sure that data is protected, or at

10   least website designers want to make sure that information is

11   protected.  Encryption is one of the biggest tools for doing

12   that.

13          And another place we care about encryption is if you

14   use an app like WhatsApp or iMessage, which are encrypted

15   communication apps, those apps will encrypt your messages so

16   that only the person you're talking with receives the actual

17   data, the actual content of what you're saying.  Anyone who's

18   trying to listen in, even the companies that operate those

19   services, can't read your messages.

20   Q.  Does that include the government too?

21   A.  That would include the government.

22   Q.  Let's talk for a moment about web browsing.  How is that

23   encrypted and what companies engage in that type of encryption?

24   A.  Just about every web browser.  So that would include

25   Google's Chrome, it would include Apple Safari, it would

P7T1STO5                         Green - Direct

1   include Firefox, if you use that.

2            THE COURT:  Just slow down for court reporter and

3   judge.  Thank you.

4            THE WITNESS:  Okay.

5            THE COURT:  Repeat.  Thank you.

6   A.  That would include just about every web browser——Google

7   Chrome, Apple Safari, and Mozilla Firefox as well.

8   Q.  And do companies promote the fact that they have encrypted

9   technology built into the web browsing?

10  A.  Yes.

11  Q.  And also the messaging apps, do they promote that

12  encryption too?

13  A.  Yes.

14  Q.  Let's talk for a moment about VPNs.  What is a VPN?

15  A.  VPN stands for virtual private networking, or network.

16  It's a way to——that does really two things.  One of the things

17  it does is it sends your web browsing through another computer

18  somewhere else, and it encrypts that communication.  So the

19  first thing it does is encrypts that communication.  The second

20  thing that it does is it hides your source IP address so people

21  who are on the other end of that connection can't see the IP

22  address of your computer, which is where you're coming from,

23  and so it gives you some added privacy when you're

24  communicating with websites, and doing anything on the web.

25  Q.  Who uses VPNs?

P7T1STO5                          Green - Direct

A.  A lot of people.  Governments use VPNs, corporations use VPNs, but you can also buy access to a commercial VPN for a few dollars a month.

        This——on the slide, I have an ad for a company called NordVPN, which is one of the many VPNs that advertise their services that normal consumers can use.

Q.  Let's talk for a moment now about tokenization.  What does that term mean in the context of online privacy?

A.  So this refers to a technology where, if you're using credit cards, you can replace your credit card with another credit card number.  Most consumers don't do this, but the systems that actually handle the credit cards do this.  When you use something like Apple Pay, which is where you tap your phone to pay, sometimes what's happening there is your actual permanent credit card number is not being given to the store.  Apple Pay will derive a one-time temporary credit card number, and that's the number that goes to the merchant you're paying.  And the reason they do that is credit card numbers are stolen very frequently.  So if somebody hacks into the merchant, this case, instead of getting your actual credit card number, they'll get this temporary credit card number, not the real thing, and then they won't be able to use that for fraud, hopefully.

Q.  Do a lot of online payment companies offer this?

A.  At least Apple Pay does use this, and I think Google Pay

P7T1STO5                          Green - Direct

1    does as well.

2    Q.  Have you heard of Tor?

3    A.  Yes.

4    Q.  What is Tor?

5    A.  Tor stands for The Onion Router, and it's sort of like a

6    VPN but it gives you extra privacy.  So instead of sending your

7    communications through one server, it sends them through

8    multiple servers, and the idea is it gives you extra privacy,

9    particularly in cases where the person controlling the network

10   that you're communicating with might not be trustworthy.

11   Q.  And who originally launched or created Tor?

12   A.  Tor was originally——the research that led to Tor was funded

13   by the Naval——the U.S. Navy under the Naval Research

14   Laboratories.

15   Q.  And has the State Department recommended Tor?

16   A.  Yes.

17              MR. ARAD:  Objection.

18              THE COURT:  Move on.

19              MR. KLEIN:  Let's move on to the next slide, please,

20   Mr. DeMarco.

21   Q.  I want to focus in on online financial security.

22              What are the security concerns with conducting

23   financial transactions online?

24   A.  Well, first off, if we're talking about the sort of

25   traditional banking and credit card services, to start with,

1    there are some pretty well-known security concerns, one of

2    which is that if the bank you're using or one of the credit

3    card agencies is subject to a data breach, your data can be

4    stolen, and that can lead to credit cards being stolen; it can,

5    in the worst case, lead to actual funds being stolen, but it

6    can also lead to your personally identifiable information being

7    stolen, and that can lead to other bad consequences.

8    Q.  Can you talk for a moment about hacks; focus on that.

9    A.  Well, there have been many, many hacks where criminals

10   break into servers, they break into servers that are run by

11   banks or credit card companies or credit reporting agencies,

12   and they steal entire databases' worth of data, and that data

13   then can be used for identity theft, it can be used to actually

14   defraud you or to find different ways to steal money from you.

15   Q.  Now a moment ago you talked about some online privacy

16   tools.  How are those tools helpful with preventing these kind

17   of things you're talking about now?

18   A.  Well, so the—those tools that I mentioned do help you from

19   some attackers, people who are listening to your network

20   communications, for example.  Tokenization can protect you if

21   somebody hacks into a store and steals credit card numbers.

22   But in other cases, they may not always help you.  If you have

23   to use your real name and actual information about yourself to

24   establish a credit account and then somebody hacks into the

25   credit provider or credit reporting agency, that information

P7T1STO5                         Green - Direct

1    will be available, and so they're helpful in some ways, not

2    helpful in others.

3    Q.  And let me ask you——one second.

4         MR. KLEIN:  Let's go to the next slide.

5    Q.  What are the two major cryptocurrencies?

6    A.  I think the two largest by market cap cryptocurrencies are

7    Bitcoin and Ethereum.

8    Q.  And do those currencies provide privacy to the users of

9    them who participate in them?

10   A.  Not necessarily.  One of the big problems with Ethereum and

11   Bitcoin is that they're run by many different computers, and

12   one of the design choices in building those cryptocurrencies is

13   that every computer on the network has to look at every single

14   transaction, and that's a good thing because it means that

15   everybody is checking to make sure that those transactions are

16   valid.  The downside of that approach is that everybody has to

17   see those transactions.  And transactions contain information

18   like the source account ID, the destination account ID of a

19   transaction, and the amount that's being paid.  And so that

20   information becomes public.

21   Q.  And you were talking about——are you talking about the

22   addresses?

23   A.  Sorry.  Yes.  Addresses, sometimes accounts, yes,

24   addresses.

25   Q.  And are those sort of like bank account numbers?

P7T1STO5                         Green - Direct

1    A.  Yeah.  They're long numbers, and you've heard someone read

2    them in here.  They're long numbers that uniquely reference

3    your account.

4    Q.  Let's move on to the next slide.

5            What is a blockchain explorer?

6    A.  So while I just said that that transaction information goes

7    to many computers, that doesn't mean that everybody wants to

8    run their own computer, if they want to see that transaction

9    data.  And there's sometimes interest in seeing it, so some

10   people run websites where you can go and you can look at all

11   the transactions on, in this case Ethereum, and these

12   blockchain explorers is what you type in an address or a

13   transaction identifier and you can see that information.  You

14   can even move around and see related transactions.  And all of

15   that information gets presented on a nice website for you to

16   read.

17   Q.  Are those websites publicly available?

18   A.  Yes.

19   Q.  And when you go and let's say you type in an address and

20   you find it, can you also trace back to all the other

21   transactions that address had been involved in?  How far back

22   can you go?

23   A.  You will see all of the transactions that are associated

24   with that particular address.  You can click on them, and they

25   go back, as far as I know on Etherscan, since the founding of

1    Ethereum, which is in 2015.

2    Q.  Let's talk for a moment about some examples.

3         MR. KLEIN:  Can you turn to slide 6, please,

4    Mr. DeMarco.

5    Q.  Let's focus back in 2017, '18, '19, '20.  Are there

6    well-known examples of people tracking people's movement of

7    funds along the Ethereum network?

8    A.  Yes.

9    Q.  Can you give us some examples.

10   A.  Well, for many years——there are so many examples, but one

11   that's on this slide is the——one of the founders, the author of

12   the Ethereum paper is Vitalik Buterin, and he has some Ethereum

13   that he owns, and so he will occasionally move or spend some

14   Ethereum from one account, send it to another.  Since that's

15   available on the blockchain, everybody can know about that

16   instantly, and there are people who watch his wallet and

17   determine whether that's happening, and that results in tweets,

18   as you can see here, it results in news stories.  Almost

19   instantaneously, that information is public.

20   Q.  So when people who have been identified——sorry.  Let me

21   step back and rephrase that.

22        In your experience are there lots of stories about

23   public figures moving funds along the Ethereum network?

24   A.  Yes.

25        MR. KLEIN:  Let's move forward to the next slide,

1    please.

2    Q.   What are some of the dangers of using a cryptocurrency like

3    Ethereum, or ETH?

4    A.   Well, every time you pay somebody, or move money on

5    Ethereum, you are revealing information about yourself.  So for

6    example, if I make a payment to buy a cup of coffee, the person

7    who receives that money will know my wallet address, and then

8    they can go on Etherscan or a blockchain explorer and they can

9    see how much money I have in my account and they can see any

10   other people I've interacted with.  They can see my entire

11   history as far back as the wallets existed.  And so there's

12   some risk to that.  If you happen to have cryptocurrency, that

13   means that people can potentially do things.  You know, knowing

14   that you have money, they can use that information in ways that

15   will harm you.

16   Q.   What are some of the examples of things people can do?

17   A.   So one of the least bad things they can do to you is that

18   once they know you have a wallet with funds in it, a lot of

19   money, they can try to hack into your computer remotely or they

20   can try to send you phishing emails to trick you into stealing

21   your money.  But there are worse things they can do.

22   Q.   Is that common, those kind of attacks?

23   A.   Extremely common.

24   Q.   And you were going to go on to something else?

25   A.   Another thing that people do—and this is sort of in the

P7T1STO5                          Green - Direct

1    same category——is they will try to target people for fraud.

2    There are situations where people try to break into people's

3    cryptocurrency accounts at exchanges.  They'll do other things

4    to people to try to trick them.  That's——these are all things

5    that can happen.

6              And then there's a worse category where people who

7    have a great deal of cryptocurrency can be physically in danger

8    and at risk, where somebody could come and they could target

9    them for physical extortion, based on that information.

10             MR. KLEIN:  Let's move to the next slide, please,

11   Mr. DeMarco.

12   Q.  And has this been a pretty common phenomenon, these

13   dangerous hacking fraud, physical danger?

14   A.  Yes.  It's been something that's been happening over the

15   years, and it's certainly been accelerating.

16   Q.  And has it been widely reported in newspapers like *The New*

17   *York Times*?

18   A.  Yes.  So for example, this is an article from February of

19   2018 that talks about a whole series of different physical

20   attacks and where physical attacks means people actually tried

21   to hurt other people, or threaten to hurt other people for

22   their cryptocurrency.

23             MR. KLEIN:  Let's move forward, please, Mr. DeMarco,

24   to the next slide.

25   Q.  I want to talk for a moment about how you got involved in

P7T1STO5                          Green - Direct

1    cryptocurrency.

2            When did you first get interested or start to work

3    with cryptocurrency?

4    A.  So I first heard about Bitcoin from a colleague in 2011.  I

5    was really interested in the system.  I didn't believe that it

6    worked.  I spent about two to three weeks installing it, trying

7    it out, trying to find problems with it, and for the most part,

8    in terms of the actual functionality of using Bitcoin to send

9    money to people, I found that it worked pretty well.  I was

10   pretty surprised by that.

11           The thing that I thought was a huge bug in the system

12   was this fact that there was no privacy whatsoever, that every

13   time you spent money, you were revealing public information the

14   whole world could see.  And I thought that this was

15   interesting, but if cryptocurrency was ever going to be a big

16   thing, if it was ever going to be important to the real world,

17   this would have to be fixed before that could happen.  There

18   would have to be some kind of new technology that could hide

19   that information in the same way that when you use a bank, you

20   don't tell the whole world about every transaction you make.

21   And so I spent some time with my graduate students and we

22   looked into a way to fix this problem.  We came up with a

23   system that uses a technology called zero knowledge proofs, and

24   we wrote a paper about that.

25   Q.  And when did you write that paper?

P7T1STO5                         Green - Direct

1    A.   I think we wrote it in 2012 and we published it in 2013.

2    Q.   Was this in connection with that same symposium we talked

3    about, the IEEE?

4    A.   Yes.

5    Q.   Okay.  And you talked about some of the problems, but let's

6    talk about what you might have perceived as some of the

7    benefits.  What did you perceive as some of the benefits for

8    cryptocurrency?

9    A.   Well, at the time cryptocurrency wasn't being used very

10   much, so it was——this is in 2011——more of, to me, a toy than

11   anything real, and it was not something I thought people would

12   be using.  But some of the benefits of cryptocurrency were that

13   you controlled your own money, so if you are a person who——this

14   was after the financial crisis, just to be clear——didn't trust

15   banks, if you were a person who couldn't get access to a bank,

16   or if you just liked the idea of holding onto your own money,

17   this was a way to do it, where all you had to do was generate a

18   wallet and you could hold that money.  This could also

19   potentially be——and many people said this——a way to hedge

20   against inflation, since there was a limited supply of these

21   coins, so this was a way to control your funds without having

22   somebody else——

23            MR. ARAD:  Objection, your Honor.

24            THE COURT:  I'll allow it.  But I know it's coming to

25   an end.  Thank you.

1    MR. KLEIN:  Yes, it is, your Honor.

2    THE COURT:  Without having somebody else?  Just finish

3    the sentence, please, sir.

4    THE WITNESS:  Sorry.  This was a way that you could

5    control your own funds directly without entrusting them to a

6    third party.

7    THE COURT:  Thank you.

8    BY MR. KLEIN:

9    Q.  Turning back to your paper and zero knowledge proofs, can

10   you give the jury——I know it's very technical.  Can you give

11   the jury a very high-level sense of what that means, what a

12   zero knowledge proof is.

13   A.  Okay.  Oh, boy.  All right.  So, zero knowledge proofs.

14   They are a way that you can prove a mathematical statement to

15   somebody, like, I know some numbers that satisfy this equation,

16   and you can prove that to somebody so that they are convinced

17   of that fact mathematically but without knowing the numbers,

18   without knowing the secret numbers that you're trying to prove,

19   and that's it.  It's a technology that's been around since the

20   1980s, and it allows you in some cases to prove statements

21   like, I know a number that allows me to spend some

22   cryptocurrency.

23   Q.  That went over my head.

24        I want to turn to the next slide.

25        Talking about zero knowledge proofs, are there

1  cryptocurrencies that started to incorporate this technology?

2  A.  Yes.

3  Q.  Can you talk about some of them.

4  A.  Well, this slide shows a few of them.  It's not a complete

5  slide.  But over on the left, you can see there is a

6  cryptocurrency called Monero, which has been around since 2014,

7  uses zero knowledge proofs to achieve privacy for

8  cryptocurrency transactions.

9         Zcash is a cryptocurrency I was one of the scientific

10  advisors to.  That started in 2016.

11         Aztec is a cryptocurrency or a protocol that was

12  launched on Ethereum.  That launched in 2017.

13         Iron Fish is a more recent cryptocurrency on Ethereum.

14         And an even more recent one is Aleo, in 2024.

15  Q.  And do all those allow for private transactions?

16  A.  Yes.

17  Q.  And what do you mean by that?

18  A.  So a private transaction, as we've seen in this case, is a

19  transaction where I can make a transaction on the blockchain

20  but where somebody looking at the blockchain does not know the

21  past history or the current history of my wallet and where that

22  money came from and everything about me, the way they normally

23  would in a traditional cryptocurrency.

24  Q.  And you mentioned Zcash.  You were involved in that?

25  A.  Yes.

1    Q.  And did you seek venture capital funding for that?

2    A.  Yes.

3              MR. KLEIN:  Okay.  Let's move on to the next slide,

4    please.

5    Q.  You mentioned Vitalik Buterin earlier.  Has he spoken about

6    the issue of privacy in Ethereum?

7    A.  Yes.

8

9

10

11

12    Q.  Was there a discussion back in 2018 and '19 in the Ethereum

13    community about the need for privacy on the Ethereum network?

14              THE COURT:  I will allow a yes or no answer to that.

15    A.  Yes.

16              THE COURT:  Were you involved in that discussion, sir?

17              THE WITNESS:  I don't recall.  I don't think so.

18              THE COURT:  Okay.  Thank you.

19              MR. KLEIN:  Let's move on to the next slide.

20    Q.  Are you familiar with Tornado Cash?

21    A.  Yes.

22    Q.  At a high level, how does it work?

23    A.  So Tornado Cash creates a series of pools, and these pools

24    basically have Ethereum in them, and the idea is that anyone

25    can deposit their funds in a particular size——for example, 10

P7T1STO5                      Green - Direct

1   Ethereum at a time——into these pools, and then there is a way

2   that they can withdraw their money from those pools.  The

3   important thing is that instead of just saying, hey, I'm the

4   same person who deposited, the withdrawal portion of the

5   Tornado Cash system allows you to use a zero knowledge proof to

6   prove that you own the money that's in there, but because it's

7   a zero knowledge proof, you don't have to say which piece of

8   that money it is and you don't have to link it to a previous

9   transaction.

10  Q.  And so Tornado Cash incorporates your zero knowledge proof

11  idea?

12  A.  Yes.

13  Q.  And is that integral to how it works——

14  A.  Yes.

15  Q.  ——and how the pools work?

16          What is a setup ceremony?

17  A.  So one of the details about using the particular zero

18  knowledge proofs that Tornado uses is that they require some

19  special numbers called parameters that have to be generated,

20  and here is the tricky thing about them.  If the parameters are

21  generated by someone you don't trust, then they can hold——they

22  can end up holding a back door that would allow them to fake

23  zero knowledge proofs that aren't true, and in the worst case,

24  that could allow them to steal money from the Tornado pools, in

25  this case.  And so in order to make sure those numbers aren't

1    vulnerable, that there's no back door, Tornado used a

2    technology where a whole set of people all contributed to

3    generating those numbers, and I believe there were over 1100

4    different people, and the way this worked was that as long as

5    one of those people was honest and didn't hold onto that back

6    door, then the resulting numbers would be honest and nobody

7    would have the power to back-door the Tornado Cash system.

8    Q.   So you only needed one out of let's say the 1100 people to

9    be honest?

10   A.   That's correct.

11   Q.   Who invented this idea of a setup ceremony?

12   A.   My colleagues and I wrote the first paper about it back in

13   2015.

14   Q.   So as a result of this ceremony, what happened, or what can

15   happen?

16   A.   So after the ceremony happens, these numbers were generated

17   in such a way that no party would have the control or the

18   ability to back-door the system.  Those numbers were then

19   uploaded into the Tornado Cash pool smart contracts, and then

20   the smart contracts were given a final instruction which made

21   sure that nobody else would be able to change those numbers or

22   make any further changes to the content of the pools that would

23   allow them to control the pools, and this was on May 18th, I

24   believe, 2020.

25   Q.   Have you heard the term "immutable" before?

P7T1STO5                          Green - Direct

1    A.  Yes.

2    Q.  What does that mean to you?

3    A.  In computer science, it means can't be changed.

4    Q.  And are there immutable features to the Tornado Cash pools?

5    Are they immutable?

6    A.  Yes.

7    Q.  And what does that mean?

8    A.  Well, the code itself, the software, can't be changed

9    because that's part of the Ethereum network.  The software, for

10   a period before May 2020, allowed you to change those special

11   numbers, the parameters, but that was closed in May of 2020

12   when the final numbers were set after the trusted setup

13   ceremony, and then finally, the ability to change the numbers

14   was closed off in May of 2020.

15   Q.  Tornado Cash runs on the Ethereum network?

16   A.  That's correct.

17   Q.  And what does that mean, just so we understand?

18   A.  So the Ethereum network is a cryptocurrency that can also

19   run programs, and you can upload a program to the Ethereum

20   network, and the computers that run the Ethereum network will

21   remember the program, and then you can send a command that says

22   run the program on this data, and those computers will do that.

23   Q.  So the Ethereum network is sort of a layer 1 to the Tornado

24   Cash, is that——

25   A.  Yes.  It's a general platform that can run many different

P7T1STO5                         Green - Direct

1  programs, and sometimes people call that a layer 1

2  cryptocurrency, and the Tornado smart contracts are some of the

3  programs, but there are many others running on Ethereum.

4  Q.  And the people who process the Ethereum network, are they

5  processing the Tornado Cash system through it?  I mean, that's

6  a very layman's way of putting it.

7  A.  I'm sorry.

8  Q.  Are the node operators on Ethereum participating or helping

9  run the Tornado Cash network?

10  A.  Yes.

11  Q.  Can you explain how.

12  A.  Well, each node operator in Ethereum sees every

13  transaction, and they can check the transactions, run those

14  programs themselves on the inputs to make sure that the

15  transaction is correct.  And a subset of those nodes are really

16  particularly responsible for picking out the transactions,

17  including them in blocks, and making sure that they become part

18  of the permanent record of the Ethereum network.  So many nodes

19  on the Ethereum network check every program.

20  Q.  I want to turn back to immutability for a moment.  What are

21  the benefits of immutability with Tornado Cash?

22  A.  Well, one of the things that's important here is that

23  there's a lot of money at stake, and the amounts can be in the

24  millions and——not for Tornado Cash but for some

25  cryptocurrencies——in the billions of dollars.  And that's a lot

P7T1STO5                          Green - Direct

 1    of money to try to secure yourself if you're a small company or
 2    a person, whereas if you write a smart contract and the smart
 3    contract itself controls the money, then as long as you don't
 4    have a bug in the smart contract and other people look at the
 5    smart contract and make sure that there are no bugs, then there
 6    isn't really anything that any criminal could do to steal the
 7    money.  The money will be controlled by the rules of your
 8    program.  And even if somebody comes to you and hacks into your
 9    own personal computer, they can't make the smart contract do
10    anything it's not programmed to do.
11    Q.  So that prevents the people who created the smart contract
12    from accessing the funds that are deposited in it?
13    A.  Yes.
14    Q.  It would also keep out hackers?
15    A.  Yes.
16    Q.  What about fraudsters you talked about?
17    A.  Absolutely.  Yes.
18    Q.  And the other thing you mentioned, the physical threats,
19    does it help mitigate that?
20    A.  Yes.  Even if somebody comes to you and physically
21    threatens you, you can't make the smart contract give them
22    money, and that might be bad for you, but that's the way the
23    system works.
24    Q.  And what is a secret note?
25    A.  When you make a deposit into the Tornado pool, your

P7T1STO5                          Green - Direct

1    wallets, the wallet, the front end, the UI, gives you a note, a

2    secret note, and this is a big piece of data that you are

3    supposed to store yourself, and think of it like a receipt,

4    where if you put something in a coat check, you get a receipt,

5    you can go back and you can take that thing back.  And that's

6    what the secret note does.  It is your receipt that allows you

7    to take that money that you deposited back out at a later

8    point.

9              MR. KLEIN:  Judge, may I have one second.

10             THE COURT:  You may.

11   Q.  I want to turn from this pool for a moment and talk about

12   what's been called the UI.  Did you look at the UI, the

13   Peppersec UI?

14   A.  Yes.

15   Q.  And where was that code hosted or where was the repository?

16   A.  Oh, so there are a lot of different places you can find it.

17   There is——one of the repositories is on a site called GitHub,

18   and it is——for example, in the Tornado Cash repositories, there

19   is a variant of the UI.

20   Q.  What is minified code?

21   A.  So when you write normal code, like JavaScript code, you

22   write it for other human beings to read, so you add comments,

23   you name your functions, you name them things useful——useful

24   things.  For example, if you want to write a piece of code that

25   adds to numbers, you might name it Add To Numbers.  But then

P7T1STO5                          Green - Direct

1    the problem is, the code gets a little bit big because it's

2    written for humans to consume, not computers.  So there are

3    special tools that will take that code and they will shrink it

4    down by renaming things.  So for example, Add To Numbers might

5    get renamed to A1, and it's a lot smaller to have all your

6    functions be named A1 than Add To Numbers, but, you know, which

7    is great when you're downloading things over the internet or

8    using mobile networks, but at the same time it's very, very

9    hard to read, or much harder to read, and so that's what

10   minification does.

11   Q.  Could you still read minified code?

12   A.  You can read it; it's just more difficult.

13   Q.  Okay.  And does minified code help, for example, UI perform

14   better and move faster?

15   A.  Yes.

16   Q.  And why does it do that?

17   A.  Well, the code gets smaller and so the code can be

18   downloaded quickly.

19   Q.  And did you look at the UI, whether it was geoblocking?

20   A.  I——the UI code that I looked at does have some files that

21   are designed to assist in geoblocking.

22   Q.  And was there a point when it wasn't able to geoblock

23   anymore?

24   A.  So again, it's hard to notice from the code, but my

25   understanding is that depending on where the code was hosted,

1    that would determine whether the geoblocking happens.

2    Q.  And if it ended up being hosted at IPFS, would that make it

3    so it couldn't geoblock?

4    A.  That's my understanding.

5    Q.  Was it always hosted on IPFS?

6    A.  No.  I believe there was a point where it was hosted on a

7    U.S. web hosting provider.

8    Q.  And do web hosting providers typically do some geoblocking

9    themselves?

10   A.  Some do.

11   Q.  I want to talk to you now for a minute about the difference

12   between something like Tornado Cash and how it operates and a

13   centralized exchange like Coinbase.  What are the differences

14   between the two?

15   A.  So a centralized exchange is a company kind of like a bank.

16   It's traditional.  It has computers.  There are people who have

17   control of those computers.  You know, it presents a website

18   most of the time.  And so the idea there is that when you

19   deposit money into one of these centralized exchanges, the

20   people who run the centralized exchange now have control of

21   that money.  You don't have the control of that money anymore

22   with your keys.  And most of the time that's fine.  We do that

23   all the time with banks.

24          With centralized exchanges, however, in the

25   cryptocurrency world, some of them have not been quite as

```
 1   reliable as, like, U.S. banks, and the result is that those

 2   people, the people running the exchange, can leave with your

 3   money, they can get hacked and they can lose your money, and

 4   there isn't really much you can do about that.

 5   Q.  And do centralized exchanges or banks sometimes sell your

 6   personal information too?

 7   A.  Yes.

 8           MR. ARAD:  Objection.

 9           THE COURT:  I would prefer you lead less.  Are we

10   coming to the end of this topic?

11           MR. KLEIN:  We are, your Honor.

12           THE COURT:  All right.  I'll allow this one question.

13   Yes or no, sir.

14   A.  Yes.

15   Q.  Were you here when Mr. Werlau testified?  I think you said

16   you were.

17   A.  I was.

18   Q.  Do you recall him testifying about a hypothetical user

19   registry for Tornado Cash?

20   A.  I do.

21

22

23

24

25
```

P7T1STO5                              Green - Direct

 1

 2    BY MR. KLEIN:

 3    Q.  Do you recall Mr. Werlau testifying about a hypothetical

 4    user registry?

 5    A.  Yes.

 6    Q.  What are your thoughts on that?

 7              MR. ARAD:  Objection.

 8              MR. KLEIN:  I can make it more honed, your Honor.

 9              THE COURT:  Please.

10    Q.  In terms of Tornado Cash and how that would work on Tornado

11    Cash, how do you think that would work?

12              MR. ARAD:  Objection.

13              THE COURT:  Are you asking about feasibility?

14              MR. KLEIN:  Feasibility, your Honor.

15              THE COURT:  I'll overrule the objection.

16              Do you understand the question?  Would it be feasible?

17    Do you understand the question?

18              THE WITNESS:  Yes.

19              THE COURT:  Can you answer it?

20              THE WITNESS:  Does it have to be a yes or no or can I

21    give——

22              THE COURT:  For me, right now, it's a yes/no.

23              THE WITNESS:  Can we define "work."

24              THE COURT:  Counsel, move on.  If he can't answer the

25    question, we really should——no, no, no.

P7T1STO5                        Green - Cross

1

2              THE COURT:  You may continue, sir.  Thank you.

3              MR. KLEIN:  Nothing further, your Honor.

4              THE COURT:  Okay.  Thank you.

5              I jumped the gun a little bit, Mr. Arad.  Is there

6   cross?

7              MR. ARAD:  There is.

8   CROSS EXAMINATION

9   BY MR. ARAD:

10  Q.  Hello, Dr. Green.

11  A.  Hello.

12  Q.  Have we met before?

13  A.  No.

14  Q.  I'm Ben Arad.  I'm part of the prosecution team.  I just

15  have a few questions for you.

16              You talked about a setup ceremony, right?  Would it be

17  accurate to describe that setup ceremony as essentially

18  throwing away the key to the pools?

19  A.  A setup ceremony is not throwing away the key.  The setup

20  ceremony is just building secure parameters so nobody can have

21  a back door.  But once the pools become immutable, they're

22  locked down so nobody can change them.  Okay.  That's a

23  metaphor I could live with.

24  Q.  I'll put the question a little differently.  You said that

25  the setup ceremony made the pools immutable, right?

P7T1STO5                    Green - Cross

1   A.  It was part of it, yes.

2   Q.  I'll ask you to answer my questions yes or no, please.

3   A.  Yes.

4   Q.  And it is the case, isn't it, that after that ceremony,

5   nobody could modify the pools?

6   A.  Yes.

7   Q.  But it's not the case, is it, that after that ceremony, the

8   Tornado Cash website became immutable?

9   A.  That's correct.

10  Q.  Not the case, right?

11  A.  Not the case.

12  Q.  The website was changeable.

13  A.  Yes.

14  Q.  Same question for the user interface.  Still changeable

15  after the ceremony, right?

16  A.  There are multiple copies of the user interface that

17  couldn't be changed, but the main website could be.

18  Q.  I'll ask you to answer my questions yes or no, please.

19          The main user interface could be changed, right?

20  A.  Yes.

21  Q.  The relayer registry could be changed, right?

22  A.  Relayer registry I don't believe existed at that time.

23  Q.  Very good point.  But it was created after the ceremony,

24  right?

25  A.  Yes.

P7T1STO5                          Green - Cross

1    Q.  And it could be changed after it was created, right?

2    A.  Yes.

3               MR. ARAD:  No further questions.

4               (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P7T5sto6                              Green - Cross

1            THE COURT:  Redirect?

2            MR. KLEIN:  No, your Honor.

3            THE COURT:  OK.

4            Sir, you may step down.  Thank you very much.

5            (Witness excused)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### 40 FOLEY SQUARE
### NEW YORK, NEW YORK 10007

**KATHERINE POLK FAILLA**
**DISTRICT JUDGE**

# JURY NOTE

Is cooperation w/ law enforcement (Foreign) Mandatory/Required w/o a Subpoena?

DATE: 8/4/25

TIME: 10²⁹ AM

_____
FOREPERSON'S SIGNATURE

8/4/2025
10:55 a.m.
Court Ex. 15

Members of the Jury —

We have received your note timed 10:24 am.
On the specific issue of whether cooperation with foreign
law enforcement was required in the absence of a
subpoena, no such evidence was admitted at trial, nor
did I instruct you on this issue. Instead, you are
to consider only the evidence that was admitted at
trial, and to consider my instructions on the law as
a whole.

KP Failla

*Cr Ex 1 β*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### 40 FOLEY SQUARE
### NEW YORK, NEW YORK 10007

**KATHERINE POLK FAILLA**
**DISTRICT JUDGE**

# JURY NOTE

Can we be provided w/the
specific GX & DX text
messages (all) #'s.

DATE: 8/9/25

TIME: 12pm

_____  _____
FOREPERSON'S SIGNATURE

Ct Ex 19
8/4/2025
1:05 pm

Members of the Jury —

In response to your request, I enclose
lists of the Government and defense exhibits
that are charts.

KPFailla

| GX - CHATS |
|:---:|
| 1001 |
| 1005 |
| 1006 |
| 1345 |
| 1346 |
| 1347 |
| 1348 |
| 1350 |
| 1367 |
| 1368 |
| 1369 |
| 1372 |
| 1376 |
| 1501 |
| 1502 |
| 1503 |
| 1505 |
| 1514 |
| 1516 |

| |
|---|
| 1517 |
| 1520 |
| 1608 |
| 1701 |
| 1701-T |
| 1702 |
| 1702-T |
| 1703 |
| 1703-T |
| 1704 |
| 1704-T |
| 1705 |
| 1705-T |
| 1706 |
| 1706-T |
| 1707 |
| 1707-T |
| 1708 |
| 1708-T |
| 1710 |
| 1710-T |

| |
|---|
| 2001 |
| 2001-T |
| 2003 |
| 2003-T |
| 2004 |
| 2004-T |
| 2006 |
| 2006-T |
| 2007 |
| 2007-1 |
| 2007-T |
| 2008 |
| 2008-T |
| 2010 |
| 2010-T |
| 2014 |
| 2014-T |
| 2015 |
| 2015-1 |
| 2015-1-T |
| 2015-T |

| |
|---|
| 2016 |
| 2016-1 |
| 2016-1-T |
| 2016-T |
| 2017 |
| 2017-T |
| 2031 |
| 2031-T |
| 2032 |
| 2032-T |
| 2033 |
| 2033-T |
| 2034 |
| 2034-T |
| 2036 |
| 2036-T |
| 2037 |
| 2037-T |
| 2038 |
| 2038-T |
| 2039 |

| |
|---|
| 2039-T |
| 2040 |
| 2040-T |
| 2041 |
| 2041-T |
| 2043 |
| 2043-T |
| 2044 |
| 2044-2 |
| 2044-T |
| 2047 |
| 2047-1 |
| 2047-4 |
| 2047-T |
| 2048 |
| 2048-1 |
| 2048-T |
| 2049 |
| 2049-T |
| 2050 |
| 2050-T |

| |
|---|
| 2052 |
| 2052-T |
| 2053 |
| 2053-T |
| 2055 |
| 2055-T |
| 2058 |
| 2058-T |
| 2059 |
| 2059-1 |
| 2059-1-T |
| 2059-2 |
| 2059-2-T |
| 2059-T |
| 2060 |
| 2060-T |
| 2061 |
| 2061-T |
| 2062 |
| 2062-T |
| 2063 |

| |
|---|
| 2063-T |
| 2064 |
| 2064-T |
| 2067 |
| 2067-T |
| 2069 |
| 2069-T |
| 2070 |
| 2101 |
| 2101-T |
| 2120 |
| 2120-T |
| 2121 |
| 2121-T |
| 2122 |
| 2122-T |
| 2124 |
| 2124-T |
| 2127 |
| 2127-T |
| 2129 |

| |
|---|
| 2129-T |
| 2130 |
| 2130-T |
| 2135 |
| 2135-T |
| 2210 |
| 2211 |
| 2245 |
| 2247 |
| 2261 |
| 2261-T |
| 2262 |
| 2262-T |
| 2295 |
| 2295-T |
| 2311 |
| 2320 |
| 2519 |

| DX - Chats |
|:---:|
| 8790 |

Ct Ex 18

# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK
### 40 FOLEY SQUARE
### NEW YORK, NEW YORK 10007

**KATHERINE POLK FAILLA**
**DISTRICT JUDGE**

# JURY NOTE

Hi Judge:

Today we will retire @ 4pm
We have agreed to the following
schedule:

Tues: in @ 8³⁰ — 12³⁰ p
Wed: in @ 8⁴⁵ — 3⁴⁵ p
Thurs: in @ 8⁴⁵ — 4⁴⁵ p
Friday: in @ 8⁴⁵ — 1pm

DATE: 8/4/25

TIME: 3³⁰ pm

_____
FOREPERSON'S SIGNATURE

Court Ex. 19
8/4/2025
3:49 pm

Members of the Jury –

   We have received your note with a proposed
schedule for the remainder of this week. We
will see you at 8:30 am tomorrow.


                              KPFaille

Ct Ex 20

# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK
### 40 FOLEY SQUARE
### NEW YORK, NEW YORK 10007

**KATHERINE POLK FAILLA**
**DISTRICT JUDGE**

# JURY NOTE

Hi Judge

We need clarification on
this question:

1) Does the something wallet
include the intermediary
wallets or just the
specified wallet?

2) Does the something follow the intermediary
wallets?)

DATE: 8/5/25

TIME: 9²⁴ Am

FOREPERSON'S SIGNATURE

Gx Ex 21

# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK
#### 40 FOLEY SQUARE
#### NEW YORK, NEW YORK 10007

**KATHERINE POLK FAILLA**
**DISTRICT JUDGE**

# JURY NOTE

Hi Judge
Can we get the
transcripts & exhibits
for Mr. William Lopez
to prove venue.

DATE: 8/5/25

TIME: 9:50 A

FOREPERSON'S SIGNATURE

8/5/2025 10:21am

Good morning, Members of the Jury —

We have received your notes timed 9:24 am and 9:50 am. I will take them in order.

With respect to your note about sanctions, I refer you to pages 52 to 54 of my charge. In response to your question (1), I instruct you that the 0x098B716 Address was placed on the SDN list. In response to your question (2), I refer you again to pages 52 to 54 of my charge, which discussed the evidence at trial regarding what persons or entities were included in the SDN list during the relevant time period.

With respect to your note regarding venue evidence, we are gathering the materials together and appreciate your patience while we do so.

KPFailli

CT EX 23
8/5/2025, 10:58am

Hello, again, Members of the Jury –

In response to your request of 9:50 a.m., I
enclose **5** copies of the testimony of William
Lopez. Please be advised that the following
exhibits were introduced during his testimony:

GX 321, 1152, 2245, 2247, 3001, 3202, 3402
DX 3535-002

Thank you.
KPVaulic

P7M5sto1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          23 Cr. 430 (KPF)

5   ROMAN STORM,

6              Defendant.                  Jury Trial
    ------------------------------x

7
                                           New York, N.Y.
8                                          July 22, 2025
                                           8:50 a.m.
9

10  Before:

11                HON. KATHERINE POLK FAILLA,

12                                         District Judge

13
                        APPEARANCES
14
    JAY CLAYTON
15       United States Attorney for the
         Southern District of New York
16  BY:  NATHAN M. REHN, ESQ.
         BEN ARAD, ESQ.
17       BENJAMIN A. GIANFORTI, ESQ.
         KEVIN G. MOSLEY, ESQ.
18       TARA M. LA MORTE, ESQ.
         Assistant United States Attorneys
19
    WAYMAKER LLP
20       Attorneys for Defendant
    BY:  BRIAN E. KLEIN, ESQ.
21       KERI CURTIS AXEL, ESQ.
         KEVIN M. CASEY, ESQ.
22       VIVIANA ANDAZOLA MARQUEZ, ESQ.

23       -and-

24  HECKER FINK LLP
         Attorneys for Defendant
25  BY:  DAVID E. PATTON, ESQ.
         CHRISTOPHER MOREL, ESQ.

1

2      WILLIAM LOPEZ,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5              THE DEPUTY CLERK:  Please, into the microphone, state

6      and spell your full name for the record?

7              THE WITNESS:  My name is William Lopez.  L-O-P-E-Z.

8      DIRECT EXAMINATION

9      BY MR. ARAD:

10     Q.  Good afternoon.

11     A.  Good afternoon.

12     Q.  Where do you currently work, sir?

13     A.  For the Federal Bureau of Investigation.

14     Q.  What is your title?

15     A.  I am a special agent.

16     Q.  How long have you been a special agent?

17     A.  Since 2018.

18     Q.  Are you assigned to a particular unit at the FBI?

19     A.  I am.  I'm assigned to the CAST unit.

20     Q.  What does that stand for?

21     A.  Stands for Cellular Analysis Survey Team.

22     Q.  How long have you been a member of the CAST team.

23     A.  I became fully certified in 2022.

24     Q.  Broadly speaking, what are your duties and responsibilities

25     in CAST?

1    A.  The CAST unit specializes in looking at historical call

2    detail records and cell site information and location data

3    based on, off of phones and other electronic devices.

4    Q.  At a high level, what are you trying to determine when

5    conducting a cell site analysis?

6    A.  The purpose of the cell site analysis is to determine

7    historically, or sometimes in real-time, the general location

8    of a device, based off of the cell site it is utilizing and

9    other location GPS data, if it is available.

10   Q.  Did you have to complete training in order to be able to do

11   this job?

12   A.  In order to be a CAST asset there is 350 hours of training

13   just to get certified.

14   Q.  Are there examinations associated with that?

15   A.  Each level of training has an independent examination, as

16   well as other evaluations within each level.

17   Q.  And once you have been certified, do you have any ongoing

18   training requirements?

19   A.  Every year there is an annual week-long recertification

20   where we learn the updated technologies and anything else that

21   is relevant to our training and investigations.

22   Q.  Approximately how many times have you performed a cell site

23   analysis?

24   A.  Hundreds, if not thousands of times, at this point.

25   Q.  Have you testified in court before about that kind of

1    analysis?

2    A.  I have.

3    Q.  Approximately how many times?

4    A.  Approximately four times in court.

5         MR. ARAD:  Your Honor, the government offers Special

6    Agent Lopez as an expert witness.

7         THE COURT:  On what please, sir?  On cell site

8    information or the review of phone records?

9         MR. ARAD:  On cell site information, your Honor.

10         THE COURT:  All right.  Is there an objection from the

11    defense?

12         MR. PATTON:  Just our ongoing objection, generally,

13    that we briefed, your Honor.

14         THE COURT:  Agent Lopez is so qualified.  Thank you.

15    BY MR. ARAD:

16    Q.  Special Agent Lopez, were you asked to perform a cell site

17    analysis in connection with this case?

18    A.  I was.

19    Q.  Was that about a particular phone number?

20    A.  It was.

21    Q.  At a general level, what were you asked to do with respect

22    to this case?

23    A.  I was given the call detail records for a particular phone

24    number and given certain dates to look at to see where the

25    device -- the general location of that device on those dates.

1              MR. ARAD:  Mr. Iannuzzelli, would you please display

2     for the witness, the Court, and the parties, what's been

3     premarked Government Exhibit 3001?

4     Q.  Special Agent Lopez, do you recognize this?

5     A.  I do.

6     Q.  What is it?

7     A.  This is a report I prepared in anticipation of this trial

8     in the examination of a phone number shown on the screen ending

9     in 7909.

10             MR. ARAD:  Your Honor, the government offers

11    Government Exhibit 3001 into evidence.

12             MR. PATTON:  Our continuing objection, your Honor.

13             THE COURT:  The objection is overruled.  Government

14    Exhibit 3001 is admitted into evidence and may be shown to the

15    jury.

16             (Government's Exhibit 3001 received in evidence)

17    BY MR. ARAD:

18    Q.  Special Agent Lopez, did you prepare Government

19    Exhibit 3001 after examining T-Mobile cellphone records?

20    A.  I did.

21    Q.  Were those records for the phone number that is on the

22    screen?

23    A.  It was.

24    Q.  What kinds of records did you examine from T-Mobile?

25    A.  These were call detail records.

1   Q.  Does Government Exhibit 3001 accurately summarize certain

2   portions of those records?

3   A.  It does.

4   Q.  I would like to begin by discussing the basic concepts

5   involved in cell site analysis.  At its most basic level, how

6   does a cellphone make or receive a call?

7   A.  So, a cellphone is very similar to a two-way radio that

8   little kids use, but instead of needing to be line of sight of

9   the other user, a cellphone has the components and the

10  capability of using the infrastructure of cellular networks

11  like radios and antennas to transmit radio frequency signals

12  all over the place.  So someone in New York can pick up the

13  phone, obviously easily call someone in California, and that's

14  all done through these networks through the infrastructure of

15  T-Mobile in this case, their cellphone towers, the antennas,

16  and radios on those towers.

17  Q.  So I think you ended your answer by discussing the

18  infrastructure.  Does that include something called cell sites?

19  A.  It does.  The term cell sites and cell towers can be used

20  interchangeably.  They're referring to the same thing.

21          MR. ARAD:  Mr. Iannuzzelli, will you please display

22  Slide 3 of this presentation?

23  Q.  Special Agent Lopez, what is this?

24  A.  This is a cell tower.

25          What I was mentioning before about the radios,

1  antennas, that is what you can see on the right-hand side of

2  this.  And what you also see is the triangular shape of the

3  tower and that is how the network is set up.  Each of these

4  towers, they are broken up into three sectors each comprising

5  of 120 degrees, so when we do this analysis we are able to see

6  which side of the tower the radio frequency signal is coming

7  from.

8  Q.  How do cellphones connect to cell towers like this?

9  A.  The phone is transmitting radio frequency to the tower and

10  the tower is taking that radio frequency signal with the radios

11  and antennas and interpreting that radio frequency signal.

12  Q.  Who operates these cell towers?

13  A.  The infrastructure is owned and operated by T-Mobile.  The

14  big three providers, Verizon, T-Mobile, and AT&T, all operate

15  their own equipment.

16  Q.  When a provider's cellphone connects with one of its

17  towers, does the provider maintain any information about that?

18  A.  It does.  If you are a user of any of these providers you

19  will see your cellphone bill each month and if you look at a

20  detailed version of that bill you can see if you made a call,

21  received a call, SMS text messages are on there.  That's all

22  kept and maintained by the provider.

23  Q.  Generally speaking, what determines which cell tower a

24  cellphone will connect to?

25  A.  The cellphone is always looking for the best possible

P7M5sto3                          Lopez - Direct

1    signal at the moment of the transaction.

2    Q.  And in the New York City metro region, does a cellphone

3    connect only to towers that are operated by its service

4    provider?

5    A.  Yes.  If you have a T-Mobile phone or AOL Time Warner

6    phone, it is only going to utilize that provider to make that

7    transaction.

8    Q.  How would you describe the density of T-Mobile cell sites

9    in Manhattan?

10   A.  Manhattan is obviously a very unique place, it is one of

11   the most populace cities so you will see cell sites on almost

12   every corner of New York City, especially Manhattan, and maybe

13   even every other block, whereas if you looked at somewhere very

14   rural and where there is not a very dense population, the

15   towers and cell sites would be much more spread out.  But, here

16   in New York City, they're very close together.

17             MR. ARAD:  Mr. Iannuzzelli, will you please display

18   Slide 6?

19   Q.  Special Agent Lopez, what is on this slide?

20   A.  This is a mapping of, you can see Manhattan and all the

21   T-Mobile cell sites located within Manhattan.

22   Q.  If a particular area has a high density of cell sites, does

23   that assist with your efforts to determine the cellphone's

24   location?

25   A.  Yes.  So the way the network is set up where I was

P7M5sto3                              Lopez - Direct

1    mentioning before, very rural areas and cell sites will be much

2    more further spread apart and it is going to cover a larger

3    footprint, whereas here in New York City you will see that the

4    towers and the cell sites are close together and the footprint

5    of those is obviously just made to be much smaller because of

6    the amount of people that it has to service.

7            MR. ARAD:  Mr. Iannuzzelli, can you please turn to

8    Slide 4?

9    Q.  Are you familiar with the term "sector", Special Agent

10   Lopez?

11   A.  Yes.

12   Q.  Using Slide 4, could you please explain that to the jury?

13   A.  Sure.  So on the right-hand side you can see what looks

14   like a clock, and the black dot in the middle of the clock is

15   the top view of a cellphone tower and you can see how it's

16   broken up into three sectors, each comprising of 120 degrees.

17   The middle point of that sector is referred to as the azimuth

18   and it is marked in black here so you can see zero degrees, 120

19   degrees, 240 degrees, each represent three different sectors,

20   Sector 1, 2, and 3.

21   Q.  And can you sometimes tell which sector a cellphone might

22   be located in at a particular time?

23   A.  When we are requesting these records from the provider, the

24   cell site as well as the sector is provided to us to give us a

25   better general idea where the phone is located during a

P7M5sto3                         Lopez - Direct

1   particular transaction.

2           MR. ARAD:  Mr. Iannuzzelli, we can take this exhibit

3   down for now.

4   Q.  Special Agent Lopez, you testified that a cellphone would

5   typically connect with a cell site with the strongest signal;

6   is that right?

7   A.  Correct.

8   Q.  Will the clearest and strongest signal, generally speaking,

9   be the closest cell tower to the location of the cellphone?

10  A.  It can be but it's not always the -- it is not always going

11  to be the answer that the cellphone is going to choose the

12  closest tower.  It could be depending on the geography or the

13  landscape, especially like an area of New York City which is

14  dense with buildings, the network could be set up that a tower

15  two blocks away better services you than one that is around the

16  corner but is blocked by a building.

17  Q.  Let's go back to the T-Mobile records you examined for a

18  minute.  Do service providers, including T-Mobile, keep records

19  of which cell sites cellphones connect to?

20  A.  Yes, they do.

21          MR. ARAD:  Mr. Iannuzzelli, can you please display for

22  the witness, the parties, and the Court, what's been marked

23  Government Exhibit 3202?

24  Q.  Special Agent Lopez, do you recognize this?

25  A.  Yes.  This is a set of call detail records from T-Mobile.

P7M5sto3                          Lopez - Direct

1    Q.   For which phone number?

2    A.   The phone number ending in 7909.

3              MR. ARAD:   Your Honor, the government offers

4    Government Exhibit 3202 pursuant to the records custodian

5    declaration that's been premarked Government Exhibit 3201.  I

6    will note for the Court that this was not part of the prior

7    discussions about exhibits that would be admitted pursuant to

8    certifications.

9              THE COURT:   All right.  Let me just see that, please.

10   You are not seeking to introduce the declaration?

11             MR. ARAD:   Correct.  Just this exhibit.

12             THE COURT:   Thank you.

13             MR. PATTON:   Objection.

14             THE COURT:   Same objection but not objecting to the --

15   well, all right.  You admit the declaration exists, sir?

16             MR. PATTON:   Yes.

17             THE COURT:   Yes.  Thank you.  I am overruling the

18   defense objection.  I am admitting Government Exhibit 3202.  It

19   may be shown to the jury.

20             (Government's Exhibit 3202 received in evidence)

21   BY MR. ARAD:

22   Q.   Special Agent Lopez, let's walk through the information on

23   the spreadsheet.  Let's begin with the first column, the Date

24   column.  What does this tell you?

25   A.   Sure.  That is meant to note the date of the particular

P7M5sto3                          Lopez - Direct

 1   transaction.

 2   Q.  And the time?

 3   A.  That is the time in Coordinated Universal Time for the

 4   transaction.

 5   Q.  And what is Coordinated Universal Time?

 6   A.  It is a standard of time that is utilized for all T-Mobile

 7   records.  And, for example, during the time period we are

 8   referencing the -- you can take the Coordinated Universal Time

 9   and subtract four hours and that will bring you to Eastern

10   standard time.

11   Q.  How about the calling number?

12   A.  That is the number that initiated the transaction.

13   Q.  When you say transaction, what do you mean by that?

14   A.  On this T-Mobile call detail record we have SMS text

15   messages and voice calls.

16   Q.  What about the called number column?

17   A.  That is the receiving device, receiving number for the

18   particular transaction.

19   Q.  Toward the right side of the screen, what does the first

20   LTE site ID tell you?

21   A.  That is going to note that is a unique set of numbers kept

22   by T-Mobile and it is going to note which cell site or cell

23   tower was utilized during the transaction referenced.

24   Q.  And the first LTE sector ID?

25   A.  That is what we were looking at before with that clock

P7M5sto3                          Lopez - Direct

1    graph that will show you which sector was utilized, 1, 2, or 3.

2    Q.  You mentioned that the transactions here seem to be

3    primarily incoming and outgoing calls.

4    A.  Correct.

5    Q.  If the user of the cellphone was using an application --

6    actually, I will first ask, are you familiar with an

7    application called Telegram?

8    A.  Yes.

9    Q.  And if the user of this particular cellphone was using that

10   application on their phone, would Telegram communications show

11   up in this chart?

12   A.  No.  That's a different data set.  Those are data

13   transactions and what we have here in the call detail records

14   are only voice calls and SMS text messages.

15   Q.  So what do you do with the data in this chart when you are

16   performing a cell site analysis?

17   A.  So this, I would take this information, the date, the time,

18   the cellphone tower and the sector, and I am able to map that

19   to create a visualization of the general location of a phone

20   during the said transactions.

21            MR. ARAD:  Mr. Iannuzzelli, we can take this down.

22            THE COURT:  You were about to something?

23            MR. ARAD:  I was going to say I'm happy to go on but

24   this is a natural breaking point, if the Court wants to break.

25            THE COURT:  I think it is appropriate for us to take

P7M5sto3                          Lopez - Direct

1   our lunch break so I think we will do that.

2              We are going to take a 45-minute lunch break and we

3   will resume at 1:30.  I am going to ask, as I always do, to not

4   discuss this case with each other or anyone else and keep an

5   open mind until all of the evidence is in.

6              Enjoy your lunch.  We will see you in 45 minutes.

7   Thank you.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        AFTERNOON SESSION

2                            1:54 p.m.

3

4            THE COURT:  Be seated.  Thank you very much.

5            Mr. Arad, you may continue.

6   BY MR. ARAD:

7   Q.  Agent Lopez, as part of your role, do you sometimes do work

8   to attribute a phone number to a particular individual?

9   A.  I do.

10            MR. ARAD:  Mr. Iannuzzelli, please display for the

11   parties and the Court and the witness what's been marked as

12   Government Exhibit 321.

13   Q.  Special Agent Lopez, do you recognize this document?

14   A.  I do.

15   Q.  What does it appear to be?

16   A.  These are Google Pay records.

17   Q.  For whose account?

18   A.  Thomas Schmidt.

19            MR. ARAD:  Your Honor, the government offers this

20   exhibit pursuant to the custodial declaration marked as

21   Government Exhibit 320.  I note, as I did before, that these

22   documents were not part of the prior discussions about

23   documents being admitted under custodial declarations.

24            THE COURT:  All right.

25            MR. PATTON:  Objection, your Honor.

P7M1STO4                          Lopez - Direct

1          THE COURT:  Government Exhibit 321 is admitted into

2   evidence and may be shown to the jury.

3          (Government's Exhibit 321 received in evidence)

4          MR. ARAD:  Mr. Iannuzzelli, could you please expand

5   the phone number toward the bottom of this page.  And the name

6   above it.

7   BY MR. ARAD:

8   Q.  As you analyze and attribute this cellphone number, what

9   does this document tell you?

10  A.  The phone number that I analyzed ending in 7909 was also

11  used here on the Google Pay account of Thomas Schmidt.

12  Q.  And if I refer to this as the Schmidt cellphone or the

13  Schmidt cellphone number over the course of your testimony,

14  will you know what I'm referring to?

15  A.  I will.

16         MR. ARAD:  Mr. Iannuzzelli, please display for the

17  Court, the witness, and the parties only Government

18  Exhibit 3402.

19  Q.  Special Agent Lopez, do you recognize this?

20  A.  I do.

21  Q.  What is it?

22  A.  It is an application to rent an apartment.

23         MR. ARAD:  Your Honor, the government offers this

24  exhibit pursuant to the custodial declaration marked as

25  Government Exhibit 3402, same qualification as before.

P7M1STO4                         Lopez - Direct

1           THE COURT:  This exhibit is 3402 and the declaration

2    is also 3402?

3           MR. ARAD:  The declaration is 3401.

4           THE COURT:  Same objection, sir?

5           MR. PATTON:  Same objection.

6           THE COURT:  Overruled.  It is admitted into evidence,

7    may be shown to the jury.

8           (Government's Exhibit 3402 received in evidence)

9           MR. ARAD:  Mr. Iannuzzelli, will you please expand the

10   portions of the Application Information section that go through

11   the phone number.

12   BY MR. ARAD:

13   Q.  Special Agent Lopez, what's the name of the applicant here?

14   A.  The applicant is Thomas Hunter Schmidt.

15   Q.  And is this the same phone number that we've been talking

16   about during the course of your testimony?

17   A.  This is the same phone number that I analyzed ending in

18   7909.

19           MR. ARAD:  Mr. Iannuzzelli, can you please scroll down

20   to the second page of this application.

21           And could you please expand the Previous Address

22   Information section.

23   Q.  Special Agent Lopez, what's the previous address listed

24   here?

25   A.  Previous address is listed as 17 John Street in New York,

P7M1STO4                         Lopez - Direct

1    New York.

2    Q.  And do you see the Residency From Date at the top right?

3    A.  I do.

4    Q.  What is that date?

5    A.  It is February 28, 2022.

6           MR. ARAD:  Mr. Iannuzzelli, we can take this down.

7    Q.  Special Agent Lopez, what type of cell site location

8    analysis were you asked to conduct in this case?

9    A.  Historical cell site analysis for the phone number ending

10   in 7909.

11   Q.  For approximately what time frame?

12   A.  Time frame that we looked at was March 15, 2022, to

13   April 6, 2022.

14          MR. ARAD:  Before we examine certain dates within that

15   range, Mr. Iannuzzelli, can you please display, only for the

16   Court, parties, and the witness, Government Exhibit 2245.

17          And your Honor, this was previously admitted subject

18   to connection.

19          THE COURT:  Yes.  So it can be shown to the jury.  Did

20   you say it was previously admitted?

21          MR. ARAD:  Subject to connection.

22          THE COURT:  This is the connection?

23          MR. ARAD:  This is the connection.

24          THE COURT:  I'll hear the connection.  Thank you.

25   BY MR. ARAD:

P7M1STO4                          Lopez - Direct

1   Q.  Special Agent Lopez, have you seen this before?

2   A.  Yes.

3   Q.  What is it?

4   A.  This is a Cellebrite extraction for a Telegram chat.

5   Q.  And did this chat take place on certain dates that you

6   analyzed location of the cellphone for?

7   A.  It did.

8           MR. ARAD:  Your Honor, the government offers

9   Government Exhibit 2245.

10          MR. PATTON:  Objection.

11          THE COURT:  Objection?  Overruled.  Government

12  Exhibit 2245 is admitted into evidence and may be shown to the

13  jury.

14          (Government's Exhibit 2245 received in evidence)

15          MR. ARAD:  Mr. Iannuzzelli, could you please scroll to

16  the second page.

17  Q.  Special Agent Lopez, do you see on this page——

18          MR. ARAD:  And Mr. Iannuzzelli, I'll ask you to expand

19  these names as we go.

20  Q.  ——the name Tom Schmidt?

21  A.  I do.

22  Q.  And do you see the name Alexey Pertsev?

23  A.  I do.

24  Q.  And the name Poma Semenov?

25  A.  I do.

P7M1STO4                    Lopez - Direct

1   Q.  And the name Roman Storm?

2   A.  I do.

3        MR. ARAD:  Mr. Iannuzzelli, please scroll to the next

4   page.

5        And if you could please expand the first two messages.

6   Q.  Special Agent Lopez, what is the date of these first two

7   messages?

8   A.  March 15, 2022.

9   Q.  Who is listed as the sender?

10  A.  Sender is Tom Schmidt.

11  Q.  Would you please read these two messages.

12  A.  Sure.  The first one says, "yo any interest in chatting

13  with www.sismo.io?  They're interested in using Tornado's

14  relayer network to put their attestations on chain."

15       MR. ARAD:  Mr. Iannuzzelli, could you please display

16  this document on one side of the screen and slide 7 of

17  Government Exhibit 3001 on the other side.

18       THE COURT:  Is this admitted?

19       MR. ARAD:  It is.

20       THE COURT:  Thank you.

21  BY MR. ARAD:

22  Q.  Special Agent Lopez, what's shown on slide 7 of Government

23  Exhibit 3001?

24  A.  Slide 7 is showing the call detail records for the same

25  date, March 15, 2022.  It's showing which cell sites the phone

1  number ending in 7909 is utilizing throughout the entire day.

2  Q.  And do you see the gray box on the left side of that screen

3  and the similar but smaller box on the top right side?

4  A.  I do.

5  Q.  What are those?

6  A.  Those are displaying the transaction times and the type of

7  transaction, in this case all incoming calls on March 15, 2022.

8  Q.  Now turning your attention back to the chat, what is the

9  time of both of these messages?

10  A.  The time that's on the right-hand side in the blue bubbles

11  is in UTC, and like I testified before, previously, at

12  March 15, 2022, you would take UTC, subtract four hours, and

13  that's——that would give you Eastern Standard Time.

14  Q.  And what time zone are the times on the slide on the left

15  listed in?

16  A.  Those are in Eastern Standard Time.

17  Q.  So if you were to convert the time that these messages were

18  sent to Eastern Standard Time, what time would that be?

19  A.  It would be 1:58 p.m.

20  Q.  And is that time within the time range of the box on the

21  left side of the slide?

22  A.  Yes, it is.

23  Q.  Does that mean that these messages were sent and received

24  within the time period during which the Schmidt cellphone was

25  located in Manhattan?

1    A.  That's correct.

2              MR. ARAD:  Mr. Iannuzzelli, in the chat message, if we

3    could take those down and then expand the next message, the

4    bottom one on this page.

5    Q.  Special Agent Lopez, what's the date of this message?

6    A.  Message was—took place on March 18, 2022.

7    Q.  And could you please read it.

8    A.  Sure.  "I remember we've talked with @borodutch about very

9    similar project (or maybe it was this one?)"

10   Q.  And who's the sender on this message?

11   A.  Poma.

12             MR. ARAD:  Mr. Iannuzzelli, could you please display

13   slide 8 of the slide deck.

14   Q.  And Special Agent Lopez, what's shown here on slide 8?

15   A.  These are the cell site records for March 18, 2022, for the

16   entire day.  Again, it's showing which tower the phone utilized

17   during particular transactions throughout the day.

18   Q.  What's the time of the message that you just read on the

19   right?

20   A.  If we were to convert that time, the UTC time you can see

21   listed as 1:38 p.m. but if we subtract four hours and convert

22   it to Eastern Standard Time, it would be 9:38 a.m.

23   Q.  And turning your attention to the small gray box on the

24   left side of the slide, what does that contain; can you remind

25   us?

P7M1STO4                          Lopez - Direct

1   A.   Those are all the transactions that took place on March 18,

2   2022, throughout the day.  You'll see OG is outgoing, IC is

3   incoming, and they're all voice calls that were recorded that

4   day for the phone number ending in 7909.

5   Q.   So you said a moment ago that the message on the right was

6   sent at 9:38 a.m. Eastern time?

7   A.   That's correct.

8   Q.   Is that time within the range of times when calls were sent

9   and received from the Schmidt phone in Manhattan?

10  A.   It is.

11          MR. ARAD:  Mr. Iannuzzelli, could you please scroll to

12  the next page of the chats.  And we'll expand some in a minute.

13  Q.   But Special Agent Lopez, what are the dates of these chats?

14  A.   These chats take place on April 1, 2022.

15          MR. ARAD:  And Mr. Iannuzzelli, could you please

16  scroll to slide 9.

17  Q.   What's shown here, Special Agent Lopez?

18  A.   These are the historical cell site records for April 1,

19  2022, for the phone number ending in 7909.

20  Q.   Is that the same date as the messages on the right?

21  A.   It is.

22          MR. ARAD:  Mr. Iannuzzelli, could you please expand

23  the first message.

24  Q.   Special Agent Lopez, what's the time of this message?

25  A.   This message is sent in UTC time as 5:53 p.m.

1   Q.  We're not going to read each and every one of these

2   messages, but we will read some.

3           MR. ARAD:  Mr. Iannuzzelli, could you please scroll to

4   pdf page 5 of the messages.  And could you please expand the

5   bottom message.

6   Q.  Special Agent Lopez, let's read these chats.

7           Who sent this message, before we begin reading?

8   A.  Message was from Roman Storm.

9   Q.  And to the extent that other messages we read are sent by

10  others, I can read those as you read Roman Storm's part.

11  A.  Okay.

12  Q.  Let's begin with this one.

13          MR. ARAD:  And Mr. Iannuzzelli, if you could scroll

14  and expand as we go, that would be great.

15  A.  "@haseebq @tomhschmidt @ashwinr14.  If you're in SF, let me

16  know."

17  Q.  "We are not, sadly."

18  A.  "Miami?  Dubai?"

19  Q.  "Haseeb is in SG, Ash in PR.  I'm in NY."  And we can pause

20  there.

21          Special Agent Lopez, you testified that the first

22  April 1st message we looked at was at 5:53 p.m. UTC.  What time

23  was the message that I just read?

24  A.  This message was——took place at 6:44 UTC.

25  Q.  And if you were to convert that time range, 5:53 UTC to

1    6:44 UTC to Eastern time, what would the time range be?

2    A.  Time range would be 1:53 Eastern Standard Time to 2:44

3    Eastern Standard Time.

4    Q.  Turning your attention to the box on the left side of the

5    slide, does the time range of that chat conversation come

6    within a couple of minutes of the first call listed here?

7    A.  Approximately two minutes.

8            MR. ARAD:  Mr. Iannuzzelli, could you please scroll to

9    pdf page 10 of the chat.

10   Q.  Special Agent Lopez, who were the senders of the messages

11   on this page?

12   A.  Senders for these messages are Roman Storm and Tom Schmidt.

13   Q.  And do you see the top message says that it's been

14   forwarded?

15   A.  Correct.

16   Q.  Could you please read the message sent by Roman Storm in

17   the middle of the page.

18   A.  Sure.  It states, "If u know some torn holders, please ping

19   them to vote."

20   Q.  And could you please read the next message.

21   A.  "Tom Schmidt: kk."

22   Q.  And what are the times of these two messages?

23   A.  Both times are in UTC at 8:47 p.m. and 8:49 p.m.

24   Q.  In Eastern Standard Time, what would that be?

25   A.  That would be 4:47 p.m. and 4:49 p.m.

1    MR. ARAD:  Mr. Iannuzzelli, could you please scroll to

2    slide 10 in the slide deck.

3         And if you go back to the last page of the chat,

4    please.

5    Q.  So what's on the slide deck here?

6    A.  Left-hand box is displaying the same analysis for the call

7    detail records, showing, for April 6, 2022, all the calls that

8    took place that day.

9    Q.  And can you just remind us, what were the times of the two

10   messages on the bottom of the chat here, in Eastern time?

11   A.  Would be 4:47 p.m. and 4:49 p.m.

12   Q.  And are those times within the range of calls sent or

13   received by the Schmidt cellphone in Manhattan on April 6,

14   2022?

15   A.  They are.

16   Q.  Do you see that on the left side of the slide?

17   A.  Yes.

18   Q.  How far, approximately, are the times of the messages from

19   the time at the bottom of box No. 1?

20   A.  Approximately less than 20 minutes.

21        MR. ARAD:  Mr. Iannuzzelli, we can take these down.

22        And Mr. Iannuzzelli, could you please display for the

23   witness and the parties and the Court Government Exhibit 1152.

24   Q.  Special Agent Lopez, as part of your responsibilities, do

25   you sometimes ascertain an individual's location by ways other

P7M1STO4                        Lopez - Direct

1  than cell site analysis?

2  A.  Yes, I do.

3  Q.  Could you give me an example.

4  A.  Sure.  If the individual has a set of financial records, if

5  the individual were using some sort of internet-based

6  applications and we subpoenaed that or got a search warrant for

7  those, for that set of data, we could ascertain location based

8  on that as well.

9  Q.  And Special Agent Lopez, turning your attention to the

10  screen, do you recognize this document?

11  A.  I do.

12  Q.  What is it?

13  A.  Credit card statement for Thomas H. Schmidt.

14        MR. ARAD:  Your Honor, the government offers

15  Government Exhibit 1152 pursuant to the custodial declaration

16  marked as Government Exhibit 1150, and the Court's prior

17  ruling.

18        THE COURT:  Same objection, sir?

19        MR. PATTON:  Yes.

20        THE COURT:  The objection is overruled.  Government

21  Exhibit 1152 is admitted into evidence and may be shown to the

22  jury.

23        (Government's Exhibit 1152 received in evidence)

24        MR. ARAD:  Mr. Iannuzzelli, could you please expand at

25  the top left the name.

P7M1STO4                          Lopez - Direct

1    BY MR. ARAD:

2    Q.  And Special Agent Lopez, what name is listed here?

3    A.  Thomas H. Schmidt.

4           MR. ARAD:  And Mr. Iannuzzelli, could you please go to

5    pdf page 34 of this document.

6           And if you could expand, please, the lines for the

7    May 2 and May 3 transactions.

8    Q.  Special Agent Lopez, do you see that four of those

9    transactions are not listed as taking place in New York?

10   A.  I do.

11   Q.  Where are they listed as taking place?

12   A.  The state of Washington and California.

13   Q.  And does that make you think that these transactions did

14   not take place in New York?

15   A.  No.

16   Q.  Why not?

17   A.  Because for these particular merchants, I know that they

18   are big national corporations and they have payment processing

19   centers in places that the user isn't necessarily located.

20   Q.  Could you please turn your attention to the May 2nd entry

21   for Dig Inn 80 Pine in New York.  Where is Pine Street?

22   A.  That's lower Manhattan.

23   Q.  And could you then turn your attention, please, to the

24   May 3rd entry for the Crosby Street Hotel in New York.  Where

25   is Crosby Street?

P7M1STO4                        Lopez - Direct

1   A.  Located in Manhattan as well.

2           MR. ARAD:  Mr. Iannuzzelli, please scroll to pdf

3   page 35.

4   Q.  Special Agent Lopez, do you see that all of these

5   transactions except the one on the bottom are on May 3rd and

6   May 4th?

7   A.  Yes.

8   Q.  I'd like to focus on the May 3rd and 4th transactions.  Do

9   you see that, like on the last page, some of these transactions

10  are not listed as taking place in New York?

11  A.  I do.

12  Q.  And same question as with the last page.  Does that tell

13  you that they did not take place in New York?

14  A.  No.  Like I mentioned previously, you could tell by looking

15  at some of these, the companies where these transactions took

16  place, you know, they're big national companies and they have

17  payment processing centers other places than New York.

18  Q.  I just want to look through a few of these examples.

19          MR. ARAD:  Mr. Iannuzzelli, could you please highlight

20  the NYCT Pay Go entries.  Those are the second and third.

21  Q.  Special Agent Lopez, do you see these highlighted entries?

22  A.  I do.

23  Q.  Do you recognize this Apple Pay NYCT Pay Go moniker?

24  A.  Yes.

25  Q.  What do you recognize that as?

1    A.   That is rec——that would be a subway transaction, and that's

2    the cost of the subway, and that's how the subway, the moniker

3    for their transactions, is listed on credit card statements.

4              MR. ARAD:   Mr. Iannuzzelli, you can minimize this.

5    And if you could next expand the entry on May 4th for Xi'an

6    Famous Foods.

7    Q.   Special Agent Lopez, do you see that next to Xi'an Famous

8    Foods, there's an open parentheses and then it says FiDi?

9    A.   Yes.

10   Q.   Where is FiDi?

11   A.   That's referring to the Financial District in lower

12   Manhattan.

13             MR. ARAD:   Mr. Iannuzzelli, please take these down.

14             And if you could display just for the parties, the

15   Court, and the witness what's been marked as Government

16   Exhibit 2247.

17   Q.   Special Agent Lopez, do you recognize this?

18   A.   I do.

19   Q.   What is this?

20   A.   It's a cellphone extraction for a Telegram chat.

21             MR. ARAD:   Your Honor, the government offers

22   Government Exhibit 2247 into evidence.

23             MR. PATTON:   Same objection.

24             THE COURT:   Objection is overruled.   Government

25   Exhibit 2247 is admitted into evidence and may be shown to the

P7M1STO4                          Lopez - Direct

1    jury.

2              (Government's Exhibit 2247 received in evidence)

3              MR. ARAD:  Mr. Iannuzzelli, could you please scroll to

4    the next page.

5    BY MR. ARAD:

6    Q.  And Special Agent Lopez, do you see on this page—and

7    Mr. Iannuzzelli, if you could please just highlight these as we

8    go—Tom Schmidt?

9    A.  Yes.

10   Q.  Alexey Pertsev?

11   A.  Yes.

12   Q.  Poma Semenov?

13   A.  Yes.

14   Q.  And Roman Storm?

15   A.  Yes.

16             MR. ARAD:  Mr. Iannuzzelli, could you please scroll to

17   the next page.

18             Sorry.  Mr. Iannuzzelli, could you please go back to

19   the last page that we looked at.

20             And could you expand the first line here.

21   Q.  What is the name of this chat, Special Agent Lopez?

22   A.  Chat is named Tornado Cash/Dragonfly.

23             MR. ARAD:  Mr. Iannuzzelli, we can go back to the next

24   page.

25   Q.  Special Agent Lopez, what is the date of these messages?

1   A.  Messages took place on June 9, 2022.

2   Q.  Let's read these together.  If you could again please read

3   the messages sent by Roman Storm and I'll read the rest.

4   A.  "Folks, TC is running low on funds.  Any ideas?  We have

5   1-3 funding to keep running.  Governance is planning to launch

6   a sale of torn."

7          "There is torn streaming to keep development but the

8   price keeps dropping."

9          "What should we do to stay afloat?"

10  Q.  "Let's chat.  Want to grab some time tomorrow?"  Link.

11         MR. ARAD:  And then seeing that the receipt of the

12  messages have no text in them, Mr. Iannuzzelli, could you

13  please scroll to the next page.

14  Q.  And then if you could read Roman Storm's part, please.

15  A.  "@tomhschmidt.  Ping.  Meeting."

16  Q.  "I'm in the Zoom."

17         And Special Agent Lopez, do you see what the date is

18  when Thomas Schmidt says he's in the Zoom?

19  A.  Yes, that's June 10, 2022.

20  Q.  And the top message you said was June 9th?

21  A.  At the start of the thread that we read was starting on

22  June 9th, correct.

23         MR. ARAD:  Mr. Iannuzzelli, could you please display

24  again Government Exhibit 1152, pdf page 52.  And please expand

25  all the purchases that took place on June 9th and 10th of 2022.

P7M1STO4                          Lopez - Direct

1   Q.  Special Agent Lopez, according to this document, where did

2   almost all of these purchases take place?

3   A.  In New York.

4   Q.  And with respect to the two purchases that took place

5   elsewhere, do these purchases tell you that they did not

6   actually take place in New York?

7   A.  No.

8   Q.  And why not?

9   A.  Like we learned previously, we know from this example that

10  DoorDash processes their payments in California, and a quick

11  Google search of this clothing company would tell you that it's

12  in Newcastle, Great Britain.

13          MR. ARAD:  Mr. Iannuzzelli, will you please highlight

14  the Matto John Street payment.

15  Q.  Special Agent Lopez, where is John Street?

16  A.  In lower Manhattan.

17          MR. ARAD:  And Mr. Iannuzzelli, could you please also

18  highlight the Pret A Manger payment on June 10th.

19  Q.  Special Agent Lopez, do you see the number right underneath

20  Pret A Manger, 10007?

21  A.  Yes.

22  Q.  Does that number tell you anything about the location of

23  this transaction?

24  A.  It does.

25  Q.  What?

P7M1STO4                         Lopez - Cross

1   A.  The store is located in lower Manhattan.

2   Q.  What is that number?

3   A.  That is the store number.  I'm sorry.

4          THE COURT:  The 10007, sir?

5          THE WITNESS:  That is the zip code for the store

6   number.

7   Q.  Were you thinking about the numbers preceding the zip code?

8   A.  Yeah, I apologize.  The numbers to the left of that

9   reference the actual store number.

10  Q.  No problem.  And I think you said this, but just to make

11  sure that we're clear, where is the 10007 zip code?

12  A.  In lower Manhattan.

13         MR. ARAD:  No further questions.

14         THE COURT:  Cross-examination?  Thank you, Mr. Patton.

15  CROSS EXAMINATION

16  BY MR. PATTON:

17  Q.  Good afternoon, Agent Lopez.

18  A.  Good afternoon, sir.

19  Q.  So I'd like to talk to you about the cellphone records that

20  you studied with the phone number ending in 7909.  You recall

21  testifying about that?

22  A.  Yes, sir.

23  Q.  And you reviewed location data on that phone number between

24  March 1st and August 8, 2022, correct?

25  A.  I believe the dates were——it was March 15, 2022, to

P7M1STO4                          Lopez - Cross

1    April 6, 2022.

2    Q.  Just as a general matter, you looked at dates——I'm not

3    referring to any particular charts.  I'm saying you looked at

4    location data for that phone from March 1 to August 8.  I

5    understand you did charts of subsets of that time, correct?

6    A.  Yes, sir.  I received records for——for the greater period

7    of time.

8    Q.  Okay.  And does March 1 to August 8 sound correct for the

9    full period of time that you looked at?

10   A.  I don't remember exactly, but——

11   Q.  Agent, one thing you created that we didn't go over here in

12   court is you made yourself sort of a chart——do you recall

13   this——of locations and dates?  It was a very simple chart?

14   A.  Are you referring to a spreadsheet?

15   Q.  Yes.

16   A.  Yes, yes.  Sorry.  Yes.  I know what you're talking about.

17           MR. PATTON:  Just so we're on the same page, could we

18   show the witness only 3535-002.

19   Q.  Do you recall——

20   A.  Yes, sir.

21   Q.  ——doing this?

22   A.  Yes, sir.

23   Q.  Okay.  And just to yourself, don't——not for the jury, if

24   you take a look at the first date you did there.

25           MR. PATTON:  And if we could scroll to the end of

P7M1STO4                    Lopez - Cross

1    this.  All the way down.

2                There we go.

3    Q.  With the exception of one outlier, does it look like you

4    went to——my apologies, I got it wrong earlier——August 10th?

5    A.  Yes, sir.

6    Q.  And in addition——

7                MR. PATTON:  We can take that down.  Thank you.

8    Q.  In addition to doing that chart for yourself, you also did

9    a disclosure of your anticipated testimony here today, correct?

10   A.  Yes.

11   Q.  And do you recall that towards the end of that you listed

12   the dates within this time frame that I've just been talking

13   about, March 1 to August——I think maybe it was 8 but 10, that

14   you listed the dates where you got a ping in Manhattan, where

15   that cellphone pinged in Manhattan?

16   A.  I'm sorry.  Could you rephrase the question, repeat the

17   question.

18   Q.  Sure.  You wrote up a disclosure of what you anticipated

19   testifying to about here, right?  And in that disclosure, you

20   had a section where you listed the complete set of dates where

21   you got a ping on this phone number we've been talking about,

22   where it pinged in Manhattan, correct?

23   A.  Okay.

24   Q.  Do you recall that?

25   A.  Yes.  Loosely.

1    Q.  Well, let's try to do better than loosely.

2           MR. PATTON:  If we could show the witness only

3    3535-006.

4    Q.  Do you see—does this look familiar to you, Agent Lopez?

5    A.  Yes, it does.

6           MR. PATTON:  And if we could scroll down to the bottom

7    of the second page.  And if we could blow up—there we go.

8    Q.  And I'm not losing my mind, right?  You did do a collection

9    between March 1, 2022, and August 8, 2022, right?

10   A.  Correct.

11   Q.  And you listed out the dates when the cellphone we've been

12   talking about pinged, 7909, in Manhattan, correct?

13   A.  Correct.

14   Q.  And Agent Lopez, I'm happy to give you a moment to review

15   this yourself, unless you happen to recall this, but roughly

16   speaking, it was a little less than half the days between

17   March 1 and August 8 had a ping in New York, right?  If you

18   want to take just a moment, it's—there aren't that many.

19   A.  I'll have to do some math on the fly here, but—

20   Q.  Does that sound about right?

21   A.  Sure, there were days that the phone did not ping in

22   Manhattan, correct.  There was no transaction at all.

23   Q.  Well, roughly half the days, right?

24   A.  Okay.

25   Q.  And if you recall that—

P7M1STO4                          Lopez - Cross

1          MR. PATTON:  We can take this down.

2    Q.  That spreadsheet that I showed you earlier, between——in

3    this time frame, the phone pinged in quite a number of other

4    cities and states, correct?

5    A.  I don't remember how many exactly, but there were——there

6    were other cities and states, yes, correct.

7    Q.  Seattle was one location, correct?

8    A.  Are we talking about the phone number ending in 7909?

9          MR. ARAD:  Objection.

10   Q.  Correct.  The 7909, correct.

11         THE COURT:  If you recall cities of which it pinged

12   to, or do you just recall it pinging in other cities?

13         THE WITNESS:  I don't remember exactly.  That wasn't

14   part of my core analysis that was in the presentation.

15         THE COURT:  And counsel, if I may.

16         Were you asked to look for instances in which the

17   phone pinged, to use your term, in Manhattan?

18         THE WITNESS:  Yes, ma'am.

19         THE COURT:  So you weren't really fixated——I mean,

20   there were times what it pinged somewhere else, but you weren't

21   looking at that.

22         THE WITNESS:  That's correct.

23         THE COURT:  Thank you.

24         Counsel, move on.

25

P7M1STO4                          Lopez - Cross

1

2              MR. PATTON:  Mr. DeMarco, could we pull back up, just

3     for the witness, 3535-02.

4     BY MR. PATTON:

5     Q.  Agent, you recall this is the spreadsheet we were just

6     talking about?

7     A.  Yes, sir.

8     Q.  Can you tell us, just without going into the details of

9     this, what this is generally and how you created it.

10    A.  Sure.  So this was just kind of a work product.  I was

11    at—I was given records for two different sets of numbers.  I

12    was given a date range of interest for those numbers.  I have a

13    software program that I could plug in the records, look at the

14    dates for each of the records, and determine generally where,

15    what tower that phone was utilizing on a particular day, and

16    then I just made a column to note whether that phone was in

17    Manhattan on that day and, if it was not in Manhattan and there

18    was data for it, where that phone was.

19    Q.  And then you created a chart that has, in one column, a

20    location, in another column, a date, and then in another

21    column, whether or not it hit in that location on that date; is

22    that correct?

23    A.  Correct.

24             MR. PATTON:  Your Honor, I would at this time offer

25    3535-002, and I'm happy to give it a defense exhibit number.

P7M1STO4                          Lopez - Cross

1          MR. ARAD:  Objection.

2          THE COURT:  Mr. Arad, is there any voir dire you wish

3    to do of this witness on this document?

4          MR. ARAD:  I'm sorry?

5          THE COURT:  Is there any voir dire you wish to ask of

6    this witness on this document?

7          MR. ARAD:  There is, your Honor.

8          THE COURT:  You may.

9    VOIR DIRE EXAMINATION

10   BY MR. ARAD:

11   Q.  Special Agent Lopez, did you create this document at the

12   end of your analysis?

13   A.  No.

14   Q.  Did you create this document at some point before you were

15   done with your analysis?

16   A.  I believe this is one of the first things I did after

17   receiving the records.

18   Q.  And for what purpose did you create this particular

19   document?

20   A.  I was being asked to create a document similar to——to this.

21   Q.  Were you asked to find out the dates when this cellphone

22   pinged in cities other than New York?

23   A.  No.  That column was completely created by me and just to

24   show that there was transactions on a particular date and where

25   they were, but I was not asked by anybody or directed to

P7M1STO4                          Lopez - Cross

1    do—-create that column.

2    Q.  Approximately how long has it been since you last saw this

3    document?

4    A.  I couldn't even give a guess.  I do so many of these.  And

5    I don't even remember exactly when I received the records for

6    these——for this case.

7    Q.  Off the top of your head, do you know what percentage of

8    the hits in this document were in New York City?

9    A.  I have no idea.

10   Q.  Or what percentage were in any other city?

11   A.  I have no clue.

12          MR. ARAD:  No further questions.

13          THE COURT:  Let me ask a question, sir.  You did put

14   this document together, yes?

15          THE WITNESS:  Yes, your Honor.

16          THE COURT:  Did you try to be accurate when you were

17   putting it together?

18          THE WITNESS:  Yes, your Honor.

19          THE COURT:  Did you believe it was accurate at the

20   time you put it together?

21          THE WITNESS:  Yes, your Honor.

22          THE COURT:  It's admitted over the government's

23   objection.  3535-002 is admitted into evidence and may be shown

24   to the jury.

25          (Government's Exhibit 3535-002 received in evidence)

P7M1STO4                    Lopez - Cross

1          MR. PATTON:  Thank you, your Honor.

2          Mr. DeMarco, could we show this.

3    BY MR. PATTON:

4    Q.  So Agent Lopez, I won't go through in too much detail, but

5    on this first sheet, we see that for 7909, we have some hits in

6    San Francisco and Seattle, correct?

7    A.  So the——are you talking about the left side, sir, where you

8    see——

9    Q.  I'm talking about the 7909 number.

10   A.  Okay.

11   Q.  And if you see there, there are a number of spots where it

12   says hit, right?

13   A.  Yes, sir.

14   Q.  And that indicates that the cellphone, the 7909 cellphone,

15   hit on a tower on that date in this general location, right?

16   A.  Yes, sir.

17          THE COURT:  Just so that I understand, sir, the column

18   A, you see column A?

19          THE WITNESS:  Yes, ma'am.

20          THE COURT:  Is that for the phone number ending 4854?

21          THE WITNESS:  No, your Honor.  That's for the phone

22   number ending in 4854.

23          THE COURT:  That's what I just asked.

24          THE WITNESS:  Oh, I'm sorry.

25          THE COURT:  Excuse me.  I'll try again.  Column A

P7M1STO4                         Lopez - Cross

1   corresponds with column C?

2              THE WITNESS:  Yes, your Honor.

3              THE COURT:  Column G corresponds with column E?

4              THE WITNESS:  Yes, your Honor.

5              THE COURT:  Thank you.

6              Counsel.

7   BY MR. PATTON:

8   Q.  Well, I just want to clarify, Agent Lopez.  The column A

9   that has the location, you see that?

10  A.  Yes.

11  Q.  And then you have two phones here, right?  One ends 4854,

12  right?

13  A.  Yes.

14  Q.  And the other ends in 7909?

15  A.  Yes.

16  Q.  And so let's just, as an easy one, take the very first

17  location you have, which is in row 2, and that's San Francisco,

18  California, right?

19  A.  Correct.

20  Q.  And if we go across, you have a hit in San Francisco for

21  the 4854 on March 1, correct?

22  A.  Correct.

23  Q.  And you have a no hit in San Francisco on March 1 for 7909,

24  correct?

25  A.  No hit there signifies there was no transaction data for

P7M1STO4                        Lopez - Cross

1    that phone on that particular day.

2    Q.  Understood.  Which means you can't say anything about San

3    Francisco or anywhere else for that matter, right?

4    A.  That's correct.

5    Q.  But if we go, say, to the next one down, so row 3, which is

6    still San Francisco, now both phones hit on March 2nd in San

7    Francisco, correct?

8           THE COURT:  No.  That's not what he's saying.  That's

9    why I had the whole conversation with him, sir.  I'll try that

10   again.

11          Sir, if there's a hit in San Francisco, is that only

12   for column C?

13          THE WITNESS:  Yes, your Honor.

14          THE COURT:  All right.  Counsel, that's what I'm

15   saying.  Column A and column C work together, column E and

16   column G work together.

17   BY MR. PATTON:

18   Q.  Agent, I just want to be clear on that.  What is the hit

19   referring to there?

20          MR. ARAD:  Objection.

21          THE COURT:  Let him testify in accordance with what

22   he's just told me twice already.

23          Go ahead.

24   A.  So, sir, if you look at column E, which refers to the

25   number ending in 7909, and you look at row 3, the green hit is

P7M1STO4                         Lopez - Cross

1  related to column F there, which is also marked green, that

2  there's a hit in the general area of S.D.N.Y. in Manhattan.

3  Q.  Got it.  My apologies.  So the Seattle and San Franciscos

4  we're looking at here are related to 4854, correct?

5  A.  Yes, sir.

6  Q.  Got it.  And throughout the 4854, we see multiple cities

7  related to San Francisco, Seattle, and if we scroll down a

8  little bit, if we keep scrolling, then there are a number there

9  in Florida, correct?

10 A.  Correct.  And I'd just like to just make a quick note.

11 When I——when I notated the city and the state, these are just

12 general.  It could be in a different city technically, but I

13 was just looking at a big map and it's near this area, so it's

14 not a hundred percent precise.

15 Q.  I understand.  Sometimes the cell towers can be less

16 precise than say, for instance, in Manhattan.

17 A.  Sure.  But I was just talking more so about the general

18 location, so, you know, it could be in a specific city outside

19 of Miami but I just called it Miami 'cause it was——it was close

20 and it wasn't——it was just a general analysis I was trying to

21 create.

22 Q.  Understood.  Understood.

23         MR. PATTON:  And we can take this down, Mr. DeMarco.

24 Q.  The testimony you were giving where there were the Telegram

25 chats and then you were comparing to cell site location maps,

1  remember, you had certain things up on the screen at the same

2  time?

3  A.  Yes.

4  Q.  The chats from Telegram, those chats are not recorded in

5  your cell site location data, correct?

6  A.  Can you rephrase that.

7  Q.  Sure.  The maps you were showing, right, that showed that

8  this cell site at different points in time connected to certain

9  cell towers in Manhattan, right, that's from voice data, voice

10  calls, correct, on the cellphone?

11  A.  That's correct.

12  Q.  That location data is not related to the time of the

13  Telegram chats themselves.  Or maybe more precisely I should

14  say, it's not mapping the chats, correct?

15          MR. ARAD:  Objection.

16          THE COURT:  Sir, can you answer the question?

17          THE WITNESS:  I think I understand that.

18          THE COURT:  All right.  You were mapping voice calls

19  and SMS messages, yes?

20          THE WITNESS:  Yes, ma'am.

21          THE COURT:  You couldn't map Telegram chats?

22          THE WITNESS:  No, that came from T-Mobile records

23  received to and from the phone.

24          THE COURT:  But I imagine if there's a Telegram chat

25  in that same time period, they didn't move that far.

P7M1STO4                      Lopez - Cross

1          THE WITNESS:  Correct.

2          THE COURT:  Counsel, please continue.

3    BY MR. PATTON:

4    Q.  And I think you went through and pointed out that some of

5    the Telegram chats were within various time frames of voice

6    calls that were made, right?

7    A.  Correct.

8    Q.  And sometimes——and that time frame varied across various

9    dates that you analyzed, correct?

10   A.  That's correct.

11   Q.  Do you recall——do you recall that there was one set of

12   chats and it was on April 1, where one of the participants said

13   "I'm in New York"?

14   A.  Yes, I remember that.

15   Q.  And do you recall that none of the other chats you reviewed

16   said "I'm in New York"?

17   A.  Yes, correct.

18   Q.  Because that was something you were looking for in trying

19   to analyze location, correct, what people were saying about

20   where they were located?

21   A.  Yeah, I mean, you look for a bunch of, whatever is

22   available, you look at to try to ascertain, you know, someone's

23   general location.

24          MR. PATTON:  And if we could pull up Government

25   Exhibit 2245.

P7M1STO4                    Lopez - Cross

1           THE COURT:  In evidence, sir?

2           MR. PATTON:  It is in evidence, your Honor.

3           THE COURT:  Thank you.

4    Q.  This is one of the Telegram chats that you testified about

5    on your direct examination.  And if we could go to page—well,

6    let's go to page 3.  And if we go down to the bottom, you see

7    there's a chat here that references Tornado, right?  Do you see

8    that?

9    A.  Yes.

10   Q.  And if we scroll down, that one is on March 15th, right?

11   A.  Correct.

12   Q.  And if we scroll down, there's a couple more—there is one

13   chat at the bottom of that page.

14           MR. PATTON:  If we could blow that up.

15   Q.  That's March 18th, right?

16   A.  Correct.

17           MR. PATTON:  Okay.  And if we could keep scrolling.

18           And now blow it up.

19   Q.  And we're now onto April 1, right?

20   A.  Yes.

21   Q.  And here the sender is Roman Storm saying, "Is this legit?

22   @haseebq," right, with a link?

23   A.  Yes.

24           MR. PATTON:  If we could just continue to scroll down

25   slowly.

P7M1STO4                    Lopez - Cross

1    Q.  Tom Schmidt chimes in.  And again, this is April 1, right?

2    A.  Yes.

3    Q.  Let me ask you just——we can keep scrolling down.

4            Do you recall any discussion involving Tornado or

5    Tornado Cash on April 1?

6    A.  Off the top of my——you asked me off the top of my head do I

7    have a recollection.

8    Q.  Sure.  But there aren't that many.  We can go through them

9    here.

10   A.  I do not remember, or recall.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P7M5sto5                         Lopez - Cross

1    BY MR. PATTON:

2    Q.  We have Roman Storm here:  Funny thing they did the --

3            Sorry, let's go back up.  Let's be clear about it.  Go

4    back up.  One more.

5            So, after Roman messages, the next one is Tom Schmidt:

6    *Yes, they spammed all of our portfolio companies with this*

7    *e-mail.  It is very annoying -- gave them a bunch of feedback*

8    *to avoid this in the future.*

9            If we could keep scrolling down?

10           *Apologies.*

11           Keep scrolling, Roman Storm says:  *Funny thing, they*

12   *did the same thing with the tribe folks.*

13           Keep scrolling.  And then there is something forwarded

14   where Roman says:  *KPMG are our third-party auditors.  I*

15   *apologize that they reached out to you.  We made it clear to*

16   *them that this was an anonymous transaction that took place on*

17   *chain.*

18           Right?  Do you see that?

19   A.  Yes.

20   Q.  And then Roman says:  *I'm in SF till Tuesday.*

21           We continue and that is still April 1; right?

22   A.  Yes, sir.

23   Q.  And we go down further and Roman says:  *If you are in San*

24   *Francisco, let me know.*

25           Right?

P7M5sto5                          Lopez - Cross

1    A.  Yes.

2    Q.  And further down -- and he's done a -- sorry.  Go back up.

3    Sorry.  He hits @haseeb and @tomschmidt and @ashwin; right?

4    A.  Yes.

5    Q.  And go down.  Tom Schmidt says:  *We are not, sadly.*

6              Roman says:  *Miami, Dubai?*

7              Right?

8    A.  Correct.

9    Q.  Further down, and we are still on April 1 here; right?

10   A.  That's correct.

11   Q.  Further down -- keep going -- and then Tom Schmidt says:

12   *Haseeb is in SG, Ash in PR.  I'm in NY.*

13             Right?  And Roman asks:  *PR?  Portugal?*

14             And Tom Schmidt says:  *Puerto Rico.*

15             This is 4/1.  Then the next thing is April 6; right?

16   A.  Yes.

17   Q.  So, a fair summary of that chat that Roman reaches out and

18   says something about if you are in San Francisco and --

19             MR. ARAD:  Objection.

20             THE COURT:  I will allow him to ask the question but I

21   am asking him to be faithful to the actual documents he is

22   summarizing.

23             MR. PATTON:  I will do my best, your Honor.

24   BY MR. PATTON:

25   Q.  And then he, in a separate chat, lists other cities, Miami

P7M5sto5                          Lopez - Cross

1    and Dubai with question marks; right?

2    A.   Right.

3    Q.   He doesn't, in any of those chats on April 1, ask if anyone

4    is in New York; correct?

5              THE COURT:   Do you recall Mr. Storm asking if anyone

6    was in New York?

7    A.   No, I do not.

8    Q.   You also looked at some American Express records; right?

9    A.   Right.

10   Q.   You were looking at American Express statements; right?

11   A.   Yes.

12   Q.   Statements that anyone who has a credit card, when you get

13   billed, a typical statement; right?

14   A.   Yes.

15   Q.   And those have dates on them; right?

16   A.   Yes.

17   Q.   But they don't have times on them; right?

18   A.   Right.

19   Q.   Even the dates, is it fair to say sometimes the dates on a

20   statement that are posted don't always align with the dates of

21   usage of a card?

22   A.   Are you asking about a specific transaction or are you

23   saying generally?

24   Q.   Just generally.  Sometimes you can use a credit card on one

25   date but the posted date on the statement can be a different

1    date; correct?

2    A.   That's correct.

3            MR. PATTON:  Your Honor, may I have one moment?

4            THE COURT:  Yes.

5            (Counsel conferring)

6            MR. PATTON:  No further questions, your Honor.

7            THE COURT:  Thank you.

8            Redirect?

9            MR. ARAD:  Brief redirect, your Honor.

10   REDIRECT EXAMINATION

11   BY MR. ARAD:

12   Q.   Special Agent Lopez, do you recall during cross-examination

13   being asked questions about the substance of the chats that we

14   read?

15   A.   Yes.

16   Q.   Do you recall being asked detailed questions about that

17   substance?

18   A.   Yes.

19   Q.   About who the participants were?

20   A.   Yes.

21   Q.   Do you recall being asked to summarize the substance of

22   certain of those chats?

23   A.   Yes.

24   Q.   Are you a case agent on this case?

25   A.   I am not.

P7M5sto5                           Lopez - Redirect

1   Q.  What was your role in this investigation?

2   A.  My role in this investigation was to look at the historical

3   call detail records and determine which cell sites were

4   utilized on the dates of interest.

5   Q.  As part of your investigation into this case, were you ever

6   required to learn who Roman Storm is?

7   A.  No.

8   Q.  Were you ever required to learn what Tornado Cash is?

9   A.  No.

10  Q.  Were you ever required to learn what something called

11  Dragonfly is?

12  A.  No.  And sitting here I have no idea what those things are.

13  Q.  Aside from analyzing the location of Tom Schmidt's phone,

14  were you required to learn anything about the participants in

15  the chat that we looked at?

16  A.  No, I was not.

17  Q.  Let's shift gears to clear up something else.

18          MR. ARAD:  Could we please display -- I don't know

19  what the Government Exhibit was that the defense just put into

20  evidence, the spreadsheet?

21          THE COURT:  3535-002.

22          MR. ARAD:  Mr. Iannuzzelli, if we could please display

23  this?  Thank you.

24  Q.  So, right off the bat, do columns A, B, and C here pertain

25  to the phone number that you were asked to analyze in this

P7M5sto5                        Lopez - Redirect

1    case?

2    A.  I do not.

3    Q.  So, if we are thinking about that phone number, can we just

4    ignore those columns altogether when they're not there?

5    A.  The only thing I did with that number is on the spreadsheet

6    on that particular day and that was the last I've seen or heard

7    from this phone number.

8    Q.  And so can we just ignore columns A, B, and C?

9    A.  Yes.

10        MR. ARAD:  Scrolling down, Mr. Iannuzzelli, please?

11   Q.  Please pay attention to the cities here, Special Agent

12   Lopez, or not necessarily cities but just locations, however

13   they're marked.

14        THE COURT:  In which column, sir?  G?

15        MR. ARAD:  In Column G.  Thank you, your Honor.

16        Please continue scrolling down, Mr. Iannuzzelli.

17   Q.  Do you see a lot of blank columns here or blank cells here?

18   A.  Yes.

19        MR. ARAD:  Mr. Iannuzzelli, please keep scrolling.

20   Q.  Please note these locations.

21        MR. ARAD:  Please keep strolling Mr. Iannuzzelli.

22   Q.  And that location.

23        MR. ARAD:  Please keep scrolling.  And please keep

24   scrolling.

25   Q.  Special Agent Lopez, do you recall being asked on

P7M5sto5                    Lopez - Redirect

1  cross-examination about cellphone pings for the cellphone you

2  analyzed in Seattle?

3  A.  Yes.

4  Q.  Did you see even one Seattle ping just now?

5  A.  I did not.

6  Q.  Are most of the pings that we just saw while scrolling in

7  the Southern District of New York?

8  A.  They are.

9  Q.  Does any other specific location that was noted come even

10  close to the number of pings in the Southern District of New

11  York?

12  A.  It does not.

13            MR. ARAD:  No further questions.

14            THE COURT:  Thank you, sir.  You are welcome to step

15  down.

16            THE WITNESS:  Thank you, your Honor.

17            (Witness excused)

18            THE COURT:  Sorry I called you by somebody else's name

19  earlier.

20            THE WITNESS:  I forgive you.

21            THE COURT:  You are very kind.

22

23

24

25

| GX - William Lopez |
| --- |
| 321 |
| 1152 |
| 2245 |
| 2247 |
| 3001 |
| 3202 |
| 3402 |

| DX - William Lopez |
| --- |
| 3535-002 |

CT EX 24

# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK
### 40 FOLEY SQUARE
### NEW YORK, NEW YORK 10007

**KATHERINE POLK FAILLA**
**DISTRICT JUDGE**

# JURY NOTE

Hi Judge
☜: We've made a lot of
progress today. We've
reached a natural stopping
point for today and are
ready to retire for today.
We will meet tomorrow @
8/5/25 8⁴⁵ Am.

DATE: _12:14 p_ dL _____
FOREPERSON'S SIGNATURE

TIME: _12:14 p_

Ct Ex 25
8/5/2025   12:30pm

Members of the Jury –

We have received your note timed 12:14 pm.
We will see you tomorrow promptly at 8:45 a.m.
All of us involved in the trial extend our best
wishes to _____ on her 90th
birthday.

KP Faille

Ct Ex 26

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### 40 FOLEY SQUARE
### NEW YORK, NEW YORK 10007

KATHERINE POLK FAILLA
DISTRICT JUDGE

# JURY NOTE

Dear Judge

while we made progress yesterday
We are dead locked on
some of the counts. We do not
believe that after 4 days of
deliberations that a unanimous
agreement is possible.
Pls Advise

DATE: 8/6/25

TIME: 9:?AM

FOREPERSON'S SIGNATURE

*Ct Ex 21*
*8/6/2025*

**Deadlock Charge**

This case is important for the Government and for Mr. Storm.

It is desirable, if a verdict can be reached, that this be done, both from the viewpoint of the Government and of Mr. Storm. But, as I stated in my instructions to you, your verdict must represent the conscientious judgment of each juror, and under no circumstances must any juror yield his or her conscientious judgment.

It is normal for jurors to have differences. This is quite common. While you may have honest differences of opinion with your fellow jurors during the deliberations, each of you should seriously consider the arguments and opinions of the other jurors. Do not hesitate to change your opinion if, after discussion of the issues and consideration of the facts and evidence in this case, you are persuaded that a change of your original opinion is justified. If, after fully exhausting your deliberations, you still cannot agree, then it is your right not to agree.

Again, I emphasize that no juror should vote for a verdict unless it represents his or her conscientious judgment.

What I have just said is not meant to rush or pressure you to reach a verdict. Take as much time as you need.

# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK
### 40 FOLEY SQUARE
### NEW YORK, NEW YORK 10007

**KATHERINE POLK FAILLA**
**DISTRICT JUDGE**

# JURY NOTE

Dear Judge,

We have made our best effort
to continue deliberating and come
to a unanimous decision, however
there are jurors who are set in stone
w/ their decision even after we're at
a good faith effort to consider all aspects
and we are deadlocked

DATE: _8/6/25_

TIME: _10:38 AM_

_____
FOREPERSON'S SIGNATURE

Court Exhibit 29

8/6/2025  11:19

## UNITED STATES v. STORM, S1 23-CR-430 (KPF)
## PARTIAL VERDICT INSTRUCTION

1    Members of the Jury: From your notes, I understand that you may have reached a

2  unanimous verdict as to one or more counts in the Indictment.  If you have reached a unanimous

3  agreement only as to some of the counts in the Verdict Form, you may, but you are not required

4  to, return a verdict on those counts on which you all agree.  If you do that, your verdict on those

5  counts will be final and cannot be changed or revisited in any way.

6    To summarize, you may (1) return a verdict on any count on which you all agree and then

7  continue deliberating on other unresolved counts; (2) wait until all deliberations are concluded to

8  return a verdict on all counts or tell me you are deadlocked on all counts; or (3) return a verdict

9  on any count on which you all agree and inform me that you are deadlocked on the unresolved

10  counts.  To return a verdict as to any count as to which you all agree, please indicate what the

11  verdict is for that particular count; for any count as to which you are not in agreement, please

12  write "Not Unanimous" next to that count.

13    Remember, any verdict you return must be unanimous.  No juror should vote for any

14  verdict unless, after full discussion and consideration and exchange of views, it represents his or

15  her considered judgment and conscientiously held belief.  Finally, I want to remind you again to

16  consider all of my instructions as a whole and that the Government bears the burden of proving

17  each element on every charge beyond a reasonable doubt.

18    Please retire and continue deliberations.

Ct Ex 30

Dear Judge.
We have reached
a verdict.

12$^{20}$pm
8/6/25