UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE UNITED STATES OF AMERICA,

v.

ROMAN STORM, ET AL.,

Defendants.

Case No. 23 Cr. 430 (KPF)

---

## DEFENDANT ROMAN STORM'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL

Brian E. Klein
Keri Curtis Axel
Becky S. James
Kevin M. Casey
Viviana Andazola Marquez
Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

David E. Patton
Christopher Morel
Hecker Fink LLP
350 Fifth Ave, 63rd Floor
New York, New York 10118
(212) 763-0883

*Attorneys for Roman Storm*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   STATEMENT OF FACTS ........................................................................................3

      A.    The Evidence at Trial Showed That Tornado Cash Was Permissionless
            and Noncustodial ...........................................................................................4

            1.    Only the User With the Secret Note Could Access Funds
                  Deposited Into the Smart Contract Pools.........................................4

            2.    The Smart Contracts Are Immutable and Accessible to Anyone as
                  Long as the Ethereum Blockchain Exists .........................................4

            3.    The UI Was Equally Permissionless and Noncustodial........................5

      B.    The Evidence at Trial Showed No Obvious or Feasible "Patch" to Prevent
            Illicit Use ......................................................................................................6

      C.    Mr. Storm and the Founders Did Not Charge Fees for, or Generate
            Revenue From, the Use of Tornado Cash .......................................................8

III.  RULE 29 LEGAL STANDARD ...............................................................................9

IV.   THE GOVERNMENT DID NOT ESTABLISH VENUE IN THIS DISTRICT .............12

      A.    Legal Standard for Venue ..............................................................................13

      B.    Communications Between the Founders and BitMart's Attorney Do Not
            Establish Venue .............................................................................................15

      C.    Payments to Infura Do Not Support Venue .....................................................18

            1.    Evidence Regarding the Payment History to Infura .........................19

            2.    The Government Failed to Prove That Payments to Infura From
                  July 2020 to February 2022 Were Deposited Into a Manhattan
                  Account or That Such Deposits Were Foreseeable to Mr. Storm..............20

            3.    Payments Made to Infura from March 2022 to August 2022 Did
                  Not Go to the Beneficiary Account in Manhattan ..................................21

            4.    The Infura Payments Do Not Satisfy the Substantial Contacts Test .........22

      D.    A Hacker's Alleged Use of the Tornado Cash Website Does Not Establish
            Venue .............................................................................................................23

      E.    The Communications With Representatives of Dragonfly Do Not Provide
            Venue .............................................................................................................25

            1.    GX 2245: Schmidt Telegram Chats (March 15-April 6)...........................26

            2.    GX 1372: Qureshi Telegram Chats (May 2-4) ........................................28

            3.    GX 2247: Schmidt Telegram Chat (June 9-10) .......................................30

V.    THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION
      ON COUNT TWO: CONSPIRING TO OPERATE AN UNLICENSED MONEY
      TRANSMITTING BUSINESS...................................................................................30

      A.    The Government Did Not Prove the Existence of an Agreement To
            Operate an Illegal Money Transmitting Business.................................................31

      B.    The Government Did Not Prove the Requisite Intent to Operate an Illegal
            Money Transmitting Business ...............................................................................34

            1.    Mr. Storm and the Founders Developed Tornado Cash Code's
                  Openly and Took Measures to Preclude Illicit Use ..................................35

            2.    The Government's Claim That the Founders Should Have Done
                  More To Prevent Misuse of Tornado Cash Is a Claim of Negligent
                  Inaction, Not Willfulness .........................................................................36

                  (a)    Mr. Werlau's Proposal Would Have Changed the
                         Fundamental Nature and Core Characteristics of Tornado
                         Cash.................................................................................40

                  (b)    Mr. Werlau's proposed user registry would not have
                         prevented bad actors from utilizing Tornado Cash.......................42

      C.    The Government Did Not Prove That Mr. Storm Knew That Tornado Cash
            Was a Money Transmitting Business ....................................................................44

      D.    The Government Did Not Prove That Mr. Storm Had Actual Knowledge
            That Funds Were Derived From or Used To Promote or Support a
            Criminal Offense Before Those Funds Were Transmitted ....................................47

      E.    Tornado Cash Was Not a Money Transmitting Business Because Tornado
            Cash Was Not a Money Transmitting "Business"..................................................50

      F.    Tornado Cash Was Not a Money Transmitting Business Because the
            Alleged Co-Conspirators Never Transferred Funds .............................................51

      G.    Tornado Cash Was Not a Money Transmitting Business Because the
            Alleged Co-Conspirators Never Took Custody or Control of the Funds .............54

      H.    Subsection (B)(1)(C) Only Applies to Businesses That Are Registered,
            Which Tornado Cash Was Not ..............................................................................58

VI.   THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL ON COUNT
      ONE: CONSPIRACY TO COMMIT MONEY LAUNDERING ....................................59

      A.    There Was No Evidence that Mr. Storm Entered Into an Agreement With
            the Criminal Object to Commit Concealment Money Laundering.......................60

      B.    There Was No Evidence that Mr. Storm Specifically and Willfully
            Intended to Engage in Money Laundering............................................................62

      C.    Neither Mr. Storm Nor Any Tornado Cash Founder Conducted Any Illicit
            Transaction...........................................................................................................63

D.     There Was No Evidence That Mr. Storm Possessed the Specific Knowledge Required for the Underlying Substantive Money Laundering Offense ....................................................................................................................65

VII.     THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL AS TO COUNT THREE: CONSPIRACY TO VIOLATE THE IEEPA .....................................68

A.     There Was No Evidence That Mr. Storm Agreed to Join a Conspiracy With a Criminal Objective and With Intent to Further That Objective ...............69

B.     The Government Failed to Prove Willfulness .......................................................71

C.     The Government Failed to Prove That Mr. Storm Provided a Service "To," or "For the Benefit of" the Lazarus Group ...........................................................75

D.     Tornado Cash Is Not a Service Under IEEPA .......................................................77

E.     The Tornado Cash Software Is Exempted by the "Informational Materials" Exception and the First Amendment .....................................................................79

VIII.    THE TRIAL DEMONSTRATED THE CONSTITUTIONAL INFIRMITIES OF EACH COUNT OF THE INDICTMENT .......................................................................83

A.     Due Process Fair Notice Requirements Require Dismissal of All Counts ...........83

B.     The Statutes Cannot Withstand First Amendment Scrutiny As Applied ..............86

1.     Strict Scrutiny Applies Because the Government's Application of the Statutes Are Not Content-Neutral .......................................................86

2.     The Government's Application of the Statutes Fails Strict Scrutiny .........88

3.     The Government's Application of the Statutes Cannot Withstand Intermediate Scrutiny ..............................................................................89

C.     The Statutes Are Facially Overbroad Under the First Amendment ......................90

IX.     CONCLUSION ...............................................................................................................91

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aronshtein v. United States*,
  2023 WL 2770145 (2d Cir. Apr. 4, 2023) ........................................................ 64

*Babbit v. Sweet Home Chapter of Communities for a Great Oregon*,
  515 U.S. 687 (1995) ........................................................................................ 85

*Bernstein v. U.S. Dep't of State*,
  974 F. Supp. 1288 (N.D. Cal. 1997) ............................................................... 80

*Bryan v. United States*,
  524 U.S. 184 (1998) .................................................................................. 34, 71

*Casey v. United States*,
  161 F. Supp. 2d 86 (D. Conn. 2001) ............................................................... 54

*Cernuda v. Heavey*,
  720 F. Supp. 1544 (S.D. Fla. 1989) ................................................................ 80

*Colvin v. Keen*,
  900 F.3d 63 (2d Cir. 2018) .............................................................................. 54

*Cornelio v. Conn.*,
  32 F.4th 160 (2d Cir. 2022) ............................................................................. 89

*Cuellar v. United States*,
  553 U.S. 550 (2008) ........................................................................................ 67

*Direct Sales Co. v. United States*,
  319 U.S. 703 (1943) .................................................................................. 48, 62

*Edenfield v. Fane*,
  507 U.S. 761 (1993) ........................................................................................ 88

*Elonis v. United States*,
  575 U.S. 723 (2015) ........................................................................................ 38

*Farrell v. Burke*,
  449 F.3d 470 (2d Cir. 2006) ............................................................................ 90

*Fischer v. United States*,
  603 U.S. 480 (2024) ........................................................................................ 58

*Forest Watch v. U.S. Forest Serv.*,
  410 F.3d 115 (2d Cir. 2005) ............................................................................ 75

*Greasley v. United States,*
  No. 15-CV-642-A,
  2021 WL 935731 (W.D.N.Y. Mar. 11, 2021) ..................................................... 54

*Kalantari v. NITV, Inc.,*
  352 F.3d 1202 (9th Cir. 2003) ......................................................................... 80

*Krulewitch v. United States,*
  336 U.S. 440 (1949) ......................................................................................... 37

*Marland v. Trump,*
  498 F. Supp. 3d 624 at 638 (E.D. Pa. 2020) ............................................. 80, 82

*Morissette v. United States,*
  342 U.S. 246 (1952) ......................................................................................... 37

*Pulsifer v. U.S.,*
  601 U.S. 124 (2024) ......................................................................................... 85

*Red Lion Broadcasting Co. v. FCC,*
  395 U.S. 367 (1969) ......................................................................................... 86

Rewis v. United States,
  401 U.S. 808 (1971) ......................................................................................... 85

*Rosemond v. United States,*
  572 U.S. 65 (2014) ........................................................................................... 34

*Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.,*
  585 F.3d 58 (2d Cir. 2009) .............................................................................. 54

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos,*
  605 U.S. 280 (2025) ................................................................................... 61, 62

*Smith v. United States,*
  586 U.S. 106 (2013) ......................................................................................... 34

*Taniguchi v. Kan P. Saipan, Ltd.,*
  566 U.S. 560 (2012) ......................................................................................... 75

*TikTok Inc. v. Trump,*
  490 F. Supp. 3d 73 (D.D.C. 2020) ................................................................... 82

*Twitter v. Taamneh,*
  598 U.S. 471 (2023) ................................................................................... 56, 61

*U.S. v. Hansen,*
  599 U.S. 762 (2023) ......................................................................................... 90

*United States ex rel. Hart v. McKesson Corp.,*
  96 F.4th 145, 155 (2024) ...................................................................... 34, 74, 75

*United States v. Abdallah,*
  528 F. App'x 79 (2d Cir. 2013) ....................................................................... 13

v

*United States v. Amen,*
   831 F.2d 373 (2d Cir. 1987)............................................................................ 58

*United States v. Amirnazmi,*
   645 F.3d 564 (3d Cir. 2011)........................................................................... 71

*United States v. Andino,*
   39 F. App'x 628 (2d Cir. 2002) .................................................................... 14

*United States v. Atilla,*
   966 F.3d 118 (2d Cir. 2020)........................................................................... 73

*United States v. Bah,*
   574 F.3d 106 (2d Cir. 2009)........................................................................... 55

*United States v. Banki,*
   685 F.3d 99 (2d Cir. 2012)...................................................................... passim

*United States v. Beech-Nut Nutrition Corp.,*
   871 F.2d 1181 (2d Cir.1989)......................................................................... 13

*United States v. Berry,*
   No. 20 Cr. 84,
   2022 WL 1515397 (S.D.N.Y. May 13, 2022) ................................................ 12

*United States v. Bogucki,*
   No. 18 Cr. 21,
   2019 WL 1024959 (N.D. Cal. Mar. 4, 2019) ................................................ 11

*United States v. Bufalino,*
   285 F.2d 408 (2d Cir. 1960).......................................................................... 45

*United States v. Cassese,*
   428 F.3d 92 (2d Cir. 2005)...................................................................... 10, 11

*United States v. Connolly,*
   24 F.4th 821 (2d Cir. 2022) .......................................................................... 10

*United States v. D'Amato,*
   39 F.3d 1249 (2d Cir. 1994).......................................................................... 11

*United States v. Doud,*
   No. 19 Cr. 285, 2023 WL 2185844 (S.D.N.Y. Feb. 23, 2023)........................ 12

*United States v. Elfgeeh,*
   515 F.3d 100 (2d Cir. 2008)..................................................................... 44, 47

*United States v. Faiella,*
   39 F. Supp. 3d 544 (S.D.N.Y. 2014)............................................................. 55

*United States v. Falcone,*
   109 F.2d 579 (1940)................................................................................. 48, 62

*United States v. Finnerty*,
    474 F. Supp. 2d 530 (S.D.N.Y. 2007)..................................................................... 11

*United States v. Garcia*,
    587 F.3d 509 (2d Cir. 2009)................................................................. 33, 34, 67

*United States v. Genao*,
    343 F.3d 578 (2d Cir. 2003)......................................................................... 64

*United States v. Gotti*,
    457 F. Supp. 2d 403 (S.D.N.Y. 2006)................................................................... 11

*United States v. Griffith*,
    515 F. Supp. 3d 106 (S.D.N.Y. 2021)................................................................... 72

*United States v. Grote*,
    961 F.3d 105 (2d Cir. 2020)......................................................................... 74

*United States v. Harmon*,
    474 F. Supp. 3d 76 (D.D.C. 2020)................................................................... 57

*United States v. Head*,
    546 F.2d 6 (2d Cir. 1976)........................................................................... 65

*United States v. Homa Int'l Trading Corp.*,
    387 F.3d 144 (2d Cir. 2004)................................................................. 71, 72, 78

*United States v. Hoskins*,
    902 F.3d 69 (2d Cir. 2018)......................................................................... 58

*United States v. Huezo*,
    546 F.3d 174 (2d Cir. 2008)......................................................................... 67

*United States v. Hunt*,
    573 F. Supp. 3d 779 (E.D.N.Y. 2021)................................................................. 10

*United States v. Johansen*,
    56 F.3d 347 (2d Cir. 1995)......................................................................... 33

*United States v. Jones*,
    420 F. Supp. 3d 242 (S.D.N.Y. 2019)................................................................. 12

*United States v. Khalupsky*,
    5 F.4th 279 (2d Cir. 2021)......................................................................... 31

*United States v. Kirk Tang Yuk*,
    885 F.3d 57 (2d Cir. 2018)......................................................................... 14

*United States v. Klein*,
    913 F.3d 73 (2d Cir. 2019)......................................................................... 10

*United States v. Kosinski*,
    976 F.3d 135 (2d Cir. 2020)......................................................................... 34

*United States v. Kukushkin*,
  61 F.4th 327, 330 (2d Cir. 2023). ............................................................ 74

*United States v. Kwan*,
  No. 02 Cr. 241,
  2003 WL 22973515 (S.D.N.Y. Dec. 17, 2003) ........................................ 11

*United States v. Lanier*,
  520 U.S. 259 (1997)............................................................................ 84, 86

*United States v. Lopac*,
  411 F. Supp. 2d 350 (S.D.N.Y. 2006)................................................ 48, 62

*United States v. Martin Linen Supply Co.*,
  430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977)................................ 10

*United States v. Mulheren*,
  938 F.2d 364 (2d Cir. 1991)...................................................................... 11

*United States v. Munshani*,
  2024 WL 4448708 (2d Cir. Oct. 9, 2024).................................................. 64

*United States v. Murgio*,
  209 F. Supp. 3d 698 (S.D.N.Y. 2016)................................................ 48, 57

*United States v. Napoli*,
  54 F.3d 63 (2d Cir. 1995).......................................................................... 64

*United States v. Pauling*,
  256 F. Supp. 3d 329 (S.D.N.Y. 2017)........................................................ 12

*United States v. Piampiano*,
  271 F.2d 273 (2d Cir. 1959)...................................................................... 65

*United States v. Reed*,
  773 F.2d 477 (2d Cir. 1985)................................................................ 15, 22

*United States v. Rodriguez*,
  392 F.3d 539 (2d Cir. 2009)................................................................ 10, 55

*United States v. Rodriguez-Moreno*,
  526 U.S. 275 (1999).................................................................................. 14

*United States v. Rommy*,
  506 F.3d 108 (2d Cir. 2007)...................................................................... 18

*United States v. Rosa*,
  17 F.3d 1531 (2d Cir.1994)........................................................................ 14

*United States v. Royer*,
  549 F.3d 886 (2d Cir. 2008).............................................................. passim

*United States v. Saavedra*,
  223 F.3d 85 (2d Cir. 2000)........................................................................ 15

*United States v. Sabhnani,*
    599 F.3d 215 (2d Cir. 2010) ................................................................. 36

*United States v. Samaria,*
    239 F.3d 228 (2d Cir. 2001) ........................................................... 67, 70

*United States v. Schulte,*
    578 F. Supp. 3d 596 (S.D.N.Y. 2021) .......................................... 10, 12

*United States v. Siembida,*
    604 F. Supp. 2d 589 (S.D.N.Y. 2008) .................................................. 12

*United States v. Sterlingov,*
    573 F. Supp. 3d 28 (D.D.C. 2021) ....................................................... 57

*United States v. Svoboda,*
    347 F.3d 471 (2d Cir. 2003) ........................................................... 13, 14

*United States v. Szur,*
    289 F.3d 200 (2d Cir. 2002) ................................................................. 64

*United States v. Tavoularis,*
    515 F.2d 1070 (2d Cir. 1975) ................................................. 45, 48, 66

*United States v. Threadgill,*
    172 F.3d 357 (5th Cir. 1999) ............................................................... 34

*United States v. Tomasetta,*
    No. 10 Cr. 1205,
    2012 WL 2064978 (S.D.N.Y. June 6, 2012) ...................................... 11

*United States v. Truman,*
    688 F.3d 129 (2d Cir. 2012) ................................................................. 10

*United States v. Tzolov,*
    642 F.3d 314 (2d Cir. 2011) ........................................................... 13, 14

*United States v. Valle,*
    807 F.3d 508 (2d Cir. 2015) ........................................................... 11, 12

*United States v. Velastegui,*
    199 F.3d 590 (2d Cir. 1999) ................................................................. 50

*United States v. Weiss,*
    930 F.2d 185 (2d Cir. 1991) ................................................................. 10

*United States v. Williams,*
    553 U.S. 285 (2008) ....................................................................... 84, 90

*Universal City Studios, Inc. v. Corley,*
    273 F.3d 429 (2d Cir. 2001) ........................................................... 80, 87

*Van Loon v. Department of the Treasury,*
    122 F.4th 549 (5th Cir. 2024). ..................................... 73, 77, 79, 82

*Virginia v. Hicks*,
    539 U.S. 113, 119 (2003) ......................................................................... 90

*Whitfield v. United States*,
    543 U.S. 209 (2005) ................................................................................ 14

*Wilkins v. Mason Tenders Dist. Council Pension Fund*,
    445 F.3d 572 (2d Cir. 2006) .................................................................... 75

*Wisconsin Cent. Ltd v. United States*,
    585 U.S. 274 (2018) ................................................................................ 56

## STATUTES

31 C.F.R. § 1010.100(ff)(5)(i) ..................................................................... 55, 56

31 C.F.R. § 201(b)(1) ................................................................................... 75

31 C.F.R. § 510.201(b)(1) ........................................................................ 75, 76

31 C.F.R. § 510.213 (c)(2) ....................................................................... 79, 83

31 C.F.R. § 510.312 ..................................................................................... 79

31 C.F.R. § 510.405(d)(1) ............................................................................ 78

31 C.F.R. § 560.538 ..................................................................................... 78

31 U.S.C. § 5330(d)(2) ................................................................................ 55

50 U.S.C. § 1702(b)(3) ............................................................................ 79, 80

50 U.S.C. § 1705(c) ..................................................................................... 72

50 U.S.C. § 4301 ......................................................................................... 71

## OTHER AUTHORITIES

55 Cong. Rec. 7015 (1917) .......................................................................... 71

FinCEN, FIN-2019-G001, *Application of FinCEN's Regulations to Certain Business
    Models Involving Convertible Virtual Currencies* (May 9, 2019) ....................... 46, 55, 56

H.R. Conf. Rep. No. 103–482, at 239, 1994 WL 151669 (1994) ................................. 80

*Substantive Criminal Law* § 6.2 (2d ed.2008) ............................................... 36

U.S. Const. art. III, § 2, cl. 3 ................................................................... 13

**<u>RULES</u>**

Fed. R. Crim. P. 29 ....................................................................................................................... 9

## I.     PRELIMINARY STATEMENT

The Court should dismiss or grant a judgment of acquittal on all three counts of the

Superseding Indictment under Federal Rule of Criminal Procedure 29. Despite assuring the

Court before trial that it would not do so, the government relied on a theory of negligent

inaction—that Roman Storm failed to implement compliance measures that he had no legal

obligation to implement but that the government argued would have prevented misuse of the

Tornado Cash software by third-party bad actors with whom he indisputably had no contact. To

be sure, the government attempted to cast its case as based on affirmative conduct by pointing to

certain steps Mr. Storm took to continue to operate or to modify certain features ancillary to the

Tornado Cash protocol, such as the UI or router. But there was no evidence that those steps were

undertaken for the criminal purpose of assisting bad actors—rather than for lawful purposes such

as making the protocol more accessible generally—or that Mr. Storm intended to violate the law

in undertaking them. Lacking such evidence, the government's only nexus between Mr. Storm

and bad actors was a claim that he knew they were using Tornado Cash and failed to take

sufficient measures to stop them. This is a negligence theory. It is unsupportable under

fundamental principles of criminal law and fails to establish the essential elements of all three

conspiracy counts.

The Court need not even reach the sufficiency issues, however, because all three counts

were improperly venued in the Southern District of New York. The government ultimately

asserted four purported bases for venue, each applicable to one or more counts, and all of which

were factually or legally invalid. Not one of the bases provides a sufficient connection between

the evidence presented and this District. The Court should dismiss this case for that reason alone.

If the Court reaches the merits, Mr. Storm addresses each count in turn, beginning with

Count Two, conspiracy to operate an unlicensed money transmitting business in violation of 18

U.S.C. § 1960(b)(1)(C), the sole count of conviction, followed by Count One (conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i)) and Count Three (conspiracy to violate the International Emergency Economic Powers Act ("IEEPA")), neither of which resulted in a verdict.

As to Count Two, a judgment of acquittal should be entered because, in addition to the government's flawed negligence theory, the evidence failed to show that Mr. Storm had the requisite advance knowledge that specific transactions involved illicit funds or that Tornado Cash was a "money transmitting business," as required for a Section 1960 violation. In fact, the evidence failed to show that Tornado Cash was a "business" at all, much less a "money transmitting business." Moreover, while the Court defined "transmission" to mean "transferring funds on behalf of the public," the evidence did not establish that either Tornado Cash, the UI, Mr. Storm, or any alleged co-conspirator ever "transferred" funds; to the contrary, the undisputed evidence showed that only *users* transferred their funds. As such, the Court should enter a judgment of acquittal on Count Two.

The evidence as to Count One suffers from the same negligence-based problems. In addition, there was no evidence that Mr. Storm or any alleged co-conspirator conducted, or agreed to conduct, any specific transactions of Tornado Cash users involving specified unlawful activity, much less conducted such transactions with the requisite advance knowledge that they involved the proceeds of unlawful activity and the knowledge that were designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

As to Count Three, additional factual and legal deficiencies require a judgment of acquittal. Tornado Cash is not a service, and Mr. Storm did not provide any Tornado Cash

software to or on behalf of the Lazarus Group, as required by the IEEPA because the Lazarus Group accessed neutral software available to anyone with an Internet connection, and even if it could be deemed a "service," criminal liability for providing software—or any pre-existing form of media—to the public is precluded by the Berman Act and the First Amendment.

Finally, and critically as to all counts, the government failed to prove the existence of a criminal conspiracy. There was no evidence that Mr. Storm, together with the founders, intended to assist or facilitate the criminal conduct of any bad actor. Coupled with the insufficiency of the government's negligence-based arguments, the absence of such evidence is fatal to the government's case. There was no evidence that Mr. Storm entered into an agreement with the intent to achieve or participate in any of the charged criminal objectives, whether it be operating an unlicensed money transmitting business, money laundering, or sanctions evasion, much less that he did so willfully.

Mr. Storm brings this motion pursuant to Rule 29(c) and also asks that the Court grant his previous motion brought pursuant to Rule 29(a), as to which the Court reserved ruling. This motion should be granted under either Rule 29(a) or 29(c). Whether the facts are viewed from the close of the government's case or from the close of all evidence, there was insufficient evidence to support a conviction on any of the charged counts.[1]

## II.    STATEMENT OF FACTS

Since the Court is familiar with the facts of the case, the following only highlights those most relevant to the determination of this motion.

---

[1] Mr. Storm is moving only for a judgment of acquittal pursuant to Rule 29 and not for a new trial pursuant to Rule 33. Mr. Storm maintains and does not in any way waive the objections he made before and during trial, on which the Court has already ruled.

A.    **The Evidence at Trial Showed That Tornado Cash Was Permissionless and Noncustodial**

The evidence established that Tornado Cash was permissionless and noncustodial, meaning anyone with an Internet connection could interact with it, but only the user who deposited their funds into the protocol and held the secret note for the deposit—and no one else—could access their funds.

1.    **Only the User With the Secret Note Could Access Funds Deposited Into the Smart Contract Pools**

It is undisputed that once funds are deposited into the Tornado Cash pool smart contracts, no one other than the user who deposited them and is in possession of the corresponding secret note can access them. Every witness who testified about the technical features of the Tornado Cash agreed on this point. (*See* Tr. 267:11-268:10 (Bram); 1194:5-14 (Werlau); 1772:11-15 (Edman).) The secret note is akin to the private keys to a software wallet, without which no one, including law enforcement, Mr. Storm, or any of the founders, can access any funds. There is no backdoor access. (*See* Tr. 1750:21-1751:1 (Edman: "[T]he developers cannot control the assets that are in the Tornado Cash protocol."); 1147:19-20; 1198:15-1199:5 (Werlau confirming "the founders couldn't go into the pools" and that there was "no back door into these pools for the founders").) This is true whether the user deposits their funds using the UI developed by Peppersec or interacts directly with the pools. (Tr. 1807:2-8, 1809:5-6 (Edman).)

2.    **The Smart Contracts Are Immutable and Accessible to Anyone as Long as the Ethereum Blockchain Exists**

It is equally undisputed that the Tornado Cash pool smart contracts are immutable and have been since May 2020. (*See* Tr. 1151:24-1152:5, 1194:25-1195:1 (Werlau); 1749:18-21, 1768:18-1769:4 (Edman).) Because they are immutable, the pool smart contracts "cannot be modified or removed from the Ethereum blockchain." (Tr. 1749:20-21 (Edman); *see also* Tr.

1152:2-5 (Werlau explaining immutability "means that no changes could be made to the contracts controlling those pools").) Even the Tornado Cash DAO could not make any changes to the pool smart contracts. (Tr. 2063:17-19 (Hurder).) Because the pools are immutable and permissionless, they are and will remain freely accessible to anyone as long as the Ethereum blockchain continues to exist. (*See* Tr. 1769:21-24, 1770:18-22 (Edman).) Any changes to other ancillary smart contracts through the DAO's governance process would not affect the "core functionality of the Tornado Cash ETH pools" or impact a user's ability to access the "ETH pools directly." (*See* Tr. 1780:4-18 (Edman).) No one could block a user from interacting directly with the pool smart contracts. (Tr. 1824:1-6 (Edman).)

### 3.    The UI Was Equally Permissionless and Noncustodial

The UI developed by Peppersec, the U.S.-based company started by Mr. Storm and his co-founders Alexey Pertsev and Roman Semenov, was accessible to anyone with an Internet connection[2] and did not conduct any transactions or take custody of any user funds. (Tr. 1191:4-14 (Werlau confirming the UI and website were "public to anybody" and "publicly accessible" in the U.S.); 218:1-6; 272:20-23 (Bram).) Older versions of the UI that had been uploaded to IPFS continued to be available for users who did not want to adopt an updated version. (Tr. 872:13-21, 876:15-877:11 (Gibbs); 1819:25-1820:2 (Edman).) The UI was also noncustodial and never conducted or wrote transactions to the blockchain. (*See* Tr. 1193:24-1194:1 (Werlau confirming ETH "doesn't get deposited into the UI").) Instead, the user connected their wallet to the UI, which would help the user prepare the instructions and generate a secret note but did not actually conduct or "write" transactions to the blockchain. (*See* Tr. 1798:5-7, 1806:14-20, 1807:2-17

---

[2] Users residing in certain countries could not access the UI via the Tornado.cash website after the founders implemented geo-blocking on the website in or around June 2020, but if a user were to "access the UI directly from IPFS, then [the geo-blocking] wouldn't apply." (*See* Tr. 1822:18-1823:20 (Edman).)

(Edman).) The UI merely obtained or "read" information from the blockchain. (*See* Tr. 1808:3-4 (Edman); 952:17-21 (Dubash); 878:7-10 (Gibbs).) The user's wallet effectuated the transaction. (Tr. 1808:6-8 (Edman explaining that "[a]ll of that information is read from the blockchain, but in order to make the deposits or the transaction to the blockchain, that has to go through your wallet software.").)

### B.    The Evidence at Trial Showed No Obvious or Feasible "Patch" to Prevent Illicit Use

Contrary to the government's claims to the Court before trial, the undisputed evidence at trial showed that there was no easy "patch" to Tornado Cash to prevent bad actors from using it such that failing to implement changes demonstrated a willful intent. (*See* July 8, 2025 Pretrial Conference ("PTC") Tr. 58:2-59:6.) The government elicited testimony from Phillip Werlau about a hypothetical user registry, but his own testimony revealed that the implementation of such a feature would have fundamentally altered the nature of the protocol and has no precedent or application in the decentralized blockchain space. (*See* Tr. 1157:14-1159:20, 1188:12-14 (Werlau).) Mr. Werlau testified that his proposal would require a user to create an account with a username and password and provide additional unspecified personal information, which would be used to associate the user's wallets with their account. (Tr. 1157:14-17, 1158:2-7, 1160:13-21 (Werlau).) All of this data would be stored in "an off-chain database maintaining the connection between deposits and withdrawals." (Tr. 1157:14-17, 1159:13-20 (Werlau).) Under the proposal, the "owners of Tornado Cash, while also maintaining a database of this transaction information, would be responsible for maintaining updates to the user registry." (Tr. 1188:12-14 (Werlau).) In other words, Mr. Werlau's proposal would have changed the very nature of Tornado Cash from a freely accessible and noncustodial protocol to a permissioned, custodial service that held the

keys to customer funds and maintained a database of user information that would require constant human intervention to keep updated.

While Mr. Werlau described such core features of Tornado Cash as mere "design choices," the immutable and noncustodial nature of the protocol was intended to keep users in control of their secret note (and thus their funds) and to avoid collecting personal information that could be exploited in a hack. An off-chain database of such information would be particularly vulnerable to a hack or exploit. (*See* Tr. 1842:4-7 (Edman).) Indeed, Mr. Werlau himself agreed that "making the pools immutable and having the user be the one with the secret note" had the effect of "making the user's deposit safer from hacks." (Tr. 1199:15-18 (Werlau).) And while Mr. Werlau testified that the implementation of the Tornado Cash relayer registry demonstrated the feasibility of his proposal (Tr. 1160:4-6 (Werlau)), he ignored a crucial distinction in that users "can add themselves to the relayer registry, subject to certain conditions like having enough TORN tokens"—or, put another way, the "relayer registry operates automatically," while his proposed user registry required human intervention and management, which is vulnerable to hacking and other exploits. (Tr. 1839:12-21, 1841:24-1842:7 (Edman).)

There is no way to collect personal information and process it using a smart contract and, for that reason, such systems are not commonly used in decentralized or blockchain protocols. (Tr. 1837:24-1838:22 (Edman).) Even in the context of centralized applications and exchanges, requiring a login and password is not an effective method of screening certain users in the blockchain context. (Tr. 1838:23-1839:1 (Edman).) Mr. Werlau conceded that, even with his proposed changes, a user "could go directly to the pool, circumventing the router." (Tr. 1152:10-13 (Werlau).) Dr. Matthew Edman noted that the perpetrators of the Alpha Homora hack deposited funds directly into Tornado Cash's 100 ETH pool in 2021. (Tr. 1841:17-23 (Edman).)

### C. Mr. Storm and the Founders Did Not Charge Fees for, or Generate Revenue From, the Use of Tornado Cash

The evidence at trial established that Mr. Storm and the founders did not charge fees or generate revenue from users of Tornado Cash—regardless of whether the users were engaging with the protocol lawfully or unlawfully.

It is undisputed that neither the Tornado Cash protocol nor the UI charged any fees for usage. (*See* Tr. 269:8-24 (Bram); 1073:17-21 (Werlau); 1775:8-24,1779:12-13 (Edman); 2032:2-14 (Hurder).) To the extent a user paid any fees for a transaction, such payments were made to relayers. (*See* Tr. 898:10-15; 910:16-25 (Ahmed confirming he paid fees to a relayer but not for usage of the protocol or the UI).) Relayers were "third parties" that set their own fees, all of which were paid to the relayers and not to the founders or the community. (Tr. 1048:6-10, 1072:16-21, 1073:4-12, 1213:13-16 (Werlau).)

Moreover, it was undisputed that neither the founders nor the company they owned, Peppersec, received any income from Tornado Cash, an open-source protocol that did not generate revenue. Dr. Stephanie Hurder testified that she reviewed Peppersec's financial statements and found that it did not earn any fees or revenues through Tornado Cash. (Tr. 2044:15-23 (Hurder).) Nor did Peppersec earn any revenues from the issuance of tokens. (Tr. 2045:12-14 (Hurder).) In fact, it did not have any operating revenue at all. (Tr. 2045:21-22 (Hurder).) Instead, Peppersec received all of its funding from investors and grants. (*See* GX 924 (Peppersec transaction spreadsheet from Rho Bank account showing deposits from Dragonfly International Holding Ltd. ("Dragonfly")); GX 1303-1304 (Dragonfly SAFE and Warrant to Peppersec for $900,000 in funding); DX 9051-9052 (Wayback Machine screenshots of Gitcoin grants); Tr. 2042:14-22 (Hurder testimony about LAO's $50,000 convertible note); Tr. 2036:5-2044:13 (Hurder testimony regarding Peppersec's investors).)

The only claim the government made about "profits" related to Mr. Storm's and the founders' personal ownership of the cryptocurrency token, TORN. Whether the price of TORN increased because of illicit use of Tornado Cash was a disputed point at trial, but the Court need not resolve that question for purposes of this motion.[3]

## III.    RULE 29 LEGAL STANDARD

The defense moves for acquittal pursuant to Rule 29(c). The defense previously moved for judgment of acquittal at the close of the government's evidence pursuant to Rule 29(a) and renewed that motion at the close of all the evidence. (Tr. 1559:12-16; 2217:8-16.) The Court reserved ruling on both motions. (Tr. 1643:9-11; 2217:10.) When a district court reserves its

---

[3] To the extent the Court thinks it necessary to address the issue of TORN's price, the evidence overwhelmingly showed that illicit use did not increase the value of TORN, such that no reasonable jury could have found otherwise beyond a reasonable doubt. TORN was primarily a governance token. (*See* Tr. 230:22-25 (Bram); 1781:6-13 (Edman); 2049:7-11, 2056:16-25, 2079:12-14 (Hurder).) TORN was created after the Tornado Cash protocol launched and was not required to use the protocol. (*Id.* 2056:16-25 (Hurder).) Dr. Hurder testified that TORN had real value as a governance token, as the Tornado Cash governance community "was well designed, it was active, and had significant power." (*Id.* 2030:16-17, 2075:9-11, 2075:18-2076:4 (Hurder).)

"[T]he price of the TORN token generally rose and fell with the overall crypto market movements" and was "highly correlated with the price movements of Bitcoin and ETH," particularly in "mid-2022." (Tr. 2030:21-22, 2082:10-17 (Hurder).) Neither the implementation of the relayer registry nor the misuse of Tornado Cash by bad actors had a positive impact on the price of TORN. (*See* Tr. 2082:23-2083:22, 2087:10-17 (Hurder).) Analyzing "the full period where the relayer registry was in full force," Dr. Hurder found that "after the launch of the relayer registry, the price of TORN fell approximately 50 percent between the launch period and the end of [the relevant period]," a greater decrease than that of Bitcoin or Ethereum during the same period. (Tr. 2083:17-22; 2084:13-15 (Hurder).) She also found that the Ronin hack "did not benefit the price of the TORN token" and, in fact, "in the two-week period after that news became public, the price of the TORN token fell 19 percent." (Tr. 2030:23-24, 2083:3-8 (Hurder).) She further found no correlation between the price of TORN and the dates that Ronin hack proceeds were deposited into the protocol according to FBI Special Agent DeCapua. (Tr. 2089:9-11 (Hurder).) While the government offered a misleading chart based on pricing data to suggest TORN performed better than other cryptocurrencies during a certain period (*see* GX 3601-5), it offered no expert analysis of its own to refute Dr. Hurder's "overall conclusion that during this period of time TORN remained highly correlated with BTC and ETH." (Tr. 2131:16-2132:12 (Hurder).) In sum, contrary to the government's arguments in closing, Mr. Storm did not profit from the misuse of Tornado Cash by bad actors.

decision on a Rule 29 motion at the close of the government's case-in-chief, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (citing Fed. R. Crim. P. 29(b)). "If a defendant moves for acquittal after the jury convicts, the court considers all evidence presented at trial, including the defense case." *United States v. Hunt*, 573 F. Supp. 3d 779, 792 (E.D.N.Y. 2021), *aff'd*, 82 F.4th 129 (2d Cir. 2023) (citing Fed. R. Crim. P. 29(c)). "Under Rule 29(c)(2), a court may enter a judgment of acquittal either where the jury has returned a guilty verdict or where the jury has failed to return a verdict." *United States v. Schulte*, 578 F. Supp. 3d 596, 611 (S.D.N.Y. 2021) (citing Fed. R. Crim. P. 29(c)(2) and *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 575, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977)).

In evaluating a defendant's challenge to the sufficiency of the evidence to support a conviction (or when a jury deadlocked), a district court must view the evidence "in the light most favorable to the [g]overnment," drawing all inferences and resolving all issues of credibility in favor of the government." *United States v. Weiss*, 930 F.2d 185, 191 (2d Cir. 1991). The evidence should be assessed "as a whole" and "not evaluate[d] piecemeal or in isolation." *United States v. Connolly*, 24 F.4th 821, 832 (2d Cir. 2022) (citing *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019)).

Although a defendant's burden to demonstrate the insufficiency of the evidence is a heavy one, it is "not insurmountable." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005). Where a "rational trier of fact could [not] have found the essential elements of [a] crime beyond a reasonable doubt," a Rule 29 motion must be granted. *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2009) (citation and quotation marks omitted). It is not enough for the government to have introduced evidence "'at least as consistent with innocence as with guilt.'"

*United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)). There is "always some evidence of guilt" in a criminal trial. *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015). But the district court must satisfy itself that a "jury could *reasonably* find" the defendant guilty "beyond a reasonable doubt." *Id.* (emphasis in original). If the trial "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," that means a "reasonable jury must necessarily entertain a reasonable doubt," and the district court must grant a judgment of acquittal. *Id.* Similarly, while inferences must be drawn in the government's favor in a Rule 29 motion, inferences that are "specious" are "not indulged," for that would permit a conviction of a defendant who is "*probably* guilty." *Id.* (emphasis in original).

Though a demanding standard, where the government has failed to meet its burden of proof, district courts will not hesitate to enter a judgment of acquittal. *See, e.g.*, *United States v. Bogucki*, No. 18 Cr. 21, 2019 WL 1024959, at *1 (N.D. Cal. Mar. 4, 2019) (Breyer, J.) (granting Rule 29 motion in wire fraud prosecution for failure to prove the making of materially false promises or representations); *United States v. Tomasetta*, No. 10 Cr. 1205, 2012 WL 2064978, at *3-4 (S.D.N.Y. June 6, 2012) (Crotty, J.) (granting Rule 29 motion in securities fraud prosecution for failure to prove venue); *United States v. Cassese*, 290 F. Supp. 2d 443, 457 (S.D.N.Y. 2003) (Sweet, J.) (granting Rule 29 motion in insider trading prosecution), *aff'd*, 428 F.3d 92 (2d Cir. 2005); *United States v. Kwan*, No. 02 Cr. 241, 2003 WL 22973515, at *11 (S.D.N.Y. Dec. 17, 2003) (Batts, J.) (granting Rule 29 motion in interstate transportation of stolen goods prosecution); *United States v. Gotti*, 457 F. Supp. 2d 403, 410 (S.D.N.Y. 2006) (Scheindlin, J.) (granting Rule 29 motion in criminal RICO prosecution); *United States v. Finnerty*, 474 F. Supp. 2d 530, 547 (S.D.N.Y. 2007) (Chin, J.) (granting Rule 29 motion in

securities fraud prosecution), *aff'd*, 533 F.3d 143 (2d Cir. 2008); *United States v. Siembida*, 604 F. Supp. 2d 589, 602 (S.D.N.Y. 2008) (Castel, J.) (granting Rule 29 motion in wire fraud prosecution), *aff'd*, 374 F. App'x 189 (2d Cir. 2010); *United States v. Valle*, 301 F.R.D. 53, 115 (S.D.N.Y. 2014) (Gardephe, J.) (granting Rule 29 motion on conspiracy charge), *aff'd in relevant part*, 807 F.3d 508 (2d Cir. 2015); *United States v. Pauling*, 256 F. Supp. 3d 329, 343 (S.D.N.Y. 2017) (Oetken, J.) (granting Rule 29 motion in narcotics trafficking conspiracy prosecution), *aff'd*, 924 F.3d 649 (2d Cir. 2019); *United States v. Jones*, 420 F. Supp. 3d 242, 256 (S.D.N.Y. 2019) (Koeltl, J.) (granting Rule 29 motion in narcotics trafficking prosecution); *United States v. Berry*, No. 20 Cr. 84, 2022 WL 1515397, at *12 (S.D.N.Y. May 13, 2022) (Nathan, J., sitting by designation) (granting Rule 29 motion in murder through use of a firearm prosecution); *United States v. Doud*, No. 19 Cr. 285, 2023 WL 2185844, at *8 (S.D.N.Y. Feb. 23, 2023) (Daniels, J.) (granting Rule 29 motion in narcotics trafficking conspiracy prosecution); *United States v. Schulte*, No. 17 Cr. 548, 2023 WL 5561141, at *7 (S.D.N.Y. Aug. 29, 2023) (Furman, J.) (granting Rule 29 motion as to obstruction of justice charge).

Whether viewed from the time of the close of the government's case or at the close of trial, the evidence was insufficient for conviction on any of the counts, and the Court should enter a judgement of acquittal.

## IV.    THE GOVERNMENT DID NOT ESTABLISH VENUE IN THIS DISTRICT

The government failed to elicit evidence at trial sufficient to tie any act in furtherance of the three charged conspiracies to this District by a preponderance of the evidence.[4] The government claimed venue was appropriate in this District on the following bases:

---

[4] On July 11, 2025, right before trial started, the defense moved to dismiss for lack of venue, and the Court denied the motion. (7/11/2025 Tr. 30:24-31:9; 41:6.) The trial further revealed the shortcomings of the government's grounds for venue, so the defense moved again pursuant to

- **Count One:** Communications to and from the founders to a hack "victim," BitMart, sent and received by BitMart's counsel in Manhattan. (Tr. 1633-1164; 2380.)

- **Counts One and Two:** Operational expenses paid to Infura's purported Manhattan-based beneficiary account. (Tr. 1635; 2340.)

- **Counts One and Two:** Payments for maintenance and operation of Tornado.cash, a proprietary website available to users in New York City, and a hacker's actual use of the website in Manhattan. (Tr. 1637; 2382.)

- **Counts One, Two, and Three:** Telegram messages between the founders and the representatives of Dragonfly while a representative was in Manhattan. (Tr. 1641-1643; 2381-2382.)

None of these provides venue on any of the counts nor are there any other bases for venue in this District, and the case should be dismissed.

## A.    Legal Standard for Venue

The Constitution protects a criminal defendant's "right to be tried in the 'district wherein the crime shall have been committed[.]'" *United States v. Svoboda*, 347 F.3d 471, 482 (2d Cir. 2003) (quoting U.S. Const. amend. VI); *see also* U.S. Const. art. III, § 2, cl. 3. This right is codified in Federal Rule of Criminal Procedure 18, which provides that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Where the defendant is charged with multiple counts, "venue must be proper for each count." *United States v. Abdallah*, 528 F. App'x 79, 81 (2d Cir. 2013) (citing *United States v. Beech-Nut Nutrition Corp.,* 871 F.2d 1181, 1188 (2d Cir.1989)).

The Second Circuit holds that "[v]enue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place." *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280

---

Rule 29 after the government rested its case-in-chief and after the defense rested its case-in-chief, with the Court reserving judgment.

(1999)). For conspiracy charges, the district where the "essential conduct" took place is one where (1) "the conspiratorial agreement was formed" or (2) "an overt act in furtherance of the conspiracy was committed by any of the conspirators." *United States v. Andino*, 39 F. App'x 628, 630 (2d Cir. 2002) (quoting *United States v. Rosa,* 17 F.3d 1531, 1541 (2d Cir.1994)). Thus, unless the conspiratorial agreement was formed in the district, an overt act in furtherance of the conspiracy is required to establish venue, even if the conspiracy charged does not have an overt act requirement for the substantive offense. *Whitfield v. United States*, 543 U.S. 209, 218 (2005) (explaining that the Supreme Court "has long held that venue is proper in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense.").

To suffice as a basis for venue, the overt act must be performed "for the purpose of accomplishing the objectives of the conspiracy." *Tzolov*, 642 F.3d at 320. "This includes not just acts by co-conspirators but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy." *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008) (citing *Svoboda*, 347 F.3d at 483). However, the venue analysis does not stop at "a single overt act performed in the district of prosecution." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018). The Second Circuit also considers whether the act was "'reasonably foreseeable' to each defendant charged with the conspiracy that a qualifying overt act would occur in the district where the prosecution is brought." *Id*.

Finally, courts in the Second Circuit sometimes also consider a "substantial contacts" test in connection with venue for conspiracy charges in the district, as a "safeguard for a defendant whose contacts with the district of prosecution are minimal." *Kirk Tang Yuk*, 885 F.3d at 70. This inquiry is particularly relevant "in those cases where the defendant's acts did not take place

within the district selected as the venue for trial." *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000). The substantial contacts test considers "the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the [venue] for accurate factfinding." *Royer,* 549 F.3d at 895 (quoting *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985)).

### B.    Communications Between the Founders and BitMart's Attorney Do Not Establish Venue

The government called Joseph Evans, an experienced blockchain lawyer at the law firm McDermott Will & Emery, to try to connect an alleged victim's outreach to Mr. Storm and the two other Tornado Cash founders to this District as the basis for venue on Count One, conspiracy to commit money laundering. (*See* Tr. 1633-1164; 2380.) Mr. Evans' testimony and the associated exhibits did not show that those communications were overt acts taken in furtherance of any conspiracy. Even when viewed in the light most favorable to the government, those communications fail to establish venue for Count One, or any other count.

Mr. Evans testified, in relevant part, that: (1) he was an experienced blockchain attorney who represented BitMart, a cryptocurrency exchange, at the time BitMart experienced a hack in December 2021; (2) after the hack, on December 14, 2021, Mr. Evans sent an email (GX 1009) and a Telegram message (GX 1006) from his Manhattan apartment to the Peppersec founders attaching a letter (GX 1005) requesting information and requesting that the founders freeze the hacked BitMart funds traced to Tornado Cash; (3) that the email he sent (GX 1009) contained a Manhattan address in the signature block; (4) that Mr. Storm responded to his email (GX 1011) and Mr. Semenov responded to his Telegram message (GX 1006) informing him there was nothing the founders could do to assist because they had no access to the funds; and (5) that he

received the response to his email (GX 1011) and his Telegram message (GX 1006) while he was in his Manhattan apartment.

The government's theory of venue based on those communications relies on the premise that the responses to Mr. Evans were "false" and designed to "dissuad[e] victims and law enforcement from continuing to pursue those stolen funds." (*See* Tr. 1634:15-17 (Rule 29 Conference).) But both of the government's assertions are wholly incorrect.

First, Mr. Storm's and Mr. Semenov's responses to Mr. Evans were factually true. The identical responses provided:

> Our company does not have any ability to affect any change or take any action with respect to the Tornado Cash protocol - it is a decentralized software protocol that no one entity or actor can control. For that reason, we are unable to assist with respect to any issues relating to the Tornado Cash protocol.

(GXs 1006; 1011.) It was undisputed that at the time of Mr. Evans's outreach to the founders about the BitMart hack, the funds at issue had already been deposited into a Tornado Cash pool (*see* GX 3002-30 (showing that BitMart hacked funds were deposited into Tornado Cash on December 4 and 5, 2021; Tr. 1858-1859 (Edman).) It was also undisputed that once funds are deposited into the Tornado Cash protocol, there is nothing anyone other than the depositor (who was the alleged hacker in this case) can do with respect to those funds. In fact, the record is replete with evidence, including from the government's case-in-chief, supporting this contention. For example, the government's own expert, Mr. Werlau, testified that once funds were deposited into the pools, there was nothing anyone could do to as to those funds other than the depositor:

> Q. So that means the founders couldn't go into the pools, right?
> A. That is correct.
> Q. In fact, no one could go into the pools except for the person with the secret note, right?
> A. Can you define "into the pool"?
> Q. No one could -- if I deposited my ETH into a pool and I had the secret note, I'm the only one who can withdraw it, right?

> A. That is correct.
> Q. So the founders -- there was no back door into these pools for the
> founders, right?
> A. That I'm aware of.
> Q. There's no back door for anyone other than -- period. The only
> person who could access was the person with the secret note, right?
> A. Correct.

(Tr. 1198:15-1199:5; *see also*, 1859:9-18 (Edman).) Likewise, during its summation, the

government acknowledged that the critical component of the "Tornado Cash service"—the

pools—could not be controlled or changed. (*Id*. 2347:2-4 ("Mr. Werlau told you that the

defendant and his co-conspirators controlled and regularly changed every component of the

Tornado Cash service *except the pools*." (emphasis added).) That the founders could have

theoretically made changes to the UI or website providing access to the Tornado Cash protocol,

as the government insisted, did not change the truth of their statements to Mr. Evans. Indeed, on

cross-examination he acknowledged:

> Q. So, Mr. Storm wrote back: Our company does not have any
> ability to affect any change or take any action with respect to the
> Tornado Cash protocol; right?
> A. That's what it says.
> Q. You didn't have any reason not to believe him at that time, did
> you?
> A. No.
> Q. Then next he writes: For that reason, we are unable to assist with
> respect to any issues relating to the Tornado Cash protocol. You had
> no reason not to believe that at the time either, did you?
> A. I had no reason not to believe that.

(*Id*. 162:4-10 (cleaned up).)

Second, while the government argued that those responses to Mr. Evans were designed to

"dissuad[e] victims and law enforcement from continuing to pursue those stolen funds[,]"

nothing in the record supports that interpretation. (*See id*. 1634:15-17.) "What matters is that the

conspirator speaks, not to hear the sound of his own voice, but to communicate to his listener

because he thinks that, by doing so, he furthers a conspiratorial goal." *United States v. Rommy*,

506 F.3d 108, 122 (2d Cir. 2007). Nothing about the founders' responses—true statements about their inability to access the pools—demonstrates any intent to dissuade victims from pursuing avenues to obtain stolen funds or from seeking support from law enforcement. Indeed, if anything, their responses acknowledge the founders' association with Tornado Cash—a fact that in the government's telling elsewhere runs counter to the aims of the conspiracy. Thus, the act of responding to Mr. Evans does not create venue in the District for Count One.

### C.     Payments to Infura Do Not Support Venue

In support of venue for Counts One and Two,[5] the government points to certain payments made to Infura, a blockchain service provider, from July 2020 to August 2022, as overt acts in furtherance of the conspiracies. FBI Special Agent Jocelyn Reyes, a forensic accountant, and Eleazar Galano, a representative from Infura, testified about these payments.

The crux of the government's basis for venue is that at some point, Infura had a beneficiary account located in Manhattan to which Mr. Storm, on behalf of Peppersec, purportedly made payments for services. Critically, however, the government failed to introduce evidence that any payments made to Infura from July 2020 to August 2022 were in fact made to the Manhattan-based bank account. At best, the government introduced evidence that it was foreseeable to Mr. Storm that Infura accepted payments to a bank account located in Manhattan *on or after* March 2022. But that evidence is neither here nor there, as the evidence the government introduced conclusively showed that the invoices from March 2022 onwards were paid by cryptocurrency, or to another Buffalo-based beneficiary bank account. Moreover, even if

---

[5] The government only tied the Infura payments to Count One for purposes of venue. (Tr. 1635; 2380:18-21.) But the government relied on the payments as substantive evidence of an overt act in furtherance of the conspiracy alleged in Count Two. (Tr. 1602; 2369-2370.) Out of an abundance of caution, the defense addresses this evidence as it relates to venue for both Counts One and Two.

the government had established the payments to Manhattan, the tenuous connection of a third-party service provider's bank having a Manhattan branch does not satisfy the substantial contacts test.

### 1.    Evidence Regarding the Payment History to Infura

The government offered the payment history to Infura from July 2020 to August 2022 in the form of receipts, invoices, and emails produced by Infura, and records from Peppersec's Rho Bank account.

Through Mr. Galano's testimony, the government introduced 21 receipts reflecting payments to Infura from July 2020 to February 2022. (GX 814-819, 821, 823, 825, 827, 829, 831, 833, 835, 837, 839, 841, 843, 845, 847, 849.) These receipts reflect payments received from three different credit cards. (GX 814-816, 818 (paid by Visa ending in 8549); 817, 819, 821, 823, 825, 827, 829, 831, 833 (paid by Visa ending in 0392); 837, 839, 841, 843, 845, 847, 849 (paid by MasterCard ending in 9754).) The government also introduced five invoices, three of which were for March 2022 (GX 851-853); one for April 2022 (GX 858); and one for August 2022 (GX 867). GX 851 and 853, two of the invoices for March 2022, listed a Manhattan-based Chase Bank account; GX 852 and GX 858 had no beneficiary account information; GX 867 listed a Buffalo-based HSBC Bank account. Finally, the government offered email correspondence showing that the March 2022 and April 2022 invoices were paid via cryptocurrency. (*See* GX 856; 862.)

Agent Reyes testified about Peppersec's Rho Bank records, which included statements from July 2020 to June 2022 (*see* GX 3101-3124) and introduced a spreadsheet of transactions covering the same period (GX 924). Agent Reyes testified that payments were made to Infura from the Rho Bank account "[o]n a monthly basis." (Tr. 366:16.) However, the spreadsheet of transactions and the statements showed that only 17 payments of the 21 receipts introduced,

spanning October 2020 through February 2022, were made from Peppersec's Rho Bank account to Infura. Those payments correspond to the Visa ending in 0392 and the MasterCard ending in 9754. (*See* GX 924; 3104-3120.)

> **2.    The Government Failed to Prove That Payments to Infura From July 2020 to February 2022 Were Deposited Into a Manhattan Account or That Such Deposits Were Foreseeable to Mr. Storm**

At the close of evidence and during its summation, the government argued that 17 payments from Peppersec's Rho Bank account were made to Infura's Chase Bank account located in Manhattan. (*See* Tr. 1635; 2381.) But nothing in the record supports this representation. There is in fact no evidence that Infura ever had a Manhattan bank account during this period, much less that any payments was received into it. The only documentation of the 17 payments are Infura receipts and the Peppersec bank account records. (*See* Infura Receipts (GX 817, 819, 821, 823, 825, 827, 829, 831, 833, 837, 839, 841, 843, 845, 847, 849); Peppersec's Rho Bank Account Statements and Spreadsheet of Transactions (GX 3101-3124; 924).) Unlike the period from March 2022 onwards, there are no Infura invoices indicating where the payments were directed. And there was no evidence at all (such as a wire transfer document) to indicate where such payments were in fact received. In fact, the only addresses which appear on any of the 21 total receipts admitted are Infura's Fort Worth, Texas address, and on occasion, Mr. Storm's Washington state address. (*See* GX 814-819, 821, 823, 825, 827, 829, 831, 833, 837, 839, 841, 843, 845, 847, 849.) In other words, there was no evidence that any act happened in Manhattan.

Assuming the payments to Infura prior to March 2022 could be deemed overt acts in furtherance of the charged conspiracies, and setting aside that the government failed to prove that the payments were in fact made to the Manhattan-based account, the government failed to prove that it was foreseeable to Mr. Storm that he was making payments to a Manhattan-based account.

Indeed, the Infura receipts prior to March 2022, including those that were not from the Peppersec Rho Bank account (*i.e.,* from July 2020 to February 2022), fail to reference this District in any manner—nor do they provide the account details for the Chase Bank account located in Manhattan. As such, there is nothing in the record showing that Mr. Storm could reasonably foresee that the account into which he was making payments was an account located in the District.

Without evidence that any act indeed happened in Manhattan and that it was foreseeable to Mr. Storm that such an act would take place in the District, none of the 21 payments made to Infura before March 2022 can serve as the basis for venue on Counts One or Two.

### 3.    Payments Made to Infura from March 2022 to August 2022 Did Not Go to the Beneficiary Account in Manhattan

The government only introduced two invoices, both of which are invoices for March 2022, bearing the routing information for Infura's Chase Bank beneficiary account in Manhattan. (*See* GX 851; 853.) However, these invoices were not paid to the Chase Bank account in Manhattan; the government's evidence shows these invoices were paid in cryptocurrency.

As shown in GX 856, Mr. Storm emailed Infura's Business Operations Manager the transaction ("TXN") hash confirming payment in cryptocurrency of the March 2022 invoice (GX 851; 853). The April 2022 invoice (GX 858), which had no beneficiary account information, was also paid via cryptocurrency. (GX 862). This was confirmed by Mr. Galano, when government asked whether the April 2022 period was "roughly around the time period that [Mr. Galano] recall[ed] Tornado Cash starting to make payments to Infura in crypto" to which Mr. Galano answered "Yes." (Tr. 753:17-20.) There is thus no evidence that any payments received by Infura ever touched Manhattan. Finally, the government did not introduce any evidence concerning payments from Peppersec to Infura for May 2022 to July 2022. The sole remaining

invoice from August 2022 reflects a new beneficiary account with an address in Buffalo, New York. (*See* GX 867.)

In sum, none of the payments made to Infura could serve as the basis for venue—even if they constitute acts in furtherance of a conspiracy—because the government failed to introduce any evidence that the payments were indeed made to the Manhattan-based beneficiary account.

### 4.    The Infura Payments Do Not Satisfy the Substantial Contacts Test

The payments made to the third-party service provider Infura, even if they did happen to go into a Manhattan bank account, do not satisfy the "substantial contacts" test, which considers "the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the [venue] for accurate factfinding." *Royer,* 549 F.3d at 895 (quoting *Reed*, 773 F.2d at 481). None of these factors support finding venue based on the Infura payments.

First, neither Mr. Storm nor his co-conspirators made any payments in Manhattan. At most, they could have caused, but did not, payments to be made to a third-party's account which happened to be (at least for some limited time) in Manhattan. Second, those payments did not go to the elements of the crime which included the furtherance of money laundering and the transmission of known illicit funds. As discussed above, the payments did not further the illegal objects of the charged conspiracies at all, but rather simply allowed Peppersec's UI software to gather certain information necessary to function. Third, the locus and effect of the alleged criminal conduct had nothing to do with where the Infura payments landed. The fact that Infura had a bank account in Manhattan did not cause any harm to occur in the District. Finally, this venue is not suitable for accurate factfinding. It is a far-flung venue from Mr. Storm's home in Washington state, and none of the conduct by the alleged co-conspirators actually occurred in

this District. In short, neither Mr. Storm nor the founders had substantial contacts with the District, and the payments made to Infura did not establish otherwise.

### D. A Hacker's Alleged Use of the Tornado Cash Website Does Not Establish Venue

The government pointed to "the payments for maintenance of and operation of a proprietary website that was available to users in New York and was in fact used by a user in New York in July 2022" as a basis for venue on Counts One and Two. (*See* Tr. 1637 (Rule 29 Conference); 2382 (Summation).) The user at issue, Shakeeb Ahmed, testified he used Tornado Cash in July 2022 to seed a wallet in order to later execute a hack. This basis for venue is fatally flawed because Mr. Ahmed's supposed use of the website was not caused by Mr. Storm or the founders and did not further any of the charged conspiracies.

For the acts of an individual outside of the conspiracy, like Mr. Ahmed, to constitute overt acts for the purposes of venue: (1) the conspirators must have caused the acts; (2) the acts must have *materially* furthered the ends of the conspiracy; and (3) the acts must have been reasonably foreseeable to each defendant. *See Royer*, 549 F.3d at 896. Mr. Ahmed's alleged use of Tornado Cash fails all three.

Mr. Ahmed testified that he accessed Tornado Cash from his Manhattan apartment in July 2022 because he "didn't want to use cryptocurrency that was directly linked to [him]" to execute a hack. (Tr. 894:12-14.) On direct examination, the government asked about why he used Tornado Cash before executing his hack. Mr. Ahmed explained that he learned about Tornado Cash when it was used "by nation-state attackers like Lazarus." (*Id.* 895:10-13.) He was then asked about his use of the website and described not withdrawing his deposit immediately from Tornado Cash because it would have "decreased [his] anonymity." (*Id.* at 901:6-19.) When the government inquired about whether he came up with the idea to leave his deposit in the pools

longer, Mr. Ahmed responded that he "knew it intuitively" and did not recall reading about it on the Tornado Cash website, after failing to recognize a screenshot of Tornado.cash shown to him by the government.[6] (*Id*. at 902:3-23.)

It is clear from Mr. Ahmed's testimony that neither Mr. Storm nor the other founders caused him to act. First, he did not hear about Tornado Cash from any advertising directed at him by Mr. Storm or the founders. Likewise, he did not learn about how to increase his anonymity or misuse Tornado Cash from the website, or anything directed to him by Mr. Storm or the other founders. There was no other evidence that demonstrated by a preponderance of the evidence that Mr. Storm or the other founders caused Mr. Ahmed to act.

Moreover, Mr. Ahmed's act did not further the aims of any conspiracy. As to the money laundering conspiracy, Mr. Ahmed testified that his money was in the Tornado Cash pool for no more than 48 hours, at most. (*Id*. 901:15-17.) The government argued that furthered the objective of the money laundering conspiracy because the more money is in the pool, the better the anonymizing aspects of the pool work. (*Id*. 1637:23-1638:12.) But for the act of a third-party to be a basis for venue, the act must have "*materially* furthered the ends of the conspiracy." *Royer*, 549 F.3d at 896 (emphasis added). Mr. Ahmed's deposits could not reasonably be said to *materially* further the ends of the money laundering conspiracy—no single deposit left in the pool for less than 48 hours could.

For similar reasons, the evidence relating to the maintenance and operation of the Tornado Cash website and Mr. Ahmed's subsequent use of the website fails to provide a basis for the operating an unlicensed money transmitting business conspiracy. Nothing that Mr.

---

[6] It is dubious whether Mr. Ahmed did in fact access the website (*i.e.*, Tornado.cash), given that he failed to recognize a screenshot of the Tornado.cash website (GX 1979), which the Court declined to admit the exhibit into evidence. (Tr. 902-903.)

Ahmed did in this District was caused by the founders, and nothing he did materially furthered the operation of the "business" of Tornado Cash. Mr. Ahmed did not pay a fee to the protocol. (Tr. 910:21-23 ("Q. You didn't have to pay any sort of fee just for the Tornado Cash protocol itself, correct? A. Deposit? Not to the protocol itself, yes, correct.").) The founders, including Mr. Storm, gained nothing, not even a financial contribution to continue operating the protocol, from Mr. Ahmed's use. Thus, Mr. Ahmed did nothing to further the conspiracy to operate an unlicensed money transmitting business—his use was wholly immaterial. His claimed use of Tornado Cash in the District, therefore, cannot confer venue for Counts One and Two.

### E.    The Communications With Representatives of Dragonfly Do Not Provide Venue

The government argued that Telegram messages between the founders and representatives of Dragonfly, an investment firm, took place while Tom Schmidt, one of the Dragonfly representatives, was located in Manhattan, and that the substance of the conversations were acts in furtherance of the charged conspiracies. (*See* Tr. 1641-1643; 2381-2382; GX 2245, 1372, 2247.) The government also introduced cell site, rental, and transaction records pertaining to Mr. Schmidt to prove he was in Manhattan for some of the time during that period. (*See* GX 321, 1152, 3001, 3202, 3402.)

Each exhibit fails to create venue because the government did not demonstrate that the messages were in furtherance of any of the conspiracies, and even if they were acts in furtherance of the conspiracy, the government failed to show that it was foreseeable to Mr. Storm that such acts were taking place in the Southern District of New York.

Notably, the only basis for venue on Count Three, GX 1372, only contains messages between Haseeb Quereshi and Mr. Storm, not with Mr. Schmidt. This is fatal to Count Three: there was no evidence that Mr. Schmidt—the only party that could plausibly tie the messages to

Manhattan—even received or read the message, and that he did so while he was in fact in Manhattan, undermining any purported basis for venue for Count Three.

### 1.    GX 2245: Schmidt Telegram Chats (March 15–April 6)

GX 2245 is a Telegram group chat between the founders and representatives of Dragonfly, containing select messages spanning from March 15, 2022 to April 6, 2022. The government admitted select messages sent by either the founders or by Mr. Schmidt. The messages, however, do not reflect a single, connected, conversation. Instead, they show three different subconversations, which largely correspond to the dates of each exchange.

First, there are three messages between March 15 and 18 that consist of Mr. Schmidt asking the founders if they are interested in talking to sismo.io about its interest in using the relayer network to put its attestations on-chain. (*See* GX 2245 at 205.) To this message, Mr. Semenov responds that he has discussed a very similar project with someone else in the Telegram group.

These messages patently fail to provide a basis for venue. Mr. Schmidt reaching out about an unrelated project involving the use of the Tornado Cash relayer network and Mr. Semenov's response merely confirms he has heard of something similar before. The subject matter of the conversation in no way relates to operation of Tornado Cash and cannot be said to be in furtherance of any of the charged conspiracies. Moreover, it is not clear how this exchange was foreseeably in the District. At this point in time, there was no evidence that Mr. Schmidt had ever indicated he was in New York, much less the District.

Second, the messages on April 1 reflect Mr. Storm asking the representatives of Dragonfly if an email he received is legitimate, which turns into an exchange concerning where everyone is currently located. (*See* GX 2245 at 206–210.) Importantly, none of these messages have anything to do with Tornado Cash or its operation. The apparent linchpin for the

government is the exchange Mr. Storm has with the Dragonfly representatives about their whereabouts. Mr. Storm asks them to let him know if they are in "SF[.]" (*Id*. at 207.) Mr. Schmidt responds, "we are not, sadly" to which Mr. Storm then responds "Miami ? dubai?" (*Id*. at 208.) Mr. Schmidt responds: "[H]aseeb is in sf, ash in pr, i'm in NY." (*Id*. at 209.) Mr. Storm asks if "PR" means Portugal and Schmit responds "Puerto Rico." (*Id*. at 210.)

This exchange has nothing to with Tornado Cash. Mr. Storm's questions actually reflect a desire to meet in San Francisco, and that he did not foresee that Mr. Schmidt was in New York. Indeed, they generally reflect Mr. Storm's understanding that the Dragonfly representatives are at locations other than New York. Further, "NY" could refer to anywhere in New York state outside of New York City, or even if New York City, the Eastern District of New York. Thus, without being acts in furtherance of the conspiracy, and without being foreseeable to Mr. Storm, the April 1 exchange also fails to provide a basis for venue.

There is also a brief exchange on April 6 where Mr. Storm forwards a Tornado Cash DAO proposal link, asking the Dragonfly representatives to tell any TORN holders to vote. (*See id.* at 217.) While the text concerns Tornado Cash, there is no indication of what the proposal is for. There is nothing to suggest this request constitutes an act in furtherance of any conspiracy. Furthermore, this conversation is five days after Mr. Schmidt said he was "in NY," and does not establish that Mr. Storm could reasonably have foreseen that Mr. Schmidt was still "in NY", much less the District.

Finally, unlike the other two exchanges, the government failed to prove it was more likely than not that these messages were sent and/or received while Mr. Schmidt was in Manhattan. The only evidence that the government pointed to was cell site data placing Mr.

Schmidt in Manhattan 20 minutes or so after the exchange with Mr. Storm. (Tr. 990:18-20.) But Mr. Schmidt could have easily been outside of Manhattan during that time.

GX 2245 as a whole failed to provide a basis for venue on any count.

### 2.    GX 1372: Qureshi Telegram Chats (May 2-4)

The government's only basis for venue on Count Three, GX 1372, a Dragonfly Telegram chat containing conversations from May 2-4, 2022, also fails to provide a basis for venue. During summation, the government argued that "Schmidt received the messages about whether there was any market interest in a 'compliant mixer,' while he was in Manhattan." (Tr. 2382:1-6.) This statement was incorrect: GX 1372 is not a conversation between Mr. Storm and Mr. Schmidt at all, but between Mr. Storm and Haseeb Qureshi, a different Dragonfly representative. Mr. Schmidt did not participate in the exchange and the government offered no evidence that Schmidt—the only person on the chat that was even possibly in New York—received the message,[7] much less that he responded to it or did any "act" in furtherance of the conspiracy.

Nor did the government point to evidence showing that Mr. Schmidt was in fact in Manhattan at the time of this conversation. The cell site data that was introduced does not reflect Mr. Schmidt's presence in Manhattan at or around the time of the exchanged messages in early May 2022. (*See* GX 3001.) The only evidence that the government introduced in support of Mr. Schmidt's presence in Manhattan in early May 2022 were American Express records showing that certain purchases were made on his card in Manhattan. (*See* GX 1152.) But the records themselves do not show where Mr. Schmidt was located, as there are charges both in San

---

[7] The Dragonfly Telegram chats were admitted over the defense objection as business records of Dragonfly, and were not authenticated by any particular individual, whether Mr. Qureshi, Mr. Schmidt, or a custodian of records who could have indicated from whose device they extracted the records. While the defense tried to call Mr. Schmidt as a witness, the government refused to grant him immunity or witness status, so he refused to testify. There thus is evidence that Mr. Schmidt ever received the message at all, much less when or where he may have received it.

Francisco and in New York each day from May 2 through May 4. And even if all the charges were in Manhattan, it would not show that Mr. Schmidt was in fact in Manhattan at the time of the messages in May 2022—the purchases made in Manhattan could have happened at any time of the day by persons other than Mr. Schmidt, or Mr. Schmidt could have otherwise easily been outside of the District at other times of the day. This is especially possible since the government's own evidence showed that even on days his phone pinged in Manhattan, Mr. Schmidt's phone pinged in places other than Manhattan about half the time. (*See* GX 3001 at 7-10; *see also*, Tr. 1001 (Agent Lopez testifying that pings happened outside of Manhattan roughly half of the time between March 1 and August 8, 2022).) So, the evidence does not show that Mr. Schmidt was in Manhattan at or around the time of this conversation, or that he even read this exchange, as he did not participate in the discussion.

Further, even if Mr. Schmidt was in Manhattan at that time, there is no evidence that his presence there would have been foreseeable to Mr. Storm. The conversation took place on May 4, 2022, more than a month after Mr. Schmit had mentioned being somewhere in "NY".

Finally, the messages themselves were not in furtherance of a conspiracy to violate IEEPA. The government argued that these messages demonstrate that, during the time in which Lazarus Group was using Tornado Cash to move the proceeds of the Ronin Hack, Mr. Storm contemplated changes to Tornado Cash to have a "compliant mixer." (Tr. 1642:7-13.) But that is a misrepresentation of the discussion. GX 1372 is clear that Mr. Storm was not proposing changes to Tornado Cash but rather was considering a distinct new project. (*See* GX 1372.) Nowhere in that message thread is there any suggestion that changes are contemplated in response to the Lazarus Group's misuse of Tornado Cash. This conversation was not an overt act in furtherance of the sanctions violations conspiracy or any other conspiracy.

### 3. GX 2247: Schmidt Telegram Chat (June 9-10)

The government argued that messages sent from June 9-10, 2022 established venue for Counts One and Two. In those messages, Mr. Storm reached out to Dragonfly representatives seeking ideas on other avenues of funding. (*See* GX 2247.) To those messages, Mr. Schmidt responds that he can have a call to discuss. (*See id.*) The government did not introduce evidence of the substance of the conversation that took place and thus failed to establish that the conversation constituted an act in furtherance of any of the conspiracies.

In support of Mr. Schmidt being in this District, the government again introduced American Express records showing Mr. Schmidt made purchases in Manhattan on June 9 and 10. (*See* GX 1152.) But, as with the May records, those records fail to demonstrate that Mr. Schmidt was in this District at the time of his communications with Mr. Storm.

Even assuming that the act of setting up a call to discuss avenues of funding for Tornado Cash could be construed as an overt act in furtherance of the conspiracy, and that Mr. Schmidt was indeed in Manhattan at the time, the government failed to introduce evidence that it was reasonably foreseeable to Mr. Storm that Mr. Schmidt was in this District at that time, as it was months after the conversation in which Mr. Schmidt had indicated he was "in NY."

## V. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION ON COUNT TWO: CONSPIRING TO OPERATE AN UNLICENSED MONEY TRANSMITTING BUSINESS

The government failed to prove that Mr. Storm conspired to operate an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(b)(1)(C). During closing argument, the government claimed there was an agreement between the Peppersec founders to build the Tornado Cash protocol and operate the UI, coupled with "the knowing transmission of criminal proceeds" and a "for-profit business," arguing this was "all the evidence" the jury needed "to convict on Count Two." (Tr. 2375:17-20.) But the government failed to clear the hurdle of even

this oversimplified theory of Section 1960 liability, which, even if proven, failed to meet the required elements.

The government did not to prove that Mr. Storm had the requisite (1) agreement to operate an unlicensed money transmitting business, (2) intent to operate an unlicensed money transmitting business, (3) knowledge that Tornado Cash was such a business, and (4) advance knowledge of and the ability to block specific criminal transactions. Instead, the government presented a theory of negligent inaction, which is legally insufficient to establish criminal liability. The government also did not prove that Tornado Cash was a business or that it transmitted funds. Finally, Mr. Storm should be acquitted on Count Two because subsection (b)(1)(C) should be read only to apply to money transmitting businesses that were registered with the U.S. Treasury's Financial Crimes Enforcement Network ("FinCEN"), and the general conspiracy statute does not apply to Section 1960.

### A.    The Government Did Not Prove the Existence of an Agreement To Operate an Illegal Money Transmitting Business

To prove conspiracy, "the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent." *United States v. Khalupsky*, 5 F.4th 279, 288 (2d Cir. 2021). For Mr. Storm to be found guilty of Count Two's alleged conspiracy, the government had to prove the existence of an agreement to operate an unlicensed money transmitting business. (Dkt. 225 ("Final Charge") at 45.) Under the charged object here, the alleged co-conspirators would have had to agree to operate a money transmitting business that involved the "transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." 18 U.S.C. § 1960(b)(1)(C). (*See also* Final Charge at 48.) The government never claimed that Mr. Storm had an agreement with anyone who transferred illicit

funds using Tornado Cash (nor could it have). Rather, the government pointed to an agreement among the Peppersec founders. But the government did not mention in closing the requirement of a criminal objective, and did not point to any piece of evidence that would support a criminal objective, because there was none.[8]

The agreement among the founders was an agreement to develop Tornado Cash, a software tool, not to operate an unlicensed money transmitting business. The founders never set out to operate a "business" at all, much less a money transmitting business. As discussed more fully below, Tornado Cash did not generate revenue; it operated without fees and was freely available to the public. Tornado Cash was specifically set up so that it did not actually "transmit" funds at all. That was the whole point of the noncustodial, permissionless platform. Neither Tornado Cash nor the founders ever conducted transactions; only users and their own wallet software could conduct transactions. Their agreement thus was only to set up this permissionless, noncustodial software platform, not to operate an unlicensed money transmitting business.

The government also introduced no evidence that the Peppersec founders ever did or said anything to indicate that their collective purpose was to operate a money transmitting business that involved the "transportation or transmission of funds that are known to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." *See* 18 U.S.C. § 1960(b)(1)(C). Far from discussing any intent to facilitate the transmission of illicit funds, the founders' discussions actually reflected a desire to curb illicit usage of Tornado Cash. (*See, e.g.*, GX 2044-T (Bablo chat showing that, on March 29, 2022, after Mr. Storm sent a link

---

[8] While AUSA Gianforti in the opening close noted Mr. Storm's neutral agreement to "work[ ] together with his business partners, Semenov and Pertsev" (Tr. 2375:23-24), he never explained how the jury could possibly find that agreement had a criminal object, and AUSA Rehn in his rebuttal close did not mention the word "agreement" even once, much less explain any evidence that would show such agreement had an unlawful purpose.

and wrote: "A cool idea on how to stop hackers," the founders discussed the feasibility of the proposal).)

Moreover, the founders actually implemented measures to prevent illicit usage. They incorporated multiple features into the UI to limit its use, including checking IP addresses and wallet addresses against lists of known bad actors and then not completing the transactions for those users. (*See, e.g.,* Tr. 1820:3-15 (Edman).) They launched the Compliance Tool, which allowed users to prove their source of funds and thus to comply with any AML requirements imposed by exchanges or other entities. (*Id.* 1820:16-21 (Edman).) They implemented the Chainalysis Sanctions Oracle, which allowed the UI to check to see if users were on OFAC's list of sanctioned entities and, if so, not complete the transaction. (Tr. 1824:7-25, 1825:17-24, 1834:18-1835:9, 1827:2-6, 1831:20-1832:6 (Edman).) The founders also implemented "geo-blocking" measures which involved the mapping of IP addresses and blocking use by usrees in certain countries, including the DPRK. (*See, e.g.,* Tr. 1822:18-1823:13, 1827:8-21, (Edman); Tr. 2186:19-2187:7 (Green).)

This evidence undermines any alleged agreement with an unlawful or criminal purpose, without which there can be no criminal conspiracy. *See United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009) (requiring knowing participation in unlawful plan). Because there is "not a whit of evidence" that Mr. Storm "shared a common goal" with the alleged bad actors, the "conspiracy charged in the indictment ""[is], in substance, a product of the [g]overnment's imagination."" *See United States v. Johansen*, 56 F.3d 347, 351 (2d Cir. 1995) (quoting *United States v. Bertolotti*, 529 F.2d 149, 155 (2d Cir. 1975)).

### B.     The Government Did Not Prove the Requisite Intent to Operate an Illegal Money Transmitting Business

For Mr. Storm to be guilty of the conspiracy alleged in Count Two, he must have *willfully* participated in an agreement with the intent to operate an unlicensed money transmitting business. *See, e.g., Smith v. United States,* 586 U.S. 106, 111 (2013). "Willfully" means "to act knowingly and with a wrongful purpose to either disobey or disregard the law." *United States v. Kosinski*, 976 F.3d 135, 153 (2d Cir. 2020)*. See also Bryan v. United States*, 524 U.S. 184, 191-92 (1998); *United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 155-56 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 163 (2024). (Final Charge at 26.) The government was required to prove that Mr. Storm knowingly and willfully became a member of a criminal conspiracy with the specific intent to commit the object of the offense: operation of an unlicensed money transmitting business. *Garcia*, 587 F.3d 509, 515; *see also United States v. Threadgill*, 172 F.3d 357, 366 (5th Cir. 1999) (defendant must "join[] the agreement knowing its purpose and with the intent to further the illegal purpose"). As the Supreme Court has explained, the "intent requirement [is] satisfied when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense." *Rosemond v. United States*, 572 U.S. 65, 77 (2014). The government failed to prove that Mr. Storm acted with a purpose to disregard or disobey the law or that he had any intent whatsoever to run an unlicensed money transmitting business.

Ultimately, the government's theory—that Mr. Storm and the founders should not have continued to work on the Tornado Cash software while failing to prevent misuse of it—does not establish willfulness at all, but at most, negligence, which is not the *mens rea* required to impose criminal liability.

1.    **Mr. Storm and the Founders Developed Tornado Cash Code's Openly and Took Measures to Preclude Illicit Use**

The government introduced no communications or conduct evidencing Mr. Storm's desire to break the law, and it failed to offer any evidence that Mr. Storm ever did anything to help facilitate the illicit usage of Tornado Cash, or even desired its use by bad actors.

Indeed, the government's own evidence was to the contrary: If Mr. Storm were truly interested in developing an illegal money transmitting business, specifically one that involved the knowing transmission of illicit funds, one would expect that the project would be kept in the dark so that both the platform and its users would not be subject to law enforcement scrutiny. But that was not the case. Multiple government witnesses testified that the founders were very open with information about Tornado Cash and communicated publicly about it regularly.

Mr. Storm publicized information about the protocol and its privacy features on the Internet and social media, using his own name. (Tr. 272:11-273:11 (Bram discussing researching Tornado Cash on its website, Twitter, Discord, Medium, and community chat groups); Tr. 756:12-757:1 (Galano discussing finding Mr. Storm on Twitter and noting that Tornado Cash was a "very public project"); *see also* GX 1901, 1904, and 1936-A; Tr. 1202:10-20 (Werlau discussing that website was publicly available and that information about Tornado Cash appeared on Medium posts and discussion boards.) Indeed, even the source code itself was publicly accessible. (Tr. 922:1-924:18 (Dever discussing Tornado Cash GitHub public repository); Tr. 1202:21-1203:14 (Werlau discussing public accessibility of code on GitHub).)[9]

---

[9] While there was some debate about the implications of the UI code being "minified" (Tr. 1202:21-1203:2 (Werlau); Tr. 1805:4-19 (Edman)), there was no debate that the UI code was published in some form on the very public Tornado Cash Github site. (Tr. 1202:21-1203:14 (Werlau); 1790:1-13 (Edman).)

The defense also introduced evidence, undisputed by the government, to show that Mr. Storm presented Tornado Cash publicly at a highly respected computer engineering conference at Harvard and, indeed, won a prize for the UI's development. (Tr. 2203-1:20; DX 8852.)

The defense also introduced evidence that Mr. Storm took multiple affirmative steps to impede bad actors from using the Tornado Cash protocol and UI (*see supra* Section V(A)), which is obviously contrary to any intent to further the illegal objective of transporting or transmitting known illicit funds. He also discussed with the founders another proposal to stop hackers. (GX 2044-T.) And perhaps most tellingly, in a June 30, 2022, chat between Messrs. Storm and Qureshi, Mr. Storm wrote in response to Mr. Qureshi's inquiry about tracing funds through Tornado Cash and back to DPRK: "I'm glad those fuckers are detected." (DX 8790.) This sentiment does not reflect any unity of spirit with the hackers who misused Tornado Cash.

In short, the government lacked any evidence that would show wrongful purpose to either disobey or disregard the law, and the evidence it offered was to the contrary.

### 2. The Government's Claim That the Founders Should Have Done More To Prevent Misuse of Tornado Cash Is a Claim of Negligent Inaction, Not Willfulness

Lacking affirmative evidence that Mr. Storm acted with the intent to assist bad actors, the government attempted to meet its willfulness burden through evidence that Mr. Storm and the founders failed to take further actions to prevent use of Tornado Cash by bad actors: a claim of conspiracy by omission. It is a claim that is antithetical to the willfulness standard and unsupported by the law. "It is a long-established principle that criminal law generally regulates action, rather than omission, and that '[f]or criminal liability to be based upon a failure to act it must first be found that there is a duty to act—a legal duty and not simply a moral duty.'" *United States v. Sabhnani,* 599 F.3d 215, 237 (2d Cir. 2010) (quoting 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.2 (2d ed.2008)). If wrongdoing may be presumed from inaction—or even

insufficient action—then the presumption of innocence has truly been turned on its head. A "presumption of intent would conflict with the overriding presumption of innocence[.]" *Morissette v. United States,* 342 U.S. 246, 275 (1952). As Justice Jackson long ago observed, "[f]ew instruments of injustice can equal that of implied or presumed or constructive crimes." *Krulewitch v. United States,* 336 U.S. 440, 457-58 (1949) (Jackson, J., concurring).

Here, the government has identified no legal duty to act to prevent misuse of Tornado Cash. The Court previously recognized precisely this problem, expressing its concern about the government referencing KYC rules and protocols because Mr. Storm "didn't have a legal or regulatory obligation to implement" such protocols, and the Court was "troubled by the idea of him being convicted for not doing what he was not legally required to do." (PTC Tr. 58:25-59:6.)

Again and again, the government asked the jury to infer willfulness from the fact that Mr. Storm, upon learning that bad actors were misusing the Tornado Cash, did not make certain changes to the website and UI—that he was "put on notice of stolen funds being deposited in his business" (Tr. 2331:9-10) and "faced a choice—keep running the business or try to do something about that dirty money." (Tr. 2341:23-2342:1.) This is a negligence theory of criminal liability, plain and simple. The government's entire theory of criminal intent was that Mr. Storm learned about the hacks and scams and should have taken affirmative steps to change the Tornado Cash UI[10] to block bad actors from using it, as it stated repeatedly in its closing arguments:

- "This is the kind of information that the defendant *could have used to design his business* to be less hospitable to hackers[.]" (Tr. 2328:11-13 (emphasis added))

_____

[10] The Tornado Cash smart contracts were undisputedly immutable already such that Mr. Storm could not have blocked bad actors from using them; Mr. Edman testified that that any changes to the UI would have been ineffective given the bad actors' technical sophistication. (*See supra* Section II(A)(2)*; accord Van Loon*, 122 F.4th at 570)

- "Just remember that the router was something that the defendant and his co-conspirators had complete control over. It was a part of the system *that could have been easily changed* to make Tornado Cash less hospitable to hackers. And did they do that? No." (Tr. 2361:6-10 (emphasis added))

- "Each of those deposits represents an instance where the defendant, a U.S. person, provided services, concealment services, to the North Koreans. *He could have done something about it, but he chose not to*." (Tr. 2379:15-19 (emphasis added))

- "Mr. Werlau explained to you . . . some of the ways that Tornado Cash … *could have easily been designed to do what normal users wanted* -- to have the ability to unconceal transactions, if necessary. You still get the ability to send money anonymously but you have a way to track it if it becomes necessary and he explained that to you. *And you could block bad actors from using the service that way*." (Tr. 2439:4-11 (emphasis added))

- "That is not Monday morning quarterbacking because you know, you have seen the evidence, that the defendant and his co-conspirators talked about exactly that idea while they were committing these crimes. *They talked about it, they knew they could do it, and they decided not to do it*." (Tr. 2439:12-17 (emphasis added))

But "could have" and "should have" are the touchstones of negligence, not willfulness. Negligence is not the standard for criminal intent. *See, e.g., Elonis v. United States,* 575 U.S. 723, 738 (2015) (Courts have "long been reluctant to infer that a negligence standard was intended in criminal statutes") (internal quotations omitted); *see also id.* at 736 (*mens rea* requirement must separate wrongful conduct from otherwise innocent conduct).

The Court recognized as much at the final pretrial conference: "This isn't a negligence case. It's a willfulness case. So when we're talking about things that [Mr. Storm] could have done, it would seem to me that what you'd have to argue is that it would be a feature—I'm going to use the term 'feature,' or a patch, or a thing that Mr. Storm must have known about—one might say most people in his position would have known about it—that he could have implemented and that he deliberately elected not to do so." (PTC Tr. 58:2-9.) Specifically with

38

regard to the anticipated testimony of the government's expert, Mr. Werlau, the Court noted that "to the extent Mr. Werlau can come up with some crazy thing that no one could have known, that would have fixed this, not going to be helpful, right? I presume what he's going to testify . . . You're going to be arguing that there are things that, if you will, and with all respect, *any idiot would have known* to have put in place that he knew about and elected not to put in place. That's what Werlau is testifying to." (PTC Tr. 61:24-62:10 (emphasis added).)

The government responded to the Court's concern by promising to prove that Mr. Storm could have taken easy steps, that "any idiot" would have known to take, and that the failure to implement those changes would be so flagrant as to demonstrate willfulness. (PTC Tr. 61:23-65:1.) But the government came nowhere close to fulfilling that pledge; indeed by the time of closing arguments it all but abandoned it.

Despite spending considerable time testifying about hypothetical ways to build an alternate version of Tornado Cash, Mr. Werlau's testimony fell far short of the "any idiot" standard for proving willfulness. The only suggestion Mr. Werlau could muster was the untenable suggestion that the founders should have implemented a "user registry," together with the maintenance of "an off-chain database maintaining the connection between deposits and withdrawals." (Tr. 1157:14-17.) As discussed further below, the "user registry" he proposed was utterly incompatible with a blockchain protocol, would not have been effective, and would have fundamentally changed the nature and purpose of Tornado Cash. In fact, the government implicitly recognized as much. After much pretrial and midtrial discussion about the importance of Mr. Werlau's testimony, the government only made one scant reference to his "user registry" idea during its entire closing argument (Tr. 2447:25-2448:10), aside from noting that Messrs. Llacuna and Ahmed testified that they did not have to log in to Tornado Cash. (Tr. 2455:10-19.)

     **(a)**    **Mr. Werlau's Proposal Would Have Changed the Fundamental Nature and Core Characteristics of Tornado Cash**

Mr. Werlau testified that to implement the user registry, the founders would have "the user create an account" with a "user name and password," which would "allow you to log in" and then "associate wallets with your account." (Tr. 1158:2-7.) The UI would then "update a user registry on the blockchain saying that this wallet is allowed to make a deposit." (Tr. 1158:8-9.) For withdrawals, the "user would log into their account on the user interface, associate a new wallet that they want to make a withdrawal to," which "would be recorded in an off-chain database, and then that address would be submitted to the user registry to approve withdrawals from that address." (Tr. 1158:11-17.) In the event that the founders received an inquiry about a particular deposit, the founders "would be able to connect deposits and withdrawals, but they could also collect other information if they chose, such as IP address." (Tr. 1160:13-21.) Mr. Werlau's user registry would have required the founders to maintain a database of user information and ensure the registry was kept up to date. (Tr. 1188:12-14.) In other words, Mr. Werlau's proposal would have changed the very nature of the Tornado Cash protocol from a freely accessible and noncustodial protocol to a permissioned, custodial service that held the keys to customer funds and maintained a database of user information that would require constant human intervention to keep updated. In sum, Mr. Werlau's proposal was the farthest thing imaginable from a "patch" of the sort that the failure to implement it would be a proxy for willfulness as the government promised.

While Mr. Werlau described such core features of Tornado Cash as mere "design choices," changes to these features would have undermined the very purpose of the protocol, which was to ensure a user could have financial privacy on the Ethereum blockchain without entrusting their private data to others. The immutable, permissionless, and noncustodial nature of

the protocol was intended to keep users in control of their secret note (and thus their funds) and to avoid collecting personal information that could be exploited in a hack. Mr. Werlau himself agreed that "when these pools became immutable in May 2020, they became less subject to hacks" because immutability "reduced one of the ways it could be attacked." (Tr. 1198:5-14.) Mr. Werlau further agreed that "making the pools immutable and having the user be the one with the secret note" had the effect of "making the user's deposit safer from hacks." (Tr. 1199:15-18; *see also* Tr. 1842:4-7 (Edman explaining: "If you are collecting a lot of personally identifying information about users of the protocol, I could imagine that that would be a particular focus for hackers or somebody who would like to access and steal that information.").) In other words, the founders designed the protocol in a manner to keep user funds as safe as possible from exploitation—a completely valid consideration or "design choice," not evidence of any intent to further the transmission of known illicit funds. Mr. Werlau's proposed user registry would have been untenable in the context of a decentralized blockchain protocol

Even assuming Mr. Werlau's user registry could be adopted, he failed to explain what types of information should be collected to effectively screen out potential bad actors from using a decentralized protocol. Nor did he identify any software patch that could achieve the same effect. Indeed, Mr. Werlau conceded that a user does not need to provide personal information in order to use MetaMask, a commonly used noncustodial wallet, or, indeed, to interact with the Ethereum protocol itself. (*See* Tr. 1204:5-21; 1205:25-1206:7.) As Dr. Edman explained, there is no way to simply collect all of a user's information and process it using a smart contract. (Tr. 1837:24-1838:1.) Dr. Edman further testified that "a login and password system" in which the service requires "a user name or email address, a password, and maybe some identifying information about yourself," such as "name and address," is not something that is "commonly

41

used in decentralized protocols" or in "blockchain protocols," in which "users are typically identified by their wallet address" and not by "their real-world identity." (Tr. 1838:2-22.) Further, Dr. Edman testified that, even for centralized applications and exchanges, requiring a login and password is not an effective method of screening out certain users in the blockchain context. (Tr. 1838:23-1839:1.) And to the extent Mr. Werlau was proposing the collection of the sort of personal identifying information required by centralized exchanges—which are, in contrast to Tornado Cash, indisputably subject to KYC and AML regulations—his proposal is, essentially, that Tornado Cash should have become a centralized exchange. The government's case thus boils down to the theory that, once Mr. Storm became aware that bad actors were misusing Tornado Cash, he should have either taken steps to shut the protocol down entirely or converted it into a different business altogether—neither of which was required by law or feasible.

### (b)    Mr. Werlau's proposed user registry would not have prevented bad actors from utilizing Tornado Cash

In addition to fundamentally altering the nature of Tornado Cash, the implementation of Mr. Werlau's proposed user registry would not have prevented bad actors from misusing it. Mr. Werlau opined that his proposal was technologically feasible because neither the "router" nor the "instance registry" smart contracts were immutable and could thus be updated to support his proposed user registry. (Tr. 1077:2-25.)

Crucially, however, Mr. Werlau's proposed changes would not have prevented anyone from interacting directly with the pool smart contracts. As he conceded, "disabling the instance registry" would only disable a user's "ability to access those pools *from the UI*." (Tr. 1152:14-15 (emphasis added).) He admitted that changes to the instance registry would only "disable[] the router's ability to communicate with the pool," which "is still present and, theoretically, you

could go directly to the pool, circumventing the router." (Tr. 1152:10-13.) Mr. Werlau's proposed changes to the instance registry would have prevented bad actors from bypassing his proposed user registry to interact directly with the *router* smart contract, but not the pools themselves, as he acknowledged. (Tr. 1188:2-9.)

In recognition of this fact, Mr. Werlau claimed that transactional information on the blockchain could be used to identify users who bypassed the router smart contract and interacted directly with the pools. (*See* Tr. 1162:14-16; Tr. 1168:13-15; Tr. 2354:9-11.) But as Dr. Edman explained, while a particular deposit transaction or a particular withdrawal transaction may be distinguishable for having bypassed the router, there is still no way to *connect* a particular deposit and a particular withdrawal—it is "the correlation between the deposits and the withdrawals that gives the protocol its privacy aspects, and that occurs within the pool itself . . . not the router." (Tr. 1931:9-12.) Dr. Edman also noted that direct deposits into a pool smart contract did, in fact, occur, when the perpetrators of the Alpha Homora hack deposited funds directly into the 100 ETH pool smart contract in 2021. (Tr. 1841:17-23.) Mr. Werlau's hypothetical changes to the instance registry and router contracts would not have prevented such direct deposits into the pools, which provided the actual privacy features.

By no stretch can the founders' failure to implement such an unworkable hypothetical measure equate to "willfulness." It simply does not follow that just because the founders implemented some but not every possible measure to prevent misuse of Tornado Cash, they must have had criminal intent. Especially where, as here, the solution proposed by the government was far from a simple "patch" as it promised before trial, it cannot be presumed that Mr. Storm's failure to adopt it met the willfulness standard.

### C.    The Government Did Not Prove That Mr. Storm Knew That Tornado Cash Was a Money Transmitting Business

Yet another failure in the government's case is the absence of evidence that Mr. Storm knew that Tornado Cash was a money transmitting business. The government skipped this step entirely in its factual presentation. As a result, there is no evidence in the record that Mr. Storm *knew* he was operating a money transmitting business as described in Section 1960. In fact, Mr. Storm had no reason to believe that the Tornado Cash was a money transmitting business, and the evidence supports the conclusion that Mr. Storm in fact did not believe it was a money transmitting business. This failure is fatal to Count Two.

Under Second Circuit law, Section 1960 requires "proof that the defendant *knew* that the business was engaged in money-transmitting." *United States v. Elfgeeh*, 515 F.3d 100, 133 (2d Cir. 2008) (emphasis added). Indeed, the *Elfgeeh* instructions expressly required the government to prove "the defendant knew that he was engaged in transmission of money on behalf of others." *Id.* at 134.

The Court's instructions recognized these requirements, and instructed the jury:

> *First*, that the charged conspiracy existed — that is, there was an agreement or understanding between two or more people to commit the object of the conspiracy, which, for Count Two, is the operation of an unlicensed money transmitting business[.]

> *Second,* that Mr. Storm knowingly and willfully became a member of the conspiracy with the intent to further its illegal purpose….

(Final Charge at 45.) This instruction required the government to prove that Mr. Storm agreed to operate not just any business, but an unlicensed money transmitting business.

The Court's instructions continued and made clear that the substantive offense also specifically requires knowledge that the defendant is operating a money transmitting business:

> The crime of operating an unlicensed money transmitting business has three elements:

...

> *Second,* that Mr. Storm or a co-conspirator controlled, conducted, managed, supervised, directed, or owned all or part of that busine*ss with knowledge that it was used as a money transmitting business*

(Final Charge at 46-47 (emphasis added).) And for Mr. Storm to be guilty of conspiring to violate Section 1960(b)(1)(C), he must have possessed the same knowledge required for the substantive offense. *See United States v. Tavoularis,* 515 F.2d 1070, 1074 (2d Cir. 1975) ("where a substantive offense requires specific knowledge, that same knowledge must be established before a defendant can be found to be a member of a conspiracy to commit that offense"); *see also United States v. Bufalino,* 285 F.2d 408, 416 (2d Cir. 1960) ("[e]vidence of the same intent or knowledge would be required to convict conspirators as to convict those charged with the substantive offense").

The government's evidence failed to show that Mr. Storm had any knowledge that he was operating an unlicensed money transmittal business. The government provided no affirmative evidence that Mr. Storm knew that Tornado Cash was a money transmitting business. There were no statements or conduct reflecting such knowledge or indicating that Mr. Storm believed he was subject to regulation as a money transmitting business.

In fact, the evidence was to the contrary. First, Mr. Storm's knowledge of how Tornado Cash operated made it entirely reasonable for him to believe that it was not a money transmitting business. It was clear from expert testimony in the case that the protocol and UI never had custody of user funds and never itself made any "transfers" of funds. As discussed below, this undisputed reality of how Tornado Cash worked leads inexorably to the conclusion that Tornado Cash was *not* a money transmitting business. But even if Tornado Cash could be construed to be a money transmitting business without actually transferring any funds, there is no evidence Mr. Storm was aware of such a novel construction. To the contrary, given his deep understanding of

45

how the protocol and UI worked, the only reasonable inference from the evidence presented was that Mr. Storm believed Tornado Cash was not a money transmitting business.[11]

In fact, his communications indicate such a belief. Specifically, the founders discussed an article that quoted the operators of a decentralized protocol: "We agree that the use of centralised mixers that take possession and custody of funds should be scrutinised and avoided ... However, free and open-source software algorithms in which there is no entity that takes custody of funds cannot be effectively regulated." (GX-2043-T.) This discussion among Mr. Storm and the founders suggests an awareness that laws that regulated custodial mixers did not apply to Tornado Cash because it did not take custody of any funds.

One of the supposed linchpins of the government's case was a discussion by Mr. Storm with representatives of Dragonfly about the possibility of implementing KYC/AML functions. (*See* GX 2246; GX 1372.) The government argued that this showed that it was possible to implement KYC/AML, and Mr. Storm elected not to do so. (Tr. 2347:19-2349:7.)

But this discussion actually proves the point that Mr. Storm did not believe Tornado Cash was required to comply with the regulations applicable to money transmitting businesses. As an initial matter, the discussion makes clear that it would have to be a *fork* of Tornado Cash, not the current protocol with its immutable pools. But more importantly, neither Mr. Storm, the

---

[11] This understanding was consistent with FinCEN guidance which, at the time Tornado Cash was established, required that a business or protocol have custody of users' funds to constitute a money transmitting business. FinCEN, FIN-2019-G001, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies* (May 9, 2019) ("FinCEN 2019 Guidance"), § 4.2. The Court excluded this evidence, as well as the evidence from defense expert Michael Carter (PTC Tr. 143:16-144:18) who proffered testimony that (1) Tornado Cash's decentralized blockchain protocol, the website, UI, and CLI are information sharing intermediaries, not financial institutions or money transmitters; (2) it was impossible for Tornado Cash to apply Know Your Customer procedures; (3) it was also impossible for Tornado Cash to implement Automated Blockchain Monitoring procedures; and (4) transactions that possess privacy features are not inherently illicit.. (*See* Dkt. 176-3.)

founders, nor any member of Dragonfly suggested that Tornado Cash itself was required to comply with KYC or AML. At no time did any of them indicate that they needed to somehow change or eliminate the existing Tornado Cash software to make it compliant. Instead, they were discussing an *option* of creating an entirely different protocol.[12] This suggests that neither party thought there was any obligation to institute compliance measures because Tornado Cash was *not* a money transmitting business subject to such regulations.

Indeed, if Mr. Storm believed he was running a money services business that was violating Section 1960, he would not have discussed it so openly with Dragonfly, and Dragonfly's response that "Legally it seems fine," in fact confirmed that the two partners discussed these issues and provided Mr. Storm comfort that there was no concern he was already operating a money services business.

If Mr. Storm did not understand Tornado Cash to be a money transmitting business, because it never took custody of or "transferred" user funds, then he did not conspire to *knowingly* conduct an unlicensed *money transmitting business* as required by *Elfgeeh* and the Court's instructions.

### D.    The Government Did Not Prove That Mr. Storm Had Actual Knowledge That Funds Were Derived From or Used To Promote or Support a Criminal Offense Before Those Funds Were Transmitted

To violate subsection 1960(b)(1)(C), a defendant must transport or transmit funds with knowledge that those funds were derived from or used to promote or support criminal activity. That knowledge must come before the transmission of the funds. The language of the subsection makes this temporal requirement clear, providing that an unlicensed money transmitting business includes one that "otherwise involves the transportation or transmission of funds that are known

---

[12] Mr. Qureshi writes, "I'm not a fan of this tbh. Legally it seems fine, but I just don't know if anyone will actually want this. Market need seems quite thin."

to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." *See also United States v. Murgio,* 209 F. Supp. 3d 698, 706 (S.D.N.Y. 2016) (business must transfer funds on behalf of the public "with knowledge that the funds were derived from a criminal offense").[13] To satisfy the knowledge requirement of subsection (b)(1)(C), it is not enough to know that some criminals have used Tornado Cash in the past or to anticipate that some users of Tornado Cash might use it to transfer or transmit funds that were derived from a criminal offense or were intended to be used to promote or support unlawful activity. The government's theory that failing to prevent such use constitutes a crime is contrary to law. "[I]n prosecutions for conspiracy, . . . [i]t is not enough that [the defendant] does not forego a normally lawful activity, of the fruits of which he knows that others will make an unlawful use; he must in some sense promote their venture himself, make it his own, have a stake in its outcome." *United States v. Falcone,* 109 F.2d 579, 581 (2d Cir.), *aff'd,* 311 U.S. 205 (1940); *see also Direct Sales Co. v. United States,* 319 U.S. 703, 709 (1943) (for supplier of goods, inference of knowledge of conspiracy "cannot be drawn merely from knowledge the buyer will use the goods illegally"); *United States v. Lopac,* 411 F. Supp. 2d 350, 362 (S.D.N.Y. 2006) (for providers of services and goods, it is not enough to prove a conspiracy to show that "the defendants reasonably knew that the products they sold were likely to be used for [illegal purposes]").

---

[13] Again, for Mr. Storm to be guilty of conspiring to violate subsection (b)(1)(C), he must have possessed the same knowledge required for the substantive offense. *See Tavoularis,* 515 F.2d at 1074; *see also* Final Charge at 48 (instructing that "[t]he [g]overnment has the burden to prove that *Mr. Storm knew* that the business involved the transportation or transmission of funds that were derived from a criminal offense or intended to be used to promote or support unlawful activity" (emphasis added)).

There was no evidence that Mr. Storm knew in advance about specific transmissions of funds that were derived from or intended to be used to promote or support criminal activity. For example, with respect to the government's witnesses, Mr. Ahmed and Mr. Llacuna, they acknowledged they never had any contact with the founders, and there was no way the founders would have known how they were using Tornado Cash. (Tr. 333:18- 334:6 (Llacuna); 911:22-912:7 (Ahmed).) Similarly, there was no evidence that Mr. Storm had any advance knowledge of specific transactions conducted by the Lazarus Group or any other criminals, even if he might have had some general awareness that hackers were using the Tornado Cash software.

Indeed, it would have been impossible for Mr. Storm to have had such knowledge, given the hackers' use of multiple intermediary wallets. (*See* Tr. 679:15-680:3, 680:21-681:5, 690:16-21 (DeCapua).) As the government's own witness, FBI Agent DeCapua acknowledged, trying to block a hacker's use of Tornado Cash is a bit like a game of "Whac-A-Mole" because even if the UI blocked one wallet address, a hacker could easily and quickly move value to a different wallet address (Tr. 694:15-24), and hackers can create "hundreds" of such wallet addresses in seconds. (*See* Tr. 679:15-680:3; 680:17-681:5; 702:3-13 (DeCapua); Tr. 1827:22-1828:16 (Edman).) Even Chainalysis, a skilled blockchain tracing company, could not provide such real-time tracing. (Tr. 1827:22-1828:16; 1833:6-11 (Edman).)[14] Consequently, the government's evidence instead showed that Mr. Storm did (and could only have) learned of any specific transactions conducted by hackers or other wrongdoers after those transactions already had occurred. (*See, e.g.,* Tr.

---

[14] Bad actors of course could also use the CLI, which they could easily modify; use a prior version of the UI or CLI; or simply deposit to the pools directly. The evidence showed they did all of those things at various times. (*See* Tr. 1811:14-1812:13, 1848:25-1849:9 (Edman on modifications to CLI and availability of prior versions of CLI); Tr. 872:13-21, 876:15-877:11 (Gibbs on old versions of UI on IPFS); Tr. 1819:25-1820:2 (Edman on same); Tr. 1824:1-6, 1841:17-23 (Edman on direct deposits into pools).)

693:20-694:14 (KuCoin hack); 697:22-699:14 (BitMart hack); *see also* GX 3002-2 (listing incident dates and exhibits purportedly reflecting Mr. Storm's knowledge of them).) But after-the-fact knowledge is not enough to impose criminal liability under Section 1960.

In the absence of advance knowledge by Mr. Storm of specific transactions involving illicit funds and the ability to prevent such transactions, Count Two must be dismissed.

### E.    Tornado Cash Was Not a Money Transmitting Business Because Tornado Cash Was Not a Money Transmitting "Business"

The defense maintains its view that an independent, necessary element of a Section 1960 offense is that the operation charges fees for its services. *See, e.g., United States v. Velastegui,* 199 F.3d 590, 592, 595 n.4 (2d Cir. 1999); *United States v. Banki,* 685 F.3d 99, 113 (2d Cir. 2012). The evidence at trial was undisputed that Tornado Cash did not charge any fees. (Tr. 269:8-24 (Bram); Tr. 910:16-25 (Ahmed); Tr. 1775:8-24; Tr. 1779:12-13 (Edman); Tr. 2044:21-23 (Hurder).)[15]

If the platform itself generated no profit and the builders had no revenue stream from transactions, as is the case with Tornado Cash, it cannot be labeled a "business." A business implies a continuous commercial enterprise, but Tornado Cash undisputedly generated no revenue. (Tr. 761:18-23 (Galano).) Tornado Cash is more aptly likened to a public good (open-source software) that operates without collecting revenue. Indeed, it continues to function today without involvement by the founders, generating no revenue.

---

[15] The evidence showed that so-called "gas fees" did not go to Tornado Cash but rather to the Ethereum network. (Tr. 1073:17-21 (Werlau); Tr. 1775:8-24 (Edman).) Although the Court previously pointed to the fees paid to relayers as satisfying any requirement of a fee, (Transcript of Decision on Motion to Dismiss dated Sept. 26, 2024 ("MTD Tr.") 24:2-25:11), the government's own evidence at trial made clear that, while relayers sometimes charged fees, the relayers were third parties, and those fees did not go to Tornado Cash. (Tr. 269:25-270:9 (Bram); Tr. 1048:6-10, 1072:15-21, 1072:24-1073:12, 1213:13-16 (Werlau).)

Recognizing the lack of a revenue stream, the government relied on the issuance of TORN tokens to claim that Tornado Cash was a business. But TORN tokens were governance tokens that at most gave voting rights in the Tornado Cash DAO but did not charge or deduct value from user transactions. (Tr. 230:22-231:2 (Bram); Tr. 1781:6-13 (Edman); Tr. 2049:6-11, 2056:16-25, 2079:12-14 (Hurder).)

The government also pointed to Mr. Storm's sale of TORN, but that was Mr. Storm's personal income, not Tornado Cash's revenue. (Tr. 2058:8-14 (Hurder).) Nor was it Peppersec's revenue (*id.*) as Peppersec did not own or sell TORN. (Tr. 2045:13-22, 2127:17-22 (Hurder).)

Count Two therefore fails because the evidence at trial failed to establish that Tornado Cash was a money transmitting business, as it did not charge fees nor was it a for-profit business.

### F. Tornado Cash Was Not a Money Transmitting Business Because the Alleged Co-Conspirators Never Transferred Funds

The Court instructed the jury that the term "money transmitting" means "transferring funds on behalf of the public by any and all means, including but not limited to transfers within the United States or to locations abroad by wire, check draft, facsimile, or courier." (Final Charge at 47.) While, over defense objection, the Court's charge did not further define "transfer," under any understanding of the term, the government failed to prove that Tornado Cash or its founders "transferred" funds. Only the users themselves could "transfer" funds.

It was undisputed that, once funds are deposited into the Tornado Cash pool smart contracts, no one other than the user who deposited the funds and possesses the corresponding secret note can transfer those funds. Every witness who testified about the technical features of the Tornado Cash agreed on this point. Mr. Werlau confirmed that "once the ETH goes into the pool . . . the only way to access it is with the secret note," which "the user who deposits their ETH into the pool has," and "unless they share with somebody, no one else can get access to that

ETH." (Tr. 1194:5-14.) In this way, the secret note is similar to the private key for a blockchain wallet address, which Special Agent Joel DeCapua explained was needed in order to "transfer the cryptocurrency from any specific address" and without which "you just can't get into the wallet." (*See* Tr. 677:23-678:9.) Dr. Edman also testified that, to gain access to cryptocurrency once it has been moved to a pool smart contract, one "would still need the secret, the secret note that the user created, and that's only known to the user." (Tr. 1772:11-15.)

Further, because the Tornado Cash pool smart contracts are noncustodial, even the founders who wrote the protocol code could not transfer any funds that had been deposited into the pools. Mr. Werlau testified that "only the user had access to their deposit" and agreed that "the founders couldn't go into the pools" to access any user funds and that there was "no back door into these pools for the founders." (*See* Tr. 1147:16-20; 1198:15-1199:5.) As Dr. Edman explained: "Non-custodial, as opposed to custodial, means that the developers cannot control the assets that are in the Tornado Cash protocol. So once ETH, we will say, is deposited to one of the immutable pools, the developers have no ability to unilaterally transfer those assets out of the pool or prevent the withdrawal." (Tr. 1750:19-1751:1.)

In previous briefing, the government argued that the founders' control over the UI was sufficient to establish that Tornado Cash "transferred" funds. (Dkt. 53 at 25-26 (arguing that the "Tornado Cash Website and UI…were designed, controlled, and paid for by the defendant and his co-conspirators at all relevant times" and "defendant personally paid the cost of transmitting [] instructions from the UI to the ETH blockchain")).) But the evidence at trial showed the fallacy of this argument. It was undisputed that the UI never actually conducted or wrote transactions on the blockchain. Mr. Werlau confirmed that when a user deposits ETH into Tornado Cash through the UI, the ETH "doesn't get deposited into the UI." (Tr. 1193:24-1194:1; *see also* Tr. 878:7-10

(Gibbs: "Q. Now through this whole process eth.limo is not conducting or initiating any transactions between the user and a blockchain, right? A. No, it's a read only service."); Tr. 952:17-21 (Dubash: "Q. For example, if a user has a MetaMask wallet and they want to make a transfer of funds using that wallet, ultimately it is the wallet that would connect and send the write request to the blockchain; is that correct? A. Correct.").) As Dr. Edman explained, "[i]n order to actually complete a deposit," a user must "connect [their] wallet to the Tornado Cash UI" and, by doing so, the user is "basically letting the two talk to each other." (Tr. 1806:13-20.) Once the user indicated the type and amount of cryptocurrency they wished to deposit, the UI generated a secret note—which, again only the user has access to—and, after the user "click[ed] Send Deposit, the Tornado Cash UI asks [the user's] wallet software to send this particular deposit to the Tornado Cash pool." (*See* Tr. 1807:1-13.) Neither the UI, nor any of the services it relied upon to read blockchain data, conducted any "write" transactions to the blockchain. (*See* Tr. 1798:5-7 (Dr. Edman: "Q. Does the UI application itself write transactions to the blockchain? A. No. That occurs through your wallet software."). The UI only reads information on the blockchain to assist the user in preparing instructions for the user's wallet software to actually effectuate the transaction. (Tr. 1808:1-8 (Dr. Edman: "All of that information is read from the blockchain, but in order to make the deposits or the transaction to the blockchain, that has to go through your wallet software.").)

Simply put, it was the users' wallet software—and not the UI—that conducted transactions on the blockchain. (Tr. 1807:14-17 (Edman).) The UI merely read data from the blockchain to facilitate transactions, but the actual transactions were always conducted by the user's wallet software. Thus, under any understanding of the term "transfer," Tornado Cash did not "transfer" funds and therefore was not a money transmitter.

### G.     Tornado Cash Was Not a Money Transmitting Business Because the Alleged Co-Conspirators Never Took Custody or Control of the Funds

As the defense has previously argued, "transmitting" or "transferring" funds under Section 1960 requires taking custody or control of the funds. The defense recognizes that the Court has previously disagreed, so it will not restate its arguments here in full detail, but incorporates them by reference and summarizes them in brief.[16] As the Court is aware, it is not precluded from revisiting its prior ruling that money transmitting does not require custody or control of funds. *See, e.g., Colvin v. Keen,* 900 F.3d 63, 68–69 (2d Cir. 2018). It is particularly appropriate to reconsider a ruling after a trial record has been developed. *See, e.g., Greasley v. United States,* No. 15-CV-642-A, 2021 WL 935731, at *49 (W.D.N.Y. Mar. 11, 2021); *Casey v. United States,* 161 F. Supp. 2d 86, 92 (D. Conn. 2001). The Court should do so here because the trial record helps illustrate exactly *why* the requirement of custody or control is so important.

To violate Section 1960, the defendant must operate a business that is engaged in "money transmitting"—defined to mean "transferring funds on behalf of the public by any and all means[.]" 18 U.S.C. § 1960(b)(2). The plain meaning of the terms "transmit" and "transfer" requires the actor to have possession or control over the thing it transmits or transfers. To "transfer" an asset, one must "convey," "pass or hand over," or "remove" it. *Transfer*, Black's Law Dictionary (12th ed. 2024); *see also transmit*, Black's Law Dictionary (12th ed. 2024) ("send or transfer"). One cannot convey, hand over, or remove an asset without first (or, indeed, ever) having possession or control of it. *See, e.g.*, *Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 71 (2d Cir. 2009) (electronic funds transfers "are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank").

---

[16] *See* Dkt. 37-1 at 19-22, Dkt. 58 at 4-5; Dkt. 112 at 13-16; Dkt. 124 at 9-10; Dkt. 154 at 28-29; Tr. 1594:19-1595:22 (Rule 29 argument).

Multiple federal courts have understood the meaning of "money transmitting" under Section 1960 to require custody or control. *See, e.g.*, *Velastegui*, 199 F.3d at 592 ("A money transmitting business *receives* money from a customer and then … transmits [it] to a recipient[.]") (emphasis added); *United States v. Bah*, 574 F.3d 106, 108 (2d Cir. 2009) ("Bah received money in New York for transmittal abroad."); *United States v. Faiella*, 39 F. Supp. 3d 544, 546 (S.D.N.Y. 2014) ("Faiella *received* cash deposits from . . . customers *and then … transferred"* funds "to the customers' accounts).

In recognition of this point, the Bank Secrecy Act ("BSA") and FinCEN require registration as a money transmitting service only if a business actually transmits money by "*accepting* currency … *and transmitting* [it] … by any means." 31 U.S.C. § 5330(d)(2) (emphases added); *see also* 31 C.F.R. § 1010.100(ff)(5)(i) (requiring businesses to register if they "accept[] … and … transmi[t]" funds "to another location or person by any means").

The FinCEN 2019 Guidance, which applies the BSA specifically to cryptocurrency, is even more explicit: Cryptocurrency wallet providers must be registered under the BSA only if they have, among other things, "total independent control over the value." FinCEN 2019 Guidance, § 4.2. Likewise, FinCEN's guidance clearly states that registration is required only for those "*receiving* one form of value … *and transmitting* [it] to another person or location." *Id.* § 2 (emphases added). FinCEN regulators have thus explained—in direct conversation with government prosecutors in this District—that "FinCEN's guidance has generally focused on custody of cryptocurrency." (*See* Dkt. 148-1 (Letter to Judge Berman at 3, *United States v. Rodriguez*, No. 24-cr-0082 (May 5, 2025), Dkt. 86).)

Indeed, FinCEN registration regulations explicitly exempt those who provide "the delivery, communication, or network access services used by a money transmitter," 31 C.F.R.

§ 1010.100(ff)(5)(ii)(A)—in other words, those who merely "suppl[y] [the] tools (communications, hardware, or software) that may be utilized in money transmission[.]" FinCEN 2019 Guidance § 4.5.1(b). And FinCEN explains that a "developer" of "a software application" is not subject to registration requirements for simply "creating or selling the application" (unless, of course, the developer "also uses" the application to "accept[] and transmit[] currency" for others). *Id.* § 1.1; *see also id.* § 5.2.2 ("[T]he developer of a [decentralized application] is not a money transmitter for the mere act of creating the application, even if [its] purpose" is to "facilitate [cryptocurrency] activities[.]").

The government's attempt to read § 1960 more broadly than the text will allow cannot be justified based on the "purpose of Section 1960"—"to 'keep pace with … evolving threats' as new methods of moving criminal proceeds emerged over time." (MTD Tr. 23:11-15.) Statutes must be interpreted according to their text, and if there is a broader statutory "purpose" that the text does not achieve as written, then the proper solution is for Congress to alter the text so that the underlying purpose can be more fully served. Courts do not have license to rewrite statutory text in service of whatever they perceive the underlying statutory purpose to be. *See Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 282 (2018).

In sum, the government cannot be right that a developer of peer-to-peer cryptocurrency software can be held responsible for "transmitting" money under subsection1960(b)—even though the developer never takes custody or control of the funds and simply provides a neutral tool for *other people* to transmit funds. By reading the statute so expansively, the government seeks to "effectively hold [a general services] provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them." *Twitter v. Taamneh*, 598 U.S. 471, 503 (2023). That interpretation "run[s] roughshod over the typical

limits" of the law. *Id.* Creating and publishing a neutral tool does not render the developer responsible for anyone who then uses that tool to transmit money themselves.

In denying Mr. Storm's motion to dismiss, this Court cited three precedents, which it concluded were not "meaningfully different" from Tornado Cash. (MTD Tr. 22:12-23:5 (citing *Murgio*, 209 F. Supp. 3d 698, *United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020), and *United States v. Sterlingov*, 573 F. Supp. 3d 28 (D.D.C. 2021).) The evidence at trial highlights how the custodial, centralized services involved in those cases do in fact materially differ from Tornado Cash. In *Murgio*, *Harmon*, and *Sterlingov*, the defendants personally operated their platforms (exchanging or mixing funds) and had custody or control of the funds being transferred, including the ability to stop or facilitate transactions. *See* Indictment, *United States v. Murgio*, Case No.15-CR-769, 2016 WL 8650910, ¶ 4-11 (S.D.N.Y. Dec. 22, 2016) (defendant operated bank accounts that accepted customer deposits and used funds in those accounts to purchase Bitcoin on the customers' behalf for a per-transaction fee); *Harmon*, 474 F. Supp. 3d at 80, 82-83 (defendant operated a service that took custody of a customer's Bitcoin, and exchanged it for different Bitcoin); *Sterlingov*, 573 F. Supp. 3d at 33 (defendant operated a *custodial* mixing service that took control of cryptocurrency and charged a per-transaction fee and was dependent on the defendant's involvement).

Moreover, they charged fees and earned profits. In each case, control and a business model were present (as evidenced by the fact that those services ceased when the operators were arrested). The evidence at trial showed none of those features for Tornado Cash.

At trial, the government did not show that Mr. Storm or any of the alleged co-conspirators ever had custody or control of deposits or withdrawals. As discussed above, there was no dispute that only the user had the secret note that would allow access to the funds, and

neither the protocol nor the founders could access or transfer user funds. (*See supra* Section II(A)(1).).

The evidence at trial was legally insufficient to convict Mr. Storm on Count Two because it failed to establish that Tornado Cash or its founders ever had custody or control over funds.

### H.    Subsection (B)(1)(C) Only Applies to Businesses That Are Registered, Which Tornado Cash Was Not

As the defense has previously argued, subsection (b)(1)(C) does not operate, like the government would have it, as a standalone prohibition on conduct related to the transfer of funds. (Dkt. 164 at 3-6; Tr. 1600:8-1601:3.) The "otherwise" clause of subsection (b)(1)(C) must be given meaning that provides some liability that is distinct from the liability created in subsections (b)(1)(A) and (b)(1)(B). *See Fischer v. United States,* 603 U.S. 480, 486 (2024).

Any money transmitting business that is not registered with FinCEN is, by definition, unlicensed under subsection (b)(1)(B). There is no need to ever inquire whether the money transmitting business is also unlicensed under subsection (b)(1)(C). Properly read, then, subsection (b)(1)(C) only applies to money transmitting businesses that *are* federally registered.

All the parties agreed that nothing was registered with FinCEN. Therefore, the government cannot prove the object of Count Two, a violation of subsection (b)(1)(C).[17] For this reason too, the Court should grant a judgment of acquittal on Count Two.

---

[17] As Mr. Storm has also previously argued (Dkt. 164 at 6-7; Dkt. 214 at 33 n.71), Count Two also fails as a matter of law because it impermissibly seeks to impose conspiracy liability on Mr. Storm. The Second Circuit has held that conspiracy liability may not be imposed when the statute limits its reach to certain specified individuals. *See United States v. Hoskins,* 902 F.3d 69, 71-72, 76-95 (2d Cir. 2018); *United States v. Amen,* 831 F.2d 373, 381-82 (2d Cir. 1987). Here, Section 1960, by its terms, limits its reach to only an individual who "conducts, controls, manages, supervises, directs or owns" all or part of the alleged unlicensed money transmitting business. 18 U.S.C. § 1960(a). Thus, just as in *Hoskins* and *Amen,* conspiracy liability does not apply to violations of Section 1960, and Mr. Storm cannot be liable, using a conspiracy theory, for a violation of Section 1960.

## VI.    THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL ON COUNT ONE: CONSPIRACY TO COMMIT MONEY LAUNDERING

The government failed to prove that Mr. Storm conspired to commit money laundering. As with Count Two, the fundamental problem with Count One is that the only agreement the government ever alleged—or had evidence to support—was an agreement among the Peppersec founders to build and support the Tornado Cash protocol. This is a lawful agreement and was not transmuted into a criminal one simply because Mr. Storm or his alleged co-conspirators later learned that bad actors were using the software to launder money and did not take steps to disable the software. But that was precisely the government's theory at trial, because there was no evidence that Mr. Storm entered into an agreement with a criminal purpose. Indeed, the government's closing argument demonstrated the limits of its evidence, asserting only that Mr. Storm had an agreement to work together with the Peppersec founders, his "business partners," but never asserting that their business agreement had money laundering as its object. Accordingly, the government failed to prove that Mr. Storm participated in a conspiracy with knowledge of its criminal purpose and with a specific intent to further that purpose.

Relatedly, the government failed to prove willfulness. Instead, as was the case with Count Two, the government's evidence and arguments amounted to a negligence theory—that Mr. Storm eventually learned that some transactions allegedly involved the proceeds of illicit activity and that he did not make certain changes to the protocol that the government alleges would have prevented further misuse. The argument that Mr. Storm could have or should have done more to prevent illicit usage is insufficient as a matter of law.

Furthermore, the fact that the Tornado Cash software was noncustodial and permissionless negates the elements of money laundering because Mr. Storm did not conduct, or agree to conduct, any specific transactions by Tornado Cash users. Nor did he or any of his

59

alleged co-conspirators have any knowledge of such transactions or by whom they were being conducted, aside from the information available to anyone on the public blockchain *after* such transactions had already been conducted.

Finally, the government failed to prove that Mr. Storm had specific knowledge of transactions involving specified unlawful activity ("SUA"). At the motion to dismiss stage, Mr. Storm pointed out that, having disclaimed any allegation that Mr. Storm and the founders were in a conspiracy with any bad actors, the government could not satisfy the knowledge element of a conspiracy to launder money, and the evidence at trial proved this point. There is simply no legal basis to attribute liability to Mr. Storm for the money laundering acts of third parties.

A judgment of acquittal should be entered on Count One.

### A.    There Was No Evidence that Mr. Storm Entered Into an Agreement With the Criminal Object to Commit Concealment Money Laundering

As the jury was instructed, the government was required to prove that Mr. Storm and at least one other alleged co-conspirator "came to a mutual understanding, either spoken or unspoken, to violate the law" by "work[ing] together to accomplish the money laundering object[.]" (Final Charge at 29, 31.) *See also Khalupsky*, 5 F.4th at 288. However, the evidence only supported—as the government effectively conceded in closing—that there was a mutual understanding, or agreement, between Mr. Storm and the founders to offer the Tornado Cash software publicly and for free. (*See* Tr. 2375 ("Count One is the money laundering conspiracy. Again, there's no real dispute on there being an agreement. The defendant was working together with his business partners, Semenov and Pertsev.").) Indeed, the government failed to even to use the word "objective" in its closing argument, or reference that the jury was required to find that the agreement among the founders had a criminal objective and find that Mr. Storm intended to further that criminal objective.

The government instead offered a flawed syllogism through four "key points" it summarized on a PowerPoint slide: (1) Tornado Cash "laundered dirty money and lots of it"; (2) Mr. Storm knew that the Tornado Cash service was laundering "dirty money, including money from sanctioned North Korean hackers"; (3) Mr. Storm knew what he was doing was wrong; and (4) Mr. Storm ran the Tornado Cash service as a for-profit money laundering business and made millions of dollars from it. (Tr. 2310:21-2311:24.) While the government misleadingly suggested that these four points were sufficient to convict Mr. Storm of the charged crimes, notably missing from this list are two required elements of the offense: (1) that Mr. Storm entered into an agreement with the criminal purpose of assisting the bad actors in their acts of money laundering and (2) that he specifically intended to further that unlawful purpose.

The agreement among the Peppersec founders was to provide the permissionless and noncustodial anonymizing Tornado Cash software to the public. In an attempt to fill the gap, the government emphasized evidence that demonstrated that bad actors used the software and that the founders continued to provide the software despite their misuses. (*See, e.g.*, GX 3002-52 (chart showing ETH deposits into Tornado Cash from Sept. 1, 2020 to Aug. 8, 2022); Tr. 664:5-666:2 (DeCapua testifying regarding deposits attributable to incidents); Tr. 2318:12-2322:21 (in closing, providing "an overview of the evidence that shows you that the Tornado Cash service was laundering money for criminals at least as early as September 2020 and well into 2022").) But mere foreseeability or even knowledge that criminals are using one's product does not create a conspiracy, and a failure to prevent a bad act is not the same as an agreement to assist it. *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 292 (2025) ("The merchant becomes liable only if, beyond providing the good on the open market, he takes steps to 'promote' the resulting crime and 'make it his own.'"); *Twitter*, 598 U.S., at 498–99 (even

though terrorists used social-media platforms for recruiting and fundraising, and the social-media companies "knew that," the companies were not liable because they did not give the terrorists "any special treatment," or "encourag[e], solicit[], or advis[e]" them, but "at most allegedly stood back and watched."). (*See also supra* Section V(D) (discussing *Falcone,* 109 F.3d at 581; *Direct Sales Co.,* 319 U.S. at 709; *Lopac,* 411 F. Supp. 2d at 362).)

Not only did the government offer no evidence that Mr. Storm and the founders agreed to assist the bad actors' misuse of Tornado Cash but, as discussed above, evidence in the defense case showed that Mr. Storm and the founders implemented various measures to discourage illicit use. (*See supra* Section V(A).) Similarly, the founders discussed a "cool idea on how to stop hackers" from using the service and that Mr. Storm, far from intending to further money laundering, stated he was "glad" that hackers who misused Tornado Cash had been deanonymized. (*See supra* Section V(B)(1); *see also* GX 2044-T; DX 8790.) Thus, Mr. Storm did nothing to "'promote' the resulting crime and 'make it his own.'" *Smith & Wesson*, 605 U.S. at 292.

Judgment of acquittal should be entered on Count One because the government failed to prove a criminal agreement.

### B.    There Was No Evidence that Mr. Storm Specifically and Willfully Intended to Engage in Money Laundering

The government also failed to prove that Mr. Storm possessed the necessary *mens rea* for a money laundering conspiracy. As discussed above with respect to Count Two,[18] the government repeatedly asked the jury to infer willfulness from the fact that Mr. Storm, upon learning that bad actors were misusing the Tornado Cash, did not make certain changes to the

_____

[18] The defense expressly incorporates here the facts and legal arguments discussed in *supra* Section III(B)(2).

website and UI—that he was "put on notice of stolen funds being deposited in his business" (Tr. 2331:9-10) and "faced a choice—keep running the business or try to do something about that dirty money." (Tr. 2341:23-2342:1.) This is a negligence theory of criminal liability, plain and simple, and cannot suffice to show the criminal *mens rea* of willfulness.

Indeed, the government's repeated emphasis on what hypothetically could or should have been done (*see supra* Section III(B)(2)) only proves that it lacked any evidence that Mr. Storm acted with the specific intent to commit money laundering or willfully chose to break the law. Rather than pointing to conduct or statements indicating an intent to facilitate illicit use, the government urged the jury to find willfulness from Mr. Storm's failure to take *sufficient* steps to prevent illicit use—in other words, by acting negligently.

Finally, as also discussed above, there was no evidence that Mr. Storm believed his conduct was unlawful and the evidence instead showed that he did not believe it was. While the government offered evidence that Mr. Storm was generally aware that bad actors committed illegal conduct, there was no evidence that Mr. Storm believed his conduct was unlawful.

Because the government lacked any evidence that Mr. Storm specifically intended to further the objective of money laundering or willfully joined a money laundering conspiracy, judgment of acquittal should be entered on Count One.

### C.    Neither Mr. Storm Nor Any Tornado Cash Founder Conducted Any Illicit Transaction

As described above, there can be no doubt on this record that the Tornado Cash software was permissionless and noncustodial, and that only the user with their secret note could conduct a transaction. There was no evidence that Mr. Storm or any alleged co-conspirator conducted, or agreed to conduct, any illicit transaction. Indeed, neither Mr. Storm nor any alleged co-conspirator could do so because they never controlled the alleged proceeds of SUA that were

purportedly laundered. As such, the government could not prove that Mr. Storm conspired to conduct each element of the substantive offense of money laundering.

The law of money laundering, 18 U.S.C. § 1956(a)(1), (h), requires that a conspirator *conduct*, or *agree to conduct*, a transaction with illicit proceeds, which implies that a co-conspirator possesses or controls the proceeds. As the evidence has shown, all the cryptocurrency that allegedly constituted SUA was moved in and out of Tornado Cash by the hackers themselves, acting alone. Storm and the founders never had custody of the bad actor's cryptocurrency—or indeed, that of any user. (*See supra* Section II(A)(3).) Moreover, the UI did not conduct or "write" any transactions but only read information from the blockchain; users connected their own wallet software to the UI, and the wallet itself actually conducted or "wrote" transactions to the blockchain. (*See id*.)

The lack of control is fatal: a conspiracy to commit money laundering requires proof that the defendant or a co-conspirator had control of the tainted money and conducted a transaction with it. *See e.g. United States v. Szur*, 289 F.3d 200, 214 (2d Cir. 2002) (acknowledging proceeds must be in conspirators' control to launder); *United States v. Munshani*, 2024 WL 4448708, *3 (2d Cir. Oct. 9, 2024), *cert. denied*, 145 S. Ct. 1211 (2025) (requisite control was established when defendant received proceeds in his bank account); *Aronshtein v. United States*, 2023 WL 2770145, *1 (2d Cir. Apr. 4, 2023) (government required "to show that proceeds of the 'specified unlawful activity' were 'realized' and 'acquire[d]' before some 'further financial transaction[] involving the proceeds' took place") (quoting *United States v. Napoli*, 54 F.3d 63, 68 (2d Cir. 1995), *abrogated on other grounds by United States v. Genao*, 343 F.3d 578, 584 (2d Cir. 2003)); *see also Napoli*, 54 F.3d at 68 (finding 18 U.S.C. § 1956(a)(1) "requires the defendant to (1) acquire the proceeds of a specified unlawful activity, and then (2) engage in a

financial transaction with those proceeds."). Because neither Storm nor his alleged co-conspirators ever handled or even could have handled any user's cryptocurrency, Mr. Storm must be acquitted of Count One.

Finally, Mr. Storm cannot be liable for a conspiracy to commit money laundering on the basis that he made his software freely available to the public, including to the third-party bad actors, who were those conducting the transactions. That would stretch the law of conspiracy law too far. Conspiracy liability does not make a defendant liable for the acts of third parties who are not their co-conspirators. Rather, a defendant is only vicariously "responsible for the substantive illegal acts of his co-conspirators, done in furtherance of the conspiracy, even though he may not have participated directly in them." *United States v. Head*, 546 F.2d 6, 10 (2d Cir. 1976); *see also United States v. Piampiano*, 271 F.2d 273 (2d Cir. 1959) ("act of one conspirator is imputed to the other conspirators"). (*See also* Final Charge at 30 ("when people enter into a conspiracy, they become agents or partners of one another in carrying out this crime.").)[19] Because no member of the alleged conspiracy conducted any transactions involving the proceeds of SUA, the government's legal theory is legally baseless, and a judgment of acquittal on Count One must entered.

### D. There Was No Evidence That Mr. Storm Possessed the Specific Knowledge Required for the Underlying Substantive Money Laundering Offense

To prove the crime of money laundering, the government had to prove several knowledge requirements: that Mr. Storm entered the conspiracy knowingly, that he knew of the specific

---

[19] For this reason, Mr. Storm argued that the jury instructions should have expressly required the jury to find that a *member of the conspiracy* conducted, or agreed to conduct, an illicit transaction, knowing that that it involved the proceeds of SUA and with the intent to conceal or disguise the nature, location, source, ownership, or control of such proceeds. (Dkt. 214 at 20 n.21; *id.* at 22 n.26, citing charge given by Hon. Lewis Kaplan in *United States v. Samuel Bankman-Fried*, No. 22 Cr. 673 (Dec. 12, 2023)).

financial transactions at issue, and that he knew that they involved the proceeds of some type of unlawful activity. It must also prove that he agreed to conduct the transactions while possessing such knowledge.

It was not sufficient, as the government argued, that Mr. Storm knew generally that bad actors were using Tornado Cash. The substantive crime of money laundering requires proof that a defendant, "***knowing*** that the property involved in [such] financial transaction represents the proceeds of some form of unlawful activity," ***and*** "knowing that the transaction is designed" "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" "***conducts or attempts to conduct such a financial transaction*** which in fact involves the proceeds of [SUA]." 18 U.S.C. § 1956(a)(1) (emphasis added). To be guilty of conspiracy to commit money laundering, Mr. Storm had to have this specific knowledge as well. *Tavoularis,* 515 F.2d at 1074; *Bufalino,* 285 F.2d at 416.

Given the nature of the technology, the government could not and did not prove that Mr. Storm was aware of the specific transactions that would constitute money laundering—that is, that he knew of the specific transactions that involved the proceeds from some unlawful activity,[20] and he knew that those transactions were designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of SUA, and that he agreed to conduct such transactions with that knowledge. At most, as discussed above, the government showed that Mr. Storm and the founders learned of specific transactions by bad actors after the transactions had taken place. (*See supra* Section V(D).)

The government's theory of knowledge was that Mr. Storm was "on notice" of hacks from "E-mails to his inbox, direct messages to his Twitter account, and candid conversations in

---

[20] Final Charge at 44-45.

his various Telegram chats." (Tr. 2331:9-14.) It argued that such general knowledge was sufficient to meet its knowledge burden. (*See* Trial Tr. 2327:11-18 ("Here are three reasons you know that Roman Storm knew that he was laundering criminal money. First, Storm was told repeatedly about dirty money being laundered through Tornado Cash. Second, Storm admitted that he knew dirty money was being laundered through Tornado Cash. And third, Storm talked about criminals laundering dirty money through Tornado Cash all the time.").)

But the fact that Mr. Storm and the founders may have been generally aware that bad actors sometimes used Tornado Cash to move their criminal proceeds is insufficient as a matter of law to meet the knowledge requirements of 18 U.S.C. § 1956(a)(1). Conspiracy requires "more than evidence of a general cognizance of criminal activity." *United States v. Samaria*, 239 F.3d 228, 233 (2d Cir. 2001), *abrogated on other grounds by United States v. Huezo*, 546 F.3d 174 (2d Cir. 2008). What is required is actual knowledge, *i.e.*, knowledge that a specific financial transaction involves SUA coupled with knowledge that the transaction is intended to conceal the proceeds of such SUA. The statute then requires that such actual knowledge be possessed by the perpetrator at the time that "***such a … transaction***" is conducted. *See* 18 U.S.C. § 1956(a)(1); *Cuellar v. United States*, 553 U.S. 550, 567 (2008) (requiring proof that "the purpose—not merely the effect—of [a transaction] was to conceal or disguise" the nature, location, source, ownership, or control of the illegal proceeds) (emphasis added); *see also Garcia*, 587 F.3d at 519 (money laundering requires proof that "the transaction itself was an effort to conceal anything about the money").

Because there was no evidence that Mr. Storm conducted or agreed to conduct a specific financial transaction, knowing that "such a transaction" involved SUA proceeds which it was

designed to conceal, the government failed to prove that he agreed to commit the underlying conspiratorial object of the conspiracy, money laundering in violation of 18 U.S.C. § 1956(a)(1).

## VII.    THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL AS TO COUNT THREE: CONSPIRACY TO VIOLATE THE IEEPA

To prove a conspiracy to violate the IEEPA, the government was required to prove beyond a reasonable doubt that Mr. Storm knowingly and willfully conspired with one or more people to provide funds, goods, or services to, by, or for the benefit of the Lazurus Group. Executive Order ("EO") 13722 and the implementing regulations in 31 C.F.R. § 510.201. But, as with Counts One and Two, the government lacked any evidence to show that Mr. Storm entered into an agreement with a criminal object, here, the object of providing services to the Lazurus Group, rather than a neutral agreement to provide software to the public.

The government also failed to prove that Mr. Storm possessed the requisite criminal intent of willfulness, which required evidence that Mr. Storm made a deliberate choice to violate the law. The government repeatedly pointed to Mr. Storm's alleged inaction upon learning that bad actors were using Tornado Cash to satisfy the element of intent. This is insufficient as a matter of law. Moreover, negating willfulness, Mr. Storm in fact implemented a tool to block sanctioned wallet addresses from using the Tornado Cash software as soon as the U.S. government or Chainalysis identified them as containing the property of Lazurus Group.

The government also failed to show that Mr. Storm willfully provided a "service" to the Lazarus Group, in that the Lazarus Group merely accessed neutral software available to anyone with an Internet connection. To the extent the government's argument is the provision of neutral software is itself a service, that theory fails for two reasons: first, because it rests on the incorrect assumption that immutable, uncontrollable, and unchangeable software that exists on a public

blockchain constitutes a "service" and, second, because it is precluded by the Berman Act and the First Amendment.

Finally, the government also failed to show that any U.S. person ever had possession or control of any property of the Lazarus Group. Indeed, the only U.S. person whom the government claimed was involved was Mr. Storm, but he never had possession or control of any cryptocurrency that interacted with the Tornado Cash protocol. Because there was no evidence that property of a sanctioned entity ever came within the possession or control of any U.S. person, the government failed to establish a basis for U.S. jurisdiction at all.

Because the government failed to prove all the elements of the offense, and because the government failed to establish a basis for U.S. jurisdiction, the Court should enter a judgement of acquittal and/or dismiss Count Three.

### A.    There Was No Evidence That Mr. Storm Agreed to Join a Conspiracy With a Criminal Objective and With Intent to Further That Objective

Count Three suffers from the same flaws as Counts One and Two: the evidence supports only agreement among the Peppersec Founders to develop the Tornado Cash protocol and UI software. (Tr. 2377:22-24 ("Again, no question about the agreement. Three Tornado Cash founders worked closely together to run the Tornado Cash business.").) The government was required, however, to prove that the agreement had the criminal objective of providing funds, goods or services to, by, or for the benefit of the Lazarus Group (the existence of the conspiracy prong),[21] *and* that Mr. Storm joined the conspiracy knowing of the unlawful objective and with an intent to further it (the membership prong).[22] (Final Charge at 31-32, 52.) The government offered no evidence at all to meet these elements of an IEEPA conspiracy offense.

---

[21] Sand, *Modern Federal Jury Instructions*, Instr. 19-3 (Existence of the Conspiracy).
[22] Sand, *Modern Federal Jury Instructions*, Instr. 19-6 (Membership in the Conspiracy).

Here, too, the government failed in closing argument even to mention that the jury was required to find that the alleged agreement had a criminal objective and to find that Mr. Storm intended to further such a criminal objective. At most, the government tried (again) to fill the gap with the flawed syllogism that (1) Mr. Storm had an agreement with the founders to develop and make available the Tornado Cash software; (2) Mr. Storm and/or the founders knew generally that bad actors were using it (Tr. 2362:10-12 ("What the communications . . . tell you is that the defendant knew he was doing business with North Korea."); *id.* at 2322:16-17 ("[T]he defendant is guilty of the charged offenses because he knew Tornado Cash was transmitting dirty money")); and (3) Mr. Storm and/or the Founders failed to prevent the Lazarus Group from using the protocol. But an agreement to develop or publicly offer software, coupled with general knowledge that a bad actor is using the software, does not equate to entering into an agreement with the purpose of providing services to a sanctioned entity, much less agreeing to further that objective.

Indeed, the charge to the jury explained that "[m]ere presence at the scene of a crime, even coupled with knowledge that a crime is taking place is not sufficient to support a conviction. In other words, knowledge without agreement and participation is not sufficient." (Final Charge at 33-34; Tr. 2498:5-9.) *See also Samaria*, 239 F.3d at 233 (conspiracy requires "more than evidence of a general cognizance of criminal activity").) Yet all the communications and web searches the government identified are exactly that: discussions that reflect general knowledge about the crimes of other people, without any agreement to commit them or participate in them personally. (*See, e.g.*, GX 209-59 (Google search about hack); 209-62 (same); 2004-T (chat about Ronin hack); 2047-T (chat about Ronin hack being linked to Lazarus Group).) Without evidence of an agreement to commit the unlawful objective of providing

services to the Lazarus Group, the government could not and did not meet its burden to show a criminal agreement.[23]

### B.    The Government Failed to Prove Willfulness

To convict Mr. Storm of a conspiracy to violate the IEEPA, the government was required to show not only that he willfully joined the conspiracy, but that he willfully chose to violate the law. The government had no such evidence.[24]

Willfulness is the highest *mens rea* requirement in criminal law which, as explained above, requires the government to prove that the defendant acted with knowledge that his conduct was unlawful. *See United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 147 (2d Cir. 2004) ("The district court properly instructed the jury that it could not convict [defendant] of violating the Embargo [issued pursuant to IEEPA] unless 'the defendant knew that such transmission of funds was a violation of the Iranian embargo, and was, thus, illegal.'") (quoting *Bryan*, 524 U.S. at 192 ). Indeed, the IEEPA's willfulness requirement has a long history dating back to Word War I and the passage of the Trading with the Enemy Act ("TWEA"), 50 U.S.C. § 4301 *et seq*. *See United States v. Amirnazmi*, 645 F.3d 564, 572 (3d Cir. 2011) ("IEEPA traces its provenance to § 5(b) of the Trading with the Enemy Act."). Willfulness was intended to hold the prosecution to a higher standard of proof—*i.e.*, that a defendant deliberately chose to violate the law. *See* 55 Cong. Rec. 7015 (1917) ("[T]o say that a man can be held because he has merely reasonable cause to believe may be quite a dangerous thing … The inquiry I make is whether the

---

[23] In fact, the government's evidence showed the founders were distraught and concerned upon learning about bad actors using Tornado Cash. (*See, e.g.*, GX 2047-T (messages from Mr. Storm after learning about Lazarus being responsible for the Ronin hack: ""*We urgently need to embed the OFAC sanctions list*"; and "*Guys, basically, I think this is serious and we need to act very fast.*").)
[24] The defense expressly incorporates here the facts and legal arguments discussed in *supra* Section III(B)(2).

word 'knowledge' is not sufficient ….'" (statements of Sen. Reed)); *id.* at 7016 (the word

"willfully" "means that a man … ***deliberately and willfully makes up his mind*** to trade with [the

enemy], to commit an offense." (emphasis added)). When Congress reformed the TWEA in

1977, it also enacted the IEEPA, which adopted the same willfulness requirement. *See*

*Amirnazmi*, 645 F.3d at 572; *see also* 50 U.S.C. § 1705(c).

At trial, the government failed to meet this higher standard because it failed to "prove that

(1) [Mr. Storm] knowingly and willfully joined a conspiracy with knowledge of its unlawful

object, *i.e.*, the providing of services to the DPRK." *United States v. Griffith*, 515 F. Supp. 3d

106, 120 (S.D.N.Y. 2021); *see also Homa Int'l Trading Corp.*, 387 F.3d at 147 (same). There

was no evidence at trial that Mr. Storm willfully engaged in conduct he knew to be unlawful.

Lacking such evidence, the government again tried to misdirect with messages and web searches

showing that Mr. Storm knew that the Lazarus Group or other hackers, having committed acts of

illegal computer intrusion, were using the protocol. (*See, e.g.*, GX 209-59; 209-62; 2004-T;

2044-T; 2047-T.) But this is not evidence that Mr. Storm acted willfully to violate the law; there

was no such evidence.

Nor was there evidence that Mr. Storm made a conscious decision to assist the Lazarus

Group. To the contrary, by the time the Lazarus Group allegedly laundered stolen crypto through

Tornado Cash (April-August 2022), the Tornado Cash protocol was long since immutable, and,

as the evidence showed, Mr. Storm knew that he could not prevent anyone from using it because,

as the government's own expert admitted, bad actors could have accessed the protocol directly at

any time. (*See, e.g.*, Tr. 1049:12-1050:3; 1192:1-3; 1193:3-11 (Werlau).) Mr. Werlau's

speculative software design changes (discussed further above) are irrelevant to Mr. Storm's state

of mind, and Mr. Storm's messages show that he believed any changes to any mutable software

(such as the UI and router) would be ineffective, given the immutable nature of the Tornado Cash smart contracts. (*See, e.g.*, GX 2047-T.)

Mr. Storm's inaction in 2022 in the face of the news reports indicating the Ronin Hack perpetrators were using Tornado Cash is not evidence of criminal intent. In its attempts to conflate inaction with willfulness, the government offered Mr. Werlau's testimony about theoretical changes to the UI that may have blocked bad actors from using Tornado Cash, such as his proposed user registry and requiring the use of log-in credentials. (*See* Tr. 1157:13-1159:2.) But as discussed above, these proposed remedies would have been ineffective in blocking sophisticated actors like the Lazarus Group,[25] and in any event are not consistent with the permissionless nature of blockchain technology. (*See supra* Section II(A).)

No court has ever upheld an IEEPA charge on such a tenuous *mens rea* theory (*i.e.*, that a developer's failure to prevent others' actions equals intent to aid those actions). To the contrary, courts expect concrete evidence of a defendant's intent to violate sanctions. As summarized by the DeFi Education Fund in its *amicus* brief in support of Mr. Storm's Motion to Dismiss, in reviewing the most recent 78 IEEPA criminal prosecutions against individual defendants, each case involved a defendant who willfully, with knowledge of their sanctioned counterparty, traded goods with an SDN, directly transacted with an SDN, or otherwise proactively engaged with an SDN. (*See* Dkt. 39 at 12-13, Ex. A (citing *United States v. Atilla*, 966 F.3d 118, 122 (2d Cir. 2020) (evidence at trial established Atilla conspired to evade Iran sanctions by laundering billions of dollars' worth of Iranian oil proceeds and lied to Treasury Deptartment to hide

---

[25] The Fifth Circuit came to the same conclusion: "Even if Tornado Cash did not want North Korea, Lazarus Group, or anyone else, for that matter, using the immutable smart contracts that the Tornado Cash founders created, Tornado Cash . . . would be powerless to stop them." *Van Loon*, 122 F.4th at 570.

scheme); *Banki,* 685 F.3d at 103-104 (defendant knowingly received $3.4M as part of Iranian hawala system); *United States v. Sarvestani,* 297 F.R.D. 228, 230 (S.D.N.Y. 2014) (defendant intentionally concealed true destination of satellite technology exported to Iran).) There was no such evidence here.

In other contexts, courts applying the willfulness standard have required more than a mere failure to act. For example, in *United States v. Kukushkin*, the Second Circuit found sufficient evidence of willfulness to conspire to violate a law that made it illegal for foreign nationals to donate to American politicians where (1) defendant sent a communication stating there was "'clarity from day 1' about their 'precise course of action'"; (2) the defendant instructed others that no donations were to be made in the name of the foreign national; and (3) the defendant discussed omitting the name of the foreign national from the corporation documents and the name was ultimately omitted. 61 F.4th 327, 330, 334 (2d Cir. 2023). Similarly, in *United States v. Grote*, the Second Circuit found sufficient evidence that defendants intentionally acted unlawfully to violate usury laws where (1) defendants intentionally used Tribes as fronts to avoid detection of violations of the usury laws; (2) used Tribal mailing addresses but had mail forwarded unopened to locations not on Tribal land; (3) built and staffed sham businesses on Tribal land; and (4) provided iPads that Tribal officials were to access once a day to "approve" loans that were already approved. 961 F.3d 105, 111, 112, 117 (2d Cir. 2020). By contrast, in *McKesson Corp.*, the Second Circuit determined that there was ***not*** sufficient evidence to establish willfulness when the defendant scrubbed a laptop and destroyed documents *after* receiving notice that prior conduct may be unlawful because concealment must occur *concurrently* with the violation to infer wrongful intent. 96 F.4th at 160.

As in *McKesson Corp.*, there was no contemporaneous evidence demonstrating any desire to assist the Lazarus Group. Indeed, Mr. Storm's extemporaneous statements are to the contrary, expressing that he had no desire to assist the Lazarus Group and indeed was "glad" they were "detected." (DX 8790.)

### C.    The Government Failed to Prove That Mr. Storm Provided a Service "To," or "For the Benefit of" the Lazarus Group

To violate the charged regulations under the IEEPA, the government had to prove that Mr. Storm made or provided "funds, goods, or services by, to, or for the benefit of" the Lazarus Group. 31 C.F.R. § 510.201(b)(1); *see also* EO 13722 § 6. But there was no evidence that Mr. Storm provided services "to" or "for the benefit of" the Lazarus Group.

Both "to" and "for the benefit of" in 31 C.F.R. § 201(b)(1) describe a relationship between the service provider and receiver of services, such that the services are specifically given from the provider to the receiver. As a basic principle of statutory and regulatory construction, words are to be given their ordinary meaning. *Taniguchi v. Kan P. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."); *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 584 (2d Cir. 2006) ("We begin our analysis of the statute and regulations with the plain meaning of the language used."); *Forest Watch v. U.S. Forest Serv.*, 410 F.3d 115, 117 (2d Cir. 2005) ("[T]he plain meaning of language in a regulation governs unless that meaning would lead to absurd results.") (citations omitted). The word "to" is a preposition; a preposition is, according to Oxford English Dictionary, "a word governing, and usually preceding, a noun or pronoun and expressing a relation to another word or element in the clause."[26] "To" is a functional word, and in EO 13772 and Section 510.201(b), the word "to" serves the function of "indicat[ing] the

---

[26] *Preposition*, Oxford English Reference Dictionary 1142 (2d ed. 1996).

receiver of an action or the one for which something is done or exists."[27] Accordingly, for Mr. Storm to be liable for violating EO 13772 or Section 510.201(b), he must have performed an action or service for the Lazarus Group specifically, not just for the general public.

"On behalf of" or "or the benefit of" are even more clear in describing that the services must specifically be done for the person receiving the service. In Black's Law Dictionary, the term "for the benefit of" comes within the definition of fiduciary, a person who has a duty to act "for the benefit of another person on all matters within the scope of their relationship."[28] It also comes up as a synonym for "in behalf of" or "in the interest of."[29] Notably, and as further discussed below, it also appears in the Black's Law definition of "service," an earlier version of which was cited by the *Banki* court: "Labor performed *in the interest or under the direction of others*; specif., the performance of some useful act or series of acts *for the benefit of another*, usu. for a fee."[30] Its most common use is in the context of bank accounts, where it allows one person or company to manage an account on someone else's behalf.[31]

The government's evidence did not show that Mr. Storm performed a service to or for the benefit of Lazarus Group. Rather, the evidence showed that Mr. Storm at most made software publicly available on the Internet and that Lazarus Group, among many others, opted to use it. This does not trigger the application of the statute, which requires that the person providing the services do so specifically for the receiver of the services. The Court should direct a verdict on Count Three also on this basis.

---

[27] *To*, Merriam-Webster's Collegiate Dictionary (11th ed. 2025), https://www.merriam-webster.com/dictionary/to.
[28] *Fiduciary*, Black's Law Dictionary (12th ed. 2024).
[29] *Behalf*, Black's Law Dictionary (12th ed. 2024).
[30] *Service*, Black's Law Dictionary (12th ed. 2024) (emphasis added); *Banki*, 685 F.3d at 107.
[31] *See, e.g.*, https://stripe.com/resources/more/what-is-an-fbo-account-a-guide-to-this-type-of-bank-account.

### D.    Tornado Cash Is Not a Service Under IEEPA

Tornado Cash is a tool, not a service. *See Van Loon v. Department of the Treasury*, 122 F.4th 549, 570 (5th Cir. 2024). The government provided no evidence to the contrary; indeed, the evidence confirmed that Tornado Cash is open-source, unownable, uncontrollable, and unchangeable software available to anyone with an Internet connection. No court has ever held that such software constitutes a service that can be subject to sanctions under IEEPA. Nor would that conclusion make sense here.

Start with the fundamental problem that neither IEEPA nor any of the executive orders and regulations pertaining to North Korea defines the term "service."[32] *Van Loon* exemplifies the problem. There, the government argued for a definition of "services" based on Black's Law Dictionary—not a statute or regulation. *Van Loon,* 122 F.4th at 570 n.73. The Fifth Circuit rejected the government's argument that "the [Tornado Cash] immutable smart contracts qualify as 'services of any nature whatsoever'" under the regulatory definition of property, explaining that they "are nothing more than lines of code," and "are less like a 'service' and more like a tool that *is used in performing* a service." *Id*. at 570. Furthermore, it emphasized that "Tornado Cash, as defined by OFAC, does not own the services provided by the immutable smart contracts." *Id.* Because the immutable smart contracts are not ownable, not contracts, and not services, they are not property and cannot be blocked under the statute. *Id.*

The Second Circuit has relied on general principles of statutory construction to interpret the term "services." *See Banki*, 685 F.3d 99. *Banki* presented the question whether the term "services" requires evidence of a fee. Reducing the prior contrary Second Circuit decision in

---

[32] To be sure, one can find regulations that give examples of things that may constitute services, but the government has not, and cannot, identify any such regulation applying that term to open-source, immutable software existing on a public blockchain.

*Homa Int'l Trading* to dicta, the *Banki* court held that the "receipt of a fee was not a necessary element of a 'service.'" *Id.* at 107.[33] It did not adopt an alternative definition, only observing that certain definitions did not turn on the fact of a fee. *See id.* at 108 (citing Merriam-Webster's Collegiate Dictionary 1067 (10th ed. 2000) (defining service as "useful labor that does not produce a tangible commodity"); Webster's Third New International Dictionary 2075 (Unabridged ed. 1993) (defining "service" as "the performance of work commanded or paid for by another" (emphasis added)); Black's Law Dictionary 1372 (7th ed. 1999) (defining service as "[a]n intangible commodity in the form of human effort, such as labor, skill, or advice")).

The definitions in *Banki* describe the core feature of a service as something procured or commanded by a party, with privity of contract between the procuring party and the party providing the service, and a nexus between what the procuring party requests and what the service provider produces. *Banki*, 685 F.3d at 104. This was decidedly true of the services provided by defendant Banki: the charged money transfer was both conducted for and at the direction of a specific person (defendant Banki's uncle), and for an economic purpose, namely to benefit a citizen of Iran who could not receive a direct transfer from the U.S. *Id.*

While never defining "services," in the NKSR and the Iranian Sanctions Regulations ("ITSR"), OFAC had provided examples of the "individualized and customized services" that it believes fall within the term, including, in the ITSR, "accounting, legal, design, or consulting services," 31 C.F.R. § 560.538, or, in the NKSR, "legal, accounting, financial, brokering, freight forwarding, transportation, [and] public relations," 31 C.F.R. § 510.405(d)(1). These types of

---

[33] Mr. Storm maintains his objection that a service does in fact require a fee, as requested in his proposed jury instructions (Dkt. 154 at 30), but that is not at issue in this motion.

services are provided directly between a person and a client or customer, suggesting a direct privity of contract that does not exist here.

*Van Loon* and Second Circuit precedents confirm that the plain and ordinary meaning of the term "service" does not encompass Mr. Storm's conduct. The Tornado Cash software was indisputably not procured or commanded by the Lazarus Group, nor was there the required specific nexus between a procuring party's direction and his activities, as there would be in consulting or legal services. The Tornado Cash smart contracts—the only piece of software to interact with any user's cryptocurrency—were immutable and in the public domain more than two years before the alleged IEEPA conspiracy began, and they were permissionless, *i.e.*, available to anyone with Internet access. Mr. Storm simply did not provide any service to a sanctioned entity under any definition of the word.[34]

### E.    The Tornado Cash Software Is Exempted by the "Informational Materials" Exception and the First Amendment

In addition to being contrary to Second and Fifth Circuit precedent, the government's argument that the Tornado Cash software was a "service" runs headlong into the informational materials exception and the First Amendment. By statute, the government cannot prohibit or criminalize the export of informational materials, which include transmissions in any form (*e.g.*, electronic media). 50 U.S.C. § 1702(b)(3); 31 C.F.R. § 510.312. Software falls within the exception. Further, the exemption applies because the Tornado Cash software was "fully created and in existence at the date of the transactions." 31 C.F.R. § 510.213 (c)(2).

Enacted in 1988 as the Berman Amendment, the informational materials exemption was "designed to prevent the executive branch from restricting the international flow of materials

---

[34] To the extent the government seeks to advance a new definition of "services" through this proceeding, it should also be rejected under the rule of lenity. (*See infra* Section VIII(A).)

protected by the First Amendment." *Kalantari v. NITV, Inc*., 352 F.3d 1202, 1204-05 (9th Cir. 2003). Congress expanded it in 1994 "to include new media, such as compact discs and CD ROMs," clarifying "that the exemption applied to importation and exportation in any '***format or medium of transmission***.'" *Id.* at 1205 (emphasis added). Concerned that the Treasury Department had "interpreted the language" too narrowly "in ways not originally intended," Congress also prohibited both direct and indirect regulation of such materials. H.R. Conf. Rep. No. 103–482, at 239, 1994 WL 151669 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 483.

Courts in this Circuit have not had the occasion to apply the informational materials exemption to software, but it is well established that software is speech subject to First Amendment protections. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449-50 (2d Cir. 2001) ("computer code conveying information is 'speech' within the meaning of the First Amendment"); *Bernstein v. U.S. Dep't of State,* 974 F. Supp. 1288, 1308 (N.D. Cal. 1997) (encryption software regulations unconstitutional prior restraint in violation of First Amendment). The Berman Amendment itself includes exemptions for compact discs and CD ROMs, which, at the time, were the media on which software was distributed, while now it is commonly distributed over the Internet. Thus, applying the informational materials exemption to the Tornado Cash software aligns with the goals of the exemption. *See Kalantari,* 352 F.3d at 1205; *Cernuda v. Heavey*, 720 F. Supp. 1544, 1553 (S.D. Fla. 1989) (discussing First Amendment concerns motivating informational materials exemption).

Attempting to call Tornado Cash software a "service" does not avoid the informational materials exception, as the President may not regulate informational materials "directly or indirectly." 50 U.S.C. § 1702(b)(3); *see also Marland v. Trump*, 498 F. Supp. 3d at 638.

(explaining exemption "extend[s] even to regulations that do not on their face regulate the exchange of informational materials, but nevertheless have such an effect").

The evidence showed that the Tornado Cash code, whether the smart contracts or the UI, are open-source expressive works, conveying information. Specifically, the Tornado Cash protocol consists of a set of smart contracts, which are computer code. (*See* Tr. 1048:11-21 (Werlau); 1749:7-1749:24 (Edman).) These smart contracts were developed in 2019 (*see* GX 1901), and the core pool smart contracts were made immutable in 2020. (*See* GX 1904; Tr. 1749:10-24 (Edman); 1780:1-15 (Edman); 2181:14-2182:14 (Green).) They live forever on the Ethereum blockchain. (*See* Tr. 1749:18-24 (Edman explaining "Tornado Cash ETH pools… cannot be modified or removed from the Ethereum blockchain"); 1770:18-22 (Edman); 2182:4-22 (Green).) The Tornado Cash smart contracts, like all smart contracts, are "basically a series of conditions" and instructions. (Tr. 1764:7-1765:17 (Edman).) Tornado Cash smart contracts were able to fulfill various conditions, including verifying zero knowledge proofs (*id*. 1773:12-1774:13 (Edman)); automatically sending cryptocurrency deposited into a Tornado Cash pool to a withdrawal address (Tr. 1774:17-1775:1 (Edman)); and creating the DAO and defining what could be changed through governance (Tr. 1781:1-5 (Edman)). None of this was disputed.

The government's case rested largely on the UI, which is akin to a web application (Tr. 1056:4-7 (Werlau); 1056:23-25 (Werlau); 1069:14-17 (Werlau); 1877:24-1878:3 (Edman)) and was hosted on the IPFS network (Tr. 875:6-25 (Gibbs); 1749:25-1750:16 (Edman)), which is a network of individual nodes or computer operators who voluntarily operate the network. (Tr. 854:24-855:14 (Gibbs); 1816:8-14 (Edman).) The UI is also computer code and was published open source on Github. (*See* GX 670; Tr. 924:13-15 (Dever); 1041:6-14 (Werlau); 1790:5-9 (Edman); 1804:24-1805:20 (Edman); 1821:25-1822:4 (Edman); 2185:11-19 (Green).) As

discussed above, the evidence was undisputed that the UI does not process any user's transaction with the Ethereum blockchain (or the Tornado Cash smart contracts); it merely provides information to the user in preparing their own transaction, which the user then submits to the Ethereum network. (Tr. 878:7-10 (Gibbs); 952:17-21 (Dubash); 1749:25-1750:16 (Edman); 1798:5-7 (Edman); 1806:14-19 (Edman); 1807:2-17 (Edman); 1810:1-12 (Edman).)

Like the present matter, the *Tik Tok* cases involved a web application and the government argued that the informational materials exception did not apply because of the active nature of the application. But two courts both found that the government's intended restrictions on Tik Tok violated the informational materials exception due to their indirect regulation on speech, and prohibited the government from shutting down Tik Tok. *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 81 (D.D.C. 2020) (The government's "prohibitions 'indirectly' 'regulate' the transmission of 'informational materials' by U.S. persons."); *see also Marland*, 498 F. Supp. 3d at 637 ("[T]he effect of the Identification will be to undermine the app's functionality such that U.S. users will be prevented from exchanging data on the app.").

The same principle applies here. There is nothing illegal about using the Tornado Cash software, whether the smart contracts or the UI. *See Van Loon*, 122 F.4th at 554. The evidence at trial showed that Americans use Tornado Cash for legitimate privacy-protecting purposes. (*See, e.g.*, Tr. 226:23-227:7 (Bram); 1567:15-1569:24 (Van Loon); 2018:23-2019:23 (Malekan).) The government may not use the IEEPA to criminalize a privacy-enhancing platform any more than it could use the IEEPA to shut down a social media platform.

Further, in the NKSR, as in parallel regulations, OFAC has expressly incorporated the informational materials exemption, but defined its scope to exempt such materials "not fully created and in existence at the date of the transactions, or to the substantive or artistic alteration

82

or enhancement of informational materials, or to the provision of marketing and business consulting services." 31 C.F.R. § 510.213(c)(2). The Third Circuit has explained that the "key distinction" between permitted and prohibited informational materials "rests between informational materials that are widely circulated in a standardized format and those that are bespoke." *Amirnazmi*, 645 F.3d at 587.

Tornado Cash falls clearly on the "widely circulated in a standardized format" side of that line. The informational materials exception therefore clearly applies. Applying it here, Mr. Storm cannot be punished for making software available, an act shielded by statute and the First Amendment. Because the government's evidence establishes only that Mr. Storm shared software, Count Three should be dismissed.

## VIII.  THE TRIAL DEMONSTRATED THE CONSTITUTIONAL INFIRMITIES OF EACH COUNT OF THE INDICTMENT

Mr. Storm previously moved to dismiss the indictment on constitutional grounds, arguing that the statutes underlying the conspiracy charges were facially overbroad and as applied under the First Amendment; that the statutes were void for vagueness under the Due Process clause, both facially and as applied; and that the rule of lenity weighed in favor of dismissal because the indictment alleged a novel and expansive interpretation of the statutes. (Dkt. 37-1 at 46-55.) The evidence offered at trial demonstrated the constitutional issues with the government's case, and all three counts should be dismissed on Due Process and First Amendment grounds.

### A.    Due Process Fair Notice Requirements Require Dismissal of All Counts

The government's evidence and arguments at trial regarding the various features that Mr. Storm and the founders could have or should have implemented demonstrate that Mr. Storm did not have fair notice that his conduct violated the law. The Due Process right to fair notice, or "fair warning," manifests itself in three ways: (1) the vagueness doctrine; (2) the rule of lenity;

and (3) the bar on novel constructions of a criminal statute. *See United States v. Lanier*, 520 U.S. 259, 266 (1997). "In each of these guises, the touchstone is whether the statute . . . made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267.

A statute is unconstitutionally vague under the Due Process Clause if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). While a vagueness challenge may be facial or as-applied, all vagueness challenges "require [courts] to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement." *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006). "[W]here a statute imposes criminal penalties, the standard of certainty is higher." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). Because the features proposed by the government were not foreseeable and would not have prevented bad actors from misusing the protocol, the statutes at issue here are impermissibly vague as applied. The government's evidence and arguments at trial boiled down to a negligence theory—that Mr. Storm and the founders should have added features that the government contends would have prevented illicit actors from misusing the protocol. (*See supra* Section V(B).) The evidence showed that, in a situation where the protocol never obtains custody over the funds at issue, there was no "easy fix" to the protocol that Mr. Storm declined to implement; rather, the government's proposed measures would have, at best, made it more difficult for bad actors to misuse the protocol, but would not have prevented them from doing so entirely. As explained above, however, Mr. Storm and the founders did, in fact, implement measures to encourage compliance and make it more difficult for bad actors to misuse the protocol. (*See supra* Section V(A).) Under the government's theory, criminal liability therefore turns on the *sufficiency* of the measures implemented, with no

clear guidance from the statute or from case law on what suffices. The statutes thus fail to give adequate notice and create a serious likelihood of arbitrary enforcement, as the government can always argue that measures adopted to prevent illicit use in the context of a decentralized protocol like Tornado Cash were insufficient.

The rule of lenity also requires dismissal, as the government's approach highlights the ambiguity in the statutes—specifically, what it means to: (1) "conduct" a transaction under 18 U.S.C. § 1956; (2) involve the "transportation or transmission" of funds under 18 U.S.C. § 1960(b)(1)(C); and (3) "provide" a "service" in violation of an order issued pursuant to the IEEPA. The rule of lenity "is premised on two ideas: First, a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed; second, legislatures and not courts should define criminal activity." *Babbit v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704 n.18 (1995) (citations and internal quotations omitted). "[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971) (citations omitted); *see also Pulsifer v. U.S.*, 601 U.S. 124, 185 (2024) (Gorsuch, J., dissenting) ("Courts construe ambiguous penal laws with lenity because a free nation operates against a background presumption of individual liberty.").

In the absence of a fair warning—"in language that the common world will understand"—of how those statutory terms apply in the context of a decentralized protocol that does not take custody of the funds at issue and of "what the law intends to do if a certain line is passed"—or even, indeed, where the "line" is—the rule of lenity should apply. *See Banki,* 685 F.3d at 109-12 (applying rule in vacating convictions for violating Iran sanctions).

Finally, the Due Process clause also bars courts from applying a "novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266. For similar reasons as discussed above, the government's actions here reflect a novel construction and application of criminal statutes to conduct that neither the statutes nor any prior judicial decision fairly disclosed to be within their scope. The Due Process clause thus requires dismissal of all three counts.

**B.     The Statutes Cannot Withstand First Amendment Scrutiny As Applied**

All three counts should be dismissed because the statutes are overbroad and violate the First Amendment, as applied. As a threshold matter, "computer code conveying information is 'speech' within the meaning of the First Amendment." *See Corley*, 273 F.3d at 449-50 (identifying three ways "in which a programmer might be said to communicate through code: to the user of the program"; "to the computer"; and "to another programmer").

**1.     Strict Scrutiny Applies Because the Government's Application of the Statutes Are Not Content-Neutral**

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* The level of scrutiny applied to computer code is dependent on its functions. *Corley* observed that the "realities of what code is and what its normal functions are require a First Amendment analysis that treats code as combining nonspeech and speech elements, *i.e.*, functional and expressive elements." *Id.* (citing *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 386 (1969) ("[D]ifferences in the characteristics of new media justify differences in the First Amendment standards applied to

them."). Observing that the "functionality of computer code properly affects the scope of its First Amendment protection," *Corley* analyzed the code at issue there—a decryption program to bypass copyright protections—and found that the restrictions imposed upon it were content-neutral and thus subject to intermediate scrutiny. *Id.* at 452-54.

Here, because the statutes as applied target the content of the software code published by Mr. Storm, strict scrutiny should apply. The government's arguments at trial demonstrated that its application of the statutes were based on the particular manner in which the Tornado Cash smart contracts and UI facilitated a user's transaction on the blockchain—in other words, based on the content of the code that makes up Tornado Cash. The government's enforcement of the statutes based on theoretical ways that Mr. Storm could have or should have re-written the Tornado Cash protocol code—to add a user registry or to simply rewrite a completely different protocol with KYC and AML coded into it—amount to content-based restrictions that should be subjected to strict scrutiny, as they both: (1) target the function or purpose of the code; and (2) cannot be justified without reference to the content of the regulated speech—computer code designed to allow users to retain custody of their funds and not have to entrust their personal information to third parties in order to improve the privacy of personal financial transactions, which is a constitutionally protected interest. *Statharos v. New York City Taxi and Limousine Commn.*, 198 F.3d 317, 322-23 (2d Cir. 1999). This distinguishes the Tornado Cash code from the software involved in *Corley*, which was designed to bypass protections for copyrighted content. *Corley*, 273 F.3d at 452-53. Further, the government's arguments at trial also reflected "disagreement with the message [the speech] conveys," *Reed*, 576 U.S. at 164, given the repeated arguments that the decentralized nature of Tornado Cash indicate it was designed for criminals rather than to provide privacy for users. (*See* Tr. 2342:22:24 ("Remember, when the

defense says privacy, what that really means is hiding money for criminals, not providing privacy to regular people."); Tr. 2349:15 ("Remember, privacy for criminals, not for regular people."); Tr. 2362:1 (same); Tr. 2370:2-3 (same); Tr. 2383:1 ("The business was privacy for criminals.").) Because the government's application of the statutes here is content-based, strict scrutiny applies.

### 2.    The Government's Application of the Statutes Fails Strict Scrutiny

The government bears the burden of proving that its conduct withstands First Amendment scrutiny. *See, e.g., Edenfield v. Fane*, 507 U.S. 761, 770 (1993). The burden cannot be met here because the statutes, as applied, are not the least restrictive means of serving the government's interests, even assuming such interests are compelling. The evidence at trial showed there are ways to enforce the statutes at issue without criminalizing the publication of software code that could be misused by bad actors. The government could focus its enforcement of these statutes on entities that take actual custody of the funds at any point in the relevant transaction and are thus capable of intervening in transactions that: (1) involve funds derived from a criminal offense or intended to be used to promote or support lawful activity; (2) are intended to conceal or disguise funds derived from SUA; or (3) are in violation of sanctions issued pursuant to the IEEPA. The government could require such entities to verify any funds withdrawn from Tornado Cash—or other decentralized protocols—by mandating that their customers submit reports using the Tornado Cash Compliance Tool. (*See supra* Section V(B).)

Absent a clear demarcation based on custody or control, the government's enforcement of these statutes may deter or chill software developers from continuing to develop and publish decentralized applications altogether. As noted above, the government's arguments about proposed amendments and alternatives to the Tornado Cash protocol ultimately amounted to the claim that Mr. Storm and the founders should have created what would essentially have been a

centralized exchange. (*See supra* Section II(B).) Indeed, under the government's theory, the Ethereum network itself could run afoul of a conspiracy to violate these statutes, to the extent that node operators validate transactions that involve SUA or are in violation of sanctions issued under the IEEPA, as would third-party data providers like Infura or Alchemy, who provide blockchain data used in connection with such transactions. Mr. Storm had no more insight into the nature of the transactions, as they were occurring, than such parties and, more to the point, could not prevent bad actors from using the Tornado Cash protocol. (*See supra* Section II(B).) In contrast, bad actors cannot unilaterally deposit into or swap their funds using centralized exchanges. Focusing its enforcement efforts to such centralized exchanges and other entities that are indisputably subject to KYC and AML regulations—and which are needed to convert cryptocurrency into traditional "fiat" currency—is a less restrictive and more efficient means of achieving the government's goals of preventing money laundering, sanctions violations, and unlicensed money transmission involving funds derived from or intended to support unlawful activity. As such, because there are less restrictive means for the government to achieve its goals, all three counts should be dismissed on First Amendment grounds.

### 3. The Government's Application of the Statutes Cannot Withstand Intermediate Scrutiny

Even assuming the statutes are being applied in a content-neutral manner such that intermediate scrutiny applies, the government's action here still fails to withstand such scrutiny because it burdens substantially more speech than is necessary to achieve its aims. *See Cornelio v. Conn.*, 32 F.4th 160, 171 (2d Cir. 2022) (to meet its burden under intermediate scrutiny, government must show that the challenged law (1) advances important governmental interests unrelated to the suppression of free speech and (2) does not burden substantially more speech than necessary to further those interests.") (citations omitted). By effectively criminalizing the

publication of decentralized software that can be misused by bad actors, the government threatens to chill the further development and publication of such software without necessarily achieving its goals. As explained above, the nature of immutable and permissionless decentralized applications are such that no one can prevent their use (and, by extension, their misuse). Limiting the application of the statutes to centralized actors with the means to prevent such transactions would allow the government to achieve its aims without burdening the First Amendment rights of software developers.

### C.    The Statutes Are Facially Overbroad Under the First Amendment

Finally, Mr. Storm renews his facial overbreadth challenge in light of the government's evidence and arguments at trial. "[T]he overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied." *U.S. v. Hansen*, 599 U.S. 762, 769 (2023). The Supreme Court justifies this doctrine "on the ground that it provides breathing room for free expression," as "[o]verbroad laws 'may deter or "chill" constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'" *Id.* at 769-70 (*quoting Virginia v. Hicks*, 539 U.S. 113, 119 (2003)); *see also Farrell*, 449 F.3d at 499 ("The purpose of an overbreadth challenge is to prevent the chilling of constitutionally protected conduct, as prudent citizens will avoid behavior that *may* fall within the scope of a prohibition, even if they are not entirely sure whether it does."). If a court finds that "the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Hansen*, 539 U.S. at 770 (citing *Williams*, 553 U.S. at 292). In light of the evidence presented and the government's articulated theory at trial, Mr. Storm asks that the Court dismiss all three conspiracy counts as

overbroad under the First Amendment, as the three statutes underlying each count deters the development of decentralized computer code designed to improve the privacy of personal financial transactions.

## IX.    CONCLUSION

For the foregoing reasons, Mr. Storm respectfully requests that the Court grant this motion.

DATED: September 30, 2025                    Respectfully submitted,


By: */s/ Brian E. Klein*
    Brian E. Klein
    Keri Curtis Axel
    Becky S. James
    Kevin M. Casey
    Viviana Andazola Marquez
    Waymaker LLP

    -and-

    David E. Patton
    Christopher Morel
    Hecker Fink LLP

    *Attorneys for Roman Storm*