UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                   :

UNITED STATES OF AMERICA

                                   :

        - v. -

                                   :    23 Cr. 430 (KPF)

ROMAN STORM,

                                   :

               Defendant.

                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# THE GOVERNMENT'S OPPOSITION TO DEFENDANT ROMAN STORM'S MOTION FOR JUDGMENT OF ACQUITTAL


JAY CLAYTON
United States Attorney
Southern District of New York

Ben Arad
Thane Rehn
Assistant United States Attorneys

Kevin Mosley
Special Assistant United States Attorney
    *- Of Counsel -*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. 3

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 4

    A. Overview of Tornado Cash Mixing Service.............................................................. 4

    B. The Relayer System.................................................................................................. 7

    C. The Defendant's Transmission of Criminal Funds through Tornado Cash ..................... 9

    D. The Ronin Hack...................................................................................................... 10

ARGUMENT ....................................................................................................................... 15

I.  Rule 29 Legal Standard................................................................................................ 15

II.  The Evidence at Trial Established by A Preponderance That Venue in this District Is
Proper As to Each Count ............................................................................................... 17

    A. Applicable Law ...................................................................................................... 17

    B. Discussion .............................................................................................................. 19

III. The Jury Reasonably Found that the Defendant Conspired to Operate a Money
Transmitting Business Involved in the Transmission of Funds Derived from a Criminal
Offense and Used to Promote Criminal Activity in Violation of 18 U.S.C. Section
1960(b)(1)(C) ............................................................................................................... 40

    A. The Evidence Proved a Criminal Agreement to Operate an Unlicensed Money
Transmission Business ........................................................................................... 41

    B. The Evidence at Trial Proved the Requisite *Mens Rea* ..................................... 45

    i.  There Was Ample Evidence in the Record from which the Jury Could Have
Reasonably Inferred that the Defendant Acted Willfully with Respect to Count Two... 45

    ii. There Is No Legal Requirement That a Defendant Must Act With Secrecy To
Conspire to Violate Section 1960......................................................................... 47

    C. The Jury Reasonably Found that Tornado Cash Was a Money Transmitter of
Criminal Proceeds, and that the Defendant Knew It .............................................. 54

    D. The Evidence Proved the Defendant's Knowledge That the Business Involved the
Transmission of Criminal Proceeds ........................................................................ 60

    E. The Jury Reasonably Found that Tornado Cash Was a "Business"........................ 62

    F. The Jury Reasonably Concluded that Tornado Cash Transferred Funds................. 65

    G. Section 1960(b)(1)(C) Applies to Unregistered Money Transmitters...................... 67

IV. There Was Sufficient Evidence to Find the Defendant Guilty of Count One ................ 68

    A. The Defendant Ignores the Evidence of His Criminal Agreement to Commit Money
Laundering.............................................................................................................. 69

    B. The Government Did Not Advance a Negligence Theory of Criminal Liability at

i

Trial as to Count One, and the Evidence Supported a Finding of the Requisite *Mens Rea* ……………………………………………………………………74

C. The Defendant Continues to Insist that His Supposed Lack of Control over Tornado Cash Negates any Potential Liability under Count One, even though the Court Has Rejected that Argument as a Matter of Law.................................................................... 76

D. The Government Did Not Need to Prove that the Defendant Knew any Specific Transactions Processed by Tornado Cash Constituted Money Laundering and, in any event, the Defendant Consciously Avoided Gaining Such Knowledge .................. 79

V. There Was Sufficient Evidence for a Rational Jury to Find the Defendant Guilty of Count Three, and the Defendant's Legal Arguments Regarding Count Three Are Largely Foreclosed by the Court's Prior Rulings and Otherwise Unavailing....................... 83

A. There Was Ample Evidence at Trial Supporting Count Three ...................................... 83

i. The Evidence Amply Supported a Finding of a Conspiracy to Violate IEEPA.............. 83

ii. The Evidence Amply Supported a Finding of Willfulness with Respect to Count Three    85

B. The Tornado Cash Service Provided a Service Under IEEPA—"to" and "for the Benefit of" the Lazarus Group ...................................................................... 88

i. *Van Loon* Continues to Have No Bearing on this Case and the Defendant Misstates the Significance of *Banki* ...................................................................... 88

ii. The Defendant Asks the Court to Disregard the Plain Meanings of the Word "To" and the Phrase "For the Benefit Of"...................................................................... 91

C. The Informational Materials Exemption Does Not Apply ............................................. 92

i. Tornado Cash Software Is Not Informational Material Under the Relevant Caselaw and OFAC Regulation ...................................................................... 93

ii. The Defendant's Remaining Arguments Concerning the Informational Materials Exemption Are Meritless ...................................................................... 97

VI. The Defendant's Constitutional Arguments Are Meritless ................................................. 100

A. The Defendant's Due Process Arguments Are Meritless............................................. 100

B. The Criminal Statutes at Issue Here Do Not Violate the First Amendment ................. 101

i. The Defendant's As-Applied Challenge Is Meritless.................................................... 101

ii. The Defendant's Facial Overbreadth Challenge Is Meritless....................................... 103

CONCLUSION................................................................................................. 105

# TABLE OF AUTHORITIES

**Cases**

*Aronshtein v. United States,*
   2023 WL 2770145 (2d Cir. Apr. 4, 2023) ............................................................. 78

*Bernstein v. U.S. Dep't of State,*
   974 F. Supp. 1288 (N.D. Cal. 1997) .................................................................... 94

*Colvin v. Keen,*
   900 F.3d 63 (2d Cir. 2018) ................................................................................. 58

*Farrell v. Burke,*
   449 F.3d 470 (2d Cir. 2006) ............................................................................... 104

*Fischer v. United States,*
   603 U.S. 480 (2024) ........................................................................................... 68

*Gardner v. Credit Mgmt. LP,*
   140 F. Supp. 3d 317 (S.D.N.Y. 2015) ................................................................. 68

*Junger v. Daley,*
   209 F.3d 481 (6th Cir. 2000) .............................................................................. 103

*Marland v. Trump,*
   498 F. Supp. 3d 624 (E.D. Pa. 2020) .................................................................. 98

*Rosemond v. United States,*
   572 U.S. 65 (2014) ......................................................................................... 43, 49

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos,*
   605 U.S. 280 (2025) ........................................................................................... 76

*Stagg P.C. v. U.S. Dep't of State,*
   2019 WL 1863418 (S.D.N.Y. Apr. 25, 2019) ..................................................... 94

*States v. Levis,*
   488 F. App'x 481 (2d Cir. 2012) ............................................................... 19, 29, 31

*TikTok Inc. v. Garland,*
   604 U.S. 56 (2025) ............................................................................................. 102

*TikTok Inc. v. Trump,*
   490 F. Supp. 3d 73 (D.D.C. 2020) ...................................................................... 98

*Twitter, Inc. v. Taamneh,*
   598 U.S. 471 (2023) ........................................................................................... 76

*United States v. Abdullaev,*
   761 F. App'x 78 (2d Cir. 2019) .......................................................................... 17

*United States v. al Ghazi,*

2009 WL 1605741 (S.D.N.Y. June 9, 2009) ........................................................ 16

*United States v. Allamon,*
2005 WL 2542905 (S.D.N.Y. Oct. 11, 2005) ...................................................... 32

*United States v. Amirnazmi,*
645 F.3d 564 (3d Cir. 2011) ................................................................. 95, 96

*United States v. Approximately Five Hundred Forty-One Thousand Nine Hundred Fifty-Three Dollars & Zero Cents Seized From JP Morgan Chase NA Acct. No. XXXXXXXX Held in Name of Jiawig Trade Inc.,*
2025 WL 923412 (E.D.N.Y. Mar. 27, 2025) ........................................................ 79

*United States v. Archer,*
977 F.3d 181 (2d Cir. 2020) ................................................................. 43

*United States v. Atilla*
966 F.3d 118 (2d Cir. 2020) ................................................................. 15

*United States v. Avenatti,*
81 F.4th 171 (2d Cir. 2023) ................................................................. 15

*United States v. Ayala-Vazquez,*
751 F.3d 1 (1st Cir. 2014) ................................................................. 79

*United States v. Banki,*
685 F.3d 99 (2d Cir. 1999) ............................................................. 87, 89, 90

*United States v. Botti,*
711 F.3d 299 (2d Cir. 2013) ................................................................. 32

*United States v. Capers,*
20 F.4th 105 (2d Cir. 2021) ................................................................. 15

*United States v. Dawkins,*
999 F.3d 767 & n.12 (2d Cir. 2021) ........................................................ 16

*United States v. Dimitrov,*
546 F.3d 409 (7th Cir. 2008) ................................................................. 56

*United States v. Dupree,*
2012 WL 5333946 (E.D.N.Y. Oct. 26, 2012) ...................................................... 50

*United States v. E-Gold, Ltd.,*
550 F. Supp. 2d 82 (D.D.C. 2008) ........................................................ 56

*United States v. Facen,*
812 F.3d 280 (2d Cir. 2016) ................................................................. 16

*United States v. Goklu,*
2023 WL 184254 (E.D.N.Y. Jan. 13, 2023) ...................................................... 16

iv

*United States v. Green*,
   599 F.3d 360–74 (4th Cir. 2010) ................................................................. 80

*United States v. Griffith*,
   515 F. Supp. 3d 106 (S.D.N.Y. 2021) ................................................ 94, 95, 96

*United States v. Gross*,
   2017 WL 4685111 (S.D.N.Y. Oct. 18, 2017) ............................................... 40

*United States v. Henry*,
   325 F.3d 93 (2d Cir. 2003) ........................................................................... 70

*United States v. Ho*,
   984 F.3d 191 (2d Cir. 2020) ......................................................................... 44

*United States v. Holmes*,
   44 F.3d 1150 (2d Cir. 1995) ....................................................................... 104

*United States v. Jackson*,
   335 F.3d 170 (2d Cir. 2003) ......................................................................... 15

*United States v. Jefferson,*
   2009 WL 2447850 (E.D. Va. Aug. 8, 2009) ........................................... 80, 83

*United States v. Kim*,
   246 F.3d 186 (2d Cir. 2001) ................................................................... 18, 38

*United States v. Kirk Tang Yuk*
   885 F.3d 57 (2d Cir. 2018) ............................................................... 18, 28, 40

*United States v. Lange*,
   834 F.3d 58 (2d Cir. 2016) ........................................................................... 18

*United States v. Levy,*
   2013 WL 3832718 (S.D.N.Y. July 15, 2013) ............................................... 16

*United States v. Mazza-Alaluf*,
   621 F.3d 205 (2d Cir. 2010) ................................................................... 55, 67

*United States v. Mi Sun Cho*,
   713 F.3d 716 (2d Cir. 2013) ......................................................................... 15

*United States v. Miller*,
   808 F.3d 607 (2d Cir. 2015) ......................................................................... 17

*United States v. Munshani*,
   2024 WL 4448708 (2d Cir. Oct. 9, 2024) ..................................................... 78

*United States v. Murgio*,
   209 F. Supp. 3d 698 (S.D.N.Y. 2016) ........................................................... 55

*United States v. Naranjo*,

14 F.3d 145 (2d Cir. 1994) ..................................................................................... 17, 18

*United States v. Nelson*,
277 F.3d 164 (2d Cir. 2002) ................................................................................ 76

*United States v. Odunaike*,
273 F. App'x 58 (2d Cir. 2008) .......................................................................... 18

*United States v. Ohle*,
441 F. App'x 798 (2d Cir. 2011) ........................................................................ 18

*United States v. Paldiel*,
2025 WL 524659 (E.D.N.Y. Feb. 18, 2025) ...................................................... 79

*United States v. Persico*,
645 F.3d 85 (2d Cir. 2011) .................................................................................. 16

*United States v. Raniere*,
55 F.4th 354 (2d Cir. 2022) .................................................................... 16, 21, 86

*United States v. Rommy*,
506 F.3d 108 (2d Cir. 2007) .......................................................................... 17, 19

*United States v. Rowe*,
414 F.3d 271 (2d Cir. 2005) .......................................................... 19, 29, 30, 32

*United States v. Royer*,
549 F.3d 886 (2d Cir. 2008) .......................................................... 19, 31, 32

*United States v. Russell*,
2014 WL 2558761 (E.D.N.Y. June 5, 2014) ...................................................... 19

*United States v. Rutigliano*,
790 F.3d 389 (2d Cir. 2015) .......................................................................... 16, 28

*United States v. Sterlingov*,
573 F. Supp. 3d 28 (D.D.C. 2021) ...................................................................... 60

*United States v. Szur*,
289 F.3d 200 (2d Cir. 2002) ................................................................................ 77

*United States v. Teman*,
465 F. Supp. 3d 277 (S.D.N.Y. 2020) ................................................................ 16

*United States v. Thomas*,
74 F.3d 701 (6th Cir. 1996) ................................................................................ 30

*United States v. Watson*,
2025 WL 510814 (E.D.N.Y. Feb. 16, 2025) ...................................................... 16

*United States v. Whitehead*,
579 F. App'x 46 (2d Cir. 2014) .......................................................................... 50

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ...................................................................................... 101, 103

*Van Loon v. Department of the Treasury*,
    122 F.4th 549 (5th Cir. 2024)........................................................................................ 88

*Greasley v. United States*,
    2021 WL 935731 (W.D.N.Y Mar. 11, 2021) ................................................................ 58

**Statutes**

18 U.S.C. § 1512 .............................................................................................................. 68

18 U.S.C. § 1956 .................................................................................................... *passim*

18 U.S.C. § 1960 .................................................................................................... *passim*

31 CFR § 510.201 ............................................................................................................ 88

31 C.F.R. § 510.213 ................................................................................................ 94, 95

31 U.S.C. § 5330 ........................................................................................... 55, 56, 67

50 U.S.C. § 1702 ....................................................................................................... 93, 94

Fed. R. Crim. P. 18 .................................................................................................... 17

Fed. R. Crim. P. 29 .................................................................................................. *passim*

Fed. R. Crim. P. 33 ....................................................................................................... 69

U.S. Const. art. III § 2 ............................................................................................... 17

## PRELIMINARY STATEMENT

The defendant, Roman Storm, was convicted after a four-week jury trial of conspiring to operate a money transmitting business—the Tornado Cash service—knowing that the business was transmitting crime proceeds and funds used to promote crime (Count Two). At trial, the Court admitted over 400 government exhibits and the Government introduced the testimony of 21 witnesses, including three expert witnesses. The evidence in support of the jury's verdict was more than sufficient; it was overwhelming. And while the jury did not reach a verdict on the other two counts, charging the defendant with conspiring to commit money laundering (Count One) and conspiring to commit sanctions violations (Count Three), the evidence was at least sufficient for a reasonable jury to convict the defendant on those counts as well.

The purpose of a Rule 29 motion is to evaluate the sufficiency of the evidence with all inferences drawn in the Government's favor. It is not a vehicle to relitigate legal issues that the Court has already considered and rejected. But large sections of the defendant's motion improperly seek to do just that. Storm repackages meritless legal arguments that have been rejected by the Court in detailed prior rulings. The Court should summarily reject the defendant's requests to revisit its prior rulings.

The defendant's motion ("Mot."), (Dkt. 230), is replete with arguments about possible exculpatory interpretations of the evidence admitted at trial, ignoring the ample trial evidence establishing the defendant's criminal intent. Those arguments are likewise irrelevant to this Court's Rule 29 determination. Indeed, the defendant repeats unfounded talking points that he has advanced throughout this prosecution, even though they are contradicted by the evidence presented at trial. Most notably, the defendant continues to claim that Tornado Cash was nothing more than

1

a "decentralized" protocol consisting of the immutable pools. That claim was decisively disproven at trial, with overwhelming evidence that the defendant and his co-conspirators exercised control over most aspects of Tornado Cash and used that control to facilitate criminal transactions and to enrich themselves. Even the defendant's own expert witness admitted that Tornado Cash consisted of multiple interlocking parts *in addition to* the pools, and in the defendant's private chats with co-conspirators, he acknowledged that their public narrative of "decentralization" was false, and that they maintained centralized points of control.

Similarly, the defendant persists in his denials that Tornado Cash was ever a business, another claim that cannot be reconciled with the evidence at trial. The Government proved that Tornado Cash was not an altruistic protocol functioning independently: it was a business operated for profit. The defendant went to great lengths to conceal from the public just how much he profited from his operation of Tornado Cash, by using a cryptocurrency account in the name of a foreign national to liquidate over $12 million in TORN holdings he received from operating Tornado Cash. His substantial profits, cashed out under a pseudonym, were also powerful evidence explaining his criminal intent in continuing to commit illegal money transmitting, money laundering, and sanctions violations—these criminal transactions made up a substantial portion of his business, which would not have been nearly as profitable without them.

On several points, the defendant's motion strains credulity and does not come close to meeting the heavy threshold required to set aside the jury's verdict under Rule 29. The evidence was more than sufficient to support the jury's conviction on Count Two: Tornado Cash encompassed many interlocking parts that worked together to transfer funds on behalf of the public; the defendant and his co-conspirators owned, operated, marketed, and controlled

2

substantial parts of Tornado Cash; Tornado Cash was a for-profit enterprise; and the defendant conspired to operate the business knowing full well that it involved the transmission of criminal proceeds and money used to promote crime, including hacks by North Korean criminals. Those conclusions were well-grounded in the overwhelming trial evidence, which more than satisfies Rule 29.

The jury's conviction on Count Two rested on extensive documentary evidence and witness testimony demonstrating the many affirmative steps the defendant took to operate, maintain, upgrade, promote, and exercise control over Tornado Cash throughout the time frame of the charged conspiracies, including evidence that he repeatedly took those steps knowing full well that he was facilitating not just the transmission of criminal funds, but the concealment of criminal proceeds and the movement of funds as a service to the Lazarus Group, a North Korean cyber-criminal organization, in violation of U.S. sanctions on North Korea. Thus, the evidence was also more than sufficient for a reasonable jury to convict the defendant on Counts One and Three as well. The defendant's recasting of the criminal prosecution as a mere "negligence" case—another longstanding refrain already rejected by this Court at the motion to dismiss stage—cannot be squared with the actual evidence presented at trial.

The Government proved that the defendant's affirmative conduct violated the law. The jury was not instructed on a negligence theory, and the Government did not argue such a theory. The defendant's claim that this case involved mere inaction is groundless.

Because the defendant has advanced no legal or factual arguments of any merit, he has failed to meet the heavy burden of showing that, with all inferences drawn in the Government's favor, no rational jury could have found that he acted with the requisite intent.

3

## FACTUAL BACKGROUND

On July 14, 2025, trial commenced on the three counts contained in the Superseding Indictment (the "Indictment") (Dkt. 105): conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count One); conspiracy to operate an unlicensed money transmission business, in violation of 18 U.S.C. §§ 371 and 1960(b)(1)(C) (Count Two); and conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), in violation of 50 U.S.C. § 1705(a), Executive Order 13722, and 31 C.F.R. § 510.201 (Count Three). On August 6, 2025, the jury returned a guilty verdict on Count Two and was unable to reach unanimous verdicts on Counts One and Three. The defendant's Rule 29 motion followed on September 30, 2025.

The Government's evidence at trial demonstrated that the defendant was the co-founder of the Tornado Cash cryptocurrency mixing service, along with two co-founders, Roman Semenov and Alexey Pertsev. The defendant was also the CEO of Peppersec Inc. ("Peppersec"), the Delaware corporation under which he and his co-founders developed and ran Tornado Cash. (*See, e.g.*, GX 1348 at 5; *see also* GX 902-A). The Tornado Cash service executed anonymous, virtually untraceable cryptocurrency transfers for its customers on various blockchains, but principally on the Ethereum blockchain. It did so by combining multiple features that together allowed it to conceal the connection between deposits and withdrawals that would otherwise be traceable on the publicly available blockchain. (*See generally* Tr. 1025-84, 1143-1223). The defendant did this and understood that these features were of immense value to cybercriminals, including sanctioned North Korean hackers, who the defendant knew used the Tornado Cash service to launder at least $1 billion in proceeds of various criminal exploits. (*See generally* Tr. 475-587, 638-728).

### A.  Overview of Tornado Cash Mixing Service

Tornado Cash advertised itself as a "mixer" that provided "noncustodial anonymous transactions on Ethereum," a cryptocurrency blockchain. (Tr. 219). A Tornado Cash customer could deposit cryptocurrency into Tornado Cash and later request to have the cryptocurrency transferred to a new address with no transaction history, so that the connection between the customer and the new address on the blockchain was practically impossible to track. (Tr. 219-20, 1046). When a customer deposited cryptocurrency through the Tornado Cash website, the UI would generate a "secret note," held only by the customer, that functioned as a password that would allow the customer to designate a clean address into which the customer's funds would be deposited. (Tr. 327, 1147). Without the secret note, the customer could not initiate a withdrawal into a clean address. (Tr. 1152-53, 1194).

Tornado Cash customer deposits were mixed together in smart contracts called the Tornado Cash pools, which were created by the defendant and his two co-founders. The pools were made "immutable" in May 2020, meaning that they could no longer be modified after that time. (Tr. 1151-52). However, the Tornado cash founders maintained control of other elements of the Tornado Cash service, including the website and UI, (Tr. 1049, 1055-56); the command line interface (the "CLI"), an alternative method for users to make deposits, (Tr. 1049, 1071); the router, a smart contract that directed deposit and withdrawal commands to the Tornado Cash pools, (Tr. 1076-79); the payment of relayer fees, (Tr. 1145-46, 1155-56); other important features of the service such as a program to reward customers for leaving deposits in the service, (Tr. 1079-80); and the relayer network, which evolved from a set list of relayers controlled by the defendant, to a list controlled by a smart contract (the relayer registry) that was released in February 2022, (Tr. 1145, 1153). The defendant's control was neither passive nor incidental: he and his co-conspirators

changed the UI approximately 250 times between February 26, 2020 and August 8, 2022, (Tr. 1063-64, 1078-79), controlling the means by which the vast majority of users accessed the Tornado Cash Service, (Tr. 1049, 1182). During the charged time period, at least 96 percent of Tornado Cash users accessed the Tornado Cash service through the UI. (Tr. 1049, 1182).

The defendant and his co-conspirators publicly claimed that there was a "decentralized" governance structure for Tornado Cash. But as the trial evidence revealed, those claims were false, and the defendant and his co-conspirators retained control over Tornado Cash throughout the charged time period. They did this in two ways. First, they exercised control over the UI at all relevant times. Because the UI was the primary point of access for Tornado Cash users, control over the UI allowed the defendant and his co-conspirators to change any aspect of the structure of Tornado Cash at any time by implementing a new router smart contract connected to the UI. (Tr. 1078-79). They could do so "unilaterally." (Tr. 1146). For Tornado Cash users to maintain anonymity, they had to access Tornado Cash through the same router as other users to "blend in," so control over the router was effectively control over the entire system. (Tr. 1161). The defendant and his co-conspirators were aware of this power to redirect users to a new router, and discussed it in their internal messages in February 2022, around the time they implemented a significant overhaul to make Tornado Cash more profitable. (GX 2059-1-T). Second, even the governance system itself was effectively under the control of the defendant and his co-conspirators at all relevant times. Governance decisions were made by the votes of TORN token holders, and the defendant and his co-conspirators had far more TORN tokens than the number of votes that were ever cast in the governance system. As the defendant's own expert acknowledged, the effect of this was to make Tornado Cash "less decentralized over time." (Tr. 2124 (Hurder)).

6

### B.  The Relayer System

A service provided by Tornado Cash was that it could transfer funds into a new wallet with no prior transaction history—in other words, a "clean" wallet whose prior transactions were obscured, making it difficult, if not impossible, to identify the true sender. (Tr. 220-21). Tornado Cash used specially designated "relayers" to provide this service, in exchange for a relayer fee. (Tr. 221, 1075-76). While a user could opt out of the relayer service, in practice doing so would undermine much of the value of using Tornado Cash. Accordingly, over 94% of transactions used relayers. (Tr. 1174). To capitalize on those relayer fees, the defendant and his co-conspirators offered for sale a crypto token that they created in December 2020, the TORN token. (Tr. 1082). The defendant and his co-conspirators allocated 55% of those tokens to the Tornado Cash registry and distributed the rest, allocating the majority of distributed tokens to themselves. (Tr. 1082-83). The founders' TORN began "vesting" in December 2021, (Tr. 2122), and shortly thereafter, in February 2022, the defendant and his co-founders deployed a new architecture for Tornado Cash that connected the TORN tokens to the relayer fees paid by Tornado Cash users, (Tr. 1153-56), thereby increasing the value of the TORN tokens the founders held by forcing relayers to transact in TORN, (GX 3601-5).

At the center of this new architecture was a smart contract containing a list of relayers, called the "relayer registry." (Tr. 1155-56). To be part of the relayer registry, a user would have to deposit or "stake" a minimum of approximately 300 TORN into a smart contract connected to Tornado Cash's governance. (Tr. 1146). Every time a relayer earned fees for a transaction, the application would transfer a portion of the relayer's TORN tokens into the governance contract; if a relayer's staked balance fell below 300 TORN, that relayer would be forced to purchase more

7

TORN to remain in the registry. (Tr. 1155, 2079, 2128).

To manage this new architecture and ensure that relayer fees were being converted into TORN payments, the defendant and his co-conspirators created a new system of smart contracts in February 2022 to govern the process by which deposits and withdrawals were made. At the center of this system was a smart contract called the "router," or occasionally the "proxy," which was the entry point for Tornado Cash deposits and withdrawals. (Tr. 1077-78). The router was integral to nearly every transaction in Tornado Cash. For example, Philip Werlau, the Government's expert on blockchain technology, smart contracts, and internet applications, (Tr. 1035-36), testified that between February 22, 2022 and August 8, 2022, *100%* of Tornado Cash's 100-ETH-pool deposits and withdrawals, and *over 99%* of all deposits into and withdrawals from the lower-denomination pools went through the router that the defendant and his co-conspirators deployed in February 2022. (Tr. 1165-66). In other words, during this time period, *zero* deposits were made directly to the 100-ETH pool and a vanishingly small number of deposits (less than 1%) were made directly to the other pools (Tr. 1166).

By creating the architecture for virtually all deposits and withdrawals, and assigning a relayer to each withdrawal for a fee, the defendant generated a market for TORN tokens through Tornado Cash users that directly increased the value of the token and, by extension, the founders' TORN holdings. (Tr. 1168-69, 1172; GX 3601-5). And as a direct result, the defendant and his co-conspirators profited immensely. The evidence at trial established that between June 2022 and August 2022, the defendant covertly sold TORN tokens whose value had been boosted by the relayer fee by transferring them to a Russian Binance account in the name of a third party, and then converting them into U.S. dollar-denominated stablecoins, earning a total of more than $12

million in profits for himself and his co-conspirators. (Tr. 1270-78; GX 2055-T, GX 2058-T).

### C.  The Defendant's Transmission of Criminal Funds through Tornado Cash

As established at trial, the defendant knew that Tornado Cash was transmitting large volumes of criminal funds: he was repeatedly informed by victims and law enforcement that this was occurring. (*See, e.g.*, GX 231, GX 1005).   Indeed, a significant number of users used Tornado Cash to promote criminal activity or to transfer hundreds of millions of dollars in criminal proceeds. Between September 2020 and August 2022, criminal actors, including hackers, fraudsters, and money launderers working for rogue states, moved at least $1 billion in illicit funds through the Tornado Cash service. (Tr. 505, 663; GX 3002-51). When contacted by people victimized by the criminals using Tornado Cash to launder funds, the defendant falsely claimed that his company was "unable to assist with respect to any issues relating to the Tornado Cash protocol" because "it is a decentralized software protocol that no one entity or actor can control," (GX 1011), without disclosing the degree of oversight and control he and his co-founders in fact exercised over the service. During the time period charged in Count Two, at least 37% of the entire volume of funds being transmitted by Tornado Cash were attributable to large-scale criminal incidents of which the defendant was personally aware. (GX 3002-60; GX 3002-2 and exhibits referenced therein). The 37% number identified by the Government's expert witness, Special Agent Joel DeCapua, was an underestimate of the volume of criminal proceeds being transmitted by Tornado Cash of which the defendant was aware. For instance, the defendant discussed with his co-founders additional hacking incidents beyond those identified by Special Agent DeCapua whose proceeds likewise flowed through Tornado Cash. (*See, e.g.*, GX 2007-T (the defendant discussing the hack of Audius smart contract, which was not one of the incidents captured in

Special Agent DeCapua's analysis, as "advertising" for Tornado Cash)).

The defendant also knew that Tornado Cash was regularly transmitting funds used to promote criminal activity. In September 2020, for example, he forwarded a message to his co-founders noting that a hacker had used Tornado Cash to "seed" a wallet with funds that were used to perpetrate a hack. (GX 2069-T). His investors at Dragonfly also reported a similar "seeding" incident to him in December 2021, where a "blackhat" hacker had "used Tornado for source of funds" to attack another Dragonfly portfolio company. (GX 1367). As the defendant understood, Tornado Cash was especially useful not only for criminals seeking to conceal proceeds, but also for criminals who sought to promote criminal activity, because they "didn't want to use cryptocurrency that was directly linked" to the hacker for their criminal exploits. (Tr. 894 (Crema Finance attacker explaining value of Tornado Cash for transmitting money used to promote criminal activity)).

### D.  The Ronin Hack

The Ronin Hack was a significant criminal exploit that was publicly announced on March 29, 2022, (Tr. 2116), and the hackers began using Tornado Cash to launder the stolen funds on April 4, 2022, (Tr. 647-48). The defendant knew about the hack the day it was announced, expected that Tornado Cash would launder the funds even before the laundering began, and knew about the laundering through Tornado Cash from the day it commenced onward. From April 4, 2022 and continuing into May 2022, with the defendant's knowledge, Tornado Cash transmitted approximately $449 million from the Ronin Hack in 1,751 transactions. (Tr. 647-48, 1183-84; GX 3002-45).

On March 29, 2022, the day that the Ronin Network announced that it had been hacked,

Semenov wrote, "Did you already see the $600,000,000 hack today? Shit might seriously hit the fucking fan now," implying his awareness that the hackers would use Tornado Cash to launder their loot, and that the co-founders would be in trouble as a result. (GX 2044-T). The defendant did not disagree that the hackers would use the Tornado Cash service, but was unconcerned about the provenance of the stolen funds: "So what the fuck," he wrote, "[i]f it's stolen it's stolen." (GX 2004-T).

The defendant was informed that proceeds of the hack were flowing through Tornado Cash beginning on April 4, 2022, when a Wall Street Journal reporter emailed the defendant alerting him to this fact, and providing a link to blockchain data showing the transactions. (Tr. 649-50; GX 279). This was the first day Tornado Cash began laundering the Ronin proceeds. (Tr. 647-48). - Ten days later, on April 14, 2022, the U.S. government sanctioned the wallet connected to the Ronin network exploit. (GX S-6). Shortly after the announcement, the defendant sent his two co-founders a news article attributing the Ronin exploit to the Lazarus Group, hackers associated with North Korea, adding, "we are fucking done for." (Tr. 653-55; GX 2047-1, 2047-T). That day, in response to the U.S. Government's sanctioning the wallet connected to the Ronin network exploit, (Tr. 651-55; GX S-6), the defendant and his co-conspirators, as a fig leaf, announced that they were implementing the Chainalysis Oracle, a tool that would purportedly "block" sanctioned entities from laundering through Tornado Cash. (GX 2047-T). In private, however, the defendant acknowledged to his co-conspirators that this measure would be "easy to bypass." (*Id.*). His messages indicate that he was focused not on actually stopping the sanctions violations but on the *perception* that they were doing so: "We urgently need to tell everyone that we do not let such individuals" use Tornado Cash, he wrote, and in his next message described his proposed public

announcement as "a very good thing for positioning." (*Id.*).

Additional messages underscored that the defendant knew he was violating sanctions and that criminal liability could follow: the day after publicly announcing the Chainalysis Oracle, the defendant wrote to his co-founders, "A guy got five years of prison for sanctions," further evincing his knowledge that he was breaking the law and that there was a risk he may get caught. (GX 2047-T). The defendant voiced growing concern minutes later, when he circulated a link to a Twitter post that read, in substantial part, "@TornadoCash laundered 26,300 Ether ($72.9 million) for the North Korean government over the last two weeks. Every holder of $TORN is an accomplice to violating sanctions. All Ether held in, or withdrawn from, @TornadoCash wallets is sanctionable." (*Id.*) In response to the link, the defendant stated, among other things, as translated from Russian, "Shit!" (*Id.*). The same day, Semenov messaged Storm and others "that law enforcement is reading [their Telegram chats] and can use them against us later," and the defendant replied: "[c]leaned it up." (GX 2062-T). These messages belie the defendant's claim that there "was no evidence at trial that Mr. Storm willfully engaged in conduct he knew to be unlawful." (Mot. 72). The defendant also cites his later, self-serving statement to one of his investors—sent on June 30, 2022, long after the defendant facilitated the Ronin Hack transactions with the sanctioned Lazarus Group and its sanctioned wallet—that he was "glad" the perpetrators of a separate hack were "detected." (DX 8790). But even if that message had any probative value with respect to the defendant's state of mind regarding the Lazarus Group and the Ronin Hack in April and May 2022, it certainly did not require the jury to conclude that he lacked criminal intent. The jury could reasonably have concluded that the defendant's self-serving statements were contradicted by his earlier statements to co-conspirators and his actions in continuing to permit the Lazarus Group to avail itself of the

12

Tornado Cash service.

Of the $449 million in proceeds from the Ronin Hack that Tornado Cash laundered, approximately $351 million was laundered after the Ronin hacker wallet was sanctioned on April 14. (Tr. 660). These funds were deposited into Tornado Cash in 1,442 separate deposits, each of which constituted a sanctions-violating transaction. (Tr. 660-61; GX 3002-49). All of these deposits were made through the router that the defendant and his co-conspirators had created in February 2022 when they introduced the relayer registry system. (*See* Tr. 660 (all 1,442 deposits were in 100 ETH increments); GX 3009 (all 100 ETH deposits after February 2022 went through the router)). During the time period of these sanctions-violating transactions, Ronin Hack proceeds alone made up more than half of the funds Tornado Cash transferred—55% of all volume—which generated significant revenue for Tornado Cash through associated relayer fees, and thus indirectly boosted the value of TORN. (Tr. 661; GX 3002-50). Indeed, TORN tokens actually increased in value from February to May 2022, as other cryptocurrencies were dropping in value, a fact that even the defendant's witness acknowledged. (Tr. 1426-27, 2109-11).

The defendant continued to take affirmative steps to operate the Tornado Cash service even after realizing he was facilitating transactions with and providing a service to sanctioned North Korean hackers. For example, he and his co-conspirators continued to pay thousands of dollars to service providers and employees and incur other expenses (*see, e.g.*, GX 720, 863, 924, 1073, 3007). In the midst of these knowing sanctions violations, the defendant discussed with his co-founders and his investors whether they should make changes to create a mixer that could not be used for such money laundering, but rejected the idea when his lead investor protested that the "market need" was "quite thin." (GX 1372 (discussing whether to create a "compliant mixer" with

"AML" features)). Unchastened by their knowing laundering of millions of dollars worth of cryptocurrency for North Korean hackers, the defendant and his co-founders continued to operate and pay for the Tornado Cash website and UI, ensure the reliability of its blockchain traffic through service providers Infura and Alchemy, manage the relayer network, and promote Tornado Cash, including with misleading messaging claiming to have actually "blocked" the sanctioned wallets. (*See, e.g.*, GX 720, 863, 2047-T).

From its earliest days in 2019 to August 2022, when the defendant secretly cashed out millions of dollars of his and his co-founders' holdings in Tornado Cash's native token, TORN, the defendant built Tornado Cash into a thriving business with customers, venture capital investors, and employees. He incurred significant monthly expenses, engaged in marketing—including what the defendant characterized as free "advertising" from large-scale hackers who turned to Tornado Cash to launder their stolen funds, (GX 2007-T)—and, most importantly, beginning in February 2022, expressly adopted a for-profit business model that monetized the revenue streams obtained from relayer fees. (*See, e.g.*, GX 1-2, 803, 814, 849, 851-52, 924, 1348, 1372, 2007-T, 2033-T, 2037-T, 2043-T, 2055-T, 2060-T, 2261-T, 3007, 3601-5, 8852A; Tr. 1076-77, 1168-69; Tr. 2414 (Def. Summation) ("Well, yes, they wanted to make money" and referring to TORN as the business's "one source of income")). The defendant was able to do this by maintaining centralized control over essentially every component of the Tornado Cash service other than the pools where Tornado Cash user deposits were stored. The defendant did so even while simultaneously claiming, publicly and falsely, that Tornado Cash was "a decentralized software protocol that no one entity or actor can control." (*Compare, e.g.*, GX 1011, 2320 *with* GX 2060-T; Tr. 1064, 1071, 1076-80,

14

1143-46, 1150, 1156; Tr. 2124 (Hurder) ("Q: So Tornado Cash became less decentralized over time, not more; isn't that right?....A: Yes.").

## ARGUMENT

### I.    Rule 29 Legal Standard

Federal Rule of Criminal Procedure 29 provides a mechanism for the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Under Rule 29, a defendant challenging the "sufficiency of the evidence to support his conviction 'bears a heavy burden.'"[1] *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (quoting *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001)). "The question is not whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt, but rather, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (emphasis in original). Accordingly, a court "may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021).

In considering a Rule 29 motion, the court must view the evidence in the light most favorable to the Government, *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020), and analyze the pieces of evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011), as "to the totality of the government's case and not to each element, as each

---

[1] Unless otherwise noted, case and record text quotations omit all internal quotation marks, citations, and previous alterations.

fact may gain color from others." *United States v. Avenatti*, 81 F.4th 171, 184 (2d Cir. 2023). This Court must also "credit every inference that the jury might have drawn in favor of the government, because the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court." *United States v. Raniere*, 55 F.4th 354, 364 (2d Cir. 2022); *see also United States v. Teman*, 465 F. Supp. 3d 277, 291 (S.D.N.Y. 2020) ("In a close case, where 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter.'") (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)). Because the jury is entitled to choose which inferences to draw, "the government's case need not exclude every possible hypothesis of innocence." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016).

"These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105. "A jury's verdict may be based entirely on circumstantial evidence." *United States v. Rutigliano*, 790 F.3d 389, 402 (2d Cir. 2015).

Rule 29 "only authorizes motions challenging the sufficiency of the evidence presented at trial." *United States v. al Ghazi*, No. 07 Cr. 354 (JSR), 2009 WL 1605741, at *2 (S.D.N.Y. June 9, 2009); *see United States v. Dawkins*, 999 F.3d 767, 780-81 & n.12 (2d Cir. 2021); *United States v. Watson*, No. 23 Cr. 82 (EK), 2025 WL 510814, at *4 (E.D.N.Y. Feb. 16, 2025). "Rule 29(c) is not an open-ended opportunity to relitigate unfavorable rulings, contest jury instructions, or advance new legal theories." *United States v. Goklu*, No. 19 Cr. 386 (PKC), 2023 WL 184254, at *4 (E.D.N.Y. Jan. 13, 2023); *see also United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 3832718, at *3 & n.2 (S.D.N.Y. July 15, 2013) (denying Rule 29 motion where defendant's "arguments in support of her Rule 29 motion [did] not address the sufficiency of the evidence presented, but rather rehash[ed] . . . arguments as to why her activities should not be considered

illegal as a matter of law."). While the Government responds to all of the defendant's arguments below, many of these arguments are attempts to reargue issues that have already been raised and decided, and the Court should deny the Rule 29 motion summarily as to all of those points.

## II. The Evidence at Trial Established by A Preponderance That Venue in this District Is Proper As to Each Count

### A. Applicable Law

The proper forum for a criminal prosecution is the district in which the crime was committed. *See* U.S. Const. art. III § 2; U.S. Const. amend. VI; Fed. R. Crim. P. 18. When "the acts constituting the crime and the nature of the crime charged implicate more than one location, the [C]onstitution does not command a single exclusive venue." *United States v. Miller*, 808 F.3d 607, 616 (2d Cir. 2015). Instead, a defendant may be tried in any district in which some part of the offense occurred. *See*, *e.g.*, *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994). For a conspiracy charge, like the three counts at issue in this case, it is well established that a defendant may be prosecuted in any district where an overt act in furtherance of a conspiracy was taken. *United States v. Rommy*, 506 F.3d 108, 119-20 (2d Cir. 2007).

The overt act need not be taken by the defendant on trial; an overt act by a co-conspirator or even an innocent third party is sufficient to confer venue, provided that it is "reasonably foreseeable to [the defendant] that an overt act in furtherance of the conspiracy would be taken in the Southern District of New York." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 72 (2d Cir. 2018). For example, the Second Circuit has explained, in the context of an IEEPA conspiracy, that venue was proper where, among other things, "an out-of-district defendant causes an overt act to be committed by an innocent third-party within the district of venue." *United States v. Abdullaev*, 761 F. App'x 78, 84-85 (2d Cir. 2019) (citing *Svoboda*, 347 F.3d at 483–84 (finding venue proper

17

where the defendant had notice that his trades were being executed by a broker in the Southern District of New York)); *United States v. Kim*, 246 F.3d 186, 192–93 (2d Cir. 2001) (finding venue proper where the defendant "caused communications to be transmitted into and out of the Southern District when he approved fraudulent invoices knowing that [the victim] paid its vendors from New York banks"); *United States v. Odunaike*, 273 F. App'x 58, 60 (2d Cir. 2008) (explaining that the phrase "in a district where the defendant intentionally or knowingly causes an act in furtherance of the charged offense" refers to "actions taken by third parties who are not part of the conspiracy, but whose actions furthered the aims of the conspiracy").

As a general matter, a phone call or communication with a person—whether a co-conspirator or not—in the district of venue that facilitates the object of the conspiracy is sufficient to establish venue. *United States v. Kirk Tang Yuk*, 885 F.3d 57, 71 (2d Cir. 2018) ("Our prior decisions leave no room for doubt that, in the context of a conspiracy, phone calls from one district to another by themselves can establish venue in either district as long as the calls further the conspiracy."); *United States v. Lange*, 834 F.3d 58, 70 (2d Cir. 2016) ("[V]enue lies both in the district where a telephonic communication in furtherance of a crime was made and where it was received."); *Naranjo*, 14 F.3d at 147 ("[P]hone calls from one district into another can establish venue in the latter district so long as they further the ends of the conspiracy."); *United States v. Russell*, No. 09 Cr. 968 (DLI), 2014 WL 2558761, at *6–7 (E.D.N.Y. June 5, 2014) (emails), *aff'd in relevant part, rev'd in part sub nom. Lange*, 834 F.3d 58. Likewise, venue is proper in a district where a financial transaction in furtherance of the conspiracy occurred at least in part, *see, e.g.*, *United States v. Ohle*, 441 F. App'x 798, 802 (2d Cir. 2011) (wire transfers through financial institutions in district), or where electronic information was made available and was accessed in

18

furtherance of the conspiracy, *see, e.g.*, *United States v. Levis*, 488 F. App'x 481, 485 (2d Cir. 2012) (report published on SEC website that was accessed by person in the district); *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008) (publication on website accessible to subscribers in the district);. Moreover, the Second Circuit has construed receipt of an electronic communication to include acts as simple as a non-conspirator accessing a chatroom. *See United States v. Rowe*, 414 F.3d 271, 279 (2d Cir. 2005) (finding venue proper when "it [was] clear that the chat room … in fact was entered in this district").

As the Second Circuit has "frequently observed, the venue requirement, despite its constitutional pedigree, is not an element of a crime so as to require proof beyond a reasonable doubt; rather, venue need be proved only by a preponderance of the evidence." *Rommy*, 506 F.3d at 119 (quotation marks omitted).

### B. Discussion

The evidence of venue was plainly sufficient as to each charged count in the Indictment. With respect to Count One, charging the defendant with participating in a conspiracy to commit money laundering from in or about September 2020 through August 8, 2022, the evidence of venue included: (i) the defendant's communications in or about December 2021 with Joseph Evans, a Manhattan-based attorney who represented BitMart after it was victimized by a hack where the proceeds were laundered using Tornado Cash; (ii) the defendant's payments on behalf of Tornado Cash to Infura for its blockchain node service, which went to Infura's Manhattan-based bank account between approximately October 2020 and February 2022; (iii) the defendant's payment for and hosting of the Tornado Cash website, which provided the primary access point to Tornado Cash for its users, and which he purposely made available to Tornado Cash users in this District

19

and was in fact accessed and used by at least one customer located in Manhattan in or about July 2022; and (iv) the defendant's communications with one of the principal investors in Tornado Cash, who was in Manhattan when these communications took place, between approximately February and July 2022.

With respect to Count Two, conspiracy to operate an unlicensed money transmitting business, all of this same evidence provides valid bases for venue apart from the December 2021 communication with BitMart's attorney which predated the start of the charged conspiracy in or about February 2022. With respect to Count Three, conspiracy to violate sanctions, which began in or about April 2022, venue is predicated on certain communications with Tornado Cash's investors, as discussed further below.

### i.     Communications with BitMart's Attorney

The first basis for venue—specific to Count One of the Indictment—is the defendant's December 2021 communications with Joseph Evans, an attorney for the cryptocurrency exchange BitMart. In or about December 2021, BitMart was the victim of a successful hacking incident, which resulted in the theft of more than $120 million. (GX 3002-51). In the aftermath of the hack, Mr. Evans represented BitMart in an effort to trace and recover the stolen funds. (Tr. 135). Mr. Evans contacted the defendant and Tornado Cash's other founders by email and by Telegram message, notifying the defendant that funds from the hack were being laundered through Tornado Cash, and requesting assistance. (GX 1005). The defendant responded by email the next day, falsely stating that his company was "unable to assist with respect to any issues relating to the Tornado Cash protocol" because "it is a decentralized software protocol that no one entity can control." (GX 1011). Also that day, Mr. Evans received a Telegram response—on which the

20

defendant was copied—from Roman Semenov, also claiming that they had no ability to take any action with regard to the Tornado Cash protocol. (GX 1006).

Mr. Evans was in fact in Manhattan when he sent and received these messages (Tr. 147), and this was foreseeable to the defendant, as Mr. Evans's email signature contained a Manhattan address, (GX 1009).

In his motion, the defendant does not contest that the messages that he and his co-founder sent to Mr. Evans constituted overt acts that foreseeably occurred in the District. Instead, the defendant asserts that these communications were not in furtherance of the conspiracy, relying entirely on defense-friendly inferences about the evidence, in contravention of the correct legal standard. As long as a reasonable jury could draw the inference that these communications furthered the conspiracy, any factual dispute resolves in the Government's favor. *Raniere*, 55 F.4th at 364. And based on the trial record, it was eminently reasonable for the jury to reject Storm's misleading disclaimer.

First, the defendant argues that his statements to Mr. Evans, including the claim that his "company does not have any ability to affect or change or take any action with respect to the Tornado Cash protocol," (GX 1011), were not in furtherance of the conspiracy because it was "factually true." (Mot. 16). The evidence, however, was overwhelmingly to the contrary. The jury heard detailed evidence about changes made by the defendant and his co-conspirators to the Tornado Cash protocol. This included the testimony from the Government's expert witness, and accompanying blockchain records, which identified 250 changes to the UI that were made by the defendant and his co-conspirators during the charged time period, (Tr. 1064), as well as two much more significant overhauls to the UI, the smart contracts, and the relayer network that the founders

implemented in December 2020 and February 2022. (Tr. 1080-81, 1145-46). And the jury saw the defendant's own messages with his co-founders, where they openly admitted to each other that their professed lack of control was false. (*See, e.g.*, GX 2059-2-T (Semenov message to Storm and Pertsev: "Like, so we say that we have immutable contracts and that's it, no one can stop it, no matter what you do there, but it turns out that no, it is possible to stop it, as long as the governance makes the right decision."); GX 2060-T (Storm message to Semenov and Pertsev: "So show me a defi project that has true decentralization, Roma. And let's take a look at how many projects have centralized potential points like ours.")).

The defendant's argument relies almost exclusively on the immutability of the pools, which formed merely *one* part of Tornado Cash. (Mot. 16-17). But the evidence at trial was more than sufficient for the jury to conclude that references to the "protocol" encompassed not just the pools, but all the interlocking parts of Tornado Cash, including the UI, relayer network, smart contracts, and the router, and that the defendant and his co-conspirators regularly affected, changed, and took actions with respect to these parts of the protocol, contrary to his denials to Mr. Evans. For instance, Mr. Werlau provided expert testimony that Tornado Cash comprised numerous parts that worked together to provide the money transmitting service and described in detail various changes that the defendant made to many of those parts over the course of the charged time period. (Tr. 1047-84, 1143-56). And in private messages between the defendant and his co-conspirators, they acknowledged that "the protocol seems immutable, but everyone must use the proxy" (another term for the router), and that this meant that they could "t[ake] back power" by releasing a new router. (GX 2059-1-T). That private message is directly contrary to the representations about the protocol that the defendant and Semenov made to Mr. Evans.

In fact, even the defendant's own code expert repeatedly testified that the defendant and others were able to make changes to what he characterized as the Tornado Cash "protocol," thus necessarily acknowledging that the protocol was not merely the immutable pools. (*E.g.*, Tr. 1780 (Edman testifying about "the December 2020 governance changes to the Tornado Cash protocol"); Tr. 1788 (Edman explaining that when a governance proposal was passed, "the protocol would be modified")).[2] As described above, the defendant and his co-conspirators in fact had the ability to implement changes outside the governance process by releasing a new router, and they also had the ability to exercise complete control over such governance proposals, so Dr. Edman's admissions further established that the defendant and his co-conspirators effectively controlled major aspects of the "protocol."

Given that the testimony of the Government's expert, the defendant's expert, and the defendant's own internal messages and conduct all revealed that changes to the Tornado Cash protocol were both feasible and frequently implemented, a rational jury certainly could have concluded that the defendant and his co-conspirator's statements to Mr. Evans that they were "unable" to take any action regarding the protocol were false. Indeed, it is hard to see how a rational jury could conclude otherwise.

Not only were the defendant's statements to Mr. Evans false, but they were also calculated to facilitate the ongoing operation of Tornado Cash as a money laundering enterprise. The defendant's decision to specifically mislead a crime victim about avenues for recovery in effect

---

[2] Moreover, Mr. Werlau's testimony established that the defendant could have provided victims with precisely the type of information Mr. Evans was requesting. (GX 1005) (requesting various information about the transactions involving BitMart's hacked funds); *see* Tr. 1160 (Werlau expert testimony explaining that Tornado Cash could have provided such information to victims).

discouraged that victim from making further requests or attempts to trace the stolen funds through Tornado Cash. In other words, by lying about his control and Tornado Cash's capabilities, Storm shielded Tornado Cash—and the criminals who used it—from scrutiny by victims, law enforcement, or regulators. (*See* Tr. 162 (Evans testimony that BitMart believed the defendant's response)). Incredibly, the defendant actually quotes the testimony of Mr. Evans in his own motion as apparent proof of the truth of Storm's statements. (Mot. 17). To the contrary, that Mr. Evans accepted Storm's misleading cover story as true is highly inculpatory evidence that the defendant successfully dissuaded a hacking victim from pursuing any remedies by misleadingly representing that the defendant was powerless to help trace those funds.

There was also abundant evidence from which the jury could infer that the cover story relayed to Mr. Evans manifested a long-running intentional effort by the defendant and others to avoid law enforcement scrutiny that would have frustrated Tornado Cash's ongoing money laundering. The defendant's "lack-of-control" verbiage was a scripted response for whenever "someone asks about hacks." (GX 2320). In connection with those talking points, the defendant and his co-founders had repeatedly expressed concern that media coverage of the use of similar cryptocurrency mixers for money laundering purposes would cause law enforcement to start "messing with" them. (GX 2043-T). The defendant's co-founder, Semenov, specifically warned the defendant that, if it became known that they in fact controlled Tornado Cash, "the FBI could send some requests regarding any trouble or how fucking stolen funds are kept." (GX 2059-2-T). And, when they discussed especially highly publicized money laundering incidents, such as the Ronin Hack and their response to it, they counseled each other to be careful about "law enforcement" reading their chats because law enforcement could "use them against us later." (GX

24

2062-T). Taken on the whole, the evidence amply supports a reasonable inference that the defendant and his co-conspirators, knowing that they were engaged in large-scale money laundering, deliberately misled a Manhattan-based attorney about their degree of control over Tornado Cash to forestall interventions that might interfere with their lucrative criminal operation. That alone is sufficient for venue on Count One.

### ii.    Payments to Infura

A second basis for venue for Count One, which also supports venue for Count Two, is the defendant's payments to Infura on behalf of Tornado Cash. Between in or about October 2020 through February 2022, the defendant made a number of payments to Infura's Manhattan-based bank account. Infura is a blockchain services company that provided blockchain node services for Tornado Cash to handle the large volume of traffic that Tornado Cash required to function. E.G. Galano, Infura's head of engineering, testified that in light of Tornado Cash's high blockchain traffic needs, payment for Infura's service prevented a situation where the "application might stop functioning," that is, the paid service prevented Tornado Cash from suffering "an outage for their users." (Tr. 735). Banking records introduced at trial showed that the defendant personally made these payments using a debit card in his name that drew on one of the Peppersec accounts. (GX 924). In February 2022, the defendant asked Infura for the option to pay in cryptocurrency, (GX 803 at 8), and Infura prepared an invoice for March 2022 that added information for paying in either crypto or fiat currency, (GX 851). That invoice, both on its own and coupled with Tornado Cash's banking records from earlier months, shows that the fiat payments the defendant had been making were deposited into Infura's bank account at a JPMorgan Chase bank branch in Manhattan. (GX 851; 3113, 3114, 3115, 3116, 3117, 3118, 3119, 3120).

25

All of these payments support venue for Count One. And at least the February 2022 payment supports venue for Count Two. Although the relayer registry was not deployed to the blockchain until later in February 2022, there was clear evidence that the conspiracy to implement the relayer registry and connect the fees earned by Tornado Cash to the value of the TORN tokens held by the founders was well underway by early February 2022, when the defendant made a payment to Infura's Manhattan-based bank account. (GX 2129-T at 3 (the defendant instructing his employees to continue their work on relayer registry on February 9, 2022); *see also* GX 2210 (the defendant instructing another employee to work on relayer registry in November 2021)).

The defendant's arguments against using the Infura payments as a basis for venue simply dispute the straightforward inferences described above, ignoring the legal requirement that the Court must "draw[] every reasonable inference in support of the jury's verdict" as to venue. *Kirk Tang Yuk*, 885 F.3d at 71; *see id.* at 73 n.4 (noting that a jury is permitted to "use logic and reason in drawing inferences from circumstantial evidence" without speculating) (quoting *United States v. Gleason*, 616 F.2d 2, 13-15 (2d Cir. 1979)). Specifically, the defendant's contention that pre-March 2022 receipts did not list Infura's Manhattan-based bank account are wholly unpersuasive: a reasonable jury could certainly draw the inference that the Infura bank account listed on the March 2022 invoices was the same bank account accepting payments in prior months.[3]  And the evidence also established that it was foreseeable to the defendant even prior to March 2022 that he was making payments that went to this District, as the bank statements he received for the

---

[3] This is particularly true given the context: the invoice was revised in response to a request for *crypto* payment information; there is nothing in the record that suggests Infura (or the defendant) sought to make any changes with regard to payments made by *fiat.*

Peppersec account identified these Infura payments as going to a recipient in "NY" with a phone number with a New York City-based 347 area code. (GX 3113, 3114, 3115, 3116, 3117, 3118, 3119, 3120).[4] Further, there was evidence from which the jury could conclude that these payments were an essential part of the operation of Tornado Cash, and thus necessary to further the ongoing money laundering conspiracy that the defendant was perpetrating through the operation of the Tornado Cash service. In addition to E.G. Galano's testimony that Infura services were needed to keep Tornado Cash functioning, (Tr. 735), the defendant himself said the same in contemporaneous messages, (GX 803 at 4 (defendant complaining that Tornado Cash "customers suffered today due to infura outage")). Thus, the defendant's arguments that these payments did not further the charged conspiracies or foreseeably involve the District are meritless.

The defendant's final argument is that the Infura payments nonetheless fail the "substantial contacts" test. (Mot. 22-23). That argument is foreclosed by Second Circuit precedent, which holds that "[w]hen an overt act in furtherance of a criminal conspiracy has been committed in the district, … this 'supplemental inquiry' has no relevance." *Kirk Tang Yuk*, 885 F.3d at 70. In other words, proof that these payments were in furtherance of the charged conspiracy is sufficient to prove venue, because such acts in the District establish that the defendant "necessarily has sufficient 'substantial contacts' to justify a finding of venue." *Id.*

And even if the "substantial contacts" inquiry had some relevance in a conspiracy case

---

[4] As the Second Circuit has recognized, a jury may reasonably infer that a reference to "New York" makes it foreseeable to a defendant—even a defendant located in another part of the country—that the reference includes the Southern District of New York. *Kirk Tang Yuk*, 885 F.3d at 73 n.4. That is especially so with respect to financial transactions, as the Southern District of New York is widely recognized by the public as having a prominent banking and financial industry.

after *Kirk Tang Yuk*, the defendant has not even attempted to show why the "substantial contacts" test would not support venue in this case. A court should only conduct a substantial contacts inquiry "if the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of the trial." *United States v. Rutigliano*, 790 F.3d 389, 399 (2d Cir. 2015). Aside from a one-line statement that the district is a "far-flung venue" from his home (a fact that applies to many defendants in this District, including many far less financially stable than the defendant), (Mot. 22), the defendant has not identified any burden on him or prejudice to him by having been tried in Manhattan. Those are essential elements of a "substantial contacts" inquiry, and the defendant has not even attempted to make the requisite showing. *See Rowe*, 414 F.3d at 280 (rejecting defendant's "substantial contacts" argument where he "offered no evidence that New York juries disfavor the conduct at issue any more than Kentucky juries, nor did he demonstrate that trial in New York would—or did—impose an undue burden on him").

### iii.    Operation of the Tornado Cash Website

Another basis for venue proven at trial, relevant to Counts One and Two, was the defendant's payment for and operation of the Tornado Cash website, a critical part of the Tornado Cash business, which was accessible to, and used by, Tornado Cash customers in the District. Nearly every Tornado Cash user called as a witness at trial testified that they accessed Tornado Cash through the website, which connected users to the UI developed by Storm and his co-conspirators.[5] (Tr. 222 (Bram); Tr. 318-22 (Llacuna); Tr. 898-99 (Ahmed); Tr. 1571 (Van Loon)).

_____

[5] The only two Tornado Cash users who did not so testify, Messrs. Almeida and Malekan, were

And Shakeeb Ahmed specifically testified that he accessed the website from his apartment in Manhattan in or about July of 2022. (Tr. 898). The defendant paid to register the website throughout the charged time period (Tr. 1051-54; GX 261, 275), and he and his co-conspirators paid to host the contents of the website, (Tr. 1054-55, GX 602). The defendant also exercised control over the contents of the website to ensure it was providing reliable access to Tornado Cash's UI. (Tr. 865-66).

As courts have routinely recognized, maintaining a website—or even simply publishing material that the defendant knows will be available on a website—that is in fact accessed by a user in a specific district is a sufficient basis for venue if the operation of the website furthers the conspiracy. In *Rowe*, for example the Second Circuit held that venue was proper for charges alleging that the defendant advertised child pornography based on an internet posting that was accessed from this District, even though the website was set up elsewhere. 414 F.3d at 277-80. The Circuit explained that it was irrelevant that the defendant "did not intentionally transact business with a New Yorker … [because the defendant] must have known or contemplated that the advertisement would be transmitted … to anyone the whole world over." *Id.* at 279. The same is true here. *See also*, *e.g.*, *United States v. Levis*, 488 F. App'x 481, 485 (2d Cir. 2012) (affirming wire fraud conviction where "[i]t was reasonably foreseeable that Doral's 10-K, which is available on the internet through the Securities and Exchange Commission's website, would be accessed by someone in the Southern District of New York," and the defendant knew there was a New York-based analyst who would review the report); *Royer*, 549 F.3d at 894-95 (the defendant ran a

---

not specifically asked how they accessed the service. (*See generally* Tr. 1938-44 (Almeida); Tr. 2016-22 (Malekan)).

29

subscriber-only website that purported to be a research tool, there were 300 subscribers, seven of whom resided in the [relevant district] and, "at a minimum, the jury could infer by a preponderance that the subscribers in the [district] received information about these stocks from Elgindy"); *United States v. Thomas*, 74 F.3d 701, 705 (6th Cir. 1996)[6] (affirming a couple's conviction in Tennessee for operating an electronic bulletin board from California from which paying subscribers could download obscene images where a federal postal inspector in the Western District of Tennessee subscribed to the bulletin board and downloaded the obscene images).

The defendant's arguments against this basis for venue suffer from many of the same flaws as his other venue arguments, which—despite Rule 29's clear and exacting standard—nonetheless rely on improperly drawing inferences in the defendant's favor and ignoring binding precedent. First, he asserts that he did not "cause" Mr. Ahmed to use the Tornado Cash website in this District. (Mot. 24). But that misstates the nature of the act in furtherance of the conspiracy, which is the defendant's operation and maintenance of the website which was made available to users in the District, and which was actually used by someone in the District. Under similar circumstances, the Second Circuit has rejected analogous arguments made by defendants that they did not "cause" third parties to access material they placed on the internet. In *Rowe*, for example, the defendant was charged with advertising child pornography, which was seen by a person in New York, and the defendant argued that he "did not intentionally transact business with a New Yorker." 414 F.3d at 279. The Second Circuit rejected that argument, noting that the act in furtherance of the charged crime was the defendant's publication on the internet, and recognizing that "venue is proper in any

---

[6] The Second Circuit cited *Thomas* in coming to a similar conclusion. *Rowe*, 414 F.3d at 279.

district 'through which force propelled by an offender operates.'" *Id.* at 278-79 (quoting *United States v. Johnson*, 323 U.S. 273, 275 (1944)); *see also Levis*, 488 F. App'x at 485 ("When the case involves publication on the internet, venue is proper in any district where it is reasonably foreseeable that the material will be accessed.").

The defendant's next argument is that Mr. Ahmed's use of Tornado Cash did not *materially* further the conspiracy because the cryptocurrency he deposited into Tornado Cash was left in the pools for a relatively brief period. (Mot. 24 (citing *Royer*, 549 F.3d at 896)). A rational jury, however, could easily conclude otherwise. There was abundant evidence of the importance of increasing the number of deposits and withdrawals into the Tornado Cash pools via deposits from users including Mr. Ahmed and others like him to make the pools more effective for concealment purposes. (*E.g.*, Tr. 224, 901-02, 1161). The jury could thus reasonably conclude that making Tornado Cash widely accessible, and in particular accessible in the largest city in the United States, furthered Tornado Cash's money laundering activities by increasing the size of the pools. Moreover, the defendant's meritless argument about the degree to which Mr. Ahmed's use of the website furthered the concealment of criminal proceeds only addresses the propriety of venue on Count One. As to Count Two, where concealment is not an element and venue is proper wherever the defendant operated a part of the money transmitting business, there is no question that making the business available to users in New York was in furtherance of the conspiracy.

In making this argument, the defendant also misreads *Royer* by concluding that venue requires "material[]" furtherance of the conspiracy. The Second Circuit found that to "materially" advance a conspiracy, there simply must be a relationship between the acts in the District and the object of the conspiracy; the Court did not find, as the defendant implies, that venue post-*Royer*

31

requires a showing of the particular degree to which an act actually furthered the conspiracy. *Id.* at 896. Thus, venue was sufficient in *Royer* based on proof that a handful of subscribers out of hundreds were located in the District, and thus that the jury could have concluded that at least one such subscriber had seen the information on the website, without any further inquiry into the degree to which access by any of these particular subscribers was "material" to the charged crime.

The defendant further argues, with respect to Count Two, that Mr. Ahmed's use of Tornado Cash could not have furthered the conspiracy to run an unlicensed money transmitting business because he did not pay a fee, reiterating his meritless argument, which the jury rejected, that Tornado Cash was not a business because the fees paid by users were paid to relayers rather than directly to Tornado Cash. (Mot. 24-25). But as detailed below with respect to Count Two, the defendant designed Tornado Cash so he and other TORN holders would profit from relayer fees, so a customer in Manhattan who did in fact pay those relayer fees contributed to Tornado Cash's profits. (Tr. 901 (Ahmed testimony about paying relayer fees)).

In passing, the defendant makes a perfunctory assertion that Mr. Ahmed's use of Tornado Cash was not "foreseeable" to him (Mot. 23), but he fails to develop that argument in any way and has therefore waived it. *United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013). In any event, courts have regularly recognized that when a defendant knowingly makes a website available to customers world-wide, it is reasonably foreseeable that it may be used in the Southern District of New York, the largest city and largest market in the United States. *See, e.g.*, *United States v. Allamon*, No. 04 Cr. 1231 (JSR), 2005 WL 2542905, at *3 (S.D.N.Y. Oct. 11, 2005) (concluding that "the defendants 'must have known or contemplated that [their website] would be transmitted … to anyone the whole world over'") (quoting *Rowe*, 414 F.3d at 279 (alterations in *Allamon*)).

This is especially so for a business like Tornado Cash, which offered cryptocurrency transferring services and was thus of specific value to users engaged in trading and other financial activities, which tend to be disproportionately centered in New York.

### iv.    Communications with a New York-Based Investor

The fourth ground for venue, which applies to all three charged counts, is the defendant's communications with Tom Schmidt, one of the two partners at the venture capital fund Dragonfly Capital ("Dragonfly") with primary responsibility for managing the fund's investment in Tornado Cash. Schmidt, who lived in Manhattan in 2022, and the other Dragonfly principal, Haseeb Qureshi, participated in a group chat with the three Tornado Cash founders in which they routinely discussed aspects of Tornado Cash's business. The following messages admitted at trial occurred on dates on which Schmidt was proven to be in Manhattan based on cellphone records, credit card records, or both:

- On March 15, 2022, Schmidt sent a message to the Tornado Cash founders discussing the possibility of a joint project using the Tornado Cash relayer network along with another crypto application called sismo.io. Semenov responded to the message on March 18, 2022, noting that the team had discussed doing a "very similar project." (GX 2245 at 3).

- On April 1, 2022, the defendant sent a message to Schmidt and Qureshi asking whether an email he had received from Dragonfly's auditor was "legit." Schmidt replied that the auditor had sent the email to "all of our portfolio companies," and the defendant then noted that the same auditor had reached out on behalf of another venture fund. (GX 2245 at 4-5). Shortly thereafter, the defendant told Schmidt that he was in San Francisco and asked whether any of the Dragonfly people were in San Francisco, to which Schmidt responded "i'm in ny." (*Id.* at 5-7).

- On April 6, 2022, the defendant sent Schmidt and Qureshi a link to a proposal for Tornado Cash and asked for help rallying support for the proposal among TORN holders. Schmidt indicated that he would do so. (GX 2245 at 10).

- Between May 2 and 4, 2022, the defendant sent several messages to Schmidt and Qureshi seeking their opinion on a new version of Tornado Cash that would offer "privacy for blockchain but with full compliance." (GX 1372 at 2). Qureshi

responded that he was "not a fan of this," because the "market need seems quite thin." (*Id.*) The defendant then queried whether Dragonfly or its principals ever used Tornado Cash, and Qureshi and he discussed the "use case" for a new version of the service with compliance features. (*Id.*).

- On June 9, 2022, the defendant alerted Schmidt and Qureshi that Tornado Cash was "running low on funds," and asked them for "ideas" on funding so that Tornado Cash could "stay afloat." (GX 2247 at 3). Schmidt responded with an offer to chat, and then the defendant and Schmidt participated in a Zoom call the following day, June 10, 2022. (*Id.* at 4-5).

All of these communications took place within the time frame of the conspiracies charged in Counts One and Two, and the last two communications took place during the sanctions violation conspiracy charged in Count Three. The jury could reasonably conclude that these communications, in which the defendant discussed with his primary investors potential new ventures, business proposals, audits, potential changes to Tornado Cash, and the need to raise more funding, were in furtherance of the ongoing operation of Tornado Cash, and thus, in furtherance of the ongoing conspiracy to commit money laundering, unlicensed money transmitting, and sanctions violations through Tornado Cash.

The defendant's arguments on this score are totally untethered to the Rule 29 standard, under which he would have to establish that no reasonable juror could have concluded that any of these chats was in furtherance of the charged conspiracies. For example, with respect to the March 15-18 chats, the defendant makes the bizarre assertion that the conversation "in no way relates to [*sic*] operation of Tornado Cash," (Mot. 26), despite the fact that Schmidt specifically couched the conversation as a potential opportunity to link "Tornado's relayer network" to another crypto enterprise. (GX 2245). The defendant's discussion with his investors of new uses of Tornado Cash's existing business relates directly to promoting Tornado Cash—the cornerstone of his conspiracy to commit money laundering and unlicensed money transmitting.

The defendant's arguments with respect to the other communications are even weaker. For the April 1 conversation, the defendant again asserts that the message was not related to Tornado Cash, (Mot. 26), which is flatly contrary to the plain face of the messages. The defendant initiated the conversation by asking Schmidt about a communication he had received from Dragonfly's auditor, and Schmidt responded by stating, in substance, that this communication had gone to all of Dragonfly's "portfolio companies," of which Tornado Cash was one. Moreover, the defendant then alerted Schmidt to the fact that another venture fund had admonished the auditor by noting that the investment in Tornado Cash was meant to be anonymous. (GX 2245). Again, these are precisely the type of communications that a business executive would have with his investor regarding an ongoing operational issue, such as outreach from an auditor, and thus relate to the ongoing operation of Tornado Cash, which was itself a necessary component of the money laundering and money transmitting conspiracies. Moreover, the defendant's communication to one of his investors that another Tornado Cash investor was seeking to conceal its investment in Tornado Cash is specifically tied to his desire to limit public awareness of the degree to which Tornado Cash was an ordinary for-profit business, and his ongoing efforts to mislead the public and prevent scrutiny of his ongoing money laundering and illegal money transmitting activities.

The same goes for the April 6 message, which the defendant again initiated, asking Schmidt to drum up support among TORN holders for a Tornado Cash proposal. This specific issue was the subject of trial testimony, as the defendant's own expert acknowledged that the defendant and his co-founders had more than enough TORN tokens to dictate the outcome of votes on proposals at this time. (Tr. 2124 (Hurder)). Despite having the ability to effectively control the process by virtue of his TORN holdings, these messages to Schmidt prove that the defendant was attempting

35

to get proposals passed through the votes of other TORN holders. A jury could reasonably infer that this attempt to rally proposal votes was not just part of the normal operations of Tornado Cash—which would be, on its own, sufficient for the message to form a basis for venue on Counts One and Two—but was also specifically part of the defendant's overall attempt to create a misleading public impression that he had less control over Tornado Cash than he actually did. This was a key part of his false "decentralization" narrative that aimed to forestall attention from law enforcement and others, thus furthering the conspiracy.

The May 2022 messages with Schmidt and Qureshi, which support venue for Count Three in addition to Counts One and Two, are similar. In those, the defendant discusses the cost-benefit of bringing Tornado Cash to "full compliance," rather than continuing its illegal operations by knowingly and intentionally facilitating money laundering and sanctions evasion. (GX 1372). As with his other arguments, the defendant simply insists on his own interpretation of the messages, while ignoring the other obvious inferences that the jury could have drawn. The May 2022 messages were sent on the heels of the defendant learning that the sanctioned North Korean perpetrators of the Ronin hack were laundering proceeds through Tornado Cash and during a time when the Ronin hackers alone were providing well over 50% of all Tornado Cash volume. The defendant also sent these private messages discussing whether to implement "compliance" shortly after he publicly claimed in a Tweet that Tornado Cash was acting in "compliance" with sanctions, which was evidence that he knew his public statements about Tornado Cash were false.

Against that backdrop, the jury could certainly have inferred that when the defendant and his co-founders were discussing with Schmidt whether to implement "full compliance," (GX 1372), at least one of their concerns was whether doing so would allow them to remain profitable

in light of the volume of their business attributable to North Korean sanctions violations and money laundering. Or, to put it another way, the defendant was reaching out to his primary investors and discussing whether to continue to engage in the ongoing criminal conspiracy, or stop. It is also irrelevant whether, in referring to his proposal as a "fork" of Tornado Cash, the defendant meant to refer to a new version of Tornado Cash or a newly branded mixer to replace Tornado Cash. Either way, these messages were in furtherance of a decision not to operate a "compliant mixer," but instead to continue to operate Tornado Cash, because Tornado Cash would not be profitable if it became a "compliant mixer." (*Id.*). A reasonably jury could therefore conclude that these messages constituted acts in furtherance of the conspiracy that occurred in this District.

That Schmidt received the May 2-4 messages in this District but did not respond is irrelevant. Government Exhibit 1372 indicates on its face that Schmidt was one of the recipients of the defendants' messages on these dates, and it is the defendant's act of sending the communication to someone in the District that is the proper basis for venue. *Kim,* 246 F.3d at 193 n.5 (observing that phone call "to or from" a district can establish venue in that district as to any member of conspiracy).

The final conversation, in June 2022, also functions as an independently valid basis for venue as to all three counts.[7] The defendant's conversations with Schmidt on June 9 and 10, 2022, were an attempt to keep Tornado Cash operating despite financing issues, as the original

---

[7] While the primary service to the sanctioned Lazarus Group was the Ronin Hack laundering that Tornado Cash conducted in April and May 2022, the jury was free to conclude that the defendant's agreement with his co-founders to continue to provide services to the Lazarus Group did not end, and that Tornado Cash remained available to provide services to the Lazarus Group through August 8, 2022. Indeed, the jury saw evidence that Tornado Cash continued to launder funds for these North Korean hackers from a different cyber exploit in June 2022. (DX 8790).

investment from Dragonfly began to run out. The defendant does not offer any serious argument to the contrary. Instead, he simply claims that there is no way of knowing "the substance" of the Zoom conversation that took place following the defendant's initial messages about Tornado Cash's need for funds, and thus that it was not in furtherance of the conspiracies. As with so many of his other arguments, the defendant's preferred reading is irrelevant. The conversation began when the defendant informed Schmidt that "t[ornado] c[ash] is running low on funds" and asking "What should we do to stay afloat?" In response, Schmidt set up the Zoom call to discuss. It does not take any great leaps of logic to draw the conclusion that they discussed exactly what they said they would—ideas to keep Tornado Cash afloat, which was plainly in furtherance of the operation of the Tornado Cash illegal money transmitting business and its ongoing money laundering and sanction violations.

Because each of these messages supports venue on its face, the defendant instead quibbles with the evidence that Schmidt was in fact in Manhattan when each of these communications took place. Some of his arguments border on the frivolous, as when he suggests that cellsite data placing Schmidt in Manhattan 20 minutes after they communicated is insufficient to support the jury's finding as to venue. (Mot. 27-28). Other defense arguments simply misconstrue the trial record, as when he suggests that Schmidt's credit card records showing purchases in both San Francisco and Manhattan in early May 2022 cannot show Schmidt's location. (Mot. 28-29). As FBI Special Agent William Lopez testified, the New York-related transactions on his statements could be tied to identifiable locations in Manhattan, and thus placed Schmidt in this District, while the other purchases were from online companies and did not indicate that Schmidt was in San Francisco. (Tr. 992-93). The defendant does not even acknowledge Special Agent Lopez's testimony, much

less offer a reason why the jury could not have credited it, or why this Court should disregard it.

Finally, the defendant argues that it was not reasonably foreseeable to him that Schmidt was in Manhattan during these conversations. That argument fails. Schmidt was no stranger to the defendant. The evidence established that Schmidt was living in Manhattan throughout this time period, (Tr. 981-82), that his cellphone pinged almost exclusively in Manhattan, (Tr. 1024), and that he had regular communications with the defendant. Those facts alone would permit the jury to draw the inference that the defendant actually knew or at least could reasonably have foreseen that a business and personal associate such as Schmidt was likely to be in Manhattan, where he resided, during at least some of their conversations, including based on the common-sense inference that a person can often identify information about the location of someone who they are talking to through a video-calling application like Zoom. On top of that, on April 1, 2022, Schmidt told the defendant he was in New York, meaning that the defendant had direct notice that Schmidt was both here during that conversation and reasonably likely to be here in general. (GX 2245). Collectively, these facts easily meet the legal standard. "Actual knowledge that an overt act was committed in the district of prosecution is not required []: venue will lie if a reasonable jury could find that it was 'more probable than not' that the defendant 'reasonably could have foreseen' that part of the offense would take place in the district of prosecution." *Kirk Tang Yuk*, 885 F.3d at 69-70.

In his argument, the defendant challenges his knowledge of Schmidt's presence in New York as to each individual conversation. But all that is required is that he could reasonably foresee that "actions in furtherance of the conspiracy would be taken" in the District, not that he specifically foresaw any *particular* action or conversation. *Id.* at 75. In *Kirk Tang Yuk*, for instance,

the Second Circuit recognized that, after a government informant told a defendant he was in New York, venue was proper as to that defendant because it was reasonably foreseeable that one of the other conspirators might communicate with that New York-based informant at some point in furtherance of the conspiracy. *Id.* Here, the foreseeability to the defendant was much stronger, because he himself continued to engage in conversations with Schmidt while on notice that it was reasonably likely that Schmidt would be in New York for at least some of these communications. *See United States v. Gross*, No. 15-CR-769 (AJN), 2017 WL 4685111, at *40 (S.D.N.Y. Oct. 18, 2017) ("Even if it was not reasonably foreseeable that any *one* of these emails would be sent from Manhattan, then, a reasonable jury could have concluded by a preponderance that it was reasonably foreseeable to Gross that, over the course of the bribery scheme and conspiracy, he would receive some essential e-mails from Murgio while Murgio was in this district."), *aff'd sub nom. United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019).

In sum, the defendant's venue arguments fail.   For all of the reasons discussed above, the jury could easily have reasonably concluded that acts in furtherance of the charged conspiracies occurred in this District and were reasonably foreseeable to the defendant.

## III.    The Jury Reasonably Found that the Defendant Conspired to Operate a Money Transmitting Business Involved in the Transmission of Funds Derived from a Criminal Offense and Used to Promote Criminal Activity in Violation of 18 U.S.C. Section 1960(b)(1)(C)

As described above, the facts proven at trial plainly proved each of the elements of Count Two. There was no serious question that the defendant, along with his two co-founder coconspirators, agreed to conduct, control, manage, supervise, and direct all or at least part of the Tornado Cash service. Moreover, Tornado Cash was plainly an enterprise that transferred funds on behalf of the public. Indeed, that was its only function—it moved cryptocurrency from one

40

location to another on the blockchain. And, as described above, the evidence was clear that the defendant knew Tornado Cash involved the transmission of criminal proceeds and funds used to promote criminal activity. Finally, the evidence was clear that Tornado Cash was an enterprise conducted for financial gain. Thus, the evidence was overwhelming as to each element of the object of the conspiracy charged in Count Two, and the jury reasonably concluded that the evidence at trial conclusively established each element of this count.

The defendant challenges the jury's findings on multiple grounds, none of which finds any support in legal precedent or in the facts proven at trial. Specifically, the defendant argues that the Government failed to prove: (1) the existence of a conspiracy to operate an unlicensed money transmission business; (2) the requisite intent to operate an unlicensed money transmission business; (3) the defendant's knowledge that Tornado Cash was a money transmission business; (4) the defendant's foreknowledge that any particular funds were criminal in nature at the time they were transmitted; (5) that Tornado Cash was a business within the meaning of Section 1960; (6) that Tornado Cash transferred funds at all; and (7) that the defendant and co-conspirators were not involved in money transmitting because Tornado Cash was noncustodial. Apart from the evidence adduced at trial, the defendant separately contends that his conviction is legally unfounded because Section 1960(b)(1)(C) applies only to money transmitting businesses registered with FinCEN. For the reasons that follow, each argument should be rejected.

## A. The Evidence Proved a Criminal Agreement to Operate an Unlicensed Money Transmission Business

The defendant's first argument on Count Two is the baseless assertion that the Government did not prove that he agreed with any of his criminal customers to operate Tornado Cash as an

unlicensed money transmission business. (Mot. 31-32). That argument is a red herring that the defendant has been advancing since the outset of this prosecution and bears little mention. The criminal agreement here—as the Government has explained many times—was among the Tornado Cash co-founders, and there was ample proof of that conspiracy supporting the jury's verdict, such as the co-founders' chats on Telegram, where they regularly discussed, among other things, Tornado Cash's development, hack proceeds being laundered through Tornado Cash, and how to evade detection by law enforcement.[8] (*See, e.g.,* GX 2004-T, 2006-T, 2007-T, 2037-T, 2040-T, 2044-T, 2047-T, 2050-T, 2055-T, 2058-T, 2062-T, 2063-T). On this score, the defendant's

---

[8] The defendant argues in passing that the Government neglected to mention in its jury addresses that the object of Count Two and the other charged conspiracies had to be criminal in nature. (Mot. at 32). Even if the defendant were correct, his argument would be immaterial, as counsel's arguments are neither evidence nor legal instruction. The Court's charge, to which the defendant did not object, was accurate. For the avoidance of doubt, the Government in fact argued repeatedly that the conspiracy required a criminal purpose. *See, e.g.,* Tr. 2312 ("I expect…that Judge Failla will instruct you that a conspiracy is just an agreement with an unlawful purpose between two or more people. As you can see here, the defendant is charged with conspiring with his co-founders to commit three different crimes.") (Government summation); Tr. 2313 ("What the government is saying and what the evidence at trial showed is that the defendant agreed with his Tornado Cash co-founders, Roman Semenov and Alexey Pertsev, to commit the charged crimes.") (Government summation); Tr. 2314 ("This is a conspiracy charge so the [Government] has to prove that the defendant agreed with the two Tornado Cash founders, two other Tornado Cash founders, to conduct those transactions. In other words, Count One is about hiding dirty money. If the defendant agreed with his co-conspirators to do that, he is guilty.") (Government summation); Tr. 2442 ("Here is the key point. The defendant and his co-conspirators knew how to block that criminal money. They talked about it. They were making a decision about how to run the business at a moment in time where they know it is a money laundering business. They've known about all these huge hacks, all the biggest days in Tornado Cash's history, and now they're trying to decide how to monetize the business. Are we going to monetize it with the dirty money or are we going to block the dirty money? And you know what they chose. They chose to do nothing to block the dirty money because the dirty money was where the volume was, that was where their opportunity to make profits was. They made a choice and they memorialized that choice in secret audio messages that they hoped you would never see so they could sell you on the cover story. But the cover story is just false.") (Government rebuttal).

argument is entirely predicated on the erroneous view that there could be no conspiracy because Tornado Cash was not "a 'business' at all, much less a money transmitting business." (Mot. at 32). For the many reasons detailed below, that argument is wrong.

The defendant's remaining arguments are equally flawed. The defendant argues that he at times expressed some misgivings that his best customers were large-scale hackers, (Mot. 32 (citing GX 2044-T)), and that he "implemented measures to prevent illicit usage," like the Chainalysis Oracle and the Compliance Tool. (Mot. 33). But neither of those points negates the proof of his intent to participate in a conspiracy to operate a money transmitting business with knowledge that it involved transmitting criminal proceeds. First, criminals frequently express "misgivings" about their wrongful conduct while continuing to engage in it. *Rosemond v. United States*, 572 U.S. 65, 79-80 (2014). But "[t]he law does not, nor should it, care whether he participates with a happy heart or a sense of foreboding." *Id.* If anything, a reasonable jury could have understood any misgivings of the defendant as powerful evidence of consciousness of guilt when he ignored those misgivings and persisted in his unlawful conduct. Second, the jury reasonably could have concluded that the defendant's various half-measures that he publicly claimed were to prevent criminals from using Tornado Cash were actually intended to give the impression of compliance with the law while not actually discouraging his best customers (large-scale hackers) from continuing to drive the volume on Tornado Cash and therefore the defendant's profits from it. Many illegal businesses take steps to appear legitimate. Thus, in the course of a criminal conspiracy, it is not uncommon for the conspirators to prepare documents that could reasonably be read either as exculpatory or as a "cover story," and it is for the jury to determine which of these inferences to draw from such materials. *United States v. Archer*, 977 F.3d 181, 190-91 (2d Cir.

2020). It is "not the province of the … court to reweigh the evidence in that regard." *Id.*

The defendant's competing interpretations of the evidence presented at trial are no basis to overturn the jury's verdict. Ultimately, "the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court." *United States v. Ho*, 984 F.3d 191, 199 (2d Cir. 2020). A reasonable jury could have rejected the defendant's proffered evidence that he had concerns about illegal activity, or even viewed it as evidence of the defendant's consciousness of guilt. The defendant's preferred inference is insufficient to grant a Rule 29 motion.

For example, with respect to the use of the Chainalysis Oracle, the jury heard unrebutted evidence that the defendant and his co-founders understood from the outset that it would be "easy to bypass" that tool, which the defendant himself admitted in his private messages with his co-conspirators, (GX 2047-T; *see also* GX 2006-T, 2063-T), which the Government's expert testified would have been apparent to someone with the defendant's level of knowledge of Tornado Cash, (Tr. 1189), and which the defendant's own expert admitted at trial was "easy" to circumvent, (Tr. 1828). Likewise, with respect to the Compliance Tool, the jury heard evidence that its use was, by design, completely at the customer's discretion. (Tr. 1910 (Edman testimony that the Compliance Tool was "completely optional for Tornado Cash users")).[9]

Any rational trier of fact could have, as the jury did, reject the defendant's interpretation of this evidence and find that it was either immaterial or incriminating. The Government's proof

---

[9] The defendant's motion also claims that he implemented "geo-blocking" features in the UI, (Mot. 33), and cites his own expert witnesses' testimony. At trial, those witnesses actually admitted that the claimed geo-blocking feature "would have had no effect" on the UI during the relevant time period. (Tr. 1915-16 (Edman); *see also* Tr. 2187 (Green acknowledging that the UI "couldn't geoblock")).

of a criminal agreement was sufficient to support the jury's finding that there was proof of a criminal conspiracy to operate an unlicensed money transmitting business.

### B. The Evidence at Trial Proved the Requisite *Mens Rea*

The defendant also attacks the Government's case under Count Two as amounting to an impermissible negligence theory of guilt. (Mot. at 34). Those arguments do not seriously address the Government's theory and the evidence at trial, which were focused primarily on affirmative acts that the defendant took to "conduct[], control[], manage[], supervise[], direct[], [and] own[] all or part of" the Tornado Cash service. 18 U.S.C. § 1960(a). While the Government introduced limited evidence regarding additional steps that the defendant could have taken, this was directly relevant to the defendant's state of mind and context for relevant communications in furtherance of the charge offenses.

> ### i. There Was Ample Evidence in the Record from which the Jury Could Have Reasonably Inferred that the Defendant Acted Willfully with Respect to Count Two

The record is overwhelmingly clear that the defendant acted willfully: he was aware that Tornado Cash was being used to transmit criminal proceeds, aware that transmitting those proceeds was unlawful, and nonetheless continued taking affirmative steps to continue Tornado Cash's money transmitting business, thereby knowingly facilitating the transmission of criminal proceeds.

First, there is no reasonable dispute that the defendant was notified on multiple occasions that proceeds of criminal hacks—both large and small—were regularly being transmitted through Tornado Cash, including in the period leading up to the implementation of the relayer registry in February 2022 and the period while the relayer registry was operating between February 2022 and

August 8, 2022. among other instances. (*See, e.g.,* GX 235, 243, 246-249, 256, 279, 553, 556, 562, 1005, 1011).

As a result, by the time of the Ronin Hack, the defendant and his co-conspirators were very much aware that criminals were using Tornado Cash to launder illicit funds. In fact, they expected it for big exploits like the Ronin Hack; so much so that when the hack was publicly announced on March 29, 2022, Semenov asked the defendant, "[w]hat will you do if it's loaded to us?" (GX2004-T). In another chat, Semenov referenced the hack and remarked "shit might seriously hit the fucking fan now." (Tr. 644-45; GX 2044-T). Despite this accurate expectation, they continued to operate the money transmitting business with full knowledge that it involved the transmission of these criminal proceeds.

The evidence that the defendant knew the business involved the ongoing transmission of criminal proceeds was overwhelming. For instance, on April 4, 2022, the defendant was notified by email that Tornado Cash was being used to transmit criminal proceeds from the Ronin Hack. On April 14, 2022, after OFAC sanctioned the wallet connected to the Ronin exploit, the defendant stated to his co-conspirators that "these hackers are using Tornado" and that "we are fucking done for." (GX 2047-T). In an effort to "*tell* everyone" that they were addressing the issue, the defendant and his co-conspirators implemented a tool that they claimed in public would "block" those criminal funds, but in private they described as a "meme" (GX 2006-T), and acknowledged that it was "easy to bypass." (G X2047-T). Over the ensuing weeks, the defendant continued to operate Tornado Cash, which transmitted an additional $351 million in funds stolen in the Ronin hack by North Korean hackers, confirming the defendant's understanding that the Chainalysis Oracle was indeed a phony measure that served only a public relations purpose.

46

Second, there was significant evidence presented at trial that Storm knew Tornado Cash's transmission of crime proceeds was unlawful. He told his Tornado Cash co-founders that sanctions violations could result in prison time and sent them links to Tweets describing them as accomplices to sanctions violations. (GX 2047-4). When Semenov expressed concern about law enforcement reading their Telegram messages, the defendant replied that he had "[c]leaned it up." (GX 2062-T). He Googled "are tornado cash criminals." (GX 209-22). And between June 2022 and August 2022, he used highly secretive and circuitous means to cash out his TORN tokens for millions of dollars. (Tr. 1270-78; GX 2055-T, 2058-T). In doing so, Storm counseled his co-conspirators to hide funds using "various offshores" and "real estate," (GX 2055-T), as well as "new wallets and new seed phrases" and by "[t]ransfer[ring] money to new addresses." (GX 2058-T). With that knowledge, the defendant and his co-founder co-conspirators continued to take steps to operate, maintain, and refine the Tornado Cash service, including by paying to host the website (GX 261), regularly updating the website and user interface (Tr. 1064), overseeing and paying payroll for a team of software developers to implement changes (GX 3007), promoting Tornado Cash (GX 2006-T, 2007-T), and paying for traffic services like Infura, (GX 814, 849, 858).

### ii. There Is No Legal Requirement That a Defendant Must Act With Secrecy To Conspire to Violate Section 1960

The defendant asserts that he could not have had criminal intent because he and his co-founders operated Tornado Cash out in the open, a proposition for which he cites not a single case. (Mot. at 35-36). Here, again, what the defendant is really asking the Court to do is to draw all inferences from the evidence in his favor, despite what Rule 29 commands. The defense made this argument in closing, (see, e.g., Tr. 2400 ("[T]his is not happening in some back alley somewhere.

They're not developing this under a rock. They're out in the open going to legitimate places saying this is what we do."), and the jury plainly and reasonably rejected it.[10]

Moreover, the defendant's argument ignores the ways in which he and his co-conspirators attempted to conceal material aspects about their operation of Tornado Cash, particularly the extent of their control of the Tornado Cash service, undermining their claims of transparency-as-innocence.

For example, in March 2021, the defendant instructed people associated with Tornado Cash that "[i]t's usually the best" "when someone asks about hacks" to respond with the cover story that Tornado Cash had no "ability to affect any change or take any action with respect to the Tornado Cash protocol – it is a decentralized software protocol that no one entity or actor can control." (GX 2320). In his private messages with his co-conspirators, however, the defendant told a different story, acknowledging that Tornado Cash did not have "true decentralization," but rather that it had "centralized potential points." (GX 2060-T). The trial evidence also included the crypto questionnaire that the defendant filled out in an effort to prevent Rho bank from closing Peppersec's bank account, in which the defendant made multiple misrepresentations about Peppersec's primary business, Tornado Cash. (GX 923). The defendant sent Rho that questionnaire on April 19, 2022, just five days after the sanctions on the Ronin hack wallet. (GX 919). The defendant also referenced "cleaning up" his Telegram chats in case law enforcement might read them. (GX 2062-T). And when cashing out his interest in Tornado Cash, the defendant secretly

---

[10] The defendant again recites the ineffectual half-measures he and his co-founders implemented to give the misleading *appearance* of legal compliance or qualms with the illegal use of Tornado Cash. (Mot. at 36). The Government has already detailed above many reasons why these arguments should be rejected and does not repeat them here.

used a Russian VPN to deposit his crypto into a Russian Binance account in someone else's name. (GX 2055-T).

In his motion, the defendant ignores almost all of this evidence, and instead fixates on one piece of the Government's case at trial as dispositive of a so-called "negligence" theory: evidence that the defendant and his co-conspirators could have changed the router smart contract to include a user registry, but did not do so. (Mot. 36-37. ("The government's entire theory of criminal intent was that Mr. Storm learned about the hacks and scams and should have taken affirmative steps to change the Tornado Cash UI to block bad actors from using it.")). That argument completely misreads the limited evidence on this issue that was presented at trial and the purpose for introducing that evidence.

To begin, the defendant's suggestion that the Government's entire case rested entirely or even largely on a theory of "inaction" simply cannot be squared with the trial record, which as discussed above, focused overwhelmingly on the defendant's affirmative conduct, decisions, and statements in operating Tornado Cash. Overall, this pattern of conduct was ample evidence of the defendant's criminal intent rising far beyond negligence. *See, e.g.*, *United States v. Whitehead*, 579 F. App'x 46, 47 (2d Cir. 2014) (a "jury may infer guilty intent from pattern of conduct"). Moreover, a defendant's decisions to continue to pursue a particular course of conduct (here, knowingly continuing to operate Tornado Cash in a form designed to attract and promote money laundering) instead of another (here, making available changes that would have prevented or discouraged such money laundering) is additional evidence of criminal intent. *Cf. Rosemond v. United States*, 572 U.S. 65, 78 n.9 (2014) ("In any criminal case, after all, the factfinder can draw inferences about a defendant's intent based on all the facts and circumstances of a crime's commission," including a

"failure to object or withdraw" after seeing a co-conspirator's use of a weapon); *United States v. Dupree*, No. 10 Cr. 627, 2012 WL 5333946, at *24 (E.D.N.Y. Oct. 26, 2012) (noting that a jury could infer from a defendant's "failure to disclose" a fraud that the defendant "knew that his conduct was unlawful and that he possessed the intent to continue" the criminal conduct), *aff'd*, 620 F. App'x 49 (2d Cir. 2015). Accordingly, evidence and argument about the defendant's decision not to make certain feasible changes to the Tornado Cash service, even when he very clearly knew that the service was transmitting criminal proceeds, does not advance a "negligence theory" or negate the other affirmative evidence of the defendant's intent; that proof is merely one additional piece of affirmative evidence that the jury could consider in assessing the defendant's intent to facilitate unlawful transactions—the evidence of which was overwhelming.

The proof as to the "user registry" issue—which took up just four pages of testimony in a weeks-long Government case (Tr. 1156-60)—was hardly the cornerstone of the Government's case. Rather, it was one of myriad facts from which the jury could conclude that the defendant acted with criminal intent. The Government does not contend that the defendant was legally obligated to adopt a user registry.   Instead, the Government argued, and the jury was entitled to weigh, that the defendant's decision not to implement this design feature was relevant to the defendant's criminal intent when, importantly, the evidence was clear that the defendant knew he was otherwise facilitating hundreds of millions of dollars in money laundering for criminal organizations involved in hacks.   This proof was also particularly relevant as context for the jury to consider the defendant's false statements—delivered to reporters, victims, and others—in which he claimed that he "couldn't" have done anything in response to the hackers using Tornado Cash. (Tr. 78). The jury could permissibly infer that the fact that the defendant determined not to take

available steps to prevent or discourage the transmission of crime proceeds at a time when he knew crime proceeds were being laundered through Tornado Cash and then lied about his purported lack of control were powerful proof of the defendant's criminal intent.  For this reason alone, the defendant's arguments on this front should be rejected in full.

During this brief portion of Mr. Werlau's trial testimony, he explained that a user registry, by which Tornado Cash could have combatted illegal money transmitting, would have been an obvious feature to implement. (Tr. 1156-60). Although the evidence presented at trial was more than sufficient to support the jury's verdict even without considering Mr. Werlau's testimony on this issue, that testimony provides a further basis on which the jury could have inferred that the defendant acted with the requisite criminal intent for the reasons set out above, and in particular because there is no serious question that the defendant understood that he was facilitating money laundering and the related transmission of criminal proceeds. The defendant's attacks on Mr. Werlau's suggestions as "utterly incompatible with a blockchain protocol, [that] would not have been effective, and would have fundamentally changed the nature and purpose of Tornado Cash," (Mot. 39), fall flat. Those are arguments made to the jury and rejected, and are not a proper basis for Rule 29 relief, where all inferences must be drawn in favor of the jury's verdict.

To begin, the defendant's argument that changing the router to include a user registry is incompatible with a blockchain protocol is belied by the record, which shows that the Tornado Cash developers installed a similar registry system for relayers in February 2022. The relayer registry did exactly what Mr. Werlau suggested was possible: it kept a database of relayers, checked that list of relayers to determine whether a relayer had staked the minimum amount of TORN, and if the relayer was short of the minimum amount, the relayer would be rejected. (Tr.

1155). It was thus not only technologically feasible to incorporate a user registry aimed at combatting the flow of illegal funds, but it would have been obvious in light of another similar feature that the defendant did incorporate. Thus, the defendant's failure to do so when he knew that criminals were laundering millions of dollars in crime proceeds through Tornado Cash and hiding money from hacks is circumstantial evidence of his intent.

The defendant relies on Dr. Edman's claims that a user registry would be ineffective and was not "commonly used in decentralized protocols," (Mot. 41-42), but the jury was not required to credit that testimony over Mr. Werlau's testimony, as the defendant now asks the Court to do. Dr. Edman's testimony was just presented as his bare say-so, without any apparent methodological basis. Additionally, unlike Mr. Werlau, Dr. Edman did not have any apparent experience in the actual development of web applications. And there was evidence that, contrary to Dr. Edman's unfounded conjecture, user registries were in fact used in the cryptocurrency industry during the relevant time period, as the witness from Infura testified that Infura employed a user registry and login system for its Ethereum node service. (Tr. 830-31).

The defendant separately argues that instituting a user registry like the one Mr. Werlau suggested "would have changed the very nature of the Tornado Cash protocol." (Mot. 40). That argument is wrong both legally and factually. As a legal matter, the "nature of the Tornado Cash protocol" or the defendant's personal ethos are not legal defenses. If the defendant knowingly operated a business (which, notably, he controlled) that violated the law, he had an obligation either to get out of the business or adapt it so it was no longer a criminal enterprise. Storm was not legally entitled to operate Tornado Cash in exactly the manner he desired, knowing that by doing so he was actively transmitting hundreds of millions of dollars in criminal proceeds, just as no

52

criminal is entitled to take actions that break the law.

Furthermore, as a factual matter, the defendant's claims are contradicted by the record. He argues that a user registry would have changed Tornado Cash to a "custodial service that held the keys to customer funds and maintained a database of user information that would require constant human intervention to keep updated," (Mot. 40), but that assertion is not supported by the evidence admitted at trial. The design change described by Mr. Werlau did not require that the developers (or anyone else) hold the private keys to customer funds. As Mr. Werlau explained, adding a user registry could be done while maintaining all the privacy features that the defendant claimed were important: the pools would remain immutable, the secret note process would remain the same, the protocol would remain non-custodial, and the privacy on the blockchain would continue. (*See* Tr. 1159 (requiring a user name and password would still allow the user to use Tornado Cash to send funds without revealing their transaction history publicly)). And to the extent that the immutable pools and secret note protected against hacks, that protection would continue. While the user registry would add additional permissions to the protocol, that was analogous to the permissions that already existed with the relayer and instance registries. (Tr. 1159-60).

The defendant also argues that a user registry described by Mr. Werlau would have been ineffectual. Ignoring direct trial testimony to the contrary, (*See* Tr. 905 (perpetrator of the Crema hack would not have used Tornado Cash if a username and password were required "[c]ause it's like leaving your calling card at the scene of the crime")), the defendant claims that the user registry would not preclude bad actors from using Tornado Cash because they could interact directly with the pools. (Mot. 42). As with his other factual arguments, it is predicated on misconstruing the record evidence. As established at trial, virtually no one accessed the Tornado Cash pools directly;

53

during the time period relevant to Count Two, 99 percent of all Tornado Cash transactions—and 100 percent of transactions in the 100 ETH pool—went through the UI and the router. (Tr. 1165-66). Bypassing the router and going directly to the pools would make those transactions "uniquely identifiable," which defeated the purpose of using Tornado Cash in the first place and was unlikely to be adopted by criminal actors, (Tr. 1167-68).

Moreover, the defendant and his co-conspirators were fully aware of this and used it to their advantage in implementing changes to make the business more profitable. (*See* GX 2059-1-T (Semenov notes in message to the defendant that "the protocol seems immutable, but everyone must use the proxy because if you bypass it, you could kind of lose anonymity because all of our users go through the proxy by default and if you bypass it, then, as it is, you, er, are kind of different from everyone"). Thus, the defendant's heavy reliance in his motion on the possibility that criminal users would go directly to the pools if a user registry were adopted was reasonably rejected by the jury. As the defendant's co-conspirator told him in a message in the midst of the conspiracy, for all practical purposes, "everyone must use the proxy," which gave the defendant and his co-conspirators effective control and the ability to implement any design changes to Tornado Cash that they chose. (*Id.*).

The jury reasonably found that the defendant willfully committed the crime.

### C. The Jury Reasonably Found that Tornado Cash Was a Money Transmitter of Criminal Proceeds, and that the Defendant Knew It

The defendant argues that the Government failed to prove he knew that Tornado Cash was a money transmitting business because the "undisputed reality of how Tornado Cash worked [*i.e.*, as a noncustodial mixer] leads inexorably to the conclusion that Tornado Cash was not a money

transmitting business." (Mot. at 44-45). This attempt to revive the defendant's various motions to dismiss is unavailing and was plainly rejected by the jury. There was ample evidence from which a reasonable jury could infer that Tornado Cash was involved in the business of transferring funds—cryptocurrency—on behalf of members of the public (and in particular those engaged in criminal conduct).

To prove that the Tornado Cash service was a money transmitter for purposes of Section 1960(b)(1)(C), the Government had to show that the business "transfer[ed] funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." 18 U.S.C. § 1960(b)(2); *see United States v. Murgio*, 209 F. Supp. 3d 698, 706 (S.D.N.Y. 2016). It was not required to prove that the defendant thereby understood his business fell under the legal definition of a money transmitting business "subject to regulation." (Mot. at 45). Section 1960(b)(1)(C)—unlike other provisions of Section 1960—is not a regulatory provision.   Instead, it addresses the willful promotion of criminal activity through the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.   Accordingly, the definition of money transmitting that applies to 1960(b)(1)(C) is distinct from the definition applicable to violations of Section 1960(b)(1)(B), which incorporates the definition of money transmitting (and the registration requirements) contained in 31 U.S.C. § 5330. *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82, 89 (D.D.C. 2008) ("Section 1960 does not borrow the definition of 'money transmitting business' from Section 5330."); *United States v. Mazza-Alaluf*, 621 F.3d 205, 210 (2d Cir. 2010) (rejecting defendant's attempt to "import[] the § 5330(b)(1)(B) definition of 'money transmitting business' into § 1960").

The Court has already held as much in this case, finding, "to the extent that anyone, including Mr. Storm, is arguing that the definitions of 'money transmitting' in Sections 1960 and 5330 are co-extensive, I do not believe that to be the case." (Transcript of Sep. 26, 2024 Conference, Dkt. 97 ("MTD Order"), at 20). Thus, the defendant is mistaken when he argues that to prove he violated Section 1960(b)(1)(C), the Government had to show he "believed he was subject to regulation as a money transmitting business." (Mot. 45).[11]  Because the Government did not proceed on a failure-to-register theory, the regulations were irrelevant, and the Government was simply required to prove that Tornado Cash "transfer[ed] funds on behalf of the public by any and all means," 18 U.S.C. § 1960(b)(2), and that the defendant knew the business "involve[d] the transportation or transmission" of criminal proceeds or money used to promote crime.

On the knowledge issue, the defendant's argument that Tornado Cash was not a money transmitting business is just a rehash of his prior legal argument, which the Court rejected, that "custody" of funds is a requirement to be such a business. (Mot. at 45). The Government briefed this issue extensively in its opposition to the defendant's motions and incorporates those arguments here. (*See* Dkt. 53 at 21-23). In deciding those motions the Court "agree[d] with the government that control is not a necessary requirement of the Section 1960 offense." (MTD Order at 21).[12]  As

---

[11]  In fact, the defendant's knowledge or belief that he was subject to regulation is not an element of *any* of the prongs of Section 1960. After the 2001 amendments to Section 1960, "the government no longer need prove that a defendant was aware of state licensing requirements or that he knew about the federal registration requirements found at 31 U.S.C. § 5330." *United States v. Dimitrov*, 546 F.3d 409, 413 (7th Cir. 2008).

[12]  The Court also rejected the defendant's reliance on "FinCEN guidance regarding intermediaries who do not qualify as money transmitters [or "the FinCEN 2019 regulatory guidance"]." (*Id.* at 21-22).

the Court put it: "At its core, the Section 1960 offense seeks to prevent the unlicensed transmission of customer funds from one location to another, irrespective of whether the transmitter obtained temporary control over the funds to effectuate the transfers or constructed the transfers specifically in a manner to avoid such control." (*Id*. at 22). The Court noted that "the value-add of Tornado Cash, or in the Tornado Cash system, was that it allowed customers to send cryptocurrency from one wallet to another, without an obvious link between the two wallets, by pooling the customers' funds in an intermediary wallet on the blockchain, and without necessitating direct customer interaction with Ethereum." (*Id*. at 22). As such it was "not meaningfully different" from other cryptocurrency mixing services subject to Section 1960. (*Id.* at 22-23 (citing cases)).

The evidence established that Tornado Cash engaged in the transfer of funds for the public and publicly marketed this service. Indeed, this was the entire purpose of Tornado Cash. (*See* Tr. 219 (the Tornado Cash Medium page described Tornado Cash as the "Tornado mixer— noncustodial anonymous *transactions* on Ethereum") (emphasis added); Tr. 219-20 (service provided by Tornado Cash was to "*transfer funds* to an entirely new address that has absolutely no transaction history") (emphasis added); Tr. 1046 (same); Tr. 1047 (describing the parts of the Tornado Cash system and how they worked together to move funds on the Ethereum blockchain)). The defendant was indisputably aware that Tornado Cash operated in this manner. Moreover, and importantly, elements of the Tornado Cash service that the defendant and his co-conspirators *controlled* were essential to the transmission of funds. For example, the defendant and his co-conspirators controlled the router, (Tr. 1079-80), "which was responsible for directing deposits and withdrawals to the appropriate pool," (Tr. 1076-77). The evidence at trial also proved that the defendant and his co-conspirators controlled the UI, which generated the secret note. This note

57

was required to generate the "zero knowledge proof" that linked a user's deposit with their withdrawal. (Tr. 1154). As the defendant acknowledges, without the secret note, it would be impossible to make a withdrawal, *i.e.*, to transfer the funds to a new location on the blockchain. (Mot. at 51-52 (citing testimony)).[13] Thus, there was more than sufficient evidence at trial for the jury to determine that Tornado Cash was a money transmitter, that the defendant was aware that Tornado Cash effectuated transmissions of funds for the public, and the defendant controlled important elements of it.[14]

The defendant argues that "his deep understanding of how the protocol and UI worked" shows beyond dispute that "the only reasonable inference from the evidence presented was that Mr. Storm believed Tornado Cash was not a money transmitting business," (Mot. at 46), yet cites scant evidence in support of this professed affirmative belief that Tornado Cash was immune from

---

[13] At the motion to dismiss stage, a key disagreement between the parties about whether Tornado Cash was only the pools or if it was composed of multiple elements including the pools, the UI, the CLI, the router, and the relayers. (MTD Order at 21 ("First of all, and as a threshold matter, I am required to accept at this stage the allegations of the indictment that the charged money transmitting business included the conduct of Tornado Cash's founders and network of relayers, and not merely the pool.")). The overwhelming evidence at trial proved that the allegations in the Indictment were correct and disproved the defendant's claims that Tornado Cash was only the pools. Indeed, even the defendant's own expert admitted "Tornado Cash has different parts. There's the smart contracts, there's the UI, there's the CLI, there's the DAO." (Tr. 2098).

[14] The defendant has asked the Court to reconsider its prior ruling regarding custody based on the record at trial. (Mot. 54 (citing *Colvin v. Keen*, 900 F.3d 63, 68-69 (2d Cir. 2018) and a civil case from the Western District of New York, *Greasley v. United States*, No. 15-CV-642-A, 2021 WL 935731 at *49 (W.D.N.Y Mar. 11, 2021)). But the defendant's arguments are essentially the same as the ones he proffered at the motion to dismiss stage and in his motion for reconsideration. The record at trial was consistent with the allegations in the Indictment—which never alleged that Tornado Cash had "custody" of the transmitted funds—so the defendant has not established any facts that would compel reconsideration now. The court has rejected these arguments twice. It should do so again here.

prosecution, even were that relevant, which it is not.[15] The defendant instead points to two pieces of evidence that, properly understood, are either irrelevant or incriminating. First, he argues that he lacked the requisite intent because there was no evidence he thought Tornado Cash had to comply with FinCEN regulations regarding KYC or AML. (Mot. 46-47). The Government's theory of trial was not predicated on FinCEN registration or AML compliance, which were not introduced or discussed at trial,[16] thus this argument is moot. Again, the defendant appears to be making arguments that—while potentially relevant to a charge under a different prong of Section 1960—are wholly irrelevant to the crime on which the Government actually proceeded to trial.

Second, the defendant, citing Government Exhibit 1372, recasts his discussion of making Tornado Cash a "compliant mixer," as evidence that he did not believe Tornado Cash had to

---

[15]  The defendant also relies on FinCEN's 2019 guidance on business models involving convertible virtual currencies in a footnote, as he has repeatedly through the pendency of this matter. (*See* Mot. at 46, n. 11). The FinCEN guidance did not feature at trial, the jury was not made aware of it, the Court has already found that the defendant's reading of it is incorrect, and it has no relevance here.

[16]  The defendant again claims that the FinCEN guidance purportedly required custody of users' funds for a business to be a money transmitter. (Mot. 46 n.11). As the Government previously briefed at length (Dkt. 53 at 31-33), that is not what the FinCEN guidance says. The Court carefully considered these arguments and explained that the defendant's assertions about the FinCEN guidance are wrong:

> And let me turn for a moment to the FinCEN 2019 regulatory guidance. Yes, it does speak of control, but it does that in the context of setting forth a four-factor test for determining whether a wallet provider is a money transmitter. *The section addressing cryptocurrency mixing services does not similarly require control.*

(MTD Order at 22 (emphasis added)). It is remarkable that the defendant persists in putting forward this claim about the FinCEN guidance, when a simple review of the guidance itself and of this Court's own prior ruling on this issue demonstrates that it does not say what he claims. But regardless, that guidance is immaterial to the count on which the jury convicted, which dealt with a separate prong of Section 1960 that does not implicate FinCEN regulations in any way—a point that the defendant continues to inexplicably ignore.

register with FinCEN.[17] (Mot. 46).  Even if that is a permissible (though deeply improbable) reading of that exhibit, it is irrelevant for the same reason, and, regardless, hardly sufficient to overcome the Rule 29 standard. The relevant knowledge for a Section 1960(b)(1)(C) violation is set forth in the statute—knowledge that the business is transmitting criminal proceeds and money used to promote crime—and on that issue, the evidence was overwhelming.

For all the reasons discussed above, there was more than sufficient evidence for the jury to conclude that Tornado Cash was a money transmitter as defined in Section 1960(b)(1)(C) and that the defendant understood that. As this Court has already recognized as a matter of law, the fact that Tornado Cash was noncustodial is irrelevant.

### D.  The Evidence Proved the Defendant's Knowledge That the Business Involved the Transmission of Criminal Proceeds

The defendant's next argument is that the Government did not prove the "temporal requirement" that the defendant have knowledge that Tornado Cash was transferring funds derived from a criminal offense "before the transmission of funds." (Mot. 47-50). That argument simply ignores the evidence at trial.   There was abundant evidence that the defendant knew Tornado Cash was transferring large volumes of criminal proceeds well before February 2022, when the conspiracy charged in Count Two began. One of his employees had quit in November 2021, telling him that Tornado Cash was "about laundering dough and hackers." (GX 2037-T). The BitMart

---

[17] The defendant also ascribes significance to Qureshi's statement that a compliant version of Tornado Cash seemed legally "fine" to him. (GX 1372; *see also* Mot. 47). Setting aside the Rule 29 standard, nothing in the record indicates that Qureshi is an attorney (he is not so far as the Government is aware) or that Qureshi was providing legal advice to the defendant (he was not and could not have legally), and the defendant ultimately declined to advance an advice-of-counsel defense at trial.

hack had happened in December 2021, the defendant knew of many other hacks, and in February 2022, Semenov noted that by implementing the new relayer registry system to make profits from Tornado Cash, they were inviting the question of why they didn't "ban … hacked money" from Tornado Cash, (GX 2059-1-T).

This is exactly the sort of knowledge that is sufficient to support a Section 1960 charge. In *United States v. Sterlingov*, 573 F. Supp. 3d 28, 35 (D.D.C. 2021), for instance, the court rejected the same argument the defendant makes here and held that evidence that the defendant's cryptocurrency mixer had "derived a substantial portion of its business" from criminal transactions was sufficient. The Court noted that the purpose of Section 1960 was "to combat the growing use of money transmitting businesses to transfer large amounts of the monetary proceeds of unlawful enterprises." *Id.* (quoting *United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir. 1999)). That purpose would not be served by imposing a requirement that a defendant must specifically have advance knowledge of each individual transaction that involves criminal proceeds, as the defendant suggests here. As noted below, that is not even a requirement for a money laundering conspiracy charge, and the language of the money transmitting statute imposes less of a knowledge requirement than the money laundering statute, requiring simply knowledge that the business involves the transmission of funds that are known to be derived from criminal activity. 18 U.S.C. § 1960(b)(1)(C).[18]

The defendant's argument is on even weaker grounds because this is a conspiracy count,

---

[18] The defendant cites cases standing for the unremarkable proposition that a provider of goods is ordinarily not in a conspiracy with those who buy the goods for illegal purposes. (Mot. 48). That has nothing to do with this case. The defendant is not alleged to be in a conspiracy with the

which does not require *any* transfer of funds at all, just an agreement to transfer funds, and so cannot require knowledge that any specific transfer involved criminal proceeds.

### E. The Jury Reasonably Found that Tornado Cash Was a "Business"

The defendant asserts that he and his co-conspirators "never set out to operate a 'business' at all, much less a money transmitting business." (Mot. 32). Again, the record says otherwise, and there was more than enough evidence for the jury to conclude that Tornado Cash was a business, and not merely a passive protocol established by previously-released software.

As an initial matter, it is undisputed that Tornado Cash offered its services to the public. (*See, e.g.*, Mot. 35-36). It is also undisputed that Tornado Cash utilized the internet, thereby affecting interstate or foreign commerce. Despite having no legal grounding, and despite the fact that this Court has already rejected his argument, the defendant again asserts that a "necessary element of a 1960 offense is that the operation charges fees for its services." (Mot. 50). The word "fee" appears nowhere in Section 1960, nor does any equivalent concept. It would also make no sense for Congress to have only prohibited one particular type of revenue model for criminal money transmitters. The Court rightly rejected this argument based on clear Second Circuit precedent that rejects the defendant's overly restrictive view of what constitutes a "business" under Section 1960. (*See* MTD Order at 24 ("the Court is also rejecting Mr. Storm's second argument for dismissal, and that is that the government was required to allege that he or his colleagues or Tornado Cash charged a fee for money transmitting services."); *see also id.* (noting that in the Second Circuit, "a 'business' [for purposes of Section 1960] is an enterprise that is carried on for

criminals for whom he is transmitting funds. Rather, he is alleged to be in a conspiracy to conduct a business that is itself illegal under Section 1960.

profit or financial gain" (citing *Banki*, 685 F.3d 99, 114 2d Cir. 2012)). Nothing in the record suggests that the Court should revisit this decision.

There was overwhelming proof from which a reasonable jury could infer that Tornado Cash was operated to generate profit for the defendant and others, and that the profits were linked to the fees charged to Tornado Cash users. In particular, the profits derived from fees paid to relayers, who were themselves a part of the integrated set of features that made up Tornado Cash. (Tr. 1047, 1072). As described above, the defendant connected the relayer fees directly to the value of TORN tokens. The relayer registry required any prospective relayer to lock at least 300 TORN in a smart contract, and as they executed withdrawals, the relayers would lose a portion of their locked tokens which were distributed to other TORN holders. (Tr. 1169). If the relayer's staked TORN dropped below the required level, it would not be able to execute the withdrawal. (Tr. 1155). Thus, to remain on the registry, a relayer would have to purchase additional TORN, thereby creating a market for the token and upward price pressure that would benefit the token holders, including the defendant and his co-conspirators. The TORN holders could also stake TORN into governance to receive distributions of TORN from the relayers. (Tr. 1172). The defendant's "tokenomics" expert agreed that the defendant hoped to profit from TORN through these means, and that appreciation in the value of TORN would have profited the defendant. (Tr. 2098, 2101). The defendant and his co-conspirators discussed how to set relayer fees "from a business standpoint," (GX 2037-T), and in encouraging his co-conspirator Semenov that they should implement the relayer registry system in February 2022, the defendant stated that the "protocol fee is for the benefit of token holders," (GX 2060-T). And the Government proved that the defendant and his co-conspirators in fact profited from their sales of TORN tokens, to the tune of millions of

dollars. (Tr. 1270-75, 1277-78; GX2055-T, 2058-T).[19]

On top of all that, the record at trial contains other evidence that the defendant and his co-conspirators intended to operate Tornado Cash as a business conducted for financial gain. (GX 1378 (the defendant noting in a conversation with Dragonfly that "Roman Semenov wants to make money"); *id*. (Qureshi noting, in 2020, that the founders would "have to sell tokens OTC [over-the-counter]" and that "most of the money [the founders will] make will be in the future when tornadocash [*sic*] is huge and successful"); GX 2261-T (Storm, noting in October 2021 regarding relayer fees: "I think we need to get people used to paying for transactions. We have capitalism rather than socialism, after all. … It's dangerous when free bread is taken away from hamsters later. It's better to take money from them right away."); GX 2043-T (Storm chiding Semenov in March 2022 for missing a meeting, "We're talking about fucking business here."); GX 3007 (showing that Storm paid employees); Tr. 1059-60 (the icon for the Bablo chat, where the founders discussed how to run Tornado Cash, was a cartoon money bag); Tr. 2099 (Dragonfly received TORN as part of its investment and planned to profit from TORN)).

Beyond the profit-generating elements of Tornado Cash, there was significant evidence in the record that Tornado Cash bore all the other classic hallmarks of a business, such as having a CEO, paying employees and monthly expenses, marketing, ad soliciting investments from a venture capital firm. (*See* MTD Order at 24-25 (the Court noting that, among other things—like taking actual profit from TORN holdings—soliciting funds from a venture capital firm would be

---

[19] The defendant's brief attempts to downplay Storm's profits by pointing to testimony from his "tokenomics" expert, Dr. Hurder, that the funds were his personal income. (Mot. 51). But any returns from a business venture—whether in the form of cash, equity, or tokens—becomes "personal" once earned.

evidence that "the Tornado Cash enterprise was not an altruistic venture.")). In short, there was abundant evidence upon which the jury could have based its conclusion that Storm and his co-conspirators operated Tornado Cash as a business.

### F.  The Jury Reasonably Concluded that Tornado Cash Transferred Funds

The defendant's next argument is to claim that Tornado Cash was not involved in the transfer of funds because, he claims, the users were the ones transferring the funds. Much of this argument is just a variation of his argument that a non-custodial mixer cannot be a money transmitter, and that Tornado Cash never had "custody" of the funds because the users held the secret notes. (Mot. 51-52). The Court should adhere to its prior ruling that custody is not a requirement of the statute and reject that argument. The relevant question is whether Tornado Cash was a business engaged in "transferring funds on behalf of the public," 18 U.S.C. § 1960(b)(2), not whether it did so by taking custody of those funds.

The defendant tries to put a new gloss on the argument by arguing that for Tornado Cash deposits, the UI merely "reads" the blockchain (that is, the UI queried information on the blockchain) and does not "write" to it (that is, the UI did not transmit transactions to the blockchain). (Mot. 53). According to the defendant, this means that it is the "user's wallet [that] conducted transactions on the blockchain." (Mot. 53).

That is both factually wrong and irrelevant. To begin with, the defendant's discussion is only about *deposits* into Tornado Cash. For withdrawals using a relayer (which were 94% of all withdrawals), the user's wallet did not send the instructions to the blockchain. Rather, withdrawals were effectuated entirely by components that were unquestionably part of Tornado Cash—the UI wrote the instructions and delivered them to a relayer, which then communicated them to the

blockchain, without using the user's wallet software. (Tr. 1154). Thus, even accepting the defendant's logic, the withdrawals are transfers of funds that are performed exclusively by Tornado Cash, not the user's wallet. The fact that the defendant's entire argument on this issue only works by ignoring roughly *half* of all Tornado Cash transactions is enough in itself to reject the argument.

But even as to deposits, all the defendant's argument establishes is that the conduit the UI used to communicate the deposit to the blockchain was the user's wallet software. The defendant does not even attempt to explain the significance of that fact, much less identify any legal authority that suggests that the existence of such an intermediate step in a transaction makes any legal difference. The UI is still conducting the transaction; it is just using the user's wallet software as a tool to implement the transaction. (Tr. 1147-48 (describing how UI used customer wallet software to transmit transaction instructions to Tornado Cash router)).   The UI is what created the unique set of transaction instructions and initiated the process of transmitting them to the blockchain; indeed, multiple Tornado Cash users testified that they would not have been able to make the deposit without using the UI. (Tr. 227-28 (Bram); Tr. 325 (Llacuna)). The jury could certainly conclude that the UI was effectuating the deposit transaction—and thus transferring the funds—by assembling the instructions and transmitting them to the blockchain via the user's wallet software, which just functioned as a passive conduit for the UI's orders.

Finally, the defendant also overlooks that once the blockchain transaction was initiated, both the instructions and the deposited funds themselves transited through the Tornado Cash router, a critical part of the fund-transferring process that the defendant and his co-conspirators repeatedly made changes to. (Tr. 1151). Nothing about the defendant's characterization of these

transactions undermines the abundant evidence in the record from which the jury could have concluded that the Tornado Cash service transferred customer funds. (*See generally, e.g.,* Tr. 1025-84, 1143-1223 (Werlau's description of overall operation of Tornado Cash service)).

### G. Section 1960(b)(1)(C) Applies to Unregistered Money Transmitters

Storm's final argument as to Count Two is that Section 1960(b)(1)(C) only applies to money transmitting businesses that *are* federally registered. And because Tornado Cash was not registered, according to Storm, he could not have conspired to violate 1960(b)(1)(C). (Mot. 58). This argument bears little mention as it cannot be squared with Second Circuit precedent or common sense.

First, the Second Circuit has held that the definition of "money transmitting business" in 31 U.S.C. § 5330, which is incorporated in the prohibition in 18 U.S.C. § 1960(b)(1)(B), does *not* apply to or limit the scope of the other prongs of Section 1960(b)(1). *See United States v. Mazza-Alaluf*, 621 F.3d 205, 210 (2d Cir. 2010) (holding that Section 5330 definition does not apply to prosecution under Section 1960(b)(1)(A) for failure to obtain a state license). Under the defendant's reading, by contrast, the only businesses that *would* be subject to Section 1960(b)(1)(C) are those that comply with the definition of money transmitting business in Section 5330 and are therefore required to be federally registered. As the Second Circuit explained in *Mazza-Alaluf* with respect to a prosecution under Section 1960(b)(1)(A), that argument would render the definition of "money transmitting" in Section 1960 itself superfluous. *Id.* The defendant cites no case that has held that a business must be federally registered in order to be prosecuted

under Section 1960(b)(1)(C).[20] Moreover, the defendant's reading of Section 1960 would have absurd results: it would mean that a business could move unlimited illicit proceeds so long as it was *doubly* deficient by failing to register with FinCEN or a state. *See Gardner v. Credit Mgmt. LP*, 140 F. Supp. 3d 317, 320 (S.D.N.Y. 2015) ("A statute should be interpreted in a way that avoids absurd results") (quoting *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000)). The more reasonable construction of "otherwise" in § 1960(b)(1)(C) is that this provision applies irrespective of registration status. In other words, this provision applies to both registered and non-registered money transmitting businesses; it is simply another, separate, ground to hold businesses criminally liable.

For all these reasons, the Court should deny the defendant's motion on Count Two.

## IV.    There Was Sufficient Evidence to Find the Defendant Guilty of Count One

The defendant levels four attacks—each meritless—at the Government's proof at trial with respect to Count One, conspiracy to commit money laundering. First, the defendant claims that there was no evidence that he entered into an agreement with the object of committing concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). (Mot. 60-62). Second, the defendant claims that the Government did not and cannot prove his *mens rea* with respect to Count

---

[20] The defendant cites the Supreme Court's decision in *Fischer v. United States*, 603 U.S. 480 (2024), which interpreted a federal obstruction of justice statute. *Fischer* does not support the defendant's argument here, as it did not hold that the use of the word "otherwise" in 18 U.S.C. § 1512(c)(2) meant that the scope of this clause was mutually exclusive with conduct covered by the other clause of the statute. On the contrary, *Fischer* held that the scope of clause (c)(2) had to be similar to the "particular types of criminal conduct" described in clause (c)(1). In any event, Section 1960 does not resemble the statute at issue in *Fischer*. It does not contain a general term that is seemingly "limited by [a] preceding list of criminal violations." *Id.* at 489. Section 1960 contains a term whose definition is subject to a cross-reference in one subsection, but not another, indicating that the two provisions are not meant to limit the scope of each other.

One. (Mot. 62-63). Third, the defendant claims that he cannot be found guilty of Count One because neither he nor his co-founders conducted an illicit transaction. (Mot. 63-65). Fourth, the defendant claims that he cannot be convicted of Count One because there was no evidence that he knew any particular transactions that went through Tornado Cash were the proceeds of some type of unlawful activity. (Mot. 65-68). Each of these arguments, which lack a legal foundation and ignore significant portions of the record evidence, fails.

### A. The Defendant Ignores the Evidence of His Criminal Agreement to Commit Money Laundering

Rather than actually grappling with the trial evidence, the defendant's argument regarding his criminal agreement repeatedly, and groundlessly, takes issue with the Government's summation. (Mot. 60-62). He then states flatly that "the evidence only supported…that there was a mutual understanding, or agreement, between Mr. Storm and the founders to offer the Tornado Cash software publicly and for free," (Mot. 60), ignoring the abundant exhibits and testimony establishing that the defendant did far more to operate Tornado Cash than merely develop and release free software. In other words, the defendant once again asks the Court to adopt his defense-friendly inferences from the record, despite what Rule 29 commands.

The defendant's attacks on the Government's summation are both irrelevant and inaccurate.[21]  For example, he claims that the Government "failed to even… reference that the jury was required to find that the agreement among the founders had a criminal objective and find that Mr. Storm intended to further that criminal objective." (Mot. 60). But the Government's

---

[21]  Indeed, despite attacking the Government's jury addresses throughout the motion, the defendant did not move for a new trial under Rule 33, presumably because he knows that these broadsides are legally irrelevant.

summation made repeated references to the required unlawful purpose of the charged criminal conspiracy. (*See, e.g.,* Tr. 2312-14). In any event, and as the defendant is well aware because the Court reminded the jury several times, (*see, e.g.,* Tr. 48, 2455, 2473), it is axiomatic that the parties' arguments are neither evidence nor legal instruction, and the charge delivered by the Court, to which the defendant did not object, was accurate.

Setting aside the Government's summation regarding Count One, the defendant's motion does not in any real way call into question the overwhelming evidence that the defendant and his co-founders not only agreed to create Tornado Cash, but to maintain the business and continue its operations, including upgrading the software and finding a way to monetize it, even after they knew that it had become a haven for hackers, money launderers, and sanctions evaders.

The defendant argues that this evidence did not show that he had the criminal purpose to further money laundering, but he does so by first misstating the law, and then by ignoring the trial evidence. On the law, the defendant strangely asserts that the "required elements" included: "(1) that Mr. Storm entered into an agreement with the criminal purpose of assisting the bad actors in their acts of money laundering and (2) that he specifically intended to further that unlawful purpose." (Mot. 61). He cites no authority for those supposed "required elements" of the offense, which are not in fact elements of money laundering conspiracy under Second Circuit precedent. Rather, the Government must prove that the defendant entered into an agreement with the objective of: (1) conducting financial transactions, (2) which in fact involved the proceeds of specified unlawful activities, (3) knowing that the transactions involved criminal proceeds, and (4) knowing that the transactions were designed in whole or in part to conceal criminal proceeds. *See United States v. Henry*, 325 F.3d 93, 103 (2d Cir. 2003) (listing what must be proven as object of money

70

laundering conspiracy charge); (Tr. 2498-99 (listing these elements as object of conspiracy)). That is, the relevant purpose is the purpose of conducting financial transactions with knowledge that they are designed to conceal criminal proceeds.

The facts clearly are sufficient to show that the defendant entered into an agreement to achieve this unlawful objective. In particular, the jury could reasonably infer that the defendant and his Tornado Cash co-founders agreed to continue to operate and profit from Tornado Cash's money transmitting business with full knowledge that by doing so, they were facilitating transactions that concealed criminal proceeds. There was copious evidence at trial that the defendant knew that Tornado Cash was laundering criminal proceeds, made changes to the protocol that made it both more attractive to criminals and more profitable for himself, and took other affirmative steps to facilitate the concealment of these criminal proceeds, such as lying to victims about his degree of control over Tornado Cash and lying to the public about Tornado Cash purportedly "blocking" North Korean transactions. The jury could have reasonably inferred from all of this that the implicit agreement between the defendant and his co-founders was criminal in nature. Indeed, the jury readily could have found the defendant guilty of Count One based on, among other things: (1) the sheer volume of the laundered funds (*see, e.g.,* GX 3002-17, 3002-33, 3002-50, 3002-51, 3002-61 (DeCapua charts showing volume of hacks laundered through Tornado Cash); *see also generally* Tr. 475-587, 638-728 (DeCapua)); (2) the repeated communications received by the defendant and his co-founders notifying them that their business was concealing dirty money (*see, e.g.,* GX 231, 233-35, 238, 243, 246-49, 253, 256, 279, 553, 556, 562, 1005); (3) the founders' internal communications about dirty money being laundered through Tornado Cash (*see, e.g.,* GX 2280-T, 2004-T, 2007-T 2044-T, 2044-2); the evidence of the defendant's

71

consciousness of guilt (*see, e.g.,* GX 209-22 (Google search for "are tornado cash criminals"), 923 (defendant's false and misleading responses to Rho's crypto questionnaire), 1372, 2006-T, 2037-T, 2040-T, 2047-T, 2050-T, 2055-T, 2059-1-T, 2060-T, 2062-T (Semenov warning co-founders about law enforcement reading their Telegram chats; defendant saying he "[c]leaned it up"), 2058-T, 2063-T, 3006-3 (George chart showing defendant's suspicious cashout of millions of dollars of TORN) and (4) the millions of dollars that he and his co-founders made from their business (*see, e.g.,* GX 803, 1348, 2033-T, 2037-T, 2043-T, 2058-T, 2060-T, 2261-T, 3006-3, 3007). That the jury was unable to reach a unanimous verdict on Count One says nothing about whether it reasonably could have—indeed, it necessarily implies that some members of the jury were ready to convict on Count One.

Moreover, while a specific purpose of "assisting the bad actors" is not required, there was ample evidence that the defendant and his co-founders did have such a purpose. For example, from the outset the defendant cultivated a public image of Tornado Cash as a money laundering service, including through his t-shirt with an image of a washing machine with the Tornado Cash logo on it, and Semenov's t-shirt with the same image and the tagline, "I keep my Ether clean with Tornado.cash." (GX 1, DX 8852A). The defense dismissed these t-shirts as "irreverent," "jokey," and "in poor taste," (Tr. 77, 2394), but the jury was free to reject these arguments and ascribe to the t-shirts their obvious meaning: that the defendant and his co-conspirators knew that the Tornado Cash service was, first and foremost, a money laundering business and embraced it.

The direct evidence of this criminal purpose also included the defendant's own characterization in messages with his co-founders and employees of another cryptocurrency company known as 1inch about criminals' use of his business for large-scale money laundering as

"free advertising" for Tornado Cash, evidencing his and his co-conspirators' joint criminal intent to benefit from such transactions. (GX 2007-T). As another example, when one of his employees quit in November 2021, telling him that it was due to the concern that "Tornado is about laundering dough and hackers," the defendant did not deny that this was the purpose, but instead circulated to his co-founders a link to a news article about the money laundering charges in the Silk Road prosecution, indicating that he viewed Tornado Cash as engaged in analogous criminal conduct. (GX 2037-T).

Again, the defendant asks the Court to set aside all of that evidence and agree with his pat assertion that the only agreement "among the Peppersec founders was to provide the permissionless and noncustodial anonymizing Tornado Cash software to the public." (Mot. at 61). Rule 29 dictates otherwise.

Finally, the defendant falls back on a rejected argument he first raised in his (first) unsuccessful motion to dismiss: that the Government did not prove that the defendant was in a conspiracy with his criminal customers. (Mot. at 62, 65; *see also, e.g.,* Dkt. 37-1 at 27-30). But that was not—and has never been—the Government's theory of the case. Nor is that what the law requires, as the Court has already found. (*See, e.g.*, MTD Order at 28-29). This argument therefore need not be revisited and should be swiftly rejected.

Additionally, the existence of some evidence in the record that could—under the defense's reading—be understood to indicate that the defendant was not at all times entirely pleased that his best customers were large-scale hackers, as well as the evidence that the defendant and his co-conspirators took certain half-measures to give the appearance of discouraging illicit use of Tornado Cash, (Mot. at 62), does not mean that he was not in a money laundering conspiracy with

his co-founders as a matter of law or that the jury could not have reasonably reached that conclusion. As described above with respect to Count Two, criminals frequently express misgivings about their wrongful conduct while continuing to engage in it. And the jury could reasonably have concluded that the purported (and ineffective) corrective measures the defendant took were part of his public cover story, rather than a genuine attempt to stop participating in criminal conduct. Similar cover stories arise frequently in money laundering cases, as "taking steps to make funds appear legitimate is the common meaning of the term 'money laundering.'" *Cuellar v. United States*, 553 U.S. 550, 558 (2008).

### B. The Government Did Not Advance a Negligence Theory of Criminal Liability at Trial as to Count One, and the Evidence Supported a Finding of the Requisite *Mens Rea*

In another rehash of an argument that has previously been rejected by this Court (*compare, e.g.,* Dkt. 37-1 at 30-33 *with* MTD Order at 30-31), the defendant claims that the Government improperly advanced at trial a "negligence theory of criminal liability." (Mot. 63). As discussed above with respect to Count Two, that is a misreading of the trial record (which contained extensive evidence of the defendant's knowing and intentional participation in a scheme to launder criminal proceeds and violate sanctions) and the Government did not advance a negligence theory.

The defendant also argues that "there was no evidence that Mr. Storm believed his conduct was unlawful and [that] the evidence showed that he did not believe it was." (Mot. 63). The record, however, supports the opposite conclusion, and the defendant's insistence on drawing only favorable inferences to himself from the evidence is contrary to Rule 29. Instead, there was significant direct and circumstantial evidence that a reasonable jury could have relied on to convict

on Count One.

For example, the defendant makes no attempt to address the Government's evidence of the defendant's consciousness of guilt, which included, among other things: his Google search history (*see, e.g.,* GX 209-22 ("are tornado cash criminals")); his discussion with his co-founders about an employee leaving the business because "his relatives think that Tornado is about laundering dough and hackers" (GX 2037-T); Semenov's explicit concerns about being approached by the FBI (GX 2059-2-T); the defendant's lies to hack victims about the nature of Tornado Cash (*see, e.g.,* GX 1011, 2060-T, 2320); the defendant's lies to Rho about the nature of his business (GX 923); the defendant's panic that he and his co-founders were "fucking done for" after he learned that the Lazarus Group was pumping the Ronin Hack proceeds through their business (GX 2047-T); the defendant's mulling about "get[ting] the fuck out of the country" in June 2022, after his bank account was closed (GX 2050-T); the defendant and his co-founders' concern about law enforcement reading their Telegram chats (GX 2062-T); and the highly suspicious and secretive manner in which he cashed out millions of dollars of TORN in June and August 2022 (*e.g.*, by using a Russian Binance account in someone else's name). (*See, e.g.,* GX 2058-T, 3006-3).

Moreover, there was copious evidence at trial that the defendant knew that Tornado Cash was laundering criminal proceeds, made changes to the protocol that made it both more attractive to criminals and more profitable for himself, and took other affirmative steps to facilitate the concealment of these criminal proceeds, such as lying to victims about his degree of control over Tornado Cash and lying to the public about Tornado Cash purportedly "blocking" North Korean transactions. The natural consequence of the defendant's affirmative conduct throughout the charged time period was to assist criminal actors in money laundering, and it is long-settled law

75

that a jury is permitted to draw the inference that a person "intends the ordinary consequences of his voluntary acts." *United States v. Nelson*, 277 F.3d 164, 197 (2d Cir. 2002). In sum, there was ample evidence from which the jury could have reasonably inferred the defendant's *mens rea* under Count One. Again, that it could not reach a unanimous verdict on this count is of no moment because some jurors plainly did so infer.[22]

### C. The Defendant Continues to Insist that His Supposed Lack of Control over Tornado Cash Negates any Potential Liability under Count One, even though the Court Has Rejected that Argument as a Matter of Law

In yet another rehash of his unsuccessful motion to dismiss, the defendant tries once more to convince the Court to toss Count One because the defendant and his co-conspirators "never had custody of the bad actor's cryptocurrency." (Mot. 64). The Court should again reject that argument, as custody is no more a requirement of a money laundering charge than it is of a money transmitting charge. The defendant still hopes to bring the Court around to his position that the lack of custody is "fatal" because, according to the defendant, "a conspiracy to commit money laundering requires proof that the defendant or a co-conspirator had control of the tainted money and conducted a transaction with it." (Mot. at 64). But the defendant does not cite any case that

---

[22] Lacking any legal authority to support his claim that "knowledge that criminals are using one's product does not create a conspiracy, and a failure to prevent a bad act" is not evidence of a money laundering conspiracy, the defendant reaches for civil cases concerning aiding and abetting liability.  (*See* Mot. at 61-62 (citing, *inter alia*, *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025) and *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023)). Those cases are obviously irrelevant to what is required to prove a criminal money laundering conspiracy, and the Court should disregard them. Among other distinctions, this is not an aiding and abetting case, and this case is not seeking to hold the defendant derivatively liable for substantive crimes committed by others. Rather, the defendant is charged based on his participation in a criminal conspiracy in which the evidence established that he knew that he was laundering criminal proceeds.

has recognized this custodial "requirement" of control over the tainted money, and the cases that he does cite in support of this proposition are inapposite. The evidence at trial, moreover, easily supported a jury finding, as reflected in the guilty verdict on Count Two, that the defendant and his co-founders did retain control over Tornado Cash protocol writ large—which the evidence demonstrated includes the non-pool components—and that they conducted—or, at a minimum, agreed to conduct—illicit transactions through the service. In particular, as discussed above, the defendant and his co-conspirators exercised control over key parts of Tornado Cash that played an essential role in facilitating the transactions at issue. The evidence was therefore more than sufficient to support a jury finding that, in exercising control over these aspects of the business, the defendant did "conduct or agree to conduct" a transaction with illicit proceeds, which is all that Section 1956 requires.

While the evidence demonstrated that the defendant did exercise control over key elements of Tornado Cash that facilitated the transactions at issue, the cases upon which the defendant relies do not in any event support his position that there is a legal requirement that conspirators have custody or control of the funds being laundered. In *United States v. Szur*, 289 F.3d 200 (2d Cir. 2002), for example, the Second Circuit addressed the concept of "merger" that sometimes arises in money laundering prosecutions that also involve charges based on the underlying specified unlawful activity and transactions derived from that unlawful activity and reinforced the longstanding principle that the Government must "distinguish[] between the crime that produces proceeds and the subsequent crime of laundering those proceeds, even though the transactions may flow together." *Id.* at 214 (quoting *United States v. McCarthy*, 271 F.3d 387, 395 (2d Cir. 2001)). All *Szur* says about control is that "funds comprise[] 'proceeds' at the moment they [are] in 'the

control of *the perpetrators*.'" *Id.* (quoting *United States v. Allen*, 76 F.3d 1348, 1361 (5th Cir. 1996) and citing *United States v. Morelli*, 169 F.3d 798, 805–09 (3d Cir. 1999) for the same proposition)) (emphasis added). In other words, *Szur* addresses *when* funds become criminal proceeds for the perpetrators of the underlying crimes; it says nothing about whether a defendant must take custody of those proceeds to have engaged in money laundering. Similarly, *United States v. Munshani*, No. 23-6520-CR, 2024 WL 4448708 (2d Cir. Oct. 9, 2024), *cert. denied*, 145 S. Ct. 1211, 221 L. Ed. 2d 275 (2025), and *Aronshtein v. United States*, No. 21-518-PR, 2023 WL 2770145 (2d Cir. Apr. 4, 2023), are also merger cases that do not insert a custody element into Section 1956. Indeed, the Court previously rejected the defendant's attempt to stretch these merger cases to say something beyond their actual holdings. (*Compare* Dkt. 112 at 10-11 (def. motion for reconsideration, citing *Szur*, *Munshani*, and *Aronshtein*) *with* Dkt. 127 at 1(order denying motion for reconsideration regarding Count One)). The Court should adhere to its prior ruling on this. There is nothing in the text of Section 1956 or the case law to support the argument that custody over tainted funds is a prerequisite of a conviction for conspiracy to commit money laundering.

Finally, the defendant retreads his argument that he cannot be held criminally liable for the misconduct of third parties with whom he did not enter a criminal conspiracy. (Mot. 65). The Government responded to this argument when the defendant made it the first time, (Dkt. 53 at 40-41), and the Court properly rejected it, holding that the Government "did not have to allege that Mr. Storm conspired with any of Tornado Cash's users to promote or further any of the illicit purposes of their transactions," (MTD Order at 28). The defendant was not charged with committing the underlying substantive crimes, aiding and abetting them, or conspiring to do so, and he is not being held criminally liable for those underlying crimes. The relevant criminal

conspiracy under Count One was the defendant's agreement with his co-conspirators to use Tornado Cash to engage in transactions that concealed criminal proceeds, and the evidence at trial provided ample support for a conviction, as discussed above.

### D. The Government Did Not Need to Prove that the Defendant Knew any Specific Transactions Processed by Tornado Cash Constituted Money Laundering and, in any event, the Defendant Consciously Avoided Gaining Such Knowledge

Finally, the defendant argues that he cannot be convicted of Count One because the Government did not prove that he knew any specific transactions processed by Tornado Cash constituted money laundering transactions at the time they were conducted. (Mot. at 66-68). He is wrong on the law and the facts.

With respect to the law, as the Court correctly explained to the jury, to convict on Count One, the Government only needed to prove that the defendant "agreed with one or more people" to, among other things, conduct a money laundering transaction. (Tr. 2499). In other words, the defendant could have been convicted on Count One in the complete absence of *any* transactions at all, so long as the evidence showed that he entered into an *agreement* that such transactions would occur. *See, e.g., United States v. Paldiel*, No. 24-CR-329 (ARR), 2025 WL 524659, at *13 (E.D.N.Y. Feb. 18, 2025) ("[B]ecause Mr. Paldiel is charged with conspiracy, the government does not need to prove that the [money laundering] transaction occurred.") (citing *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009)); *accord United States v. Approximately Five Hundred Forty-One Thousand Nine Hundred Fifty-Three Dollars & Zero Cents Seized From JP Morgan Chase NA Acct. No. XXXXXXXX Held in Name of Jiawig Trade Inc.*, No. 23-CV-9585 (MKB) (PK), 2025 WL 923412, at *7 (E.D.N.Y. Mar. 27, 2025) (citing *Paldiel* and collecting cases); *see also United States v. Ayala-Vazquez*, 751 F.3d 1, 14 (1st Cir. 2014) ("[T]o secure a conviction the

government needed to prove not that Ayala himself carried out each transaction, but that he was part of a conspiracy the object of which was to engage in money laundering."); *United States v. Green*, 599 F.3d 360, 373-74 (4th Cir. 2010) ("[T]he Government was not required to prove beyond a reasonable doubt Boyd's participation in any actual financial transaction knowingly using drug trafficking proceeds while intending to conceal the 'nature, the location, the source, the ownership, or the control of' drug trafficking proceeds in order to prove beyond a reasonable doubt Boyd's knowing participation in the charged money laundering conspiracy which had, as its object, exactly that."). Accordingly, to convict the defendant of Count One, the Government simply had to prove that he agreed with others to launder funds, not that he knew that funds were in fact laundered.

Moreover, even assuming that for a conspiracy charge to lie the Government had to prove that the defendant was aware that money was actually laundered, the defendants cite no authority (and the Government is aware of none), supporting the novel proposition that the defendant had to know which specific funds were illicit as opposed to having knowledge more broadly that some illicit transactions among the many he facilitated constituted money laundering. *See United States v. Jefferson*, No. 07 Cr. 209, 2009 WL 2447850, at *5 (E.D. Va. Aug. 8, 2009) ("[S]ettled authority makes plain that an individual who directs others to conduct a monetary transaction is guilty as a principal even if he does not know the details of how the transaction is carried out") (citing *United States v. Jackson*, 72 F.3d 1370, 1385 (9th Cir. 1995); *United States v. Delgado*, 256 F.3d 264, 276-77 (5th Cir. 2001) ("The lack of knowledge regarding the specific amount of money and the specific date of the transaction does not alter the fact that [defendant's] affirmative instructions facilitated the money laundering and caused the transaction to occur.")).

80

Even if the defendant were correct that the Government needed to prove, down to the specific transaction, that the defendant knew he was laundering funds—and he is not—there was ample evidence in the record that, at a minimum, the defendant consciously avoided learning of specific money laundering transactions on Tornado Cash. As the Court correctly instructed the jury, "[c]onscious avoidance can only be established where a defendant deliberately decided not to confirm a key fact when it was obvious or highly probable that that fact was true. One may not willfully and intentionally remain ignorant of important facts in order to escape the consequences of the criminal laws." (Tr. 2520-21).

For example, on April 4, 2022, a reporter with the *Wall Street Journal* contacted the defendant by email and stated that the Ronin Hack "attackers moved 2,100 ETH to an address this morning and subsequently have been transferring it to Tornado.cash in a series of transactions" in an attempt "to use Tornado.cash to launder stolen funds." (GX 279). In the same email, the reporter provided a link to particular money laundering transactions he had identified using Etherscan. (GX 279; *see also* GX 231, Tr. 513 (hack victim KuCoin providing the defendant with Etherscan link); GX 235, Tr. 522 (law enforcement officer investigating Furucombo hack providing the defendant with Etherscan links)). Special Agent DeCapua confirmed that the Lazarus Group in fact started laundering the proceeds of the Ronin Hack through Tornado Cash on April 4, 2022, a process that would continue through at least May 19, 2022. (Tr. 649-51, 660-61). At various times during this period, contemporaneous communications showed that the defendant and his co-founders remained aware that the Lazarus Group was depositing hacked funds into Tornado Cash. (*See, e.g.* GX 2006-T, 2006-4, 2063-T). Indeed, Special Agent DeCapua testified that between approximately April 4, 2022, when the Lazarus Group began depositing the Ronin Hack funds into

81

Tornado Cash, and May 19, 2022, the Lazarus Group laundered approximately $449 million in cryptocurrency through Tornado Cash, with approximately $351 million of those funds being deposited after OFAC imposed sanctions, at an average rate of approximately 50 deposits per day during that period, representing 55% of the total volume of Tornado Cash deposits. (*See* Tr. 650-51, 660-61; GX 3002-45, 3002-49). And during this time period, the defendant and his co-conspirators themselves discussed the ongoing laundering and estimated that, on particular days, as much as "99%" of Tornado Cash volumes were attributable solely to the Ronin Hack. (GX 2006-T).

A jury could easily have concluded that, after being specifically notified of Ronin Hack deposits into Tornado Cash, the defendant and his co-founders were well aware that criminal proceeds constituted a very significant portion of their business activity, even if they took no steps to determine which *specific* deposits came from the Lazarus Group. Moreover, Special Agent DeCapua testified that common blockchain explorers like Etherscan are tools that he uses to trace cryptocurrency in connection with his investigations. (Tr. 480, 482). And the record reflects that the defendant was well acquainted with Etherscan, using it to confirm payments to Infura for the crucial services the company was providing to Tornado Cash. (*See, e.g.,* GX 856, 862).

What all of the foregoing evidence tells the Court is that the defendant was not just on notice generally that the Lazarus Group was laundering the proceeds of the Ronin Hack through Tornado Cash, but that he was aware of it *in real time*, was fully capable of informing himself of which specific transactions each day were the Lazarus Group's deposits, and decided not to. In short, even if knowledge of particular criminal transactions were required in order to support a conspiracy charge (which it is not), the jury could reasonably have found, at a minimum, that the

defendant deliberately closed his eyes to learning this information. Accordingly, this final argument on Count One has no more merit than the rest.

**V.    There Was Sufficient Evidence for a Rational Jury to Find the Defendant Guilty of Count Three, and the Defendant's Legal Arguments Regarding Count Three Are Largely Foreclosed by the Court's Prior Rulings and Otherwise Unavailing**

There was more than sufficient evidence introduced at trial for a reasonable jury to conclude, beyond a reasonable doubt, that the defendant knowingly agreed to join a conspiracy whose criminal objective was to provide services to, and transact with, the sanctioned Lazarus Group and its wallet in the wake of the Ronin Hack. For the reasons set forth below, the defendant's claims that "bad actors could have accessed the protocol directly at any time" and that the Government's "proposed remedies would have been ineffective in blocking sophisticated actors like the Lazarus Group" are meritless. (Mot. 72-73). Nor is there merit to the defendant's legal arguments that the Tornado Cash service did not provide "services" under IEEPA or "to" or "for the benefit of" the sanctioned Lazarus Group and its wallet, or that the Informational Materials Exemption applies. (Mot. 75-83). Indeed, as set forth below, the Court already foreclosed the bulk of these legal arguments in prior rulings.[23]

**A.  There Was Ample Evidence at Trial Supporting Count Three**

**i.    The Evidence Amply Supported a Finding of a Conspiracy to Violate IEEPA**

---

[23] The defendant also argues that, "[b]ecause there was no evidence that property of a sanctioned entity ever came within the possession or control of any U.S. person, the government failed to establish a basis for U.S. jurisdiction at all." (Mot. at 69). This argument is misplaced, as the Government abandoned the blocked-property object of Count Three prior to the charge conference, (*see* Dkt. 215 at 11), and the Court did not instruct the jury on that object, (*see generally*, Tr. at 220-26).

The defendant echoes the arguments he makes with respect to Counts One and Two recasting the evidence to his preferred reading, namely, that "the evidence supports only an agreement among the Peppersec Founders to develop the Tornado Cash protocol and UI software," (Mot. 69), and quibbling with the Government's summation, (*id.* at 70). As with Counts One and Two, the Court must make all inferences in the Government's favor, and the Government's summation arguments are of no particular moment given that the Court accurately instructed the jury on the law as to Count Three, as with Counts One and Two, and that counsel's arguments are not evidence.

The evidence at trial established that the defendant and his co-conspirators learned that the North Korean Lazarus Group was laundering funds through Tornado Cash no later than April 4, 2022, when a *Wall Street Journal* reporter reached out to the defendant with detailed information about particular transactions that the Lazarus Group had executed with the Tornado Cash Service earlier that day. (GX 279). For the next ten days, the defendant and his co-conspirators continued running the business, taking no steps to prevent the Lazarus Group's transfer of funds through Tornado Cash. On April 14, 2022, OFAC sanctioned the Lazarus Group wallet that held funds from the Ronin Hack, forcing the defendant and his co-conspirators to take the half-measure of implementing the Chainalysis Oracle to give the appearance that they were combatting illicit activity on the platform, while knowing that such transfers were a key economic driver of the Tornado Cash Service and that the implemented measure was "easy to bypass." (GX 2047-T).

In the ensuing weeks, the defendant and his co-founders carefully followed and discussed the fact that they were still processing transactions involving the sanctioned Lazarus Group wallet and continued to engage in these transactions while complaining about the bad press they were

84

getting for doing so. (*See, e.g.*, GX 2006-T at 6, 2006-4, 2063-T at 6). In his motion, the defendant claims that these messages show that he and his co-conspirators were "distraught and concerned" about the Lazarus Group being part of his customer base. (Mot. 71 n.23). Of course, there is no need to draw that inference, but even if that characterization is accurate, a jury could reasonably have inferred that the defendant's "concern" reflected the additional attention the Lazarus Group transactions were likely to draw to the Tornado Cash service from law enforcement, not a genuine desire to avoid transacting in criminal proceeds. Indeed, the only decisive step the defendant took in response was to secretly start cashing out the founders' TORN tokens in June, as part of his plan to reap millions of dollars in profit before any cataclysmic fallout would result from his transfers of Ronin Hack proceeds.

### ii. The Evidence Amply Supported a Finding of Willfulness with Respect to Count Three

It was uncontested at trial that, as established by Special Agent DeCapua's cryptocurrency tracing analysis, hundreds of millions of dollars' worth of cryptocurrency stolen from the Ronin Network by the Lazarus Group and held in the sanctioned Lazarus Group wallet flowed through the Tornado Cash service over approximately six weeks between April 4 to May 19, 2022. Numerous statements by the defendant and his co-conspirators in their long-running founders chat during that period further established that the defendant willfully participated in the conspiracy to facilitate those transactions. Those discussions show that the defendant was aware of the Lazarus Group's deposits and withdrawals and was aware that the Lazarus Group and its wallet were sanctioned for most of that period, and yet he willfully continued to operate the Tornado Cash service despite that knowledge, taking only an ineffectual, purportedly preventative step:

implementing the Chainalysis Oracle to attempt to shield himself from criminal liability by creating the perception that he was attempting to stop the Lazarus Group's transactions, while knowing full well that he was doing nothing of the sort. That the defendant presented a different reading of these communications at trial is inapposite. "[T]he task of choosing among competing, permissible inferences is for the jury, not for the reviewing court." *Raniere*, 55 F.4th at 364. A reasonable jury, when considering all of the evidence as context, could infer that these messages did not evince a desire for legal compliance, but a desire for air cover.

The defendant claims that the Government's evidence of willfulness is fatally undermined by the fact that "bad actors could have accessed the protocol directly at any time." (*See* Mot. 72, 73). While it is true that bad actors could, in theory, have accessed the Tornado Cash pools directly,[24] as discussed above, the evidence at trial established that virtually no users—criminal or otherwise—did so, and that doing so would have eliminated the main benefit of the Tornado Cash service: anonymity. For the Ronin hack in particular, the evidence established that all the sanctioned transactions were in the 100-ETH pool, and that 100% of those transactions used the router architecture that the defendant had implemented in February 2022, shortly before the hack took place. (Tr. 1166).

For these reasons, the defendant's claim that bad actors could have transacted directly with the pools misses the mark. While technically feasible, the most natural interpretation of the evidence, and one a jury could reasonably and easily have drawn, is that they would not have done

---

[24] The Government understands that, when the defendant states that "bad actors could have accessed the protocol directly," he means that they could have accessed the pools directly, since the defendant has yet to acknowledge—for obvious strategic reasons—that the protocol was comprised of anything beyond the pools.

so, as it would have undermined the central purpose for using Tornado Cash. And, as set forth above, the jury reasonably could have found that the defendant and his co-conspirators' implementation of the easy-to-bypass Chainalysis Oracle was not, as the defendant claims, an attempt at compliance, but an effort to avoid getting caught. Each of those actions is evidence of the defendant's conscious decision to assist the Lazarus Group.

Finally, the defendant cites an amicus brief that was filed in support of his motion to dismiss, which claims to have identified 78 IEEPA prosecutions without a single one premised on a failure to act. (Mot. 73-74).[25] That argument, however, is premised on a mischaracterization of this case. As discussed above with respect to Count Two, this prosecution was *not* based on the defendant's mere failure to act. Rather, throughout the time period of the Lazarus Group transactions, the defendant affirmatively acted to keep operating the Tornado Cash business, to keep upgrading it, to pay the various costs associated with the business that were necessary to make it useable for the Lazarus Group, to lie to the public about the effect of purported screening mechanisms he had implemented, and to profit handsomely from the Lazarus Group's payment of relayer fees. He did all of this while knowing that he was doing business with a sanctioned North Korean cybercriminal organization. Thus, a reasonable jury could certainly premise a guilty verdict on Count Three solely on affirmative actions taken by the defendant to violate sanctions. And the jury could also take into account the defendant's determination not to take actions that

---

[25] The characterization of these cases as all involving action is questionable at best. For instance, the defendant cites *United States v. Banki*, 685 F.3d 99, 103-04 (2d Cir. 1999), but in that case the defendant had simply received deposits from U.S. persons into his bank account, with the knowledge that corresponding transfers were being sent by other people to Iran in return. Thus, *Banki* could easily be characterized as involving a failure to act.

could have frustrated or prevented the ongoing sanctions violations in which he was engaged as additional evidence of his criminal state of mind.

## B. The Tornado Cash Service Provided a Service Under IEEPA—"to" and "for the Benefit of" the Lazarus Group

The defendant's next argument attacking Count Three is that the Government did not and cannot prove as a matter of law that he "made or provided 'funds, goods, or services by, to, or for the benefit of'" the Lazarus Group." (Mot. 75 (quoting 31 C.F.R. § 510.201(b)(1)). This argument is premised on a number of unsustainable legal contortions and should be rejected.

### i. *Van Loon* Continues to Have No Bearing on this Case and the Defendant Misstates the Significance of *Banki*

As in his prior motions, the defendant relies on *Van Loon v. Department of the Treasury* for the proposition that "Tornado Cash is a tool, not a service" because the smart contract pools are "open-source, unownable, uncontrollable, and unchangeable software." (Mot. 77 (citing 122 F.4th 549, 570 (5th Cir. 2024))). But in denying the defendant's post-*Van Loon* motion for reconsideration, the Court expressly rejected the defendant's narrow definition of the Tornado Cash service as encompassing nothing more than the smart contract pools[26]—as follows:

> [T]he universe of Defendant's conduct alleged to violate IEEPA incorporates, *but is not limited to*, the immutable smart contracts. For example, the Indictment alleges that, after Defendant relinquished control over the smart contract pools, he retained control over other decisions such as the operation and design of the user interface. Likewise, the Indictment alleges that Defendant and his coconspirators implemented a relayer algorithm and a related relayer registry, and deliberately implemented an ineffective sanctions screen. At trial, the Government may prove that Defendant conspired to violate IEEPA by means of features over which he had

---

[26] *Van Loon* was decided on a much slimmer administrative record, without the benefit of a full trial record, and, in any event, was decided by a court that does not have precedential authority here and answered a narrow legal question, which is not presented in this case, of whether an immutable smart contract may be sanctioned under IEEPA.

control, such as these (and others).

(Dkt. 127 at 2 (emphasis in original) (citations omitted)). As set forth above, the evidence at trial proved exactly that: the defendant and his co-conspirators designed, controlled, updated, and administered the many interlocking features of the Tornado Cash protocol, including the website and UI, (*see, e.g.*, Tr. 1049, 1050, 1078-79); the command line interface, (*see, e.g.*, Tr. at 1049-50, 1071); the relayer registry, (*see, e.g.*, 1145-46); TORN tokens, (*see, e.g.*, Tr. 2124); a variety of additional smart contracts, including the router, (*see, e.g.*, Tr. at 1079-80, 1146); and payments for various back-office functions of the Tornado Cash service, (*see, e.g.*, GX 924).   In light of this trial evidence, *Van Loon*'s narrow ruling with regard to the Tornado Cash smart contracts has little if any relevance.

Similarly misguided is the defendant's reliance on *United States v. Banki*, 685 F.3d 99 (2d Cir. 2012), for the proposition that Tornado Cash did not violate sanctions it did not "perform[] an action or service for the Lazarus Group specifically." (Mot. 76). *Banki* and the sanctions regulations the defendant cites provide no support for his position.

The central holding of *Banki* was that "the execution of money transfers from the United States to Iran on behalf of another, *whether or not performed for a fee*, constitutes the exportation of a service." *Id.* at 108. Under that holding, it is clear that the defendant exported a sanctions-violative service by transmitting and laundering cryptocurrency for the sanctioned Lazarus Group.

Perhaps recognizing this, the defendant does not rely on *Banki*'s holding. Rather, he contends that a handful of dictionary definitions of "service" that are cited in *Banki* support his position that, in order to have violated sanctions, the Tornado Cash service could not have been one offered "for the general public." (Mot. 76). Specifically, the defendant cites the following

89

definitions of "service:" "'useful labor that does not produce a tangible commodity,'" "'the performance of work commanded or paid for by another,'" and "'an intangible commodity in the form of human effort, such as labor, skill, or advice.'" (Mot. 78). But none of those definitions suggests, as the defendant claims, that the "service" may not be offered "for the general public" or that "the core feature of a service" includes "privity of contract between the procuring party and the party providing the service." (Mot. 76, 78). To the contrary, the Tornado Cash service—the product of the defendant and others' labor to create, upgrade, and maintain the relayer network, TORN tokens, additional smart contracts, and other back-office functions for the purpose of transmitting cryptocurrency in an anonymized fashion—fits comfortably within the definitions of "service" cited by the defendant. And there is no suggestion in *Banki* that the case would have turned out differently if the defendant in that case had offered his services to other people in addition to committing sanctions violations. Indeed, the defendant's argument here would threaten to undermine the entire regime of sanctions enforcement, by exempting any business that offers services to the general public from having to comply with United States sanctions.

In his effort to bend the meaning of "service" in his favor, the defendant also makes a throwaway reference to the North Korea Sanctions Regulations and Iran Sanctions Regulations. (*See id.* at 78-79). Recognizing that those regulations do not actually define the term "service," the defendant points to a list of examples of services referenced in the regulations—namely, "accounting, legal, design, . . . consulting[,] . . . financial, brokering, freight forwarding, transportation, and public relations"—and flatly posits that those kinds of services "suggest[] a direct privity of contract that does not exist here." (*Id.* at 78-79 (internal quotation marks, citations, and modifications omitted)). But the Tornado Cash service fits squarely within one of those

90

examples: financial services. And in any event, the list of examples cited by the defendant is non-exclusive and therefore could not, under any circumstance, categorically exclude the Tornado Cash service.

For all these reasons, the Court should reject the defendant's legal fallacy that the Tornado Cash service was not a "service" within the meaning of the IEEPA regulations.

### ii. The Defendant Asks the Court to Disregard the Plain Meanings of the Word "To" and the Phrase "For the Benefit Of"

It is equally obvious that the Tornado Cash service provided services "to" and "for the benefit of" the Lazarus Group. Here again, the defendant summarily concludes that, "for Mr. Storm to be liable for violating [sanctions], he must have performed an action or service for the Lazarus Group specifically, not just for the general public." (Mot. 76). But the fact that "'to' is a preposition" and a "functional word" that "indicate[s] the receiver of an action or the one for which something is done or exists" does not lead to the absurd conclusion that the defendant cannot be held liable for facilitating sanctions-violative transactions because the transmitting service he provided was also provided to others. (*See id.*).

The defendant similarly relies on an unnatural and narrow interpretation of "for the benefit of," claiming that the only relevant definitions of that phrase equate the phrase to acting as a fiduciary for another party. (*See id.* at 75-76). He thus immediately strays from his own proclamation that "words are to be given their ordinary meaning." (*Id.* at 75). Indeed, the ordinary meaning of "for the benefit of"—*i.e.*, "for the advantage of," or "on behalf of"—clearly fits the service that the defendant provided to the Lazarus group: money laundering for the advantage of,

or on behalf of, the hackers.[27] Notably, in this entire discussion, the defendant cites not a single case supporting his interpretation of IEEPA and its implementing regulations. The Court should decline the defendant's invitation to adopt his strained interpretations.

### C. The Informational Materials Exemption Does Not Apply

The defendant also restates from his motion to dismiss the argument that (1) his conduct with respect to the Tornado Cash service was limited to "the export of" Tornado Cash software; (2) Tornado Cash software constitutes "informational materials" under IEEPA's Informational Materials Exemption; and (3) the defendant's conduct is therefore outside the reach of IEEPA. (*See* Mot. 79-83; *see also* Dkt. 37-1 at 36-40). The Court previously rejected the defendant's motion to dismiss and upheld the Indictment as consistent with the Informational Materials Exemption because the Indictment alleged far more than the mere development or "export of" Tornado Cash software. Specifically, the Court ruled:

> The indictment doesn't predicate criminal liability on the mere development of software. To the contrary, Count Three alleges that Mr. Storm conspired with others to knowingly, actively, and profitably cause the Tornado Cash service, the UI, the relayer network, the pools, other smart contracts, and other components of the service, in order to launder funds for the OFAC-designated North Korean Lazarus Group, to then accept deposits from that group's OFAC-sanctioned cryptocurrency wallet, and to process withdrawals of those funds.

(MTD Order at 33). As the Court concluded, "Mr. Storm is not being charged with exporting Tornado Cash software, but with laundering funds using the Tornado Cash service, which definitionally extends beyond the software." (*Id.*). This is precisely what the Government proved

---

[27] *See* "For the Benefit Of" Definition, Oxford English Dictionary, https://www.oed.com/dictionary/benefit_n?tab=meaning_and_use#23477391 (visited November 5, 2025) (defining the phrase as "for the advantage of" or "on behalf of").

at trial, and that conduct is outside the scope of the Informational Materials Exemption for the reasons set forth in the Court's ruling. For that reason alone, the Court should reject the defendant's Informational Materials arguments here.

> **i.    Tornado Cash Software Is Not Informational Material Under the Relevant Caselaw and OFAC Regulation**

Because this case is about providing services to the Lazarus Group, not the export of software, it does not implicate the Informational Materials Exception. But even if the Government had argued merely that the defendant exported Tornado Cash software to the Lazarus Group, Tornado Cash software is not informational material based on the relevant regulations, legislative history, and statutory context surrounding the Informational Materials Exemption.[28]

Congress included in IEEPA the following exception to the President's authority, commonly called the "Informational Materials Exemption":

> The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—
>
> . . .
>
> the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds.

50 U.S.C. § 1702(b)(3).

---

[28]  In its ruling on the defendant's motion to dismiss, the Court declined to rule on whether Tornado Cash software is informational material because the Court's finding that the Government had alleged more than the mere exportation of software was sufficient to dispense with the defendant's invocation of the Informational Materials Exemption. (MTD Order at 32-33). The Court need not reach the issue here, either, but if it does, it should rule for the Government.

OFAC has issued multiple regulations interpreting and implementing the Informational Materials Exemption, including the following section of the applicable North Korea Sanctions Regulations, implementing Executive Order 13772, providing that software and technology do not fall within the Informational Materials Exemption:

> [The Informational Materials Exemption] does not exempt transactions incident to … the exportation of goods *(including software) or technology* for use in the transmission of any data . . . . The exportation of such items or services . . . to a person whose property and interests in property are blocked pursuant to § 510.201(a) [is] prohibited.

31 C.F.R. § 510.213(c)(3) (the "Software and Technology Regulation") (emphasis added).

The Informational Materials Exemption "has not been construed by the Second Circuit." *United States v. Griffith*, 515 F. Supp. 3d 106, 116-17 (S.D.N.Y. 2021) (deferring to OFAC's interpretation of the Informational Materials Exemption). The Government is not aware of any case—and the defendant cites none—holding that software constitutes informational material. To the contrary, one court observed in *dictum* that "there is no support for the contention that software generally would fall within the [informational materials] exemption." *Bernstein v. U.S. Dep't of State*, 974 F. Supp. 1288, 1303 n. 17 (N.D. Cal. 1997).[29]  The text of the Informational Materials Exemption contains a long list of examples that conspicuously omits software—even after Congress amended the exemption in 1994 in order to prevent, as the legislative history explains, "narrow[] and restrictive[] interpret[ations] [of] the language in ways not originally intended." H.R. Conf. Rep. No. 103-482, at 239 (1994); *see also* 50 U.S.C. § 1702(b)(3) (listing "publications,

---

[29] This decision "was appealed and initially affirmed by a three-judge panel; the which [*sic*] affirmance was then withdrawn by the Ninth Circuit for a rehearing en banc that ultimately did not happen." *Stagg P.C. v. U.S. Dep't of State*, No. 15 Civ. 8468 (KPF), 2019 WL 1863418, at *10 n.4 (S.D.N.Y. Apr. 25, 2019).

films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds" but not software). At most, "technology and software *are capable* of qualifying as 'informational materials'"—but they are not necessarily informational materials in every case. *United States v. Amirnazmi*, 645 F.3d 564, 582, 588 (3d Cir. 2011) (emphasis added) (upholding the jury's determination that the software at issue did not constitute informational material).

In the absence of a clear answer to whether a particular item constitutes informational material, courts routinely look to relevant interpretive regulations issued by OFAC. *See, e.g.*, *id.* at 586-87 (deferring to an OFAC interpretive regulation, not applicable here, that the agency can regulate the exportation of "informational materials not fully created and in existence at the date of the transaction"); *Griffith*, 515 F. Supp. 3d 106, 116-17 (same). Through the Software and Technology Regulation, OFAC expressly interpreted the Informational Materials Exemption to not apply to transactions incident to the exportation of software or the exportation of software to an SDN. *See* 31 C.F.R. § 510.213(c)(3). Specifically, the Software and Technology Regulation states that the Informational Materials Exemption "does not exempt transactions incident to . . . the exportation of goods (including software) or technology for use in the transmission of any data." *Id.* The provision further states that "[t]he exportation of such items or services . . . to a person whose property and interests in property are blocked pursuant to § 510.201(a) are prohibited." *Id.* In other words, such transactions are prohibited under Executive Order 13772 and the North Korean Sanctions Regulations, particularly when they are provided for the benefit of an entity sanctioned under those authorities, such as the Lazarus Group.

The Software and Technology Regulation makes clear that the Informational Materials

Exemption does not apply to the software comprising the Tornado Cash service. As explained above, there was ample evidence at trial that the defendant did not merely create and export Tornado Cash's software; he conspired with others to affirmatively operate Tornado Cash, which included facilitating transactions with the Lazarus Group's OFAC-sanctioned wallet in order to provide money transmitting services to the Lazarus Group. These transactions, which involved all of the myriad aspects of the Tornado Cash protocol, are most fairly viewed as transactions "incident to" any supposed "exportation" of the software underlying the Tornado Cash service. The Software and Technology Regulation thus confirms that the defendant's conduct, as established at trial, is outside the scope of the Informational Materials Exemption.[30]

Storm argues, based on legislative history, that the Informational Materials Exemption should encompass any materials that would be protected by the First Amendment, (*See* Mot. 79-80), but courts have in fact endorsed far narrower interpretations. In particular, courts have decided whether the Informational Materials Exemption applies on a case-by-case basis without holding that it prohibits regulation of all materials protected under the First Amendment. *Compare* H.R. Conf. Rep. No. 103-482, at 239 *with Griffith*, 515 F. Supp. 3d at 116-17 (making no mention of the First Amendment in analyzing the Informational Materials Exemption).

In any event, even if the Informational Materials Exemption could be understood to prohibit the export of all items protected by the First Amendment, the Tornado Cash software is not such an item. As discussed below, the use of Tornado Cash software to accept deposits and

---

[30] Congress has tacitly endorsed the Software and Technology Regulation as comporting with the purposes of the Informational Materials Exemption by leaving it intact even after having amended IEEPA to invalidate a different interpretive regulation. *See Amirnazmi*, 645 F.3d at 586.

provide money transmitting services, similar to the use of software by traditional financial institution to process transactions, does not even implicate First Amendment-protected activity. Accordingly, Tornado Cash software would not qualify for the Informational Materials Exemption even if that provision could be understood to include everything that is protected by the First Amendment.

### ii.    The Defendant's Remaining Arguments Concerning the Informational Materials Exemption Are Meritless

The defendant's arguments fail even if Tornado Cash's software could be understood to comprise informational material—which, as explained above, it cannot. The defendant argues, as he did in his motion to dismiss, that the sanctions underlying Count Three "indirectly" regulate the exportation of the Tornado Cash service's software. (*See* Mot. 79-80; Dkt. 37-1 at 39). But, as in his motion to dismiss, he does not explain how. (*See generally*, Mot. 79-83; Dkt. 37-1 at 36-40). Presumably, he means that the sanctions at issue indirectly regulate the exportation of the Tornado Cash service's software insofar as they prohibit the provision of services involving that software to the Lazarus Group or transactions involving that software with the Lazarus Wallet. This interpretation of indirect regulation under the Informational Materials Exemption would have breathtakingly broad implications, immunizing the provision of services to a sanctioned group or transactions with blocked property whenever such conduct involves software that has been exported from the United States. For example, under this interpretation, the President could not prohibit foreign branches of American banks from providing financial services to a sanctioned group if the banks use software to provide those services, as virtually all modern financial transactions do. Nor could the President prohibit individuals or entities outside the United States

from using American software like Venmo or PayPal to send funds to a sanctioned group. In the modern era, when American software touches nearly everything, constraining the Executive Branch in these ways would create a gaping loophole in the President's ability to deal with the national security threats that IEEPA requires the President to address. The Court should not countenance that outcome.

The defendant's reliance on two cases concerning the social media platform TikTok, Inc. ("TikTok") (*see* Mot. 81) is off base. The courts there found on summary judgment that the sanctions at issue prohibited the exact conduct that the Informational Materials Exemption protects because, unlike the Tornado Cash service—which, as the Government proved at trial, is a tool for hiding money on the internet—the "TikTok app is a platform for creating and exchanging informational materials." *Marland v. Trump*, 498 F. Supp. 3d 624, 636-37 (E.D. Pa. 2020); *see also TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 81 (D.D.C. 2020) ("TikTok . . . is primarily a conduit of 'informational materials.'"). As a result of the sanctions against TikTok, users of the application would "no longer be able to export their comedy, music, and fashion videos, [or] to view videos from TikTok's substantial global user base which … consists of at least 600 million users." *Marland*, 498 F. Supp. 3d at 637. The sanctions underlying Count Three of the Indictment simply do not prohibit that kind of expressive conduct by users of the Tornado Cash service, which merely permitted its users to deposit and withdraw funds anonymously, with no further exchange of information or ideas. The TikTok cases the defendant cites are thus inapposite.

Similarly misguided is the defendant's reliance on a portion of the North Korea Sanctions Regulations ("NKSR") that permits regulation of "information or informational materials not fully created and in existence at the date of the transactions, or to the substantive or artistic alteration or

enhancement of informational materials … ." (the "NKSR Provision"). 31 C.F.R. § 510.213(c)(2). As an initial matter, it is not clear why the defendant cites this provision, which places certain informational materials *outside* the scope of the Informational Materials Exemption, thus defining the exemption narrowly (in favor of the Government's position) rather than expansively (against the defendant's position).

In any event, like the Informational Materials Exemption itself, the NKSR Provision applies only to informational materials—a category of material that, for the reasons set forth above, excludes the Tornado Cash service's software. *Amirnazmi*, on which the defendant relies, further illustrates this point. The software at issue in that case was "a database" with a "planning tool" that provided analysis of the information in the database. 645 F.3d at 567. Accordingly, the software's primary function was to make information, in the form of data and analysis, available to its users. In contrast, the function of the Tornado Cash service and the software it utilized was to transmit and conceal cryptocurrency on the blockchain. Tornado Cash does not provide any information at all; it simply conducts deposits and withdrawals of cryptocurrency. For that reason alone, the Tornado Cash service's software is not informational material and the NKSR Provision is inapposite.

In sum, the Court should deny the Motion because, the defendant's conduct did not involve the exportation of software; rather, he founded, operated, and developed a sophisticated money-laundering company that used software to provide a financial service and then provided that service to North Korean hackers for profit. Even if the defendant's conduct had been limited to the exportation of software (it was not), the relevant case law, OFAC regulations, legislative history, and statutory context require the Court to hold—should it reach the issue—that Tornado Cash

Software is not informational material within the exemption.

## VI.    The Defendant's Constitutional Arguments Are Meritless

The defendant concludes his brief by repeating the constitutional arguments he made previously in his motion to dismiss the Indictment, which the Court already considered and rejected. Rather than engage with the Court's careful reasoning in ruling against the defendant's prior Due Process and First Amendment arguments, the defendant simply ignores those rulings and makes no attempt to explain how the evidence at trial has somehow changed the constitutional analysis. Those arguments are meritless. The Court should adhere to its prior rulings.

### A.  The Defendant's Due Process Arguments Are Meritless

The defendant previously raised the same due process arguments that he reasserts in his post-trial briefing. The Government previously responded to those arguments, (Dkt. 53 at 68-77), and the Court rejected them in a thoughtful and detailed discussion. Specifically, the Court has already ruled that: the statutes at issue are not unconstitutionally vague, (MTD Order at 40-43 (finding that "the statutes at issue gave Mr. Storm adequate notice that his conduct was criminal and created no threat of arbitrary enforcement"), the rule of lenity does not apply, (*id.* at 43-44 (finding that the defendant "has not made a threshold showing of statutory ambiguity, and there is, therefore, nothing for lenity to resolve"), and the defendant has not shown that this case involved a novel construction of any of the applicable statutes, (*id.* at 44-45 (denying the defendant's novel construction argument because he "has not shown that the alleged conduct is outside of or not within the scope of the statutes in question").

In his post-trial motion, the defendant makes essentially the same constitutional arguments he made previously, and offers little to no explanation of how the trial record implicates the Court's

carefully reasoned conclusions. To the extent that the defendant bootstraps his constitutional challenge on his incorrect assertion that the Government advanced a "negligence" theory of liability, that effort fails for all the reasons stated above.

As the Court has already ruled, the defendant's Due Process challenges to this prosecution lack merit. The trial record offers no basis to revisit that conclusion, and the defendant's attempt to renew his arguments should be rejected.

### B.  The Criminal Statutes at Issue Here Do Not Violate the First Amendment

#### i.    The Defendant's As-Applied Challenge Is Meritless

In his motion to dismiss, the defendant also raised as-applied First Amendment challenges to each of the criminal statutes with which he is charged. The Government's prior briefing explained why those arguments were meritless, (Dkt. 53 at 65-68), and the Court agreed in a thoughtful and detailed decision, (MTD Order at 37-40). Now, the defendant raises the same issues, relying on the same misreadings of the same cases on which he relied previously. The premise of his argument—that he is being prosecuted for expressive conduct—is simply wrong. As even he admits, this prosecution and the evidence at trial related to the function of the computer code that operated Tornado Cash, *i.e.*, the way that it "facilitated a user's transaction on the blockchain." (Mot. 87). That concession dooms his as-applied challenge. Where a prohibition is applied to computer code "solely because of its capacity to instruct a computer," "[t]hat functional capability is not speech within the meaning of the First Amendment," and the regulation is content-neutral.  *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001).

This Court has already recognized as much, concluding that "the conduct charged in the indictment includes the functional capability of code, which does not implicate the First

Amendment." (MTD Order at 37). Rather than grapple with that holding, the defendant simply ignores it and makes the same meritless arguments he made before. Those arguments should accordingly be rejected.

The only reference to the record at trial is to contest the Government's arguments that the jury should not credit the defendant's claims about being motivated by privacy. (Mot. 87-88). But such quotidian advocacy is not an impermissible infringement of the defendant's expressive conduct; it was merely argument regarding the reasonable inference to draw from the evidence. As the Court found when addressing a similar argument citing references to privacy concerns in the Indictment, they "amount to allegations that Mr. Storm had the requisite state of mind, not indications that the government aims to punish the expression of a generalized belief in promoting privacy." (MTD Order at 39). Accordingly, the Court should adhere to its prior ruling that the defendant's conduct at issue in this case "does not implicate the First Amendment," much less trigger strict scrutiny. (*Id.* at 38).

Because this case is about the functional use of computer code, not expressive conduct, it does not even trigger intermediate scrutiny. But even if it did, the Court should again adhere to its prior ruling in the alternative that "the application of these laws to Mr. Storm's conduct satisfies intermediate scrutiny." (MTD Order at 38). The defendant offers no new analysis that would warrant a different conclusion, instead repeating the same arguments he made previously. Even if intermediate scrutiny applied, the statutes at issues easily satisfy that standard. A law passes intermediate scrutiny if it "further[s] an important Government interest unrelated to the suppression of free expression and do[es] not burden substantially more speech than necessary to further that interest." *TikTok Inc. v. Garland*, 604 U.S. 56, 73-74 (2025). Here, the Government

has substantial interests in combating the laundering of criminal proceeds and restricting transactions involving property of actors that have been determined to be a threat to national security. These interests are even more substantial than the interest in preventing unauthorized access to copyrighted material that the Second Circuit recognized as substantial in *Corley*. 273 F.3d at 454; *see also Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) (recognizing "national security interests" as a substantial government interest). And the interest in preventing the laundering of proceeds from criminals and sanctioned actors is unrelated to any interest in suppressing free expression. Moreover, the defendant fails to make a serious case that there are less restrictive alternatives to the application of the normal rules against money laundering and money transmitting of criminal funds to him. He makes the fanciful argument that it would somehow be less restrictive or burdensome to mandate that all users of Tornado Cash maintain their own records of transactions and submit them to cryptocurrency exchanges. (Mot. 88). If such "alternatives" could be used to sustain an as-applied challenge to a criminal prosecution, the Government would never be able to enforce these laws against large-scale illegal money transmitters and money launderers. And in any event, "a content-neutral regulation need not employ the least restrictive means of accomplishing the governmental objective." *Corley*, 273 F.3d at 455. The application of the generally applicable criminal laws to the defendant's conduct does not create an unreasonable burden on protected speech.

### ii.    The Defendant's Facial Overbreadth Challenge Is Meritless

As with his as-applied challenge, the defendant raises for the second time facial overbreadth challenges to the three criminal statutes at issue in this case, despite the fact that this Court has already expressly rejected those challenges at length. (MTD Order at 34-37). The

defendant says he is "renewing" these challenges based on the evidence at trial, but that fundamentally misperceives the nature of a facial overbreadth challenge, which by definition is not premised on the facts of a particular case, but on the statute itself. "A party alleging overbreadth claims that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them." *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006).

The Government previously explained in detail why these federal criminal statutes should not be invalidated in their entirety as facially overbroad. (Dkt. 53 at 63-65). As argued in more detail in prior submissions, these statutes have a plainly legitimate purpose, seeking to combat the "organized criminal groups which reap profits from unlawful activity by camouflaging the proceeds through elaborate laundering schemes." *United States v. Holmes*, 44 F.3d 1150, 1154 (2d Cir. 1995) (internal citations omitted). The defendant cites no authority suggesting these statutes are facially overbroad, and does not even acknowledge the Court's careful reasoning in rejecting that argument. (MTD Order at 36 (holding that the defendant "has shown neither a substantial overbreadth, nor the potential for it," and that "these laws do not target protected expressive conduct")). His argument should again be summarily rejected.

## **CONCLUSION**

For the reasons set forth above, the defendant's Rule 29 motion should be denied.

                      Respectfully submitted,

                      JAY CLAYTON
                      United States Attorney for the
                      Southern District of New York


                      By: /s/   Thane Rehn
                          Ben Arad
                          Thane Rehn
                          Assistant United States Attorneys
                          (212) 637-2354

                          Kevin Mosley
                          Special Assistant United States Attorney


Dated: November 12, 2025
       New York, New York