

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jakob K. Javitz Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

April 20, 2026

**BY ECF AND EMAIL**

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      **Re:**    *United States v. Roman Storm*, S1 23 Cr. 430 (KPF)

Dear Judge Failla:

      The Government respectfully writes to address the Court's inquiry regarding how, if at all, it should consider the "Technology Facts Appendix" (the "Appendix") of the defendant's Rule 29 reply brief. (*See* Dkt. 242 at 68-73; April 9, 2026 Tr. 52). The defendant claims that the Appendix "distill[s] the undisputed facts concerning the technology at issue" (Dkt. 242 at 12). That characterization is inaccurate. The Appendix is an effort to re-litigate factual matters presented to the jury. The Appendix entirely disregards significant portions of the factual evidence and is replete with argument and characterizations that draw disputed inferences from trial testimony.

      For those reasons, the Appendix is inconsistent with the actual inquiry this Court must take in considering the defendant's Rule 29 motion—an assessment of the entirety of the evidence properly put before the jury, considered in conjunction and in its totality, and with all inferences drawn in the Government's favor. *See United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011); *United States v. Avenatti*, 81 F.4th 171, 184 (2d Cir. 2023); *United States v. Raniere*, 55 F.4th 354, 364 (2d Cir. 2022). Applying that standard, the evidence was more than sufficient to establish what the Government has long asserted: that the defendant agreed with his co-conspirators to operate, maintain, upgrade, and promote Tornado Cash, and took literally hundreds of steps to do so, knowing full well that he was actively facilitating the transmission and concealment of criminal funds, including by transferring criminal proceeds for the sanctioned North Korean cyber-criminal organization the Lazarus Group. The evidence was also plainly sufficient to establish that the defendant engaged in this conduct with the requisite *mens rea* for each of the charged counts. (*See, e.g.*, Dkt. 241 at 45-62 (discussing *mens rea* evidence on Count Two); Dkt. 241 at 69-75 (discussing *mens rea* evidence on Count One); Dkt. 241 at 83-88 (discussing mens rea evidence on Count Three). The fact that Tornado Cash used technology in a new way does not change the applicable legal standard. There is no basis—in the Appendix or elsewhere—on which to overturn the jury's guilty verdict on Count Two or to dismiss Counts One or Three.

The Government is mindful that the Court asked for a brief letter on this topic. Absent an instruction from the Court to do so, the Government will not address each of the Appendix's arguments and characterizations of the technical evidence here, especially because the vast majority of these issues were addressed in the Government's prior briefing.[1] But as one example of how the Appendix is not limited to undisputed facts, the Appendix contends that Mr. Werlau's proposed alternative improvements for Tornado Cash "Destroy[] Privacy." (Dkt. 242 at 71). That is not a fact—it is an argument. Nor is it undisputed—the evidence at trial easily supports the reasonable inference that Mr. Werlau's testimony about the potential to collect limited user information was entirely consistent with preserving privacy interests. (*See, e.g.*, Tr. 1159: 13-20 (Werlau testimony that the design would "maintain[] privacy"; Tr. 868:22-869:3, 882:8-11 (testimony from CEO of blockchain technology company that he "respect[s]" Tornado Cash's "dedication to privacy and security on the blockchain," that his company is also "committed to privacy," and that his company nevertheless collects user information akin to the limited user information that Mr. Werlau's design would have collected).

At bottom, a defendant's intent is a jury question, and there is a difference between protecting privacy and providing anonymity to facilitate money laundering. The defendant at trial sought to conflate those matters and does so again in the proposed Appendix. There was ample evidence at trial supporting the commonsense view that they are quite distinct, and that privacy can be protected without providing anonymity that purposefully facilitates evasion of law. The Appendix is replete with statements that similarly reflect a clearly incomplete view of the trial evidence or fail to identify and credit inferences the jury may have drawn in the Government's favor, and therefore should be disregarded.

---

[1] For TFA 1 (custody), *see, e.g.*, Dkt. 241 at 56-58, 76-78 (discussing why "custody" is legally irrelevant). For TFA 2 (pools being "permissionless"), *see, e.g.*, Dkt. 241 at 6, 8, 53-54, 86 (discussing how in practice all transactions needed to use the router smart contract—which the defendant and his co-conspirators controlled and periodically replaced—to remain anonymous, making all Tornado Cash customers subject to permissions the defendant and his co-conspirators embedded in the router such as the instance and relayer registries). For TFA 3 (the claim that the UI "blocked" sanctions violations through the Oracle), *see, e.g.*, Dkt. 241 at 13 (discussing voluminous continued sanctions violations after implementation of Oracle). For TFA 4 (ability to create new wallet addresses to avoid real-time tracing), it is unclear what the relevance of this is because the Government never suggested the defendant could have or should have implemented "real-time" tracing. On the efficacy of the measures the Government did introduce evidence about, *see, e.g.*, Dkt. 241 at 53-54. In any event, the jury heard evidence that the defendant knew the Ronin hacking proceeds were being deposited into Tornado Cash within hours of the first such deposit (Tr. 647-49), and that subsequently, the defendant not only could but did continue to monitor these North Korean transactions in real time, day after day, over a period of weeks, during which these deposits made up more than 50% of all Tornado Cash volume. *See, e.g.*, Dkt. 241 at 84-85. For TFA 5 (relayers), *see, e.g.*, Dkt. 241 at 63 (discussing evidence that relayers were "part of the integrated set of features that made up Tornado Cash"). For TFA 6 (UI's role in transactions), *see, e.g.*, Dkt. 241 at 65-67 (discussing how UI and router transferred funds). For TFA 7 (whether Werlau's testimony about a registry "Destroy[s] Privacy"), *see, e.g.*, Dkt. 241 at 52-53.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____

Ben Arad
Thane Rehn
Assistant United States Attorneys
(212) 637-6521
(212) 637-2354


Kevin Mosley
Special Assistant United States Attorney


cc:    Brian Edward Klein, Esq.
       Alyssa Wright, Esq.
       Keri Curtis Axel, Esq.
       Kevin Michael Casey, Esq.
       Viviana Andazola Marquez, Esq.
       Ashley Martabano, Esq.
       Becky S. James, Esq.
       Emily Stierwalt, Esq.
       David E. Patton, Esq.